UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____

|  |  |
|---|---|
| BRUCE RHYNE and JANICE RHYNE, | ) |
|  | ) |
|     Plaintiffs, | ) |
|  | ) |
|     vs. | ) |
|  | ) |
| UNITED STATES STEEL CORPORATION | ) |
| SUNOCO, INC. (R&M) f/k/a Sun Company, Inc. | ) |
| and f/k/a/ Sun Oil Company, Inc., EXXONMOBIL | ) |
| CORPORATION, CHEVRON U.S.A., Inc. as | ) |
| Successor in Interest to Gulf Oil Company, | ) |
| SAFETY-KLEEN SYSTEMS, INC., CRC | ) |
| INDUSTRIES, INC., UNIVAR USA, INC. | ) |
| f/k/a Chemcentral Corp. and Van Waters & | ) |
| Rodgers, Inc., KANO LABORATORIES, INC., THE | ) |
| STECO CORPORATION, ACUITY SPECIALTY | ) |
| PRODUCTS, INC. f/k/a Acuity Specialty Products | ) |
| Group, Inc., THE SAVOGRAN COMPANY TURTLE | ) |
| WAX, INC., Individually and as Successor in Interest | ) |
| to Marvel Oil Company, Inc., | ) |
|  | ) |
|     Defendants. | ) |

_____)

## CIVIL ACTION COMPLAINT

Plaintiffs, Bruce Rhyne and Janice Rhyne bring this Complaint against the above-listed

Defendants, and allege as follows:

## I.    INTRODUCTION.

1.    This case is brought by the Plaintiff, Bruce Rhyne, and his spouse, alleging claims

arising out of workplace and non-workplace exposure to benzene and related compounds and

resultant personal injury.

2.    The case was originally filed in state court in Pennsylvania, captioned as follows:

*Rhyne v. United States Steel Corporation, et al.,* No. 160100228, Court of Common Pleas,

Philadelphia County, Pennsylvania. That complaint was filed on January 5, 2016. However, that court subsequently dismissed the case on grounds of forum *non conveniens*. Plaintiffs have filed notices of appeal to the Pennsylvania Superior Court of the December 19, 2017 Order of the Philadelphia Court of Common Pleas dismissing the Complaint and the subsequent Order denying the Plaintiffs' motion for reconsideration. The Philadelphia Court of Common Pleas' December 19, 2017 Order provided the Plaintiffs a limited period of time within which to re-file this lawsuit in another jurisdiction so that the statute of limitations would relate back to the January 5, 2016 date that the Complaint was originally filed upon. Plaintiffs have therefore been required to file this Complaint in order to preserve their rights and by filing this Complaint they do not waive, concede or prejudice any arguments that they intend to raise on appeal. Accordingly, the Plaintiffs are re-filing the case in this Court as this Court has jurisdiction over this matter and venue lies in this Court.

## II.    <u>JURISDICTION AND VENUE.</u>

3.     Subject matter jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332 because there is more than $75,000.00 at issue and complete diversity exists between the parties.

4.     Plaintiff, Bruce Rhyne was exposed to Defendant's benzene-containing products in whole or part in North Carolina causing him injuring in North Carolina. Thus, specific jurisdiction exists because this cause of action arises out of Mr. Rhyne's exposures causing injury in North Carolina.

5.     Venue in this Court is proper pursuant to 28 U.S.C. Sec. 1331 since every Defendant regularly conducts business within the Western District of North Carolina, and

2

transactions and occurrences out of which the cause of action arose occurred in Western District of North Carolina. Venue is also proper, in addition to other reasons averred herein, because the Plaintiffs live in the Western District of North Carolina.

## III.    THE PARTIES.

6.    The Plaintiff, BRUCE RHYNE with his spouse, Plaintiff-Spouse JANICE RHYNE, resides at the address of 3587 Gordon Street, Terrell, NC 28682-9728.

7.    The Defendant, UNITED STATES STEEL CORPORATION, is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 600 Grant Street, Room 1500, Pittsburgh, PA 15219-2800.

8.    The Defendant, SUNOCO, INC. (R&M) f/k/a Sun Company, Inc., and f/k/a/ Sun Oil Company, Inc., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 1735 Market Street, Suite LL, Philadelphia, PA 19103.

9.    The Defendant, EXXONMOBIL CORPORATION, is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process:  5959 Las Colinas Boulevard, Irving, TX  75039.

10.    The Defendant, CHEVRON U.S.A., Inc. as Successor in Interest to Gulf Oil Company, is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 575 Market Street, San Francisco, CA  94105.

3

11. The Defendant, SAFETY-KLEEN SYSTEMS, INC., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 5360 Legacy Drive, Building 2, Suite 100, Plano, TX 75024.

12. The Defendant, CRC INDUSTRIES, INC., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 885 Louis Drive, Warminster, PA 18974.

13. The Defendant, UNIVAR USA, INC. f/k/a Chemcentral Corp., and Van Waters & Rodgers, Inc., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 17425 NE Union Hill Road, Redmond, WA 98052.

14. The Defendant, KANO LABORATORIES, INC., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 1000 E. Thompson Lane, Nashville, TN 37211-02627.

15. The Defendant, THE STECO CORPORATION, is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 2330 Cantrell Road, Little Rock, AR 72202.

16. The Defendant, ACUITY SPECIALTY PRODUCTS, INC., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business

4

located at the following address at which it may also be served with process: f/k/a Acuity Specialty Products Group, Inc., 3330 Cumberland Boulevard, Suite 700, Atlanta, GA 30339.

17.     The Defendant, THE SAVOGRAN COMPANY, is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: PO Box 130, 259 Lenox Street, Norwood, MA 02062.

18.     The Defendant, TURTLE WAX, INC., Individually and as Successor in Interest to Marvel Oil Company, Inc., is a corporation incorporated or organized in a state outside of North Carolina, and has a principal place of business located at the following address at which it may also be served with process: 208 South LaSalle Street, Suite 814, Chicago, IL 60604.

## IV.     FACTS.

19.     At all times material hereto, Plaintiff was exposed to benzene-containing products occupationally and non-occupationally including as follows:

    a.  He was exposed in performing non-occupational work at home from approximately 1970 to 1975/1976;

    b.  in his High School shop classes in approximately 1974-1975;

    c.  during his work study/employment with the Setzler automotive dealership (hereinafter "employer") in approximately 1974 – 1975;

    d.  and during his employment with Duke Energy Corporation (hereinafter "employer") at the below facilities during the corresponding approximate dates:
        i.   McGuire Plant, Huntersville, NC -- 1976-1983;
        ii.  Allen Steam Station, Belmont, NC -- September-December, 1987;
        iii. Cliffside Steam Plant, Cliffside, NC -- April, 1985;
        iv.  Oconee Plant, Seneca, SC -- December 1986-February 1987;
        v.   Catawba Plant, York, SC -- 1983-January, 2015; and
        vi.  at the McGuire Plant, Huntersville, NC -- January, 2015 - May, 2015.

