# EXHIBIT F

```
 1                               VOLUME:    I
                                 PAGES:     1-379
 2                               EXHIBITS:  1-12
             IN THE UNITED STATES DISTRICT COURT
 3       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                      CHARLOTTE DIVISION
 4            Case No. 3:18-cv-00197-RJC-DSC
 5     _____
 6     BRUCE RHYNE and JANICE RHYNE,        )
 7                   Plaintiffs,            )
 8             vs.                          )
 9     UNITED STATES STEEL CORPORATION,     )
10     et al.,                              )
11                   Defendants.            )
12     _____)
13                   DEPOSITION OF ROBERT F. HERRICK,
14     Sc.D., CIH, FAIHA, called as a witness by and on
15     behalf of the Defendants, Chevron U.S.A., Inc., CRC
16     Industries, Inc., and Univar Solutions USA Inc.,
17     f/k/a Univar USA Inc., pursuant to the applicable
18     provisions of the Federal Rules of Civil Procedure,
19     before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR
20     #13192, NH-LSR #91, MA-CSR #123193, and Notary
21     Public, within and for the Commonwealth of
22     Massachusetts, at Veritext Legal Solutions, 101
23     Arch Street, Suite 650, Boston, Massachusetts, on
24     Wednesday, November 6, 2019, commencing at 9:09
25     a.m.
```

1     manufactured by Magnuflux Corporation?
2             MR. DuPONT:  Form.
3        A.   No, I don't -- oh, well, sure -- sure I
4     do, 'cause here it is.  It's -- I mean, it does
5     mention Magnuflux in the Approved Chemical List.
6             So yeah, I do see that.
7        Q.   Do you understand that Magnaflux
8     Corporation is not a named defendant in the case?
9        A.   Oh, no, I guess they're not.
10       Q.   Did Mr. Rhyne have benzene exposures from
11    daily living every day of his life before he was
12    diagnosed with AML -- separate and apart from any
13    exposures that he had to benzene from the products
14    that you talk about in Tables 3 and 4?
15            MR. DuPONT:  Form.
16       A.   Okay.  So you're referring to, say,
17    nonoccupational exposures?
18       Q.   Well, I think your report talks about
19    nonoccupational exposure to certain products.
20            So I'm talking about did he have -- or I'm
21    asking about whether he had benzene exposures from
22    daily living, separate and apart from any benzene
23    to which he was exposed from the products on Tables
24    3 and 4?
25            MR. DuPONT:  Form.

1          A.   Yeah, I mean, he probably had the same
2     kind of exposures that, you know, most of us have.
3     There's benzene levels in ambient air -- varied,
4     you know, quite a lot, depending on where you live.
5               He -- I don't remember if this came up,
6     but he very likely pumped his own gas at the gas
7     station and filled his car.  So, you know, he had
8     that source.
9               He wasn't a smoker, so, you know, I think
10    that's -- that's, you know, sort of, off the table.
11    That's always, you know, something to consider.
12              And I don't know that he, you know, I
13    don't remember from the record if he lived with
14    anyone who smoked.  I just don't remember that
15    part.
16         Q.   Did you in your report estimate his daily
17    exposure to benzene, separate and apart from what
18    you believe he was exposed to from the products in
19    this case?
20         A.   No, I didn't.
21         Q.   Did you in your report calculate his
22    cumulative exposure to benzene from daily living in
23    the nearly 60 years before he was diagnosed with
24    AML, separate and apart from benzene to which he
25    was exposed to the products that you list in Tables

```
 1    3 and 4?
 2         A.   No, I didn't.
 3         Q.   Why didn't you do any calculations to
 4    assess his exposure to benzene -- either on a daily
 5    basis or a cumulative basis -- from daily living?
 6         A.   Well, I think it was -- it was partly as I
 7    was trying to be responsive to the -- you know, the
 8    question that was put to me, you know, in -- in
 9    engaging me as an expert here, was around his
10    occupational exposure.
11              So that's why I restricted it to that.
12         Q.   You understand that before you were
13    retained in this matter as an expert on behalf of
14    the plaintiffs that the plaintiffs had retained
15    Stephen Petty?
16         A.   Right, I do.
17         Q.   Okay.  You understand that he served in
18    the same role that you're now serving?
19         A.   I do, yeah.
20         Q.   How did you learn that the plaintiffs had
21    previously retained Mr. Petty?
22         A.   Well, that's when -- when Mr. DuPont sent
23    me a copy of Petty's report.
24         Q.   Were you told why Mr. Petty was no longer
25    serving as an expert for the plaintiffs in this
```

