UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:18-CV-00197

_____

| | |
|---|---|
| BRUCE RHYNE and JANICE RHYNE, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES STEEL CORPORATION, | ) |
| SUNOCO, INC. (R&M) f/k/a Sun Company, Inc. | ) |
| and f/k/a/ Sun Oil Company, Inc., EXXONMOBIL | ) |
| CORPORATION, CHEVRON U.S.A., Inc. as | ) |
| Successor in Interest to Gulf Oil Company, | ) |
| SAFETY-KLEEN SYSTEMS, INC., CRC | ) |
| INDUSTRIES, INC., UNIVAR USA, INC. | ) |
| f/k/a Chemcentral Corp. and Van Waters & | ) |
| Rodgers, Inc., KANO LABORATORIES, INC., THE | ) |
| STECO CORPORATION, ACUITY SPECIALTY | ) |
| PRODUCTS, INC. f/k/a Acuity Specialty Products | ) |
| Group, Inc., THE SAVOGRAN COMPANY, TURTLE | ) |
| WAX, INC., Individually and as Successor in Interest | ) |
| to Marvel Oil Company, Inc., | ) |
| | ) |
|     Defendants. | ) |

_____

## DEFENDANT TURTLE WAX, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Now Comes Defendant Turtle Wax, Inc., individually and incorrectly named as successor in interest to Marvel Oil Company, Inc. (hereinafter "Defendant" or "Turtle Wax") by and through undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submits this Memorandum of Law in support of its Motion for Summary Judgment. For the following reasons, Defendant Turtle Wax respectfully requests that their Motion for Summary Judgment be GRANTED.

1

## STATEMENT OF CASE

Plaintiffs originally filed this action in Pennsylvania state court alleging that Mr. Bruce Rhyne developed Acute Myeloid Leukemia ("AML") as a result of his exposure to benzene-containing products of Defendants. While in Pennsylvania, the parties conducted discovery and Plaintiffs designated experts. At that point, the action was dismissed based upon *forum non conveniens*. Plaintiffs then filed this action in the Western District of North Carolina. Only limited discovery was conducted in the action filed in the North Carolina matter. The parties have now served expert reports and the depositions of Plaintiffs' experts have occurred. Plaintiffs are currently in the process of taking depositions of the Defendants' experts. Defendant Turtle Wax now moves for Summary Judgment.[1]

## STATEMENT OF FACTS

Plaintiffs allege that Mr. Bruce Rhyne was exposed to benzene through his use of various products sold by Defendants. As to Defendant Turtle Wax, Plaintiffs allege that Turtle Wax is a successor in interest to Marvel Oil Company, the producer of Marvel Mystery Oil.[2]

Marvel Mystery Oil is a product normally used as an additive in gasoline, oil, or diesel fuel to improve performance and/or lubricate engines. At Duke Energy, Marvel Mystery Oil was used as a lubricant for the oilers in the ice condenser vibrators to prevent freezing. (Exh. A, Rhyne Depo., pp. 155, 699-700, 709). Rhyne used Marvel Mystery Oil

---

[1] Defendant Turtle Wax reserves its right to renew its Motion for Summary Judgment after the Court rules on Motions to Exclude Plaintiffs' Experts, which per the scheduling order, are to be filed as Motions in Limine.

[2] There is no evidence in the record in this matter to establish this allegation.

on ice condenser vibrators in a Duke Energy nuclear reactor building that was ventilated. (Exhibit A, Deposition of Bruce Carlton Rhyne, pp. 720-721). Rhyne had limited exposure to Marvel Mystery Oil as he would use a funnel to pour the Marvel Mystery Oil into the oilers in the ice condenser vibrators and there is no evidence that he had any dermal contact with Marvel Mystery Oil. (*Id.*, pp. 709-711). Further, Rhyne only worked with the ice condensers on outages that would occur every nine to eighteen months from approximately 1985 until 1998, when he became a supervisor. (*Id.*, pp. 155, 687, 709).

As a result of his insubstantial use and exposure, Plaintiffs' expert, Robert Herrick, was unable to calculate a cumulative inhalation exposure for Rhyne to any alleged benzene in Marvel Mystery Oil. (Exhibit B, Deposition of Robert F. Herrick, pp. 268-270; Exhibit C, Deposition of Robert Harrison, MD, pp. 119-120). Plaintiffs' other experts have indicated that they are relying upon Herrick's exposure estimates for their opinions as well. (Exh. C, Harrison Depo., p. 118; Exhibit D, Deposition of Steven Gore, MD, pp. 62, 85; Exhibit E, Deposition of Peter Infante, p. 119, 123-124).

