IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| BRUCE RHYNE and JANICE RHYNE,<br><br>    Plaintiffs,<br>v.<br><br>UNITED STATES STEEL<br>CORPORATION, et al.,<br><br>    Defendants. | Case No.: 3:18-cv-00197-RJC-DSC |

**DEFENDANT CRC INDUSTRIES, INC.'S MEMORANDUM OF LAW
<u>IN SUPPORT OF SUMMARY JUDGMENT</u>**

Plaintiffs seek damages claiming that Mr. Rhyne contracted Acute Myelogenous Leukemia ("AML") from exposure to alleged benzene-containing products. Defendant CRC Industries, Inc. ("CRC") is entitled to summary judgment because there is no evidence that Mr. Rhyne ever worked with the CRC product from which Plaintiffs claim he was exposed to benzene.

<u>**FACTS**</u>

**A.**     **Background**

Plaintiffs Bruce Rhyne and his wife, Janice Rhyne, brought this action in April 2018, seeking damages claiming that Mr. Rhyne contracted AML from working with defendants' alleged benzene-containing products. Complaint ¶¶ 1, 19–22, ECF No. 1. Plaintiffs allege that Mr. Rhyne worked with different benzene-containing products manufactured or supplied by the dozen defendants they named in this action, including "CRC 3-36, CRC Belt Dressing, carburetor cleaner products, brake cleaner products, rust penetrants and lubricants, which exposed the Plaintiff to benzene." *Id.* ¶ 30. CRC denied the material allegations in the Complaint. CRC's Answer, ECF No. 26.

1
Case 3:18-cv-00197-RJC-DSC   Document 136   Filed 11/29/19   Page 1 of 13

### B. There is No Evidence That Mr. Rhyne Worked With the CRC Product From Which Plaintiffs Claim He Was Exposed to Benzene, Or Any Other CRC Benzene-Containing Product

The parties have conducted extensive discovery.[1]

At his deposition, Mr. Rhyne testified that he worked with a CRC product as an employee of Duke Energy, but he could not identify that product. Exh. A at 445:10–12; 445:21–446:1. While for purposes of this motion only, CRC does not contest that Mr. Rhyne worked with a CRC product, summary judgment is appropriate because there is no evidence identifying that CRC product or, therefore, that it contained any amount of benzene.[2]

In the Philadelphia Action, Plaintiffs served reports from several expert witnesses, including an industrial hygienist, Stephen Petty. Mr. Petty offered the opinion that Mr. Rhyne was exposed to benzene from various products manufactured or supplied by many of the named defendants, at levels which he calculated and identified in his report, *see* exh. E (expert report; Stephen E. Petty) at 249–50; § 13.9, Table 13-22, which Plaintiffs' medical causation experts

---

[1] Plaintiffs originally brought their claims in the Court of Common Pleas of Philadelphia County ("Philadelphia Action"), but refiled them in this Court after the Philadelphia Action was dismissed based on *forum non conveniens*. Complaint ¶ 2. The dismissal has since been affirmed on appeal. *Rhyne v. U.S. Steel Co.*, No. 432 EAL 2018, 13–14 (Pa. Super. Ct. Feb. 22, 2019), *appeal denied*, No. 126 EAL 2019 (Pa. Sept. 9, 2019). While virtually all of the discovery between the parties was conducted in the Philadelphia Action, that discovery applies with equal force to this action. Pretrial Order and Case Management Plan at 2 n.2, ECF No. 94 ("to avoid undue delay, all discovery already conducted in the proceedings of this case in the Court of Common Pleas Philadelphia County, before the case was filed in the Western District of North Carolina, shall apply in this Court to these proceedings.").

[2] CRC's inventory of products at the relevant time consisted of products that contained petroleum-based solvents and products that did not. The petroleum-based solvents, which are derived from crude oil, may have contained trace amounts of naturally occurring benzene. However, there were products in CRC's inventory that did not contain petroleum-based solvents or, therefore, any amount of benzene. *See* Exh. M (Declaration of Adam Selisker, dated November 26, 2019 ("Selisker Decl.")) ¶ 2. Because Plaintiffs cannot identify the CRC product with which Mr. Rhyne worked at Duke Energy, they cannot say it was a benzene-containing product as opposed to a CRC product that did not contain any amount of benzene.

