# EXHIBIT B

 1                                  VOLUME:    I

                                    PAGES:    1-379

 2                                  EXHIBITS:  1-12

             IN THE UNITED STATES DISTRICT COURT

 3       FOR THE WESTERN DISTRICT OF NORTH CAROLINA

                    CHARLOTTE DIVISION

 4          Case No. 3:18-cv-00197-RJC-DSC

 5    _____

 6    BRUCE RHYNE and JANICE RHYNE,         )

 7                  Plaintiffs,             )

 8             vs.                          )

 9    UNITED STATES STEEL CORPORATION,     )

10    et al.,                              )

11                  Defendants.            )

12    _____)

13                  DEPOSITION OF ROBERT F. HERRICK,

14    Sc.D., CIH, FAIHA, called as a witness by and on

15    behalf of the Defendants, Chevron U.S.A., Inc., CRC

16    Industries, Inc., and Univar Solutions USA Inc.,

17    f/k/a Univar USA Inc., pursuant to the applicable

18    provisions of the Federal Rules of Civil Procedure,

19    before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR

20    #13192, NH-LSR #91, MA-CSR #123193, and Notary

21    Public, within and for the Commonwealth of

22    Massachusetts, at Veritext Legal Solutions, 101

23    Arch Street, Suite 650, Boston, Massachusetts, on

24    Wednesday, November 6, 2019, commencing at 9:09

25    a.m.

1          looked for, was to see if I could identify a

2          particular CRC material that he used, and, in fact,

3          there was one included in the list.

4               Q.    When you say you tried to identify a --

5          you know, a product that he used, I'm not sure I'm

6          following you.

7                    What do you mean by that?

8               A.    Well, you know, from his deposition he was

9          able to identify the brand, but as -- as you know,

10         of course, there's -- there's lots of different

11         formulations of CRC products, and he didn't really

12         have that level of recall as to, you know, what --

13         what the product number or what the particular name

14         was.

15                   So that's what I was trying to drill down

16         to -- to find.

17              Q.    And did this tell you what product he

18         used?

19              A.    Yeah.

20              Q.    "This" being the Approved Chemical List.

21              A.    Yeah, that's one segment --

22              Q.    Let me just -- I've marked this as Exhibit

23         2.  I'm sorry about that.

24                   Is this the Approved Chemical List that

25         we're talking about?

```
 1          A.    Let's see.

 2                MR. FISHKIN:  Do you want a copy of it?

 3                MR. DuPONT:  Let's see.  Thanks.

 4                Do we have a binder clip for his report or

 5     something just so it doesn't go flying --

 6                THE WITNESS:  I've got this.

 7          A.    Yeah, this -- I mean, I never printed it

 8     off.  You know, I have it electronically, but this

 9     looks familiar.

10                (Exhibit Herrick 2, Approved

11                Chemical List, PLF005295-339.)

12          Q.    So that is the Approved Chemical List to

13     which you are referring in your footnotes 241 and

14     245?

15          A.    I believe it is, yeah.  Yeah.

16          Q.    Okay.  How did that Approved Chemical List

17     tell you that Mr. Rhyne used the CRC 3-36 product?

18          A.    Well, I think I found it.  I'm looking --

19     you know, I could look here again.

20          Q.    It's at 305.

21          A.    Oh.

22          Q.    It's on there.

23          A.    Okay.  So I went down -- say again, I

24     didn't have it in printed copy, but I, you know,

25     looked through it on the computer, and found --
```

```
 1        let's see -- "Cleaner, CRC 3-36, bulk CRC
 2        Chemicals."  That's the trade name and
 3        manufacturer.
 4                So that's -- that's how I found it.
 5        Q.   How did this entry on this list on this
 6        page tell you that he actually used that product?
 7        A.   Oh, I see.
 8                Well, it's -- it doesn't really.  But
 9        aside from the fact that, you know, as I look
10        through this, I'm pretty sure I remember that this
11        was the only CRC product that was identified, you
12        know, in this -- in this list.  So that's what I
13        did to conclude that that's what he used.
14        Q.   Sir, what is your rate of compensation in
15        this matter?
16        A.    I -- I think the company -- I think the
17        billing out is at 450 an hour.
18        Q.   All right.  Are you billing out through
19        EH&E?
20        A.   I am, yeah.
21        Q.   Okay.  And what is your professional
22        relationship with EH&E?
23        A.   Well, I'm -- I'm a part-time employee.
24        I'm a senior scientist --
25        Q.   Okay.
```

1       prior to starting your report?

