IN THE UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:18-CV-00197

BRUCE RHYNE AND JANICE RHYNE,

    Plaintiffs,

v.

UNITED STATES STEEL CORPORATION SUNOCO, INC. (R&M) F/K/A SUN COMPANY, INC. AND F/K/A SUN OIL SUN OIL COMPANY, INC., EXXONMOBIL CORPORATION, CHEVRON U.S.A., INC. AS SUCCESSOR IN INTEREST TO GULF OIL COMPANY, SAFETY-KLEEN SYSTEMS, INC., CRC INDUSTRIES, INC., UNIVAR USA, INC. F/K/A CHEMCENTRAL CORP. AND VAN WATERS & RODGERS, INC., KANO LABORATORIES, INC., THE STECO CORPORATION, ACUITY SPECIALTY PRODUCTS, INC. F/K/A ACUITY SPECIALTY PRODUCTS GROUP, INC., THE SAVOGRAN COMPANY TURTLE WAX, INC, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO MARVEL OIL COMPANY, INC.,

    Defendants.

**DEFENDANT KANO LABORATORIES, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Kano Laboratories, Inc. ("Kano") moved for summary judgment on three simple bases. First, there was insufficient evidence that Plaintiff, Bruce Rhyne ("Rhyne"), even

used its product, Kroil Oil ("Kroil").  Second, even if Rhyne used Kroil, Kroil does not contain benzene.  And, third, even if Rhyne used Kroil, and Kroil contains benzene, the amount of benzene to which Rhyne was exposed, as calculated by Plaintiff's own expert, was insufficient to have proximately caused Rhyne's acute myeloid leukemia ("AML").  Plaintiffs' brief in opposition to Kano's motion for summary judgment utterly failed to directly address, let alone refute, the arguments raised by Kano.  Rather, Plaintiffs resort to misrepresenting evidence, including the testimony and opinions of their own experts, in an attempt to avoid summary judgment.

## ARGUMENT

### A. Summary Judgment is appropriate in this case.

Plaintiffs seem to believe that if they simply state that Rhyne used Kroil or that Kroil has benzene, they have created an issue of material fact that preclude summary judgment.  However, that is not the Rule 56 standard.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986).  A genuine fact includes "evidence . . . that a reasonable jury could return a verdict for the nonmoving party." *Id.*  Further, summary judgment is proper, unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S. Ct. at 2511 (citations omitted).

2

In *First National Bank of Arizona v. Cities Service Co.*, the Supreme Court affirmed the granting of summary judgment where no genuine factual dispute existed. *See* 391 U.S. 253, 88 S. Ct. 1575 (1968). The Court interpreted Rule 56(e) to require that a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 288, 88 S. Ct. at 1592; *see also Holloway v. Wachovia Bank & Trust Co., N.A.,* 339 N.C. 338, 351, 452 S.E.2d 233, 240 (1994). The Supreme Court went on to hold that a plaintiff must submit "significant probative evidence tending to support the complaint" in order to dispute a properly supported motion for summary judgment. *First National Bank of Arizona,* 391 U.S. at 290, 8 S. Ct. at 1593.

In the present action, in order to survive Kano's properly supported motion for summary judgment, Plaintiffs were required to present significantly probative evidence, rather than relying on "merely colorable" evidence or "mere allegations . . . of [their] pleading." Plaintiffs have failed, yet again, to present any significantly probative evidence, and as such, failed to create a genuine issue of material fact. Summary judgment in favor of Kano is appropriate.

### B. Plaintiffs failed to forecast sufficient evidence showing that Rhyne used Kroil.

Plaintiffs argue that Rhyne did use Kroil, however, Plaintiffs cite no further evidence regarding Rhyne's alleged use of Kroil to refute Defendant's uncontroverted evidence. When asked during his deposition to identify the product he used periodically

from the early 1990s to 1998 to break apart ice condenser vibrators, Rhyne testified that the product he used was "a clear thicker type of consistency" liquid in a "brownish looking" glass bottle with plain white labels and black writing. (Doc. 132-1 at 678:20–680:6). However, the uncontroverted evidence establishes that Kroil was never sold in a "brownish looking" bottle and is not a "clear, thicker type of consistency" liquid. Rather, Kroil was sold in a very distinct and vibrant orange container and is a reddish liquid. (Doc. 132-2 at ¶¶ 4-5; Doc. 132-3 at p. 4). As such, Plaintiffs are not able to forecast evidence that whatever product Rhyne used was Kroil or that it was produced by Kano.

