IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:18-cv-197-RJC

| | |
|---|---|
| BRUCE RHYNE and JANICE RHYNE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES STEEL CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' BRIEF IN SUPPORT OF *DAUBERT* MOTION TO PRECLUDE IN PART EXPERT TESTIMONY OF JOHN SPENCER**

Plaintiffs file this brief in support of their *Daubert* motion to preclude in part the defense expert testimony by Defendants' industrial hygiene expert John Spencer.

**I.    INTRODUCTION.**

Defendants are expected to have Mr. Spencer testify at trial that it is impossible to use Liquid Wrench in the manner that Mr. Rhyne did because the product would burst into flames. Based on this incredible and ungrounded speculation, Mr. Spencer theorizes that Mr. Rhyne must not be telling the truth. All the evidence in the case is that Mr. Rhyne routinely used Liquid Wrench and it never somehow burst into flames, ignited or exploded. Mr. Spencer's baseless speculation should be excluded on multiple grounds.

First, Mr. Spencer's written expert report fails to include an opinion covering the subject in any adequate manner. There is no opinion stated to a reasonable degree of certainty that using Liquid Wrench in the manner that Mr. Rhyne did would cause it to burst into flames. His opinions are found at report pages 40 to 42, under the heading "Summary of Opinions."

1

(**Exhibit 1** – Spencer report dated October 17, 2019). No flammability opinion is found there. Under the law, the written report must include the complete opinions. Fed. R. Civ. P. 26. Because his report does not include this opinion, such testimony should be barred at trial. The passing references in the expert report elsewhere do not suffice.

Second, even if there was any reference in the report that could meet the Rule 26 requirement for a written opinion with supporting facts and data, Mr. Spencer failed to apply a reliable method that could support such an opinion. At his deposition, he admitted he had never sought to test his hypothesis that the product would burst into flames if used in the way stated by the Plaintiff. (**Exhibit 2** – Spencer depo. 28:13-29:6). Mr. Spencer never bothered to test the product for himself. He never tried using Liquid Wrench in the way that the Plaintiff did. (Ex. 2, Spencer depo. 29:23-30:19). Further, he cited to no peer-reviewed published studies by others that support his hypothesis that using Liquid Wrench will cause a fire. Because his purported opinion lacks a reliable foundation, it should be excluded.

Third, in his deposition Mr. Spencer conflates different concepts to leap to his unsupported flammability conclusion. He extrapolates from a general "flammability" warning to theorize that using the product when sawing or beveling pipes would cause a fire. But a "flammable" warning label, without more, allows no such conclusion. There are many criteria informing when a substance is or is not under the regulations deemed to be "combustible," "flammable," or to have a particular "flashpoint" or "flammability level." The criteria that trigger the need for a "flammable" label on a product do not support a conclusion that the use of Liquid Wrench in a plant or machine shop setting as for Mr. Rhyne would cause ignition.

As importantly, in his report and at his deposition, Mr. Spencer does not even begin to set forth an actual scientific foundation or reliable analysis to support his speculation that the product would have burst into flames.

And, neither Mr. Rhyne nor any other witnesses ever said that it did. In this regard, Mr. Spencer's testimony seeks to attack Mr. Rhyne's credibility and opine on his credibility. This is an improper area for expert testimony.

Thus, the testimony would serve no use purpose, would confuse the jury, and is unfairly prejudicial under Federal Rule of Evidence 403, and fails to pass the *Daubert* gatekeeper inquiry.

## II.     LEGAL STANDARD.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the trial judge as a "gatekeeper" must determine whether an expert should be allowed to give proffered opinions at trial. The Court may consider non-exclusive factors including:

(i)     has the theory or technique been tested?
(ii)    has it been subjected to peer review?
(iii)   Does the method used have a potential rate of error?
(iv)    are there objective reliable standards for controlling the operation of the analysis or method that the expert used?
(v)     is this method generally accepted?

