Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:18-cv-197-RJC**

| | |
|---|---|
| **BRUCE RHYNE and JANICE RHYNE,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **UNITED STATES STEEL** | ) |
| **CORPORATION**, *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>DECLARATION OF ROBERT HERRICK, Sc.D., CIH, FAIHA</u>

I, Robert Herrick, Sc.D., CIH, FAIHA, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury the following is true and correct:

1) My name is Robert Herrick.

2) I am of a majority age and otherwise competent to make this declaration.

3) I have personal knowledge of the facts in this declaration.

4) I have reviewed the Memorandum of law in Support of Defendants Safety-Kleen Systems, Inc. and United States Steel Corporation's Joint Motion to Exclude the Testimony, Opinions, and Report of Dr. Robert Herrick ("Joint Motion to Exclude").

5) I have reviewed The Savogran Company's Memorandum of Law in Support of Motion to Exclude the Testimony, Opinions and Report of Plaintiffs' Expert Dr. Robert Herrick ("Savogran Motion to Exclude").

6)     Both the Joint Motion to Exclude and Savogran Motion to Exclude contain numerous erroneous statements. Some of those misstatements will be corrected in this declaration.

The Joint Motion to Exclude

7)     The Joint Motion to Exclude largely focuses on my use of the ART model to assess Mr. Rhyne's benzene exposure. The Joint Motion to Exclude implies that I used ART model to assess Mr. Rhyne's exposure to benzene from both Safety-Kleen parts washing solvent and Liquid Wrench. That is not correct. As I wrote in my report and stated in my deposition, I calculated the Liquid Wrench benzene exposures through the use of the near field/far field model, which is the same model used by Mr. John Spencer.

8)     The following claim is made in the Joint Motion to Exclude:

Dr. Herrick relied on an inapplicable European exposure model with absolutely no data from the United States… even though this European model was developed to assess exposures to large populations of workers covering multiple companies or facility sites and is not calibrated for individual exposure assessments. (Joint Motion to Exclude p. 4)

9)     This is statement is untrue.

10)    The Advanced Reach Tool (ART) is not a "European model". European Community regulations do require manufactures and sellers of products into the European Community to ensure that chemicals are not manufactured, marketed, or used unless it can be shown that they can be safely used without risk to man and environment.  The  ART model was developed to meet these requirements by predicting worker exposures. However, the ART model is actually a more modern advancement of the near field/far field model that has long been used by the industrial hygiene community to assess worker exposures. In describing the ART approach, Tielemans (2011) stated "The mechanistic model is based on a conceptual framework

2

following a source receptor approach (Cherrie and Schneider, 1999; Tielemans et al.,2008)."[1] This reference to Cherrie and Schneider is an article titled "Cherrie JW, Schneider T. (1999) Validation of a new method for structured subjective assessment of past concentrations. Ann Occup Hyg; 43: 235–45." The approach Cherrie (1999) describes is the foundation of what evolved to the current tools known as ART. The source-receptor approach was applied in the context of a series of benzene exposure industrial hygiene and epidemiology studies conducted by a consortium of oil companies ("Shanghai Health Consortium") for the very purpose of modeling individual worker exposures. These studies have collectively been referred to as the Shanghai Health Study.

11)      I am intimately familiar with the development of the ART model as well as its application. I was selected as an independent reviewer for the Shanghai Health Study exposure assessments that employed the source-receptor approach that is the foundation of the ART model. I taught the use of the ART model as a senior lecturer at the Harvard University School of Public Health. As discussed below, I am listed as an author on a manuscript by LeBlanc (2018) that compares the ART modeling with measured exposure values and near field-far field predictions of benzene exposures in parts washing.

12)      The ART model improves upon the near field/far field model in several ways. Among these are (1) the ability to incorporate actual air monitoring data results to better align the ART model's exposure predictions to real world air monitoring data, (2) adjust the model to separately predict the contribution from primary (near field ) exposure sources, secondary (far field sources), or the overall exposure from both types of sources, (3) the ability to quantify the uncertainty in the model results by calculating the midpoint (the 50%) value as well as the

---

[1] Tielemans et al.  (2011) Advanced REACH Tool (ART): overview of version 1.0 and research needs. Ann Occup Hyg. 2011 Nov;55(9):949-56. doi: 10.1093/annhyg/mer094. PubMed PMID: 22080161

interquartile range (25% to 75%) around the midpoint value. Thus, while the near field/far field model continues to be a reliable and effective tool for assessing an individual's exposure to benzene, the ART model does have certain advantages over the near field/far field model.

