Exhibit 13

Page 1

```
 1                            VOLUME:    I
                              PAGES:     1-379
 2                            EXHIBITS:  1-12
              IN THE UNITED STATES DISTRICT COURT
 3        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                       CHARLOTTE DIVISION
 4             Case No. 3:18-cv-00197-RJC-DSC
 5     _____
 6     BRUCE RHYNE and JANICE RHYNE,       )
 7                    Plaintiffs,          )
 8               vs.                       )
 9     UNITED STATES STEEL CORPORATION,    )
10     et al.,                             )
11                    Defendants.          )
12     _____)
13                    DEPOSITION OF ROBERT F. HERRICK,
14     Sc.D., CIH, FAIHA, called as a witness by and on
15     behalf of the Defendants, Chevron U.S.A., Inc., CRC
16     Industries, Inc., and Univar Solutions USA Inc.,
17     f/k/a Univar USA Inc., pursuant to the applicable
18     provisions of the Federal Rules of Civil Procedure,
19     before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR
20     #13192, NH-LSR #91, MA-CSR #123193, and Notary
21     Public, within and for the Commonwealth of
22     Massachusetts, at Veritext Legal Solutions, 101
23     Arch Street, Suite 650, Boston, Massachusetts, on
24     Wednesday, November 6, 2019, commencing at 9:09
25     a.m.
```

```
 1      APPEARANCES:
 2
 3           LOCKS LAW FIRM, LLC
 4           BY:  Andrew J. DuPont, Esq.
 5           The Curtis Center, Suite 720E
 6           601 Walnut Street
 7           Philadelphia, PA  19106
 8           215 893-0100
 9           Adupont@lockslaw.com
10           For the Plaintiffs
11
12
13           FISHKIN LUCKS LLP
14           BY:  Andrew P. Fishkin, Esq.
15           The Legal Center
16           One Riverfront Plaza, Suite 410
17           Newark, NJ  07102
18           973 536-2800
19           Afishkin@fishkinlucks.com
20           For Defendants Chevron U.S.A.
21           Inc., CRC Industries, Inc., and
22           Univar Solutions USA Inc., f/k/a
23           Univar USA Inc.
24
25
```

```
 1      APPEARANCES:  (CONT'D)
 2
 3           (Via Telephone)
 4           BABST CALLAND
 5           BY:  Kathy K. Condo, Esq.
 6           Two Gateway Center
 7           603 Stanwix Street
 8           Pittsburgh, PA  15222
 9           412 394-5453
10           Kcondo@babstcalland.com
11           For Acuity Specialty Products
12           Products Group, Inc.
13
14           DICKIE McCAMEY
15           BY:  Vaughn K. Schultz, Esq.
16           Two PPG Place, Suite 400
17           Pittsburgh, PA  15222-5402
18           412 392-5531
19           Vschultz@dmclaw.com
20           For ExxonMobil Corporation
21
22
23
24
25
```

```
 1      APPEARANCES:  (CONT'D)
 2
 3           (Via Telephone)
 4           GORDON & REES
 5           SCULLY MANSUKHANI LLP
 6           BY:  Joshua W.  Dixon, Esq.
 7           40 Calhoun Street
 8           Suite 350
 9           Charleston, SC  29401
10           843 714-2502
11           jdixon@grsm.com
12           For the Savogran Company
13
14
15           (Via Teleconference)
16           ROGERS TOWNSEND & THOMAS, PC
17           BY:  Roy Shelley, Esq.
18           1221 Main Street, 14th Floor
19           Columbia, SC  29201
20           803 744-1818
21           Roy.shelley@rtt-law.com
22           For Steco Corp.
23
24
25
```

```
 1      APPEARANCES:  (CONT'D)
 2
 3           CANFILL SUMNER & HARTZOG LLP
 4           BY:  Virginia Wooten, Esq.
 5           2907 Providence Road, Suite 200
 6           Charlotte, NC  28211
 7           704 940-3401
 8           Vwooten@cshlaw.com
 9           For Turtle Wax
10
11           (Via Telephone)
12           MARON MARVEL BRADLEY ANDERSON
13           & TARDY LLC
14           BY:  Chad D. Mountain, Esq.
15           Three Logan Square
16           1717 Arch Street, Suite 3710
17           Philadelphia, PA  19103
18           215 231-7100
19           Cmountain@maronmarvel.com
20           For Sunoco (R&M) LLC
21
22
23
24
25
```

