# EXHIBIT "L"

```
                          VOLUME:    I
                          PAGES:     1-379
                          EXHIBITS:  1-12
           IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                   CHARLOTTE DIVISION
             Case No. 3:18-cv-00197-RJC-DSC
```

_____

BRUCE RHYNE and JANICE RHYNE,          )

               Plaintiffs,          )

           vs.                    )

UNITED STATES STEEL CORPORATION,       )

et al.,                                )

             Defendants.          )

_____)

            DEPOSITION OF ROBERT F. HERRICK,

Sc.D., CIH, FAIHA, called as a witness by and on

behalf of the Defendants, Chevron U.S.A., Inc., CRC

Industries, Inc., and Univar Solutions USA Inc.,

f/k/a Univar USA Inc., pursuant to the applicable

provisions of the Federal Rules of Civil Procedure,

before P. Jodi Ohnemus, RPR, RMR, CRR, CA-CSR

#13192, NH-LSR #91, MA-CSR #123193, and Notary

Public, within and for the Commonwealth of

Massachusetts, at Veritext Legal Solutions, 101

Arch Street, Suite 650, Boston, Massachusetts, on

Wednesday, November 6, 2019, commencing at 9:09

a.m.

f80149dc-3ac9-479f-a949-3cf0ea58afb8

```
1   APPEARANCES:
2
3          LOCKS LAW FIRM, LLC
4          BY:  Andrew J. DuPont, Esq.
5          The Curtis Center, Suite 720E
6          601 Walnut Street
7          Philadelphia, PA  19106
8          215 893-0100
9          Adupont@lockslaw.com
10         For the Plaintiffs
11
12
13         FISHKIN LUCKS LLP
14         BY:  Andrew P. Fishkin, Esq.
15         The Legal Center
16         One Riverfront Plaza, Suite 410
17         Newark, NJ  07102
18         973 536-2800
19         Afishkin@fishkinlucks.com
20         For Defendants Chevron U.S.A.
21         Inc., CRC Industries, Inc., and
22         Univar Solutions USA Inc., f/k/a
23         Univar USA Inc.
24
25
```

```
1   APPEARANCES:  (CONT'D)
2
3          (Via Telephone)
4          BABST CALLAND
5          BY:  Kathy K. Condo, Esq.
6          Two Gateway Center
7          603 Stanwix Street
8          Pittsburgh, PA  15222
9          412 394-5453
10         Kcondo@babstcalland.com
11         For Acuity Specialty Products
12         Products Group, Inc.
13
14         DICKIE McCAMEY
15         BY:  Vaughn K. Schultz, Esq.
16         Two PPG Place, Suite 400
17         Pittsburgh, PA  15222-5402
18         412 392-5531
19         Vschultz@dmclaw.com
20         For ExxonMobil Corporation
21
22
23
24
25
```

```
1   APPEARANCES:  (CONT'D)
2
3          (Via Telephone)
4          GORDON & REES
5          SCULLY MANSUKHANI LLP
6          BY:  Joshua W.  Dixon, Esq.
7          40 Calhoun Street
8          Suite 350
9          Charleston, SC  29401
10         843 714-2502
11         jdixon@grsm.com
12         For the Savogran Company
13
14
15         (Via Teleconference)
16         ROGERS TOWNSEND & THOMAS, PC
17         BY:  Roy Shelley, Esq.
18         1221 Main Street, 14th Floor
19         Columbia, SC  29201
20         803 744-1818
21         Roy.shelley@rtt-law.com
22         For Steco Corp.
23
24
25
```

```
1   APPEARANCES:  (CONT'D)
2
3          CANFILL SUMNER & HARTZOG LLP
4          BY:  Virginia Wooten, Esq.
5          2907 Providence Road, Suite 200
6          Charlotte, NC  28211
7          704 940-3401
8          Vwooten@cshlaw.com
9          For Turtle Wax
10
11         (Via Telephone)
12         MARON MARVEL BRADLEY ANDERSON
13         & TARDY LLC
14         BY:  Chad D. Mountain, Esq.
15         Three Logan Square
16         1717 Arch Street, Suite 3710
17         Philadelphia, PA  19103
18         215 231-7100
19         Cmountain@maronmarvel.com
20         For Sunoco (R&M) LLC
21
22
23
24
25
```

2 (Pages 2 to 5)

```
1   APPEARANCES: (CONT'D)
2
3          McANGUS GOUDELOCK & COURIE LLC
4          BY: John Jeffries, Esq.
5          6302 Fairview Road, Suite 700
6          Charlotte, NC 28210-2287
7          704 405-4571
8          Jjeffries@mgcla.com
9          For Kano Laboratories
10
11         (Via Telephone)
12         HARRIS BEACH PLLC
13         BY: Brian A. Bender, Esq.
14         445 Hamilton Avenue
15         Suite 1206
16         White Plains, NY 10601
17         212 313-5405
18         Bbender@harrisbeach.com
19         For Safety-Kleen Systems, Inc.
20
21
22
23
24
25
```

```
1   APPEARANCES: (CONT'D)
2
3          THE CAIRONE LAW FIRM PLLC
4          BY: Matthew Cairone, Esq.
5          1900 Main Street, Suite 107 PMB 58
6          Canonsburg, PA 15317-5861
7          724 416-3261
8          Mcc@caironelawfirm.com
9          For United States Steel Corp.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                 I N D E X
2
3   TESTIMONY OF:              PAGE
4
5   ROBERT F. HERRICK, Sc.D.
6
7   (By Mr. Fishkin)            9
8   (By Mr. Cairone)           164, 363
9   (By Mr. Schultz)           193
10  (By Ms. Wooten)            267
11  (By Mr. Jeffries)          276
12  (By Mr. Bender)            321, 375
13  (By Mr. Dixon)             347
14  (By Mr. DuPont)            365
15
16
17
18
19
20
21
22
23
24
25
```

```
1              E X H I B I T S
2   EXHIBIT      DESCRIPTION          PAGE
3
4   Exhibit      Expert Report of Robert F.    14
5   Herrick 1     Herrick, Sc.D., CIH, FAIHI
6   Exhibit      Approved Chemical List,       25
7   Herrick 2     PLF005295-339
8   Exhibit      Robert F. Herrick curriculum  32
9   Herrick 3     vitae
10  Exhibit      Material Safety Data Sheet     79
11  Herrick 4
12  Exhibit      Articles: "Accuracy           91
13  Herrick 5     Evaluation of Three
14            Modelling Tools for
15            Occupational Exposure
16            Assessment"; "A study of the
17            Validity of Two Exposure
18            Assessment Tools:
19            Stoffenmanager and the
20            Advanced Reach Tool";
21            "Evaluation of Exposure
22            Assessment Tools under
23            REACH: Part II -- Higher
24            Tier Tools
25            page 39 of John Spencer       182
```

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  Herrick 6       Summary Report
2  Exhibit         five-page document,      195
3  Herrick 7       handwritten notes
4  Exhibit         Article: "The Performance   196
5  Herrick 9       of Passive Diffusion
6                  Monitors for Organic Vapours
7                  for Personal Sampling of
8                  Painters
9  Exhibit         five-page document,      196
10 Herrick 8       spreadsheet
11 Exhibit         Article: "Haematopoietic    220
12 Herrick 10      Cancer Mortality Among
13                 Vehicle Mechanics."
14 Exhibit         Article: "Comparison Of the  256
15 Herrick 11      Near Field/Far Field Model
16                 and the Advanced Reach Tool
17                 (ART) Model V1.5:  Exposure
18                 Estimates to Benzene During
19                 Parts Washing with Mineral
20                 Spirits
21 Exhibit         one-page document: Table 4,  291
22 Herrick 12      "Cumulative Benzene Exposure
23                 by Product and Facility
24                 update
25

1       ROBERT F. HERRICK, Sc.D., CIH, FAIHA,
2       having satisfactorily been identified by
3       the production of a driver's license,
4       and being first duly sworn by the Notary
5       Public, was examined and testified as
6       follows to interrogatories
7  BY MR. FISHKIN:
8       Q.  Doctor Herrick, good morning.
9       My name is Andy Fishkin.  I represent CRC
10 in this case, along with Univar and Chevron.
11      How are you doing this morning?
12      A.  Doing great.  Thanks.
13      Q.  Good.  Doctor, how did you become involved
14 in this matter?
15      A.  I -- let's see...
16      I got a contact from -- from Andrew
17 DuPont -- I'm trying to remember if it was an email
18 or a phone call -- but he asked me if I was willing
19 to be an expert in this case.
20      Q.  And when was that, sir?
21      A.  At least a year ago.
22      Q.  Do you have a date?
23      A.  You know, it's back there somewhere.  I
24 can -- would it have been -- probably last fall,
25 maybe early -- early in 2019.

1       Q.  Okay.  What -- when you say that Mr.
2  DuPont asked if you were willing to be an expert,
3  did he ask you what he wanted you to do in the
4  case?
5       A.  Well, I had done some -- some cases with
6  him previously, and the request was -- was similar;
7  that this would be a case where he would like me to
8  prepare a report with my assessment of Mr. Rhyne's
9  exposures.
10      MS. CONDO:  I don't mean to interrupt, but
11 I don't know if others are having trouble -- I'm
12 having trouble hearing the witness on the phone.
13      (Discussion off the record.)
14      Q.  Were you asked to do anything else in the
15 matter other than assess exposures?
16      A.  No, that was really the -- the primary
17 responsibility.  The -- the whole assessment
18 process, you know, I kind of, view it as being in
19 two steps:  One step is compiling a detailed work
20 history for the person, and, then, that's, kind of,
21 the foundation for linking up the exposures with
22 the particular work activities that he did.
23      Q.  And did you prepare a detailed work
24 history for Mr. Rhyne?
25      A.  I did, and that's -- that's included --

1  that's basically the first half of the report.
2       Q.  Okay.  And did you do that personally?
3       A.  Well, I did that, together with some other
4  people I work with at the firm, EH&E.
5       Q.  Okay.
6       A.  Yeah.
7       Q.  And how did the division of labor work?
8       A.  Well, what we try to do is, they have some
9  people who are very good at combing through the
10 detailed work histories, and -- and so they do that
11 and -- and I do it separately, and then basically
12 merge the results of -- of our -- our findings.
13      So the -- the final version that's in the
14 report reflects my assessment of the work history,
15 but they do help in that process.
16      Q.  Okay.  Did you read Mr. Rhyne's deposition
17 testimony --
18      A.  I did.
19      Q.  -- personally?
20      A.  I did.
21      Q.  Okay.  Each day of it?
22      A.  Yup.
23      Q.  Okay.  And obviously you prepared a report
24 in the matter?
25      A.  Yes.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1    Q.  And did you prepare the report?
2    A.  Yeah, I write the report, and then it goes
3  in at -- at the firm, EH&E, to the final
4  production, where they format it and -- and, you
5  know, do the final editing and cosmetic changes.
6    Q.  Okay.  I'm going to put before you what
7  we've marked as Herrick 1.
8    A.  Okay.
9    Q.  Doctor, is that your report in this
10 matter?
11       (Exhibit Herrick 1, Expert Report of
12       Robert F. Herrick, Sc.D., CIH, FAIHI.)
13   A.  (Witness reviews document.)  Yeah, this
14 looks like my report.
15   Q.  All right.  Going through the report, does
16 that help you to tell me when exactly you first
17 became involved in the matter?
18   A.  (Witness reviews document.)  Well, let's
19 see.  So I signed -- the report's signed off as of
20 September 17th, 2019.  So I think I was probably
21 involved, you know, for a period of -- of roughly
22 six months, six or eight months.
23       So, I mean, I -- my recollection is that,
24 you know, I really started getting information
25 about this in early 2019.

1    Q.  Okay.  Does the report contain all of your
2  opinions in this matter?
3    A.  Yes, it does.  Yeah.
4    Q.  Did anyone else participate in the
5  preparation of the report?
6    A.  Well, aside from the -- the person, you
7  know, the -- the staff I mentioned at EH&E, who
8  contributed to, you know, helping me put together
9  the work histories, but no one other than that.
10   Q.  Okay.  Obviously the report refers to some
11 modeling you did; is that correct?
12   A.  Right.  Yes.
13   Q.  Or modeling that was done.
14       Did you do the modeling yourself?
15   A.  Yes, I did.
16   Q.  So you sat in front of the computer and
17 actually did the model?
18   A.  I did, yes.
19   Q.  Okay.  And you picked all of the -- I
20 mean, we're going to get into this later -- but
21 obviously you relied -- at least in part -- on the
22 ART model?
23   A.  That's correct.
24   Q.  Okay.  And the ART model contains --
25       MR. DuPONT:  Objection to form.

1    Q.  And the ART model contains a number of
2  modifying factors.
3    A.  Yeah, there's -- there's a number of
4  inputs.
5       I want to make sure I understand your
6  question.  You know, I do -- in the ART model, you
7  know, the user doesn't enter the modifying factors,
8  per se, but you have a series of inputs that you
9  provide the program.
10   Q.  Understood.
11       You have a series of choices that you can
12 select from.
13   A.  Sure.
14   Q.  Okay.  And did you make those choices?
15   A.  I did.
16   Q.  You made all of the selections?
17   A.  I did.
18   Q.  Okay.  Thank you.
19       MR. DuPONT:  Can I clarify something?
20       MR. FISHKIN:  Sure.  Yeah.
21       MR. DuPONT:  Sure.  Were there certain
22 exposure assessments you did that were not through
23 the ART model in this case?
24       THE WITNESS:  Oh, there were, yeah.
25   A.  Are we going to talk about them?  'Cause I

1  did some other modeling, but different procedure.
2    Q.  Yeah.  Understand.
3       Yeah -- no, I -- I think my question was
4  -- I think you relied on the ART model in part.  If
5  I didn't say that, I meant to say that.
6       MR. DuPONT:  That wasn't the question,
7  which is why I wanted to clarify.
8       MR. FISHKIN:  Okay.  Yeah.
9    Q.  No, I understand you didn't rely
10 exclusively on the ART model.  Okay.  Understood.
11       So obviously you received information in
12 the matter before preparation of the report; is
13 that right?
14   A.  I did, yeah.
15   Q.  Okay.  What information did you receive
16 before preparing the report?
17   A.  Well, there was a -- I think we used a --
18 a Dropbox or a share file -- I'm not sure what the
19 technology was in this case -- but Mr. DuPont
20 included information about -- well -- the
21 depositions, obviously, from -- from Rhyne, and
22 there was another deposition from one of his
23 coworkers, whose name I'm blanking on right at the
24 moment; and there were lots of documents in there
25 about the safety data sheets and the product

Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 6 of 97

1  information that he -- that Rhyne recalled using.
2       And let's see...
3       There were records from his radiation
4  badge monitoring that he had worn.
5       Those are the main things that I'm
6  bringing -- that I can bring to mind.
7    Q.  So before the deposition started Mr.
8  DuPont sent us a -- a Dropbox.
9       Have you seen that -- the material that's
10 contained in that Dropbox that Mr. DuPont sent us?
11   A.  I don't know that -- if it -- if it's the
12 same information he sent me, then I have.
13   Q.  Yeah.
14   A.  I -- I have to, kind of, defer to you
15 know, him 'cause I didn't -- I don't recall.
16       Was this something he sent you very
17 recently, or...
18   Q.  Yes.  And that -- and that's what I'm
19 trying to find out whether the information that Mr.
20 DuPont sent us in the Dropbox was everything that
21 was in your file, or whether there were things
22 beyond what was in your file.
23       And you haven't seen the Dropbox, so you
24 can't tell me.
25   A.  I guess I can't, no.

1    Q.  Okay.
2    A.  Yeah.
3    Q.  All right.
4       MR. FISHKIN:  Let's just go off the record
5  for a moment.
6       (Discussion off the record.)
7    Q.  Did you receive anything from Mr. DuPont's
8  office or Mr. DuPont after you prepared this
9  report?
10   A.  Yeah, he sent me -- there were some other
11 expert reports.  I got the report from Spencer.  I
12 got the report from -- is her name Deeds?  I'm,
13 kind of, blanking on everybody's name exactly.
14 Just a couple of days ago he sent me a deposition
15 from Peter Infante, and, then, there were some
16 other documents he sent me that were from
17 physicians and, then, oncologists and people -- I'm
18 not remembering all the names -- who were offering
19 opinions in the case.
20       So, yeah, there were some things that --
21 that came in after I wrote the report.
22   Q.  Okay.  You understand that Mr. Spencer is
23 one of the defense experts in the case?
24   A.  Yeah, I do.
25   Q.  Okay.  Other than Mr. Spencer's report and

1  the Deeds report, did you receive any other defense
2  expert reports?
3    A.  Not that I recall.  I don't think so.
4    Q.  Did you receive --
5    A.  Well, no.  I'm sorry.  These physicians --
6  I'm sorry.  Let me amend.
7    Q.  Sure.
8    A.  These people who were commenting on the --
9  the genetic characteristics of Mr. Rhyne and all, I
10 mean, those are all defense experts; right?
11   Q.  Yeah, I don't -- I don't know who you're
12 referring to, because I haven't been able to -- to
13 look in the Dropbox --
14   A.  Okay.
15   Q.  -- but just -- do you remember the names?
16   A.  Oh, well, there was one.  It's -- it's
17 coming.  Oh, boy.  Oh, Hoel, H-o-e-l.
18       Is that one of the experts, David Hoel?
19 Yeah.
20       No, I'm sorry.  There -- there were
21 several people, you know, with degrees -- you know,
22 physicians and, then -- backgrounds apparently in
23 various aspects of genetics and so forth who
24 offered opinions, but I'm not really getting -- I
25 can't bring up their names right here.

1    Q.  Do you recall receiving a report drafted
2  or written by Pamela Williams?
3    A.  Let's see.  I -- I don't think I saw a
4  Williams report in this one.
5       Oh, and also I should say, you know, there
6  was an earlier report -- I might have done this --
7  that I got from a gentleman named Petty, P-e-t-t-y.
8  I have that.
9    Q.  Okay.  And you got the Petty report before
10 you prepared your report?
11   A.  I did, yeah.
12   Q.  Okay.  Is it fair to say that the entirety
13 of your -- well, withdraw that.
14       There are a couple of footnotes in your
15 report which you have in front of you and
16 specifically at Nos. -- at footnotes 241 and 245
17 that refer to "Documents Produced."
18   A.  Let me take a look and see that.  (Witness
19 reviews document.)  Oh, right.  Uh-huh.
20   Q.  Okay.  What -- what is that referring to?
21   A.  Well, in 241 this was information that we
22 got -- that I got from Mr. DuPont about the
23 chemicals that were on an approved list for the
24 nuclear station, for McGuire.  So, I mean, that's
25 what that's referring to.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1      Q.  What did you mean by "Documents Produced"?
2      I assume that's your language.  And I'm
3  looking at the footnote.
4      A.  Uh-huh.  Well, that's -- you know, it was
5  a document that was provided to me in the Dropbox.
6      Q.  Okay.  Do you know if it was produced in
7  the matter?
8      Let me withdraw that.
9      Your -- your reference to "Documents
10  Produced" is just simply to communicate that you
11  received it.
12      A.  Yeah.
13      Q.  Okay.
14      A.  Okay.
15      Q.  You don't know whether it was produced in
16  the matter, or, if it was, when it was.  You don't
17  know any of those details.
18      A.  Oh, like, what the actual origin -- how it
19  got to the Dropbox before I saw it?
20      Q.  Sure.  Yeah.
21      A.  No, I don't.
22      Q.  Okay.  When did you receive that Approved
23  Chemical List?
24      A.  I was -- I was probably, maybe, midway
25  through the process.

1      So say that I finished the report in
2  September, I probably got it in -- early fall.
3      Q.  Did you speak to Mr. DuPont about the
4  Approved Chemical List?
5      A.  Oh, well, yeah, I did -- we did, yeah.
6      Q.  Okay.  Can you tell me about those
7  conversations.
8      A.  Well, typically what -- you know, the
9  conversations usually involved email or a call back
10  and forth between us when he had added something to
11  the list, so -- or to the Dropbox, rather.  So it
12  was either an email from DuPont himself or from the
13  paralegal at his firm, just alerting me that there
14  was new information for me to look at.
15      Q.  Are those emails -- are those emails
16  contained in your file?
17      A.  I actually don't know if all the emails
18  are in the file or not.
19      Q.  Okay.  Did you talk to Mr. DuPont about
20  the substance of the Approved Chemical List?
21      A.  Yeah, because one of the things I was
22  interested in was trying to drill down a little bit
23  on a CRC product that Rhyne recalled using.  And
24  so, you know, when I got the Approved Chemical
25  List, I -- you know, that was one of the things I

1  looked for, was to see if I could identify a
2  particular CRC material that he used, and, in fact,
3  there was one included in the list.
4      Q.  When you say you tried to identify a --
5  you know, a product that he used, I'm not sure I'm
6  following you.
7      What do you mean by that?
8      A.  Well, you know, from his deposition he was
9  able to identify the brand, but as -- as you know,
10  of course, there's -- there's lots of different
11  formulations of CRC products, and he didn't really
12  have that level of recall as to, you know, what --
13  what the product number or what the particular name
14  was.
15      So that's what I was trying to drill down
16  to -- to find.
17      Q.  And did this tell you what product he
18  used?
19      A.  Yeah.
20      Q.  "This" being the Approved Chemical List.
21      A.  Yeah, that's one segment --
22      Q.  Let me just -- I've marked this as Exhibit
23  2.  I'm sorry about that.
24      Is this the Approved Chemical List that
25  we're talking about?

1      A.  Let's see.
2      MR. FISHKIN:  Do you want a copy of it?
3      MR. DuPONT:  Let's see.  Thanks.
4      Do we have a binder clip for his report or
5  something just so it doesn't go flying --
6      THE WITNESS:  I've got this.
7      A.  Yeah, this -- I mean, I never printed it
8  off.  You know, I have it electronically, but this
9  looks familiar.
10      (Exhibit Herrick 2, Approved
11      Chemical List, PLF005295-339.)
12      Q.  So that is the Approved Chemical List to
13  which you are referring in your footnotes 241 and
14  245?
15      A.  I believe it is, yeah.  Yeah.
16      Q.  Okay.  How did that Approved Chemical List
17  tell you that Mr. Rhyne used the CRC 3-36 product?
18      A.  Well, I think I found it.  I'm looking --
19  you know, I could look here again.
20      Q.  It's at 305.
21      A.  Oh.
22      Q.  It's on there.
23      A.  Okay.  So I went down -- say again, I
24  didn't have it in printed copy, but I, you know,
25  looked through it on the computer, and found --

1  let's see -- "Cleaner, CRC 3-36, bulk CRC
2  Chemicals." That's the trade name and
3  manufacturer.
4       So that's -- that's how I found it.
5       Q. How did this entry on this list on this
6  page tell you that he actually used that product?
7       A. Oh, I see.
8       Well, it's -- it doesn't really. But
9  aside from the fact that, you know, as I look
10 through this, I'm pretty sure I remember that this
11 was the only CRC product that was identified, you
12 know, in this -- in this list. So that's what I
13 did to conclude that that's what he used.
14      Q. Sir, what is your rate of compensation in
15 this matter?
16      A. I -- I think the company -- I think the
17 billing out is at 450 an hour.
18      Q. All right. Are you billing out through
19 EH&E?
20      A. I am, yeah.
21      Q. Okay. And what is your professional
22 relationship with EH&E?
23      A. Well, I'm -- I'm a part-time employee.
24 I'm a senior scientist --
25      Q. Okay.

1       A. -- is the title.
2       Q. And what are you paid by CR -- by EH&E?
3       A. Oh, what's my actual...
4       Gee, that's a good question, 'cause my
5  wife, kind of, takes care of the -- the finances at
6  home.
7       MR. DuPONT: Are you asking his -- in this
8  case?
9       Q. Well, what's your -- I'm trying to
10 understand your financial relationship with EH&E.
11      A. Uh-huh.
12      Q. So, for example, are you paid hourly by
13 EH&E?
14      A. Yes.
15      Q. Okay. What are you paid hourly by EH&E?
16      A. I think by the time it all -- you know,
17 because they -- you know, they basically treat me
18 as an employee, you know, so they -- they take
19 taxes and everything else out, so I think I'm
20 seeing about 250 an hour. Something like that.
21      Q. Okay. Do you know if you were personally
22 retained in the matter or if it was EH&E?
23      A. Well, the contact, you know, to -- the
24 question about whether I would be involved, you
25 know, came to me from Mr. DuPont, but in recent

1  years all the work I've done -- you know, any kind
2  of work involving litigation I do through EH&E.
3       Q. Okay. And is your rate at EH&E 450 an
4  hour for everything that you do in the matter, or
5  are there different rates for different tasks?
6       A. No, it's a flat rate for everything.
7       Q. Okay. So that includes deposition
8  testimony, that includes trial testimony?
9       A. That's correct, yeah.
10      Q. Who else at EH&E has worked on this
11 matter?
12      A. Well, the person who helped when I was
13 doing the work histories is -- is a woman named
14 Bemnet Genesse, and she's an EH&E employee.
15      Q. Did anyone else from EH&E work on this
16 matter?
17      A. No, I don't think they did on this case --
18 well, I'm sorry. Let me correct that.
19      Once I wrote the report, I sent it to EH&E
20 in a Word -- as a Word final, and they have a
21 production department that then, you know, makes
22 the tables look good and -- and, you know, does the
23 editorial work and -- and makes it into a PDF
24 that's the final product.
25      Q. How many hours did you spend on the matter

1  prior to starting your report?
2       A. That's a good question.
3       You know, I easily could have spent maybe
4  30 or 40 hours, because, you know, I had some of
5  the documents. I had Petty's report as a starting
6  point. So, you know, I looked at that before I
7  started writing my own report.
8       So, you know, that's probably a fair, you
9  know, number -- in that range.
10      Q. What did you use Petty's report for?
11      A. Well, it was really [, of a -- of a
12 background document. And, you know, I took a look
13 at the way he had organized the information and the
14 way he had described Rhyne's work history and --
15 and the way he had calculated his exposures.
16      So, you know, that was -- those were the
17 main things I looked for.
18      Q. Did you notice that Doctor Petty or Mr.
19 Petty did not calculate an exposure with a CRC
20 product?
21      A. I think that does -- that does sound
22 familiar, yeah.
23      Q. Okay. Do you recall why he didn't?
24      A. No, I really don't. Truthfully, I -- I
25 had a little trouble following his report just in

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510  ~  202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 9 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1    terms of the way it was organized.
2        Q.  How much time did you spend preparing your
3    report?
4        A.  Oh, wow.  You know, I -- I know that would
5    be in the billing records.  I -- right off the top
6    of my head I -- I wouldn't want to hazard a guess.
7    I mean, it was -- it was a pretty extensive
8    process.
9        Q.  Your time in the matter is billed by EH&E?
10       A.  It is, yeah.
11       Q.  Okay.  Have bills gone out?
12       A.  Uh-huh -- yeah.
13       Q.  And do they go to Mr. DuPont's office?
14       A.  They do.
15       Q.  Okay.  Have you done anything in the
16   matter since signing your report?
17       A.  Well, I've mainly read, you know, the
18   documents that have come in since my report that we
19   talked about earlier.  You know, I took a look at
20   the experts' reports, and -- and, then, I've been
21   reviewing information to prepare for today.
22       Q.  How much time did you spend preparing for
23   today?
24       A.  It's -- it's been substantial.  I -- I
25   think I could have easily put in 15 or 20 hours.

1        Q.  Did you meet with Mr. DuPont in
2    preparation for today's deposition?
3        A.  We did.  We met yesterday.
4        Q.  Okay.  For how long did you meet with him?
5        A.  It was about two hours.
6        Q.  Do you recall any of the documents that
7    you reviewed in preparation for today's deposition?
8        A.  Well, my report, obviously; and I looked
9    back at Rhyne's deposition; and I also looked at,
10   you know, the experts' documents -- especially
11   Spencer's and -- and Deeds -- that, you know,
12   commented on -- on my report.
13           And, then, these three or four articles
14   that I mention that I'd like to, you know, get into
15   the discussion today, I looked over those again,
16   just to make sure they were what -- you know, what
17   I was really looking for.
18       Q.  Have you ever talked to Mr. Rhyne?
19       A.  No, I haven't.
20       Q.  Have you ever asked to talk to Mr. Rhyne?
21       A.  No, I haven't.
22       Q.  Have you talked to Mr. Petty --
23       A.  No.
24       Q.  -- about anything?
25       A.  No, I don't know Petty, actually.

1        Q.  Okay.  Okay.
2            Did you ever speak to anyone else in this
3    case, other than perhaps coworkers at EH&E and Mr.
4    DuPont?
5            Have you talked to anyone else?
6        A.  No, I haven't.
7        Q.  You -- you are not a medical doctor; is
8    that right?
9        A.  That's correct, yeah.
10       Q.  You're not a toxicologist.
11       A.  No, I'm not.
12       Q.  You're not an epidemiologist.
13       A.  I'm not.
14       Q.  Your report does not contain an opinion on
15   general medical causation.
16       A.  It does not.
17       Q.  Or specific medical causation.
18       A.  Neither, no.
19       Q.  And your report does not contain an
20   opinion on warnings.
21       A.  No, it doesn't.
22           MR. FISHKIN:  I'll mark -- I have a -- I'm
23   going to mark as Herrick 3 what purports to be your
24   CV with a date of August of 2019.
25           (Exhibit Herrick 3, Robert F. Herrick

1            curriculum vitae.)
2        Q.  I assume you've seen that before?
3        A.  Yes, I have.
4        Q.  Is -- is that the current version of your
5    CV?
6        A.  (Witness reviews document.)  Well, I need
7    to update it, actually, because there's a couple
8    new publications that aren't reflected here.  And
9    also, I just did a review for EPA that I should
10   mention on -- on this.
11           So -- but it's substantially current,
12   yeah.
13       Q.  Okay.  Can you update it for us now on the
14   record.  Tell us what's missing.
15       A.  There's a couple of articles -- I can't
16   give you the -- you know, exact citation -- that
17   have been published since -- since April.  That's
18   the last one I have on here.
19           And, then, the review I did for EPA was a
20   review of a PCP document.
21       Q.  All right.  What was the subject of the
22   couple of publications?
23       A.  Oh, they -- they're papers that I'm a
24   coauthor on with some of the -- some of my
25   colleagues from Harvard, and it mainly had to do

9 (Pages 30 to 33)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 10 of 97

1  with take-home exposures as a result of electronics
2  recycling.
3      Q.  Nothing at all to do with benzene?
4      A.  No, these weren't benzene.  It's metals
5  and PCBs.
6      Q.  Anything to do with the ART model?
7      A.  No.  There was no modeling in those, no.
8      Q.  Other than the couple of publications and
9  the EPA review, that is -- that CV is current?
10     A.  Let's see.  (Witness reviews document.)
11     Yeah.
12     Q.  On how many occasions have you been asked
13 to testify or to serve as an expert witness in a
14 litigation matter?
15     A.  In -- in total over...
16     Q.  Yes.
17     A.  It's -- it's probably around -- I'd say
18 between 10 and 12.  It's getting up there.
19     Q.  And what's the split between plaintiffs
20 and defendants?
21     A.  Oh, it's -- it's all been plaintiffs.
22     Q.  Have you ever declined a request to serve
23 as an expert witness in a litigation matter?
24     A.  Well, I've had some conversations -- not
25 recently, but years ago -- there were some requests

1  and things that I -- that I discussed about
2  asbestos litigation, and I thought about doing it,
3  and then decided that -- that I just wasn't going
4  to.
5      Q.  Why did you decide not to do it?
6      A.  Well, some of it just had to do with my
7  sense that I wasn't really as current as I would
8  have wanted to be on asbestos, 'cause I hadn't
9  worked in asbestos for quite a while; and it would
10 have been a pretty steep learning curve, I felt, to
11 really get to the point where I would have felt
12 comfortable.
13     So -- and it was also -- I was -- it was
14 when I first started at Harvard, and I was trying
15 to, you know, get my research and teaching and,
16 then, other things launched, so I just didn't feel
17 like I should put the time to it.
18     Q.  When did you first serve as an expert
19 witness in litigation?
20     A.  That would have probably been -- maybe
21 almost 10 years ago.
22     Q.  What kind of cases have you served as an
23 expert in litigation?
24     In what kind of cases, I should say.
25     A.  Oh, okay.

1      Well, there's -- some of them had to do
2  with people who were -- I mean, the issue was
3  adverse reproductive outcomes and -- and several of
4  those involved people who worked in the
5  semiconductor industry.  So that was -- that was
6  one set.
7      And, then, another set had to do with
8  cases involving PCBs in building materials, where
9  people were suing Monsanto -- or Bayer, I guess, as
10 it's now called -- over remediation issues to -- to
11 remove the PCBs from the buildings.
12     And, then, I've done two or three -- maybe
13 this is the fourth -- of these cases involving
14 benzene with Mr. DuPont.
15     Q.  When did you start working with Mr. DuPont
16 as an expert witness in litigation?
17     A.  See, I'm going back.  There -- I mean, I
18 think it's been a couple of years -- two or -- I'll
19 -- I'll estimate about two years.
20     Q.  Have you worked with anyone else in
21 benzene litigation other than Mr. DuPont?
22     A.  No, I haven't.
23     Q.  What's -- can you tell me the name of the
24 cases that you have worked on with Mr. DuPont.
25     A.  Well, the people who were involved, one

1  case is -- is Lesher, L-e-s-h-e-r; another is
2  Coppage, C-o-p-p-a-g-e; another was Lee, L-e-e; and
3  -- well, Rhyne, obviously; and, then, there was one
4  for Howell, H-o-w-e-l-l.
5      Q.  So it's five matters?
6      A.  I think that's right, yeah.  Yeah.
7      Q.  Okay.  Were -- were you asked to perform
8  exposure assessments in those other matters that
9  you worked -- that you were working on with Mr.
10 DuPont -- or did work on with him?
11     A.  Yeah.  They all involved exposures; right.
12     Q.  And you did modeling in each of them?
13     A.  I'm trying to remember.  I don't -- I -- I
14 shouldn't be -- I can't say that with absolute
15 certainty, 'cause I actually don't remember, you
16 know, in some of the -- maybe one of the earlier
17 cases.
18     What I try to do, you know, just in
19 general is take a look at what's available in terms
20 of published information on exposures.  And so, as
21 -- as you saw from -- from this report, I -- you
22 know, I tried to use the best information I could
23 find, and sometimes that includes historical
24 measurements of exposure, and, then, other times it
25 includes modeled exposures; and, like in the case

10  (Pages 34 to 37)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 11 of 97

1  of -- of Rhyne here, it includes both.
2     Q.  Is it always your preference to use
3  historical measurements of exposures, as opposed to
4  modeling?
5         MR. DuPONT:  Form.
6     A.  Well, I found over the years that, you
7  know, it -- it's usually impossible to rely just on
8  the historical measured exposures, and that's
9  frequently because the information is just too
10  sparse.
11        And also, frankly, over time I've come to
12  the feeling that a lot of the methodology around
13  the modeling of exposures has improved, and I've
14  also, you know, tried to -- to stay current on the,
15  you know, new developments in that area.
16        So, you know, I guess what I try to do is
17  use the data as fully as possible and that would
18  include both the measurements and the models.
19     Q.  Have you testified at depositions in any
20  matter in which you've served as an expert witness?
21     A.  Have I done depositions --
22     Q.  Yes.
23     A.  -- prior to this one?
24        Yes, I have.
25     Q.  Okay.  What matters?

1     A.  Well, I've done those semiconductor cases,
2  those adverse reproductive outcome cases I
3  mentioned; and I've done depositions in, I think,
4  three of the PCB cases; and now this is the second
5  deposition around the benzene cases.
6     Q.  The first one being the Howell deposition?
7     A.  Yeah.  Right.  Right.
8     Q.  Okay.  When were the PCB depositions?
9     A.  They've been a couple of years.  They --
10  they were probably in 2016 and '17.
11     Q.  Do you recall the names of those cases?
12     A.  Well, they were schools -- school
13  districts that were suing Monsanto, and so one was
14  Hartford, Connecticut; another was Westport,
15  Massachusetts; and another was -- I'm blanking.  It
16  was the first one that I worked on.  It's not --
17  it's back there somewhere, but I'm not recalling
18  it, which -- which school it was.
19     Q.  Do you recall the plaintiff's lawyer that
20  you worked on those cases with?
21     A.  The -- the firm in one case was Kennedy &
22  Madonna, and the other two were Baron & Budd.
23     Q.  Who at Baron & Budd did you work with, if
24  you recall?
25     A.  Is his name Brett?  I think Brett Land, I

1  think.
2     Q.  Do you have copies of the transcripts from
3  those depositions?
4     A.  You know, I don't -- you know, I doubt it.
5  I mean, I probably didn't -- I don't think I -- I
6  can't say for sure.  In -- in the time that's
7  elapsed between then and now, I moved, and I -- I
8  offloaded a lot of -- a lot of paper that I just
9  didn't want to transport.  So I can't say for sure
10  that I have them.
11     Q.  Have you ever testified as an expert at a
12  trial?
13     A.  No, I haven't.
14     Q.  Has a court ever declined to allow you to
15  testify as an expert at trial?
16     A.  No.
17     Q.  Have you ever served as an expert in
18  litigation on any subject other than industrial
19  hygiene?
20     A.  No, I haven't.
21     Q.  Do you hold any current employment, other
22  than with EH&E?
23     A.  No, I mean, that -- you know, these
24  advisory positions, you know, like the CPA
25  advisory, that isn't, you know, really a -- it's

1  not, you know, not in the same category.  That's
2  just doing something, you know, as a consultant.
3     Q.  Are you getting paid for that work?
4     A.  On that EPA review I was, yeah.  Yeah.
5     Q.  But that's over?
6     A.  It is finished.
7     Q.  Okay.
8     A.  It was a one-off, unless they decide they
9  want to kick it some more, but at least that
10  initial project is done.
11     Q.  Okay.  In terms of paid work, it's
12  exclusively through EH&E at this point?
13     A.  That's correct, yeah.
14     Q.  Okay.  And is your work for EH&E
15  exclusively serving as an expert witness in
16  litigation?
17     A.  It is at this point, yeah.
18     Q.  You are fully retired from Harvard?
19     A.  That's correct; I am.
20     Q.  Not doing any teaching at all.
21     A.  Not this semester, no.
22     Q.  Are you -- do you have plans to go back?
23     A.  Well, there's always -- you know, I mean,
24  I'm still associated as an instructor, and so,
25  depending on if they were to ask, I -- I would

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 12 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  consider doing some more, yeah.
2      Q.  Is -- is anything in place now -- have you
3  taken any steps to go back to Harvard and teach
4  there?
5      A.  No, I haven't.
6      Q.  Is it your hope or expectation to become
7  involved as an expert witness in additional benzene
8  cases?
9          MR. DuPONT:  Form.
10     A.  Well, that's a good question.
11         I -- you know, it depends, I guess, a
12  little bit on the nature of the workload, because
13  the other activities I've been doing around the
14  semiconductor cases are, kind of, picking up steam
15  and heating up; and so what I try to do is balance
16  out so that I don't have too many things going on
17  simultaneously.
18         So I guess that -- that's, kind of, a long
19  answer to say I actually don't know.
20     Q.  You've never worked as an expert in
21  litigation for a defendant, I think you said
22  earlier; is that correct?
23     A.  That's right, yeah.
24     Q.  Okay.  And no defendant's ever asked you
25  to serve as an expert in litigation.

1      A.  No, I did -- a long time ago I did a
2  report for a defendant, but that -- that was -- you
3  know, that was where it ended.  I just wrote the
4  report, and that was the end.
5      Q.  And what kind of case was that?
6      A.  It was asbestos.
7      Q.  And when was that?
8      A.  That was early in the going.  That was
9  probably back in the mid-90s.
10     Q.  All right.  I want to ask you about some
11  of your opinions in the matter.  You've got your
12  report there.
13     A.  Yeah.
14     Q.  Okay.  I want to start with Table 3, which
15  I think is actually on page 39.
16     A.  Okay.
17     Q.  As I understand, Table 3 is the "Daily
18  Average Benzene Exposure to Certain Products By
19  Product Name and Facility"; is that right?
20     A.  Let me just get to it here.  (Witness
21  reviews document.)
22         Right.  That's what -- that's what we're
23  looking at here, yes.
24     Q.  All right.  Table 4, which is on page 43,
25  is the cumulative benzene exposure to each of those

1  products by product name and facility; is that
2  right?
3      A.  That's correct.  Yes.
4      Q.  Who selected the products that are listed
5  in Tables 3 and 4?
6      A.  This is my assessment of what he reported
7  in his depositions that he used.
8      Q.  You performed an exposure -- as I
9  understand it, you performed an exposure assessment
10  for each of the products listed in Tables 3 and 4,
11  other than Tap Magic/Rapid Tap and Spotcheck; is
12  that correct?
13         MR. DuPONT:  Form.
14     A.  Well -- and also the Marvel Mystery Oil, I
15  didn't do a calculation of commuted exposure for
16  that either.
17     Q.  Okay.
18     A.  But, yes.  Yes, to your one question.
19     Q.  Did you perform an assessment to determine
20  Mr. Rhyne's exposure to benzene from any products
21  beyond the products that are listed in Tables 3 and
22  4 for which you actually did perform this exposure
23  assessment?
24     A.  No, I didn't.
25         MR. DuPONT:  Form.

1      Q.  Why didn't you perform an exposure
2  assessment to assess Mr. Rhyne's exposure to
3  benzene beyond the products -- or from products
4  beyond those listed in Tables 3 and 4?
5      A.  Well, these were the products that he
6  reported having used at home and -- as he -- as he
7  was growing up and as he was a student and, then,
8  during his employment.  So that was really all I
9  had to go on in terms of his, you know, history of
10  product use.
11     Q.  All right.  Just one followup on that
12  answer:  You said that these are the products that
13  he identified using.  Do you agree with me that he
14  did not identify having used the CRC 3-36 product?
15         MR. DuPONT:  Form.
16     A.  I -- I'd have to look in his deposition.
17         My -- my recollection was that he reported
18  using CRC when he was cleaning parts.
19         What I don't remember is that he was able
20  to identify a particular brand or trade name or...
21     Q.  Do you recall that he testified that he
22  could not identify the specific CRC product that he
23  used?
24     A.  Well, I wouldn't rule that out.  I'd have
25  to, you know, look to -- look in his deposition to,

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  you know, be absolutely sure, but, you know, I
2  think that's certainly possible, yeah.
3      Q.  But sitting here now you don't recall if
4  that's accurate.
5      A.  I just don't remember one way or the
6  other.  I mean, I do remember that he, you know,
7  was able to recall CRC, but I don't remember that
8  he knew the particular product.
9      Q.  Okay.  I'm going to -- I have his
10  testimony here.
11     A.  Okay.
12     Q.  I'm going to put before you his testimony
13  at page 445, and it's got some of my handwritten
14  notes -- or it's just got a couple of arrows --
15     A.  Okay.
16     Q.  -- which you could ignore or do what you
17  want with.
18         If you could just read page 445.
19     A.  (Witness reviews document.)  Okay.  So the
20  question has to do -- "For the end bells that you
21  did not take to the parts washer, did you use
22  products to clean them other than the CRC product?"
23  And he said, "I don't recall any.  Question:  What
24  was the name of the CRC product that you used?
25  Answer:  CRC is all I can remember."

1      Q.  And then he testifies to that again.  The
2  questioner asked him the same question again.
3      A.  Question was "What was the name of the CRC
4  product?"  And his answer was "CRC is the only one
5  I --" and then the question:  "Anything beyond
6  that?"  And he said, "No, sir."
7      Q.  Okay.  So does that refresh your
8  recollection that he testified that he could not
9  identify the CRC product that he used?
10         MR. DuPONT:  Objection.  Form.
11     A.  I -- this is, yeah.  I think this is
12  pretty, you know, that -- that was the best
13  recollection he had.  He remembered CRC, but he
14  wasn't able to identify a particular brand or
15  product name.
16     Q.  All right.  I'll take that back.  Thank
17  you.
18         Do you recall anything in the record in
19  this matter that -- withdraw that.
20         Did you see any information that Mr. Rhyne
21  ever worked with or around a Berryman product?
22     A.  I -- I don't recall that coming up at
23  all.  I don't recall that he mentioned that he had
24  ever used Berryman, no.
25     Q.  Did you see any information in the record

1  that Mr. Rhyne ever worked with or around a 3M
2  product?
3      A.  That does not ring a bell.  I don't
4  remember that he mentioned that, no.
5      Q.  Doctor, did you have any information about
6  the different manufacturers and suppliers of
7  solvent ingredients that may have been contained in
8  the different products that you listed in Tables 3
9  and 4?
10         MR. DuPONT:  Compound.
11     A.  Could you help me understand the "solvent
12  ingredients."
13     Q.  Sure.
14     A.  That would be, say, the manufacturer of
15  the components that were in these -- these end user
16  products?
17     Q.  Yes.
18         Manufacturers or suppliers.
19     A.  Uh-huh.
20         MR. DuPONT:  Compound.
21     A.  I don't remember -- I don't believe that I
22  had that information, no.
23     Q.  Do you understand -- obviously -- well,
24  let me take that back.
25         Do you understand that each of the

1  products that are listed in your Tables 3 and 4
2  contain various components or ingredients?
3          MR. DuPONT:  Compound.
4      A.  I do understand that, yeah.
5      Q.  Okay.  Do you know anything about the
6  parties -- party or parties that supplied those
7  solvents or ingredients or manufactured those
8  solvents or ingredients in those products?
9          MR. DuPONT:  Compound.
10     A.  Well, in some cases, you know, there was
11  information -- for example, on the Liquid Wrench,
12  you know, there was information about the raffinate
13  material that was, you know, an ingredient in
14  Liquid Wrench.  So I do know something about that.
15         Kutzit, there was information about the
16  benzene content and about the -- the change in the
17  formulations and all, but I -- I don't remember the
18  details about, you know, who was really supplying
19  the ingredients.
20     Q.  I'm going to see if I can narrow my
21  question a little bit.
22     A.  Okay.
23     Q.  There's a product on there, Safety-Kleen
24  parts washing -- or washer.
25         Do you see that?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1    A. I do. Yeah.
2    Q. You understand the Safety-Kleen parts
3 washer contains mineral spirits?
4    A. I do.
5    Q. Do you know who supplied or manufactured
6 mineral spirits that were contained in Safety-Kleen
7 parts washing solvent that Mr. Rhyne worked with?
8    A. I don't remember that from -- from the
9 record, no.
10   Q. Do you understand that CRC 3-36 was
11 comprised of different components?
12   A. I do, yeah.
13   Q. Do you know who manufactured or supplied
14 any of the components contained in the CRC 3-36,
15 which you seem to believe Mr. Rhyne worked with?
16   A. No, I had information -- I think it was a
17 2008 safety data sheet from CRC. So that's how I
18 identified what I think the ingredients were, but I
19 don't know what the source was.
20   Q. You don't know -- you don't know what the
21 source was for the ingredients.
22   A. I don't, no.
23   Q. So I want to talk a little bit more about
24 Rapid Tap/Tap Magic.
25   A. Okay.

1    Q. And that is a product that you did not
2 perform an exposure assessment for; is that
3 correct?
4       MR. DuPONT: Form.
5    A. That's correct.
6    Q. If you go to page 30 of your report.
7       Do you see that there's -- oh, I'm sorry.
8    A. Got it.
9    Q. You see that there's a paragraph entitled
10 "Rapid Tap -- Tap Magic"?
11   A. Yes.
12   Q. Okay. And in the first sentence of that
13 paragraph you refer to the "Approved Chemical
14 List"; is that right?
15   A. Right.
16   Q. And you refer to the fact that the Pro Tap
17 Magic Cutting Fluid Red is contained on that
18 Approved Chemical List; is that right?
19   A. It is, yeah.
20   Q. Now, as I understand it, in the rest of
21 the paragraph you are communicating that you did
22 not estimate his benzene exposure from that source,
23 because the record evidence in the case didn't
24 indicate which specific Tap Magic product Mr. Rhyne
25 used.

1       Do I have that right?
2    A. You do, yeah.
3    Q. There's a discussion about Spotcheck in
4 the next paragraph there.
5       Do you see that?
6    A. I do.
7    Q. Spotcheck is another product that was on
8 the Approved Chemical List; is that right?
9    A. Right.
10   Q. But you also did not estimate his exposure
11 to benzene from that product; is that right?
12      MR. DuPONT: Form.
13   A. That's correct, yeah.
14   Q. And you didn't assess his exposure to
15 benzene from that product, because in your view the
16 record in the case did not indicate the composition
17 of the product as used by Mr. Rhyne.
18   A. That's true, yeah.
19   Q. Did you do anything to search for MSDSs
20 for Spotcheck?
21   A. I'm trying to remember if I did. I think
22 I probably did.
23      The one thing, you know, I found in -- in
24 searching the internet is that, you know,
25 occasional -- you know, sometimes you can get a

1 current MSDS, but in a case like -- like this,
2 going back to the 1980s, you know, it's very rare
3 to -- to find that kind of historical information
4 on just an internet search.
5    Q. Why doesn't a current MSDS satisfy your
6 needs?
7    A. Well, I think --
8       MR. DuPONT: Form.
9    A. -- you know, it reflects the -- the change
10 in -- in people's approach to formulating products;
11 that, you know, it's not surprising that something
12 that, you know, reflects the current composition is
13 not a good representation of what was used 30 years
14 ago.
15   Q. Did you ask Mr. DuPont if he had an MSDS
16 for Spotcheck from the relevant time?
17   A. I think I did, because as we, you know,
18 exchanged information back and forth, you know,
19 where there were gaps and, you know, missing
20 information or -- or documents that I could have
21 used, I -- I followed up and asked, yeah.
22   Q. Do you have a specific recollection of
23 asking him that?
24   A. I don't.
25   Q. Do you understand that Spotcheck is

14 (Pages 50 to 53)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 15 of 97

1 manufactured by Magnuflux Corporation?
2      MR. DuPONT: Form.
3      A. No, I don't -- oh, well, sure -- sure I
4 do, 'cause here it is. It's -- I mean, it does
5 mention Magnuflux in the Approved Chemical List.
6      So yeah, I do see that.
7      Q. Do you understand that Magnaflux
8 Corporation is not a named defendant in the case?
9      A. Oh, no, I guess they're not.
10      Q. Did Mr. Rhyne have benzene exposures from
11 daily living every day of his life before he was
12 diagnosed with AML -- separate and apart from any
13 exposures that he had to benzene from the products
14 that you talk about in Tables 3 and 4?
15      MR. DuPONT: Form.
16      A. Okay. So you're referring to, say,
17 nonoccupational exposures?
18      Q. Well, I think your report talks about
19 nonoccupational exposure to certain products.
20      So I'm talking about did he have -- or I'm
21 asking about whether he had benzene exposures from
22 daily living, separate and apart from any benzene
23 to which he was exposed from the products on Tables
24 3 and 4?
25      MR. DuPONT: Form.

1      A. Yeah, I mean, he probably had the same
2 kind of exposures that, you know, most of us have.
3 There's benzene levels in ambient air -- varied,
4 you know, quite a lot, depending on where you live.
5      He -- I don't remember if this came up,
6 but he very likely pumped his own gas at the gas
7 station and filled his car. So, you know, he had
8 that source.
9      He wasn't a smoker, so, you know, I think
10 that's -- that's, you know, sort of, off the table.
11 That's always, you know, something to consider.
12      And I don't know that he, you know, I
13 don't remember from the record if he lived with
14 anyone who smoked. I just don't remember that
15 part.
16      Q. Did you in your report estimate his daily
17 exposure to benzene, separate and apart from what
18 you believe he was exposed to from the products in
19 this case?
20      A. No, I didn't.
21      Q. Did you in your report calculate his
22 cumulative exposure to benzene from daily living in
23 the nearly 60 years before he was diagnosed with
24 AML, separate and apart from benzene to which he
25 was exposed to the products that you list in Tables

1 3 and 4?
2      A. No, I didn't.
3      Q. Why didn't you do any calculations to
4 assess his exposure to benzene -- either on a daily
5 basis or a cumulative basis -- from daily living?
6      A. Well, I think it was -- it was partly as I
7 was trying to be responsive to the -- you know, the
8 question that was put to me, you know, in -- in
9 engaging me as an expert here, was around his
10 occupational exposure.
11      So that's why I restricted it to that.
12      Q. You understand that before you were
13 retained in this matter as an expert on behalf of
14 the plaintiffs that the plaintiffs had retained
15 Stephen Petty?
16      A. Right, I do.
17      Q. Okay. You understand that he served in
18 the same role that you're now serving?
19      A. I do, yeah.
20      Q. How did you learn that the plaintiffs had
21 previously retained Mr. Petty?
22      A. Well, that's when -- when Mr. DuPont sent
23 me a copy of Petty's report.
24      Q. Were you told why Mr. Petty was no longer
25 serving as an expert for the plaintiffs in this

1 matter?
2      A. No.
3      Q. Did you ever ask?
4      A. No.
5      Q. Do you know why he's no longer serving?
6      A. I don't.
7      Q. Do you know if it has anything to do with
8 the fact that he did not assess any benzene
9 exposure from a CRC product?
10      A. As I said, I don't know why he isn't
11 involved at this point.
12      THE WITNESS: Are we getting close to a
13 break?
14      We've been going about an hour.
15      MR. FISHKIN: Take a break whenever you
16 need it.
17      THE WITNESS: Is that reasonable?
18      MR. FISHKIN: Sure. Yeah.
19      (Recess was taken.)
20      Q. Doctor, are you ready?
21      A. Okay.
22      Q. Okay.
23      MR. FISHKIN: Andrew, are you ready?
24      MR. DuPONT: Just a second.
25      Yeah, go ahead.

15 (Pages 54 to 57)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 16 of 97

1    Q.  Doctor, did you see anything in the record
2  in this matter that told you that Mr. Rhyne did, in
3  fact, actually work with or around CRC 3-36?
4    A.  Other than what we just looked at in the
5  deposition when he recalled using a CRC product,
6  but he didn't recall the -- the particular brand or
7  -- or product name.
8    Q.  Right.  And that's what I'm getting at.  I
9  -- there was testimony -- without question -- in
10  which Mr. Rhyne said he used a CRC product, but I'm
11  focused on what product it was.
12      So -- so my question is did you see
13  anything in the record in this matter that told you
14  that Mr. Rhyne did, in fact, work with or around
15  the CRC 3-36 product?
16    A.  Other than what was on the approved
17  product list for McGuire, that was the only thing
18  that really identified a particular CRC product.
19    Q.  Did anyone ask you to run an exposure
20  assessment for the CRC 3-36 product?
21    A.  Specifically --
22    Q.  Yes.
23    A.  -- beyond -- no, not beyond, you know, the
24  general request that I do the exposure assessment
25  for -- for Rhyne.  There was no particular, you

1  know, CRC call-out or anything that I -- that I,
2  you know, looked at uniquely.
3    Q.  When you received the -- do you recall the
4  circumstances under which you received the Approved
5  Chemical List?
6    A.  I -- I'd have to say I think it was
7  probably the same way I got everything else:
8  Either Mr. DuPont or his paralegal sent me a note
9  and said, you know, we've -- we've updated the
10  Dropbox, so there's new information in the Dropbox;
11  here's the link.
12    Q.  What was -- do you recall receiving that
13  as a stand-alone document?
14    A.  The notification that that particular list
15  was now in the box?
16    Q.  Yes, sir.
17    A.  I -- I don't think so.  I mean, it tended
18  to be more, you know, there were -- there were --
19  information was, sort of, coming in -- in batches.
20  And so I don't think it was a, you know, unique
21  communication to say, Hey, look at the box; there's
22  an Approved Chemical List there.
23    Q.  Was it called out to you when you received
24  the list that there was a CRC product on the list?
25    A.  No, I -- I found it myself.

1    Q.  Do you know anything about the chemical
2  list, other than what's contained in the chemical
3  list?
4    A.  I'm trying to remember if anybody asked
5  him about it.  I don't remember there being any
6  discussion about the list from the depositions.  So
7  beyond what's, you know, evident from looking at
8  the list, I really don't have any information
9  beyond that.
10    Q.  Do you know if the list is authentic?
11    A.  I don't have any reason to -- to doubt
12  that it is.  It sure looks authentic to me.
13    Q.  But do you know, one way or another --
14    A.  I don't, no.
15    Q.  -- whether it is.
16      Do you know whether it's a document that
17  was actually prepared by Duke Energy?
18    A.  I guess I don't have it in front of me, do
19  I?
20    Q.  Yeah, you should have in that stack.  We
21  marked it as 2.
22    A.  Oh, sorry.  Here it is.
23    Q.  Is that 2, did we mark it as?
24    A.  Yeah, it's 2.
25      MR. DuPONT:  It is.

1    A.  Well, you know, the header on each page
2  does say:  "McGuire Nuclear Station Approved
3  Chemical List," page number and a date.  So, you
4  know, I -- I would infer that, you know, that --
5  that leads me to believe that it is authentic.
6    Q.  Well, do you know if it was actually a
7  document that was prepared by Duke Energy?
8    A.  Well, no one -- there's no -- in the
9  version that I saw there was no, you know, cover
10  letter or transmittal, or, you know, sign-off of
11  any kind.  So I don't have any information beyond
12  what's here.
13    Q.  If it was prepared by Duke Energy, do you
14  have any information concerning the circumstances
15  surrounding its preparation?
16    A.  I don't remember that anybody -- you know,
17  that it really came up in any of the depositions as
18  to, you know, kind of, the circumstances or -- or
19  how it was prepared or why.
20    Q.  Do you know when it was prepared?
21    A.  Well, it is dated April 1st, 1992.
22    Q.  Understand.
23      Do you know when it was prepared?
24    A.  I don't, no.
25    Q.  Now, do you understand that this applies

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 17 of 97

1  to chemicals approved for use at McGuire at a
2  particular time on April 1, 1992?
3      MR. DuPONT: Form.
4    A.  I think that would be a reasonable
5  conclusion to reach, yeah.
6    Q.  So this list doesn't tell you what the
7  approved chemicals were for any other Duke Energy
8  location; is that correct?
9    A.  No, it doesn't.
10   Q.  And it doesn't say that any of the
11  chemicals approved for McGuire -- withdraw that.
12       It doesn't say that any of these chemicals
13  listed as approved for McGuire were approved for
14  use at McGuire before April 1, '92 is that correct?
15   A.  No, it looks like it's a -- you know, it
16  reflects a point in time, but, you know, you'd have
17  to speculate beyond that.
18   Q.  Do you know for how long after April 1,
19  1992, these products were approved for use at
20  McGuire?
21   A.  No, I don't.
22   Q.  So you can't say they were still approved
23  for use at McGuire in May of 1992; for example?
24   A.  No, I can't.
25   Q.  Now, this list is -- I would represent to

1  you is 46 pages long, and it contains -- from my
2  quick review -- about 20 different chemicals on
3  each page, which gets us to about 900 chemicals.
4       Do you see that?
5    A.  I think that looks like a reasonable
6  estimate, yeah.
7    Q.  Do you know how many of these 900-or-so
8  chemicals were actually at McGuire on April 1,
9  1992?
10   A.  I don't.
11   Q.  Can you identify the ones that were
12  actually at McGuire on April 1, 1992?
13   A.  No, I can't.
14       MR. DuPONT: Form. Compound.
15   Q.  Can you identify the chemicals on this
16  list that were not actually at McGuire on April 1,
17  1992?
18   A.  There's -- there's really no -- I don't
19  have any information that would let me do that.
20   Q.  Do you know whether there were products at
21  McGuire at this time that were not on the approved
22  -- on this Approved Chemical List?
23   A.  I -- I don't know that.
24   Q.  Now, on the top right of this document
25  there's a reference to "Storage Color, Label, and

1  Commodity ID."
2      Do you see that?
3    A.  Yeah, I do.
4    Q.  And do you understand -- and to the far
5  right column there are references -- or there are
6  indications -- there are "Ns" and there are "Ys."
7      Do you see that?
8    A.  I do see that, yeah.
9    Q.  Do you understand the "Y" refers to the
10  fact that there was a label?
11      MR. DuPONT: Form.
12   Q.  And that the "N" refers to the fact that
13  there was not a label.
14      MR. DuPONT: Form.
15   A.  You know, that would be a reasonable
16  conclusion to draw from the header on that column;
17  that's what -- that's what that is designating,
18  yeah.
19   Q.  Do you know what "Storage Color" refers
20  to?
21   A.  I don't.  I mean, I could guess, but that
22  would just -- you know, I don't really know their
23  system.  So no, I don't.
24   Q.  Do you know what "commodity ID" refers to?
25   A.  Well, I guess that, you know, I would

1  interpret that to be, you know, essentially an
2  inventory number of some kind that the company was
3  using to keep track of this.
4    Q.  Do you know that?
5    A.  I -- it didn't really come up anywhere in
6  -- in the record that would -- I'm just trying to
7  draw what I think would be a logical conclusion.
8    Q.  Top left refers to "Category and Fact
9  Sheet Number."
10      Do you see that?
11   A.  I do.
12   Q.  Do you know what they refer to?
13   A.  Well, the categories are pretty big and
14  broad.  So, you know, you see it's stuff like
15  abrasives and chemical additives and coatings, and
16  I think they have sealants and lab -- lab chemicals
17  and things like that.  So, I mean, I think that
18  that's pretty self-explanatory.
19   Q.  What about "Fact Sheet Number"?
20   A.  That, I don't really -- you know, it must
21  refer to some internal system that they had where
22  there was further information in a database or
23  something, but I don't remember that being
24  discussed anywhere in the documents I reviewed.
25   Q.  Do you know how Duke characterized its

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 18 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  products in 1992?
2  MR. DuPONT:  Form.
3  A.  No, I don't.
4  Q.  Do you know whether there are any mistakes
5  on this Approved Chemical List?
6  A.  No, I don't.
7  Q.  Do you understand the reference to "CRC
8  3-36 includes the word "bulk"?
9  And, again, it's on page 305.
10  A.  (Witness reviews document.)  Oh, I see.
11  Yeah.  "CRC 3-36 bulk, CRC Chemicals."
12  Q.  Does that suggest to you that what
13  purports to be approved here is the product in
14  bulk, such as in drums or some other container used
15  for bulk shipment?
16  A.  Well, I wouldn't rule it out.  It's --
17  it's interesting.  You know, it's -- it's not
18  uniform; right?  If you look at all these other
19  cleaners on the page, for example, they don't
20  specify if something is bulk or not.
21  Q.  Well, they don't -- the other cleaners on
22  the page don't contain the word "bulk"; correct?
23  A.  That's -- that's what I'm saying; right.
24  Q.  And the CRC 3-36 says, "bulk."  So my
25  question is do you understand that to mean that

1  what purports to be approved here is the CRC 3-36
2  product in bulk?
3  A.  Well, I think that would be a reasonable,
4  you know, conclusion to reach, you know, not -- not
5  really knowing Duke's system, but I certainly
6  wouldn't rule that out.
7  Q.  Did you see any information in the record
8  that Duke had a canning operation where it placed
9  bulk liquids into aerosolized cans?
10  A.  You know, I don't remember that coming up.
11  I don't remember seeing that.
12  Q.  Did Mr. Rhyne ever work at McGuire?
13  A.  Did he work at McGuire?
14  Q.  Yes.
15  A.  Yes.
16  Q.  When did he work at McGuire?
17  A.  I don't know.  I'd have to look at the
18  report.  I can -- I can try to dig that out.  I
19  think I have it.
20  Sounds like -- 1976 to 1983.  I think
21  that's his time at McGuire.
22  Q.  Where did -- where did Mr. Rhyne work in
23  April of 1992?
24  A.  (Witness reviews document.)  I'm just
25  looking through his work history here.

1  Q.  Have you look at page 10 of your report --
2  A.  Uh-huh.
3  Q.  -- you refer to the fact that he
4  transferred to Catawba in 1983 and worked there
5  until 2015.
6  Do you see that?
7  A.  Uh-huh.  Yeah, I do see that.  Yes.
8  Right.
9  Q.  So let me just ask you the question again:
10  Where did Mr. Rhyne work in April of 1992?
11  A.  Well, so, as he mentioned in his
12  deposition, from 1983 to January of 2015 he was
13  based at Catawba.
14  Q.  So if you interpret Exhibit 2 as an
15  Approved Chemical List which indicates that CRC
16  3-36 bulk was at McGuire in April of 1992 and Mr.
17  Rhyne did not work at McGuire in April of 1992, how
18  does this Approved Chemical List lead you to
19  believe that he worked with or around CRC 3-36?
20  MR. DuPONT:  Form.
21  A.  Well, it's really, as I -- as I tried to
22  discuss it on page 11, you know, from his
23  deposition, he said that he used CRC from 1985 to
24  the '90s, and up to maybe 2000, and it was
25  originally in aerosol, but they switched to a pump

1  sprayer.
2  That's, you know, the extent of the
3  information that I have.
4  Q.  Yeah.  No, I understand that.
5  But I'm just trying to understand your
6  rationale in relying on this Approved Chemical List
7  which shows -- or purports to show that the product
8  is approved for use at McGuire at a time when he's
9  not at McGuire.  I'm trying to understand your
10  rationale in taking this approved list to mean that
11  he worked with or around 3-36.
12  MR. DuPONT:  Form.
13  A.  When he was at Catawba?
14  Q.  Yeah.
15  A.  Right.  No, I mean, I follow your point.
16  I guess I would just say that, you know, I wouldn't
17  find it to be unreasonable that the same products
18  were used across different facilities.
19  Q.  Do you have any information that the same
20  products were used across different facilities at
21  Duke?
22  A.  Well, as he said, you know, in his
23  deposition, that, you know, he used CRC at a time
24  when he was actually at Catawba, so that that's
25  about the only information that's in the record

18 (Pages 66 to 69)

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  that would shed any light on that.
2      Q.  Do you have any information from the
3  record that the same products were used across
4  different locations at Duke?
5      A.  You know, I don't remember that coming up.
6  I -- I wouldn't consider it to be unreasonable, but
7  it isn't really explicit in the record.
8      Q.  Is it implicit in the record?
9      A.  Well, you know, knowing a little bit
10  about, kind of, you know, how big companies like
11  Duke operated, I would say it's not unreasonable to
12  think that the same products were used across
13  facilities.
14      Q.  How do you know how Duke operated?
15      A.  Well, I -- I know a bit about how major
16  corporations tend to function and how they tend to
17  procure supplies and how they're -- especially when
18  they're, you know, operating similar facilities.
19  So I guess I would just say I wouldn't be surprised
20  if the same products weren't used throughout the
21  corporation.
22      Q.  Okay.  But you have no knowledge that they
23  were, in fact, at Duke Energy; is that correct?
24      A.  I don't have anything explicit.  You know,
25  it didn't really come up in anything in the record.

1      Q.  Can you rule out that Mr. Rhyne worked
2  with a CRC product other than CRC 3-36?
3      A.  No, because there -- there's only that one
4  snapshot of the approved chemicals from 1992.
5      Q.  Can you rule out that, if Mr. Rhyne worked
6  with a CRC product, it was a CRC product that did
7  not contain benzene or benzene-containing solvents?
8      A.  Oh, I see.  Okay.
9          No, it didn't really -- you know, I didn't
10  really see anything in the record that would shed
11  any light on that.
12      Q.  You understand from reviewing Mr. Rhyne's
13  testimony that he claims to have used the CRC
14  product to clean parts such as nuts, bolts,
15  washers, end bell flanges, tools, and heat exchange
16  components?
17          And, in fairness, I'm reading from 12 and
18  13 of your report.
19      A.  (Witness reviews document.)  Right.  I
20  remember that.  And that really is pretty much
21  straight from his deposition.
22          So yes.
23      Q.  All right.  Do you see any information in
24  the record that employees at Duke cleaned equipment
25  with lubricants or corrosion inhibitors?

1          MR. DuPONT:  Form.
2      A.  That they cleaned equipment with
3  lubricants and...
4      Q.  Yes.
5      A.  I don't remember seeing that level of
6  information, yeah, that he was asked about that or
7  that anybody really commented on that.
8      Q.  Would it be unusual in your experience for
9  a mechanic to clean equipment with a lubricant?
10          MR. DuPONT:  Compound.
11      A.  I don't know if I would say, "unusual."  I
12  mean, there's clearly some products that have a
13  variety of -- of properties that, you know, could
14  include both cleaning and lubrication.
15          I don't remember that, you know, really
16  being discussed in anything that he talked about,
17  though.
18      Q.  Did you see any testimony from Mr. Rhyne
19  about the color of the label of the CRC aerosol
20  product he claims he used?
21      A.  I remember him talking about, you know,
22  the aerosol can, and, then, at some point in time
23  it was changed over to something that was in a -- a
24  pump, you know, where you pumped it to generate
25  the -- the spray.  But just sitting here right now,

1  I'm not getting a real clear recollection that he
2  remembered -- or maybe if he even was asked about
3  the color.
4      Q.  If -- if I asked you to assume that he
5  testified that the CRC product had an orange label
6  -- I'm asking you to assume that --
7      A.  Uhm.
8      Q.  -- would that affect your belief that the
9  CRC product that he used was the CRC 3-36?
10          MR. DuPONT:  Form.
11      A.  You know, I don't remember the CRC product
12  line that well to know if that is a distinguishing
13  characteristic of the 3 -- 3-36.
14      Q.  Have you ever seen an approved -- I think
15  you -- I'm not sure that you answered this
16  question; you may have; I apologize if you did:
17  Have you ever seen an approved chemical list for
18  the Catawba nuclear station during the time period
19  when Mr. Rhyne worked there?
20      A.  No, I only have the list from McGuire.
21      Q.  "List" being Herrick 2?
22      A.  Right.  The exhibit you're talking about,
23  yes.
24      Q.  All right.  You opine in your report that
25  Mr. Rhyne had a total mean cumulative benzene

19  (Pages 70 to 73)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 20 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1 exposure ranging from 8.86 ppm-years to 34.44
2 ppm-years, with a midpoint estimate of 19.77
3 ppm-years; is that correct?
4          That's on page 44.
5     A.   Uh-huh.  (Witness reviews document.)
6 Right.  That's what I said.
7     Q.   Okay.  That -- those numbers are markedly
8 lower than the numbers that Mr. Petty came up with;
9 is that correct?
10    A.   Yeah, they are.  They are.  Uh-huh.
11    Q.   Did you review how Mr. Petty came up with
12 those numbers?
13    A.   Well, I did review his report.  You know,
14 I -- as I said earlier, I had a little problem, you
15 know, fully understanding the methodology.  So, I
16 mean, I -- I -- in a general sense I think I
17 understand how he came to his -- to his answers,
18 but I don't recall, you know, the real details.
19    Q.   Did you think there was any basis for his
20 exposure numbers?
21         MR. DuPONT:  Form.
22    A.   Well, I think he described his -- his
23 basis.  What I couldn't quite follow was exactly
24 how he implemented his methods, but I -- I thought
25 his explanation, you know, was -- was pretty

1 substantial.
2     Q.   Did you think his numbers were wrong?
3          MR. DuPONT:  Form.
4     A.   Not really.  I mean, you know, in these,
5 you know, kind of, you know, reconstructions --
6 which I've done, you know, and, kind of, made
7 that --
8          (Environmental noise.)
9          (Discussion off the record.)
10    A.   I mean, as you probably saw from my CV, I
11 mean, this kind of exposure reconstruction is a
12 pretty big part of what I've done over my years in
13 research, and so I'm not, you know, really
14 surprised to see, you know, somewhat discrepant
15 results between different investigators employing
16 different methods.
17         MR. FISHKIN:  Okay.  Let's go off the
18 record.
19         (Discussion off the record.)
20    Q.   Now, the -- the cumulative benzene
21 exposure numbers or ranges and midpoint estimate
22 that you came to was without dermal exposure; is
23 that correct?
24    A.   That's correct, yeah.
25    Q.   You didn't calculate any dermal exposures

1 that Mr. Rhyne had?
2     A.   No, I didn't.
3     Q.   And you don't offer any opinion in your
4 report about dermal exposures specific to CRC; is
5 that correct?
6          MR. DuPONT:  Form.
7     A.   Well, my -- you know, I did try to address
8 dermal exposures, but I didn't do it on a
9 product-specific basis, no.
10    Q.   Now, based on your assumption that Mr.
11 Rhyne used CRC 3-36, you offer the opinion that Mr.
12 Rhyne's benzene exposure from that product was
13 between approximately 1/4 of 1 percent and 2 1/2
14 percent of the total exposure to benzene he had
15 working with the products for which you performed
16 exposure assessments; is that correct?
17    A.   Yeah, I think that's right.  I'm just --
18 and as you saw, it depends a little bit on what
19 assumption you make about the benzene content,
20 'cause I did it for 10 parts per million and also
21 for 100 parts per million.
22    Q.   Right.  You just said it depends a little
23 bit on that.  I understood it depended exclusively
24 on that.
25    A.   Well, I suppose that's a better way to put

1 it, yeah.
2     Q.   All right.  Am I correct that the CRC 3-36
3 contribution would have been even lower -- had you
4 included it in your cumulative exposure number --
5 the benzene to which he would have been exposed
6 from working with the products for which you did not
7 calculate benzene exposures?
8          MR. DuPONT:  Objection.  Form.
9 Foundation.
10    A.   Well, I -- I tried, you know, not knowing
11 what other products that could possibly be -- are
12 you referring to things in the workplace or --
13    Q.   Yes.
14    A.   -- stuff at home or --
15    Q.   I'm referring to Rapid Tap/Tap Magic and
16 Spotcheck.
17    A.   Oh, I see.
18         MR. DuPONT:  Form.
19    A.   Okay.  Yeah, if -- if those had been, you
20 know, substantial contributors to the overall
21 benzene, then the share that was allocated to CRC
22 would have been lower.
23    Q.   Well, if they had been contributors to any
24 extent, the share attributed to CRC would have been
25 lower.

20 (Pages 74 to 77)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 21 of 97

1     MR. DuPONT:  Form.
2     A.  Yeah.  Yeah, the total would have been
3 larger, and the CRC share would have been smaller.
4     Q.  And CRC's share would have been still
5 smaller if you had included in your benzene
6 exposures his exposure to benzene from daily living
7 over the 58 years before his diagnosis; is that
8 correct?
9     MR. DuPONT:  Objection to form.
10     A.  Yeah, although I must say, you know, not
11 having any reason to think that his benzene
12 exposures, you know, from his life outside the
13 workplace were in any way remarkable, you know --
14 he didn't live near a refinery or something like
15 that -- I think the contribution from those sources
16 would have been small.
17     Q.  When did CRC begin selling its 3-36
18 product in aerosol cans?
19     A.  You know, I don't know the answer to that.
20     Q.  Do you have any information on the
21 composition of the product in the 1990s?
22     A.  I think I do.  I mean, you know, I can't
23 pull one up to mind right now, but, I mean, I do
24 have a pretty good set of safety data sheets for
25 the range of CRC products.

1     Q.  So I -- my understanding -- and I may be
2 wrong -- but my understanding was that the MSDS
3 that you had for CRC 3-36 was from 2008.
4     A.  Oh, that -- I'm sorry.  I may have
5 misunderstood your question.
6     Were you referring just to that one
7 particular product --
8     Q.  Yes.
9     A.  -- for CRC?
10     Q.  Yes.
11     A.  Oh.  Yeah, the only information I really
12 had for that particular CRC product is that safety
13 data sheet from 2008; right.
14     MR. FISHKIN:  Okay.  And let's just mark
15 it for the record for completeness sake.
16     Q.  So, Doctor, I've marked as Herrick 4 an
17 MSDS.
18     A.  Okay.
19     Q.  Is that the MSDS for 3-36 that you had in
20 your file?
21     (Exhibit Herrick 4, Material Safety
22     Data Sheet.)
23     A.  Looks like it, yes.
24     Q.  And that's the only MSDS that you have
25 seen for 3-36?

1     A.  I believe it is, yes.
2     Q.  And, by the way, do you see in this MSDS
3 any indication that this product has cleaning
4 capabilities?
5     MR. DuPONT:  Form.
6     A.  Well, it's identified as "Multi-Purpose
7 Lubricant and Corrosion Inhibitor."  That's -- you
8 know, and I don't remember there being any, you
9 know, particular information about, you know, sort
10 of, the intended uses or applications beyond what's
11 in the product name.
12     Q.  You understand that the primary ingredient
13 in this product -- in 2008, at least -- is a
14 petroleum distillate CAS No. 64742-47-8?
15     A.  I do see that, yeah.
16     Q.  Do you understand that's a hydrotreated
17 mixture?
18     A.  I do, yes.
19     Q.  Do you understand that it consists of
20 hydrocarbons having carbon numbers predominantly in
21 the range of C-9 through C-16?
22     A.  Correct.  That's my recollection, yeah.
23     Q.  You understand it has boiling points in
24 the range of 150 to 290 degrees Celsius?
25     A.  I wouldn't question it.  I don't know that

1 detail off the top of my head.
2     Q.  Do you -- do you remember what the boiling
3 point is for benzene?
4     A.  Right off the top of my head, I can't say
5 that I really do.
6     Q.  Do you know that benzene is a C-6
7 hydrocarbon?
8     A.  I do know that, yes.
9     Q.  If I told you its boiling point was 80
10 degrees Celsius, does that sound right to you?
11     A.  Sure, that sounds reliable.
12     Q.  Do you understand that solvents with an
13 initial boiling point above 104 degrees Celsius
14 usually contain little benzene?
15     MR. DuPONT:  Form.
16     A.  Well -- and that's why -- I mean, I do.
17 And that's why, you know, what I tried to reflect
18 in my estimates was, you know, the information
19 that's available about the benzene content of
20 hydrotreated petroleum distillates, which, you
21 know, that's why I used the values of 10 and 100.
22     Q.  You recognize that treatment technologies
23 like hydronation [verbatim] significantly reduce
24 the benzene content of the petroleum distillates?
25     MR. DuPONT:  Form.

21  (Pages 78 to 81)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 22 of 97

1    A.  I do.
2    Q.  Do you agree that after hydrotreating the
3  petroleum distillate in the CRC 3-36 in 2008, that
4  it would have been unlikely for that petroleum
5  distillate to have had even as much as 10 ppm
6  benzene?
7        MR. DuPONT:  Form.
8    A.  Well, I -- you know, I actually don't know
9  that.  I mean, what I'm looking at is, you know,
10  the -- the blend of -- of materials that are in
11  here, because, you know, as you point out, he does
12  have that hydrotreated -- like distillates.
13  There's also 15 to 25 percent of these solvent
14  refined heavy paraffinic distillates.
15        And so, you know, that's why, you know,
16  based on information that I found in the
17  literature, I thought that the benzene content, you
18  know, reasonably would have been between 10 and
19  100.
20    Q.  Okay.  Is it your testimony that the
21  inhibited paraffinic oils would have had benzene?
22    A.  You know, I don't really have any
23  information.  You know, they consider that to be
24  proprietary information, so I really don't know
25  what that inhibitor blend refers to.

1    Q.  And, then, the other piece of this or
2  component of this is carbon dioxide, if I'm
3  recalling --
4    A.  Right.
5    Q.  Okay.  And that doesn't have any benzene;
6  is that right?
7    A.  Right.
8    Q.  So just getting back to the petroleum
9  distillates, do you agree that after hydrotreating
10  the petroleum distillates in the 3-36 as they
11  existed in 2008, that after hydrotreating those
12  petroleum distillates, it would have been unlikely
13  for them to have as much as even 10 ppm benzene?
14        MR. DuPONT:  Form.
15    A.  But, you know, my impression is -- and I'm
16  referring really to -- there's a World Health
17  Organization document that I referenced in one of
18  the footnotes, and they were the ones, you know,
19  who concluded that the hydrotreated materials
20  containing -- I think they said less than .1
21  percent to low part per million levels -- I think
22  that -- those are the words that they said, so
23  that's why I thought it was -- it was reasonable to
24  bracket it and say, Okay.  Well,
25  low-part-per-million level, I'll -- I'll give it a

1  10.  Less than .1 percent, that would be 100; and
2  so the -- the truth is in the middle somewhere.
3    Q.  So if I asked you for your authority for
4  the proposition that the petroleum distillates in
5  the CRC 3-36 after hydrotreating could have
6  contained as much as 10 ppm benzene, it would be
7  that WHO citation you just gave us?
8    A.  Right, it's that environmental health
9  criteria document; right.
10    Q.  Your report does not calculate peak
11  exposures; is that correct?
12        MR. DuPONT:  Form.
13    A.  That is correct, yeah.
14    Q.  And why doesn't it?
15    A.  Well, what I tried to do was use the
16  exposure information that I thought was most
17  representative of what Rhyne really used.  And so,
18  for example, in some of the Liquid Wrench uses, for
19  example, the data that we had was for a 60-minute
20  exposure, which, you know, strictly speaking, isn't
21  really a peak exposure, but it's a short-term
22  exposure.
23        And so that was, you know, really the
24  basis for choosing the intervals that I did.
25    Q.  How did you come to rely, at least in

1  part, on the ART model in this case?
2        In other words, why did you pick that
3  model?
4    A.  Well, what I tried to do, you know, kind
5  of, the philosophy around the ART modeling approach
6  is that it's based on scenarios.  And so if you're
7  looking at, say -- like, in my case you see in this
8  report I used three approaches:  You know, if there
9  was historical measurement information available,
10  you know, that was one of the things I considered
11  using.  In other cases --
12        (Environmental noise.)
13    Q.  Do you want to just finish so you don't
14  lose your --
15    A.  Sure.
16    Q.  -- and then we'll see what's going on.
17    A.  Yeah, in other cases where it looked as
18  though there was a good scenario available that was
19  a fit for the ART model -- for example, the parts
20  washers -- that led me to use the ART approach.
21        In other cases -- like where the Liquid
22  Wrench was used in the honing and sawing
23  operation -- there really wasn't a good scenario
24  that fit the ART approach, so I used the two-zone
25  approach.

22  (Pages 82 to 85)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 23 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1     (Discussion off the record.)
2     (Recess was taken.)
3    Q. Doctor, the ART model was developed to
4 assess chemical exposures from consumer and
5 industrial products under a chemical policy in
6 Europe called REACH; is that correct?
7    A. That's correct, yeah.
8    Q. And the ART model is a free online
9 program; is that correct?
10   A. Yes, it is.
11   Q. And it simulates exposure to various
12 substances from various activities that users
13 create through exposure scenarios by selecting
14 predetermined options regarding the product that's
15 used and the circumstances under which it's being
16 used; is that correct?
17   A. Yeah, I think that's fair.
18   MR. DuPONT: Form.
19   Q. And, then, those inputs are put into a
20 simulator, and an algorithm is run, and then you
21 come out with a value; you come out
22 with a value; the model spits out a value; is that
23 right?
24   A. Yeah, the only other thing I would add is,
25 you know, the algorithm then is calibrated against

1 a set of data that's built into the system, and so
2 you wind up with an estimate that is based on the
3 results of the algorithm, which is, sort of, the
4 physicochemical properties of the product -- or the
5 material and the size of the room and the type of
6 process and this kind of thing, and then that
7 algorithm output is -- is dropped into a model,
8 along with the calibration data, and that's what
9 gives you the model outputs.
10   Q. What -- what is the calibration data in
11 the system?
12   A. There's a dataset of -- I think it's
13 probably 2,500 or 3,000 measurements that people
14 have put in there, and so they're measurements of
15 exposure that are characteristic of the -- the
16 scenario that's being modeled. And so if you are
17 spraying a solvent, the calibration data is
18 measurements of solvent concentrations associated
19 with spraying.
20   Q. Is all that data from Europe?
21   A. I think there's a good chance it is;
22 probably, yeah.
23   Q. You're not aware of any data in the ART
24 model calibration that is from the United States;
25 is that correct?

1    A. I -- I don't know that there is. I don't
2 think there is, yeah.
3    Q. Has the ART model ever been validated?
4    MR. DuPONT: Form.
5    A. Well, "validation's" an interesting term.
6 You know, it, sort of, implies that you -- you know
7 the ultimate truth and you compare your model or
8 your measurement against that, you know, knowable
9 truth.
10   So I would say, you know, on that basis,
11 really, none of these models have been formally
12 validated. I think a better term to apply is that
13 their -- their performance has been evaluated. I
14 think that's a better way to put it than saying its
15 validation.
16   Q. When you say none of these models have
17 been evaluated -- I'm sorry -- have been validated,
18 what models are you talking about?
19   A. Well, the ART, for sure; and, then, also
20 if we look at, say, these two-zone models that have
21 been around for awhile that were originally --
22 well, not originally, but at least right now are
23 available through the American Industrial Hygiene
24 Association, there's, you know, quite a lot of
25 studies people have done where they use the -- say

1 the two-zone model and -- or one of those AIHA
2 models and generated or predicted or an estimated
3 exposure and then compared that with a measurement
4 of exposure to see how well they agreed.
5    Q. Are you talking about the Near Field/Far
6 Field model?
7    A. I'm sorry. That's what I meant by
8 two-zone.
9    Q. Okay.
10   A. Yup.
11   Q. Has the ART model's performance ever been
12 evaluated for an aerosol spray in the way Mr. Rhyne
13 says he used the CRC product in the setting he says
14 he used it when he used it?
15   MR. DuPONT: Form.
16   A. Good question.
17   I think so, because that's actually one of
18 the -- you know, I brought some articles I'd like
19 to try to get into the record that were just
20 recently published, where the performance of the
21 ART model was evaluated by comparison with
22 measurements of exposure, and some of those
23 measurements were -- involved liquids that were
24 being sprayed.
25   Q. Okay. Do you want to just identify the --

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  the articles that you referred to --
2      A.  Sure.
3      Q.  -- a few times there.
4      A.  I've got the -- and I brought the full
5  copies, 'cause I know they didn't get into the
6  record.
7          I mean, these are all recent publications,
8  but they all, you know, speak to the issue that you
9  are raising -- you know, the question about how
10  well these different models compare with
11  measurements of exposure.
12     Q.  Okay.  Would you mind just handing, you
13  know, and I'll -- I'll mark them.
14     A.  Okay.
15     Q.  Is that part of this also?
16     A.  Oh, this is a third one.  Sorry.
17     Q.  Are these all of them?
18     A.  That's the three, yeah.
19         MR. FISHKIN:  So I'm going to mark as
20  Herrick 5 in a single exhibit the three articles
21  that Doctor Herrick just handed to me.  First one
22  is: "Accuracy Evaluation of Three Modeling Tools
23  For Occupational Exposure Assessment."
24         Lead author is Spinazze?
25     A.  Uh-huh.

1      Q.  Next is "A Study of the Validity of Two
2  Exposure Assessment Tools:  Stoffenmanager and the
3  Advanced Reach Tool."
4          Lead author is Landberg.
5          And the third is:  "Evaluation of Exposure
6  Assessment Tools Under REACH:  Part Two -- Higher
7  Tier --" Models [verbatim].
8          Lead author is Lee.
9          And all those are a single exhibit.
10         (Exhibit Herrick 5, articles: "Accuracy
11         Evaluation of Three Modelling Tools for
12         Occupational Exposure Assessment; A
13         Study of the Validity of Two Exposure
14         Assessment Tools:  Stoffenmanager and the
15         Advanced Reach Tool; Evaluation of
16         Exposure Assessment Tools under REACH:
17         Part II -- Higher Tier Tools.")
18     Q.  So, Doctor, which of these -- which one or
19  more of these three do you rely on to conclude that
20  the -- the model -- the model's performance was
21  evaluated for aerosol sprays in a way that Mr.
22  Rhyne says he used the CRC's product in the setting
23  he says he used it?
24     A.  Let me just take a look to make sure I
25  give you a good answer on that, 'cause in the one

1  by Spinazze, they -- they looked at organic
2  solvents as one of the scenarios, and -- but I'm
3  just trying to look at it quickly to see if I can
4  identify which ones of those might have involved
5  spraying.
6          (Witness reviews document.)
7          Well, here's one, for example, that looked
8  at cleaning solvents, and this was in a a --
9  degreasing operation that included a spraying step,
10  so --
11     Q.  Which one -- which article are you
12  referring to?
13     A.  I'm looking -- it's actually the one that
14  we've talked about -- or might talk about later.
15  It is a Plisko and Spencer article on part
16  cleaning.
17     Q.  Was that -- was --
18     A.  And --
19     Q.  I don't mean to interrupt you.
20         Was that part of Exhibit 5?
21     A.  Well, what I'm looking at is the -- the
22  studies that they did the comparisons on.  So one
23  of the studies that they looked at -- this is their
24  No. 6 -- and it's -- it references the data that
25  was published by these other guys, by Plisko and

1  Spencer.
2      Q.  Okay.  For the record, what -- what
3  article is that in?
4      A.  Oh, that's in -- Plisko and Spencer is --
5      Q.  No, what --
6      A.  I'm sorry.  This is in Spinazze.
7      Q.  Okay.  Go ahead.  Thank you.
8      A.  Sure.
9      Q.  Anything else?
10     A.  Do you mind -- I'll just flip through and
11  see if I can --
12     Q.  Sure.
13     A.  -- you know, give you a good answer here,
14  'cause some of them look more at solvents, and
15  others looked at dust and things like that.
16         So I'll just see which processes, types of
17  industries, and scenarios they looked at.  (Witness
18  reviews document.)
19         Here we go.  Well, so, on the one by
20  Landberg, one of the operations they looked at was
21  spray painting.  So it's -- you know, it involves
22  an aerosol, you know, being -- being applied.  So
23  it's not identical to what he used, but it does
24  involve spraying.  So that --
25     Q.  Was --

24  (Pages 90 to 93)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 25 of 97

1     A.  I'm sorry.
2     Q.  Was that one referred to in your Bayesian
3   model results for the CRC ART model?
4     A.  No, I don't think so.
5     Q.  Okay.
6     A.  And just so -- since we're on it, you
7   know, I typically didn't use the Bayesian
8   corrections very often --
9     Q.  Yeah.
10    A.  -- because frequently they came up with
11  higher -- higher values.
12    Q.  Okay.  We'll talk about the Bayesian.
13    A.  Sure.  Okay.
14    Q.  But I'm interrupting.  I'm sorry.
15    A.  No, that's fine.
16        So that's -- so I would say Landberg, you
17  know, does including painting as one of the
18  activities, you know, that involves spraying a
19  product around.
20        And, then, this one by Lee, I just want to
21  see what scenarios they mention they looked at
22  here.  (Witness reviews document.)
23        Yeah, this one included they looked --
24  they looked at solvents, and they included spraying
25  operations in that one.  So I think I would say

1   that all three of them included, you know, various
2   types of -- of solvent spraying as one of the
3   scenarios that they evaluated.
4     Q.  Is the ART model accepted by any
5   scientific community for assessment of specific
6   workers' inhalation exposures?
7     A.  Well, it's -- I mean, if -- in terms of
8   acceptance, you know, I wouldn't say that there's,
9   like, any formal institutional endorsement, or, you
10  know, certification, but as you see from -- from
11  these, you know, articles and what's going on, they
12  -- they are widely used.
13    Q.  Is the ART model -- withdraw that.
14        Was the ART model ever intended to be used
15  as a retrospective exposure assessment for an
16  individual executing specific tasks in specific
17  conditions?
18        MR. DuPONT:  Form.
19    A.  Well, it was in the sense that if you, you
20  know, go back to, sort of, the origin of the ART
21  model, a lot of the foundational work on that was
22  done by this guy named John Cherrie, C-h-e-r-r-i-e.
23  And you'll see he's -- he's a coauthor on most of
24  these articles about ART.
25        And he really evolved that whole approach

1   of -- of developing these scenarios and then coming
2   up with this approach to modeling exposure, in part
3   because he was working on what in the benzene world
4   is referred to as the Shanghai Study, and he and I
5   were on an advisory group that was working together
6   with those guys from Exxon who were doing that
7   investigation.
8        And -- and Cherrie's approach was really
9   applied and evolved in that situation where they
10  were trying to estimate historical exposures.
11    Q.  Has the model -- the ART model gained
12  general acceptance in the industrial hygiene
13  community in the United States?
14        MR. DuPONT:  Form.
15    A.  It has.  It's actually been adopted pretty
16  broadly.  In fact, this -- in these three articles
17  that I just threw into the mix here, it turns out
18  that article by Lee -- the first author there, Lee,
19  is actually a NIOSH guy.  So it is, you know, being
20  adopted, you know, at a fairly rapid pace.
21    Q.  When you say it's been adopted broadly,
22  who has adopted it?
23    A.  Well, people --
24    Q.  In the United States.
25    A.  Well, it's a fair -- you know, a fair

1   amount of it is work just like this, where people
2   are involved in trying to reconstruct historical
3   exposures, you know, when -- when there's
4   litigation involved.
5     Q.  So there are certain individuals that have
6   elected to use it or employ it.
7     A.  Right.
8     Q.  Okay.  Has the AIHA commented on the ART
9   model?
10    A.  Well, they talk about it pretty
11  extensively.  You know, the AIHA has an exposure
12  assessment committee, and they discuss, you know,
13  the various approaches to modeling.  Now, I don't
14  recall that -- you know, AIHI as a bureaucracy, you
15  know, at an organizational level, has actually come
16  out, you know, with any particular comment or
17  position about the ART model.
18    Q.  Has the exposure assessment committee in
19  the AIHI adopted the ART model?
20    A.  Well, people on their committee use it.  I
21  don't think the committee, you know, as a -- as an
22  entity has formally adopted it, no.
23    Q.  Well, who are the individuals that you
24  believe -- who are the individuals on the AIHI
25  exposure assessment committee that have used the

25  (Pages 94 to 97)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 26 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1 ART model?
2    A.  Well, one guy in particular who I've
3 worked with is a guy named James Stewart,
4 S-t-e-w-a-r-t.
5    Q.  Anybody else?
6    A.  I'd have to check back, you know, and
7 actually see.  I confess I haven't really looked to
8 see who's actually on the committee right at the
9 moment.
10    Q.  Okay.  Mr. Stewart works in the benzene
11 litigation as an expert for plaintiffs?
12    A.  He does.
13    Q.  Okay.  Has the ACGIH commented on the ART
14 model?
15    A.  Not formally to my knowledge, no.
16    Q.  So there's been no adoption by the ACGIH
17 of this model; is that right?
18    A.  I mean, I guess to try to answer your
19 question fully in terms of any of these
20 professional organizations -- AIHI or ACGIH, or any
21 of the others -- you know, I don't recall that
22 they've formally come out and said anything about,
23 really, any of the modeling approaches.
24    Q.  Have you, sir -- or Doctor -- ever used
25 the ART model outside of your work in litigation

1 matters and in the classroom?
2    A.  Those have been the two primary places.
3 I've used it in my teaching.  I haven't really had
4 occasion to use it in any of the research studies I
5 did.
6    Q.  All right.  So outside of your teaching in
7 the classroom and your work as a litigation expert,
8 you have not used the ART model.
9    A.  I think that's fair, yeah.
10    Q.  Is the ART model used by any US agency or
11 organization?
12        MR. DuPONT:  Compound.
13    A.  I'm just trying -- I don't recall seeing
14 it, although, as I say, this -- this recent article
15 that we just talked about by Lee, you know, Lee is
16 -- is a NIOSH employee.  So I suppose in a -- in a
17 sense, you know, he's using it, even though it's
18 not a -- you know, formal instrument that's used by
19 NIOSH.
20    Q.  Do you agree that application of the ART
21 model of retrospective exposure assessment requires
22 precise knowledge of the relevant exposure scenario
23 in order to calculate an accurate prediction of an
24 individual's exposure?
25        MR. DuPONT:  Form.

1    A.  Well, that's one of the comments -- and I
2 -- and that's attributed to -- I think his name is
3 Sikstul [verbatim] -- I forget exactly how he
4 pronounced his name -- but he's published, you
5 know, articles where he's talked about areas where
6 the ART model is -- is -- needs further
7 development, and that's actually one of the areas
8 that he pointed out.
9    Q.  Do you agree with that?
10    A.  Oh, sure.  I mean, you know -- and if you
11 look at any of the documentation around the ART
12 model, these people who, you know, have developed
13 it and continue to refine it all acknowledge that
14 it's -- it's, you know, it's an evolving tool, and
15 that they're, kind of, certainly trying to improve
16 it.
17    Q.  Is the model intended to be a conservative
18 model to ensure exposure concentrations would be
19 representative of the higher end of the spectrum?
20        MR. DuPONT:  Compound.
21    A.  Well, what it tries to do is give you an
22 estimate of the -- the center of -- of a
23 distribution of exposures, and it also has built
24 into it the capability of looking at the upper 95th
25 percentile or the 75th percentile and also the

1 lower 25th percentile.  So in that sense it does
2 try to -- to give you a sense -- you know, give you
3 a -- a midpoint value and also the high end and the
4 low end of the exposure that's likely to occur.
5    Q.  Do you agree that miscalculating a single
6 input parameter can significantly distort the
7 output from the model?
8        MR. DuPONT:  Form.
9    A.  Well, like any model, you know, there --
10 there clearly is the opportunity for -- for
11 uncertainty to be introduced, because you're
12 putting in variables, and the quality of the
13 information you put in, you know, clearly does
14 determine the -- the quality of the output.
15        But that would be true not just for ART.
16 That's true for really any model.
17    Q.  What is a mechanistic model?
18    A.  Well, that would be something that's
19 based, you know, say, primarily on physicochemical
20 properties:  boiling point, vapor pressure, size of
21 the room.
22        Things like that.
23    Q.  What is a higher-tiered or highly-tiered
24 model?
25    A.  Well, that's kind of what they're

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  referring to in the ART model and also the
2  Stoffenmanager model that we just talked about,
3  'cause within EU there's, sort of, first-tier
4  models, which are really meant to be, sort of,
5  qualitative -- I'd, kind of, say rough estimates,
6  maybe, is the way to think of it -- that give
7  people an indication of whether they really have
8  exposures that are high enough to be of concern or
9  not.
10        And so that's a -- that's a tier 1 model.
11        And, then, these other models like ART and
12  Stoffenmanager are tier 2 or higher tier models to
13  try to quantify that exposure.
14     Q.  So you believe the ART models is a tier 2
15  model?
16     A.  That's -- that's one of the things --
17  higher tier or tier 2 -- that it's referred to,
18  yeah.
19     Q.  Is a part of the ART model a mechanistic
20  model?  In other words, does it contain two
21  different -- let me withdraw that.
22        Does the ART model contain two different
23  components, one of which is a mechanistic model?
24     A.  Yeah, there is a -- you know, the initial
25  prediction or input to the algorithm is based on

1  physicochemical properties.  So it's ventilation,
2  and molecular weight, and vapor pressure.  Things
3  like that.
4     Q.  And is the other component in the ART
5  model the Bayesian component?
6     A.  Well, the Bayesian component -- you know,
7  and that's an option.  You can -- you can use that
8  or not.
9        But in terms of the -- the second step in
10  -- in that development of the exposures is the
11  application of that calibration data to the
12  algorithm outputs.
13        And so that gives you an estimate that you
14  can then decide if you want to apply the Bayesian
15  adjustment to it or not.
16     Q.  Is it -- is the Bayesian component the
17  component of the model that makes the ART model
18  tier 2 model?
19     A.  No, not really.  You can -- you can -- the
20  idea of the tier 2 is really that it -- it gives
21  you a quantitative output.  You know, it gives you
22  a number.  And so you can go with the -- the
23  unadjusted value, or you can do the Bayesian
24  adjustment, but they're both considered outputs of
25  a two tier -- a tier 2 model.

1     Q.  So your testimony is that the ART model,
2  even without the -- even without the Bayesian
3  component, is a tier 2 model?
4     A.  Yeah, it is, yeah.
5     Q.  Okay.
6     A.  That's how it's considered in the -- or
7  under REACH.
8     Q.  Okay.  Are you -- are you able to cite me
9  to any literature that says that?
10     A.  Well, I think we can -- you know, even
11  just looking at these articles here, I think
12  they -- they talk about, you know, what, they
13  consider to be a the distinction between a tier 1
14  and a tier 2 model.  See if I can --
15     Q.  You don't -- if that's what you're relying
16  on, that's fine.  I mean, you're free to continue
17  to look if you want --
18        MR. DuPONT:  Just for the record, the
19  witness is referring to Exhibit 5.
20        THE WITNESS:  Oh, sorry.
21     Q.  So are you referring to all the articles
22  in Exhibit 5, or one or more of --
23     A.  I was going to try to give you one -- see
24  if there's one that actually speaks to that.
25     Q.  Sure.

1     A.  You know, 'cause there are articles --
2  here we go.  Okay.  So I'm looking now in the one
3  by Landberg.
4     Q.  Uh-huh.
5     A.  And Landberg talks about the -- you know,
6  this European chemical agency that administers
7  REACH.  And so they talk about following a tiered
8  approach.  The tools with a high uncertainty that
9  are supposed to overestimate exposure are tier 1,
10  and should be used as an initial step, and then it
11  goes on and on and it talks about the difference
12  between tier 1 and tier 2.
13        So it -- I mean, it does get at that in
14  the Landberg article.
15     Q.  So you rely on Landberg for the
16  proposition that the ART model without a Bayesian
17  component is a tier 2 model.
18     A.  Yeah, in other places, too.  I mean, here
19  Landberg says, "The Advanced Reach Tool, hereafter
20  referred to ART, is the tier 2 developed by some
21  collaborating companies, institutions and
22  universities."
23        But, you know, it isn't really essential
24  that you incorporate the Bayesian adjustment.
25  That's not what makes it tier 2.

27 (Pages 102 to 105)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 28 of 97

1    Q.  Okay.  Any other literature that you rely
2 on for that proposition other than Landberg?
3    A.  I could -- there's other articles
4 published.  I could find them.  I don't have them
5 -- you know, I can't give you the cite right off
6 the top of my head --
7    Q.  Okay.
8    A.  -- but, you know, I think that's -- that's
9 pretty much been what -- what people consider to be
10 the defining characteristic between tier 1 and tier
11 2.
12    Q.  All right.  So what exactly does the
13 Bayesian component refer to, then?
14    A.  It takes another -- and this is going to
15 get beyond my statistical capability, but I'll give
16 you my --
17    Q.  Well, it's definitely beyond mine, so you
18 have nothing to worry about.
19    A.  Well, I don't consider myself a
20 statistician, obviously --
21    Q.  Yeah.
22    A.  -- but what it winds up doing is that the
23 Bayesian approach takes what's called a -- a
24 posterior assumption and -- and the starting point
25 assumption -- I'm blanking on what term they

1 actually use -- but it essentially takes the
2 estimate and then modifies it based on measurements
3 of exposure that are also in -- in another
4 database.
5         And so it gives you a -- a likelihood
6 distribution of how -- how the measurement -- or
7 how the molded exposure compares after adjustment
8 with these measurements of exposure.
9    Q.  And the measurements of exposure are
10 real-world data.
11    A.  Right.
12    Q.  Okay.
13    A.  They're in -- in our database.
14    Q.  Okay.  And you did not use -- in applying
15 the Bayesian -- excuse me -- applying the ART model
16 -- at least for the CRC product -- you did not use
17 the Bayesian component.
18    A.  No, and I think I can -- and in the report
19 I think -- maybe I can find this without chewing up
20 too much time here.  One of the -- the things
21 that's, sort of -- well, that's actually specified
22 in using the Bayesian approach is that you should
23 be using what they call "fully analogous data."
24    Q.  Uh-huh.
25    A.  And if the data isn't really fully

1 analogous, it -- you can -- you can get a
2 misleading result.  And in using these over the
3 years, you know, if I didn't have my own data to
4 upload to do the adjustment and I just used the --
5 the adjustments that's in the -- in the ART
6 database, I found that my Bayesian-adjusted values
7 were higher.
8         And so for the sake of, you know, doing
9 these kinds of reconstructions, I opted to use the
10 unadjusted values, because they were the lower
11 values.
12    Q.  Okay.  In your -- in your report, on the
13 last page of the report -- that's the last page --
14 as I understand it, that's the last page of your
15 model for the CRC product cleaning part, the CRC
16 aerosol; is that right?
17    A.  I'm just looking right here.  (Witness
18 reviews document.)  Yeah.  Right.
19         So the last one -- yeah, the last three
20 pages here, this is for the CRC product.
21    Q.  Is that where the 100 ppm benzene --
22    A.  That's what I am looking for.  I think it
23 is.
24    Q.  Yeah.  The one before that says 10, so I
25 assume --

1    A.  Okay.  You've got it.  Yeah, so it's for
2 100.
3         I mean, this is a good example.  So if you
4 do the mechanistic model, you get an answer of 5.9
5 milligrams per cubic meter.  If you do the Bayesian
6 adjustment, it's 95.
7         And so I thought, Well, if I'm going to be
8 off, I'd rather be off on the side of being too
9 low.  So that's why I use the mechanistic model
10 result.
11    Q.  Right.  But the 5.9 and the 95 -- 5.9
12 milligrams and 95 milligrams -- that's not apples
13 to apples.  Those are not both benzene.
14         MR. DuPONT:  Form.
15    A.  Yeah, those are both benzene, yeah.
16    Q.  Okay.  So my understanding was the 95
17 milligrams were total hydrocarbons.
18         You think that's wrong?
19    A.  I think that's wrong, because -- well, I
20 can say, 'cause if we take a look at what I put
21 into the model, you know, I put in for benzene.
22 You see I've got the benzene CAS number.  And the
23 vapor pressure I used is the vapor pressure for
24 benzene.  The mole fraction is the mole fraction of
25 benzene at 100 parts per million.

28 (Pages 106 to 109)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 29 of 97

1  Q.  Yeah, and I'm not -- I'm not disputing any
2  of that.  So maybe I'm understanding this, but...
3      So, first of all, this ART model refers to
4  the Bayesian model results.  So am I correct in
5  saying that the Bayesian model was initially used,
6  but then the results were rejected?  Is that what
7  you're --
8      A.  Well, you have the option -- you know, so
9  the way the model -- the way the ART program runs
10 is it takes you through -- and the first output is
11 get is the mechanistic model result, and then you
12 get another dropdown, and it says, Do you want to
13 apply the Bayesian adjustment to it --
14     Q.  Uh-huh.
15     A.  -- you can say yes or say no.
16     So this case I wanted to see what it was.
17 So I said, Sure.  So I followed down and did the
18 Bayesian adjustment.  So the way the Bayesian
19 adjusted it with was some data from spraying paint.
20 But, you know, I took a look at the output, and I
21 said, Well, this is -- this is -- this seems way
22 too high --
23     Q.  Okay.
24     A.  -- you know, so I'll go with a more
25 conservative value.

1      Q.  Okay.  So the data sources referred to
2  here under the Bayesian model results, these are
3  two studies of spray painting; right?
4      A.  Uh-huh.  Right.  Right.
5      Q.  Okay.  Do you recall what they were spray
6  painting?
7      A.  I don't right offhand.  You know, that's
8  all, you know, available.  You know, you can dig
9  down into the underlying literature, but I don't
10 remember as I'm sitting here.
11     Q.  Okay.  You recall the second one was
12 furniture?
13     A.  I'm sorry?
14     Q.  Do you recall the second one was
15 furniture?
16     A.  You know, I wouldn't rule it out.
17     Q.  Okay.
18     A.  I -- I just don't remember.
19     Q.  And so if I say to you that my
20 understanding is that for the predicted 50th
21 percentile long-term exposure is 95 milligrams,
22 that's referring to total hydrocarbons, you're --
23 you disagree with that.  You think that's referring
24 to benzene.
25     A.  Well, I'd have to look.  Yeah, I mean, I

1  think it is referring to benzene, but I'd have to
2  look into it.
3      Q.  Okay.
4      A.  But in any case, I didn't use it.
5      Q.  Okay.
6      A.  You know, I used the lower value.
7      Q.  And why didn't you use it?
8      A.  I just didn't think it was realistic.  I
9  mean, I thought it -- you know, it just seemed so
10 much vastly higher than the mechanistic result.
11 And, as I say, if I was going to err, I wanted to
12 err on the side of being too low.
13     Q.  But do you agree that it's only higher if
14 the 95 milligrams refers to benzene?  It might not
15 be higher if the 95 refers to total hydrocarbons?
16     A.  Well, certainly possible.
17     Q.  Okay.
18     A.  I mean, I'd have to dig down into it.
19     Q.  All right.  Are you aware of instances
20 where the ART model has been challenged in terms of
21 its use in United States litigation?
22     A.  Yes.
23     Q.  Okay.  On how many occasions are you aware
24 that its employment in litigation in the United
25 States have been challenged?

1      A.  Well, I could only speak, you know, really
2  to my own personal experience.  I've used it in
3  some other cases, and they were not benzene-based
4  cases this.  They were cases in the semiconductor
5  industry.  And I used it there and -- and, you
6  know, people raised questions, you know, and -- and
7  made some of the same challenges that we're talking
8  about here today.
9      Q.  Okay.  And -- and are you aware of a Court
10 having refused to allow use of the ART model in a
11 litigation?
12     A.  No.  Actually, those -- I mean, I don't
13 think those cases are -- are finished yet, but it
14 wasn't as if they threw it out or anything.
15     Q.  All right.  Are you aware of any formal
16 challenge that was made to the use of an ART model
17 in litigation in the United States?
18     MR. DuPONT:  Form.
19     A.  I'm sorry.  Help me understand what would
20 -- what would constitute a formal challenge.
21     Q.  Fair enough.  A motion -- and you may not
22 know, but what -- to your knowledge, has an
23 application ever been made to a Court, arguing that
24 the ART model is not generally accepted and should
25 not be allowed to be used in this case?

1    A.  Well, I -- I think I can answer that.  I
2  mean, I -- there -- in a case that I was involved
3  in there was an expert report and raised, you know,
4  a lot of the same questions that we're seeing here
5  today.  And, you know, there probably was a motion.
6  Yeah, I think they probably wanted to throw me out,
7  but I'm still in.
8    Q.  Okay.  What case is that?
9    A.  That was one -- I'm trying to remember.
10       There was a series of cases -- and these
11  are still in progress, you know, they're still
12  underway -- that involved people who worked at
13  Motorola.  And for the most part, you know -- and
14  you tell me what this means -- those cases have all
15  settled.
16    Q.  Okay.  Where were those cases -- were
17  those cases pending in a particular jurisdiction or
18  multiple jurisdictions?
19    A.  Good question.  That's kind of a level of
20  legal detail I don't -- I don't really remember.  I
21  think they might all be in the same jurisdiction,
22  but I actually don't really know that.
23    Q.  Okay.  What lawyer did you work on --
24    A.  Oh, this is the Thornton law firm.  The
25  lead guy is David Strauss.

1    Q.  Okay.  And do you know whether a Court
2  ever ruled on the admissibility of the ART model in
3  -- in that group of cases?
4    A.  You know, I don't know how far -- you
5  know, as I say, what I remember was there were
6  expert reports -- you know, kind of like we have
7  here -- that questioned my use of it.  I wrote
8  responses.  And, you know, I think there was --
9  there might have been a motion, you know, to try to
10  get the whole thing thrown out.
11       It never -- you know, at least in this
12  particular set of cases, it never actually got to
13  trial, because there was a settlement before that.
14    Q.  Have you ever heard of a case called
15  Boykin, B-o-y-k-i-n?
16    A.  Doesn't ring a bell.
17    Q.  Have you ever been retained to model
18  workplace exposures to chemicals in the United
19  States outside of litigation?
20       MR. DuPONT:  Form.
21    A.  I'm trying to think.
22       Would this be involved, say, with a
23  research project if someone sponsored my research?
24  Is that the kind --
25    Q.  No.  No, no, not research project.

1    A.  Then, no.  I would say no.
2    Q.  Okay.  With a research project.
3    A.  Yeah, one -- there was a project that I
4  did where we were looking at exposures to asphalt
5  in highway paving; and we did some modeling, you
6  know, in that one.
7    Q.  Did you use the ART model there?
8    A.  No.  Actually, this was before the ART
9  model was really out there and available.
10       (Discussion off the record.)
11    Q.  So I want to talk about the ART model as
12  it was applied here, at least with respect to the
13  CRC product, but I first want to talk about some of
14  your conclusions.
15    A.  Okay.
16    Q.  So as I understand it, you concluded that
17  if Mr. Rhyne used the CRC product containing 100
18  ppm benzene for one hour a day, he predicted 50th
19  percentile exposure to benzene for the one hour he
20  used the product would be 1.85 parts per million;
21  is that right?
22    A.  Let me just -- we're in Table 3, I'm
23  guessing, is that --
24    Q.  Yes.  Yeah.
25    A.  Hang on one second.  Let me just flip to

1  it.
2    Q.  Well, it's actually -- yeah, I think it's
3  before Table 3, but you know better than me.
4       In Table 3 you did a calculation to get to
5  the number.
6    A.  Oh, right.
7       Well, that was -- that's because -- yeah,
8  I'm sorry.  Table 3 is his daily exposure.
9    Q.  Yeah.
10    A.  So probably what you're describing is his
11  one-hour exposure.
12    Q.  Yeah.
13    A.  And I -- yeah.  Right.
14       So you're on page 30?  Is that where we
15  are here?
16    Q.  If you go to -- 38, I think, is your
17  discussion that gets you to the 1.85.
18    A.  Right, 'cause I was trying to say, Well,
19  okay, you know, based on the way he described his
20  work, how long did he use the product?  And, you
21  know, so I made the assumption that he used it for
22  an hour a day, and then, for the other seven hours,
23  he -- he wasn't exposed from that source.
24    Q.  So the 1.85 is a value that was calculated
25  by the model after you input various information

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 31 of 97

1  into the model; is that right?
2  　A.  Yeah, that's that 50 -- 50th percentile.
3  That would be, sort of, the number that's in the
4  middle of the range.
5  　Q.  And -- and if he used the product with the
6  10 ppm benzene, it would be 10 times less than
7  that, or .18; is that right?
8  　A.  Yeah, that's where -- that's where the .18
9  comes from --
10  　Q.  Okay.
11  　A.  -- yeah, that's right.
12  　Q.  And -- and is there any literature -- any
13  published data on benzene exposures -- or other
14  literature to which you believe those outputs or
15  against which you believe those outputs can be
16  validated?
17  　　MR. DuPONT:  Form.
18  　A.  I'm just trying to think of, you know, the
19  range of -- of information that's been published on
20  spraying materials that contain these kinds of
21  levels of benzene.
22  　　You know, aside from what's out there, you
23  know, maybe in studies of spray painting and things
24  like that, but right off the top of my head, you
25  know, I can't come up with a particular source of

1  　Q.  Okay.
2  　　(Discussion off the record.)
3  　Q.  So if we go to -- if we go to Table 3, we
4  go from the 1.85 and the .18 to the .07 and .007;
5  is that right?
6  　A.  Right.  Right.
7  　Q.  Okay.  And I just want to make sure that I
8  understand how you got there.
9  　　So my understanding -- well, first of all,
10  is this -- is this intended to be the time-weighted
11  average?
12  　A.  That's what it would be, yeah.  That's his
13  daily average time-weighted over the eight-hour
14  period.
15  　Q.  Okay.  So my understanding is what you did
16  -- at least for the -- I'll take the 10 ppm benzene
17  --
18  　A.  Uh-huh.
19  　Q.  -- 'cause I'm partial -- more partial to
20  that one, as you might imagine.
21  　A.  Sure.
22  　Q.  So -- so what you did there is, you took
23  the .18, and you multiplied it in the first
24  instance by .125 because that's one hour out of an
25  eight-hour day; is that right?

1  information.
2  　Q.  Did the value -- these values that we're
3  talking about 1.85 and the .18, did they assume
4  that Mr. Rhyne was using the CRC product in an
5  aerosol can?
6  　A.  Well, the -- the model basically asks you,
7  you know, if the application -- how it was being
8  applied, whether it was being applied from a
9  pressurized can or applied with a -- a hand-powered
10  sprayer.  The model really doesn't distinguish
11  between those two.
12  　Q.  Okay.  I didn't know that.  All right.
13  　A.  Well, you know, the model's only a model.
14  It just doesn't -- it doesn't know.  So it asks
15  you, you know, if the stuff was being applied as an
16  aerosol.
17  　Q.  No, I did know that, but I didn't -- I
18  understood you to just say that the model is
19  agnostic or it doesn't -- it doesn't -- it doesn't
20  matter whether you're spraying it from a
21  pressurized can or a spray bottle.
22  　　Did I misunderstand you?
23  　A.  No.  No.  I think that that is the way --
24  　Q.  Okay.
25  　A.  -- the way it runs.

1  　A.  Yeah, to factor in seven hours when he
2  wasn't exposed.
3  　Q.  And then you did a further calculation.
4  You multiplied that by .30 because he used the
5  product for 30 percent of that one hour?
6  　A.  Uh-huh.
7  　Q.  All right.  And where did you get that
8  from?
9  　A.  That was from his deposition, 'cause he
10  talked about, you know, when he was cleaning parts
11  sometimes he used a parts washer and sometimes he
12  used the -- the CRC product; and you know, as I
13  remember, he, kind of, said, Well it just depended.
14  It was a convenience thing.  It depended on how far
15  away from the parts washer they were.
16  　　And so if they were close enough, they
17  would take the part to the washer.  If not, they
18  would just use the spray.
19  　Q.  All right.  So you were assuming that he
20  used the CRC plod for 18 minutes a day.
21  　A.  I think that's right.  Is that -- I'm just
22  trying to --
23  　Q.  It's 30 percent of 60 minutes.
24  　A.  I think that's right, yeah.
25  　Q.  Are you familiar with the precautionary

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000　~　610-434-8588　~　302-571-0510 ~ 202-803-8830

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1  principle?
2    A.  As a, you know, kind of, a general
3  practitioner of environmental health, yeah.
4    Q.  All right.  Do you understand that the
5  precautionary principle states essentially that
6  where there -- where a risk exists, that action
7  should be taken to minimize it or eliminate it,
8  even though absolute proof has not been presented
9  that quantifies the risk?
10    A.  I think that's a -- that's a fair
11  statement of, you know, kind of, the underlying
12  philosophy, yeah.
13    Q.  It's actually a definition that I wrote
14  down here.  So...
15    A.  Okay.  Well, then, I wouldn't dispute it.
16    Q.  Was the ART model intended as a screening
17  tool to serve the precautionary principle?
18    MR. DuPONT:  Form.
19    A.  I'd have to really go back -- you know,
20  there's a lot of publications out there around, you
21  know, kind of, the underlying philosophy and -- and
22  the whole approach to the -- in your model.
23    I have to -- you know, the whole
24  precautionary principle applies, you know, very
25  broadly across a whole range of --

1    Q.  Yeah.
2    A.  You know, things like eating fried bacon
3  and everything else.  So I guess I haven't really
4  ever thought of the ART model as, you know, quite
5  in those terms as really being a tool that applies
6  to the precautionary principle.
7    Q.  If a product complies with safety
8  standards in Europe, according to the ART model's
9  predictions, the product is then cleared for use in
10  Europe; is that correct?
11    A.  Yeah.  Well, it's kind of -- it's a little
12  more nuanced than that in a sense, because the
13  product, you know, can still be used, but based on
14  the output that someone gets from the ART model,
15  you know, they could do anything from nothing to,
16  Well, you know, maybe we better find a substitute
17  material, or maybe we need to install some
18  ventilation here to try to address this, or maybe
19  we, you know, need to put people in respirators or
20  something like that.
21    So there's kind of a -- a whole hierarchy
22  of activities that -- that, you know, would flow,
23  depending on what the ART model produces.
24    Q.  But is it fair to say that if it complies
25  with safety standards according to the ART's

1  predictions that the product is cleared for use?
2    MR. DuPONT:  Form.
3    A.  You know, I'm afraid I don't really know
4  exactly how that European chemical agency, you
5  know, would apply or how they would view a
6  particular result from ART.  So I'd have to say I
7  guess I don't really have a good answer for that.
8    Q.  Do you understand that if a product is not
9  comply -- does not comply with safety measures
10  according to the ART's predictions, that the
11  product is not banned?
12    MR. DuPONT:  Form.
13    A.  No, I think that's fair.  I mean, I do
14  understand that as the idea of the whole REACH
15  approach isn't really to -- to ban chemicals.  It's
16  to give people who make them and use them a -- a
17  sense of, you know, what -- what the need for
18  control is.
19    Q.  Do you know what happens, if anything, in
20  the assessment process after the ART model
21  determines that a product did not comply with
22  safety measures?
23    A.  Well, again, you know, in some of the
24  underlying documents that are generated around
25  REACH and ART -- and there is that whole idea that

1  if something comes in with a value that's -- that's
2  higher than is acceptable, there's a whole range of
3  controls and -- and administrative measures that
4  can be taken.
5    Q.  So -- so you understand that if a product
6  fails safety measures according to ART, that it can
7  still be used in Europe?
8    MR. DuPONT:  Form.
9    A.  Oh, it's -- yeah, it may just be that it's
10  -- you know, as I say, there's an indication that
11  some sort of a control was needed.
12    Q.  All right.  I want to ask you some
13  questions, Doctor, about the appendix in your
14  report.
15    So what is the appendix comprised of?
16    A.  Well, I've got the outputs from the ART
17  model which we've been talking about, and, then, I
18  also have the results of the two-zone modeling or
19  the Near Field/Far Field modeling that I did --
20  especially for the Liquid Wrench product.
21    Q.  So just focusing on the -- on the ART
22  model data for a moment, are these -- I'm sorry.
23  What are these called?  Are these worksheets?
24    Or what do you call them?
25    A.  Well, when you get your results, you can

1 download it either as a PDF or an Excel, and so
2 this is really the report document, I guess you
3 could call it, the result -- reported results.
4    Q. Okay. So these are the reported result
5 documents from the ART models that you ran.
6    A. Right.
7    Q. All right. Were there other ART models
8 that you ran for which we do not have output
9 documents in this appendix?
10    A. Are you referring to specifically in this
11 case --
12    Q. Yes.
13    A. -- other models that I did?
14    Q. Well, I'm talking about other ART models
15 that you did.
16       MR. DuPONT: Form.
17    Q. Do you understand my question?
18    A. No, I'm --
19    Q. Okay. I don't mean to be confusing.
20 So...
21       As I understand it these -- these are --
22 focusing on the ART model, these are the output
23 documents from the models that you ran?
24    A. Correct.
25    Q. Okay. Did you run output models -- I'm

1 sorry.
2       Did you run models for which we do not
3 have output documents in this appendix?
4    A. No.
5    Q. Okay.
6    A. These are the -- these are -- you know,
7 'cause before I ran the models, you know, I tried
8 to, you know, kind of, lock in on the input
9 conditions and, like in the case of CRC, you know,
10 what were the concentrations, and -- well,
11 actually, you know, let me -- no, it wasn't in this
12 case.
13       I mean, just to -- not to belabor the
14 point, but, you know, one of the things I was
15 interested in -- not on CRC, but on the results
16 around the parts washer -- you know, the mineral
17 spirits parts washer -- one of the questions had to
18 do with the comparison I made between my model and
19 these estimates that had been generated by Fedoruk
20 in his papers.
21       And one of the differences there was that
22 the temperature that I assumed in the room was 25,
23 and he assumed 19 or 18 I think. So I did run a
24 model just to see how different the results would
25 be at those two temperatures.

1    Q. Okay. So you didn't run the ART model for
2 CRC with any input conditions other than what I am
3 seeing in this appendix.
4    A. That's -- that's a fair statement, sure.
5 That's -- that's right.
6    Q. Okay. If you could go to your ART model
7 for the CRC product, and it's dated 29 July, '19.
8 It's the cleaning parts with CRC aerosol 10 ppm
9 benzene.
10    A. Yeah, let me just flip to it.
11    Q. I think it's, like, four or five pages
12 from the end.
13    A. Yup.
14       (Witness reviews document.) Yup. I've
15 got it.
16    Q. Okay. So on each of these output -- these
17 are output reports, I think you said?
18    A. Well, what this gives is, you know,
19 essentially it recounts for you what you put in,
20 you know. And so in this case, you know, there was
21 only one activity. You can model up to four
22 activities. I only, you know, did it for one.
23    Q. I'm just trying to remember. What -- what
24 were you calling these? Output reports? Is that
25 acceptable to you, or --

1    A. Yeah, that's what they --
2    Q. Okay.
3    A. -- you know, they call it -- their title
4 at the top says "ART Report," so I'd say --
5    Q. That's a good -- that's a good thing to
6 call it. Let's just call it that.
7    A. Sure.
8    Q. So each report has a date on it.
9    A. Right.
10    Q. This one has 29 July, '19.
11    A. Uh-huh.
12    Q. What is that referring to?
13    A. Oh, that would be the date that I created,
14 you know, this information -- that I inputted to
15 the -- to the model.
16    Q. Okay. That's the date you ran the model.
17    A. Uh-huh -- yeah.
18    Q. You testified earlier that you were
19 physically in front of the computer, inputting the
20 data, and waiting for the result.
21    A. That's -- that's what it would mean, yeah.
22 Yeah.
23    Q. Okay. So I see here ART version is 1.5.
24       When did 1.5 come out?
25    A. Good question. I mean, it's -- it's

33 (Pages 126 to 129)

1  probably been a couple of years, 'cause that was,
2  you know, part of this, kind of, evolutionary
3  process that -- that we were talking about.  And --
4  and so it's been at least a couple of years --
5  could be at least three years.
6       I'm just trying to think when I was --
7  you, know when I used it in class.
8       I'll say three years.
9    Q.  And, then, under "Date created" we see
10 again 29 July, 2000 -- '19, I assume that is?
11   A.  Uh-huh.
12   Q.  Then there's a "Date last edited" of 1
13 January '01.
14       What is that?
15   A.  Good question.
16       That's -- that's in there.  I didn't input
17 that data.  That's -- that's, you know, generated
18 by the program itself, and I'd have to look in and
19 see what that refers to.
20   Q.  Well, if we go back to the -- if you flip
21 a few pages back in your report, there's an ART
22 model -- I'm sorry -- there's an ART report "Fresh
23 Mineral Spirits Parts Washing, 21 June, '19."
24       I went back three or four pages.
25   A.  Okay.

1    Q.  Do you see that there?
2    A.  I'm looking.  (Witness reviews document.)
3  Oh, here we go, yeah.
4    Q.  Okay.
5    A.  Uh-huh.
6    Q.  So -- so that one is dated 21 June, '19
7  and it's got a "Date created" of 19 June, '19.
8    A.  Uh-huh.
9    Q.  So I guess the first question is:  Do you
10 know how those two dates can be different,
11 recognizing they're a couple of days off?
12   A.  Are you referring to that "Date last
13 edited"?
14   Q.  No, I'm referring to the "Date created,"
15 'cause I thought what you just testified to with
16 respect to the CRC report -- ART report was the --
17 the 29 July, '19, date was the date it was created,
18 and you see that on the CRC ART report --
19   A.  Uh-huh.
20   Q.  -- two places.  Here there's a two-day
21 difference.  I'm just trying to understand why that
22 is.
23   A.  I'm sorry.  I'm not following the two-day
24 difference.
25   Q.  So --

1    A.  19 June, '19?
2    Q.  No.  I'm sorry.  There's a date at the
3  top.
4    A.  Oh.  Oh.  I'm sorry.  Gotcha.  Gotcha.
5       That's just the title I gave it.  You
6  know -- and so it's -- it's possible that I, you
7  know, I dropped in the wrong date on the -- on the
8  title of the report that I --
9    Q.  Okay.  And -- and on this report it says,
10 "Date last edited," 19 June '19 --
11   A.  Uh-huh.
12   Q.  -- which is the same date it was created.
13   A.  Yeah.
14   Q.  So I'm wondering why this CRC ART report
15 doesn't contain the same date it was created, which
16 was 29 July, '19.
17   A.  Yeah, that's a really good -- I don't know
18 the answer to that, I'm afraid.  If I could go take
19 a look at some of the others.
20   Q.  Was the ART report for CRC 10 ppm benzene
21 edited at any time?
22   A.  No, it would have -- you know, I think
23 that would have been reflected in that "Date
24 created" if I had gone through and -- and plugged
25 in new numbers.

1       So -- and, you know, that -- that that "Date
2  last edited," that's -- that's so far back in time,
3  I don't even understand where -- how that got in
4  there.
5    Q.  Okay.  So if we -- we move forward with
6  the CRC ART report --
7    A.  Okay.
8    Q.  -- again, we're on the one for 10 ppm
9  benzene.
10   A.  Uh-huh.
11   Q.  Next page:  "Emission sources, Near Field,
12 Far Field" -- "Near Field" is checked.  "Far Field"
13 is not.
14   A.  Yeah.
15   Q.  What does that reflect?
16   A.  Well, what it let's you do is establish
17 whether there's more than one source.  And so, for
18 example, when Mr. Rhyne was doing this parts
19 cleaning, you know, what I assumed in here was that
20 he was the only source of exposure.  So he was in
21 his own near field.
22       If there had been somebody, say, right
23 across the work table or the bench or something
24 from him who was doing a similar process or
25 generating benzene from some other source, you

34 (Pages 130 to 133)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 35 of 97

1  know, Rhyne would have been in that person's far
2  field.  And so you can add that -- what they
3  consider a secondary source, and that's what would
4  happen if you checked the "Far Field."
5      Q.  What does "Process temperature" refer to?
6      A.  That would be the -- the room temperature.
7  So in this case, you know, he's got those metal
8  parts, and, you know, the room temperature.  In --
9  in the case, you know, that -- that I used here, I
10 assumed it was 25 degrees C, since he was in North
11 Carolina.
12     Q.  I'm sorry.  I saw -- for "Process
13 temperature" I see "298 K."
14     A.  Well, that's Kelvin.  It's just -- you
15 know, it's just another scale of -- of temperature,
16 but the way the ART system is set up, you have to
17 put the temperature in in degrees Kelvin, and so
18 that's where the 298 comes from.
19     Q.  And what does that convert to in Celsius?
20     A.  That's 25 C.  That's the same as about 77
21 Fahrenheit.
22     Q.  Okay.  Vapor -- by the way, lower process
23 temperature, how does that change the output?  Or
24 higher process temperature, how does that change
25 the output?

1      A.  Yeah, it does have an effect.  If you go
2  to a lower temperature you wind up with less
3  vaporization, right, of the benzene from the
4  liquid.  And so lower temperature gives you lower
5  airborne concentrations; and vice versa:  If you go
6  with higher temperatures, the concentration goes
7  up.
8      Q.  And I'm sorry.  You may have included this
9  in your last answer, but how did you get to 77
10 degrees Fahrenheit?
11     A.  Oh, well, I -- you know, that was my, you
12 know, kind of working assumption to say, Well,
13 where is this guy doing his job?  He's in North
14 Carolina.  So what's a reasonable indoor
15 temperature in North Carolina?  And so I used 25 C.
16     Q.  Okay.  And the model allowed you to -- as
17 I understand it, in certain places a model contains
18 three to five selections that you can make for a
19 particular variable.
20     A.  Yeah.  Well -- like -- yes, and in some
21 cases like, you know, in this thing about -- where
22 you talk about the activity class --
23     Q.  Uh-huh.
24     A.  -- under spraying, "Spray direction," you
25 know, so you can say spraying overhead, or spraying

1  in any direction.
2      Q.  Yeah.
3      A.  And so, you know, my way of visualizing
4  what he was doing was that he had the part on the
5  table before him, and he was spraying horizontally
6  or downward.
7      Q.  Okay.
8      A.  So, yeah, the menu gives you maybe four
9  choices.
10     Q.  For "Process temperature," is it fair to
11 say that you're not limited by those choices; that
12 you could pick any process temperature you'd like?
13     A.  You can.  That's a free field.
14     Q.  Okay.
15     A.  You can enter the number yourself.
16     Q.  "Vapour pressure," what is that referring
17 to?
18     A.  Well, that's the inherent property of the
19 -- in this case benzene -- to evaporate from the
20 liquid to the vapor phase.  And so that's -- and
21 that's a standard number that you look up in a
22 table.
23     Q.  And the "Liquid mole fraction --" that
24 "Liquid mole fraction" is 10 ppm?
25     A.  That's the concentration, right,

1  comparative mole fraction.
2      Q.  All right.  You mentioned a moment ago
3  what the "Activity coefficient" -- here it's 1.
4  That's reflecting the fact that you were modeling
5  for a single activity?
6      A.  Well, actually, it's a little more related
7  to the -- the concentration of the material in --
8  in the overall mixture.  And so 1 is, kind of, a
9  default value for a dilute solution like this.
10     Q.  Next is, "Activity class:  Surface
11 spraying of liquids."
12     A.  Uh-huh.
13     Q.  What -- what were the choices there?
14     A.  Oh, good -- I'd have to remember.  I'd
15 have to look into it.  I mean, this is one of those
16 where, you know, it gives you three or four
17 choices, I think.  And I think right off the top of
18 my head I'm not -- I'm not remembering what the
19 other ones were.
20     Q.  Okay.  Are you aware of any data that
21 speaks to the amount of product that's released
22 from an aerosol can per spray?
23     A.  There is some data.  I -- I remember at
24 one point in the past doing a calculation on that.
25 You know, I think it varies quite a lot, though,

1  depending on the product.  And so, you know, what
2  you try to -- if you need to do that, you do try to
3  find information about, you know, the total volume
4  of the liquid in the can -- you know, so there's
5  propellant in there, you know, carbon dioxide or
6  whatever -- and the -- so you've got the mass in
7  the can; and you've got the -- try to find out the
8  number of times someone sprayed before a can was
9  empty, and then do a calculation of the mass that
10  was released each spray.
11     Q.  Do you know what the range was in -- in
12  that study or those studies?
13     A.  You know, I don't.  I did it once for a
14  calculation.  You know, I don't know that I've seen
15  much published on that.
16     Q.  Are you aware of any data that speaks to
17  the rates of product released from an aerosol over
18  time, whether it be a second, a minute, or some
19  other measurement?
20        MR. DuPONT:  Form.
21     A.  You're talking about, like, the
22  evaporation rate of, say, the benzene from the
23  aerosol or --
24     Q.  No, the amount of product that comes out
25  when you depress the spray top over time.

1     A.  Well, I think that's, kind of, what --
2  well, if we look at the choices here where it says,
3  "Situation" I think that's what that's to address
4  is the application rate -- so the volume that's
5  released per minute.
6        And so, you know, in this case I chose the
7  low rate, you know, that -- 'cause I didn't really
8  have, you know, data from -- from Rhyne's
9  discussion of how he actually used the product.
10  So, you know, I, kind of, again tried to make a --
11  a conservative assumption to say, Well, I'll just
12  say it's a low application rate.
13     Q.  Did you make any determination as to the
14  amount of the CRC product you believe Mr. Rhyne
15  used on an average daily basis in the years that he
16  used the CRC product?
17     A.  I think -- I think it's in the report.
18  I'm not -- not coming right off the top of my head,
19  but I thought in the discussion he mentioned the
20  amount of product that he used, but I have to do
21  that --
22     Q.  Can you check on that?  I don't know if
23  it's -- because I didn't believe that he did, but
24  maybe I'm wrong.
25     A.  Okay.  No.  No.  It's possible.  I'm just

1  -- you know, there was, kind of, a lot -- he talked
2  about a lot of stuff here, and so I'm not sure I --
3     Q.  To save time --
4     A.  Okay.
5     Q.  -- to the extent that you -- if Rhyne --
6  so I think my question is did you make a
7  determination of how much product he used?  If you
8  did, it would have been based on his testimony?
9     A.  Uh-huh.
10     Q.  And if he didn't testify to it, then you
11  did not make a --
12     A.  It wouldn't be there.  So I would, kind
13  of, default to this low rate.
14     Q.  Okay.  Do you know if Mr. Rhyne used one
15  -- used more or less than one can or spray bottle
16  of CRC per day in the years that he used the
17  product?
18     A.  You know, again, I -- without going back
19  to his testimony, I really don't remember that.
20     Q.  Okay.
21     A.  In fact, it -- I can't even -- I don't
22  actually remember if he was even asked that.  But I
23  -- I don't have that in mind.
24     Q.  Okay.  What were the choices for
25  application rate that you could have selected? --

1  recognizing that you selected low application rate.
2     A.  Uh-huh.
3     Q.  Okay.  What were the other choices?
4     A.  Well, you could go up medium and high
5  application, because, you know, as you see, one of
6  the other things that is, sort of, implicit in this
7  is the spray technique.  And so the spraying, you
8  know, you can apply this surface spraying activity
9  to spray painting, for example.  And so there, you
10  know, you might have, you know, a much higher
11  application rate or you can use it -- you can apply
12  it to spraying a pesticide.
13        So, you know, where you're trying to
14  really put out, you know, much larger volumes of
15  material.  So those are the kinds of options you
16  have.  And that's why, you know, given what I
17  could, sort of, infer from his description of the
18  process, I chose the low rate.
19     Q.  So just tell me:  What -- what were the
20  choices?  I think you said there was low; there was
21  medium; there was high.
22     A.  I think so.  You know, again I'd have to
23  refer to the -- to the -- you know, to the package
24  itself, but I think that those are definitely
25  included.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 37 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1    Q.  So -- so when you're sitting at your
2  computer, running the model, the choices are in
3  front of you on the screen?
4    A.  Uh-huh.
5    Q.  Okay.  Do you recall that there was a very
6  low choice?
7    A.  Well, you know, I wouldn't rule it out.
8  There could have been, yeah.  Yeah.
9    Q.  Okay.  So I'm going to ask you to assume
10  for the moment that there was a very low choice,
11  and I'll tell you what I think it was --
12    A.  Okay.
13    Q.  -- I believe that the very low application
14  rate was less than .03 liters a minute.
15    A.  Okay.
16    Q.  All right?
17    A.  That would fit with what they said for
18  low, yeah.
19    Q.  And low was .03 liters per minute to .3
20  liters per minute; is that right?
21    A.  Right.
22    Q.  Okay.  So low, in essence, means 1 ounce
23  to 10 ounces a minute? -- if you accept that a
24  liter has -- I think it's, like, 33, 34 ounces or
25  something?

1    A.  Uh-huh.  Yeah, I would accept that.  I
2  think that's reasonable.
3    Q.  Okay.
4    A.  Sure.
5    Q.  So, again, accepting that there was a very
6  low option, why did you choose low, rather than
7  very low?
8    A.  Oh, well, I don't -- I mean, I think
9  that's a fair -- a fair question.  It could have --
10  you know, this was, kind of, a -- a call based on
11  fairly limited information from him about the way
12  he used the stuff.  So that -- you know, I chose
13  low.  It -- it -- you know, I could have chosen
14  very low.
15    Q.  Do you agree that selecting very low would
16  have reduced the predicted benzene exposure level
17  by approximately three-fold?
18      MR. DuPONT:  Form.
19    A.  You know, I'd have to take a look at it.
20  That seems like a -- like a really big reduction,
21  but I -- you know, I could -- I could certainly run
22  the model and -- and see if it reduces it by that
23  much.
24    Q.  Do you recall that Mr. Rhyne testified
25  that when using the CRC product to clean nuts,

1  bolts, and washers, he would lay the part on a rag
2  on his toolbox and then spray it and wipe it off?
3      And I'm getting that from page 13 of your
4  report.
5    A.  Uh-huh.  That -- that does sound really
6  familiar, yeah.
7    Q.  Would you agree with me that that suggests
8  that he's spraying downward?
9    A.  Well, I think so.  Although you remember,
10  you know, he -- talked about, you know, cleaning
11  tools of -- or cleaning parts of all kinds and
12  sizes --
13    Q.  Uh-huh.
14    A.  -- and the things called "end bells,"
15  which were, you know, larger; you know, 8 inches, I
16  guess, in diameter.  And so, you know, if it was a
17  nut or a bolt or something and he had it on the
18  table in front of him, you know, we could make the
19  case that it was definitely a -- primarily a
20  downward spray.
21      If it was a larger part -- like he was
22  cleaning that (indicating) -- I could imagine there
23  was a horizontal component to it.
24    Q.  Okay.  Do you see -- and, I mean, you're
25  right.  He was not only cleaning nuts, bolts, and

1  washers, there was testimony about end dams and
2  some other products that were larger.
3    A.  Uh-huh.
4    Q.  Did you see anything in the record that
5  suggested that he cleaned those other parts --
6  those larger parts -- in anything other than a
7  downward motion?
8    A.  You know, I -- I don't remember the -- you
9  know, there was really that much detail in -- in
10  the record about, you know, kind of, the exact
11  technique that he was claiming.
12    Q.  So for "Spray direction" you -- you
13  checked or you selected only horizontal or
14  downward; is that right?
15    A.  Well, yeah, because, you know, the
16  contrast would be, you know, was he spraying
17  overhead with something?  And so, you know, he
18  clearly wasn't doing that.  So that was why I wound
19  up choosing this.
20    Q.  What were the other choices, other --
21  other than "Only horizontal or downward" or
22  overhead?
23    A.  You know, I just -- I'm afraid I just
24  don't remember.  I'd have to look into it.
25    Q.  Do you recall that one of the choices was

1 downward?
2    A. I wouldn't rule that out. Sure, that
3 could have been.
4    Q. I'm going to ask you to accept that one of
5 the choices was only downward.
6    A. Uh-huh.
7    Q. Can you tell me why you elected to choose
8 or select "Only horizontal or downward," as opposed
9 to only downward?
10    A. Well, it was partly, you know, because, as
11 we just assessed just a minute ago; that, you know,
12 if he was cleaning these -- what do they call it,
13 end bells or something? -- these larger parts, you
14 know, that part was big enough that, you know,
15 he -- in order to spray on it, you know, he would
16 have very likely been spraying both downward, as
17 well as horizontal to hit the surface.
18    Q. And where are you getting that it was --
19 that he would have been spraying not only downward
20 but horizontal?
21    A. I'm just --
22    Q. That's what I'm trying to understand.
23    A. Well, I'm trying to visualize the actual
24 movement around these things that are -- you know,
25 he says, "Anything above 8 inches on the end bell

1 would not be cleaned on a parts washer, instead CRC
2 was used."
3    So, you know, if that's the diameter of
4 this part called a parts washer -- or, I mean,
5 called an "end bell," you know -- say an 8-inch
6 piece about this big -- in order to spray to get
7 the -- you know, to get the cleaning solution onto
8 the surface, you know, I think it very likely that
9 he was spraying horizontally, as well as downward.
10    Q. You're assuming the 8 inches is height,
11 not length?
12    A. Well, I'm thinking what an end bell, you
13 know, must, kind of, look like, and I haven't run
14 across one lately myself, but, you know, it's some
15 metal object, you know, with a diameter of 8
16 inches. So if I'm -- if it's sitting here on the
17 table in front of me and I need to, you know, get
18 the spray onto the surface so I can clean it, you
19 know, I'm spraying horizontally, as well as
20 downward, to get surface coated.
21    Q. But if you're standing up and it's sitting
22 on the table in front of you, aren't you spraying
23 down?
24    MR. DuPONT: Form.
25    A. Well, again, I don't know enough about,

1 you know, the way his workstation was really
2 configured -- or even if he was standing. I mean,
3 I don't anybody, you know, really got to that
4 level of -- of detail in terms of his work
5 practices.
6    Q. Do you know what effect the selection of
7 only downward would have had on the predicted
8 benzene exposure to the CRC product under the ART
9 model?
10    A. I don't know. I haven't looked at that.
11    Q. If we go back to the -- the ART report
12 that we were just talking about, there's a -- and
13 are all these modifying factors on the left-hand
14 column of the page that we're on?
15    A. Yeah, those are all, you know, as you go
16 through the one screen after another, it presents
17 you, you know, with these fields; and, then -- and
18 so, you know, some of these are -- you know, like,
19 the free text field, like, where you can drop in
20 the mole fraction. And then you go to the next
21 page, and it asks you what the activity class is,
22 and it gives you a series of choices; and you, you
23 know, check the surface spraying with liquids and
24 then it takes you to another set of choices.
25    Q. So each of these is a modifying factor?

1    And I'm not --
2    A. Uh-huh.
3    Q. You just have to answer --
4    A. Oh, I'm sorry. Yes.
5    Q. Okay. 'Cause I -- I've read literature
6 that talks about the fact that there are nine
7 modifying factors in the ART model, and I see --
8 and if each of these is a modifying factor, I'm
9 seeing more than nine.
10    A. You know what? I think what they're
11 probably referring to is, you know, kind of, those
12 big, bold headings where it says, "Operating
13 Conditions," or -- yeah, "Operating Condition, Risk
14 Management Measures," I mean, that's --
15    Q. That's only two.
16    A. That's only two, yeah. No -- yeah. Okay.
17 I'll have to --
18    Q. I may be misremembering, but I thought it
19 was --
20    A. I don't remember --
21    Q. So -- okay.
22    A. -- the nine either.
23    Q. All right. We'll move on.
24    So "Spray technique," what is that? What
25 were the choices there? You -- you selected

38 (Pages 146 to 149)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC Document 234-1 Filed 04/28/20 Page 39 of 97

1  "Spraying with no or low compressed air use."
2      What is -- what were the choices?
3      A.  Yeah, well, the other -- at the other
4  extreme, you know, you could -- and there may be
5  something in the middle, but as I recall the other
6  extreme would have been, you know, using
7  high-pressure air like you would with spray
8  painting.
9      Q.  Okay.
10     A.  So that's, kind of, at the other end of
11 that spectrum.
12     Q.  Do you recall something on the lower end
13 of the spectrum below "Spraying with no or low
14 compressed air use"?
15     A.  I don't really.  It's possible there was
16 one maybe for manual pulping or something like
17 that, but I actually don't remember, sitting right
18 here.
19     Q.  Do you recall how you came to select
20 "Spraying with no or low compressed air use"?
21     A.  Well, I -- you know, it was clear that he
22 didn't have compressed air, you know, as the
23 driving force to create the aerosol.  He was using
24 either the pressure air from the carbon dioxide in
25 the aerosol can, or when he was using the spray

1  gun, you know, it was just the mechanical force
2  that he produced as he pumped the sprayer.
3      Q.  Next section is "Surface contamination --
4  Process fully enclosed."  You have no -- what is
5  that referring to?
6      A.  Yeah -- well, if you were spraying in a
7  booth, for example, like a laboratory hood or
8  something like that, where you were -- the -- the
9  part that you were spraying is isolated inside some
10 kind of a booth and you're standing on the outside,
11 that would be a full closure.
12     Q.  "Effective housekeeping practices in
13 place" and general -- I'm sorry.  "Effective
14 housekeeping practices in place," you entered "No"
15 there.
16     A.  Right.
17     Q.  What is that referring to?
18     A.  Well, it gives you -- when you're actually
19 in the program, it gives you some examples, you
20 know, of are there, you know, special cleaning
21 procedures; are there, you know, disposable
22 materials, I suppose, in place.  You know, any --
23 you know, and -- and from what I could conclude
24 about the way he did the job, none of those really
25 applied.

1      Q.  Do you know -- and the other -- I assume
2  there was one other choice, and the other choice
3  was yes, or am I --
4      A.  Yeah, I think --
5      Q.  Okay.
6      A.  Yeah, I think so.
7      Q.  Do you know what a yes answer would have
8  done to the calculation here?
9      A.  I don't.  I don't.
10     Q.  And, then, "General -- general
11 housekeeping practices in place," you wrote "Yes"
12 or you entered "Yes."
13     A.  Right.
14     Q.  What's the difference between "Effective
15 housekeeping practices in place" and "General
16 housekeeping practices in place"?
17     A.  I think the way they -- what they're
18 trying to get at there is, you know, is there like,
19 sort of, a particular specialized housekeeping that
20 applies to that process, as opposed to general
21 housekeeping throughout the facility; and so on
22 that basis I -- I said "Yes" to the "General."
23     Q.  And where are you getting that distinction
24 from when you say that that's what it's referring
25 to?

1      A.  Well, I think -- I mean, I -- I'm trying
2  to remember back, you know, as -- as you go through
3  the user's guide for ART, it explains what the --
4  you know, what they really mean by the -- by the
5  language in the selection that you make.  And so
6  that's where that kind of information would be, is
7  in the ART user guide.
8      Q.  Did you review Mr. Rhyne's testimony
9  concerning the size of the buildings where he
10 worked at the Catawba facility?
11     A.  I did.
12     Q.  Did you consider that testimony in running
13 the ART model?
14     A.  Well, I did here in this case, because,
15 you know, based on the way he described doing these
16 parts-cleaning activities, it -- it struck me that
17 he could be doing them almost anyplace.
18         And so -- 'cause you remember one of his
19 things was that, you know, they were doing this out
20 on the shop floor, and depending on how far away
21 they were from the parts washer, they would either
22 use the CRC product, or they would take the part,
23 you know, into the -- into the room where the
24 washer was.
25         So, you know, not being able to, kind of,

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 40 of 97

1    pin down where he was likely to be doing it, I just
2    said, Well, we'll give it any size workroom.
3        Q.   All right.  Do you recall that he
4    testified that the rooms that he worked in at
5    Catawba were very large?
6        A.   Some of those, yeah, definitely were,
7    yeah.
8        Q.   All right.  Did you see anything in the
9    materials that you reviewed in connection with this
10   case that contradicted Mr. Rhyne's description of
11   the size or sizes of the rooms that you worked in
12   at Catawba?
13           MR. DuPONT:  Form.
14       A.   Well, let me try to understand it.  I
15   mean, you know, he did work, you know, say in the
16   pipe shop, you know, in some of these places, and
17   he worked in areas that were, you know, more
18   confined than the general workroom space, but I
19   don't -- I didn't consider that to be exactly a
20   contradiction.
21       Q.   Yeah.  No -- and I don't believe it is
22   either.  My question may not have been a good
23   question.
24           So you've got testimony from Mr. Rhyne
25   about the size of the workrooms -- however big or

1    however small they were.
2        A.   Uh-huh.  Uh-huh.
3        Q.   Okay.  If we were to put that on one side,
4    did you see anything in the -- in the record that
5    contradicted any of his testimony about the size of
6    the rooms that he worked in?
7        A.   Oh.  I see what you're saying.
8            No, not really, 'cause, you know, he had
9    his discussion, and then, you know, some of the
10   exhibits were hand-drawn, you know, sort of, floor
11   plans of the spaces that he was in, but I didn't
12   really see that there was anything that
13   contradicted his recollections.
14       Q.   Do you recall that Mr. Rhyne testified
15   that the auxiliary building in which he worked had
16   4 floors and was 10 times larger than his
17   deposition room with a ceiling height ranging from
18   10 to 14 feet?
19           Do you recall that?
20       A.   That does sound true, yeah.
21       Q.   Do you recall that he estimated that the
22   reactor building that he worked in was 60 feet in
23   diameter and at least 100 feet tall?
24       A.   That sounds familiar, sure.
25       Q.   And do you recall that he testifies or he

1    described the turbine building as having three
2    floors that were 100 by 120 each, with a ceiling
3    height of 14 to 16 feet?
4        A.   I do recall that, yeah.
5        Q.   Okay.  What were the other -- so for room
6    size, you picked any room size; is that right?
7        A.   Right.
8        Q.   And, as I understand it, any room size
9    means that he could have been working in rooms as
10   small as 300 square feet or as large as 3,000
11   square feet; is that right?
12       A.   Yeah, 'cause it -- it -- the way the model
13   does -- it partitions; if you choose any size, it
14   partitions off into, sort of, I think three
15   categories of room size.
16       Q.   What were the other choices that you could
17   have -- or the other selections you could have made
18   for room size?
19       A.   Well, if you choose indoors, then, if you
20   know, you know, exactly the particular floor -- say
21   the volume of the space, I think there's three or
22   four room volumes, and you can choose and -- and
23   specify that.
24       Q.   Is --
25       A.   But --

1        Q.   I'm sorry.
2        A.   Oh, no, but just in -- you know, in this
3    case, I mean, you know, just, again, I'm, kind of,
4    reflecting on my own experience.  You know, I've
5    done a decent amount of work in nuclear power
6    plants, and I -- you know, I know there are, you
7    know -- even though as you say -- and as he
8    recalled -- you know, on a macroscale, the rooms
9    are really huge; these are enormous buildings, but
10   within these spaces, you know, there are smaller
11   rooms that are partitioned off and -- and, you
12   know, isolated to some extent from the general
13   plant area.  And, you know, that was why, you know,
14   not really knowing a whole lot of detail about
15   where he really worked at a given moment, I just
16   used that.
17       Q.   You've never been to the Catawba facility;
18   is that correct?
19       A.   I have not.
20       Q.   Okay.  Did you see any record evidence
21   that he worked in these separate rooms, as you've
22   described them?
23       A.   I don't think anybody really asked him,
24   you know, that -- that kind of information about
25   this particular activity he was conducting.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 41 of 97

1    Q.  So one of the other options that you could
2 have selected rather than "Any size workroom" would
3 have been "Large workrooms only"; is that right?
4    A.  I think that's one of the choices, yeah.
5 Yeah.
6    Q.  And do you know what size large workrooms
7 are?
8    A.  Right off the top of my head, I -- I know,
9 you know, just trying to visualize what's in the --
10 in the menu that drops down and gives you your
11 choices, it has room volumes in cubic meters, I
12 suppose, but I don't remember what number they
13 applied it at.
14    Q.  Why didn't you choose "Large workrooms
15 only"?
16    A.  Oh, well, just 'cause, as I said, as I was
17 thinking about what I recall from the configuration
18 of these power plants, you have a lot of big, open
19 space, but you also have areas that are either
20 enclosed or semi-enclosed, and I didn't want to
21 rule out the possibility he was working in both.
22    Q.  Okay.  And what power plants are you
23 referring to there?
24    A.  That I've been in?
25    Q.  Yeah.

1    A.  Oh I've been in the Millstone plants in
2 Connecticut --
3    Q.  Uh-huh.
4    A.  -- when they were under construction.  I
5 spent, actually, a fair amount of time there.
6    Q.  Okay.  Do you know what the selection of
7 "Large workrooms only" would have done to the
8 result of this model -- to the predicted benzene
9 exposure level?
10    A.  No, I don't.
11    Q.  "Localized controls" is the next item
12 here.
13    A.  Uh-huh.
14    Q.  And it states under "Localized controls,"
15 "Primary" and "Secondary."  And for both of those
16 you entered "No" or you selected "No localized
17 controls."
18    A.  Uh-huh.
19    Q.  What is that referring to?
20    A.  Well, the main control they're -- they're
21 identifying there is ventilation or isolation.  And
22 so if there were, for example, a space where he,
23 you know, cleaned parts in -- in a ventilated hood
24 or in a -- like, a lab hood or a glove box or
25 something like that, that would be, you know,

1 considered a -- a primary control.
2    Q.  The next item here is "Ventilation rate."
3    Why did you select -- for the CRC model --
4 workrooms having "Only good natural ventilation"?
5    A.  Well, the choices, you know, would be if
6 you had a particular air exchange rate that you,
7 know, had been calculated or you knew there was a
8 certain air volume being exhausted from a room and
9 you knew the volume of the room, you could, you
10 know, improve this and come up with a more
11 quantitative estimate.
12    But not having that information, you know,
13 my default position to try to be conservative about
14 it is, just say, Well, you know, I don't have any
15 reason to think that there wasn't good natural
16 ventilation in these -- in these spaces.
17    Q.  What were the other choices you could have
18 selected?
19    A.  You know, I'd have to go back.  I --
20 sitting here, I'm not sure I actually remember what
21 all the choices were.
22    Q.  Do you know what only good ventilation
23 means in terms of ACHs?
24    A.  I don't.  I don't know what that -- you
25 know what, that defaults to.

1    Q.  Would it be appropriate to select "Only
2 good natural ventilation" when a product is used in
3 building that had mechanical and perhaps
4 specialized sources of room ventilation?
5    MR. DuPONT:  Form.
6    A.  Well, it would, I think, depend on the --
7 you know, where that -- where that specialized
8 ventilation was focused.  I mean, kind of, by its
9 nature, you know, specialized ventilation system
10 wouldn't necessarily have much effect on the -- the
11 general ventilation, you know, throughout the rest
12 of the building.
13    (Discussion off the record.)
14    Q.  I'm sorry.  You do not know what the ACH
15 value is that -- withdraw that.
16    You don't know what only good ventilation
17 means in terms of ACH value; is that correct?
18    A.  Yeah, I don't know really what number the
19 model drops in.  It's -- you know, I'm guessing
20 it's a range of values, and they -- you know,
21 they -- they may partition it off kind of like they
22 do around the room size thing where they have, you
23 know, two to three different values that they
24 apply, and they apportion, you know, 20 percent to
25 this, 30 percent to that, and -- and do the

41 (Pages 158 to 161)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 42 of 97

1　calculation that way.
2　　Q.　What -- what would the selection be if the
3　ACH was higher than, you know, you thought it was
4　at the time you made the selection of only good
5　ventilation?
6　　A.　Are you asking, like, what would the
7　effect be on the --
8　　Q.　No, what -- what would it be called?　What
9　would the selection be called?
10　　A.　Oh, well, you could have, you know, very
11　good, you know, mechanical ventilation, forced
12　ventilation.　Something like that.
13　　Q.　Okay.　Has any study compared results from
14　the ART model to real-world measurements based on a
15　controlled simulation study?
16　　A.　Well, yeah.　In fact, that paper that --
17　that I was a coauthor on where we looked at the ART
18　model with the parts washers we did that.
19　　Q.　Which paper is that?
20　　A.　Oh, it's the one -- the first author is
21　LeBlanc.
22　　Q.　That's not part of Exhibit 5; correct?
23　　A.　No.　No.
24　　Q.　Okay.
25　　A.　That's actually been in play before.

1　　Q.　Okay.　And any other study that you can
2　cite to, other than LeBlanc?
3　　A.　Well, actually, you know, that's kind of
4　what, you know, these three papers that I just
5　threw into play today, you know, what they did was
6　compare ART predictions with measurements of
7　exposure.　So that's really what all three of those
8　papers address.
9　　Q.　What -- what is a physical mass-balance
10　model?
11　　A.　Well, it's -- that's, kind of, a form of a
12　-- of a mechanistic model where, you know, your
13　inputs are the physicochemical characteristics of
14　the material that's being used and the -- the
15　temperature and the size of the room and the air
16　exchange rate.　You know, so it -- it relies on
17　physicochemical properties to calculate a
18　prediction.
19　　Q.　Are -- are physical mass-balance models
20　generally considered stronger tools for
21　case-specific exposure assessments, as opposed to
22　the ART model?
23　　A.　Well, there is one article -- and I forget
24　the name of the author who -- who made that point.
25　Interestingly, though, he was mainly talking about

1　dust exposures.
2　　Q.　Uh-huh.
3　　A.　But that is, you know, one of the
4　critiques, I guess I'd call it, that's been made
5　in, you know, people's discussion of the ART model.
6　　Q.　Do you -- do you agree that
7　physical-mass-based models are stronger tools for
8　case-specific exposure assessments than the ART
9　model?
10　　　MR. DuPONT:　Form.
11　　A.　Not in general.　I mean, I think, you
12　know, specifically I -- I'm recalling the paper
13　you're referring to.　His point there really was
14　around aerosols and particles, not around vapors.
15　　Q.　Do you agree that the Near Field -- is
16　Near Field/Far Field a physical mass-balanced model
17　-- physical mass-balanced model?
18　　A.　It's of that type, yeah.　It relies on the
19　physicochemical properties of the materials.
20　　Q.　Do you agree that the Near Field/Far Field
21　is generally considered a strong tool for
22　case-specific exposure assessments than --
23　　A.　I'm sorry.　Could you repeat that.　I
24　missed part of that.
25　　Q.　Sure.

1　　　Do you agree that the Near Field/Far Field
2　model is generally considered a stronger tool for
3　case-specific exposure assessments than the ART
4　model?
5　　　MR. DuPONT:　Form.
6　　A.　I actually wouldn't agree with that, and
7　-- and, you know, there haven't been a lot of
8　direct comparisons, but the one that I, you know,
9　would refer to is that paper LeBlanc did -- my
10　student did.　And, as it turned out, the
11　predictions of the ART model were actually closer
12　to the measurements of exposure than the
13　predictions from the two-zone model.
14　　　MR. FISHKIN:　Thank you very much.　I'm
15　going to -- I'm going to turn it over to my
16　colleagues.　I may have some other questions if I
17　missed anything, but thank you for your time.
18　Appreciate it.
19　　　MR. DuPONT:　Let's take a break.
20　　　(Whereupon the deposition recessed at
21　　　12:22 p.m.)
22
23
24
25

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000　~　610-434-8588　~　302-571-0510 ~ 202-803-8830

1   AFTERNOON SESSION (12:58 PM)
2   EXAMINATION
3   BY MR. CAIRONE:
4   Q.  Good afternoon, Doctor Herrick.
5   A.  Hi.
6   Q.  My name's Matt Cairone.  I'll be asking
7   you questions next, and I hope to be brief, and I
8   may be jumping around because I'm trying to fill in
9   some gaps; okay?
10   A.  Sure.
11   Q.  Would you look at page 22 of your report,
12   please.
13   Let me know when you're there.
14   A.  Yup.  I'm here.
15   Q.  So the last sentence of the second full
16   paragraph -- I just want to make -- make sure I
17   understand what you did.  You assumed that Liquid
18   Wrench contained raffinate until January of 1979;
19   correct?
20   A.  Yeah, end of -- yeah, right.  End of '78,
21   December of '78/January of '79; right.
22   Q.  And that's based on an assumption that
23   there was no recall the product, so you assumed it
24   contained raffinate after the last sale by US Steel
25   of raffinate to radiator [verbatim] in April of 78;

1   is that right?
2   A.  Yeah, that's what I was trying to
3   approximate that there was a certain amount of it
4   that was already out there in the supply chain, and
5   it wound up being used, and -- and so my cut off
6   then was January '79.
7   Q.  If that assumption is not correct, you've
8   overestimated the time in which Mr. Rhyne could
9   have been exposed to raffinate-containing Liquid
10   Wrench by about eight months; right?
11   A.  Yeah, if it were a scenario where, you
12   know, like, sort of, someone threw the switch, and,
13   you know, it was all replaced, and he wasn't using
14   it for that eight-month period, that would be true,
15   yeah.
16   Q.  And that would be 8 months out of a 2 1/2
17   year period; correct?
18   A.  Yes.  Right.
19   Q.  Could you go to page 44 of your report,
20   please.
21   A.  Okay.
22   Q.  So I just want to see if you can clarify
23   something that I don't understand.
24   You calculate a cumulative benzene
25   exposure for Liquid Wrench at 6.55 ppm-years, but

1   the range ends at 6.25 ppm-years.
2   A.  Oh, you're right.
3   Q.  Can you -- so how do you explain that?
4   A.  I think it must be a typo of some kind.
5   Let me take a look at Table 4 and see what I put in
6   Table 4.  (Witness reviews document.)
7   Yeah.  I'm sorry.  That -- the value that
8   should be applied is the value that's in the table.
9   So this is -- what I put in the conclusion is a
10   typo.
11   Q.  So which value from the table should be
12   the range?  What should the correct range be in
13   your conclusions?
14   A.  Sure.  What I tried to say here would
15   be -- let's just say for the 5 percent benzene the
16   cumulative -- the midpoint of the cumulative would
17   be 6.25, and the range should be 5.42 to 7.55,
18   which is what is in -- is in the table.
19   That's for the 5 percent benzene.
20   Q.  And if there are other conclusions on page
21   44 of your report which have similar issues -- for
22   example, the Kutzit -- where the range is less than
23   the cumulative benzene exposure, would the same
24   explanation apply?
25   A.  Oh, I'm sorry.  Yeah, I see there's --

1   there's a couple of things that I just didn't catch
2   when I was -- was proofing this.
3   So the Kutzit value --
4   A.  Yeah, it would be the sum of the -- you
5   know, the midpoint would be the sum of that column,
6   cumulative midpoint exposure, and, then, the range
7   would be the sum of the values in that range.
8   So I -- I'm sorry.  I'll -- I can redo
9   these calculations or -- well, I mean, the
10   calculations are okay.  It's just I -- I didn't
11   carry over the data from the table into the
12   conclusions correctly.
13   Q.  And does that same explanation apply for
14   the conclusion with respect to mineral spirits?
15   A.  Let's see.  Just off the top of my head --
16   I haven't done the -- I can't do the calculation --
17   just sitting here -- in my head that quickly, but
18   that could be correct, 'cause that 4.41, you know,
19   should be the sum of the one, two, three, four
20   values that are there under "Safety-Kleen Mineral
21   Spirits Part Washer" in that column, the midpoint
22   column.
23   So I -- I can do that calculation, but I
24   think that could be -- that value could be the
25   number that I meant to carry over, yeah.

43 (Pages 166 to 169)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 44 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1    Q.  Okay.  And you proofed this report
2  yourself; right?
3    A.  Well, obviously not very well.  I didn't
4  -- I missed some of these typos.
5       But, yes, I did.
6    Q.  So the assessment you did in this case was
7  an exposure assessment; correct?
8    A.  Correct.
9    Q.  And you'll agree with me that there's a
10  difference between exposure and dose.
11    A.  Sure, yes.
12    Q.  Exposure is the last measure in the
13  external environment; right?
14    A.  That's the way I've always thought of it,
15  yeah.
16    Q.  And it's not until a substance gets into
17  somebody's biological system that they have a dose.
18    A.  Yeah, that's -- I mean, the, sort of, the
19  conventional definition of dose is that it's the
20  biologically relevant component of exposure.
21    Q.  Right.  And there are steps in between
22  exposure and dose.
23    A.  Yes.
24    Q.  What kind of steps are there?
25    A.  Well, if you think about -- let's just --

1  since we're talking about benzene, if you inhale
2  the benzene vapor, you know, there's benzene in the
3  air that winds up in your respiratory system, and,
4  then, there's a partitioning between the air and
5  the circulating blood that's going through your
6  lungs, for example.  So, you know, there's -- a
7  trans-- a translational, sort of, process getting
8  from the air into the biological media, and then,
9  once it's in the blood, it's metabolized by various
10  pathways in different ways throughout the body.  So
11  you have, sort of, this continuum of the
12  relationship between what's outside the body as the
13  exposure, and what winds up actually getting to
14  some site -- either at the molecular level or the
15  cellular level -- where it can have some sort of an
16  effect.
17    Q.  Right.  So exposure can't create a toxic
18  response without a dose; right?
19    MR. DuPONT:  Form.
20    A.  Well, sure.  It's -- you know, it's part
21  of the pathway, I guess, is the way I've always
22  thought of it.
23    Q.  When you say, "sure," are you agreeing
24  with what I said?
25    MR. DuPONT:  Form.

1    A.  Sure, it's part of that pathway that you
2  characterized, yeah.
3    MR. DuPONT:  Form and scope.
4    Q.  Doctor Herrick, do you agree that under
5  OSHA, the duty of an employer is to provide a safe
6  and healthful workplace for its employees?
7    MR. DuPONT:  Scope.
8    A.  Yeah.  In very general terms, that's
9  language that's right out of the OSHA Act.
10    Q.  Okay.  What's your understanding of what a
11  flammable substance is?
12    A.  Well, it would be, you know, kind of, a --
13  my -- my operational definition of it would be a
14  material that -- that's capable of burning in air.
15    Q.  And is there a general cutoff for a
16  flammable liquid in terms of flash point?
17    A.  Yeah, they're kind of related.  I mean,
18  and, you know, what you have for -- for a flammable
19  liquid would be, sort of, a range of air
20  concentrations, and at the lower end of that would
21  be what they call the "lower flammable limit," and
22  at the higher end would be the "upper flammable
23  limit."
24    Q.  Do you have an understanding of what a
25  flammable liquid flash point is to -- to make it a

1  flammable liquid?
2       In other words, is there a flash point at
3  which a liquid is considered flammable in terms of
4  workplace safety?
5    MR. DuPONT:  Form.
6    A.  Yeah.  I mean, actually, I think the more
7  useful concept is -- is, you know, the upper and
8  lower flammable limit, 'cause that's what -- if
9  you're trying to assess the risk that there could
10  be, you know, an explosion or a fire, that's the
11  quantity that people measure.  You know, that's --
12  that's the -- the airborne concentration that
13  dictates whether there's enough of a material
14  present in the vapor phase to actually explode or
15  catch fire.
16    Q.  Okay.  What is your definition of flash
17  point?
18    A.  Yeah, that's why I'm struggling with it a
19  little bit.  I think that's -- you know, I haven't
20  really used it that much, to tell you the truth,
21  'cause you don't -- if you're -- if you're trying
22  to assess the risk of a fire or -- or explosion,
23  you tend to use the upper and lower flammable limit
24  more as your -- as your metric than -- than the
25  actual flash point.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1    Q.  Okay.  So let's -- let's talk about the
2  lowest temperature at which a combustible liquid
3  gives off enough vapor to cause a fire.
4        Is that what you're talking about in terms
5  of the lower level?
6        MR. DuPONT:  Object.
7    A.  Okay.  Yeah.  Actually, the lower level,
8  you know, what I'm referring to is the
9  concentration in air.  It's not really the
10  temperature of the liquid, per se.
11    Q.  Okay.  Do you know what the flash point of
12  raffinate is?
13    A.  The flash point?  I don't, off the top of
14  my head.
15    Q.  Now, you -- you've read Mr. Rhyne's
16  deposition testimony; correct?
17    A.  I did.
18    Q.  And so you understand how he was using
19  Liquid Wrench, according to his testimony, in the
20  pipe fab shop at McGuire; right?
21    A.  I do remember that, yeah.
22    Q.  How was he using it?
23    A.  Well, there were a couple of different
24  ways, and he mentioned it, and, then, the other
25  gentleman whose name I'm blanking on who was

1  deposed, you know, talked about it in a similar
2  process.  And as I recall, they -- they were using
3  it in a couple of different ways:  One is when they
4  were doing this honing process, which is, kind of,
5  a low-speed, lathing-type process, as I recall it.
6  It's a -- puts a bevel on the end of -- of pipe.
7        And so they were using the Liquid Wrench
8  as a lubricant and a coolant on this little sharp
9  bit that actually does the honing, you know, that
10  -- that creates the bevel at the end of the piece
11  of metal.
12        And, then, the other application was when
13  they were using one of the saws to cut through the
14  metal parts, they used the Liquid Wrench again as a
15  lubricant and a coolant during that cutting
16  process.
17    Q.  And do you have any understanding as to
18  whether Liquid Wrench is intended to be used as a
19  coolant?
20    A.  I -- I don't.  I mean, they were -- they
21  were using it -- I remember that that was their
22  testimony that they used it that way, but, you
23  know, I -- I don't really have a comprehensive, you
24  know, sort of grasp of all the intended uses for
25  Liquid Wrench.

1    Q.  Do you have any understanding as to what
2  the product Rapid Tap is designed for?
3    A.  Only in a limited sense.  I mean, just --
4  especially given the way it's titled.  You know, my
5  sense would be that if you were putting -- say in a
6  piece of metal -- if you were drilling it and then
7  putting in threads that a bolt would be installed
8  in, you know, that -- that's my understanding of
9  what's usually called a tapping process, is
10  creating that threaded hole.
11    Q.  Okay.  Do you have any understanding as to
12  what the product Tap Magic is intended for -- in
13  terms of use?
14    A.  Only in the most general sense.
15        I mean, I -- I sort of infer from the way
16  it's titled that it's a similar application.
17    Q.  Do you have any understanding as to what a
18  cutting oil is?
19    A.  Well, that I'm closer to, 'cause you
20  know, I've studied metal machining, you know, in a
21  lot of situations.  And, yeah, I do have a working
22  knowledge of what "cutting oil" refers to.
23    Q.  Okay.  And what are cutting oils used for?
24    A.  Well, they're more in -- in metal
25  machining -- to cool parts, to lubricate parts, and

1  to remove the excess metal that's been produced
2  from the machining process.
3    Q.  So based on the testimony that you read
4  from Mr. Rhyne -- and I think you're referring to
5  Mr. Couch as the other person?
6    A.  Couch, yeah.  Thanks.
7    Q.  In terms of what they were doing in the
8  pipe fab shop, would it make sense to you if they
9  were using a cutting oil?
10        MR. DuPONT:  Objection.  Form.
11    A.  Well, not having, you know, really seen
12  what they were doing in action, you know, I -- my
13  impression is that that's what they were using
14  Liquid Wrench for:  as a substitute for a cutting
15  oil.
16    Q.  And do you have any opinion as to whether
17  that's an appropriate use of Liquid Wrench?
18    A.  I really don't.  It -- you know, what I
19  don't recall is, you know, from his deposition or
20  any of the questions, you know, if he was actually
21  asked, you know, Why did you do that?  Or, Where
22  did you guys get the idea that that's, you know,
23  the practice that you should be following?  I don't
24  remember that coming up.
25    Q.  If I ask you to assume that the lowest

45 (Pages 174 to 177)

1 temperature at which raffinate can ignite in the
2 presence of an ignition source in oxygen is 25
3 degrees Fahrenheit, would that change your view of
4 whether that was an appropriate use of Liquid
5 Wrench?
6      MR. DuPONT: Objection to form.
7    A. Well, what's really in play here isn't so
8 much the -- the flash point as the lower flammable
9 limit. You know, that would be the amount of vapor
10 that you would need to have in order for there to
11 be a flash or to be a fire of any kind. And -- and
12 I did try to look that up. And so for benzene the
13 lower flammable limit is -- is 1.2 percent. And
14 that's the same as 12,000 parts per million.
15      So they would have to have reached that
16 concentration in order for the lower flammable
17 limit to be exceeded so you could have had
18 ignition.
19    Q. But isn't that based on the assumption
20 that the flammability of raffinate was solely due
21 to the benzene content?
22    A. Well, that's a good point. That -- that's
23 the -- that's the lower flammable limit for
24 benzene, right.
25    Q. Right. But I'm asking to you assume the

1 lower -- lower flammable limit for raffinate is 25
2 degrees Fahrenheit. I know you want to talk about
3 it in different terms -- but let me ask a different
4 question.
5    A. Sure.
6    Q. I'll withdraw that.
7      Do you know what's in raffinate besides
8 the benzene?
9    A. You know, I remember reading -- and off
10 the top of my head I'm not really sure I could give
11 you a real good, you know, sort of, list of
12 ingredients.
13    Q. Do you know any of the other ingredients?
14    A. I'm guessing there's other hydrocarbons --
15 I mean, just given the source, you know, of the
16 raffinate to begin with. And isn't it, sort of,
17 like a -- it was described as kind of a milky,
18 emulsion-type product -- kind of had a creamier,
19 milky appearance to it.
20    Q. What's the source of that description of
21 raffinate?
22    A. I'm just trying to remember from -- from
23 some of the documents I reviewed that talked about,
24 you know, kind of, the -- role of -- of
25 raffinate as a source of benzene or Liquid Wrench.

1    Q. What is the source of raffinate?
2    A. Well, it, I think, is from the -- from the
3 coking process, from the -- the processing of coal
4 into coke.
5    Q. Can you be more specific?
6    A. I don't remember exactly where, you know,
7 in the process stream it would have come from.
8    Q. Let me ask a more general question: Do
9 you think it is appropriate to use a flammable
10 liquid to cool hot machinery?
11      MR. DuPONT: Objection. Form.
12    A. Well, I would say it's -- it's not -- it
13 wouldn't be the first choice, especially from a,
14 you know, perspective of somebody -- if -- if you
15 were, you know, asked for an assessment or an
16 opinion as a health and safety person, is that, you
17 know, what you would recommend, I don't think
18 anybody would make that their first choice.
19    Q. And that's exactly what I'm asking you as
20 an expert in the field. It wouldn't be your first
21 choice, would it?
22    A. No.
23      MR. DuPONT: Objection to form.
24    Q. An appropriate choice would be a cutting
25 oil; right?

1      MR. DuPONT: Objection. Form.
2    A. Well, you know, I think, you know, given
3 the way they describe the process, you know, the
4 nature of these beveling and sawing processes, you
5 know, that there would have been other materials
6 that would have been, you know, a better choice for
7 that application.
8    Q. And earlier you talked about the Approved
9 Chemical List.
10      Do you remember that?
11    A. I do.
12    Q. Is Liquid Wrench on that list?
13    A. Good question.
14      I can -- I mean, I've got it right here.
15 Should I take a look?
16    Q. If you would like. I mean, I can tell you
17 that I couldn't find it on there, but I'm not
18 asking you to take my word for it.
19    A. Okay. Well, I -- I mean, if you -- you've
20 obviously looked more recently than I have, so --
21    Q. So rather -- it is what it is. So let's
22 assume it is not on there --
23    A. Okay.
24    Q. -- and if it is, then I'm -- then I'm
25 proven wrong.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1        Rapid Tap is on there, right, 'cause you
2  mention that in your report?
3      A.  I'll take -- take your word on that, sure.
4      Q.  And Tap Magic is on the Approved Chemical
5  List.
6      A.  Right.
7      Q.  So those are two cutting oils that would
8  have been more appropriate to use in the pipe fab
9  shop; correct?
10       MR. DuPONT:  Well, that's making an
11  assumption.
12      A.  You know, not really having, you know,
13  intimate knowledge of -- of how -- how and why they
14  were doing it or -- you know, I think those --
15  those materials could have been useful for that
16  application, sure.
17      Q.  Okay.
18       MR. CAIRONE:  Can I mark...
19       (Exhibit Herrick 6, page 39 of John
20       Spencer Summary Report.)
21      Q.  Doctor Herrick, I've marked Exhibit 6 --
22  it is page 39 from John Spencer's report in this
23  case, which I think you indicated you have read;
24  correct?
25      A.  I have, yeah.

1      Q.  So there's a paragraph where he evaluates
2  your evaluation of benzene exposure to Liquid
3  Wrench.
4        Do you see that?  There's a title, "Doctor
5  Herrick's Evaluation of Benzene Exposure to Liquid
6  Wrench"?
7      A.  I do see that, yeah.
8      Q.  Could you read the last -- you can read
9  the whole paragraph if you'd like, but I'm focused
10  on the last three sentences, and I'd like to get
11  your reaction to that.
12      A.  "As noted on the Liquid Wrench label, the
13  Flammable Mixture Do Not Use Near Fire Or Flame.
14  Application of this product to a hot metal surface
15  may cause a fire.  Consequently, it is unlikely
16  that Mr. Rhyne used Liquid Wrench as described in
17  any exposure assessment based on this practice is
18  neither relevant nor reliable."
19      Q.  Do you have a reaction to that?
20      A.  Well, I mean, I have read this, and I -- I
21  see, you know, Spencer's comment.  I guess my -- my
22  reaction is, I don't have any reason to question
23  what Rhyne and -- what's his name, Couch?
24      Q.  (Nods.)
25      A.  -- you know, gave in their -- you know, I

1  mean, they were under oath.  They gave this as
2  their -- as their testimony.  And, you know, I'm
3  not trying to speculate as to why they would have
4  said it if it -- if it wasn't what they actually
5  did.
6      Q.  Any other reaction to that?
7      A.  To what they said or to what Spencer said?
8      Q.  To -- to Mr. Spencer's comment in the
9  report.
10       MR. DuPONT:  Compound.
11      A.  Well, let me just say, I mean, just, you
12  know, in general, you know -- and I've done a lot
13  of these retrospective exposure assessments; you
14  know, one thing I've -- I've concluded over the
15  years is that, you know, people are -- are pretty
16  good at telling you what they did.  And that -- you
17  know, just taking occupational histories on people,
18  they -- they tend to remember information like
19  this.
20        They may not have a good recollection of
21  how big the room was, or, you know, some of the
22  other details, but if you ask people, you know,
23  What did you do, and how did you do it, they're --
24  they're usually pretty good.
25      Q.  Do you recall when you reviewed Mr.

1  Rhyne's deposition that he said that the metal he
2  was cooling was too hot for him to touch with his
3  bare hands?
4      A.  Well, I remember this came up, you know,
5  sort of, in -- in some of the conversation about
6  wearing gloves and -- and so forth and whether he
7  was getting any -- anything on his skin, and, yeah,
8  I do remember him saying that the metal did get
9  hot.
10      Q.  And do you have any opinion on what the
11  temperature of metal has to be before it is painful
12  to the human touch?
13      A.  Ooh.  That's a good question.
14        I guess I really don't.  I mean, it
15  probably -- I mean, I guess -- I imagine there's a
16  lot of variability between people, but I -- I
17  wouldn't feel comfortable trying to put a number to
18  it.
19      Q.  Okay.  Fair enough.
20        I've read some things that suggest it's
21  above 100 degrees Fahrenheit.  If -- if you agree
22  with that or not, you can just let me know.
23      A.  Let's see.  100 degrees Fahrenheit.  I'm
24  just trying to think of -- you know, if you open
25  your car door on a hot, sunny day.  I imagine if

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1  it's -- if it's 100 degrees, it would, you know,
2  you would definitely, you know, feel, you know,
3  possibly there's an uncomfortable sensation on your
4  skin, yeah.
5    Q.  And I think you testified earlier that you
6  read all four volumes of Mr. Rhyne's deposition.
7    A.  I did.
8    Q.  What is your process for determining what
9  information you need to develop your opinion in a
10  case like this?
11    A.  Well, it's -- it takes a long time, I can
12  -- I can definitely testify to that.
13      I mean, my -- my process in -- in trying
14  to do these assessments and -- and develop this
15  report is to use the -- the work history as, sort
16  of, the foundational document. And so, you know --
17  and that's, you know, derived primarily from the
18  deposition.
19      In a case like this, you know -- excuse me
20  -- there were, you know, lots of rounds of
21  questioning. And so what I tried to do was, you
22  know, synthesize, you know, the answers -- you
23  know, the responses that he gave, you know, to
24  different people, based on, you know, the way he
25  described the working conditions and the -- the

1  nature of what he, you know, actually did
2  specifically with regard to the -- to the materials
3  that he was handling, to the chemicals that he was
4  using.
5      So in building this all together, the work
6  history really then, as I say, kind of provides a
7  a framework for trying to develop ways of -- of
8  estimating what the levels of exposure were.
9    Q.  Other than the deposition testimony where
10  -- from which you derive work histories, do you ask
11  for any other information or documents in order to
12  formulate your opinions in a case like this?
13      MR. DuPONT: Objection. Form.
14    A.  Well, the information about the -- the
15  products, for example. In other cases where I've
16  had, like, detailed reports about industrial
17  hygiene measurements, for example, that people
18  made, you know, that kind of helped shed light on
19  the -- the levels of the exposures that people had.
20      You know, there are times when I'll get
21  information about their hazard communication
22  programs, information about the training that
23  people have, respirator programs. Things like
24  that.
25    Q.  Did you ask for any of that in this case?

1    A.  No, I didn't, so --
2    Q.  Why not?
3    A.  Well, that's a good question. I mean, it
4  could have been useful. I mean, I had the
5  impression that they didn't really have, you know,
6  a lot of air sampling and industrial hygiene
7  measurements, for example. And that didn't
8  surprise me, you know, partly because a lot of what
9  he was doing was construction and maintenance
10  activities; and over the years, you know, it's been
11  my experience that there's -- there's -- it's, sort
12  of, rare, actually, that a lot of exposure
13  measurements are taken during those phases.
14    Q.  Well, aside from air measurements, did you
15  ask for any documentation in terms of what Duke
16  Energy required with respect to personal protective
17  equipment?
18      MR. DuPONT: Form.
19    A.  I didn't ask for more. There was some
20  information, you know, in his depositions about the
21  use of gloves and, you know, things like that. So
22  there was some of that.
23    Q.  More generally, do you ask for
24  information, or do you just assess what you're
25  given?

1    A.  Well, in a case like this, you know,
2  given, you know, kind of, what the -- what my
3  charge was, you know, which was to -- to do the
4  exposure assessment and not to try to, you know,
5  get into the particulars about any of his programs
6  or any of the protective equipment that he was
7  using, I didn't go further looking for more
8  information, no.
9    Q.  Okay. Did you ask for any information in
10  addition to that which you received in terms of his
11  potential exposure to radiation at Duke Energy?
12    A.  Well, no. I had those, you know, summary
13  sheets of his dosimetry, and, you know, I did look
14  at those. And I remember reading from his
15  deposition about an episode when he felt there --
16  you know, there had been radiation exposure, and
17  there was a followup investigation that was
18  conducted by the Duke health physics staff, I
19  suppose.
20      So beyond what was in that exhibit, I
21  didn't dig for anything more.
22    Q.  Any reason why you didn't ask for anything
23  more?
24    A.  Well, I looked it over, and, as I recall,
25  you know, he had -- I think they were quarterly

48 (Pages 186 to 189)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 49 of 97

1 results. There was -- there was the summary in
2 those sheets they had monitoring from, you know,
3 his period of employment. And with the exception
4 of those couple of samples that I -- that I
5 commented on in the report, all of his other
6 measurements came back a zero or nondetected.
7     Q. And when Mr. Fishkin was asking you
8 questions earlier about some assumptions you made
9 about the size of the work -- workspace and work
10 areas -- do you recall those questions?
11     A. Sure.
12     Q. Do you know whether, for example, the pipe
13 fab shop where Mr. Rhyne says he was exposed to
14 Liquid Wrench at McGuire in the late '70s, do you
15 know if that facility still exists?
16     A. Good question. I -- I don't know. Given
17 what they were doing in there, I -- I think I'd be
18 a little surprised if it was still there in the
19 same configuration and -- and size as it was,
20 'cause, you know, that was part of the construction
21 process; and, you know, once the facility was
22 finished, I don't imagine that they needed to do
23 that much more fabrication.
24     Q. Did you ask whether it was still in
25 existence?

1     A. No.
2     Q. Why not?
3     A. Well, I -- I didn't really find that I --
4 that I needed that additional information, given
5 what was already in the record.
6     Q. But a visit to a facility that still
7 exists would be a better gauge of its dimensions
8 than someone's recollection from 40 years ago.
9     Would you agree with that?
10     MR. DuPONT: Objection to form.
11     A. If -- unless there had been some, you
12 know, change --
13     Q. Assuming the same -- assuming it was the
14 same.
15     A. Well, sure. I mean, if you can visit
16 something and see it firsthand yourself, as opposed
17 to relying on, you know, recollections of people
18 from 40 years ago, sure.
19     Q. And up until the time you prepared your
20 report, which you have in front of you -- I think
21 you may have been asked this, and I apologize, but
22 I just want to make sure I understand -- how much
23 time did you spend on this case?
24     A. I'm sorry -- make sure I understand the
25 question.

1     Q. Through the preparation of the report --
2     A. Of the entire --
3     Q. Up and through -- yeah.
4     A. Oh, wall to wall, from beginning to --
5     Q. Until you signed the report.
6     MR. DuPONT: Asked and answered.
7     A. You know, I know it's in -- it's in the
8 records -- it's in the records, you know, from EH&E
9 about -- 'cause my hours are billed by project.
10 You know, it easily could have been a couple of
11 hundred hours.
12     MR. CAIRONE: Look through my notes really
13 quickly, and then I'll be done. (Reviews
14 documents.)
15     Q. Do you recall from the deposition
16 testimony of Mr. Couch and Mr. Rhyne how many
17 beveling machines were in the pipe fab shop?
18     A. Off the top of my head, I don't. And I --
19 you know, I don't really -- I'm just trying to
20 think if I included that in the report or not.
21     I don't think I have it in the report, so
22 I -- I don't know.
23     Q. Do you recall from that testimony how many
24 large saws were in the pipe fab shop?
25     A. I don't right offhand, and I -- I don't

1 recall that I have that in the report.
2     Q. Do you recall from the testimony of Mr.
3 Rhyne and Mr. Couch what they said they used the
4 Liquid Wrench for in terms of a cooling oil?
5     MR. DuPONT: Objection. Asked and
6 answered.
7     Q. On which equipment? -- let me put it that
8 way.
9     A. Oh, okay. Well, the -- and for the two
10 guys, what they describe was using it on this
11 beveling machine. They -- they definitely recalled
12 using it there.
13     And I just want to see what -- 'cause I
14 know he used, you know, a couple of different types
15 of saw, and I'm just trying to see if I put in here
16 which of the saws they actually used it on.
17 (Witness reviews document.)
18     'Cause they had -- one saw they, kind of,
19 referred to as a one-armed bandit, I think, and my
20 impression from that is that's, kind of, like a
21 Sawzall -- kind of like a chop saw. And, then,
22 some of the other saws were more like, sort of, a
23 fixed band saw that was in a single stationary
24 spot.
25     And, you know, just sitting here right

1  now, I don't remember how many of those that they
2  said were actually in the -- in the pipe shop.
3      Q.  Do you recall whether they said they used
4  Liquid Wrench on that bandit saw?
5      A.  That's -- bandit saw.  Sorry.  That's what
6  it was.  I think that's where they used it.  I
7  could go back -- I'm quite sure they mentioned that
8  somewhere in the deposition.  I'm not -- I don't
9  have it in my mind right at this moment.  It was on
10 one of the saws.
11     Q.  And if I ask you to assume that the
12 testimony is that there was one beveling machine
13 and one large saw, and that the only thing they
14 used Liquid Wrench on was that one beveling machine
15 and that one large saw, that would impact on how
16 often an individual employee could be performing
17 that work; correct?
18     A.  Yeah, and I just was -- I think I put it
19 in here what the duration -- you know, how long
20 they actually used the different tools each day.
21         I'm just looking for my -- through my
22 notes here. (Witness reviews document.)  Yeah,
23 both Mr. Rhyne and Mr. Couch recalled doing the
24 beveling process on an average of at least an hour
25 a day.  And that's -- that's what I had from the

1  deposition.
2      Q.  Okay.  And you are not offering any
3  opinions in this case on warnings; correct?
4      A.  No.
5      Q.  Okay.
6      MR. CAIRONE:  Thank you, Doctor Herrick.
7      THE WITNESS:  Okay.  Thanks.
8      MR. SCHULTZ:  Can we go off the record for
9  just a minute.
10         EXAMINATION
11 BY MR. SCHULTZ:
12     Q.  Doctor Herrick, my name is Vaughn Schultz.
13 We've not previously met.  Nice to meet you.
14     A.  Nice to meet you.
15     Q.  While we were off the record there for a
16 short break you handed me some additional materials
17 that we have marked as exhibits.  It looks like --
18 I've marked Exhibit 7 as your handwritten notes for
19 this case?
20         (Exhibit Herrick 7, five-page document,
21          handwritten notes.)
22     A.  Right.
23     Q.  Okay.  You can hand that back to me.
24     A.  Sure.
25     Q.  And, then, you handed me another article

1  you wanted to make a part of your deposition,
2  Exhibit 9.  Looks like van der Wal from 1984?
3         (Exhibit Herrick 9, Article:  "The
4          Performance of Passive Diffusion Monitors
5          For Organic Vapours for Personal Sampling
6          Of Painters.")
7      A.  Right.
8      Q.  And then you've also -- took it out of
9  order -- but you gave us some Excel spreadsheet
10 printouts that we marked as Exhibit 8, and these
11 spreadsheet printouts are the results of the ART
12 model?
13         (Exhibit Herrick 8, five-page
14          document, spreadsheet.)
15     A.  And -- and the other estimations as well.
16 So those are -- that's the calculation to get to
17 the cumulative exposure.
18     Q.  Okay.
19     A.  Yeah.
20     Q.  Were these spreadsheet values taken from
21 the ART model?
22     A.  Some of them were, yeah.  Yeah.  But, you
23 know, as you recall, in some cases I used model
24 results from the two-zone model --
25     Q.  Okay.

1      A.  -- in a couple of these situations, and
2  then there were others where I used the data from
3  other sources.
4      Q.  And for those calculations you just
5  inputted your results into this spreadsheet.
6      A.  That's right, yeah.
7      Q.  Okay.  I'm just going to pass this to
8  other counsel if they want to look at your notes.
9      A.  Okay.
10     Q.  You're not a chemical engineer; correct?
11     A.  No.  No, I'm a chemist.
12     Q.  You never worked in a refinery?
13     A.  Well, I did -- I wasn't an employee of a
14 refinery.  One of the things I was able to do in my
15 NIOSH days, though, was spend a lot of time in
16 refineries, because we were doing a study of
17 polycyclic hydrocarbon emissions from refineries.
18     Q.  Where was that at?
19     A.  Well, turned out I was all over the place.
20 I was all over California, Texas, Oklahoma, Great
21 Falls, Montana.
22     Q.  And you were measuring -- what did you say
23 -- polycyclic hydrocarbons?
24     A.  Yeah, the heavy organic PAHs that were
25 emitted from the refinery.

1    Q.  What years was that?
2    A.  That was in my, kind of, early NIOSH days.
3  That would have been in the late '70s.
4    Q.  Were those results ever published?
5    A.  Well, they were published in NIOSH
6  reports, yeah.
7    Q.  Do you recall the names or numbers or
8  anything like that?
9    A.  I could get it for you.  It's, you know --
10    Q.  Is it on your CV?
11    A.  You know, I did -- I don't think it's on
12  the CV, because I didn't -- you know, they weren't
13  peer-reviewed in the sense that they were in a
14  journal.  They were published as -- with the NIOSH
15  publication number.
16    Q.  Okay.  Would your name have been on the
17  author list?
18    A.  Well, you know, the way they cited those
19  government reports, they didn't really identify,
20  you know, the author.  They -- they had the name of
21  the agency and -- and the report number.  But you'd
22  have -- I mean, I'm sure my name is in there, but
23  you'd have to, you know, you'd have to dig down
24  into the -- into the text.
25    Q.  Okay.  So your work, though, at those

1  refineries was limited to measuring air sampling?
2    A.  Yeah, that's what we were doing.  We would
3  spend about a week at each one and -- and do a
4  pretty extensive walk-through of the facility, and
5  then identify sites where we took personal samples
6  on the guys who were doing the refining jobs.
7    Q.  You have not actually worked on the
8  distillation of crude oil yourself, though; is that
9  correct?
10    A.  Not as a refinery employee or a...
11    Q.  Your -- your CV noted that you worked on a
12  scientific advisory panel for Exxon from '91 to
13  '95.  And I understand you've testified a little --
14  a bit about that in the past, but I wanted to ask:
15  Who hired you for that role that you had?
16    A.  Well, this is the -- the "Exxon Shanghai
17  Study," as people refer to it, and what they put
18  together was an advisory panel -- external advisory
19  panel, and the guy who was the chair of it was this
20  guy named Gerry Rice, who had been an
21  epidemiologist at the National Cancer Institute,
22  and I knew him from some work I had done with NCI;
23  and he invited me to participate on the exposure
24  site.
25    Q.  How many people were on the panel?

1    A.  Yeah, gee, I think it was about -- I'm
2  going to say between eight and 10.
3    Q.  Were you paid for that work?
4    A.  I was.
5    Q.  By the NCI?
6    A.  No.  See, by this time Rice was retired
7  from NCI.  So this actually wasn't really a
8  government-related study at all.  I think probably
9  Exxon paid me.
10    Q.  Do you recall getting checks that said
11  "Exxon" on it?
12    A.  It's been a while.  You know, I honestly
13  -- and it may have even been direct deposit for all
14  I know, but, you know, the way the study was
15  conducted is they had a University of Colorado
16  scientist who was, sort of, the -- the primary
17  investigator, and, then, they also had people
18  working on the project who were Exxon employees.
19        And so our role was -- but, then, Exxon
20  basically paid -- you know, paid for the cost of
21  all that research.
22    Q.  That's what I want to know.
23        What was your role as a member of the
24  panel?
25    A.  Yeah.  Well, they -- they asked us to be,

1  kind of, the outside advisors around the issues of
2  the study design, and then, you know, as they were
3  doing these surveys in China and collecting
4  information, I was working on, you know, the --
5  looking at the information that -- that came in
6  from the exposure side.
7        Because they had all kinds of
8  collaborators in China, including these people who
9  were, you know, kind of, like the local health
10  department-type guys who were trained to collect
11  air samples.  And so they went out into these
12  different factories in China and did air sampling.
13        In some cases there was historical data, a
14  little bit of old data that the factories had.
15  They collected all that.  And the task that was at
16  hand was to take that information and synthesize it
17  together so they could use that exposure as part of
18  this epidemiologic study that they were doing.
19    Q.  When you said, "they asked you," did you
20  mean the scientists that were -- were involved from
21  the universities?
22    A.  Yeah, the scientists, and, then, also
23  the -- the scientists from Exxon, because it was --
24  they were, kind of, doing it hand-in-hand; and so
25  they had, like, the two Exxon guys; and the one

51 (Pages 198 to 201)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 52 of 97

1　guy's name was Rob Schneider the other is Tom
2　Armstrong.  You know, they were, sort of, our
3　connections with the company, and, then, they
4　were -- they were working directly with the people
5　at the university.
6　　　　But the university people were a little
7　more focused on the genotoxic side.  You know, they
8　were looking at cellular -- you know, DNA changes,
9　basically cellular changes.
10　　　　So it was, kind of, a hybrid design of the
11　study, I suppose you could call it, in that you had
12　university investigators, and, then, you also had
13　Exxon's scientists working on it as well.
14　　Q.  Did you provide comments on drafts of
15　papers that were published out of that study?
16　　A.  We -- yeah, I mean, my stuff was, you
17　know, really focused more on the exposure side.  So
18　I didn't review the -- you know, the EPI reports
19　and that kind of stuff, but I think what we wound
20　up doing was, we tended -- this advisory group
21　tended to review and advise on the reports that
22　were produced, and then the -- the researchers from
23　the university and the company used that as the
24　basis for their manuscripts.
25　　Q.  Okay.  Earlier Mr. Fishkin was asking you

1　about exposure to benzene in the ambient air that
2　all of us are experiencing.
3　　　　Have you ever seen any literature about
4　the dose that that would accumulate to over the
5　course of a person's lifetime?
6　　　　MR. DuPONT: Objection.  Form.
7　　A.  I have seen some.  I don't remember -- you
8　know, I don't have a particular recollection of
9　what the levels would be.  I mean, I do remember
10　that, you know, just the ambient levels tend to be
11　highly variable, depending on whether you're living
12　in an urban setting or a rural setting or downwind
13　of a -- of a -- you know, major refinery or
14　something.
15　　Q.  I want to ask you about primarily the
16　exposure calculation you did in Table 4 --
17　　A.  Okay.
18　　Q.  -- for mineral spirits cleaning, where you
19　reached a cumulative midpoint of 2.8 parts per
20　million years.
21　　A.  Yeah.  Okay.
22　　Q.  The product that you are assuming that was
23　used for that mineral spirits cleaning, what
24　exactly was that product?
25　　A.  Yeah, let me look, because that was when

1　we're -- you know, that was information that was in
2　the deposition.  And let's see...
3　　　　And this was when he was on the
4　pipefitting crew, and -- this is Mr. Rhyne -- you
5　know, in his deposition he said he would go to the
6　painters to get what he called Varsol.  So that was
7　the term that he used.
8　　Q.  Do you understand "Varsol" and "mineral
9　spirits" to be used interchangeably?
10　　A.  Well, my recollection was that Varsol is
11　really the trade name, right, for the product that
12　-- that Exxon produces.  And, you know, I've always
13　considered it, you know, to be in that broad family
14　of what we call mineral spirits, yeah.
15　　Q.  Are you aware of people using the word
16　"Varsol" colloquially as they would "Kleenex" or
17　"Xerox" to refer to a generic product?
18　　　　MR. DuPONT: Form.
19　　A.  Yeah, I think that -- that does sound
20　familiar.  I mean, I think, you know, it's a -- a
21　common product, and it's the kind of thing that
22　people, you know, may well have, you know, attached
23　that name, without necessarily even knowing that it
24　was, you know, unique to a particular company.
25　　Q.  On page 27 of your report you note that

1　Exxon Varsol No. 18 appears on the Approved
2　Chemical List that we've discussed today?
3　　A.  Uh-huh -- yes.
4　　Q.  You can agree with me that that Approved
5　Chemical List is 11 years after Mr. Rhyne testified
6　that he used Varsol in '80-'81?
7　　A.  Sure, 'cause didn't we establish the list
8　was from '92; is that --
9　　Q.  That's correct.
10　　　　You would agree that there's no testimony
11　that he used Varsol in 1992; correct?
12　　A.  I don't think he was -- he wasn't doing
13　this job in '92, no.
14　　Q.  You have not seen any Approved Chemical
15　List from any other year?
16　　A.  No, I only have the one.
17　　Q.  Did you assume that because Varsol 18 was
18　on the list of products in '92 that he was using
19　Varsol 18 in 1980-81?
20　　　　MR. DuPONT: Objection.  Form.
21　　A.  Well, you know, in terms of the way I
22　tried to estimate his exposure, you know, which I
23　used the ART model for, you know, it didn't really
24　require that I assumed that it was Varsol 18 or any
25　other one.

52 (Pages 202 to 205)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000　~　610-434-8588　~　302-571-0510　~　202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 53 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1        What I did was I, you know, I calculated
2  his exposure, saying, Well, okay, what would it be
3  if the mineral spirits contained 50 parts per
4  million, or how much would it be if it was 500, and
5  what would it be if it was a thousand.
6      Q.  Do you understand that ExxonMobil is being
7  sued for Varsol in this case?
8      A.  Sure, I guess.  I mean, I -- I don't know
9  exactly why they're -- why anybody is being sued,
10  but...
11      Q.  Do you have any evidence that the Varsol
12  he used in 1980-81 was ExxonMobil Varsol?
13          MR. DuPONT:  Objection to form.
14      A.  There was nothing in the record that, you
15  know, other than him testifying that he went to the
16  painters and got Varsol, but that's pretty much the
17  extent of the information.
18      Q.  He did not testify that the Varsol he used
19  was ExxonMobil's, was it, correct?
20      A.  You know, I don't think that ever -- no
21  one ever asked him that, and I don't think it came
22  up in his deposition, no.
23      Q.  Do you know how many different types of
24  Varsol are manufactured by ExxonMobil?
25      A.  Wow.  No, I don't.

1      Q.  Are you aware that there are multiple
2  versions at different points in time?
3      A.  That wouldn't surprise me at all, yeah.
4      Q.  Do you know the benzene content of those
5  different types?
6          MR. DuPONT:  Objection.  Form.
7      A.  Well, I've tried to read -- you know, and
8  there's been a lot of publication about that
9  obviously, about the different benzene content of
10  different, you know, grades and products as they've
11  changed over time and by geography.  And, you know,
12  so I've read the summary articles, you know, that
13  Williams prepared, and, then, there's Kopstein's
14  article and some other reviews.
15        So, I mean, I -- I have tried to, you
16  know, get a working familiarity with that, yeah.
17      Q.  What about for the time period of 1980 to
18  '81?
19      A.  I don't have a particular number in hand.
20  You know, I mean, there's -- there's some data in
21  that Williams report in her supplementary tables of
22  what benzene content was in mineral spirits in --
23  in 1980.  I don't think she identifies it
24  specifically as being Varsol.
25      Q.  Did you conduct any search in the

1  published literature for the benzene content of
2  ExxonMobil's Varsol?
3      A.  No, I didn't.
4      Q.  Do you know if any such data exists in the
5  published literature?
6      A.  That's unique to Exxon's Varsol?
7      Q.  Yes.
8      A.  I don't know that.
9      Q.  You note on page 25 of your report that
10  there is no indication that mineral spirits Mr.
11  Rhyne used were formulated in accordance with Rule
12  66, which applied to California and not North
13  Carolina, where he was employed.
14        Do you see that on page 25?
15      A.  I do see that, yeah.  Yeah.
16      Q.  Do you know when Rule 66 went into effect?
17      A.  Oh, good question.  No, I don't.
18      Q.  Do you know whether Varsol 18 was a Rule
19  66 solvent?
20      A.  I don't know that.
21      Q.  If Varsol 18 is a Rule 66 solvent, how
22  would that have changed your analysis?
23      A.  It really wouldn't have, because I didn't
24  have any reason to think that Mr. Rhyne used Rule
25  66 mineral spirits in North Carolina.

1      Q.  My question was if Varsol 18 was a Rule 66
2  solvent and you are assuming that he used Varsol
3  18, how would that have changed your analysis --
4      A.  Oh, sorry.
5      Q.  -- if it was a Rule 66 solvent?
6      A.  I see.  Gotcha.
7          MR. DuPONT:  Objection.  Form.
8      A.  Well, I think I would have, you know,
9  considered that the -- the benzene content, you
10  know, is closer to the low end of those three that
11  I chose -- is closer to the 50 parts per million
12  than it is to the thousand parts per million.
13      Q.  Is your opinion that he was exposed to 2.8
14  parts per million years with mineral spirits
15  cleaning in Table 4 directed exclusively to
16  ExxonMobil?
17      A.  Well, no, because he didn't -- there's
18  really nothing in the record that would specify
19  that the mineral spirits he got from the painters
20  was from ExxonMobil.
21      Q.  The ART model calculates exposures during
22  events; correct?  It does not calculate your
23  cumulative numbers in Table 4?
24      A.  Right.  It -- it's scenario based.  I
25  mean, that's, kind of, what the authors

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1 characterize it as, it -- characterizes exposure by
2 scenario.
3 Q. If you look at Table 3, when you're
4 talking about your daily average benzene exposures,
5 is that a number that ART calculated for you, or
6 did you calculate the TWAs yourself after ART gave
7 you the task-based numbers?
8 A. The way I did this one -- and I can check
9 the appendix -- is I -- I think his duration for
10 using this was one hour. And so that was what I
11 asked ART to give me was the one-hour average. And
12 -- and so that's the output. And so, then, what I
13 would take is the time-weighted average, assuming
14 that the other seven hours were unexposed.
15 And so that's the -- that would be his
16 daily average.
17 Q. So just -- just so we're clear, the .56
18 that you calculated for the mineral spirits
19 cleaning, you basically took the ART value and
20 divided it by eight.
21 MR. DuPONT: Objection. Form.
22 A. That's effectively what you do, yeah --
23 Q. Okay.
24 A. '-- cause the other seven -- seven hours
25 are zero.

1 Q. And in Table 4, to get to the 2.8, how did
2 you reach that number?
3 A. Well, that's -- what's in that spreadsheet
4 I gave you was -- that's multiplying -- and I'm
5 trying to think if I had...
6 (Witness reviews document.) Oh, see --
7 and also I -- well, never mind. That -- that had
8 to do with the duration of time that he spent on
9 the pipefitting crew.
10 Q. Okay.
11 A. So he had his daily average, and, then,
12 that was his average each day times the years that
13 he had that daily average.
14 Q. And you're saying that was five years?
15 A. I think that's right. Am I right about --
16 I can double-check.
17 MR. DuPONT: Don't guess. Take a look.
18 A. No, double-check.
19 Q. Well, .56 times 5 is how you get 2.8;
20 correct?
21 A. That would be the -- the calculation,
22 yeah.
23 Q. But wouldn't you agree with me -- and I
24 think you write it on page 9 in your report -- that
25 he only used Varsol for two years: '80 and '81.

1 MR. DuPONT: Compound.
2 A. Mr. Rhyne recalls using Varsol during the
3 early '80s around '80 and '81 while working on
4 pipefitting.
5 Q. That's only two years; correct?
6 A. '80 and '81, yeah. Yeah.
7 Q. So is this 2.8 that you've used five years
8 incorrect?
9 A. Can I take a look at the -- the
10 spreadsheet here? 'Cause I can see what I used for
11 the -- for that multiplication. Let me just take a
12 peek here.
13 (Witness reviews document.) So I did use
14 five years for the mineral spirits. For cleaning
15 with mineral spirits I used five for the
16 calculation.
17 Q. Should you have used two?
18 A. Well, let me go back and check. It's
19 possible. I mean, it may be that I had -- I can --
20 I'll double-check, but I -- it's possible.
21 Q. Well, are you aware of any evidence, as
22 you sit here today, that he used Varsol outside of
23 the '81-'81 time period?
24 A. Well, that's the part I need to go back
25 and check to see, 'cause I -- I see where, you

1 know, I have that -- that reference to a page in
2 his deposition, and I'd have to go back and -- and
3 see if I carried that over correctly.
4 Q. If the evidence is that he only used it
5 from '80 to '81, is the appropriate factor 2
6 instead of 5?
7 A. If he only used it for the two years,
8 then, yeah, that would be his duration.
9 Q. And if you had calculated Table 4 using
10 two years, would you agree that you would have
11 reached the result of 1.12 part per million years
12 as your cumulative exposure midpoint?
13 A. That would be the -- the way that would
14 multiply, yeah.
15 Q. And these numbers are based on the 500
16 parts per million benzene content assumption;
17 correct?
18 A. Let's see what I used for...
19 (Witness reviews document.) Yes, that is
20 based on the five -- well, actually, you know, if
21 you remember, on page 36 what I tried to do was
22 adjust it for the fact that he changed the Varsol
23 twice a week or once a week. I can't remember.
24 So on one day he was using fresh Varsol,
25 and on the next day he was using day-old Varsol;

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC Document 234-1 Filed 04/28/20 Page 55 of 97

1  and so I adjusted it down to reflect that there had
2  been, you know, benzene released in the first day
3  of use. And so on the second day, the Varsol
4  didn't contain, you know, the same amount as it had
5  on the first day.
6    Q. Planned to ask you about that --
7    A. Okay.
8    Q. -- but my -- my question is, I guess:
9  You're starting from 500-parts-per-million value to
10  calculate the Table 3 and Table 4 figures; correct?
11    A. That's what we're starting with, and,
12  then, as you're probably about to ask, you know, on
13  the second, you know, for some of the days the
14  value was -- was less than 500.
15    Q. So I want to walk through some of the
16  assumptions that you made to reach this .56
17  cumulative -- I'm sorry -- "Daily Exposure
18  Midpoint" on the -- derived from the ART model.
19      You would agree the higher benzene content
20  you put in the model, the higher the output;
21  correct?
22    A. That's right, yes.
23    Q. Did you use any ExxonMobil benzene content
24  data in the ART model?
25    MR. DuPONT: Form.

1    A. In an indirect sense that, you know, I
2  mean, there are lots of reports out there of -- of
3  benzene content of -- of various mineral spirits
4  and including Varsol; and so, you know, the way I
5  came to this, you know, sort of range of 50 to
6  1,000 was to try to recognize that there really
7  isn't a consensus around, you know, the amount of
8  benzene that's present, you know, especially going
9  back in time.
10      And so what I tried to do was to capture
11  what I thought was, you know, the range, which
12  would be 50 to 1,000, and, then, the midpoint of
13  that range.
14      So that was, kind of, my logic in choosing
15  those numbers.
16    Q. If ExxonMobil's Varsol contained closer to
17  50 parts per million or less of benzene, would the
18  appropriate figure have been to use the lowest
19  value in your range?
20    MR. DuPONT: Form.
21    A. Well, that's why I did the range, you
22  know, so that you -- you know, we could take a look
23  at the -- you know, the extreme values, as well as
24  the -- the value in the middle.
25    Q. In the materials that we received this

1  morning immediately prior to your deposition that
2  were your file materials in a Dropbox, I noted that
3  you had a set of records of 57 pages of Varsol 1
4  testing data that had been previously produced to
5  Mr. DuPont.
6      Did you review that data?
7    A. I have reviewed it. I haven't reviewed it
8  recently, so I can't, you know, really speak to it
9  in any detail.
10    Q. Why did you not use any of the benzene
11  content listed in that data when you were
12  calculating the ART figures for the mineral spirits
13  cleaning?
14    A. Well, because what I was trying to do was
15  capture, you know, what -- what the range could
16  have been, and, you know, I didn't really have the
17  unique data that would let me anchor the -- the
18  number to a specific Varsol product. I was just
19  trying to, you know, capture the range and midpoint
20  values.
21    Q. When you used the ART model on the
22  Safety-Kleen parts-washing activity --
23    A. Uh-huh.
24    Q. -- you used 58 parts per million from
25  Fedoruk; correct?

1    A. I did.
2    Q. Why did you feel that it was not
3  appropriate to use that same value for the mineral
4  spirits used for the other task in the bucket?
5    A. Oh, I see. Well, partly the mineral
6  spirits, you know, in the parts washer -- what I
7  was trying to capture there was that it wasn't
8  fresh material. You know, it could have been used
9  for some period of time before those measurements
10  were taken.
11      Whereas the mineral spirits that were used
12  in this bucket-cleaning procedure, you know, he got
13  directly from the painters, and so I assumed this
14  was fresh material.
15    Q. Are you saying that the figures from
16  Fedoruk were not from fresh material?
17    A. No, but I -- no, what Fedoruk did to get
18  to 58 is, he actually spiked to get up to that
19  level.
20      What I was trying to reflect was what was
21  more typical in -- in use of a parts washer. And
22  so when I did my -- or when LeBlanc actually -- she
23  was investigator -- did her calculations, we, you
24  know, basically did -- I used the same calculation
25  here to say, Well, for the sake of comparison, I'll

55 (Pages 214 to 217)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC Document 234-1 Filed 04/28/20 Page 56 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1    use the same value that Fedoruk did.
2        Q.  So you are assuming when you did the
3    Safety-Kleen ART calculation that that mineral
4    spirit product when it was put in the parts washer
5    had a higher benzene content, but you
6    conservatively used 58 because you think it was
7    sitting there for a while.
8        MR. DuPONT:  Objection.  Form.
9        A.  Well -- and there's a whole literature
10   around, you know, the whole rate at which the
11   benzene decays or is released from the -- from the
12   liquid solvent in the parts washer.  So that was
13   what I was trying to reflect, was that, you know,
14   the -- the mineral spirits that was in the parts
15   washer wasn't necessarily fresh.
16       Q.  You don't have any evidence of that,
17   though, right?  You're just making an assumption
18   that it wasn't fresh.
19       MR. DuPONT:  Objection.  Form.
20       A.  Well -- and I think it's a pretty good
21   assumption.  You know, I mean, that's the whole
22   point of the -- the parts washer is to, you know,
23   recirculate the solvent, so it's -- it's used, you
24   know, repeatedly.
25       Q.  What was the fresh mineral spirits content

1    that Fedoruk used nonspiked?
2        MR. DuPONT:  Actually, that's a
3    misrepresentation, so -- and a compound question.
4        Q.  You can answer.
5        A.  Okay.  Well --
6        Q.  If you understand it.
7        A.  Well, I think I do.  I mean, I think, you
8    know, based on what he wrote in -- in his paper, a
9    couple of things:  One is that he did it in
10   California in 2003 -- I think is when he actually
11   did the experiment.
12       And so getting the mineral spirits, you
13   know, as his starting point, it was probably
14   California, low benzene -- you know, low aromatics,
15   Rule 66 mineral spirits; and I think the one level
16   of exposure that he used or level of benzene was 9
17   parts per million.
18       So it was quite a different mineral spirit
19   formulation than would have necessarily been used
20   in North Carolina in the '80s.
21       Q.  Okay.  You also cited in your report to
22   Hunting '95, and you stated that Hunting '95
23   referenced Varsol containing 1 percent benzene?
24       A.  Uh-huh.
25       Q.  Do you recall that?

1        A.  I do, yeah.
2        Q.  When's the last time that you looked at
3    Hunting '95?
4        A.  Well, it was the last time I did a
5    deposition.
6        Q.  Do you know what the citation that Hunting
7    used for that reference was?
8        A.  I don't remember it off the top of my
9    head.  I remember we looked at it at that last
10   deposition.
11       Q.  I'm going to hand you a copy of it.  I'm
12   going to mark it as Exhibit 10.
13       (Exhibit Herrick 10, Article:
14       "Haematopoietic Cancer Mortality Among
15       Vehicle Mechanics.")
16       Q.  You can look at the whole thing, but I'm
17   going to point you to that section where she talks
18   about that right up here, and she references
19   footnote 34 for that comment.
20       A.  (Witness reviews document.)
21       Q.  What is footnote 34 a reference to?
22       A.  Well, that's a health hazard evaluation
23   from -- conducted by NIOSH.
24       Q.  Have you ever seen it?
25       A.  Well, I've looked for it, and I've never

1    been able to find it.
2        Q.  So you don't know whether it says in that
3    NIOSH document that Varsol contains 1 percent
4    benzene?
5        A.  I haven't been able to get that document
6    from NIOSH.  I mean, I know that's what she said
7    here, but I -- I recognize that, you know, there's
8    -- there's something missing in the way that's
9    cited.
10       MR. DuPONT:  Objection.  Form.
11       Q.  You were at NIOSH, correct, for a while?
12       A.  Yes.
13       Q.  Are you aware of NIOSH ever taking a
14   position that Varsol contained 1 percent benzene?
15       MR. DuPONT:  Objection to form.
16       A.  I -- no, I am not.
17       Q.  For your ART run on this mineral spirits
18   cleaning in the bucket, you assumed a one-hour
19   constant exposure; is that fair?
20       A.  I think that's what I put in there, yeah.
21   One hour.
22       Q.  Where did you get that number?
23       A.  Let me take a look.
24       I -- I'm -- I'd have to go back into the
25   -- his work history discussion, but I think --

56 (Pages 218 to 221)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 57 of 97

1  let's see. This is his description: They would
2  place the fasteners, bolts into the pail to clean
3  them, and he would soak the items for about 30
4  minutes before brushing. So that was during his
5  deposition.
6      Q. You assumed, then, 30 minutes for soaking
7  and 30 minutes for brushing?
8      A. Yeah, I said, Well, if he spent one hour a
9  day, if he soaked them for 30 minutes, spent the
10  second 30 minutes brushing, then -- so for his
11  daily exposure, I'll use the value of one hour.
12      Q. You're assuming, though, that his exposure
13  was one hour for both soaking and brushing
14  combined, though; right?
15      A. That was my approach to it, yeah; that he
16  was -- the total cleaning process was one hour.
17      Q. You assumed different values for cleaning
18  and brushing after soaking for other companies'
19  products in this case, such as the Safety-Kleen
20  task of 7 minutes, 14 minutes.
21      Why did you assume 30 for the parts in the
22  pail?
23      MR. DuPONT: Compound.
24      A. Well, I think that was from his
25  deposition. I could try to find it here and -- but

1  I didn't just hallucinate 30 minutes. I mean, I
2  think that's what he testified to.
3      Q. If he did not testify to that, would your
4  values change?
5      A. Yeah, they -- yeah, I would have -- yeah,
6  it would have, you know, resulted in a -- a
7  different calculation, yeah. Yes.
8      Q. The ART model, as we've seen you use it in
9  this case and also in LeBlanc, allows you to
10  separate out tasks into separate activities;
11  correct?
12      A. That's correct, yeah.
13      Q. So you could have, if you wanted to, done
14  a 30-minute soaking task and a 7- or 14-minute
15  brushing task, or even a 30-minute brushing task;
16  you could have separated those out; correct?
17      A. Yeah, it does let you put in the different
18  activities, yeah.
19      Q. Why did you not do that for the --
20  parts-washing in the bucket?
21      A. Well, that's a good question. I mean, I
22  -- I could have. I -- I just didn't -- I didn't
23  think of doing it that way, but I -- I could have.
24      Q. Wouldn't it have been more accurate to do
25  it that way?

1      MR. DuPONT: Objection. Form.
2      A. You know, I don't know. I'd have to --
3  I'd have to take a look at it again, because --
4  well, you know, I could -- well, I -- I can't
5  really do it just sitting here, but, you know, I'm
6  just trying to, kind of, visualize what would
7  generate more benzene vapors. Is it just, sort of,
8  the passive soaking, or is it, you know, actually
9  taking something that's, you know, coated with
10  solvent and then, you know, physically trying to
11  dislodge, you know, whatever is on the surface with
12  some kind of a brush, whether that would actually
13  contribute to a greater generation of vapor than
14  just the passive soaking.
15      And I actually don't know the answer to
16  that, but, I mean, it would be interesting to look
17  at.
18      Q. But you did that separate calculation for
19  the Safety-Kleen parts washer?
20      A. Well, that -- yeah, in fact, that was --
21  you know, what I was trying to do there was follow
22  through on the same set of work activities that
23  Fedoruk had done, 'cause I wanted to be able to
24  compare it with his results.
25      Q. And that separate calculation was done in

1  LeBlanc?
2      A. That -- right. That was the approach that
3  took, yeah.
4      Q. You were part of that, though; right?
5      A. Well, I was her advisor, yeah, when she
6  was a student.
7      Q. You were a coauthor?
8      A. Uh-huh -- yes.
9      Q. In the Safety-Kleen scenario, you assumed
10  14 minutes for brushing parts that were described
11  as transmission parts?
12      A. I don't remember.
13      Was this in LeBlanc?
14      Q. No, I'm sorry.
15      In your report in the ART runs in the back
16  in the appendix --
17      A. Uh-huh.
18      Q. -- you assumed 14 minutes for Safety-Kleen
19  brushing of transmission parts.
20      A. Oh, okay. I didn't -- it doesn't -- it's
21  not critical that they be transmission parts.
22      Q. That's fine.
23      A. Yeah.
24      Q. You understand, though, that when he was
25  cleaning parts in this small bucket, he was

57 (Pages 222 to 225)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 58 of 97

1  cleaning bolts and fasteners.
2      MR. DuPONT: Objection. Form.
3      A.  I think that's plausible.  This was when
4  he -- let me take a look.  I mean, I think I may
5  have even tried to mention that.
6      Q.  I actually think you just mentioned it
7  when you were going through it with me.
8      A.  Yeah, I said, "They would place
9  fasteners/bolts into the pail to clean them."
10     Q.  Would you expected it to take more or less
11  time to clean a fastener or a bolt with a brush
12  than a large transmission part?
13         MR. DuPONT: Objection. Form.
14     A.  I think it would depend on the part,
15  truthfully.  In some of the -- the work I've done
16  in another case, you know, the whole -- the whole
17  topic centered around cleaning transmission parts,
18  you know, from vehicles, from automobiles.  And in
19  that case, you know, there were situations where it
20  probably took longer just because of the nature of
21  the material they were trying to remove.
22     I don't really know what condition the
23  fasteners and bolts that he was cleaning would have
24  been in.  So I guess I can't really, you know,
25  offer much of an opinion on that.

1      MR. DuPONT: It's been an hour and 15
2  minutes -- if you get to a good time for a break.
3      MR. SCHULTZ: Sure.  We can take a break.
4      Q.  Let me ask you one question before we move
5  on:  The 60 minutes of exposure that you calculated
6  for this activity, where would Mr. Rhyne's
7  breathing zone being during that activity?
8      A.  Well, that's good.
9      Well, I -- you know, not having seen it --
10  and no one really asked him that level of detail --
11  I would be pretty confident that when he was doing
12  the brushing, he was definitely, you know, within
13  that, sort of, 2 1/2 foot, 3-foot distance that we
14  tend to think of as the breathing zone.
15     And when he was doing the soaking, you
16  know, it's possible that it didn't require that he
17  be there, you know, in direct proximity, you know,
18  to that pail, since my impression was that the
19  soaking was just, sort of, a passive process.
20     Q.  So you're assuming that he would likely
21  walk away from the bucket while it's soaking.
22         MR. DuPONT: Objection. Form.
23     A.  You know, I don't know him well enough to
24  know what his work habits would have been.  I mean,
25  it's -- if he had something else going on that he

1  went over and checked on, or if he went and talked
2  to one of his friends, or if he, you know,
3  basically just stood there, working a crossword
4  puzzle, you know, I really have no way of knowing.
5      Q.  Assuming that his breathing zone was not
6  within 2 or 3 feet of the bucket for the soaking
7  process, he wouldn't have a near-field exposure
8  during that time; correct?
9      A.  Well, if -- if that's the correct
10  assumption; that he, you know, moved more than,
11  say, 3 feet away from the bucket, then, right, he
12  would be outside the near field.
13         MR. SCHULTZ: We can take a break.  Thank
14  you.
15         (Recess was taken.)
16     Q.  Doctor Herrick, just want to circle back
17  on a couple of things:  In your materials that you
18  provided this morning via Mr. DuPont, I saw a
19  reference to a NIOSH document.  It's entitled,
20  "Kaiser, 1990 NIOSH."
21     A.  Oh.
22     Q.  Do you recall that?
23     A.  Yeah.  Yeah.
24     Q.  What relevance does that have in this
25  case?

1      A.  Oh, it's a health hazard evaluation where
2  they were looking at benzene from blanket wash
3  product, you know, from a -- from a printing
4  process.  And Kaiser did some air sampling there
5  and measured benzene about 1.1 parts per million in
6  the air when they were using this blanket wash
7  material.
8      Q.  Did you cite to that in your report?
9      A.  No, I just -- no, I didn't.
10     Q.  What -- what relevance does it have to
11  your opinions in this case?
12     A.  Only, you know, just in -- in the sense
13  that using these petroleum-based solvents can
14  result in benzene exposures in the range of a part
15  per million.
16     Q.  Did you know what the content of the
17  liquid content was of that blanket wash?
18         MR. DuPONT: Object to form.
19     A.  I don't off the top of my head.  I'll have
20  to dig it up.
21     Q.  Can you use ART to calculate exposure in
22  mineral spirits?
23     A.  It turns out you can, yeah.  You know, I
24  didn't realize that until fairly recently that you
25  could, you know, dial that in as a mixture.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 59 of 97

1     The thing you have to try to do is come up
2 with a decent value to use for its vapor pressure.
3     Q.  Could you have done that in this case and
4 -- and done a calculation?
5     A.  You -- I mean, the -- the short answer is
6 yes -- you know, with the caveat that, you know, as
7 I'm sure you know, there's a wide range of values
8 for the vapor pressure of mineral spirits.  And so
9 I -- I don't know that I'd have a lot of confidence
10 in -- in the model's output.  You know, it's a
11 typical thing with a model.  It can only, you know,
12 predict based on the quality of the information
13 that you give it.
14     Q.  Another input that you chose to -- to use
15 when calculating the exposure to mineral spirits in
16 the bucket was the -- the size of the bucket;
17 correct?
18     A.  Let me just take a look.  I think I -- I
19 mean, that's -- that's here in the appendix.
20        (Witness reviews document.)
21     Q.  So you assumed a 5-gallon bucket was used
22 for this task?
23     A.  Yeah, that was the recollection, I think,
24 that he had from the -- in his testimony, yeah.
25     Q.  You believe Mr. Rhyne testified about the

1 size of the -- the pail or bucket that he used?
2     A.  Sitting right now, I don't remember
3 -- and I think I remembered him describing it.
4 Whether he actually specified it was 5 gallons or
5 not, I -- I don't remember.
6     Q.  Did you assume the bucket was full of
7 mineral spirits?
8     A.  Pretty -- yeah, I think that would be --
9 you know, just trying to visualize the way he would
10 have done -- maybe not, like, full to the brim, but
11 if you were going to get a bucket and put parts in
12 it -- these bolts and nuts and stuff -- you know, I
13 would imagine that it would be at least, you know,
14 say, two-thirds, three-quarters full.
15     Q.  Do you know what the surface area is of
16 the 5-gallon bucket?
17     A.  I don't offhand.
18        MR. DuPONT:  Objection to form.
19     A.  You know, we could -- we could do the
20 calculation.  I mean, in my model the situation I
21 used was an open surface between .3 and 1 square
22 meter.
23     Q.  That's also the same selection that you
24 used for parts washer; correct?
25     A.  I think so.  I could check.

1     Q.  I'll represent to you that it is the same.
2     A.  It is?  Okay.  Sure.
3     Q.  You would agree with me that the surface
4 area of a 5-gallon bucket is smaller than a parts
5 washer; correct?
6        MR. DuPONT:  Objection.  Form.
7     A.  Well, I'm trying to remember what we --
8 'cause it's -- it's in the Fedoruk paper, and, you
9 know, it's in LeBlanc too what the actual
10 dimensions of the part washer -- you know, the open
11 tank was, and I don't recall that right off the top
12 of my head.
13     Q.  In Fedoruk there's a description of the
14 parts washer as being 24 inches by 12 1/2 inches.
15 Does that sound familiar to you?
16     A.  That sounds about right, yeah.  Yeah.
17     Q.  Would you agree that that's larger than
18 the surface area of a 5-gallon bucket?
19        MR. DuPONT:  Form.
20     A.  24 by 12?  I think they're pretty
21 comparable.  I'm just trying to, you know,
22 visualizing, you know, that's 2 square feet, right?
23 That's 24 by 12.  So that's a 2-square-foot
24 opening.
25        You know, say roughly the size of, you

1 know, this manila-folder thing that we have here
2 (indicating); and the area of a -- a 5-gallon
3 bucket -- you know, I can't do the pi parts square
4 calculation thing in my head, but I -- you know, my
5 sense would be that they're -- they're in the same
6 order of magnitude.
7     Q.  If I were to represent to you that the --
8 the square meters of the Fedoruk parts washer was
9 .1935, would you have any reason to dispute my
10 calculation?
11     A.  Well, I haven't done the calculation, so
12 if -- if that's what 2 square feet converts to,
13 sure.
14     Q.  Or 24 inches by 12.5; correct?
15     A.  Uh-huh.
16     Q.  Okay.  Can we agree that a 5-gallon bucket
17 is about 12 inches across?
18        MR. DuPONT:  Object to form.
19     A.  That -- that -- sure, we can agree to
20 that.
21     Q.  If I were to represent to you that the
22 square meters on a 12-gallon [verbatim] bucket
23 surface area, then, would be .0729 square meters,
24 would you have any reason to dispute that?
25        MR. DuPONT:  Objection.  Form.

59 (Pages 230 to 233)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 60 of 97

1    A.  No, I'm not going to question your
2  calculation.
3         MR. DuPONT:  If you don't know, then say
4  you don't know.
5    Q.  That's certainly smaller than the Fedoruk
6  number; correct?
7    A.  When -- was that .11 --
8    Q.  .1935.
9    A.  Oh, 1935 and .07, yes.
10   Q.  There are other surface area selections in
11 ART that would fit into the .0729 square meters
12 surface area; correct?
13   A.  Right, I could have chosen a -- a
14 different area.
15   Q.  The correct selection could have been 0.1
16 meter squared or less?
17   A.  I think that -- that certainly is
18 possible, yeah.
19   Q.  And if you had used a smaller surface area
20 input in your ART calculation, the final output
21 would have been lower as well; correct?
22        MR. DuPONT:  Objection.  Form.
23   A.  Yeah, I don't -- you know, I could take a
24 look at it.  I don't know just in here, I mean, how
25 much lower, but I think it could have been lower,

1  sure.
2    Q.  "Surface activity class" is another input
3  that you used to calculate this ART figure for
4  mineral spirits in the pail.
5    A.  Right.
6    Q.  And for the "Surface activity class," you
7  selected a subclass of "Activities with agitated
8  surfaces"; correct?
9    A.  Uh-huh.  Right.
10   Q.  And this activity subclass was used for
11 the entire 60 minutes; correct?
12   A.  Yes.
13   Q.  Would you agree with me that ART describes
14 that activity subclass as analogous with mechanical
15 mixing, gas bubbling, and boiling?
16   A.  That -- I think that's what -- that's what
17 appears when you make that selection, yeah.
18   Q.  And those things were not happening to a
19 pail of mineral spirits sitting stationary;
20 correct?
21   A.  No, they probably weren't.
22   Q.  How or why did you assume that the mineral
23 spirits was being agitated for 60 minutes?
24   A.  Well, I could have chosen a different
25 activity class, sure.

1    Q.  And there is an activity class that was
2  available to you entitled, "Activities with
3  relatively undisturbed surfaces"; correct?
4    A.  Right.
5    Q.  And you used that activity subclass for
6  the soaking task in the Safety-Kleen analysis and
7  also in LeBlanc; correct?
8    A.  Correct.
9    Q.  But you did not use it here for the pail.
10        MR. DuPONT:  Object to the form.
11   A.  No, as you said, I -- I had the other
12 activity chosen.
13   Q.  You -- if you had used an "Activities with
14 relatively undisturbed surfaces" input, the number
15 would have been lower; correct?
16   A.  I think that's probably true, yeah.
17        MR. DuPONT:  Objection.  Form.
18   Q.  Do you know how much lower?
19   A.  No, I don't.
20   Q.  Do you recall in LeBlanc that the agitated
21 surfaces was only used because of compressed air
22 and spraying?
23   A.  And spraying or...
24        MR. DuPONT:  Object.
25   Q.  Yeah.

1    A.  Compressed -- could you repeat that one.
2    Q.  Do you agree in LeBlanc that the selection
3  of agitated surfaces was only used when compressed
4  air or spraying was taking place?
5         And I can show you LeBlanc.
6    A.  Okay, yeah.  Yeah.  I'm not questioning.
7  I'm just trying to remember.  You know, I mean,
8  that does sound right, yeah.
9    Q.  And there was no compressed air or
10 spraying going on in the pail of mineral spirits;
11 correct?
12   A.  Right.
13   Q.  Now, for this pail of mineral spirits it
14 appears you have also modeled a far-field exposure.
15   A.  Right.
16   Q.  And that, according to, I think, your
17 testimony this morning, is due to a second exposure
18 source; correct?
19   A.  Right.
20   Q.  What is that exposure source?
21   A.  Yeah, in this case I -- you know, that
22 probably should have been left just as a
23 near-field.
24   Q.  Okay.  If we had removed the far-field
25 calculation, how much would it have taken off of

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1  your benzene estimate?
2      A.  Yeah, I would have to do the calculation.
3  I can't just estimate it.
4      Q.  Do you have any -- I don't know if it's in
5  your spreadsheet or if you have it in some other
6  format -- when you did your ART runs for the near
7  field and the far field at the different values of
8  benzene, do you have a number of what the
9  near-field number was, versus the far field?
10     A.  When you say, "number," are you referring
11 to the -- to the input?
12     Q.  No, the output.
13     A.  No, it -- it gives you just a single
14 result.  I mean, it doesn't really, you know, give
15 you that separate.
16     Q.  So for the -- the 50-part-per-million
17 mineral spirits, it came up with a 5.8 milligram
18 per cubic meter result.
19     A.  Right.
20     Q.  In the 50th percentile?
21     A.  Right.
22     Q.  You don't know how much of that is
23 attributed to near field and far field?
24     A.  No, you can't tell just, you know, from
25 these results.

1      Q.  You could tell if you ran it without the
2  far field, though; right?
3      A.  Right, that would be the way to do it.
4      Q.  Would it surprise you to know at 50 parts
5  per million that the far field value was 4.3
6  milligrams per cubic meter?
7          MR. DuPONT:  Objection.  Form.
8      A.  What was the near field?
9      Q.  Would have been the balance.  It would
10 have been 1.5.
11     A.  So the -- I don't think that is possible.
12         So you're saying the far field result is
13 actually higher than the near-field result?
14     Q.  That's correct.
15     A.  I -- I don't see how that can be.  The
16 near field is, you know, the 2-feet distance from
17 the source; whereas the far field is, you know,
18 everything further away.
19         It's just -- that isn't really possible.
20     Q.  I agree.  It's confusing to me as well.
21 I'm -- I'm wondering why for the far field you
22 chose an open surface of 3 meters squared for the
23 mineral spirits with the pail?
24         MR. DuPONT:  Objection to form.
25     A.  Oh, I see where you are.  (Witness reviews

1  document.)  Just sitting here now, I don't remember
2  how that would have been chosen.
3      Q.  But that's significantly higher than the
4  pail value that you used in the near field of .3 to
5  1; correct?
6      A.  Uh-huh -- yup.
7      Q.  Do you think that could account for the
8  reason for why the far field would be higher than
9  the near field?
10     A.  I guess it's possible.  I'd have to -- you
11 know, I'd have to look into it a little more just
12 to see where -- you know, what's contributing to
13 those levels.
14     Q.  But it is also true that you assumed that
15 he was being exposed to the near field and the far
16 field for the entire 60 minutes; correct?
17     A.  That's correct, yeah.
18     Q.  And it sounds like that has overestimated
19 your calculations?
20     A.  Well, I think, you know, the -- the
21 calculation, you know, definitely could be redone,
22 you know, looking only at the near-field
23 contribution, yeah.
24     Q.  You used the activity coefficient of 1.5
25 for benzene at all three values; correct?

1      A.  Right.
2      Q.  What's the citation or the basis for that
3  assumption?
4      A.  Well, that's -- there's a -- within the --
5  the data within the -- the software -- or within
6  the -- the program, rather, there's a series of
7  choices; and so for dilute solutions of
8  hydrocarbons like this, that's, kind of, the
9  default value of 1.5.
10     Q.  Correct me if I'm wrong, but I believe
11 when you were being cross-examined by Mr. Fishkin
12 this morning, you testified that you used the value
13 of 1 for the CRC product.
14     A.  I did, yeah.
15     Q.  Why did you choose the higher value for
16 the Varsol -- I'm sorry for the mineral spirits?
17     A.  Well, I mean, it could have been 1.  That
18 particular input value isn't really crucial in
19 terms of the overall model performance.
20     Q.  But if it was 1, it would have decreased
21 your values in some respect.
22         MR. DuPONT:  Objection.  Form.
23     A.  You know, I really don't know.  I'd have
24 to take a look at it.
25         I mean, the really crucial value is the

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 62 of 97

1  mole fraction. I mean, these are -- activity and
2  the mole fraction are both, kind of, getting at the
3  same underlying concept, is the concentration of
4  the analyte in the mixture.
5      Q.  If you look again at the
6  50-part-per-million mineral spirit ART run, there
7  you chose a mole fraction of .000104 for far-field
8  exposure.
9      A.  Right.
10     Q.  That correlates, I think, to 58 parts per
11 million?
12     A.  Right.
13     Q.  And then you used a different number for
14 the mole fraction for the near field.
15     A.  Right.  That's -- that's what corresponds
16 to the -- oh, I see what you're saying.
17        I'd have to take a look at what -- you
18 know, what the mole fraction of what that .000104
19 actually corresponds to in terms of parts per
20 million.  I don't have that right off the top of my
21 head.
22     Q.  But we can agree, though, I think, based
23 on your testimony, that we can exclude the
24 far-field exposure from your analysis for the
25 mineral spirits in the pail?

1      A.  I think the -- the correct approach would
2  be to model just the near field.
3      Q.  You also assumed that for the near field
4  that this activity was taking place indoors.
5         Do you see that selection?
6      A.  I do, yeah.
7      Q.  Why did you choose "Indoors"?
8      A.  Well, my -- my recollection from the way
9  he described this process was that it was an indoor
10 process.  He was doing it inside the facility.
11     Q.  What facility?
12     A.  I have to take a look and see how he
13 described it.
14     Q.  This was the McGuire nuclear facility, I
15 believe --
16     A.  Okay.
17     Q.  -- during that 1980 to '81 time period.
18     A.  Let me just take a look.  (Witness reviews
19 document.)
20        Yeah, so this was during the time he was
21 on the pipefitting crew.
22     Q.  Not in the pipe fab shop; correct?
23     A.  Right.  Right.
24     Q.  So this time you described on page 9 of
25 your report.

1      A.  Uh-huh.  Yeah, I see it.
2      Q.  Sorry.  Just give me one second.
3         So what about the facility did you believe
4  to be indoors when he was walking around, not while
5  working in the pipe fab shop?
6      A.  Well, what I recall is -- and, again, this
7  is the way he described it -- was that "He recalled
8  going to the painters to get the Varsol; they would
9  pump it out of their barrel into an open pail that
10 he would then carry back to his workstation."
11        And so --
12     Q.  This was -- sorry.
13     A.  I mean, so from that, you know, I don't
14 remember that there was any, you know, discussion
15 in the deposition about whether his workstation was
16 indoors or outdoors.  I assumed it was indoors.
17     Q.  Do you recall him describing that facility
18 as humongous?
19        MR. DuPONT:  Objection to form.
20     A.  That term probably came up.  I don't
21 remember, but it wouldn't surprise me.
22     Q.  Now, for another task that Mr. Rhyne did
23 at Duke Energy for using Kutzit to remove gaskets
24 out in the facilities --
25     A.  Uh-huh.

1      Q.  -- not in the pipe fab shop, you selected
2  "Outdoors."
3      A.  In the ART modeling?
4      Q.  Yes.
5      A.  Oh, okay.
6         MR. DuPONT:  Are you saying at Duke?
7         MR. SCHULTZ:  Yeah.
8      Q.  Why did you select outdoor for the gasket
9  work out in the shop -- or out in the field, not
10 shop, but for the mineral spirits in the pail --
11 out in the facility not in the shop -- you selected
12 "Indoors."
13        MR. DuPONT:  Objection.  Form.
14     A.  I don't recall.  I don't really know the
15 answer to that.
16     Q.  Would it have been more appropriate to use
17 "Outdoors" for the mineral spirits with the pail?
18        MR. DuPONT:  Objection to form.  Hold on.
19        Why don't we look at your report and
20 confirm what he's saying is true.
21        MR. SCHULTZ:  I object to that question as
22 saying I'm misrepresenting what's in his report.
23        MR. DuPONT:  Well, there are multiple
24 different time periods at which Varsol was used.
25 So if you're --

62 (Pages 242 to 245)

1    MR. SCHULTZ:  You mean Kutzit?
2    MR. DuPONT:  Excuse me -- Kutzit was used.
3 So --
4    MR. SCHULTZ:  Yeah, I'm talking about his
5 ART run, which was, I think, the first one.
6    MR. DuPONT:  The one that says, "ART
7 reports spreading Kutzit for removing gaskets at
8 home"?
9    MR. SCHULTZ:  Yes.  I believe that was a
10 misprint, 'cause he was not removing gaskets at
11 home.  He was removing gaskets at Duke.
12    MR. DuPONT:  No, that is not a misprint,
13 'cause he testified to removing gaskets on vehicles
14 on his family's car at home, which is exactly why I
15 asked him to look at for that person to determine
16 whether what you were representing were true or
17 not.
18    A.  Well, just on the Kutzit point, I mean,
19 that is correct that I did the modeling outdoors
20 for his work at home because there was really no
21 data available on Kutzit as it was used outside.
22 So that's --
23    Q.  Did he use Kutzit to remove gaskets at
24 Duke or --
25    A.  Well, definitely at home.

1    MR. DuPONT:  Compound.
2    A.  Let me just check and see, 'cause I had
3 that in the report about where -- what he would
4 have done at Duke.
5    (Witness reviews document.)  Yeah, so I
6 have he used Kutzit at home, and that's when he was
7 doing it outside.  And, then, he also used Kutzit
8 at Duke, removing gaskets from flanges.
9    So, I mean, the answer is, I have it that
10 he used it as both places.
11    Q.  If you look at Table 3, when he used
12 Kutzit in Duke Energy maintenance, that .024, was
13 that calculated with ART?
14    A.  I think so.  Let me just double-check it.
15 (Witness reviews document.)  I'm sorry.  Could you
16 repeat the question.  I just want to make sure
17 I...
18    Q.  Table 4, the .042 value for Kutzit, was
19 that calculated with ART?
20    A.  That's working outdoors on his vehicles?
21 Is that the one?
22    Q.  It says, "Duke Energy -- Maintenance."
23    A.  Oh, Duke.  Okay.  (Witness reviews
24 document.)
25    Oh, no, I didn't use ART for the work that

1 he did there.
2    Q.  How was that calculated?
3    A.  Yeah.  I'm looking right now.  So I think
4 I took the same approach at Setzer's and also at
5 Duke for his Kutzit use that, since he was Kutzit
6 in 1985, that it was containing between 25 and 50
7 percent toluene, and I assumed that the toluene was
8 from .1 to 1 percent benzene, so then I did the
9 calculation of the benzene content of the Kutzit
10 when he did that; and I adjusted the proportion of
11 the airborne concentration from that data that we
12 had from the Young experiment, and -- and, you
13 know, used that proportion and calculated that for
14 the one-hour period when he used the Kutzit with 25
15 to 50 percent toluene, his daily exposure was .08
16 parts per million.
17    Q.  So this ART run does not apply to Duke
18 Energy.
19    A.  No -- and I'm on page 36 in the text --
20 but I -- I didn't use the ART approach for the
21 Kutzit use at Duke.
22    Q.  For the Varsol with the mineral spirits in
23 the pail, you selected good natural ventilation as
24 well?
25    A.  Right.

1    Q.  I apologize.  Going back to the selection
2 about the size of the room, you selected "Any size
3 workroom" for that facility?
4    A.  I did, yeah.
5    Q.  He -- he did not testify to using Varsol
6 -- I'm sorry -- mineral spirits in a pail in a
7 workroom; did he?
8    MR. DuPONT:  Objection.  Form.
9    A.  Well, I think what we were looking at from
10 his testimony was that he said he got the pail from
11 the painters, and then he took it back to his
12 workstation.
13    Q.  His workstation was not in a workroom;
14 correct?
15    MR. DuPONT:  Object to form.
16    A.  Well, that's why I used -- no, I mean, it
17 wasn't necessarily in a workroom, and that's why,
18 you know, for that selection in the ART -- of the
19 ART choices I basically chose any size room.
20    Q.  You -- I think you testified earlier you
21 did not know the air changes per hour for good
22 natural ventilation?
23    MR. DuPONT:  Object to form.
24    A.  I don't have a good number that I could,
25 you know, refer you right here.

63 (Pages 246 to 249)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 64 of 97

1    Q.   If I were to tell you that it was .3 to 3
2  air changes per hour, would that sound right?
3       MR. DuPONT:  Form.
4    A.   It's probably reasonable -- I mean, within
5  -- you know, I mean, "good" is, kind of, a, you
6  know, undefined term in a sense, but that's
7  probably roughly what we have in here, and I would
8  say this is pretty good natural ventilation.
9    Q.   Well, that's what I was going to ask you.
10  I mean, .3 to 3 air changes per hour is the same as
11  in a residential building or a house; right?
12    A.   Some houses, yeah.  I mean, it's -- it's a
13  good airflow, you know, spaces that are, you
14  know, general occupancy.
15    Q.   Would you think that is analogous to a
16  nuclear power facility?
17       MR. DuPONT:  Object to form.
18    A.   In terms of just, you know, sort of, the
19  general open space inside the building, I think
20  that's reasonable, yeah.
21    Q.   There is measurement in literature about
22  what air changes per hour happen in factories and
23  facilities that are like the size of this place?
24       MR. DuPONT:  Object to form.
25    A.   There's -- there's, sort of, general

1  reference values, you know, that people use.  I
2  mean, this would be in facilities that don't have,
3  you know, specific point sources of some emission
4  or something like that, yeah.
5    Q.   Are you familiar with the Burton Field
6  Guide?
7    A.   Yeah.
8    Q.   It's a source that you would rely on?
9       MR. DuPONT:  Object to form.
10    A.   Well, I've used it.  I mean, it's one of
11  the sources of, you know, ventilation information
12  in -- in general practice, yeah.
13    Q.   Do you know what the air changes per hour
14  referenced in the Burton Field Guide for factories
15  is?
16    A.   I don't remember -- I don't remember a
17  single number.  I mean, there's -- there's -- no, I
18  don't.
19    Q.   You think it's higher than 3?
20       MR. DuPONT:  Object to form.  Foundation.
21    A.   I actually don't know.  I don't remember
22  the number.
23    Q.   That's fair.
24       You didn't research, though, for this
25  case; right?

1    A.   Well, you know, it's one of those things
2  I've used many times, but just sitting here right
3  now, I'm not -- I'm just not getting the number
4  that I can call up for you.
5    Q.   You noted on page 37 that you assumed for
6  this hour of usage of the mineral spirits in the
7  pail that the benzene content was constant?
8       MR. DuPONT:  Object to form.
9    A.   Over that one hour time; correct.
10    Q.   Correct.  Yeah.
11       You agree that LeBlanc notes that this is,
12  sort of, a limitation on the ART model.
13       MR. DuPONT:  Objection.  Form.
14    A.   Well, it is.  Not just in this
15  application, but that it doesn't really let you
16  address a change in emission rate.
17    Q.   And then you reduced it by 50 percent,
18  based upon a citation to -- was it Nicis?
19    A.   Well, Nicis took Fedoruk's information
20  about the rate of emission of benzene and -- and
21  developed a modeling approach to try to expand on
22  it -- and actually Williams did the same thing.
23    Q.   So in the Nicis publication he assumed
24  that -- I'm sorry -- he concluded that the benzene
25  content of the parts washed in solvent had

1  decreased 50 percent after five hours of use;
2  correct?
3    A.   That was what -- yeah, that's what Nicis
4  concluded, yeah.
5    Q.   And so you used that 50 percent value for
6  the next day's benzene content value; correct?
7    A.   Yeah, I thought I was, you know, trying
8  to, kind of, be conservative and -- and say, well,
9  even though it was only really used for -- for an
10  hour -- and it wasn't used in the same way, you
11  know, the rate of the Nicis was referring to was in
12  the parts-washing application, you know, where you
13  have the spraying and all that going on, but I
14  thought it was a reasonable approximation.
15    Q.   Nicis noted that that's an exponential
16  rate; correct?
17    A.   It is, yeah.
18    Q.   So after another 5 hours, would it go down
19  another 50 percent?
20    A.   Well, that's what I was trying to -- to,
21  you know, address here is that, the Nicis, you
22  know, calculations were based on actually using the
23  parts washer for five hours.  So you had this five
24  hours of active agitation and spraying and brushing
25  and so forth.

64 (Pages 250 to 253)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 65 of 97

1       Whereas in this case, there was an hour of
2  -- of soaking and -- and then brushing, say, in
3  total, and then the remaining time it was just a
4  quiescent -- you know, just sitting there in the
5  pail. There wasn't any of this activity going on.
6       So I felt like, Well, okay, since there
7  was nothing going on to agitate or -- or release
8  the components of the solution, I'll say
9  conservatively that, just sitting there overnight,
10 it lost 50 percent.
11      I mean, I actually think it probably lost
12 less.
13     Q.  Less?
14     A.  Sure, because it was just -- it's just
15 sitting there. You know, it isn't -- there isn't
16 any energy being applied that would cause benzene
17 or anything else to evaporate.
18     Q.  But we're talking probably about 16 to 20
19 hours between usage; right?
20         MR. DuPONT: Object to form.
21     A.  Well, if it sat overnight, yeah.
22      Just since we're on that point, you know,
23 there isn't really unanimity around this value that
24 Nicis has used about the rate at which the benzene
25 comes out of mineral spirits. And, in fact, this

1  article -- I think it might be in the package that
2  Plisko and Spencer wrote addressed that, by
3  measuring benzene on three consecutive days from a
4  parts washer -- mineral spirits parts washer, and
5  found that the rate of benzene depletion was much
6  lower.
7      Q.  That was Plisko and Spencer?
8      A.  Uh-huh.
9      Q.  For the purposes of the mineral spirits
10 used in the pail, what data did you use to validate
11 your model output?
12     A.  Well, like any of these model predictions,
13 I didn't formally validate the result. I think we
14 talked about this this morning. I don't really
15 consider that, you know, these models' results --
16 that anyone really "validates" them in the
17 strictest sense.
18      About the closest, you know, that I would
19 say we've done is that LeBlanc paper, where we
20 tried to evaluate how well the results compared
21 with each other.
22     Q.  Do you have LeBlanc?
23     A.  I think it's in -- I don't have it with me
24 right here as we sit --
25     Q.  Okay.

1      A.  -- but it's in -- I think it's in the
2  folder.
3      Q.  Let me give you a copy of it -- I want to
4  ask you about.
5          MR. SCHULTZ: We'll mark it as Exhibit 11.
6      (Exhibit Herrick 11, Article: "Comparison
7      Of the Near Field/Far Field Model and the
8      Advanced Reach Tool (ART) Model V1.5:
9      Exposure Estimates to Benzene During Parts
10     Washing with Mineral Spirits.")
11     Q.  Again, you can review the whole thing. I
12 assume you're familiar with it, since you're an
13 author, but I'm going to point you to Table 5.
14     A.  (Witness reviews document.)
15     Q.  Now, would you agree with me that Table 5,
16 the values that are listed under the first column,
17 "Estimated TWA during parts washing ppm" are for 60
18 minutes?
19     A.  Let me take a look just to make sure I've
20 got the...
21     Q.  And if you want to look back at section
22 3.1, it's reporting "ART mechanistic model alone
23 predicted a TWA airborne concentration -- 50th
24 percentile -- of 4.25 ppm during the reported 60
25 minutes."

1      A.  Oh, okay.
2      Q.  So do you agree with me that the first
3  column there in Table 5 is they're all 60 minute
4  exposures being compared?
5          MR. DuPONT: Form.
6      A.  I'm not -- well, I mean, that's definitely
7  the case for the LeBlanc data, and she reports it
8  with the Bayesian adjustment.
9       In 3.1 -- oh, I see. Yeah.
10      Well, the Near Field/Far Field stuff
11 there, that .33, that -- that's the 60-minute
12 value.
13     Q.  Okay.
14     A.  And --
15     Q.  Let's just talk about those first three,
16 then -- I mean .425, .5 and .3. Your 60-minute
17 value for mineral spirits was 4.5. I mean, roughly
18 10 times that value; is that fair?
19     A.  I'd have to take a look. I think so.
20     Q.  Does that not give you any kind of pause
21 about validating your results, when I think you
22 just said that LeBlanc was a pretty good validation
23 tool?
24     A.  (Witness reviews document.)
25         MR. DuPONT: Objection. Form.

65 (Pages 254 to 257)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 66 of 97

1      A.  I'm going to have to ask you where that --
2  'cause I'm looking on my page 37, and from my
3  looking here, I'm looking at 2.2 parts per million
4  for a one-hour average from using Safety-Kleen.
5      Q.  I'm asking you about the parts -- I'm
6  sorry -- the pail of mineral spirits up above.
7      A.  Oh, oh, oh, the pail, as opposed to the...
8      No, I'm actually not completely surprised
9  by that.  I mean, it seems to me, you know, you've
10 got a very different kind of exposure scenario
11 going on there, where, you know, rather than having
12 this device that, you know, is -- is recirculating
13 the solvent and -- and, you know, has the basin,
14 that you've got this open pail of mineral spirits
15 that can evaporate to the surrounding air.
16     So I'm -- I'm not really surprised to see
17 that there's a higher exposure there.
18     Q.  You think the pail should have a higher
19 exposure?
20     A.  Oh, I think it easily could, I mean, just
21 given the way the parts washer is designed.  You
22 know, it's got the sides, you know, so the --
23 there's a -- you know, most of the solvent's
24 actually down underneath in the reservoir, and,
25 then, you've got the -- as we were just talking

1  about earlier, you have this sort of a little tray
2  device and, you know, it's got a cover that
3  partially comes down on the top.  So you've got a
4  whole lot less susceptibility to, say,
5  cross-currents and airflow around it, and I -- I
6  don't find it implausible that you could have a
7  difference like that.
8      Q.  I believe earlier you just testified that
9  you thought the benzene would evaporate out of the
10 mineral spirits parts washer faster than the pail;
11 correct?
12     MR. DuPONT:  Objection.  Form.
13     A.  Oh, this was comparing, like, letting it
14 sit overnight.  Yeah, it's a little bit apples and
15 oranges, though.  I was just referring to when
16 something was sitting there with actually -- with
17 no, you know, nothing being done to it -- there's
18 no parts in it, there's no brushing -- it's just
19 actually sitting there completely quiet.
20     Q.  But you compared that to the mineral
21 spirits parts washer being used; right?
22     MR. DuPONT:  Object to form.
23     Q.  And agitated.
24     A.  That was the point of that comparison
25 when I was saying that I thought that the values

1  for the depletion that Nicis used were, you know,
2  reasonable to apply to the bucket just sitting
3  there quietly overnight.
4      Q.  So even though we -- we agree that you can
5  strike the far field from your analysis, you still
6  think that your 4.5 ppm value for an hour is
7  accurate?
8      A.  Well, no -- I mean, I -- you know, I think
9  I admitted earlier that I would -- I would redo
10 that calculation and focus it only on the
11 near-field contribution.
12     Q.  But when you saw this and you saw that it
13 was 10 times the values in LeBlanc for an hour,
14 that didn't trigger anything to say, Hey, something
15 must be off in my calculation?
16     MR. DuPONT:  Objection.  Form.
17     A.  I don't, you know, remember exactly making
18 that direct comparison, but, you know, I -- I would
19 like to revisit that calculation, sure.
20     Q.  But LeBlanc is something you would have
21 used to validate the -- the results; right?
22     MR. DuPONT:  Objection.  Asked and
23 answered.
24     A.  I really wouldn't.  I mean, again, I --
25 you know, I kind of am reluctant to characterize

1  these comparisons as validations to begin with.
2      Q.  For the Kutzit scenario, the -- the ART
3  model that you ran, it's attached -- I understand
4  now you're saying that's during the home use -- you
5  estimated 50 percent benzene in that product during
6  that calculation in ART; correct?
7      A.  I think -- I think that's right, yeah.
8      Q.  And for your ART calculation for the
9  mineral spirits in the pail, you estimated 500;
10 correct?
11     MR. DuPONT:  Part per million?
12     Q.  Yeah, 500 part per million.
13     A.  On the first day, and, then, less on the
14 second day.  Yeah, that's right.
15     Q.  Okay.  Fair.
16     The one-hour usage calculation for Kutzit
17 is 130 parts per million on page 34.
18     Do you see that?
19     A.  I'm -- I'm looking right now.
20     MR. DuPONT:  Are you talking about
21 outdoors?
22     MR. SCHULTZ:  Yeah, this is the 1974
23 calculation on page 34.
24     MR. DuPONT:  You're saying that's
25 outdoors?

1      MR. SCHULTZ: Yeah.
2      MR. DuPONT: That's your representation?
3      A. I'm sorry. Help me find this on 34. Are
4  we talking about --
5      Q. It says, "So for the years before '75 I
6  used the value of 130 parts per million for the
7  benzene exposure. Mr. Rhyne used Kutzit for a
8  one-hour period."
9      A. And that's taken from that Young -- so it
10  isn't a modeled result. That's the average
11  measurement that Young took over that 25-minute
12  period.
13      MR. DuPONT: That said Seltzer's not
14  outdoors.
15      Q. Okay. So this is using 52 percent from
16  Young.
17      A. Right.
18      Q. Okay. And you're using a value of 130
19  part per million.
20      A. Yeah, for -- that was for the use at --
21      Q. Setzer?
22      A. -- Setzer's, thank you. Right.
23      Q. So let me ask you this: If you calculated
24  a one-hour exposure to mineral spirits in a pail at
25  4.5 parts per million, versus one hour at Setzer at

1  130 parts per million, that's a factor of roughly
2  30 or so --
3      MR. DuPONT: Setzer isn't a calculate --
4  130 parts per million is not a calculation.
5      MR. SCHULTZ: Okay. That's fine.
6      Q. The value that you chose for the Kutzit
7  exposure in 1 hour was 130 parts per million?
8      A. Right.
9      Q. That's about a factor of 30-or-so from the
10  4.5 you used for the mineral spirits; fair?
11      A. That's about right, yeah.
12      Q. Yet that product had approximately a
13  thousand times more benzene than the mineral
14  spirits; correct?
15      A. Correct.
16      Q. Does that seem accurate to you?
17      MR. DuPONT: Objection.
18      Counsel, look he's already testified about
19  the difference between the near field and the far
20  field. You're beating a dead horse at this point.
21  Why don't you move onto a different topic.
22      MR. SCHULTZ: Let him answer the question.
23      A. Well, the point I would make is that, you
24  know, the rate at which these materials -- like,
25  just say benzene -- evaporate or vaporize from

1  these complex mixtures depend on a lot of factors,
2  including what else is present in the mixture. And
3  the formulation of what's actually in Kutzit, you
4  know, is -- is quite different from what's the
5  inflation in mineral spirits.
6      So I don't find that to be, you know, too
7  surprising that you had a very different rate of
8  benzene emission between those two materials.
9      Q. Your model indicates that the action level
10  would have been exceeded for using mineral spirits
11  if your calculation of the eight-hour TWA is indeed
12  .56 parts per million?
13      A. Just help me.
14      Are we back on the Kutzit scenario?
15      Or where are we?
16      Q. I apologize. On -- on page 39 for the
17  "Daily Exposure Midpoint," .56 for "Mineral Spirits
18  Cleaning" is an 8-hour TWA; correct?
19      A. On 39?
20      Q. Yeah.
21      A. Okay.
22      Q. The .56, that's an eight-hour TWA?
23      A. That's his daily average, yeah.
24      Q. And that would be in excess of OSHA's
25  action level?

1      A. As an air -- as a daily average, yeah.
2      Q. Do you think that that is accurate from
3  using a mineral spirits pail one hour a day?
4      MR. DuPONT: Objection. Form. Compound.
5  Incomplete hypothetical.
6      A. Well, you know, I -- I would like to go
7  back and -- and revisit that calculation, yeah.
8      Q. Would you agree that the occupational
9  medicine and industrial hygiene community has
10  instructed industry and persons to use other
11  solvents in place of benzene?
12      MR. DuPONT: Objection. Form. Beyond the
13  scope.
14      A. Help me understand: Who are you referring
15  to as actually making that advice or...
16      Q. Scientific community --
17      MR. DuPONT: Objection. Form. Vague.
18      Q. -- which I would assume you hold yourself
19  to be a member of, like the industrial hygiene
20  community?
21      MR. DuPONT: Objection. Vague. Beyond
22  the scope.
23      A. Well, I think, you know, there's -- this
24  is one of those aspects where, you know, I think
25  the -- the weight of information is really, you

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1  know, what would drive people or what would bring
2  this to prominence in the minds of the people who
3  can decide, you know, what the materials should be
4  and what the exposures should be.
5      I don't know that I would, you know,
6  uniquely, you know, link that to the occupational
7  medicine or industrial hygiene community.
8      Q.  What other solvents were -- were industry
9  and persons using as benzene was no longer being
10 used?
11     MR. DuPONT:  Objection.  Form.  Vague.
12 Beyond the scope.
13     A.  Well, I wouldn't hold myself out as, you
14 know, an expert on material substitution, but, you
15 know, what I did observe over time was that it
16 wasn't unusual to see people -- people substitute
17 toluene for benzene.  That was one of the
18 substitution steps that I think was fairly common.
19     Q.  And xylene?
20     A.  I think xylene, although, you know, it's a
21 little -- you know, chemically it's getting to be a
22 little bit different, you know, toluene's a lot
23 more structurally similar to benzene than -- than
24 xylene is.
25     Q.  And mineral spirits?

1      MR. DuPONT:  Form.  Vague.  Beyond the
2  scope.
3      A.  You know, it depends a little on what the
4  use of the benzene was.  If the benzene was there,
5  you know, as some sort of an active reagent, you
6  know, the mineral spirits may have may not have
7  been a good substitution.  If it was just there as
8  a solvent or a vehicle, then, yeah, there could
9  have been that substitution.
10     Q.  You agree, though, that mineral spirits'
11 use instead of benzene would reduce exposure to
12 benzene and reduce risk?
13     MR. DuPONT:  Form.  Vague.  Compound.
14 Beyond the scope.
15     A.  Well, I think, you know -- especially if I
16 compared, say, mineral spirits with pure benzene,
17 there's no doubt that there's less benzene exposure
18 associated with that mineral spirits.
19     MR. SCHULTZ:  Doctor Herrick, I think you
20 answered all my questions.  I appreciate your time.
21     THE WITNESS:  Okay.  Thanks.
22     (Discussion off the record.)
23         EXAMINATION
24 BY MS. WOOTEN:
25     Q.  Good afternoon.  I don't know if we met

1  off the record or not, but my name's Virginia
2  Wooten, and I represent Turtle Wax in this matter.
3  I just have a few questions for you, and they're
4  mainly going to be a product called Marvel Mystery
5  Oil.
6      A.  Oh, sure.
7      Q.  And just to start, all your opinions
8  regarding Rhyne's exposure to any benzene and
9  Marvel Mystery Oil are contained in your report;
10 correct?
11     A.  That's right, yeah.
12     Q.  And if you look at Table 3 on page 39 in
13 your report, and you go down to where Marvel
14 Mystery Oil is listed, and under the "Daily
15 Exposure Midpoint," it says, "Not determined"; is
16 that correct?
17     A.  That's correct, yeah.
18     Q.  And why is that?
19     A.  Well, it was really my view of the way he
20 was using that particular product, and my
21 recollection was -- you know, and he -- he talked
22 about this in his deposition -- that he was adding
23 that liquid to these cylinders, I think I would
24 call them; they were reservoirs that were on the
25 vibrators that he was doing this maintenance work

1  on.  And so, as he described what he did, it seemed
2  to me that the opportunity for there to be
3  substantial vapor exposure was really very minor.
4      Q.  And, then, in Table 4 on page 43, if you
5  look down at where Marvel Mystery Oil is listed,
6  once again, under the "Cumulative Exposure
7  Midpoint" it says, "Not determined."  Is that a
8  similar reason as to why that's not determined in
9  that table as well?
10     A.  Right, because I -- what I, you know,
11 tried to do was -- was talk about -- in -- in the
12 narrative that precedes this -- what was in the
13 record about the composition of the Marvel Mystery
14 Oil; and I, you know, recognized, you know, the --
15 the ingredients, you know, the petroleum-based
16 ingredients as being things that, over time, you
17 know, could have had benzene as one of the
18 ingredients -- one of the components.  But what was
19 really, you know, sort of, leading me to this "Not
20 determined" classification was the way he was using
21 it.
22     Q.  So were you unable to, I guess, get a
23 cumulative exposure based upon the way he was using
24 it?
25     A.  That was really what was -- what was

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1  driving it, yeah.
2  Q. Okay. So there's no -- you did not
3  calculate any cumulative exposure for Marvel
4  Mystery Oil in this matter?
5  A. I didn't.
6  Q. Okay. And if you turn to page 44 in your
7  "Conclusions" page, you would agree that there's no
8  conclusion regarding Marvel Mystery Oil listed on
9  that page.
10  A. Let me just double-check. (Witness
11  reviews document.) No, there is not.
12  Q. Okay. And my guess is there's not going
13  to be a model report attached in your appendix
14  specifically for Marvel Mystery Oil in your report.
15  A. No, I didn't do any calculations or
16  develop any modeling for that.
17  Q. And if we go back to -- I believe it's
18  page 29 of your report, you discuss Marvel Mystery
19  Oil on page 29, and if you look at the second full
20  paragraph on page 29, it, kind of, discusses Mr.
21  Rhyne's use of Marvel Mystery Oil.
22  Is your understanding of how Mr. Rhyne
23  used the Marvel Mystery Oil from his deposition?
24  A. It is, yeah.
25  Q. Is there any other source you are using to

1  determine how he would use Marvel Mystery Oil?
2  A. No, just his description of the -- the way
3  the work process was conducted.
4  Q. Okay. If you look at that last full
5  paragraph on page 29, the first sentence, and I'll
6  just read it: "As of 1985 Marvel Mystery Oil is
7  reported to contain mineral spirits, 30 percent,
8  and naphthenic base oil distillate, 67 percent."
9  A. Right.
10  Q. And where are you getting that from?
11  A. I'd have to go back into my files. I
12  think I -- it's either from a safety data sheet or
13  from some, you know, possibly correspondence that I
14  have in the record about the composition of this
15  product.
16  Q. Sure. And I'll -- I'll represent to you
17  we received a Dropbox earlier today, and it had two
18  Material Safety Data Sheets for Marvel Mystery Oil
19  contained in it.
20  Do you know if you used two separate data
21  sheets for Marvel Mystery Oil?
22  A. I did, and -- and it is, kind of, coming
23  back to me now. As I recall, the -- the first one,
24  the one from 1985 really was pretty sparse. You
25  know, there wasn't really very much information

1  contained in that, other than what I've presented
2  here.
3  And, then, the one from 1995 and, then,
4  these others that I mentioned for, you know, later
5  dates had a lot more detail.
6  Q. Do you know if you pulled those Material
7  Safety Data Sheets, or if you were provided those
8  sheets?
9  A. I think they were provided.
10  Q. And, then, same thing: Paragraph 3 on
11  page 29, in that second sentence, is that coming
12  from a Material Safety Data Sheet as well?
13  A. It is, yeah.
14  Q. Same thing with the -- the next sentence.
15  Would that be from your review of safety data
16  sheets?
17  A. Right, those are.
18  Q. Okay. And, then, there's the next
19  sentence: "In the time period when Mr. Rhyne used
20  this product at Catawba --" from 1986 to 1998 "--
21  the benzene contents of the petroleum derived
22  solvents reportedly ranged from 100 to 2,000 --"
23  parts per million.
24  And where is that coming from?
25  A. Oh, what I was reflecting there -- and I

1  think, you know, probably the -- the underlying
2  source there is that review article that Williams
3  prepared --
4  Q. Uh-huh.
5  A. -- because in her supplementary tables she
6  has a variety of products over time.
7  Q. Uh-huh.
8  A. And so among these mineral spirits or
9  petroleum distillate products, that was the range
10  that she reported going over this, you know,
11  20-year time period.
12  Q. Okay. And, then, it looks like the last
13  sentence says when you determined that the range of
14  Rhyne's benzene exposures from Marvel Mystery Oil
15  "-- to be .01 to 1 parts per million with a
16  midrange value of .5 parts per million for the
17  duration of each use," and how did you come up with
18  that calculation?
19  A. Yeah. That actually would have been what
20  I -- you know, again, that's -- that's based on the
21  range of exposures that Williams had reported for
22  the materials that ranged from 100 to 2,000 parts
23  per million.
24  So, again, that -- and that's from the
25  supplementary table No. 1 in her report.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 70 of 97

1    Q.  Okay.
2    A.  But, you know, since I later decided that
3  I really just didn't feel comfortable trying to
4  determine the exposure level, I really should have
5  taken that last sentence out.
6    Q.  So sitting here today you believe you
7  should have taken the last sentence out of
8  paragraph 3 on page 29 out of the report?
9    A.  Well, reflecting on, you know, as I really
10  tried to think about, you know, both the potential
11  content of benzene in the material, but also what I
12  concluded or inferred about the way he was using
13  it, I really didn't feel that there was a
14  substantial opportunity for him to have exposure.
15       So that that's why I gave it this category
16  as "Not determined."
17    Q.  As far as any benzene that would be
18  contained in Marvel Mystery Oil, would that be
19  coming from the mineral spirits only?
20    A.  Well, in some --
21       MR. DuPONT:  Objection.  Form.
22       THE WITNESS:  I'm sorry.
23    A.  No, some of these, you know, ingredients
24  that are listed, say, like, in -- in 1985, you
25  know, we have the "mineral oil petroleum distillate

1  solvent dewax severe," I mean, they're, you know,
2  "heavy naphthenic petroleum lubrication oil," you
3  know, so there's a range of, I mean, ingredients
4  there that could potentially contain benzene.
5    Q.  And can you just go over which ingredients
6  you believe --
7    A.  Well, I think, you know, you clearly could
8  have had from -- from the petroleum distillate
9  solvent refined the heavy naphthenic petroleum lube
10  oil, the Stoddard Solvent mineral spirits.  I mean,
11  I think those three would be candidates.
12    Q.  And you did not perform any product
13  testing on Marvel Mystery Oil; is that correct?
14    A.  No, I haven't.
15    Q.  And you haven't provided any opinion
16  regarding dermal exposure to Marvel Mystery Oil.
17       MR. DuPONT:  Objection.  Form.
18    A.  No.
19       MS. WOOTEN:  Doctor Herrick, I believe
20  that is all the questions I have for you right now.
21  Thank you.
22       MR. DuPONT:  It's been about an hour.
23  Take a quick break.
24       (Recess was taken.)
25              EXAMINATION

1  BY MR. JEFFRIES:
2    Q.  All right.  Good evening, Doctor Herrick.
3  My name is John Jeffries.  I represent Kano
4  Laboratories in this case.  They manufacture a
5  product called Kroil Oil.
6       Are you familiar with Kroil Oil?
7    A.  I am now, yeah.
8    Q.  When did you first familiarize yourself
9  with this product?
10    A.  It was when I started reading the
11  depositions from Mr. Rhyne.
12    Q.  Okay.  And I take it, then, you had never
13  analyzed or studied or tested or evaluated Kroil
14  Oil in the context of any other similar situation
15  in the past?
16    A.  No, I haven't.
17    Q.  Okay.  Are all of the conclusions and
18  opinions you anticipate expressing in this case
19  with regard to this particular product contained
20  with your report?
21    A.  They are.
22       MR. DuPONT:  Objection.  Form.
23    Q.  Do you anticipate any further testing,
24  analysis, or modeling beyond that that's been done
25  and included in your report with respect to the

1  Kroil Oil product?
2    A.  No, I don't.
3    Q.  All right.  Is there any further testing
4  or modeling you'd like to do that you think would
5  assist in your evaluation of them?
6    A.  I don't think so.  I mean, I'm just trying
7  to, kind of, visualize the way he described that he
8  used it and -- and what I know about the
9  composition.
10       I mean, I suppose the only thing that, you
11  know, would be useful would be if there were safety
12  data sheets or -- or product composition
13  information going back to 1990.
14    Q.  What about, like, any prior testing of the
15  product?
16    A.  That could -- that could be useful too,
17  sure.
18    Q.  Has that been provided to you?
19    A.  Well, what I have is the expert's report
20  from -- is her name Deeds?
21    Q.  Yes, sir.
22    A.  Yeah.  And so I -- I've seen that.  And,
23  then, I've also seen the Certificates of Analysis
24  from archive samples --
25    Q.  Yes, sir.

70 (Pages 274 to 277)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 71 of 97

1    A. -- some information that -- but I got all
2  that after the report had been written, so you
3  don't see it reflected in here.
4    Q. All right. And was there anything about
5  that material that changed your evaluation or your
6  assessment about the benzene content in this
7  product?
8    A. Well, you know, I mean, it's -- it's a
9  good question. I -- I read the discussion, and I
10  guess I read her deposition, is it? Her -- no, I
11  read her review -- her comments on -- on my report.
12  I saw that.
13    Q. Yes, sir.
14    A. And, then, I also saw the deposition of
15  someone whose name I'm going to blank on -- gosh.
16  Come on. Help me out here. The guy from Kano.
17    Q. Mr. Zimmerman?
18    A. Zimmerman. Thank you.
19    Q. Yeah.
20    A. So I saw his deposition too.
21    Q. And when were those materials provided to
22  you?
23    A. I think I just saw those last week.
24    Q. Is it fair to say that all the material
25  you've reviewed in the case -- other than the

1  academic articles and the materials you actually
2  produced, is it fair to say all these materials
3  came from Mr. DuPont's office?
4    A. I think that is fair to say, yeah.
5    Q. So you haven't reviewed anything from any
6  outside sources other than these academic studies
7  that you've studied?
8    A. On -- on this product, you mean, the
9  particular --
10    Q. Yes, sir.
11    A. No, that's -- that's pretty much the
12  extent of it.
13    Q. Okay. And, again, not having had the
14  prior testimony when you did your assessment, is it
15  fair to say that you made some assumptions and --
16  and looked at some more general information, as
17  opposed to specific testing of the Kroil Oil
18  product?
19    MR. DuPONT: Object to form.
20    A. Yeah, as of the time that I wrote it, I
21  really didn't have specific testing results from
22  this product, and what I, you know, wound up using
23  was largely this information from the 2005 Material
24  Safety Data Sheet.
25    Q. Okay. And then assessed that in the

1  context of -- I think you've referenced the 2008
2  Williams study; correct?
3    A. Where she talked -- yes, where she talked
4  about the range of benzene in various products.
5    Q. Is it fair to say that's a more general
6  assessment, as opposed to a specific assessment of
7  data on this product?
8    MR. DuPONT: Object to form.
9    A. You mean her overall --
10    Q. Yes.
11    A. -- approach?
12    Yeah, I mean, she was looking at the whole
13  family of petroleum-based products.
14    Q. Okay. And that encompasses a wide range
15  of products with wildly varying compositions and
16  ingredient lists and things of that nature;
17  correct?
18    MR. DuPONT: Compound. Form.
19    A. True, yeah, although I will say, you know,
20  she -- she organized it in a way that you can, you
21  know, see specific characteristics. But, yeah,
22  it's -- it's a very wide-ranging survey.
23    Q. Okay. And, again, I'm trying to
24  streamline things. I know we've all been here
25  longer than we thought we would, but the -- your

1  report suggests that you're assessing Mr. Rhyne's
2  use of this product sometime between the early
3  1990s and 1998; correct?
4    A. That's right, yeah.
5    Q. Okay. And, then, again, just to
6  streamline and clarify: This is the only time
7  period that you've evaluated his use of the Kroil
8  product.
9    A. It is, that's right.
10    Q. Okay. Do you know what form he used this
11  product in?
12    MR. DuPONT: Form.
13    A. You're thinking of, like, as a liquid or
14  an aerosol?
15    Q. Liquid, aerosol, or gel or what -- what --
16    A. My -- I'm trying to recall that he was
17  discussed. I think it was a liquid that he used as
18  -- as a penetrant.
19    Q. Okay. That's a fairly significant aspect
20  of the analysis; right?
21    A. Well, it would be, although, you know,
22  most of the information that's out there around
23  these cross-penetrant materials, you know, does
24  tend to be on the liquids.
25    Q. Okay. Well, I mean -- and, again, I'm

71 (Pages 278 to 281)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 72 of 97

1  just trying to understand the perspective from
2  which you evaluated it.
3        Did you assume it was a liquid?
4        Do you -- do you have information in your
5  report to suggest to you the form he used it?
6    A.  As I recall -- and I don't have the safety
7  data sheet here with me, or, you know, like,
8  readily accessible, but, you know, frequent --
9  well, I would say, you know, in general, if it is
10  in the form of some kind of an aerosol, there's an
11  ingredient listed as a propellant, and I don't
12  recall there being any propellant mentioned in that
13  safety data sheet.  So that would lead me to
14  conclude it's a liquid.
15    Q.  All right.  And do you know how it was
16  sold or distributed?  In bulk?  In bottles?  In
17  drums?
18    A.  I really don't.
19    Q.  Do you know how Duke Energy purchased it
20  in the 1990s?
21    A.  I don't.
22    Q.  Okay.  Do you recall how Mr. Rhyne
23  described the product's appearance?
24    A.  I -- sitting here right now, I really
25  can't remember how -- what he said about it.

1    Q.  No recollection of color?  Viscosity?
2  Type of packaging?
3    A.  I remember some of these materials, you
4  know, he mentioned where it was, like, kind of a
5  red solution or red liquid.  You know, I'm -- I'm
6  not really recalling that particular detail for
7  this product.
8        MR. DuPONT:  Compound.
9    Q.  And did you ever determine whether or not
10  his description was accurate?
11    A.  No, I didn't.
12    Q.  What was Kroil used for in the 1990s?
13    A.  Well, my recollection was this was when he
14  was breaking these ice vibrators apart, and he
15  described that the process was, you know, they had
16  to use, like, a bar and -- and these things were
17  you know, difficult to -- to break loose.
18        And so my impression of the way he used
19  this, you know, was as a -- a penetrant to help
20  release the -- the fastening -- the nut and the
21  bolt, I suppose -- that were holding these
22  vibrators together.
23    Q.  Okay.  Is that what -- was it a nut and a
24  bolt?  Was it a bar?  A flange?  I mean, what was
25  it?

1        MR. DuPONT:  Form.
2    A.  I -- you know, that's a good question.  I
3  mean, he talked about using a bar to help break
4  the -- break this part, you know, to get it to
5  move.  So I -- I assumed it was some kind of a nut,
6  at least.
7    Q.  Okay.  Did you ever perform any
8  investigation or seek any additional information to
9  clarify that point?
10        MR. DuPONT:  Form.
11    A.  No, I didn't.
12    Q.  Okay.  Would it be important to know
13  precisely how the material was being used so that
14  you could evaluate the volume of material used, how
15  it might be applied, how it might -- how the -- how
16  the worker may come into contact with it?
17        MR. DuPONT:  Form.
18    A.  Well, I think what he described -- I mean,
19  that information is helpful.  I mean, what --
20  what's actually, I think, more useful for me was
21  the way he described, you know, the -- the length
22  of time per day.  So that when he was doing some of
23  these jobs, you know, he would spend the entire
24  10-hour day using the product to break these parts
25  so he could disassemble this vibrator.

1    Q.  Yeah, I understand that, and I think it's
2  important to talk about that, because what part of
3  the day is he actually using the product?  I mean,
4  you've described it as a rust penetrant.  I'm
5  assuming that it's not constantly poured on a -- a
6  part or a machine.  It's applied and then given
7  some time to work or used in some other way.
8        Did you familiarize yourself with that?
9        MR. DuPONT:  Compound.
10    A.  Well, no, I -- I really didn't.  You know,
11  and, as you describe it, you know, it -- what had
12  occurred to me was that it reminds me of the
13  approach that people use with Liquid Wrench, where
14  they do, you know, exactly what you described:  You
15  apply it to the part, let it sit for some short
16  period of time, see if that has allowed the part to
17  release; if it doesn't, the penetrant is reapplied.
18        You know, sometimes you rap it with a tool
19  to see if that helps break everything loose, and --
20  and so it's the, kind of, a repeat process of
21  applying it, letting it sit, and then trying to to
22  free the part.
23    Q.  You never made any information -- never
24  made any attempt to clarify that information with
25  Mr. Rhyne; is that right?

1    A.  No, I didn't.
2    Q.  And just to be clear, I mean, we've heard
3  this answer a lot from you today, that you don't
4  know, or you don't remember, or you don't have
5  access to information.
6        Mr. Rhyne's attorney hired you to testify
7  in this case; correct?
8        MR. DuPONT:  Compound.
9    A.  That's true, yeah.
10   Q.  To offer opinions about his various
11 exposures or alleged exposures to this whole host
12 of products; correct?
13   A.  That's correct, yeah.
14   Q.  Mr. Rhyne and his lawyer, your client, so
15 to speak, in this endeavor; right?
16   A.  I'm sorry.  Could you repeat that.
17   Q.  His lawyer and -- Mr. Rhyne and his lawyer
18 are your clients in terms of your role in this
19 case; correct?  And you're doing work for them,
20 you're sending them bills, you're collecting
21 payment from them; correct?
22        MR. DuPONT:  Compound.
23   A.  Well, that's true, yeah.
24   Q.  Okay.  So is there any reason why you, if
25 you needed this information to understand how long

1  he had to apply the Kroil, how long he had to wait
2  between applications, things of that nature -- is
3  there any reason you couldn't have contacted Mr.
4  Rhyne to obtain that information?
5    A.  Well, I could have, you know, called and
6  -- and, you know, asked for some more specific
7  information.  What I was mainly interested in from
8  him was the -- or on this particular application
9  was the length of time that he used the material
10 over the course of the day.
11   Q.  But we don't know that; right?  I mean,
12 the bottle may have been sitting on the table for a
13 10-hour day, but he may have used it for 8 minutes;
14 right?
15        I mean, do we know?
16        MR. DuPONT:  Form.  Compound.
17   A.  You know, I'm trying to recall, you know
18 and I don't have his deposition right here in front
19 of me, of course, but, you know, I think he used
20 words like, You know, I used Kroil for the entire
21 10-hour day.  You know, I think that's in my
22 report, and I think that came straight from his
23 deposition.
24        So, you know, I didn't think it was
25 unreasonable to say, Well, he was using this, you

1  know, over the course of the workday.  I didn't
2  have any -- any more detailed information about how
3  many times per hour he applied it, or if he applied
4  it once and then it sat on -- on the counter, you
5  know, for the rest of the time.
6    Q.  And, I guess, how do you understand how to
7  make the approximations you made in using the --
8  the computer system simulator that you used and the
9  program that you used to calculate these exposures
10 without knowing that?
11        MR. DuPONT:  Form.
12   A.  Well, you know, in this case I didn't
13 really use, you know, any of the modeling for --
14 for this.  I used this value that -- these values
15 -- this range that I talked about that I derive
16 from the Williams data.
17        So I took that as the exposure that was
18 prevalent throughout that 10-hour work period.
19   Q.  Okay.  So you didn't use any of the
20 computer modeling in your assessment of Kroil.
21   A.  I did not, no.
22   Q.  Okay.  All right.  And we'll talk about
23 more in a minute how that was done.
24        What understanding do you have about this
25 work he was doing -- what -- what's your

1  understanding of the -- his job duties as a
2  technician at the Catawba plant between 1991 and
3  1998?
4    A.  Well, this was one of the responsibilities
5  that he had during the outages.  And so he did
6  other tasks, you know, during that time period when
7  they weren't doing this maintenance, this -- this
8  outage work that involved the use of Kroil.
9        And so, you know, I think I tried to
10 address that in my report what his, you know, kind
11 of, scope of duties and responsibilities were
12 during other time periods.
13        And, then, I think this was also the time
14 period when -- wasn't he detailed temporarily to
15 some of the other plants where he would, you know,
16 work on the maintenance activities too?  This was
17 part of his overall responsibilities as a
18 pipefitter.
19   Q.  Okay.  Yeah, I understand.
20        And, again, since you're talking about or
21 assuming that he is only using Kroil during the
22 outage work, but I'm trying to determine is your
23 understanding of what percentage of his time during
24 that employment did that involve?
25   A.  Oh, I see your point.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1        Well -- and that's one of the things that,
2  when we get to the data, I can, you know, point out
3  that I, you know, when I did the calculation, I --
4  I incorrectly assigned that he was exposed over
5  that entire seven-year period. And I realized
6  later that that was incorrect.
7        And so, based on the number of outages
8  that he worked on and the typical duration of the
9  outages, I recalculated his cumulative exposures to
10 reflect just the period of time he was spending
11 doing the outage.
12    Q.  Okay. But that's not reflected in your
13 report.
14    A.  No, I --
15    Q.  It's a separate calculation you've done?
16    A.  I did, and I revised his cumulative
17 exposure table to reflect that; correct.
18    Q.  Did you just do that today?
19    A.  No, I did this last week.
20    Q.  Oh. Can I see --
21    A.  Sure. I just brought it -- I brought it
22 for you guys for today. But those handwritten
23 numbers reflect his -- his corrected cumulative
24 exposures.
25    Q.  Okay. And this is, kind of, a reworking

1  of Table 4, which is on page 43 of your report;
2  correct?
3    A.  Right, yeah.
4        MR. CAIRONE: Off the record.
5        (Exhibit Herrick 12, one-page document:
6        Table 4, "Cumulative Benzene Exposure by
7        Product and Facility update".)
8    Q.  All right. Doctor Herrick, so you're --
9  while we were off the record I marked as Exhibit 12
10 the revised Table 4 that you gave me, and you had
11 you suggested that you had miscalculated your
12 quantification or your -- your assessment of the
13 cumulative exposure to benzene as a result of
14 Kroil, because you had assumed that he -- Mr. Rhyne
15 -- used that over his entire seven-year work period
16 at the Catawba plant, and you've revised that to
17 suggest now he only used it during these outages.
18    A.  That is correct, yeah.
19    Q.  And I think he described it in his
20 deposition as doing preventative maintenance work
21 during the outages? That's why they would shut the
22 plants down?
23    A.  That was, kind of, my understanding, and
24 there was a lengthy discussion about these ice
25 condenser devices that -- that he had to empty and

1  -- and, you know, replace and all; and that taking
2  these vibrators off was part of that whole
3  maintenance process.
4    Q.  All right. And did you calculate or -- or
5  record in your assessment how many of these outages
6  took place during the period of his employment at
7  the Catawba plant?
8    A.  In his deposition he estimated -- 'cause
9  someone asked him this -- he estimated that he had
10 done -- I think he said 15 or 16 of these outages.
11    Q.  And I think that's right.
12        And I think that he also estimated that he
13 would -- that was -- essentially an outage would
14 essentially take a workweek; right?
15    A.  That sounds about right, because it took
16 him -- he said he could do maybe 15 of these a day,
17 and there were 70 of these vibrators.
18        So that -- that would work out to be about
19 a full week.
20    Q.  So is it your understanding, then, that
21 his view -- the maximum amount that he has
22 described using this product, this Kroil product,
23 is for a 15- to 16-week period over a seven-year --
24 seven- to eight-year employment time frame;
25 correct?

1    A.  That's correct, yeah.
2    Q.  Okay. I think I did the math. That comes
3  out to about 5 percent?
4    A.  That's about what I came up too is
5  4-point-something percent of his time.
6    Q.  Okay. And, again, this is important, I
7  think, to talk a little bit about how he used the
8  product itself, and, then, you said he may have
9  used it as a loosening agent for -- for nuts and
10 bolts.
11        Are you familiar or aware of any other
12 methods in which he used it?
13    A.  I don't remember, 'cause I -- that I think
14 came up in the deposition; and -- and, as I recall,
15 he had a very specific application for this product
16 and it was to -- to free up these -- these
17 vibrators in this maintenance activity.
18    Q.  And you haven't obtained any more specific
19 information on that; correct?
20        MR. DuPONT: Objection to form.
21    A.  No, I haven't.
22    Q.  Do you know what it means to break up an
23 ice condenser?
24    A.  I think that was, kind of, the general
25 process that he referred to, because once he took

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 75 of 97

1  these vibrators off, then there was -- there were
2  these long, sort of, baskets or cages of some sort
3  that were, what, 48 feet tall, or something like
4  that; and that they, you know, had to empty these
5  out, and -- and weigh the contents, and then there
6  was a reassembly step.
7      Q.  Was it your understanding that these were
8  fairly big pieces of equipment?
9      A.  Yeah, sounds like it.  I've never -- you
10 know, I don't recall ever seeing one, but they -- I
11 think the number 48-feet long sticks in my mind.
12 So, yeah, they were big.
13     Q.  And he described his working in the
14 reactor buildings and the auxiliary building and
15 the turbine building as fairly large structures;
16 correct?
17         MR. DuPONT:  Form.  Compound.
18     A.  Yes, yes.
19     Q.  There were some questions earlier about 4
20 stories high and 100 feet high and things like
21 that.  These are large, open spaces to house this
22 large equipment; correct?
23         MR. DuPONT:  Compound.
24     A.  It's full of large equipment, yeah.
25     Q.  Okay.  And did you obtain any specific

1  information about any kind of ventilation or
2  exhaust system in these facilities?
3      A.  I don't have anything beyond, you know,
4  kind of, a -- a sense that they had, you know, good
5  natural ventilation throughout the building, but I
6  didn't -- I didn't recall seeing anything in there
7  that would, you know, specify anything beyond that.
8      Q.  You mentioned having experienced touring
9  or evaluating nuclear power facilities in the --
10 here in this area in Connecticut; correct?
11     A.  That's true, yes.
12     Q.  Did those facilities have ventilation
13 systems or forced air systems or -- as a safety
14 precaution for, you know, protection from radiation
15 exposures or leaks or anything like that, or...
16         MR. DuPONT:  Compound.
17     A.  Yeah, and it depended a lot on the area of
18 the plant, because some of it is in what they call
19 the "containment area," and, then, there's other
20 parts of the plant that are just, you know, sort
21 of, the general plant and the control facilities
22 and things like that.
23         So, I mean, my short answer would be:
24 Yes, but it was very area-specific.
25     Q.  And Mr. Rhyne described working in these

1  containment-type areas; right?  He -- he described
2  working in areas with ventilation and air control,
3  air monitoring systems; right?
4          MR. DuPONT:  Compound.
5      A.  Well, he did, yeah, especially, you know,
6  'cause as I know you're aware, some of his work was
7  done in -- in the construction phase --
8      Q.  Right.
9      A.  -- and then there was other work that he
10 did when the plant was actually operational.
11     Q.  Right.  But this preventative maintenance
12 work is once the plants is operational and these
13 systems would be in place.
14         MR. DuPONT:  Compound.
15     A.  That's correct, yeah.
16     Q.  You didn't have a different understanding,
17 did you?
18         MR. DuPONT:  Compound.
19     A.  No, that -- that's similar to the way it
20 seemed like he described it.
21     Q.  Okay.  And is that a factor in terms of
22 his exposure?  If he's using a -- a product that
23 he's exposed to -- to vapors emitted from the
24 product in an area where there's a ventilation
25 system, does that impact the nature and extent and

1  magnitude of his exposure?
2          MR. DuPONT:  Compound.
3          You're -- you went from air monitoring
4  devices to now saying, "air ventilation."
5      Q.  I should say air -- air monitoring.
6          And, again, I apologize.  I'm not terribly
7  familiar with how these systems work in a nuclear
8  power plant.  I know about as much as Homer Simpson
9  does, I guess.
10         But at any rate, the -- there's some
11 system in there to control the ventilation and the
12 airflow in the event of contamination or leak or
13 other hazards; correct?
14         MR. DuPONT:  Compound.  Lacks foundation.
15     A.  Yeah, there is, you know, especially if
16 there's, you know, some kind of an upset condition
17 or some sort of emergency, there's a lot of layers
18 of protection and ventilation.
19         I guess the -- the thought I had in terms
20 of this particular set of tasks he was doing was
21 that, you know, these were done during outage
22 periods; and so the plant really wasn't running.
23 You know, it wasn't up and functioning.
24         So some of these ventilation systems that
25 might have been in place at other times were

1  possibly not functional when he was doing the
2  maintenance.
3  Q.  Okay.  But that -- you didn't confirm
4  that.  That was an assumption you made.
5  A.  Yeah, that's kind of my -- my sense of how
6  this would have been done, but I -- I didn't
7  confirm it, no.
8  Q.  All right.  Other than breaking apart the
9  ice condensers, are you aware of any other area in
10  which he use the Kroil product?
11  A.  I really don't.  I mean, I remember in the
12  deposition there was discussion about, you know,
13  how he used it, and my recollection was that that
14  was pretty much the -- the dedicated application
15  for this product.
16  Q.  And your understanding was that it was a
17  liquid?
18  A.  Well, looking at the safety data sheet,
19  you know, I mean -- and I'm trying to remember if
20  that specifically came up in a deposition, and I
21  don't remember -- but, you know, I'm inferring from
22  the fact that there wasn't any propellant listed in
23  the safety data sheet that it was a liquid.
24  Q.  All right.  And how was it applied, if you
25  know?

1      MR. DuPONT:  Form.  Asked and answered.
2  A.  You know, again, I'm trying to remember
3  how he -- if he -- if that really came up, or how
4  he described the process.
5      I don't remember him really getting into a
6  lot of detail or -- or him being asked exactly how
7  he applied it.
8  Q.  Do you know whether it was applied on the
9  external portion of the machine, or whether it was
10  used on interior parts as well?
11  A.  Well, I'm, sort of, visualizing, you know,
12  how he had to open up this -- this vibrator to get
13  at these parts, and so my expectation would be that
14  it was pretty much an external application to this
15  nut or bolt that he was trying to -- to free so he
16  could remove the vibrator.
17  Q.  But, again, that's an assumption you're
18  making; correct?
19  A.  Yeah, it didn't really come up, you know,
20  specifically in -- in his deposition.
21  Q.  Okay.  And do you have any specific
22  information about the length of time that the
23  product would be applied in the course of
24  attempting to break apart one of these vibrators or
25  ice baskets or ice condensers?

1  A.  I'm -- you know, just, kind of,
2  back-calculating from the way he described the work
3  process:  If he worked at this for, say, 10 hours a
4  day, and on a good day I think he said they could
5  do 15 of these -- you know, my sense is this -- you
6  know, this a difficult job; and so there was,
7  you know, a lot of time, you know, spent trying to
8  -- to get this part freed, and so the -- the Kroil
9  was being used throughout that period.
10  Q.  Do you know how much time it took the
11  Kroil to "operate" to perform its intended
12  function?
13  A.  You know, I really don't.  I mean, if it's
14  -- if it's anything like the work cycle around some
15  of the Liquid Wrench projects, you know, it's -- it
16  wouldn't be unusual that there would be repeated
17  applications.
18  Q.  But, again, you didn't review any kind of
19  instructions or -- or labeling of the product to
20  verify that; correct?
21  A.  No, I didn't.
22  Q.  All right.  And no specific information
23  from Mr. Rhyne about how many applications he may
24  do in a given day; correct?
25  A.  You know, he -- I don't think he was asked

1  that, and he didn't -- didn't recall it or didn't
2  bring it up.
3  Q.  And you have not -- I think it was asked
4  by one of the other attorneys -- you have not
5  visited this plant or any -- or any of the three
6  plants that he indicated working at during the
7  '90s; correct?
8  A.  That's correct.
9  Q.  Have you seen any schematics or sketches
10  or photographs of the buildings?
11  A.  Short of his handwritten drawings that are
12  there as exhibits, that was pretty much it.
13  Q.  What you did see, did you find it to be
14  comparable to the facilities you'd seen in
15  Connecticut in your other projects?
16  A.  It generally is.  You know, it's -- it's
17  that, you know, sort of, characteristic design of
18  nuclear plants that were built during that era.
19  Q.  Okay.
20  A.  So I'd say, yeah, you know, at a
21  30,000-foot level, sure.
22  Q.  Okay.  During these outages do you know
23  what percentage of time he would have spent
24  breaking down these vibrators, versus doing other
25  tasks?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1    A.  I got the impression that this was really
2  his primary task; that this was where, you know, he
3  was really spending -- because they -- you know,
4  they -- the whole outage is a pretty intense event.
5  They want to get the plant back online.
6        And so, you know, my impression from the
7  way he described it was that, you know, he -- he
8  could have, you know, been working on -- on that
9  task for the entire -- for -- well, let me -- I'm
10  sorry.
11        Let me correct that, because part of it
12  was he had the disassembly process, which was when
13  he was using Kroil, but, then, there was a
14  reassembly process, which I think, if I remember
15  correctly, was about a third as long or something;
16  it was a lot faster to put stuff back together than
17  it was to take it apart.
18    Q.  Right.
19    A.  So in the total outage period, you know,
20  there was a portion of that time when he was
21  reassembling things, not when he was doing the
22  disassembly.
23    Q.  And you agree with me that the -- the
24  lubricant would not be used for the reassembly, or
25  would not be necessary.

1        Is that your understanding?
2    A.  I -- I think that would be a reasonable
3  expectation.  You know, there wouldn't necessarily
4  be a reason to use it when you are putting stuff
5  back together.
6    Q.  And I -- I appreciate what you said about
7  the -- the taking down the equipment and taking
8  more time and so forth, but Mr. Rhyne described
9  this as doing preventative maintenance.  So, I
10  mean, it wasn't simply just taking it apart and
11  putting it back together; right?
12    A.  Right.
13    Q.  There was -- did you assume there was
14  something they were doing to the equipment once
15  they had it disassembled?
16    A.  Yeah, I think that, you know, I hadn't
17  really thought about particularly what it would
18  have been, but I can imagine that, you know, they
19  had to verify that these baskets were structurally
20  intact and that they were in good working condition
21  before they did the reassembly.
22        I mean, that's, kind of, the way, you
23  know, things would run in a nuclear environment;
24  that things had to be right.
25    Q.  At some period of time they'd have to fix

1  or replace anything that wasn't up to standard;
2  correct?
3        MR. DuPONT:  Form.
4    A.  I would think that would be true, and
5  there's probably some inspection steps involved in
6  there.
7    Q.  Okay.  So even assuming, as you did, that
8  the disassembly process took the majority of the
9  time, you would agree with me, wouldn't you, that
10  there were other aspects of this particular job he
11  was doing during which he would not be using a
12  product like Kroil?
13    A.  Well, I think that's fair to say, 'cause
14  there would be the -- the reassembly process and --
15  and whatever else if there was inspection involved.
16    Q.  Okay.  And even in your recalculations of
17  the cumulative exposure, you -- you still assumed
18  -- at least for those 40- to 50-hour weeks -- 100
19  percent of the times using Kroil; correct?
20    A.  Yeah, I did.  That would --
21    Q.  So you --
22    A.  -- within the day that he was using it,
23  yeah.
24    Q.  So the adjustments you made was to -- as
25  opposed to assuming that he used Kroil for every

1  day he was employed in that job, you adjusted it to
2  account for the fact that he only may have used
3  this product during these outages.
4    A.  Right, roughly 5 percent of his -- of his
5  time over that 7- or 8-year period.
6    Q.  And that was my next question:  About 4 to
7  5 percent of his time?
8    A.  That's the number that I wound up using,
9  yeah.
10    Q.  But of that 4 to 5 percent, you did not
11  make any adjustment to account for the fact that
12  some of the time would have been spent on
13  reassembly, some of the time would have been spent
14  on preventative maintenance, and those tasks likely
15  did not involve the use of a lubricant or a product
16  like Kroil; is that fair?
17    A.  Yeah, I think that's fair to say.  There
18  were other things going on.
19    Q.  So it may be that even these revised
20  estimates are a bit high, given that at least a
21  third to a half of his time may have been spent
22  doing jobs that did not involve the use of this
23  product.
24        MR. DuPONT:  Objection.  Form.  Compound.
25    A.  Yeah, I mean -- and I could -- I could

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1  take a look back, you know, in his deposition,
2  'cause, as I say, somehow I have it in my mind that
3  he -- he seemed to, I think, say the reassembly
4  took about a third of the time of the disassembly.
5      Q.  And in your defense, I think he only
6  talked about it for about six pages.  So it's --
7  the fact that you recall as much as you do is to
8  your credit.  I appreciate that.
9          All right.  So let's -- I think that
10  clarifies a lot of what I wanted to talk with you
11  about in terms of his actual work.
12          Let's -- let's talk about how you arrived
13  at these figures.  So how does -- how does the
14  process start when you were evaluating this daily
15  exposure and cumulative exposure?
16          Kind of -- kind of walk me through that.
17      A.  Well, in the -- in this particular case --
18      Q.  Right, and as it relates to Kroil, sure.
19          I'm sorry.  I didn't ask a very good
20  question.
21      A.  Well, it kind of starts with trying to see
22  what I can learn about the composition of the
23  products that he was, you know, running into when
24  he used Kroil.  And so that leads me back to the
25  safety data sheet in this case, as I didn't have,

1  you know, any of the other information that we just
2  talked about earlier.
3          So there, you know, you can -- and in this
4  case, based on the content of the materials that he
5  was using from the safety data sheet, I went back
6  and -- and, you know, used the information from the
7  published literature, in particular that Williams
8  paper that we've talked about about what levels of
9  exposure were associated with products that were in
10  use, say, from about -- I think she spoke from
11  about the '70s to 2000, over that time period --
12  what was the range of benzene content of those
13  products.
14          And so that's how I matched up and said,
15  okay, well, for the range that I'm going to use for
16  him, is -- we'll say it's somewhere between 100 --
17  let me just make sure I give you the right values
18  here -- (witness reviews document) -- that the
19  range over those years was from 100 to 2,000 parts
20  per million; and the one-hour average -- average
21  exposures that were associated with that ranged
22  from .01 to 1 parts per million.  And -- and that's
23  -- and so the midrange of that is .5.
24      Q.  Okay.
25      A.  So that's how that number comes to be.

1      Q.  And those -- those are figures you derived
2  from looking at the listing of items in the
3  Material Safety Data Sheet --
4          MR. DuPONT:  Objection --
5      Q.  -- and then assessing that prior study.
6          MR. DuPONT:  Objection to form.
7      A.  Right, I mean, 'cause we knew the
8  ingredients that were present, at least in -- as of
9  2005 -- that were present in Kroil.
10      Q.  So, I mean, not to oversimplify things,
11  but tell me, what is the Material Safety Data
12  Sheet?
13      A.  Oh, well, it's a document that's produced
14  really in compliance with the hazard communication
15  standard, and so the manufacturers, industry
16  readers, you know, use this as a means of
17  communicating information to the people who use the
18  product.
19      Q.  All right.  And what is typically
20  contained on the Material Safety Data Sheet?
21      A.  Well, that's a good question, because, you
22  know, over the years and -- and between companies,
23  it varies all over the place.  And I've seen some
24  that, you know, look like they were written by the
25  corporate toxicologist, because they've got, you

1  know, elaborate detail about the results of animal
2  studies, and, then, there's others that are -- that
3  are really sparse.
4          But, you know, for the most part they have
5  information about the -- the composition -- you
6  know, the ingredients, the fire safety, hazard
7  information for poison control centers, information
8  about acute and chronic toxicity, and that -- and
9  this kind of variable.
10          The more recent ones have information
11  about how these chemicals are classified by states
12  like California and by EPA and by other
13  organizations that, you know, do different kind of
14  ratings around hazards.
15          They have information in there about
16  firefighting, about emergency response, about spill
17  response.  That kind of thing.
18      Q.  Okay.  With regard to the -- the content
19  -- well, since you, kind of, suggested there's a,
20  kind of, a spectrum, do you have a specific
21  recollection -- with regard to this MSDS sheet you
22  reviewed for Kroil -- whether it was specific or
23  general?
24          MR. DuPONT:  Form.
25      A.  You know, just sitting here right now, I

78 (Pages 306 to 309)

1  am not getting a good recollection of that --
2      Q.  Okay.
3      A.  -- particular one.
4      Q.  And it looks like you outlined some of the
5  contents on page 29 of your report; is that -- I
6  think that's where you're discussing this.
7      A.  Right.  That's --
8      Q.  First full paragraph.
9      A.  Yeah, I tried to summarize what was
10  identified from that 2005 safety data sheet.
11      Q.  Okay.  Can you go through with me what
12  some of these items are that are on the --
13  "Hydrotreated Petroleum Distillates," what does
14  that refer to?
15      A.  Yeah.  Well, that's one of the things --
16  you know, we kind of talked about that earlier
17  today.  It's one of the petroleum-based materials
18  that's been further processed to try to reduce the
19  content of the aromatic fraction, in particular
20  benzene.  And so that's present at about 30 to to
21  50 percent.  The "Light Petroleum Distillates," you
22  know, that's, kind of, a family of materials; you
23  see there's like three different CAS numbers listed
24  there, and that -- you know, that's just one of the
25  fractions from the refining process.  You know, it

1  hasn't really been processed further, but it -- you
2  know, the light refers to the molecular weight and
3  the boiling range of those particular --
4      Q.  Okay.
5      A.  -- of that fraction.  Naphthenic alcohols
6  -- like all ethers -- you know, those are -- you
7  know, two families of compounds that are, you know,
8  I'm imagining are added, you know, for the
9  performance of the -- of the final product, and,
10  then, 5 to 15 percent of it is identified as
11  proprietary.
12      Q.  All right.  So, I mean, that -- I can't
13  take this and make a batch of Kroil Oil; right?
14  It's not a very specific --
15      A.  Right --
16      Q.  -- accounting of what's in there; right?
17      A.  Right.
18      Q.  And, again, you mentioned earlier, having
19  reviewed the report of Ms. Deeds, a couple of
20  statements she made, and I want to see if you agree
21  with these.
22          Would you agree that these individual
23  ingredients referred to as petroleum base oil,
24  petroleum solvent, petroleum naphtha are actually
25  complex mixtures derived from the cracking and

1  refining of crude oil?
2      A.  I think that's a fair characterization,
3  yeah.
4      Q.  Okay.  And would you agree that these are
5  not pure chemical substances?
6      A.  I would agree with that, yeah.
7      Q.  All right.  And these CAS numbers that are
8  assigned to petroleum distillates, is it fair to
9  say or is it accurate that the CAS number is based
10  upon the refining process and not necessarily the
11  chemical composition of the substance?
12          MR. DuPONT:  Compound.  Vague.
13      A.  I don't -- it's a good question.  I don't
14  really know.  You know, as opposed to, you know,
15  like the CAS number for benzene refers to, you
16  know, the particular molecule.
17      Q.  Uh-huh.
18      A.  You know, I'd have to say I don't quite
19  know how they decide, you know, how to assign these
20  CAS numbers to these variable mixtures.
21      Q.  Okay.  Is it true the products with the
22  same CAS number may be very different in terms of
23  their chemical composition?
24          MR. DuPONT:  Form.  Vague.
25      A.  Sure.  I mean, I think if you did the

1  detailed chemistry around light petroleum
2  distillates, you know, that you could easily see
3  within the same CAS number there could be a lot of
4  variability in their individual chemistry.
5      Q.  Is that true with regard to benzene
6  content as well?
7          MR. DuPONT:  Form.  Vague.
8      A.  Well, I think it -- it, you know, would be
9  fair to apply that to the overall content, you
10  know, to only one of the ingredients in the
11  mixture.
12      Q.  Okay.  So it's understood, I guess, within
13  your field that these are general descriptions of a
14  wide range of products.  You referred to them as a
15  family of products, correct, or --
16          MR. DuPONT:  Form.  Vague.
17      Q.  -- or substances.
18          MR. DuPONT:  Form.  Vague.
19      A.  Yeah, I think, you know, considering it to
20  be a family or a group of related compounds is a --
21  is an accurate way to look at it.
22      Q.  All right.  And it's impossible, isn't it,
23  to identify specifically the benzene content of a
24  particular substance based on the use of these
25  general descriptors in the MSDS sheets; is that

79 (Pages 310 to 313)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 80 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1 accurate?
2 MR. DuPONT: That's so vague. And
3 misrepresentation.
4 MR. JEFFRIES: Just "objection" will be
5 fine.
6 MR. DuPONT: Come on.
7 A. Well, I think that's why you see in the
8 literature, you know, people tend to report ranges.
9 You know, across a category of compounds they
10 report a range of benzene contents, because, you
11 know, unless there is some individual analysis to
12 go on, a range is a better way to -- to try to
13 capture, you know, the true number that's in there
14 somewhere.
15 Q. Would you agree that in situations where
16 there is an individual analysis, that is the better
17 dataset to use?
18 MR. DuPONT: Form.
19 A. If -- if you have, you know, a good, sort
20 of, linkage, you know, of -- of the information to
21 the specific product that's in question, if you
22 have analysis like that, it's -- it's definitely
23 something to be used.
24 Q. Okay. And, again, your numbers of the 100
25 to 2,000 part per million is based upon the

1 Williams study that suggests that the range of
2 benzene content in these types of substances is
3 anywhere from 1/100th of a percent to 2/10ths of a
4 percent.
5 A. Yeah, that's what's in that 2008 paper.
6 Q. Okay. All right. So without specific
7 testing, without specific data you start with this
8 range.
9 What's the next step in the process?
10 A. Well, that's why I tried to, you know,
11 say, Okay, Well, here's -- here's a range. What's
12 the midpoint of the range.
13 Q. Okay.
14 A. And that's how I wound up with this value
15 of .5. That's the -- the middle of this range that
16 we're looking at here. And so when I did the
17 calculations, you know, I -- I tried to capture the
18 high end of the distribution, the low end of the
19 distribution, and the value that's in the middle.
20 Q. Okay. And that midpoint, I mean, that --
21 you calculate the midpoint, but, again, that's
22 still an assumption; correct?
23 A. Yeah well.
24 MR. DuPONT: Form.
25 A. Just trying to, you know, put a bracket

1 around it and say, Okay, well this is the -- these
2 are the extreme values. What's in the middle?
3 Q. Right. But the actual -- you know, the
4 actual data may be somewhere far to one end of the
5 spectrum or far to the other end; correct?
6 MR. DuPONT: Form.
7 A. Well, yeah, and that's -- you know, that's
8 why I'm trying to be, you know, circumspect about
9 you know, kind of, the uncertainty by reporting
10 the -- the range the way I did.
11 Q. Right. I understand. And, again, not to
12 oversimplify it, but if the range is 1 to 100, 50
13 is the midpoint, but the actual number may be 12,
14 right? Or 92 --
15 A. It could.
16 Q. -- right? Okay.
17 A. Yeah.
18 Q. And without specific testing all we can do
19 is make the approximation and use the range.
20 A. That's kind of the approach I took, yeah.
21 Q. Okay. All right.
22 So that calculation gets you to a daily
23 exposure level which you initially put at .5 ppm.
24 A. That would be the value in the middle;
25 right.

1 Q. Okay. All right.
2 Now that you have established that, what
3 is the next step in your analysis?
4 A. Well, so you've got, say, like the kind of
5 information that's in Table 3, so -- which is what
6 you see, you know, the -- the range and the
7 midpoint of the range; and, then, to get from that
8 to Table 4, you -- I would take the duration of
9 time that -- that he was exposed at that level, and
10 then multiply duration by the daily average to get
11 the cumulative exposure.
12 Q. Okay. All right.
13 And I want to go through that process and
14 the new numbers, but I think another one of the
15 lawyers asked you if you -- obviously, if you used
16 these values on the lower end of the spectrum, your
17 daily cumulative -- your daily and cumulative
18 exposures are going to be much reduced; correct?
19 MR. DuPONT: Form.
20 A. I'm sorry. Could you repeat the --
21 Q. If you used the estimated benzene content
22 on the lower end of the spectrum, then your daily
23 and cumulative exposure levels will be reduced well
24 below that midpoint; correct?
25 MR. DuPONT: Form.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    A.  Right.
2    Q.  And conversely if you use the values on
3  the high end of the spectrum, then the -- daily
4  and cumulative totals will be elevated.
5    A.  Correct.  Yeah.
6    Q.  All right.  If I used 10 parts per million
7  versus 100 parts per million, the -- the exposure
8  will be less by a factor of 10; right?
9        MR. DuPONT:  Form.
10    A.  Yeah, that's -- that's a --
11    Q.  That's just simple math at that point.
12    A.  -- an approximation.  Yeah.  Sure.  Right.
13    Q.  Okay.  So how do we get the daily exposure
14  figures -- or the new figures, I guess?
15        We might only have one of these, so we
16  might have to share.
17    A.  Though the daily didn't change, but what
18  changed was the cumulative.
19    Q.  I'm sorry.  Cumulative.  Yes, sir.  My
20  apologies.
21    A.  So what I did was I adjusted his duration
22  values so that instead of using that whole
23  seven-year period as his period of exposure, I -- I
24  downsized that.  It was, I think, by a factor to
25  make it about five percent of his time during that

1  seven-year period when he was actually exposed.
2        So the calculation that would be on the
3  spreadsheet is the product of his daily average
4  times the years.  And so instead of seven years,
5  it's, I think, about .035 years.
6    Q.  Okay.  And so that's reflected here in
7  Exhibit 12.
8    A.  That's the -- yeah, that's the result of
9  doing that calculation with the correct duration
10  value.
11    Q.  And the revised assessments you had for
12  Kroil is -- I'm sorry.  There's a mark there.
13        Is that 10.02 or .02?
14    A.  Sorry.  That -- I probably should have
15  done -- that's just meant to divide that cell into
16  two parts.
17    Q.  Okay.  Okay.
18    A.  So it's 0.02.
19    Q.  Okay.  So that's the cumulative exposure
20  and the midpoint of the cumulative exposure in
21  ppm-years.
22    A.  That's right.
23    Q.  All right.  And, then, so that comes from
24  a range of .004 to .04 for the cumulative range;
25  correct?

1    A.  That's correct, yeah.
2    Q.  All right.  And are there any other
3  changes to the totals -- well, explain to me on the
4  bottom here under "Total."  Why are there three
5  separate calculations?
6    A.  Oh, what I tried to do was capture -- you
7  know, if you think about the kind of range of
8  scenarios that he had, you know, and -- and the
9  things that were, you know, his major uses -- the
10  Liquid Wrench, he had three different benzene
11  concentrations in Liquid Wrench; and then, in the
12  CRC products, I, you know, calculated it for two
13  different levels of benzene.
14        And so what I tried to, kind of, collapse
15  overall here is as low, medium, and high, would be
16  -- low would be at the lowest benzene in Liquid
17  Wrench and the lowest benzene in CRC --
18    Q.  Okay.
19    A.  -- and net high is the high and the high.
20    Q.  Okay.  So those adjustments, as well as
21  the adjustment for the Kroil are the only changes
22  from Table 4 contained in your report; correct?
23        MR. DuPONT:  He didn't adjust the Liquid
24  Wrench numbers.  He just adjusted what the total --
25  by reducing the Kroil numbers.

1    A.  Right, the only, like, change is that
2  Kroil value.
3    Q.  All right.  Doctor, I apologize if I asked
4  you this already:  Have any of your cases in which
5  you worked as an expert witness or consultant been
6  in North Carolina or South Carolina?
7    A.  Let's see.  There was one, and it never
8  really actually went to trial, because they
9  abandoned it, I think, but it was a South Carolina
10  case where the issue was trying to get someone
11  Workers' Compensation.
12    Q.  Okay.
13    A.  And I was involved in some of the early
14  background work and report-writing on that.  But I
15  -- I think that wound up being settled before it
16  ever even got to the point of a report.
17    Q.  You didn't give a deposition or testimony
18  in a hearing?
19    A.  No, it never went very far.
20        MR. JEFFRIES:  All right.  Doctor, I think
21  I will pass the baton so that we can wrap this up.
22  I appreciate your time.  Thank you.
23        THE WITNESS:  Thank you.
24            EXAMINATION
25  BY MR. BENDER:

81 (Pages 318 to 321)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 82 of 97

1    Q.  Okay.  Doctor Herrick, good afternoon.  My
2  name is Brian Bender.  I'm with the law firm of
3  Harris Beach, and we represent Safety-Kleen in the
4  case.  I apologize I couldn't be there in person.
5  I will do my best to get this done quickly over the
6  phone.
7       If you can't hear me or you don't
8  understand something, please let me know, and we'll
9  try to clear it up for you; okay?
10    A.  Okay.
11    Q.  All right.  I want to go back to this
12  number of 58 parts per million that you assumed was
13  in whatever was in the Safety-Kleen parts washers
14  when you did the ART modeling.
15       Do you remember talking about that
16  earlier?
17    A.  I do.
18    Q.  I know that you said -- I think it was in
19  response to Mr. Schultz's question -- that the 58
20  is intended to represent the amount of benzene in
21  whatever was in those parts washers, taking into
22  account evaporation or loss as a result of use of
23  the parts washers; is that correct?
24       Did I characterize that right?
25    A.  That was the way I tried to approach it,

1  yeah.
2    Q.  How did you get there, is my question.
3       I mean, did you start with what you
4  thought was the amount of benzene in -- in the
5  pure, fresh batch of whatever was in those parts
6  washers, and then do some math to get to the 58 --
7  58 parts per million?  Or did you do something
8  else?
9    A.  Well, no.  What I tried to do was, I -- I
10  used the 58 because that was the value that was in
11  Fedoruk and also in the work that LeBlanc had done,
12  and so I wanted to be able to make some comparisons
13  across those two studies, as well as the -- you
14  know, the calculation I was doing for the work that
15  Mr. Rhyne did.
16       But I also felt that it gave me, you know,
17  a margin -- you know, a good margin of -- of
18  safety, recognizing that the parts washer didn't
19  contain fresh mineral spirits, except maybe once
20  every two weeks or so, because, you know, there was
21  information from SK about the rate or the frequency
22  of changing out the solvents.
23       So on any given day, the range, you know,
24  would have been somewhere between the original
25  content of benzene at the start of that change-out

1  period and -- and the benzene content as time
2  passed.
3       So I felt that, you know, 58, in addition
4  to being consistent with those other guys' worked,
5  was actually a -- a pretty good value that was, you
6  know, if anything, probably lower than the actual
7  content that was present in the real world.
8    Q.  So the 58 parts per million, is that in
9  any way based on evidence that's been produced in
10  this case?  Or is it all based upon things that are
11  extraneous to this case:  other studies, other
12  information you've seen, things like that?
13       MR. DuPONT:  Form.  Compound.  Vague.
14    A.  Well, yeah, in terms of, you know, what
15  was really available about the mineral spirits that
16  were used in these power plants, you know, I didn't
17  really have any direct analysis or -- or specific
18  information, you know, that would let me try to
19  hone in on that.  And so, as I say, I was trying to
20  be conservative and -- and recognize that the --
21  the parts washers didn't contain fresh mineral
22  spirits, and I felt like this 58 was a reasonable
23  value that reflected what was actually in use.
24    Q.  And you thought that was appropriate to
25  use because of what you see in the Fedoruk study,

1  what you saw in the LeBlanc study.
2       Anything else?
3       MR. DuPONT:  Form.  Compound.
4    A.  No, those -- those were the main
5  considerations.  As I say, the -- the data really
6  wasn't very abundant to let me make a hard
7  assumption about the actual starting point
8  concentration.
9       You know, I mean, my -- my review of the
10  literature suggested that, you know, in the fresh
11  mineral spirits, you know, you had estimates
12  anywhere, you know, from numbers around 100, other
13  people who maintain that the levels were over a
14  thousand in mineral spirits, and so I thought,
15  Well, there isn't really a consensus value, so I'm
16  going to -- you know, if anything, I'll use, you
17  know, what may be a low-end estimate for my
18  calculations, and so that's how I got to 58.
19    Q.  Yeah.  And as I see in your report at
20  pages 24 and 25, there are references to some of
21  these sorts of numbers.  And particularly on page
22  24, that last paragraph, you make references to
23  levels below 100 parts per million, and then I see
24  references up to 10,000 parts per million.  So
25  we're going from less than 100 to 10,000.  And you

82 (Pages 322 to 325)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 83 of 97

1 ended up with 58.
2 And I'm curious. There's also a reference
3 here on page 24 to some Safety-Kleen data that
4 showed -- you have it as 32.7 parts per million.
5 Was there some reason why you didn't use the 32.7,
6 since it was a Safety-Kleen-related data, as
7 opposed to taking it from Fedoruk and LeBlanc?
8 MR. DuPONT: Compound.
9 A. Well, you know, what I tried to do was
10 kind of consider the universe of information that
11 was out there, and, you know, that one data point
12 from Safety-Kleen, you know, reflected the level
13 that you mentioned. And I considered that, you
14 know, in the context of all the other inputs, you
15 know, to the decision, you know, that, as you say,
16 reported information that ranged, you know, from
17 somewhere around 100 to some values, you know,
18 reported up to 10,000.
19 And so I thought, you know, picking a
20 number in that order of magnitude -- like 58 -- was
21 a -- was a safe value that, if anything, you know,
22 might be off on the low end.
23 Q. Do you know whether or not Safety-Kleen
24 produced any information in this case that would
25 reflect levels of benzene -- either in fresh or

1 recycled solvent -- that it was distributing during
2 the relevant time frame here?
3 A. I don't remember actually seeing -- you
4 know, there -- there was information -- those
5 safety data sheets and all from Safety-Kleen -- and
6 I don't remember seeing something that necessarily
7 would have been specific, you know, say, to the
8 area of the country and this time period where
9 Rhyne was working.
10 So, I mean, I guess that's, kind of, a
11 long way of saying, I don't, you know, recall
12 seeing that information.
13 Q. Did it matter to you in using the
14 58-parts-per-million figure that, for instance,
15 Fedoruk intentionally spiked solvent to that level,
16 as opposed to using -- I'm sorry -- using solvent
17 that just had 58 parts per million in it?
18 MR. DuPONT: Compound.
19 A. No, I -- I -- you know, I mean, remember,
20 we -- we talked about this a little bit earlier;
21 that, you know, given the time and place where
22 Fedoruk was doing the study, you know, what I'm
23 imagining is that he was using mineral spirits that
24 he was able to access locally there in California,
25 and so he needed to -- to do that spiking to get it

1 up to 58.
2 Q. Do you know what the benzene content was
3 in the unspiked solvent that he obtained for his
4 study?
5 A. Well, the -- the low-end value that he
6 reported was 9 parts per million. And so I don't
7 know this with great certainty, but I -- I surmise
8 that would have been the starting point material
9 that he got for his project.
10 Q. Was there a reason why you didn't use 9
11 part per million, as opposed to the 58 that was
12 intentionally spiked?
13 A. Well, I mean, again, just considering the
14 time and the place, you know, given that this was a
15 study in North Carolina and not California, you
16 know, I -- and that it was, you know, work that was
17 done you know, years before Fedoruk's experiment, I
18 thought that, you know, the 9-part-per-million
19 value was probably not a representative value for
20 the mineral spirits that Rhyne was using.
21 Q. What is -- what is that based on with --
22 vis-a-vis the dates? Let's say, the date
23 difference between Mr. Rhyne's work and Fedoruk's
24 study, how does the date issue support the
25 assumption that you just made; that the 9 would be

1 far lower a long time ago and -- I'm sorry -- the 9
2 would be -- I'm sorry -- far lower now than it
3 would have been when Mr. Rhyne was working?
4 MR. DuPONT: Form.
5 Q. And I can rephrase that if I completely
6 massacred your answer.
7 A. No, let me try to answer.
8 I mean, I think I -- you know, can
9 respond.
10 Q. Yeah.
11 A. In looking at the published literature,
12 you know, even people who, you know, come to
13 different conclusions about the benzene content in
14 mineral spirits, I think, you know, they would all
15 agree that, over time, you know, the trend line has
16 been to lower and lower benzene content; and -- and
17 so, even if they come to a different you know,
18 final number as to what they think is a
19 representative value, I think there is some
20 agreement that the concentrations have gone down
21 with time.
22 Q. Can you point me to anything that would
23 support the fact that 9 parts per million in fresh
24 solvent as used by Fedoruk --
25 MR. DuPONT: Whoa. Whoa. Counsel, no.

83 (Pages 326 to 329)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC Document 234-1 Filed 04/28/20 Page 84 of 97

1  No. No.
2      Q.  -- is something that you --
3          MR. DuPONT:  Why don't you pull up the
4  Fedoruk study and see if the words "fresh solvent"
5  and "9 parts per million" are listed together
6  before you make that representation.
7          MR. BENDER:  I'll rephrase it.
8          MR. DuPONT:  I think if you looked at the
9  study, it would say that it's recycled solvent.
10         MR. BENDER:  I'll rephrase it.
11     Q.  Can you point me to anything that shows
12  that what appears in the Fedoruk study would
13  automatically lead you to whatever number higher
14  than 58 would have been the starting point for your
15  assumptions in this case?
16         MR. DuPONT:  Form.
17     A.  I'm going to have to ask you to try that
18  again.
19         I mean, I don't -- I didn't quite follow.
20     Q.  Well, you're telling us that -- that you
21  -- that you made an assumption in this case that
22  fresh solvent in these parts washers would have
23  contained benzene in excess of 58 parts per million
24  by volume; right?
25     A.  That's right.

1      Q.  And what I'm asking you -- I mean, you're
2  not giving us what that number is, but if there's
3  something that you can point us to that would allow
4  us to do some math to figure out what that number
5  would be, whether it's extrapolating from the 58,
6  or extrapolating from the 9 that we see in the
7  recycled solvent in Fedoruk that wasn't spiked.
8          MR. DuPONT:  Compound.  Just not
9  understanding, Counsel.
10     A.  Yeah, I'm -- maybe I'm just -- getting too
11  late in the day, but I'm afraid I'm going to have
12  to ask for that again.  I didn't quite -- I don't
13  know quite how to respond.
14     Q.  It is getting late.  I'll try it again.
15         Other than just saying that you've seen
16  things in the literature that say the benzene
17  content in solvent has trended downwards in more
18  recent years, is there anything else you can point
19  us to that would enable -- would enable us to draw
20  a curve and relate the assumption you made in this
21  case at 58 parts per million to what Mr. Rhyne was
22  actually using?
23         MR. DuPONT:  Objection.  Vague and
24  ambiguous.
25     A.  Well --

1      Q.  Are you basing that statement, sir, on
2  anything other than just a general review and
3  understanding of the literature?
4      A.  Oh, okay.  Well, I can -- I can try to
5  answer that.
6          I mean, my -- what I tried to do in -- in
7  using that number was reflect what I think would be
8  a good representation based on what's presented in
9  the literature about the benzene content of mineral
10  spirits during the -- the time period when Rhyne
11  was using it, recognizing that, you know, I think,
12  if anything, it is potentially on the low side.
13  But that would -- that would be appropriate, you
14  know, given that it isn't fresh mineral spirits in
15  the parts washer.
16     Q.  And the literature you're referring to is
17  -- is what?  I mean, you've talked about Williams
18  today.
19         Is -- is that one of them?
20         MR. DuPONT:  Come on, Counsel.  It's
21  listed in the report.  Why have you got to do this
22  at 4:40 in the afternoon in a deposition starting
23  at 9:00 o'clock in the morning when you've already
24  deposed him on the issue?
25         MR. BENDER:  Andrew, you're killing more

1  time right now.
2          MR. DuPONT:  No.  Compared to what you're
3  doing, not at all.
4      A.  Well, what I -- let me try to answer.  I
5  mean, you know, the two, you know, really, you
6  know, kind of, wide-ranging reviews that I -- that
7  I -- that I relied on were this Kopstein review
8  paper and -- and the Williams review paper.
9          And so, you know, they came up with
10  different, you know, conclusions about the benzene
11  content in fresh mineral spirits, and so I tried to
12  recognize, you know, what that range would be.  And
13  for the sake of the calculation I did, I actually
14  picked, you know, the 58, which is, you know, if
15  anything, you know, I think below that range.
16         But as I said before, I think that's
17  appropriate given that, you know, what was in
18  Rhyne's parts washer wasn't necessarily fresh
19  mineral spirits.
20     Q.  On page 26 and 27 of your report you talk
21  about how the results of your modeling stack up
22  against Fedoruk's work.
23         Do you know where that is?
24     A.  Right, I do see that.
25     Q.  And you talk about the fact that Fedoruk

84 (Pages 330 to 333)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 85 of 97

1  -- this is right at the bottom of that paragraph on
2  page 26. He says -- I'm sorry. You say that
3  Fedoruk came out to 440 parts per billion for the
4  personal exposure.
5        Do you see that?
6     A.  I do see that, yeah.
7     Q.  And then there was another -- at breathing
8  zone height it was at 550 part per billion.
9        Do you see that?
10    A.  I do see that, yeah.
11    Q.  And, then, your results were something
12 different; right?  Up top you gave an example of
13 the one-hour period being a range of 1.2 to 4.4
14 parts per million?
15    A.  That's --
16    Q.  And then you talk about -- you talk about
17 a temperature difference.  And if I -- tell me if
18 I'm reading this correctly.  You think that -- and
19 this is language from page 27 -- your results and
20 the Fedoruk results were in very good agreement.
21       Is that a fair way to read what you're
22 saying here?
23    A.  Yeah, that's what I said; right.
24    Q.  And -- and although they were somewhat
25 different, you're accounting for a temperature

1  difference; right?
2     A.  Right, I think that was a factor in -- in
3  the difference, yes.
4     Q.  Would you have expected to see -- I think
5  you're saying -- that doubling for every 18 degrees
6  Fahrenheit?  And I think, based on your -- your
7  temperature difference -- we were just under 18.
8  So to get this math to line up, we would expect
9  something less than doubling, based on the
10 difference in temperature between your work and --
11 and Fedoruk's work?
12    A.  Yeah, I -- I wasn't -- if I could just
13 clarify.  I mean, you know, when -- when I'm using
14 the term "good agreement," you know, I'm anchoring
15 that, you know, back to other studies that have
16 been done comparing measurements and models and --
17 and between models; and, you know, in -- in the
18 world of those comparisons, a factor of 2
19 difference is actually really considered good
20 agreement.
21    Q.  So is that a reference just to your
22 results being compared to Fedoruk, or your results
23 being compared to other things as well?
24       MR. DuPONT:  Objection.  Form.
25    A.  Well, this would be a comparison that, you

1  know, would apply across, you know, any number of
2  -- of comparisons of, say, between measurements and
3  -- and between measurements and models, but I was
4  specifically referring to it as a good agreement
5  between my results and Fedoruk's.
6     Q.  And you would still describe it as very
7  good, even though your results are higher than
8  double when, according to the rule that's cited
9  here, we would expect to see them -- your results
10 somewhere less than double?
11       MR. DuPONT:  Objection.  Form.  Compound.
12    A.  Yeah, I mean, and not to -- to try to beat
13 up on other experts, but in -- in the review, the
14 critique that Spencer wrote of my report, you know,
15 he reported some of his own comparisons between
16 measurements and models where the difference was a
17 factor of 4; and he characterized that as being
18 excellent agreement.
19       So it -- anyway, I'll just leave it at
20 that.
21    Q.  With respect to your results as compared
22 to Fedoruk's results, did you do anything to verify
23 or -- or assess the validity of Fedoruk's results?
24 Or did you take them at face value?
25    A.  I didn't do, for example, any, you know,

1  recalculation or any, you know, separate
2  experiments to try to -- to do any validation of
3  his results, no.
4     Q.  Okay.  Did you do anything to determine
5  whether or not the results that are listed in his
6  paper are consistent with one another?
7        (Court Reporter comment.)
8        MR. DuPONT:  Form.
9     A.  Help me understand the question.
10       Are you referring to, say, the comparison
11 that he did between the different levels of benzene
12 concentration in -- in the mineral spirits and the
13 results?
14       Is that what you are wondering about?
15    Q.  What I'm -- what I'm asking -- to really
16 just get to the point is, were there -- there
17 were two substudies in the Fedoruk paper; right?
18 There was a review of results in the unspiked
19 sample of solvent, and, then, there was a set of
20 results for the spiked sample of solvent.  And
21 there were results in both of those studies for
22 breathing zone, perimeter -- all the different
23 sampling media that they used.
24       Do you recall seeing that in the Fedoruk
25 paper?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1    A.  Yeah.  Right.  He had personal samples,
2  and he had area samples.  I do remember seeing
3  that, yeah.
4    Q.  Did you do anything to assess whether or
5  not the results that were shown across all those
6  media in the -- first study, the -- the
7  unspiked study -- were consistent or in line with
8  the results that are seen in -- in the second
9  study, the spiked study?
10      MR. DuPONT: Objection.  Form.
11    A.  Only in -- in, sort of, a qualitative
12  sense in that, you know, the air levels that he
13  reported in the work that was done at the lower
14  benzene concentration, those air levels were lower
15  than the air levels that were found using the
16  higher benzene concentration.
17      So, you know, in, sort of, a qualitative
18  sense, I would say that I felt that there was
19  consistency within his data, yeah.
20    Q.  Okay.  And -- and, then, did you do
21  anything to assess whether or not the parts washer
22  that was used in the Fedoruk study was the same or
23  similar to or different from the parts washers
24  described by Mr. Rhyne?
25    A.  I didn't really have the -- you know,

1  exactly the same level of detail from Rhyne's
2  testimony as was reported in Fedoruk.  You know,
3  Fedoruk had dimensions and everything else.
4      But just on, you know, a descriptive
5  basis, the configuration sounded to be similar.
6    Q.  Okay.  All right.  Really quick going to
7  the appendix in -- in your report.
8    A.  Okay.
9    Q.  A little earlier you spent some time
10  looking at the ones that have to do with fresh
11  mineral spirits parts washing involving a 5-gallon
12  bucket.
13      Would I be correct in saying that none of
14  those reports have anything to do with
15  Safety-Kleen?
16    A.  Well, the -- you know, discussion that we
17  had around his recollection -- around Rhyne's
18  recollection was, he reported that he went to the
19  painters and -- and got a bucket of Varsol.  And so
20  that was the identifying information that I had for
21  that particular process.
22    Q.  That's fine.
23      And -- and so that's all you were thinking
24  about or all you were analyzing when you did the
25  ART modeling for fresh mineral spirits parts

1  washing, right, was the testimony you just
2  referenced?
3    A.  And are you -- I guess I'm trying to
4  understand --
5      MR. DuPONT: I think he's trying to ask
6  you: The fresh mineral spirits parts washing in a
7  bucket was not from the Safety-Kleen parts washing
8  machine.
9    A.  Oh, is that -- is that the question?
10    Q.  That's the question.
11    A.  Okay.  Well, given that he reported that
12  he got the -- the Varsol from the painters, you
13  know, I -- I'm going to say I think it's probably
14  reasonable that that wasn't coming from the
15  Safety-Kleen product stream.
16    Q.  Okay.  So -- and I think, just to be
17  perfectly clear, the only modeling you did with
18  respect to Safety-Kleen and parts washers related
19  to Safety-Kleen was ART modeling; right?
20    A.  That is correct, yeah.
21    Q.  Okay.  And all of the ART modeling that
22  relates to Safety-Kleen is contained in the balance
23  of these ART reports, the ones that say "benzene
24  from parts washing," 18 June, '19?
25    A.  That's right.  That's correct, yeah.

1    Q.  Why do these reports say "Exposures as
2  calculated in LeBlanc 2018"?
3    A.  Oh, I -- that's just a note that I put in
4  there to myself, because what I did was, you know,
5  take -- took a look, 'cause what she had done is
6  carried over the information that was presented by
7  Fedoruk about the conditions in the room, and the
8  -- the size of the -- of the tank and whether it
9  was fully enclosed.  You know, those inputs that we
10  talked earlier on the modeling, you know, the
11  inputs to the ART system.
12      So that's -- that was the note that I just
13  added there just to remind myself where that came
14  from.
15    Q.  And -- and you referenced "her."
16      You're talking about who?
17    A.  Oh, I'm sorry, I'm talking about that
18  paper by LeBlanc.
19    Q.  I think you said somebody carried this
20  over.
21    A.  Oh, I -- well, in -- in the LeBlanc paper,
22  taking a look at the model inputs that were used
23  for ART, they were the same conditions that were
24  reported from the workplace that Fedoruk -- that --
25  where he did the sampling.

86 (Pages 338 to 341)

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1    Q.  Okay.  And so you applied those same
2  parameters to your modeling of Mr. Rhyne's
3  exposure?
4        MR. DuPONT:  Form.
5    A.  Well, I -- I adjusted, you know, where
6  there were differences, but I think, for the most
7  part, those were the same, yeah.
8    Q.  All right.  So to speed this up, as far as
9  I can tell -- correct me if I'm wrong -- all of the
10  ART modeling you did that bears on safety cleaning
11  included both near field and far field; correct?
12        MR. DuPONT:  Form.
13    A.  That's correct, yeah.
14        MR. DuPONT:  I'm sorry.
15    Q.  Would the same thing be true here that you
16  -- you had said earlier that you -- you wouldn't
17  need to do far field with respect to the parts
18  washing modeling?
19        (Court Reporter comment.)
20    A.  I think in a case like this, you know,
21  given where he was, you know, doing this, you know,
22  I -- I wouldn't rule out that there couldn't have
23  been secondary exposure sources, and that's what I
24  was trying to address, you know, by including that
25  far-field contribution.

1        But, you know, the -- these could be
2  recalculated using just the near-field approach.
3    Q.  Secondary exposure sources being other
4  parts washers containing something associated with
5  Safety-Kleen or -- or other sources of exposure?
6        MR. DuPONT:  Form.
7    A.  Yeah, I was thinking more of other sources
8  of benzene exposure in general.
9    Q.  And so if you included that as far-field
10  exposure in these models of Mr. Rhyne's exposure to
11  parts washers enclosing something with Safety-Kleen
12  in it, you're actually including nonSafety-Kleen
13  exposures; right?
14        MR. DuPONT:  Form.
15    A.  Yeah, what I was trying to model was
16  the -- his exposure during, you know, the
17  parts-washing process.  And so if there is
18  contribution from -- from other sources, it
19  wouldn't have to be from -- you know, attributable
20  to Safety-Kleen.
21    Q.  But if you were trying to attribute a
22  specific amount of exposure to Safety-Kleen, we
23  couldn't use these reports on their face, could we?
24  We'd have to back out all that secondary stuff that
25  has nothing to do with Safety-Kleen; right?

1        MR. DuPONT:  Object to form.
2    A.  Yeah, and I -- I guess it's just a
3  difference -- I wasn't really trying to do the
4  calculation in such a way that attributed something
5  uniquely to that product.  I was looking at his
6  exposure, you know, overall in the environment
7  where he was doing the parts washing.
8    Q.  So how -- how can you then use these
9  reports that are in your appendix that say,
10  "benzene from parts washing" to attribute a
11  specific amount of Mr. Rhyne's alleged exposure to
12  a Safety-Kleen product with any specificity?
13    A.  I see your point.  Okay.
14        Well, in this -- in this case, you know,
15  if there was a big contribution, you know, from
16  another source, it -- it would be -- or whatever
17  the contribution is -- if there is a contribution
18  from another source -- it would be nested under the
19  mineral-spirits-part-washing category.
20    Q.  Nested meaning -- meaning what?
21        Then, how would we interpret your report
22  if we just wanted to find out what exposure can
23  actually be attributed to Safety-Kleen to a
24  reasonable degree of scientific certainty?
25    A.  Oh, well, the -- you know, and which I

1  could -- I could certainly do this.  I could go
2  back and -- and recalculate and -- and, you know,
3  just estimate -- just model only the contribution
4  from the part-washing source, the near field where
5  he was working, and not include the far-field
6  contribution.
7    Q.  But -- but can we do that?
8        Can we identify, to a reasonable degree of
9  scientific certainty, Mr. Rhyne's exposure to
10  Safety-Kleen only using your report as it exists
11  right now?
12    A.  I think it's -- it's a -- it's a good
13  estimate, a good modeled estimate, but it could be
14  refined if -- if the calculation were done in a
15  different approach, yeah.
16    Q.  But a good estimate is different from
17  something that is reasonable to a degree of
18  scientific certainty; right?
19        I mean, would you stand behind this and
20  say this report is exactly what Mr. Rhyne's
21  exposure was to Safety-Kleen?
22        MR. DuPONT:  Well, you just asked two
23  different questions.  You asked reasonable degree
24  of scientific certainty, and the exact exposure.
25        MR. BENDER:  You're right.  I'll rephrase

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1  that.
2      Q.  Could you under oath tell a Court or a
3  jury right now that what is in this report
4  represents, to a reasonable degree of scientific
5  certainty, what Mr. Rhyne's exposure was to any
6  given Safety-Kleen product only?
7      A.  I would have to say, you know, that the
8  approach that I took to the modeling didn't
9  uniquely target the contribution from the
10 Safety-Kleen product.  It was the exposure overall
11 as a result of the parts-washing process, which --
12 where there could have been other sources of
13 exposure.
14     MR. BENDER:  All right.  Thank you, sir.
15 That's all I have.
16     MR. DuPONT:  Very quickly -- no, this
17 is going to be it, 'cause we're leaving.
18     THE PHONE:  Andrew, is that you?  I can't
19 tell.  I'm sorry to talk over you.  I don't want to
20 let you go if I haven't gone yet.
21     MR. DuPONT:  Who is this?
22     MR. DIXON:  This is Josh Dixon for
23 Satogran.
24     MR. DuPONT:  How much time do you have?
25     MR. DIXON:  Five, ten.

1      MR. DuPONT:  Let's take a break.
2      (Recess was taken.)
3      MR. DuPONT:  We're on the record.  It's 5
4  o'clock.  I'm opening up questioning to people on
5  the phone.
6            EXAMINATION
7  BY MR. DIXON:
8      Q.  I have some questions for you regarding
9  the statements in the report regarding the outdoor
10 work with the father.
11     A.  Okay.
12     Q.  You state on page 31 of your report that
13 you conservatively estimated that Mr. Rhyne you put
14 that one-third of the time he worked on the family
15 cars.
16        Do you see that?
17     A.  Yeah.  I'm looking right now, yeah.
18     Q.  How did you come up with that one-third
19 time number?
20     A.  I'm trying to remember.  He was asked
21 about, you know, the overall work process and how
22 many times -- you know, he worked on the car with
23 his father once a month about six or seven hours
24 each time -- I'm just looking at the notes here --
25 how he used the Kutzit it.

1      And I estimated that -- and I think this
2  was as a result of -- of the responses that he gave
3  to the questions, that he didn't use Kutzit every
4  time.  He didn't always remove the gaskets.
5      And so that -- I think he -- he may have
6  used that figure of one-third.  I don't remember
7  the exact language in the deposition, but that was
8  what I used to recognize that he didn't always use
9  Kutzit.
10     Q.  If he did not say that he used Kutzit
11 one-third of the time, would you admit that this is
12 speculation?
13     MR. DuPONT:  Objection.  Form.
14     A.  Well, I haven't looked at his, you know,
15 deposition, but, you know, this would be my
16 estimate, you know, which I would -- you know,
17 which I used for the calculation.
18     I don't remember if he was specifically
19 asked about this or not.
20     Q.  So if he wasn't specifically asked about
21 it, how did you come up with the one-third
22 estimation?
23     A.  Well, that -- that was my value that I
24 estimated as -- as a reasonable frequency for the
25 kinds of work that he described doing on these

1  cars.
2      Q.  But how did you arrive at that
3  information?
4      MR. DuPONT:  Just asked and answered.
5      Q.  You can answer, Doctor.
6      A.  Yeah, I mean he --
7      MR. DuPONT:  He did answer it.
8      A.  He -- he -- well, if you take a look at
9  the kind of work that he was doing where he wound
10 up removing gaskets, he was, you know, taking off
11 the valve covers, he was taking off the oil pan
12 gaskets.  So he clearly didn't do that every time
13 that he worked on the car, but I thought it was a
14 reasonable estimate to say, Well, those were kinds
15 of tasks that he would have done about a third of
16 the time.
17     Q.  Okay.  On that same page you described
18 your methodology for the ART model; correct?
19     A.  That's correct.
20     Q.  And that's at the very bottom of page 31.
21     And as you describe it in the last two
22 paragraphs of page 31, you assume that took Mr.
23 Rhyne 30 minutes to apply the Kutzit and then
24 another 60 to scrape it off the automotive head
25 gasket, the oil pan gasket he was working on; is

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC  Document 234-1  Filed 04/28/20  Page 89 of 97

1 that right?
2    A. Yeah, I believe that was, you know,
3 information that he provided in his deposition.
4    Q. Okay. And, then, in the appendix -- we've
5 looked at this already -- but the hard backup or
6 detail, it states that he was in the near field for
7 this entire 90 minutes; correct?
8    A. I'm just --
9    Q. I'm looking now on here -- go ahead.
10    A. Yeah, I'm just taking a look right now.
11 (Witness reviews document.)
12    Yeah, that -- that's the duration I used
13 was that 90-minute period.
14    Q. Okay. So the near-field exposure in the
15 ART model is based on exposure data for people
16 continuously staying in the same place -- or at
17 least staying in the near field while using the
18 product; correct?
19    A. Yeah, the idea would be that he was, say,
20 somewhere around in about a 3-foot radius of the
21 part that he was working on.
22    Q. Okay. And on page 3 of that appendix, the
23 data source is referred to as the "Spreading of
24 glue"; right?
25    A. Well, see, that's in the Bayesian model

1 adjustment. So that was the scenario that they
2 derived the information for that they -- that they
3 used for the adjustment, yeah.
4    Q. Okay. But applying Kutzit to an
5 automotive gasket is not similar to spreading glue;
6 is it?
7      MR. DuPONT: Objection. Form.
8    A. Well, it -- you know, I think -- no, I
9 mean, it's not identical. I would just point out,
10 you know, this is one of those cases where, by
11 doing the Bayesian adjustment, it actually lowered
12 the exposure from the mechanistic model; and so it
13 -- this is a case where -- where, again, I chose
14 the lower value.
15    Q. Okay. Have you ever read the product
16 description of how Kutzit is supposed to be used?
17    A. I remember seeing the information on the
18 labels in some of cans. I don't know if I've
19 actually -- I don't recall the actual product use
20 instructions.
21    Q. I'll represent to you the -- the
22 instructions or the directions are to let the
23 product soak in for 15 to 30 minutes between the
24 initial application and the scraping stops.
25    If that's the case, isn't it true that

1 this number -- the number that came up in the ART
2 model -- would overestimate the exposure?
3      MR. DuPONT: Objection. Form.
4    A. Are you referring to the length of time
5 that he let the Kutzit sit there in 15 minutes
6 versus 30? Is that --
7      MR. DuPONT: No, he's saying what the
8 label says, not what Mr. Rhyne actually did.
9    Q. No.
10    What I'm saying is that, if the product
11 were applied, there would be no reason for the
12 individual to stand there over the product, and
13 watch it work. He could walk away --
14      MR. DuPONT: Objection.
15    Q. -- while the product worked.
16    If that happened this would -- your
17 estimates would overestimate the exposure; correct?
18      MR. DuPONT: Objection. Form.
19    A. Well, if he -- if he didn't stay, you
20 know, right at the -- you know, in the location
21 where he was doing the work, and, you know, he went
22 in the house to watch TV or something, yeah, he
23 wouldn't -- he wouldn't be, you know, close to the
24 source of exposure, so his exposure would be lower.
25      MR. DuPONT: Of which there's no evidence.

1    Q. So the ART model assumes a person is
2 standing within 3 feet of the application for the
3 full 90 minutes; is that correct?
4    A. Yeah, that's -- that's the way the model
5 operates. It's estimating the exposure in -- in
6 that near-field range.
7    Q. Okay. Do you know the surface area for a
8 V8 automotive head gasket?
9    A. Well, I remember seeing them in the
10 distant past when I worked on cars, but I -- I
11 don't know that I could really give you a good, you
12 know, point estimate of that.
13    Q. Would approximately 100 square centimeters
14 seem reasonable to you?
15      MR. DuPONT: Objection. Form.
16    A. Let's see. That's about 10 centimeters by
17 10 centimeters? I -- that might be -- that might
18 be a little on the small side. I really, you know,
19 wouldn't --
20      MR. DuPONT: Don't guess.
21    A. -- feel comfortable trying to guess at
22 that.
23    Q. Okay. The -- as I understand it here --
24 and I'm looking now on page 2 of the Kutzit
25 appendix -- the ART model simulation uses a

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC Document 234-1 Filed 04/28/20 Page 90 of 97

1  scenario based on application of surface area of .1
2  to .3 square meters; is that right?
3      A.  That's right, yeah.
4          (Attorneys Fishkin and Schultz left
5          the room and joined via telephone.)
6      Q.  That's between a thousand and 3,000 square
7  centimeters; right?
8      A.  I think that's -- that's right, yeah.
9      Q.  So if these assumptions in the ART model
10 assume that the product was applied to a minimum
11 square surface area of a thousand square
12 centimeters and the real situation is closer to 110
13 square centimeters, isn't it likely that the model
14 overestimated exposure?
15         MR. DuPONT:  Lacks foundation.
16         There's no evidence that it was the size
17 you're saying it was.
18     Q.  I'd like you to assume, Doctor, that the
19 square centimeterage of an automotive head gasket
20 is 110 square centimeters, isn't it true that this
21 model would overestimate exposure?
22     A.  Well, you know, and I -- I don't really
23 know the size of area for -- for an automobile head
24 gasket, but in answer to your question, if the area
25 that was actually -- you know, where the Kutzit was

1  applied is -- is smaller, then -- then there would
2  be less exposure.
3      Q.  Okay.  And -- and here in the hypothetical
4  I've just posed, it would be significantly smaller;
5  right?  I've posed the hypothetical of 110 square
6  centimeters.  The ART data had the smallest size
7  being 1,000 square meters; right?
8          MR. DuPONT:  Objection.  Form.
9      A.  That's -- that's what the situation -- you
10 know, that's what the model calls out, yeah.
11     Q.  And so the overstatement in my
12 hypothetical is close to a factor of 10-fold;
13 right?
14         MR. DuPONT:  Objection.  Form.  Lacks
15 foundation.
16     A.  Yeah, and I -- you know, I don't really
17 know what the effect of that would be on the
18 ultimate exposure that's calculated.  I'd have to,
19 you know, try that in the model, put a different
20 area in there, and see how big the effect is.
21     Q.  For the -- I'm looking now at the same
22 page where it says, "Spreading of liquid at
23 surfaces or work spaces."
24         Do you see where I am on the second page
25 of the appendix?

1      A.  Yes, I do.
2      Q.  Is there a -- a category for work pieces
3  that are smaller than that that you could have
4  entered?
5      A.  You know, I'd have to take a look at it.
6  Just sitting here right now, I actually don't
7  remember if it is or not.
8      Q.  Okay.  Are you aware of an approximately
9  how long it takes for a person to scrape a softened
10 head gasket following the application and
11 soaking-in time for Kutzit?
12         MR. DuPONT:  Objection.  Form.
13     A.  Well, as I recall, I mean, I think he was
14 asked about that.  I thought he -- I thought he
15 said it took about an hour.
16     Q.  If the total scraping time actually took
17 approximately 5 minutes, you would agree that that
18 would reduce the exposure significantly; correct?
19         MR. DuPONT:  Objection.  Form.
20     A.  Well, I'm looking in -- in the report --
21 you know, again, I don't have his deposition right
22 in front of me.  But, you know, what I said in the
23 report was scraping the gaskets took over an hour.
24 And -- and that, you know -- you know, that must
25 have come from his deposition.  You know, that --

1  that would be the source of that information.
2      Q.  Right.  I'm just asking you to assume that
3  instead of an hour it took five minutes.
4          And, then, the question is you would agree
5  that that would reduce the exposure to benzene;
6  correct?
7          MR. DuPONT:  Objection.  Form.  Incomplete
8  hypothetical.
9      A.  Yeah, well, the -- the duration of time
10 that he spent, you know, in the -- contact with the
11 material would -- would have an impact on the level
12 of his exposure.
13     Q.  Right.  And it would decrease it based on
14 the decrease in time; correct?
15         MR. DuPONT:  Incomplete hypothetical.
16 Form.
17     A.  Yeah, the -- the time would be lower and
18 -- and so would the exposure level.
19     Q.  Okay.  Thank you.
20         I want to talk now about the work at
21 Setzer Buick.
22     A.  Okay.
23     Q.  Give me a second.
24         Based on your prior testimony, my
25 understanding of your methodology here is that you

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1   used an ART model for the exposure of working on
2   cars for home use, but for Setzer's and Duke, the
3   estimation was based on the Young 1978 study; is
4   that correct?
5       A.  That is correct, yeah.
6       Q.  Was the Young study data generated by
7   evaluating indoor or outdoor use, if you know?
8       A.  It -- it was indoor.  It was in a -- I
9   think a two-car garage, a two-door garage.
10      Q.  And do we -- do you have any information
11  as to whether Mr. Rhyne's work at Setzer was
12  indoors or outdoors?
13      A.  I'm trying to remember what he said about
14  the -- the workplace at Setzer.  You know, it's a
15  mechanic shop.  So, you know, I thought it was
16  reasonable to assume that it was that work done
17  indoors.
18      Q.  If it was -- some of the work was done
19  outdoors, would that change your values that you
20  arrived at --
21          MR. DuPONT:  Objection.
22      Q.  -- for the exposure at Setzer?
23          MR. DuPONT:  Form.  Incomplete
24  hypothetical.
25          Are you suggesting that Mr. Rhyne

1   testified that he used Kutzit outdoors at Setzer?
2           MR. DIXON:  I'm simply asking a
3   hypothetical question of the expert.
4       A.  You know, I haven't done the comparison of
5   between -- I guess we could -- you know, what his
6   levels were when he did the work outdoors, versus
7   what the model predicted.  But if there were better
8   ventilation outdoors, you know, it wouldn't be
9   unreasonable to say that the exposures could have
10  been lower.
11      Q.  Okay.  Thank you, Doctor.
12          There was -- according to your expert
13  report the formula for Kutzit changed; correct?
14      A.  That's my understanding, yes.
15      Q.  Okay.  And it looks like the formula
16  change -- or at least there's evidence of a formula
17  change that occurred right around the time of the
18  calendar year turning from 1973 to 1974; right?
19          MR. DuPONT:  Objection.  Form.  Misstates
20  the evidence.
21      A.  I have to -- to look at this.  My -- you
22  know, the way I approached it was I, you know,
23  assumed that the Kutzit that he used through 1974
24  was the older Kutzit that contained benzene, and
25  the Kutzit that he used starting in 1975 was the --

1   the product that had replaced it with toluene.
2       Q.  And why did you make that assumption,
3   Doctor?
4       A.  Well, there's some data -- and, then, I'll
5   try to see if I can find the right pages in the
6   report here where I talked about what I had in the
7   record about the composition of Kutzit.
8           Let me just try to find that here.
9   (Witness reviews document.)  You know, I think I --
10  I think I must have it in the --
11      Q.  If it helps you, Doctor, I'm looking at on
12  page 17 of your report.
13      A.  Yeah, it does.  Thank you.  I was just
14  trying to sort out the pages here.
15          Yeah, there was information, you know,
16  that I -- that was provided to me about the timing
17  of the replacement and -- and the changes in the
18  formulation.  And so on that basis, I, you know,
19  felt that this cut date using -- using a cutoff of
20  1974 as -- as being the end date for that
21  benzene-containing material in use, and that the
22  new formulation would have been what he used
23  starting in 1975, I thought that was -- that was a
24  reasonable point to -- to draw that distinction.
25      Q.  Drawing your attention to -- to page 17,

1   the -- towards the bottom -- or the end, rather, of
2   the second full paragraph, do you see the sentence
3   that begins -- the one after footnote 203 in the
4   main text, and "Savogran inventory records indicate
5   that the blend of benzene and acetone was used
6   until February 28th, 1974"?
7       A.  I do see that, yeah.
8       Q.  Does that mean that the benzene was no
9   longer used after that date?
10      A.  Well, my -- my interpretation of that
11  record would be that, with the manufacturing
12  process that was in place after that date, the new
13  formula was being formulated, the new -- the new
14  toluene-containing formula was being prepared.  And
15  so my rationale, though, for thinking that the end
16  of '74 is a good cut-point time is that there would
17  have been been product that was in -- in the
18  marketplace -- you know, was in the product stream,
19  and that that, you know, we could say was -- was
20  being used until it was depleted at the end of '74.
21      Q.  You don't know how long product sat on the
22  shelf in 1974; correct?
23      A.  I don't really have any information in the
24  record about that.  That's -- you know, I tried to
25  make a -- a conservative assumption that by the end

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830

1 of '74, it had all been moved out.
2    Q. Okay. And you don't know whether or not
3 this particular entity, Setzer, acquired product
4 directly from Savogran; right?
5    A. This would be Setzer's?
6    No, I really -- I don't remember seeing
7 anything in there about what -- what the source of
8 the Kutzit was.
9    Q. Okay. So if Setzer purchased product
10 directly from Savogran such that they didn't buy
11 off the shelf, isn't it plausible that the product
12 could have sold to Setzer as early as March 1st,
13 1974?
14    MR. DuPONT: Objection. Form.
15    Q. The new mixture I mean.
16    MR. DuPONT: Objection. Form. Incomplete
17 hypothetical.
18    You're also contradicting what your client
19 says.
20    A. You know, I -- I really, you know, I mean,
21 it's kind of a speculation on my part, I guess, to
22 know, you know, what the inventory practice is and
23 -- and how they would have approached it.
24    Q. For purposes of generating exposure
25 opinions after that change, you state -- or you

1 assume that the Kutzit used by the plaintiff in
2 1975 at Setzer contained 20 to 2 -- sorry -- 25 to
3 50 percent volume by weight; correct?
4    A. That's right, yeah.
5    Q. And where did you get that -- on what do
6 you base that assumption?
7    A. I'd have to go back -- you know, I'd --
8 just sitting here right now, I'm -- I'm not sure I
9 can recall exactly where that came from. They, you
10 know, clearly got rid of the -- the benzene
11 content. And I -- I do recall information I saw in
12 the record that toluene was the replacement, but I
13 -- I can't point you to a -- an exact document
14 right here.
15    MR. DIXON: That's all the questions I
16 have. Thank you.
17    MR. CAIRONE: One minute, just because --
18 on Exhibit 12, okay?
19    FURTHER EXAMINATION
20 BY MR. CAIRONE:
21    Q. Doctor, can you look at Exhibit 12?
22    A. Yeah.
23    Q. This is the exhibit where you changed at
24 least part of your exposure assessment; correct?
25    A. This is where I revised the Kroil.

1    Q. Yeah. I just want to make it clear for
2 the record that that also changes your conclusion
3 on page 44 of your report.
4    So if you could look at page 44, the
5 current report says, "The total mean cumulative
6 benzene exposure Mr. Rhyne experienced ranged from
7 8.86 to 34.44 ppm-years, with a midpoint estimate
8 of 19.77 ppm-years"; correct?
9    A. That's what it says now, yeah.
10    Q. And that's not right anymore, is it?
11    A. No, and that's why -- you know, I don't
12 know exactly what the right maneuver would be, if I
13 should do an errata sheet or another revision.
14    Q. Well, I'd just like to ask you the
15 question.
16    A. Oh sure.
17    Q. So based on Exhibit 12, that opinion now
18 would be the total mean cumulative benzene
19 exposures Mr. Rhyne experienced ranged from 8.79 to
20 27.48 ppm-years, with a midpoint estimate of 18.135
21 ppm-years, which is what I calculated -- you're --
22 you're free to check that midpoint, but everything
23 I said is correct, subject to your verifying that
24 midpoint.
25    Do you agree with me?

1    A. Yeah, I think.
2    My calculation of the midpoint -- well,
3 I'd have to -- I'd have to calculate it, but I take
4 that, you know, since you did the calculation.
5    Q. But you do agree with me now that the
6 range is from 8.79 to 27.48 ppm-years; correct?
7    A. That's -- that's what I calculated to,
8 yeah.
9    MR. CAIRONE: Okay. Thank you, Doctor.
10    EXAMINATION
11 BY MR. DuPONT:
12    Q. Doctor Herrick, I just need to be clear
13 about a couple of things.
14    When you talk about flammability
15 assumptions, you're talking about the vapor in the
16 air not the liquid itself; right?
17    A. That's right, I did.
18    Q. All right. So -- I don't know, US Steel
19 was attempting to suggest that a flash point of 25
20 degrees Fahrenheit meant that if Liquid Wrench was
21 used on something that was hotter than 25 degrees
22 Fahrenheit, that would create a fire hazard, but
23 obviously things that are 25 degrees Fahrenheit are
24 below freezing; right?
25    A. 25? Yeah.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1   Q.  Okay.
2   A.  Yeah.
3   Q.  So that would suggest that anything that
4  Liquid Wrench was used on that wasn't frozen would
5  create a fire hazard, which makes no sense; right?
6       MR. CAIRONE:  Object to the form.
7  Leading.
8   A.  Well, that was why I was trying to -- in
9  answer -- you know, to answer his question or
10  respond, I was trying to redirect it more around
11  the flammable limits, 'cause that's -- that's
12  really the meaningful concept when it comes to the
13  fire risk.
14   Q.  Right.  It's -- it's what's -- it's the
15  vapor concentration in the air that matters; right?
16   A.  It's --
17       MR. CAIRONE:  Objection.  Leading.
18   A.  -- yeah, 'cause it's the vapor that burns;
19  correct.
20   Q.  For example, if there was another document
21  concerning the Liquid Wrench product that showed
22  that there was an autogenous ignition temperature
23  of 309 degrees -- 390 degrees Celsius, which is
24  actually over 700 degrees Fahrenheit that discussed
25  the temperature at which combustion in the air

1  would occur from the vapors of the product, that's
2  more along the lines with your opinion about the
3  lower flammability limit of benzene in a product.
4       MR. CAIRONE:  Leading.
5   A.  That's -- that's a more related concept
6  than the flash point we were talking about, yeah.
7   Q.  Okay.  And if the other hydrocarbons in
8  the Liquid Wrench -- like ethyl benzene and hexane
9  and xylene and cyclohexane -- had similar lower
10  flammability limits to them as benzene, then those
11  other aromatic hydrocarbon would not greatly reduce
12  the lower flammable limit for benzene; correct?
13       MR. CAIRONE:  Form.  Form and leading.
14   Q.  Based on -- for Liquid Wrench, based on
15  benzene.
16       MR. CAIRONE:  Same objection.
17   A.  No, I think, you know, it's -- those are
18  all pretty chemically and physically similar
19  materials.  And so they're -- they're all in that
20  same range of flammability.
21   Q.  All right.  So basing the feasibility of
22  Mr. Rhyne using Liquid Wrench in the way he and his
23  coworker, Mr. Couch, testified about using Liquid
24  Wrench in the pipe prefab shop, basing that off of
25  the flash point wouldn't be the correct way to

1  look; is that fair?
2       MR. CAIRONE:  Leading.
3   A.  Yeah, I mean, just in -- in that specific
4  case, but also in general terms of thinking about
5  the risk of fire or explosion, it's really the
6  upper and lower flammable limits that are -- that
7  are the relevant metrics.  It's not the -- the
8  flash point.
9   Q.  All right.  The Fedoruk study -- so this
10  is clear -- when they took the sample of mineral
11  spirits, it was -- actually, strike that.
12       In the Fedoruk study when they found 9
13  parts per million benzene, that was on recycled
14  parts-washing solvent; right?
15   A.  That's my recollection of their
16  discussion, yeah.
17   Q.  And that was sourced in California; right?
18   A.  It was, yeah.
19   Q.  Okay.  And you've seen many data points
20  from the ATSDR, published peer-reviewed literature
21  that shows that there are much higher quantities of
22  benzene in mineral spirits, which was the basis of
23  the Safety-Kleen parts washing solvent; fair?
24   A.  That's a fair --
25       MR. BENDER:  Objection to form.

1   Q.  And you've seen data from the Southwest
2  Research Institute study that there was benzene
3  emitted from Varsol at levels that exceeded a part
4  per million?
5   A.  I have seen it --
6       MR. SCHULTZ:  Object to the form.
7   Q.  And you referred to -- earlier in your
8  testimony -- a NIOSH HETA study by Kaiser and
9  McManus that was using a mineral spirits-type
10  product that caused exposures to benzene over a
11  part per million?
12       MR. SCHULTZ:  Object to the form.
13   A.  Yeah.  I have seen that report, yes.
14   Q.  All right.  So when you look at 58 parts
15  per million in parts washing solvent that is, as
16  you said, at the low end of the representative
17  benzene content of the mineral spirits?
18       MR. SCHULTZ:  Object to the form.
19   A.  I'm sorry.  Could you repeat that?
20       I didn't follow the question completely.
21   Q.  So 58 parts per million benzene in mineral
22  spirits is at the low end of what one would assume
23  the mineral spirits benzene content would be.
24   A.  Well, that's what I tried --
25       MR. SCHULTZ:  Same objection.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 94 of 97

f80149dc-3ac9-479f-a949-3cf0ea58afb8

1    A.  That's what I tried to reflect by using
2  the range that I did, yeah.
3    Q.  All right.  The McGuire-approved chemicals
4  list that listed Tap Magic or Rapid Tap, that
5  didn't say that Tap Magic and Rapid Tap were
6  available for use in the pipe fab shop during the
7  period 1976 to 1979; correct?
8        MR. CAIRONE:  Leading.
9    A.  There's -- there's no information in that
10  inventory about where the products were used in the
11  -- in the -- in the plant.
12    Q.  Or that they were used in the plant in
13  1976 to 1979; correct?
14        MR. CAIRONE:  Leading.
15    A.  No it's, it's a point-in-time inventory
16  document, it looks like.
17    Q.  Okay.  And I want to be clear.
18        And your report accounts for this, but
19  after Mr. Rhyne transferred to the Catawba plant,
20  he continued to go back to McGuire and perform
21  maintenance work there; is that fair?
22    A.  That is fair.  He did go out on those
23  outages.
24    Q.  Okay.  With respect to the testing that
25  was conducted on archive samples of Kroil product,

1  are there concerns that one should have about
2  testing archived samples of product?
3        MR. JEFFRIES:  Objection.
4    A.  Yeah, and I haven't really seen, you know,
5  details about the methodology.  I've seen the
6  certificates of analysis, but it would really be
7  important to know how they assured sample integrity
8  over the time, especially since some of those
9  samples, if they were taken from the '80s, you
10  know, the material was over 30 years old.
11        And so it would really be important to
12  know how they -- how they verified that that was
13  still the -- you know, that that was still a valid
14  sample.
15    Q.  All right.  And what would you do to
16  verify that it was still a valid sample?
17    A.  Well, going back in time, it would be kind
18  of hard, unless they had some analysis from the
19  time when the sample was actually archived and they
20  could compare the results of that analysis with the
21  analysis that's being done today.
22        I mean, I've done this kind of stuff in
23  some of my research, and what we do, if you're
24  going to archive a sample, is you take the
25  chemical and the ingredient that you're interested

1  in analyzing, and add a known quantity of that
2  material to the sample, then put it into the
3  archive, and when it's removed 10 years later -- or
4  whatever time later to do the analysis -- you check
5  to see how much of that known amount is still
6  there.
7    Q.  When gas chromatograph testing is done on
8  a product, what volume of liquid is actually
9  tested?
10    A.  It's microliters.  It's a very tiny
11  amount.
12    Q.  And should one also test the headspace,
13  meaning the area between the top of the liquid and
14  the top of a container within a product to see what
15  amount of benzene evaporated into that area?
16        MR. JEFFRIES:  Object to the form of the
17  question.
18    A.  Well, I think especially if you were
19  looking at a -- a mixture that included volatile
20  fractions like benzene, you would want to know how
21  much of it was present in the headspace, yeah.
22    Q.  And you'd also want to know whether the
23  archive sample was kept in a way that the benzene
24  didn't evaporate off of it?
25        MR. JEFFRIES:  Object to the form.

1    A.  Yeah, that's, kind of, what I was getting
2  at in terms of sort of trying to establish the
3  integrity of the sample.  You know, how was it
4  stored?  What kind of conditions was it stored
5  under?  What kind of containers was it stored in?
6    Q.  Now, assuming that there are records from
7  Safety-Kleen indicating that there was problems
8  with their product stream being contaminated with
9  things like gasoline and Liquid Wrench that would
10  increase the benzene content of the parts washing
11  solvent beyond just what was in mineral spirits,
12  that's also something that can be considered in
13  determining the benzene content of the parts
14  washing solvent?
15    A.  Yeah --
16        MR. BENDER:  Objection to form.
17    A.  -- you know, given the description of --
18  of how people, you know, use the parts washers, you
19  know, that it was not unusual that old solvent was
20  dumped in there or gasoline was dumped in there,
21  things like that.  So the benzene content isn't
22  uniquely a property of the mineral spirits
23  themselves.
24    Q.  All right.  And to be clear, when Mr.
25  Rhyne's skin came into contact with products that

1  he described using, such as Liquid Wrench or Kutzit
2  or mineral spirits, was there dermal absorption of
3  benzene?
4     A.  Oh, yeah.  And I tried to say that in the
5  report; that, you know, it's -- everyone agrees
6  that skin, you know, can be a significant route of
7  exposure.  And he reported, you know, having dermal
8  exposure.
9       In fact, at some points he -- I think he
10  mentioned he had trouble playing basketball because
11  his fingers were cracked as a result of his
12  exposures at work.
13       So there's definitely dermal uptake, which
14  is what I tried to say in the report.
15     Q.  And have there been studies, for example,
16  on mechanics that have found that 80 percent of
17  their benzene exposure came from the dermal route?
18     MR. CAIRONE:  Leading.
19     A.  Well, there's a very substantial
20  literature out there on dermal uptake of benzene,
21  and so that -- and that's one of the findings
22  that's included in that, yeah.
23     Q.  So your calculations of Mr. Rhyne's
24  benzene exposure is -- actually underestimated his
25  benzene exposure because you didn't calculate

1  the -- the dermal uptake?
2     A.  That's correct, yeah.
3     MR. DuPONT:  Okay.  Those are all the
4  questions I have.
5     MR. BENDER:  This is Mr. Bender.  I have
6  one quick one.
7         FURTHER EXAMINATION
8  BY MR. BENDER:
9     Q.  Doctor Herrick, Mr. DuPont just asked you
10  a hypothetical question about Safety-Kleen having
11  the quote/unquote "problem with its solvent
12  stream."
13       Did you review any documents that would
14  support that hypothetical in preparing this report
15  in this case?
16     A.  I'm trying to think.  I -- I don't
17  remember a specific document that I -- that I saw
18  for this case, no.
19     MR. BENDER:  Okay.  Thank you.  That's all
20  I have.
21     MR. DuPONT:  Actually, I think the term
22  Safety-Kleen uses is that we are losing control or
23  lost control of our product stream, if you want to
24  be specific.
25     Q.  (By Mr. Bender)  Well, Doctor, did you see

1  anything like that and consider it in preparing the
2  report?
3     A.  No, I don't recall factoring that in.
4     MR. BENDER:  Thank you.
5     MR. DuPONT:  I'm sure Counsel has a memo
6  if he wants to read it for you.
7     (Whereupon the deposition ended at
8     5:36 p.m.)

1  Commonwealth of Massachusetts
2  Middlesex, ss.
3
4
     I, P. Jodi Ohnemus, Notary Public
5  in and for the Commonwealth of Massachusetts,
    do hereby certify that there came before me
6  on the 6th day of November, 2019, the deponent
    herein, who was duly sworn by me; that the ensuing
7  examination upon oath of the said deponent was
    reported stenographically by me and transcribed
8  into typewriting under my direction and control;
    and that the within transcript is a true record of
9  the questions asked and answers given at said
    deposition.
10
11    I FURTHER CERTIFY that I am neither
    attorney nor counsel for, nor related to or
12  employed by any of the parties to the action
    in which this deposition is taken; and, further,
13  that I am not a relative or employee of any
    attorney or financially interested in the outcome
14  of the action.
15
    IN WITNESS WHEREOF I have hereunto set my
16  hand and affixed my seal of office this
    10th day of November, 2019, at Waltham.
17
18
      &lt;%6433,Signature%&gt;
19
    P. Jodi Ohnemus, RPR, RMR, CRR
20    CSR, Notary Public,
    Commonwealth
21    of Massachusetts
    My Commission Expires:
22    3/14/2021
23
24
25

95 (Pages 374 to 377)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  610-434-8588  ~  302-571-0510 ~ 202-803-8830
Case 3:18-cv-00197-RJC-DSC   Document 234-1   Filed 04/28/20   Page 96 of 97

| | |
|---|---|
| 1    Andrew DuPont, Esquire | 1    Rhyne, Bruce v. U.S. Steel |
| 2    adupont@lockslaw.com | 2    Robert F. Herrick , Sc.D., CIH, FAIHA (#3611003) |
| 3             November 12, 2019 | 3        ACKNOWLEDGEMENT OF DEPONENT |
| 4    RE: Rhyne, Bruce v. U.S. Steel | 4    I, Robert F. Herrick , Sc.D., do hereby declare that I |
| 5    11/6/2019, Robert F. Herrick , Sc.D., CIH, FAIHA (#3611003) | 5    have read the foregoing transcript, I have made any |
| 6      The above-referenced transcript is available for | 6    corrections, additions, or changes I deemed necessary as |
| 7    review. | 7    noted above to be appended hereto, and that the same is |
| 8      Within the applicable timeframe, the witness should | 8    a true, correct and complete transcript of the testimony |
| 9    read the testimony to verify its accuracy. If there are | 9    given by me. |
| 10    any changes, the witness should note those with the | 10 |
| 11    reason, on the attached Errata Sheet. | 11    _____ _____ |
| 12      The witness should sign the Acknowledgment of | 12    Robert F. Herrick , Sc.D., CIH, FAIHA   Date |
| 13    Deponent and Errata and return to the deposing attorney. | 13    *If notary is required |
| 14    Copies should be sent to all counsel, and to Veritext at | 14        SUBSCRIBED AND SWORN TO BEFORE ME THIS |
| 15    cs-midatlantic@veritext.com | 15        _____ DAY OF _____, 20___. |
| 16 | 16 |
| 17    Return completed errata within 30 days from | 17 |
| 18    receipt of testimony. | 18    _____ |
| 19    If the witness fails to do so within the time | 19    NOTARY PUBLIC |
| 20    allotted, the transcript may be used as if signed. | 20 |
| 21 | 21 |
| 22        Yours, | 22 |
| 23        Veritext Legal Solutions | 23 |
| 24 | 24 |
| 25 | 25 |

1    Rhyne, Bruce v. U.S. Steel
2    Robert F. Herrick , Sc.D., CIH, FAIHA (#3611003)
3       E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10    PAGE_____ LINE_____ CHANGE_____
11    _____
12    REASON_____
13    PAGE_____ LINE_____ CHANGE_____
14    _____
15    REASON_____
16    PAGE_____ LINE_____ CHANGE_____
17    _____
18    REASON_____
19    PAGE_____ LINE_____ CHANGE_____
20    _____
21    REASON_____
22
23    _____  _____
24    Robert F. Herrick , Sc.D., CIH, FAIHA   Date
25

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830