## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| BRUCE RHYNE and JANICE RHYNE,<br><br>            Plaintiffs,<br><br>v.<br><br>UNITED STATES STEEL CORPORATION, et al.,<br><br>            Defendants. | Civil Action No.: 3:18-cv-00197 |

## DEFENDANT SAFETY-KLEEN SYSTEMS, INC.'S
## REPLY IN FURTHER SUPPORT OF MOTION TO EXCLUDE
## THE TESTIMONY, OPINIONS, AND REPORT OF DR. ROBERT HERRICK

Defendant Safety-Kleen Systems, Inc. ("Safety-Kleen") respectfully submits this Reply Memorandum of Law in Further Support of the Motion pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) To Exclude the Testimony, Opinions, and Report of Plaintiffs' Expert Dr. Robert Herrick (the "Motion").

The Motion established that Dr. Herrick's conclusion-driven methodology contained in his report (the "Report") and deposition is unscientific, unreliable, and warrants exclusion under Federal Rule of Evidence 702 and *Daubert*, 509 U.S. 579, because Dr. Herrick: (1) failed to consider real-world testing data, produced in discovery, before using a model, ECF 201, Motion at 18-20; (2) selected unrepresentative data from a study that manipulated the samples by adding pure benzene, *id.* at 16-18; (3) failed to isolate Mr. Rhyne's exposures by product, *id.* at 21-23; (4) used an inapplicable exposure model, *id.* at 6-10; and (5) modeled exposures from products Mr. Rhyne did not use, while ignoring others he did use, *id.* at 13-16.

In the opposition (the "Opposition" or "Opp.")[1], Plaintiffs (1) falsely accuse Defendants'

expert of bias to distract from Dr. Herrick's failure to consider available real-world data, *see* Opp.

at 18-19; (2) make unsupported claims about the benzene data Dr. Herrick relied on, *see* Opp. at

14-17; (3) distort scientific literature *absent* from Dr. Herrick's Report and testimony in an attempt

to salvage the ART model, *see* Opp. at 5-7; (4) fail to explain why Dr. Herrick included

unsubstantiated exposures and excluded substantiated ones, *see* Opp. at 11-14; and (5) fail to show

Dr. Herrick validated his results.  *See* Opp. at 21-23.  Indeed, Dr. Herrick conceded these defects

in his analysis at deposition, and Plaintiffs do nothing to refute his admissions.

In fact, Plaintiffs' position is so tenuous that they had Dr. Herrick produce an untimely and

improper supplemental expert report in the form of a 21-page declaration (the "Herrick

Declaration"), that did not include any information that could not have been included in the original

Herrick Report when it was disclosed.  Plaintiffs cannot now attempt to use the Herrick Declaration

to remedy the inadequacies of the original Herrick Report.

I.      **THE HERRICK DECLARATION IS AN IMPROPER AND UNTIMELY,
        SUPPLEMENTAL EXPERT REPORT AND SHOULD BE DISREGARDED**

Unable to defend Dr. Herrick's unreliable and methodologically flawed Report and

deposition testimony, Plaintiffs instead attempt to rescue Dr. Herrick's inadequate and

inadmissible opinions by supplementing his original Report, for the first time, in Plaintiffs'

Opposition, with the Herrick Declaration. *See* ECF 226-1, Herrick Declaration.  The Herrick

Declaration includes statements and opinions by Dr. Herrick that could and should have been

---

[1]      Plaintiffs' Opposition is, in fact, Plaintiffs' *third* attempt to oppose Safety-Kleen's Motion.
Plaintiffs did not file their Opposition until April 29, 2020, triggering a May 6 deadline for this
brief.  ECF 239.  This reply brief is thus timely.  ECF 159, Amended Pretrial Order and Case
Management Plan, ¶ D ("Replies to responses, if any, must be filed within seven (7) days of the
date on which the response is filed."); ECF 180 at 16 (same); LCR 7.1(e) (same)).

included in Dr. Herrick's original Report but were not. The Herrick Declaration is thus an improper, untimely attempt to supplement Dr. Herrick's flawed Report in response to Defendants' Motion, in violation of Rule 26(e). *See S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 599 (4th Cir. 2003) (affirming exclusion of plaintiff's untimely supplemental expert report); *see also* Ex. 1, *Rojas v. Marko Zaninovich, Inc.*, No. 1:09-CV-00705, 2011 WL 4375297, at *6 (E.D. Cal. Sept. 19, 2011) (striking supplemental expert report and declaration because the information was available at the time of the original reports).

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure specifically requires that expert witness disclosures be accompanied by a report. Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). While Rule 26(e) "requires supplementation when a 'party learns that in some material respect the information disclosed is incomplete or incorrect' . . . . **The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions**." *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) (quoting Rule 26(e)(1)) (emphasis added). Rule 26(e) is not a device to allow an expert to engage in additional work to perfect a litigation strategy. Ex. 2, *Cochran v. Brinkmann Corp.*, No. 1:08-CV-1790-WSD, 2009 WL 4823858, at *5 (N.D. Ga. Dec. 9, 2009), *aff'd sub nom.*, 381 F. App'x 968 (11th Cir. 2010).

A violation of Rule 26 warrants **automatic and mandatory** exclusion, unless the violation was justified or harmless. *See* Fed. R. Civ. P. 37(c)(1); Ex. 3, *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *5 (S.D. Fla. June 2, 2016). An expert declaration submitted in response to a *Daubert* motion is not justified or harmless. *Companhia Energetica Potiguar*, 2016 WL 3102225 at *8 (finding untimely declaration not harmless where filed after discovery and *Daubert* motions); *see also* Ex. 4, *Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 3:06-CV-1352, 2009 WL 5873112, at *4 (D. Conn. Feb. 23, 2009) (finding "untimely

self-serving [expert opinion] supplementation . . . neither substantially justified nor harmless"); *See* Ex. 5, *Lightfoot v. Georgia-Pac. Wood Prod., LLC*, No. 7:16-CV-244-FL, 2018 WL 4517616, at \*7 (E.D.N.C. Sept. 20, 2018) (noting the issue for defendant's motion to strike was that plaintiff's expert declaration was drafted in response to *Daubert* motions and not to correct errors or omissions in the original report or deposition).

The Fourth Circuit has a five-factor analysis to assess whether a failure to supplement is justified or harmless: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence. *S. States Rack And Fixture, Inc.*, 318 F.3d at 597.