20.     As a condition of his employment, Plaintiff worked directly and indirectly with and was directly and indirectly exposed to, on a regular, frequent and proximate basis, various benzene-containing products, including but not limited to, penetrating solvents, solvents, oil, paint thinners, lubricating oil, and other benzene-containing products for use in maintenance and mechanical activities (hereinafter or "benzene-containing products") which products and/or their ingredients, were manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce by the Defendants.

21.     Plaintiff was exposed to the Defendants' benzene-containing products and ingredients, including but not limited to, benzene, toluene, xylene, mineral spirits, naphtha, heptanes, petroleum distillates, acetone, polycyclic aromatic hydrocarbons, raffinate, ethylene compounds, and to the vapors, aerosols, mists and fogs from said products, by means of inhalation and dermal absorption (from direct dermal contact with said products, dermal contact with clothes contaminated by said products and/or dermal contact with benzene vapors in the air.).

22.     As a direct and proximate result of his exposure to the Defendants' benzene-containing products and the Defendants' wrongful conduct, Plaintiff contracted Acute Myeloid Leukemia, (hereinafter "AML") with which he was diagnosed on or after May 23, 2015. Plaintiff has suffered multiple symptoms and side effects of his AML and medical treatments necessitated by the AML.

23.     At all times material hereto, Defendants acted through their agents, ostensible agents, servants or employees, who were acting within the scope of their employment on the business of the Defendants. The Defendants' agents and ostensible agents included their

6

employees and other persons and entities, since the Defendants are all corporations that must act through their employees and others that the Plaintiffs are not able to identify by name without conducting discovery.

24.     The Defendants are all corporations, companies or other business entities which, during all times material hereto and for a time prior thereto, manufactured, produced, processed, compounded, converted, sold, distributed, marketed and/or otherwise placed into the stream of commerce, benzene-containing products and/or raw material ingredients used in benzene-containing products, all of which were used by and around Plaintiff and Plaintiff's employers, or are the successors to and/or otherwise liable for companies which engaged in said conduct.

25.     Defendant UNITED STATES STEEL CORPORATION ("US Steel") upon information and belief is a Delaware corporation.  US Steel during the pertinent times manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing solvents which were used as component chemicals to manufacture co-Defendants' products, including but not limited to Liquid Wrench, which exposed the Plaintiff to benzene.

26.     Defendant SUNOCO, INC. (R&M) f/k/a Sun Company, Inc. and Sun Oil Company, Inc. ("Sunoco") upon information and belief, is a Pennsylvania corporation. Upon information and belief, Sunoco has assumed certain liabilities for the Liquid Wrench product and/or ingredients thereof, including Raffinate, through its acquisition of Aristech Chemical Company. On October 14, 1986, USX Corporation formed Aristech Chemical Company as a wholly owned subsidiary. On December 4, 1986, USX Corporation transferred all of its assets and

liabilities of the USS Chemicals Division to Aristech Chemical Company. On or about November 9, 2000, Sunoco, Inc. (R&M) acquired the stock, assets and liabilities of Aristech Chemical Company, including liabilities for USS Chemicals Division that existed prior to December 4, 1986. Additionally, upon information and belief, Sunoco manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products to which the Plaintiff was exposed, including but not limited to benzene-containing solvents which were used as ingredients in co-Defendants' benzene-containing products.

27.     Upon information and belief, Sunoco supplied benzene containing solvents to co-Defendants for use as ingredients in their benzene containing products, including mineral spirits supplied to Safety-Kleen and used in its parts washing solvent Safety-Kleen 105 Solvent Recycled, and toluene, xylene, hexane, mineral spirits, naphthas and other benzene containing solvents supplied to co-Defendants, including but not limited to CRC Industries, Inc. for use in brake cleaner, carburetor cleaner and rust penetrant and lubricant products, which exposed the Plaintiff to benzene.

28.     Defendant CHEVRON USA, INC., Individually and as Successor-in-Interest to Gulf Oil Company and Union Oil Company of California ("Chevron") is believed to be a corporation organized and existing under the laws of the State of Delaware. Gulf Oil Company manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to Gulf and Chevron solvents used in co-Defendants' benzene-containing products, which exposed the Plaintiff to benzene.

8

29. Defendant SAFETY-KLEEN SYSTEMS, INC. ("Safety-Kleen"), is believed to be a Wisconsin corporation. Safety-Kleen is sued individually and as a successor-in-interest to Safety-Kleen Corporation. Safety-Kleen manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to Safety-Kleen parts-washing solvents, including 105 Solvent Recycled, which exposed the Plaintiff to benzene. Safety-Kleen also manufactured, designed, marketed and distributed parts washing machines, which exposed the Plaintiff to benzene.

30. Defendant CRC INDUSTRIES, INC. ("CRC Industries") upon information and belief is a Pennsylvania corporation. Defendant CRC Industries manufactured, produced, processed, compounded, converted, sold, marketed, distributed, supplied, re-labeled and/or otherwise placed into the stream of commerce products containing benzene, as a known ingredient and/or as a contaminant and/or component of which it knew or should have known. Plaintiff was directly and/or indirectly exposed, in the manner described herein, to this Defendant's benzene containing products, including but not limited to CRC 3-36, CRC Belt Dressing, carburetor cleaner products, brake cleaner products, rust penetrants and lubricants, which exposed the Plaintiff to benzene.

31. Defendant KANO LABORATORIES, INC. ("Kano") is believed to be a Tennessee corporation. Defendant Kano manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to Kroil Oil, which exposed the Plaintiff to benzene.

9

32.     Defendant UNIVAR USA, INC. Individually and as successor in interest to Chem Central and Van Waters & Rogers ("Univar USA") upon information and belief is a Delaware corporation or entity. Defendant Univar USA  manufactured, produced, processed, compounded, converted, sold, marketed, distributed, supplied, re-labeled and/or otherwise placed into the stream of commerce benzene-containing products, including benzene-containing mineral spirits used in Safety-Kleen parts-washing solvents, including 105 Solvent Recycled, and toluene, xylene, hexane, mineral spirits, naphthas and other benzene-containing solvents used in CRC Industries, Inc. and other co-Defendants' products, which exposed the Plaintiff to benzene.

33.     Defendant THE STECO CORPORATION ("Steco") is believed to be an Arkansas corporation.   Defendant Steco manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to Tap Magic, which upon information and belief, exposed the Plaintiff to benzene.

34.     Defendant ACUITY SPECIALTY PRODUCTS, INC. f/k/a Acuity Specialty Products Group, Inc., successor to and d/b/a Zep Manufacturing Company ("ASP") is believed to be a Delaware corporation or entity. Defendant ASP manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to parts washing solvent, which exposed the Plaintiff to benzene. ASP also manufactured, designed, marketed and distributed parts washing machines, which exposed the Plaintiff to benzene.

35.     Upon information and belief, Defendant, ASP was spun off from NSI in 2001, and

10

acquired and assumed the assets and liabilities of Zep Manufacturing Company, including those incurred and pertaining to Zep Manufacturing Company's manufacturing, marketing, distributing and selling benzene containing products, including Zep Parts Washing Solvent, to Plaintiff's employers, and continued the Zep Manufacturing Company product lines, including Zep Parts Washing Solvent product lines, which it manufactured, marketed and sold after 2001.