1  academic articles and the materials you actually
2  produced, is it fair to say all these materials
3  came from Mr. DuPont's office?
4      A.  I think that is fair to say, yeah.
5      Q.  So you haven't reviewed anything from any
6  outside sources other than these academic studies
7  that you've studied?
8      A.  On -- on this product, you mean, the
9  particular --
10     Q.  Yes, sir.
11     A.  No, that's -- that's pretty much the
12  extent of it.
13     Q.  Okay.  And, again, not having had the
14  prior testimony when you did your assessment, is it
15  fair to say that you made some assumptions and --
16  and looked at some more general information, as
17  opposed to specific testing of the Kroil Oil
18  product?
19         MR. DuPONT:  Object to form.
20     A.  Yeah, as of the time that I wrote it, I
21  really didn't have specific testing results from
22  this product, and what I, you know, wound up using
23  was largely this information from the 2005 Material
24  Safety Data Sheet.
25     Q.  Okay.  And then assessed that in the

1   context of -- I think you've referenced the 2008
2   Williams study; correct?
3        A.   Where she talked -- yes, where she talked
4   about the range of benzene in various products.
5        Q.   Is it fair to say that's a more general
6   assessment, as opposed to a specific assessment of
7   data on this product?
8             MR. DuPONT:  Object to form.
9        A.   You mean her overall --
10       Q.   Yes.
11       A.   -- approach?
12            Yeah, I mean, she was looking at the whole
13  family of petroleum-based products.
14       Q.   Okay.  And that encompasses a wide range
15  of products with wildly varying compositions and
16  ingredient lists and things of that nature;
17  correct?
18            MR. DuPONT:  Compound.  Form.
19       A.   True, yeah, although I will say, you know,
20  she -- she organized it in a way that you can, you
21  know, see specific characteristics.  But, yeah,
22  it's -- it's a very wide-ranging survey.
23       Q.   Okay.  And, again, I'm trying to
24  streamline things.  I know we've all been here
25  longer than we thought we would, but the -- your

```
 1      report suggests that you're assessing Mr. Rhyne's
 2      use of this product sometime between the early
 3      1990s and 1998; correct?
 4           A.   That's right, yeah.
 5           Q.   Okay.  And, then, again, just to
 6      streamline and clarify:  This is the only time
 7      period that you've evaluated his use of the Kroil
 8      product.
 9           A.   It is, that's right.
10           Q.   Okay.  Do you know what form he used this
11      product in?
12                MR. DuPONT:  Form.
13           A.   You're thinking of, like, as a liquid or
14      an aerosol?
15           Q.   Liquid, aerosol, or gel or what -- what --
16           A.   My -- I'm trying to recall how that was
17      discussed.  I think it was a liquid that he used as
18      -- as a penetrant.
19           Q.   Okay.  That's a fairly significant aspect
20      of the analysis; right?
21           A.   Well, it would be, although, you know,
22      most of the information that's out there around
23      these cross-penetrant materials, you know, does
24      tend to be on the liquids.
25           Q.   Okay.  Well, I mean -- and, again, I'm
```