Even more significant, benzene is not a known component in Marvel Mystery Oil and there have been no tests performed by Plaintiffs or Plaintiffs' experts to establish that benzene was actually contained in the Marvel Mystery Oil used by Mr. Rhyne. (Exh. B, Herrick Depo., pp. 274-275). According to a 1985 Material Safety Data Sheet ("MSDS"), Marvel Mystery Oil contained 30% Solvents – Mineral Spirits and 67% Napthenic Base Oil Distillate. (*Id.*, pp. 271-272). A 1995 MSDS disclosed mineral oil, petroleum distillate solvent refined mild, heavy napthenic petroleum luboil, mineral oil petroleum distillate solvent dewaxed heavy napthenic/petroleum lubrication oil, and Stoddard Solvent/mineral

spirits. (*Id.*) Later MSDS from 1998, 2000, and 2001 disclosed petroleum lubricating oil, mineral spirits, and chlorinated hydrocarbons. (*Id.*). Benzene was not listed as a component of Marvel Mystery Oil and benzene has not been confirmed in any Marvel Mystery Oil product used by Mr. Rhyne. (*Id.*, pp. 271-272, 275). Further, Plaintiffs' expert, Herrick, did not provide any opinion that Marvel Mystery Oil was defective or that labels were inadequate. (Exh. B, Herrick Depo., pp. 15, 32).

In general, benzene is recognized as omnipresent such that the entire population of the United States is exposed to small quantities of benzene. (Exh. B, Herrick Depo., pp. 54-55; Exh. C, Harrison Depo., pp. 108-110; Exh. D, Gore Depo., pp. 55-56; *see also Indus. Union Dep't., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 615, 626 (1980)). In addition to being manufactured on an industrial basis, benzene is a naturally occurring compound found in ambient air, water, virtually every consumer food product, crude oil, and smoke. (*Id.*)

Mr. Rhyne worked for Duke Energy Corporation from approximately 1976 to 2015. He became a pipefitter and worked in that capacity until 1991, when he became a mechanic (Exh. A, Rhyne Depo., p. 17). Rhyne was also exposed to radioactive material while working on a steam generator in January 1987. (*Id.*, pp. 116-118). In addition to his unquantifiable use of Marvel Mystery Oil at Duke, Mr. Rhyne is also alleged to have used a variety of products in and outside of the occupational setting, including but not limited to Safety-Kleen parts washer, Liquid Wrench, Rapid Tap, Spotcheck, Kroil Oil, CRC aerosol, Varsol, Safety-Kleen, Zep parts washers, a CRC aerosol product, Tap Magic, Kroil Oil, and Kutzit. (D.E. 1, Complaint).

Further, AML can occur at any age, but the chances of contracting it increase with age, and doctors do not know what causes most cases of AML. (Exh. D, Gore Depo., pp. 60-61, Exh. C, Harrison Depo., pp. 144-145, 148). At the time of his AML diagnosis in May 2015, Mr. Rhyne was approximately 59 years old and had a BMI considered obese, both of which are risks factor for AML. (*Id.*). Mr. Rhyne's sister was previously diagnosed with AML, which can also be a risk factor for AML. (Exh. D, Gore Depo. p. 35).

## **STANDARD OF REVIEW**

Summary judgment shall be granted when "the movant shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its initial burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party may not rely upon mere allegations or denials of allegations in her pleadings to defeat a motion for summary judgment, instead, they "must set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323. Allegations or denials of allegations not supported by specific facts are insufficient to defeat a motion for summary judgment. *Id.* at 323-24; *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (stating that "conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of his case") (citations omitted). The non-moving

party must present sufficient competent evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248; *see also Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). Finally, summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23.

## ARGUMENT

## I. PLAINTIFFS LACK EVIDENCE TO PROVE THEIR CLAIM FOR NEGLIGENCE UNDER NORTH CAROLINA PRODUCT LIABILITY STATUTE.

While the Plaintiffs' claims are masked in various legal theories, they are premised on a single claim of product liability. North Carolina General Statute § 99B–1(3) states that a "[p]roduct liability action includes any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling of any product." In this matter, there is insufficient evidence to support Plaintiffs' claims for product liability, and as such, all claims should be dismissed.

## A. Plaintiffs lack adequate evidence of a defect in any product sold by Defendant Turtle Wax or a breach of duty by Defendant Turtle Wax as there is not adequate evidence showing that Marvel Mystery Oil used by Mr. Rhyne contained benzene.[3]

"North Carolina law requires that a plaintiff bringing a products liability action based on negligence prove '(1) the product was defective at the time it left the control of

---

[3] North Carolina does not recognize strict liability for products liability claims, so any claim based upon strict liability should be dismissed. *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 678, 268 S.E.2d 504, 510 (1980).