2

relied on to offer their own opinions that Mr. Rhyne's benzene exposure from those products was a substantial contributing cause of his AML. *See* exhs. F (expert report; Robert Harrison, M.D.) at 13; G (expert report; Steven Gore, M.D.) at 20–21 (¶ 31); H (expert report; Peter Infante) at 79 (¶ 16). However, given Mr. Rhyne's admission that he could not identify the CRC product with which he worked—and given the absence of any other record evidence identifying that CRC product (and that it contained any amount of benzene)—Mr. Petty did not attribute any of Mr. Rhyne's benzene exposure to a CRC product. Exh. E at 136 ("since Mr. Rhyne could not identify the specific class of CRC cleaning product used, no benzene exposures associated with the CRC product was completed."); 181–82 (Table 7-39) ("Mr. Rhyne was not able to specify specific class of CRC Cleaners Used . . . so not [sic] Exposure Calculated for CRC Cleaners"); 250 ("[d]id not include any benzene exposure for CRC Cleaner products because the specific class of cleaners could not be recalled by Mr. Rhyne."). Thus, Plaintiffs' medical causation experts did not (and indeed, could not) offer the opinion that any CRC product was a substantial contributing cause of Mr. Rhyne's AML. *See* exhs. F at 6, 11–12 (¶ 5), 13 (no opinion by Dr. Harrison that Mr. Rhyne was exposed to benzene from a CRC product); G at 13–14 (¶ 20), 17 (¶ 25) (no opinion by Dr. Gore that Mr. Rhyne had benzene exposure from a CRC product); H at 10–11 (no opinion by Mr. Infante that Mr. Rhyne was exposed to benzene from a CRC product).

Plaintiffs' roster of experts disclosed in the instant action, exh. I (Plaintiffs' Rule 26(a)(2) Disclosures), was identical to their roster of experts in the Philadelphia Action, with one notable exception: Plaintiffs replaced Mr. Petty with a new industrial hygienist, Robert Herrick, M.S., from whom they later served an expert report. *See* Exh. J (expert report; Robert Herrick, M.S.).[3]

---

[3] Plaintiffs re-served in this action the same reports from their medical causation experts that they served in the Philadelphia Action. Plaintiffs also served short supplemental reports from

3

At his deposition, Dr. Herrick testified that he reviewed Mr. Rhyne's deposition testimony, including Mr. Rhyne's admissions that he is unable to identify the CRC product with which he worked at Duke Energy. Exh. B at 24:4–14 ("from his deposition he [Mr. Rhyne] was able to identify the brand [CRC], but as—as you know of course, there's—there's lots of different formulations of CRC products, and he [Mr. Rhyne] didn't really have that level of recall as to, you know, what—what the product number or what the particular name was"); 47:7–15 (Mr. Rhyne "remembered CRC, but he wasn't able to identify a particular brand or product name"). Dr. Herrick also knew that Mr. Petty had not calculated that Mr. Rhyne was exposed to benzene from a CRC product. *Id*. at 29:18–22. Nevertheless, in his report, Dr. Herrick concluded that Mr. Rhyne had worked at Duke with a CRC product called "CRC 3-36," from which Dr. Herrick calculated that Mr. Rhyne had experienced a *de minimus* exposure to benzene. Exh. J at 30.[4]

When asked at his deposition about the basis for his belief that Mr. Rhyne used 3-36, Dr. Herrick conceded that it was based solely on a document titled "McGuire Nuclear Station Approved Chemical List," dated April 1, 1992 ("List"). Exh. C.

> Q. Doctor, did you see anything in the record in this matter that told you that Mr. Rhyne did, in fact, actually work with or around CRC 3-36?
>
> A. Other than what we just looked at in the deposition when he recalled using a CRC product, but he didn't recall the—the particular brand or—or product name.

---

Mr. Infante and Dr. Harrison. which did not change their opinions. *See* exhs. K (supplemental expert report; Peter Infante) at 1 and L (supplemental expert report; Robert Harrison, M.D.) at 2.

[4] Based on an incomplete exposure assessment that failed to account for Mr. Rhyne's benzene exposures from other products and his daily living over the 58 years of his life before his diagnosis with AML, Dr. Herrick calculated that Mr. Rhyne's exposure to benzene from CRC 3-36 was .25% to 2.5% of his total lifetime exposure to benzene. Exh. J at 43–44. Had Dr. Herrick included in his assessment Mr. Rhyne's benzene exposures from other sources, the amount of benzene to which Mr. Rhyne was exposed from (allegedly) working with CRC 3-36 would have been an even smaller fraction of the total volume of benzene to which he was exposed over his lifetime.