2            A.   That's a good question.

3                 You know, I easily could have spent maybe

4       30 or 40 hours, because, you know, I had some of

5       the documents.  I had Petty's report as a starting

6       point.  So, you know, I looked at that before I

7       started writing my own report.

8                 So, you know, that's probably a fair, you

9       know, number -- in that range.

10           Q.   What did you use Petty's report for?

11           A.   Well, it was really [, of a -- of a

12      background document.  And, you know, I took a look

13      at the way he had organized the information and the

14      way he had described Rhyne's work history and --

15      and the way he had calculated his exposures.

16                So, you know, that was -- those were the

17      main things I looked for.

18           Q.   Did you notice that Doctor Petty or Mr.

19      Petty did not calculate an exposure with a CRC

20      product?

21           A.   I think that does -- that does sound

22      familiar, yeah.

23           Q.   Okay.  Do you recall why he didn't?

24           A.   No, I really don't.  Truthfully, I -- I

25      had a little trouble following his report just in

Veritext Legal Solutions

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 136-2  Filed 11/29/19  Page 6 of 18

1    Q.   And then he testifies to that again.  The

2    questioner asked him the same question again.

3    A.   Question was "What was the name of the CRC

4    product?"  And his answer was "CRC is the only one

5    I --" and then the question:  "Anything beyond

6    that?"  And he said, "No, sir."

7    Q.   Okay.  So does that refresh your

8    recollection that he testified that he could not

9    identify the CRC product that he used?

10        MR. DuPONT:  Objection.  Form.

11   A.   I -- this is, yeah.  I think this is

12   pretty, you know, that -- that was the best

13   recollection he had.  He remembered CRC, but he

14   wasn't able to identify a particular brand or

15   product name.

16   Q.   All right.  I'll take that back.  Thank

17   you.

18        Do you recall anything in the record in

19   this matter that -- withdraw that.

20        Did you see any information that Mr. Rhyne

21   ever worked with or around a Berryman product?

22   A.   I -- I don't remember that coming up at

23   all.  I don't recall that he mentioned that he had

24   ever used Berryman, no.

25   Q.   Did you see any information in the record

1        Q.   And that is a product that you did not

2     perform an exposure assessment for; is that

3     correct?

4             MR. DuPONT:  Form.

5        A.   That's correct.

6        Q.   If you go to page 30 of your report.

7             Do you see that there's -- oh, I'm sorry.

8        A.   Got it.

9        Q.   You see that there's a paragraph entitled

10    "Rapid Tap -- Tap Magic"?

11       A.   Yes.

12       Q.   Okay.  And in the first sentence of that

13    paragraph you refer to the "Approved Chemical

14    List"; is that right?

15       A.   Right.

16       Q.   And you refer to the fact that the Pro Tap

17    Magic Cutting Fluid Red is contained on that

18    Approved Chemical List; is that right?

19       A.   It is, yeah.

20       Q.   Now, as I understand it, in the rest of

21    the paragraph you are communicating that you did

22    not estimate his benzene exposure from that source,

23    because the record evidence in the case didn't

24    indicate which specific Tap Magic product Mr. Rhyne

25    used.

1              Do I have that right?

2         A.    You do, yeah.

3         Q.    There's a discussion about Spotcheck in

4    the next paragraph there.

5              Do you see that?

6         A.    I do.

7         Q.    Spotcheck is another product that was on

8    the Approved Chemical List; is that right?

9         A.    Right.

10        Q.    But you also did not estimate his exposure

11   to benzene from that product; is that right?

12             MR. DuPONT:   Form.

13        A.    That's correct, yeah.

14        Q.    And you didn't assess his exposure to

15   benzene from that product, because in your view the

16   record in the case did not indicate the composition

17   of the product as used by Mr. Rhyne.

18        A.    That's true, yeah.

19        Q.    Did you do anything to search for MSDSs

20   for Spotcheck?

21        A.    I'm trying to remember if I did.  I think

22   I probably did.

23             The one thing, you know, I found in -- in

24   searching the internet is that, you know,

25   occasional -- you know, sometimes you can get a

1      Q.   Doctor, did you see anything in the record

2   in this matter that told you that Mr. Rhyne did, in

3   fact, actually work with or around CRC 3-36?

4      A.   Other than what we just looked at in the

5   deposition when he recalled using a CRC product,

6   but he didn't recall the -- the particular brand or

7   -- or product name.

8      Q.   Right.  And that's what I'm getting at.  I

9   -- there was testimony -- without question -- in

10  which Mr. Rhyne said he used a CRC product, but I'm

11  focused on what product it was.

12          So -- so my question is did you see

13  anything in the record in this matter that told you

14  that Mr. Rhyne did, in fact, work with or around

15  the CRC 3-36 product?