Rather than explain this contradiction, Plaintiffs resorted to misrepresenting the dates Rhyne allegedly used Kroil. Specifically, Plaintiffs alleged Rhyne used Kroil at the Catawba Plant from 1983 to 1985. (Doc. 148 at p. 3). However, this is based upon Rhyne's affidavit that was later recanted and clarified during his deposition. Rhyne was asked if he can recall the specific years he used Kroil at the Catawba Plant, to which he responded, "[e]arly nineties. Nineties till '98 time frame." (Doc. 132-1 at 675:5–675:9).

Moreover, even if Rhyne had used Kroil during the 1980s, testing from the 1980s shows that Kroil did not have any detectable levels of benzene. *See* Test America Kroil Test Results ("Test Results"), attached hereto as Exhibit "A."

Ultimately, Plaintiffs are left with their allegation that "[i]n Plaintiffs' Complaint, they specifically identify [Kano's] benzene-containing product." (Doc. 148 at p. 11). However, as noted above, relying on the mere allegations of a pleading is not enough to present a genuine issue of material fact. *See First National Bank of Arizona*, 391 U.S. 253, 88 S. Ct. 1575; *see also Holloway,* 339 N.C. 338, 452 S.E.2d 233. Simply stating

4

that the complaint identifies Kroil and alleges that it was a benzene-containing product does not create a genuine issue of material fact. Such a conclusory statement does nothing to establish that Kroil contained benzene or that Rhyne used the product.

Put simply, Plaintiffs have failed to present sufficient evidence that the product Rhyne used was Kroil or that it was produced by Kano. Rather, Plaintiffs only present their allegations made in the Complaint, which is not sufficient to create a genuine issue of fact under the summary judgment standard. *See First National Bank of Arizona*, 391 U.S. 253, 88 S. Ct. 1575; *see also Holloway,* 339 N.C. 338, 452 S.E.2d 233. As such, summary judgment is proper.

### C. Plaintiffs have failed to forecast any evidence that Kroil contained benzene.

In Plaintiffs' brief, Plaintiffs' repeatedly state that Kroil contained benzene. However, the arguments of Plaintiffs not only contradict the uncontroverted evidence in this matter, they misrepresent and misstate the testimony, findings, and conclusions of Plaintiffs' own expert witnesses. Plaintiffs can point to no forecast of competent evidence to support the allegation that Kroil, even if used by Rhyne, contained any detectible levels of benzene.

Kano's forecast of evidence remains uncontroverted. Kano has produced a purchase order specifying that the component chemicals being purchased to manufacture Kroil were free of any benzene. (Doc. 132-4). The CEO of Kano, Rhoads Zimmerman, has offered uncontroverted testimony confirming that the component chemicals purchased in the 1990's to manufacture Kroil were also free of any benzene. (Doc. 132-2

5
Case 3:18-cv-00197-RJC-DSC   Document 154   Filed 12/18/19   Page 5 of 14

at ¶ 7). Most importantly, samples of Kroil that existed at the time Rhyne was alleged to have worked with Kroil have been tested, and those tests revealed no detectable levels of benzene. (Doc. 132-5 and 132-2 at ¶ 8).

Plaintiffs attempt to dispute this uncontroverted evidence by arguing that Kano's contention "contradicts the benzene content that Plaintiffs' experts found within the Kroil Oil product due to its benzene containing components." (Doc. 148 at p.14). Whether intentionally or unintentionally, this statement is highly misleading. Plaintiffs suggest that Kroil has been tested and analyzed by Plaintiffs' experts, and the results of that testing revealed that the product contained benzene. No statement could be further from the truth. The only testing of Kroil from the time Rhyne allegedly used Kroil shows no detectible level of benzene. (Doc. 132-5).

In fact, the expert that "found" benzene in Kroil, Dr. Robert Herrick, testified that he was unfamiliar with the Kano product in any capacity until being retained to serve as an expert in this case and reading the deposition of Rhyne. *See* Deposition of Robert Herrick ("Herrick Dep.") at 276:8-276:11, attached hereto as Exhibit "B." Further, Dr. Herrick admitted that he had never analyzed, studied, or tested Kroil. *See* Herrick Dep. at 276:12-276:16.

Rather, Dr. Herrick assumed Kroil contained benzene based upon his analysis of material safety data sheets ("MSDS") from 2005. *See* Herrick Dep. at 279:13-279:24. It is important to note that if Rhyne used Kroil, he did so between 1990 and 1998. Dr. Herrick acknowledges that he did not review MSDS from that timeframe. *See* Herrick Dep. at 308:1-308:9. He acknowledged that the content of the MSDS can vary between

6

companies and in many other respects. However, the MSDS generally have information about the composition of a product, its ingredients, fire safety ratings, hazard information from poison control centers, and general information about acute and chronic toxicity. *See* Herrick Dep. at 308:10-309:17. Dr. Herrick agrees that the MSDS contain a general description of the contents of product rather than a specific listing of ingredients and their components. *See* Herrick Dep. at 311:12-311:17.