The district court's "gatekeeper" rulings are discretionary. *General Electric Co. v. Joiner*, 522 U.S. 136 (1997). *Daubert* applies to all expert testimony, not just "scientific" testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

In reviewing *Daubert* motions, as well as motions *in limine* generally, the Court may exclude testimony where it is irrelevant or where its probative value is substantially outweighed by its danger of causing unfair prejudice, confusing the issues or misleading the jury.[1]

---

[1] *See Prassas Capital, LLC v. Blue Sphere Corp.,* No. 3:17-cv-131-RJC-DCK, 2019 U.S. Dist. LEXIS 111416, 2019 WL 2881560 (W.D.N.C. July 3, 2019) (Conrad, J.), slip op. at 8 ("Accordingly, the Court finds that Jannace's testimony should be EXCLUDED altogether under Federal Rules of Evidence 401–403 because it is largely irrelevant and 'its probative value is substantially outweighed by a danger of' causing unfair prejudice, confusing the issues, misleading the jury, unduly delaying trial, and wasting time. Fed. R. Evid. 403.").

Furthermore, expert opinions fall under Federal Rule 37's automatic exclusion rule where the opinions are not set forth in the expert's written report per Rule 26.[2]

### III. FACTS.

The Plaintiff, Mr. Rhyne, testified that he used the Liquid Wrench product during his years of working for Duke Energy. He stated that he used the product during work with a lathe, with pipes and while cutting and machining pipes. (See summary of his testimony found in Mr. Herrick's expert report, previously filed at Doc. 126-4, at pp. 6-7, citing to the Plaintiff's deposition testimony).

Mr. Rhyne testified that he used Liquid Wrench to lubricate and to keep stainless steel piping from chipping. When working on beveling and heavy wall pipes, he would use more of the product than otherwise. The product helped reduce heat during the work process. (Herrick report, Doc. 126-4, p. 7). Mr. Rhyne would use it when he was sawing the pipes or working with pipe supports. (*Id.*, p. 8).

For example, during bevel-related work, with "one hand" he would "run the tool end," while in "the other hand I had the … Liquid Wrench. And you just continuously use it until you – you get the bevel done. And that would take a lot of time to do that." (Plaintiffs' brief opposing US Steel's motion for summary judgment, Doc. 152, p. 3, citing and attaching deposition pages).

Mr. Rhyne stated that he did other jobs in the pipe fab shop other than just cutting bevels on pipe and couplings. (*Id.*). He also testified to other uses he made of Liquid Wrench. (See

---

[2] *Prassas Capital, LLC,* slip op. at 6 ("Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert testimony and requires, among other things, the production of a written report setting forth 'a complete statement of all opinions the witness will express and the basis and reasons for them.' Fed. R. Civ. P. 26(a)(2)(B)(i). It is well-established that 'expert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1).'") (citing *U.S. Bank N.A. v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 132 (S.D.N.Y. 2015).").

summary in Plaintiffs' brief, Doc. 152, pp. 2-3). He used it when working on a car and for some activities in his shop class. (*Id*., p. 2).

There is no testimony by Mr. Rhyne that when he was using the product, the product would ever somehow spark or show a flame or burst into fire.

The product labels for Liquid Wrench included a generic "flammable" warning. *See* Doc. 169-5 (photos of front and back of product container); Doc. 140-18, p. 4 (describing text of product label). It apparently said:

CAUTION – FLAMMABLE MIXTURE<br>DO NOT USE NEAR OPEN FIRE OR FLAME

*See id*.[3] The label did not go into any detail that in any particular circumstances if the product was being used in a tool shop or metal fabrication shop or in connection with helping to lubricate a saw or lathe or beveling process for metal pipes the product could somehow explode into flame. Nor does Mr. Spencer go into any detail in his report or deposition to establish what, exactly, he believed the product label to state, and what his evidentiary foundation was for his belief.

Mr. Spencer also does not explain why Liquid Wrench would have been marketed to use in garage and shop and plant environments if it was as hazardous as an ignition source as he speculates. The product was marketed for use in tool shops and garages generally to help with loosening bolts and dissolving rust. Those settings could include situations with saws, beveling equipment, lathes, drills, hot equipment or heated metal. But Mr. Spencer offers no basis to conclude that such settings could be dangerous for Liquid Wrench use because it was somehow highly flammable. Indeed, there is evidence that the Liquid Wrench label even included

---

[3] Other versions of the product label over the years have been put in the record with similar language. For example, another version seen in materials previously filed by Defendants says "combustible mixture." Doc. 140-18, p. 19 of 36.

encouragement to add it "to crankcase oil" to help dissolve sludge.  Doc. 169-5.  Such a use would put Liquid Wrench in and around engines – something one would not expect if it was somehow dangerously flammable.