13)     As described below, the use of the ART model to assess an individual worker's exposure to benzene from mineral spirits has been the subject of peer reviewed literature.[2] The United States Environmental Protection Agency recently updated its Exposure Factors Handbook. In the Exposure Factors Handbook, the ART model is listed among "Leading examples of indoor air models…." See, U.S.EPA Exposure Factors Handbook, at p 19-19. In October, 2019, the U.S. EPA published its Guidelines for Human Exposure Assessment in order to "incorporate advances in exposure assessment reflecting the best science currently conducted across the Agency in all offices, programs and regions". See, U.S. EPA Guidelines for Human Exposure Assessment, p. xi. The EPA's Guidelines for Human Exposure Assessment "to aid exposure scientists in preparing exposure assessments… and conducting epidemiology studies." See, U.S. EPA Guidelines for Human Exposure Assessment, p. xi. The U.S. EPA again describes the ART model as an "improved exposure assessment model[]". See, U.S. EPA Guidelines for Human Exposure Assessment, p. 21

14)     The ART model permits the user to asses an individual worker's benzene exposure by setting the model to the worker's specific working conditions. The ART model can also function predict exposures across a wider group of people, and at a variety of worksites, since it permits the user to incorporate a wide variety of working conditions and environmental conditions that a product is used in. However, simply because the ART model is capable of predicting exposures among a group of people and variety of work places does not mean that its

---

[2] LeBlanc (2018) Comparison of the near field/far field model and the advanced reach tool (ART) model VI.5: exposure estimates to benzene during parts washing with mineral spirits.

function is limited to this use. Rather, it highlights an advantage of the ART model over the near field/far field model. As Tielemans stated in his 2011 article[3], "ART is initially developed in the scope of REACH but is equally useful for exposure assessment in other areas."

15)     The Joint Motion to Exclude cites to the Schinkel (2014)[4] article for the claim that the ART model "was developed to assess exposures to large populations of workers covering multiple companies or facility sites and is not calibrated for individual exposures assessments." (Joint Motion to Preclude p. 4). This is not an accurate representation of the Schinkel (2014) article. Initially, it is necessary to note that the Schinkel (2014) article published the results of a study that utilized the ART 1.0 program. The ART 1.0 program is not the same program that I used for my exposure modeling for Mr. Rhyne. I used ART version 1.5. The ART 1.0 program is more than 6 years old and the ART program has undergone a series of updates and changes to improve its functionality. More importantly, nowhere does that article state that the ART program cannot reliably be used for individual exposure assessments. While it does state that one of the functions of ART is to estimate exposures for groups of workers that share operational conditions, nowhere does the article state that this is the only function or purpose for the ART model. One must understand the context of the Schinkel (2014) article. The article reports the findings of a study that was conducted to analyze the degree of agreement between the results of the modeling when ART was used by 54 different exposure assessors. Importantly, the study was limited in its scope to the use of the ART model to assess exposures to inhalable dust and exposure to non-volatile liquids. The participants in the study did not model exposure to volatile organic chemicals, such as benzene. The participants in the study did not use the ART Version

[3] Tielemans et al.  (2011) Advanced REACH Tool (ART): overview of version 1.0 and research needs. Ann Occup Hyg. 2011 Nov;55(9):949-56. doi: 10.1093/annhyg/mer094. PubMed PMID: 22080161
[4] Schinkel (2014) Reliability of the Advanced REACH Tool (ART), Brit. Occ. Hyg. Society

1.5 that includes the option of applying Bayesian adjustments to the tool. The Bayesian adjustments select exposure measurement series with similar characteristics, then the model user can compare the results of the mechanistic model results with the adjusted results. In the case of Mr. Rhyne's estimated exposures, I conservatively selected the lower of the results from the mechanistic models or the Bayesian adjusted values. .

16) The primary conclusions from the Schinkel (2014) article demonstrate that with proper training, familiarity with the ART program and sufficient industrial and occupational hygiene experience, the ART program is a reliable model. Where limitations in the use of the ART program were encountered they resulted from (1) the exposure assessors having limited or no training on the use of the model before participating in the study, (2) the exposure assessors being required to extract information to input into the ART program from a video and text without having the ability to gather additional information required to make the exposure assessments, (3) the exposure assessors having insufficient experience in industrial and occupational hygiene, and (4) insufficient instruction provided in the guidance document (user manual) for this earlier version of the program. Thus, the factors impacting the reliability of the ART model were not inherent to the model itself, but instead were due to the user's lack of experience with ART and industrial hygiene in general. Unlike the subjects of the Schinkel (2014) study, I have over a decade experience both directly using the ART model and teaching students at Harvard University how to use the model. Unlike the subjects of the Schinkel (2014) study, I have more than 40 years' experience in industrial hygiene. Moreover, I used Art version 1.5, not version 1.0, and ART version 1.5 has a number of improvements that eliminate concerns observed by Schinkel.