2 (Pages 2 - 5)

Case 3:18-cv-00197-RJC-DSC   Document 226-13   Filed 04/23/20   Page 2 of 8
Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 6

APPEARANCES: (CONT'D)

McANGUS GOUDELOCK & COURIE LLC
BY: John Jeffries, Esq.
6302 Fairview Road, Suite 700
Charlotte, NC 28210-2287
704 405-4571
Jjeffries@mgcla.com
For Kano Laboratories

(Via Telephone)
HARRIS BEACH PLLC
BY: Brian A. Bender, Esq.
445 Hamilton Avenue
Suite 1206
White Plains, NY 10601
212 313-5405
Bbender@harrisbeach.com
For Safety-Kleen Systems, Inc.

Page 7

APPEARANCES: (CONT'D)

THE CAIRONE LAW FIRM PLLC
BY: Matthew Cairone, Esq.
1900 Main Street, Suite 107 PMB 58
Canonsburg, PA 15317-5861
724 416-3261
Mcc@caironelawfirm.com
For United States Steel Corp.

Page 8

I N D E X

| TESTIMONY OF: | PAGE |
|---|---|
| ROBERT F. HERRICK, Sc.D. | |
| (By Mr. Fishkin) | 9 |
| (By Mr. Cairone) | 164, 363 |
| (By Mr. Schultz) | 193 |
| (By Ms. Wooten) | 267 |
| (By Mr. Jeffries) | 276 |
| (By Mr. Bender) | 321, 375 |
| (By Mr. Dixon) | 347 |
| (By Mr. DuPont) | 365 |

Page 9

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Herrick 1 | Expert Report of Robert F. Herrick, Sc.D., CIH, FAIHI | 14 |
| Exhibit Herrick 2 | Approved Chemical List, PLF005295-339 | 25 |
| Exhibit Herrick 3 | Robert F. Herrick curriculum vitae | 32 |
| Exhibit Herrick 4 | Material Safety Data Sheet | 79 |
| Exhibit Herrick 5 | Articles: "Accuracy Evaluation of Three Modelling Tools for Occupational Exposure Assessment"; "A study of the Validity of Two Exposure Assessment Tools: Stoffenmanager and the Advanced Reach Tool"; "Evaluation of Exposure Assessment Tools under REACH: Part II -- Higher Tier Tools | 91 |
| | page 39 of John Spencer | 182 |

3 (Pages 6 - 9)

Case 3:18-cv-00197-RJC-DSC   Document 226-13   Filed 04/23/20   Page 3 of 8
Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

|  | Page 22 |  | Page 24 |
|---|---|---|---|
| 1 | Q. What did you mean by "Documents Produced"? | 1 | looked for, was to see if I could identify a |
| 2 | I assume that's your language. And I'm | 2 | particular CRC material that he used, and, in fact, |
| 3 | looking at the footnote. | 3 | there was one included in the list. |
| 4 | A. Uh-huh. Well, that's -- you know, it was | 4 | Q. When you say you tried to identify a -- |
| 5 | a document that was provided to me in the Dropbox. | 5 | you know, a product that he used, I'm not sure I'm |
| 6 | Q. Okay. Do you know if it was produced in | 6 | following you. |
| 7 | the matter? | 7 | What do you mean by that? |
| 8 | Let me withdraw that. | 8 | A. Well, you know, from his deposition he was |
| 9 | Your -- your reference to "Documents | 9 | able to identify the brand, but as -- as you know, |
| 10 | Produced" is just simply to communicate that you | 10 | of course, there's -- there's lots of different |
| 11 | received it. | 11 | formulations of CRC products, and he didn't really |
| 12 | A. Yeah. | 12 | have that level of recall as to, you know, what -- |
| 13 | Q. Okay. | 13 | what the product number or what the particular name |
| 14 | A. Okay. | 14 | was. |
| 15 | Q. You don't know whether it was produced in | 15 | So that's what I was trying to drill down |
| 16 | the matter, or, if it was, when it was. You don't | 16 | to -- to find. |
| 17 | know any of those details. | 17 | Q. And did this tell you what product he |
| 18 | A. Oh, like, what the actual origin -- how it | 18 | used? |
| 19 | got to the Dropbox before I saw it? | 19 | A. Yeah. |
| 20 | Q. Sure. Yeah. | 20 | Q. "This" being the Approved Chemical List. |
| 21 | A. No, I don't. | 21 | A. Yeah, that's one segment -- |
| 22 | Q. Okay. When did you receive that Approved | 22 | Q. Let me just -- I've marked this as Exhibit |
| 23 | Chemical List? | 23 | 2. I'm sorry about that. |
| 24 | A. I was -- I was probably, maybe, midway | 24 | Is this the Approved Chemical List that |
| 25 | through the process. | 25 | we're talking about? |