Dr. Herrick's report is dated September 17, 2019 and his deposition was on November 6, 2019, roughly five to seven months before the Herrick Declaration. Despite the criticisms in Defendants' October 18, 2019 expert reports and adduced at Dr. Herrick's deposition, Plaintiffs have, even now, failed to supplement Dr. Herrick's report in accordance with Rules 26 and 37. Plaintiffs' counsel's attempt to submit Dr. Herrick's declaration more than half a year after Defendants 'experts criticized Dr. Herrick's original analysis in their reports and only in response to Defendants' *Daubert* motion, is a transparently improper attempt to sidestep Rule 37(c)(1) of the Federal Rules of Civil Procedure and should be disregarded. *See* Ex. 6, *Southern v. Bishoff*, 675 F. App'x 239, 249 (4th Cir. 2017) (prohibiting plaintiffs from relying on supplemental affidavits submitted two months after the discovery deadline); Ex. 7, *Earhart v. Countrywide Bank, FSB*, No. 3:08-CV-238-RJC, 2009 WL 2998055, at \*6 (W.D.N.C. Sept. 15, 2009) (striking appraisal report and affidavit submitted after summary judgment); Ex. 5, *Lightfoot*, 2018 WL

4517616, at *6 ("Courts distinguish 'true supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship. . . .").

Paragraphs 7 through 35 of the Herrick Declaration attempt to address the Motion and fail to discuss **any** information in this case that could not have been included in Dr. Herrick's original Report. In fact, all Dr. Herrick does is identify, summarize, and then try to refute arguments in the Motion. *See, e.g.*, ECF 226-1, Herrick Decl., ¶¶ 8, 15, 17, 18, 19, 25, 31. For example, paragraphs 7 through 18 purportedly explain why the ART model is reliable, all opinions he should have expressed in his Report or deposition (if at all). *See* ECF 226-1, Herrick Decl., ¶¶ 7-18.

The only additional information Dr. Herrick offers is in paragraph 35, where he provides a calculation in response to a question from his deposition **more than five months ago**. *See* ECF 226-1, Herrick Decl., ¶ 35. This self-serving "supplement" is not permitted. Ex. 2, *Cochran*, 2009 WL 4823858, at *5 (holding Rule 26(e) is not device for expert to perform additional work or perfect litigation strategy); *Jones Creek Investors, LLC v. Columbia Cnty.*, 98 F. Supp. 3d 1279, 1289 (S.D. Ga. 2015) (holding Rule 26(e) prohibits supplementation to add points that could have been made in original expert report or to shore up inadequacies); Ex. 1, *Rojas*, 2011 WL 4375297 (striking untimely supplemental report where information was available at time of initial report).

The Herrick Declaration is thus an improper backdoor attempt to extend Plaintiffs' Opposition 21 additional pages beyond the page limits set forth in Local Rule 7.1(d), which they already tried to skirt by moving to file a 43-page brief on April 21, 2020. ECF 212. *See* Ex. 3, *Companhia Energetica Potiguar*, 2016 WL 3102225, at *4 (striking plaintiff's untimely supplemental expert report as merely response to defendant's *Daubert* motion and improper extension of opposition).

In *Companhia Energetica Potiguar*, plaintiff filed a post-discovery, post-report expert declaration in support of its opposition to defendants' *Daubert* motion. Ex. 3, 2016 WL 3102225, at *1. There, as here, plaintiff filed the declaration solely to respond to arguments in defendants' *Daubert* motion. *Id.* at *2. The court struck the declaration as a late supplemental report because: (1) it did not address any new information; and (2) plaintiff filed it after the close of discovery, after summary judgment motions, and after defendants filed their *Daubert* motions in reliance on the expert's prior report and deposition testimony. *Id.* at *8-9. The situation here is the same.

Here, Plaintiffs forecast no intent to supplement Dr. Herrick's Report during expert discovery, even though Defendants raised numerous issues with his Report at deposition and through their own experts' reports. *See* Ex. 5, *Lightfoot*, 2018 WL 4517616, at *8 (finding surprise where plaintiff forecast no intention to supplement his expert's report, despite issues raised at deposition and in defendants' expert reports). The difficulty in curing the surprise also weighs in favor of striking the Herrick Declaration, as expert discovery is closed, reports have been submitted, depositions are complete, and trial is now only months away. *Id.*; *see also* Ex. 3, *Companhia Energetica Potiguar*, 2016 WL 3102225, at *8. Moreover, Defendants filed *Daubert* motions in reliance on Dr. Herrick's Report and depositions. Ex. 5, *Lightfoot*, 2018 WL 4517616, at *8 (finding defendants severely hampered in curing surprise because they filed *Daubert* motions in reliance on plaintiffs' experts' original reports and depositions). The ability to cross-examine an expert at trial is **not** a cure. *S. States Rack And Fixture, Inc.*, 318 F.3d at 598.

Dr. Herrick discusses no information about the case in his Declaration that could not have been discussed in his original Report. His Declaration is dedicated to justifying his model and responding to criticisms in the Motion, thus satisfying the fourth factor set forth in *S. States Rack And Fixture, Inc.,* 318 F.3d at 597. *See Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741-43 (7th

Cir. 1998) (affirming exclusion of untimely "supplemental" expert testimony because opinions were based on information available prior to close of discovery). Lastly, Plaintiffs have no credible justification for their failure to disclose any of the information or opinions in Dr. Herrick's Declaration until now, given that, "if defendants' arguments were all faulty as plaintiff contends, then plaintiff ought to have been able to rely upon the original expert reports and deposition testimony to defeat them." Ex. 5, *Lightfoot*, 2018 WL 4517616, at *9. The Herrick Declaration is an untimely and improper supplemental report that should be stricken. *See S. States Rack And Fixture, Inc.*, 318 F.3d at 599; Ex. 3, *Companhia Energetica Potiguar*, 2016 WL 3102225, at *5; Ex. 4, *Innis Arden Golf Club*, 2009 WL 5873112, at *4; Ex. 1, *Rojas*, 2011 WL 4375297, at *6.