36.    ASPG is liable for Zep Manufacturing Company's manufacture, marketing, sales and distribution of benzene containing products to the Plaintiff for one or more of the following reasons: (1) the corporate transactions amounted to a consolidation or merger; (2) ASP is merely a continuation of the prior corporation, Zep Manufacturing Company; (3) ASPG continued the prior corporation, Zep Manufacturing Company's product lines; and, (4) ASPG is the alter ego of the prior corporation, Zep Manufacturing Company.

37.    Defendant, EXXON MOBIL CORPORATION ("ExxonMobil"), is believed to be a New Jersey corporation. Defendant ExxonMobil manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to, Varsol, Unirex, and including benzene-containing mineral spirits used in Safety-Kleen parts-washing solvents, including 105 Solvent Recycled, and toluene, xylene, hexane, mineral spirits, naphthas and other benzene-containing solvents used in CRC Industries, Inc. and other co-Defendants' products, which exposed the Plaintiff to benzene.

38.    Defendant THE SAVOGRAN COMPANY ("Savogran") it is believed to be a corporation organized and existing under the laws of the State of Massachusetts. Savogran manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold,

distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including Kutzit, which exposed the Plaintiff to benzene.

39.     Defendant, TURTLE WAX, INC., Individually and as Successor-in-Interest to Marvel Oil Company, Inc. ("Turtle Wax") is believed to be an Illinois corporation.  Defendant Turtle Wax manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to Marvel Mystery Oil, which exposed the Plaintiff to benzene.

## COUNT I – NEGLIGENCE

40.     Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

41.     Plaintiff used, worked with, around and in close proximity to, handled, inhaled, dermally absorbed, ingested and was otherwise directly and indirectly exposed to Defendants' benzene-containing products and/or vapors therefrom, during the ordinary, foreseeable and intended use of the Defendants' benzene-containing products.

42.     Defendants knew, or in the exercise of reasonable care, should have known that persons such as Plaintiff would use, work with, around and in close proximity to, handle, inhale, dermally absorb, ingest and otherwise be directly and indirectly exposed to their benzene-containing products or vapors therefrom.

43.     Defendants knew, should and/or reasonably could have known that benzene causes AML, Myelodysplastic Syndrome, Aplastic Anemia, all forms of chronic and acute leukemia,

12

lymphomas, Multiple Myeloma and other blood and bone marrow disease and damage, and is otherwise extremely dangerous to human health.

44.     Defendants knew, should and/or could have reasonably known that their benzene-containing products contained benzene.

45.     Defendants knew, should and/or reasonably could have known that their benzene-containing products were carcinogenic, leukemogenic, poisonous to the blood and bone marrow, inherently defective, ultra-hazardous, dangerous, deleterious, poisonous and otherwise highly harmful to the body and health of Plaintiff and persons similarly situated.

46.     Plaintiff, his employers and similarly situated persons did not and could not know of the nature and extent of the danger to their bodies and health, including the risk for cancer, and leukemia, caused by exposure to the Defendants' benzene-containing products and/or vapors therefrom.

47.     The Defendants knew, should and/or reasonably could have known that Plaintiff and other persons similarly situated, would come into direct and indirect contact with, handle, inhale, ingest, dermally absorb and otherwise be exposed to benzene during the ordinary and foreseeable use of said benzene-containing products.

48.     The Defendants knew, should and/or reasonably could have known that Plaintiff, his employers and other persons similarly situated did not know, understand or fully appreciate nature and extent of the danger to their bodies and health, including the risk for cancer and leukemia, caused by exposure to the Defendants' benzene-containing products and/or vapors therefrom.

49.     The Defendants had a duty to all consumers, workers and employers to exercise

13

reasonable care in the creation, manufacturing, designing, formulating, refining, producing, processing, packaging, marketing, selling, warning, distributing and otherwise placing their respective benzene-containing products into the stream of commerce, including a duty to assure that the products did not pose a risk of injury, harm, disease and death, including blood and bone marrow damage and disease, leukemias, Myelodysplastic Syndrome, lymphomas, Multiple Myeloma and other cancers.

50.     Defendants breached their duty and were negligent because, despite all of the above, they:

a.      Manufactured, produced, designed, formulated, processed, packaged, compounded, converted, sold, marketed, re-labeled, supplied, distributed and/or otherwise placed in the stream of commerce products that contained benzene, i.e. the benzene-containing products;

b.      Failed to take precautions to warn and/or adequately warn Plaintiff and his employers of the dangers to their health, including the nature and extent thereof, caused by exposure to benzene and the benzene-containing products, including the risk for contracting leukemia;

c.      Failed to take precautions to warn or adequately warn Plaintiff and his employers of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene-containing products;

d.      Failed and omitted to place any warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene-containing products were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene-containing products to protect against the risk of dangers to health;

e.      Continued to manufacture, produce, process, sell, market, distribute, supply

14

and/or otherwise place into the stream of commerce known cancer-causing products, to-wit, benzene-containing products;

f.  Failed and omitted to package the said chemical products so that, in the ordinary and foreseeable use and handling of them, Plaintiff and other persons similarly situated would not come into direct and indirect contact with, handle, inhale, dermally absorb and otherwise be exposed to benzene-containing products and/or vapors therefrom;

g.  Failed and omitted to take all reasonable, necessary, proper and prudent measures to assure that all necessary warnings, notices and instructions as to the products' benzene content, leukemogenic, carcinogenic, deleterious, poisonous and dangerous nature, and the reasonable and necessary safe guards and procedures for use in conjunction with the products, reached the actual end user, and were complied with by Plaintiff's employers and end users including Plaintiff and other persons similarly situated;

h.  Knew, should and/or could have known that the failure to warn and/or adequately warn of the risks, dangers and harm created by exposure to the benzene-containing products, and the reasonably safe and sufficient precautions, practices, personal protective equipment, wearing apparel, appliances and engineering controls to use with the benzene-containing products, would act as an inducement to Plaintiff and other end users similarly situated to come into direct and indirect contact with, handle, inhale, dermally absorb and otherwise be exposed to benzene-containing products and/or vapors therefrom, without proper and adequate protection;

i.  Failed to train and advise the Plaintiff and his employers of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene-containing products, resulting in the creation of an atmosphere that the Defendants' benzene-containing products were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to;

j.  Knew, should and/or could have known, but also failed to take reasonable, sufficient and proper precautions reasonably calculated to recommend methods to improve the work environment, such as that of Plaintiff's employer, to which Defendants sold, marketed, distributed, supplied and/or otherwise placed into the stream of commerce, benzene-containing products;

k.  Failed to comply with all federal, state, local and trade statutes, codes, regulations and ordinances relating to the benzene content of their products,