1     know, over the course of the workday.  I didn't
2     have any -- any more detailed information about how
3     many times per hour he applied it, or if he applied
4     it once and then it sat on -- on the counter, you
5     know, for the rest of the time.
6          Q.   And, I guess, how do you understand how to
7     make the approximations you made in using the --
8     the computer system simulator that you used and the
9     program that you used to calculate these exposures
10    without knowing that?
11              MR. DuPONT:  Form.
12         A.   Well, you know, in this case I didn't
13    really use, you know, any of the modeling for --
14    for this.  I used this value that -- these values
15    -- this range that I talked about that I derive
16    from the Williams data.
17              So I took that as the exposure that was
18    prevalent throughout that 10-hour work period.
19         Q.   Okay.  So you didn't use any of the
20    computer modeling in your assessment of Kroil.
21         A.   I did not, no.
22         Q.   Okay. All right.  And we'll talk about
23    more in a minute how that was done.
24              What understanding do you have about this
25    work he was doing -- what -- what's your

Page 306

1  take a look back, you know, in his deposition,
2  'cause, as I say, somehow I have it in my mind that
3  he -- he seemed to, I think, say the reassembly
4  took about a third of the time of the disassembly.
5     Q.   And in your defense, I think he only
6  talked about it for about six pages.  So it's --
7  the fact that you recall as much as you do is to
8  your credit.  I appreciate that.
9     All right.  So let's -- I think that
10 clarifies a lot of what I wanted to talk with you
11 about in terms of his actual work.
12     Let's -- let's talk about how you arrived
13 at these figures.  So how does -- how does the
14 process start when you were evaluating this daily
15 exposure and cumulative exposure?
16     Kind of -- kind of walk me through that.
17     A.   Well, in the -- in this particular case --
18     Q.   Right, and as it relates to Kroil, sure.
19     I'm sorry.  I didn't ask a very good
20 question.
21     A.   Well, it kind of starts with trying to see
22 what I can learn about the composition of the
23 products that he was, you know, running into when
24 he used Kroil.  And so that leads me back to the
25 safety data sheet in this case, as I didn't have,

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 132-6   Filed 11/27/19   Page 10 of 16

1     you know, any of the other information that we just
2     talked about earlier.
3             So there, you know, you can -- and in this
4     case, based on the content of the materials that he
5     was using from the safety data sheet, I went back
6     and -- and, you know, used the information from the
7     published literature, in particular that Williams
8     paper that we've talked about about what levels of
9     exposure were associated with products that were in
10    use, say, from about -- I think she spoke from
11    about the '70s to 2000, over that time period --
12    what was the range of benzene content of those
13    products.
14            And so that's how I matched up and said,
15    okay, well, for the range that I'm going to use for
16    him, is -- we'll say it's somewhere between 100 --
17    let me just make sure I give you the right values
18    here -- (witness reviews document) -- that the
19    range over those years was from 100 to 2,000 parts
20    per million; and the one-hour average -- average
21    exposures that were associated with that ranged
22    from .01 to 1 parts per million.  And -- and that's
23    -- and so the midrange of that is .5.
24        Q.   Okay.
25        A.   So that's how that number comes to be.

1  Q.  And those -- those are figures you derived
2  from looking at the listing of items in the
3  Material Safety Data Sheet --
4         MR. DuPONT:  Objection --
5  Q.  -- and then assessing that prior study.
6         MR. DuPONT:  Objection to form.
7  A.  Right, I mean, 'cause we knew the
8  ingredients that were present, at least in -- as of
9  2005 -- that were present in Kroil.
10 Q.  So, I mean, not to oversimplify things,
11 but tell me, what is the Material Safety Data
12 Sheet?
13 A.  Oh, well, it's a document that's produced
14 really in compliance with the hazard communication
15 standard, and so the manufacturers, industry
16 readers, you know, use this as a means of
17 communicating information to the people who use the
18 product.
19 Q.  All right.  And what is typically
20 contained on the Material Safety Data Sheet?
21 A.  Well, that's a good question, because, you
22 know, over the years and -- and between companies,
23 it varies all over the place.  And I've seen some
24 that, you know, look like they were written by the
25 corporate toxicologist, because they've got, you