the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff damage.'" *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, No. 5:06–CV–160–D, *5 (E.D.N.C. March 31, 2011) (quoting *Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.*, 138 N.C. App. 70, 75, 530 S.E.2d 321, 326, *disc. review denied*, 353 N.C. 268, 546 S.E.2d 112 (2000)). Plaintiff must show that the product manufactured by Defendant was defective at the time it left defendant's plant, and that defendant was negligent in its design of the product, in its selection of materials, in its assembly process, or in its inspection of the product. *See Jolley v. General Motors Corp*., 55 N.C.App. 383, 385, 285 S.E.2d 301 (1982). Plaintiff must make these showings with evidence sufficient to "establish, beyond mere speculation or conjecture, every essential element of negligence" for each product. *Penland v. BIC Corp*., 796 F. Supp. 877, 883–84 (W.D.N.C. 1992) (quoting *Jolley*, 55 N.C.App. at 385).

Further, the North Carolina appellate courts have held that "a plaintiff may not prove negligence by stacking inference upon inference." *Farrar,* 2011 WL 1262159, at *5 (quoting *Carlton v. Goodyear Tire & Rubber Co.*, 413 F. Supp. 2d 583, 588 (M.D.N.C. 2005), *appeal dismissed*, 192 Fed. Appx. 190 (4th Cir. 2006)). "Thus, a plaintiff who relies on indirect evidence to prove the first element (i.e., product defect) may not also rely on an inference to prove the second element (i.e., negligence)." *Id.* Negligence may not be inferred without actual evidence of a defect. *Carlton,* 413 F. Supp. 2d 583, 588.

In this case, Plaintiffs have no direct evidence that <u>either</u> the Marvel Mystery Oil used by Mr. Rhyne contained benzene or that there was a breach of duty by Defendant Turtle Wax in that they supplied a dangerous product used by Mr. Rhyne. Rather, Plaintiffs

are seeking to infer a defect and negligence from the mere fact that Marvel Mystery Oil contained some petroleum-based ingredients that may have contained benzene.

First, the Material Safety Data Sheets ("MSDS") for Marvel Mystery Oil reviewed by Plaintiffs' expert, Herrick, for the time period of Rhyne's usage, do not cite any benzene being contained in Marvel Mystery Oil. (Exh. B, Herrick Depo., pp. 274-275). Rather, Plaintiff's expert, Herrick, acknowledged that the petroleum-based ingredients *could* have contained benzene.

> Q. And, then, in Table 4 on page 43, if you look down at where Marvel Mystery Oil is listed, once again, under the "Cumulative Exposure Midpoint" it says, "Not determined." Is that a similar reason as to why that's not determined in that table as well?
> A. Right, because I -- what I, you know, tried to do was -- was talk about -- in -- in the narrative that precedes this -- what was in the record about the composition of the Marvel Mystery Oil; and I, you know, recognized, you know, the -- the ingredients, you know, the petroleum-based ingredients as being things that, over time, you know, **could have had benzene** as one of the ingredients -- one of the components. But what was really, you know, sort of, leading me to this "Not determined" classification was the way he was using it.

(Exh. B, Herrick Depo., p. 269, lines 4-21) (emphasis added). Herrick further acknowledged that there were components that **could** contain benzene, but that he had not done any product testing to determine if the components in the Marvel Mystery Oil used by Mr. Rhyne actually contained benzene.

> Q. As far as any benzene that would be contained in Marvel Mystery Oil, would that be coming from the mineral spirits only?
> A. Well, in some – (MR. DuPONT: Objection. Form.)
> THE WITNESS: I'm sorry.
> A. No, some of these, you know, ingredients that are listed, say, like, in -- in 1985, you know, we have the "mineral oil petroleum distillate solvent dewax severe," I mean, they're, you know, "heavy naphthenic petroleum lubrication

oil," you know, so there's a range of, I mean, ingredients there that **could potentially** contain benzene.
Q. And can you just go over which ingredients you believe --
A. Well, I think, you know, you clearly could have had from -- from the petroleum distillate solvent refined the heavy naphthenic petroleum lube oil, the Stoddard Solvent mineral spirits. I mean, I think those three would be candidates.
Q. And you did not perform any product testing on Marvel Mystery Oil; is that correct?
A. No, I haven't.

(Exh. B, Herrick Depo., pp 274-275) (emphasis added).

In addition, Dr. Infante also concluded that not all mineral spirits are the same and that they normally differ in chemical make-up.

Q. Specific chemical. Mineral spirits is a specific product manufactured and sold in the United States of America; is it not?
A. Well, I would modify it a little bit. A specific product, because, you know, mineral spirits is like a -- it's a mixture of different -- of various chemicals. And some mineral spirits are a little different than other mins. You just can't say, okay, that's mineral spirits.

(Exh. E, Infante Depo., pp. 22-23).

Further, the record is absolutely devoid of any evidence regarding the designing and manufacturing processes for Marvel Mystery Oil, or the source, nature, or purity of its component parts, much less any evidence of a negligent action or omission that occurred during those processes. For this reason, Plaintiffs have not produced evidence that would allow a jury to find for him on the second element of his negligence based claims. Defendants are, therefore, entitled to summary judgment on Plaintiffs' negligence claims.

**B.    Plaintiffs lack evidence of sufficient exposure to benzene from Marvel Mystery Oil to support their claims, and as such, Plaintiffs' claims should be dismissed.**

In order to carry the burden of proving a plaintiff's injury was caused by exposure to a specified substance, the "plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263–64 (4th Cir. 1999) (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir.1999)); *see also Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir.1996) (concluding that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case"). In the absence of quantitative exposure levels, there must be evidence to demonstrate that the exposure was significant. *Westberry*, 178 F.3d 257, 263–64 (4th Cir. 1999).

Moreover, there must be a showing that the plaintiff's level of exposure is comparable to the levels of exposure that are hazardous as a general matter. *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 850–51 (E.D.N.C. 2015) (citing *Westberry*, 178 F.3d at 263 (quotations omitted); *see also Zellars v. NexTech Northeast, LLC*, 895 F.Supp.2d 734, 742 (E.D.Va.2012) ("'Ruling in' exposure to a particular substance as a possible cause of a patient's medical condition requires (1) a reliable determination of the level of exposure necessary to cause the condition and (2) a reliable determination that the patient was exposed to the substance at this level."). The Fourth Circuit and other courts have applied these principles not only to assess the sufficiency of the evidence supporting plaintiff's case, but also to consider whether expert testimony on causation is reliable. *See Westberry*, 178 F.3d at 263; *Zellars v. NexTech Northeast, LLC*, 533 Fed.Appx. 192, 198 (4th Cir.

2013) (affirming exclusion of expert for failure to demonstrate plaintiff's actual level of exposure); *Roche v. Lincoln Property Co.*, 278 F.Supp.2d 744, 754 (E.D.Va.2003) (excluding expert on finding that he "lack[ed] any knowledge of the levels of exposure to mold required to manifest any symptoms."). Such standards are consistent with a "central tenet" in the science of the harmful effects of chemical and physical agents on organisms— "the dose makes the poison," i.e. "all chemical agents are intrinsically hazardous, whether they cause harm is only a question of dose." *Yates*, 113 F. Supp. 3d 841, 850–51 (citation omitted).

Further, when there are multiple possible causes of the plaintiff's injury, the plaintiff must demonstrate that the defendant's actions or omissions were a substantial factor in bringing about his damages and a mere possibility is not enough. *Ross v. Wash. Mut. Bank*, 566 F. Supp. 2d 468, 479 (E.D.N.C. 2008). To sufficiently establish proximate causation, an expert's opinion must "take the case out of the realm of conjecture and remote possibility," *Holley v. ACTS, Inc.*, 581 S.E.2d 750, 753 (N.C. 2003) (citation omitted)), and establish that the defendant's product was the "probable, rather than merely a possible cause" of Plaintiffs' injuries. *Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 989 (E.D.N.C. 2015). Other federal courts applying North Carolina law have used the test articulated in *Lohrmann v. Pittsburgh Corning Corp.* 782 F.2d 1156, 1162 (4th Cir. 1986). *See, e.g., Logan v. Air Prod. & Chemicals, Inc.,* 2014 WL 5808916, at *2 (M.D.N.C. Nov. 7, 2014). Also referred to as the "frequency, regularity and proximity" test, this test requires plaintiffs to demonstrate "more than a casual or minimum contact with the product." *Lohrmann*, 782 F.2d at 1162.

Plaintiff must establish the level or dose of harmful chemicals to which Mr. Rhyne was allegedly exposed. *Id.* at 1162-63. Without this data, Plaintiff cannot show that Mr. Rhyne's AML was caused by his occupational exposures to Marvel Mystery Oil. Here, Plaintiff's industrial hygienist, Robert Herrick, did not determine exposure rates to benzene for the product, Marvel Mystery Oil. (Exh. B, Herrick Depo, pp. 268-270, 273-274; Exhibit F, Excerpt of Herrick Report, Exhibit 1 to Herrick Depo, pp. 39, 43).

> Q. Okay. So there's no -- you did not calculate any cumulative exposure for Marvel Mystery Oil in this matter?
> A. I didn't.

(Exh. B, Herrick Depo., p. 270, lines 2-5). It is undisputed that Dr. Herrick did not provide a dose or cumulative level of exposure of benzene from Marvel Mystery Oil for Mr. Rhyne. In fact, even if there was any potential exposure, Herrick found it was very minor exposure at best.

> Q. And if you look at Table 3 on page 39 in your report, and you go down to where Marvel Mystery Oil is listed, and under the "Daily Exposure Midpoint," it says, "Not determined"; is that correct?
> A. That's correct, yeah.
> Q. And why is that?
> A. Well, it was really my view of the way he was using that particular product, and my recollection was -- you know, and he -- he talked about this in his deposition -- that he was adding that liquid to these cylinders, I think I would call them; they were reservoirs that were on the vibrators that he was doing this maintenance work on. And so, as he described what he did, it seemed to me that the opportunity for there to be substantial vapor exposure was really very minor.

(Exh. B, Herrick Depo., pp. 268-269). Further, Dr. Herrick found that there was not "substantial opportunity" for Rhyne to have exposure to benzene through Marvel Mystery Oil, even if we were to assume *arguendo* that the product contained any benzene.

> A. Well, reflecting on, you know, as I really tried to think about, you know, both the potential content of benzene in the material, but also what I concluded or inferred about the way he was using it, I really didn't feel that there was a substantial opportunity for him to have exposure. So that that's why I gave it this category as "Not determined."

(Exh. B, Herrick Depo., p. 273-274). It is striking that expert Herrick, after considering the situation further, took out his initial estimate of potential exposure and concluded it could not be determined based upon the circumstances. (*Id*.). Even if the Court considers Dr. Herrick's opinion reliable and Plaintiffs' speculation that component parts of Marvel Mystery Oil may have contained benzene, it would only be evidence of an insignificant exposure and would allow prejudicial speculation by a jury.

Further, Plaintiffs' other experts are relying on Herrick for the benzene exposure amounts, if any, for Marvel Mystery Oil.[4] (Exh. C, Dr. Robert Harrison Depo., p. 118; Exhibit D, Dr. Steven Gore Depo., pp. 62, 85; Exh. E, Peter Infante Depo., p. 119). Without a defined exposure rate, Plaintiff's experts cannot reliably opine that Rhyne's exposure to benzene through Marvel Mystery Oil was a cause of his AML.

Here, there is a complete absence of any cumulative exposure estimate for Marvel Mystery Oil and evidence that Mr. Rhyne was exposed to benzene through his use of Marvel Mystery Oil. As Plaintiffs' expert put it, the level of exposure, if any, was not determined. As such, all claims against Defendant should be dismissed.

## C. Plaintiffs' Design Defect Claim Fails For Lack Of A Feasible Alternative Design.

---

[4] Plaintiff originally designated Stephen Petty to determine exposure rates, but Petty is no longer serving as an expert in this matter.

Plaintiffs' Complaint asserts a negligence claim based upon allegations of design defect. However, Plaintiffs' design defect claim fails as a matter of law because Plaintiffs have not identified or disclosed any evidence to support this contention. Specifically, in order to assert a design defect, negligence claim, Plaintiffs would be required to establish that a "safer, practical, feasible, and reasonable alternative design" for Marvel's products existed prior to Mr. Rhyne's last alleged exposure in 1998. *See* N.C. Gen. Stat. § 99B-6; *DeWitt v. Eveready Battery Co., Inc.*, 144 N.C. App. 143, 155 (2001); *Sisk v. Abbot Labs*., 2012 WL 3155586, at *4 (W.D.N.C. June 19, 2012) (although plaintiff's allegations of a feasible alternative design were sufficient to survive a motion to dismiss, plaintiff "will ultimately have to introduce evidence that these alternate designs are a safer, practical, feasible, and reasonable alternative design").

North Carolina courts have further held that proof that a feasible, alternative design existed must be established by competent expert testimony. *See Howerton v. Arai Helmet*, Ltd., 358 N.C. 440, 471-72 (2004) (design defect negligence claims under § 99B-6 require evidence that the manufacturer "unreasonably failed to adopt a safer, feasible design alternative," which is dependent on expert testimony); *Richardson v. Gen. Motors Corp.*, 223 F. Supp. 2d 753, 756 (M.D.N.C. 2002) (requiring expert opinion on the adequacy of product's design under N.C. Gen. Stat. § 99B-6). Here, Plaintiffs have not designated any expert competent to testify that a feasible, alternative design existed for Marvel Mystery Oil prior to 1998 nor has any expert provided such an opinion. Thus, Plaintiffs have not forecast the necessary evidence to support their design defect claim, and Defendants are entitled to judgment as a matter of law pursuant to Rule 56.

**D.  Plaintiffs' Inadequate Warning Claims Fail For Lack Of Evidence.**

Under the North Carolina Product Liability Act, no manufacturer or seller of a product shall be held liable in an action based upon inadequate warning or instruction unless the claimant proves: 1) that the manufacturer or seller *acted unreasonably* in failing to provide such warning or instruction; 2) that the failure to provide adequate warning or instruction was a proximate cause of the claimant's harm; and 3) that the manufacturer or seller knew or should have known that the product created an unreasonably dangerous condition when it left the control of the manufacturer or seller or that the manufacturer or seller became aware (or should have become aware), after the product left its control, that the product posed a substantial risk of harm but failed to take reasonable steps to give adequate warning or instruction. *Fontenot v. TASER Int'l, Inc.*, 2011 WL 2535016, at *6 (W.D.N.C. June 27, 2011) (citing  N.C.G.S. § 99B5(a)) (emphasis added). Chapter 99B does not adopt the doctrine of strict liability. Thus, the essential elements for a products liability claim are based upon negligence and include "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach; and (4) loss because of the injury." *Fontenot*, 2011 WL 2535016, at *6 (citation omitted). Plaintiff must establish a link between the inadequate warning and the resulting injury. *See* N.C.G.S. § 99B–5(a); *Smith v. Wyeth–Ayerst Labs. Co.*, 278 F.Supp.2d 684, 706 (W.D.N.C. 2003) (holding that a products liability plaintiff asserting a failure to warn claim must show that the injury was caused by the defendant's failure to warn).

Here, there is no sufficient evidence establishing that Marvel Mystery Oil lacked an adequate warning nor have Plaintiffs designated an expert that has opined or testified that Marvel Mystery Oil had inadequate warnings. Thus, Plaintiffs have not forecast the necessary evidence to support their inadequate warnings claim, and Defendant is entitled to judgment as a matter of law pursuant to Rule 56.

## II. DEFENDANT IS ALSO ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF IMPLIED WARRANTY CLAIM BECAUSE PLAINTIFFS HAVE FAILED TO PRESENT ADEQUATE EVIDENCE OF A PRODUCT DEFECT.

"The elements essential to a claim for breach of implied warranty of merchantability are: (1) the goods bought and sold were subject to an implied warranty of merchantability, (2) the goods were defective at the time of the sale, (3) the defective nature of the goods caused plaintiff's injury, and (4) damages were suffered as a result." *Goodman v. Wenco Foods, Inc.*, 333 N.C. 1, 21-22, 423 S.E.2d 444, 454 (1992). A lack of evidence of negligence on the part of defendant applies equally to a lack of evidence of breach of implied warranty". *Penland v. BIC Corp.*, 796 F. Supp. 877, 885 (W.D.N.C. 1992) (citing *Jolley*, 55 N.C.App. at 386, 285 S.E.2d 301).

Here, similar to the negligence claim, Plaintiffs cannot establish that there was a defect in product or any breach to support a claim for breach of implied warranty. In determining whether the plaintiff has presented adequate circumstantial evidence of a defect, the Court considers the following factors:

> (1) the malfunction of the product; (2) expert testimony as to a possible cause or causes; (3) how soon the malfunction occurred after the plaintiff first obtained the product and other relevant history of the product, such as its age and prior usage by plaintiff and others,

including evidence of misuse, abuse, or similar relevant treatment before it reached the defendant; (4) similar incidents, when accompanied by proof of substantially similar circumstances and reasonable proximity in time; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that such an accident would not occur absent a manufacturing defect.

*DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 689-90, 565 S.E.2d 140, 151 (2002) (citations omitted).

In this case, a consideration of the *DeWitt* factors can lead only to the conclusion that Plaintiffs have failed to present sufficient circumstantial evidence of a defect existing in any product at the time it was sold by Defendant.[5] As an initial matter, this case is unlike the conventional products liability case in that Plaintiffs are unable to produce the allegedly defective product.

In *Penland v. BIC Corp.*, 796 F. Supp. 877, 884 (W.D.N.C. 1992), the District Court for the Western District of North Carolina held that the plaintiff in a products liability action could not recover where the plaintiff could not identify or produce the lighter she contended was defective and caused her injuries. In that case, the plaintiff sued the lighter's manufacturer after she was burned while attempting to use the lighter. *Id.* at 879. The plaintiff's only evidence was that when she attempted to use the lighter, it caught fire and she was burned. *Id.* at 884. The Court affirmed summary judgment for the manufacturer on the plaintiff's claims, explaining that because she could not produce the lighter that allegedly caused her injuries, she could not prove a defect existed at the time of sale. *Id.* at 884-85.

---

[5] In addition, the evidence in the record does not demonstrate that Mr. Rhyne was a purchaser of the product, Marvel Mystery Oil, but obtained it from a Duke Energy Warehouse. (Exh. A, Rhyne Depo., p. 711.)

Similar to *Penland*, in this case, at most, Plaintiffs have not tested the actual product in this matter, but are relying upon what they believe to be the chemical make-up of the product. Plaintiffs speculate that the petroleum-derived solvents contained in Marvel Mystery Oil contained benzene. However, their expert opined that these petroleum-derived chemicals **could** contain benzene and there is not sufficient evidence to show the Marvel Mystery Oil used by Mr. Rhyne actually did contain benzene. (Exh. B, Herrick Depo., p. 269). Nor is there a cumulative exposure calculated for Mr. Rhyne's exposure of benzene from Marvel Mystery Oil because Plaintiffs' expert, Herrick, did not believe there was sufficient exposure under the circumstances to come up with a reliable or useful calculation. As such, they cannot meet the first *DeWitt* factor - that Defendants sold a defective product. Plaintiffs are only *speculating* that Marvel Mystery Oil may have contained benzene and they compound that speculation by not having any exposure analysis.

Finally, Plaintiffs' experts have also acknowledged other possible ways that Mr. Rhyne could have developed AML, and that AML can occur absent a defect in Marvel Mystery Oil or without any occupational exposure to benzene at all. (Exh. D, Steven Gore, MD, Depo., pp. 23-25, 35, 60-61, Exh. C, Robert Harrison, MD, Depo., pp. 144-145). In fact, AML is often idiopathic without any known specific cause. Defendant is therefore entitled to summary judgment on Plaintiffs' claim for breach of implied warranty.

**III.  DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FRAUDULENT CONCEALMENT CLAIM BECAUSE PLAINTIFFS HAVE FAILED TO PRESENT ADEQUATE EVIDENCE OF ANY FRAUD BY DEFENDANT TURTLE WAX.**

18

Plaintiffs do not have adequate evidence to support a claim for either actual or constructive fraud in this matter. "Actual fraud is the more common type, arising from arm's length transactions." *Terry v. Terry*, 302 N.C. 77, 82, 273 S.E.2d 674, 677 (1981). To successfully assert an allegation of actual fraud, the plaintiff must prove five elements: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Watts v. Cumberland Cty. Hosp. Sys., Inc*., 317 N.C. 110, 116-17, 343 S.E.2d 879, 884 (1986) (citation omitted).

Here, there is no evidence in the record to demonstrate that Defendant Turtle Wax concealed any material fact and had any intent to deceive the Plaintiffs.  As explained earlier, there is no direct evidence and there is not sufficient circumstantial evidence to establish that the Marvel Mystery Oil used by Mr. Rhyne contained benzene.  In addition, none of Plaintiffs' experts have opined that the labeling or warnings for Marvel Mystery Oil was inaccurate or inadequate.  As such, Plaintiffs cannot demonstrate any actual fraud.

"Constructive fraud arises where a confidential or fiduciary relationship exists, and its proof is less 'exacting' than that required for actual fraud." *Watts*, 317 N.C. at 115-16, 343 S.E.2d at 884 (citation omitted). To assert a cause of action for constructive fraud, the plaintiff must allege facts and circumstances "(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950). Specifically, a fiduciary relationship arises whenever "there is confidence reposed on one side[ ], and resulting

19

domination and influence on the other." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931) (quoting 25 C.J. Fiduciary § 9, at 1119 (1921)).

Here, no such fiduciary relationship existed between Defendant and Plaintiffs to establish a claim for constructive fraud. As such, Plaintiffs do not have sufficient evidence to support their claim for fraudulent concealment, and it should be dismissed.

### IV. THERE IS NOT SUFFICIENT EVIDENCE TO SUPPORT A CLAIM OF PUNITIVE DAMAGES OR LOSS OF CONSORTIUM.

In North Carolina, the standard for recovery of punitive damages is, in relevant part, as follows:

> (a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
> (1) Fraud.
> (2) Malice.
> (3) Willful or wanton conduct.
> (b) The claimant must prove the existence of an aggravating factor by clear and convincing evidence.

N.C.G.S. § 1D–15(a)–(b). "Punitive damages are recoverable in a negligence action only upon a showing that the negligence was gross or wanton"—that is, done with "conscious and intentional disregard" of the safety of others. *Fontenot*, 2011 WL 2535016, at *13 (citation omitted). Further, if plaintiff cannot prove underlying tort claim, then a loss of consortium claim also fails since it is a derivative claim. *See, e.g., Stokes v. Southeast Hotel Props, Ltd.*, 877 F. Supp. 986, 1001 (W.D.N.C. 1994) (holding that wife's claim for loss of consortium was derivative of husband's claim for negligence and because husband's claim was barred by statute of limitations, wife's claim must also fail). Here, as explained

above, Plaintiffs cannot prove their underlying claims, so the derivative claims of loss of consortium and punitive damages should be dismissed. Further, Plaintiffs do not have clear and convincing evidence to demonstrate that Defendant Turtle Wax acted with any of the required aggravating factors under 1D, and therefore, the claim for punitive damages and loss of consortium should be dismissed.

## **CONCLUSION**

For the reasons set forth above, Defendant Turtle Wax, Inc. respectfully requests that its Motion for Summary Judgment be allowed and that each of Plaintiffs' claims be dismissed.

This the 27th day of November, 2019.

CRANFILL SUMNER & HARTZOG LLP

BY:     /s/ John W. Ong
        John W. Ong, NC Bar #24674
        Virginia Wooten, NC Bar #48180
        *Attorneys for Defendant Turtle Wax*
        Post Office Box 30787
        Charlotte, North Carolina 28230
        Telephone:  (704) 332-8300
        E-mail: jong@cshlaw.com
                vwooten@cshlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November, 2019, I electronically filed the foregoing **DEFENDANT TURTLE WAX, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys of record:

· **Brian Andrew Bender**
bbender@harrisbeach.com
· **Peri Berger**
pberger@harrisbeach.com,ManagingClerksNYC@HarrisBeach.com,HBSafetyKleen@HarrisBeach.com
· **Matthew Cairone**
mcc@caironelawfirm.com
· **Diana Coada**
diana.coada@rtt-law.com,Sheryl.Jones@rtt-law.com,erin.sweatman@rttlaw.com,robyn.thompson@rtt-law.com
· **Kathy K. Condo**
kcondo@babstcalland.com
· **Judi Abbott Curry**
jcurry@harrisbeach.com
· **Mark Philip Doby**
mdoby@wallacegraham.com
· **Andrew J. DuPont**
adupont@lockslaw.com,etelles@lockslaw.com,clippmann@lockslaw.com
· **Jennifer Lynne Emmons**
jemmons@lockslaw.com
· **Andrew P. Fishkin**
afishkin@fishkinlucks.com,lhoefel@fishkinlucks.com,akim@fishkinlucks.com,awyckoff@fishkinlucks.com
· **William M. Graham**
bgraham@wallacegraham.com,cpine@wallacegraham.com,athompson@wallacegraham.com,mdoby@wallacegraham.com
· **Timothy Gray**
Tim.Gray@formanwatkins.com

- **John T. Holden**

jholden@dmclaw.com,mpritt@dmclaw.com,mhopey@dmclaw.com

- **Janice Holmes**

jholmes@gwblawfirm.com,sbook@gwblawfirm.com

- **John S. Hughes**

jhughes@wallacegraham.com,lwike@wallacegraham.com,mwallace@wallacegraham.com

- **Howard E. Jarvis**

jarvish@wmbac.com,gsutton@wmbac.com,acarr@wmbac.com

- **John T. Jeffries**

jjeffries@mgclaw.com,patricia.powell@mgclaw.com,elifer@mgclaw.com

- **Christopher M. Kelly**

ckelly@gwblawfirm.com,clee@gwblawfirm.com

- **Douglas Everette Kingsbery**

dek@tharringtonsmith.com,bsvendsgaard@tharringtonsmith.com

- **Jeffrey Brandt Kuykendal**

jeffrey.kuykendal@mgclaw.com,patricia.powell@mgclaw.com,laura.martin@mgclaw.com

- **Christopher C. Lam**

clam@bradley.com,jschulz@bradley.com,chester@bradley.com,dholdren@bradley.com

- **Brian M. Ledger**

bledger@grsm.com

- **Steven M. Lucks**

slucks@fishkinlucks.com,kroman@fishkinlucks.com,awyckoff@fishkinlucks.com

- **Chad D. Mountain**

cmountain@maronmarvel.com,nhares@maronmarvel.com

- **Timothy Peck**

tpeck@foxrothschild.com,hhgrant@foxrothschild.com

- **Eric G. Sauls**

eric.sauls@lewisbrisbois.com

- **Vaughn Karl Schultz**

vschultz@dmclaw.com

- **Jonathan Edward Schulz**

jschulz@bradley.com,mduscha@bradley.com,chester@bradley.com

- **Thomas McRoy Shelley , III**
  roy.shelley@rtt-law.com
- **Joshua S. Snyder**
  jsnyder@babstcalland.com
- **William M. Starr**
  bill.starr@nelsonmullins.com,kathy.southworth@nelsonmullins.com,jill.tucker@nelson
  mullins.com
- **Christopher Stofko**
  cstofko@dmclaw.com
- **Daniel Robert Strecker**
  dstrecker@HarrisBeach.com
- **Michael Joseph Sweeney**
  msweeney@dmclaw.com
- **Daniel Bowman White**
  dwhite@gwblawfirm.com
- **Nicholas Damian Wilson**
  nwilson@gordonrees.com

CRANFILL SUMNER & HARTZOG LLP

BY:   /s/ John W. Ong
      John W. Ong, NC Bar #24674
      Virginia Wooten, NC Bar #48180
      *Attorneys for Defendant Turtle Wax*
      Post Office Box 30787
      Charlotte, North Carolina 28230
      Telephone:  (704) 332-8300
      E-mail: jong@cshlaw.com
              vwooten@cshlaw.com