> Q. Right. And that's what I'm getting at. I—there was testimony—without question—in which Mr. Rhyne said he used a CRC product. But I'm focused on what product it was. So—so my question is did you see anything in the record in this matter that told you that Mr. Rhyne did, in fact, work with or around the CRC 3-36 product?
>
> A. Other than what was on the approved product list for McGuire, that was the only thing that really identified a particular CRC product.

Exh. B at 58:1–18. But when asked how the inclusion of CRC 3-36 on the List was evidence that Mr. Rhyne "actually used that [3-36] product," Dr. Herrick had no choice but to admit that it "doesn't really," *id.* at 26:5–13, and he could not rule out that Mr. Rhyne never worked with CRC 3-36, but with another CRC product, such as a CRC product that did not contain any amount of benzene.

> Q. Okay. How did that Approved Chemical List tell you that Mr. Rhyne used the CRC 3-36 product?
>
> A. Well, I think I found it. I'm looking—you know, I could look here again.
>
> Q. It's at [page] 305.
>
> A. Oh.
>
> Q. It's on there.
>
> A. Okay. So I went down—say again, I didn't have it in printed copy, but I, you know, looked through it on the computer, and found—let's see—"Cleaner, CRC 3-36, bulk CRC Chemicals." That's the trade name and manufacturer. So that's—that's how I found it.
>
> Q. How did this entry on this list on this page tell you that he [Mr. Rhyne] actually used that product?
>
> A. Oh, I see. Well, it's—**it doesn't really,** but aside from the fact that, you know, as I look through this, I'm pretty sure I remember that this was the only CRC product that was identified, you know,

5

> in this—in this list. So that's what I did to conclude that that's what he used.

*Id*. at 25:16–26:13 (emphasis added);

* * *

> Q. Can you rule out that Mr. Rhyne worked with a CRC product other than CRC 3-36?
>
> A. No, because there—there's only that one snapshot of the approved chemicals from 1992.
>
> Q. Can you rule out that if Mr. Rhyne worked with a CRC product, it was a CRC product that did not contain benzene or benzene-containing solvents?
>
> A. Oh, I see. Okay. No, it didn't really—you know, I didn't really see anything in the record that would shed any light on that.

*Id.* at 71:1–11 (emphasis added).

Dr. Herrick's concession that CRC 3-36's inclusion on the List "doesn't really" constitute evidence Mr. Rhyne worked with that product is a gross understatement. In fact, its inclusion on the List does not constitute evidence *at all* that Mr. Rhyne worked with that product.

For starters, as Dr. Herrick admits, there is no evidence the List is authentic. *Id*. at 60:10–61:12. But even if the List was prepared by Duke Energy and could be authenticated, there is also no evidence interpreting what it means. So, for example, there is no evidence that any of the more than 900 products identified on the List, including CRC 3-36, were physically present at McGuire on the date of the List, or, if some number of them were, which ones. And even if there was evidence that some of the products were physically present, and CRC 3-36 was one of them, there is no evidence that any of those products were physically present at McGuire before April 1, 1992 (the date of the List), or after that date. *Id*. at 61:25–63:19. Critically important to this discussion is the fact that Mr. Rhyne was not working at the McGuire facility on April 1, 1992. As Plaintiffs state in their Complaint, in 1992, Mr. Rhyne worked at Duke's Catawba facility in York, South

6

Carolina. Complaint ¶ 19d. Mr. Rhyne worked at Duke Energy's McGuire facility, in Huntersville, North Carolina, from 1976–1983 and from January 2015–May 2015. *Id*. *See also* exh. D (Plaintiffs' Answers and Objections to (former Defendant) Hunt Refining's Interrogatories) at 3–4. Of course, even if the inclusion of a product on the List was evidence the product was physically present at McGuire on the date of the List, it is not evidence the product was physically present on that same date in another Duke Energy facility, located in another state, such as the Catawba facility where Mr. Rhyne was working. As Dr. Herrick had to admit, the fact that the List does not identify approved chemicals for any other Duke Energy facility, much less products that were physically present in another facility, exh. B at 62:6–9, is another reason why there is no rationale for his reliance on the List to conclude that Mr. Rhyne worked with CRC 3-36:

> Q. But I'm just trying to understand your rationale in relying on this Approved Chemical List which shows—or purports to show that the product is approved for use at McGuire at a time when he's [Mr. Rhyne] not at McGuire. I'm trying to understand your rationale in taking this approved list to mean that he [Mr. Rhyne] worked with or around 3-36.
>
> MR. DuPONT: Form.
>
> A. When he was at Catawba?
>
> Q. Yeah.
>
> A. Right. No, I mean I follow your point. I guess I would just say that, you know, I wouldn't find it to be unreasonable that the same products were used across different facilities
>
> Q. Do you have any information that the same products were used across different facilities at Duke?
>
> A. Well, as he said, you know, in his deposition, that you know, he used CRC at a time when he was actually at Catawba, so that that's about the only information that's in the record that would shed any light on that.

7

> Q. Do you have any information from the record that the same products were used across different locations at Duke?
>
> A. You know, I don't remember that coming up. I—I wouldn't consider it to be unreasonable, but it isn't really explicit in the record.

*Id.* at 69:5–70:7.[5]

If the preceding discussion does not sufficiently illustrate the absence of any evidence that Mr. Rhyne worked with CRC 3-36, there is also Mr. Rhyne's testimony at deposition that the CRC product he worked with at Duke Energy had an orange label, exh. A at 96:4–8, when CRC's 3-36 product never had an orange label. *See* exh. M ¶ 3.

Given that the List is Plaintiffs' only "evidence" that Mr. Rhyne worked with CRC 3-36, and the List does not even so much as begin to suggest that Mr. Rhyne actually worked with that product, Plaintiffs have no evidence identifying the CRC product with which Mr. Rhyne claims he worked at Duke, much less that it was a product that contained any amount of benzene. Plaintiffs' failure to establish product identification in this regard is fatal to their claims against CRC.

---

[5] Dr. Herrick has himself admitted that a product's appearance on the List is not evidence that Mr. Rhyne worked with the product. For example, while "Pro Tap Magic Cutting Fluid Red," manufactured by defendant The Steco Corporation, appeared on the List, exh. C at 42, Dr. Herrick declined to offer an opinion that Mr. Rhyne was exposed to benzene from that product for the very reason now argued by CRC: a product's inclusion on the List is not "evidence" that Mr. Rhyne worked with the product. That is, just as the inclusion of a specific CRC product on the List is not evidence that Mr. Rhyne worked with that specific product, the inclusion of a specific Tap Magic product on the List is not "record evidence in the case [that] indicate[s] which specific Tap Magic product Mr. Rhyne used." Exh. B at 51:9–52:2.

# ARGUMENT

### A. Legal Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is "no genuine issue as to any material fact . . . because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322–23 (1986). To defeat a summary judgment motion, the nonmoving party must provide more than "merely colorable" evidence. Instead, it must show evidence that is "significantly probative" and supports her complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). To do so, the nonmoving party cannot simply rely on the mere allegations or denials of the adverse party's pleading, but instead must show specific facts to support the contention that there is a genuine issue for trial. *U.S. v. $95,945.18, U.S. Currency*, 913 F.2d 1106, 1111 (4th Cir. 1990) (citing *Boas v. Smith*, 786 F.2d 605, 609 (4th Cir. 1986)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."). Without evidence upon which a jury could reasonably find for the non-moving party, summary judgment should be granted. *Anderson*, 477 U.S. at 252.

### B. CRC is Entitled to Summary Judgment Because There is No Evidence that Mr. Rhyne Worked with CRC 3-36 or Any Other CRC Product that Contained any Amount of Benzene

Under the North Carolina Products Liability Act, a plaintiff bringing a product liability action must establish that the subject product caused his alleged injury. N.C. Gen. Stat. § 99B-1(3).[6] Naturally, if a plaintiff suing for injury caused by a defendant's product cannot show that

---

[6] The statue defines "product liability action" as including "any action brought for or on account of personal injury . . . caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing,

he was exposed to that product, his claims against that defendant must be dismissed. *See, e.g.*, *Starnes v. A.O. Smith Corp.*, No. 1:12–CV–360, 2014 WL 4744782, at *2–3 (W.D.N.C. Sept. 23, 2014) (granting summary judgment to defendants where plaintiff failed to present evidence he was exposed to defendants' products); *Mullis v. Armstrong Int'l, Inc.*, No. 2:12-60155, 2013 WL 5548838, at *1 n.1 (E.D. Pa. Aug. 20, 2013) (under North Carolina law, granting summary judgment to defendant in the absence of evidence decedent was exposed to dust from defendant's products as opposed to from another manufacturer's or supplier's products); *Elledge v. Pepsi Cola Bottling Co. of Winston-Salem*, 113 S.E.2d 435, 436 (N.C. 1960) (affirming dismissal when plaintiff did not show defendant manufactured product at issue); *see also Griffin v. Tenneco Resins, Inc.*, 648 F. Supp. 964, 966–67 (W.D.N.C. 1986) (summarizing cases applying North Carolina law and holding that North Carolina courts do not apply "market share liability" theory or other "exotic" theories in product liability cases).

Plaintiffs claim Mr. Rhyne contracted AML from his exposure to benzene contained in defendants' products with which he allegedly worked, including while at Duke Energy. Insofar as their claims concern CRC, Plaintiffs allege Mr. Rhyne was exposed to benzene from working with CRC 3-36. While CRC does not contest in this motion that Mr. Rhyne worked with a CRC product, there is *no* evidence that CRC product was CRC 3-36 (or any other CRC product that contained any amount of benzene). As discussed, Mr. Rhyne admitted he could not identify the CRC product with which he worked (and, in fact, he only identified a product that indisputably had a different label). And Plaintiffs' first named expert industrial hygienist conceded that in the absence of evidence identifying the CRC product, which he could not find, he could not say that

---

certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling of any product." *Id.*

Mr. Rhyne was exposed to benzene from a CRC product. While Plaintiffs found a new industrial hygienist (Dr. Herrick) who concluded that Mr. Rhyne worked with CRC 3-36, there is nothing supporting his conclusion.

As discussed, Dr. Herrick's conclusion is based solely on the List. But even if the List is authentic, Dr. Herrick admits that a product's appearance on the List is not evidence that Mr. Rhyne worked with the product. Exh. B at 51:16–52:2.

In fact, Plaintiffs have not presented any evidence indicating what the inclusion of a product on the List means, if anything. Thus, for example, Dr. Herrick does not know whether any of the more than 900 chemicals on the List were physically present in the Duke Energy facility to which the List purportedly pertains (McGuire) as of the date of the List (April 1, 1992). But even if a product's inclusion on the List means the product was physically present in the McGuire facility on April 1, 1992, Mr. Rhyne was not working at McGuire on April 1, 1992. Mr. Rhyne left McGuire nine years earlier, in 1983, and he did not return to work there until 2015. Complaint ¶ 19d. On April 1, 1992, Mr. Rhyne worked in a different Duke Energy facility (Catawba), in a different state (South Carolina). *Id.*

Given that the List does not even *begin* to suggest that Mr. Rhyne worked with CRC 3-36, when pressed even gently about his reliance on it, Dr. Herrick admitted (i) the List "doesn't really" establish that Mr. Rhyne worked with CRC 3-36 at Duke Energy, exh. B at 25:16–26:13; and (ii) he cannot rule out that Mr. Rhyne worked with a different CRC product that did not contain any amount of benzene. *Id.* at 71:5–11.

The absence of evidence from which a jury can conclude that Mr. Rhyne worked with CRC 3-36, the CRC product from which they claim Mr. Rhyne was exposed to benzene, or any other CRC product that contained any amount of benzene, is fatal to Plaintiffs' claims against CRC.

## CONCLUSION

For the foregoing reasons, CRC's motion should be granted and Plaintiffs' claims against CRC should be dismissed on summary judgment.

 /s/ Timothy Peck
Timothy Peck (N.C. Bar No. 9991)
Attorney for Defendant CRC Industries, Inc.
Fox Rothschild LLP
300 N. Greene St., Suite 1400
Greensboro, NC 27401
Telephone: (336) 378-5200
Fax: (336) 378-5400
E-mail: tpeck@foxrothschild.com

Andrew P. Fishkin (admitted *pro hac vice*)
Attorney for Defendant CRC Industries, Inc.
Fishkin Lucks LLP
One Riverfront Plaza
Suite 410
Newark, NJ 07102
Telephone: (973) 536-2800
Fax: (973)-679-4435
E-mail: afishkin@fishkinlucks.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 29, 2019, I electronically filed the foregoing "Defendant CRC Industries, Inc.'s Memorandum of Law in Support of Summary Judgment" with the exhibits thereto with the clerk of the United States District Court for the Western District of North Carolina using the CM/ECF system which will send notification of this filing and an electronic copy of same to all counsel of record registered with the CM/ECF system, and I hereby certify that I have electronically served the documents upon all counsel in this action registered with the CM/ECF system.

This is the 29th day of November, 2019.

/s/ Timothy Peck
Timothy Peck (N.C. Bar No. 9991)
Attorney for Defendant CRC Industries, Inc.
Fox Rothschild LLP
300 N. Greene St., Suite 1400
Greensboro, NC 27401
Telephone: (336) 378-5200
Fax: (336) 378-5400
E-mail: tpeck@foxrothschild.com