16     A.   Other than what was on the approved

17  product list for McGuire, that was the only thing

18  that really identified a particular CRC product.

19     Q.   Did anyone ask you to run an exposure

20  assessment for the CRC 3-36 product?

21     A.   Specifically --

22     Q.   Yes.

23     A.   -- beyond -- no, not beyond, you know, the

24  general request that I do the exposure assessment

25  for -- for Rhyne.  There was no particular, you

Page 60

1      Q.   Do you know anything about the chemical

2    list, other than what's contained in the chemical

3    list?

4      A.   I'm trying to remember if anybody asked

5    him about it.  I don't remember there being any

6    discussion about the list from the depositions.  So

7    beyond what's, you know, evident from looking at

8    the list, I really don't have any information

9    beyond that.

10      Q.   Do you know if the list is authentic?

11      A.   I don't have any reason to -- to doubt

12    that it is.  It sure looks authentic to me.

13      Q.   But do you know, one way or another --

14      A.   I don't, no.

15      Q.   -- whether it is.

16           Do you know whether it's a document that

17    was actually prepared by Duke Energy?

18      A.   I guess I don't have it in front of me, do

19    I?

20      Q.   Yeah, you should have in that stack.  We

21    marked it as 2.

22      A.   Oh, sorry.  Here it is.

23      Q.   Is that 2, did we mark it as?

24      A.   Yeah, it's 2.

25           MR. DuPONT:  It is.

Veritext Legal Solutions

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Case 3:18-cv-00197-RJC-DSC  Document 138-2  Filed 11/29/19  Page 11 of 18

```
 1        A.   Well, you know, the header on each page

 2    does say:  "McGuire Nuclear Station Approved

 3    Chemical List," page number and a date.  So, you

 4    know, I -- I would infer that, you know, that --

 5    that leads me to believe that it is authentic.

 6        Q.   Well, do you know if it was actually a

 7    document that was prepared by Duke Energy?

 8        A.   Well, no one -- there's no -- in the

 9    version that I saw there was no, you know, cover

10    letter or transmittal, or, you know, sign-off of

11    any kind.  So I don't have any information beyond

12    what's here.

13        Q.   If it was prepared by Duke Energy, do you

14    have any information concerning the circumstances

15    surrounding its preparation?

16        A.   I don't remember that anybody -- you know,

17    that it really came up in any of the depositions as

18    to, you know, kind of, the circumstances or -- or

19    how it was prepared or why.

20        Q.   Do you know when it was prepared?

21        A.   Well, it is dated April 1st, 1992.

22        Q.   Understand.

23             Do you know when it was prepared?

24        A.   I don't, no.

25        Q.   Now, do you understand that this applies
```

1    to chemicals approved for use at McGuire at a

2    particular time on April 1, 1992?

3              MR. DuPONT:  Form.

4         A.   I think that would be a reasonable

5    conclusion to reach, yeah.

6         Q.   So this list doesn't tell you what the

7    approved chemicals were for any other Duke Energy

8    location; is that correct?

9         A.   No, it doesn't.

10        Q.   And it doesn't say that any of the

11   chemicals approved for McGuire -- withdraw that.

12             It doesn't say that any of these chemicals

13   listed as approved for McGuire were approved for

14   use at McGuire before April 1, '92 is that correct?

15        A.   No, it looks like it's a -- you know, it

16   reflects a point in time, but, you know, you'd have

17   to speculate beyond that.

18        Q.   Do you know for how long after April 1,

19   1992, these products were approved for use at

20   McGuire?

21        A.   No, I don't.

22        Q.   So you can't say they were still approved

23   for use at McGuire in May of 1992; for example?

24        A.   No, I can't.

25        Q.   Now, this list is -- I would represent to

1      you is 46 pages long, and it contains -- from my

2      quick review -- about 20 different chemicals on

3      each page, which gets us to about 900 chemicals.

4           Do you see that?

5      A.   I think that looks like a reasonable

6      estimate, yeah.

7      Q.   Do you know how many of these 900-or-so

8      chemicals were actually at McGuire on April 1,

9      1992?

10     A.   I don't.

11     Q.   Can you identify the ones that were

12     actually at McGuire on April 1, 1992?

13     A.   No, I can't.

14          MR. DuPONT:  Form.  Compound.

15     Q.   Can you identify the chemicals on this

16     list that were not actually at McGuire on April 1,

17     1992?

18     A.   There's -- there's really no -- I don't

19     have any information that would let me do that.

20     Q.   Do you know whether there were products at

21     McGuire at this time that were not on the approved

22     -- on this Approved Chemical List?

23     A.   I -- I don't know that.

24     Q.   Now, on the top right of this document

25     there's a reference to "Storage Color, Label, and

Case 3:18-cv-00197-RJC-DSC   Document 138-2   Filed 11/29/19   Page 14 of 18

1    sprayer.

2              That's, you know, the extent of the

3    information that I have.

4         Q.    Yeah.   No, I understand that.

5              But I'm just trying to understand your

6    rationale in relying on this Approved Chemical List

7    which shows -- or purports to show that the product

8    is approved for use at McGuire at a time when he's

9    not at McGuire.   I'm trying to understand your

10   rationale in taking this approved list to mean that

11   he worked with or around 3-36.

12             MR. DuPONT:   Form.

13        A.    When he was at Catawba?

14        Q.    Yeah.

15        A.    Right.   No, I mean, I follow your point.

16   I guess I would just say that, you know, I wouldn't

17   find it to be unreasonable that the same products

18   were used across different facilities.

19        Q.    Do you have any information that the same

20   products were used across different facilities at

21   Duke?

22        A.    Well, as he said, you know, in his

23   deposition, that, you know, he used CRC at a time

24   when he was actually at Catawba, so that that's

25   about the only information that's in the record

 1    that would shed any light on that.

 2         Q.   Do you have any information from the

 3    record that the same products were used across

 4    different locations at Duke?

 5         A.   You know, I don't remember that coming up.

 6    I -- I wouldn't consider it to be unreasonable, but

 7    it isn't really explicit in the record.

 8         Q.   Is it implicit in the record?

 9         A.   Well, you know, knowing a little bit

10    about, kind of, you know, how big companies like

11    Duke operated, I would say it's not unreasonable to

12    think that the same products were used across

13    facilities.

14         Q.   How do you know how Duke operated?

15         A.   Well, I -- I know a bit about how major

16    corporations tend to function and how they tend to

17    procure supplies and how they're -- especially when

18    they're, you know, operating similar facilities.

19    So I guess I would just say I wouldn't be surprised

20    if the same products weren't used throughout the

21    corporation.

22         Q.   Okay.  But you have no knowledge that they

23    were, in fact, at Duke Energy; is that correct?

24         A.   I don't have anything explicit.  You know,

25    it didn't really come up in anything in the record.

1      Q.   Can you rule out that Mr. Rhyne worked

2   with a CRC product other than CRC 3-36?

3      A.   No, because there -- there's only that one

4   snapshot of the approved chemicals from 1992.

5      Q.   Can you rule out that, if Mr. Rhyne worked

6   with a CRC product, it was a CRC product that did

7   not contain benzene or benzene-containing solvents?

8      A.   Oh, I see.  Okay.

9           No, it didn't really -- you know, I didn't

10   really see anything in the record that would shed

11   any light on that.

12      Q.   You understand from reviewing Mr. Rhyne's

13   testimony that he claims to have used the CRC

14   product to clean parts such as nuts, bolts,

15   washers, end bell flanges, tools, and heat exchange

16   components?

17           And, in fairness, I'm reading from 12 and

18   13 of your report.

19      A.   (Witness reviews document.)  Right.  I

20   remember that.  And that really is pretty much

21   straight from his deposition.

22           So yes.

23      Q.   All right.  Do you see any information in

24   the record that employees at Duke cleaned equipment

25   with lubricants or corrosion inhibitors?

```
 1      Commonwealth of Massachusetts
 2      Middlesex, ss.
 3

 4
                I, P. Jodi Ohnemus, Notary Public
 5      in and for the Commonwealth of Massachusetts,
        do hereby certify that there came before me
 6      on the 6th day of November, 2019, the deponent
        herein, who was duly sworn by me; that the ensuing
 7      examination upon oath of the said deponent was
        reported stenographically by me and transcribed
 8      into typewriting under my direction and control;
        and that the within transcript is a true record of
 9      the questions asked and answers given at said
        deposition.
10
11              I FURTHER CERTIFY that I am neither
        attorney nor counsel for, nor related to or
12      employed by any of the parties to the action
        in which this deposition is taken; and, further,
13      that I am not a relative or employee of any
        attorney or financially interested in the outcome
14      of the action.
15
                IN WITNESS WHEREOF I have hereunto set my
16      hand and affixed my seal of office this
        10th day of November, 2019, at Waltham.
17

18              [signature: Patricia Jodi Ohnemus]

19
20              P. Jodi Ohnemus, RPR, RMR, CRR
                CSR, Notary Public,
21              Commonwealth
                of Massachusetts
22              My Commission Expires:
                3/14/2021
23
24
25
```