From his review of the MSDS, Dr. Herrick identified three potential petroleum based materials that may have been contained in the ingredients listed on Kroil's MSDS. Dr. Herrick describes these groups of materials as hydrotreated petroleum distillates, light petroleum distillates, and petroleum naphtha. *See* Herrick Dep. at 310:11-311:11. Dr. Herrick agrees that these individual ingredients are actually "complex mixtures derived from the cracking and refining of crude oil." *See* Herrick Dep. at 311:18-312:3. Further, these ingredients are not pure chemical substances. *See* Herrick Dep. at 312:4-312:6. Rather, Dr. Herrick refers to these substances as a family of compounds. *See* Herrick Dep. at 313:12-313:21. Thus, these ingredients could have a wide variety, and be very different, in terms of their chemical composition. *See* Herrick Dep. at 312:21-313:11.

In performing his analysis, Dr. Herrick does not have specific information as to the benzene in these particular substances based upon the use of these general descriptors in the MSDS sheet. *See* Herrick Dep. at 313:5-314:23. As a result, Dr. Herrick testified that in attempting to analyze potential benzene content, he reported "ranges" of values. *See* Herrick Dep. at 313:22-314:14. He assigned a high end value of benzene content and a low end value of benzene content to these particular ingredients. From there, he

7

assumed the midpoint of that range and utilized this "midpoint" and **_assumed_** that it represented a fair value for the level of benzene content of Kroil based upon its potential component parts. *See* Herrick Dep. at 314:24-316:20.

The problem with this analysis is that Dr. Herrick had no specific information about the specific ingredients of Kroil and what component chemicals from these "families" or "groups" of chemical mixtures. He acknowledges that his assignment of benzene content or a range of benzene content to these component parts is nothing more than an assumption. Dr. Herrick was specifically questioned as follows:

> Q. Okay. And that midpoint, I mean, that – you calculate the midpoint, but, again, that's still an assumption; correct?
>
> A. Yeah well.
>
> Mr. DuPont: Form.
>
> A. Just trying to, you know, put a bracket around it and say, Okay, well this is the – these are the extreme values. What's in the middle?
>
> Q. Right. But the actual -- you know, the actual data may be somewhere far to one end of the spectrum or far to the other end; correct?
>
> Mr. DuPont: Form.
>
> A. Well, yeah, and that's – you know, that's why I'm trying to be, you know, circumspect about you know, kind of, the uncertainty by reporting the – the range the way I did.
>
> Q. Right. I understand. And, again, not to oversimplify it, but if the range is 1 to 100, 50 is the midpoint, but the actual number may be 12, right? Or 92 –
>
> A. It could.
>
> Q. -- right? Okay.

| | A. | Yeah. |
|---|---|---|
| | Q. | And without specific testing all we can do is make the approximation and use the range. |
| | A. | That's kind of the approach I took, yeah. |

*See* Herrick Dep. at 315:20-316:20.

In his deposition testimony, Dr. Herrick acknowledges that he simply assumed a range of values for potential benzene content based upon one (which he selected) of numerous academic studies, and assumed that the benzene content for Kroil was at the midpoint of that range of figures. *See* Herrick Dep. at 314:24-315:5. Dr. Herrick specifically acknowledges that he did not perform or rely on testing showing actual benzene levels in Kroil. *See* Herrick Dep. at 276:12-276:16. Rather, he made assumptions about the potential benzene content of Kroil based upon a generalized description of some of the chemical compounds it may have contained rather than an analysis of the product itself.

When compared to Kano's forecast of evidence, which includes uncontroverted testing showing that no detectible levels of benzene were found in actual samples of Kroil retained from the relevant time period of 1990 through 1998 and purchase information, which expressly prohibited the presence of benzene, there is no genuine issue of material fact. Plaintiff has produced nothing more than speculative evidence and conjecture from Dr. Herrick suggesting that he guessed at a range of values of benzene content based on a "complex mixture" of a "family" of compounds and then arbitrarily assigned values for the potential content of this product about which he knew nothing at all. Plaintiffs make

no other forecast of evidence to suggest or establish that Kroil, if used by Rhyne, contained benzene.

**D. Plaintiffs fail to forecast evidence that exposure to benzene as a result of the use of Kroil was a proximate cause of Rhyne's AML**.

In its brief in support of its motion for summary judgment, Kano pointed out that even if Rhyne used Kroil, and even if Kroil contained benzene, Plaintiffs had failed to forecast evidence sufficient to establish that Rhyne was exposed to sufficient levels of benzene from Kroil to establish that such exposure was a proximate cause of his development of AML. Kano pointed out that Plaintiffs' own expert, Dr. Herrick, testified that Rhyne's alleged benzene exposure was between .004 to .04 ppm-years, with a midpoint of this range at .02 ppm-years. *See* Herrick Dep. at 319:23-320:1. This amount was below the baseline level of exposure of 0.43 ppm-years that any member of the general public experiences during the course of daily life in Western North Carolina. (Doc. 132-11).

In response, Plaintiffs did not dispute the baseline level of exposure for the general public, but rather, cited exposure estimates contained in Dr. Herrick's original report, which notes an exposure ranging from .07 to 7.0 PPM years, with a midpoint of 3.5 PPM years. (Doc. 148 at p. 13). This is a value that Dr. Herrick admitted was a miscalculation. *See* Herrick Dep. at 291:8-291:18. Undersigned suspects that Plaintiffs had to rely on the disavowed exposure value because the accurate amount was too low to be considered a proximate cause of Rhyne's AML.

In his deposition, Dr. Herrick voluntarily admitted that he had miscalculated alleged exposure levels associated with Kroil. *See* Herrick Dep. at 291:8-291:18. The only testimony of alleged use of Kroil by Rhyne was during his employment at the Catawba Nuclear Facility between 1991 and 1998. In his initial calculations, Dr. Herrick assumed that Rhyne used Kroil for 10 consecutive hours each and every workday over that entire seven-year period. However, upon a review of Rhyne's testimony, Dr. Herrick realized that his assumption was incorrect. *See* Herrick Dep. at 291:8-293:21. Rather, Dr. Herrick learned that Rhyne only used Kroil during certain outage events that occurred when the plant would be shut down for preventive maintenance. Over the course of his seven-year employment, the undisputed evidence establishes that Rhyne performed this type of work over only a 15-16 week period spread out over that seven years. *See* Herrick Dep. at 292:4-293:1. In other words, Rhyne only worked with Kroil, at maximum, for roughly 4.5% of the time he was employed at the Catawba Nuclear Facility, rather than the 100% that Dr. Herrick had initially assumed. *See* Herrick Dep. at 291:8-293:21.

As a result of his miscalculation, Dr. Herrick prepared a revised cumulative exposure chart with respect to both the alleged exposure to benzene as a result of the use of Kroil and the gross cumulative exposure to benzene allegedly experienced by Mr. Rhyne over the course of his professional working life. This revised chart was attached as Exhibit 12 to Dr. Herrick's deposition and ratified by Dr. Herrick during the course of his testimony. *See* Herrick Dep. at 291:4-291:18 and Doc. 132-8. Not surprisingly, even Dr. Herrick's assumed cumulative exposure levels were reduced significantly when this

error was corrected. Even viewing Dr. Herrick's opinions in the light most favorable to the Plaintiff's, the actual estimated cumulative exposure to benzene as a result of the alleged use of Kroil was 175 times less than amount improperly and incorrectly cited in Plaintiffs' Response.

As is clear, Plaintiffs' effort to establish that Kroil was a proximate cause by utilizing Dr. Herrick's original report as opposed to his corrected testimony is telling and simply inexcusable. Plaintiffs misstate the findings and conclusions of Plaintiffs' own expert apparently for the sole purpose of misleading the Court to refute Plaintiff's own evidence that Rhyne's exposure to benzene from Kroil, if any, was well below, in fact, more than 20 times less, than the baseline exposure to benzene for any individual living in the region of the country inhabited by Mr. Rhyne at all relevant times. Thus, it is not reasonably foreseeable that Rhyne would develop AML from his use of Kroil. *See Pope v. Bridge Broom, Inc.*, 240 N.C. App. 365, 379, 770 S.E.2d 702, 713 (2015) (reasonable foreseeability required showing that an injury was more than "merely possible."); *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984) (some injury must have been *probable* under the circumstances). As Plaintiffs cannot demonstrate Rhyne's use of Kroil proximately caused his AML, Kano is entitled to summary judgment on all of Plaintiffs' claims.

## **CONCLUSION**

For the above stated reasons, Defendant Kano Laboratories, Inc., moves that judgment as a matter of law be entered in its favor.

12
Case 3:18-cv-00197-RJC-DSC   Document 154   Filed 12/18/19   Page 12 of 14

This the 18th day of December, 2019.

/s/ Jeffrey B. Kuykendal
John T. Jeffries (Bar #: 22134)
Jeffrey B. Kuykendal (Bar #: 37693)
McAngus, Goudelock and Courie, PLLC
Post Office Box 30307
Charlotte, North Carolina 28230
Phone: 707-643-6303
Fax: 704-643-2376
jjeffries@mgclaw.com
jeffrey.kuykendal@mgclaw.com
Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the date specified above, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing upon all parties.

/s/ Jeffrey B. Kuykendal
John T. Jeffries
Jeffrey B. Kuykendal