Mr. Spencer's expert report focuses on other issues but includes a passing reference to flammability in the context of criticizing the Plaintiffs' expert Mr. Herrick.  Mr. Spencer theorizes that it "does not make sense" that Mr. Rhyne would have used Liquid Wrench at Duke Energy "because there were available products Mr. Rhyne used and were available to him for this purpose and because of safety considerations."  (Ex. 1, p. 39).  Mr. Spencer announced that the "proper fluid" that Mr. Rhyne should have used was "Rapid Tap or Tap Magic, not Liquid Wrench."  Because Liquid Wrench had a "flammable" warning on the container, Mr. Spencer speculated that "[a]pplication of this product to a hot metal surface may cause a fire."  (*Id.*).  He gives no reliable basis for his conclusion and goes into no further detail.  As discussed below, his deposition fails to provide any further reliable foundation.

**IV.    ARGUMENT.**

Mr. Spencer's speculation, that Liquid Wrench was highly flammable and that meant that Mr. Rhyne could not have used it, does not pass muster.

**A.    <u>The opinion is not in the written report and so it is excluded</u>.**

Mr. Spencer's expert report is attached.  (**Exhibit 1**).  His expert opinions that he purports to express to a reasonable degree of certainty are found at pages 40 to 42 of his report.  The opinions are given as a set of ten bullet points.  At page 42 he states that each is "to a reasonable degree of scientific certainty…."

None of these listed opinions includes an opinion that to a reasonable degree of scientific certainty, Liquid Wrench, when used the way that Mr. Rhyne has testified, will cause it to burst into flames.  Mr. Spencer's opinions that are expressed to a reasonable degree of certainty cover

6

other subjects, but not that one.[4]

"Rule 26 requires disclosure of experts' reports—not just their identities—because information about their opinions and methods are essential to trial preparation." *Bell v. Ward*, No. 3:12-CV-72-WGH-RLY, 2013 U.S. Dist. LEXIS 174573, at *3 (S.D. Ind. Dec. 9, 2013). Under Rule 26(a)(2)(B), a party that intends to rely upon the testimony of a retained expert witness is required to furnish a written report containing, among other information, a complete statement of all opinions the retained expert will provide, and the basis and reasons for them. The pertinent part of Rule 26 provides:

> (B) Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. **The report must contain:**
>
> **(i) a complete statement of all opinions the witness will express and the basis and reasons for them;**
>
> **(ii) the facts or data considered by the witness in forming them;**
>
> (iii) any exhibits that will be used to summarize or support them….

(Emphasis added).

The report must include "'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Siburt v. U.S. Bank*, No. 10-C-135, 2011 U.S. Dist. LEXIS 94531, at *8 (E.D. Wis. Aug. 23, 2011) (quoting *Salgado by Salgado v. Gen. Motors*

---

[4] Mr. Spencer opines that "[b]ased on standard industrial hygiene exposures to these solvents are not associated with acute myelogenous leukemia (AML) or any cancer in humans." (Ex. 1, first bullet point, report p. 40). He opines that Mr. Rhyne's cumulative benzene exposure was low and less than various standards. (Second, third bullet points, p. 40). Mr. Spencer opines that the protective duty was on the employer not the product maker (fourth bullet, p. 41) and that the warnings were adequate. (Fifth bullet, p. 41, ninth bullet, pp. 41-42). He critiques the exposure estimates of the Plaintiff's experts. (Sixth to eighth bullets, p. 41). Finally, he opines that dermal (skin) exposure is not an issue. (Tenth bullet, p. 42).

7

*Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)). "Rule 26(a) requires that the expert report contain the basis and reasons for each opinion." *Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, No. 00- C-5658, 2001 U.S. Dist. LEXIS 9626, at *10 (N.D. Ill. July 12, 2001). Further, there is "a well-accepted notion that expert witnesses cannot testify about facts or data, but fail to disclose the same." *Ravo v. Covidien LP,* 55 F. Supp. 3d 766, 776 (W.D. Pa. Oct. 24, 2014) (citing *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1286 (Fed. Cir. 2011)). Where an expert "has not identified specific facts or data considered ... [her] report is useless in preparing for cross-examination." *Siburt,* 2011 U.S. Dist. LEXIS 94531, at *8 (citations and quotation marks omitted).

Nor does Rule 26(a)(2) allow parties "to cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). In *Ciomber*, the Seventh Circuit explained:

> The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—**before the deposition**—as to what the expert witness will testify and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony. Allowing parties to cure a deficient report with later depositions would further undermine a primary goal of Rule 26(a)(2): to shorten or decrease the need for expert depositions. After all, the parties' need for expert depositions would increase if they could use deposition testimony to provide information they should have initially included in their Rule 26(a)(2) report.

(Emphasis added). Before our deposition of Mr. Spencer, all Plaintiffs were provided was a report focused on other topics, with only a passing reference to this one. (Ex. 1).

Failure to timely disclose the information required by Rule 26 triggers Rule 37. Under Rule 37(c)(1), exclusion of non-disclosed evidence is automatic and mandatory unless the evidence proponent can show that the non-disclosure was justified or harmless. *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). Rule 37(c)(1) "gives teeth" to the Rule 26(a)(2) requirements by "forbidding a party's use of improperly

8

disclosed information at a trial … unless the party's failure to disclose is substantially justified or harmless." *Tokai Corp. v. Easton Enterprises*, 632 F.3d 1358, 1365 (Fed. Cir. 2011) (citing *Yeti By Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)); *see also Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)).

Here, the only discussion of flammability in the <u>written</u> expert report for this expert is as follows:

> Dr. Herrick evaluated Mr. Rhyne's benzene exposure to Liquid Wrench, based upon Mr. Rhyne's testimony that he used Liquid Wrench at Duke Power as a coolant and lubricating fluid while machining metal parts, including beveling and cutting steel pipe, hangers, and other parts. The use of Liquid Wrench in this matter does not make sense because there were available products Mr. Rhyne used and were available to him for this purpose and because of safety considerations. The proper fluid to use in this case is cutting fluid like Rapid Tap or Tap Magic, not Liquid Wrench. As noted on the Liquid Wrench label, the Flammable Mixture Do Not Use Near Fire or Flame. [sic] Application of this product to a hot metal surface may cause a fire. Consequently, it is unlikely that Mr. Rhyne used Liquid Wrench as described and any exposure assessment based on this practice is neither relevant nor reliable.

(Ex. 1, p. 39).

There is no discussion of how Mr. Spencer went about determining an opinion to a reasonable degree of certainty that use of Liquid Wrench in a metal fabrication shop, to lubricate the pipe-cutting process, etc., will cause a fire. Obviously, an expert cannot simply announce that he thinks that use of a product "does not make sense" does not qualify as a reliable opinion. All Spencer notes is that per the product container warning, the product "may" be flammable. There is nothing in this part of Spencer's report that establishes:

- That he has performed a proper scientific test of the Liquid Wrench product of the kind that was available when Mr. Rhyne was working, in a setting controlled to materially imitate the way Mr. Rhyne testified that he used it, to demonstrate whether in fact those circumstances trigger a fire.

- That he has consulted and cited to published, vetted, peer-reviewed scientific or

9

> technical literature establishing when Liquid Wrench can cause a fire, when it does not, and what factors would make it certain to a reasonable degree of scientific certainty that the product would have burst into flames had Mr. Rhyne used it as he says he did.
>
> - That he has applied any reliable method or analysis to determine that when Mr. Rhyne used the product in connection with machining or cutting pipes or beveling metal in the metal fab shop, given that all the warning label says is "do not use near fire or flame." (See copy of the label filed at Doc. 169-5). There is no testimony that Rhyne was using a blowtorch. Rather, he was using things like a saw or beveling equipment.

Mr. Spencer concludes based on no factual or scientific foundation or application of a reliable scientific method, that "it is unlikely that Mr. Rhyne used Liquid Wrench as described." Mr. Spencer's basis is the conclusion that if Liquid Wrench was used in the manner that Mr. Rhyne used it, it would catch fire, and therefore, Mr. Rhyne would not have used it. Such an opinion obviously frames Mr. Rhyne – who all witnesses who know and worked with him say is honest and trustworthy – as a liar. It is improper for an expert to make opinions regarding the credibility of a witness – that is the jury's function. It is also obviously improper for an expert to leap from the existence of a generic flammability warning label to the abrupt conclusion that the Liquid Wrench had to burst into flames if used as said.

Testimony of that nature, which completely contradicts the clear firsthand knowledge and testimony of parties and fact witnesses, to say the least must be backed up by a reliable scientific method. Yet Mr. Spencer did not bother to try to set up a laboratory experiment to prove or disprove his *ipse dixit*[5] conclusion, nor did he locate any published studies on the issue. All that his written report says in this regard is the product had a flammability warning.

---

[5] *See General Electric Co. v. Joiner*, 522 US 136 (1997) (*Daubert* applies to all testimony under the abuse of discretion standard, is a flexible inquiry, and deference need not be given to the *ipse dixit* of the expert).

B.  **Spencer's deposition testimony fails to reflect an admissible expert opinion for trial on the issue.**

Mr. Spencer's deposition fails to support the flammability opinion, either. At his deposition, Mr. Spencer sought to expand on the comments in his report, contending that Mr. Rhyne was not exposed to Liquid Wrench with benzene based upon a theory that the Liquid Wrench would have caught fire on a hot surface due to its low flashpoint. Mr. Spencer's theory is unreliable, not based on evidence and misleading.

In his deposition, Mr. Spencer claims that Liquid Wrench had "a flash point well below 100 degrees Fahrenheit." (Ex. 2 – Spencer depo. 25:13-14). But it is absurd to contend that if Liquid Wrench is used on a surface measured at over 100 degrees Fahrenheit, it will burst into flames. That is not what a "flashpoint" means.

To set 100° Fahrenheit in context, the Court may take judicial notice that –

- Normal skin temperature of the human body varies between 92 and 98 degrees Fahrenheit.[6] If a worker drips some Liquid Wrench on his skin, is he going to explode into flames?

- The average hot water heater in a home is set at a thermostat level of 120 degrees to 140 degrees Fahrenheit.[7] Is using Liquid Wrench on a hot water heater or on your bathtub is going to cause a fire?

- Generally, the temperature of a hot bath will fall in the range of 90 to 105 degrees Fahrenheit.[8] Same comment.

---

[6] Wikipedia entry for "skin temperature." At https://en.wikipedia.org/wiki/Skin_temperature.
[7] United States government website, Energy.Gov ("Although some manufacturers set water heater thermostats at 140ºF, most households usually only require them to be set at 120ºF, which also slows mineral buildup and corrosion in your water heater and pipes."). At https://www.energy.gov/energysaver/services/do-it-yourself-energy-savings-projects/savings-project-lower-water-heating.
[8] Patrick Allen, How to Give Yourself a Spa-Like Bath at Home, Feb. 22, 2016 ("Generally, you want your bathwater to be somewhere between 90° F and 105°F by the time you get in."). At https://lifehacker.com/how-to-give-yourself-a-spa-like-bath-at-home-1760560654.

11

- A hot sidewalk can get up to around 145 degrees Fahrenheit.[9]

In short, if Liquid Wrench was to catch fire at its "flashpoint" then this would render the product unusable in virtually any real-life circumstances. But obviously, that is not the case.

Stated differently, Mr. Spencer, through either ignorance or a deliberate effort to muddy the waters, confuses the concepts of <u>flashpoint</u> with another concept known as the <u>lower flammability limit</u>, in addition to making other errors and false assumptions.

The <u>flashpoint</u> is not the temperature at which a liquid or its vapors will catch fire. Rather, it is the temperature at which a liquid will *begin* to release the vapors that *eventually* have the *potential* to catch on fire *if* those vapors reach a concentration at which they are capable of catching fire.[10]

The <u>lower flammability limit</u> is defined as the lower end of the concentration range over which a flammable mixture of gas or vapor in air can be ignited at a given temperature and pressure.[11] (But even there, whether that means the substance in question actually *will* catch fire depends on having more detailed facts and context).

Regulatory definitions of these and related concepts reflect that there are many nuances and variations as to when a given substance, liquid, or vapor may be flammable or combustible,

---

[9] U.S. Library of Congress, Is it possible to fry an egg on the sidewalk if it's hot enough? ("Wolke found that a hot sidewalk might only get up to 145°F."). At https://www.loc.gov/everyday-mysteries/item/is-it-possible-to-fry-an-egg-on-the-sidewalk-if-its-hot-enough/.

[10] *See* 29 C.F.R. § 1910.106(a)(14) ("Flashpoint means the minimum temperature at which a liquid gives off vapor within a test vessel in sufficient concentration to form an ignitable mixture with air near the surface of the liquid….").

[11] See Wikipedia entry for "Flammability limit," describing that the "Lower flammability limit (LFL)" is "[t]he lowest concentration (percentage) of a gas or a vapor in air capable of producing a flash of fire in the presence of an ignition source (arc, flame, heat). The term is considered by many safety professionals to be the same as the lower explosive level (LEL). At a concentration in air lower than the LFL, gas mixtures are 'too lean' to burn." See https://en.wikipedia.org/wiki/Flammability_limit#Lower_flammability_limit.

or not, in various situations. The factors include if the substance is in a liquid or vapor form, whether there is an ignition source and what it is, the relative proportions of the ingredients in the substance, the duration of its use, how and where it comes into contact with something hot, and numerous other factors.[12]

The mere fact that under some circumstances a given product may satisfy criteria that require a warning label to refer to a general "flammability" risk does not equate to a conclusion that the circumstances of use that Mr. Rhyne described would cause a fire to occur. Thus, where Mr. Spencer contends that "[i]t was clearly a highly flammable substance," he provides no factual basis, applies no reliable method and the testimony should be excluded. (Ex. 2, Spencer depo. 36:13-14).

The product label does not say "highly" flammable. Depending on the regulations one references, a "highly" flammable substance can have a flashpoint below 20 degrees Fahrenheit.[13] Generally, the freezing point of water is 32 degrees Fahrenheit. Are we really to believe Liquid Wrench was a fire hazard on a cold winter's day? Mr. Spencer is adding words to the product label and then giving them the definition he wants.

Mr. Spencer also appears to associate his speculation that Liquid Wrench is "highly

---

[12] *See* 29 C.F.R. § 1910.106 (regarding flammable liquids); 29 C.F.R. § 1926.155 (regarding flammable, combustible liquids; flashpoints); *see also W.M. Barr & Co., Inc. v. South Coast Air Quality Management Dist*., 207 Cal. App. 4th 406, 420 (Cal. 2nd District Court of Appeal 2012) (describing testimony that "[g]enerally, a 'combustible' liquid has a flashpoint above 100 degrees Fahrenheit while a 'flammable' liquid has a flashpoint above 20 degrees Fahrenheit and below 100 degrees Fahrenheit."); *Davis v. Insurance Co. of N. Am*., 652 So. 2d 531, 538-39 (La. Ct. App. 1995) (noting testimony regarding "the combustibility and flammability of products" and that "under the standards of the Department of Transportation (DOT), a 'combustible' product has a flash point between 100 and 200 degrees. A 'flammable' material, on the other hand, has a flash point lower than 100 degrees.").
[13] *See W.M. Barr & Co., Inc. v. South Coast Air Quality Management Dist*., 207 Cal. App. 4th 406, 420 (Cal. 2nd District Court of Appeal 2012) ("An 'extremely flammable' liquid has a flashpoint at or below 20 degrees Fahrenheit.").

13

flammable" with a focus on the raffinate ingredient. Ex. 2, Spencer depo. 25:9-13 ("See I would not use a highly flammable substance as a metal working fluid. The same reason I didn't use lighter fluid for metal working fluid; I wouldn't have used the **raffinate** version of Liquid Wrench.") (emphasis added). At summary judgment, Defendants sought to minimize the percentage of the Liquid Wrench product that was the raffinate ingredient. But after insisting the product only had a token amount of raffinate, Defendants' expert attempts to characterize the product as being 100% highly flammable raffinate. There is no reliable method behind this flip-flopping.

Mr. Rhyne's own testimony does not include that there were any fires or explosions when he used the Liquid Wrench. His coworkers say the same. For Mr. Spencer, or any defense expert, to seek to give an admissible expert opinion to the contrary, it is necessary that the expert issues a written report showing the application of a reliable method and foundational facts to justify the opinion. That does not exist here.

By conflating concepts such as flashpoint and lower flammability limit, Mr. Spencer will mislead the jury to believe that the Liquid Wrench is flammable at a temperature that is much lower than what is true. As shown above, even a cursory consideration of Mr. Spencer's theory demonstrates that it is not only false but essentially impossible.

Mr. Spencer's opinion about the flammability of Liquid Wrench should be stricken because it is not based on a foundation of facts or evidence of the flammability of Liquid Wrench or the circumstances under which it is flammable. Completely absent from Mr. Spencer's report are any facts or evidence of the concentrations of Liquid Wrench vapors that **are** flammable. Equally absent are any facts or evidence that the Liquid Wrench vapors reached a concentration at which they could catch fire while Mr. Rhyne used the product. Indeed, Mr. Spencer conceded at his deposition that he did not conduct any research into the circumstances

of Liquid Wrench's flammability and whether the manner that Mr. Rhyne sued the product would cause it to catch fire. (See Ex. 2, depo. excerpts, at pp. 25-34).

With regard to the manner in which Mr. Rhyne used the product, at his deposition Mr. Spencer was asked, "Q. Have you ever done any analysis of your own to see what would happen if Liquid Wrench was used in that way?" His answer was to admit, "A. Not in particular on Liquid Wrench." (Ex. 2, Spencer depo. 28:13-15).

Mr. Spencer sought to add that he had done studies of other flammable substances, but not of Liquid Wrench. (Ex. 2, depo. 28:15-21). However, amorphous reference to some unspecified evaluation he might have done of "the effect of flammable vapors traveling across an area" for some other substance does not provide the reliable foundation needed for his opinions here. Nor were such other purported studies described and detailed in his written expert report. (Ex. 1).

It is clear from Mr. Spencer's deposition that his sole purported basis for his opinion in this regard is that the Liquid Wrench label said it was flammable. He was questioned, "Q. You're just assuming that it would react in that way if he had used it in that way?" His response was to contend that "[i]t's not just an assumption. **It's based on the label, on the container it said flammable**." (Ex. 2, depo. 31:4-9) (emphasis added). But without further analysis, this is an absurd basis on which to ground his conclusion to the effect that Mr. Rhyne must have been lying about using Liquid Wrench and must have been using some other product instead because if he had been using Liquid Wrench it would have caught fire. Mr. Spencer did not scientific study to determine what the temperature would have been during Mr. Rhyne's use of the product, what amount of the Liquid Wrench would have been liquid or vapor, how long the product would stay on the surfaces to which it was applied, etc. He just speculates.

C.  **<u>The opinion impermissibly attacks credibility.</u>**

Mr. Spencer's opinion must also be excluded because it clearly encroaches on the jury's role of assessing credibility. Mr. Spencer opines that "[t]he use of Liquid Wrench in this matter does not make sense because there were available products Mr. Rhyne used and were available to him for this purpose and because of safety considerations." (Ex. 1). What does and does not "make sense" is simply credibility by a different name. Mr. Spencer is not permitted to tell a jury what they should or should not believe. It would be permissible to provide the jury with evidence upon which they can reach that conclusion on their own, but Mr. Spencer fails to do that, as described above. Thus, he runs afoul of the rule that experts cannot opine on credibility.[14]

## CONCLUSION

Plaintiffs respectfully request that the Court grant this motion and preclude Mr. Spencer from impermissibly testifying to opinions on flammability or related issues regarding the Liquid Wrench product.

---

[14] *See United States v. Gonzalez-Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997) ("An expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion."); *Nimely v. City of New York*, 414 F.3d 381, 398 (2nd Cir. 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."); *United States v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997) ("Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury."); *Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006) ("An expert may not opine on another witness's credibility."); *United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995) ("[A]n expert witness is not permitted to testify specifically to a witness' credibility."); *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) ("Absent unusual circumstances, expert medical testimony concerning the truthfulness or credibility of a witness is inadmissible ... because it invades the jury's province to make credibility determinations.").

Dated: April 7, 2020.

                                                    *s/Andrew J. DuPont*
Andrew J. DuPont, *admitted pro hac vice*
LOCKS LAW FIRM
601 Walnut St. Suite 720 East
Philadelphia, PA 19106
Phone: (215) 893-3425
adupont@lockslaw.com

Mark Doby (NCBN 39637)
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
mdoby@wallacegraham.com

EXHIBITS:

1. Spencer report.
2. Spencer deposition pages.

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

Respectfully submitted,
Attorneys for Plaintiffs

*s/Andrew J. DuPont*
Andrew J. DuPont, *admitted pro hac vice*
LOCKS LAW FIRM
601 Walnut St. Suite 720 East
Philadelphia, PA 19106
Phone: (215) 893-3425
adupont@lockslaw.com

Mark Doby (NCBN 39637)
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
mdoby@wallacegraham.com