17)     The allegation that the ART model is inapplicable to exposure assessments such as Mr. Rhyne's benzene exposures is a canard.  The scientific basis for using ART in exposure estimation is well-established.  A review of the literature (PubMed) shows that as of today there have been 33 peer-reviewed articles published on the development and use of ART, and the number of publications has grown steadily  each year signifying its adoption as an exposure assessment tool.  Notably, these publications include studies that evaluated the determining accuracy and robustness of ART modeling results by comparison with exposure measurements by NIOSH in US facilities (ref Lee EG, et al., Evaluation of Exposure Assessment Tools under REACH: Part II-Higher Tier Tools. Ann Work Expo Health. 2018 Dec 9. doi: 10.1093/annweh/wxy098. [Epub ahead of print] PubMed PMID: 30535049.  ART results were also found to compare well with exposures measured on individuals, especially for organic vapors (such as benzene) (Ref Savic N, et al., Comparing the Advanced REACH Tool's (ART) Estimates With Switzerland's Occupational Exposure Data. Ann Work Expo Health. 2017 Oct 1;61(8):954-964. doi: 10.1093/annweh/wxx069. PubMed PMID:29028254.  In a comparison of ART and two other modeling tools with measured  exposure levels, ART was found to be the most accurate model, especially for organic solvents (such as benzene) (Ref Spinazzè A, et al., Accuracy Evaluation of Three Modelling Tools for Occupational Exposure Assessment. Ann Work Expo Health. 2017 Apr 1;61(3):284-298. doi: 10.1093/annweh/wxx004. PubMed PMID: 28355416.  A comparison of ART with exposures measured over 7 types of industries found that ART tended to underestimate exposures to liquids by an average of about 0.5 mg/m3 (Ref Landberg HE, et al.,  A Study of the Validity of Two Exposure Assessment Tools: Stoffenmanager and the Advanced REACH Tool. Ann Work Expo Health. 2017 Jun 1;61(5):575-588. doi: 10.1093/annweh/wxx008. PubMed PMID: 28355454.)

18)     The claim that the ART model does not incorporate data from the United States is a non-sequitur. Benzene has its own physiochemical properties. Those properties are the same in Europe, the United States and any other country. Thus the location that the data is collected from is therefore indistinguishable in this way. Moreover, working conditions in Europe are sufficiently similar to those in the United States. If anything, European countries have equivalent, or in many cases, far more stringent workplace health and safety regulations. The Scandinavian countries, for example, are considered leaders in workplace health and safety. Therefore, European air monitoring data for benzene exposure from products like mineral spirits is expected to be comparable and even underestimate the same exposure in the United States.

19)     The following claim is made in the Joint Motion to Exclude:

> In addition to relying on a wholly inappropriate model, Dr. Herrick chose inaccurate data and used incorrect settings, while also ignoring relevant real-world data that would have produced far more accurate and representative results for Plaintiff's alleged exposures… (conceding that mineral spirits is an available input on the European model, but that he instead selected benzene when attempting to model mineral spirits products.)

20)     This claim is untrue.

21)     First, the ART model can be used to model exposure to mineral spirits or benzene emitted from mineral spirits. Since the question in this case was Mr. Rhyne's exposure to benzene, the proper method for using the ART model was to select benzene as the chemical to model. If the goal of the analysis were to model the amount of Mr. Rhyne's mineral spirits exposures, then setting the ART model to assess exposure to mineral spirits would be the proper use of the product. Here, setting the ART model to calculate benzene exposure is the correct method for using the ART model.

22)     I was an author on a peer reviewed paper LeBlanc (2018) Comparison of the near field/far field model and the advanced reach tool (ART) model VI.5: exposure estimates to

benzene during parts washing with mineral spirits. The LeBlanc (2018) article reported on the use of the ART model to assess a worker's exposure to benzene from a Safety-Kleen mineral spirits parts washing machine. Similar to my application of the ART model in this case, the LeBlanc (2018) authors assessed exposure to benzene from the parts washing machine by using the setting for benzene in the ART model. The analysis presented in LeBlanc (2018) underwent a peer review process and was published in the International Journal or Hygiene and Environmental Health. This is one of the most highly regarded journals in the industrial hygiene and exposure modeling community. The peer review process involved a group of experts on industrial hygiene and exposure modeling conducting a detailed analysis of the scientific merits of the paper. If the use of the benzene setting in the ART model to assess benzene exposure from mineral spirits was indeed improper, the article never would have passed peer review and would not have been published.

23)    Indeed there is no other way to assess benzene exposure from mineral spirits using the ART model except to choose the setting for benzene. It is necessary to select the benzene setting. Benzene has its own physiochemical properties. The model is calibrated to apply the physiochemical properties of a particular material incorporated into the ART model through an algorithm. The physiological properties of benzene are based on a set of real world air monitoring data that has been collected and built into the system. An advantage of the ART model is that incorporates actual air monitoring data. This is in contrast to the near field far field model which mathematically models exposures without calibrating the results to align the model with real world air monitoring data. It is therefore nonsensical to claim that selecting the benzene setting was improper. If one were to set the ART model to mineral spirits, as opposed to benzene, the model would not assess benzene exposure. This would be equivalent to assessing a

9

worker's exposure to asbestos when changing brakes by selecting a field for all brake dust, as opposed to the asbestos component of the brake dust.

24)     In order to validate the accuracy of the ART model's performance in predicting benzene exposures from mineral spirits, LeBlanc (2018) compared the results of both the ART model and its predecessor, the near field/far field model, to the results of actual air monitoring for benzene emitted from the Safety-Kleen parts washing machine as published in the peer reviewed literature[5] Fedoruk (2003). The near field/far field model is the method that Mr. John Spencer used to predict Mr. Rhyne's exposure to benzene from the Safety-Kleen parts washing machine. As I describe below, the ART model more accurately predicted the benzene exposures caused by the parts washing machine. Therefore, not only is it proper to choose the benzene setting in the ART model to assess exposure to benzene from mineral spirits parts washing, it is a more accurate method than the near field/far field model applied by Mr. Spencer.

25)     The Joint Motion to Exclude makes the following claim:

> Dr. Herrick admits that he completely failed to validate his results (though he readily could have attempted to do so, as demonstrated by John Spencer, who did, in fact, validate his own results)…("Well like any of these model predictions, I didn't formally validate the results.") (Joint Motion to Exclude p. 4).

26)     This omits all but one sentence of my answer. My complete answer to the question posed was "Well, like any of these model predictions, I didn't formally validate the result. I think we talked about this this morning. I don't really consider that, you know, these models' results - - that anyone really 'validates' them in the strictest sense. About the closest, you know, that I would say we've done is that LeBlanc paper, where we tried to evaluate how well the results compared with each other."[6] The testimony that I referred to from "this morning"

---

[5] Fedoruk (2003) Benzene Exposure Assessment for Use of a Mineral Spirits=Based Degreaser, Applied Occp. And Env. Hygiene, 18: 764-771
[6] Robert Herrick, CIH Deposition transcript p. 255:9-21.

was "Well, 'validation's' an interesting term. You know, it, sort of, implies that you - - you know the ultimate truth and you compare your model or your measurement against that, you know, knowable truth. So I would say, you know, on that basis, really, none of these models have been formally validated. I think a better term to apply is that their - - their performance has been evaluated. I think that's a better way to put it than saying its validated."[7]

27)      As I explained in my deposition, I use the term "validate" in the strictest sense that sense, meaning that a model has been compared a gold standard reference value.  This is the way the term validation is used in the laboratory, where a measurement result is compared with a known concentration of a chemical in a standard reference material. When "validated" is defined in this manner, no model has ever been "validated".

28)      Rather, the accuracy of exposure models' predictions can be compared to actual air monitoring results in order to judge their accuracy. Some scientists do refer to such assessments of model accuracy as "validation". This is the definition used by Mr. Spencer in his report, and is the definition used in the published literature, such as LeBlanc (2018).

29)      Mr. Spencer used the same approach for "validating" his model as I did. For example, Mr. Spencer used a near field/far field model to estimate that Mr. Rhyne's exposure to benzene from Liquid Wrench was 0.12 ppm benzene during the use of the product. Mr. Spencer then compared this result to the Williams (2007) study which measured the concentration of benzene in the air during a simulated use of a re-formulated version of Liquid Wrench and reported 0.038 ppm benzene in the air. Mr. Spencer concluded that his modeled exposure of 0.12 ppm was in "good agreement" with the benzene concentration of 0.038 ppm reported by Williams (2007). There is a 300% difference between Mr. Spencer's modeled prediction of

---

[7] Robert Herrick, CIH Deposition transcript p. 88:3-15

benzene concentration and the Williams (2007) recorded benzene concentration. By way of comparison, the LeBlanc (2018) study shows that there is only a 15% difference between the ART model prediction of benzene exposure from Safety-Kleen parts washing machine (0.425 ppm) and the benzene concentration measured by Fedoruk (2003) of 0.5 ppm. Thus, my ART model of benzene exposure from the Safety-Kleen parts washing machine is far more accurate than Mr. Spencer's model of benzene exposure from Liquid Wrench when compared to actual air monitoring data. This is consistent with the conclusion reached by LeBlanc (2018) that the ART model is a more accurate predictor of benzene exposure than the near field/far field model used by Mr. Spencer.

30)     The ART model for benzene exposure from a Safety-Kleen mineral spirits parts washing machine was compared to actual air monitoring data for benzene exposure from the use of a Safety-Kleen parts washing machine in LeBlanc (2018). As discussed above, the ART model was found to accurately predict the benzene exposures recorded in the Fedoruk (2003) study. Indeed, the ART model was more accurate than the near field/far field model used by Mr. Spencer. Thus, if one uses the term "validate" to mean an analysis of the model's accuracy by comparison to real world air monitoring data, my ART model has (1) been validated, (2) the validation was subjected to the independent peer review process, and (3) found to be more accurate than the model used by Mr. Spencer.

31)     The Joint Motion to Exclude makes the following claim:

> Dr. Herrick also admits that his use of the European model does not allow him to isolate exposure results by product, a troubling concession given that his report purports to separate the alleged exposures by product… ("I wasn't really trying to do the calculation in such a way that attributed something uniquely to that product.")

32) This claim is false. I did not testify that the ART model does not allow me to isolate exposure results by product. I actually said the opposite. This claim omits the majority of my answer to the question as well as my testimony describing how I actually employed the ART model for the Safety-Kleen parts washing exposures. I will describe this in more detail below.

33) The ART model operates through a set of drop-down menus. One can choose a primary exposure source that is within 3 feet of the worker's head. This is called the near field source. One can also choose a secondary source present in the workroom in addition to the source in the breathing zone of the worker. That would be considered a far field source. If a worker performs a task in an environment that involves exposure solely from the primary source in their near filed, then one can use the ART model to calculate only the near field exposure. However, in actual workplaces, there are often secondary sources of exposure from the far field that can be evaluated with the ART model by including the far field exposures.

34) Mr. Rhyne's testimony described the use of the Safety-Kleen parts washer in the pipe fabrication shop. He described this to be a large room where other workers also used solvent products to perform their work. The Safety-Kleen parts washer was within his near field and the primary source of his benzene exposure while washing parts at the machine. However, other workers used solvents in a manner that could have contributed to his benzene exposures. I therefore made the judgment that it was appropriate to model not only Mr. Rhyne's exposure to benzene from the Safety-Kleen parts washer in his near field, but also exposures that may have been caused by his coworkers use of solvent products near to him. This would provide a more accurate assessment of Mr. Rhyne's exposures. By modeling both the near field and far field exposures, the ART model predicted total exposure from the primary source, adding in the small additional contribution from the secondary source.

13

35)　　The contribution from the secondary sources (far field) was small. For example, during Mr. Rhyne's use of the parts washer for 2 hours in the pipe fabrication shop, his average benzene exposure was 1.0 ppm (3.2 mg/m3) when both the primary (Safety-Kleen parts washer) and secondary sources (coworkers' use of solvents in the far field) were included. If Mr. Rhyne's secondary sources were not considered, his exposure would have been 0.85 ppm (2.7 mg/m3). The difference is about 15%.  During my deposition I did not have my ART program with me and therefore was not able to state with precision the amount of contribution from the secondary sources.

### The Savogran Motion to Exclude

36)　　The Savogran Motion to Exclude contains the following claims:

> As to home use of Kutzit, Plaintiff allegedly used Kutzit to remove gaskets when working on family cars. In estimating Plaintiff's exposure from such work, Dr. Herrick assumed Plaintiff used Kutzit one third of the times he worked on the family cars. This assumption has no evidentiary support.
> As to use at Setzer's, Plaintiff allegedly used Kutzit to remove gaskets from cars. In estimating Plaintiff's exposure from such work, Dr. Herrick assumed Plaintiff used Kutzit one hour per day one day per week. This assumption has no evidentiary support.
> As to use at Duke Power, Plaintiff allegedly used Kutzit to remove gaskets. In estimating Plaintiff's exposure from such work, Dr. Herrick assumed Plaintiff used Kutzit for removing gaskets at Duke Power from 1985 to 1998. This assumption has no evidentiary support.

37)　　Contrary to these claims, Mr. Rhyne provided information in an interview that supports the frequency of Kutzit use and Kutzit usage times that I incorporated into my modeling of his benzene exposures. The questions asked of Mr. Rhyne at his deposition did not elicit much detail about his use of the Kutzit product. Mr. Rhyne was therefore interviewed by Stephen Petty, CIH. It is a common practice in the industrial hygiene community to interview subjects to elicit very specific details about their exposures. Industrial hygienists routinely rely upon information gathered from such interviews to assess individuals' exposures in a variety of

14

contexts from epidemiology studies to day-to-day evaluation of the workplace. The American Industrial Hygiene Association publishes recommendations with respect to conducting such interviews (.American Industrial Hygiene Association (AIHA) publication A Strategy for Assessing and Managing Occupational Exposures, 3rd edition, p 233, 2006 When persons who are not trained in industrial hygiene question a witness they often fail to ask for the type of details that are needed to conduct an exposure assessment. As stated in his report, Mr. Petty therefore conducted an interview with Mr. Rhyne to obtain additional detail regarding his use of the Kutzit product.

38) I reviewed Mr. Petty's report and interview as part of my work in this case. During the interview conducted by Mr. Petty, Mr. Rhyne stated he recalled using the Kutzit product at home on average approximately 2 times per month (consisting of once per month on his father's cars and once per month on his own car) over the course of a four year timeframe (age 14 – 17).[8] Mr. Rhyne also told Mr. Petty that he used the Kutzit for one hour per event at home.[9] This is consistent with Mr. Rhyne's deposition testimony where he state that he used Kutzit to remove two gaskets at a time, and that it took him for 30 minutes to apply the Kutzit and remove the gasket on each gasket.[10] Mr. Rhyne testified that he used Kutzit to remove gaskets from valve covers and oil pans. I conservatively estimated that he removed these gaskets one day in every three days that he worked on cars at home, and he worked on the cars one day per month in calculating his cumulative benzene exposure from this source (0.04 ppm each year for 6 years, total 0.24 ppm-years.). I assumed that each time he worked on gasket he used the Kutzit as did not testify that any other product was used to remove gaskets at home.

---

[8] Stephen Petty, CIH Report, Appendix B, Bruce Carlton Rhyne's Interviews, October 5-6, 2017, p. 382.
[9] Stephen Petty, CIH Report, Appendix B, Bruce Carlton Rhyne's Interviews, October 5-6, 2017, p. 382.
[10] Bruce Rhyne deposition transcript, p. 321-322.

39)    For Kutzit use at school, Mr. Rhyne told Mr. Petty during the interview that he used the Kutzit 8 times per month over 9 month periods during both his junior and senior years of high school (i.e., 18 months total).[11] For Kutzit use at Setzer's Buick, Mr. Rhyne told Mr. Petty that he used the Kutzit product approximately one time per week over a 9 months period.[12] Mr. Rhyne also told Mr. Petty that he used the Kutzit for one hour per event at school and at Setzer's.[13] I consider Mr. Rhyne's interview description of the amount of time it took him to complete this task at Setzer's to be reliable, and make sense, because it was consistent with the one hour length of time that Mr. Rhyne testified it took him to use Kutzit to remove gaskets at home.[14] It is logical that the same person, using the same product, to perform the same task on the same type of parts would take approximately the same amount of time to complete the task.

40)    The following claim is made in The Savogran Motion to Exclude:

> [W]hen calculating exposures at Setzer's, Dr. Herrick assumed the air concentrations of benzene from Kutzit were exactly the same as those reported in the Young Study, which involved a product other than Kutzit and air samples collected in a two-car garage.

41)    To calculate Mr. Rhyne's exposures to Kutzit at Setzer's Buick I used the Similar Exposure Group (SEG) method. This method has been adopted by the American Industrial Hygiene Association (AIHA), a leading organization in the field of industrial hygiene. The SEG method stems from the practical reality that for the vast majority of workers and work places there is no exposure monitoring data available. In the absence of air monitoring data for a particular person or workplace, the SEG method allows the industrial hygienist to apply sufficiently similar exposure data from air monitoring conducted for a different person at a

---

[11] Stephen Petty, CIH Report, Appendix B, Bruce Carlton Rhyne's Interviews, October 5-6, 2017, p. 382.
[12] Stephen Petty, CIH Report, Appendix B, Bruce Carlton Rhyne's Interviews, October 5-6, 2017, p. 382.
[13] Stephen Petty, CIH Report, Appendix B, Bruce Carlton Rhyne's Interviews, October 5-6, 2017, p. 382.
[14] Bruce Rhyne deposition transcript, p. 321-322.

different place. The AIHA defines a SEG as "A group of workers having the same general exposure profile for an agent because of the similarity and frequency of the task(s) they perform, the similarity of materials and processes with which they work, and the similarity of the way they perform the task(s)".[15]

42)    The underlying concept is that when people do similar tasks, using similar chemicals, under similar conditions, they have similar exposures.  A SEG can represent either a single task of short duration or a group of tasks that comprise a full-shift exposure. The SEG method requires the industrial hygienist to use his or her professional judgment and experience to identify a task performed by a worker, the product used by the worker and the environmental conditions that the tasks are performed in. The industrial hygienists should then identify air monitoring data collected for the material at issue (in this case benzene) during the use of a sufficiently similar product under sufficiently similar circumstances. Since it is essentially impossible to find air monitoring data collected under exactly identical circumstances for the exactly identical product, the industrial hygienist must use their professional judgement and experience to identify air monitoring data that adequately, though not perfectly, represent the subject individual's exposures.

43)    In this case, I used the SEG method to assess Mr. Rhyne's exposure to benzene from the Kutzit product at Setzer's Buick by applying air monitoring data from the Young (1978)[16] study published in the scientific literature. I concluded that the Young (1978) data adequately represented Mr. Rhyne's benzene exposures during the use of Kutzit at Setzer's Buick for the following reasons.

---

[15] American Industrial Hygiene Association (AIHA) publication *A Strategy for Assessing and Managing Occupational Exposures,* 3rd edition, p 33, 2006.
[16] Young (1978), Benzene in Consumer Products, Science, Vol. 199, p. 248.

44)     First, I assessed the similarities of the Kutzit product and the paint remover utilized in the Young (1978) study. Kutzit was a liquid paint remover product that contained ~52% benzene (and as much as 58% benzene) when Mr. Rhyne used the product at Setzer's Buick. The Young (1978) study also used a liquid paint remover product that was formulated with 52% benzene. Thus, the Kutzit product and the liquid paint remover used in the Young (1978) study are virtually identical in their benzene content. This makes the liquid paint remover from the Young (1978) study an excellent candidate for use in the SEG. It is not common to find air monitoring data from a product that is so similar in its benzene content. There is no evidence to indicate that the liquid paint remover used in the Young (1978) study had any other properties that would make the air monitoring results from its use any different from the Kutzit product.

45)     Second, I assessed the similarities of the environments in which Mr. Rhyne used the Kutzit at Setzer's and the environment in which the authors of the Young (1978) study used the liquid paint remover. Setzer's was a garage with four bays and garage doors. The Young (1978) study was performed in a two car garage with overhead garage doors. The authors of the Young (1978) study opened the garage doors every 5 minutes throughout the course of the study so that one of the authors could enter the garage and change the charcoal tubes on the author which applied the liquid paint remover. Thus, outdoor air was frequently permitted to enter the garage. While Setzer's was a larger facility, there is no reason to think that the exposures in the near field, meaning within a 3 foot distance to the point where the product is applied, were different. Generally, room size, air movement and room air exchanges have much less impact on the exposure modeling outcome than do factors than the benzene content of the product and how the product is used.

18

46) Third, I assessed how the Young (1978) authors applied the liquid paint remover and compared that to Mr. Rhyne's application of the product. The Young (1978) authors poured the liquid paint remover into a can and then applied the liquid paint remover with a paint brush and removed the paint debris with a scraper.[17] This is sufficiently similar to how Mr. Rhyne used the Kutzit as Mr. Rhyne testified that he poured the Kutzit into a plate and then applied the Kutzit to the gasket with a brush and scrapped the gasket material off with a scraper.[18]

47) The following claim is made in The Savogran Motion to Exclude:

> When calculating Plaintiff's exposure to benzene from Kutzit at Setzer's in 1974, Dr. Herrick makes the assumption that Plaintiff used the pre-2/28/74 formula throughout 1974. (Savogran Motion to Exclude p. 7).

48) Savogran's inventory/production records, and the testimony of Savogran's president Mark Monique, indicate that Savogran continued to use its inventory of benzene to manufacture the Kutzit product into at least February 28, 1974, when the last 186 gallons of benzene was consumed.[19] Thus, Savogran continued to sell the benzene-formulated Kutzit product after February 28, 1974. There is no evidence that the Kutzit product was ever recalled. Savogran sold Kutzit and other products through distributors. The distributors in turn sold the Kutzit to retailers, where consumers like Mr. Rhyne purchased the product.[20] Thus, the benzene-formulated Kutzit that was in the chain of distribution, on store shelves and in workplace inventory remained in circulation well after February, 1974. It is therefore logical to conclude that the benzene-formulated Kutzit remained in circulation through 1974. Moreover, Mr.

---

[17] The Young (1978) article itself describes the use of the paint brush and scraper. Photographs from the study provided by Peter Infante, MPH, Dr.PH, FACE, the Young (1978) investigator who actually applied the liquid paint remover in the study, demonstrate the use of the can to store the liquid paint remover during the brushing operation.

[18] B. Rhyne deposition transcript p. 319-321.

[19] Lee-Savogran 92-95.

[20] Mr. Rhyne testified that the Kutzit was purchased for home use at a NAPA automotive parts store. Bruce Rhyne deposition transcript, p. 325.

Rhyne's description of the appearance of the Kutzit container and smell of the product at

Setzer's Buick is consistent with the benzene-formulated Kutzit product.

49) The Savogran Motion to Exclude makes the following claim:

> Dr. Herrick references no deposition testimony from Plaintiff, wherein he testified that he used Kutzit at Duke Power from 1985 to 1998. Although Plaintiff did testify that he began using Kutzit at Duke Power in 1985, he did not testify how long he continued to use Kutzit while at Duke Power. In fact, Plaintiff testified that he could not recall when he last used Kutzit at Duke Power, and twice stated that it would have been before 1998. (Savogran Motion to Exclude p. 7).

50) As described above, Mr. Rhyne was interviewed by Mr. Petty who gathered

additional detail regarding Mr. Rhyne's use of the Kutzit product. Mr. Petty's record of the

interview states that Mr. Rhyne told him that he used the Kutzit product at Duke from 1985

through 1998.[21] This is consistent with Mr. Rhyne's deposition testimony that he used the Kutzit

product in the time frame that he worked in maintenance at Duke.[22] Mr. Rhyne testified that he

was a worker in the maintenance department from 1985 until he became a supervisor in 1998.[23]

51) The Savogran Motion to Exclude makes the following claim:

> Dr. Herrick assumed the benzene concentrations from toluene in the post-2/28/74 formula were 0.025%-0.5%. Exhibit "B", Herrick's Report at p. 36. Dr. Herrick then simply took the 130 ppm Young exposure average and reduced it in proportion to the lower amount of his estimate of benzene in the post-2/28/74 formula vs. the pre-2/28/74 formula, which results in a reduction from average air exposures of 130 ppm to 0.65 ppm. Exhibit "B", Herrick's Report at p. 36. Dr. Herrick provides no basis for showing that it is generally accepted in the scientific community to employ such a methodology, which piles one assumption upon another. (The Savogran Motion to Exclude p. 9).

52) In order to assess the concentration of benzene exposure from use of the Kutzit

formulated with toluene I extrapolated the benzene air concentration recorded by Young (1978).

Basic laws of chemistry indicate that the in air concentration of a volatile chemical, such as

---

[21] Stephen Petty, CIH Report, Appendix B, Bruce Carlton Rhyne's Interviews, October 5-6, 2017, p. 382.
[22] Bruce Rhyne deposition transcript, p. 323.
[23] Bruce Rhyne deposition transcript, p. 113, 154-155, 194-195

benzene, emitted from a mixture of chemicals is generally proportionate to the concentration of the chemical in the liquid state of the mixture. Raoult's Law holds that the equilibrium vapor pressure that is observed for a compound is proportional to the mole fraction (that is, the concentration) of that compound in solution (Ref US EPA Methods for Estimating Air Emissions from Chemical Manufacturing Facilities, Vol II, Chapter 16, p 16.6-7, August 2007). Given the evaporative properties of benzene from a mixture of organics such as in mineral spirits, basic principles of chemistry support extrapolating the in air benzene concentration emitted from a liquid mixture containing approximately 56% benzene to one containing 0.025-0.5% benzene.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED this 21st day of April, 2020 in town of Marblehead, State of Massachusetts.

_____
Robert Herrick, Sc.D., CIH, FAIHA