|  | Page 23 |  | Page 25 |
|---|---|---|---|
| 1 | So say that I finished the report in | 1 | A. Let's see. |
| 2 | September, I probably got it in -- in early fall. | 2 | MR. FISHKIN: Do you want a copy of it? |
| 3 | Q. Did you speak to Mr. DuPont about the | 3 | MR. DuPONT: Let's see. Thanks. |
| 4 | Approved Chemical List? | 4 | Do we have a binder clip for his report or |
| 5 | A. Oh, well, yeah, I did -- we did, yeah. | 5 | something just so it doesn't go flying -- |
| 6 | Q. Okay. Can you tell me about those | 6 | THE WITNESS: I've got this. |
| 7 | conversations. | 7 | A. Yeah, this -- I mean, I never printed it |
| 8 | A. Well, typically what -- you know, the | 8 | off. You know, I have it electronically, but this |
| 9 | conversations usually involved email or a call back | 9 | looks familiar. |
| 10 | and forth between us when he had added something to | 10 | (Exhibit Herrick 2, Approved |
| 11 | the list, so -- or to the Dropbox, rather. So it | 11 | Chemical List, PLF005295-339.) |
| 12 | was either an email from DuPont himself or from the | 12 | Q. So that is the Approved Chemical List to |
| 13 | paralegal at his firm, just alerting me that there | 13 | which you are referring in your footnotes 241 and |
| 14 | was new information for me to look at. | 14 | 245? |
| 15 | Q. Are those emails -- are those emails | 15 | A. I believe it is, yeah. Yeah. |
| 16 | contained in your file? | 16 | Q. Okay. How did that Approved Chemical List |
| 17 | A. I actually don't know if all the emails | 17 | tell you that Mr. Rhyne used the CRC 3-36 product? |
| 18 | are in the file or not. | 18 | A. Well, I think I found it. I'm looking -- |
| 19 | Q. Okay. Did you talk to Mr. DuPont about | 19 | you know, I could look here again. |
| 20 | the substance of the Approved Chemical List? | 20 | Q. It's at 305. |
| 21 | A. Yeah, because one of the things I was | 21 | A. Oh. |
| 22 | interested in was trying to drill down a little bit | 22 | Q. It's on there. |
| 23 | on a CRC product that Rhyne recalled using. And | 23 | A. Okay. So I went down -- say again, I |
| 24 | so, you know, when I got the Approved Chemical | 24 | didn't have it in printed copy, but I, you know, |
| 25 | List, I -- you know, that was one of the things I | 25 | looked through it on the computer, and found -- |

7 (Pages 22 - 25)

|  | Page 26 |  | Page 28 |
|---|---|---|---|
| 1 | let's see -- "Cleaner, CRC 3-36, bulk CRC | 1 | years all the work I've done -- you know, any kind |
| 2 | Chemicals." That's the trade name and | 2 | of work involving litigation I do through EH&E. |
| 3 | manufacturer. | 3 | Q. Okay. And is your rate at EH&E 450 an |
| 4 | So that's -- that's how I found it. | 4 | hour for everything that you do in the matter, or |
| 5 | Q. How did this entry on this list on this | 5 | are there different rates for different tasks? |
| 6 | page tell you that he actually used that product? | 6 | A. No, it's a flat rate for everything. |
| 7 | A. Oh, I see. | 7 | Q. Okay. So that includes deposition |
| 8 | Well, it's -- it doesn't really. But | 8 | testimony, that includes trial testimony? |
| 9 | aside from the fact that, you know, as I look | 9 | A. That's correct, yeah. |
| 10 | through this, I'm pretty sure I remember that this | 10 | Q. Who else at EH&E has worked on this |
| 11 | was the only CRC product that was identified, you | 11 | matter? |
| 12 | know, in this -- in this list. So that's what I | 12 | A. Well, the person who helped when I was |
| 13 | did to conclude that that's what he used. | 13 | doing the work histories is -- is a woman named |
| 14 | Q. Sir, what is your rate of compensation in | 14 | Bemnet Genesse, and she's an EH&E employee. |
| 15 | this matter? | 15 | Q. Did anyone else from EH&E work on this |
| 16 | A. I -- I think the company -- I think the | 16 | matter? |
| 17 | billing out is at 450 an hour. | 17 | A. No, I don't think they did on this case -- |
| 18 | Q. All right. Are you billing out through | 18 | well, I'm sorry. Let me correct that. |
| 19 | EH&E? | 19 | Once I wrote the report, I sent it to EH&E |
| 20 | A. I am, yeah. | 20 | in a Word -- as a Word final, and they have a |
| 21 | Q. Okay. And what is your professional | 21 | production department that then, you know, makes |
| 22 | relationship with EH&E? | 22 | the tables look good and -- and, you know, does the |
| 23 | A. Well, I'm -- I'm a part-time employee. | 23 | editorial work and -- and makes it into a PDF |
| 24 | I'm a senior scientist -- | 24 | that's the final product. |
| 25 | Q. Okay. | 25 | Q. How many hours did you spend on the matter |

|  | Page 27 |  | Page 29 |
|---|---|---|---|
| 1 | A. -- is the title. | 1 | prior to starting your report? |
| 2 | Q. And what are you paid by CR -- by EH&E? | 2 | A. That's a good question. |
| 3 | A. Oh, what's my actual... | 3 | You know, I easily could have spent maybe |
| 4 | Gee, that's a good question, 'cause my | 4 | 30 or 40 hours, because, you know, I had some of |
| 5 | wife, kind of, takes care of the -- the finances at | 5 | the documents. I had Petty's report as a starting |
| 6 | home. | 6 | point. So, you know, I looked at that before I |
| 7 | MR. DuPONT: Are you asking his -- in this | 7 | started writing my own report. |
| 8 | case? | 8 | So, you know, that's probably a fair, you |
| 9 | Q. Well, what's your -- I'm trying to | 9 | know, number -- in that range. |
| 10 | understand your financial relationship with EH&E. | 10 | Q. What did you use Petty's report for? |
| 11 | A. Uh-huh. | 11 | A. Well, it was really [, of a -- of a |
| 12 | Q. So, for example, are you paid hourly by | 12 | background document. And, you know, I took a look |
| 13 | EH&E? | 13 | at the way he had organized the information and the |
| 14 | A. Yes. | 14 | way he had described Rhyne's work history and -- |
| 15 | Q. Okay. What are you paid hourly by EH&E? | 15 | and the way he had calculated his exposures. |
| 16 | A. I think by the time it all -- you know, | 16 | So, you know, that was -- those were the |
| 17 | because they -- you know, they basically treat me | 17 | main things I looked for. |
| 18 | as an employee, you know, so they -- they take | 18 | Q. Did you notice that Doctor Petty or Mr. |
| 19 | taxes and everything else out, so I think I'm | 19 | Petty did not calculate an exposure with a CRC |
| 20 | seeing about 250 an hour. Something like that. | 20 | product? |
| 21 | Q. Okay. Do you know if you were personally | 21 | A. I think that does -- that does sound |
| 22 | retained in the matter or if it was EH&E? | 22 | familiar, yeah. |
| 23 | A. Well, the contact, you know, to -- the | 23 | Q. Okay. Do you recall why he didn't? |
| 24 | question about whether I would be involved, you | 24 | A. No, I really don't. Truthfully, I -- I |
| 25 | know, came to me from Mr. DuPont, but in recent | 25 | had a little trouble following his report just in |

8 (Pages 26 - 29)

Case 3:18-cv-00197-RJC-DSC   Document 226-13   Filed 04/23/20   Page 5 of 8
Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 calculation that way.
2 Q. What -- what would the selection be if the
3 ACH was higher than, you know, you thought it was
4 at the time you made the selection of only good
5 ventilation?
6 A. Are you asking, like, what would the
7 effect be on the --
8 Q. No, what -- what would it be called? What
9 would the selection be called?
10 A. Oh, well, you could have, you know, very
11 good, you know, mechanical ventilation, forced
12 ventilation. Something like that.
13 Q. Okay. Has any study compared results from
14 the ART model to real-world measurements based on a
15 controlled simulation study?
16 A. Well, yeah. In fact, that paper that --
17 that I was a coauthor on where we looked at the ART
18 model with the parts washers we did that.
19 Q. Which paper is that?
20 A. Oh, it's the one -- the first author is
21 LeBlanc.
22 Q. That's not part of Exhibit 5; correct?
23 A. No. No.
24 Q. Okay.
25 A. That's actually been in play before.

1 Q. Okay. And any other study that you can
2 cite to, other than LeBlanc?
3 A. Well, actually, you know, that's kind of
4 what, you know, these three papers that I just
5 threw into play today, you know, what they did was
6 compare ART predictions with measurements of
7 exposure. So that's really what all three of those
8 papers address.
9 Q. What -- what is a physical mass-balance
10 model?
11 A. Well, it's -- that's, kind of, a form of a
12 -- of a mechanistic model where, you know, your
13 inputs are the physicochemical characteristics of
14 the material that's being used and the -- the
15 temperature and the size of the room and the air
16 exchange rate. You know, so it -- it relies on
17 physicochemical properties to calculate a
18 prediction.
19 Q. Are -- are physical mass-balance models
20 generally considered stronger tools for
21 case-specific exposure assessments, as opposed to
22 the ART model?
23 A. Well, there is one article -- and I forget
24 the name of the author who -- who made that point.
25 Interestingly, though, he was mainly talking about

1 dust exposures.
2 Q. Uh-huh.
3 A. But that is, you know, one of the
4 critiques, I guess I'd call it, that's been made
5 in, you know, people's discussion of the ART model.
6 Q. Do you -- do you agree that
7 physical-mass-based models are stronger tools for
8 case-specific exposure assessments than the ART
9 model?
10 MR. DuPONT: Form.
11 A. Not in general. I mean, I think, you
12 know, specifically I -- I'm recalling the paper
13 you're referring to. His point there really was
14 around aerosols and particles, not around vapors.
15 Q. Do you agree that the Near Field -- is
16 Near Field/Far Field a physical mass-balanced model
17 -- physical mass-balanced model?
18 A. It's of that type, yeah. It relies on the
19 physicochemical properties of the materials.
20 Q. Do you agree that the Near Field/Far Field
21 is generally considered a strong tool for
22 case-specific exposure assessments than --
23 A. I'm sorry. Could you repeat that. I
24 missed part of that.
25 Q. Sure.

1 Do you agree that the Near Field/Far Field
2 model is generally considered a stronger tool for
3 case-specific exposure assessments than the ART
4 model?
5 MR. DuPONT: Form.
6 A. I actually wouldn't agree with that, and
7 -- and, you know, there haven't been a lot of
8 direct comparisons, but the one that I, you know,
9 would refer to is that paper LeBlanc did -- my
10 student did. And, as it turned out, the
11 predictions of the ART model were actually closer
12 to the measurements of exposure than the
13 predictions from the two-zone model.
14 MR. FISHKIN: Thank you very much. I'm
15 going to -- I'm going to turn it over to my
16 colleagues. I may have some other questions if I
17 missed anything, but thank you for your time.
18 Appreciate it.
19 MR. DuPONT: Let's take a break.
20 (Whereupon the deposition recessed at
21 12:22 p.m.)

1  Q. Okay. And so you applied those same
2  parameters to your modeling of Mr. Rhyne's
3  exposure?
4      MR. DuPONT: Form.
5  A. Well, I -- I adjusted, you know, where
6  there were differences, but I think, for the most
7  part, those were the same, yeah.
8  Q. All right. So to speed this up, as far as
9  I can tell -- correct me if I'm wrong -- all of the
10 ART modeling you did that bears on safety cleaning
11 included both near field and far field; correct?
12     MR. DuPONT: Form.
13 A. That's correct, yeah.
14     MR. DuPONT: I'm sorry.
15 Q. Would the same thing be true here that you
16 -- you had said earlier that you -- you wouldn't
17 need to do far field with respect to the parts
18 washing modeling?
19     (Court Reporter comment.)
20 A. I think in a case like this, you know,
21 given where he was, you know, doing this, you know,
22 I -- I wouldn't rule out that there couldn't have
23 been secondary exposure sources, and that's what I
24 was trying to address, you know, by including that
25 far-field contribution.

1      But, you know, the -- these could be
2  recalculated using just the near-field approach.
3  Q. Secondary exposure sources being other
4  parts washers containing something associated with
5  Safety-Kleen or -- or other sources of exposure?
6      MR. DuPONT: Form.
7  A. Yeah, I was thinking more of other sources
8  of benzene exposure in general.
9  Q. And so if you included that as far-field
10 exposure in these models of Mr. Rhyne's exposure to
11 parts washers enclosing something with Safety-Kleen
12 in it, you're actually including nonSafety-Kleen
13 exposures; right?
14     MR. DuPONT: Form.
15 A. Yeah, what I was trying to model was
16 the -- his exposure during, you know, the
17 parts-washing process. And so if there is
18 contribution from -- from other sources, it
19 wouldn't have to be from -- you know, attributable
20 to Safety-Kleen.
21 Q. But if you were trying to attribute a
22 specific amount of exposure to Safety-Kleen, we
23 couldn't use these reports on their face, could we?
24 We'd have to back out all that secondary stuff that
25 has nothing to do with Safety-Kleen; right?

1      MR. DuPONT: Object to form.
2  A. Yeah, and I -- I guess it's just a
3  difference -- I wasn't really trying to do the
4  calculation in such a way that attributed something
5  uniquely to that product. I was looking at his
6  exposure, you know, overall in the environment
7  where he was doing the parts washing.
8  Q. So how -- how can you then use these
9  reports that are in your appendix that say,
10 "benzene from parts washing" to attribute a
11 specific amount of Mr. Rhyne's alleged exposure to
12 a Safety-Kleen product with any specificity?
13 A. I see your point. Okay.
14     Well, in this -- in this case, you know,
15 if there was a big contribution, you know, from
16 another source, it -- it would be -- or whatever
17 the contribution is -- if there is a contribution
18 from another source -- it would be nested under the
19 mineral-spirits-part-washing category.
20 Q. Nested meaning -- meaning what?
21     Then, how would we interpret your report
22 if we just wanted to find out what exposure can
23 actually be attributed to Safety-Kleen to a
24 reasonable degree of scientific certainty?
25 A. Oh, well, the -- you know, and which I

1  could -- I could certainly do this. I could go
2  back and -- and recalculate and -- and, you know,
3  just estimate -- just model only the contribution
4  from the part-washing source, the near field where
5  he was working, and not include the far-field
6  contribution.
7  Q. But -- but can we do that?
8      Can we identify, to a reasonable degree of
9  scientific certainty, Mr. Rhyne's exposure to
10 Safety-Kleen only using your report as it exists
11 right now?
12 A. I think it's -- it's a -- it's a good
13 estimate, a good modeled estimate, but it could be
14 refined if -- if the calculation were done in a
15 different approach, yeah.
16 Q. But a good estimate is different from
17 something that is reasonable to a degree of
18 scientific certainty; right?
19     I mean, would you stand behind this and
20 say this report is exactly what Mr. Rhyne's
21 exposure was to Safety-Kleen?
22     MR. DuPONT: Well, you just asked two
23 different questions. You asked reasonable degree
24 of scientific certainty, and the exact exposure.
25     MR. BENDER: You're right. I'll rephrase

87 (Pages 342 - 345)

Case 3:18-cv-00197-RJC-DSC   Document 226-13 Filed 04/23/20   Page 7 of 8
Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  that.
2  Q. Could you under oath tell a Court or a
3  jury right now that what is in this report
4  represents, to a reasonable degree of scientific
5  certainty, what Mr. Rhyne's exposure was to any
6  given Safety-Kleen product only?
7  A. I would have to say, you know, that the
8  approach that I took to the modeling didn't
9  uniquely target the contribution from the
10 Safety-Kleen product. It was the exposure overall
11 as a result of the parts-washing process, which --
12 where there could have been other sources of
13 exposure.
14     MR. BENDER: All right. Thank you, sir.
15 That's all I have.
16     MR. DuPONT: Very quickly -- no, this
17 is going to be it, 'cause we're leaving.
18     THE PHONE: Andrew, is that you? I can't
19 tell. I'm sorry to talk over you. I don't want to
20 let you go if I haven't gone yet.
21     MR. DuPONT: Who is this?
22     MR. DIXON: This is Josh Dixon for
23 Satogran.
24     MR. DuPONT: How much time do you have?
25     MR. DIXON: Five, ten.

1     MR. DuPONT: Let's take a break.
2     (Recess was taken.)
3     MR. DuPONT: We're on the record. It's 5
4  o'clock. I'm opening up questioning to people on
5  the phone.
6           EXAMINATION
7  BY MR. DIXON:
8  Q. I have some questions for you regarding
9  the statements in the report regarding the outdoor
10 work with the father.
11 A. Okay.
12 Q. You state on page 31 of your report that
13 you conservatively estimated that Mr. Rhyne you put
14 that one-third of the time he worked on the family
15 cars.
16   Do you see that?
17 A. Yeah. I'm looking right now, yeah.
18 Q. How did you come up with that one-third
19 time number?
20 A. I'm trying to remember. He was asked
21 about, you know, the overall work process and how
22 many times -- you know, he worked on the car with
23 his father once a month about six or seven hours
24 each time -- I'm just looking at the notes here --
25 how he used the Kutzit it.

1  And I estimated that -- and I think this
2  was as a result of -- of the responses that he gave
3  to the questions, that he didn't use Kutzit every
4  time. He didn't always remove the gaskets.
5  And so that -- I think he -- he may have
6  used that figure of one-third. I don't remember
7  the exact language in the deposition, but that was
8  what I used to recognize that he didn't always use
9  Kutzit.
10 Q. If he did not say that he used Kutzit
11 one-third of the time, would you admit that this is
12 speculation?
13    MR. DuPONT: Objection. Form.
14 A. Well, I haven't looked at his, you know,
15 deposition, but, you know, this would be my
16 estimate, you know, which I would -- you know,
17 which I used for the calculation.
18    I don't remember if he was specifically
19 asked about this or not.
20 Q. So if he wasn't specifically asked about
21 it, how did you come up with the one-third
22 estimation?
23 A. Well, that -- that was my value that I
24 estimated as -- as a reasonable frequency for the
25 kinds of work that he described doing on these

1  cars.
2  Q. But how did you arrive at that
3  information?
4     MR. DuPONT: Just asked and answered.
5  Q. You can answer, Doctor.
6  A. Yeah, I mean he --
7     MR. DuPONT: He did answer it.
8  A. He -- he -- well, if you take a look at
9  the kind of work that he was doing where he wound
10 up removing gaskets, he was, you know, taking off
11 the valve covers, he was taking off the oil pan
12 gaskets. So he clearly didn't do that every time
13 that he worked on the car, but I thought it was a
14 reasonable estimate to say, Well, those were kinds
15 of tasks that he would have done about a third of
16 the time.
17 Q. Okay. On that same page you described
18 your methodology for the ART model; correct?
19 A. That's correct.
20 Q. And that's at the very bottom of page 31.
21    And as you describe it in the last two
22 paragraphs of page 31, you assume that took Mr.
23 Rhyne 30 minutes to apply the Kutzit and then
24 another 60 to scrape it off the automotive head
25 gasket, the oil pan gasket he was working on; is