## II.   DR. HERRICK FAILED TO CONSIDER REAL-WORLD DATA

The Motion established that Dr. Herrick could have had, but chose not even to ask for, real-world air-monitoring data on the product at issue, information he also **admitted** could have been useful to have: "I mean, it could have been useful. I mean, I had the impression that they didn't have, you know, a lot of air sampling and industrial hygiene measurements, for example." *See* Motion at 18-20 (quoting ECF 201-3, Herrick Dep. Tr. at 187:14-188:7). Indeed, Safety-Kleen produced real-world air-monitoring data on its 105 Solvent collected by industrial hygienists with the National Medical Advisory Service ("NMAS"). *See* ECF 201, Motion at 18-19; *see also* ECF 201-18, NMAS 105 Solvent Risk Assessment (produced as SKS-RHYNE-001236-001847).

Real-world air-monitoring data is described as "the gold standard for occupational hygiene compliance testing of exposure limits." *See* Ex. 8, Savic, et al., *Comparing the Advanced REACH Tool's (ART) Estimates With Switzerland's Occupational Exposure Data*, 61 Annals of Work Exposures and Health 954, 954-62 (2017) (cited in Opp. at 6 and ECF 226-1, Herrick Decl. at ¶17). Dr. Herrick's failure to evaluate that data is a basic methodological flaw that renders his

opinions inadmissible under *Daubert*. *See* ECF 201-16, *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152 JD, 2018 WL 276324, at *6 (N.D. Ind. Jan. 3, 2018) ("When an expert 'ignores critical data' in forming his opinions, he fails to satisfy Daubert."). Faced with Dr. Herrick's fundamentally flawed analysis, Plaintiffs turn to: (1) an empty accusation of bias; (2) a vague accusation that NMAS was performed for an insurance company, though it plainly was not; and (3) an unsupported allegation that the NMAS data is not representative of occupational benzene exposure from parts washing. *See* Opp. at 18-19.

### A. NMAS Is Not Biased Because One Of The Researchers Was Retained As An Expert Twenty-Five Years Later

Plaintiffs claim the NMAS data is biased because one of the researchers, John Spencer, CIH, is retained by Safety-Kleen as an expert here. *Id.* Plaintiffs' accusation of bias is unavailing, as they fail to actually identify any flaws with the NMAS data or evaluation. *See generally* Opp. at 18-19. In reality, the NMAS researchers strictly adhered to Occupational Safety and Health Administration ("OSHA") and National Institute for Occupational Safety and Health ("NIOSH") guidelines for air-monitoring. *See* ECF 201-18, NMAS 105 Solvent Risk Assessment at 8-10. Further, all air samples were analyzed by an American Industrial Hygiene Association accredited laboratory in accordance with OSHA or NIOSH methodology and all lab results were provided. *Id.* at 10. Additionally, the NMAS researchers convened a scientific advisory panel of occupational medicine physicians, an oncologist, toxicologists, and a biostatistician to review the data and make recommendations. *Id.* at 82. Plaintiffs provide no insight into how a study published in 1995 could be biased as a result of Mr. Spencer's retention **twenty-five years** later. The reason is simple: the NMAS professionals were studying real-life air quality so Safety-Kleen could better understand its product. *Id.* at 1. That the results were favorable speaks to the quality and safety of 105 Solvent, not some unidentified bias as alleged by Plaintiffs' counsel.

**B. NMAS Was Retained By Safety-Kleen, Not An Insurance Company**

Plaintiffs assert that NMAS performed the 1995 evaluation for Safety-Kleen's insurance company. Opp. at 18. Their only purported support for this false accusation is a quote from the Building Health Sciences ("BHS") division on NMAS's website, stating it provides "our insurance clients with a diverse and defensible array of claims consulting services." *See* Opp. at 18, n. 28. Plaintiffs' reference to the BHS division website reflects either an intentional misrepresentation or a complete failure to read and navigate the NMAS website and the NMAS study documents.

The 1995 NMAS study plainly states it was performed for Safety-Kleen. *See* ECF 201-18, NMAS 105 Solvent Risk Assessment at title page (SKS-RHYNE-001236). Second, over 60 industrial hygiene logs, all signed by Mark Nealley, CIH (a co-author of the NMAS evaluation), *see id.* at 86, plainly state, "**NMAS ENVIRONMENTAL SCIENCES/OCCUPATIONAL HEALTH DIVISION**." *Id.* at Appendices A-D (SKS-RHYNE-001402-1527). NMAS's BHS division is never referenced, and Plaintiffs have no basis to assert that the 1995 study was performed through that division. In any event, the 1995 NMAS evaluation was a broad ranging occupational health evaluation. *See* ECF 201-18, NMAS 105 Solvent Risk Assessment at 1 (stating evaluation's purpose was to identify potential health hazards and effects of 105 Solvent under "standard work practice conditions"). Further, Dr. Herrick never expressed this unfounded criticism of the NMAS evaluation in his Report, at deposition, or in his untimely and improper Declaration. Plaintiffs' argument should be rejected on this basis alone. *See Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 860 (E.D. N.C. 2015) (rejecting explanation for expert's failure to include studies where the expert "did not offer this as his reason for rejecting these studies").

### C. NMAS Evaluated The Same Product, Use, And Time Period At Issue Here

Plaintiffs also claim, without any support, that the NMAS data does not represent Mr. Rhyne's use of and exposure to Safety-Kleen solvent. *See* Opp. at 18-19. In reality, the NMAS data is the most representative available. Mr. Rhyne alleges that he used Safety-Kleen 105 Solvent in 1991 to wash metal parts in an industrial facility, *see* ECF 201-2, Herrick Report at 12; the NMAS data is actual air monitoring of 105 Solvent in 1991 used by workers washing parts in industrial facilities, *see* ECF 201-18, NMAS 105 Solvent Risk Assessment at 1-4, 37-44. The NMAS researchers also collected air-monitoring samples from 105 Solvent used at eleven automotive facilities, which would have been highly representative of Mr. Rhyne's unsubstantiated exposures to 105 Solvent prior to his work at Duke Power. *Id.* at 1-4, 11-37. Plaintiffs' argument that the NMAS data is not representative of Mr. Rhyne's exposure or a typical worker's exposure lacks support in the facts, science, and law. *See* ECF 201-18, NMAS 105 Solvent Risk Assessment at 1 (stating NMAS observed 105 Solvent exposures under "standard work practice conditions").

A model's purpose is to accurately estimate real-world results. *See* ECF 201-7, Jody Schinkel, et al., *Reliability of the Advanced REACH Tool (ART)*, Vol. 58, No.4, Ann. Occup. Hyg. 450, 450-51 (2014). Dr. Herrick had access to real-world data on the product he was attempting to model and failed to consider it. *See* ECF 201, Motion at 18-19. **No industrial hygienist in an academic or professional setting would ignore this data**. *See* Ex. 8, Savic, *supra*, at 955. Dr. Herrick's failure is unjustifiable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *see also* ECF 201-16, *Zimmer, Inc.*, 2018 WL 276324, at *6.

## III. DR. HERRICK'S CONCLUSION-DRIVEN ANALYSIS LED HIM TO CHERRY-PICK UNREPRESENTATIVE DATA

The Motion showed that Dr. Herrick neglected actual data on the benzene content of Safety-Kleen 105 Solvent and cherry-picked data from a study that spiked mineral spirits with pure benzene to reach a target concentration of **"approximately 50 ppm greater than the standard amount present in recycled solvent**." *See* ECF 201-17, Fedoruk et al., *Benzene Exposure Assessment for Use of a Mineral Spirits-Based Degreaser*, 18 Applied Occup. and Envtl. Hygiene 764, 768-69 (2003) (emphasis added); ECF 201-2, Herrick Report at 26.

In their Opposition, Plaintiffs make inaccurate statements about Fedoruk (2003), reference irrelevant, non-Safety-Kleen data without explaining its relevance, and fail to justify Dr. Herrick's exclusion of data on Safety-Kleen 105 Solvent. *See* Opp. at 14-18; ECF 201-2, Herrick Report at 24-5; ECF 201-3, Herrick Dep. Tr. at 326:9-22. Plaintiffs downplay the relevance of testing data on Safety-Kleen 105 Solvent within just miles of Mr. Rhyne's alleged exposure, and suggest that a single data point in one risk assessment performed at a single Safety-Kleen facility some 3000 miles away is meaningful, despite no evidence at all linking that single data point to Mr. Rhyne's alleged exposure. *See* Opp. at 18, citing ECF 226-10, Operational Risk Assessment.

In reality, the data Dr. Herrick dismisses without analysis was independent testing data of 105 Solvent showing a benzene level of 32.7 ppm, or 43.6 percent lower than the 58 ppm figure from the spiked and unrealistic results of the Fedoruk study. *See* ECF 201-2, Herrick Report at 24-5; ECF 201-3, Herrick Dep. Tr. at 326:2-22; Opp. at 15; ECF 201-17, Fedoruk, *supra* at 764. Dr. Herrick also ignored additional, real-life benzene testing data produced to Plaintiffs in discovery on 105 Solvent from numerous Safety-Kleen facilities, including Lexington, South Carolina, that showed the average benzene concentrations came nowhere near the 58ppm he opted to use. *See* ECF 201, Motion at 18; ECF 201-5, Recycled 105 Composite Data and Samples.

**A. Dr. Herrick Assumed Benzene Levels For Safety-Kleen 105 Solvent From A Study That Intentionally Spiked Mineral Spirits With Pure Benzene**

The Motion detailed the unreliability of Dr. Herrick's assumption that a benzene concentration of 58 ppm for his modeling using the Fedoruk (2003) study was appropriate, instead of more realistic and reliable figures. *See* ECF 201, Motion at 16-18.

Plaintiffs claim that the mineral spirits analyzed in Fedoruk (2003) were from southern California, which according to Plaintiffs means they contained a lower benzene content than the mineral spirits Mr. Rhyne used. *See* Opp. at 17. Plaintiffs do not support this contention and Fedoruk (2003) does **not** identify the source of the mineral spirits. *See* ECF 201-17, Fedoruk, *supra* at 765. While the study was performed in "greater Los Angeles," *see* Opp. at 17, n. 24 (quoting ECF 201-17, Fedoruk, *supra* at 765), that does not identify the source **or** benzene content of the mineral spirits, though Dr. Herrick made that speculative leap at deposition. *See* ECF 201-3, Herrick Dep. Tr. at 219: 7-17, 327:22-25 ("One is that he [Fedoruk] did it in California in 2003 – I think is when he actually did the experiment. **And so getting the mineral spirits, you know, as his starting point, it was <u>probably</u> California**, low benzene . . . **what I'm <u>imagining</u> is that he was using mineral spirits that he was able to access locally**. . . .") (emphasis added). This type of imaginative speculation does not satisfy *Daubert*. Furthermore, independent benzene testing data showed that 105 Solvent at Safety-Kleen's Reedley, California facility has a **higher** benzene concentration than in Lexington, South Carolina. *See* ECF 201-5, Recycled 105 Composite Data and Samples.

Plaintiffs also claim the authors of Fedoruk (2003) spiked the solvent to 58 ppm "to represent a <u>more realistic</u> benzene content of the product." Opp. at 17 (emphasis in original). This statement is contrary to Fedoruk (2003) which says the exact opposite: "**[s]tudy 2 involved spiking the product to a target benzene concentration of approximately 50 ppm greater than**

the <u>standard amount</u> **present in recycled solvent.**" *See* ECF 201-17, Fedoruk, *supra* at 768-69 (emphasis added). Plaintiffs ignore this clear language in favor of stating their baseless beliefs. *See* Opp. at 17.

The impropriety of using Fedoruk (2003) to support Dr. Herrick's conclusions is plain from the study's conclusion that "cleaning parts using a recycled mineral spirits–based solvent in an open warehouse setting **did not result in exposures in excess of the current occupational exposure limit of 0.5 ppm averaged over 8 hours for solvent benzene content between 9 and 58 ppm**." *See* ECF 201-17, Fedoruk, *supra* at 764. Both Plaintiffs and Dr. Herrick fail to explain why he ignored this conclusion. But the answer is simple: the actual conclusion of Fedoruk (2003) is inconsistent with Dr. Herrick's conclusion-driven analysis; somehow Dr. Herrick's model, purportedly using the same 58 ppm benzene number, produced benzene numbers five times greater than the actual air monitoring in Fedoruk (2003). *See* ECF 201, Motion at 23; ECF 201-8, Spencer Report at 39. Dr. Herrick's conclusions-first analysis is methodologically flawed, improper, and must be disregarded.

Plaintiffs also claim that Defendants argue Dr. Herrick should have adopted the 9 ppm figure in Fedoruk (2003) from the pre-spiked mineral spirits. *See* Opp. at 17. Neither Defendants nor their experts made this argument. *See* ECF 201, Motion at 16-18. The Motion simply notes that the baseline benzene level in Fedoruk (2003) was 8 to 9 ppm before it was spiked. Motion at 16-17. John Spencer, Defendants' expert, utilized 36.5 ppm in his analysis, and nowhere did anyone suggest 8-9 ppm is the appropriate starting point. *See* ECF 201, Motion at 16-17.

**B. Dr. Herrick Ignored Real-World Representative Benzene Testing Data For Safety-Kleen 105 Solvent Without Explanation**

The Motion demonstrated not only that Dr. Herrick used the 58 ppm value from Fedoruk (2003), but that he ignored **actual, real-world** testing data on 105 Solvent. *See* Motion at 17-18.

Real-world testing shows the 58 ppm relied on by Dr. Herrick was inflated anywhere from 80% (32.1 to 58 ppm) to 157% (22.5 to 58 ppm) to as much as 271% (15.6 to 58 ppm). *See* Motion at 18. Dr. Herrick's failure to consider this data warrants exclusion. *See* ECF 201-16, *Zimmer, Inc.*, 2018 WL 276324, at *6 ("When an expert 'ignores' critical data in forming his opinions, he fails to satisfy Daubert."); *see also In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) (excluding expert for ignoring relevant evidence and inconsistently selecting data).

Plaintiffs dismiss the Lexington, South Carolina data by claiming there is no evidence that facility serviced Mr. Rhyne's employer. *See* Opp. at 17-18. Plaintiffs ignore that Safety-Kleen's industrial hygienist, John Spencer, plainly stated the Lexington facility serviced Mr. Rhyne's employer. *See* ECF 201-8, Spencer Report at 23. Plaintiffs also ignore that the next closest facility after Lexington was over 500 miles away in Hebron, Ohio. *See* ECF 201-18, NMAS 105 Solvent Risk Assessment at SKS-RHYNE-001754 (reproducing Safety-Kleen Parts Washer Solvents Study – Major Component Characterization).

Even putting aside the Lexington data, Dr. Herrick ignored actual testing data from numerous other facilities in the United States – **all** demonstrating average benzene concentrations well below 58 ppm. *See* ECF 201-5, Recycled 105 Composite Samples (Denton: 24.7 ppm, Dolton: 15.7 ppm, Lexington 32.1 ppm, and Reedley: 36.3 ppm). Only one facility in the United States, the Reedley, California facility, showed average benzene levels higher than Lexington, at 36.3 ppm, with two showing levels *lower* than Lexington (i.e. Safety-Kleen's experts did not select the most favorable data). *Id.* Safety-Kleen produced all of this data, but because of his conclusion-driven analysis, Dr. Herrick baselessly selected a manufactured, spiked data point of 58 ppm. *See* ECF 201-3, Herrick Dep. Tr. at 324:8-19.

Plaintiffs also try to support Dr. Herrick's conclusion-first analysis with a series of **unsupported** statements on the condition of solvent as it relates to pre- and post-recycling and the reduction of benzene content over time. *See* Opp. at 18. Plaintiffs also assert that because Kopstein (2011) said "regular mineral spirits" can range from 1,000 to 10,000ppm, Dr. Herrick was justified in selecting the spiked 58 ppm number, even though Kopstein was referring to observed benzene content in ExxonMobil Varsol and Texaco Texsolve S mineral spirits, not Safety-Kleen. *See* Opp. at 15-16; Ex. 9, Kopstein, et al., *Estimating Airborne Benzene Exposures from Air Monitoring Data for Mineral Spirits* 8 J. Occup. and Envtl. Hygiene 300, 301-02 (2011). Plaintiffs also ignore that Kopstein's references do not support his assertions; for example, Hunting (1995), cited to show mineral spirits can reach 10,000 ppm benzene, states that Varsol contains 10,000 ppm and was used "at one time," and then cites to a NIOSH health hazard evaluation. *See* Ex. 10, Hunting, et al., *Haematopoietic cancer mortality among vehicle mechanics*, 52 Occup. and Envtl. Med., 673, 677 (1995). Dr. Herrick testified that he has never seen the referenced NIOSH document, and despite working at NIOSH, is unaware of NIOSH ever taking a position that Varsol contains 1% (10,000 ppm) of benzene. *See* ECF 201-3, Herrick Dep. Tr. at 220:2-221:16.

Similarly, Carpenter (1975), cited by Kopstein (2011) to show mineral spirits can reach 1,000 ppm benzene, used a single sample from "one of the major American producers," and did not perform its own benzene testing, relying on data from the producer (with no details on the testing method). Ex. 11, Carpenter, et al., *Animal and Human Response to Vapors of Stoddard Solvent*, 32 Toxicology and Applied Pharmacology 282, 283-84 (1975).

Dr. Herrick acknowledged the testing data on Safety-Kleen 105 Solvent showing 32.7 ppm benzene, but tried to account for the "universe" of information by selecting the intentionally spiked 58 ppm from Fedoruk (2003) as a "safe value." *See* ECF 201-3, Herrick Dep. Tr. 326: 9-22; *see*

*also* ECF 201-2, Herrick Report at 24-6.  This position is nonsensical, unscientific, and exemplifies Dr. Herrick's conclusions-first analysis: Safety-Kleen is not the "universe" of mineral spirits, and it is inexcusable under *Daubert* to disregard data on the specific product at issue for data on products not at issue.  *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 634 (4th Cir. 2018) ("[r]esult-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."); *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 521 (S.D.W. Va. 2014) (holding that expert statement of disagreement with studies "[b]ecause that's not what I have seen, read, studied, observed, and that's not biologically plausible" is unreliable "[w]ithout further explanation").

Plaintiffs cite Opposition Exhibit 10, a draft risk assessment performed at Safety-Kleen's Reedley, California recycle center in 1997, and state the benzene content of **spent solvent** (after customer use) was 0.1% benzene and thus the Lexington documents on Safety-Kleen **recycled 105 Solvent** (before customer use) are of limited relevance.  *See* Opp. at 18.  This argument is another example of Plaintiffs trying to fix Dr. Herrick's analysis: Dr. Herrick never cited or mentioned this document in his Report or deposition.  *See* ECF 201-2, Herrick Report at 1-44; ECF 201-3, Herrick Dep. Tr.  at 1-376; *Yates*, 113 F. Supp. 3d at 860 (rejecting counsel's explanation for expert's failure to include studies where expert did not offer this as his explanation for the failure).

Plaintiffs also indulge in misdirection: **Plaintiffs omit the words "Reedley, California" from Exhibit 10's <u>title</u> in their citation** and relegate it to a footnote.  *See* Opp. at 18, n. 27.  The document on its face states "Reedley, California" and is clearly limited to that irrelevant facility.  Plaintiffs have provided no evidence otherwise.  Finally, the full version of the Assessment, which Plaintiffs fail to provide, states the **spent** solvent analyzed was a combination of three different

**spent** solvents, not just 105 Solvent, rendering the data irrelevant, given Plaintiffs' exclusive allegation of exposure to 105 Solvent. *See* Ex. 12, Draft Operational Health Risk Assessment, Safety-Kleen Recycling Center, Reedley, California September 29, 1997 at 18-19.

## IV.    DR. HERRICK IMPROPERLY RELIED UPON THE ART MODEL

The Motion established that the ART model is inappropriate for individual retrospective exposure assessments like the one Dr. Herrick performed here. *See* ECF, Motion at 6-10.

Plaintiffs respond with one opinion (from a different circuit) and a number of studies that fail to show the reliability of the ART model in an individual retrospective exposure scenario, let alone one involving mineral spirits and parts washing. *See* Opp. at 2-11. Not only were these studies **not** in Dr. Herrick's Report or deposition, but Plaintiffs cherry-picked snippets to support arguments that run contrary to the studies' actual findings and conclusions.

### A.    Dr. Herrick Utilizes ART For A Purpose That Is Not Scientifically Valid

The Motion established that the ART Model was developed for occupational exposure assessments on groups of workers to fulfill European Union legal requirements. *See* Motion at 7 (citing ECF 201-9, Kevin McNally, et al., *Advanced REACH Tool: A Bayesian Model for Occupational Exposure Assessment*, Vol. 58, No.5, Ann. Occup. Hyg. 551, 551-52 (2014)). In response, Plaintiffs argue the ART model is not limited to exposure groups in Europe, *see* Opp. at 3, though Dr. Herrick failed to make this point in his Report or at deposition where he explicitly stated that of the 2,500-3,000 data points used to calibrate the ART model, all were European exposure scenarios and **none were from the United States**. *See* ECF 201-3, Herrick Dep. Tr. at 86:19-87:12-25. Dr. Herrick failed to explain in his Report or at deposition how these data points are more relevant to Mr. Rhyne's alleged exposure than the real-world test data that was produced to Plaintiffs and therefore available to Dr. Herrick at the time he prepared his Report.

Plaintiffs also introduce a number of new studies (all but one of which were available when Dr. Herrick issued his original Report) to show the alleged accuracy of the ART model and its capacity for individual exposure assessments. *See* Opp. at 4-7. In reality, these studies: (1) state that ART is intended for large group exposure assessments across industries and workplaces; (2) identify major flaws in ART (among others); and (3) conclude that ART was simply the least inaccurate among a series of models that all need further study.

**The cited studies do not support ART's capacity for individual exposure assessments**. *See, e.g.*, Cherrie (2020) (stating ART "always represents an extensive group of workplaces" and operates "by first calculating an average exposure level that describes the situation in general and then to include the variation in exposures measured in a range of specific workplaces.")[2]; Landberg (2019) (stating that debate continues about ART's accuracy, when it should be used to assess exposure, and that ART may results in higher exposure estimates than other models)[3]; Spinazzè (2019) (concluding ART overestimates low exposures, and no complete evaluation exists, "suggesting the need for correct and harmonized validation")[4]; Lee (2019) (concluding ART can be used as "generic model" in Korea, but overestimates low exposures, resulting "in a significant decrease in the level of agreement with measured exposures . . . further studies are certainly needed to calibrate and refine the models. . . .")[5]; Spinazzè (2017) (single-page, five-paragraph abstract with no details of the methodology or data, stating ART may lead to more accurate results when

---

[2] Ex. 13, Cherrie, et al., *Exposure Models for REACH and Occupational Safety and Health Regulations*, 17 Int'l J. Envtl. Pub. Health 1, 3 (2020).
[3] Ex. 14, Landberg, et al., *Evaluating the Risk Assessment Approach of the REACH Legislation: A Case Study*, 63 Annals of Work Exposures and Health 68, 69-74 (2019).
[4] Ex. 15, Spinazzè, et al., *How to Obtain a Reliable Estimate of Occupational Exposure? Review and Discussion of Models' Reliability*, 16 Int'l J. Envtl. Pub. Health 1, 1-19 (2019).
[5] Ex. 16, Lee, et al., *Comparison of Quantitative Exposure Models for Occupational Exposure to Organic Solvents in Korea*, 63 Annals of Work Exposures and Health 197, 197-216 (2019).

well-documented exposure scenarios are available)[6]; Savic (2017) (stating ART "has only been tested on a limited amount of exposure data", concluding it overestimates low exposures, recommending "further, more comprehensive, investigations", and noting it is a "general model")[7]. These studies do not demonstrate ART's alleged superior accuracy, nor that ART is capable of reliable individual exposure assessments.

### B. The 2013 Massachusetts Opinion Cited By Plaintiffs Is Undermined by Subsequent Scientific Literature

Plaintiffs identified a single opinion, from outside the Fourth Circuit, to support their argument. *Milward v. Acuity Specialty Prod. Grp., Inc.*, 969 F. Supp. 2d 101 (D. Mass. 2013), *aff'd sub nom.*, 820 F.3d 469 (1st Cir. 2016) (affirming summary judgment, but **not** addressing ART model). Every one of the above studies concluding ART is a general model designed for large-scale workplace exposures that needs further research and refinement came out between 2017 and 2020, after *Milward* was decided. Furthermore, the most recent study, Cherrie 2020, explained that ART is designed for exposures on a macro level across workplaces in generic scenarios like, "'use of paint A for industrial spraying in workshop.'" Ex. 13, Cherrie, *supra* at 3. The literature does not support ART's use for individual exposure assessments. *See id.*; *see also* Ex. 16, Lee, *supra* at 215. Had these studies been available in 2013, the *Milward* decision may very well have been different, especially since the ART 1.5 model Dr. Herrick used came out after *Milward*. *See* ECF 226-1, Herrick Decl. at ¶15.

---

[6] Ex. 17, Spinazzè, et al., *Accuracy Evaluation of Three Modelling Tools for Occupational Exposure Assessment*, 61 Annals of Work Exposures and Health 284 (2017) [Plaintiffs only cite to the abstract available at https://www.ncbi.nlm.nih.gov/pubmed/28355416].
[7] Ex. 8, Savic, et al., *Comparing the Advanced REACH Tool's (ART) Estimates With Switzerland's Occupational Exposure Data*, 61 Annals of Work Exposures and Health 954, 954-62 (2017).

*Milward* acknowledged a 2012 study where the ART model overestimated exposures by almost a factor of three, but claimed imprecision is typical of models. *Milward*, 969 F. Supp. 2d at 107. Eight years later, this Court has the benefit of additional literature consistently concluding: (1) there are systematic overestimation issues with ART; (2) the ART model needs further study and refinement; and (3) it is designed for large-scale industry exposure assessments to comply with European regulations. ART's overestimation is not the typical imprecision that *Milward* noted and relied on, because ART's overestimation is **by design**. *See* Ex. 13, Cherrie, *supra* at 2-3; Ex. 8, Savic, *supra* at 955. ART is a "regulatory risk model" for companies to show the European Union that their products are regulatory-compliant even in worst-case scenarios. *See* Ex. 13, Cherrie, *supra* at 2-3; Ex. 8, Savic, *supra* 955. Lastly, nothing in *Milward* indicates that real-world data for the product in issue was produced like it was here. *See Milward*, 969 F. Supp. 2d at 105-08. Thus, the court in *Milward* was apparently not faced with one of the fundamental methodological flaws that exist here, where Dr. Herrick improperly ignored available real-world air-monitoring data in favor of modeling. *See* Ex. 8, Savic, *supra* at 955.

## C. The ART Model Is Not Generally Accepted for Individual Exposure Scenarios and Dr. Herrick Failed to Validate His Results

Plaintiffs and Dr. Herrick cite the *Milward* decision and EPA Guidelines for Human Exposure Assessment to suggest that ART is appropriate here. Opp. at 11; ECF 226-1, Herrick Decl., ¶ 13. Plaintiffs' references to the EPA Guidelines are cherry-picked and fail to mention the language stating that the focus of the Guidelines "is on human exposure to chemical agents in the **non-occupational environment**." *See* Ex. 18, EPA, *EPA Exposure Assessment Handbook, Chapter 19: Building Characteristics*, at xi-xiv (2019) (emphasis added). Given that Dr. Herrick used the ART model solely to model Mr. Rhyne's occupational exposures, the EPA Guidelines are irrelevant. *See* ECF 201-2, Herrick Report at 31-39.

The only other support Plaintiffs and Dr. Herrick identify for the proposition that ART has general acceptance is LeBlanc (2018), which Dr. Herrick co-authored. *See* Opp. at 11. This is **the only study** in Dr. Herrick's report and deposition analyzing the ART model, let alone its use for mineral spirits exposures. *See* ECF 201-2, Herrick Report at 26; *see also* ECF 201-3, Herrick Dep. Tr. at 255:9-21. Dr. Herrick neglects to mention that LeBlanc (2018) states, "[t]o our knowledge, **this study is the first application of the ART to worker exposures to vapors** emitted from low concentrations of a solvent/contaminant . . . **e.g., benzene in mineral spirits**. . . ." ECF 201-11, Mallory LeBlanc, et al., *Comparison of the near field/far field model and the advanced reach tool (ART) model V1.5: exposure estimates to benzene during parts washing with mineral spirits*, 221 Int'l J. of Hygiene and Envtl. Health 231, 235 (2018) (emphasis added). By definition, first instance is not general acceptance. *See* ECF 201, Motion at 9-10.

Plaintiffs' argument that Dr. Herrick validated his results is a confusing and circular argument that also fails. The Herrick Declaration states that Dr. Herrick has a more stringent definition of validation than both Defendants' industrial hygienist and the authors in LeBlanc (2018). *See* ECF 226-1, Herrick Decl., ¶¶ 27-8. However, Plaintiffs then contradictorily state that Dr. Herrick validated his results with Leblanc (2018) (despite the fact that Dr. Herrick *was* one of the authors in LeBlanc), the very study Dr. Herrick says does not meet his validation standard. *See* Opp. at 22. Plaintiffs and Dr. Herrick cannot criticize LeBlanc (2018) for failing to meet his validation standard, *see* ECF 226-1, Herrick Decl., ¶¶ 27-8, and then argue he validated his results with LeBlanc (2018). *See* Opp. at 22.

Plaintiffs also state Dr. Herrick validated his results with Fedoruk (2003), however, this is contradicted by Dr. Herrick's own testimony, *see* ECF 201-3, Herrick Dep. Tr. 255:9-21 (stating

the closest he came to validation is LeBlanc), and by the fact that Plaintiffs cite nothing to support

their statement.

## V.    DR. HERRICK ADMITTED HE FAILED TO ISOLATE PRODUCT EXPOSURES DESPITE OPINING ON EXPOSURES BY PRODUCT IN HIS REPORT

The Motion exposed Dr. Herrick's failure to isolate exposures on a product-specific basis

while simultaneously opining on individual product exposures in his Report.  *See* Motion at 21-

23.  In opposition, Plaintiffs state "**Dr. Herrick's modeling was a good estimate of Mr. Rhyne's**

**exposure to benzene from the Safety-Kleen parts washing machine**." Opp. at 21 (emphasis

added).  Confusingly, Plaintiffs then make the contradictory claim Dr. Herrick could have isolated

exposures but did not because it was more accurate to include nearby exposures to other products.

*Id.* at 20-21.  By definition, measuring exposure to Safety-Kleen and other products together is

less accurate for identifying Safety-Kleen exposure than measuring Safety-Kleen alone, a point

Dr. Herrick conceded at deposition:

> **Q.** And so if you included that as far-field exposure in these models of Mr. Rhyne's exposure to parts washers enclosing something like Safety-Kleen in it, you're actually including non-Safety-Kleen exposures; right?
>
> **A.** Yeah, what I was trying to model was the – his exposure during, you know, the parts washing process. And so if there is contribution from – from other sources, it wouldn't have to be from – you know, attributable to Safety-Kleen.

ECF 201-3, Herrick Dep. Tr. at 343:15-25.  As noted in the Motion, this approach unsurprisingly

inflated Dr. Herrick's product-specific exposure numbers. *See* Motion at 21-23.

Despite Dr. Herrick's admission that this approach was inaccurate, his Report represents

that he calculated separate, isolated exposures for each product.  *See* ECF 201-2, Herrick Report

at 31-43 (detailed breakdowns and tables of exposure to each product).  When confronted with this

discrepancy at deposition (with respect to Safety-Kleen), Dr. Herrick offered to "go back and –

and recalculate and – and, you know, just estimate – just model only the contribution from the

parts washing source, the near field where he was working, and not include the far field contribution." *See* ECF 201-3, Herrick Dep. Tr. at 344:25-345:6. Dr. Herrick supposedly provides this calculation (for the first time) in the Herrick Declaration submitted in response to the Motion, nearly six months after his deposition and after expert discovery, summary judgment, and *Daubert* deadlines have all passed. *See* ECF 226-1, Herrick Decl., ¶ 35. His reason for waiting six months? Unclear, given that he simply logs into a website to access ART. ECF 201-2, Herrick Report at 18-19 (stating website for ART, "www.advancedreachtool.com").

If Dr. Herrick's exposure numbers for individual products included far-field exposures to other surrounding products, as he stated at deposition, then his individual numbers are wrong and his cumulative numbers are grossly inflated. This is not a reliable methodology of calculating individual or cumulative exposures. *See Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 786 (E.D. La. 2015) (stating that when an expert relies on invalid data his method and results are unreliable).

## VI. DR. HERRICK INCLUDED UNSUBSTANTIATED EXPOSURES AND OMITTED SUBSTANTIATED EXPOSURES

The Motion established that Dr. Herrick modeled exposures to CRC 3-36, despite no evidence of these exposures, and then factored the results into his cumulative exposure assessment. *See* ECF 201, Motion at 11-12 (citing ECF 180 (granting CRC motion for summary judgment)).

Plaintiffs ignore the Court's order that no evidence of CRC 3-36 exposure exists and claim Dr. Herrick concluded from Mr. Rhyne's testimony that he used CRC 3-36. *See* Opp. at 11-12. This is patently false, as Dr. Herrick testified. *See* ECF 201-3, Herrick Dep. Tr., at 47:11-15 ("he [Mr. Rhyne] remembered CRC but **he wasn't able to identify a particular brand or product name**") (emphasis added).

Plaintiffs then argue that the CRC 3-36 exposures, as calculated by Dr. Herrick, were not substantial. *See* Opp. at 13. This argument inappropriately attempts to justify Dr. Herrick's

inclusion of non-existent data that renders his methodology unreliable *per se*; unlike Dr. Herrick, *Daubert* does not work backwards from result to method. *See Ruffin*, 149 F.3d at 296 (holding *Daubert* focuses on methodology not conclusions). An expert who includes unsubstantiated, non-existent data is using an unreliable method. *See Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 792 (S.D. Tex. 2000).

Moreover, Plaintiffs' original industrial hygienist, Stephen Petty, did not include CRC exposure in his analysis. *See* ECF 201, Motion at 13. Plaintiffs claim Mr. Petty did not calculate CRC exposures because the McGuire Approved Chemicals List was not available his review. *See* Opp. at 11-12. But Mr. Petty's report is dated October 1, 2017, and Plaintiffs' responses to Safety-Kleen's interrogatories dated October 10, 2016 state, "McGuire Nuclear Station Chemical List", and then list the manufacturer, product, and MSDS numbers from the McGuire Nuclear Station Chemical List. *See* ECF 201-13, Report of Stephen Petty at 1; ECF 201-15, Plaintiffs' Interrogatory Responses, Response No. 18; ECF 136-3, 1992 McGuire Approved Chemical List. The list was thus available at least one year before Mr. Petty issued his report. The far more likely scenario: Mr. Petty did not include CRC because it was an error to do so.

Dr. Herrick also failed to include exposures from two benzene-containing products Mr. Rhyne testified to using, Spotcheck and Tap Magic. *See* Motion at 13-15. Plaintiffs claim there are several types of Tap Magic (but cite **none**) and argue the McGuire Approved Chemical List does not specify the type of Tap Magic used. *See* Opp. at 12. However, Plaintiffs fail to resolve the contradiction created by the fact that the record also does not specify which CRC product Mr. Rhyne used, yet Dr. Herrick modeled exposure to CRC 3-36.

Lastly, Plaintiffs argue that the failure to account for Spot-Check is acceptable because Mr. Rhyne used "very little" of Spot-Check. This argument fails because (1) it impermissibly works

backwards from result to methodology; and (2) rigorous scientific analysis does not permit an industrial hygienist to disregard an exposure when conducting an exposure analysis. *Daubert*, 509 U.S. at 595 (holding the focus is on principles and methodology, not conclusions).

## VII.  **CONCLUSION**

For the reasons set forth above and in the Motion, Defendant Safety-Kleen respectfully requests the Court enter an Order: (1) granting Safety-Kleen and US Steel's Motion; (2) striking the Herrick Declaration in its entirety, and striking all portions of Plaintiffs' opposition that rely upon the Herrick Declaration; (3) excluding the testimony, opinions, and report of Plaintiffs' expert Dr. Robert Herrick; and (4) for such other and further relief as the Court deems just and proper. Respectfully Submitted this 6th day of May, 2020.

By:  */s/ Eric G. Sauls*
Eric G. Sauls
Lewis Brisbois Bisgaard & Smith, LLP
N.C. State Bar No. 38481
4101 Lake Boone Trail, Suite 514
Raleigh, North Carolina 27607-3977
Telephone: (919) 821-4020
Facsimile: (919) 829-0055
Eric.Sauls@lewisbrisbois.com

and

Brian A. Bender (*pro hac vice*)
Christopher C. Palermo (*pro hac vice*)
Judi A. Curry (*pro hac vice*)
Peri A. Berger (*pro hac vice*)
Harris Beach PLLC
100 Wall Street
New York, NY 10005
Telephone: (212) 687-0100
bbender@harrisbeach.com
cpalermo@harrisbeach.com
jcurry@harrisbeach.com
pberger@harrisbeach.com
*Attorneys for Defendant Safety-Kleen Systems, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

      This is to certify that the undersigned counsel has this date filed **DEFENDANT SAFETY-KLEEN SYSTEMS, INC.'S REPLY IN FURTHER SUPPORT OF THE MOTION TO EXCLUDE THE TESTIMONY, OPINIONS, AND REPORT OF DR. ROBERT HERRICK** with the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

      This the 6th day of May, 2020.

By: <u>/s/ Peri A. Berger</u>
Peri A. Berger