15

actions required to determine and analyze the hazardous nature of their products and the warnings and instructions accompanying same, including but not limited to 29 C.F.R. § 1910.1200; 29 C.F.R. § 1910.1028; and, 49 CFR Parts 100-199;

l.    Failed to comply with the Federal Hazardous Substances Act including, but not limited to, because they failed to conspicuously state the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard and failed to conspicuously provide an affirmative statement of the principal hazards of the product;

m.   Failed to take all reasonable, necessary, proper and prudent measures to test their benzene-containing products to determine the products' benzene content, the amount of benzene released from the product, and the quantity of benzene released into the breathing zone of the end user, and dermally absorbed by the end user, during the ordinary, intended and foreseeable use thereof;

n.    Failed to test their benzene-containing products for health hazards, including AML and lymphohematopoietic disease;

o.    Failed to test the adequacy of labels, warnings and instructions appearing upon or distributed with their benzene-containing products;

p.    Failed to take all reasonable, necessary, proper and prudent measures to make their benzene-containing products safe for their intended and foreseeable use;

q.    Failed to properly and adequately manufacture, design, produce and process their products so as to eliminate all benzene content thereof;

r.    Failed to research, develop, design, manufacture, produce, market and sell safer alternative products, to wit products which did not contain benzene;

s.    Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products; and

t.    Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective.

16

51.     Pursuant to North Caroline General Statute § 99B, Plaintiffs assert that Defendants are jointly and severally liable for failure to warn under the North Carolina Product Liability Act, including but not limited to because they failed to take precautions to warn and/or adequately warn Plaintiff and his employers that their benzene-containing products contain benzene.

52.     Pursuant to North Caroline General Statute § 99B, Plaintiffs assert that Defendants are jointly and severally liable for defective design under the North Carolina Product Liability Act, including but not limited to because they failed to act reasonably to replace the benzene and other related poisonous and dangerous ingredients in their products with feasible alternatives.

53.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which caused and continues to cause  him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, increased susceptibility to infection, and placed him at risk of contracting diseases, conditions and cancers in the future.

54.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff, Bruce Rhyne, is prevented from engaging in those activities from which he derives life's pleasures.

55.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

56.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and

has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

57.    For all of the foregoing reasons, Plaintiffs pray for judgment from Defendants, individually, jointly and severally, for damages for negligence in an amount in excess of seventy five thousand dollars ($75,000.00).

## COUNT II -- GROSS NEGLIGENCE, WILLFUL, WANTON AND RECKLESS CONDUCT, PUNITIVE DAMAGES

58.    Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

59.    Plaintiff used, worked with, around and in close proximity to, handled, inhaled, dermally absorbed, ingested and was otherwise directly and indirectly exposed to Defendants' benzene-containing products and/or vapors therefrom, during the ordinary, foreseeable and intended use of the Defendants' benzene-containing products.

60.    Defendants knew, or in the exercise of reasonable care, could and/or should have known that persons such as Plaintiff would use, work with, around and in close proximity to, handle, inhale, dermally absorb, ingest and otherwise be directly and indirectly exposed to their benzene-containing products and/or vapors therefrom.

61.    Defendants knew, should and/or reasonably could have known that benzene causes AML, Myelodysplastic Syndrome, Aplastic Anemia, all forms of chronic and acute leukemia, lymphomas, Multiple Myeloma and other blood and bone marrow disease and damage, and is otherwise extremely dangerous to human health.

18

62.     Defendants knew, should and/or could have reasonably known that their benzene-containing products contained benzene.

63.     Defendants knew, should and/or reasonably could have known that their benzene-containing products were carcinogenic, leukemogenic, poisonous to the blood and bone marrow, inherently defective, ultra-hazardous, dangerous, deleterious, poisonous and otherwise highly harmful to the body and health of Plaintiff and persons similarly situated.

64.     Plaintiff, his employers and similarly situated persons did not and could not know of the nature and extent of the danger to their bodies and health, including the risk for cancer, and leukemia, caused by exposure to the Defendants' benzene-containing products and/or vapors therefrom.

65.     The Defendants knew, should and/or reasonably could have known that Plaintiff and other persons similarly situated, would come into direct and indirect contact with, handle, inhale, ingest, dermally absorb and otherwise be exposed to benzene during the ordinary and foreseeable use of said benzene-containing products.

66.     The Defendants knew, should and/or reasonably could have known that Plaintiff, his employers and other persons similarly situated did not know, understand or fully appreciate nature and extent of the danger to their bodies and health, including the risk for cancer and leukemia, caused by exposure to the Defendants' benzene-containing products and/or vapors therefrom.

67.     The Defendants had a duty to all consumers, workers and employers to exercise reasonable care in the creation, manufacturing, designing, formulating, refining, producing, processing, packaging, marketing, selling, warning, distributing and otherwise placing their

19

respective benzene-containing products into the stream of commerce, including a duty to assure that the products did not pose a risk of injury, harm, disease and death, including blood and bone marrow damage and disease, leukemias, Myelodysplastic Syndrome, lymphomas, Multiple Myeloma and other cancers.

68.     The Defendants intentionally and fraudulently continued to conceal the dangers of benzene exposure thus denying Plaintiff the knowledge with which to take necessary safety precautions or to select the use of products that did not contain benzene.

69.     Under the facts and circumstances, the conduct of the Defendants rose to the level of gross negligence and willful, wanton or reckless conduct, including but not limited to due to the following facts and circumstances, reflecting that said Defendants during the pertinent times and despite their knowledge of the risks and dangers:

a.      Continued to use and sell benzene-containing products despite knowledge that benzene causes fatal blood diseases, such as aplastic anemia, and cancers such as AML and Myelodysplastic Syndrome;

b.      Concealed the benzene content of their products;

c.      Continued to sell benzene containing products despite the determination that their own employees should not use benzene containing solvents and despite taking extensive measures to protect their own employees against benzene exposure;

d.      Failed to take precautions to warn and/or adequately warn Plaintiff and his employers of the dangers to their health, including the nature and extent thereof, caused by exposure to benzene and the benzene-containing products, including the risk for contracting leukemia;

e.      Failed to take precautions to warn or adequately warn Plaintiff and his employers of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene-containing

20

products;

f.        Failed and omitted to place any warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene-containing products were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene-containing products to protect against the risk of dangers to health;

g.        Failed to issue warnings or adequate warnings with the knowledge and concern that benzene warnings deterred the sale of benzene and products containing benzene;

h.        Used statements and marketing to make their benzene containing products appear to be safe and non-hazardous when they were not safe and contained hazardous and carcinogenic chemicals and waste chemicals;

i.        Knew, should and/or could have known that the failure to warn and/or adequately warn of the risks, dangers and harm created by exposure to the benzene-containing products, and the reasonably safe and sufficient precautions, practices, personal protective equipment, wearing apparel, appliances and engineering controls to use with the benzene-containing products, would act as an inducement to Plaintiff and other end users similarly situated to come into direct and indirect contact with, handle, inhale, dermally absorb and otherwise be exposed to benzene-containing products and/or vapors therefrom, without proper and adequate protection;

j.        Failed to comply with all federal, state, local and trade statutes, codes, regulations and ordinances relating to the benzene content of their products, actions required to determine and analyze the hazardous nature of their products and the warnings and instructions accompanying same, including but not limited to 29 C.F.R. § 1910.1200; 29 C.F.R. § 1910.1028; and, 49 C.F.R. Parts 100-199;

k.        Failed to comply with the Federal Hazardous Substances Act including, but not limited to, because they failed to conspicuously state the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard and failed to conspicuously provide an affirmative statement of the principal hazards of the product;

21

l.  Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products;

m.  Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective; and

n.  Otherwise grossly deviated from the ordinary standard of care.

70.  As the direct and proximate result of the Defendants' acts and omissions, Plaintiff contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which caused and continues to cause him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, increased susceptibility to infection, and placed him at risk of contracting diseases, conditions and cancers in the future.

71.  As the direct and proximate result of the Defendants' acts and omissions, Plaintiff, Bruce Rhyne, is prevented from engaging in those activities from which he derives life's pleasures.

72.  As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

73.  As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

74.  Under the circumstances, Defendants engaged in fraudulent or willful and wanton

22

conduct within the meaning of N.C. Gen. Stat. § 1D-5(4) & (7) and N.C. Gen. Stat. § 15.

75.     Under the circumstances, Defendants engaged in acts and omissions giving rise to one or more aggravating factors within the meaning of N.C. Gen. Stat. § 1D-15 and N.C. Gen. Stat. § 1D-35.

76.     On information and belief, Defendants' relevant officers, directors, or managers participated in or condoned the conduct constituting the aggravating factor justifying punitive damages, within the meaning of N.C. Gen. Stat. § 1D-15(c).

77.     Each Defendant is properly liable for punitive damages in that Defendant is liable for compensatory damages and committed one or more aggravating factors, including without limitation, acts of egregious and reckless behavior, and of willful and wanton conduct

78.     Accordingly, as a result of the Defendants' conduct in which they acted in willful, wanton, grossly negligent and in total disregard for the health and safety of the user, consumer and/or visitor, such as Plaintiff, Plaintiff seeks exemplary and punitive damages against Defendants to punish them for their actions, which were willful, wanton, gross and in total disregard of the health and safety of the users and consumers of their products and/or visitors to their premises.

79.     Accordingly, the Plaintiffs request an award of damages for Defendant's gross negligence, willful and wanton conduct and for an award of punitive damages in such amount as the jury may deem appropriate herein.

## COUNT III - BREACH OF IMPLIED WARRANTY

80.     Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

81.     Defendants, individually, jointly and severally expressly and/or impliedly warranted, to Plaintiff and other end users of their benzene-containing products, who were similarly situated, that the benzene-containing products, were merchantable, reasonably fit and safe for their intended, stated and described purpose and application, when in fact they were not.

82.     Defendants, individually, jointly and severally breached said warranties to Plaintiff, in that their benzene-containing products were inherently defective, ultrahazardous, dangerous, deleterious, poisonous, carcinogenic, unfit for use, not properly merchantable and not safe, as marketed, for their foreseeable use and purpose, in that they contained benzene and caused lymphohematopoietic diseases, including AML, were defectively designed and lacked warnings, instructions and training, or adequate and sufficient warnings, instructions and training, as more fully set forth above, and including because:

     a.     They contained benzene and benzene causes cancer, leukemia and other harm to the blood and bone marrow of humans;

     b.     They lacked all elements necessary to make them safe for their intended and foreseeable use;

     c.     The Defendants failed to take precautions to warn and/or adequately warn Plaintiff and his employers that their benzene-containing products contained benzene;

     d.     They lacked warnings and instructions, and or adequate warnings and instructions, of the dangers to human health, including the nature and extent thereof, caused by exposure to benzene and the benzene-containing products, including the risk for contracting cancer, leukemia and other blood and bone marrow disease;

     e.     They did not warn or adequately warn Plaintiff and his employers of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene-containing products;

24

f.       There were no warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene-containing products were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene-containing products to protect against the risk of dangers to health;

g.      Failed to train and advise, or adequately train and advise, the Plaintiff and his employers of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene-containing products, resulting in the creation of an atmosphere that the Defendants' benzene-containing products were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to;

h.      Failed to train, communicate, publish, adopt and enforce a safety plan and a safe method of handling and working with their benzene-containing products;

i.       They failed to recommend methods to improve the work environment;

j.       The Defendants failed to develop alternative products, including products which did not contain benzene;

k.      The Defendants failed to assure that warnings, instructions, advisements, and training reached Plaintiff's employer, Plaintiff and other end users similarly situated, such that Plaintiff and other end users were adequately warned and protected, against the hazards posed by benzene, as contaminants in, or as ingredients of their benzene-containing products;

l.       The ordinary and foreseeable use of the Defendants' benzene-containing products, or those benzene-containing products of Defendants which were distributed to Plaintiff's employer, is an intrinsically dangerous and ultra hazardous activity;

m.    The Defendants' benzene-containing products were also defectively designed in that their hazards outweighed the benefit, if any, of the products' benzene content;

n.     The Defendants' benzene-containing products were defective in that they failed to meet their consumer's expectations for safety;

25

o.       Were packaged in a manner that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

p.       Contained directions for use that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

q.       Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products;

r.       Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective;

s.       Failed to comply with all federal, state, local and trade statutes, codes, regulations and ordinances relating to the benzene content of their products, actions required to determine and analyze the hazardous nature of their products and the warnings and instructions accompanying same; and

t.       the Defendants failed to comply with the Federal Hazardous Substances Act including, but not limited to, because they failed to conspicuously state the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard and failed to conspicuously provide an affirmative statement of the principal hazards of the product.

83.      Defendants' warranties were made both orally and in writing, and Plaintiff is no longer in possession of the written materials upon which such warranties were made.

84.      Pursuant to N.C. Gen. Stat. § 25–2–314(1), Defendants are liable for their breach, jointly and severally, of their warranty that the relevant goods shall be merchantable which was implied in the relevant contracts for their sale.  Under the facts and circumstances, the goods in question were not fit for the ordinary purposes for which such goods are used under N.C. Gen.Stat. § 25–2–314(2)(c).

85.      Under the facts as alleged above, the Defendants are liable for breach of implied

26

warranty of merchantability, in that the goods in question were subject to an implied warranty of merchantability; the goods were defective at the time of the sale and as such did not comply with the warranty; the resulting injury was due to the defective nature of the goods; and damages were suffered.

86.     As the direct and proximate result of the Defendants' acts and omissions and breach of implied warranty of merchantability, Plaintiff contracted and suffers from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which cause him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, increased susceptibility to infection, and placed him at risk of contracting diseases, conditions and cancers in the future.

87.     As the direct and proximate result of the Defendants' acts and omissions and breach of implied warranty of merchantability, Plaintiff is prevented from engaging in those activities from which he derives life's pleasures.

88.     As the direct and proximate result of the Defendants' acts and omissions and breach of implied warranty of merchantability, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

89.     As the direct and proximate result of the Defendants' acts and omissions and breach of implied warranty of merchantability, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

90.     For all of the foregoing reasons, Plaintiffs pray for judgment from Defendants,

27

individually, jointly and severally, for their breach of warranty, damages in an amount in excess of seventy five thousand dollars ($75,000.00).

## COUNT IV - FRAUDULENT CONCEALMENT

91.     Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

92.     Defendants concealed their knowledge of the benzene content of their products and the health hazard of benzene when they failed to disclose this information through warnings, labeling, packaging, material safety data sheets, marketing material, oral communications and otherwise.

93.     Defendants misrepresented the benzene content and health hazards of their benzene-containing products by disclosing certain information about their products' chemical contents and health hazards, and not disclosing their products' benzene content, the risk for blood damage, bone marrow damage and cancer associated with benzene, and by making affirmative representations through language, symbols and product names that stated and/or gave the impression that their products were safe when they were not safe, and/or that their products did not possess a benzene and cancer hazard when they did.

94.     Defendants intended for the Plaintiff, his employers and others similarly situated to rely upon the information the Defendants provided and omitted regarding their products' benzene content and health hazards, which representations and omissions the Plaintiff, his employers and others similarly situated relied upon directly and proximately resulting in harm to the Plaintiff by causing his exposure to benzene and his AML.

28

95.     Defendants' misrepresentations and omissions were fraudulent because they (a) knew them to be untrue, and/or (b) did not believe them to be true or were indifferent to the their truth, and/or (c) by reason of special circumstance had a duty to know whether the representations were true, including but not limited to because they were manufacturers of the products with control over their chemical contents, they performed or had the opportunity to perform testing regarding the products for their benzene content, benzene release and health hazards, they possessed special and proprietary knowledge of the products, their ingredients and the health hazards of benzene, statutes, regulations, industry and internal practices and standards created the duty to know whether the representations made were true.

96.     Defendants were capable of manufacturing, producing and processing the identified products in a manner that eliminated or significantly reduced their benzene content.

97.     Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that their benzene-containing products placed the Plaintiff, and other end users similarly situated, at a significantly increased risk for contracting cancer, leukemia and other blood and bone marrow disorders, including AML, as a direct and proximate result of exposure to the benzene-containing products.

98.     Defendants knew that Plaintiff, his employers and coworkers, and other end users similarly situated, did not know of or appreciate that that benzene-containing products' contained benzene content, or that benzene and the benzene-containing products were capability of causing cancer, leukemia and other blood and bone marrow disorders, including AML.

99.     Defendants knew that Plaintiff, his employers and coworkers, and other end users similarly situated, did not know of the proper and necessary personal protective equipment,

29

appliances, wearing apparel, engineering controls, procedures and practices for use in conjunction with the benzene-containing products to prevent or minimize benzene exposure and the risk for contracting cancer, leukemia and other blood and bone marrow disorders, including AML.

100.    Defendants knew that their failure to warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' benzene content and capability of causing cancer, leukemia and other blood and bone marrow disorders, including AML, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose himself to their benzene-containing products without necessary and proper personal protective equipment, practices and procedures in order to reduce or eliminate benzene exposure and leukemia risk.

101.    Defendants knew that their failures, by intent and omission, to warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' benzene content and capability of causing cancer, leukemia and other blood and bone marrow disorders, including AML, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose himself to benzene and place himself at risk for contracting leukemia.

102.    Defendants knew that their failures to warn, instruct and train the Plaintiff, his employers and coworkers of the proper and necessary personal protective equipment, work practices and procedure to avoid benzene exposure and the risk of contracting cancer, leukemia and other blood and bone marrow disorders, including AML, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose himself to benzene and place himself at risk for contracting leukemia, through the use of their identified products without proper and necessary personal protective equipment, work practices and procedures.

103.    Defendants knew that their failures, by intent and omission, to warn, instruct and

30

train the Plaintiff, his employers and coworkers would cause Plaintiff to aggravate his condition and situation, by preventing him from avoiding further exposure to these benzene-containing products, taking proper precautions to minimize or eliminate any risk from such exposure, seeking medical opinions regarding the true state of his medical condition or changing the nature of his job description or areas of work, so he would have no contact with Defendants' benzene-containing products.

104. Defendants knew that properly and adequately warning, instructing and training the Plaintiff, his employers, coworkers and the general public of the benzene-containing products' benzene content and capability of causing cancer, leukemia and other blood and bone marrow disorders, including AML, would be detrimental to their business interests, as such would deter the purchase and use of said products, by the Plaintiff, his employers, coworkers and the general public.

105. Chevron knew by no later than 1948 that benzene causes leukemia by virtue of its membership in the American Petroleum Institute and receipt of the 1948 Toxicological Review on Benzene.

106. Despite its knowledge of benzene causing cancer, Chevron did not disclose its knowledge and information that benzene causes cancer.

107. Chevron did not disclose the benzene content of its products identified in this Complaint.

108. Chevron withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer, with the intent, expectation and foreseeability that Plaintiff, his employers and others similarly situated, as well as its customers, would rely upon its statements

31

and omissions in determining whether to work upon its premises and use its benzene-containing products.

109. ExxonMobil Corporation, and its predecessors Exxon and Mobil, knew by no later than 1948 that benzene causes leukemia by virtue of its membership in the American Petroleum Institute and receipt of the 1948 Toxicological Review on Benzene, and by virtue of one of its medical doctors authoring this document.

110. ExxonMobil did not disclose the benzene content of its products identified in this petition.

111. Despite its knowledge of benzene causing cancer, ExxonMobil did not disclose its knowledge and information that benzene causes cancer.

112. ExxonMobil withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer, with the intent, expectation and foreseeability that Petitioner, his employers and others similarly situated as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

113. ExxonMobil made affirmative statements about the health hazards of benzene and its ability to cause cancer that were not accurate and which led the user to believe that its products were safer than they actually were.

114. United States Steel Corporation has been a member of the National Safety Council ("NSC") since at least 1934.

115. In the spring of 1923, at a meeting of the NSC's Chemical and Rubber Sections, it was reported that for three years the committee collected proof of at least 15 fatal and 83 nonfatal

32

cases of benzene poisoning immediately preceding 1923.

116.     In October 1924, during the Thirteenth Annual Safety Congress of the NSC, it was reported by the Chemical Section's Industrial Poison Committee that the committee was preparing a proposed bulletin on benzol (also known as benzene) indicating that the characteristic signs of benzene poisoning included a marked decrease in white blood cells, decrease in red blood cells, and aplastic anemia. Further, it was reported that 15 deaths and 83 cases of sickness occurred due to benzol poisoning during the past few years, and that 11 of the deaths and 81 of the sicknesses resulted from habitual exposure to lower concentrations of benzol.

117.     Harry A. Schultz, of US Steel, was on the Executive Committee of the NSC in 1935.  On October 9, 1936, Robert B. Hunt, Medical Adviser, American Mutual Liability Insurance Co. presented the paper The Lesser Known Facts About Common Occupational Diseases to the Occupational Diseases Section. In that paper, Mr. Hunt wrote that, "Benzol is extremely poisonous, entering either the nose or mouth or absorbed through the skin. Its action within the body is varied and may produce a multitude of signs and symptoms. The bone marrow becomes affected which in turn alters the character of the blood; hemorrhages are common; it may cause death."

118.     In 1950, the NSC published that, "Chronic benzene poisoning affects the blood and blood forming organs, producing serious degeneration in the bone marrow. . . When the damage is severe, no known treatment will restore the marrow to normal or make it able to perform its vital functions of furnishing red blood cells, white blood cells, and blood platelets." Further, and with respect to benzene exposure, the NSC published that, "There is no way to determine the sensitivity of an individual beforehand. Causes of fatal poisoning have been recorded from very light

33

exposures."

119.     In 1956, during the Forty Fourth National Safety Congress of the NSC, John H. Foulger, MD, Director of DuPont's Haskell Laboratory, addressed the NSC's Aviation Section and, among his comments, stated that, "[f]or many years, it has been known that chronic exposure to benzol can produce severe injury to bone marrow. It is often incurable."

120.     United States Steel Corporation has been a member of the Manufacturing Chemists Association a/k/a Chemical Manufacturer's Association a/k/a American Chemistry Council ("MCA") since at least 1956. Chevron, Texaco, ExxonMobil, Unocal and other Defendants were also members of the MCA.

121.     In 1960, the MCA issued a Chemical Safety Data Sheet SD2 Properties and Essential Information for Safe Handling and Use of Benzene 1960 (3rd Edition), in which it was published that, "[t]he principal hazard [of benzene] is from the inhalation of the vapors of benzene. Acute poisoning results from inhalation of high concentrations of vapor (above 3,000 ppm volume in air) usually for short periods of time, often in a matter of minutes. Chronic poisoning results from daily exposure to unsafe concentrations of benzene vapor over a prolonged period of time." Further, it was stated that chronic exposures to benzene can result in "weakness and anemia (reduction in the number of red blood cells and other blood constituents) due to the effects on the blood forming organs."

122.     United States Steel Corporation maintained a copy of the 1948 publication "Occupational Medicine and Industrial Hygiene" by Rutherford T. Johnstone, A.B., M.D. of the University of California, Los Angeles. In this publication, Dr. Johnstone wrote that, "While the use of benzol in industry has considerably reduced in recent years, the incidence of benzol

34

poisoning is still fairly frequent. Too often is benzol hidden under a trade name or is carelessly substituted for less toxic solvents." Dr. Johnstone continued to write that, "Chronic benzol poisoning usually produces severe degrees of injury to the blood forming organs, and often proves fatal." These warnings were not provided by United States Steel Corporation to Radiator Specialty Company and therefore did not appear on the containers or MSDS for Liquid Wrench.

123.    By 1953 US Steel considered its benzol department to be an area of cancer concern.

124.    By 1953 US Steel recognized that issuing United States Public Health Service warnings for benzene resulted in decreased sales of benzene.

125.    In 1956, US Steel authored a document entitled "Survey of Potential Toxic Gas Hazards in Coal Chemical Operations" wherein it recommended that pre-employment and periodic physical examinations be given to benzol exposed workers and that such examinations should be centered on the blood forming organs and should include red, white, and differential cell counts. Mechanical ventilation to control benzene vapor exposures, warnings signs, routine air monitoring and safe work procedures were also instituted for benzene exposed workers. No such advices were provided by United States Steel Corporation when it sold benzene.

126.    In 1957, US Steel recorded an incident of benzol poisoning suffered by one of its workers at the plant that refined benzene. US Steel maintained a copy of the 1966 Handbook of Organic Industrial Solvents (Third Edition, Revised) of the American Mutual Insurance Alliance, which stated that "BENZENE is implicated as a producer of leukemia, a blood cancer. . . Where exposure occurs, close medical and industrial hygiene supervision is in order." No such advices were provided by US Steel when it sold benzene.

127.    By 1963 US Steel knew that benzene was a suspect carcinogenic agent and that all

forms of acute and chronic leukemia were observed after benzene intoxication.

128.   US Steel maintained a copy of the Third Edition of N. Irving Sax's authoritative textbook "Dangerous Properties of Industrial Materials," dated 1968. Sax reported that benzene "[p]oisoning occurs most commonly through inhalation of the vapor, though benzene can penetrate the skin, and thus contribute to poisoning" and that "chronic, rather than acute form of benzene poisoning is important in industry; it has toxic action on the blood forming organs." Further, Sax stated that, "cases of myeloid leukemia have been reported" from benzene exposure. No such advices were provided by United States Steel Corporation when it sold benzene.

129.   US Steel maintained a copy of Alice Hamilton's Industrial Toxicology, Third Edition, published in 1974. Therein, it is written that, "[i]t is now generally accepted that benzene can produce leukemia of varying forms and that such leukemia can appear with or without an antecedent history of aplastic anemia." United States Steel Corporation and the Liquid Wrench product label did not warn that benzene exposure causes leukemia.

130.   Long before it sold benzene-containing raffinate to others, United States Steel Corporation's internal industrial hygiene procedures prohibited the use of benzene and products containing benzene as cleaning solvents because of their toxicity.  United States Steel Corporation recognized that warnings of benzene's toxicities will deter customers from buying the product. Despite this knowledge of United States Steel Corporation, and its knowledge that benzene exposure could cause leukemia and severe and fatal damage to the blood forming system, United States Steel Corporation sold benzene to co-Defendants for use as a cleaning solvent.

131.   In May of 1977 OSHA issued an Emergency Temporary Standard declaring benzene a known human carcinogen, requiring a cancer warning and a reduction in the benzene

36

content of products and benzene exposure in the workplace.

132. US Steel delayed an additional five years until 1982 before it provided a benzene cancer warning.

133. US Steel withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and that benzene should not be used as a solvent, with the intent, expectation and foreseeability that its customers and end users of the Raffinate would rely upon its statements and omissions in determining whether to use Raffinate and Liquid Wrench. Other companies did detrimentally rely upon US Steel's fraudulent statements and omissions in deciding to use Raffinate and Liquid Wrench, and that reliance was a cause of the Plaintiff's injuries.

134. Safety-Kleen knew by no later than 1977 that there was benzene in its parts washing solvents and that benzene exposure causes cancer.

135. Safety-Kleen knew that its parts washing solvent became contaminated with gasoline, Liquid Wrench and other solvents that increased the benzene content of its parts washing solvents.

136. Safety-Kleen knew that its solvent recycling system caused its parts washing solvent to be contaminated with chlorinated solvents and that these solvents are known or suspected carcinogens.

137. Safety-Kleen knew that its solvent recycling procedures did not eliminate or reduce benzene and chlorinated solvent content from the parts washing solvent, but, rather it increased the benzene and chlorinated solvent content.

138. Despite its knowledge that its parts washing solvent contained benzene, Safety-

Kleen affirmatively told customers that it did not contain benzene.

139. Safety-Kleen Systems, Inc. named its product "Safety-Kleen" misleading customers to believe that it is safe and clean, despite Safety-Kleen Systems, Inc.'s knowledge that the products were not safe or clean because they contained toxic chemicals and carcinogens and consisted of waste solvent.

140. Despite its knowledge, Safety-Kleen did not disclosed that its parts washing solvent contained benzene, chlorinated solvents and that it presented a cancer risk.

141. Safety-Kleen withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer, with the intent, expectation and foreseeability that Petitioner, his employers and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

142. Defendant, CRC Industries, Inc. by no later than 1977 was aware that benzene causes cancer.

143. Defendant, CRC Industries, Inc. knew that there was benzene in its products.

144. Despite its knowledge that there was benzene in its products and that benzene causes cancer, CRC Industries, Inc. withheld this knowledge and did not warn or otherwise disclose this information.

145. Sunoco, knew by no later than 1948 that benzene causes leukemia by virtue of its membership in the American Petroleum Institute and receipt of the 1948 Toxicological Review on Benzene.

146. Sunoco was a member of the NSC since prior to 1940. Through its membership in

38

the NSC, Sunoco received and had access to that information and those publications set forth in paragraphs 94-104, above.

147. Sunoco knew, prior to the Plaintiff's first exposure to any of its products, that said products contained benzene, that exposure to benzene and its benzene containing products cause blood disease, asplastic anemia, cancer, leukemia and myelodysplastic syndrome.

148. Despite this knowledge, Sunoco did not disclose the benzene content of its products or the ability of the products and their benzene content to cause blood blood disease, asplastic anemia, cancer, leukemia and myelodysplastic syndrome.

149. Despite all of this knowledge, Defendants willfully and wantonly, through affirmative acts or omissions:

    a. Manufactured, produced, processed, marketed, sold and distributed to the Plaintiff, his employers and coworkers, products which contained a known carcinogenic and leukemogenic compound, benzene;

    b. Did not eliminate or minimize the benzene content of the identified benzene-containing products;

    c. Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' benzene content;

    d. Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' ability to cause cancer, leukemia and other blood and bone marrow disorders, including AML;

    e. Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the insidious, highly hazardous and deleterious nature of benzene;

    f. Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers that there is no safe level of exposure to benzene;

    g. Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the necessary and proper personal protective equipment,

39

practices and procedures to minimize or prevent benzene exposure and leukemia risk;

h.    Did not affix labels or warnings upon the identified products, their containers or shipping documents the warn, instruct, train and advise the Plaintiff, his employers and coworkers of the products' benzene content, an their AML and leukemia risk;

i.    Did not affix labels or warnings upon the identified products, their containers or shipping documents the warn, instruct, train and advise the Plaintiff, his employers and coworkers that there is no safe level of exposure to benzene;

j.    Did not affix labels or warnings upon the identified products, their containers or shipping documents the warn, instruct, train and advise the Plaintiff, his employers and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and leukemia risk;

k.    Did not post signs, warnings or other statements upon the premises of the Plaintiff's employers warn, instruct, train and advise the Plaintiff, his employers and coworkers of the products' benzene content, and their AML and leukemia risk;

l.    Did not post signs, warnings or other statements upon the premises of the Plaintiff's employers warn, instruct, train and advise the Plaintiff, his employers and coworkers that there is no safe level of exposure to benzene;

m.    Did not post signs, warnings or other statements upon the premises of the Plaintiff's employers warn, instruct, train and advise the Plaintiff, his employers and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and leukemia risk;

n.    Did not train and advise Plaintiff, his employers and coworkers of how to adopt and implement a safe, sufficient and proper plan and method to properly handle and use their benzene-containing products, resulting in the creation of an atmosphere at Plaintiff's employer, that the Defendants' benzene-containing products were relatively safe to handle, come in direct and indirect contact with, inhale, ingest and dermally absorb;

o.    Sacrificed the health and safety of the workers and other end users of their benzene-containing products in order to further the Defendants' economic

40

advantage, convenience and profit;

p.      Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products; and,

q.      Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective.

41

150. Defendants' acts and omissions were unreasonable in their character, and made in disregard of a risk known to them or so obvious them that they must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

151. Defendants' acts and omission acts and omissions demonstrated a conscious indifference to their consequences, namely causing the Plaintiff to contract AML and other injuries identified herein.

152. As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff contracted and suffered from AML, and multiple side effects, conditions, illnesses and symptoms caused by AML and the medical treatments necessitated thereby, which causes him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, increased susceptibility to infection, and placed him at risk of contracting diseases, conditions and cancers in the future.

153. As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff is prevented from engaging in those activities from which he derives life's pleasures.

154. As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

155. As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses

42

and losses, which expenses and loses may continue to accrue.

156.    For all of the foregoing reasons, Plaintiffs pray for judgment from Defendants, individually, jointly and severally, for their fraudulent conduct, damages in an amount in excess of seventy five thousand dollars, ($75,000).

### COUNT V – LOSS OF CONSORTIUM

157.    Plaintiffs hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

158.    The Plaintiff-Spouse, Janice Rhyne, is entitled to damages for loss of consortium, either as an independent claim or as an element of damages, and accordingly Plaintiffs plead her entitlement to such damages in the alternative.  *See* Fed. R. Civ. P. 8(a)(3).

159.    At times material hereto, including from the date of the Bruce Rhyne's diagnosis with AML to the present, Janice Rhyne is and was married to Bruce Rhyne.

160.    As the result of the injuries caused by the Defendants to Bruce Rhyne, Janice Rhyne has suffered a loss of consortium.

161.    Janice Rhyne has lost, continues to lose and in the future will lose the love, companionship, friendship, society, services, emotional support and financial support provided by her husband, Bruce Rhyne.

162.    Janice Rhyne has lost, continues to lose and will lose wages, and has incurred, continues to incur and in the future will incur significant medical and other expenses and costs to care for and treat Bruce Rhyne's injuries, and to replace the services and support which Bruce Rhyne would have provided but for the illness and injuries directly and proximately caused by the

43

Defendants' wrongful conduct.

163.    Plaintiffs demand judgment in their favor and against the Defendants, jointly and/or severally, loss of consortium damages in amount in excess of seventy five ($75,000.00).

## JURY DEMAND

Plaintiffs respectfully request a trial by jury of any and all claims so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court award and enter judgment as follows:

1.    That Plaintiffs be granted a trial by jury;

2.    That Plaintiffs recover from Defendants compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00);

3.    That Plaintiffs recover from Defendants punitive damages;

4.    That Plaintiffs recover the costs and expenses incurred in prosecuting this action, all allowable pre-judgment and post-judgment interest as provided by law, and any other allowable costs, expenses and attorneys' fees to the extent provided for by law; and

5.    That the Court award such other and further relief as it deems just and proper.

44

Respectfully submitted, this the 17th day of April, 2018.

s/William M. Graham
William M. Graham
NCSB 17972
Mark Doby
NCSB 39637
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
bgraham@wallacegraham.com
mdoby@wallacegraham.com

Andrew J. DuPont, Esq.
Locks Law Firm
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-0100
adupont@lockslaw.com
*to be admitted pro hac vice*

*Attorneys for Plaintiffs*