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 132-6   Filed 11/27/19   Page 12 of 16

```
 1           A.   Right.
 2           Q.   And conversely if you use the values on
 3      the high end of the spectrum, then the -- the daily
 4      and cumulative totals will be elevated.
 5           A.   Correct.  Yeah.
 6           Q.   All right.  If I used 10 parts per million
 7      versus 100 parts per million, the -- the exposure
 8      will be less by a factor of 10; right?
 9           MR. DuPONT:  Form.
10           A.   Yeah, that's -- that's a --
11           Q.   That's just simple math at that point.
12           A.   -- an approximation.  Yeah.  Sure.  Right.
13           Q.   Okay.  So how do we get the daily exposure
14      figures -- or the new figures, I guess?
15                We might only have one of these, so we
16      might have to share.
17           A.   Though the daily didn't change, but what
18      changed was the cumulative.
19           Q.   I'm sorry.  Cumulative.  Yes, sir.  My
20      apologies.
21           A.   So what I did was I adjusted his duration
22      values so that instead of using that whole
23      seven-year period as his period of exposure, I -- I
24      downsized that.  It was, I think, by a factor to
25      make it about five percent of his time during that
```

1    seven-year period when he was actually exposed.
2              So the calculation that would be on the
3    spreadsheet is the product of his daily average
4    times the years.  And so instead of seven years,
5    it's, I think, about .035 years.
6         Q.   Okay.  And so that's reflected here in
7    Exhibit 12.
8         A.   That's the -- yeah, that's the result of
9    doing that calculation with the correct duration
10   value.
11        Q.   And the revised assessments you had for
12   Kroil is -- I'm sorry.  There's a mark there.
13             Is that 10.02 or .02?
14        A.   Sorry.  That -- I probably should have
15   done -- that's just meant to divide that cell into
16   two parts.
17        Q.   Okay.  Okay.
18        A.   So it's 0.02.
19        Q.   Okay.  So that's the cumulative exposure
20   and the midpoint of the cumulative exposure in
21   ppm-years.
22        A.   That's right.
23        Q.   All right.  And, then, so that comes from
24   a range of .004 to .04 for the cumulative range;
25   correct?

1    A.   That's correct, yeah.
2    Q.   All right.  And are there any other
3    changes to the totals -- well, explain to me on the
4    bottom here under "Total."  Why are there three
5    separate calculations?
6    A.   Oh, what I tried to do was capture -- you
7    know, if you think about the kind of range of
8    scenarios that he had, you know, and -- and the
9    things that were, you know, his major uses -- the
10   Liquid Wrench, he had three different benzene
11   concentrations in Liquid Wrench; and then, in the
12   CRC products, I, you know, calculated it for two
13   different levels of benzene.
14        And so what I tried to, kind of, collapse
15   overall here is as low, medium, and high, would be
16   -- low would be at the lowest benzene in Liquid
17   Wrench and the lowest benzene in CRC --
18   Q.   Okay.
19   A.   -- and net high is the high and the high.
20   Q.   Okay.  So those adjustments, as well as
21   the adjustment for the Kroil are the only changes
22   from Table 4 contained in your report; correct?
23        MR. DuPONT:  He didn't adjust the Liquid
24   Wrench numbers.  He just adjusted what the total --
25   by reducing the Kroil numbers.

1      A.   Right, the only, like, change is that
2   Kroil value.
3      Q.   All right.  Doctor, I apologize if I asked
4   you this already:  Have any of your cases in which
5   you worked as an expert witness or consultant been
6   in North Carolina or South Carolina?
7      A.   Let's see.  There was one, and it never
8   really actually went to trial, because they
9   abandoned it, I think, but it was a South Carolina
10  case where the issue was trying to get someone
11  Workers' Compensation.
12     Q.   Okay.
13     A.   And I was involved in some of the early
14  background work and report-writing on that.  But I
15  -- I think that wound up being settled before it
16  ever even got to the point of a report.
17     Q.   You didn't give a deposition or testimony
18  in a hearing?
19     A.   No, it never went very far.
20          MR. JEFFRIES:  All right.  Doctor, I think
21  I will pass the baton so that we can wrap this up.
22  I appreciate your time.  Thank you.
23          THE WITNESS:  Thank you.
24                    EXAMINATION
25  BY MR. BENDER: