# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
Civil Action No.: 3:18-cv-197-RJC

BRUCE RHYNE and JANICE RHYNE, )
                                      )

      **Plaintiffs,**            )
                                        )

  **vs.**                             )
                                        )

**UNITED STATES STEEL**      )
**CORPORATION,** *et al.,*       )
                                        )

      **Defendants.**          )
                                        )

---

## PLAINTIFFS' NOTICE OF FILING OF DEPOSITION DESIGNATIONS

Plaintiffs hereby file certain deposition designations along with objections and counter-designations for the following deponents:

1. Steven Gore

2. James Graeber

3. Thomas Keenan

4. John Masaitis (Davis)

5. John Masaitis (Krem)

6. Myron A. Mehlman

7. Mark Monique (Lee)

8. Mark Monique (Thomas)

*Handwritten note:*
$O$ = Overruled
$S$ = Sustained

I

Respectfully Submitted,

Dated: September 2, 2020

*/s/Mark Doby*
Mark Doby (NCBN 39637)
John Hughes (NCSB 22126)
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
mdoby@wallacegraham.com
jhughes@wallacegraham.com

Andrew J. DuPont, *admitted pro hac vice*
LOCKS LAW FIRM
601 Walnut St. Suite 720 East
Philadelphia, PA 19106
Phone: (215) 893-3425
adupont@lockslaw.com

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was served by e-filing via the

Western District of North Carolina's e-Filing Portal to all counsel of record on September 2, 2020

Dated: September 2, 2020

/s/Mark Doby
Mark Doby (NCBN 39637)
John Hughes (NCSB 22126)
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
mdoby@wallacegraham.com
jhughes@wallacegraham.com

Andrew J. DuPont, *admitted pro hac vice*
LOCKS LAW FIRM
601 Walnut St. Suite 720 East
Philadelphia, PA 19106
Phone: (215) 893-3425
adupont@lockslaw.com

# Exhibit 1



Plaintiffs' designations are in yellow
Defendants' collective designations are in green

# Deposition of
# **Steven D. Gore, M.D.**

**Date:** November 4, 2019

**Case:** Bruce Rhyne and Janice Rhyne v. United States Steel
Corporation, et al.

**No.** 3:18-cv-00197-RJC-DSC

**Court Reporter:** Roselind C. Pisano, CSR

Paszkiewicz Court Reporting
Phone: 618-307-9320
Toll-Free: 855-595-3577
Fax: 618-855-9513
www.spreporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

BRUCE RHYNE and JANICE        )

RHYNE,                        )

      Plaintiffs,        )Case No.:

    vs.                      ) 3:18-cv-00197-RJC-DSC

UNITED STATES STEEL           )

CORPORATION, et al.,          )

      Defendants.        )


    The deposition of STEVEN D. GORE, M.D., called
for examination pursuant to Notice and pursuant to
the Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, taken before Roselind C. Pisano, C.S.R.
No. 084-002031, Certified Shorthand Reporter and a
Notary Public within and for the County of Cook and
State of Illinois, at The Blake Hotel, 9 High Street,
New Haven, Connecticut, on November 4, 2019,
commencing at the hour of 9:31 a.m.

```
 1   APPEARANCES:
 2       LOCKS LAW FIRM
         BY: MR. ANDREW J. DuPONT
 3       601 Walnut Street
         Suite 720 East
 4       Philadelphia, Pennsylvania 19106
         adupont@lockslaw.com
 5           Representing the Plaintiff;
 6
         BABST CALLAND CLEMENTS and ZOMNIR, P.C.
 7       BY: MS. KATHY K. CONDO (VIA TELEPHONE)
         Two Gateway Center
 8       603 Stanwix Street
         6th Floor
 9       Pittsburgh, Pennsylvania 15222
         kcondo@babstcalland.com
10           Representing the Defendant,
             Acuity Specialty Products Group, Inc.;
11
12       CRANFILL SUMNER & HARTZOG
         BY: MS. VIRGINIA M. WOOTEN
13       2907 Providence Road
         Suite 200
14       Charlotte, North Carolina 28211
         vwooten@cshlaw.com
15           Representing the Defendant, Turtle Wax;
16
         DICKIE McCAMEY
17       BY: MR. VAUGHN K. SCHULTZ
         Two PPG Place
18       Suite 400
         Pittsburgh, Pennsylvania 15222
19       vschultz@dmclaw.com
             Representing the Defendant,
20           Exxon Mobil Corporation;
21
         FISHKIN LUCKS
22       BY: MR. ANDREW P. FISHKIN (VIA TELEPHONE)
         277 Broadway
23       Suite 408
         New York, New York 10007
24       afishkin@fishkinlucks.com
             Representing the Defendants,
25           Univar, Chevron and CRC;
```

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 4 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 7 of 1330

Page 3

```
 1    APPEARANCES: (Continued)
 2       FORMAN WATKINS & KRUTZ LLP
          BY: MR. TIM GRAY
 3       201 St. Charles Avenue
          Suite 2100
 4       New Orleans, Louisiana 70170
          tim.gray@formanwatkins.com
 5            Representing the Defendant,
              United States Steel;
 6
 7       GORDON REES SCULLY MANSUKHANI, LLP
          BY: MR. JOSHUA W. DIXON (VIA TELEPHONE)
 8       40 Calhoun Street
          Suite 350
 9       Charleston, South Carolina 29401
          jdixon@grsm.com
10            Representing the Defendant, Savogran;
11
          HARRIS BEACH PLLC
12       BY: MR. BRIAN A. BENDER (VIA TELEPHONE)
          100 Wall Street
13       New York, New York 10005
          bbender@harrisbeach.com
14            Representing the Defendant, Safety-Kleen;
15
          MARON MARVEL BRADLEY ANDERSON & TARDY LLC
16       BY: MR. CHAD D. MOUNTAIN (VIA TELEPHONE)
          Three Logan Square
17       1717 Arch Street
          Suite 3710
18       Philadelphia, Pennsylvania 19103
          cmountain@maronmarvel.com
19            Representing the Defendant, Sunoco (R&M), LLC;
20
          McANGUS GOUDELOCK & COURIE LLC
21       BY: MR. JOHN JEFFRIES (VIA TELEPHONE)
          6302 Fairview Road
22       Suite 700
          Charlotte, North Carolina 28210-2267
23       jjeffries@mgclaw.com
              Representing the Defendant, Kano Labs.
24
25
```

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/03/20   Page 5 of 199
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 8 of 1330

1                    I N D E X

2   WITNESS                          EXAMINATION

3   STEVEN D. GORE, M.D.

4        Examination By Mr. Gray              5

5        Examination By Mr. Schultz          51

6        Examination By Ms. Wooten           79

7        Examination By Mr. Fishkin          85

8        Examination By Mr. Jeffries         90

9        Examination By Mr. Dixon           151

10       Examination By Mr. Dupont          153

11

12

13                  E X H I B I T S

14  NUMBER                         MARKED FOR ID

15  Dr. Gore Deposition Exhibit

16       Nos. 1 and 2                         5

17

18

19  (Original exhibits were given to the court reporter,

20  scanned and returned to Mr. Gray.)

21

22

23

24

25

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 6 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 9 of 1330

1           (Witness sworn.)

2               STEVEN D. GORE, M.D.,

3       called as a witness herein, having been first duly

4       sworn, was examined and testified as follows:

5                   EXAMINATION

6       BY MR. GRAY:

7           Q.  Dr. Gore, good morning.  I'm Tim Gray.  We

8       have met before.

9           **A.  We have.  Good morning to you.**

10          Q.  How are you, sir?

11          **A.  I'm well.  Thanks.**

12          MR. GRAY:  I'm going to attach two things as

13      exhibits.  Number 1 is the deposition notice that we

14      issued in this case, and Exhibit 2 is a report signed

15      by you and dated October 1, 2017.

16                  (Dr. Gore Exhibit Nos. 1 and 2

17                  marked for identification.)

18      BY MR. GRAY:

19          Q.  I'm going to hand those both to you.

20          **A.  Okay.**

21          Q.  Irrespective of whether you recall the

22      specifics of that deposition notice, have -- other

23      than published literature, to your knowledge, are all

24      of the materials that you've reviewed in preparation

25      for this case Mr. DuPont has?

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 7 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 10 of 1330

1    A.  Yes, absolutely.

2    Q.  Either he sent it to you or you sent it to

3    him?

4    A.  Absolutely.

5    Q.  And then that report marked as Exhibit 2,

6    that's the report you've generated in this case?

7    A.  Yes.  Two years ago.

8    Q.  What have you done since that report was

9    generated in this case?

10   A.  I reviewed my report, I reread some of the

11   medical records.  I think that's about it.

12   Q.  We received a Dropbox link from Mr. DuPont.

13   I'm going to walk through some of the things that

14   were on that link.

15   A.  Okay.

16   Q.  Some of these may be things he provided to

17   you that you may or may not have reviewed, so my

18   questions are going to be pretty brief.

19   A.  Okay.

20   Q.  For example, we received the deposition of

21   Dr. Diane Howard.  Did you review that deposition?

22   A.  I think -- was that done two years ago?

23   MR. DUPONT:  Yes.

24   THE WITNESS:  Yes, I had reviewed it, because I

25   referenced it in my report, but I haven't recently.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 8 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 11 of 1330

1   BY MR. GRAY:

2       Q.  And then, of course, there is a reference to

3   Mr. Petty's report which you reference in your

4   report.

5       A.  Yes.

6       Q.  There is a reference to a report by an

7   expert named Deeds?

8       A.  Deeds?

9       Q.  D-e-e-d-s.

10      A.  Never heard of him.

11      Q.  Okay.  That's from one of the defendants.

12  You haven't reviewed that report?

13      A.  I don't know anything about it.

14      Q.  You don't recall?

15      A.  I recall I haven't.

16      Q.  This will be a compound question.  Do you

17  recall reviewing any of Dr. Dominic Alexander,

18  Dr. Peter Shields, David Pyatt or Dr. Natelson --

19  have you reviewed any of their reports in this case?

20      A.  I glanced at Dr. Shields' report last night,

21  but not in great detail.  I skimmed it.

22      Q.  Did you have any specific criticisms or

23  critiques?

24          Obviously you disagree about some things, as

25  stated in your report.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 9 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 12 of 1330

1      Is there anything, other than what's already

2 in your report, that you would say is a specific

3 critique of Dr. Shields' report based upon your quick

4 review last night?

5      A.   I want to emphasize, it wasn't a thorough

6 review.  It was far too long for me to do that.

7      Yes, I have some problems with Dr. Shields'

8 report.  First of all, I've gone back and looked

9 online at his CV.  He's certainly not a leukemia

10 physician, he's not a -- actually he's not

11 hematopoietic malignancies at all.

12      I understand that he's a cancer biologist

13 and seems to take care of lung cancers.  But he

14 doesn't appear to be somebody who assesses leukemia

15 risk on a routine basis.

16      But that's just kind of my assessment of who

17 he would be as a witness.

18      He comments that the finding, while the

19 patient was in remission, of FLT-3/NPM-1 mutated cell

20 in the blood would indicate a germline predisposition,

21 and that is patently false because, first of all, it

22 was never detected again.  If it was a germline

23 mutation, you would still find it, and you would find

24 it in the bone marrow as well.  And it wouldn't go

25 away.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 10 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 13 of 1330

1        Second of all, NPM-1/FLT-3 mutations are

2   never germline.  That just betrays kind of ignorance

3   of leukemia genetics to me.  I was a little surprised

4   that that was there.  I did notice that.

5        I also noticed that he goes to the Bert

6   Vogelstein paper that says a lot of cancers are just

7   random.  And I am certainly familiar with that work.

8        But I don't think Dr. Vogelstein would want

9   his paper being interpreted to say that there aren't

10  also environmental factors on top of some randomness.

11  That's just misconstruing their mathematical model.

12  To me, that's a -- it's irrelevant.  It's an

13  obfuscating piece of evidence.

14        Those are the only things I noted off the

15  top of my head.

16      Q.  You -- we received from Mr. DuPont a folder

17  of medical bills.  Have you reviewed the medical

18  bills in this case?

19      A.  I did two years ago.  I haven't gone back to

20  them.

21      Q.  Do you have an opinion, as you sit here

22  today, of the total amount of medical bills that

23  Mr. Rhyne has incurred?

24      A.  Everything looks appropriate to me.

25      Q.  Were there anything in the medical bills you

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 11 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 14 of 1330

1    reviewed that were unrelated to leukemia treatment?)

2         A.    It's been too long.    I don't remember.

3         Q.    Is it fair to say your opinion is -- in the

4    medical bills you reviewed, to the extent that you

5    determined the treatment referenced in the bills

6    which related to leukemia, your opinion is that

7    treatment was appropriate; is that fair?

8         A.    Fair.

9         Q.    But as you sit here today, you wouldn't be

10   ready to say -- to pull out from those bills or

11   identify things in those bills that are unrelated to

12   leukemia treatment, fair?

13        A.    Yes.    And if somebody were to ask me to do

14   so, I would be very happy to do so.    In general,

15   Counselor, when I am given medical bills to review in

16   this kind of case, there is often things that show up

17   and -- that has to do with the regular care because

18   of the billing system and everything.    So I really

19   scan looking for egregious, what's that, kind of

20   things.

21             So I don't really ever -- I don't, in

22   general, sort out like, oh, they should circle this

23   because that's not related to leukemia.    I never go

24   through it with that level of detail.

25        Q.    Fair enough.    If I read out to you the --

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 12 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 15 of 1330

(1)  well, I guess that Dropbox link will speak for

(2)  itself.

(3)          You reviewed medical bills from numerous

(4)  providers; is that fair?

(5)      A.  Two years ago.

6       Q.  Two years ago.  There is also a report from

7   a Dr. Hoel, H-o-e-l.  Do you recall reviewing that

8   report?

9       A.  I don't remember that.

10      Q.  That's certainly fine.

11          And then a report from John Spencer.  Do you

12  recall reading Mr. Spencer's report?

13      A.  I don't believe I did.

14      Q.  Some of the records were -- scratch that.

(15)          Is it your understanding you've reviewed all

(16) of the medical records that were collected in this

(17) case from Mr. Rhyne or is it your understanding

(18) Mr. DuPont selected a subset?

(19)     A.  I'm pretty sure I haven't seen a complete

(20) set of records.

(21)     Q.  What is your understanding as to the records

(22) you received from Mr. DuPont in this case?

23      MR. DUPONT:  Objection; vague.

24      THE WITNESS:  I remember a note from the initial

(25) physician to whom he presented in May of 2015, more

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 13 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 16 of 1330

1    or less, documenting the high white count and

2    appearance of blasts in the blood, the decision to

3    transfer him to the specialty hospital, Wake Forest,

4    I believe. Wake Forest, yeah. I remember a variety

5    of discharge summaries for sure that I did review

6    quite a few of them yesterday just briefly. And I

7    know that when I wrote the report and in looking at

8    Dr. Shields -- is that his name?

9    BY MR. GRAY:

10        Q.  He is one of the experts, yes.

11        A.  About whom we were speaking of?

12        Q.  Yes.

13        A.  Dr. Shields' report, noting also that the

14   last clinical update I had seen -- and I certainly

15   haven't seen anything since then -- was from his

16   treating doctor's deposition, that he apparently

17   still was in remission in August of 2017. So I know

18   I haven't seen anything since then and I also know

19   there probably wasn't anything that I've seen in the

20   approximate period of time.

21        Q.  So from a process standpoint then, you don't

22   request that Mr. DuPont send you every single medical

23   record collected in this case, correct?

24        A.  I don't, because that -- from a causation

25   point of view, that's certainly not necessary.  I can

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 14 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 17 of 1330

1    scan medical bills without having the records knowing

2    the time frame and gauge how appropriate weekly CBCs

3    are, monthly CBCs, that thing of kind.  So I don't

4    really need that level of granularity unless a big

5    weird thing showed up there, some crazy proton

6    something.  I might ask for that and say, Hey, what's

7    this?

8         Q.  And this really isn't directed more towards

9    medical bills.  This is just, in general, trying to

10   get to the process by which records are selected for

11   your review.

12        Is it your understanding that Mr. DuPont

13   sends you essentially the diagnosing records and

14   sufficient patient histories to give you some

15   snapshots of the patient over time or is there a more

16   structured process that you can describe?

17        A.  Andrew will usually send me -- often he'll

18   give me a thumbnail on the telephone and I'll ask him

19   what does he know about the occupational history,

20   because I don't really want to waste my time if it

21   doesn't seem like -- if either the disease doesn't

22   seem like something I can comment intelligently and

23   meaningfully about or if the occupational history

24   sounds like it's going to be very iffy.

25        Mr. DuPont is a pretty smart guy and pretty

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 15 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 18 of 1330

1  good at what he does, so that's almost never

2  happened.  There's sometimes one that might be

3  something that's out of his experience.

4      Really more with some other plaintiff's

5  attorneys that I work with where they will ask, What

6  do you think about this disease.

7      Certainly could be caused by benzene, I

8  know, but you're going to have a hard time figuring

9  that one out in a convincing way, unless you know

10 some literature that I don't yet know.  I'm not

11 really your guy for that, and you probably don't

12 really want to get involved yourself with that.

13     I might counsel to them that.

14     That said, if it sounds like it's something

15 that I can be helpful with and that I have time to

16 and it sounds like it's reasonable to do, Mr. DuPont

17 will send me kind of what he thinks I need, and then

18 I'll read through it and tell him what I don't feel

19 is adequate, if there is other things he needs to get

20 for me.

21     That's kind of how it works.

22 Q.  That makes perfect sense.

23     The deposition transcripts, other than

24 Dr. Howard, that were on the Dropbox link we received

25 from Mr. DuPont were days 1 and 2 of Mr. Rhyne's

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 16 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 19 of 1330

1    deposition.

2         A.  I read it two years ago.  I haven't

3    refreshed my memory on that one.  I kind of wanted

4    to, but I didn't have time.

5         Q.  And those two volumes, those are the only

6    fact depositions that you've read in this case,

7    correct?

8         A.  That's all that I remember.

9         Q.  And then there were two documents that

10   involved radiation exposure.  One, the file name is

11   NRC, Everyday Radiation Exposure Doses in Our Daily

12   Lives.  I have it on my screen here.

13        Do you recall sending something like that to

14   Mr. DuPont or is that something he sent to you?

15        A.  I saw that last night.  I had a big question

16   mark about that.  I wasn't sure what it was doing

17   there.  I don't remember anything about it.  I saw it

18   last night.

19        As a matter of fact, it was then -- I was

20   having trouble finding my report.  For some reason I

21   didn't file it in the place I usually do.  And I

22   didn't realize it was two years ago.  I was having

23   trouble jogging my memory.  I remember doing a

24   radiation case.  I don't usually do radiation cases.

25   I would consider it, but I don't.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 17 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 20 of 1330

1     Q.  You're not sure how that got in the file?

2     **A.  As I'm sitting here today.  Maybe I knew two**

3 **years ago.  I don't know now.**

4     Q.  I don't have a hard copy, but at the bottom

5 it's https://www.nrc.gov/about-nrc/radiation/

6 around-us/doses-daily-lives.html, August 10, 2017.

7       And then there is another document also from

8 that same website -- not the exact same ending, same

9 date, but it's Radiation Doses and Regulatory Limits.

10       I'm showing you now on the screen that

11 document that was on the thumb drive.  Does that look

12 familiar to you?

13     **A.  Again, I opened it yesterday.**

14     Q.  You didn't remember having seen that before

15 yesterday when you opened it?

16     **A.  Yeah.  I can't place it.**

17     Q.  Okay.  Do you have any opinions in this case

18 about radiation exposures?

19     **A.  You know -- do you mind if I take a peek**

20 **here?**

21     Q.  No.

22     **A.  See, my brain is not what it used to be.**

23     Q.  You are on page 13 of your report?

24     **A.  12 of 13.  I read it last night, but that's**

25 **how much I remember from yesterday.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 18 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 21 of 1330

1          That he did work in a nuclear plant at Duke

2     Energy, of course.  And he also wore his radiation

3     badge per his testimony.  And that would be expected

4     there.  Of course you'd probably be fired if you had

5     a history of not complying with that.

6          In Mr. Petty's report, which I have no

7     reason to dispute, his lifetime estimate was 1.8 REMs

8     occupationally, which is well under the -- 100-fold

9     less than the upper limit of what's allowable in

10    occupational radiation exposure.

11         So it would be my opinion that there is no

12    reason to be concerned that that amount of radiation

13    was contributory to his leukemia.

14         Q.  Do you understand that Mr. Petty has been

15    withdrawn as an expert?

16         **A.  I do understand that.**

17         Q.  Other than Mr. Petty's calculation, you

18    don't have any other calculation that you rely upon

19    for Mr. Rhyne's potential radiation exposure, do you?

20         **A.  I haven't gone back to that, no.**

21         Q.  And in the absence of Mr. Petty's calculation,

22    you wouldn't be able to rule out radiation exposure

23    as a cause of Mr. Rhyne's cancer, could you?

24         MR. DUPONT:  Objection; form.

25         THE WITNESS:  The nature of the business that he

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 19 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 22 of 1330

Page 18

1  was in there, as a pipe fitter and things like that,

2  is not what I would consider to be a high-risk

3  radiation occupation.  It is not like he's working in

4  the reactor or with wastewater or any of that.

5          So, again, I'm not, by any means, any kind

6  of expert in how radiation plants work, nuclear

7  reactors work.  But I do know, at least in our

8  country, the radiation exposure is carefully

9  monitored.

10          So for somebody who is in kind of a totally

11  auxiliary job that doesn't involve being in the heart

12  of the radiation, I think it would be very unlikely.

13  BY MR. GRAY:

14      Q.  But you can't rule it out?

15      **A.  That is absolutely fair, Counsel.  You are**

16  **right.**

17      Q.  And you would expect, though, a nuclear

18  facility such as the one Mr. Rhyne worked at would

19  probably pay pretty close attention to safety-related

20  rules given --

21      **A.  They have to.**

22      MR. DUPONT:  Objection; form.

23  BY MR. GRAY:

24      Q.  Pretty serious outcomes if there is an

25  incident at a nuclear power plant.  You would agree?

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 20 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 23 of 1330

1      A.   I've seen the HBO mini-series on Chernobyl.

2      Q.   You make a statement -- I believe it was on

3  page 13 -- assuming Mr. Petty is correct, that his

4  radiation exposure was no greater than adults of his

5  age who were not occupationally exposed would have?

6      A.   Ambient.

7      Q.   Ambient.  On what data do you rely for that

8  opinion?

9      A.   You know, honestly -- I honestly haven't

10  reviewed this in recent days.  That's my honest --

11      Q.   Okay.

12      A.   But, you know, my process would have been

13  that I would have -- I would have compared it to

14  whatever standards, you know, I found in terms of

15  ambient radiation exposure, probably to that.

16         But as I'm sitting here today, I can't quote

17  you chapter and verse.

18      Q.   Like other carcinogens, there has never been

19  a safe level of radiation exposure?

20      A.   I would agree with that.  You know me too

21  well, Counselor.

22      Q.   One of the few good questions I've ever

23  asked you.

24      A.   I wouldn't say that.

25      Q.   Let's talk quickly about Mr. Rhyne's

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 21 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 24 of 1330

1    clinical course.  So he had a stem cell transplant in

2    2015.  And based on the records you've reviewed, he

3    has remained in remission through the date of the

4    last record you've reviewed, right?

5         **A.  That's correct.**

6         Q.  And even as of Dr. Howard's deposition, I

7    believe in 2017, he was still in remission, right?

8         **A.  That's correct.**

9         Q.  You may not be aware, but I'll represent to

10   you that in July 2019 Mrs. Rhyne was deposed.  And if

11   she said he continued to be in remission, would that

12   be surprising to you?

13        **A.  No.**

14        Q.  If he is in remission as late as July

15   2019 -- assume that's correct -- what are his odds of

16   recurrence at this point?

17        **A.  They are quite low.**

18        Q.  More likely than not, he will remain free

19   from leukemia for the rest of his life?

20        **A.  If he is four years out -- that would have**

21   **been '15, so that's three and a half years out.**

22   **Usually we think, of people who are five years out**

23   **from alginate stem cell transplant, most myeloid**

24   **leukemias are at extremely low risk of recurrence of**

25   **that leukemia, although they could be at risk of**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 22 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 25 of 1330

1     subsequent leukemias from whatever caused their first

2     leukemia.

3            It would be very unlikely for this leukemia

4     to recur.

5        Q.  So you -- I've got just a few questions

6     about different statements in your report that I have

7     never asked you about.  On page 4, in paragraph 5,

8     you refer to -- in the second sentence of paragraph

9     5 -- exogenous toxins.

10       A.  Yep.

11       Q.  Can you educate me a little bit.  What do

12    you mean by an exogenous toxin?

13       A.  Something from the environment.

14       Q.  So you can have mistakes in your cell

15    replication that come from the environment, they are

16    exogenous, or they can be generated physiologically,

17    which means they're not caused by something in the

18    environment?

19       A.  Yes.  Cells make mistakes.  There is also

20    cellular processes in the body that generate things

21    like reactive oxygen species, which are -- which can

22    be DNA-damaging.

23       Q.  And instead of exogenous, would those be

24    endogenous?

25       A.  Yeah.  They'd be endogenously derived.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 23 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 26 of 1330

1    Q.  So those endogenously -- would you call that

2    an endogenously derived toxin?

3         Or what's the noun I want to attach to

4    that -- or that I should attach to that?

5    **A.  Endogenously derived DNA-damaging agent.**

6    **Reactive species.**

7         **You know, you're dressed like a Yale**

8    **professor.  You can start giving these lectures.**

9    Q.  Thought I'd look the part.

10        I'm sorry, the whole phrase was endogenously

11   derived -- what's the last part of that?

12   **A.  DNA-damaging agent.**

13   Q.  So these endogenously derived DNA-damaging

14   agents, those can occur in the body separate and

15   apart from any external chemical exposure, for

16   example, right?

17   **A.  Yes.**

18   Q.  And those agents -- would you say they are

19   ever present in the human body, at least at some

20   level?

21   MR. DUPONT:  Objection; form.

22   THE WITNESS:  Normal physiological processes

23   generate things like superoxide, which can cause DNA

24   damage, for sure.  That's why people like to take

25   antioxidants for the idea that you can -- it's an

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 24 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 27 of 1330

1    unproven idea -- that you can, through nutrition,

2    mitigate some of these factors.

3    BY MR. GRAY:

4        Q.  All of the juice bars are pushing those.

5    Now I can tell them.

6        **A.  It is not helping your hair color though.**

7        Q.  No, it's not.  It is going downhill.

8            So on a regular basis we are exposed to

9    these agents.  When these processes are going on in

10   our body, are they always causing cellular damage or

11   is it that they have the potential to cause cellular

12   damage?

13       MR. DUPONT:  Compound.

14       THE WITNESS:  Well, for sure potential.  I'd

15   stick with "potential."  I think "always" is a tough

16   word.  I think "commonly" is appropriate.

17   BY MR. GRAY:

18       Q.  So later in your report you say, "Any

19   cellular exposure to benzene can lead to DNA damage."

20           That's not a controversial statement.  Would

21   you agree that "any cellular exposure to benzene can

22   lead to DNA damage" doesn't mean that every cellular

23   exposure to benzene does cause DNA damage?

24       **A.  You are correct.**

25       Q.  And the same would be true of these

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 25 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 28 of 1330

1  endogenous DNA-affecting agents as well?

2      A.  Absolutely.

3      Q.  Have scientists been able to determine the

4  percentage of acute myeloid leukemias that are

5  substantially caused by these endogenous processes?

6      A.  I'll say the answer to that is no.

7      Q.  But do we know from --

8      A.  Defense attorneys would like to query me

9  about so-called de novo leukemia, as if that means

10  something.  It means idiopathic leukemia, leukemia

11  for which we don't know the cause.

12          But we do know that all leukemias are caused

13  by DNA damage and genetic mutation, at least in part.

14  So the question really is, and fundamentally in

15  causation is, what are the main factors in this

16  particular person, if you are trying to get that

17  granular, that more likely on a probabilistic basis

18  to have caused the appropriate damage that led to

19  this disease over time.

20          And, you know, I think it is entirely

21  probable that many cases of what we call de novo or

22  idiopathic AML, in part, derive from these endogenous

23  toxins.  The literature that points to obesity as

24  being a risk factor all has to do with the fact that

25  obesity sets up a chronic inflammatory state.  And

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 26 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 29 of 1330

1    it's the inflammatory states that are particularly

2    enriched for DNA-damaging mediators.

3           So that would be the connector between

4    obesity.  It is not just because God doesn't like fat

5    people.  It's the state of being less than perfect

6    normal weight leads to an inflammatory weight.

7           The same thing, in part, why obese people

8    are more likely to get cardiovascular disease,

9    because of the chronic state in the blood vessels.

10           And Dr. Vogelstein's paper, since we're

11    talking about it, has a lot to do with that because

12    it's a probabilistic calculation of how many cancers

13    are caused by how many mistakes cells make

14    probabilistically in dividing and such.

15           And some of that also has to do with this

16    endogenous cancer generation potential as a human

17    being.

18       Q.   So, for example, with benzene, we've got a

19    lot of data in epidemiology studies that help us

20    determine what someone's increased risk of leukemia

21    is based upon --

22       A.   Yeah.

23       Q.   -- benzene exposure.

24       A.   So that would be increased risk over this

25    baseline that everybody has, right?  So what

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 27 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 30 of 1330

1  everybody has, because of what our body is doing, you

2  know, with genetic variation, with obesity, blah,

3  blah, blah, that's the baseline, right?  That we

4  can't get below because we are human beings and

5  defective.

6         And then environmental exposures give you a

7  delta positive risk above and beyond.  And that's how

8  you -- epidemiologically that's how you detect a

9  signal, by looking for a statistically significant

10 measurable increment above the baseline.  So the

11 baseline incorporates all that stuff presumably.

12     Q.  Okay.

13     A.  I enjoyed that question.

14     Q.  I try to come up with a few every time.

15     A.  It's great.

16     Q.  This is going to be more boring.  Liquid

17 Wrench --

18     A.  Liquid Wrench, yeah.

19     Q.  -- on page 14 of your report, at the top

20 there you say, "Particularly prior to '79, the

21 formulation of Liquid Wrench was known to be

22 constituted with at least 5 to 14 percent benzene."

23         Have you looked at any data that indicates

24 that Liquid Wrench benzene -- the benzene in Liquid

25 Wrench could have been as low as 3 percent?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 28 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 31 of 1330

1   A.  Well, there was a -- Andrew may -- if Andrew

2   is allowed to help me with this -- there is an

3   attachment to a prior case, not that I was involved

4   with.  There was testimony from somebody -- from a

5   radiator specialist that talked about this, right?

6   Am I remembering that correctly?

7        So the radiator -- whatever it is --

8   testified to the contamination of benzene.  It is an

9   addendum to some deposition of theirs, and that's

10  where I got these numbers from.

11       And we know that they were also measured as

12  high as 50 percent.  I haven't done that research

13  recently.  That's kind of what I carry around in my

14  file of facts and then --

15  Q.  You haven't undertaken to look at --

16  A.  Again?

17  Q.  -- all of the -- or have you ever at any

18  point said, I want to look at all the documents --

19  A.  Every single thing?  No.

20  Q.  Just so I know the court reporter gets it

21  down.  You've never sat down and said, I'm going to

22  look at all the documents and testimony that

23  pertained to the benzene content of Liquid Wrench to

24  reach a professional opinion about that.  That's not

25  something that you've done?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 29 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 32 of 1330

1    **A.   I haven't done that, but I've seen enough**

2    **data, including direct assessments and testimony,**

3    **that convinces me that these numbers are conservative.**

4        Q.   Mr. DuPont has never shown you records

5    indicating that the raffinate portion of Liquid

6    Wrench was as low as 3 percent?

7            That's not a document that's ever been shown

8    to you?

9        **A.   I can't say that it was or wasn't because I**

10   **don't remember.   I can say, truthfully, that I don't**

11   **remember.**

12       MR. DUPONT:   I know it is a little early in the

13   process, but can we take a comfort break at some

14   point?

15       MR. GRAY:   Let's do that.   We're going to take

16   five.

17                        (Whereupon, a break was taken

18                        from 10:04 a.m. until 10:09 a.m.)

19   BY MR. GRAY:

20       Q.   Another question out of your report on page

21   6, paragraph 10 --

22       **A.   Yes.**

23       Q.   Oh, actually paragraph 9.   Sorry.

24       **A.   Okay.**

25       Q.   At the bottom of the first paragraph in

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 30 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 33 of 1330

1  paragraph 9 where it says, "Each new and different

2  type of DNA damage, including the early exposures to

3  benzene and subsequent exposures to other

4  leukemogens, is significant and relevant to the

5  formation of the ultimate clinical disease."

6          Would that also be true if, instead of early

7  exposure to benzene, I inserted endogenously derived

8  DNA-affecting agents?

9      A.  Yeah, absolutely.  The thing is, that for

10  each of these things there is a dose relationship,

11  and there are different dose relationships, right?

12          So some are strong DNA-damaging gene agents,

13  some are small and some are agents -- some kinds of

14  DNA repair -- I'm trying to be mindful of our court

15  reporter.  Some types of DNA repair, the body has

16  evolved to be more -- of DNA damage, the body has

17  evolved to be better at correcting.

18          So for the stuff that goes on every day,

19  endogenously the body is pretty good at fixing a lot

20  of that.  But the body -- humans didn't evolve to be

21  in relationship to benzene exposure.  That's not

22  something that would have been selected for

23  evolutionarily.  So I'll leave it at that.

24      Q.  Radiation, for example, humans also weren't

25  evolved to be exposed to radiation?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 31 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 34 of 1330

1      **A.  Low-dose radiation.**

2      Q.  So the low-dose radiation could also be

3  described as exposures that could be significant and

4  relevant to the formation of the ultimate clinical

5  disease?

6      MR. DUPONT:  Form.

7      THE WITNESS:  No.  You read me backwards.  So

8  what I was saying is that humans have evolved to

9  tolerate the usual DNA damage coming from activation

10  of neutrophils and things like that, so a lot of that

11  gets repaired in a pretty efficient way.

12         Humans didn't evolve to deal with benzene-

13  derived cross-linking of DNA.

14         The low-dose radiation due to solar energy

15  and so on, well, some yes and some no.  We certainly

16  know there are skin cancers due to solar cancer, and

17  that's not been dealt with, at least in fair-skinned

18  populations.

19         The reason why there are dark-skinned

20  populations in the areas of greatest solar intensity

21  is certainly for that reason.

22         So what you said was kind of backwards.

23  BY MR. GRAY:

24      Q.  So is the type of radiation exposure a

25  person would have in a nuclear reactor facility the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 32 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 35 of 1330

1    same type of radiation exposure a person would get

2    from the sun?

3         MR. DUPONT:  Form.

4         THE WITNESS:  Again, we're talking about very

5    tiny amounts for somebody who's not -- it's gamma

6    radiation.  Most of what we get from the sun is

7    ultraviolet.  There are -- what do you call them?

8    Cosmic rays, I think, might be gamma.  I'm not an

9    expert in how much cosmic rays we get.

10   BY MR. GRAY:

11        Q.  And I wasn't really speaking to dose.  I was

12   just speaking of the type or the physiologic

13   description --

14        **A.  It is not exactly the same, no.**

15        Q.  The radiation from the sun would not be --

16        **A.  Not the same as radiation from nuclear**

17   **particles, no.**

18        Q.  And nuclear particles would be the particles

19   you could potentially have exposure to in a nuclear

20   power plant, right?

21        **A.  Correct.**

22        Q.  That's all I wanted to establish.

23             You cite the Health Watch studies a couple

24   times in your report and you cite data for increased

25   risks of AML at different levels of benzene exposure.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 33 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 36 of 1330

1      Based on the subsequent work by Schnatter

2   and others in the combined case control study, would

3   you agree that the AMLs were probably overcounted in

4   Dr. Glass's earlier studies that predated the 2012

5   and that the -- because they should have been counted

6   as NDSs or not?

7      MR. DUPONT:  Compound.

8      THE WITNESS:  I think it's hard to sort that

9   out.  But as I know that you are aware, Counselor, I

10  don't think that it makes sense to sort those out

11  really because they are the same disease.  They are

12  just different presentations of the same disease.

13      So it is really artificial to draw lines and

14  then try to put boundaries, statistical boundaries,

15  around them because biologically that doesn't make

16  any sense.

17      So biologically they should be combined in a

18  combined fashion, in my truly expert opinion, because

19  I'm kind of something of an international guru in

20  MDS.  Doesn't mean everyone agrees with me.

21  BY MR. GRAY:

22      Q.  I understand that opinion.  My point is, I

23  guess, if you count a disease in an AML in a pre-2012

24  study and you calculate an odds ratio for benzene

25  exposure in AML, and then if in a subsequent study

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 34 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 37 of 1330

1    you recategorized that AML as an MDS and then

2    calculate an odds ratio for MDS exposure, at some

3    level you are double-dipping.

4        A.   Except that the second study was combined,

5    so it doesn't go straight to the Australian -- it's

6    not a reanalysis of the Australian Health Watch.  And

7    you haven't seen -- you may know of one.  I'm happy

8    to respond to it, if you can show it to me -- going

9    back to the Glass study and recategorizing, but they

10   may have not been able to, because I don't know what

11   kind of pathology they had available to them.

12       Q.   And we can't tell from the Schnatter paper

13   which comes from where, MDSs come from which of the

14   three studies, right?

15       A.   The way I look at the Schnatter paper and

16   the other one that goes along with it is that we know

17   that the Canadian, particularly the British, studies

18   failed to show us an effect.  There are a variety of

19   reasons that might be.

20           So now you have this very large combined

21   series and they sliced and diced it.  And they have

22   this very significant effect at rather what would

23   have been considered fairly lower -- relatively lower

24   lifetime exposures to benzene in the cases they

25   categorize as MDS.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 35 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 38 of 1330

1        But I don't know that we know where they're

2    coming from.

3        Maybe these are the ones we didn't see in

4    the --

5        Q.  But it's not --

6        A.  It's not a zero-sum game here because it's

7    an expanded data set.

8        Q.  But then Schnatter didn't find excess AML --

9        A.  In the expanded data set.

10       Q.  -- in the expanded data set?

11       A.  That's correct.

12       MR. DUPONT:  Form.

13   BY MR. GRAY:

14       Q.  Didn't find statistically significant excess

15   AML because --

16       MR. DUPONT:  Form.

17       THE WITNESS:  Correct.

18   BY MR. GRAY:

19       Q.  What would really be helpful would be a

20   paper that combined the AMLs and the MDSs in

21   Schnatter and then ran odds ratios from there on a

22   combined basis, based on your view of the --

23       A.  I think that that would be the best way to

24   look at this, absolutely.

25       Q.  Let's talk about familial AML.  Mr. Rhyne's

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 36 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 39 of 1330

1   sister had AML.  I think you reference that on page
2   11 of your report?
3       A.  Yep.
4       Q.  Having a sibling with AML is certainly a
5   risk factor for AML?
6       A.  It is.
7       Q.  Are there published data -- without doing
8   any underlying genetic testing, just knowing you have
9   a sibling with AML, is there published data that
10  would tell us what someone like Mr. Rhyne's odds
11  ratio for an AML diagnosis is?
12      A.  I may have included that here.  Maybe not.
13          Yeah.  So I don't -- I don't carry those
14  data -- I can't carry those data around.  The most
15  recent analysis -- I think the most -- the least
16  biased analysis probably that's emerging is from
17  Dr. Godley, whose work I do reference in here.  And I
18  recently heard her talk.  And I guess I can't come up
19  with that number for you.
20      Q.  Okay.
21      A.  But there is some increased risk from having
22  a sibling, for sure.
23      Q.  Is Dr. Godley's data the data that you
24  reproduced in the tables on page 12?
25      A.  Those are from one of her papers, but they

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 37 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 40 of 1330

1   don't address the specific question you asked me.

2      Q.  That's where you would recommend I go to

3   find that data?

4      A.  I would go to one of her recent datas.

5   She's really done a remarkable job collecting --

6   well, she collects families where there is more than

7   one leukemia or more than one cancer.

8          It turns out that it's a leukemia in people

9   who have first -- they're degree relatives with

10  cancer.  And she is coming up with estimates of, you

11  know, given X number of first-degree relatives with

12  cancer, what are the chances that if you study it

13  you're going to find a familial gene?

14         That's kind of the process.  And there is a

15  bunch we never do.  And she never gets much above 25

16  percent, as I recall.  So in her most highest-risk

17  families, I think -- and I'm really -- I don't want

18  this put on the record as the facts that I know.

19     Q.  You are telling me you are -- go to the

20  paper?

21     A.  I am telling you what I remember the paper

22  saying.  It's vague.  It's generalized.

23     Q.  Yeah.

24     A.  That in the cases that she would consider

25  the most fruitful in whom to investigate the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 38 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 41 of 1330

1    possibility that it's part of a familial cancer

2    syndrome, the best you can get is 25 percent yield

3    with the genes we know about right now.

4        Q.  And is that a --

5        A.  The highest-risk families, I guess, they

6    find them at 25 percent.

7        Q.  Not a 25 percent increased risk, but

8    actually a 25 percent estimate risk?

9        MR. DUPONT:  Objection.

10      THE WITNESS:  No.  The risk of finding such a

11   gene in families like that is 25 percent, at best.

12   And those families are much more positive than this

13   one would be.

14        So that would be the highest risk of finding

15   a familial gene if you were to look for it.

16   BY MR. GRAY:

17        Q.  Okay.

18        A.  So with one sibling, it's, I'm sure, less

19   than 25 percent.  Right from where we are sitting, I

20   haven't -- I just haven't thought to look at that.

21   Sorry.

22        Q.  Even if you can't find the familial gene --

23   well, the familial genes that have been identified

24   may not be all of --

25        A.  Absolutely.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 39 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 42 of 1330

1      Q.   Just for the court reporter's record, may

2   not be all of the genes that are actually involved in

3   familial AML.   You agree with that?

4      A.   Yeah.

5      Q.   Have you ever counseled any of your patients

6   to conduct testing to determine whether or not they

7   have those genes?

8      A.   Yes.

9      Q.   Is it in circumstances where they had family

10   members with the gene -- or with the disease?

11      A.   No.   Well --

12      Q.   Let me ask a better question.   Under what

13   circumstances, as a treating clinician, would you

14   recommend testing for these genes?

15      A.   So we screen every AML and MDS for about 50

16   commonly mutated genes because that's important

17   prognostically and it's helpful diagnostically.   And

18   even sometimes direct therapies specifically based on

19   those findings nowadays.

20          Now, when we find mutations, we determine

21   what's called an allelic ratio, which tells us how

22   many -- like what percent of the DNA of that gene is

23   mutated.

24          You with me?

25      Q.   Yes.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 40 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 43 of 1330

1     A.  So if your allelic ratio is 50 percent, that

2   means half of the genes of that nature are mutated.

3          So most likely one copy, either mom's copy

4   or dad's copy, is mutated and the other one is not.

5   It doesn't tell you if it's acquired or not.

6          If it's 100 percent, that means both copies

7   are abnormal.

8          And that would be very unusual.  And when

9   that happens, we worry about a germline mutation,

10  which would be a familial thing.  And the first thing

11  we would do there is to get germline DNA, which we

12  can do in a number of ways.  And from a paper that

13  I've recently been involved with in MDS through the

14  National Heart, Lung and Blood Institute's MDS

15  Natural History Study, we examined various sources of

16  germline DNA for these patients.

17         You understand that blood goes through all

18  the tissues, so anything you look at is going to be

19  contaminated with blood.  And the standard is you

20  take a skin biopsy and let the skin cells grow over a

21  month.  But that's slow.

22         It turns out that the T lymphocytes, which

23  you can get out of the blood, turn out to be a great

24  source of material.  You can get it pretty cleanly,

25  isolate pretty cleanly.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 41 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 44 of 1330

1    And so we recently did that.  We had a -- it

2    was patient in whom we felt there was likely to be a

3    germline mutation in whichever gene it was.  I think

4    it was C/EBP-alpha.

5    And we had the genetics people isolate the

6    T cells and they ran the T cells.  And, in fact,

7    there is a germline mutation there.  And then she

8    acquired the second mutation which caused her

9    leukemia.  That's a germline mutation.

10    Now they're going back and testing the

11    parents and the other sibs to see who's at risk.  So

12    that's one scenario.

13    Q.  Okay.

14    A.  There is another scenario in a paper that

15    I'm currently -- that was just submitted where I am a

16    co-author from Dr. Godley's group.  We had a

17    family -- I don't remember if it was from my time at

18    Hopkins or from here -- that was -- it was like crazy,

19    had to be a familial cancer because it was very

20    unusual kind of leukemia and a bunch of people in the

21    family had that very rare kind of leukemia.

22    It was nothing like anybody had ever seen

23    before.  And they worked up the family.  I referred

24    them to her and they worked up the family.  I don't

25    remember what gene they found.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 42 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 45 of 1330

1      So that's a different story.  That's kind of

2  more like what you were saying.  Like if you have a

3  history like that, you do it.

4      But the more frequent thing would be, when

5  we do our routine -- our routine screening and we

6  find out that the allelic ratio for any given

7  mutation is 100 percent, that suggests there may be a

8  germline.

9      Q.  The routine screening that you've described

10  in your practice, was that screening performed on

11  Mr. Rhyne from your review of the records?

12      A.  No.  Because of the emergent nature of his

13  presentation, it is said in the records, or in the

14  depositions -- and whether there is a dot, dot, dot --

15  we kind of dropped the ball.

16      It wasn't the first thing they were thinking

17  about, I think, is the thing.  They just wanted to

18  stabilize the patient, who was critically ill, and

19  they didn't send it.

20      Q.  And once you've started treatment, it's

21  really too late to --

22      A.  No, that's not true.

23      Q.  Okay.  You still could?

24      A.  You still could.  But once somebody is in

25  remission, then it's hit or miss.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 43 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 46 of 1330

1    Q.   This is not a standard of care question, but

2    just in your own practice, you would have done

3    additional testing on Mr. Rhyne?

4         Or if he was your patient, he would have

5    received additional testing that would have shed more

6    light on this issue, fair?

7    MR. DUPONT:   Objection; form, vague.

8    THE WITNESS:   It's fair, but I'm sure there have

9    been situations where we have been remiss as well.

10   And what usually happens in those cases, this kind of

11   patient is in the intensive care unit.   The primary

12   team taking care of the patients are intensivists.

13        More importantly, the nursing team is an

14   intensive care team that doesn't know a lot about

15   leukemia.   Now, the leukemia team works carefully

16   with them to spell out everything.   You put all your

17   records in Epic.   It's the electronic medical record.

18        And the way our Epic system here is

19   configured at Yale, it would be pretty easy for

20   things to be ordered and not sent if somebody doesn't

21   know what it is.   That would be an easy human error

22   when you are trying to do a lot of things in the

23   critically ill patient.

24        So that has happened to us in just this

25   scenario where somebody is super sick and you ordered

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 44 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 47 of 1330

1    everything right and you call a week later for the

2    results and it was never sent.

3          It's really unfortunate when that happens.

4    But it happens, I'm sure, everywhere.

5    BY MR. GRAY:

6          Q.  So Mr. Herrick's report, he calculates

7    exposure to Liquid Wrench during the use of Liquid

8    Wrench as a coolant and a lubricant on hot metal

9    surfaces.  Do you recall seeing testimony or

10   statements in reports to that effect?

11         **A.  Yes.**

12         Q.  You understand that Liquid Wrench is a

13   flammable material?

14         MR. DUPONT:  Objection; form, beyond the scope.

15         THE WITNESS:  Yes, it is.

16   BY MR. GRAY:

17         Q.  Would you expect a -- is it a good work

18   practice to use a flammable material on a hot metal

19   surface on a regular basis?

20         MR. DUPONT:  Form, beyond the scope.

21         THE WITNESS:  I'm not an expert in fire prevention.

22   I'm not.

23   BY MR. GRAY:

24         Q.  Just from your common sense, in a nuclear

25   power plant, knowing everything you know about the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 45 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 48 of 1330

1    hazards of an incident in a nuclear power plant, you

2    would agree it is not a good idea to use a flammable

3    material on a hot metal surface on a regular basis?

4        Would you agree with that?

5        MR. DUPONT:  Conversations about fair questions

6    and misleading questions like you wanted to have on

7    Friday of last week and Mr. Rhyne wasn't in the

8    nuclear power plant portion of the building when

9    using the Liquid Wrench on the lathes.

10       MR. GRAY:  You can -- all those objections are --

11       THE WITNESS:  All I would say --

12       MR. DUPONT:  I'll object to form and scope.

13       THE WITNESS:  All I can say is, I would hope

14   that in a place like Duke Energy, it was a highly

15   regulated environment.  I assume that their

16   contractors have highly regulated SOPs.  And I'm

17   assuming that the SOPs, for whatever they use, are

18   followed.

19       And I would expect that good workplace

20   practice includes following your SOPs.  And if they

21   don't have such SOPs, then that's probably Duke

22   Energy.  But given that they're regulated by the U.S.

23   Nuclear Commission, whatever it's called nowadays,

24   I'm guessing they're probably now just like what they

25   were like 30 years ago.  I don't know.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 46 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 49 of 1330

BY MR. GRAY:

  Q.  For anyone working with a product that is
listed as flammable, just as a layperson's common
knowledge, setting aside the nuclear facility aspect,
you would agree it's generally not a good idea to
pour a flammable material on a hot metal surface?

  MR. DUPONT:  Objection; form, beyond the scope.

  THE WITNESS:  I would say it probably has to do
with what the ignition temperature is or how hot the
thing is, because it's not one-size-fits-all in that
regard.

BY MR. GRAY:

  Q.  And that's not information you have?

  **A.  About what he did?  I haven't reread his --
I haven't reread his testimony in two years.  I'm
sorry.**

  Q.  Did you recall seeing any discussion or
explanation of that issue in Mr. Herrick's report
where he sort of worked the corners of that issue and
he talked about, even though it's flammable, here is
why it's okay?

  Did he address the possibility at all of --

  **A.  I didn't read Mr. Herrick's report in great
detail.  I mainly focused on his estimates and how
they differed from Mr. Petty's.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 47 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 50 of 1330

1    Q.   And at this point you are relying on

2  Mr. Herrick's --

3    A.   Yes.

4    Q.   -- estimates as well?

5    A.   Yes.

6    Q.   Mr. Herrick did not calculate any exposure

7  to benzene after 1998.  Does that -- that's what I

8  picked up from page 14 of his report.

9    A.   I would have to take a look at it.

10    Q.   It's a long report, so rather than asking

11  you to go through the whole thing, I'm just going to

12  point out one example of his -- his exposure discussion

13  stopped in 1998 on page 14 there.  I've circled it.

14        Do you see that?

15    A.   That's referring to that sentence.  It

16  doesn't tell me what he is doing for the rest of the

17  thing.

18    Q.   I'm trying to get around having you --

19    A.   I gotcha.

20    Q.   Assume that I'm correct and that Mr. Herrick

21  didn't calculate any exposure after 1998.

22    A.   Are we talking about Liquid Wrench still?

23    Q.   To any benzene-containing product.

24    A.   Okay.

25    Q.   That would be 17 years between '98 and the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 48 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 51 of 1330

1    diagnosis in 2015, right?  16 years.

2        **A.   Yes.**

3        Q.   That's all I have for that.

4             You can describe some of Mr. Rhyne's work as

5    the type of work a mechanic would do?

6        **A.   Plumber it seems more like.  Pipe fitting is**

7    **a plumber's job.**

8        Q.   We've talked about this before.  There are a

9    number of epidemiological studies of mechanics that

10   have data on the extent to which they are at

11   increased risk of leukemia and other cancers, right?

12       **A.   I know that we've talked about that, yeah.**

13       Q.   You have never undertaken to generate an

14   opinion about whether or not people doing mechanic

15   work are at increased risk of AML as a group, have

16   you?

17       **A.   Well, I think that there is such a variety**

18   **of what mechanics do that that would be kind of a**

19   **useless endeavor.**

20       Q.   Well -- but there have been over a dozen

21   studies published about that.  You think those

22   authors were wasting their time?

23       **A.   I would have to look at any particular one**

24   **that you point me to.  I think you have to define**

25   **your population that's potentially at risk carefully**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 49 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 52 of 1330

1    and specifically potentially product-based.

2          So a mechanic who just does dry wrenches and

3    whatever else in soldering and other things mechanics

4    do and uses different kinds of solvents for cleaning

5    is going to be substantially different than somebody

6    who is using Liquid Wrench, back in the day especially,

7    and the mineral spirits even currently and such.  I

8    think that matters.

9          Q.   Okay.

10         A.   Excuse me.  Can we take a break so I can

11   feed my meter?  It will be two seconds.

12                        (Whereupon, a break was taken

13                        from 10:35 a.m. until 10:37 a.m.)

14   BY MR. GRAY:

15         Q.   I'm going to hand you -- I'm not going to

16   mark it, but it's Dr. Shields' report.  And on page

17   51 he has a discussion of his review of the

18   literature on mechanics and AML risk.

19         A.   Go ahead.

20         Q.   He makes a statement at the very top of his

21   discussion of mechanics and AML risk where he refers

22   to studies that have looked at mechanics and risk of

23   cancer, including leukemia, and he cites footnotes, I

24   think, 447 through 462.

25         A.   Uh-huh.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 50 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 53 of 1330

1     Q.  Suggesting that's about 15 studies.  I

2  understand why you wouldn't have done it based on

3  your prior testimony.  But you've never undertaken a

4  comprehensive review of, I'm going to go out and find

5  all the mechanic studies and I'm going to read them

6  and reach a conclusion about whether or not as a

7  worker group there is an increased risk of --

8     **A.  Well, his next sentence that you don't have**

9  **underlined says, "These studies date back to a time**

10  **when mechanics would have worked with products that**

11  **had benzene contents of solvents that could be much**

12  **higher."**

13     **But in so stating, the implication is that**

14  **he doesn't know that they did because it wasn't**

15  **enumerated in those studies.  So everything that I've**

16  **said about the reasons that those would not be**

17  **considered to be valid comparers obtains here.**

18     Q.  So I think that answers my question.  That's

19  not something you've done, and you've just explained

20  why you haven't done it, fair?

21     **A.  Yeah, fair.**

22     Q.  It's your opinion that compounds that have

23  low levels of benzene in the 1, 2, 3, 5 percent --

24     **A.  Products.  Products that have low --**

25     Q.  Products.  Yes, products.  I'm just going to

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 51 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 54 of 1330

1    use a broad range.  Between 1 and 5 percent benzene

2    can cause AML?

3         **A.  Yes.**

4         MR. DUPONT:  Form.

5    BY MR. GRAY:

6         Q.  Are you familiar with statements by IARC

7    about whether or not gasoline has been determined to

8    be a carcinogen?  You are, right?

9         **A.  Yes.**

10         Q.  As of IARC volume 45, IARC said there was

11    inadequate evidence that gasoline is a carcinogen,

12    right?

13         **A.  Right.  But that's a separate question about**

14    **whether gasoline is a carcinogen.**

15         Q.  Well, IARC found there was inadequate

16    evidence that gasoline was a carcinogen, right?

17         **A.  That's correct.**

18         Q.  And ACGIH has made similar statements in its

19    publications?

20         **A.  You'll have to give me the -- explain your**

21    **acronym.**

22         Q.  The American Conference of Governmental

23    Industrial Hygienists.  Is that --

24         **A.  I don't know.**

25         MR. GRAY:  Dr. Gore, those are all the questions

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 52 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 55 of 1330

1    I have.

2         THE WITNESS:  Thank you.

3         MR. GRAY:  Are you ready or do you want to take

4    a break?

5         MR. SCHULTZ:  We can go off the record.

6                        (Whereupon, a break was taken

7                        from 10:41 a.m. until 10:42 a.m.)

8                   EXAMINATION

9    BY MR. SCHULTZ:

10        Q.  Doctor, we are back on the record.  My name

11   is Vaughn Schultz.  I just want to continue with some

12   questions.  I want to touch on a couple of topics

13   that Mr. Gray asked you about.

14        **A.  Okay.**

15        Q.  You implied earlier when Mr. Gray was

16   questioning you that the body has evolved to repair

17   endogenous damage better than exogenous damage; is

18   that fair?

19        **A.  Yeah.**

20        Q.  Okay.  What's your basis for that statement?

21        **A.  Because we survive, on average, 75 years, or**

22   **70 years.  And if we didn't have such protection, we**

23   **would all have cancer at very young ages, because**

24   **cancer is a disease of aging.  So it goes, therefore,**

25   **without question that -- since we know that these**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 53 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 56 of 1330

1    events happen a gazillion times a day, reactive

2    oxygen species and superoxide and free radicals.  It

3    is well known, we know the body has antioxidants.

4    These are carefully studied.  There is glutathione.

5    There's many others.

6         Q.  But you're just basing that on an assumption

7    because people live longer?

8         A.  I am basing it on evolutionary biology.

9         Q.  You are not an evolutionary biologist,

10   right?

11        A.  No, but I am a biologist.

12        Q.  You are not an expert in evolution?

13        A.  No, I am not.

14        Q.  Do you have any idea how the body's repair

15   system differentiates from endogenous toxin damage

16   versus exogenous toxin damage?

17        A.  Well, you know, the area of DNA repair is

18   very complicated.  There are several pathways

19   involved which have numerous multiprotein complexes.

20   There is the non-homologous end joining, which would

21   be abbreviated NHEJ, and the more conventional DNA

22   repair machinery.

23            And you are asking me if I remember why one

24   kind of repair would be easier than the other or why

25   repair -- some of it has to do with -- with

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 54 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 57 of 1330

1    complexity of damage and amount of damage.

2        Q.   I'm asking you, do you know how the body

3    differentiates that damage?

4        A.   Well, there is different -- absolutely.  So

5    there is different types of DNA damage induced by

6    these various agents.  Some are single-stranded

7    breaks, some are double-stranded breaks.  There is

8    cross-linking, and some the body is not good at and

9    some the body is good at.

10            That's absolutely known.  Again, I can't

11   recite chapter and verse, but I think the fact that

12   we survive is prima facie evidence that we deal with

13   most of the DNA damage that's done through

14   physiological processes pretty well, because we know

15   if we measured it at any given time, it's going on

16   all the time.

17       Q.   You agree, correlation does not mean

18   causation, correct?

19       A.   I would agree with that.

20       Q.   Would you also agree that benzene has

21   existed on earth longer than humans have?

22       A.   Yes.

23       Q.   So your statement that humans have evolved

24   to deal with radiation but have not dealt with

25   benzene is based on what?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 55 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 58 of 1330

1    A.    You weren't asking me about radiation.    You

2  were talking about endogenous DNA-damaging agents, is

3  what you asked me about.

4    Q.    I apologize.    I'm going back to what you

5  told Mr. Gray this morning that --

6    A.    Well, we talked about several things.

7    Q.    Right.    You had mentioned -- tell me if I'm

8  wrong -- that the body has evolved to handle

9  radiation exposure better than benzene; is that fair?

10    A.    I don't really think we had that discussion,

11  no.    We had a discussion about the body had evolved

12  to deal with endogenous DNA-damaging molecules like

13  free radicals and superoxide, ozone to some extent.

14    Q.    Well, if you didn't testify, that's fine.    I

15  wrote down that you said that humans can tolerate

16  radiation better than benzene.    Is that not your

17  testimony?

18    A.    I did not testify to that.

19    Q.    So you don't have an opinion that humans can

20  tolerate radiation better than benzene?

21    A.    There is a different dose response to

22  radiation.    And we know that radiation causes

23  leukemia in the appropriate setting.    And certainly

24  radiation and chemical toxins, particularly in the

25  form of chemotherapy, can synergize to cause leukemia.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 56 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 59 of 1330

1    We know that.

2        Q.  So you do not have an opinion that the body

3    can tolerate radiation better than benzene?

4        A.  I mean, I don't mean this in an insulting

5    way, but it's kind of -- I won't say it's a stupid

6    question, but it's not really -- it's not a

7    reasonable thing that you are asking me to compare.

8        Q.  Okay.

9        A.  Because we give radiation at super high

10   doses for treatment, and we know there is limits --

11   there is tissue limits for different tissues.  The

12   spinal cord is very sensitive.  The gastrointestinal

13   system is very sensitive.

14       Other tissues are much less sensitive.  So

15   you can give a lot of radiation to the prostate to

16   cure prostate cancer that you couldn't give to the

17   bone marrow.  That's very well characterized.

18       And the kind of radiation that Mr. Gray and

19   I were talking about had to do with solar radiation

20   and ambient cosmic radiation.  It's a wholly

21   different magnitude.

22       So I can't tell you if I had -- I just don't

23   think they can be compared, let's just put it that

24   way.  I'll make it simple.

25       Q.  There is ambient benzene exposure to humans,

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1  Filed 09/02/20  Page 57 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20  Page 60 of 1330

1    correct?

2         A.   There is.

3         Q.   And some of that is naturally occurring

4    benzene?

5         MR. DUPONT:   Form.

6         THE WITNESS:   I don't know about that actually.

7    Most of the benzene in our environment is an

8    industrial pollutant.

9    BY MR. SCHULTZ:

10        Q.   There is certainly benzene in food and air

11   and water?

12        A.   Trace amounts.

13        Q.   Do you have an opinion as to whether that

14   benzene is not tolerated by the body compared to

15   radiation from solar?

16        A.   You know, I just -- I'm not trying to be

17   difficult, Counselor.   I don't know how to respond to

18   you.

19             I think that everything that the body

20   ingests and everything that's in the environment

21   contributes to the baseline incidence of myeloid

22   malignancies in the population that's not

23   occupationally otherwise exposed or industrially

24   exposed or chemotherapeutically exposed or exposed to

25   cigarettes.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 58 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 61 of 1330

1          I think there is some baseline that the

2    average person leading a relatively healthy life has

3    a certain incidence of leukemia and it doesn't come

4    out of the blue.  Has to do with mistakes their body

5    made, has to do with stuff in their environment.

6          But, sure, it could include some benzene in

7    the food.  I have no reason to think -- to doubt

8    that.  It could have to do with some radiation in the

9    environment.  All of that is possible.

10         And that gets summed in some baseline rate.

11   Now we're talking about occupational exposures to X,

12   Y or Z that increase that rate from B to E, whatever

13   that might be.

14        Q.  In your report --

15        A.  And the same is true of radiation.

16        Q.  In your report, first -- there is several

17   paragraphs that have no citation and it is just a lot

18   of prose that you have written out.  Paragraphs 4, 5,

19   6, 7, 8, 9, 10 have no citations whatsoever.

20        A.  4, 5 is my history and training and my CV.

21        Q.  Oh, you must have more than 4.

22        A.  Are you in section 2?

23        Q.  I'm on page 4 -- paragraphs 4 through 10 on

24   page 6, there is no citations for any of those

25   paragraphs.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 59 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 62 of 1330

1     A.  That's correct.

2     Q.  Where is that information derived from?

3     A.  This is basic biology.  This is well-agreed-

4  upon biology, so I'm really summarizing a vast

5  quantity of the stuff that I've learned over the last

6  30 years and I don't feel the need to annotate them

7  because I don't think any of it is really

8  controversial.

9     Q.  What about the statement that "A leukemic

10  stem cell may be" --

11     A.  Quiescent.

12     Q.  -- "quiescent for an extensive period" in

13  paragraph 8?

14     A.  Because we --

15     Q.  What's the citation or the basis for that?

16     A.  Well, we know that leukemia -- the stem

17  cells are quiescent.  And we know the leukemia stem

18  cells become quiescent.  There is plenty of data

19  about that.

20     Q.  Can you cite that?

21     A.  As we are sitting here?  Nobody has asked me

22  to, but I'm happy to supply you with information

23  about that, absolutely.  There is published data

24  about leukemia stem cells which are mostly in a

25  quiescent state.  We know that.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 60 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 63 of 1330

1          Again, that's stem cell biology.  There is a
2     gazillion articles about that.
3          Q.  But you haven't cited any, right?
4          A.  As you stated, I didn't, because it's like
5     telling you that your hair is red.
6               Do I have a set citation for that?  It's
7     true.  We know that.
8          Q.  Well, my hair is not red.
9          A.  Well, I would call it red.
10    MR. DUPONT:  That's not the point.
11    BY MR. SCHULTZ:
12         Q.  The statement "may be quiescent," what is
13    the certainty that a leukemic stem cell would be
14    quiescent?
15         A.  Most stem cells are quiescent.  The vast
16    majority of stem cells are quiescent, malignant and
17    otherwise.  That's stem cell biology.
18         Q.  What percentage?
19         A.  99 percent, or something like that, at any
20    given time.  That's the nature of stem cells.
21         Q.  Do you agree that benzene only causes
22    damages to dividing stem cells?
23         A.  No, that's not true.  That's not necessarily
24    true.
25         Q.  Not necessarily true?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 61 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 64 of 1330

1      A.   That's not true.

2      Q.   Are you familiar with the work of Martin

3  Smith?

4      A.   You'll have to tell me what you are talking

5  about in particular.

6      Q.   You are aware of who Martin Smith is?

7      A.   I am.

8      Q.   Have you read any of his papers?

9      A.   I have.

10     Q.   Are you familiar with any of his papers that

11  suggests that benzene only damages dividing stem

12  cells?

13     A.   Not as we sit here, no.

14     Q.   With regard to obesity, you noted at least

15  some data that has suggested a risk factor of 1.5 --

16     A.   Correct.

17     Q.   -- for causation of AML?

18     A.   Yeah.

19     Q.   Assuming Mr. Rhyne had no occupational

20  exposures to any solvents or chemicals, would that

21  have been significant to you, the 1.5 risk ratio?

22     A.   Yeah, I think it is.  Even with him having

23  that, I think that that's a factor in his risk for

24  leukemia, absolutely.  His BMI was about 31 and that

25  puts him in a category that has about a 1.5-fold risk

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 62 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 65 of 1330

 1    of leukemia over the thinner populations.

 2       Q.  If you could turn to -- I guess it's

 3    paragraph 1 of your methodology section.  The first

 4    sentence there, it suggests that you were evaluating

 5    an individual's exposure to one or more chemicals.

 6            Is what that your methodology was in this

 7    case?

 8        MR. DUPONT:  Vague.

 9        THE WITNESS:  I was asked to respond to whether

10    this patient's occupational exposure to benzene may

11    have been causative in his leukemia.  So by

12    definition, that is what I was asked to do.

13            That's not a method.  That is a happenstance

14    when evaluating, when tasked with this.  But what you

15    read to me is not a method.  The method is what you

16    do in order to respond to the task.

17    BY MR. SCHULTZ:

18       Q.  My question is, were there more than one

19    chemical that you evaluated or was benzene the only

20    one?

21        MR. DUPONT:  Vague.

22        THE WITNESS:  We know that raffinate and Liquid

23    Wrench have other chemicals that we don't associate

24    with the same kind of leukemic risk, things like

25    toluene and other hydrocarbons.  We did talk about

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 63 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 66 of 1330

1    the radiation issue, which I did address.  We can

2    consider radiation a chemical in that way.

3    BY MR. SCHULTZ:

4        Q.  Did you look at any literature or evaluate

5    mineral spirits as a chemical in this case?

6        **A.  I have, sure.**

7        Q.  And how did you evaluate -- or where are

8    your opinions about mineral spirits in your report?

9        **A.  Mineral spirits would be another source of**

10   **benzene through its benzene contamination, which we**

11   **know to be often substantial, and I would rely then**

12   **on the industrial hygienist expert, in this case**

13   **Mr. Herrick, to quantify the likely exposure to**

14   **benzene through mineral spirits in his or her report.**

15   **I would rely on that because I am really not**

16   **trained to do that.**

17       Q.  So you did not evaluate any of the

18   epidemiological or medical literature regarding

19   mineral spirits exposure?

20       **A.  No, I have.  In general, I didn't have to,**

21   **no, because I come with a body of information about**

22   **this and I am well aware that mineral spirits is**

23   **contaminated with significant amounts of benzene.**

24       **So that's a question of, not does mineral**

25   **spirits cause cancer, but does the benzene in mineral**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 64 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 67 of 1330

 1    spirits cause cancer.

 2         Benzene doesn't care if it's next to methane

 3    or -- benzene is benzene.  The body doesn't care.  It

 4    is the same molecule, no matter how you get it.

 5         So the question that you're asking is an

 6    obfuscating one.  It is a question of how much

 7    benzene does he get through his use of mineral

 8    spirits, not does mineral spirits cause cancer.

 9         That's not really a question here.  It's

10    whether benzene causes cancer, which we know it does.

11         Is benzene in mineral spirits?  Yes.

12         How much benzene does he get from mineral

13    spirits?  And then determining whether that --

14    whether that is seen as a significant thing.

15         But you can't parse out one source of

16    benzene from another in the body, so you have to sort

17    of add up a lump sum because you can't isolate the

18    benzene that came from mineral spirits versus the

19    benzene that came from raffinate versus the benzene

20    that came from whatever other thing he was doing.

21         The body doesn't know where it came from.

22    We don't know which molecule benzene did what.

23    Everything has to be considered to be contributory.

24         Q.  You said a lot there.  I'm just trying to

25    unpack some of it.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 65 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 68 of 1330

1         Did you just say mineral spirits is benzene?

2     A.  I did not say that.  Maybe you should have

3  her read back about that if you want.

4         Mineral spirits is known to be contaminated

5  with benzene, I believe is what I said.  I'm sure

6  that's true.

7     Q.  We can move on.  Is it fair that you have

8  not evaluated any literature specific to exposure to

9  mineral spirits?

10     A.  You asked and I answered that, Counselor.  I

11  said that I have.

12         I did not in this particular incident

13  because I have reviewed those data.

14     Q.  Do mineral spirit -- strike that.

15         Does mineral spirits -- strike that.

16         Does exposure to mineral spirits cause

17  cancer?

18     A.  I would say that in the right amounts,

19  exposure to mineral spirits does cause cancer,

20  because mineral spirits is a complex amalgam of a

21  variety of compounds, some of which we know to cause

22  cancer.  So yes.

23     Q.  Other than you, Dr. Gore, who has issued the

24  opinion, from any international agency or governmental

25  agency, that mineral spirits exposure causes cancer?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 66 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 69 of 1330

1      A.   Again, you are turning my answer around,

2  Counselor, which I object to a little bit because I

3  said the benzene in mineral spirits causes cancer.

4  That's a different question.

5      Q.   That's fine.  You can answer that question.

6           My question is different, which I believe

7  you answered prior.  Does exposure to mineral spirits

8  cause cancer?

9      A.   I said it does in the right circumstances

10  because it contains benzene.

11      Q.   Is that a dose-dependent question for you?

12      A.   Absolutely.

13      Q.   What is the dose of exposure to mineral

14  spirits that causes cancer?

15      A.   It would be based on the fraction of mineral

16  spirits that has benzene, and I would base it on the

17  benzene literature.  So if you have 1 percent benzene

18  in mineral spirits, you would have to figure out the

19  parts per million-years of benzene based on their

20  occupational exposure, and I would derive it not from

21  mineral spirits data, but from benzene data I would

22  extrapolate.

23           And that is my methodology.

24           So if you get to above 3 parts per million-

25  years -- let's just say, just to be Schnatteresque

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 67 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 70 of 1330

1  about it, if you get 3 parts per million-years of

2  benzene from slapping mineral spirits all over your

3  body every day, you would be at risk for leukemia.

4        And if you came to me and said, I'm a

5  hobbyist and I smear mineral spirits all over me

6  every day and this is what it is and it's every day

7  and it's this much, and some hygienist says, Well,

8  that gets to 3 parts per million-years, you bet that

9  that was contributory to your leukemia.

10        Q.  Where have you seen published data that

11  exposure to mineral spirits causes leukemia?

12        MR. DUPONT:  Objection; form.

13        THE WITNESS:  I don't have a response to that

14  right now.

15  BY MR. SCHULTZ:

16        Q.  Have you ever seen it?

17        MR. DUPONT:  Objection; form.

18        THE WITNESS:  I haven't re-upped my reading

19  specifically looking at mineral spirits, per se, for

20  this testimony and so I'm not going to respond to

21  that.

22  BY MR. SCHULTZ:

23        Q.  You are familiar with IARC, correct?

24        A.  I am familiar with IARC.

25        Q.  You do not cite IARC anywhere in your

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 68 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 71 of 1330

1   report; is that fair?

2       A.  Right.  Because I think IARC is of limited

3   utility in these cases.  I know defense attorneys

4   love IARC, but it's all obfuscation.  It's all saying --

5   trying to say that my product, which was looked at in

6   a certain way, is considered to be safe under certain

7   circumstances.

8           But that's not the circumstances we're

9   talking about here.  Now we're talking about multiple

10  chronic exposures to multiple benzene-indicating

11  compounds, and that's what's causing leukemia.

12          So the thing specifically about whether

13  mineral spirits, per se, causes leukemia is an

14  irrelevant question, in my opinion, causation-wise.

15      Q.  Do you agree with IARC's findings with

16  regard to benzene?

17      MR. DUPONT:  Form, compound.

18      THE WITNESS:  I agree that IARC sets standards

19  of reasonable risk for the country and other agencies

20  to employ which will accept a certain amount of

21  cancer causation by the various things it studies.

22  The society as a whole accepts a certain amount of

23  risk.

24          That's what these agencies do; they say

25  what's an unacceptable risk, what's an acceptable

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 69 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 72 of 1330

Page 68

1  risk, where do we get it.  And none of it is

2  absolutely safe.

3        Absolutely IARC says that there are no safe

4  levels of benzene, and then they set standards.  And

5  given that we have to use it, what are we going to

6  accept?

7        So I think you are using IARC and other

8  regulatory agencies for the wrong purpose, Counselor.

9  They don't absolve any of these compounds from being

10  carcinogenic.

11  BY MR. SCHULTZ:

12     Q.  Did you just say IARC says that there is no

13  safe level of exposure to benzene?  I'm just asking --

14     **A.  I did say that.**

15     Q.  Did you mean to say that?

16     **A.  You know, some of the regulatory documents,**

17  **whether it is IARC or another one, absolutely say**

18  **that there is no safe level of benzene.**

19        **Whether it is IARC exactly, I can't tell you**

20  **exactly.**

21     Q.  Do you agree that IARC has determined that

22  benzene -- can you mute your phone, please?

23     **A.  Whoever is typing needs to be on mute.**

24     Q.  Do you agree that IARC has determined

25  benzene to be a carcinogen because of its propensity

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 70 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 73 of 1330

1    to cause acute myelogenous leukemia?

2        A.   Yes.

3        Q.   Do you disagree with that finding?

4        A.   Do I disagree with that finding?

5        Q.   That's not a trick question.

6        A.   I feel like it was a trick question.   I

7    don't have the IARC monograph in front of me and I

8    didn't review it for this testimony.

9            I am familiar with it.   I can't recite it

10   chapter and verse.

11           I feel like you are asking me to be boxed

12   into something that could be factually incorrect.

13   You are potentially trying to corner me into

14   something that IARC did or didn't say.

15           I think what I would ask, or request, is

16   that if you want me to respond to a certain thing in

17   the IARC monograph, please pull it up and I'm very

18   happy to tell you whether I agree with that or not,

19   because I don't have it memorized.

20       Q.   Sure.   It wasn't a trick question.

21       A.   Well, why should I trust you?

22       Q.   I'm just asking --

23       A.   I'm under oath, you're not.

24       Q.   -- do you agree that IARC has determined

25   benzene to be a carcinogen?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 71 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 74 of 1330

1     **A.   Yes.**

2        Q.   Do you agree that IARC has not determined

3     mineral spirits to be a carcinogen?

4     **A.   I don't remember off the top of my head.**

5        Q.   Have you ever reviewed IARC's monograph on

6     mineral spirits?

7     **A.   I have.   Have I done it recently?   No.**

8        Q.   Did you do it for this case?

9     **A.   No.   I already told you I didn't review**

10    **mineral spirits literature for this case.**

11       Q.   You noted in your report that the absence of

12    a safe threshold is critically important to your

13    analysis?

14    **A.   Yes.**

15       Q.   Is there a safe threshold of exposure to

16    mineral spirits?

17    **A.   Counselor, I feel like you really haven't**

18    **listened to me, intentionally or otherwise.   And so**

19    **I'll try to explain it maybe differently or more**

20    **simply.   I am responding to the question of whether**

21    **benzene causes leukemia in this case.   I believe the**

22    **answer is yes.**

23    **The next question is, does mineral spirits**

24    **contain benzene?   Yes.**

25    **Did the patient use mineral spirits?   Yes.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 72 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 75 of 1330

1          Can the benzene in the mineral spirits be

2     dismissed?  No.

3          That is my testimony.

4     Q.   I understand what your position is and how

5     you got to your position.  I asked a simple question.

6     Is there a safe level of exposure to mineral spirits?

7     A.   I would say no.

8     MR. GRAY:  Asked and answered.

9     BY MR. SCHULTZ:

10    Q.   And what is your basis for that statement?

11    A.   Because it has benzene in it and there is no

12    safe level of benzene.  I am very consistent in my

13    logic, Counselor.

14    Q.   So if there is no safe level of benzene, how

15    do you dismiss certain benzene exposures in the air

16    or in water or food?

17    A.   Because it's all probabilistic.  And the

18    amount in air, water and food is orders of magnitude

19    less than in your product, Counselor, assuming that

20    you are representing a mineral spirits manufacturer,

21    which it would seem to me that you must be.  Either

22    that or you're trying to defend somebody else out of

23    the goodness of your heart.

24    Q.   Is there a safe level of exposure to

25    chemicals that have not been determined to be

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 73 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 76 of 1330

1    carcinogen?

2         MR. DUPONT:  Objection; vague.

3         THE WITNESS:  Well, let's take sodium chloride.

4    That's a chemical.  And from a cancer point of view,

5    I think there is no evidence that sodium chloride

6    causes cancer.  It does cause high blood pressure.

7              Even sodium chloride, one of our most

8    popular chemicals in the food industry, we know it to

9    be unsafe for people who have high blood pressure.

10             So, yeah, there are limits to that.  That's

11   sodium chloride.  But it's not going to cause cancer,

12   as far as we know.

13             Olive oil.  Olive oil is a chemical.  It's

14   compounds.  There are fats, an amalgam of fats, that

15   don't particularly include benzene, as far as I know.

16   Olive oil is pretty good for you if you're going to

17   eat fats in your diet.  We usually know that.

18             But there are people who need to restrict

19   the amount of fats in their diet because of their

20   health.  So there is a limit to everything.

21   BY MR. SCHULTZ:

22        Q.  Would you consider benzene exposures from

23   the ambient air trivial?

24        **A.  I would consider them part of the baseline**

25   **to which all of our leukemia patients are exposed.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 74 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 77 of 1330

1   So trivial in that way.  That's what trivial means.

2   You can't boost it above baseline because everyone is

3   exposed to the ambient.  It is part of the given, the

4   given from which we can't get away.

5        Q.  Do you know what the published literature

6   reports for cumulative lifetime ambient exposures to

7   benzene?

8        MR. DUPONT:  Objection.

9        THE WITNESS:  It's in the parts per billion

10  range.

11  BY MR. SCHULTZ:

12       Q.  You haven't seen any literature suggesting

13  it could be between .5 and 1 part per million in a

14  lifetime?

15       A.  I'm not recalling it, as I sit here, but I'm

16  happy to respond to anything you might supply me

17  with, Counselor.

18       Q.  Are you familiar with the National

19  Toxicology Program?

20       A.  Not as we sit here.

21       Q.  You are not aware of its list of carcinogens

22  it's published?

23       A.  You asked me if I recognize that name and I

24  am saying I don't.  It doesn't mean I haven't seen

25  anything about it.  I just don't know, as I'm sitting

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 75 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 78 of 1330

1    here.

2       Q.  That's fine.  I wasn't trying -- just have

3    you ever heard of the National Toxicology Program's

4    list of carcinogens?

5       **A.  I may or may not have.  I don't know, as I**

6    **sit here.  I guess I would say "I don't know" is the**

7    **appropriate answer.**

8       Q.  Do you agree with OSHA's decision to

9    regulate benzene as a carcinogen?

10      MR. DUPONT:  Objection; vague.

11      THE WITNESS:  I agree with OSHA that it should

12   be regulated, yes.

13   BY MR. SCHULTZ:

14      Q.  Do you agree with their decision not to

15   regulate mineral spirits as a carcinogen?

16      MR. DUPONT:  Objection; vague, misleading.

17      THE WITNESS:  There is many reasons to regulate

18   these chemicals, and I think they should all be

19   regulated.

20         Again, I haven't examined recently, as I've

21   told you already -- and I'm sure you remember that,

22   that I haven't reviewed the IARC monograph on mineral

23   spirits recently.  So it's hard for me to agree or

24   disagree with it.

25         I certainly know that there is guidelines

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 76 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 79 of 1330

1   around how you use mineral spirits.  For example, you

2   don't ingest it, you don't use it without appropriate

3   protective gloves.  That recognizes there is toxicity

4   to it.  So there is regulation around it.

5           I'm sure it has a skull and crossbones on

6   its container.

7   BY MR. SCHULTZ:

8       Q.  In your report you have not listed any

9   studies that show a statistically significant

10  relationship between exposure to mineral spirits and

11  AML.

12      **A.  That's correct.**

13      Q.  Do you know what the benzene content of

14  mineral spirits is?

15      **A.  Well, it's been a while since I've looked at**

16  **that, but I'm remembering things like in the 1**

17  **percent range.  That's what I remember, as I'm sitting**

18  **here.  But as I said, I haven't reviewed that recently.**

19      Q.  I know you have not cited to any in your

20  report.  As you sit here today, can you cite to any

21  article or publication that describes statistically

22  significant increased risk of leukemia from exposure

23  to mineral spirits?

24      **A.  I thought you just asked me that and I said**

25  **I couldn't.  You just asked me that.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 77 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 80 of 1330

1      I was waiting for some "asked and answered"

2   from my colleague on the left.

3      Q.  I thought I asked first whether it was in

4   your report, and that was if you can think of any --

5      A.  That's fine.  I'm happy to repeat myself.

6   You're paying for it.  That's okay.

7      Q.  You cited the API 1948 document in your

8   report in footnote.  Do you recall that?

9      A.  Show me where.

10     Q.  Paragraph 16 -- page 16.

11     A.  EPA.  Is that what you said, EPA?

12     Q.  API, 1948.  It's in footnote 4.

13     A.  Yes.

14     Q.  When is the last time you reviewed that

15  document?

16     A.  Ten years ago probably.

17     Q.  Do you recall the author of the document?

18     A.  I don't.

19     Q.  Have you ever heard of Marshall Clinton?

20     A.  Not as we sit here.

21     Q.  Have you ever investigated yourself the

22  basis for the statement that there is no safe level

23  of exposure to benzene that was cited in that 1948

24  document?

25     A.  I have read lots of literature about benzene

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 78 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 81 of 1330

1    **and carcinogenesis, and most of the scientific data**

2    **which I am aware comes to a conclusion that there is**

3    **no known safe level of benzene.**

4    **And it's not a unique finding.  That's just**

5    **one of the first.**

6    Q.  My question was, have you ever investigated

7    the basis for the statement in that 1948 document?

8    **A.  I don't remember.**

9    Q.  Do you know what they cited to?

10    **A.  I said, "I don't remember."**

11    Q.  Okay.  Earlier you mentioned that you

12    thought that Vogelstein would have an issue with how

13    his work has been utilized by some people.

14    **A.  I haven't talked to Bert about it, but I**

15    **wouldn't be surprised.**

16    Q.  You're aware that there have been some

17    papers that have actually criticized the Tomasetti

18    and Vogelstein work?

19    **A.  Absolutely.**

20    Q.  Are you familiar with the Wu papers?

21    **A.  Counselor, you like to recite things which**

22    **you can remember because you've specifically prepared**

23    **for this testimony in a certain way.  And I don't**

24    **have files of names in my head if it's not something**

25    **I'm prepared for.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 79 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 82 of 1330

1      **So I don't particularly know the Wu studies.**

2  **Doesn't mean I haven't read them. I may or may not**

3  **have. There is lots of Wus. I read a lot of papers**

4  **by people with Asian names in a lot of fields.**

5      **I just a little bit object to the way you**

6  **present yourself. I'm sorry. Personally.**

7      **It's not my job to, but I'm just saying,**

8  **this is why I have difficulty responding to your**

9  **questions, because you ask them in a way that I feel**

10  **that are not really respondable, which maybe that's**

11  **your goal. I don't know.**

12    Q. All I asked is if you are familiar with the

13  paper. If you can't remember, as you sit here,

14  that's fine.

15    MR. DUPONT: You said the Wu paper, which lacks

16  a title, lacks publication, lacks a year. There is

17  many ways that the question is inappropriate.

18  BY MR. SCHULTZ:

19    Q. Sure. Are you familiar with the Wu paper

20  that responded to the Tomasetti and Vogelstein work?

21    **A. I'm not sure what you're referring to, is**

22  **all I'll say.**

23    Q. Are you aware of any governmental agency

24  that has regulated mineral spirits as a carcinogen?

25    MR. DUPONT: Vague.

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 80 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 83 of 1330

1      THE WITNESS:  I am not.

2      MR. SCHULTZ:  I think that's all the questions I

3  have for you.

4      THE WITNESS:  Thank you.

5      MS. WOOTEN:  Do you want to take a break?

6      THE WITNESS:  I'm fine.

7      MR. GRAY:  Could we take a quick five?  We've

8  been going a little over an hour since the last

9  break.

10                     (Whereupon, a break was taken

11                      from 11:17 a.m. until 11:32 a.m.)

12                  EXAMINATION

13  BY MS. WOOTEN:

14      Q.  Dr. Gore, we met earlier.  My name is

15  Virginia Wooten, and I represent Turtle Wax in this

16  matter.

17      **A.  Turtle Wax.**

18      Q.  And I just have a few follow-up questions

19  for you.  I know we've been going for a while and we

20  touched on the subjects --

21      **A.  We're good.**

22      Q.  -- at this point.

23          Do you happen to have a record of your prior

24  expert testimony in cases?

25      **A.  Andrew has it.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 81 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 84 of 1330

1      Q.  Andrew has it?  Okay.

2      MR. DUPONT:  I can email that out.  I'm thinking

3  it's in the Dropbox.

4      MS. WOOTEN:  That would be great.

5      MR. DUPONT:  Or part of our Rule 26 disclosures.

6  I'll get that to you.

7  BY MS. WOOTEN:

8      Q.  What percentage of past cases have you been

9  hired by the plaintiff as an expert witness?

10     **A.  This plaintiff?**

11     Q.  In general by the plaintiff's side.

12     **A.  Oh, so -- so in one case, which is not**

13  **exactly the same, I worked for insurance companies**

14  **that indemnify a radiator specialty company in a case**

15  **having to do with latency.**

16       So that was -- the issue at hand was whether

17  liability-carrying insurance companies that carried

18  radiator in the past should be considered responsible

19  for later onset leukemia.  So in that case in some

20  ways I was -- I don't know what you call that.  But

21  in some ways I was working for radiator as the

22  plaintiff.  I don't know.  I don't know how you call

23  it.  But my medical causation issues here have been

24  for plaintiff.

25     Q.  How many cases have you testified in either

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 82 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 85 of 1330

Page 81

1    deposition or at trial?

2         A.   12 to 15.

3         Q.   How many have involved benzene exposure?

4         A.   Almost exclusively.  Yeah, it's almost

5    exclusively benzene.

6         Q.   Ever testified in a case in North Carolina?

7         A.   I'm not sure.  I think I did something in

8    North Carolina that had to do with something else.

9    There was -- there may not have been.  There was a

10   case where I was deposed via Skype on little tablets.

11   I think that was North Carolina.  That was some rural

12   place in North Carolina.  That was last year.

13        Q.   Do you happen to remember the name of the

14   case or the parties involved?

15        A.   I won't forget the faces of the two attorneys,

16   who were brothers.  But, no, I don't remember.  I

17   could fish it up for you.

18             There was something in North Carolina that

19   had to do with -- that had to do with a pharmaceutical

20   company that had been taken over by another

21   pharmaceutical company, and I believe it had to do

22   with insurance coverage for an employee who developed

23   leukemia.  I don't think it was a causation case, but

24   I don't remember what it had to do with.  That was in

25   North Carolina also, I'm pretty sure.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 83 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 86 of 1330

1       Q.   Have you ever practiced medicine in

2   North Carolina?

3       **A.   No.**

4       Q.   Licensed to practice medicine in North

5   Carolina?

6       **A.   No.**

7       Q.   Have you ever been hired by Mr. DuPont

8   before to testify as an expert?

9       **A.   Yes.**

10       Q.   How many times?

11       **A.   I'm going to guess eight.**

12       Q.   Have you ever been excluded as an expert in

13   a case?

14       **A.   I was once -- well, there was two**

15   **situations.   One was a case called Schultz -- I think**

16   **that was you.   No, Schultz was not you.   Scott --**

17   **what's his name, from Houston maybe.**

18       **So there was a case called Schultz in**

19   **Wisconsin where my testimony was denied and then on**

20   **appeal it was reinstated.   And I think plaintiff**

21   **ended up winning that case eventually.**

22       **And then there was a Daubert hearing in**

23   **Oklahoma City where the judge excluded me under**

24   **Daubert, whatever that was.**

25       Q.   Do you remember the name of that case?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 84 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 87 of 1330

1    A.   Nope.   But it's in my list.

2    Q.   In regards to this lawsuit, have you met

3    with Bruce Rhyne ever?

4    A.   No.

5    Q.   Have you talked to Bruce Rhyne on the phone?

6    A.   No.

7    Q.   Have you had any direct communication with

8    any party in this case?

9    A.   No.

10   Q.   Dr. Gore, is your understanding of how

11   Mr. Rhyne used Marvel Mystery oil derived from --

12   A.   I thought you said Turtle Wax.

13   Q.   Correct.

14   A.   They make Marvel Mystery oil?   Oh.

15   Q.   Is your understanding of how Mr. Rhyne used

16   Marvel Mystery oil, is that derived from either

17   Petty's or Herrick's report?

18   A.   I did read Mr. Rhyne's deposition two years

19   ago, and I haven't updated it about specific

20   products -- I haven't updated my knowledge about use

21   since then about specific products.

22        So anything I would have today would be from

23   those other reports.

24   Q.   So would it be correct to say that your

25   knowledge of how Mr. Rhyne used Marvel Mystery oil

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 85 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 88 of 1330

1    would be derived from his deposition and either

2    Herrick or Petty's reports?

3        **A.  Yes, that would be correct.**

4        Q.  How about, is your knowledge from -- excuse

5    me.

6          Is your knowledge of the amount of benzene

7    contained in Marvel Mystery oil at the time Mr. Rhyne

8    was using it based upon either Mr. Herrick or Petty's

9    reports?

10       **A.  I haven't done any personal research about**

11   **that, no.**

12       Q.  So other than Herrick or Petty's reports,

13    you don't have any independent knowledge of the

14    amount of --

15       **A.  The first time I encountered Marvel --**

16    THE REPORTER:  I'm sorry.  I didn't get the rest

17    of her question.

18    BY MS. WOOTEN:

19       Q.  So just to clarify, your knowledge of the

20    amount of benzene contained within Marvel Mystery oil

21    would be derived from either Mr. Petty or

22    Dr. Herrick's reports?

23       **A.  Otherwise it's a mystery.  I believe that**

24   **this is the first -- that was a joke.  I believe this**

25   **is the first time that I think that I've actually run**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 86 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 89 of 1330

1    into that particular product, as far as I remember.

2        Q.   Just to follow up on that, your

3    understanding of Rhyne's exposure to any benzene from

4    Marvel Mystery oil would be derived from either

5    Herrick or Petty's reports?

6        A.   **That would be correct.  Sounds mysterious**

7    **though.**

8        Q.   I see you are punning.

9        A.   **I can be.  I am a dad.  I have been known to**

10   **make dad jokes.**

11       MS. WOOTEN:  Dr. Gore, I believe that's all the

12   questions I have for you.  Thank you.

13       THE WITNESS:  Thank you.

14       MS. WOOTEN:  Anyone on the phone?

15       MR. FISHKIN:  Yeah.  This is Andy Fishkin, and I

16   have a few questions.

17                    EXAMINATION

18   BY MR. FISHKIN:

19       Q.   Doctor, can you hear me okay?

20       A.   **You are loud and clear.  Emphasis on loud.**

21       Q.   Okay.  I'll try to talk lower.

22       A.   **It's not your fault.  It's the --**

23       Q.   My name is --

24       A.   **I'm sorry, go ahead.  Your name is Andy**

25   **Fishman, I hear.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 87 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 90 of 1330

1    Q.   It is Fishkin.  And I represent several of

2    the defendants in the case.  I just have a few

3    questions.

4         It's going to be difficult for me not to

5    step over you given the delay on the phone and vice

6    versa, but I'll do my best.  Okay?

7    **A.   And I'll do my best too, but I'm really bad**

8    **at that.**

9    Q.   Me too, so we'll see how it goes.

10        Doctor, did you see anything in the

11   materials that you reviewed in this matter that

12   suggests that Mr. Rhyne worked with or around a

13   product that was manufactured or supplied by a

14   company by the name of Univar?

15   **A.   I don't know the manufacturers.  I don't**

16   **have any manufacturers' names.  I happen to know the**

17   **radiation specialist because I've encountered Liquid**

18   **Wrench in a lot of work that I've done, but I**

19   **generally don't know the names of the manufacturers.**

20   Q.   In paragraph 25 of your report you list

21   various products that I suppose you believe Mr. Rhyne

22   was exposed to.  Do you see that?

23   **A.   I'm getting there.   25?**

24   Q.   Yes.  On page 17 of your report.

25   **A.   Well, as you know, this was clearly in**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 88 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 91 of 1330

1    reference to Mr. Petty's report at the time so -- and

2    I haven't been asked to update my report based on

3    Herrick's report.  But I would rely on Herrick's

4    estimations at this point.

5         Q.  Put aside for the moment the estimations.

6    Are you aware of any products that Mr. Rhyne was

7    exposed to, other than the products that are listed

8    in paragraph 25 of your report?

9         DEFENSE COUNSEL:  Object to the form.

10        THE WITNESS:  Go ahead.

11   BY MR. FISHKIN:

12        Q.  You can answer.

13        MR. DUPONT:  There was an objection and I think

14   he lost the question when the objection was made.

15        THE WITNESS:  I thought you were objecting to

16   yourself, which I thought was kind of --

17   BY MR. FISHKIN:

18        Q.  I hardly ever --

19        **A.  Not to be offensive to anybody but --**

20        Q.  I hardly ever object to myself.

21            But let me do it again.  So paragraph 25 --

22        MR. DUPONT:  You have to get better at that.

23        MR. FISHKIN: -- you list -- I'm sorry?

24        MR. DUPONT:  I say you have to get better at

25   that.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 89 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 92 of 1330

1  BY MR. FISHKIN:

2      Q.  Paragraph 25 of your report you list several

3  products.  Do you see that?

4      **A.  I do.**

5      Q.  Okay.  Are you aware of Mr. Rhyne having had

6  exposure to any products other than those products

7  listed in paragraph 25 of your report?

8      **A.  Counselor, as I've previously testified**

9  **today, I did not review the patient's prior**

10 **deposition during my preparation for this deposition**

11 **and so my memory is not refreshed.  Whatever was**

12 **mentioned in that deposition, I certainly had been**

13 **aware of at one time and I can become aware of again**

14 **as soon as I reread that.**

15          **But as I'm sitting here, I could not**

16 **enumerate other products.**

17      Q.  Fair enough.  I just want to be sure I

18 understand your testimony.  The products that you are

19 aware that Mr. Rhyne was exposed to are the products

20 listed here in paragraph 25 of your report and any

21 other products that Mr. Rhyne identified at his

22 deposition; is that correct?

23      DEFENSE COUNSEL:  Object to the form.

24      THE WITNESS:  Yeah, essentially that's true.

25 I'm just trying to think if that is comprehensive.  I

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 90 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 93 of 1330

1  think essentially that's probably true.  I think it's

2  possible that in somebody else's testimony some other

3  products theoretically could come up.  I just don't

4  remember.  I'm sorry.

5  BY MR. FISHKIN:

6      Q.  Now, CRC, Doctor, is not listed in your

7  paragraph 25.  I will represent to you that Mr. Rhyne

8  testified that he worked with a CRC product.  My

9  question is, Doctor, do you know what CRC product

10  Mr. Rhyne worked with?

11      **A.  As I'm sitting here, no.**

12      Q.  I think I know the answer to the next

13  question, but I need to ask it anyway.

14      **A.  Sure.**

15      Q.  Do you know what the ingredient -- do you

16  know what the ingredients were in the CRC product

17  that Mr. Rhyne claims he worked with?

18      MR. DUPONT:  Form.

19      THE WITNESS:  As I'm sitting here, I don't, no.

20      MR. FISHKIN:  Thank you.  That's all that I have.

21      THE WITNESS:  Thank you, Mr. Fishkin.

22      MR. JEFFRIES:  This is John Jeffries.  I guess

23  I'm the last one, unless anybody else wants to jump

24  in.

25      THE WITNESS:  Sure.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 91 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 94 of 1330

1                     EXAMINATION

2     BY MR. JEFFRIES:

3          Q.  Doctor, I represent Kano Laboratories and a

4     product they made known as Kroil oil, K-r-o-i-l.  Are

5     you familiar personally with this product at all?

6          **A.  Not personally.  I've never encountered a**

7     **can of Kroil oil.  Between that and the Mystery oil,**

8     **I kind of feel a little left out though.**

9          Q.  Have you, to your knowledge, ever offered an

10    opinion or testified in a case in which Kano

11    Laboratories in reference to this product was named a

12    defendant or a party in the case?

13         **A.  Counselor, to be very clear, the word you**

14    **are saying before Laboratories is garbled, so I don't**

15    **know that I've ever had a case with blah, blah, blah**

16    **Laboratories.**

17         Q.  I apologize for that.

18         **A.  So could you tell me --**

19         Q.  Kano, K-a-n-o, Laboratories.

20         **A.  Kano Laboratories doesn't ring a bell for**

21    **me.**

22         Q.  Okay.  And I take it then you are not

23    familiar in any way with Kroil oil, how it's

24    packaged, its appearance, how it's dispensed, things

25    of that nature, correct?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 92 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 95 of 1330

 1      **A.   I am a virgin when it comes to Kroil oil.**

 2      Q.   I assume that you have never tested Kroil

 3   oil or reviewed any tests with respect to the

 4   chemical composition of Kroil oil; is that correct?

 5      **A.   That would be absolutely correct.**

 6      Q.   And is it fair to say that your only

 7   knowledge of Mr. Rhyne's alleged use of Kroil oil

 8   comes from your review of his deposition testimony?

 9      **A.   That's correct.**

10      Q.   As you are here to offer your opinions

11   today, do you have any recollection as to the

12   frequency with which he used the product?

13      **A.   I apologize that I did not review that**

14   **yesterday.**

15      Q.   So you don't have any independent knowledge

16   or any specific recollection about the environment in

17   which the product was used, the form in which he used

18   it, how he used it, whether he used any protective

19   gear or anything of that nature?

20      MR. DUPONT:   Compound.

21      THE WITNESS:   I would be totally dependent on

22   his testimony and the testimony of any other workers

23   who might have been deposed, of which I'm not aware.

24   BY MR. JEFFRIES:

25      Q.   And, again, I apologize if I bounce around a

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 93 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 96 of 1330

1    little bit, but some of this stuff has already been

2    covered.

3            You were asked some questions about your

4    previous experience testifying as an expert witness.

5    What amount of your professional time is devoted to

6    offering consulting services in litigation matters

7    versus your clinical practice versus the academic

8    portion of your endeavors?

9            Could you kind of break that down for us?

10       MR. DUPONT:  Compound.

11       THE WITNESS:  Consulting is a tiny fraction --

12   legal consulting is a tiny fraction of the percent.

13   So it's just an as-happens thing.

14   BY MR. JEFFRIES:

15       Q.  When did you start doing that?

16       A.  Well, first of all, I'm not sure that I ever

17   said I started doing it.  It wasn't something that I

18   set out to do.

19       Q.  Right.

20       A.  I think the first case that I was involved

21   with was a patient of mine at Johns Hopkins probably

22   in the mid '90s, whose name I don't remember.  And I

23   was really a fact witness as well as an expert

24   witness there because I was his physician.

25           And I don't believe I charged for that

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 94 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 97 of 1330

1  testimony because I wanted to do it as the patient's

2  doctor.

3         So that would have been about 20 years ago,

4  is my guess.

5     Q.  And you recall the first time you testified

6  as a paid consultant or when you offered your

7  services in that regard?

8     MR. DUPONT:  Form, compound.

9     THE WITNESS:  I never offered it.  This is not

10  something I have ever advertised or sought out or

11  anything like that.  Ever.

12        So I was approached.  I think the first

13  attorney who approached me was Keith Patton.  He's

14  the one who moved to Arizona, right?

15    MR. DUPONT:  Mexico.

16    THE WITNESS:  Actually, I think Mr. Patton was

17  representing my patient.  That might have been what

18  happened.  And that's where I met Mr. Patton.  And

19  I've done a couple of other things along the way for

20  Mr. Patton.  And then Scott Free -- from Houston?

21  Scott Frieling -- I want to say Scott Frieling, I

22  think that's his name -- I think, read my testimony

23  probably in that case and he approached me.

24        I don't really know when it was.  I mean, in

25  general, I've done one -- no more than, in general,

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 95 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 98 of 1330

1    one or two a year max.

2         Max -- like I said, if I've been involved

3    with 15, that's a lot, and I don't think it's been

4    that many.  And that would be over 20 years.

5    BY MR. JEFFRIES:

6         Q.  To your knowledge, other than the lawyers

7    you just named -- Mr. Patton or Mr. Frieling have any

8    relationship to Mr. DuPont or his law firm?

9         A.  I'm sure that they don't.

10        Q.  All right.  And what is your rate for your

11   time spent testifying in this case?

12        A.  $500 per hour for preparation of report,

13   preparation for deposition, that kind of thing.

14        Q.  And one rate for all your services?

15        A.  Pretty much.  I think I have a daily rate

16   for, you know, out-of-town testimony.

17        Q.  What is that rate?

18        A.  I was worried you were going to ask that.

19   It used to be 2,500 bucks, but I think I raised my

20   price to $4,000, but I'm not sure honestly.  I have

21   it written down somewhere.

22        Q.  That's a per diem?  If you have to travel

23   somewhere to testify in a hearing or court, that's a

24   per diem thing?

25        A.  That's the idea.  I assume that I invoice.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 96 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 99 of 1330

1    And that happens about 50 percent of the time.

2            You wonder why Mr. DuPont likes me given

3    that I'm not too smart.

4        Q.  I wanted to ask you some of the things you

5    talked about earlier.  And some of the earlier

6    questions is, when you've been consulted by

7    Mr. DuPont about cases in the past, that he will call

8    you and give you information and kind of his

9    assessment of the medical history of the patient, and

10   then you make a determination about whether you want

11   to get involved or believe you should get involved?

12       A.  He does not give me --

13       Q.  I don't want to mischaracterize.

14       A.  That's a little bit of a

15   mischaracterization.  Andrew would never ever give me

16   his impressions of a medical thing.  He is not

17   qualified to do that and he doesn't think he is

18   either.

19           He can only tell me what the patient -- the

20   client has told him and what his staff may have

21   gotten out of any medical records that they've

22   reviewed.

23           But the first thing he'll do is to send me

24   the pathology report and anything about that and have

25   me assess that.  So just to be clear.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 97 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 100 of 1330

1    Q.  And how frequently do you have those types

2  of interactions or discussions with him?

3         I mean, how often does he call to bounce a

4  case off you or give you that opportunity?

5    A.  It varies between zero times a year and

6  three times a year, I would say.  Mr. DuPont

7  understands that this is not something I spend a lot

8  of time on, that I'm not particularly doing this out

9  of a financial imperative.

10        I really like to help patients, so it's

11  really dependent upon my -- you know, whether I feel

12  I have the time and what the time frame is going to

13  be about the thing.  Whether it is going to be

14  out-of-town testimony involved, that's part of it.

15  And if so, whether we have enough lead time to be

16  able to put that into my calendar.  That's been dicy

17  on occasion.

18        And sometimes he's asked me to look at

19  things that aren't about a case that he is inviting

20  me to talk about.  I think he values my opinion as

21  either fact checker or what do I think or this expert

22  said this or his expert is saying that or do I agree.

23        And I never charge him for that kind of

24  service.  I just have a generic, friendly, collegial

25  relationship that I'm always happy to help him.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 98 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 101 of 1330

1          Q.  I understand.  And that's why -- part of the

2     reason that I'm asking.  How often do those type of

3     conversations take place?

4          MR. DUPONT:  Objection; asked and answered.

5     BY MR. JEFFRIES:

6          Q.  Is that more than the zero to three times

7     per year?

8          **A.  No.  I mean usually not, no.  That would be**

9     **part of it.**

10         Q.  At least several times per year you're

11    receiving communications from him either about

12    consulting to get involved in a case or offering

13    opinion on something an expert said or something with

14    relation to your professional background and how it

15    applies to a case he may be handling.  Is that a fair

16    assessment of it?

17         **A.  No.  The range I gave you was zero to three**

18    **times per year.  That includes zero, and there are**

19    **many years where it is, in fact, zero.**

20         Q.  By your estimation you said eight to ten

21    cases in which you testified as an expert in matters

22    Mr. DuPont has been litigating?

23         **A.  I'm guessing eight, but I don't know.  We'll**

24    **provide you the list.**

25         Q.  Over what period of time?

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 99 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 102 of 1330

1          As Ms. Wooten indicated in her questioning,

2     that was not included in the materials we were

3     provided, otherwise I probably wouldn't be asking you

4     these questions.

5          A.   I don't mind answering questions to the best

6     of my ability.

7               I'm guessing over 12 years.  You know, when

8     you get to a certain age like mine, which is 61,

9     almost 62, putting anything in sequence is really

10    tough in terms of -- like, you know, I could say I've

11    known Andrew for 30 years.  Well, he'll object to

12    that because he would have been ten years old or

13    something at that point.

14              But it feels like -- I feel like I've known

15    Andrew for a long time and I value him as a person.

16    So I enjoy working with him because he's a great guy,

17    and I feel like his heart is in the right place.

18              So I don't know how long it's been.  I feel

19    like in some ways we're old colleagues.  It could be

20    five years.  I don't know.

21              We'll supply that to you.  I'm very happy --

22    I'm sure Mr. DuPont will supply that to you.

23         MR. DUPONT:  Yeah, I'm sorry.

24    BY MR. JEFFRIES:

25         Q.   I agree.  I'm sure it was just an oversight.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 100 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 103 of 1330

1      A.   Totally.   I mean I'm speaking for him.

2   Nobody asked me to do it.

3      Q.   And, again, I apologize for some of the

4   questions that I'm going to ask you are out of my

5   ignorance more than anything else.

6      A.   Don't be apologetic.   We expect lawyers to

7   be ignorant.

8      Q.   I'm with you.   And that's one thing we'll

9   agree on.

10     A.   Good.

11     Q.   Generally speaking, is AML a relatively

12  common form of cancer?

13     A.   No.   There are about 10 to 20 thousand cases

14  in the U.S. per year.   It's considered uncommon.

15     Q.   That 10 to 20 thousand cases in a population

16  of somewhere around what, 350 million, depending upon

17  how many of the illegals you count?

18     MR. DUPONT:   That's not a very nice word to use,

19  Counsel.   You can comport yourself in a better manner.

20  BY MR. JEFFRIES:

21     Q.   350 million?

22     MR. DUPONT:   No person is illegal.   If so -- if

23  that were the case, all your ancestors probably could

24  be considered illegal.

25     THE WITNESS:   I believe that our census data

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 101 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 104 of 1330

1    actually enumerates documented and undocumented
2    workers -- residents to the extent that such can be
3    determined.  And, of course, that's been the subject
4    of some rather interesting political debate this year
5    in terms of whether that should be a collected
6    question, citizenship.
7            But the goal of the --
8    BY MR. JEFFRIES:
9        Q.  I'm asking about --
10       A.  But the goal of the census, as you know, is
11   to enumerate every person living in the United
12   States, be they three-fifths of a person or five-
13   fifths of a person.
14       Q.  What percentage of that population is
15   affected by this disease?
16       A.  Well, you'll have to do the math because I'm
17   a little tired here.  But it's 10 thousand to 20
18   thousand out of whatever denominator you want to
19   pick.  I think 350 sounds pretty good.  And if I'm
20   not mistaken, it comes out to something like 10 out
21   of 100,000, or something like that.
22       Q.  Is it true that most of those cases have no
23   known identifiable cause?
24       MR. DUPONT:  Compound.
25       THE WITNESS:  The majority of cases of AML do

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 102 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 105 of 1330

1  not have an attributable cause outside of the various

2  things we discussed, which cause cancer all the time,

3  but that we can't isolate outside of every other

4  person in the United States of America.

5  BY MR. JEFFRIES:

6      Q.  All right.  And are you aware of any

7  literature, or whatever the case may be, that

8  establishes a percentage of those cases that are

9  determined to be caused by industrial exposure of

10  benzene?

11      MR. DUPONT:  Vague.

12      THE WITNESS:  I don't think there is a document

13  like that, and I'm thinking -- because I'm personally

14  writing a review, a critical review, of the

15  occupational low-dose benzene exposure literature

16  with one of our epidemiologists.  And I don't

17  believe -- I'm not sure that's really an

18  ascertainable number because those questions aren't

19  asked routinely, so I'm not sure.

20  BY MR. JEFFRIES:

21      Q.  Tell me about the article you're writing.

22  An article on low-dose exposure to benzene?

23      **A.  Yep.**

24      Q.  What's the context of that?

25      **A.  We are submitting it to Blood Reviews.  It's**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 103 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 106 of 1330

1    going to be very much along the line of the kind of

2    literature that we discussed in these matters and --

3    you know, for a more clinically oriented audience,

4    you know, of leukemia doctors and other physicians

5    taking care of patients with hematologic malignancies

6    to increase awareness of potential occupational risks

7    so that they can be better informed in advising their

8    patients.

9        Q.   Okay.  So the target audience for the study

10   is clinicians who are interacting directly with

11   patients and assessing their cases with regard to

12   these low-dose exposures?

13       A.   Well, medical students, anybody who is

14   interested in reading about benzene and leukemia.

15   I'm sure it's a pretty broad -- Blood Reviews is read

16   by a pretty broad audience.

17       Q.   Tell me who commissioned the study.

18            Is there a -- I don't know how you describe

19   it.  Is there a goal?  A target?  A specific issue

20   you thought to address?

21       MR. DUPONT:   Compound.

22       THE WITNESS:   It's an academic endeavor aiming

23   to give a critical assessment of the literature.

24   BY MR. JEFFRIES:

25       Q.   And that literature deals specifically with

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 104 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 107 of 1330

1    low-dose exposure to benzene and their relationship

2    to what, AML or --

3         A.   Myeloid malignancies.

4         Q.   And that, as you talked about earlier, is

5    kind of the broader categories that includes AML and

6    some other variations of this type of malignancies at

7    different stages, right?

8         A.   I mean, the most common one we would talk

9    about would be MDS, but I think you could talk about

10   things like myeloproliferative neoplasms, a chronic

11   myeloid leukemia.  But there is far less literature

12   about those.

13        Q.   Right.  And I'm sorry, I was just trying to

14   narrow it down.  It includes a broader spectrum of

15   things beyond AML, correct?

16        A.   Correct.  But most of it will be around AML

17   and MDS.

18        Q.   Can you explain to me what was studied?

19             What was the clinical review of?

20        A.   Well, it's a clinical review of -- it's a

21   critical -- critical review of epidemiological

22   literature.

23        Q.   In what context?  Explain to me like I am a

24   5th grader, if you could.

25        A.   Let's say you are a fellow in oncology and

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 105 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 108 of 1330

1  you've just learned that benzene causes leukemia.

2  But you are a chemistry major, so you say, Gee, I

3  know in organic chemistry lab they warned us about a

4  lot of chemicals and they warned us nothing is pure

5  and I wonder if I was at risk.  Or it seems like a

6  lot of things that people commonly use like paint

7  thinner and other things may have benzene in it and

8  they kind of want to know about that.

9          You could spend many years going through the

10  literature a little bit at a time, as I and many

11  others have done, but wouldn't it be nice to have a

12  handy resource where people like me working with

13  epidemiologists have not only sort of summarized the

14  literature, but evaluated it.

15          So that's kind of what it's about.

16      Q.  Correct.  I would have loved to have

17  something like that in the last month.

18      A.  Well, just wait.

19      Q.  What stage is it in?

20          Is it published yet?

21      A.  No.  We're still writing it.

22      Q.  Is it concluded?

23          Are there conclusions or key findings that

24  are -- that you are in a position to discuss now, or

25  is it still in the works?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 106 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 109 of 1330

1      A.   In the works.

2      Q.   Was there a specific type of exposure that

3   you studied?

4           Or was it all occupational in nature or --

5      A.   Well, we've looked at environmental

6   accidents as well.

7      Q.   Okay.  When you say "environmental

8   accidents," you mean like a chemical spill or

9   something like that?

10     A.   Yep.

11     Q.   Is there any evaluation of like -- and some

12  of the lawyers have asked you questions about, based

13  on exposures in the environment, food or water, those

14  types of exposures.  Are they analyzed in your study?

15     MR. DUPONT:  Compound.

16     THE WITNESS:  We certainly take everything in

17  that context, of course.

18  BY MR. JEFFRIES:

19     Q.   I'm sorry, I didn't mean to get sidetracked.

20     A.   That's all right.  And, by the way, I would

21  give you at least a 6th grade credit.

22     Q.   You're generous.

23          Is there a typical demographic for an AML

24  patient in terms of age, race, sex, age of onset of

25  the symptoms?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 107 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 110 of 1330

1      MR. DUPONT:  Vague.

2      THE WITNESS:  AML can present in infancy, but

3  the majority median age would be around 60.  But the

4  incidence persists as people age.

5  BY MR. JEFFRIES:

6      Q.  Right.  What about, is there any one -- is

7  it more prevalent in males or females?

8      **A.  There is a slight male predominance.**

9      Q.  Is it more prevalent in members of any

10  different race or other demographic of that nature?

11      **A.  Latinos appears to be very -- particularly**

12  **sensitive to myeloid malignancies.  But based on**

13  **numbers, Latinos still represent a minority in our**

14  **country.**

15      **But the incidence rate among Latinos is**

16  **probably higher than among people of European origin.**

17      Q.  Is that a statistically significant amount

18  or is that just kind of observational?

19      **A.  Well, you know, I can't answer that with 100**

20  **percent surety, but I believe that there probably is**

21  **a statistically higher rate of AML among Latinos.**

22  **But I wouldn't go to mat on that.  I'm pretty sure**

23  **there is.**

24      Q.  In Mr. Rhyne's case, his age and sex at

25  least were consistent with which you've seen in the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 108 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 111 of 1330

1    more common -- where this disease is more common,

2    correct?

3        MR. DUPONT:  Compound.

4        THE WITNESS:  It is certainly not an unusual

5    presentation, if that's what you mean.

6    BY MR. JEFFRIES:

7        Q.  And what are some of the other risk factors

8    for the development of AML?

9        A.  Smoking, prior chemotherapy, prior

10   radiation, obesity is now being examined more and

11   more, familial cancer syndromes.  Those are the main

12   ones of identifiable --

13       Q.  What about --

14       A.  What about diet?

15       Q.  What about diet?

16       A.  Diet?

17       Q.  Yes.

18       A.  No.  Were you suggesting something in the

19   diet specifically?

20       Q.  No.  I mean, are --

21       A.  Benzene in your diet is bad.  And I wouldn't

22   drink Mystery oil or mineral spirits if I were you.

23       Q.  All right.

24       A.  Just saying.  No matter what IARC says.

25       Q.  Any other chemical exposures that are risk

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 109 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 112 of 1330

1    factors?

2         A.  Oh, we talked about a variety of chemotherapy

3    drugs.

4         Q.  Right.  To your knowledge, he's never

5    undergone any of that type of therapy, has he?

6         A.  No.

7         MR. DUPONT:  Not prior to his diagnosis.  That's

8    your question?

9         THE WITNESS:  You know, pesticides -- pesticides

10   are associated.  I'm sorry, I'm just kind of tired

11   right now.

12         For a while there's been a thing about hair

13   dye.  That's been kind of debunked.  Probably

14   chemical dyes, aniline chemical dyes and other dyes

15   in the printing industry, definitely.

16         So there's a handful of things that have

17   been studied and are likely associated.  But I gave

18   you the big ones.

19   BY MR. JEFFRIES:

20        Q.  Okay.  And in particular with regard to

21   benzene -- and you mentioned this earlier -- is

22   benzene something that people are exposed to in their

23   daily lives?

24        A.  In minute amounts.

25        Q.  What are some of the sources of benzene

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 110 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 113 of 1330

1    exposure that you would consider when you are

2    making -- I think you referred to it as like a

3    baseline assessment?

4         MR. DUPONT:  Vague.

5         THE WITNESS:  Well, baseline for a meaningful

6    different-than-normative-exposure for most patients

7    with leukemia, it's through petrochemicals, whether

8    it's diesel fuel, petroleum products, solvents like

9    Liquid Wrench and others.  Those would be the vast

10   majority that I've seen.

11        You know, I do run into patients who are

12   involved in industries where I might not be familiar

13   with the products they are using.  I did have a case

14   that I was involved with once that had to do with the

15   upholstery industry, which I know very little about,

16   and I did get to learn about some of the products

17   involved in upholstery cleaning and stuff that I

18   couldn't recite to you at all right now and learned

19   about, in this case, benzene concentration there.  So

20   that kind of surprised me.

21        If I have a patient who is involved with

22   some weird job that involves smelly chemicals in

23   particular -- obviously they don't all smell -- I

24   would always say that, I don't know a lot about the

25   chemicals that you're using, but a lot of chemicals

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 111 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 114 of 1330

1    do contain substances that can cause leukemia.

2         So if you're interested in me looking into

3    it, I would be happy to.  If you can get me the MSDS

4    sheets and stuff, I could certainly spend some time

5    in doing it.

6    BY MR. JEFFRIES:

7         Q.  I guess I was more concerned with this

8    concept you talked about around our environmental

9    exposure.  For example, things like exhaust fumes

10   from vehicles, is that a source of benzene exposure?

11        A.  Yeah, it is.  But unless you're working like

12   in a toll booth, or something like that, you are not

13   going to get enough -- what's in smog contributes to

14   the -- again, the ambient rate of cancer.  And we

15   can't erase that.

16        But if somebody is working in a toll booth

17   and all these things with bad exhaust things are

18   coming through, that might be a different story.

19   Might be.

20        Or somebody who is working in a muffler

21   business -- I'm just talking off the top of my

22   head -- where you might think that there is a

23   different level of exposure to automobile exhaust

24   than what you and I do with our windows rolled up and

25   the air conditioning on.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 112 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 115 of 1330

1          That's a different story from somebody who's
2     working -- or somebody -- there was one case, the one
3     that I was Daubert'd on, was about a woman who got
4     leukemia who lived in the shadow of a Conoco -- of a
5     very notorious Conoco plant that was subsequently
6     shut down.  And they actually evacuated the
7     neighborhood and made it into a Superfund site.  And
8     she was downwind of all this terrible stuff coming
9     out of there.  And there was stuff in the water and
10    everything.

11          And that was -- that's the only case that
12    I've actually done like that.

13          But I have had patients who live in similar
14    areas.  And I've raised that question to them, and if
15    they want to follow up on that, that's their
16    business.

17    Q.  You mentioned diesel fuel.  Is it more
18    prevalent in diesel fuel than in non-diesel fuel?

19    MR. DUPONT:  Form.

20    THE WITNESS:  You know, I just mentioned diesel
21    fuel because it seems like some of the people that
22    I've worked with over the years tend to use diesel
23    fuel as a cleaning agent.  I don't know if that's
24    just the people I run into, but it seems like in some
25    auto shops and stuff -- maybe because it's cheap.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 113 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 116 of 1330

1   They have these vats of diesel fuel and they put

2   stuff in there with no gloves on and it's really

3   awful.

4   BY MR. JEFFRIES:

5       Q.  Is there benzene in gasoline?

6       **A.  There is, yeah, a little bit.**

7       Q.  And are people exposed to it in gasoline

8   fumes when you are filling up your car?

9       **A.  Yeah.  Small amounts, absolutely.  Again, I**

10  **would attribute that to the ambient risk that we're**

11  **all at, sure.**

12      Q.  And are you aware of any study that kind of

13  cumulatively or quantitatively assesses that ambient

14  risk?

15      **A.  That's impossible to do because everyone is**

16  **exposed to it.  So in order to assess the risk, you**

17  **need an exposed and an unexposed population.  So you**

18  **need to have the population of all of those of us who**

19  **do everything like you and I do, drive around in cars**

20  **and pump gas and fly in airplanes and everything**

21  **else, and a bunch of monks in Shangri-La maybe who**

22  **have their HEPA-filtered, you know, retreats and they**

23  **breathe great mountain air and drink from the source**

24  **of the Ganges and everything -- or whatever.**

25          **We don't have a lot of studies like that.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 114 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 117 of 1330

1    Q.   Right.   But is there any -- are you aware of

2    any effort to quantify the amount of that baseline

3    exposure in terms of a parts-per-million calculation

4    like you see --

5        A.   There are definitely things like that.   As a

6    matter of fact, there is a study just out this past

7    year, recently -- I'm not going to be able to come up

8    with the name -- where they actually went to data

9    that -- I think it's the EPA.   I think it's the EPA,

10   but it could be another agency and I've not memorized

11   the alphabet soup.

12       But there is a nationwide environmental

13   monitoring of benzene that's done on a routine basis.

14   And this particular paper associated risk of leukemia

15   regionally with the measured so-called ambient

16   benzene population.   And although it's an early

17   study, there is a suggestion that there is an

18   association with the ambient levels.

19       Q.   All right.   Do you recall any more specifics

20   about the study or where to find it?

21       A.   I would be happy to supply it to you, but I

22   can't come up with it from my feeble brain right now.

23   And the author, I can picture her, but I can't tell

24   you her name.

25       Q.   Okay.   So there was some -- that study

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 115 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 118 of 1330

1    involved some calculation of the amount of ambient

2    exposure?

3        A.   Yeah.   Based on -- based on routine

4    monitoring that the government does.

5        Q.   And that -- was that based on what

6    geographic region you may be in?

7        A.   Well, they have different stations where

8    they monitor the stuff around the country.   So it's

9    whatever the National Institute of Environmental

10   Health, or whoever it is that does this -- it is

11   whatever data they already collect, and then they

12   cross-match it against the regional incidence of

13   cancer, in this case leukemia.

14           It is from the National Institutes of

15   Health.   I just can't come up with her name.   She is

16   terrific.

17       Q.   But that study suggests there is some level

18   of benzene in the environment that we are all exposed

19   to?

20       A.   That's not a question.   Everybody knows

21   that.   This is a question of whether the variations

22   in the ambient levels leads to a variation in

23   regional incidence, and it would suggest that

24   probably yes.   That we can't -- some of these things

25   that you want to call idiopathic or unknown may well

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 116 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 119 of 1330

1  be associated with environmental exposures.

2      It is just hard to get that since you don't

3  have, you know, your big population of Tibetan

4  priests, or some similar thing.  I don't mean to

5  disparage Tibetans.  I think that would be a

6  great life.

7      Q.  And the -- okay.  Is it your opinion that

8  exposure to very small amounts of benzene can cause

9  AML?

10     A.  Can or cannot?

11     Q.  Can.

12     A.  Yes.  Well, can contribute to the cause,

13  yes.

14     MR. DUPONT:  Vague.

15  BY MR. JEFFRIES:

16     Q.  And, again, I think you mentioned earlier

17  there is a dose relationship.  The greater the

18  exposure, the greater the risk?

19     A.  Correct.  Yep.

20     Q.  Determining the amount of the exposure

21  accurately would have a significant impact on the

22  accurate assessment of the risk.  Is that a fair

23  statement?

24     MR. DUPONT:  Form.

25     THE WITNESS:  I don't think we are good enough

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 117 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 120 of 1330

1    to assess risk at that level, Counselor.  I think,

2    you know, in a court of law, convincing evidence

3    requires reliance on epidemiological data, which is

4    associated with statistical parameters.  So we do our

5    best to understand whether the occupational exposure

6    falls in those ballparks.

7         It doesn't mean that people who have

8    occupational exposure below those levels don't have

9    benzene-related cancer.  It just becomes a question

10   of what can you, you know -- how cogent and

11   convincing a legal argument can you make.

12        But from a biological point of view, I'm

13   sure there are many people of occupational leukemias

14   at levels that are probably lower than that which has

15   been demonstrated to be statistically significant in

16   the epidemiological literature.

17   BY MR. JEFFRIES:

18        Q.  I think you reference in your report there

19   is no way to identify what exposure may have resulted

20   in the initiation of the process of forming the

21   disease --

22        **A.  Correct.**

23        Q.  -- at the time that occurred?

24        **A.  That is correct.**

25        Q.  But the extent to which you could say with

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 118 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 121 of 1330

1   any degree of medical certainty or scientific

2   probability that a specific exposure or type of

3   exposure caused a condition is influenced by the

4   magnitude of the exposure; is that right?

5       MR. DUPONT:  Vague, compound.

6       THE WITNESS:  I would say on a probabilistic

7   basis, that has to be true.

8   BY MR. JEFFRIES:

9       Q.  Okay.  In other words, the greater the

10  exposure, the more likely that someone in your

11  position could reach a reliable conclusion that there

12  was some relationship between that exposure and the

13  onset of the disease?

14      A.  Because I can't isolate each exposure, I

15  don't do that.  However, if you asked me on a

16  statistical basis if somebody has -- 99 percent of

17  somebody's benzene exposure is due to product A and 1

18  percent to product B, I don't exonerate product B,

19  because it's part of the cumulative benzene exposure.

20  But on a probability point of view, it's more likely

21  product A.  But it doesn't take away the fact that

22  product B also was part of the source of benzene

23  exposure.

24      Q.  All right.  I understand what you are

25  saying.  Thank you.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 119 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 122 of 1330

1       So you don't believe there is a threshold
2   level of exposure at which you would have to reach to
3   state with a reasonable degree of medical certainty
4   that that exposure caused or contributed to the
5   development of AML in someone like Mr. Rhyne?
6       MR. DUPONT:  Vague and compound.
7       THE WITNESS:  Your question is complicated
8   because of the implied legal implications, to a
9   reasonable degree of medical certainty.  So my report
10  and other testimonies that I've given, that you are
11  certainly familiar with if you look, have stated
12  there is no safe threshold, and any amount of
13  exposure to benzene may be contributory or causative,
14  and, therefore, there is no threshold.  I do believe
15  that is the case.
16       I also recognize the difficulty of making
17  that case in the absence of achieving certain
18  cumulative exposures which are known to be associated
19  with statistically significant increases in risk of
20  leukemia just from the point of view of making a
21  convincing argument.
22       I don't know if that answers your question
23  the way you'd like it, but that's the case.  That's
24  how I approach it.
25

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 120 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 123 of 1330

1  BY MR. JEFFRIES:

2      Q.  Well, you referenced earlier -- and I don't

3  know if it was just by way of example, but in your

4  testimony earlier today, you referenced a level of 3

5  parts per million-years.  Is there some kind of

6  significance to that level?

7      A.  Yeah.  I made another kind of offhand

8  comment in the Schnatterization, meaning that is the

9  level of exposure that was tested in the Schnatter

10  paper that was associated with the statistically

11  significant increased risk of myelodysplastic

12  syndrome in that case.

13          Now -- and then you get into what levels did

14  they test it.  Because biology isn't a binary --

15  almost never a binary thing.  So statisticians kind

16  of pick the best numbers to look at based on the

17  numbers they have and the distributions they have,

18  but it is only bad interpreters of statistics then

19  glom on to that and say 3 is the number.  3 is the

20  level that they showed statistically increased risk

21  for in that paper with certain confidence bounds

22  around it.

23          And because that's what's published, I can

24  make a credible argument based on that for somebody

25  who has 3 or more.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 121 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 124 of 1330

1          Now, there is the Stenahom (phonetic) paper,

2    if you want to talk to that, that suggests that

3    levels in the less than 1 parts per million-years is

4    associated with a myeloid malignancy.

5          So the data are evolving.  One is what's

6    biologically true and what I tell a patient and

7    stuff, and one is what I'm willing to spend my time

8    on preparing for a trial if somebody were to ask me

9    to do so.

10          Like I say, I don't really do this for

11    money.  And if I think that it's not going to be a

12    useful exercise for the parties, I'll give the

13    attorney that feedback, that this seems borderline

14    that you can win this case.  And I can tell you,

15    Yeah, it sound like this could be a benzene case, but

16    unless the exposure is more clear, I don't think you

17    can make a case and I don't really want to be

18    bothered with that.  Not that I don't feel bad for

19    the patient.

20          I tell that to my own patients actually that

21    ask me about lawsuits.  I say, Well, it sounds to me,

22    just from what you're telling me -- I have a patient

23    right now who is in remission from leukemia and he

24    has a job somewhere near the ferries in Bridgeport, I

25    think, and it sounds like he is exposed to all sorts

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 122 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 125 of 1330

1    of terrible stuff that have benzene.  I told him, I

2    think that's probably the case.  But until a real

3    industrial hygienist were to take his history and

4    quantify that, I could be totally off base.

5            But usually my nose about this is pretty

6    good.  These stories occupationally stand out because

7    most people in our society don't work in those kind

8    of jobs, at least that I see.

9        Q.  Was there anything of significance to you in

10   terms of how you would evaluate a case for -- I don't

11   know if legal causation as you refer to it -- at

12   either of the levels, the 1 part per million or 3

13   parts per million?

14       MR. DUPONT:  Objection; form.

15       THE WITNESS:  Is there anything significant?

16   Yes, I have published data from peer-reviewed

17   credentialed publications that I can use to make my

18   argument.  I think that's important.

19   BY MR. JEFFRIES:

20       Q.  You made the argument at 3 parts per

21   million-years or more or at 1 part per million-years

22   or more based on which of those studies you elect to

23   cite; is that right?

24       MR. DUPONT:  Objection; form.

25       THE WITNESS:  You know, I hesitate to be put

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 123 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 126 of 1330

1   into any kind of corner here because my beginning

2   premise is that there isn't a safe level of exposure

3   to benzene.  So, you know, I think that there is less

4   literature in the lower doses.  Maybe there is going

5   to be more soon.  Maybe there will be biomarkers

6   soon.  I don't know.

7          I just think the -- you know, I just think

8   your level of legal certainty is higher the higher

9   you get.

10         It used to be like 40.  The old literature

11  said 40 parts per million-years.

12  BY MR. JEFFRIES:

13     Q.  I was looking at your report, and it looks

14  like you've got two paragraph 24s, but then on the

15  bottom of page 17 you reference the Australian study

16  that found that at 8 parts per million-years the

17  likelihood was seven times greater than that of the

18  general public to contract this form of leukemia.

19         And then they found that at 4.79 parts per

20  million-years it was 2.5 times more likely.

21         I guess my question is, as those numbers

22  change, those probability levels are altered

23  significantly, right?

24     MR. DUPONT:  Objection; form, vague.

25     THE WITNESS:  The increased risk over the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 124 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 127 of 1330

1   general population changes, that is correct.  But

2   that doesn't mean that those people at that lower

3   exposure who have higher risks than normal didn't

4   have leukemia caused by benzene.  It just means that

5   of people who got that exposure, fewer of them

6   developed leukemia.  But it is so many more of those

7   people who don't have that exposure.

8         So for those that have leukemia, I think we

9   can conclude that it's because of the benzene, not

10   that they didn't have leukemia associated with

11   benzene.  It is just that they were the unlikely in

12   that group.

13   BY MR. JEFFRIES:

14     Q.  Right.  But that cites a level of probability

15   that you're willing to apply to that scenario based

16   upon that --

17     **A.  No.**

18     Q.  -- calculation, right?

19     **A.  No.**

20     MR. DUPONT:  Object to form, vague.

21     THE WITNESS:  I disagree with you, Counselor.

22   BY MR. JEFFRIES:

23     Q.  Can you explain that for me?

24     **A.  Because they are in a range that you know is**

25   **definitely associated with a higher risk of leukemia.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 125 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 128 of 1330

1   It is like, there you have it.

2          It's like if the president talks to another

3   president of another country and says, You gotta do

4   me a favor.  He asks that question.  You can

5   attribute whatever you want to it.

6          Q.  And I guess we are just looking at the

7   numbers.  At 8 parts per million -- in this study

8   that you cited, at 8 parts per million-years, it is

9   seven times more likely.  You drop that down to 4.79,

10  that's not even cutting it in half, but it reduces

11  the likelihood threefold.

12         I guess my question is, you continue to go

13  down, you continue to see that kind of precipitous

14  drop in the amount of increased risk?

15         MR. DUPONT:  Objection.

16         THE WITNESS:  There is definitely a dose

17  relationship.  Nobody would argue with that.  There

18  is a dose relationship.

19         I think in that particular paragraph I was

20  summarizing the results of one particular study.  I

21  guess I could have copied in the graph from the

22  study, but I don't presume that everybody has the

23  equal ability in the legal profession to analyze

24  graphs.

25         It's probably not part of your LSATs, maybe

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 126 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 129 of 1330

 1    it is.  But it's part of our MCATs.  You're expected

 2    to be able to analyze graphs like that.  And I

 3    wouldn't expect a jury to be able to necessarily

 4    understand that without me explaining it.

 5    BY MR. JEFFRIES:

 6        Q.  All right.  But -- well, a jury can

 7    understand that as the amount of the exposure goes

 8    down significantly so does the risk?

 9        MR. DUPONT:  Objection; form.

10        THE WITNESS:  Right.  It's still related.  I

11    totally agree with you there.

12    BY MR. JEFFRIES:

13        Q.  My question is, you would agree it is

14    important -- when assessing this probability or

15    likelihood that a particular exposure was a causative

16    factor or a substantial causative factor, it is

17    important to have as accurate a base of information

18    that you can obtain with regards to making that

19    calculation?

20        MR. DUPONT:  Objection; vague.

21        THE WITNESS:  Knowledge is always power and the

22    truth will set you free.

23    BY MR. JEFFRIES:

24        Q.  All right.  I think I can accept that answer

25    and move on.  I have just a few questions about just

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 127 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 130 of 1330

1    some items from your report.

2              And I think you were asked this earlier.

3    The report is dated October 1, 2017, correct?

4         **A.   I believe you.   I don't have any reason to**

5    **think that's not correct.**

6         Q.   And you haven't done any kind of updated or

7    revised report since that time?

8         **A.   I have not.**

9         Q.   Have you formed any additional or new

10   opinions since -- with regard to Mr. Rhyne's case

11   since the time you authored this report?

12             MR. DUPONT:   Objection; vague.

13             THE WITNESS:   You know, I am aware that

14   Mr. Petty is no longer testifying, that Mr. Herrick

15   has done exposure calculations which do not include

16   dermal exposure.   I don't personally believe that

17   dermal exposure should be excluded, but that's fine.

18   And that even without considering the dermal exposure

19   estimates of Mr. Petty, that the estimates of benzene

20   exposure that Mr. Herrick comes with are certainly

21   within the range that anybody who understands the

22   epidemiological literature would agree is associated

23   with an increased risk of AML.   So that would be the

24   update to my report.

25

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 128 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 131 of 1330

1  BY MR. JEFFRIES:

2      Q.  You told us earlier that you had not read

3  Dr. Herrick's report; is that right?

4      A.  I've looked at it, but I haven't read it

5  cover to cover, no.

6      Q.  How much of it have you reviewed or read?

7      A.  I'm not sure how to quantify it.  I would

8  say I've probably skimmed it.  I looked particularly

9  at the exposure tables.

10          That's what I would say.

11      Q.  How much time do you think you spent

12  reviewing it?

13      A.  Probably an hour.

14      Q.  Ten minutes, 30 minutes, an hour?  Okay.

15          Did you bill for that time?

16      A.  I haven't billed at all for this case.  Oh,

17  I don't know if I billed for the -- I might have

18  billed for the report originally.  I don't know.

19          I haven't billed at all this year for this

20  case.  I might have billed in 2017.

21      Q.  Do you intend to bill for the time you spent

22  reviewing Dr. Herrick's report?

23      A.  No -- yes.  Honestly, I'll roll it into

24  deposition prep, which will probably come out to be

25  three or four hours, something like that, five maybe.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 129 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 132 of 1330

1    Q.   In your report on page 2 underneath section

2   2 discussing methodology, on the third line -- second

3   and third line you said, "it is important to gather

4   as much information as possible regarding the

5   person's exposure to the chemicals of interest."

6        Have you done any independent investigation

7   to gather information regarding Mr. Rhyne's alleged

8   exposure to the chemicals of interest?

9    **A.   I have not.**

10    MR. DUPONT:  Objection; vague.

11   BY MR. JEFFRIES:

12    Q.   Any reason why?

13    MR. DUPONT:  Objection; vague.

14    THE WITNESS:  I trust our nurses and nursing

15   assistants to get blood pressure.  That's their job,

16   to gather data for me.

17        When I used to run a lab, I counted on the

18   laboratory technicians and postdoctoral fellows to

19   generate data and present it to me.

20        That's called running a business or running

21   a practice or running a team.

22        And in this case I rely on industrial

23   experts proffered by Mr. DuPont to do that analysis

24   for me.  That's what they are trained to do.  And I

25   have to use them as my Bronners, you know, as my

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 130 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 133 of 1330

1    measuring.

2            I count on the weather people to tell me

3    what the chance of a hurricane tomorrow is.  I count

4    on Siri to do this and that for me, although I'm not

5    really a big Siri user honestly.

6    BY MR. JEFFRIES:

7        Q.  Who is your client in this case?

8        **A.  My client?  I'm a witness.  I'm not -- I**

9    **don't have a client.**

10           **What do you mean?  I don't know what that**

11   **means.**

12       Q.  Who is your client?  Mr. Rhyne, Mr. DuPont?

13       MR. DUPONT:  Objection; asked and answered.

14       THE WITNESS:  I don't feel like I have a client.

15   I feel like I'm an advisor, a witness.

16   BY MR. JEFFRIES:

17       Q.  To who?

18       MR. DUPONT:  Object.

19       THE WITNESS:  To the plaintiff's case.  I'm not

20   sure what you mean.

21           I will submit my invoices to Locks Law for

22   my time spent.  And I don't know how they manage

23   their accounting in terms of where I get reimbursed

24   from.  That's their business.

25           I guess at some level, you know, Locks Law

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 131 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 134 of 1330

1    will issue a 1099 tax form for nonemployment

2    compensation and I'll be considered a consultant for

3    them.

4         So I guess they are a client for my

5    consulting business, I guess, if that's how you want

6    to look at it.

7    BY MR. JEFFRIES:

8         Q.  Have you ever interviewed Mr. Rhyne or his

9    wife?

10        **A.  Nope.**

11        Q.  Never evaluated him?

12        **A.  Nope.**

13        MR. DUPONT:  Objection; vague.

14   BY MR. JEFFRIES:

15        Q.  Did you obtain any medical documentation

16   about his prediagnosis, medical history?

17        MR. DUPONT:  Vague.

18        THE WITNESS:  Yes.

19   BY MR. JEFFRIES:

20        Q.  What did you review in that regard?

21        **A.  Well, this was a long time ago, but there**

22   **was -- I know that there was no -- there was**

23   **documentation of normal blood counts in some time**

24   **period before and kind of general, you know, medical**

25   **care, nothing of which -- nothing that stuck out in**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 132 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 135 of 1330

1    my mind, as I'm sitting here.

2        Q.  How far in advance of his diagnosis did you

3    review these records?

4        MR. DUPONT:  Objection; vague.

5        THE WITNESS:  How far?

6    BY MR. JEFFRIES:

7        Q.  Was it a five-year history, ten-year

8    history, 20-year history?

9        MR. DUPONT:  Vague.

10       THE WITNESS:  All of his histories include past

11   medical history.  That's a cumulative thing.  I have

12   his primary care doctor's records.  That was two

13   years ago.  I can't really tell you that honestly

14   with any degree of certainty.

15   BY MR. JEFFRIES:

16       Q.  Over what period of time do you have his

17   primary care doctor's records?

18       A.  I don't have the answer to that right now

19   for you.

20       Q.  Well --

21       A.  But it's in the Dropbox.  Sorry.

22       Q.  How much of that would you typically want to

23   review in your quest to gather as much information as

24   possible about the patient?

25       MR. DUPONT:  Objection; vague.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 133 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408-1  Filed 09/15/20  Page 136 of 1330

1    THE WITNESS:  It depends on the case.  I mean,

2    if I review a past medical history that's taken by

3    some good physicians at the time of presentation of

4    leukemia, that will point me to potential things to

5    be alerted about.

6        Let's say Mrs. Jones has leukemia and she

7    was treated ten years ago for ovarian cancer, that's

8    going to get my attention.  I'm going to make sure I

9    get the records about how she was treated for ovarian

10   cancer because that's likely to be a causative thing.

11       Somebody who is treated for breast cancer

12   and lymphoma and develops leukemia, I need to know

13   that.

14       But if there is nothing untoward in their

15   past history, there is no reason to go back that far.

16   I don't know what you would find.

17   BY MR. JEFFRIES:

18       Q.  But you don't recall physically how much of

19   that you reviewed in Mr. Rhyne's case?

20       **A.  Since it was two years ago, I don't remember**

21   **that.**

22       Q.  Okay.  Did you request any medical

23   documentation with respect to his sister's treatment

24   for AML?

25       **A.  Well, you know, I think that -- I think that**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 134 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 137 of 1330

1    I remember that we discussed whether such data were

2    available.  This would have been two years ago.

3           And, of course, there are many HIPAA issues

4    involved here to start with that need to be

5    surmounted.  I don't remember hearing more about it

6    at that time.

7           So that's what I remember about that

8    particular topic.

9      Q.  When you say you discussed it, you mean with

10   Mr. DuPont?

11     A.  Yeah.  Do you have any information about the

12   sister or -- and, again, this is the vaguest of

13   memories, but I think the discussion was, Well, yeah,

14   we're going to talk about it, but there are HIPAA

15   issues and we can't just solicit those records.

16          I don't know what happened after that.  I

17   don't know that it would change anything, honestly,

18   Counselor, because she clearly had a history of AML

19   which does increase his risk for developing AML also,

20   which I concede.

21     Q.  And have you ever communicated with

22   Dr. Howard?

23          Have you ever consulted with her or had a

24   conference with her about his treatment or his

25   current condition?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 135 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 138 of 1330

1      A.  Nope.

2      Q.  So let's talk about briefly -- just kind of

3  moving on through the report.  I guess Mr. Petty and

4  Dr. Herrick, correct?

5      **A.  Yeah.**

6      Q.  When did you first --

7      **A.  Go ahead.**

8      Q.  I'm sorry.

9      **A.  No, no.**

10      Q.  The lag is getting us again.  When did you

11  first become aware of Dr. Herrick's involvement in

12  the case?

13      **A.  I think that I was emailed his report about**

14  **two weeks ago, if I'm not mistaken.  October**

15  **something-ish.  19th is sticking out in my head.  So**

16  **it was recent.**

17      Q.  All right.  Have you worked on other cases

18  in which Dr. Herrick has been involved?

19      **A.  I don't remember.**

20      Q.  Have you worked on other cases in which

21  Mr. Petty has been involved?

22      **A.  Yes.**

23      Q.  Were those also cases litigated by

24  Mr. DuPont or another member of his firm?

25      **A.  I don't know.**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 136 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 139 of 1330

1      Q.   Have you ever spoken with Mr. Petty or

2  Dr. Herrick about this case?

3      **A.   No.**

4      Q.   Do you have any independent knowledge of the

5  basis or source of the information they gathered and

6  incorporated into their reports?

7      MR. DUPONT:  Vague.

8      THE WITNESS:  Only what would be in the report

9  as they describe it.

10  BY MR. JEFFRIES:

11      Q.   Do you know whether they've ever evaluated

12  or considered any testing of the Kroil product with

13  respect to the benzene content?

14      MR. DUPONT:  Compound, vague.

15      THE WITNESS:  Whether they've done testing?

16  BY MR. JEFFRIES:

17      Q.   Yes, sir.

18      **A.   In my experience with such experts, they**

19  **usually don't.  They usually, you know, default to**

20  **Material Safety Data Sheets and other stuff that's in**

21  **the literature and in the compliance regulatory data**

22  **analyses.  That's usually what happens.  So I assume**

23  **that's what the case was here.**

24      Q.   If there was data associated with direct

25  testing of a product, would you expect them to review

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 137 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 140 of 1330

1    that?

2        MR. DUPONT:  Objection; vague, compound.

3        THE WITNESS:  You know, I don't know.  I mean,

4    you know, these things -- maybe I don't understand

5    your question exactly, but there is different lots

6    and everything, so you test things at different

7    times.  And we know that things vary some in

8    industrial production.

9            So I think one usually goes by what's

10   documented per the EPA, or whatever the agency might

11   be.

12           Maybe you could ask the question differently

13   and I can help you better.

14   BY MR. JEFFRIES:

15       Q.  Would you agree that it's a more accurate

16   source of information to assess the direct testing of

17   the product than to rely upon the estimations and

18   ranges contained in the Material Safety Data Sheet?

19       MR. DUPONT:  Vague, compound.

20       THE WITNESS:  No.  No.  Why would that be?  I

21   don't.

22   BY MR. JEFFRIES:

23       Q.  You don't think the direct testing of a

24   product --

25       MR. DUPONT:  That's the second --

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 138 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 141 of 1330

1  BY MR. JEFFRIES:

2     Q.  -- over a period of time provides more

3  accurate and reliable information with respect to the

4  content of that product?

5     MR. DUPONT:  I think he just answered that

6  question.

7     THE WITNESS:  Let me give you an example,

8  Counselor.  I bought a new car that we discussed on

9  Saturday, although I haven't received it.  It's a

10  Hyundai Kona electric vehicle.  And in doing my

11  research among the electric vehicles, one of the

12  things that I was concerned about was the range of

13  the car on a full charge.

14         And we test-drove the Nissan LEAF, which I

15  thought I had read had a very comparable range.  And

16  it was a very comfortable car.  It wasn't quite as

17  nicely appointed.

18         But then when I went back to what's

19  published and what's reported by the EPA, it reported

20  a 205-mile range, or something like that.  You know,

21  I was reached out to by a Nissan salesperson whom I

22  hadn't actually met but I talked to on the phone, and

23  I texted him back that I had decided to go with one

24  of the Korean cars because of the range.

25         He said, Well, you know, we get 250 miles

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 139 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 142 of 1330

1   per charge.  And I said, Well, the EPA doesn't say

2   so.

3           He said, Well, I would like you to come test

4   the car and I will show you when you drive it that

5   the car will say it's charged to 250 miles.

6           I believe the EPA.  I believe Consumer

7   Reports.  You know what I'm saying?

8           And these guys --

9   BY MR. JEFFRIES:

10      Q.  What if you bought the car and you actually

11  drove 250 miles on a charge?  Would you believe your

12  own personal experience or would you believe the EPA?

13      MR. DUPONT:  Vague.

14      THE WITNESS:  Well, about that particular car

15  and that particular charge, maybe.  But none of these

16  industrial hygienists are necessarily experts in

17  analytic chemistry.

18          You need to have analytic chemists do that.

19          So I think I basically just screwed your

20  premise.  You might like my analogy or not.

21          But I didn't buy the Nissan.

22  BY MR. JEFFRIES:

23      Q.  Is the most accurate information with

24  respect to the content of the product the actual

25  testing of the product itself versus estimation from

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 140 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 143 of 1330

1    the use of the Material Safety Data Sheet?

2        MR. DUPONT:  He's answered that several times

3    now.  You're just trying to get him to change the

4    testimony.  Asked and answered.

5        Move on.

6    BY MR. JEFFRIES:

7        Q.  Doctor, go ahead and answer the question,

8    please.

9        MR. DUPONT:  Asked and answered.

10   BY MR. JEFFRIES:

11       Q.  Unless Mr. DuPont is your lawyer and he's

12   advising you not to answer, then you need to answer

13   the question.

14       MR. DUPONT:  Nobody said -- the only question I

15   told him not to answer was when you referred to

16   people here in this country undocumented as illegals.

17   And if you do it again, we'll have a conversation --

18       MR. JEFFRIES:  You're just telling him not to

19   answer that question and to move on, sir.

20       THE WITNESS:  No, he didn't actually.  But now

21   you're going to have to restate the question because

22   I don't remember it anymore.

23   BY MR. JEFFRIES:

24       Q.  My question is, do you disagree with the

25   premise that the actual testing of the actual product

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 141 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 144 of 1330

1    at issue is a more accurate assessment of the

2    product's contents than the estimations and

3    approximations that may be contained in the list of

4    ingredients in the Material Safety Data Sheet?

5        A.   I'm going to have to ask you to clarify,

6    then, Counselor.  Are you going to posit that Kryoil,

7    or whatever the hell oil it is, if that particular

8    can that he might have used 15 or 20 years ago had

9    been tested at that time, that that would be better

10   than knowing the range of content?

11           Yes, that would probably be better if each

12   can that he had ever used was assayed by itself in

13   real time; that probably would be better.

14           But I don't see how that's a feasible thing.

15       MR. JEFFRIES:  Okay.  Thank you.

16           Why don't we take a short break and I'll try

17   to streamline this as much as I can.

18                       (Whereupon, a break was taken

19                       from 12:47 p.m. until 12:51 p.m.)

20   BY MR. JEFFRIES:

21       Q.   Doctor, looking through your report on page

22   5 and subparagraph 7, you make a reference to

23   "workers chronically exposed to benzene."  How would

24   you define that term "chronically" in the context of

25   how you used it in your report?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 142 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 145 of 1330

1    A.   Regularly for an ongoing period of time.

2    Q.   Any specific period of time?

3    A.   No.

4    Q.   A month, a year, ten years, 20 years?

5    A.   You know, most people in a particular

6    occupation continue what they are doing for many

7    years, several years.  That's kind of what I was

8    referring to there.

9    Q.   Okay.  Flipping ahead a few pages to section

10   C, paragraphs 12 and 14 on pages 9 and 10.

11   A.   Okay.

12   Q.   I want to make sure I'm not misunderstanding

13   what you wrote in your report.

14        Do you customarily attempt to determine

15   causation in patients that you treat clinically?

16   A.   At a very broad level, yes.  I look for -- I

17   look for exposures which may have contributed to

18   leukemia, in part, because patients want to know.

19        So, yes, I do that routinely.  I take a

20   social/occupational history on every patient.

21   Q.   But do you attempt to determine a cause?

22        Are you able to determine a cause in most

23   patients?

24   A.   Most patients know, but there are the

25   occasional patients with very worrisome histories,

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 143 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 146 of 1330

1  either family or occupational or chemotherapy, and I

2  call that to the patient's attention, yes.

3      Q.  But you said -- in paragraph 14 on page 10,

4  you say, "I have been unable to identify any of the

5  environmental factors that ultimately led to the

6  cancer."

7          And a couple of sentences later you say, "in

8  a handful of cases, based on the history, I have been

9  able to conclude, to a reasonable degree of medical

10  certainty, that the patient's occupational exposures

11  to carcinogens, such as benzene, contributed to the

12  development of their AML."

13          What percentage of those cases would you

14  estimate that you were able to conclusively determine

15  that causal relationship in the patients that you

16  treat clinically?

17      A.  It's very rare.  I would say over 30 years I

18  can think of -- are we talking now about benzene or

19  are we talking about all causes?

20      Q.  Maybe you can tell me about both.

21      A.  So a certain --

22      Q.  Maybe let's start with benzene.

23      A.  -- percentage of my patients smoke.  And if

24  they have a long smoking history, I'll put that into

25  the causation column.  And then I'll take into

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 144 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 147 of 1330

1    account the history of obesity a little bit.

2          Family history is something we get quite

3    frequently.  Chemotherapy we have in about 5 percent

4    of the patients.

5          But for people who have stories where it

6    seems like it's going to be chemically induced

7    throughout the occupational exposure, I suspect

8    there's probably been about ten over 30 years.  But

9    that's a crazed, wild guess.

10         Q.  Okay.  I think you reference in your report

11   that you don't feel as a clinician you have any

12   obligation to do that, but you do that if you can put

13   the patient at ease or help you determine the best

14   treatment options, or something like that?

15         A.  No, I do think I do have an obligation to do

16   that because I'm an academic physician and that's how

17   we generate hypotheses and learn about our diseases.

18         So I think it's absolutely incumbent upon us

19   to do that.

20         Q.  And how many -- over your 30-year career,

21   how many patients do you think you've treated

22   clinically for AML?

23         A.  Treated or that I've been personally

24   responsible for their longitudinal treatment?

25         Q.  I'm not really sure I understand the

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 145 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 148 of 1330

1  difference, but I'll let you explain it to me.

2      A.  Because in an academic setting, I touch, at

3  some point, almost every patient with AML who is

4  managed by my team.  In most places that I've worked,

5  there have been probably 50 or so new leukemics a

6  year, and because I touch almost every one of those

7  patients, you multiple 50 times 30, and I think that

8  comes out to 1,500.

9      Of those 50, potentially 20 of them will be

10  patients that I personally manage over time, or 15,

11  something like that.  And so if you go 20 a year

12  times 30 years, that's 600.

13      Q.  I guess what I was trying to get at, the

14  subset of -- you said an estimation of maybe ten

15  patients that you have been able to determine that

16  their occupational exposure to carcinogens such as

17  benzene contributed to their development of AML, that

18  subset of ten.  And that's ten out of how many?  Out

19  of 600?

20      MR. DUPONT:  I think the term was wild guess,

21  not estimate.

22      THE WITNESS:  Well, that's hard to say because

23  sometimes I discover these things when I'm talking to

24  somebody else's patient when I'm in the hospital

25  working with them.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 146 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 149 of 1330

1          I also hear about cases from other doctors.

2     It's just a guessing game that you're asking me to

3     play.  I don't know.

4     BY MR. JEFFRIES:

5          Q.  With regard to Mr. Rhyne's sister, are you

6     familiar with whether or not she was exposed to any

7     occupational petrochemicals or solvents?

8          **A.   I am not.**

9          Q.  Did you seek to obtain that information?

10         **A.   No.**

11         Q.  And you reference on page 12 of your report

12    these lists of contributing -- other syndromes and --

13    I think you called them cancer predisposition

14    syndrome?

15         **A.   Yep.**

16         Q.  Are these items that were tested for?

17              Are these -- what are these predisposition

18    syndromes?

19         MR. DUPONT:  Objection; form.

20         THE WITNESS:  These are the published known

21    familial syndromes as of the date of this report.

22    And they go along with certain leukemias that he

23    almost certainly didn't have.

24    BY MR. JEFFRIES:

25         Q.  And I guess that was my question.  Was there

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 147 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 150 of 1330

1    any testing to determine he didn't have these?

2        **A.  No.  They are clinical diagnoses that you**

3    **would know.  The ones on the top -- the ones in the**

4    **top table are things that you would know if he had**

5    **before he had leukemia, and the ones in the bottom**

6    **are things that he would have been diagnosed with.**

7        Q.  Okay.  And none of that was present in the

8    medical history that you reviewed?

9        MR. DUPONT:  Form.

10       THE WITNESS:  Correct.

11   BY MR. JEFFRIES:

12       Q.  Doctor, looking at page 19 of your report

13   where you talk about the radiation.  Were you made

14   aware of any scenario which Mr. Rhyne was exposed to

15   radiation contamination during his employment with

16   Duke Power?

17       **A.  I believe I saw the results of his dosimetry**

18   **reported, and that's all I remember, as we're sitting**

19   **here.**

20       Q.  Is that from the monitoring of the badge?

21       **A.  Yeah.**

22       Q.  You saw separate paperwork related to that?

23       I mean, you saw documentation of that

24   monitoring?

25       **A.  I think so.  That was two years ago, so I**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 148 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 151 of 1330

1    **believe I did, yes.**

2        Q.  Just trying to move through my notes here,

3    so bear with me.

4        **A.  Sure.**

5        Q.  Looking in section 2, paragraph 28, of your

6    report, you discuss that in order to be -- in order

7    "to make the causation analysis meaningful, evidence

8    of exposure to the carcinogen in question must be

9    more than trivial, hypothetical, negligible or

10   theoretical."

11           Can you tell me how you would define those

12   terms in the context you were using them here in your

13   report?

14       **A.  Demonstrably above what everybody's ambient**

15   **exposure is.**

16       Q.  Okay.  Is there any way to quantify that?

17   Like two standard deviations or, you know -- how do

18   you define "demonstrably"?

19       MR. DUPONT:  Form.

20       THE WITNESS:  Quacks like a duck.

21   BY MR. JEFFRIES:

22       Q.  If it looks like it's more, then it must be

23   more, that kind of thing?

24       **A.  I would never suggest to a patient -- let's**

25   **say -- let's say, God forbid, I get acute leukemia,**

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 149 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 152 of 1330

1  which is possible.  And I know that I stripped wood

2  in our old house in Baltimore and I did not use all

3  of the best practices that I might have used with the

4  paint stripper.

5      Q.  Okay.

6      A.  And my doctor asked me if I ever had any

7  chemicals exposure.  I said, Well, there was this one

8  time that I spent about a week stripping this wood.

9  I can't exclude the fact -- the possibility that

10  the -- what's the -- something chloride, whatever the

11  thing is, they don't sell it anymore.  Benzyl

12  chloride, I think it is, which is thought to be

13  carcinogenic.  It is now removed.

14      I can't discount that that might have not

15  played a role, but it was a very brief exposure and I

16  don't have any other chemical exposures.  So I'm not

17  going to say that it couldn't have anything to do

18  with it.  But it was basically a one-time flash in

19  the pan.  It probably didn't.

20      If I was doing paint stripping every day

21  over many months and I was not using a ventilator,

22  respiratory, gloves, that's a bit of a different

23  story.

24      Q.  So the first example you gave would be

25  consistent with what you would refer to as a trivial

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 150 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 153 of 1330

1    or negligible exposure?

2        A.  Understanding that I don't exclude the

3    possibility that it was, in fact, causative.  I'm not

4    going to make a case out of it because probably it

5    wasn't.  But you never know.

6            Yes, it's not something that I would --

403/611   7    Q.  I understand.
cumulative
8        A.  Okay.

9        Q.  Doctor, you suggest on paragraph 34 of your

10   report that you reviewed the records associated with

11   the treatment that Mr. Rhyne underwent here in North

12   Carolina?

13       A.  Yes.

14       Q.  And, again, I apologize if this has been

15   asked previously, but did you review all the records

16   associated with his treatment?

17       MR. DUPONT:  Asked and answered.

18       THE WITNESS:  No.

19   BY MR. JEFFRIES:

20       Q.  And you have expressed an opinion here that

21   the charges for those treatments were reasonable and

22   appropriate.  What is your basis for that opinion?

23       A.  I scanned the charge history that was

24   provided to me looking for anything that looked out

25   of bounds, and everything looked completely consistent

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 151 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 154 of 1330

1    with what I would expect in somebody being treated

2    for AML.

3         Q.  When you say "everything," you mean

4    everything in terms of like the actual procedures

5    performed and the treatments administered?

6         MR. DUPONT:  Form.

7         THE WITNESS:  Yes.  As well as the charges

8    associated with them.

9    BY MR. JEFFRIES:

10         Q.  You told us earlier you never treated a

11    patient in North Carolina, correct?

12         A.  That's correct.

13         Q.  I assume you never issued a medical bill in

14    North Carolina, have you?

15         A.  That's correct.

16         Q.  You've never been responsible for billing

17    for medical services or setting rates for medical

18    services for any patient treated in North Carolina,

19    have you?

20         A.  I have not.

21         MR. JEFFRIES:  Doctor, thank you so much for

22    your patience.  I think those are all of my

23    questions.

24         THE WITNESS:  You're very welcome.

25

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 152 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 155 of 1330

1                    EXAMINATION

2    BY MR. DIXON:

3        Q.  Doctor, this is Josh Dixon from Savogran.  I

4    just have a few questions.

5        A.  I think our court reporter doesn't know

6    doesn't know Stavogran.  Can you spell that out for

7    us?

8        Q.  S-a-v-o-g-r-a-n.

9        A.  Oh, Savogran.  N, as in Nancy, or M, as in

10   Maurie?

11       Q.  N, as in Nancy.

12       A.  Nancy.  Savogran.  That's not a very good

13   name for a company.  At first I thought it was like

14   Stravomatic or something, or Spyrograph.  I'm sorry.

15       Q.  That's okay.  Doctor, if you would please

16   turn to page 14 of your report.

17       A.  Sure.  I'm there.

18       Q.  The third sentence on that page says,

19   "Kutzit was known to contain around 50 percent

20   benzene into the mid 1970s."

21           Do you see that?

22       A.  Yes, I do.

23       Q.  Where did you get that information?

24       A.  That is a good question.  I would have to go

25   into my files to figure out where that was from.  I

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 153 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 156 of 1330

1    honestly don't remember where it is from.

2         But I like the name, Kutzit.  It sounds like

3    a crazy toy or something.  Kutzit.

4    Q.  To your knowledge, have you done any studies

5    on Kutzit to determine the benzene content?

6    A.  You know, I don't remember what I did two

7    years ago honestly, Counselor.  I'm sorry.  I haven't

8    recently.

9    Q.  Have you ever previously had a case, to your

10   recollection, involving Kutzit?

11   A.  I don't believe so.  Like I say, I like

12   names, as you can tell, and I like to riff on names.

13   So Kutzit was one that I would probably remember, and

14   I don't remember Kutzit.

15   Q.  You were asked this question by prior

16   counsel about a different product --

17   A.  That's okay.

18   Q.  -- but just to clarify, as to Kutzit, your

19   knowledge of Mr. Rhyne's use of Kutzit came

20   exclusively from his deposition; is that correct?

21   A.  Yeah.

22   MR. DUPONT:  Objection.

23   THE WITNESS:  Well, from any of the depositions

24   that described his occupational use pattern, yes.  I

25   have no other --

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 154 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 157 of 1330

1    BY MR. DIXON:

2        Q.   From any of the materials --

3        **A.   What's that?**

4        Q.   From any of the materials you were

5    provided -- that knowledge came only from the

6    materials you were provided --

7        **A.   Yes, I didn't go out and investigate his use**

8    **of Kutzit personally.**

9        MR. DIXON:  Okay.  Thank you.

10       THE WITNESS:  That wouldn't have "Kutzit."

11           That's it.

12       MR. DIXON:  That's it.

13       THE WITNESS:  You did "Kutzit."

14           Are there more?  Any more people in that

15   box?

16       MR. DUPONT:  Is that it from the defense?

17                       EXAMINATION

18   BY MR. DUPONT:

19       Q.   Just a couple clarifying questions.

20   Dr. Gore, you were asked by one attorney earlier in

21   your deposition whether Mr. Petty's report was your

22   only information on radiation exposures that

23   Mr. Rhyne may have had.  But is it correct that

24   you've received dosimetry records and there is also a

25   summary of radiation exposure information that can be

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 155 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 158 of 1330

1    determined from Dr. Herrick's report?

2        A.  Yes, that's true.

3        Q.  And similarly, just to clarify, in addition

4    to reviewing the fact witness testimony of Mr. Rhyne's

5    use of products, you've also received and have

6    available to rely upon Dr. Herrick's report that

7    provides information on how Mr. Rhyne used products

8    and what his benzene exposures were from those

9    products?

10       A.  That's correct.

11       Q.  That's true for the CRC products, Kroil

12   products and other products listed in Dr. Herrick's

13   report?

14       A.  Correct.

15       Q.  Sometimes industrial hygienists will express

16   a benzene exposure in a cumulative dose and sometimes

17   they don't.  But just because there's no cumulative

18   dose given from a benzene exposure from a particular

19   product, that doesn't mean the person didn't have

20   exposure to benzene from their product; is that

21   right?

22       A.  If the product contains benzene --

23       DEFENSE COUNSEL:  Objection.

24       THE REPORTER:  I'm sorry, is there somebody on

25   the phone that's saying something?  I didn't hear any

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 156 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 159 of 1330

1  objections.

2      DEFENSE COUNSEL:  Object to the form of the

3  question, to all three questions thus far.

4      THE REPORTER:  Thank you.  Now I can hear you.

5      THE WITNESS:  Say it again.

6  BY MR. DUPONT:

7      Q.  If a person's cumulative dose of exposure to

8  benzene is not assessed, does that mean they're not

9  exposed to benzene from a product?

10     **A.  Of course not.**

11     MR. DUPONT:  All right.  No more questions.

12     THE WITNESS:  Going once.

13     MR. GRAY:  That's a wrap.

14     MR. DUPONT:  Do you want to read it and sign?

15     THE WITNESS:  I prefer to.  Last time I said

16  yes, I didn't get it.

17     MR. DUPONT:  Yes.  We would like to read and

18  sign.

19     THE WITNESS:  Especially if it's in the big-

20  print version.

21     (AND FURTHER DEPONENT SAITH NOT AT 1:11 P.M.)

22

23

24

25

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 157 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 160 of 1330

```
 1                 UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                      CHARLOTTE DIVISION

 3    BRUCE RHYNE and JANICE        )

 4    RHYNE,                        )

 5                 Plaintiffs,      )   Case No.:

 6           vs.                    )   3:18-cv-00197-RJC-DSC

 7    UNITED STATES STEEL           )

 8    CORPORATION, et al.,          )

 9                 Defendants.      )

10

11         This is to certify that I have read the
      transcript of my deposition taken on November 4, 2019,
12    in the above-entitled cause by Roselind C. Pisano,
      CSR, consisting of Pages 1-158, inclusive, and that
13    the foregoing transcript accurately states the
      questions asked and the answers given by me, with
14    corrections, if any, appearing on the attached
      correction sheet(s).

15

16              _____ Correction sheet(s) attached

17              _____ No corrections have been submitted

18

19

20         _____
                    STEVEN D. GORE, M.D.
21
      SUBSCRIBED AND SWORN TO
22    before me this_____ day
      of _____ 20__.
23

24

25    _____
             Notary Public
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 158 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 161 of 1330

1    STATE OF ILLINOIS        )

2                             )  SS:

3    COUNTY OF C O O K        )

4        I, Roselind C. Pisano, a Certified Shorthand

5    Reporter and Notary Public within and for the County

6    of Cook and State of Illinois, do hereby certify that

7    heretofore, to wit, on November 4, 2019, personally

8    appeared before me at The Blake Hotel, 9 High Street,

9    New Haven, Connecticut, STEVEN D. GORE, M.D., in a

10   cause now pending and undetermined in the United

11   States District Court, Western District of North

12   Carolina, Charlotte Division, wherein BRUCE RHYNE and

13   JANICE RHYNE are the Plaintiffs and UNITED STATES

14   STEEL CORPORATION, et al., are the Defendants.

15       I further certify that the taking of this

16   deposition was pursuant to Notice and that said

17   witness was first duly sworn to testify the truth,

18   the whole truth, and nothing but the truth, in the

19   cause aforesaid; that the testimony then given by

20   said witness was reported stenographically by me in

21   the presence of the said witness, and afterwards

22   reduced to typewriting by Computer-Aided

23   Transcription, and the foregoing is a true and

24   correct transcript of the testimony so given by said

25   witness as aforesaid.

**Paszkiewicz Court Reporting**
**(618) 307-9320 / Toll-Free (855) 595-3577**
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 159 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 162 of 1330

1      I further certify that the signature of the

2   witness to the foregoing deposition was reserved.

3      I further certify that my certificate annexed

4   hereto applies only to the transcript signed and

5   notarized by me and produced by me personally or

6   under my direction and control.  The undersigned

7   assumes no responsibility for the accuracy of any

8   reproduced copies not made under my control or

9   direction.

10      I further certify that I am not counsel for nor

11   in any way related to the parties to this suit, nor

12   am I in any way interested in the outcome thereof.

13      IN TESTIMONY WHEREOF:  I have hereunto set my hand

14   and affixed my notarial seal this 14th day of

15   November 2019.

16

17

18

19   _____

20                ROSELIND C. PISANO
         Notary Public, Cook County, Illinois
              Certified Shorthand Reporter
21              License No. 084-002031

22

23   OFFICIAL SEAL
     ROSELIND C. PISANO
     Notary Public - State of Illinois
24   My Commission Expires 6/21/2020

25

**Paszkiewicz Court Reporting**
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 160 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 163 of 1330

| A |
|---|

a.m 1:20 28:18
28:18 48:13,13
51:7,7 79:11
79:11
abbreviated
52:21
ability 98:6
124:23
able 17:22 24:3
33:10 96:16
113:7 125:2,3
141:22 142:9
142:14 144:15
abnormal 39:7
above-entitled
156:12
absence 17:21
70:11 118:17
absolutely 6:1,4
18:15 24:2
29:9 34:24
37:25 53:4,10
58:23 60:24
65:12 68:2,3
68:17 77:19
91:5 112:9
143:18
absolve 68:9
academic 92:7
102:22 143:16
144:2
accept 67:20
68:6 125:24
acceptable
67:25
accepts 67:22
accidents 105:6
105:8
account 143:1
accounting
129:23
accuracy 158:7
accurate 115:22
125:17 136:15

137:3 138:23
140:1
accurately
115:21 156:13
ACGIH 50:18
achieving
118:17
acquired 39:5
40:8
acronym 50:21
activation 30:9
actual 138:24
139:25,25
150:4
Acuity 2:10
acute 24:4 69:1
147:25
add 63:17
addendum 27:9
addition 154:3
additional 42:3
42:5 126:9
address 36:1
45:22 62:1
102:20
adequate 14:19
administered
150:5
adults 19:4
adupont@loc...
2:4
advance 131:2
advertised 93:10
advising 102:7
139:12
advisor 129:15
affixed 158:14
afishkin@fish...
2:24
aforesaid 157:19
157:25
age 19:5 98:8
105:24,24
106:3,4,24
agencies 67:19

67:24 68:8
agency 64:24,25
78:23 113:10
136:10
agent 22:5,12
111:23
agents 22:14,18
23:9 24:1 29:8
29:12,13 53:6
54:2
ages 51:23
aging 51:24
ago 6:7,22 9:19
11:5,6 15:2,22
16:3 44:25
76:16 83:19
93:3 130:21
131:13 132:7
132:20 133:2
134:14 140:8
146:25 152:7
agree 18:25
19:20 23:21
32:3 38:3 44:2
44:4 45:5
53:17,19,20
59:21 67:15,18
68:21,24 69:18
69:24 70:2
74:8,11,14,23
96:22 98:25
99:9 125:11,13
126:22 136:15
agrees 32:20
ahead 48:19
85:24 87:10
134:7 139:7
141:9
aiming 102:22
air 56:10 71:15
71:18 72:23
110:25 112:23
airplanes 112:20
al 1:8 156:8
157:14

alerted 132:5
Alexander 7:17
alginate 20:23
alleged 91:7
128:7
allelic 38:21
39:1 41:6
allowable 17:9
allowed 27:2
alphabet 113:11
altered 122:22
amalgam 64:20
72:14
ambient 19:6,7
19:15 55:20,25
72:23 73:3,6
110:14 112:10
112:13 113:15
113:18 114:1
114:22 147:14
America 101:4
American 50:22
AML 24:22
31:25 32:23,25
33:1 34:8,15
34:25 35:1,4,5
35:9,11 38:3
38:15 47:15
48:18,21 50:2
60:17 75:11
99:11 100:25
103:2,5,15,16
105:23 106:2
106:21 107:8
115:9 118:5
126:23 132:24
133:18,19
142:12 143:22
144:3,17 150:2
AMLs 32:3
34:20
amount 9:22
17:12 53:1
67:20,22 71:18
72:19 84:6,14

84:20 92:5
106:17 113:2
114:1 115:20
118:12 124:14
125:7
amounts 31:5
56:12 62:23
64:18 108:24
112:9 115:8
analogy 138:20
analyses 135:22
analysis 35:15
35:16 70:13
128:23 147:7
analytic 138:17
138:18
analyze 124:23
125:2
analyzed 105:14
ancestors 99:23
ANDERSON
3:15
Andrew 2:2,22
13:17 27:1,1
79:25 80:1
95:15 98:11,15
Andy 85:15,24
aniline 108:14
annexed 158:3
annotate 58:6
answer 24:6
65:1,5 70:22
74:7 87:12
89:12 106:19
125:24 131:18
139:7,12,12,15
139:19
answered 64:10
65:7 71:8 76:1
97:4 129:13
137:5 139:2,4
139:9 149:17
answering 98:5
answers 49:18
118:22 156:13

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 161 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 164 of 1330

antioxidants 22:25 52:3
anybody 40:22 87:19 89:23 102:13 126:21
anymore 139:22 148:11
anyway 89:13
apart 22:15
API 76:7,12
apologetic 99:6
apologize 54:4 90:17 91:13,25 99:3 149:14
apparently 12:16
appeal 82:20
appear 8:14
appearance 12:2 90:24
APPEARAN... 2:1 3:1
appeared 157:8
appearing 156:14
appears 106:11
applies 97:15 158:4
apply 123:15
appointed 137:17
approach 118:24
approached 93:12,13,23
appropriate 9:24 10:7 13:2 23:16 24:18 54:23 74:7 75:2 149:22
approximate 12:20
approximations 140:3
Arch 3:17

area 52:17
areas 30:20 111:14
argue 124:17
argument 116:11 118:21 119:24 121:18 121:20
Arizona 93:14
around-us/dos... 16:6
article 75:21 101:21,22
articles 59:2
artificial 32:13
as-happens 92:13
ascertainable 101:18
Asian 78:4
aside 45:4 87:5
asked 19:23 21:7 36:1 51:13 54:3 58:21 61:9,12 64:10 71:5,8 73:23 75:24,25 76:1 76:3 78:12 87:2 92:3 96:18 97:4 99:2 101:19 105:12 117:15 126:2 129:13 139:4,9 148:6 149:15,17 152:15 153:20 156:13
asking 46:10 52:23 53:2 54:1 55:7 63:5 68:13 69:11,22 97:2 98:3 100:9 145:2
asks 124:4
aspect 45:4

assayed 140:12
assess 95:25 112:16 116:1 136:16
assessed 155:8
assesses 8:14 112:13
assessing 102:11 125:14
assessment 8:16 95:9 97:16 102:23 109:3 115:22 140:1
assessments 28:2
assistants 128:15
associate 61:23
associated 108:10,17 113:14 115:1 116:4 118:18 119:10 120:4 123:10,25 126:22 135:24 149:10,16 150:8
association 113:18
assume 20:15 44:15 46:20 91:2 94:25 135:22 150:13
assumes 158:7
assuming 19:3 44:17 60:19 71:19
assumption 52:6
attach 5:12 22:3 22:4
attached 156:14 156:16
attachment 27:3
attempt 141:14 141:21

attention 18:19 132:8 142:2
attorney 93:13 120:13 153:20
attorneys 14:5 24:8 67:3 81:15
attributable 101:1
attribute 112:10 124:5
audience 102:3 102:9,16
August 12:17 16:6
Australian 33:5 33:6 122:15
author 76:17 113:23
authored 126:11
authors 47:22
auto 111:25
automobile 110:23
auxiliary 18:11
available 33:11 133:2 154:6
Avenue 3:3
average 51:21 57:2
aware 20:9 32:9 60:6 62:22 73:21 77:2,16 78:23 87:6 88:5,13,13,19 91:23 101:6 112:12 113:1 126:13 134:11 146:14
awareness 102:6
awful 112:3

B

B 4:13 57:12 117:18,18,22

BABST 2:6
back 8:8 9:19 17:20 33:9 40:10 48:6 49:9 51:10 54:4 64:3 132:15 137:18 137:23
background 97:14
backwards 30:7 30:22
bad 86:7 107:21 110:17 119:18 120:18
badge 17:3 146:20
ball 41:15
ballparks 116:6
Baltimore 148:2
bars 23:4
base 65:16 121:4 125:17
based 8:3 20:2 25:21 32:1 34:22 38:18 49:2 53:25 65:15,19 84:8 87:2 105:12 106:12 114:3,3 114:5 119:16 119:24 121:22 123:15 142:8
baseline 25:25 26:3,10,11 56:21 57:1,10 72:24 73:2 109:3,5 113:2
basic 58:3
basically 138:19 148:18
basing 52:6,8
basis 8:15 23:8 24:17 34:22 43:19 44:3

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC Document 311-1 Filed 09/02/20 Page 162 of 190
Case 3:18-cv-00197-RJC-DSC Document 408 Filed 09/15/20 Page 165 of 1330

51:20 58:15
71:10 76:22
77:7 113:13
117:7,16 135:5
149:22
bbender@har...
3:13
**BEACH** 3:11
**bear** 147:3
**beginning** 122:1
**beings** 26:4
**believe** 11:13
12:4 19:2 20:7
64:5 65:6
70:21 81:21
84:23,24 85:11
86:21 92:25
95:11 99:25
101:17 106:20
118:1,14 126:4
126:16 138:6,6
138:11,12
146:17 147:1
152:11
**bell** 90:20
**BENDER** 3:12
**benzene** 14:7
23:19,21,23
25:18,23 26:22
26:24,24 27:8
27:23 29:3,7
29:21 31:25
32:24 33:24
46:7 49:11,23
50:1 53:20,25
54:9,16,20
55:3,25 56:4,7
56:10,14 57:6
59:21 60:11
61:10,19 62:10
62:10,14,23,25
63:2,3,3,7,10
63:11,12,16,18
63:19,19,22
64:1,5 65:3,10

65:16,17,17,19
65:21 66:2
67:16 68:4,13
68:18,22,25
69:25 70:21,24
71:1,11,12,14
71:15 72:15,22
73:7 74:9
75:13 76:23,25
77:3 81:3,5
84:6,20 85:3
101:10,15,22
102:14 103:1
104:1,7 107:21
108:21,22,25
109:19 110:10
112:5 113:13
113:16 114:18
115:8 117:17
117:19,22
118:13 120:15
121:1 122:3
123:4,9,11
126:19 135:13
140:23 142:11
142:18,22
144:17 151:20
152:5 154:8,16
154:18,20,22
155:8,9
**benzene-** 30:12
**benzene-conta...**
46:23
**benzene-indic...**
67:10
**benzene-related**
116:9
**Benzyl** 148:11
**Bert** 9:5 77:14
**best** 34:23 37:2
37:11 86:6,7
98:5 116:5
119:16 143:13
148:3
**bet** 66:8

**betrays** 9:2
**better** 29:17
38:12 51:17
54:9,16,20
55:3 87:22,24
99:19 102:7
136:13 140:9
140:11,13
**beyond** 26:7
43:14,20 45:7
103:15
**biased** 35:16
**big** 13:4 15:15
108:18 115:3
129:5
**big-** 155:19
**bill** 127:15,21
150:13
**billed** 127:16,17
127:18,19,20
**billing** 10:18
150:16
**billion** 73:9
**bills** 9:17,18,22
9:25 10:4,5,10
10:11,15 11:3
13:1,9
**binary** 119:14
119:15
**biological**
116:12
**biologically**
32:15,17 120:6
**biologist** 8:12
52:9,11
**biology** 52:8
58:3,4 59:1,17
119:14
**biomarkers**
122:5
**biopsy** 39:20
**bit** 21:15 65:2
78:5 92:1
95:14 104:10
112:6 143:1

148:22
**blah** 26:2,3,3
90:15,15,15
**Blake** 1:18 157:8
**blasts** 12:2
**blood** 8:20 12:2
25:9 39:14,17
39:19,23 72:6
72:9 101:25
102:15 128:15
130:23
**blue** 57:4
**BMI** 60:24
**body** 21:20
22:14,19 23:10
26:1 29:15,16
29:19,20 51:16
52:3 53:2,8,9
54:8,11 55:2
56:14,19 57:4
62:21 63:3,16
63:21 66:3
**body's** 52:14
**bone** 8:24 55:17
**boost** 73:2
**booth** 110:12,16
**borderline**
120:13
**boring** 26:16
**bothered** 120:18
**bottom** 16:4
28:25 122:15
146:5
**bought** 137:8
138:10
**bounce** 91:25
96:3
**boundaries**
32:14,14
**bounds** 119:21
149:25
**box** 153:15
**boxed** 69:11
**BRADLEY** 3:15
**brain** 16:22

113:22
**break** 28:13,17
48:10,12 51:4
51:6 79:5,9,10
92:9 140:16,18
**breaks** 53:7,7
**breast** 132:11
**breathe** 112:23
**BRIAN** 3:12
**Bridgeport**
120:24
**brief** 6:18
148:15
**briefly** 12:6
134:2
**British** 33:17
**broad** 50:1
102:15,16
141:16
**broader** 103:5
103:14
**Broadway** 2:22
**Bronners**
128:25
**brothers** 81:16
**Bruce** 1:3 83:3,5
156:3 157:12
**bucks** 94:19
**building** 44:8
40:20 112:21
**business** 17:25
110:21 111:16
128:20 129:24
130:5
**buy** 138:21

---

| C |
| --- |

**C** 1:15 141:10
156:12 157:3,4
158:19
**C.S.R** 1:15
**C/EBP-alpha**
40:4
**calculate** 32:24

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 163 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 166 of 1330

33:2 46:6,21
calculates 43:6
calculation
17:17,18,21
25:12 113:3
114:1 123:18
125:19
calculations
126:15
calendar 96:16
Calhoun 3:8
call 22:1 24:21
31:7 43:1 59:9
80:20,22 95:7
96:3 114:25
142:2
CALLAND 2:6
called 1:11 5:3
38:21 44:23
82:15,18
128:20 145:13
Canadian 33:17
cancer 8:12
17:23 25:16
30:16 36:7,10
36:12 37:1
40:19 48:23
51:23,24 55:16
62:25 63:1,8
63:10 64:17,19
64:22,25 65:3
65:8,14 67:21
72:4,6,11
99:12 101:2
107:11 110:14
114:13 116:9
132:7,10,11
142:6 145:13
cancers 8:13 9:6
25:12 30:16
47:11
car 112:8 137:8
137:13,16
138:4,5,10,14
carcinogen 50:8

50:11,14,16
68:25 69:25
70:3 72:1 74:9
74:15 78:24
147:8
carcinogenesis
77:1
carcinogenic
68:10 148:13
carcinogens
19:18 73:21
74:4 142:11
144:16
cardiovascular
25:8
care 8:13 10:17
42:1,11,12,14
63:2,3 102:5
130:25 131:12
131:17
career 143:20
carefully 18:8
42:15 47:25
52:4
Carolina 1:1
2:14 3:9,22
81:6,8,11,12
81:18,25 82:2
82:5 149:12
150:11,14,18
156:1 157:12
carried 80:17
carry 27:13
35:13,14
cars 112:19
137:24
case 1:5 5:14,25
6:6,9 7:19 9:18
10:16 11:17,22
12:23 15:6,24
16:17 27:3
32:2 61:7 62:5
62:12 70:8,10
70:21 80:12,14
80:19 81:6,10

81:14,23 82:13
82:15,18,21,25
83:8 86:2
90:10,12,15
92:20 93:23
94:11 96:4,19
97:12,15 99:23
101:7 106:24
109:13,19
111:2,11
114:13 118:15
118:17,23
119:12 120:14
120:15,17
121:2,10
126:10 127:16
127:20 128:22
129:7,19 132:1
132:19 134:12
135:2,23 149:4
152:9 156:5
cases 15:24
24:21 33:24
36:24 42:10
67:3 79:24
80:8,25 95:7
97:21 99:13,15
100:22,25
101:8 102:11
134:17,20,23
142:8,13 145:1
categories 103:5
categorize 33:25
category 60:25
causal 142:15
causation 12:24
24:15 53:18
60:17 67:21
80:23 81:23
121:11 141:15
142:25 147:7
causation-wise
67:14
causative 61:11
118:13 125:15

125:16 132:10
149:3
cause 17:23
22:23 23:11,23
24:11 50:2
54:25 62:25
63:1,8 64:16
64:19,21 65:8
69:1 72:6,11
100:23 101:1,2
110:1 115:8,12
141:21,22
156:12 157:10
157:19
caused 14:7 21:1
21:17 24:5,12
24:18 25:13
40:8 101:9
117:3 118:4
123:4
causes 54:22
59:21 63:10
64:25 65:3,14
66:11 67:13
70:21 72:6
104:1 142:19
causing 23:10
67:11
CBCs 13:2,3
cell 8:19 20:1,23
21:14 58:10
59:1,13,17
cells 21:19 25:13
39:20 40:6,6
58:17,18,24
59:15,16,20,22
60:12
cellular 21:20
23:10,11,19,21
23:22
census 99:25
100:10
Center 2:7
certain 57:3
67:6,6,20,22

69:16 71:15
77:23 98:8
118:17 119:21
142:21 145:22
certainly 8:9 9:7
11:10 12:14,25
14:7 30:15,21
35:4 54:23
56:10 74:25
88:12 105:16
107:4 110:4
118:11 126:20
145:23
certainty 59:13
117:1 118:3,9
122:8 131:14
142:10
certificate 158:3
Certified 1:16
157:4 158:20
certify 156:11
157:6,15 158:1
158:3,10
CHAD 3:16
chance 129:3
chances 36:12
change 122:2
133:17 139:3
changes 123:1
chapter 19:17
53:11 69:10
characterized
55:17
charge 96:23
137:13 138:1
138:11,15
149:23
charged 92:25
138:5
charges 149:21
150:7
Charles 3:3
Charleston 3:9
Charlotte 1:2
2:14 3:22

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 164 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 167 of 1330

156:2 157:12
cheap 111:25
checker 96:21
chemical 22:15
54:24 61:19
62:2,5 72:4,13
91:4 105:8
107:25 108:14
108:14 148:16
chemically
143:6
chemicals 60:20
61:5,23 71:25
72:8 74:18
104:4 109:22
109:25,25
128:5,8 148:7
chemistry 104:2
104:3 138:17
chemists 138:18
chemotherape...
56:24
chemotherapy
54:25 107:9
108:2 142:1
143:3
Chernobyl 19:1
Chevron 2:25
chloride 72:3,5
72:7,11 148:10
148:12
chronic 24:25
25:9 67:10
103:10
chronically
140:23,24
cigarettes 56:25
circle 10:22
circled 46:13
circumstances
38:9,13 65:9
67:7,8
citation 57:17
58:15 59:6
citations 57:19

57:24
cite 31:23,24
58:20 66:25
75:20 121:23
cited 59:3 75:19
76:7,23 77:9
124:8
cites 48:23
123:14
citizenship
100:6
City 82:23
Civil 1:13
claims 89:17
clarify 84:19
140:5 152:18
154:3
clarifying
153:19
cleaning 48:4
109:17 111:23
cleanly 39:24,25
clear 85:20
90:13 95:25
120:16
clearly 86:25
133:18
CLEMENTS
2:6
client 95:20
129:7,8,9,12
129:14 130:4
clinical 12:14
20:1 29:5 30:4
92:7 103:19,20
146:2
clinically 102:3
141:15 142:16
143:22
clinician 38:13
143:11
clinicians
102:10
Clinton 76:19
close 18:19

cmountain@...
3:18
co-author 40:16
cogent 116:10
colleague 76:2
colleagues 98:19
collect 114:11
collected 11:16
12:23 100:5
collecting 36:5
collects 36:6
collegial 96:24
color 23:6
column 142:25
combined 32:2
32:17,18 33:4
33:20 34:20,22
come 21:15
26:14 33:13
35:18 57:3
62:21 89:3
113:7,22
114:15 127:24
138:3
comes 33:13
77:2 91:1,8
100:20 126:20
144:8
comfort 28:13
comfortable
137:16
coming 30:9
34:2 36:10
110:18 111:8
commencing
1:20
comment 13:22
119:8
comments 8:18
Commission
44:23
commissioned
102:17
common 43:24
45:3 99:12

103:8 107:1,1
commonly 23:16
38:16 104:6
communicated
133:21
communication
83:7
communicatio...
97:11
companies
80:13,17
company 80:14
81:20,21 86:14
151:13
comparable
137:15
compare 55:7
compared 19:13
55:23 56:14
comparers
49:17
compensation
130:2
complete 11:19
completely
149:25
complex 64:20
complexes 52:19
complexity 53:1
compliance
135:21
complicated
52:18 118:7
complying 17:5
comport 99:19
composition
91:4
compound 7:16
23:13 32:7
67:17 91:20
92:10 93:8
100:24 102:21
105:15 107:3
117:5 118:6
135:14 136:2

136:19
compounds
49:22 64:21
67:11 68:9
72:14
comprehensive
49:4 88:25
Computer-Ai...
157:22
concede 133:20
concentration
109:19
concept 110:8
concerned 17:12
110:7 137:12
conclude 123:9
142:9
concluded
104:22
conclusion 49:6
77:2 117:11
conclusions
104:23
conclusively
142:14
condition 117:3
133:25
conditioning
110:25
CONDO 2:7
conduct 38:6
conference
50:22 133:24
confidence
119:21
configured
42:19
Connecticut
1:19 157:9
connector 25:3
Conoco 111:4,5
conservative
28:3
consider 15:25
18:2 36:24

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 165 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 168 of 1330

62:2 72:22,24
109:1
**considered**
33:23 49:17
63:23 67:6
80:18 99:14,24
130:2 135:12
**considering**
126:18
**consistent** 71:12
106:25 148:25
149:25
**consisting**
156:12
**constituted**
26:22
**consultant** 93:6
130:2
**consulted** 95:6
133:23
**consulting** 92:6
92:11,12 97:12
130:5
**Consumer** 138:6
**contain** 70:24
110:1 151:19
**contained** 84:7
84:20 136:18
140:3
**container** 75:6
**contains** 65:10
154:22
**contaminated**
39:19 62:23
64:4
**contamination**
27:8 62:10
146:15
**content** 27:23
75:13 135:13
137:4 138:24
140:10 152:5
**contents** 49:11
140:2
**context** 101:24

103:23 105:17
140:24 147:12
**continue** 51:11
124:12,13
141:6
**continued** 3:1
20:11
**contract** 122:18
**contractors**
44:16
**contribute**
115:12
**contributed**
118:4 141:17
142:11 144:17
**contributes**
56:21 110:13
**contributing**
145:12
**contributory**
17:13 63:23
66:9 118:13
**control** 32:2
158:6,8
**controversial**
23:20 58:8
**conventional**
52:21
**conversation**
139:17
**conversations**
44:5 97:3
**convinces** 28:3
**convincing** 14:9
116:2,11
118:21
**Cook** 1:17 157:6
158:20
**coolant** 43:8
**copied** 124:21
**copies** 39:6
158:8
**copy** 16:4 39:3,3
39:4
**cord** 55:12

**corner** 69:13
122:1
**corners** 45:19
**Corporation** 1:8
2:20 156:8
157:14
**correct** 12:23
15:7 19:3 20:5
20:8,15 23:24
31:21 34:11,17
46:20 50:17
53:18 56:1
58:1 60:16
66:23 75:12
83:13,24 84:3
85:6 88:22
90:25 91:4,5,9
103:15,16
104:16 107:2
115:19 116:22
116:24 123:1
126:3,5 134:4
146:10 150:11
150:12,15
152:20 153:23
154:10,14
157:24
**correcting** 29:17
**correction**
156:14,16
**corrections**
156:14,17
**correctly** 27:6
**correlation**
53:17
**cosmic** 31:8,9
55:20
**counsel** 14:13
18:15 87:9
88:23 99:19
152:16 154:23
155:2 158:10
**counseled** 38:5
**Counselor** 10:15
19:21 32:9

56:17 64:10
65:2 68:8
70:17 71:13,19
73:17 77:21
88:8 90:13
116:1 123:21
133:18 137:8
140:6 152:7
**count** 12:1 32:23
99:17 129:2,3
**counted** 32:5
128:17
**country** 18:8
67:19 106:14
114:8 124:3
139:16
**counts** 130:23
**County** 1:17
157:3,5 158:20
**couple** 31:23
51:12 93:19
142:7 153:19
**COURIE** 3:20
**course** 7:2 17:2
17:4 20:1
100:3 105:17
133:3 155:10
**court** 1:1 4:19
27:20 29:14
38:1 94:23
116:2 151:5
156:1 157:11
**Courts** 1:14
**cover** 127:5,5
**coverage** 81:22
**covered** 92:2
**CRANFILL**
2:12
**crazed** 143:9
**crazy** 13:5 40:18
152:3
**CRC** 2:25 89:6,8
89:9,16 154:11
**credentialed**
121:17

**credible** 119:24
**credit** 105:21
**critical** 101:14
102:23 103:21
103:21
**critically** 41:18
42:23 70:12
**criticisms** 7:22
**criticized** 77:17
**critique** 8:3
**critiques** 7:23
**cross-linking**
30:13 53:8
**cross-match**
114:12
**crossbones** 75:5
**CSR** 156:12
**cumulative** 73:6
117:19 118:18
131:11 154:16
154:17 155:7
**cumulatively**
112:13
**cure** 55:16
**current** 133:25
**currently** 40:15
48:7
**customarily**
141:14
**cutting** 124:10
**CV** 8:9 57:20

---

**D**

**D** 1:11 3:16 4:1
4:3 5:2 156:20
157:9
**D-e-e-d-s** 7:9
**dad** 85:9,10
**dad's** 39:4
**daily** 15:11
94:15 108:23
**damage** 22:24
23:10,12,19,22
23:23 24:13,18
29:2,16 30:9

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 166 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 169 of 1330

51:17,17 52:15
52:16 53:1,1,3
53:5,13
**damages** 59:22
60:11
**dark-skinned**
30:19
**data** 19:7 25:19
26:23 28:2
31:24 34:7,9
34:10 35:7,9
35:14,14,23,23
36:3 47:10
58:18,23 60:15
64:13 65:21,21
66:10 77:1
99:25 113:8
114:11 116:3
120:5 121:16
128:16,19
133:1 135:20
135:21,24
136:18 139:1
140:4
**datas** 36:4
**date** 16:9 20:3
49:9 145:21
**dated** 5:15 126:3
**Daubert** 82:22
82:24
**Daubert'd** 111:3
**David** 7:18
**day** 29:18 48:6
52:1 66:3,6,6
148:20 156:22
158:14
**days** 14:25 19:10
**de** 24:9,21
**deal** 30:12 53:12
53:24 54:12
**deals** 102:25
**dealt** 30:17
53:24
**debate** 100:4
**debunked**

108:13
**decided** 137:23
**decision** 12:2
74:8,14
**Deeds** 7:7,8
**default** 135:19
**defective** 26:5
**defend** 71:22
**defendant** 2:10
2:15,19 3:5,10
3:14,19,23
90:12
**defendants** 1:9
2:24 7:11 86:2
156:9 157:14
**defense** 24:8
67:3 87:9
88:23 153:16
154:23 155:2
**define** 47:24
140:24 147:11
147:18
**definitely**
108:15 113:5
123:25 124:16
**definition** 61:12
**degree** 36:9
117:1 118:3,9
131:14 142:9
**delay** 86:5
**delta** 26:7
**demographic**
105:23 106:10
**demonstrably**
147:14,18
**demonstrated**
116:15
**denied** 82:19
**denominator**
100:18
**dependent** 91:21
96:11
**depending** 99:16
**depends** 132:1
**DEPONENT**

155:21
**deposed** 20:10
81:10 91:23
**deposition** 1:11
4:15 5:13,22
6:20,21 12:16
14:23 15:1
20:6 27:9 81:1
83:18 84:1
88:10,10,12,22
91:8 94:13
127:24 152:20
153:21 156:11
157:16 158:2
**depositions** 1:15
15:6 41:14
152:23
**derive** 24:22
65:20
**derived** 21:25
22:2,5,11,13
29:7 30:13
58:2 83:11,16
84:1,21 85:4
**dermal** 126:16
126:17,18
**describe** 13:16
47:4 102:18
135:9
**described** 30:3
41:9 152:24
**describes** 75:21
**description**
31:13
**detail** 7:21 10:24
45:24
**detect** 26:8
**detected** 8:22
**determination**
95:10
**determine** 24:3
25:20 38:6,20
141:14,21,22
142:14 143:13
144:15 146:1

152:5
**determined** 10:5
50:7 68:21,24
69:24 70:2
71:25 100:3
101:9 154:1
**determining**
63:13 115:20
**developed** 81:22
123:6
**developing**
133:19
**development**
107:8 118:5
142:12 144:17
**develops** 132:12
**deviations**
147:17
**devoted** 92:5
**diagnosed** 146:6
**diagnoses** 146:2
**diagnosing**
13:13
**diagnosis** 35:11
47:1 108:7
131:2
**diagnostically**
38:17
**Diane** 6:21
**diced** 33:21
**DICKIE** 2:16
**dicy** 96:16
**diem** 94:22,24
**diesel** 109:8
111:17,18,20
111:22 112:1
**diet** 72:17,19
107:14,15,16
107:19,21
**differed** 45:25
**difference** 144:1
**different** 21:6
29:1,11 31:25
32:12 41:1
48:4,5 53:4,5

54:21 55:11,21
65:4,6 103:7
106:10 110:18
110:23 111:1
114:7 136:5,6
148:22 152:16
**different-than...**
109:6
**differentiates**
52:15 53:3
**differently**
70:19 136:12
**difficult** 56:17
86:4
**difficulty** 78:8
118:16
**direct** 28:2
38:18 83:7
135:24 136:16
136:23
**directed** 13:8
**direction** 158:6
158:9
**directly** 102:10
**disagree** 7:24
69:3,4 74:24
123:21 139:24
**discharge** 12:5
**disclosures** 80:5
**discount** 148:14
**discover** 144:23
**discuss** 104:24
147:6
**discussed** 101:2
102:2 133:1,9
137:8
**discussing** 128:2
**discussion** 45:17
46:12 48:17,21
54:10,11
133:13
**discussions** 96:2
**disease** 13:21
14:6 24:19
25:8 29:5 30:5

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 167 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 170 of 1330

| | | | | **E** |
|---|---|---|---|---|
| 32:11,12,23 | doctors 102:4 | 6:21 7:17,18 | 34:12,16 37:9 | E 4:1,13 57:12 |
| 38:10 51:24 | 145:1 | 7:18,20 8:3,7 | 42:7 43:14,20 | earlier 32:4 |
| 100:15 107:1 | document 16:7 | 9:8 11:7 12:8 | 44:5,12 45:7 | 51:15 77:11 |
| 116:21 117:13 | 16:11 28:7 | 12:13 14:24 | 50:4 56:5 | 79:14 95:5,5 |
| diseases 143:17 | 76:7,15,17,24 | 20:6 25:10 | 59:10 61:8,21 | 103:4 108:21 |
| dismiss 71:15 | 77:7 101:12 | 32:4 35:17,23 | 66:12,17 67:17 | 115:16 119:2,4 |
| dismissed 71:2 | documentation | 40:16 48:16 | 72:2 73:8 | 126:2 127:2 |
| disparage 115:5 | 130:15,23 | 50:25 64:23 | 74:10,16 78:15 | 150:10 153:20 |
| dispensed 90:24 | 132:23 146:23 | 79:14 83:10 | 78:25 80:2,5 | early 28:12 29:2 |
| dispute 17:7 | documented | 84:22 85:11 | 82:7 87:13,22 | 29:6 113:16 |
| distributions | 100:1 136:10 | 127:3,22 | 87:24 89:18 | earth 53:21 |
| 119:17 | documenting | 133:22 134:4 | 91:20 92:10 | ease 143:13 |
| District 1:1,1,14 | 12:1 | 134:11,18 | 93:8,15 94:8 | easier 52:24 |
| 156:1,1 157:11 | documents 15:9 | 135:2 153:20 | 95:2,7 96:6 | East 2:3 |
| 157:11 | 27:18,22 68:16 | 154:1,6,12 | 97:4,22 98:22 | easy 42:19,21 |
| dividing 25:14 | doing 15:16,23 | draw 32:13 | 98:23 99:18,22 | eat 72:17 |
| 59:22 60:11 | 26:1 35:7 | dressed 22:7 | 100:24 101:11 | educate 21:11 |
| Division 1:2 | 46:16 47:14 | drink 107:22 | 102:21 105:15 | effect 33:18,22 |
| 156:2 157:12 | 63:20 92:15,17 | 112:23 | 106:1 107:3 | 43:10 |
| Dixon 3:7 4:9 | 96:8 110:5 | drive 16:11 | 108:7 109:4 | efficient 30:11 |
| 151:2,3 153:1 | 137:10 141:6 | 112:19 138:4 | 111:19 115:14 | effort 113:2 |
| 153:9,12 | 148:20 | drop 124:9,14 | 115:24 117:5 | egregious 10:19 |
| DNA 22:23 | Dominic 7:17 | Dropbox 6:12 | 118:6 121:14 | eight 82:11 |
| 23:19,22,23 | dose 29:10,11 | 11:1 14:24 | 121:24 122:24 | 97:20,23 |
| 24:13 29:2,14 | 31:11 54:21 | 80:3 131:21 | 123:20 124:15 | either 6:2 13:21 |
| 29:15,16 30:9 | 65:13 115:17 | dropped 41:15 | 125:9,20 | 39:3 71:21 |
| 30:13 38:22 | 124:16,18 | drove 138:11 | 126:12 128:10 | 80:25 83:16 |
| 39:11,16 52:17 | 154:16,18 | drugs 108:3 | 128:13,23 | 84:1,8,21 85:4 |
| 52:21 53:5,13 | 155:7 | dry 48:2 | 129:12,13,18 | 95:18 96:21 |
| DNA-affecting | dose-dependent | duck 147:20 | 130:13,17 | 97:11 121:12 |
| 24:1 29:8 | 65:11 | due 30:14,16 | 131:4,9,25 | 142:1 |
| DNA-damaging | doses 15:11 16:9 | 117:17 | 133:10 134:24 | elect 121:22 |
| 21:22 22:5,12 | 55:10 122:4 | Duke 17:1 44:14 | 135:7,14 136:2 | electric 137:10 |
| 22:13 25:2 | dosimetry | 44:21 146:16 | 136:19,25 | 137:11 |
| 29:12 54:2,12 | 146:17 153:24 | duly 5:3 157:17 | 137:5 138:13 | electronic 42:17 |
| doctor 51:10 | dot 41:14,14,14 | DuPONT 2:2 | 139:2,9,11,14 | else's 89:2 |
| 85:19 86:10 | double-dipping | 4:10 5:25 6:12 | 144:20 145:19 | 144:24 |
| 89:6,9 90:3 | 33:3 | 6:23 9:16 | 146:9 147:19 | email 80:2 |
| 93:2 139:7 | double-strand... | 11:18,22,23 | 149:17 150:6 | emailed 134:13 |
| 140:21 146:12 | 53:7 | 12:22 13:12,25 | 152:22 153:16 | emergent 41:12 |
| 148:6 149:9 | doubt 57:7 | 14:16,25 15:14 | 153:18 155:6 | emerging 35:16 |
| 150:21 151:3 | downhill 23:7 | 17:24 18:22 | 155:11,14,17 | Emphasis 85:20 |
| 151:15 | downwind 111:8 | 22:21 23:13 | dye 108:13 | emphasize 8:5 |
| doctor's 12:16 | dozen 47:20 | 28:4,12 30:6 | dyes 108:14,14 | employ 67:20 |
| 131:12,17 | Dr 4:15 5:7,16 | 31:3 32:7 | 108:14 | |

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 168 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 171 of 1330

employee 81:22
employment
146:15
encountered
84:15 86:17
90:6
endeavor 47:19
102:22
endeavors 92:8
ended 82:21
endogenous
21:24 24:1,5
24:22 25:16
51:17 52:15
54:2,12
endogenously
21:25 22:1,2,5
22:10,13 29:7
29:19
energy 17:2
30:14 44:14,22
enjoy 98:16
enjoyed 26:13
enriched 25:2
entirely 24:20
enumerate
88:16 100:11
enumerated
49:15
enumerates
100:1
environment
21:13,15,18
44:15 56:7,20
57:5,9 91:16
105:13 114:18
environmental
9:10 26:6
105:5,7 110:8
113:12 114:9
115:1 142:5
EPA 76:11,11
113:9,9 136:10
137:19 138:1,6
138:12

Epic 42:17,18
epidemiological
47:9 62:18
103:21 116:3
116:16 126:22
epidemiologic...
26:8
epidemiologists
101:16 104:13
epidemiology
25:19
equal 124:23
erase 110:15
error 42:21
especially 48:6
155:19
essentially 13:13
88:24 89:1
establish 31:22
establishes
101:8
estimate 17:7
37:8 142:14
144:21
estimates 36:10
45:24 46:4
126:19,19
estimation 97:20
138:25 144:14
estimations 87:4
87:5 136:17
140:2
et 1:8 156:8
157:14
European
106:16
evacuated 111:6
evaluate 62:4,7
62:17 121:10
evaluated 61:19
64:8 104:14
130:11 135:11
evaluating 61:4
61:14
evaluation

105:11
events 52:1
eventually 82:21
everybody 25:25
26:1 114:20
124:22
everybody's
147:14
Everyday 15:11
evidence 9:13
50:11,16 53:12
72:5 116:2
147:7
evolution 52:12
evolutionarily
29:23
evolutionary
52:8,9
evolve 29:20
30:12
evolved 29:16,17
29:25 30:8
51:16 53:23
54:8,11
evolving 120:5
exact 16:8
exactly 31:14
68:19,20 80:13
136:5
examination
1:12 4:2,4,5,6
4:7,8,9,10 5:5
51:8 79:12
85:17 90:1
151:1 153:17
examined 5:4
39:15 74:20
107:10
example 6:20
22:16 25:18
29:24 46:12
75:1 110:9
119:3 137:7
148:24
excess 34:8,14

exclude 148:9
149:2
excluded 82:12
82:23 126:17
exclusively 81:4
81:5 152:20
excuse 48:10
84:4
exercise 120:12
exhaust 110:9
110:17,23
Exhibit 4:15
5:14,16 6:5
exhibits 4:19
5:13
existed 53:21
exogenous 21:9
21:12,16,23
51:17 52:16
exonerate
117:18
expanded 34:7,9
34:10
expect 18:17
43:17 44:19
99:6 125:3
135:25 150:1
expected 17:3
125:1
experience 14:3
92:4 135:18
138:12
expert 7:7 17:15
18:6 31:9
32:18 43:21
52:12 62:12
79:24 80:9
82:8,12 92:4
92:23 96:21,22
97:13,21
experts 12:10
128:23 135:18
138:16
explain 50:20
70:19 103:18

103:23 123:23
144:1
explained 49:19
explaining 125:4
explanation
45:18
exposed 19:5
23:8 29:25
56:23,24,24,24
72:25 73:3
86:22 87:7
88:19 108:22
112:7,16,17
114:18 120:25
140:23 145:6
146:14 155:9
exposure 15:10
15:11 17:10,19
17:22 18:8
19:4,15,19
22:15 23:19,21
23:23 25:23
29:7,21 30:24
31:1,19,25
32:25 33:2
43:7 46:6,12
46:21 54:9
55:25 61:5,10
62:13,19 64:8
64:16,19,25
65:7,13,20
66:11 68:13
70:15 71:6,24
75:10,22 76:23
81:3 85:3 88:6
101:9,15,22
103:1 105:2
109:1 110:9,10
110:23 113:3
114:2 115:8,18
115:20 116:5,8
116:19 117:2,3
117:4,10,12,14
117:17,19,23
118:2,4,13

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 169 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 172 of 1330

119:9 120:16
122:2 123:3,5
123:7 125:7,15
126:15,16,17
126:18,20
127:9 128:5,8
143:7 144:16
147:8,15 148:7
148:15 149:1
153:25 154:16
154:18,20
155:7
**exposures** 16:18
26:6 29:2,3
30:3 33:24
57:11 60:20
67:10 71:15
72:22 73:6
102:12 105:13
105:14 107:25
115:1 118:18
141:17 142:10
148:16 153:22
154:8
**express** 154:15
**expressed**
149:20
**extensive** 58:12
**extent** 10:4
47:10 54:13
100:2 116:25
**external** 22:15
**extrapolate**
65:22
**extremely** 20:24
**Exxon** 2:20

— F —

**faces** 81:15
**facie** 53:12
**facility** 18:18
30:25 45:4
**fact** 15:6,19
24:24 40:6
53:11 92:23

96:21 97:19
113:6 117:21
148:9 149:3
154:4
**factor** 24:24
35:5 60:15,23
125:16,16
**factors** 9:10 23:2
24:15 107:7
108:1 142:5
**facts** 27:14
36:18
**factually** 69:12
**failed** 33:18
**fair** 10:3,7,8,12
10:25 11:4
18:15 42:6,8
44:5 49:20,21
51:18 54:9
64:7 67:1
88:17 91:6
97:15 115:22
**fair-skinned**
30:17
**fairly** 33:23
**Fairview** 3:21
**falls** 116:6
**false** 8:21
**familial** 34:25
36:13 37:1,15
37:22,23 38:3
39:10 40:19
107:11 145:21
**familiar** 9:7
16:12 50:6
60:2,10 66:23
66:24 69:9
73:18 77:20
78:12,19 90:5
90:23 109:12
118:11 145:6
**families** 36:6,17
37:5,11,12
**family** 38:9
40:17,21,23,24

142:1 143:2
**far** 8:6 72:12,15
85:1 103:11
131:2,5 132:15
155:3
**fashion** 32:18
**fat** 25:4
**fats** 72:14,14,17
72:19
**fault** 85:22
**favor** 124:4
**feasible** 140:14
**feeble** 113:22
**feed** 48:11
**feedback** 120:13
**feel** 14:18 58:6
69:6,11 70:17
78:9 90:8
96:11 98:14,17
98:18 120:18
129:14,15
143:11
**feels** 98:14
**fellow** 103:25
**fellows** 128:18
**felt** 40:2
**females** 106:7
**ferries** 120:24
**fewer** 123:5
**fields** 78:4
**fifths** 100:13
**figure** 65:18
151:25
**figuring** 14:8
**file** 15:10,21
16:1 27:14
**files** 77:24
151:25
**filling** 112:8
**financial** 96:9
**find** 8:23,23
34:8,14 36:3
36:13 37:6,22
38:20 41:6
49:4 113:20

132:16
**finding** 8:18
15:20 37:10,14
69:3,4 77:4
**findings** 38:19
67:15 104:23
**fine** 11:10 54:14
65:5 74:2 76:5
78:14 79:6
126:17
**fire** 43:21
**fired** 17:4
**firm** 2:2 94:8
134:24
**first** 5:3 8:8,21
21:1 28:25
36:9 39:10
41:16 57:16
61:3 76:3 77:5
84:15,24,25
92:16,20 93:5
93:12 95:23
134:6,11
148:24 151:13
157:17
**first-degree**
36:11
**fish** 81:17
**Fishkin** 2:21,22
4:7 85:15,15
85:18 86:1
87:11,17,23
88:1 89:5,20
89:21
**Fishman** 85:25
**fitter** 18:1
**fitting** 47:6
**five** 20:22 28:16
79:7 98:20
127:25
**five-** 100:12
**five-year** 131:7
**fixing** 29:19
**flammable**
43:13,18 44:2

45:3,6,20
**flash** 148:18
**Flipping** 141:9
**Floor** 2:8
**FLT-3/NPM-1**
8:19
**fly** 112:20
**focused** 45:24
**folder** 9:16
**follow** 85:2
111:15
**follow-up** 79:18
**followed** 44:18
**following** 44:20
**follows** 5:4
**food** 56:10 57:7
71:16,18 72:8
105:13
**footnote** 76:8,12
**footnotes** 48:23
**forbid** 147:25
**foregoing**
156:13 157:23
158:2
**Forest** 12:3,4
**forget** 81:15
**form** 17:24
18:22 22:21
30:6 31:3
34:12,16 42:7
43:14,20 44:12
45:7 50:4
54:25 56:5
66:12,17 67:17
87:9 88:23
89:18 91:17
93:8 99:12
111:19 115:24
121:14,24
122:18,24
123:20 125:9
130:1 145:19
146:9 147:19
150:6 155:2
**FORMAN** 3:2

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 170 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 173 of 1330

formation 29:5 30:4
formed 126:9
forming 116:20
formulation 26:21
found 19:14 40:25 50:15 122:16,19
four 20:20 127:25
fraction 65:15 92:11,12
frame 13:2 96:12
free 20:18 52:2 54:13 93:20 125:22
frequency 91:12
frequent 41:4
frequently 96:1 143:3
Friday 44:7
Frieling 93:21 93:21 94:7
friendly 96:24
front 69:7
fruitful 36:25
fuel 109:8 111:17,18,18 111:21,23 112:1
full 137:13
fumes 110:9 112:8
fundamentally 24:14
further 155:21 157:15 158:1,3 158:10

**G**

game 34:6 145:2
gamma 31:5,8
Ganges 112:24

garbled 90:14
gas 112:20
gasoline 50:7,11 50:14,16 112:5 112:7
gastrointestinal 55:12
Gateway 2:7
gather 128:3,7 128:16 131:23
gathered 135:5
gauge 13:2
gazillion 52:1 59:2
gear 91:19
Gee 104:2
gene 29:12 36:13 37:11,15,22 38:10,22 40:3 40:25
general 10:14,22 13:9 62:20 80:11 93:25,25 122:18 123:1 130:24
generalized 36:22
generally 45:5 86:19 99:11
generate 21:20 22:23 47:13 128:19 143:17
generated 6:6,9 21:16
generation 25:16
generic 96:24
generous 105:22
genes 37:3,23 38:2,7,14,16 39:2
genetic 24:13 26:2 35:8
genetics 9:3 40:5
geographic

114:6
germline 8:20 8:22 9:2 39:9 39:11,16 40:3 40:7,9 41:8
getting 86:23 134:10
give 13:14,18 26:6 50:20 55:9,15,16 95:8,12,15 96:4 102:23 105:21 120:12 137:7
given 4:19 10:15 18:20 36:11 41:6 44:22 53:15 59:20 68:5 73:3,4 86:5 95:2 118:10 154:18 156:13 157:19 157:24
giving 22:8
glanced 7:20
Glass 33:9
Glass's 32:4
glom 119:19
gloves 75:3 112:2 148:22
glutathione 52:4
go 8:24 10:23 33:5 36:2,4,19 46:11 48:19 49:4 51:5 85:24 87:10 106:22 124:12 132:15 134:7 137:23 139:7 144:11 145:22 151:24 153:7
goal 78:11 100:7 100:10 102:19
God 25:4 147:25
Godley 35:17

Godley's 35:23 40:16
goes 9:5 29:18 33:16 39:17 51:24 86:9 125:7 136:9
going 5:12,19 6:13,18 13:24 14:8 23:7,9 26:16 27:21 28:15 33:8 36:13 39:18 40:10 46:11 48:5,15,15 49:4,5,25 53:15 54:4 66:20 68:5 72:11,16 79:8 79:19 82:11 86:4 94:18 96:12,13 99:4 102:1 104:9 110:13 113:7 120:11 122:4 132:8,8 133:14 139:21 140:5,6 143:6 148:17 149:4 155:12
good 5:7,9 14:1 19:22 29:19 43:17 44:2,19 45:5 53:8,9 72:16 79:21 99:10 100:19 115:25 121:6 132:3 151:12 151:24
goodness 71:23
GORDON 3:7
Gore 1:11 4:3,15 5:2,7,16 50:25 64:23 79:14 83:10 85:11 153:20 156:20 157:9

gotcha 46:19
gotta 124:3
gotten 95:21
GOUDELOCK 3:20
government 114:4
governmental 50:22 64:24 78:23
grade 105:21
grader 103:24
granular 24:17
granularity 13:4
graph 124:21
graphs 124:24 125:2
Gray 3:2 4:4,20 5:6,7,12,18 7:1 12:9 18:13,23 23:3,17 28:15 28:19 30:23 31:10 32:21 34:13,18 37:16 43:5,16,23 44:10 45:1,12 48:14 50:5,25 51:3,13,15 54:5 55:18 71:8 79:7 155:13
great 7:21 26:15 39:23 45:23 80:4 98:16 112:23 115:6
greater 19:4 115:17,18 117:9 122:17
greatest 30:20
group 2:10 40:16 47:15 49:7 123:12
grow 39:20
guess 11:1 32:23 35:18 37:5

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 171 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 174 of 1330

61:2 74:6
82:11 89:22
93:4 110:7
122:21 124:6
124:12,21
129:25 130:4,5
134:3 143:9
144:13,20
145:25
**guessing** 44:24
97:23 98:7
145:2
**guidelines** 74:25
**guru** 32:19
**guy** 13:25 14:11
98:16
**guys** 138:8

## H

**H** 4:13
**H-o-e-l** 11:7
**hair** 23:6 59:5,8
108:12
**half** 20:21 39:2
124:10
**hand** 5:19 48:15
80:16 158:13
**handful** 108:16
142:8
**handle** 54:8
**handling** 97:15
**handy** 104:12
**happen** 52:1
79:23 81:13
86:16
**happened** 14:2
42:24 93:18
133:16
**happens** 39:9
42:10 43:3,4
95:1 135:22
**happenstance**
61:13
**happy** 10:14
33:7 58:22

69:18 73:16
76:5 96:25
98:21 110:3
113:21
**hard** 14:8 16:4
32:8 74:23
115:2 144:22
**HARRIS** 3:11
**HARTZOG**
2:12
**Haven** 1:19
157:9
**hazards** 44:1
**HBO** 19:1
**he'll** 13:17 95:23
98:11
**head** 9:15 70:4
77:24 110:22
134:15
**health** 31:23
33:6 72:20
114:10,15
**healthy** 57:2
**hear** 85:19,25
145:1 154:25
155:4
**heard** 7:10
35:18 74:3
76:19
**hearing** 82:22
94:23 133:5
**heart** 18:11
39:14 71:23
98:17
**hell** 140:7
**help** 25:19 27:2
96:10,25
136:13 143:13
**helpful** 14:15
34:19 38:17
**helping** 23:6
**hematologic**
102:5
**hematopoietic**
8:11

**HEPA-filtered**
112:22
**hereto** 158:4
**heretofore** 157:7
**hereunto** 158:13
**Herrick** 46:6,20
62:13 84:2,8
84:12 85:5
126:14,20
134:4,18 135:2
**Herrick's** 43:6
45:18,23 46:2
83:17 84:22
87:3,3 127:3
127:22 134:11
154:1,6,12
**hesitate** 121:25
**Hey** 13:6
**high** 1:18 12:1
27:12 55:9
72:6,9 157:8
**high-risk** 18:2
**higher** 49:12
106:16,21
122:8,8 123:3
123:25
**highest** 37:14
**highest-risk**
36:16 37:5
**highly** 44:14,16
**HIPAA** 133:3,14
**hired** 80:9 82:7
**histories** 13:14
131:10 141:25
**history** 13:19,23
17:5 39:15
41:3 57:20
95:9 121:3
130:16 131:7,8
131:8,11 132:2
132:15 133:18
141:20 142:8
142:24 143:1,2
146:8 149:23
**hit** 41:25

**hobbyist** 66:5
**Hoel** 11:7
**honest** 19:10
**honestly** 19:9,9
94:20 127:23
129:5 131:13
133:17 152:1,7
**hope** 44:13
**Hopkins** 40:18
92:21
**hospital** 12:3
144:24
**hot** 43:8,18 44:3
45:6,9
**Hotel** 1:18 157:8
**hour** 1:20 79:8
94:12 127:13
127:14
**hours** 127:25
**house** 148:2
**Houston** 82:17
93:20
**Howard** 6:21
14:24 133:22
**Howard's** 20:6
**https://www.n...**
16:5
**human** 22:19
25:16 26:4
42:21
**humans** 29:20
29:24 30:8,12
53:21,23 54:15
54:19 55:25
**hurricane** 129:3
**hydrocarbons**
61:25
**hygienist** 62:12
66:7 121:3
**hygienists** 50:23
138:16 154:15
**hypotheses**
143:17
**hypothetical**
147:9

**Hyundai** 137:10

## I

**IARC** 50:6,10
50:10,15 66:23
66:24,25 67:2
67:4,18 68:3,7
68:12,17,19,21
68:24 69:7,14
69:17,24 70:2
74:22 107:24
**IARC's** 67:15
70:5
**ID** 4:14
**idea** 22:25 23:1
44:2 45:5
52:14 94:25
**identifiable**
100:23 107:12
**identification**
5:17
**identified** 37:23
88:21
**identify** 10:11
116:19 142:4
**idiopathic** 24:10
24:22 114:25
**iffy** 13:24
**ignition** 45:9
**ignorance** 9:2
99:5
**ignorant** 99:7
**ill** 41:18 42:23
**illegal** 99:22,24
**illegals** 99:17
139:16
**Illinois** 1:18
157:1,6 158:20
**impact** 115:21
**imperative** 96:9
**implication**
49:13
**implications**
118:8
**implied** 51:15

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 172 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 175 of 1330

118:8
**important** 38:16
70:12 121:18
125:14,17
128:3
**importantly**
42:13
**impossible**
112:15
**impressions**
95:16
**inadequate**
50:11,15
**inappropriate**
78:17
**incidence** 56:21
57:3 106:4,15
114:12,23
**incident** 18:25
44:1 64:12
**include** 57:6
72:15 126:15
131:10
**included** 35:12
98:2
**includes** 44:20
97:18 103:5,14
**including** 28:2
29:2 48:23
**inclusive** 156:12
**incorporated**
135:6
**incorporates**
26:11
**incorrect** 69:12
**increase** 57:12
102:6 133:19
**increased** 25:20
25:24 31:24
35:21 37:7
47:11,15 49:7
75:22 119:11
119:20 122:25
124:14 126:23
**increases** 118:19

**increment** 26:10
**incumbent**
143:18
**incurred** 9:23
**indemnify** 80:14
**independent**
84:13 91:15
128:6 135:4
**indicate** 8:20
**indicated** 98:1
**indicates** 26:23
**indicating** 28:5
**individual's**
61:5
**induced** 53:5
143:6
**industrial** 50:23
56:8 62:12
101:9 121:3
128:22 136:8
138:16 154:15
**industrially**
56:23
**industries**
109:12
**industry** 72:8
108:15 109:15
**infancy** 106:2
**inflammatory**
24:25 25:1,6
**influenced** 117:3
**information**
45:13 58:2,22
62:21 95:8
125:17 128:4,7
131:23 133:11
135:5 136:16
137:3 138:23
145:9 151:23
153:22,25
154:7
**informed** 102:7
**ingest** 75:2
**ingests** 56:20
**ingredient** 89:15

**ingredients**
89:16 140:4
**initial** 11:24
**initiation** 116:20
**inserted** 29:7
**Institute** 114:9
**Institute's** 39:14
**Institutes**
114:14
**insulting** 55:4
**insurance** 80:13
80:17 81:22
**intelligently**
13:22
**intend** 127:21
**intensity** 30:20
**intensive** 42:11
42:14
**intensivists**
42:12
**intentionally**
70:18
**interacting**
102:10
**interactions**
96:2
**interest** 128:5,8
**interested**
102:14 110:2
158:12
**interesting**
100:4
**international**
32:19 64:24
**interpreted** 9:9
**interpreters**
119:18
**interviewed**
130:8
**investigate**
36:25 153:7
**investigated**
76:21 77:6
**investigation**
128:6

**inviting** 96:19
**invoice** 94:25
**invoices** 129:21
**involve** 18:11
**involved** 14:12
15:10 27:3
38:2 39:13
52:19 81:3,14
92:20 94:2
95:11,11 96:14
97:12 109:12
109:14,17,21
114:1 133:4
134:18,21
**involvement**
134:11
**involves** 109:22
**involving** 152:10
**irrelevant** 9:12
67:14
**Irrespective**
5:21
**isolate** 39:25
40:5 63:17
101:3 117:14
**issue** 42:6 45:18
45:19 62:1
77:12 80:16
102:19 130:1
140:1
**issued** 5:14
64:23 150:13
**issues** 80:23
133:3,15
**items** 126:1
145:16

——— **J** ———

**J** 2:2
**JANICE** 1:3
156:3 157:13
**jdixon@grsm....**
3:9
**Jeffries** 3:21 4:8
89:22,22 90:2

91:24 92:14
94:5 97:5
98:24 99:20
100:8 101:5,20
102:24 105:18
106:5 107:6
108:19 110:6
112:4 115:15
116:17 117:8
119:1 121:19
122:12 123:13
123:22 125:5
125:12,23
127:1 128:11
129:6,16 130:7
130:14,19
131:6,15
132:17 135:10
135:16 136:14
136:22 137:1
138:9,22 139:6
139:10,18,23
140:15,20
145:4,24
146:11 147:21
149:19 150:9
150:21
**jjeffries@mgc...**
3:23
**job** 18:11 36:5
47:7 78:7
109:22 120:24
128:15
**jobs** 121:8
**jogging** 15:23
**John** 3:21 11:11
89:22
**Johns** 92:21
**joining** 52:20
**joke** 84:24
**jokes** 85:10
**Jones** 132:6
**Josh** 151:3
**JOSHUA** 3:7
**judge** 82:23

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC Document 311-1 Filed 09/02/20 Page 173 of 190
Case 3:18-cv-00197-RJC-DSC Document 408 Filed 09/15/20 Page 176 of 1330

juice 23:4
**July** 20:10,14
**jump** 89:23
**jury** 125:3,6

---
### K
**K** 2:7,17 157:3
**K-a-n-o** 90:19
**K-r-o-i-l** 90:4
**Kano** 3:23 90:3
90:10,19,20
**KATHY** 2:7
**kcondo@babs...**
2:9
**Keith** 93:13
**key** 104:23
**kind** 8:16 9:2
10:16,19 13:3
14:17,21 15:3
18:5,10 27:13
30:22 32:19
33:11 36:14
40:20,21 41:1
41:15 42:10
47:18 52:24
55:5,18 61:24
87:16 90:8
92:9 94:13
95:8 96:23
102:1 103:5
104:8,15
106:18 108:10
108:13 109:20
112:12 119:5,7
119:15 121:7
122:1 124:13
126:6 130:24
134:2 141:7
147:23
**kinds** 29:13 48:4
**knew** 16:2
**know** 7:13 12:7
12:17,18 13:19
14:8,9,10 16:3
16:19 18:7

19:9,12,14,20
22:7 24:7,11
24:12,20 26:2
27:11,20 28:12
30:16 32:9
33:7,10,16
34:1,1 36:11
36:18 37:3
42:14,21 43:25
44:25 47:12
49:14 50:24
51:25 52:3,17
53:2,14 54:22
55:1,10 56:6
56:16,17 58:16
58:17,25 59:7
61:22 62:11
63:10,21,22
64:21 67:3
68:16 72:8,12
72:15,17 73:5
73:25 74:5,6
74:25 75:13,19
77:9 78:1,11
79:19 80:20,22
80:22 86:15,16
86:19,25 89:9
89:12,15,16
90:15 93:24
94:16 96:11
97:23 98:7,10
98:18,20
100:10 102:3,4
102:18 104:3,8
106:19 108:9
109:11,15,24
111:20,23
112:22 115:3
116:2,10
118:22 119:3
121:11,25
122:3,6,7
123:24 126:13
127:17,18
128:25 129:10

129:22,25
130:22,24
132:12,16,25
133:16,17
134:25 135:11
135:19 136:3,3
136:4,7 137:20
137:25 138:7
141:5,18,24
145:3 146:3,4
147:17 148:1
149:5 151:5,6
152:6
**knowing** 13:1
35:8 43:25
140:10
**knowledge** 5:23
45:4 83:20,25
84:4,6,13,19
90:9 91:7,15
94:6 108:4
125:21 135:4
152:4,19 153:5
**known** 26:21
52:3 53:10
64:4 77:3 85:9
90:4 98:11,14
100:23 118:18
145:20 151:19
**knows** 114:20
**Kona** 137:10
**Korean** 137:24
**Kroil** 90:4,7,23
91:1,2,4,7
135:12 154:11
**KRUTZ** 3:2
**Kryoil** 140:6
**Kutzit** 151:19
152:2,3,5,10
152:13,14,18
152:19 153:8
153:10,13

---
### L
**lab** 104:3 128:17

**Laboratories**
90:3,11,14,16
90:19,20
**laboratory**
128:18
**Labs** 3:23
**lacks** 78:15,16
78:16
**lag** 134:10
**large** 33:20
**late** 20:14 41:21
**latency** 80:15
**lathes** 44:9
**Latinos** 106:11
106:13,15,21
**law** 2:2 94:8
116:2 129:21
129:25
**lawsuit** 83:2
**lawsuits** 120:21
**lawyer** 139:11
**lawyers** 94:6
99:6 105:12
**layperson's** 45:3
**lead** 23:19,22
96:15
**leading** 57:2
**leads** 25:6
114:22
**LEAF** 137:14
**learn** 109:16
143:17
**learned** 58:5
104:1 109:18
**leave** 29:23
**lectures** 22:8
**led** 24:18 142:5
**left** 76:2 90:8
**legal** 92:12
116:11 118:8
121:11 122:8
124:23
**let's** 19:25 28:15
34:25 55:23
65:25 72:3

103:25 132:6
134:2 142:22
147:24,25
**leukemia** 8:9,14
9:3 10:1,6,12
10:23 17:13
20:19,25 21:2
21:3 24:9,10
24:10 25:20
36:7,8 40:9,20
40:21 42:15,15
47:11 48:23
54:23,25 57:3
58:16,17,24
60:24 61:1,11
66:3,9,11
67:11,13 69:1
70:21 72:25
75:22 80:19
81:23 102:4,14
103:11 104:1
109:7 110:1
111:4 113:14
114:13 118:20
120:23 122:18
123:4,6,8,10
123:25 132:4,6
132:12 141:18
146:5 147:25
**leukemias** 20:24
21:1 24:4,12
116:13 145:22
**leukemic** 58:9
59:13 61:24
**leukemics** 144:5
**leukemogens**
29:4
**level** 10:24 13:4
19:19 22:20
33:3 68:13,18
71:6,12,14,24
76:22 77:3
110:23 114:17
116:1 118:2
119:4,6,9,20

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 174 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 177 of 1330

122:2,8 123:14
129:25 141:16
levels 31:25
49:23 68:4
113:18 114:22
116:8,14
119:13 120:3
121:12 122:22
liability-carry...
80:17
License 158:21
Licensed 82:4
life 20:19 57:2
115:6
lifetime 17:7
33:24 73:6,14
light 42:6
likelihood
122:17 124:11
125:15
likes 95:2
limit 17:9 72:20
limited 67:2
limits 16:9 55:10
55:11 72:10
line 102:1 128:2
128:3
lines 32:13
link 6:12,14 11:1
14:24
Liquid 26:16,18
26:21,24,24
27:23 28:5
43:7,7,12 44:9
46:22 48:6
61:22 86:17
109:9
list 73:21 74:4
83:1 86:20
87:23 88:2
97:24 140:3
listed 45:3 75:8
87:7 88:7,20
89:6 154:12
listened 70:18

lists 145:12
literature 5:23
14:10 24:23
48:18 62:4,18
64:8 65:17
70:10 73:5,12
76:25 101:7,15
102:2,23,25
103:11,22
104:10,14
116:16 122:4
122:10 126:22
135:21
litigated 134:23
litigating 97:22
litigation 92:6
little 9:3 21:11
28:12 65:2
78:5 79:8
81:10 90:8
92:1 95:14
100:17 104:10
109:15 112:6
143:1
live 52:7 111:13
lived 111:4
lives 15:12
108:23
living 100:11
LLC 3:15,19,20
LLP 3:2,7
Locks 2:2
129:21,25
Logan 3:16
logic 71:13
long 8:6 10:2
46:10 98:15,18
130:21 142:24
longer 52:7
53:21 126:14
longitudinal
143:24
look 16:11 22:9
27:15,18,22
33:15 34:24

37:15,20 39:18
46:9 47:23
62:4 96:18
118:11 119:16
130:6 141:16
141:17
looked 8:8 26:23
48:22 67:5
75:15 105:5
127:4,8 149:24
149:25
looking 10:19
12:7 26:9
66:19 110:2
122:13 124:6
140:21 146:12
147:5 149:24
looks 9:24
122:13 147:22
lost 87:14
lot 9:6 25:11,19
29:19 30:10
42:14,22 55:15
57:17 63:24
78:3,4 86:18
94:3 96:7
104:4,6 109:24
109:25 112:25
lots 76:25 78:3
136:5
loud 85:20,20
Louisiana 3:4
love 67:4
loved 104:16
low 20:17,24
26:25 28:6
49:23,24
low-dose 30:1,2
30:14 101:15
101:22 102:12
103:1
lower 33:23,23
85:21 116:14
122:4 123:2
LSATs 124:25

lubricant 43:8
LUCKS 2:21
lump 63:17
lung 8:13 39:14
lymphocytes
39:22
lymphoma
132:12

_____

**M**

M 2:12 151:9
M.D 1:11 4:3 5:2
156:20 157:9
machinery
52:22
magnitude
55:21 71:18
117:4
main 24:15
107:11
major 104:2
majority 59:16
100:25 106:3
109:10
making 109:2
118:16,20
125:18
male 106:8
males 106:7
malignancies
8:11 56:22
102:5 103:3,6
106:12
malignancy
120:4
malignant 59:16
manage 129:22
144:10
managed 144:4
manner 99:19
MANSUKHA...
3:7
manufactured
86:13
manufacturer

71:20
manufacturers
86:15,19
manufacturers'
86:16
mark 15:16
48:16
marked 4:14
5:17 6:5
MARON 3:15
marrow 8:24
55:17
Marshall 76:19
Martin 60:2,6
Marvel 3:15
83:11,14,16,25
84:7,15,20
85:4
mat 106:22
material 39:24
43:13,18 44:3
45:6 135:20
136:18 139:1
140:4
materials 5:24
86:11 98:2
153:2,4,6
math 100:16
mathematical
9:11
matter 15:19
63:4 79:16
86:11 107:24
113:6
matters 48:8
92:6 97:21
102:2
Maurie 151:10
max 94:1,2
McANGUS 3:20
MCATs 125:1
McCAMEY
2:16
MDS 32:20 33:1
33:2,25 38:15

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 175 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 178 of 1330

39:13,14 103:9
103:17
**MDSs** 33:13
34:20
**mean** 21:12
23:22 32:20
53:17 55:4,4
68:15 73:24
78:2 93:24
96:3 97:8 99:1
103:8 105:8,19
107:5,20 115:4
116:7 123:2
129:10,20
132:1 133:9
136:3 146:23
150:3 154:19
155:8
**meaning** 119:8
**meaningful**
109:5 147:7
**meaningfully**
13:23
**means** 18:5
21:17 24:9,10
39:2,6 73:1
123:4 129:11
**measurable**
26:10
**measured** 27:11
53:15 113:15
**measuring**
129:1
**mechanic** 47:5
47:14 48:2
49:5
**mechanics** 47:9
47:18 48:3,18
48:21,22 49:10
**median** 106:3
**mediators** 25:2
**medical** 6:11
9:17,17,22,25
10:4,15 11:3
11:16 12:22

13:1,9 42:17
62:18 80:23
95:9,16,21
102:13 117:1
118:3,9 130:15
130:16,24
131:11 132:2
132:22 142:9
146:8 150:13
150:17,17
**medicine** 82:1,4
**member** 134:24
**members** 38:10
106:9
**memories**
133:13
**memorized**
69:19 113:10
**memory** 15:3,23
88:11
**mentioned** 54:7
77:11 88:12
108:21 111:17
111:20 115:16
**met** 5:8 79:14
83:2 93:18
137:22
**metal** 43:8,18
44:3 45:6
**meter** 48:11
**methane** 63:2
**method** 61:13,15
61:15
**methodology**
61:3,6 65:23
128:2
**Mexico** 93:15
**mid** 92:22
151:20
**miles** 137:25
138:5,11
**million** 73:13
99:16,21
121:12,13
124:7

**million-** 65:24
**million-years**
65:19 66:1,8
119:5 120:3
121:21,21
122:11,16,20
124:8
**mind** 16:19 98:5
131:1
**mindful** 29:14
**mine** 92:21 98:8
**mineral** 48:7
62:5,8,9,14,19
62:22,24,25
63:7,8,11,12
63:18 64:1,4,9
64:14,15,16,19
64:20,25 65:3
65:7,13,15,18
65:21 66:2,5
66:11,19 67:13
70:3,6,10,16
70:23,25 71:1
71:6,20 74:15
74:22 75:1,10
75:14,23 78:24
107:22
**mini-series** 19:1
**minority** 106:13
**minute** 108:24
**minutes** 127:14
127:14
**mischaracteri...**
95:15
**mischaracterize**
95:13
**misconstruing**
9:11
**misleading** 44:6
74:16
**mistaken** 100:20
134:14
**mistakes** 21:14
21:19 25:13
57:4

**misunderstan...**
141:12
**mitigate** 23:2
**Mobil** 2:20
**model** 9:11
**molecule** 63:4
63:22
**molecules** 54:12
**mom's** 39:3
**moment** 87:5
**money** 120:11
**monitor** 114:8
**monitored** 18:9
**monitoring**
113:13 114:4
146:20,24
**monks** 112:21
**monograph** 69:7
69:17 70:5
74:22
**month** 39:21
104:17 141:4
**monthly** 13:3
**months** 148:21
**morning** 5:7,9
54:5
**mountain** 3:16
112:23
**move** 64:7
125:25 139:5
139:19 147:2
**moved** 93:14
**moving** 134:3
**MSDS** 110:3
**muffler** 110:20
**multiple** 67:9,10
144:7
**multiprotein**
52:19
**mutated** 8:19
38:16,23 39:2
39:4
**mutation** 8:23
24:13 39:9
40:3,7,8,9 41:7

**mutations** 9:1
38:20
**mute** 68:22,23
**myelodysplastic**
119:11
**myelogenous**
69:1
**myeloid** 20:23
24:4 56:21
103:3,11
106:12 120:4
**myeloprolifer...**
103:10
**mysterious** 85:6
**mystery** 83:11
83:14,16,25
84:7,20,23
85:4 90:7
107:22

## N

**N** 4:1 151:9,11
**name** 12:8 15:10
51:10 73:23
79:14 81:13
82:17,25 85:23
85:24 86:14
92:22 93:22
113:8,24
114:15 151:13
152:2
**named** 7:7 90:11
94:7
**names** 77:24
78:4 86:16,19
152:12,12
**Nancy** 151:9,11
151:12
**narrow** 103:14
**Natelson** 7:18
**National** 39:14
73:18 74:3
114:9,14
**nationwide**
113:12

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 176 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 179 of 1330

| | | | | |
|---|---|---|---|---|
| **Natural** 39:15 | 157:9 | **November** 1:19 | 129:18 155:2 | **occupationally** |
| **naturally** 56:3 | **NHEJ** 52:21 | 156:11 157:7 | **objecting** 87:15 | 17:8 19:5 |
| **nature** 17:25 | **nice** 99:18 | 158:15 | **objection** 11:23 | 56:23 121:6 |
| 39:2 41:12 | 104:11 | **novo** 24:9,21 | 17:24 18:22 | **occur** 22:14 |
| 59:20 90:25 | **nicely** 137:17 | **nowadays** 38:19 | 22:21 37:9 | **occurred** 116:23 |
| 91:19 105:4 | **night** 7:20 8:4 | 44:23 | 42:7 43:14 | **occurring** 56:3 |
| 106:10 | 15:15,18 16:24 | **NPM-1/FLT-3** | 45:7 66:12,17 | **October** 5:15 |
| **NDSs** 32:6 | **Nissan** 137:14 | 9:1 | 72:2 73:8 | 126:3 134:14 |
| **near** 120:24 | 137:21 138:21 | **NRC** 15:11 | 74:10,16 87:13 | **odds** 20:15 |
| **necessarily** | **non-diesel** | **nuclear** 17:1 | 87:14 97:4 | 32:24 33:2 |
| 59:23,25 125:3 | 111:18 | 18:6,17,25 | 121:14,24 | 34:21 35:10 |
| 138:16 | **non-homologo...** | 30:25 31:16,18 | 122:24 124:15 | **offensive** 87:19 |
| **necessary** 12:25 | 52:20 | 31:19 43:24 | 125:9,20 | **offer** 91:10 |
| **need** 13:4 14:17 | **nonemployment** | 44:1,8,23 45:4 | 126:12 128:10 | **offered** 90:9 |
| 58:6 72:18 | 130:1 | **number** 4:14 | 128:13 129:13 | 93:6,9 |
| 89:13 112:17 | **Nope** 83:1 | 5:13 35:19 | 130:13 131:4 | **offering** 92:6 |
| 112:18 132:12 | 130:10,12 | 36:11 39:12 | 131:25 136:2 | 97:12 |
| 133:4 138:18 | 134:1 | 47:9 101:18 | 145:19 152:22 | **offhand** 119:7 |
| 139:12 | **normal** 22:22 | 119:19 | 154:23 | **oh** 10:22 28:23 |
| **needs** 14:19 | 25:6 123:3 | **numbers** 27:10 | **objections** 44:10 | 57:21 80:12 |
| 68:23 | 130:23 | 28:3 106:13 | 155:1 | 83:14 108:2 |
| **negligible** 147:9 | **North** 1:1 2:14 | 119:16,17 | **obligation** | 127:16 151:9 |
| 149:1 | 3:22 81:6,8,11 | 122:21 124:7 | 143:12,15 | **oil** 72:13,13,16 |
| **neighborhood** | 81:12,18,25 | **numerous** 11:3 | **observational** | 83:11,14,16,25 |
| 111:7 | 82:2,4 149:11 | 52:19 | 106:18 | 84:7,20 85:4 |
| **neoplasms** | 150:11,14,18 | **nurses** 128:14 | **obtain** 125:18 | 90:4,7,7,23 |
| 103:10 | 156:1 157:11 | **nursing** 42:13 | 130:15 145:9 | 91:1,3,4,7 |
| **neutrophils** | **Nos** 4:16 5:16 | 128:14 | **obtains** 49:17 | 107:22 140:7 |
| 30:10 | **nose** 121:5 | **nutrition** 23:1 | **obviously** 7:24 | **okay** 5:20 6:15 |
| **never** 7:10 8:22 | **notarial** 158:14 | | 109:23 | 6:19 7:11 |
| 9:2 10:23 14:1 | **notarized** 158:5 | **_____** | **occasion** 96:17 | 16:17 19:11 |
| 19:18 21:7 | **Notary** 1:17 | **O** | **occasional** | 26:12 28:24 |
| 27:21 28:4 | 156:25 157:5 | | 141:25 | 35:20 37:17 |
| 36:15,15 43:2 | 158:20 | **O** 157:3,3 | **occupation** 18:3 | 40:13 41:23 |
| 47:13 49:3 | **note** 11:24 | **oath** 69:23 | 141:6 | 45:21 46:24 |
| 90:6 91:2 93:9 | **noted** 9:14 60:14 | **obese** 25:7 | **occupational** | 48:9 51:14,20 |
| 95:15 96:23 | 70:11 | **obesity** 24:23,25 | 13:19,23 17:10 | 55:8 76:6 |
| 108:4 119:15 | **notes** 147:2 | 25:4 26:2 | 57:11 60:19 | 77:11 80:1 |
| 130:11 147:24 | **notice** 1:12 5:13 | 60:14 107:10 | 61:10 65:20 | 85:19,21 86:6 |
| 149:5 150:10 | 5:22 9:4 | 143:1 | 101:15 102:6 | 88:5 90:22 |
| 150:13,16 | 157:16 | **obfuscating** 9:13 | 105:4 116:5,8 | 102:9 105:7 |
| **new** 1:19 2:23 | **noticed** 9:5 | 63:6 | 116:13 142:1 | 108:20 113:25 |
| 2:23 3:4,13,13 | **noting** 12:13 | **obfuscation** 67:4 | 142:10 143:7 | 115:7 117:9 |
| 29:1 126:9 | **notorious** 111:5 | **object** 44:12 | 144:16 145:7 | 127:14 132:22 |
| 137:8 144:5 | **noun** 22:3 | 65:2 78:5 87:9 | 152:24 | 140:15 141:9 |
| | | 87:20 88:23 | | |
| | | 98:11 123:20 | | |

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 177 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 180 of 1330

141:11 143:10
146:7 147:16
148:5 149:8
151:15 152:17
153:9
**Oklahoma**
82:23
**old** 98:12,19
122:10 148:2
**Olive** 72:13,13
72:16
**once** 41:20,24
82:14 109:14
155:12
**oncology** 103:25
**one-size-fits-all**
45:10
**one-time** 148:18
**ones** 34:3 107:12
108:18 146:3,3
146:5
**ongoing** 141:1
**online** 8:9
**onset** 80:19
105:24 117:13
**opened** 16:13,15
**opinion** 9:21
10:3,6 17:11
19:8 27:24
32:18,22 47:14
49:22 54:19
55:2 56:13
64:24 67:14
90:10 96:20
97:13 115:7
149:20,22
**opinions** 16:17
62:8 91:10
126:10
**opportunity**
96:4
**options** 143:14
**order** 61:16
112:16 147:6,6
**ordered** 42:20

42:25
**orders** 71:18
**organic** 104:3
**oriented** 102:3
**origin** 106:16
**Original** 4:19
**originally**
127:18
**Orleans** 3:4
**OSHA** 74:11
**OSHA's** 74:8
**out-of-town**
94:16 96:14
**outcome** 158:12
**outcomes** 18:24
**outside** 101:1,3
**ovarian** 132:7,9
**overcounted**
32:3
**oversight** 98:25
**oxygen** 21:21
52:2
**ozone** 54:13

_____
**P**
**P** 2:22
**P.C** 2:6
**p.m** 140:19,19
155:21
**packaged** 90:24
**page** 16:23 19:3
21:7 26:19
28:20 35:1,24
46:8,13 48:16
57:23,24 76:10
86:24 122:15
128:1 140:21
142:3 145:11
146:12 151:16
151:18
**pages** 141:9,10
156:12
**paid** 93:6
**paint** 104:6
148:4,20

**pan** 148:19
**paper** 9:6,9
25:10 33:12,15
34:20 36:20,21
39:12 40:14
78:13,15,19
113:14 119:10
119:21 120:1
**papers** 35:25
60:8,10 77:17
77:20 78:3
**paperwork**
146:22
**paragraph** 21:7
21:8 28:21,23
28:25 29:1
58:13 61:3
76:10 86:20
87:8,21 88:2,7
88:20 89:7
122:14 124:19
142:3 147:5
149:9
**paragraphs**
57:17,18,23,25
141:10
**parameters**
116:4
**parents** 40:11
**parse** 63:15
**part** 22:9,11
24:13,22 25:7
37:1 72:24
73:3,13 80:5
96:14 97:1,9
117:19,22
121:12,21
124:25 125:1
141:18
**particles** 31:17
31:18,18
**particular** 24:16
47:23 60:5
64:12 85:1
108:20 109:23

113:14 124:19
124:20 125:15
133:8 138:14
138:15 140:7
141:5 154:18
**particularly**
25:1 26:20
33:17 54:24
72:15 78:1
96:8 106:11
127:8
**parties** 81:14
120:12 158:11
**parts** 65:19,24
66:1,8 73:9
119:5 120:3
121:13,20
122:11,16,19
124:7,8
**parts-per-mill...**
113:3
**party** 83:8 90:12
**patently** 8:21
**pathology** 33:11
95:24
**pathways** 52:18
**patience** 150:22
**patient** 8:19
13:14,15 40:2
41:18 42:4,11
42:23 70:25
92:21 93:17
95:9,19 105:24
109:21 120:6
120:19,22
131:24 141:20
143:13 144:3
144:24 147:24
150:11,18
**patient's** 61:10
88:9 93:1
142:2,10
**patients** 38:5
39:16 42:12
72:25 96:10

102:5,8,11
109:6,11
111:13 120:20
141:15,18,23
141:24,25
142:15,23
143:4,21 144:7
144:10,15
**pattern** 152:24
**Patton** 93:13,16
93:18,20 94:7
**pay** 18:19
**paying** 76:6
**peek** 16:19
**peer-reviewed**
121:16
**pending** 157:10
**Pennsylvania**
2:4,9,18 3:18
**people** 20:22
22:24 25:5,7
36:8 40:5,20
47:14 52:7
72:9,18 77:13
78:4 104:6,12
106:4,16
108:22 111:21
111:24 112:7
116:7,13 121:7
123:2,5,7
129:2 139:16
141:5 143:5
153:14
**percent** 26:22,25
27:12 28:6
36:16 37:2,6,7
37:8,11,19
38:22 39:1,6
41:7 49:23
50:1 59:19
65:17 75:17
92:12 95:1
106:20 117:16
117:18 143:3
151:19

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 178 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 181 of 1330

percentage 24:4
59:18 80:8
100:14 101:8
142:13,23
perfect 14:22
25:5
performed
41:10 150:5
period 12:20
58:12 97:25
130:24 131:16
137:2 141:1,2
persists 106:4
person 24:16
30:25 31:1
57:2 98:15
99:22 100:11
100:12,13
101:4 154:19
person's 128:5
155:7
personal 84:10
138:12
personally 78:6
90:5,6 101:13
126:16 143:23
144:10 153:8
157:7 158:5
pertained 27:23
pertaining 1:14
pesticides 108:9
108:9
Peter 7:18
petrochemicals
109:7 145:7
petroleum 109:8
Petty 17:14 19:3
84:21 126:14
126:19 134:3
134:21 135:1
Petty's 7:3 17:6
17:17,21 45:25
83:17 84:2,8
84:12 85:5
87:1 153:21

pharmaceutical
81:19,21
Philadelphia 2:4
3:18
phone 68:22
83:5 85:14
86:5 137:22
154:25
phonetic 120:1
phrase 22:10
physically
132:18
physician 8:10
11:25 92:24
143:16
physicians 102:4
132:3
physiologic
31:12
physiological
22:22 53:14
physiologically
21:16
pick 100:19
119:16
picked 46:8
picture 113:23
piece 9:13
pipe 18:1 47:6
Pisano 1:15
156:12 157:4
158:19
Pittsburgh 2:9
2:18
place 2:17 15:21
16:16 44:14
81:12 97:3
98:17
places 144:4
plaintiff 2:5 80:9
80:10,22,24
82:20
plaintiff's 14:4
80:11 129:19
Plaintiffs 1:5

156:5 157:13
plant 17:1 18:25
31:20 43:25
44:1,8 111:5
plants 18:6
play 145:3
played 148:15
please 68:22
69:17 139:8
151:15
plenty 58:18
PLLC 3:11
Plumber 47:6
plumber's 47:7
point 12:25
20:16 27:18
28:14 32:22
46:1,12 47:24
59:10 72:4
79:22 87:4
98:13 116:12
117:20 118:20
132:4 144:3
points 24:23
political 100:4
pollutant 56:8
popular 72:8
population
47:25 56:22
99:15 100:14
112:17,18
113:16 115:3
123:1
populations
30:18,20 61:1
portion 28:5
44:8 92:8
posit 140:6
position 71:4,5
104:24 117:11
positive 26:7
37:12
possibility 37:1
45:22 148:9
149:3

possible 57:9
89:2 128:4
131:24 148:1
postdoctoral
128:18
potential 17:19
23:11,14,15
25:16 102:6
132:4
potentially
31:19 47:25
48:1 69:13
144:9
pour 45:6
power 18:25
31:20 43:25
44:1,8 125:21
146:16
PPG 2:17
practice 41:10
42:2 43:18
44:20 82:4
92:7 128:21
practiced 82:1
practices 148:3
pre-2012 32:23
precipitous
124:13
predated 32:4
prediagnosis
130:16
predisposition
8:20 145:13,17
predominance
106:8
prefer 155:15
premise 122:2
138:20 139:25
prep 127:24
preparation
5:24 88:10
94:12,13
prepared 77:22
77:25
preparing 120:8

presence 157:21
present 22:19
78:6 106:2
128:19 146:7
presentation
41:13 107:5
132:3
presentations
32:12
presented 11:25
president 124:2
124:3
pressure 72:6,9
128:15
presumably
26:11
presume 124:22
pretty 6:18
11:19 13:25,25
18:19,24 29:19
30:11 39:24,25
42:19 53:14
72:16 81:25
94:15 100:19
102:15,16
106:22 121:5
prevalent 106:7
106:9 111:18
prevention
43:21
previous 92:4
previously 88:8
149:15 152:9
price 94:20
priests 115:4
prima 53:12
primary 42:11
131:12,17
print 155:20
printing 108:15
prior 26:20 27:3
49:3 65:7
79:23 88:9
107:9,9 108:7
152:15

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 179 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 182 of 1330

probabilistic 24:17 25:12 71:17 117:6
probabilistical... 25:14
probability 117:2,20 122:22 123:14 125:14
probable 24:21
probably 12:19 14:11 17:4 18:19 19:15 32:3 35:16 44:21,24 45:8 76:16 89:1 92:21 93:23 98:3 99:23 106:16,20 108:13 114:24 116:14 121:2 124:25 127:8 127:13,24 140:11,13 143:8 144:5 148:19 149:4 152:13
problems 8:7
Procedure 1:13
procedures 150:4
process 12:21 13:10,16 19:12 28:13 36:14 116:20
processes 21:20 22:22 23:9 24:5 53:14
produced 158:5
product 45:2 46:23 67:5 71:19 85:1 86:13 89:8,9 89:16 90:4,5 90:11 91:12,17

117:17,18,18 117:21,22 135:12,25 136:17,24 137:4 138:24 138:25 139:25 152:16 154:19 154:20,22 155:9
product's 140:2
product-based 48:1
production 136:8
products 2:10 49:10,24,24,25 49:25 83:20,21 86:21 87:6,7 88:3,6,6,16,18 88:19,21 89:3 109:8,13,16 154:5,7,9,11 154:12,12
profession 124:23
professional 27:24 92:5 97:14
professor 22:8
proffered 128:23
prognostically 38:17
Program 73:19
Program's 74:3
propensity 68:25
prose 57:18
prostate 55:15 55:16
protection 51:22
protective 75:3 91:18
proton 13:5
provide 97:24

provided 6:16 98:3 149:24 153:5,6
Providence 2:13
providers 11:4
provides 137:2 154:7
public 1:17 122:18 156:25 157:5 158:20
publication 75:21 78:16
publications 50:19 121:17
published 5:23 35:7,9 47:21 58:23 66:10 73:5,22 104:20 119:23 121:16 137:19 145:20
pull 10:10 69:17
pump 112:20
punning 85:8
pure 104:4
purpose 68:8
pursuant 1:12 1:12 157:16 14
pushing 23:4
put 32:14 36:18 42:16 55:23 87:5 96:16 112:1 121:25 142:24 143:12
puts 60:25
putting 98:9
Pyatt 7:18

Q

Quacks 147:20
qualified 95:17
quantify 62:13 113:2 121:4 127:7 147:16
quantitatively 112:13

quantity 58:5
query 24:8
quest 131:23
question 7:16 15:15 24:14 26:13 28:20 36:1 38:12 42:1 49:18 50:13 51:25 55:6 61:18 62:24 63:5,6,9 65:4,5,6,11 67:14 69:5,6 69:20 70:20,23 71:5 77:6 78:17 84:17 87:14 89:9,13 100:6 108:8 111:14 114:20 114:21 116:9 118:7,22 122:21 124:4 124:12 125:13 136:5,12 137:6 139:7,13,14,19 139:21,24 145:25 147:8 151:24 152:15 155:3
questioning 51:16 98:1
questions 6:18 19:22 21:5 44:5,6 50:25 51:12 78:9 79:2,18 85:12 85:16 86:3 92:3 95:6 98:4 98:5 99:4 101:18 105:12 125:25 150:23 151:4 153:19 155:3,11 156:13
quick 8:3 79:7

quickly 19:25
quiescent 58:11 58:12,17,18,25 59:12,14,15,16
quite 12:6 20:17 137:16 143:2
quote 19:16

R

R&M 3:19
race 105:24 106:10
radiation 15:10 15:11,24,24 16:9,18 17:2 17:10,12,19,22 18:3,6,8,12 19:4,15,19 29:24,25 30:1 30:2,14,24 31:1,6,15,16 53:24 54:1,9 54:16,20,22,22 54:24 55:3,9 55:15,18,19,20 56:15 57:8,15 62:1,2 86:17 107:10 146:13 146:15 153:22 153:25
radiator 27:5,7 80:14,18,21
radicals 52:2 54:13
raffinate 28:5 61:22 63:19
raised 94:19 111:14
ran 34:21 40:6
random 9:7
randomness 9:10
range 50:1 73:10 75:17 97:17 123:24 126:21

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 180 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 183 of 1330

137:12,15,20
137:24 140:10
**ranges** 136:18
**rare** 40:21
142:17
**rate** 57:10,12
94:10,14,15,17
106:15,21
110:14
**rates** 150:17
**ratio** 32:24 33:2
35:11 38:21
39:1 41:6
60:21
**ratios** 34:21
**rays** 31:8,9
**re-upped** 66:18
**reach** 27:24 49:6
117:11 118:2
**reached** 137:21
**reactive** 21:21
22:6 52:1
**reactor** 18:4
30:25
**reactors** 18:7
**read** 10:25 14:18
15:2,6 16:24
30:7 45:23
49:5 60:8
61:15 64:3
76:25 78:2,3
83:18 93:22
102:15 127:2,4
127:6 137:15
155:14,17
156:11
**reading** 11:12
66:18 102:14
**ready** 10:10 51:3
**real** 121:2
140:13
**realize** 15:22
**really** 10:18,21
13:4,8,20 14:4
14:11,12 24:14

31:11 32:11,13
34:19 36:5,17
41:21 43:3
54:10 55:6
58:4,7 62:15
63:9 70:17
78:10 86:7
92:23 93:24
96:10,11 98:9
101:17 112:2
120:10,17
129:5 131:13
143:25
**reanalysis** 33:6
**reason** 15:20
17:7,12 30:19
30:21 57:7
97:2 126:4
128:12 132:15
**reasonable**
14:16 55:7
67:19 118:3,9
142:9 149:21
**reasons** 33:19
49:16 74:17
**recall** 5:21 7:14
7:15,17 11:7
11:12 15:13
36:16 43:9
45:17 76:8,17
93:5 113:19
132:18
**recalling** 73:15
**recategorized**
33:1
**recategorizing**
33:9
**received** 6:12,20
9:16 11:22
14:24 42:5
137:9 153:24
154:5
**receiving** 97:11
**recite** 53:11 69:9
77:21 109:18

**recognize** 73:23
118:16
**recognizes** 75:3
**recollection**
91:11,16
152:10
**recommend**
36:2 38:14
**record** 12:23
20:4 36:18
38:1 42:17
51:5,10 79:23
**records** 6:11
11:14,16,20,21
13:1,10,13
20:2 28:4
41:11,13 42:17
95:21 131:3,12
131:17 132:9
133:15 149:10
149:15 153:24
**recur** 21:4
**recurrence**
20:16,24
**red** 59:5,8,9
**reduced** 157:22
**reduces** 124:10
**REES** 3:7
**refer** 21:8
121:11 148:25
**reference** 7:2,3
7:6 35:1,17
87:1 90:11
116:18 122:15
140:22 143:10
145:11
**referenced** 6:25
10:5 119:2,4
**referred** 40:23
109:2 139:15
**referring** 46:15
78:21 141:8
**refers** 48:21
**refreshed** 15:3
88:11

**regard** 45:11
60:14 67:16
93:7 102:11
108:20 126:10
130:20 145:5
**regarding** 62:18
128:4,7
**regards** 83:2
125:18
**region** 114:6
**regional** 114:12
114:23
**regionally**
113:15
**regular** 10:17
23:8 43:19
44:3
**Regularly** 141:1
**regulate** 74:9,15
74:17
**regulated** 44:15
44:16,22 74:12
74:19 78:24
**regulation** 75:4
**regulatory** 16:9
68:8,16 135:21
**reimbursed**
129:23
**reinstated** 82:20
**related** 10:6,23
125:10 146:22
158:11
**relation** 97:14
**relationship**
29:10,21 75:10
94:8 96:25
103:1 115:17
117:12 124:17
124:18 142:15
**relationships**
29:11
**relatively** 33:23
57:2 99:11
**relatives** 36:9,11
**relevant** 29:4

30:4
**reliable** 117:11
137:3
**reliance** 116:3
**rely** 17:18 19:7
62:11,15 87:3
128:22 136:17
154:6
**relying** 46:1
**remain** 20:18
**remained** 20:3
**remarkable**
36:5
**remember** 10:2
11:9,24 12:4
15:8,17,23
16:14,25 28:10
28:11 36:21
40:17,25 52:23
70:4 74:21
75:17 77:8,10
77:22 78:13
81:13,16,24
82:25 85:1
89:4 92:22
132:20 133:1,5
133:7 134:19
139:22 146:18
152:1,6,13,14
**remembering**
27:6 75:16
**remiss** 42:9
**remission** 8:19
12:17 20:3,7
20:11,14 41:25
120:23
**removed** 148:13
**REMs** 17:7
**repair** 29:14,15
51:16 52:14,17
52:22,24,25
**repaired** 30:11
**repeat** 76:5
**replication**
21:15

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 181 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 184 of 1330

**report** 5:14 6:5
6:6,8,10,25 7:3
7:4,6,12,20,25
8:2,3,8 11:6,8
11:11,12 12:7
12:13 15:20
16:23 17:6
21:6 23:18
26:19 28:20
31:24 35:2
43:6 45:18,23
46:8,10 48:16
57:14,16 62:8
62:14 67:1
70:11 75:8,20
76:4,8 83:17
86:20,24 87:1
87:2,3,8 88:2,7
88:20 94:12
95:24 116:18
118:9 122:13
126:1,3,7,11
126:24 127:3
127:18,22
128:1 134:3,13
135:8 140:21
140:25 141:13
143:10 145:11
145:21 146:12
147:6,13
149:10 151:16
153:21 154:1,6
154:13
**reported** 137:19
137:19 146:18
157:20
**reporter** 1:16
4:19 27:20
29:15 84:16
151:5 154:24
155:4 157:5
158:20
**reporter's** 38:1
**reports** 7:19
43:10 73:6

83:23 84:2,9
84:12,22 85:5
135:6 138:7
**represent** 20:9
79:15 86:1
89:7 90:3
106:13
**representing** 2:5
2:10,15,19,24
3:5,10,14,19
3:23 71:20
93:17
**reproduced**
35:24 158:8
**request** 12:22
69:15 132:22
**requires** 116:3
**reread** 6:10
45:14,15 88:14
**research** 27:12
84:10 137:11
**reserved** 158:2
**residents** 100:2
**resource** 104:12
**respect** 91:3
132:23 135:13
137:3 138:24
**respiratory**
148:22
**respond** 33:8
56:17 61:9,16
66:20 69:16
73:16
**respondable**
78:10
**responded** 78:20
**responding**
70:20 78:8
**response** 54:21
66:13
**responsibility**
158:7
**responsible**
80:18 143:24
150:16

**rest** 20:19 46:16
84:16
**restate** 139:21
**restrict** 72:18
**resulted** 116:19
**results** 43:2
124:20 146:17
**retreats** 112:22
**returned** 4:20
**review** 6:21 8:4
8:6 10:15 12:5
13:11 41:11
48:17 49:4
69:8 70:9 88:9
91:8,13 101:14
101:14 103:19
103:20,21
130:20 131:3
131:23 132:2
135:25 149:15
**reviewed** 5:24
6:10,17,24
7:12,19 9:17
10:1,4 11:3,15
19:10 20:2,4
64:13 70:5
74:22 75:18
76:14 86:11
91:3 95:22
127:6 132:19
146:8 149:10
**reviewing** 7:17
11:7 127:12,22
154:4
**Reviews** 101:25
102:15
**revised** 126:7
**Rhyne** 1:3,4
9:23 11:17
18:18 20:10
41:11 42:3
44:7 60:19
83:3,5,11,15
83:25 84:7
86:12,21 87:6

88:5,19,21
89:7,10,17
118:5 129:12
130:8 146:14
149:11 153:23
154:7 156:3,4
157:12,13
**Rhyne's** 14:25
17:19,23 19:25
34:25 35:10
47:4 83:18
85:3 91:7
106:24 126:10
128:7 132:19
145:5 152:19
154:4
**riff** 152:12
**right** 18:16 20:4
20:7 22:16
25:25 26:3
27:5 29:11
31:20 33:14
37:3,19 43:1
47:1,11 50:8
50:12,13,16
52:10 54:7
59:3 64:18
65:9 66:14
67:2 92:19
93:14 94:10
98:17 101:6
103:7,13
105:20 106:6
107:23 108:4
108:11 109:18
113:1,19,22
117:4,24
120:23 121:23
122:23 123:14
123:18 125:6
125:10,24
127:3 131:18
134:17 154:21
155:11
**ring** 90:20

**risk** 8:15 20:24
20:25 24:24
25:20,24 26:7
35:5,21 37:7,8
37:10,14 40:11
47:11,15,25
48:18,21,22
49:7 60:15,21
60:23,25 61:24
66:3 67:19,23
67:25 68:1
75:22 104:5
107:7,25
112:10,14,16
113:14 115:18
115:22 116:1
118:19 119:11
119:20 122:25
123:25 124:14
125:8 126:23
133:19
**risks** 31:25
102:6 123:3
**Road** 2:13 3:21
**role** 148:15
**roll** 127:23
**rolled** 110:24
**Roselind** 1:15
156:12 157:4
158:19
**routine** 8:15
41:5,5,9
113:13 114:3
**routinely** 101:19
141:19
**rule** 17:22 18:14
80:5
**rules** 1:13 18:20
**run** 84:25
109:11 111:24
128:17
**running** 128:20
128:20,21
**rural** 81:11

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 182 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 185 of 1330

**S**

S 4:13

S-a-v-o-g-r-a-n 151:8

safe 19:19 67:6 68:2,3,13,18 70:12,15 71:6 71:12,14,24 76:22 77:3 118:12 122:2

Safety 135:20 136:18 139:1 140:4

Safety-Kleen 3:14

safety-related 18:19

SAITH 155:21

salesperson 137:21

sat 27:21

Saturday 137:9

Savogran 3:10 151:3,9,12

saw 15:15,17 146:17,22,23

saying 30:8 36:22 41:2 67:4 73:24 78:7 90:14 96:22 107:24 117:25 138:7 154:25

says 9:6 29:1 49:9 66:7 68:3 68:12 107:24 124:3 151:18

scan 10:19 13:1

scanned 4:20 149:23

scenario 40:12 40:14 42:25 123:15 146:14

Schnatter 32:1 33:12,15 34:8

34:21 119:9

Schnatteresque 65:25

Schnatterizati... 119:8

Schultz 2:17 4:5 51:5,9,11 56:9 59:11 61:17 62:3 66:15,22 68:11 71:9 72:21 73:11 74:13 75:7 78:18 79:2 82:15,16,18

scientific 77:1 117:1

scientists 24:3

scope 43:14,20 44:12 45:7

Scott 82:16 93:20,21,21

scratch 11:14

screen 15:12 16:10 38:15

screening 41:5,9 41:10

screwed 138:19

SCULLY 3:7

se 66:19 67:13

seal 158:14

second 9:1 21:8 33:4 40:8 128:2 136:25

seconds 48:11

section 57:22 61:3 128:1 141:9 147:5

see 16:22 34:3 40:11 46:14 85:8 86:9,10 86:22 88:3 113:4 121:8 124:13 140:14 151:21

seeing 43:9

45:17

seek 145:9

seen 11:19 12:14 12:15,18,19 16:14 19:1 28:1 33:7 40:22 63:14 66:10,16 73:12 73:24 106:25 109:10

selected 11:18 13:10 29:22

sell 148:11

send 12:22 13:17 14:17 41:19 95:23

sending 15:13

sends 13:13

sense 14:22 32:10,16 43:24

sensitive 55:12 55:13,14 106:12

sent 6:2,2 15:14 42:20 43:2

sentence 21:8 46:15 49:8 61:4 151:18

sentences 142:7

separate 22:14 50:13 146:22

sequence 98:9

series 33:21

serious 18:24

service 96:24

services 92:6 93:7 94:14 150:17,18

set 11:20 34:7,9 34:10 59:6 68:4 92:18 125:22 158:13

sets 24:25 67:18

setting 45:4 54:23 144:2

150:17

seven 122:17 124:9

sex 105:24 106:24

shadow 111:4

Shangri-La 112:21

shed 42:5

Sheet 136:18 139:1 140:4

sheet(s) 156:14 156:16

sheets 110:4 135:20

Shields 7:18 12:8

Shields' 7:20 8:3 8:7 12:13 48:16

shops 111:25

short 140:16

Shorthand 1:16 157:4 158:20

show 10:16 33:8 33:18 75:9 76:9 138:4

showed 13:5 119:20

showing 16:10

shown 28:4,7

shut 111:6

sibling 35:4,9,22 37:18

sibs 40:11

sick 42:25

side 80:11

sidetracked 105:19

sign 155:14,18

signal 26:9

signature 158:1

signed 5:14 158:4

significance

119:6 121:9

significant 26:9 29:4 30:3 33:22 34:14 60:21 62:23 63:14 75:9,22 106:17 115:21 116:15 118:19 119:11 121:15

significantly 122:23 125:8

similar 50:18 111:13 115:4

similarly 154:3

simple 55:24 71:5

simply 70:20

single 12:22 27:19

single-stranded 53:6

sir 5:10 135:17 139:19

Siri 129:4,5

sister 35:1 133:12 145:5

sister's 132:23

sit 9:21 10:9 60:13 73:15,20 74:6 75:20 76:20 78:13

site 111:7

sitting 16:2 19:16 37:19 58:21 73:25 75:17 88:15 89:11,19 131:1 146:18

situations 42:9 82:15

skimmed 7:21 127:8

skin 30:16 39:20 39:20

skull 75:5

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 183 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 186 of 1330

Skype 81:10
slapping 66:2
sliced 33:21
slight 106:8
slow 39:21
small 29:13
  112:9 115:8
smart 13:25
  95:3
smear 66:5
smell 109:23
smelly 109:22
Smith 60:3,6
smog 110:13
smoke 142:23
smoking 107:9
  142:24
snapshots 13:15
so-called 24:9
  113:15
social/occupat...
  141:20
society 67:22
  121:7
sodium 72:3,5,7
  72:11
solar 30:14,16
  30:20 55:19
  56:15
soldering 48:3
solicit 133:15
solvents 48:4
  49:11 60:20
  109:8 145:7
somebody 8:14
  10:13 18:10
  27:4 31:5
  41:24 42:20,25
  48:5 71:22
  89:2 110:16,20
  111:1,2 117:16
  119:24 120:8
  132:11 144:24
  150:1 154:24
somebody's

117:17
someone's 25:20
something-ish
  134:15
soon 88:14 122:5
  122:6
SOPs 44:16,17
  44:20,21
sorry 22:10
  28:23 37:21
  45:16 78:6
  84:16 85:24
  87:23 89:4
  98:23 103:13
  105:19 108:10
  131:21 134:8
  151:14 152:7
  154:24
sort 10:22 32:8
  32:10 45:19
  63:16 104:13
sorts 120:25
sought 93:10
sound 120:15
sounds 13:24
  14:14,16 85:6
  100:19 120:21
  120:25 152:2
soup 113:11
source 39:24
  62:9 63:15
  110:10 112:23
  117:22 135:5
  136:16
sources 39:15
  108:25
South 3:9
speak 11:1
speaking 12:11
  31:11,12 99:1
  99:11
specialist 27:5
  86:17
specialty 2:10
  12:3 80:14

species 21:21
  22:6 52:2
specific 7:22 8:2
  36:1 64:8
  83:19,21 91:16
  102:19 105:2
  117:2 141:2
specifically
  38:18 48:1
  66:19 67:12
  77:22 102:25
  107:19
specifics 5:22
  113:19
spectrum
  103:14
spell 42:16 151:6
Spencer 11:11
Spencer's 11:12
spend 96:7
  104:9 110:4
  120:7
spent 94:11
  127:11,21
  129:22 148:8
spill 105:8
spinal 55:12
spirit 64:14
spirits 48:7 62:5
  62:8,9,14,19
  62:22,25 63:1
  63:8,8,11,13
  63:18 64:1,4,9
  64:15,16,19,20
  64:25 65:3,7
  65:14,16,18,21
  66:2,5,11,19
  67:13 70:3,6
  70:10,16,23,25
  71:1,6,20
  74:15,23 75:1
  75:10,14,23
  78:24 107:22
spoken 135:1
Spyrograph

151:14
Square 3:16
SS 157:2
St 3:3
stabilize 41:18
staff 95:20
stage 104:19
stages 103:7
stand 121:6
standard 39:19
  42:1 147:17
standards 19:14
  67:18 68:4
standpoint
  12:21
Stanwix 2:8
start 22:8 92:15
  133:4 142:22
started 41:20
  92:17
state 1:18 24:25
  25:5,9 58:25
  118:3 157:1,6
stated 7:25 59:4
  118:11
statement 19:2
  23:20 48:20
  51:20 53:23
  58:9 59:12
  71:10 76:22
  77:7 115:23
statements 21:6
  43:10 50:6,18
states 1:1,7,13
  3:5 25:1
  100:12 101:4
  156:1,7,13
  157:11,13
stating 49:13
stations 114:7
statistical 32:14
  116:4 117:16
statistically 26:9
  34:14 75:9,21
  106:17,21

116:15 118:19
  119:10,20
statisticians
  119:15
statistics 119:18
Stavogran 151:6
Steel 1:7 3:5
  156:7 157:14
stem 20:1,23
  58:10,16,17,24
  59:1,13,15,16
  59:17,20,22
  60:11
Stenahom 120:1
stenographica...
  157:20
step 86:5
STEVEN 1:11
  4:3 5:2 156:20
  157:9
stick 23:15
sticking 134:15
stopped 46:13
stories 121:6
  143:5
story 41:1
  110:18 111:1
  148:23
straight 33:5
Stravomatic
  151:14
streamline
  140:17
Street 1:18 2:3,8
  3:8,12,17
  157:8
strike 64:14,15
stripped 148:1
stripper 148:4
stripping 148:8
  148:20
strong 29:12
structured
  13:16
stuck 130:25

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 184 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 187 of 1330

students 102:13
studied 52:4
103:18 105:3
108:17
studies 25:19
31:23 32:4
33:14,17 47:9
47:21 48:22
49:1,5,9,15
67:21 75:9
78:1 112:25
121:22 152:4
study 32:2,24,25
33:4,9 36:12
39:15 102:9,17
105:14 112:12
113:6,17,20,25
114:17 122:15
124:7,20,22
stuff 26:11 29:18
57:5 58:5 92:1
109:17 110:4
111:8,9,25
112:2 114:8
120:7 121:1
135:20
stupid 55:5
subject 100:3
subjects 79:20
submit 129:21
submitted 40:15
156:17
submitting
101:25
subparagraph
140:22
SUBSCRIBED
156:21
subsequent 21:1
29:3 32:1,25
subsequently
111:5
subset 11:18
144:14,18
substances

110:1
substantial
62:11 125:16
substantially
24:5 48:5
sufficient 13:14
suggest 114:23
147:24 149:9
suggested 60:15
suggesting 49:1
73:12 107:18
suggestion
113:17
suggests 41:7
60:11 61:4
86:12 114:17
120:2
suit 158:11
Suite 2:3,13,18
2:23 3:3,8,17
3:22
sum 63:17
summaries 12:5
summarized
104:13
summarizing
58:4 124:20
summary
153:25
summed 57:10
SUMNER 2:12
sun 31:2,6,15
Sunoco 3:19
super 42:25 55:9
Superfund
111:7
superoxide
22:23 52:2
54:13
supplied 86:13
supply 58:22
73:16 98:21,22
113:21
suppose 86:21
sure 11:19 12:5

15:16 16:1
22:24 23:14
35:22 37:18
42:8 43:4 57:6
62:6 64:5
69:20 74:21
75:5 78:19,21
81:7,25 88:17
89:14,25 92:16
94:9,20 98:22
98:25 101:17
101:19 102:15
106:22 112:11
116:13 127:7
129:20 132:8
141:12 143:25
147:4 151:17
surety 106:20
surface 43:19
44:3 45:6
surfaces 43:9
surmounted
133:5
surprised 9:3
77:15 109:20
surprising 20:12
survive 51:21
53:12
suspect 143:7
sworn 5:1,4
156:21 157:17
symptoms
105:25
syndrome 37:2
119:12 145:14
syndromes
107:11 145:12
145:18,21
synergize 54:25
system 10:18
42:18 52:15
55:13

_____
T
_____
T 4:13 39:22

40:6,6
table 146:4
tables 35:24
127:9
tablets 81:10
take 8:13 16:19
22:24 28:13,15
39:20 46:9
48:10 51:3
72:3 79:5,7
90:22 97:3
105:16 117:21
121:3 140:16
141:19 142:25
taken 1:15 28:17
48:12 51:6
79:10 81:20
132:2 140:18
156:11
talk 19:25 34:25
35:18 61:25
85:21 96:20
103:8,9 120:2
133:14 134:2
146:13
talked 27:5
45:20 47:8,12
54:6 77:14
83:5 95:5
103:4 108:2
110:8 137:22
talking 25:11
31:4 46:22
54:2 55:19
57:11 60:4
67:9,9 110:21
142:18,19
144:23
talks 124:2
TARDY 3:15
target 102:9,19
task 61:16
tasked 61:14
tax 130:1
team 42:12,13

42:14,15
128:21 144:4
technicians
128:18
telephone 2:7,22
3:7,12,16,21
13:18
tell 14:18 23:5
33:12 35:10
39:5 46:16
54:7 55:22
60:4 68:19
69:18 90:18
95:19 101:21
102:17 113:23
120:6,14,20
129:2 131:13
142:20 147:11
152:12
telling 36:19,21
59:5 120:22
139:18
tells 38:21
temperature
45:9
ten 76:16 97:20
98:12 127:14
132:7 141:4
143:8 144:14
144:18,18
ten-year 131:7
tend 111:22
term 140:24
144:20
terms 19:14
98:10 100:5
105:24 113:3
121:10 129:23
147:12 150:4
terrible 111:8
121:1
terrific 114:16
test 119:14
136:6 138:3
test-drove

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 185 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 188 of 1330

137:14
tested 91:2
  119:9 140:9
  145:16
testified 5:4 27:8
  80:25 81:6
  88:8 89:8
  90:10 93:5
  97:21
testify 54:14,18
  82:8 94:23
  157:17
testifying 92:4
  94:11 126:14
testimonies
  118:10
testimony 17:3
  27:4,22 28:2
  43:9 45:15
  49:3 54:17
  66:20 69:8
  71:3 77:23
  79:24 82:19
  88:18 89:2
  91:8,22,22
  93:1,22 94:16
  96:14 119:4
  139:4 154:4
  157:19,24
  158:13
testing 35:8 38:6
  38:14 40:10
  42:3,5 135:12
  135:15,25
  136:16,23
  138:25 139:25
  146:1
tests 91:3
texted 137:23
thank 51:2 79:4
  85:12,13 89:20
  89:21 117:25
  140:15 150:21
  153:9 155:4
Thanks 5:11

theirs 27:9
theoretical
  147:10
theoretically
  89:3
therapies 38:18
therapy 108:5
thereof 158:12
They'd 21:25
thing 13:3,5
  25:7 27:19
  29:9 39:10,10
  41:4,16,17
  45:10 46:11,17
  55:7 63:14,20
  67:12 69:16
  92:13 94:13,24
  95:16,23 96:13
  99:8 108:12
  115:4 119:15
  131:11 132:10
  140:14 147:23
  148:11
things 5:12 6:13
  6:16 7:24 9:14
  10:11,16,20
  14:19 18:1
  21:20 22:23
  29:10 30:10
  42:20,22 48:3
  54:6 61:24
  67:21 75:16
  77:21 90:24
  93:19 95:4
  96:19 101:2
  103:10,15
  104:6,7 108:16
  110:9,17,17
  113:5 114:24
  132:4 136:4,6
  136:7 137:12
  144:23 146:4,6
think 6:11,22
  9:8 14:6 18:12
  20:22 23:15,16

24:20 31:8
  32:8,10 34:23
  35:1,15 36:17
  40:3 41:17
  47:17,21,24
  48:8,24 49:18
  53:11 54:10
  55:23 56:19
  57:1,7 58:7
  60:22,23 67:2
  68:7 69:15
  72:5 74:18
  76:4 79:2 81:7
  81:11,23 82:15
  82:20 84:25
  87:13 88:25
  89:1,1,12
  92:20 93:12,16
  93:22,22 94:3
  94:15,19 95:17
  96:20,21
  100:19 101:12
  103:9 109:2
  110:22 113:9,9
  115:5,16,25
  116:1,18
  120:11,16,25
  121:2,18 122:3
  122:7,7 123:8
  124:19 125:24
  126:2,5 127:11
  132:25,25
  133:13 134:13
  136:9,23 137:5
  138:19 142:18
  143:10,15,18
  143:21 144:7
  144:20 145:13
  146:25 148:12
  150:22 151:5
thinking 41:16
  80:2 101:13
thinks 14:17
thinner 61:1
  104:7

third 128:2,3
  151:18
thorough 8:5
thought 22:9
  37:20 75:24
  76:3 77:12
  83:12 87:15,16
  102:20 137:15
  148:12 151:13
thousand 99:13
  99:15 100:17
  100:18
three 3:16 20:21
  33:14 96:6
  97:6,17 127:25
  155:3
three-fifths
  100:12
threefold 124:11
threshold 70:12
  70:15 118:1,12
  118:14
thumb 16:11
thumbnail 13:18
Tibetan 115:3
Tibetans 115:5
Tim 3:2 5:7
tim.gray@for...
  3:4
time 12:20 13:2
  13:15,20 14:8
  14:15 15:4
  24:19 26:14
  40:17 47:22
  49:9 53:15,16
  59:20 76:14
  84:7,15,25
  87:1 88:13
  92:5 93:5
  94:11 95:1
  96:8,12,12,15
  97:25 98:15
  101:2 104:10
  110:4 116:23
  120:7 126:7,11

127:11,15,21
  129:22 130:21
  130:23 131:16
  132:3 133:6
  137:2 140:9,13
  141:1,2 144:10
  148:8 155:15
times 31:24 52:1
  82:10 96:5,6
  97:6,10,18
  122:17,20
  124:9 136:7
  139:2 144:7,12
tiny 31:5 92:11
  92:12
tired 100:17
  108:10
tissue 55:11
tissues 39:18
  55:11,14
title 78:16
today 9:22 10:9
  16:2 19:16
  75:20 83:22
  88:9 91:11
  119:4
told 54:5 70:9
  74:21 95:20
  121:1 127:2
  139:15 150:10
tolerate 30:9
  54:15,20 55:3
tolerated 56:14
toll 110:12,16
toluene 61:25
Tomasetti 77:17
  78:20
tomorrow 129:3
top 9:10,15
  26:19 48:20
  70:4 110:21
  146:3,4
topic 133:8
topics 51:12
total 9:22

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 186 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 189 of 1330

91:21 99:1
121:4 125:11
touch 51:12
144:2,6
touched 79:20
tough 23:15
98:10
toxicity 75:3
Toxicology
73:19 74:3
toxin 21:12 22:2
52:15,16
toxins 21:9
24:23 54:24
toy 152:3
Trace 56:12
trained 62:16
128:24
training 57:20
transcript
156:11,13
157:24 158:4
Transcription
157:23
transcripts
14:23
transfer 12:3
transplant 20:1
20:23
travel 94:22
treat 141:15
142:16
treated 132:7,9
132:11 143:21
143:23 150:1
150:10,18
treating 12:16
38:13
treatment 10:1,5
10:7,12 41:20
55:10 132:23
133:24 143:14
143:24 149:11
149:16
treatments

149:21 150:5
trial 81:1 120:8
trick 69:5,6,20
trivial 72:23
73:1,1 147:9
148:25
trouble 15:20,23
true 23:25 29:6
41:22 57:15
59:7,23,24,25
60:1 64:6
88:24 89:1
100:22 117:7
120:6 154:2,11
157:23
truly 32:18
trust 69:21
128:14
truth 125:22
157:17,18,18
truthfully 28:10
try 26:14 32:14
70:19 85:21
140:16
trying 13:9
24:16 29:14
42:22 46:18
56:16 63:24
67:5 69:13
71:22 74:2
88:25 103:13
139:3 144:13
147:2
turn 39:23 61:2
151:16
turning 65:1
turns 36:8 39:22
Turtle 2:15
79:15,17 83:12
two 2:7,17 5:12
6:7,22 9:19
11:5,6 15:2,5,9
15:22 16:2
45:15 48:11
81:15 82:14

83:18 94:1
122:14 131:12
132:20 133:2
134:14 146:25
147:17 152:6
type 29:2 30:24
31:1,12 47:5
97:2 103:6
105:2 108:5
117:2
types 29:15 53:5
96:1 105:14
typewriting
157:22
typical 105:23
typically 131:22
typing 68:23

U

U.S 44:22 99:14
Uh-huh 48:25
ultimate 29:5
30:4
ultimately 142:5
ultraviolet 31:7
unable 142:4
unacceptable
67:25
uncommon
99:14
undergone
108:5
underlined 49:9
underlying 35:8
underneath
128:1
undersigned
158:6
understand 8:12
17:14,16 32:22
39:17 43:12
49:2 71:4
88:18 97:1
116:5 117:24
125:4,7 136:4

143:25 149:7
understanding
11:15,17,21
13:12 83:10,15
85:3 149:2
understands
96:7 126:21
undertaken
27:15 47:13
49:3
underwent
149:11
undetermined
157:10
undocumented
100:1 139:16
unexposed
112:17
unfortunate
43:3
unique 77:4
unit 42:11
United 1:1,7,13
3:5 100:11
101:4 156:1,7
157:10,13
Univar 2:25
86:14
unknown
114:25
unpack 63:25
unproven 23:1
unrelated 10:1
10:11
unsafe 72:9
untoward
132:14
unusual 39:8
40:20 107:4
update 12:14
87:2 126:24
updated 83:19
83:20 126:6
upholstery
109:15,17

upper 17:9
use 43:7,18 44:2
44:17 50:1
63:7 68:5
70:25 75:1,2
83:20 91:7
99:18 104:6
111:22 121:17
128:25 139:1
148:2 152:19
152:24 153:7
154:5
useful 120:12
useless 47:19
user 129:5
uses 48:4
usual 30:9
usually 13:17
15:21,24 20:22
42:10 72:17
97:8 121:5
135:19,19,22
136:9
utility 67:3
utilized 77:13

V

vague 11:23
36:22 42:7
61:8,21 72:2
74:10,16 78:25
101:11 106:1
109:4 115:14
117:5 118:6
122:24 123:20
125:20 126:12
128:10,13
130:13,17
131:4,9,25
135:7,14 136:2
136:19 138:13
vaguest 133:12
valid 49:17
value 98:15
values 96:20

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 187 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 190 of 1330

| | | | | |
|---|---|---|---|---|
| variation 26:2 114:22 | 2:19 | 105:13 111:9 | Western 1:1 | 121:15,25 |
| variations 103:6 114:21 | vwooten@cshl... 2:14 | WATKINS 3:2 | 156:1 157:11 | 122:25 123:21 |
| varies 96:5 | | Wax 2:15 79:15 79:17 83:12 | whatsoever 57:19 | 124:16 125:10 |
| variety 12:4 | **W** | way 14:9 30:11 | WHEREOF | 125:21 126:13 |
| 33:18 47:17 | W 3:7 | 33:15 34:23 | 158:13 | 128:14 129:8 |
| 64:21 108:2 | wait 104:18 | 42:18 55:5,24 | whichever 40:3 | 129:14,15,19 |
| various 39:15 | waiting 76:1 | 62:2 67:6 73:1 | white 12:1 | 130:18 131:5 |
| 53:6 67:21 | Wake 12:3,4 | 77:23 78:5,9 | wholly 55:20 | 131:10 132:1 |
| 86:21 101:1 | walk 6:13 | 90:23 93:19 | wife 130:9 | 135:8,15 136:3 |
| vary 136:7 | Wall 3:12 | 105:20 116:19 | wild 143:9 | 136:20 137:7 |
| vast 58:4 59:15 | Walnut 2:3 | 118:23 119:3 | 144:20 | 138:14 139:20 |
| 109:9 | want 8:5 9:8 | 147:16 158:11 | willing 120:7 | 144:22 145:20 |
| vats 112:1 | 13:20 14:12 | 158:12 | 123:15 | 146:10 147:20 |
| Vaughn 2:17 | 22:3 27:18 | ways 39:12 | win 120:14 | 149:18 150:7 |
| 51:11 | 36:17 51:3,11 | 78:17 80:20,21 | windows 110:24 | 150:24 152:23 |
| vehicle 137:10 | 51:12 64:3 | 98:19 | winning 82:21 | 153:10,13 |
| vehicles 110:10 | 69:16 79:5 | we'll 86:9 97:23 | Wisconsin 82:19 | 154:4 155:5,12 |
| 137:11 | 88:17 93:21 | 98:21 99:8 | wit 157:7 | 155:15,19 |
| ventilator | 95:10,13 | 139:17 | withdrawn | 157:17,20,21 |
| 148:21 | 100:18 104:8 | we're 25:10 | 17:15 | 157:25 158:2 |
| versa 86:6 | 111:15 114:25 | 28:15 31:4 | witness 4:2 5:1,3 | woman 111:3 |
| verse 19:17 | 120:2,17 124:5 | 57:11 67:8,9 | 6:24 8:17 | wonder 95:2 |
| 53:11 69:10 | 130:5 131:22 | 79:21 98:19 | 11:24 17:25 | 104:5 |
| version 155:20 | 141:12,18 | 104:21 112:10 | 22:22 23:14 | wood 148:1,8 |
| versus 52:16 | 155:14 | 133:14 146:18 | 30:7 31:4 32:8 | Wooten 2:12 4:6 |
| 63:18,19 92:7 | wanted 15:3 | we've 25:18 47:8 | 34:17 37:10 | 79:5,13,15 |
| 92:7 138:25 | 31:22 41:17 | 47:12 79:7,19 | 42:8 43:15,21 | 80:4,7 84:18 |
| vessels 25:9 | 44:6 93:1 95:4 | 105:5 | 44:11,13 45:8 | 85:11,14 98:1 |
| vice 86:5 | wants 89:23 | weather 129:2 | 51:2 56:6 61:9 | word 23:16 |
| view 12:25 34:22 | warned 104:3,4 | website 16:8 | 61:22 66:13,18 | 90:13 99:18 |
| 72:4 116:12 | wasn't 8:5 12:19 | week 43:1 44:7 | 67:18 72:3 | words 117:9 |
| 117:20 118:20 | 15:16 28:9 | 148:8 | 73:9 74:11,17 | wore 17:2 |
| virgin 91:1 | 31:11 41:16 | weekly 13:2 | 79:1,4,6 80:9 | work 9:7 14:5 |
| Virginia 2:12 | 44:7 49:14 | weeks 134:14 | 85:13 87:10,15 | 17:1 18:6,7 |
| 79:15 | 69:20 74:2 | weight 25:6,6 | 88:24 89:19,21 | 32:1 35:17 |
| Vogelstein 9:6,8 | 92:17 137:16 | weird 13:5 | 89:25 91:21 | 43:17 47:4,5 |
| 77:12,18 78:20 | 149:5 | 109:22 | 92:4,11,23,24 | 47:15 60:2 |
| Vogelstein's | waste 13:20 | welcome 150:24 | 93:9,16 99:25 | 77:13,18 78:20 |
| 25:10 | wastewater 18:4 | well-agreed- | 100:25 101:12 | 86:18 121:7 |
| volume 50:10 | wasting 47:22 | 58:3 | 102:22 105:16 | worked 18:18 |
| volumes 15:5 | Watch 31:23 | went 113:8 | 106:2 107:4 | 40:23,24 45:19 |
| vs 1:6 156:6 | 33:6 | 137:18 | 108:9 109:5 | 49:10 80:13 |
| vschultz@dm... | water 56:11 | weren't 29:24 | 111:20 115:25 | 86:12 89:8,10 |
| | 71:16,18 | 54:1 | 117:6 118:7 | 89:17 111:22 |
| | | | | 134:17,20 |

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 188 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 191 of 1330

144:4
**worker** 49:7
**workers** 91:22
  100:2 140:23
**working** 18:3
  45:2 80:21
  98:16 104:12
  110:11,16,20
  111:2 144:25
**workplace** 44:19
**works** 14:21
  42:15 104:25
  105:1
**worried** 94:18
**worrisome**
  141:25
**worry** 39:9
**wouldn't** 8:24
  10:9 17:22
  19:24 49:2
  77:15 98:3
  104:11 106:22
  107:21 125:3
  153:10
**wrap** 155:13
**Wrench** 26:17
  26:18,21,24,25
  27:23 28:6
  43:7,8,12 44:9
  46:22 48:6
  61:23 86:18
  109:9
**wrenches** 48:2
**writing** 101:14
  101:21 104:21
**written** 57:18
  94:21
**wrong** 54:8 68:8
**wrote** 12:7 54:15
  141:13
**Wu** 77:20 78:1
  78:15,19
**Wus** 78:3

---
**X**

**X** 4:1,13 36:11
  57:11

---
**Y**

**Y** 57:12
**Yale** 22:7 42:19
**yeah** 12:4 16:16
  21:25 25:22
  26:18 29:9
  35:13 36:23
  38:4 47:12
  49:21 51:19
  60:18,22 72:10
  81:4 85:15
  88:24 98:23
  110:11 112:6,9
  114:3 119:7
  120:15 133:11
  133:13 134:5
  146:21 152:21
**year** 78:16 81:12
  94:1 96:5,6
  97:7,10,18
  99:14 100:4
  113:7 127:19
  141:4 144:6,11
**years** 6:7,22
  9:19 11:5,6
  15:2,22 16:3
  20:20,21,22
  44:25 45:15
  46:25 47:1
  51:21,22 58:6
  65:25 76:16
  83:18 93:3
  94:4 97:19
  98:7,11,12,20
  104:9 111:22
  131:13 132:7
  132:20 133:2
  140:8 141:4,4
  141:7,7 142:17
  143:8 144:12
  146:25 152:7
**Yep** 21:10 35:3

101:23 105:10
  115:19 145:15
**yesterday** 12:6
  16:13,15,25
  91:14
**yield** 37:2
**York** 2:23,23
  3:13,13
**young** 51:23

---
**Z**

**Z** 57:12
**zero** 96:5 97:6
  97:17,18,19
**zero-sum** 34:6
**ZOMNIR** 2:6

---
**0**

**084-002031** 1:16
  158:21

---
**1**

**1** 4:16 5:13,15
  5:16 14:25
  49:23 50:1
  61:3 65:17
  73:13 75:16
  117:17 120:3
  121:12,21
  126:3
**1-158** 156:12
**1,500** 144:8
**1.5** 60:15,21
**1.5-fold** 60:25
**1.8** 17:7
**1:11** 155:21
**10** 16:6 28:21
  57:19,23 99:13
  99:15 100:17
  100:20 141:10
  142:3
**10:04** 28:18
**10:09** 28:18
**10:35** 48:13
**10:37** 48:13

**10:41** 51:7
**10:42** 51:7
**100** 3:12 39:6
  41:7 106:19
**100-fold** 17:8
**100,000** 100:21
**10005** 3:13
**10007** 2:23
**1099** 130:1
**11** 35:2
**11:17** 79:11
**11:32** 79:11
**12** 16:24 35:24
  81:2 98:7
  141:10 145:11
**12:47** 140:19
**12:51** 140:19
**13** 16:23,24 19:3
**14** 26:19,22 46:8
  46:13 141:10
  142:3 151:16
**14th** 158:14
**15** 20:21 49:1
  81:2 94:3
  140:8 144:10
**151** 4:9
**15222** 2:9,18
**153** 4:10
**16** 47:1 76:10,10
**17** 46:25 86:24
  122:15
**1717** 3:17
**19** 146:12
**19103** 3:18
**19106** 2:4
**1948** 76:7,12,23
  77:7
**1970s** 151:20
**1998** 46:7,13,21
**19th** 134:15

---
**2**

**2** 4:16 5:14,16
  6:5 14:25
  49:23 57:22

128:1,2 147:5
**2,500** 94:19
**2.5** 122:20
**20** 93:3 94:4
  99:13,15
  100:17 140:8
  141:4 144:9,11
  156:22
**20-year** 131:8
**200** 2:13
**201** 3:3
**2012** 32:4
**2015** 11:25 20:2
  47:1
**2017** 5:15 12:17
  16:6 20:7
  126:3 127:20
**2019** 1:19 20:10
  20:15 156:11
  157:7 158:15
**205-mile** 137:20
**2100** 3:3
**24s** 122:14
**25** 36:15 37:2,6
  37:7,8,11,19
  86:20,23 87:8
  87:21 88:2,7
  88:20 89:7
**250** 137:25
  138:5,11
**26** 80:5
**277** 2:22
**28** 147:5
**28210-2267** 3:22
**28211** 2:14
**2907** 2:13
**29401** 3:9

---
**3**

**3** 26:25 28:6
  49:23 65:24
  66:1,8 119:4
  119:19,19,25
  121:12,20
**3:18-cv-00197...**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC  Document 311-1  Filed 09/02/20  Page 189 of 190
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 192 of 1330

**1:6** 156:6
**30** 44:25 58:6
  98:11 127:14
  142:17 143:8
  144:7,12
**30-year** 143:20
**31** 60:24
**34** 149:9
**350** 3:8 99:16,21
  100:19
**3710** 3:17

—————— **4** ——————
**4** 1:19 21:7
  57:18,20,21,23
  57:23 76:12
  156:11 157:7
**4,000** 94:20
**4.79** 122:19
  124:9
**40** 3:8 122:10,11
**400** 2:18
**408** 2:23
**447** 48:24
**45** 50:10
**462** 48:24

—————— **5** ——————
**5** 4:4,16 21:7,9
  26:22 49:23
  50:1 57:18,20
  73:13 140:22
  143:3
**50** 27:12 38:15
  39:1 95:1
  144:5,7,9
  151:19
**500** 94:12
**51** 4:5 48:17
**5th** 103:24

—————— **6** ——————
**6** 28:21 57:19,24
**60** 106:3
**600** 144:12,19

**601** 2:3
**603** 2:8
**61** 98:8
**62** 98:9
**6302** 3:21
**6th** 2:8 105:21

—————— **7** ——————
**7** 57:19 140:22
**70** 51:22
**700** 3:22
**70170** 3:4
**720** 2:3
**75** 51:21
**79** 4:6 26:20

—————— **8** ——————
**8** 57:19 58:13
  122:16 124:7,8
**85** 4:7

—————— **9** ——————
**9** 1:18 28:23
  29:1 57:19
  141:10 157:8
**9:31** 1:20
**90** 4:8
**90s** 92:22
**98** 46:25
**99** 59:19 117:16

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577
Case 3:18-cv-00197-RJC-DSC   Document 311-1   Filed 09/02/20   Page 190 of 190
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 193 of 1330

# Exhibit 2

# Transcript Report

---

## Graeber, James

Plaintiffs designations are in yellow

US Steel's designations are in green

**Transcript of Graeber, James**

# Full Transcript Report
## Designation Legend

GRAEBER, JAMES - (COWEY) VOL 1

**Transcript of Graeber, James**

```
01
02                    CAUSE NO. A-167,693
03
04   JAMES COWEY AND RUTH       ) IN THE   DISTRICT   COURT
05   COWEY                      )
06                              )
07            PLAINTIFFS,       )
08                              )
09   VS.                        ) JEFFERSON COUNTY, TEXAS
10                              )
11   RADIATOR SPECIALTY         )
12   COMPANY, ET AL             )
13                              )
14            DEFENDANTS.       )
15                              ) 58TH   JUDICIAL DISTRICT
16
17   ********************************************************
18
19           ORAL AND VIDEOTAPED DEPOSITION OF
20
21                   JAMES GRAEBER
22
23                  OCTOBER 31, 2003
24
25   ********************************************************
26     ORAL AND VIDEOTAPED DEPOSITION OF JAMES GRAEBER,
27   produced as a witness at the instance of the PLAINTIFFS,
28   and duly sworn, was taken in the above-styled and
29   numbered cause on the 31ST of OCTOBER, 2003, from 9:04
30   a.m. EST to 11:51 a.m. EST, before Mark A. Miller, CSR
31   in and for the State of Texas, reported by machine
32   shorthand, at the law offices of Nelson, Mullins, Riley
33   & Scarborough, 999 Peach Tree Street, Suite 1400,
34   Atlanta, Georgia, pursuant to the Texas Rules of Civil
35   Procedure and the provisions stated on the record or
36   attached hereto.
37          (Timestamping is in Central Standard Time)
```

**Transcript of Graeber, James**

```
01                    A P P E A R A N C E S

02

03   FOR THE PLAINTIFFS:

04       MR. LANCE LUBEL

05       HEARD, ROBINS, CLOUD, LUBEL & GREENWOOD

06       910 TRAVIS STREET, SUITE 2020

07       HOUSTON, TEXAS  77002

08

09   FOR THE DEFENDANTS UNITED STATES STEEL CORPORATION,

10   ARISTECH CHEMICAL CORPORATION AND USX CORPORATION:

11       MS. LAURA CALLAWAY HART

12       NELSON, MULLINS, RILEY & SCARBOROUGH

13       1330 LADY STREET

14       COLUMBIA, SOUTH CAROLINA  29201

15

16   FOR THE DEFENDANT RADIATOR SPECIALTY COMPANY:

17       MR. JAMES M. RILEY

18       COATS ROSE

19       1001 FANNIN, SUITE 800

20       HOUSTON, TEXAS  77002-6707

21

22   ALSO PRESENT:

23       MR. JOHN GROSSMAN

24

25

26

27

28

29

30

31

32

33

34
```

Transcript of Graeber, James

# Graeber, James

Rhyne Trial Master

```
01                    INDEX
02                                        PAGE
03
04  Appearances...................................    2
05
06  Stipulations..................................    4
07
08  JAMES GRAEBER
09      Examination by MR. LUBEL.................    4
10      Examination by MR. RILEY................   75
11      Re-Examination by MR. LUBEL.............   82
12      Examination by MS. HART.................   86
13      Re-Examination by MR. LUBEL.............  105
14      Re-Examination by MS. HART..............  116
15      Re-Examination by MR. RILEY.............  120
16
17  Signature and Changes......................... 122
18
19  Reporter's Certificate........................ 124
20
21
22                   EXHIBITS
23  NO.DESCRIPTION                           PAGE
24  1  Notice Of Deposition                  18
25  2  Letter dated May 25, 1977 to Theobaldo
26     Tames from J. Graeber                 58
27
28          3  Safety Data Sheet - Raffinate        99
29
30          4  USS Chemicals Form Letter from
31     William Souder                       101
32  5  Letter dated October 30, 2003 to Lance
33     Lubel from Cortland Maddux           105
34
35          6  Document, Typical Analysis Of Clairton
36     Raffinate                            118
```

**Transcript of Graeber, James**

01                    THE REPORTER:  Would you like to take the

02    deposition by the rules?

03                    MR. LUBEL:  Yes.

04                    THE REPORTER:  Would you like for the

05    witness to read and sign his deposition?

06                    MS. HART:  Yes.

07                    VIDEO OPERATOR:  The time is 9:04 a.m.

08    We're on the record.

09                         JAMES GRAEBER

10    was called as a witness by the Plaintiff, and being

11    first duly sworn, testified as follows:

12                         EXAMINATION

13    BY MR. LUBEL:

14         Q.   Would you please state your full name?

15         A.   James Charles Graeber.  And that's

16    G R A E B E R.

17         Q.   Where do you live, Mr. Graeber?

18         A.   I presently reside in Plainfield, Illinois,

19.   which is southwest of Chicago.

20         Q.   And are you retired?

21         A.   Yes.

22         Q.   And who did you work for before you retired?

23         A.   You want the employment history?

24         Q.   That would be great.  If you want to -- I know

25    from looking at some of your prior depositions that

Objection: Prior Depositions

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

```
01   you've given that you went to college, correct?
02       A.   That's correct.
03       Q.   And then, why don't you tell us about your
04   educational background first, and then we'll go into
05   your work history.
06       A.   I have a Bachelors of Science degree in
07   chemistry from St. Mary's University in Winona,
08   Minnesota.  I have a Master of Science in organic
09   chemistry from Loyola University in Chicago.
10       Q.   And did you do any significant work before you
11   got your college degree?
12       A.   I began my -- well, which degree are you
13   speaking of?
14       Q.   Let's start with just your -- your Bachelor of
15   Science in chemistry.
16       A.   All right.  I did labor work in the summertime
17   during that period.
18       Q.   In an industrial setting or some other type of
19   setting?
20       A.   For bricklayers, plasterers, that type of
21   thing.
22       Q.   Okay.  And then, I take it, then, you went to
23   college, correct?
24       A.   I was going to college, and during the summer,
25   I would do that.
```

GRAEBER,
JAMES - (COWEY)
VOL 1

Transcript of Graeber, James

Page 6

01    Q.  All right.  Fair enough.  When was the first

02  time that you had a job that had any continuity to it?

03    A.  Before I completed my Masters degree, I went

04  to work at Sinclair Research Laboratories in Harvey,

05  Illinois.

06    Q.  And what kind of business was Sinclair in?

07    A.  They were an oil refiner, and they later got

08  absorbed by Atlantic Richfield.

09    Q.  Is that -- is Atlantic Richfield what we in

10  Texas refer to as Arco, or is that a different company?

11    A.  That would be the same one.

12    Q.  All right.  And do you recall whether or not

13  Sinclair had any operations in Texas; in particular, the

14  Houston area?

15    A.  I believe they did, but I couldn't tell you

16  what they were.

17    Q.  At any rate, when you started with them, that

18  was approximately what year?  1959?

19    A.  1950 -- I think it was '58.

20    Q.  And how long did you work for Sinclair

21  Laboratories?

22    A.  Approximately one year.

23    Q.  And why did you leave there?

24    A.  I wasn't satisfied with the research setting.

25  If I wanted to make a decision, I wanted to make a

Transcript of Graeber, James

01    decision, not wait for a group of Ph.D.'s to tell me to

02    do what I wanted to do.

03         Q.    And is that part of the reason that you went

04    and got your Ph.D. in chemistry?

05         A.    I did not get a Ph.D.

06         Q.    You got a Masters?

07         A.    Masters.

08         Q.    All right.

09         A.    I was getting it at the time.

10         Q.    What type of research was Sinclair doing that

11    you were working on during that time period?

12         A.    Catalyst research, and then I worked on

13    upscaling some processes that they were considering for

14    producing some chemicals.

15         Q.    Now, were you aware back then when you were

16    working for Sinclair that they made a product called

17    benzene?

18         A.    No.

19         Q.    Did you later in time become aware of that?

20         A.    I don't think Sinclair ever produced benzene

21    as a saleable material.

22         Q.    Okay.  But they were an oil refiner, correct?

23         A.    That's correct.

24         Q.    And do you understand, from your experience,

25    that oil refineries, there is actually benzene in crude

**Transcript of Graeber, James**

01  oil as a component?

02      A.   That's correct.

03      Q.   And that the oil refiners, historically, did

04  their best to take the benzene out of the crude oil?

05      A.   I wouldn't say that that's a totally correct

06  situation.  They did in later years.  But there were

07  times at which they did not worry about benzene as a

08  chemical.  Certain refiners started to do this.

09          Originally, benzene was pretty much of a coal

10  chemical.  As refiners progressed, they then started to

11  look at benzene, particularly when they started

12  reformers, which produced large volumes of toluene,

13  xylene and benzene along with it.

14          And when they had that large volume versus

15  what naturally occurred in crude oil, that's when they

16  looked at benzene.  But I don't think Sinclair did that.

17  I was not aware of it, and I can't answer it any further

18  than that.

19      Q.   Let me ask you this, you made a comment that

20  benzene was initially, or originally, I don't want to

21  put words in your mouth, but you said something about

22  that it was a coal chemical.  What does that mean?

23      A.   Derived from coal.

24      Q.   And did that change?

25      A.   No.

**Transcript of Graeber, James**

01     Q.   Okay.  Did benzene at some point in time, was

02  it primarily produced from coal, and then over time, did

03  people or companies start to produce it out of crude

04  oil, is that what you're telling me?

05     A.   Out of a crude oil refining process.

06     Q.   All right.  And when was this change made?

07     A.   Okay.  I can't tell you exactly when that

08  change -- it evolved.

09     Q.   And why was it that a change was made where

10  people or companies went from taking benzene out of

11  coal, and started looking at taking it out of oil, crude

12  oil?

13     A.   When markets presented themselves.  You know,

14  what you're basically asking me is, when did plastics

15  start to come into prominence, which plastics, the ones

16  that would consume benzene, via additional processing,

17  and, for instance, you can make styrene out of benzene,

18  that type of an idea.

19     Q.   I hear you.  But when -- let's take that

20  example, you can make styrene out of benzene.  Did the

21  benzene come from coal or from crude oil?

22     A.   I don't know the timing on that.  But the

23  original sources of benzene were -- was coal.

24     Q.   And is benzene, to your knowledge, still

25  produced from coal even today?

**Transcript of Graeber, James**

01    A.    Indirectly.

02    Q.    Is it produced from crude oil today?

03    A.    Yes, through reforming.

04    Q.    Through a refining process?

05    A.    Yeah.  It's an additional process.  Reforming

06  originally was there strictly to upgrade the octane in

07  gasoline.  And when you do this, you create toluene, you

08  create benzene, you create xylenes, and when that

09  occurs, and there is more profitability than gasoline,

10  then you look at those markets and start to produce

11  benzene.  I mean, that's --

12    Q.    And was there --

13    A.    -- basically what occurred.

14    Q.    Essentially, was there not enough coal to

15  produce benzene where the companies started looking at

16  other sources of it, and one of the sources they

17  identified was crude oil?

18    A.    You know, I can't answer that, but --

19    Q.    Let me --

20    A.    -- it's possible.

21    Q.    Let me ask you this, you left Sinclair

22  Research Laboratory in about 1959 or so; is that true?

23    A.    Yes.

24    Q.    Where did you go next?

25    A.    To the Gary Works of U.S. Steel Corporation.

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01    Q.    What do you mean by Gary Works?

02    A.    That is a large plant, and that's the way they

03  referred to the different ones.  There was a South

04  Chicago Works, Gary Works, Duquesne Works, plants.

05    Q.    I got you.  Who were you getting your paycheck

06  from at that time?

07    A.    U.S. Steel Corporation.

08    Q.    And you just happened to be working at their

09  Gary Works plant, which I heard you say was in Indiana,

10  correct?

11    A.    Yes.

12    Q.    And how long did you stay at that particular

13  plant?

14    A.    I started on November 16th, 1959.  And that's

15  easy because my birthday is the day before that.  And it

16  was in December of '60 that I was transferred to

17  Pittsburgh, to the coal chemical sales division of U.S.

18  Steel Corporation.

19    Q.    Let me kind of jump ahead.  How long did you

20  work for United States Steel Corporation from beginning

21  to end?

22    A.    That was until Aristech Chemical was formed,

23  and that was 1986, but I can't remember when in '86.

24    Q.    All right.  So, would it be fair to say that

25  from about 1959 through sometime roughly in 1986, you

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

# Graeber, James

## Rhyne Trial Master

01    were an employee of United States Steel Corporation?

02        A.    Correct.

03        Q.    Now, you may have gone to different plants,

04    but you still got your paycheck from them, correct?

05        A.    That's correct.

06        Q.    Now, did you work continuously for United

07    States Steel Corporation between 1959 and 1986, other

08    than vacation and sick time?

09        A.    Yes.

10        Q.    Didn't work for anybody else, correct?

11        A.    No.

12        Q.    Now, do you understand that you've been

13    designated as a corporate representative, somebody to

14    speak on behalf of United States Steel Corporation?

15        A.    Yes.

16                MS. HART:  Object to form.

17        A.    I believe that is correct.

18        Q.    (BY MR. LUBEL)  How did you learn that?

19        A.    I really can't say that.  I have been deposed,

20    as you mentioned before, and I believe it was in that

21    same basis, and it was, I guess, through conversations

22    with -- you got to give me your law firm, Nelson,

23    Mullins & Riley.

24        Q.    You understand that law firm to represent

25    United States Steel Corporation?

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01    A.   That is correct.

02    Q.   Now, how did you learn about the deposition

03  that we're taking today?

04              THE WITNESS:  Laura, I believe you

05  contacted me on that, and --

06    Q.   (BY MR. LUBEL)  U.S. Steel's lawyer called you

07  about giving the deposition?

08              THE WITNESS:  If that's what I call

09  you -- if you're U.S. --

10    A.   If Laura Hart is U.S. Steel Corporation's

11  lawyer, then the answer is yes.

12    Q.   (BY MR. LUBEL)  Okay.  At any rate, do you

13  believe that you're here today to speak on behalf of the

14  company?

15    A.   You know, really, I don't know how to answer

16  that question.  Do I believe that I'm here to speak --

17    Q.   Let me ask you this, you live in Illinois

18  right now, right?

19    A.   That's correct.

20    Q.   We're taking your deposition in Atlanta,

21  Georgia, correct?

22    A.   Uh-huh.

23    Q.   True?

24    A.   Correct.

25    Q.   How did you get here?

**Transcript of Graeber, James**

# Graeber, James

### Rhyne Trial Master

```
01     A.   I flew down yesterday morning.

02     Q.   Who paid -- who is paying for your flight?

03     A.   I don't know the mechanics of this, but it was

04  handled by Nelson, Mullins & Riley.

05     Q.   And did they furnish you a ticket, are they

06  going to reimburse you for your ticket, or how is that

07  supposed to work, to your knowledge?

08     A.   At my request, the ticket was furnished.

09     Q.   At your request?

10     A.   Yes.

11     Q.   Now, did they put you in first class, or did

12  they make you sit in coach with the rest of the people?

13     A.   Well, if you knew what type of airplane I was

14  on, there isn't much difference.

15     Q.   Did they send you on the United States Steel

16  airplane?

17     A.   No.

18     Q.   At any rate, you were contacted by somebody to

19  come give a deposition on a U.S. Steel case, did you

20  understand that?

21     A.   Yes.

22     Q.   And you've come?

23     A.   Correct.

24     Q.   And I take it that you're not going to suffer

25  any out-of-pocket expenses by coming all this way from
```

**Transcript of Graeber, James**

01  Illinois to Atlanta, correct?

02      A.   I hope not.

03      Q.   Do you have any agreement with the lawyers

04  that represent U.S. Steel, or U.S. Steel -- Steel

05  itself, as far as how you're going to be compensated for

06  your testimony?

07      A.   Yes.

08      Q.   What is that agreement?

09      A.   Just verbal.

10      Q.   I understand.  But what's the -- what is

11  the -- what does it consist of?  What did they tell you?

12      A.   What did they tell me?

13      Q.   What kind of deal did you work out, is what

14  I'm asking you?

15      A.   Well, without giving you specifics, I have a

16  per diem charge and transportation and other valid

17  expenses would be covered.

18      Q.   Okay.  Do they pay you for your time, as far

19  as an hourly rate?

20      A.   No.  Daily.

21      Q.   You get a daily rate?

22      A.   That's correct.

23      Q.   And what is that rate?

24      A.   Do I have to answer that?

25      Q.   Well, is there any particular reason why you

**Transcript of Graeber, James**

```
01    don't want to tell this jury in Jefferson County, Texas,

02    how much U.S. Steel or their lawyers are paying you to

03    be here?

04        A.    $750.00 a day.

05        Q.    All right.  And that applies regardless of how

06    long you work, I take it?

07        A.    That's correct.

08        Q.    So whether this deposition lasts 30 minutes or

09    whether it lasts all day, you're going to get $750.00?

10        A.    That's correct.

11        Q.    Plus incidentals, correct?

12        A.    Plus valid expenses.

13        Q.    And by that I mean if you buy a sandwich for

14    lunch, they're going to pay you back, that's your

15    agreement?

16        A.    Correct.

17        Q.    And they're going to pay for your airplane

18    ticket, true?

19        A.    They did.

20        Q.    They already did.  You got here last night,

21    they put you up in a hotel, right?

22        A.    Correct.

23        Q.    You didn't have to pay for that yourself, did

24    you?

25        A.    No.
```

**Transcript of Graeber, James**

01    Q.   How long have you had this type of agreement
02  with U.S. Steel or their attorney?
03    A.   Well, this is the first time I -- excuse me --
04  I have traveled away from Illinois, out of the Chicago
05  area, so they're picking up expenses, other than
06  parking, which, in Illinois, there was no real charges
07  involved.
08    Q.   But you got paid for your time, correct?
09    A.   Correct.
10    Q.   But you didn't have to get in an airplane is
11  what you're saying?
12    A.   That's correct.
13    Q.   You didn't have to stay in a hotel?
14    A.   Correct.
15    Q.   But how long have you had this agreement with
16  U.S. Steel that you would appear on their behalf to give
17  testimony for a fee?
18    A.   It has not been a general agreement.  It has
19  been when I've been contacted that my services would be
20  desired or needed.
21    Q.   All right.  Now, do you have any type of
22  pension from your work with United States Steel
23  Corporation?
24    A.   That was taken as a lump sum upon retirement.
25    Q.   All right.  You had the option of taking that

**Transcript of Graeber, James**

01  money on a monthly basis over time or getting it all at

02  once, and you chose to take it all at once?

03      A.   Correct.

04      Q.   Do you own any stock?

05            MR. RILEY:  Excuse me.

06            MR. LUBEL:  That's not me.  Riley, is

07  that your daughter's phone?

08            MR. RILEY:  I apologize.

09            MR. LUBEL:  That's all right.  It's a

10  good break.

11      Q.   (BY MR. LUBEL)  Are you ready to proceed?

12      A.   Sure.

13      Q.   My question is, do you own any stock in United

14  States Steel Corporation or any successor to it?

15      A.   No.

16            MR. LUBEL:  Do you have an exhibit

17  sticker there, Mr. Miller?

18            (Exhibit 1 marked.)

19      Q.   (BY MR. LUBEL)  How many depositions have you

20  given for U.S. Steel?

21      A.   Four, but one was in creosote.

22      Q.   So the one for creosote and then three for the

23  raffinate Liquid Wrench cases?

24      A.   That's correct.

25      Q.   Would this be the fourth Liquid Wrench

**Transcript of Graeber, James**

```
01   raffinate case?
02        A.   Yes, it would be
03        Q.   And have you done any consulting for United
04   States Steel Corporation about the cases, apart from
05   giving testimony; in other words, sitting here and
06   having to ask -- answer questions, you know, with a
07   videographer and a court reporter?
08        A.   Nothing that was not connected to a
09   deposition.
10        Q.   And by that, what I mean is, since your
11   employment with United States Steel Corporation in 1986,
12   have they asked you to consult with the company on any
13   work they were doing, apart from defending lawsuits?
14        A.   No.
15        Q.   Now, let's go back to the lawsuits.  You got
16   in, for instance, last night to come here this morning,
17   correct?
18        A.   I got in around noon time.
19        Q.   Did you have a chance to meet with U.S.
20   Steel's lawyers?
21        A.   Correct.
22        Q.   Did you talk to them about the case?
23        A.   Correct.
24        Q.   How long did you meet with them yesterday?
25        A.   Oh, I'd say overall about three hours.
```



GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

```
01      Q.   All right.  Now, did you review any documents
02   as you talked to them, or did they read from any
03   documents to you?
04      A.   We looked at documents.
05      Q.   What type of documents did you look at?
06      A.   It would be -- you have to wait a minute while
07   I think back.
08      Q.   Take your time.
09      A.   Well, one was the deposition, or a deposition
10   that I took part in, and I forget the year, concerning
11   benzene and Liquid Wrench.
12      Q.   Did you bring that here, or did they show it
13   to you?
14      A.   It was shown to me.
15      Q.   And did they tell you that the reason they
16   were showing it to you is so that any statements you
17   made today were not inconsistent with it?
18           MS. HART:  Object, privilege.  You're
19   asking about our conversations now.
20           MR. LUBEL:  I'll honor the privilege if
21   you're saying that he's the client.
22           MS. HART:  Well, I mean, he's speaking
23   for U.S. Steel, you may not understand that, but he is
24   the designated corporate representative on certain
25   topics that are noticed in the -- in the Deposition
```

**Transcript of Graeber, James**

01   Notice.  So, in that sense, he's U.S. Steel.  But, you

02   know, he's retired, so he's not U.S. Steel, you know, in

03   the legal sense.

04      Q.   (BY MR. LUBEL)  Do you understand now from

05   listening to your lawyer that you are, in fact, a

06   corporate spokesperson for United States Steel

07   Corporation?

08      A.   After hearing that, yes.

09      Q.   All right.  Now, was there anything

10   confidential that was discussed between you and the

11   lawyers for United States Steel Corporation when you met

12   yesterday to get ready for the deposition?

13      A.   What do you mean by "confidential"?

14      Q.   Was there anything discussed in your meeting

15   that you felt as though was in anticipation of

16   litigation, or preparing for litigation, that you felt

17   as though was something that should not be disclosed to

18   third parties, such as the jury in this lawsuit?

19         MS. HART:  Objection, form.

20      A.   I don't believe there was anything of that

21   nature.

22      Q.   (BY MR. LUBEL)  At any rate, the lawyers

23   provided you one of your older depositions to look at,

24   correct?

25      A.   Correct.

**Transcript of Graeber, James**

```
01    Q.    And you-all went through it?

02    A.    No.  I had it to look through.

03    Q.    They gave it to you to take home?

04    A.    Yeah.

05    Q.    To look at last night?

06    A.    Yes.

07    Q.    What else did you look at other than that?

08    A.    Oh, I've got one thing right in front of me,

09  Typical Analysis of Clairton Raffinate.

10    Q.    But other than the documents that are sitting

11  in front you, is there anything else that you looked at?

12  And I understand you looked at the deposition.

13    A.    There were more voluminous pieces of paper

14  than this, but they were all on this same type of a

15  subject.

16    Q.    Had you seen them before, or were they new to

17  you?

18    A.    Most I had seen before.

19    Q.    Now, were you ever asked to go search for

20  documents that any of the parties in the lawsuit had

21  requested from United States Steel Corporation?

22    A.    No, because I would have no way of doing it.

23    Q.    But at any time during your employment, were

24  you asked to maintain files on benzene or raffinate or

25  any of those subjects?
```

**Transcript of Graeber, James**

```
01      A.    No.

02      Q.    Why not?

03      A.    Because we never kept personal files.  If

04  correspondence went out, it was put into a central file

05  system, copies were.  If you wanted to keep a copy, you

06  could keep a copy.  But after awhile it gets voluminous

07  enough that you get rid of them.

08      Q.    And how did you get rid of them?

09      A.    Wastebasket.

10      Q.    All right.  But how did you make sure that the

11  copy went to the central files, or that the original

12  went to the central file?

13      A.    Just designated one to go.

14      Q.    But give me the mechanics of how that document

15  would get from your office to these central files.

16      A.    The central file was in the office.  I'm going

17  back originally to coal chemical sales and then USS

18  Chemicals, which evolved from coal chemical sales and

19  Pittsburgh Chemical.

20      Q.    In Pittsburgh, Pennsylvania?

21      A.    Pardon me?

22      Q.    In Pittsburgh, Pennsylvania?

23      A.    Correct.

24      Q.    Was that the headquarters of United States

25  Steel Corporation?
```

**Transcript of Graeber, James**

01   A.   Yes, it was.  And then after Aristech was

02   formed, they just followed through with the same

03   situation.

04   Q.   Did Aristech take over the same facilities,

05   actual buildings, structures and property that United

06   States Steel Corporation had?

07          MS. HART:  Objection, beyond the scope of

08   this deposition.

09   A.   You're asking me a question that I really

10   can't comprehend because of -- Aristech took over

11   chemical producing facilities that were spelled out in

12   the agreement for the formation of Aristech Chemical.

13   Q.   (BY MR. LUBEL)  Did you ever see that

14   agreement?

15   A.   No.

16   Q.   Has anybody ever talked to you about the

17   substance of that agreement?

18   A.   Oh, in general, we were told what it was, but

19   I -- the agreement had to be monstrous in volume.

20   Q.   Why is that?  Why do you say that?

21   A.   Well, Aristech was a stock corporation created

22   by USX Corporation, and they divested themselves of all

23   money in that corporation when they put it on the New

24   York Stock Exchange.

25   Q.   Well, the reason I'm asking you questions

**Transcript of Graeber, James**

01  about this, is because you made a comment about the

02  central files that existed in the Pittsburgh,

03  Pennsylvania headquarters of United States Steel

04  Corporation, when it became Aristech, it was the same

05  central file, did you say that?

06      A.   Well, files that were passed on.  Now, I have

07  no idea what they might have discarded, and I have very

08  little knowledge of anything that was saved.

09      Q.   You don't know either way on that, right?

10      A.   No.

11      Q.   But was it in the same building, is my

12  question?

13      A.   Correct.

14      Q.   So, when Aristech took over the headquarters,

15  they officed in the same building?

16      A.   Correct.

17      Q.   Were the same people working there?

18      A.   Not exactly.

19      Q.   Well, was there much overlap?

20      A.   No.

21      Q.   There was not much overlap?

22      A.   Between U.S. Steel and --

23      Q.   Aristech.

24      A.   -- Aristech?  No.  It was a clean-cut

25  severance.

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

```
01      Q.   All right.
02      A.   Because you were basically saying that USS
03 Chemicals, division of U.S. Steel Corporation, became
04 Aristech Chemical Corporation.
05      Q.   But you kept your job there, right?
06      A.   Correct.
07      Q.   Same office?
08      A.   They moved the offices within the same
09 building.
10      Q.   Did you have a different boss?
11      A.   No.
12      Q.   Who was your boss at the time of the change?
13      A.   Jay Windfelder.  J.J. Windfelder.
14      Q.   What was his title?
15      A.   General manager of coal chemicals.
16      Q.   Did the people within your group of the coal
17 chemicals stay essentially the same when the changeover
18 occurred from the United States Steel Corporation to
19 Aristech?
20      A.   Yes.
21      Q.   You-all may have moved your offices within the
22 building, but you were in the same structure?
23      A.   Correct.
24      Q.   And now, once that change was made, your
25 paycheck would say Aristech on it instead of United
```

**Transcript of Graeber, James**

# Graeber, James
### Rhyne Trial Master

01  States Steel Corporation, I take it?

02      A.   I believe that's the way.

03      Q.   All right.  Did you ever get a paycheck from a

04  company called USX?

05      A.   I'm having trouble recalling, but I think that

06  prior to Aristech, it came through USS Chemicals,

07  division of USX.

08      Q.   What is your understanding and belief as to

09  when USX started to have a relationship with United

10  States Steel Corporation, otherwise known as USS

11  Chemicals?

12              MS. HART:  Object to form.

13      Q.   (BY MR. LUBEL)  When did USX become involved?

14      A.   USX was formed at some point after Marathon

15  Oil was acquired, and USS Chemicals had been, prior to

16  that, a division of U.S. Steel Corporation.

17      Q.   All right.  But I'm talking about USX.

18      A.   I know.  USX was formed, and I can't tell you

19  when exactly.

20      Q.   Approximately?  Can you give me an approximate

21  decade?

22              MS. HART:  Listen, this is beyond the

23  scope of discovery.  We've objected to this.  It's in

24  our written objections, which I'd like to make an

25  exhibit to this deposition.  He's not designated as a

**Transcript of Graeber, James**

01  spokesperson on the various corporate structures.

02          He's not speaking for the corporation on the

03  various corporate structures.  You're asking him

04  questions about his personal paycheck, and I was letting

05  you ask him about that.  But he -- he never worked in

06  that area, and he just knows from being an employee.

07          MR. LUBEL:  Right.  I think if you look

08  at that Deposition Notice close, we -- we said that

09  we're going to take these guys not only in their

10  corporate representative capacity, but also in their

11  individual capacity.  So --

12          MS. HART:  I don't -- I don't remember

13  that from the Notice.  Perhaps I'm wrong.  But I don't

14  remember that from the Notice.  And that's why -- you

15  know, I don't mind you asking him some questions about

16  his personal thing, you have to understand how this

17  comes out, but he is not the designated corporate

18  spokesperson on the corporate entities --

19          MR. LUBEL:  Who is going to do it?

20          MS. HART:  Well, we've objected to that

21  because it's all irrelevant to this case.  The relevant

22  time period ended in 1978 with the last sales of

23  raffinate --

24          MR. LUBEL:  Well, who's liable?

25          MS. HART:  -- to Radiator Specialty.

**Transcript of Graeber, James**

01          MR. LUBEL:  Who's --

02          MS. HART:  United States Steel

03  Corporation, we've told you that several times in the

04  course of all of this.  United States Steel Corporation.

05  And, you know --

06          MR. LUBEL:  All right.  Maybe I can cut

07  this short.  If the plaintiffs in this case go down and

08  get a judgment in their favor, you're saying that United

09  States Steel Corporation is liable for that judgment?

10          MS. HART:  If there is a judgment in this

11  case against the entity that sold raffinate, the

12  successor entity, that would be United States Steel

13  Corporation, yes.

14      Q.   (BY MR. LUBEL)  Well, let me ask you this,

15  Mr. Graeber, which company sold the raffinate during the

16  time you worked there?

17      A.   I'm trying to get back in my mind in the

18  history timing.  If raffinate was sold prior to 1964, it

19  would have been through the coal chemical sales division

20  of U.S. Steel Corporation.

21      Q.   United States Steel Corporation?

22      A.   Of United States Steel.

23      Q.   All right.  Post '64, raffinate sales, through

24  '78, which company sold raffinate?

25      A.   It would have been USS Chemicals Corporation,

**Transcript of Graeber, James**

```
01   which I believe --
02               MS. HART:  No.
03               THE WITNESS:  Am I in the wrong here?
04               MR. LUBEL:  Do you-all want to take a
05   break?  I just want to get this straight.  That's what I
06   need to get straight.
07               MS. HART:  Yeah, let's take a break.
08   Let's talk, and I think maybe we can straighten this
09   out.
10               MR. LUBEL:  I understand.  I'm going to
11   need something on the record from somebody --
12               MS. HART:  Right.
13               MR. LUBEL:  -- that clears this up for
14   me.  I don't care if it's him, but --
15               MS. HART:  I can clear it up for you.
16               MR. LUBEL:  Great.  Go ahead.
17               THE REPORTER:  Are we off or on?
18               MR. LUBEL:  We can go off the videotape.
19               VIDEO OPERATOR:  The time is 9:39 a.m.,
20   and we're off the video record.
21               THE REPORTER:  Do you want it on, on
22   this?
23               MR. LUBEL:  Let's hear the -- let's go
24   off the record.
25               (A break was taken from 9:39 to 9:41.)
```

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

01          MR. LUBEL:  Make your stipulation on the

02     record.  We'll use that.

03          MS. HART:  United States Steel

04     Corporation stipulates that the sales of raffinate to

05     Radiator Specialty Company were made through 1978 by USS

06     Chemicals division of United States Steel Corporation.

07     And there were no sales after 1978 that we are aware of.

08          VIDEO OPERATOR:  The time is 9:41 a.m.,

09     and we're on the video record.

10     Q.   (BY MR. LUBEL)  Are you ready to proceed?

11     A.   Yes, I am.

12     Q.   Mr. Graeber, isn't it true that when you

13     started at United States Steel Corporation in roughly

14     1960, or sometime shortly thereafter, you learned that,

15     in fact, your company had supplied Radiator Specialty

16     Company with raffinate before you ever started working

17     there?

18     A.   I never learned that.  What I did learn at

19     some point, and I can't really tell you when that was,

20     that USS -- that we were supplying raffinate to Radiator

21     Specialty, but I cannot tell you what year.

22     Q.   Do you recall giving testimony that's

23     different than what you're telling us right now?

24     A.   No.

25     Q.   Okay.  Have you been supplied with the

**Transcript of Graeber, James**

```
01   deposition that you gave in the Melvin Rector and Helen
02   Rector case, on November 2nd of 2000, where it was an
03   oral and videotaped deposition where you were under oath
04   just like you are here today?  Do you remember that?
05        A.   Not all of it.
06        Q.   Do you remember giving a deposition under oath
07   in that case?
08        A.   Yes.
09        Q.   And see if on page 39, you'll go ahead and
10   read lines three through seven first, just the
11   paragraph, the question that was asked to you.
12        A.   Do you want me to read it out loud?
13        Q.   Yes, sir, please.  Three through seven.
14        A.   "Question:  Okay.  In 1960, when you went to
15   work at United States Steel or shortly after, you became
16   aware that Radiator Specialty, Incorporated had been
17   buying raffinate from United States Steel even before
18   you went to work in 1960?"
19        Q.   And read for us your answer you gave in that
20   testimony.  If you go down you'll see an answer.
21             MS. HART:  Objection.  There was an
22   objection he skipped over.
23        Q.   (BY MR. LUBEL)  Read your answer, sir.
24        A.   I'm trying to get to it.  "I believe that is
25   correct, but I'm not sure of that."
```

**Transcript of Graeber, James**

01     Q.  What was the next question that was asked of

02  you right after that?

03     A.  "But that's what you've testified to?  Yeah."

04     Q.  And, in fact, what the lawyer was asking you

05  there in another deposition that you gave, I believe in

06  the Lennon case, you had testified that, in fact, you

07  had learned that U.S. Steel Corporation was supplying

08  Radiator Specialty Company with raffinate before you

09  started in 1960, correct?

10           MS. HART:  Objection, form.

11     A.  I don't know if you've got something that I

12  can read -- obviously, I must have said it because it

13  was recorded.  But on the other hand, I'm talking to you

14  with the best of my recollection at this time.

15     Q.  (BY MR. LUBEL)  Okay.  Let me ask you this,

16  was your recollection, in November of 2000, do you think

17  it was better than you have today?

18     A.  It might have been.

19     Q.  So, to the extent, in November of 2000, you

20  believed that it was correct that, in fact, U.S. Steel

21  had been supplying Radiator Specialty Company with

22  raffinate before you started working there in 1960 --

23     A.  I think if you read through my original answer

24  there, there is a guarded situation where I'm saying I

25  think.

**Transcript of Graeber, James**

01    Q.   You did.  You said, "I believe that is

02  correct, but I'm not sure of that."

03    A.   Yes.

04    Q.   I want to be fair with you.  I'm not trying to

05  put words in your mouth.

06    A.   No, but that's the way I answered it, and that

07  says, basically, to the best of my knowledge, that's it,

08  but it's not necessarily a fact.

09    Q.   But you weren't guessing -- I mean, you knew

10  not to just guess at questions, correct?

11    A.   That isn't a guess.  It's a statement of some

12  doubt.

13    Q.   But you understood the seriousness of giving

14  testimony under oath, didn't you?

15    A.   Correct.

16    Q.   And you understand that today?

17    A.   Yes.

18    Q.   So -- and I take it that you were advised by

19  somebody not to speculate or give guesses about answers

20  to questions; is that true?

21    A.   Yes.

22    Q.   So, when you testified that you thought that

23  was correct, but you weren't sure, you felt as though

24  that was, in fact, true?

25    A.   Say that again.

**Transcript of Graeber, James**

01      Q.   In November of 2000, when you gave your

02  testimony under oath, just like you're doing here today,

03  you believed that before you started at U.S. Steel in

04  about 1960, that there had been a relationship between

05  Radiator Specialty Company and U.S. Steel regarding the

06  sale of raffinate, is that what you said?

07      A.   No, I don't believe that's what I said.

08  Somebody else said that, and I guardedly concurred.

09      Q.   You said, I believe that's correct, but I'm

10  not sure of that.

11      A.   Yeah.

12      Q.   Why did you say you believe that is correct?

13      A.   I believed it was correct, but I wasn't sure.

14      Q.   I know, but why, why did you believe it was

15  correct?

16      A.   I probably answered the question incorrectly.

17      Q.   Why do you say that now?

18      A.   Because with the way you're speaking with me,

19  I should have said I don't know.

20      Q.   Well, look, isn't it true, Mr. Graeber, that

21  United States Steel, that their only customer of

22  raffinate was Radiator Specialty company?

23          MS. HART:   Objection, form.

24      Q.   (BY MR. LUBEL)   Is that true or not?

25      A.   I cannot tell you that 100 percent.  I can

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01 only tell you what I think is correct.

02     Q. Tell me what your understanding of that was.

03     A. To the best of my recollection, raffinate was

04 only sold to Radiator Specialty.

05     Q. Why do you say that?

06     A. Up until 1978.

07     Q. Why do you say that?

08     A. Because I was unaware of raffinate being sold

09 to anybody else. I myself was unaware.

10     Q. Well, didn't you believe that the raffinate

11 that existed at U.S. Steel before 1960, before you

12 started working there, was sold to Radiator Specialty

13 Company before you started working for U.S. Steel,

14 because Radiator Specialty Company, at least you were

15 told by your supervisors, was the only customer of that

16 product?

17         MS. HART: Objection, form.

18     A. I didn't learn that until after 1960. I

19 started in Pittsburgh in December of '60.

20     Q. (BY MR. LUBEL) I understand that. But you

21 knew that raffinate was a product at U.S. Steel

22 Corporation shortly after you started working there in

23 1960, correct?

24     A. It would have been mid-'61 before I got to

25 that point. It was not a major product, it was a

```
01  by-product.
02      Q.   I understand that.  But at any rate, at some
03  point in time, whether it be the late '60s or the early
04  '61 time period, you learned that raffinate was a
05  product of the company?
06              MS. HART:  Objection, form.
07      A.   I had to, yes.
08      Q.   (BY MR. LUBEL)  And you knew it was not a
09  product that just started being made when you started
10  working there in '61, correct?
11      A.   I don't know when the benzene refining unit
12  went on stream, but raffinate was produced after the
13  benzene refining facility went into operation.  What
14  that date was, what year, I cannot answer it.
15      Q.   Have you given testimony under oath before
16  today that United States Steel Corporation started
17  making raffinate at the Clairton plant?
18      A.   Clairton?
19      Q.   Clairton plant in 1955?  Do you remember
20  saying that under oath?
21      A.   I could have.  I don't remember exactly.
22      Q.   Let me see if I can refresh your recollection
23  with that.  I'm going to read from the same deposition
24  we went through in the Rector case.  I'm going to read
25  the question to you.
```

**Transcript of Graeber, James**

01          "United States Steel manufactured the

02   raffinate at the Clairton plant, and you don't know when

03   they started manufacturing the material; is that

04   correct?"  And would you read your answer starting on

05   lines 9 through 21?

06      A.   Well, which was the question?

07              MS. HART:  I think you meant 19.

08      Q.   (BY MR. LUBEL)  19 through 21.

09      A.   19.

10      Q.   I apologize.

11      A.   "No, I believe I can say that when the plant

12   started up raffinate began to appear, and that would

13   have been, if I'm not mistaken, 1955."

14      Q.   So, in fact, you believed, at least when you

15   gave that deposition in November of 2000, that that

16   plant of U.S. Steel, the Claremont (sic) plant started

17   making raffinate as early as 1955?

18      A.   At that time I believe it began operation in

19   1955.  On the other hand, I could have been wrong about

20   when it started up.  I was not there.  I wasn't even

21   working for U.S. Steel Corporation in 1955.  I hadn't

22   even graduated with a Bachelors degree in 1955.

23      Q.   I understand.  But when you started working

24   there in roughly 1960, there were people that were

25   working there that had been there before you had?

**Transcript of Graeber, James**

01     A.    Correct.

02     Q.    And you learned the history of the company

03 based upon talking to people that had worked there?

04     A.    Yes.  But it's possible I confused the date.

05     Q.    Okay.  Well, look, I agree with you, it's

06 possible everything you've said in-between today's

07 deposition and the prior testimony you've given is

08 completely confusion and wrong.  I'll grant you that.

09          But was it your belief when you gave that

10 testimony in November of 2000, that that was an accurate

11 statement, that, in fact, raffinate was on-line at the

12 Claremont U.S. Steel facility in 1955?

13     A.    Clairton.

14     Q.    Clairton.  Do you agree with that?

15     A.    It was my belief it started in 1955.

16     Q.    Thank you.  Now, what is your understanding as

17 to why United States Steel Corporation manufactured

18 raffinate?  We know they wanted to make money, but what

19 is the technical explanation?

20     A.    Raffinate was a by-product of a Udex

21 extraction, which is separation of aromatics from

22 nonaromatics in an organic chemical stream.  The

23 nonaromatics are what is called the raffinate in the

24 Udex process.  And by nature, you cannot extract all of

25 the aromatic materials, but you strive to do the best

# Graeber, James
### Rhyne Trial Master

01 job possible.  Raffinate is a naturally occurring
02 material.
03     Q.   Raffinate is?
04     A.   In this system.
05     Q.   In the process?
06     A.   Yeah.
07     Q.   So, it was a by-product, and it was something
08 that United States Steel Corporation could sell for a
09 profit, true?
10     A.   It was something that U.S. Steel Corporation
11 strived to sell for a profit.
12     Q.   Well, I mean, you know enough about the
13 company to make a statement that United States Steel
14 Corporation would not have been in the raffinate
15 business for almost 30 years if they couldn't make money
16 doing it; is that true?
17          MS. HART:   Object to form.
18     A.   There was no choice raffinate occurred, you
19 either burn it or sell it, and they were not really
20 equipped to burn.
21     Q.   (BY MR. LUBEL)  So, they had to get rid of it
22 some way, and they chose to sell it?
23     A.   That's correct.
24     Q.   True?
25     A.   Yes.

Obj:
Form

Obje
ctio
n:
Cont
inui
ng

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

Page 41



Continuing Objection

```
01      Q.   And they chose to sell it to Radiator
02 Specialty Company?
03      A.   Correct.
04      Q.   And you're not aware of any other customers
05 that bought this raffinate that contained benzene,
06 correct?
07      A.   Raffinate as raffinate, correct.
08      Q.   But the raffinate from United States Steel
09 Corporation contained benzene, true?
10      A.   Normally, it did.
11      Q.   Now, the amounts may have varied, and I've
12 seen you have given testimony on that before, but there
13 was benzene in it, true?
14      A.   Correct.
15      Q.   And as I appreciate it, it's your belief that
16 the concentration of benzene in the raffinate varied
17 somewhere between one percent and 14 percent, is that an
18 accurate statement?
19      A.   I think so.
20      Q.   And you've seen the -- you've seen the
21 documentation from U.S. Steel where their chemists, in
22 fact, said that the minimum concentration of benzene in
23 the raffinate, the minimum amount was five percent,
24 you've seen that document in depositions, correct?
25      A.   Correct.
```

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

# Graeber, James

## Rhyne Trial Master

01    Q.  And I think that you're aware that United

02  States Steel Corporation, they actually measured the

03  concentration of benzene in the raffinate on at least a

04  daily basis?

05    A.  That is correct.  When the Udex Unit was

06  running, and it's done basically to know that you're

07  operating as best you can, because the desired amount of

08  benzene in raffinate is zero.

09    Q.  But you can't get there?

10    A.  That's correct.

11    Q.  So -- but at any rate, my point is, U.S. Steel

12  knew every single day that they produced raffinate that

13  there was some component of benzene in it?

14    A.  That the component of benzene was present.

15    Q.  In the raffinate?

16    A.  Yes.

17    Q.  So, there is no doubt in your mind that when

18  United States Steel Corporation was selling the

19  raffinate to Radiator Specialty Company, that the

20  company knew that there was benzene in the product?

21    A.  Correct.

22    Q.  And that benzene would vary between one

23  percent and 14 percent?

24    A.  Yes.  I'll answer it that way.

25    Q.  Now, to your knowledge, did United States

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

Case 3:18-cv-00197-RJC-DSC   Document 311-2   Filed 09/02/20   Page 45 of 131
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 238 of 1330

```
01   Steel Corporation, did they provide these daily

02   measurements of the benzene concentrations to Radiator

03   Specialty Company, so that they would know whether the

04   percentage was one percent or two percent or three

05   percent or on the high side of 14 percent?

06        A.   No, we did not do that on a routine basis.

07        Q.   How often did you tell Radiator Specialty

08   Company how much benzene there was?

09        A.   Whenever they inquired.

10        Q.   And how many times did you talk to them about

11   it?

12        A.   Once, maybe twice.

13        Q.   Who did you speak to about it?

14        A.   I think there is a name in correspondence in

15   here.

16        Q.   The chief chemist for Radiator Specialty

17   Company?

18        A.   I believe so.

19        Q.   Mr. Kologiski?

20        A.   Yeah.

21        Q.   Mr. K.?

22        A.   Okay.

23        Q.   Just because we can't pronounce it.

24        A.   Okay.

25        Q.   Whatever his name was at Radiator Specialty
```

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01    Company, that's who you spoke to once or twice?

02        A.    I've spoke to another person, too, Theobaldo

03    Tames or something.

04        Q.    What, was he a chemist, too, to your

05    knowledge?

06        A.    I think so.

07        Q.    Can you count on your hands the number of

08    conversations you had with anybody at Radiator Specialty

09    Company?

10        A.    Well --

11        Q.    One or two, two or three?

12        A.    I guess three.

13        Q.    And was, generally, the substance of those

14    conversations about measurements you-all had made about

15    what was in the raffinate, was that generally what they

16    were about?

17        A.    I was asked, I believe, what is the benzene

18    concentration in raffinate, and what I did was have

19    these daily production logs reviewed, oh, let's say over

20    a two-month period, but I can't tell you exactly what it

21    was, so that I wasn't given a single analysis.  And then

22    had people average them and then take the out high --

23    years on the high and the low side, and that's how that

24    data was formed, from production logs.

25'        Q.    But can you remember the substance of your



**Transcript of Graeber, James**

01  conversation with these men from Radiator Specialty

02  Company, do you remember talking about anything else

03  other than the fact that there was benzene in the

04  raffinate and what the percentage was during that

05  period?

06      A.   Not that I know of.

07      Q.   All right.  Well, did you volunteer to

08  Radiator Specialty Company that it was a poison?

09      A.   No.

10      Q.   Did you tell Radiator Specialty Company that

11  it could harm the blood or the blood-forming organs of

12  people that were exposed to it?

13      A.   No.

14      Q.   Did you tell them that it can cause cancer?

15      A.   No.

16      Q.   Did they ask you any of those questions?

17      A.   Not really.  They asked, I believe, because

18  of -- of fear, that benzene would cause some illness,

19  but I don't think at that time it was known what benzene

20  caused.

21      Q.   What time are you talking about?

22           MS. HART:  Objection, form.

23      Q.   (BY MR. LUBEL)  What time are you talking

24  about?

25      A.   1967, '68.

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01     Q.   So you don't --

02     A.   Somewhere in that area.

03     Q.   All right.  In that area, you do not believe

04   that the industry knew what benzene could do to people?

05     A.   I do not believe that they had facts

06   assembled, enough data put together that any kind of a

07   conclusion could have been formed as to what maximum

08   exposure to benzene should be set.

09     Q.   If they did know, they didn't tell you?

10     A.   That's correct.  But I don't know who it was

11   that would have told me.  The government was looking at

12   it.  Industry was looking at it.

13     Q.   Well, let me ask you this --

14          MR. RILEY:  Objection, form.

15     Q.   (BY MR. LUBEL) -- during this time period of

16   '67 and '68, we'll call it the late '60s, if you will,

17   did U.S. Steel Corporation have medical personnel that

18   worked at the company?

19     A.   Yes, they did.

20     Q.   They had a medical department, correct?

21     A.   Correct.

22     Q.   They had industrial hygienists, correct?

23     A.   I'm not positive, but I believe so.

24     Q.   Okay.  And did -- do you understand that

25   industrial hygienists, that their job is to identify,

**Transcript of Graeber, James**

01 evaluate and control hazards in the workplace?

02     A.   I don't know if I know what their job

03 description was or what their particular duties were.

04     Q.   All right.

05     A.   And the reason I say that is because this was

06 United States Steel Corporation.

07     Q.   The only point I'm trying to make,

08 Mr. Graeber, is that when you make a statement that your

09 company did not know of the hazards of benzene in the

10 raffinate, the point I'm trying to make is that you

11 personally can't speak for what the company knew,

12 correct?

13     A.   That's correct.

14     Q.   In other words, that wasn't your job to assess

15 the hazard of benzene or any other chemical they used

16 out there, right?

17     A.   That's correct.

18     Q.   So, you're hoping, as a human being and former

19 employee of United States Steel Corporation, that they

20 didn't know?

21            MS. HART:  Object to form.

22     A.   No, I think I wouldn't say hoping, I'm saying

23 I don't know.

24     Q.   (BY MR. LUBEL)  I understand that.  But the

25 reason you'd make a statement that they didn't know,

**Transcript of Graeber, James**

01 that you'd make a guess like that, is because you, in

02 your mind, think that the company that you worked for,

03 for a number of years, that if, in fact, they knew of

04 the hazards of benzene, you hope they would have told

05 you, correct?

06                 MS. HART:  Object to form.

07     A.   I can only say that I feel that if they had

08 enough firm information and fact information that they

09 would have said something, but I cannot tell you what

10 point they know and how much they knew at any given

11 period.

12     Q.   (BY MR. LUBEL)  Do you agree, sir, that a

13 responsible company that manufactures chemicals has an

14 obligation to warn their employees about the hazards --

15 health hazards of such chemicals?

16     A.   Yes, I do.

17     Q.   And to the extent that that company that's

18 manufacturing these chemicals that can hurt people, to

19 the extent that they know or should know of those

20 hazards, do you agree that they should pass on

21 information to their customers that are purchasing it?

22     A.   Yes.

23     Q.   And would you agree, sir, that -- that the

24 customer that is purchasing the potentially hazardous

25 chemicals, if they're putting those hazardous chemicals

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01    in a product, that they should, in turn, pass it on to

02    the consumer, people that are buying it, using it and

03    are potentially exposed to it?

04             MS. HART:  Objection, form.

05      A.   If there is enough information available as to

06    definitive problems with a chemical contained in a

07    material, then it should be disseminated.

08      Q.   (BY MR. LUBEL) You --

09      A.   But once -- once there is enough information,

10    and I don't know, because I'm not in that field, or

11    never was in that field, how you define "enough

12    information" --

13      Q.   Were you --

14      A.   -- in fact.

15      Q.   Were you aware, sir, that United States Steel

16    Corporation started manufacturing benzene as early as

17    1918?

18      A.   I have heard that, but I certainly can't say

19    for sure that it was 1918.

20      Q.   But you learned that from working around

21    people at United States Steel Corporation, correct?

22      A.   I think so, yeah.

23      Q.   And you've testified about that before, that

24    you believe that to be true?

25      A.   I think I did.

**Transcript of Graeber, James**

# Graeber, James

Rhyne Trial Master

01     Q.   And are you aware of any studies that United

02 States Steel Corporation did to determine whether or not

03 benzene was, in fact, dangerous?

04     A.   I am not aware of any studies that U.S. Steel

05 did.

06     Q.   Are you familiar with a organization called

07 the American Petroleum Institute?

08     A.   I know of it.  I'm not real familiar with it.

09     Q.   Well, if, in fact, the American Petroleum

10 Institute, in 1948, said that there is absolutely no

11 safe level of exposure to benzene, do you believe that's

12 something that people using those products should be

13 told about?

14           MS. HART:  Objection, form.

15     A.   I'm not sure I know what that statement meant,

16 there is no safe level.

17     Q.   (BY MR. LUBEL)  Have you ever seen the API

18 1948 study?

19     A.   No.

20     Q.   Were you --

21     A.   Not that I know of.

22     Q.   Were you aware that it was sponsored by the

23 American Petroleum Institute, made up of large

24 companies, oil companies?

25     A.   I've never seen the study.  I do not know what

**Transcript of Graeber, James**

01 you're speaking of, and therefore, I don't know how to

02 answer that question.

03     Q.   Well, if, in fact, there was a study that was

04 sponsored by members of the American Petroleum

05 Institute, in 1950 -- in 1948, at least the results were

06 in 1948, and that Harvard doctors and experts from the

07 Harvard Medical School, in particular Dr. Drinker, who

08 is a noteworthy expert, had written that there was no

09 safe level of benzene exposure, if all that is true,

10 would you agree that that information should have been

11 passed on to people using the product?

12             MS. HART:  Objection, form.

13     A.   Looking at it from this point and as now, it

14 probably should have been, but I must tell you that I

15 don't know what they mean by no safe level.

16       Did they measure that in percentages, or parts

17 per million and how well were they able to, in 1948,

18 determine the concentration of benzene?  I don't know.

19 But gas chromatography, I don't believe, was even in its

20 infancy in 1948.

21       So, what are you speaking of when you say no

22 safe level?  In other words, one percent?

23     Q.   Here's what I'm telling you, Mr. Graeber, is

24 that, were you aware that in the late 1800s, there was

25 reports of benzene poisoning people?

**Transcript of Graeber, James**

01    A.    No, I was not aware.

02    Q.    And how about the 1930s, that there was a risk

03  of leukemia, that people were getting leukemia from

04  working around benzene?

05    A.    I was not aware.

06    Q.    And, in fact, because of these reports, the

07  American Petroleum Institute started studying benzene,

08  and, in fact, learned, or at least their report stated,

09  that there was no safe level of exposure to it?

10           MS. HART:  Objection, form.

11    A.    My answer is, I was not aware.  This is the

12  first time that I've heard it today.

13    Q.    (BY MR. LUBEL)  Well, let me ask you this,

14  when did United States Steel Corporation tell you that

15  the benzene in their plants could hurt you?  I'm not

16  talking about from a flammability standpoint.  I'm

17  talking about, if you're exposed to it, it can cause you

18  serious injury or death.

19    A.    I personally was not -- I was -- pardon me.  I

20  personally was not told --

21    Q.    Ever?

22    A.    -- of that.  By anybody I directly worked for.

23    Q.    Nobody you worked for at the company ever told

24  you that?

25           MS. HART:  Object to form.

**Transcript of Graeber, James**

01      A.   Not that I recall.

02      Q.   (BY MR. LUBEL)  Did the company ever tell you

03  that you needed to wear a respirator around benzene, and

04  tell you the reason you need to wear a respirator is

05  because it can cause serious injury or death?

06      A.   No.

07      Q.   Did the company ever tell you --

08      A.   Excuse me.  When you say, did the company, I'm

09  not sure I know what you mean.  Was there a corporate

10  letter, or did somebody mention it to me?

11      Q.   That's what I'm asking you.

12      A.   Casually or pointedly?

13      Q.   That's what I'm asking you.

14      A.   What?

15      Q.   What's your answer to that?

16      A.   Did someone mention it casually or pointedly?

17      Q.   Correct.

18      A.   Fellow workers had mentioned that you could

19  have a blood problem, they thought.

20      Q.   When was that?

21      A.   Oh, 1959 to early '60.

22      Q.   Now, who were these fellow workers?

23      A.   I was a relief foreman in the coal chemical

24  unit, and we produced what today would have been called

25  a very crude benzene through an acid washing process,

Obj:
402
All on
page

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

01   and the conversation would come up once in a while when

02   we were handling or draining a vessel.

03       Q.   These weren't company officers that were

04   telling you this, were they?

05       A.   No.  Absolutely not.

06       Q.   These were working stiffs?

07       A.   Like I was.

08       Q.   That's what we call them in Texas.

09       A.   Okay.

10       Q.   The working man and woman that --

11       A.   Thanks for the compliment.

12       Q.   -- that doesn't office, you know, in the air

13   conditioning, they're the working stiffs, correct?

14   Those are the people you're talking about?  Can you

15   remember their name?

16       A.   No.

17       Q.   Now, did you ever, once you got that

18   information, go to any of the managers, the supervis --

19   supervisory-type people, and say, look, I'm hearing

20   reports from my coworkers that this -- I hear that this

21   benzene can cause damage to the blood or the

22   blood-forming organs, what -- what am I supposed to do

23   about it?

24       A.   I never asked that question.

25       Q.   And I take it --

Continuing Objection

GRAEBER, JAMES - (COWEY) VOL 1

**Transcript of Graeber, James**

Case 3:18-cv-00197-RJC-DSC   Document 311-2   Filed 09/02/20   Page 57 of 131
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 250 of 1330

01    A.   I never worried about it.

02    Q.   Well, did you believe in this 1950, 1960

03  time -- '59 or '60 time period, that if there was, in

04  fact, a real potential problem with this, that the

05  company would tell you about it, and tell you how to

06  handle it?

07    A.   I would have felt that if they felt there was

08  a real problem, I would have been told.

09    Q.   And told in a serious format, like a training

10  session or a policy and procedure manual or something of

11  that kind?

12    A.   Oh, I would expect even a -- a letter being

13  issued, but I was not told --

14    Q.   And that never happened?

15    A.   -- nor -- not that I know of.

16    Q.   You never remember getting a letter to that

17  effect, correct?

18    A.   No.

19    Q.   Now, did you think when you were having these,

20  you know, two or three conversations with the Radiator

21  Specialty people that you should pass on this

22  information that you had heard in 1959 or 1960, or was

23  your thought process, I don't need to pass this on

24  because it may or may not be true because the company

25  has never given me information on it?

**Transcript of Graeber, James**

01    A.    I never confronted myself with that particular

02  balance on the question.  I believe that my information

03  at the time was no better than what Radiator Specialty

04  had.

05    Q.    Well, how do you know that?

06         MR. RILEY:  Objection, form.

07    A.    I don't.  I said I believe.

08    Q.    (BY MR. LUBEL)  Well, how -- how -- why do you

09  think that Radiator Specialty, in 1959 or 1960, would

10  know what you had heard, and that is, that the benzene

11  could damage the blood or the blood -- blood-forming

12  organs?  Why do you say that?

13    A.    I was told that you could have a blood problem

14  period.  Not organs, nothing brought in that way.

15    Q.    But why do you think --

16         MS. HART:  Let him finish his answer.

17    Q.    (BY MR. LUBEL)  Why do you think Radiator --

18         MS. HART:  Let him finish his answer.  He

19  wasn't complete.

20    A.    The people that were telling me this were

21  people that were in the plant as foremen and not

22  particularly educated in the products and their effects

23  at all.  They were not -- they were very far from

24  being --

25    Q.    (BY MR. LUBEL)  A chemist?

**Transcript of Graeber, James**

01    A.   -- an accurate -- or an accurate source of

02   that information.

03    Q.   So your point is, if these people at U.S.

04   Steel Corporation, that are not sophisticated from an

05   educational standpoint, if they know of this, then,

06   clearly, you thought the Radiator Specialty people would

07   know of it, is that your analysis?

08    A.   No.

09    Q.   Okay.  What's your analysis?

10    A.   I think you're putting words into my mouth.

11    Q.   Well, then, tell -- let me ask the question.

12   Why do you believe that Radiator Specialty Company, or

13   its employees, that they would know what you had heard

14   in 1959 or '60 about benzene potentially causing damage

15   to the blood?

16    A.   I never said that I believe that they knew

17   this in 1959 or '60.  1959 or '60 was when I would have

18   been working in the plant and had the casual

19   conversation.

20    Q.   When do you -- you don't know when they knew

21   about it, or if they ever knew about it, correct?

22    A.   I believe that in one of the phone

23   conversations I had with one of the two individuals,

24   that they brought up that benzene is being looked at, I

25   don't know whether it was as a carcinogen, or as a

**Transcript of Graeber, James**

```
01   leukemia causer, or something of that nature, and that

02   is why they wanted to look at benzene concentration.  I

03   cannot tell you the year that it occurred.

04       Q.   Can you tell us who you spoke to?

05       A.   It would have been either Kologiski or Tames.

06   I think those are the two names.  By the way, I think I

07   pronounced it correctly.

08       Q.   Kologiski or Tames?

09       A.   Yes.

10       Q.   So we won't call him Mr. K. anymore.

11       A.   No.

12       Q.   All right.  Let me -- let me mark as Exhibit

13   Number 2, a document that your lawyers have furnished to

14   you, and ask you if you can identify that for us?

15                 (Exhibit 2 marked.)

16       A.   Okay.  What do you want me to do?

17       Q.   (BY MR. LUBEL)  Do you -- do you recognize it?

18       A.   Yes, I do.

19       Q.   Do you rec -- look at the first page, it's got

20   your name on it, right?

21       A.   Uh-huh.

22       Q.   Is that a yes?

23       A.   Yes.

24       Q.   Is that your signature?

25       A.   It sure is.
```

**Transcript of Graeber, James**

01    Q.   Okay.  Is that a true and correct copy of a

02  letter that you sent to Radiator Specialty Company?

03    A.   As far as I am able to ascertain it, at this

04  point, it is correct.

05    Q.   What's the date of it?

06    A.   It is May 25th, 1977.

07    Q.   And in that letter you're telling somebody

08  from Radiator Specialty Company that you can't send them

09  a Safety Data Sheet on raffinate, aren't you?

10    A.   I stated that, and they were being reviewed at

11  that time for republication.  I'm pretty positive that

12  that's what occurred.  And when they are reviewing

13  things, the committee that had that said, we do not

14  issue anymore until we check these Safety Data Sheets

15  for accuracy, et cetera.

16    Q.   Well, what was Radiator Specialty Company's

17  employees supposed to do in the meantime while your

18  committee is reviewing the Safety Data Sheets?  Are they

19  supposed to go out and do their own research on the

20  hazards of your product?

21    A.   I don't know.

22    Q.   What are they supposed to do to protect

23  themselves?

24    A.   I don't know.

25    Q.   Well, did you think about that?

**Transcript of Graeber, James**

# Graeber, James

### Rhyne Trial Master

01    A.    I gave them information from a chemical
02    constituency.
03    Q.    Where does that letter say that the benzene
04    can damage the blood?
05    A.    The letter I wrote doesn't say a thing about
06    it.  That wasn't the question.
07    Q.    Well, let me ask you this, why, in here, does
08    it say -- I'm going to read it and I'll give it right
09    back to you -- the second paragraph says, "As I
10    explained to you, I'm unable to furnish you a Safety
11    Data Sheet for this product at this time."  And by this
12    product we're talking about raffinate, correct?
13    A.    Correct.
14    Q.    And then it goes on to say, "We will forward
15    one to you when the basis for necessary information is
16    firmly established."
17         What did you mean by that?  What basis for
18    necessary information are you talking about?
19    A.    I cannot accurately answer your question.
20    Q.    Because you don't remember the conversation?
21    A.    No.  I -- I remember a bit about the
22    conversation, but when you're reviewing data and
23    statements of this nature, there had to be a concurrence
24    of a committee, and it's basically saying I cannot
25    furnish you with the Safety Data Sheet at this point,

**Transcript of Graeber, James**

# Graeber, James

## Rhyne Trial Master

611, form

602,
speculation

602,
speculation
611,
nonresponsive

```
01  but I believe that they had received one in the past.
02      Q.   You have no basis for that.  You didn't send
03  them one, did you?
04              MS. HART:  Objection, form.
05      A.   No.
06      Q.   (BY MR. LUBEL)  So you don't know if they got
07  one?
08      A.   I believe they got one.
09      Q.   You believe.  But you don't know that they got
10  one?
11      A.   Well, we'll go back to some of my other
12  statements where I used that type of wording and you
13  come back to me with it --
14      Q.   I'm asking you right now.
15              MS. HART:  Let him finish his statement.
16      Q.   (BY MR. LUBEL)  Do you know --
17      A.   I believe that they had received a Safety Data
18  Sheet prior to this time from USS Chemicals, because I
19  believe there was one that was put together earlier than
20  this time period, and the only reason to put it together
21  would have been for dissemination to your only customer.
22              MR. RILEY:  Objection, responsiveness.
23      Q.   (BY MR. LUBEL)  Who put it together?  Who put
24  it together?
25      A.   The people that were in the committee that
```

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

(01)  started the form for Safety Data Sheets.

(02)       Q.   Who were they?

(03)       A.   I don't know at this point.

(04)       Q.   All right.  So you don't know who the people

(05)  were that were on this alleged committee, correct?

06              MS. HART:  Objection, form.

(07)       A.   I believe I knew at the time, but I don't know

(08)  now.

09         Q.   (BY MR. LUBEL)  All right.  Now, you were

10    never furnished with a Safety Data Sheet, that's what

11    you told us earlier, correct?

12         A.   That is correct.  Not when I was in a plant.

13         Q.   All right.  Not when you worked -- were you

14    ever furnished the Safety Data Sheet as an employee of

15    the company?

16         A.   No.

17         Q.   Did you ever -- were you ever asked to

18    participate in what it should say?  Anybody ask you your

19    opinion?

20         A.   No.

(21)       Q.   And you didn't personally drop this alleged

(22)  Safety Data Sheet in the mail to Radiator Specialty

(23)  Company, did you?

(24)       A.   No.

(25)       Q.   Did you ever tell somebody in your office,

**Transcript of Graeber, James**

01) mail one to Radiator Specialty Company?  Did you ever do

02) that?

03)     A.   No.

04)     Q.   Can you tell us anybody that you know did?

05)     A.   I am -- I cannot name anybody.

06)     Q.   Can you think of an event, go back to whatever

07) this time period is, the '60s or '70s, and think to

08) yourself and say, you know what, I remember during this

09) time period overhearing somebody in the offices or in a

10) plant say we mailed this to Radiator Specialty Company,

11) do you ever remember that?

12)     A.   I cannot remember that, no.

13)     Q.   Do you ever remember anything like that?

14)     A.   No, but I -- the person that I worked for was

15) part of the group, his name was Frank Sedlack, and I at

16) times would hear from him about, either through

17) grumbling or what he might call communication, that this

18) information was being put together, and at that point I

19) knew that the only direction or reason for doing that

20) would have been for Radiator Specialty, because they

21) were the only customer of the raffinate --

22)           MR. RILEY:  Objection, responsiveness.

23)     A.   -- at the time.  And the document had no

24) reason to exist internal ly in a file cabinet.  It was

25) put together for a purpose.  And I have to assume that

**Transcript of Graeber, James**

611, non-responsive

602, speculation

```
01   somebody, and it wasn't me, because I basically wasn't
02   allowed to furnish that information at that time.
03        Q.   (BY MR. LUBEL)  Why?
04             MR. RILEY:  Objection, responsiveness.
05        Q.   (BY MR. LUBEL)  Why couldn't you furnish it?
06        A.   Because I was not the contact for Radiator
07   Specialty.  If they called me, I could reply, but on
08   occasion, sometimes I would have to have someone else
09   answer the question.
10             It was policy about who was the contact for
11   the customer, the salesman, the sales manager, versus,
12   at that time, the technical representative, which is
13   what I was.
14        Q.   Well, did you work at this plant that made the
15   benzene?
16        A.   Did I work?
17        Q.   At the plant?
18        A.   At Clairton?
19        Q.   Right.
20        A.   No, I never actually worked at Clairton, only
21   Gary.
22        Q.   Where was the raffinate made?
23        A.   At Clairton.
24        Q.   Did you ever visit the plant?
25        A.   Yes, I did.
```

**Transcript of Graeber, James**

01     Q.   For what type of reasons? Why would you go

02 there?

03     A.   To educate myself. That was the original

04 intent.

05     Q.   Did you see this unit where it was being made?

06     A.   Yes, I did.

07     Q.   Did you see workers walking around there?

08     A.   Absolutely.

09     Q.   When was the first time you were there?

10     A.   In 1961.

11     Q.   What type of protection were those workers

12 wearing around that raffinate?

13     A.   Nothing.

14     Q.   Not a thing?

15     A.   Correct.

16     Q.   No respirator?

17     A.   No.

18     Q.   No handkerchief?

19     A.   No.

20     Q.   No gas masks?

21     A.   No. There were none that I saw.

22     Q.   How about, were they wearing any rubber

23 gloves?

24     A.   Oh, I think at times they wore gloves, but I

25 don't know whether they were rubber or fabric.

**Transcript of Graeber, James**

01    Q.    Now, did you go back to the plant on occasion?

02    A.    I did.  Throughout the years, I did go back

03 there.

04    Q.    Now, at any time throughout the years, did you

05 ever see it change to where those people were wearing

06 protection around the raffinate?

07    A.    Not that I recall.

08              MR. LUBEL:  Can we take a short break?  I

09 think I'm almost done.

10              MS. HART:  All right.

11              MR. LUBEL:  Is that all right with you,

12 Mr. Graeber?

13              THE WITNESS:  Yeah.

14              VIDEO OPERATOR:  The time is 10:29 a.m.

15 We'll go off the video record.

16              (A break was taken from 10:29 to 10:37.)

17    Q.    (BY MR. LUBEL)  Mr. Graeber, we took a short

18 break so that everybody could get a drink and go to the

19 restroom, correct?

20    A.    I believe so.

21    Q.    All right.  And during the break, I've shown

22 you what I had earlier marked as Exhibit Number 1, which

23 is a Notice of Deposition.

24    A.    Okay.

25    Q.    Correct?  All right.  And can you tell from

**Transcript of Graeber, James**

# Graeber, James

## Rhyne Trial Master

01  looking at it, that -- that generally what I've asked
02  for is for the corporations that you used to work for,
03  to provide representatives to speak on the company's
04  behalf?  You understand that's generally what we're
05  doing here today?
06      A.   Yes, I do.
07      Q.   All right.  And in particular, I asked for the
08  company to designate people most knowledgeable about
09  like document retention and destruction policies and
10  procedures, and that wasn't your area, true?
11      A.   That is correct.  It is not.
12      Q.   And the company's membership and/or
13  affiliation with industry or trade groups, that was not
14  your job?
15      A.   Correct.
16      Q.   All right.  And in this case, you were not
17  asked to search and locate any documents that I had
18  asked for, for my clients, correct?
19      A.   Correct.
20      Q.   And although we've asked you questions today
21  about the relationship between U.S. Steel, USX,
22  Aristech, Marathon, et cetera, you're not -- you're
23  clearly not the person most knowledgeable about those
24  relationships, if any?
25      A.   That's correct.

**Transcript of Graeber, James**

01    Q.    So, what you have done, at our request, was

02    you've actually looked at Exhibit Number 1, the

03    deposition, and you circled the areas for which you had

04    anything to say about; is that true?

05    A.    Correct.

06    Q.    And you've marked defendant's sales of

07    benzene-containing products to Radiator Specialty

08    Company, and by that it says, in part, and we had a

09    discussion off the record with your lawyer present

10    wherein you told us that you knew that raffinate that

11    contained benzene was sold to Radiator Specialty over a

12    number of years, correct?

13    A.    Correct.

14    Q.    But you're not the person that actually knows

15    where the records are that reference that, right?

16    A.    That is correct.

17    Q.    That would be in a different department?

18    A.    Yes.

19    Q.    All right.  So, that's why you said in part

20    you know that it happened, but you can't testify all the

21    years that it happened and things of that nature?

22    A.    That is correct.

23    Q.    All right.  You also know, and you've told us

24    about, some testing that was done on the raffinate, and

25    we talked about that, that's the daily testing that was

**Transcript of Graeber, James**

01  done to determine the relative components, or

02  ingredients, if you will, of the raffinate?

03      A.    Well, it was done as a control to minimize

04  benzene and it's analogs in the raffinate.

05      Q.    But at any rate, those -- those daily test

06  results also told you components other than benzene and

07  their relative amounts in the product?

08      A.    Correct.

09      Q.    Do you know where those daily records would

10  be?

11      A.    No, I do not.

12      Q.    Now --

13      A.    You're talking about a laboratory that was

14  disbanded, and moved, plant shut down, and I have no

15  idea.

16      Q.    But you would rely on the laboratory to

17  provide you with accurate information?

18      A.    Correct.

19      Q.    In other words, you wouldn't take the sample

20  of the raffinate, walk it down to the laboratory and

21  then look at it?

22      A.    No.

23      Q.    That was somebody else's job?

24      A.    Correct.

25      Q.    So you would actually get daily results, or

**Transcript of Graeber, James**

# Graeber, James

## Rhyne Trial Master

01  would you see daily results?

02      A.   No, I did not see daily results because I was

03  not involved with the control of the operation.

04  However, I was privileged to receive the information if

05  I requested it.

06      Q.   And I take it that you didn't ask for daily

07  results?

08      A.   No.

09      Q.   There was times, and I think you talked about

10  it earlier, where you would ask for a couple-month

11  period of time and look at that data?

12      A.   I didn't do it.  I had the person involved in

13  it, I told them what I wanted him to do for me, and he

14  did it, and I took his results.

15      Q.   So you'd look at a summary?

16      A.   He would give me a summary.

17      Q.   All right.  And the reason you would do

18  something like that with regard to raffinate is to

19  report back to the customer, such as Radiator Specialty

20  Company, what those results were?

21      A.   Correct.

22      Q.   But that's not something that you did every

23  month or every day or anything like that?

24      A.   No.

25      Q.   And as a matter of fact, we've only seen maybe

**Transcript of Graeber, James**

01    two documents that reference that area, correct?

02        A.    Uh-huh.

03        Q.    How much benzene and other --

04        A.    Yes.

05        Q.    -- stuff was in the raffinate?

06        A.    I believe there are only two in there.

07        Q.    So that was not something that you did on a

08    regular basis?

09        A.    No.

10        Q.    People in the company were measuring it on a

11    daily basis, but that was not what you did, and you

12    didn't review those tests?

13        A.    Correct.

14        Q.    Was there any other testing on the raffinate

15    that you're familiar with, other than the testing that

16    was done on a daily basis to determine the relative

17    concentrations in the raffinate of the components?

18        A.    None that I know of.

19        Q.    All right.  Are you familiar with any

20    epidemiological or toxicological testing that was done

21    on raffinate?

22        A.    I am not aware of it.

23        Q.    That's not your area?

24        A.    It's not my area, and I've never even heard of

25    anything.

**Transcript of Graeber, James**

01     Q.   All right. And you wouldn't be the company

02 official most knowledgeable about the health hazards of

03 raffinate or benzene?

04     A.   Absolutely, no.

05     Q.   You've told us what you can remember about

06 that, but that's not your expertise?

07     A.   That is correct.

08     Q.   And then, the last area that we asked for was,

09 information supplied by defendants and any subsidiaries

10 to users of raffinate, including instructions,

11 recommendations and warnings, and have you told us

12 everything you know about that so far?

13     A.   I believe so.

14     Q.   All right. Now --

15     A.   Which wasn't much, I guess, but --

16     Q.   But whatever you can remember, you told us

17 about; is that fair?

18     A.   Yes.

19     Q.   Now, I've seen some of your prior testimony

20 where you acknowledge that -- that you, when you were

21 employed by United States Steel Corporation, that you

22 appreciated, since you only had one customer of

23 raffinate, that being Radiator Specialty Company, that,

24 in fact, they were using that for their Liquid Wrench

25 products, correct?

**Transcript of Graeber, James**

Page 73

01    A.  I didn't learn that until one of those two

02 conversations that occurred between either Kologiski or

03 Tames and myself.

04    Q.  All right.  But, at any rate, since you only

05 had one customer of raffinate, being Radiator Specialty

06 Company, if you wanted to, you could have learned, in

07 1960, what they were using it for, correct?

08    A.  I'm not sure that that information was

09 disseminated by Radiator Specialty, and that's where it

10 would have come from.

11    Q.  Yeah.

12    A.  Had to have come from.

13    Q.  But if you would have asked them, they may or

14 may not have told you?

15    A.  That's correct.

16    Q.  Okay.  But you never asked them?

17    A.  I never did, no.  I never had contact with

18 them other than the two times through letters.

19    Q.  Well, there is some discussion in your prior

20 testimony about the fact that you had yourself used

21 Liquid Wrench before, right?

22    A.  Uh-huh.

23    Q.  Is that true?

24    A.  Yes.

25    Q.  And you -- you recognized and appreciated that

**Transcript of Graeber, James**

```
01   Liquid Wrench was a product that was distributed
02   throughout the United States?
03        A.   I knew about Liquid Wrench when I worked
04   during the summer at Linde Crystal Production Plant
05   where they made synthetic sapphire, and they had some
06   machinery there, and one of the machines froze up, and
07   they, pardon my English, but defrosted it with Liquid
08   Wrench, meaning they freed the motor and the unit up.
09        Q.   But I guess my point is, that you knew that
10   product was available to consumers in stores?
11        A.   I had bought some once.
12        Q.   Where?
13        A.   At a hardware store in the area that I lived
14   in.
15        Q.   All right.  Is there any testimony that you've
16   given today that you'd like to change your answers
17   before I sign off?
18        A.   Not that I know of, but --
19        Q.   Well, just --
20        A.   -- after I read it in a couple of months, I
21   probably would find something that I'd say, did I say
22   that?
23        Q.   But as we sit here right now, there is nothing
24   that sticks out in your mind that you think you need to
25   change so that the record is fair and accurate, true?
```

**Transcript of Graeber, James**

```
01      A.   I don't believe so.

02      Q.   And --

03      A.   There might have been some misunderstandings

04 here and there, but I hope I have expressed everything

05 correctly.

06      Q.   You've done your best today?

07      A.   As far as I know.

08      Q.   And as you sit here right this moment, you

09 can't think of anything that you want to tell me that's

10 different than you said earlier, correct?

11      A.   No.

12      Q.   Is that true?

13      A.   That's correct.

14      Q.   And have I been fair and courteous to you?

15      A.   Oh, absolutely.

16           MR. LUBEL:   Thank you very much for your

17 time.

18           THE WITNESS:   Thank you.

19                EXAMINATION

20 BY MR. RILEY:

21      Q.   Mr. Graeber, Jim Riley.  We've met before.

22      A.   Yes.

23      Q.   And I represent Radiator Specialty.  And

24 they're handing me the mike, as I talk softly, so I'm

25 going to put that on.
```

**Transcript of Graeber, James**

01          Mr. Graeber, one thing you said that struck me

02     as kind of odd, and I'm wondering if you made a mistake

03     or meant to say it, I believe I heard you say that the

04     government was investigating benzene in '67 or '68.  Did

05     you mean to say that, or did you misspeak and meant to

06     say '77, '78?

07               MR. LUBEL:  Objection, form.

08               MR. RILEY:  Let me rephrase the question.

09     Q.   (BY MR. RILEY)  Tell me whether or not you

10     meant to say that the government was investigating

11     benzene in '67, '68, or did you misspeak and mean to say

12     '77 to '78?

13     A.   I probably transplanted the dates, but at the

14     same time, they could very well have been looking at it

15     in '67 and '68.

16     Q.   When you were answering Mr. Lubel's questions,

17     did -- is it -- was it your intent to say '67, '68, or

18     did you misspeak and meant to say '77, '78?

19               MR. LUBEL:  Objection, form.

20     A.   I'd have to go back to the question that I was

21     answering.

22     Q.   (BY MR. RILEY)  Okay.  Fair enough.

23     A.   And I don't know what it was at this point.

24     Q.   Well, let me see if I could ask you something

25     else.  You talked about having a conversation with

**Transcript of Graeber, James**

01 somebody at Radiator Specialty, and you mentioned about

02 government regulations. And you told us here today you

03 couldn't remember the year.

04      Now, do you remember having your deposition

05 taken back in May 10th of 2002, in the case of Howard

06 Collins, remember that, sir?

07    A.   May 10th?

08    Q.   Right. 2002. It was taken in Rosemont,

09 Illinois.

10    A.   All right.

11    Q.   And you were asked a question, let me see.

12 I'll read your testimony, on page 12 -- on page 49, line

13 12, "I'm trying to remember exactly whether it was Tames

14 or Kologiski had mentioned that the government was going

15 to be placing threshold limit values on materials for

16 benzene."

17      At line 17, another question: "Now, would

18 this have been your '77 conversation with them?"

19      Answer: "I believe so."

20      Does that -- I'll show it to you. Did I read

21 that correctly?

22         MR. LUBEL:  Objection, form.

23    A.   Where are we here? Okay. Now, what is --

24    Q.   (BY MR. RILEY) First of all, do you remember

25 that to be your prior testimony?

**Transcript of Graeber, James**

01    A.    Yes.

02    Q.    Does it refresh your recollection about when

03 the conversation about government regulations would have

04 occurred with either Mr. Tames or Kologiski?

05    A.    It would have to be within the time frame of

06 that letter.

07    Q.    Okay.  Which would be 1977, correct?

08    A.    I believe so.

09    Q.    Okay.  And that's when the government

10 regulations time period that we're talking about would

11 have been in 1977, that you know of?

12              MR. LUBEL:  Objection, form.

13    Q.    (BY MR. RILEY)  Am I correct or not in that?

14    A.    I don't know when the government started.

15    Q.    Fair enough.  Okay.

16    A.    I don't know when they started coming to

17 conclusions, and then there was furors over what the

18 limits should really be.

19    Q.    Okay.  But, in any event, 1977 was the time of

20 the discussions with one of the representatives with

21 Radiator Specialty about the regulations, as per your

22 prior testimony?

23    A.    Correct.

24    Q.    Now, let's talk generally, in the '60s and the

25 '70s, was benzene a rare chemical, or was it in wide use

**Transcript of Graeber, James**

01    in the United States?

02        A.    Wide use.

03        Q.    Was U.S. Steel the only company that

04    manufactured benzene?

05        A.    Absolutely, no.

06        Q.    How many companies, from your recollection,

07    were in the business of manufacturing benzene in the

08    '60s and '70s?

09        A.    I don't know the answer to that, but it was

10    voluminous.

11        Q.    I believe in prior testimony you've said that

12    it could be as many as 75, is that correct or not?

13        A.    Okay, then.

14        Q.    Sounds reasonable?

15        A.    It's as good as any number I could come up

16    with now.

17        Q.    All right.

18        A.    Of course, that's changed now versus --

19        Q.    Of course.  And I'm talking about the '60s

20    and '70s, there were many companies that were in the

21    business of manufacturing benzene?

22        A.    Yes.

23        Q.    Had wide commercial uses in the '60s and '70s,

24    correct?

25        A.    Yes.

**Transcript of Graeber, James**

# Graeber, James

Rhyne Trial Master

01    Q.    And you've already testified that raffinate

02    was a by-product?

03    A.    Correct.

04    Q.    And benzene, in the '60s and the '70s, was,

05    frankly, the more valuable chemical than the by-product,

06    right?

07    A.    Beyond a doubt.

08    Q.    And from a pure economic sense standpoint, it

09    was absolutely to the company's benefit to get as much

10    of the benzene out of raffinate as possible?

11    A.    Correct.  I believe I stated that today, also.

12    Q.    Now, raffinate also contains a chemical called

13    cyclohexane, correct?

14    A.    Correct.

15    Q.    Now, we have some testimony in this case about

16    Mobil Corporation doing a test on Liquid Wrench.  But

17    I'm not even going to limit my question to Mobil.

18        If any company who did not know the

19    composition of raffinate, and that it had cyclohexane in

20    it, were to test Liquid Wrench, and did not gear their

21    analysis for a separation of cyclohexane and benzene,

22    could cyclohexane overlap benzene and be confused with

23    benzene on the final percentage and get a false reading?

24    A.    Yes.  And speaking of gas chromatography and

25    lumping together of two components --

**Transcript of Graeber, James**

602, foundation

611, leading Radiator Specialty has a unified interest

602, foundation and hypothetical. 611, Leading Radiator Specialty has a unified interest

```
01    Q.    Because they could look the same?
02    A.    -- you had to be able to do a chemical-type
03 separation to get those apart because they boil very
04 close together.  This is the reason that you have a Udex
05 Unit.  You can't separate them by distillation, so you
06 extract one from the other.
07    Q.    And so, when you -- when you confuse
08 cyclohexane with benzene in an analysis, what you're
09 going to get is an artificially high percentage finding
10 of what may be mistakenly believed as benzene, correct?
11            MR. LUBEL:  Objection, form.
12    A.    Correct.
13    Q.    (BY MR. RILEY) Let me ask it again.  Am I
14 correct or not that if a company were to do an analysis,
15 again with the assumption of what I said in my other
16 question where they didn't know the composition of
17 cyclohexane and raffinate, and they were to have a
18 finding of -- and cyclohexane, as you testified, could
19 be confused as overlapping benzene, can you tell me
20 whether or not you could then have an artificially high
21 reading of benzene because it would -- the cyclohexane
22 might be misread as benzene?
23    A.    That is correct.
24            MR. RILEY:  I think that's all of the
25 questions I have, Mr. Graeber.  Thank you very much for
```

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

```
01    your time.  I'll pass the witness.
02              MR. LUBEL:  I've just got -- do you want
03    me to do mine and you can do yours, or do you want to go
04    now?  It's up to you.
05              MS. HART:  You can go ahead.
06              MR. LUBEL:  You may want to --
07              MS. HART:  Go ahead.  We'll wrap it up
08    after you finish.
09              MR. LUBEL:  Okay.
10                   RE-EXAMINATION
11    BY MR. LUBEL:
12        Q.   Who produced raffinate in the United States
13    during the 1960s other than United States Steel
14    Corporation?
15        A.   Any --
16        Q.   I'm asking you for names.
17        A.   I cannot give you names.
18        Q.   Can you name one company other than United
19    States Steel Corporation that manufactured or produced
20    raffinate other than your company?
21        A.   For sale?
22        Q.   Correct.
23        A.   No, I cannot.
24        Q.   How did United States Steel package and
25    deliver the raffinate that was sold to Radiator
```

Obj:
402
All

GRAEBER,
JAMES - (COWEY)
VOL 1

403, waste fo time, cumulative

**Transcript of Graeber, James**

403, waste of time, cumulative

```
01   Specialty Company?
02        A.   It was shipped in tank cars, 10- and
03   20,000-gallon quantities, I believe.  It's possible that
04   an occasional truck was shipped.  I don't know that for
05   sure.
06        Q.   Tank cars, you mean by rail?
07        A.   Yes.
08        Q.   And most of the quantities were 10- to 20,000?
09        A.   Yes.
10        Q.   And how was the product off-loaded from rail
11   or truck into the Radiator Specialty facility, if you
12   know?
13        A.   I have no idea how they did it.
14        Q.   Were any of the radiator -- strike that.
15             Were any of the shipments of raffinate from
16   United States Steel to Radiator Specialty Company
17   delivered by U.S. Steel in 55-gallon drums, say, or
18   other containers?
19        A.   We had no drumming facility at Clairton for
20   benzene and derived products.  There was drumming for,
21   oh, cresylic acids, but that was abandoned, and I can't
22   remember when that was.  It was a totally different
23   area.
24        Q.   As you recall it, the raffinate that was
25   delivered by U.S. Steel to Radiator Specialty was done
```

**Transcript of Graeber, James**

01  in mass quantities?

02      A.   In bulk.

03      Q.   And was there some sort of pipeline that would

04  take it from the unit to the -- to the railcar?

05      A.   In general, in anything that was loaded into

06  tank cars or trucks, you had a storage tank, you had a

07  line that you could utilize from that storage tank,

08  sometimes it would be in common with another one, but

09  they were normally purged with product before you would

10  use it.  It would just go right to the tank car at a

11  loading station, which was a spout that you could swivel

12  into the top of a tank car.

13      Q.   How big was the storage tanks that the

14  raffinate resided in?

15      A.   I believe it was a 200,000-gallon storage

16  tank.  The reason I pick that out is, if we had to load

17  a barge, we had to preload some tank cars and then

18  collect more, and the barges was when the material was

19  shipped as reformate, not raffinate.

20      Q.   Same thing, but different name?

21      A.   Correct.

22      Q.   And as I appreciate discussions you've had

23  before today, the reformate was sold to Ashland Oil

24  Company?

25      A.   Correct.

**Transcript of Graeber, James**

01    Q.    And it was sold via barge?

02    A.    Normally.

03    Q.    And you don't know if there were any warnings

04 or instructions that accompanied the raffinate that went

05 to Radiator Specialty Company, correct?

06    A.    No.  There might have been placards on the

07 cars, but --

08    Q.    I'm talking about when the product was shipped

09 from U.S. Steel to Radiator Specialty Company, do you

10 know of any instructions or warnings that accompanied

11 the product?

12    A.    When you say "instructions," I don't know -- I

13 think at one point we had adopted putting, you'd call

14 them chemical tags or whatever the name was, I can't

15 tell you for sure, onto cars that would have some basic

16 information.

17    Q.    Would it tell on instructions how to use the

18 raffinate?

19    A.    No.

20    Q.    Would it tell about that the raffinate

21 contains benzene, that it's poison?  Would it contain

22 that kind of health hazard information?

23    A.    I don't think it contained that information,

24 no.  I'm not sure, but I don't think.

25    Q.    But as you sit here, you can't tell us that?

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

```
01    A.   No.

02    Q.   Correct?

03    A.   Correct.

04         MR. LUBEL:  Okay.  Thank you.

05              EXAMINATION

06  BY MS. HART:

07    Q.   And I have a few questions, Mr. Graeber.

08  You've talked some about the Udex Unit that was based at

09  Clairton Works, right?

10    A.   Yes.

11    Q.   Just tell us briefly how that worked, how

12  raffinate resulted from the use of the Udex Unit?

13    A.   Okay.  The Udex Unit was put in to separate

14  aromatic hydrocarbons from aliphatic and cycloparaffins.

15    Q.   Excuse me, what -- what product or material

16  were you working with to do this separation?

17    A.   Triethylene and diethylene glycol.

18    Q.   All right.  That's not my question.  My

19  question was, what material were you running through the

20  Udex Unit to separate out like with the glycols you were

21  talking about?

22    A.   We hydro -- hydrodesulfurized light oil, which

23  was the benzene-containing material obtained from

24  coke-oven gas.  And in hydrodesulfurizing, you would

25  form paraffins and cycloparaffins, which were difficult
```

Transcript of Graeber, James

01  to remove by physical separation, such as distillation

02  from the aromatics, meaning benzene, toluene and xylene.

03      Q.   Okay.  And the underlying material you're

04  talking about trying to separate all these other

05  chemicals from was the light oil?

06      A.   Correct.

07      Q.   Okay.  Go ahead.

08      A.   Now, light oil was hydrodesulfurized.  After

09  it was hydrodesulfurized, it was extracted with the

10  triethylene or diethylene glycol, and the benzene,

11  toluene and xylene, under perfectly theoretical usage,

12  would all be absorbed into the glycol.

13          The remaining material, that which was not

14  absorbed in the glycol, was then raffinate.  And I

15  believe that's the definition of it in the UOP, Udex

16  process.

17      Q.   All right.  What is UOP?

18      A.   Universal Oil Products.

19      Q.   Who are they?

20      A.   They owned the patent on the Udex process.

21  They're -- I believe you call them a brain trust for the

22  oil industry.

23      Q.   All right.  So, did U.S. Steel buy the Udex

24  process from UOP?

25      A.   Correct.

**Transcript of Graeber, James**

```
01      Q.   Was the Udex process or -- was that available

02 to other companies?

03      A.   Yes, it was.

04      Q.   Was it purchased by other companies?

05      A.   Oh, I'm sure.

06      Q.   And used in the same way that U.S. Steel used

07 it at the Clairton works?

08                MR. LUBEL:  Form and speculation is my

09 objection.

10      A.   Let me answer it this way, not in exactly the

11 same way, because we were predominantly aromatic, and

12 they were more 50/50 or more aliphatic and cycloparaffin

13 in the string that they would put through, so we were

14 sized differently, and you operate it differently.

15      Q.   (BY MS. HART)  All right.  U.S. Steel used the

16 Udex Unit in the processing of its light oil that was

17 derived from the coke ovens, correct?

18      A.   Yes.

19      Q.   Other companies used Udex Units in the

20 processing of other materials, is that what you're

21 telling us?

22      A.   Normally, reformate from a reformer.

23      Q.   Which -- what material were they running

24 through the Udex Unit?

25      A.   A -- a wide-band fraction that contained
```

**Transcript of Graeber, James**

01 benzene, toluene and xylene, plus its saturated

02 materials; hexane, heptane and also cyclohexane,

03 methylcyclohexane --

04     Q.   Okay.  Well, let me stop you real quickly.

05     A.   Please.

06     Q.   Let me ask you, though, what the -- were other

07 companies, to your knowledge, using the Udex Unit to

08 process light oil that had been derived from coke ovens

09 as U.S. Steel was?

10               MR. LUBEL:  Objection, form.

11     A.   I don't believe so at that time.

12     Q.   (BY MS. HART)  Okay.  Were other companies

13 using Udex Units to process light oil derived from

14 something other than coke-oven gases?

15     A.   If you rephrased that to process other

16 materials other than coke oven, or material derived from

17 coke-oven gas, the answer is, yes.

18     Q.   All right.  So, they were -- you're not aware

19 of other companies using Udex Units to process what was

20 the result of the coke-oven gases?

21     A.   That's correct.

22     Q.   Okay.  And that's what distinguished the U.S.

23 Steel use from the use of others, but other Udex Units

24 were in operation and producing by-products as well,

25 correct?

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

```
01      A.    Not by-products, because you're dealing with a
02  refinery.
03      Q.    Okay.
04      A.    They were just basically separating --
05      Q.    Okay.
06      A.    -- main streams.
07      Q.    All right.  So they were separating just other
08  things.
09            Now, when U.S. Steel finished with the
10  processing through the Udex Unit, what did it do with
11  the raffinate that resulted from that process?  Where
12  did it keep it?
13      A.    Oh, you take it from a day collection tank and
14  transfer it to a storage tank.
15      Q.    Was that that 200,000-gallon tank you referred
16  to in response to Mr. Lubel's questions?
17      A.    Correct.
18      Q.    Okay.  So, the daily analysis that the lab
19  did, was that done -- was that done on the product
20  before it went into the 200,000-gallon tank?
21      A.    Correct.
22      Q.    Okay.  You need to speak up, all right?
23            MR. LUBEL:  For the court reporter, not
24  for us.
25            MS. HART:  All right.
```

**Transcript of Graeber, James**

# Graeber, James

Rhyne Trial Master

01    Q.  (BY MS. HART)  So, if you had a day's analysis

02  that showed 14 percent of benzene in the raffinate for

03  that day, that production would be put into a

04  200,000-gallon storage tank, correct?

05    A.  Correct.

06    Q.  Would other days' productions be added to that

07  200,000-gallon storage tank?

08    A.  Yes.

09    Q.  Okay.  And what was the average, from your

10  analysis, that you requested of benzene in raffinate

11  that was shipped out?

12    A.  At the time that I did that, I believe it was

13  three percent.

14    Q.  All right.

15    A.  Yes.

16    Q.  All right.  Now, you're looking -- you're

17  looking at what's been marked as Exhibit 2, correct?

18    A.  Yes.

19    Q.  All right.  And page 2 of Exhibit 2 is a

20  document that you prepared and forwarded to Radiator

21  Specialty Company; is that correct?

22    A.  Yes, it is.

23    Q.  All right.  And the composition of raffinate

24  is given on this page, correct?

25    A.  Yes, it is.

Transcript of Graeber, James

# Graeber, James

Rhyne Trial Master

01  Q.  I guess it's called approximate composition?

02  A.  Yes.

03  Q.  And tell us what the composition -- tell us

04  how much benzene was in this raffinate, as you

05  approximated it.

06  A.  Well, the ranges were between one and 14

07  percent, and the approximate average of all of the

08  analyses looked at was three percent.

09  Q.  Okay.  Are you aware of any benzene being

10  shipped out directly from a daily production that might

11  be 14 percent to a customer?

12  A.  Any raffinate?

13  Q.  Yes.

14  A.  With a benzene --

15  Q.  With a benzene content --

16  A.  -- content of 14 percent?

17  Q.  Thank you.  Yes.

18  A.  No, I don't think you would find something

19  that high, because of the idea I've mentioned before, if

20  you saw 14 percent the unit wasn't functioning properly

21  and an adjustment would have to be made to try to reduce

22  that.

23  Q.  Okay.  And the intention and purpose, then,

24  would be to reduce the amount of benzene in the next

25  day's production, correct?

Transcript of Graeber, James

611, leading

611, leading

01    A.    Correct.

02    Q.    And that next day's production would be added

03 to the previous day's production in that 200,000-gallon

04 tank, correct?

05    A.    Yes.

06    Q.    And it would go on like that day after day?

07    A.    That is correct.

08    Q.    All right.

09              MR. LUBEL:  We're going to change tapes.

10              VIDEO OPERATOR:  This concludes tape one

11 to the deposition of Mr. James Graeber.  The time is

12 11:15 a.m., and we're off the video record.

13              (A break was taken from 11:15 to 11:16.)

14              VIDEO OPERATOR:  The time is 11:16 a.m.,

15 and we're on the video record.

16    Q.    (BY MS. HART)  All right.  Mr. Graeber, we

17 were looking at page 2 of Exhibit 2, which is the

18 analysis that you prepared and forwarded to Radiator

19 Specialty Company at their request, correct?

20    A.    Yes, we were.

21    Q.    Now, when was this analysis done?

22    A.    Well, the letter and the information was put

23 in print on May 25th, 1977.

24    Q.    All right.  Now, you indicated to Mr. Lubel,

25 that Exhibit 2 seemed to be a true and correct copy of

**Transcript of Graeber, James**

Page 94

```
01    the document you sent to Radiator Specialty.  Let me ask
02    you a couple of questions.
03            Do you know whose handwriting is across the
04    top here?  There is some handwriting on the top right?
05    A.    I have no idea.
06    Q.    Did you write that there?
07    A.    No.
08    Q.    Okay.
09            MR. LUBEL:  What's that say?  I haven't
10    seen that.  Can I look at it real quick?
11            MS. HART:  Sure.  Lance --
12            MR. LUBEL:  I can't read it.
13            MS. HART:  I know.  But my whole purpose
14    is being that I think this stuff was added after he sent
15    the letter --
16            MR. LUBEL:  Okay.
17            MS. HART:  -- you know, and I just want
18    to -- I want to make sure that true and correct
19    doesn't --
20            MR. LUBEL:  Okay.
21    Q.    (BY MS. HART)  Did you put that handwriting on
22    there?
23    A.    No.
24    Q.    Okay.  And this -- there is a stamp on there,
25    "R & D, May 27, 1977," did you put that on there?
```

**Transcript of Graeber, James**

01    A.    No, I did not.

02    Q.    And there is a stamp at the bottom, "RSC

03  000177," did you put that on there?

04    A.    No.

05    Q.    Okay.  On the second page there is an "RSC

06  000178," did you put that on there?

07    A.    No, I did not.

08    Q.    Okay.  But other than that -- oh, and there is

09  a check mark here on the right --

10    A.    Yeah.  I did not put that on there.

11    Q.    -- right margin.  Okay.  Other than that, this

12  document is what you sent, other than those notations

13  that we just pointed out, these documents are what you

14  sent to Radiator Specialty, to the best of your

15  knowledge?

16    A.    Yes.

17    Q.    Okay.  Now --

18            MR. LUBEL:  Is there something good on

19  there that I'm not recognizing?

20            MS. HART:  No.  No.  I'm just --

21            MR. LUBEL:  Okay.

22            MS. HART:  But you asked him true and

23  correct, and --

24            MR. LUBEL:  Now you got me wondering

25  whether I need to get a magnifying glass or something

**Transcript of Graeber, James**

# Graeber, James

Rhyne Trial Master

```
01   to --
02              MS. HART:  No.  No.  No.
03       Q.  (BY MS. HART)  All right.  Mr. Graeber, you
04   had referenced a Safety Data Sheet for raffinate in your
05   earlier testimony, correct?
06       A.  Yes.
07       Q.  Okay.  Let me show you this document and see
08   if you can identify that.
09       A.  Okay.
10       Q.  What is that?
11       A.  I have seen this.
12       Q.  Okay.
13       A.  It's a Safety Data Sheet concerning raffinate.
14   I believe it was the product of a committee that was
15   working on Safety Data Sheets.  I do not know when it
16   was put together.
17       Q.  Okay.  You had earlier testified in earlier
18   depositions, I think, that this was a time period of
19   about 1967 that a committee put together various Safety
20   Data Sheets for USS Chemicals products, do you remember
21   that?
22              MR. LUBEL:  Objection, form.
23       A.  I don't remember the date.
24       Q.  (BY MS. HART)  Okay.
25       A.  I can look at this and see somebody put
```

**Transcript of Graeber, James**

01  5-15-67 on there.

02      Q.  Okay.  All right.  Now, was this a USS

03  Chemicals document?

04              MR. LUBEL:  Objection, form.

05      A.  I certainly believe it was.  I don't -- I

06  mean, there it is, USS Chemical Safety Data Sheet for

07  raffinate.

08      Q.  (BY MS. HART)  Okay.  And in 1967, were -- did

09  USS Chemicals have any responsibility for the production

10  of raffinate at Clairton?

11      A.  No.

12      Q.  Okay.  USS Chemical's responsibility was what

13  as related to raffinate?

14      A.  At that time we were marketers --

15      Q.  Okay.

16      A.  -- of the products produced at Clairton.

17      Q.  You didn't control the production -- USS

18  Chemicals people did not control the production at

19  Clairton?

20              MR. LUBEL:  Objection, form.

21      A.  That is correct.

22      Q.  (BY MS. HART)  All right.  And you at that

23  time were assigned to USS Chemicals, division of United

24  States Steel Corporation, correct?

25      A.  Yes, I was.

**Transcript of Graeber, James**

Page 98

01    Q.    Okay.  And how many people worked in the

02  technical -- your job title was what in the '60s?

03    A.    Technical representative.

04    Q.    Okay.  How many technical representatives were

05  there for USS Chemicals?

06    A.    It depends on when you're speaking.  Probably

07  two at that time.

08    Q.    Okay.  All right.

09    A.    It changed, oh, my guess is around '69.

10    Q.    In 1969, you mean?

11    A.    The organization changed its --

12    Q.    All right.  Okay.  But you were one of two

13  technical representatives that USS Chemicals had --

14    A.    Well --

15    Q.    Let me finish my question, okay?  You were one

16  of two -- or were you one of two technical

17  representatives employed by USS Chemicals to interact

18  with customers on their technical requirements?

19    A.    I was one of two people, but the other person

20  was called the manager of technical service.

21    Q.    Okay.  All right.  Now, for what purpose would

22  USS Chemicals have for preparing the Safety Data Sheet

23  for raffinate in 1967?

24          MR. LUBEL:  Objection, form, speculation.

25    A.    The only reason that I can possibly understand

602, speculation

**Transcript of Graeber, James**

602, speculation

```
01    would be for dissemination to customers, and in this
02    case, there was only one customer for raffinate.
03         Q.    (BY MS. HART)  All right.
04              MR. RILEY:  Objection, responsiveness.
05         A.    Radiator Specialty.
06              MR. RILEY:  Objection, responsiveness.
07         Q.    (BY MS. HART)  All right.
08              MR. LUBEL:  I'll join in that one.
09              MS. HART:  Can you mark this as Exhibit
10    3, please.  Or Defendant's 1.  However you want to do
11    it.
12              (Exhibit 3 marked.)
13         Q.    (BY MS. HART)  All right.  Now, let me show
14    you one more document, Mr. Graeber, and see if you can
15    identify this.  Can you tell us what this is?
16         A.    It's a form letter that Mr. Bill Souder must
17    have put together for dissemination of Safety Data
18    Sheets and products that were in his jurisdiction.
19         Q.    Okay.  Was Mr. Souder the other technical --
20    well, was he employed by USS Chemicals in 1967?
21         A.    Yes, he was.
22         Q.    Okay.  All right.  And did you work with
23    Mr. Souder?
24         A.    I worked with him, but not for him.
25         Q.    Okay.  Were you aware of an effort within USS
```

**Transcript of Graeber, James**

# Graeber, James

Rhyne Trial Master

01 Chemicals to transmit Safety Data Sheets for its

02 products to its customers?

03     A.   I was not involved in the effort, but I was

04 aware of the effort.

05     Q.   Okay. And what -- what can you tell us about

06 what you knew about that?

07           MR. LUBEL: Objection, form.

08     A.   I knew that they were putting together Safety

09 Data Sheets for our products that the MCA, or CMA,

10 depending upon what year it was, did not have Safety

11 Data Sheets established for. We used MCA data -- Safety

12 Data Sheets whenever they were available to cover our

13 products. And --

14     Q.   (BY MS. HART) If there was not a --

15           MR. LUBEL: Objection, responsiveness.

16 Nonresponsive.

17     Q.   (BY MS. HART) If there was not a CMA Safety

18 Data Sheet available for a particular product that USS

19 Chemicals distributed to customers, what did USS

20 Chemicals do in that circumstance?

21     A.   There had been a committee formed for

22 producing Safety Data Sheets, and they were done in

23 accordance with that formulation.

24     Q.   Are you -- are you telling us that USS

25 Chemicals prepared Safety Data Sheets for other

**Transcript of Graeber, James**

# Graeber, James

## Rhyne Trial Master

01  products?

02      A.   USS Chemicals, I don't believe it had

03  representation on the committee.  I think the committee

04  was within USX or U.S. Steel.

05      Q.   Okay.  But somebody at the corporation put

06  together some Safety Data Sheets when they couldn't get

07  Safety Data Sheets for particular products from CMA or

08  the MCA, as it was then called; is that correct?

09              MR. LUBEL:  Objection, form.

10      A.   That's correct.

11      Q.   (BY MS. HART)  Okay.  And at that point what

12  did USS Chemicals do with the Safety Data Sheets,

13  whether they came from the CMA or whether they were

14  prepared by the corporation?

15      A.   I believe that they distributed by a letter

16  such as this to our customers of those products.

17              MS. HART:  Okay.  I'm going to mark this

18  as Exhibit 4.

19              (Exhibit 4 marked.)

20      Q.   (BY MS. HART)  Now, Mr. Graeber, when you were

21  responding to some questions by Mr. Lubel, you indicated

22  that you were in -- you worked in a plant, a U.S. Steel

23  plant, in 1959; is that correct?

24      A.   I went to work November 16th, 1959, so it was

25  that part of '59 on, and then in 1960 until December.

403,
cumulative
602,
lfoundation

**Transcript of Graeber, James**

01    Q.    Okay.  So, from November of 1959 until

02  December 1960, you were working in a steel plant called

03  Gary Works; is that right?

04    A.    Correct.

05    Q.    Okay.  After you left Gary Works, were you

06  ever again employed on a daily basis in a plant?

07    A.    No.

08    Q.    In a production facility?

09    A.    No.

10    Q.    Okay.  Where were -- where did you work?  I

11  mean, physically, where did you work?  Was it a plant or

12  something else?

13    A.    In the office of coal chemical sales, which

14  was in downtown Pittsburgh.

15    Q.    Did you regularly handle products -- chemical

16  products, after 1960?

17    A.    When you say "handled," you mean disseminate

18  information, develop information?

19    Q.    No, no, that's not what I mean.  No.  No.  No.

20  I mean, were you handling, physically handling, or

21  exposed to products on a daily basis, chemical products

22  on a daily basis, in your work in the USS Chemicals

23  division in downtown Pittsburgh?

24    A.    No, I was not exposed to products at that

25  point.

**Transcript of Graeber, James**

01    Q.    Okay.  You would go out into plants from time

02    to time; is that right?

03    A.    Yes.  And it's quite possible I was exposed to

04    them.

05    Q.    Okay.  But your job was basically an office

06    job; is that -- is that fair?

07    A.    An office and an airplane job.

08    Q.    Okay.  All right.  And I just want to ask you

09    one or maybe two questions about the -- I think you

10    referred to some shipping tags that were used by USS

11    Chemicals when it shipped product to customers?

12    A.    Yes, I did at the end.

13    Q.    All right.  Let me ask my question.  What was

14    the purpose of putting shipping tags on tank cars and

15    transportation units?

16    A.    Oh, I believe federal regulations that came

17    out caused those to come about.

18    Q.    Were those shipping tags and things that were

19    physically attached to the shipping container, were they

20    intended for use by the ultimate customer of who was

21    going to receive the product, or were they intended for

22    use during transportation to the ultimate customer?

23            MR. LUBEL:  Objection, form.

24    A.    I would guess or estimate that it was mainly

25    for use during transportation should anything happen.

**Transcript of Graeber, James**

```
01      Q.   (BY MS. HART)  All right.  You were not
02   responsible or employed in the transportation or
03   shipping departments for USS Chemicals, correct?
04      A.   No, I was not.
05      Q.   Okay.
06               MR. LUBEL:  We'll withdraw our objection.
07      Q.   (BY MS. HART)  And you were not employed or
08   had any role in industrial hygiene responsibilities at
09   United States Steel Corporation; is that right?
10      A.   No, I did not.
11      Q.   How about the medical department, did you have
12   any role or responsibilities in that area?
13      A.   No, I did not.
14      Q.   Are you trained in medicine in any way?
15      A.   No, I am not.
16      Q.   Are you trained in industrial hygiene?
17      A.   No, I am not.
18      Q.   Are you trained in toxicology?
19      A.   No, I am not.
20      Q.   Did you ever have any role or responsibility
21   at United States Steel Corporation, USS Chemicals
22   division of U.S. Steel, for toxicology issues?
23      A.   No, I was not.
24               MS. HART:  Okay.  And I want to make
25   this, our letter -- well, actually, the letter from
```

**Transcript of Graeber, James**

Page 105

01  Fulbright & Jaworski to plaintiff's counsel dated

02  October 30 regarding the parameters of this deposition

03  also an exhibit.

04                    (Exhibit 5 marked.)

05              MS. HART:  That's all I have.

06              MR. LUBEL:  All right.  I've just got a

07  few.  Jim, do you want me to go, or do you --

08              MR. RILEY:  Go ahead.

09              MR. LUBEL:  All right.

10                    RE-EXAMINATION

11  BY MR. LUBEL:

12      Q.   Where is the letter that your lawyers had?  Is

13  it Exhibit Number 4?  Is that right, Mr. Graeber?

14      A.   Yes.

15      Q.   Do you see that letter?

16      A.   Yes, I do.

17      Q.   And that's a letter where the lawyer for U.S.

18  Steel was trying to get you to say that U.S. Steel was

19  sending out Safety Data Sheets to their customers,

20  correct?

21              MS. HART:  Object, form.

22      A.   USS Chemicals, and very basically, I state

23  that this was a form letter that was put together for

24  dissemination to customers of products of benzene,

25  toluene and xylene.

**Transcript of Graeber, James**

```
01      Q.    (BY MR. LUBEL)   Yeah, but that letter is
02   signed, isn't it?
03      A.    Yes.
04      Q.    Well -- I mean, it's signed by who?
05      A.    Bill Souder, manager of light oil products.
06      Q.    Well, why would he sign a form letter that's
07   just distributed throughout the company for people to
08   use?
09              MS. HART:   Objection, form.
10      A.    I cannot really answer that, but if I were to
11   guess at it, I would say that all that needed to be done
12   was to put in "Dear whoever," up there.
13      Q.    (BY MR. LUBEL)   So you type over the letter --
14      A.    By the -- by the salespeople.
15              MR. RILEY:   Objection.
16      Q.    (BY MR. LUBEL)   Okay.   Where is the letter
17   from Mr. Souder, at United States Steel Corporation,
18   where he says, "Enclosed please find a form letter that
19   I prepared that people within your department need to
20   send to your customers"?   Where is that?
21      A.    I haven't got any idea.
22      Q.    Did you ever see such a thing?
23      A.    I don't know.
24      Q.    All right.   Now, hold that form letter up
25   there that's got his signature.   Would you show -- hold
```

**Transcript of Graeber, James**

01    it up for the videographer?

02        A.    (Witness complying).

03                    MR. LUBEL:  Can you zoom in on that?

04        Q.    (BY MR. LUBEL)  Now, what happened to the date

05    on that letter?

06        A.    I do not know.

07        Q.    And it doesn't -- it doesn't show who it was

08    sent to, correct?

09        A.    That's correct.

10        Q.    And if you look at the version, do you see

11    these black marks and stuff on the document?  There

12    is -- it looks like it's either a poor copy or like

13    there has been some -- something covering up some stuff

14    on the document.  Do you see that?  Do you see these

15    black marks?

16                    MS. HART:  Objection, form.

17        A.    I see the marks, but I haven't got any idea.

18        Q.    (BY MR. LUBEL)  Okay.  And if you'll hold that

19    document back up for the videographer, you'll see that

20    at the bottom it says, "enclosures."  Do you see that?

21        A.    Yes.

22        Q.    Okay.  Where is the enclosures?

23        A.    I don't know.

24        Q.    Okay.

25        A.    I think it tells you what is supposed to be

**Transcript of Graeber, James**

01 enclosed with it up in the first paragraph.

02    Q.   That's right.  But it -- but it doesn't have a

03 copy attached to this of what the enclosures should look

04 like?  Or what they say?

05    A.   That's correct.

06    Q.   And have you seen any of the actual letters

07 that allegedly went out to the customers, copies of any

08 of those?

09    A.   No.

10    Q.   Have you seen lists that were kept by the

11 company that describe who they were sent to?

12    A.   No.

13    Q.   Anything documented that way?

14    A.   My only guess is that this letter, along with

15 numerous copies of each of the Safety Data Sheets, were

16 sent to the district offices, sales offices, who would

17 then send them to "Dear whoever," up here, and -- pardon

18 me.

19    Q.   That's all right.  Are you okay?

20    A.   Send the Safety Data Sheets along with a

21 filled-out copy.  But that's just my guesstimate as to

22 what occurred.

23           MR. RILEY:  Objection.

24    Q.   (BY MR. LUBEL)  That's a guess, right?

25    A.   That's correct.

**Transcript of Graeber, James**

01    Q.   And the reason that this strikes me as being

02   kind of awkward is because when you look at the letter,

03   Mr. Souder, who was the manager of the light oil

04   products, he was not the person that would have the

05   relationships with the customer, would he?

06    A.   Not the direct contact.

07    Q.   It would be people like you?

08    A.   No.

09    Q.   Who would it be?

10    A.   The salesmen and the sales manager.

11    Q.   Well, wouldn't you --

12    A.   And they were in various districts around the

13   country.

14    Q.   Well, wouldn't you think that the letter with

15   the attachments would actually come from the people

16   within United States Steel Corporation that have the

17   relationship with the customer; in other words, they'd

18   be sending a letter?  Wouldn't that make the most sense

19   to you?

20    A.   I don't think it makes much difference what

21   made the most sense to me.  I'm guessing based on what I

22   believe occurred at that particular time.

23    Q.   And you don't know what that time is?

24    A.   No.

25    Q.   All right.  How many plants did United States

**Transcript of Graeber, James**

01 Steel Corporation have when you started working for them

02 in the '60s?

03     A.   That produced coal chemicals?

04     Q.   No.  Period.  Plants.  Facilities.

05     A.   I have a tough time answering that.  I might

06 be able to tell you how many steel production

07 facilities, but plants by itself, no.

08     Q.   How many steel production facilities?

09     A.   Okay.

10     Q.   Roughly?

11     A.   I've got to count like this.  Nine or 10.

12     Q.   But I take it that United States Steel

13 Corporation did more than just steel plants, they had

14 other --

15     A.   Oh, yes.  But I was trying to count up

16 basically --

17     Q.   No, no.  I appreciate --

18     A.   -- steel production plants.

19     Q.   I appreciate you doing that.  But you

20 recognized, in 1959, 1960 time period, when you started

21 working there, that it was a rather large corporation,

22 correct?

23     A.   Oh, yes.

24     Q.   And they had -- they had work that was even in

25 foreign countries, true?

**Transcript of Graeber, James**

```
01      A.   At that time, I'm not sure.

02      Q.   At some point in time, United States Steel

03  Corporation, their business just didn't encompass the

04  United States, they went into foreign countries?

05      A.   Oh, I know that we sold steel at that time in

06  foreign countries.

07      Q.   And they were not only just in the steel

08  business, they actually had a chemical division that you

09  worked in?

10      A.   It was called the coal chemical sales division

11  originally, and, yes, the export -- U.S. Steel Export

12  Company also would sell to foreign entities.  The volume

13  wasn't real great, but --

14      Q.   Where did the chemical division do business in

15  the United States?

16      A.   Where?

17      Q.   Right.  Did they do business throughout the

18  United States?

19      A.   We had offices throughout the U.S. yes.

20      Q.   And approximately how many employees did

21  United States Steel Corporation have at the height of

22  the company's success?

23      A.   Oh, I could tell you there were 21,000

24  employees at Gary when I worked there.

25      Q.   Just at that one plant?
```

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

Page 112

```
01        A.    Yes.   And I believe the total employees now is

02   probably a little less than that.   But I really don't

03   know --

04        Q.    Times have changed?

05        A.    I would say over 100,000.

06        Q.    At the highest point?

07        A.    Yes.

08        Q.    But not all 100,000 were involved in steel,

09   and not all 100,000 were involved in chemicals, they

10   worked in different areas, correct?

11        A.    That's correct.

12        Q.    Pretty large, sophisticated company, would you

13   agree, over the years?

14        A.    Oh, yes.

15        Q.    And definitely had resources to maintain files

16   and records the way big companies ought to keep them,

17   correct?

18        A.    I can't even assess that.   All I know is what

19   we did with our --

20        Q.    All right.   We -- the jury is going to see

21   documents that go back to the -- to the 1960s.   So

22   somebody decided to keep documents, right?   Some

23   documents?

24        A.    Apparently, yes.

25        Q.    So, my question is, is where are the documents
```

Obj:
402
403
602

GRAEBER,
JAMES - (COWEY)
VOL 1

**Transcript of Graeber, James**

Page 113

Obj:
402
403
602
All
Lines



01 that show the Safety Data Sheets being sent to the

02 customers?  Where are those records?

03     A.  I do not know.  I have no idea.

04     Q.  I mean, you've discussed with us records --

05 you-all have found records that -- that summarize two

06 months' worth of measurements of the raffinate, right?

07 True?

08     A.  Yes.

09     Q.  You've seen those before, not just today, but

10 they're -- they're historical records, correct?

11     A.  Yes.

12     Q.  Corporate archive records, they've been kept?

13 Apparently somebody kept them?

14     A.  Yes, somebody kept them.

15     Q.  So, I'm wondering, if you have any explanation

16 to the jury as to why the company cannot produce to the

17 jury the documents that show the transmittal of these

18 Safety Data Sheets to the customers?

19     A.  I have no idea.

20     Q.  All right.  Now, let's go back and let's talk

21 about the levels of benzene concentrations.  And I'm not

22 going to bicker with you.  I think we discussed this

23 when -- when I first started asking you questions.

24         It's clear that the benzene, as a component of

25 the raffinate, ranged somewhere, in your mind, between

GRAEBER,
JAMES - (COWEY)
VOL 1

Transcript of Graeber, James

Case 3:18-cv-00197-RJC-DSC   Document 311-2   Filed 09/02/20   Page 116 of 131
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 309 of 1330

01  one and 14 percent, and that's what the studies that you

02  looked at showed, correct?

03      A.   Those were during a two-month period, a high

04  and a low.

05      Q.   All right.  And you didn't have those studies

06  compiled for your review on anything other than a

07  two-month period?

08      A.   That's correct.

09      Q.   So, you can't tell this jury with any degree

10  of certainty that on another two-month period that it

11  was actually, you know, two percent as opposed to seven

12  percent, the average, you don't know?

13      A.   That's correct.

14      Q.   You -- but you do feel comfortable saying that

15  the concentration was somewhere between one and 14

16  percent, unless there was a hiccup in the system, true?

17      A.   That's correct.

18      Q.   And, in fact, we talked about this earlier,

19  we've actually looked at, you've seen this before, the

20  1963 document that was actually sent to Radiator

21  Specialty Company, that says the minimum benzene

22  content, the minimum amount is five percent, you've seen

23  that before?

24      A.   I saw that, yes.

25      Q.   And that was at a time period where you were

**Transcript of Graeber, James**

01   not asking for summaries of what the results were,

02   correct?

03       A.   That's correct.

04       Q.   So, for instance, for that time period, you'd

05   have to rely on what somebody else was saying, would

06   that be fair?

07       A.   That's correct.

08       Q.   In other words, whoever wrote that memo, their

09   characterization may be better than yours?

10       A.   That was Frank Sedlack, I believe, and he was

11   the manager of technical service, the person whom I

12   reported to.

13       Q.   So, you'd trust his results?

14       A.   I don't know if that was written as a result.

15       Q.   Whatever was written?

16       A.   It was written in a -- to me, I don't quite

17   understand the way he used minimum and maximum on there.

18       Q.   Well, but you -- you've acknowledged to this

19   jury that the amount of benzene in the raffinate, it

20   varies?  It's not --

21       A.   Yes.

22       Q.   It may not be the same every day, correct?

23       A.   That's correct.

24       Q.   And you would not expect it to be the same

25   every day of every month, and every month of every year,

**Transcript of Graeber, James**

01  correct?

02      A.   That is correct.

03      Q.   That's just part of the -- some of the

04  uncertainty that goes with that particular unit, right?

05      A.   Uh-huh.

06      Q.   But one thing we do know is that whatever the

07  uncertainty is, whatever the range is, there was some

08  benzene in the raffinate that went from United States

09  Steel Corporation to Radiator Specialty every day they

10  got it, do you agree with that?

11      A.   Yes, I would.

12          MR. LUBEL:  That's all I have.  Thank

13  you.

14              RE-EXAMINATION

15  BY MS. HART:

16      Q.   Mr. Graeber, the -- now, we know that some

17  benzene was in raffinate when it was shipped out,

18  correct?

19      A.   Yes.

20      Q.   All right.  Now, Exhibit 2, page 2 of Exhibit

21  2, has an analysis over a two-month period of high, low

22  and average, correct, of the benzene composition?  The

23  average was what in that particular time period?

24      A.   Three percent.

25      Q.   All right.  Let me show you another document.

**Transcript of Graeber, James**

# Graeber, James
Rhyne Trial Master

```
01   This is titled, Typical Analysis of Clairton Raffinate,
02   and this shows a benzene composition of five percent, do
03   you see that?
04       A.   Yes.
05       Q.   Where did this -- do you recognize this
06   particular document?
07       A.   I believe I put that together, and it was in a
08   document that described light oil processing and benzene
09   production --
10       Q.   Okay.
11       A.   -- for the president of USS Chemicals.
12       Q.   Okay.
13       A.   Who did not have very much knowledge on this
14   subject.
15       Q.   All right.  Well, now, Exhibit 2 and the
16   analysis attached to it is dated 1977, right?
17       A.   Uh-huh.
18       Q.   Do you know when this particular document,
19   this particular analysis of Clairton raffinate was
20   prepared?
21       A.   When was USS Chemicals formed?  Do you know?
22       Q.   You can't ask me questions, I'm afraid.  I
23   actually do know.
24           MR. LUBEL:  Keep asking her.  Keep asking
25   questions, would you?
```

**Transcript of Graeber, James**

01    A.   It was, oh, about -- about a year after USS
02  Chemicals was formed.
03    Q.   (BY MS. HART)  Okay.  Was that in the 1960s or
04  the 1970s?
05    A.   '60s.
06    Q.   Okay.  So, the 1960s time period is what we're
07  talking about; is that right?
08    A.   Yes.
09         MR. LUBEL:  Do you mind putting a sticker
10  on that?
11         MS. HART:  Yeah, I'd be happy to do that.
12  This will be 6, I believe.
13              (Exhibit 6 marked.)
14    Q.   (BY MS. HART)  Now, as we've -- as you've
15  already testified, the benzene composition in this
16  particular analysis is five percent.  Do you know how
17  that number was arrived at?
18    A.   I believe I did it in the same way, but not
19  confining it to two months.
20         I think at that time I talked to the
21  laboratory supervisor and just said, okay, look at the
22  information and tell me where -- you know, a good number
23  for a composition, and I can't tell you what time period
24  was involved.
25    Q.   Was it longer than a day?

**Transcript of Graeber, James**

Page 119

```
01      A.   Oh, sure.

02      Q.   Longer than a week?

03      A.   I would -- I'm positive.

04      Q.   Okay.  So this was a multiple-day average of

05  the daily analysis that was done in the lab at Clairton

06  of the components of raffinate; is that fair?

07           MR. LUBEL:  Objection, form.

08      A.   I would say it's an eyeball average.

09      Q.   (BY MS. HART)  Okay.  But it was over a time

10  period as opposed to one day?

11      A.   Yes.

12      Q.   Okay.  So in that sense, it was similar to the

13  Exhibit 2 analysis, correct?

14      A.   Yes.

15      Q.   Okay.  And that average was five percent, in

16  the 1960s, it was and three percent in the 1970s --

17           MR. LUBEL:  Objection, form.

18      Q.   (BY MS. HART)  -- of benzene -- excuse me --

19  benzene composition of raffinate?

20      A.   At that time frame.

21      Q.   All right.  Have you ever seen an average

22  composition -- average benzene composition in raffinate

23  as high as 14 percent?

24      A.   No.  If I did, somebody would have had their

25  position changed in the operating unit.
```

**Transcript of Graeber, James**

```
01      Q.    Why is that?
02      A.    Because the benzene would have been way too
03 high.  The object was to make it zero.
04              MS. HART:  All right.  That's all I have.
05              MR. RILEY:  I think I've just got three.
06 And I think I need the microphone again.
07              MR. LUBEL:  I've heard that before.
08              MR. RILEY:  I'm usually pretty close.
09              MR. LUBEL:  Yeah, but yours lead to
10 others asking questions.
11                  RE-EXAMINATION
12 BY MR. RILEY:
13      Q.    Mr. Graeber, I have to ask you this because
14 I'm unclear about something you said earlier.
15              When you were asked if you ever knew if
16 raffinate was used in Liquid Wrench, is -- what I'm
17 unclear about, and I believe in one of the two or three
18 conversations you had with Radiator Specialty that it
19 was mentioned that raffinate was used in Liquid Wrench;
20 is that correct?
21      A.    Yes.
22      Q.    Okay.  That clears that up.  Thank you, sir.
23              The second question is, you've talked at great
24 length about the chemical Safety Data Sheet, which has
25 been marked as Exhibit 3, and you've stated your belief,
```

**Transcript of Graeber, James**

```
01    but in terms of definite personal knowledge, you're not
02    the one who could say that it definitely was received by
03    Radiator Specialty Company; is that correct?
04        A.    That's correct.
05        Q.    Thank you.  And, finally, sir, in terms of
06    Safety Data Sheets for the employees at the Clairton
07    plant, have you ever seen one?
08        A.    Nope.
09              MR. RILEY:  That's all I have, sir.
10    Thank you very much.
11              MR. LUBEL:  Thank you.
12              VIDEO OPERATOR:  This concludes the
13    deposition of Mr. James Graeber.  The time is 11:51
14    a.m., and we're off the video record.
15
16
17
18
19
20
21
22
23
24
25
```

**Transcript of Graeber, James**

Page 122

```
01              CHANGES AND SIGNATURE
02    PAGELINE        CHANGE              REASON
03    _____
04    _____
05    _____
06    _____
07    _____
08    _____
09    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

**Transcript of Graeber, James**

```
01        I, JAMES GRAEBER, have read the foregoing
02 deposition and hereby affix my signature that same is
03 true and correct, except as noted above.
04
05
06        _____
07                 JAMES GRAEBER
08
09 THE STATE OF _____)
10 COUNTY OF _____)
11
12        Before me, _____, on
13 this day personally appeared JAMES GRAEBER, known to me
14 (or proved to me under oath or through
15 _____) (description of identity
16 card or other document) to be the person whose name is
17 subscribed to the foregoing instrument and acknowledged
18        to me that they executed the same for the purposes and
19 consideration therein expressed.
20        Given under my hand and seal of office this
21 _____ day of _____, _____.
22
23
24        _____
25                 NOTARY PUBLIC IN AND FOR
26                 THE STATE OF _____
27                 COMMISSION EXPIRES: _____
28
29
30
31
32
33
34
35
```

**Transcript of Graeber, James**

```
01                CAUSE NO. A-167,693

02   JAMES COWEY AND RUTH        ) IN THE   DISTRICT   COURT

03   COWEY                       )

04                               )

05            PLAINTIFFS,        )

06                               )

07   VS.                         ) JEFFERSON COUNTY, TEXAS

08                               )

09   RADIATOR SPECIALTY          )

10   COMPANY, ET AL              )

11                               )

12            DEFENDANTS.        )

13                               ) 58TH  JUDICIAL DISTRICT

14

15            REPORTER'S CERTIFICATION

16        DEPOSITION OF JAMES GRAEBER

17            OCTOBER 31, 2003

18

19      I, Mark A. Miller, Certified Shorthand Reporter in

20   and for the State of Texas, hereby certify to the

21   following:

22      That the witness, JAMES GRAEBER, was duly sworn by

23   the officer and that the transcript of the oral

24   deposition is a true record of the testimony given by

25   the witness;

26      That the deposition transcript was submitted on

27   _____ to the witness or to the attorney

28   for the witness for examination, signature and return to

29   me by _____;

30      That the amount of time used by each party at the

31   deposition is as follows:

32   MR. LUBEL.....01 HOURS:56 MINUTE(S)
```

**Transcript of Graeber, James**

# Graeber, James
## Rhyne Trial Master

```
01   MR. RILEY.....00 HOURS:09 MINUTE(S)

02   MS. HART.....00 HOURS:29 MINUTE(S)

03       That pursuant to information given to the

04   deposition officer at the time said testimony was taken,

05   the following includes counsel for all parties of

06   record:

07

08   FOR THE PLAINTIFFS:

09       MR. LANCE LUBEL

10       HEARD, ROBINS, CLOUD, LUBEL & GREENWOOD

11       910 TRAVIS STREET, SUITE 2020

12       HOUSTON, TEXAS  77002

13

14   FOR THE DEFENDANTS UNITED STATES STEEL CORPORATION,

15   ARISTECH CHEMICAL CORPORATION AND USX CORPORATION:

16       MS. LAURA CALLAWAY HART

17       NELSON, MULLINS, RILEY & SCARBOROUGH

18       1330 LADY STREET

19       COLUMBIA, SOUTH CAROLINA  29201

20

21   FOR THE DEFENDANT RADIATOR SPECIALTY COMPANY:

22       MR. JAMES M. RILEY

23       COATS ROSE

24       1001 FANNIN, SUITE 800

25       HOUSTON, TEXAS  77002-6707

26       I further certify that I am neither counsel for,

27   related to, nor employed by any of the parties or

28   attorneys in the action in which this proceeding was

29   taken, and further that I am not financially or

30   otherwise interested in the outcome of the action.

31

32

33
```

**Transcript of Graeber, James**

```
01     Further certification requirements pursuant to Rule
02  203 of TRCP will be certified to after they have
03  occurred.
04     Certified to by me this 2ND of NOVEMBER, 2003.
05
06
07                    _____
08                    Mark A. Miller
09                    Texas CSR No. 1190
10                    Expiration Date:  12/31/04
11
12                    Nell McCallum & Associates
13                    Firm Registration No. 243
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

**Transcript of Graeber, James**

```
01          FURTHER CERTIFICATION UNDER RULE 203 TRCP
02      The original deposition was/was not returned to the
03  deposition officer on _____;
04      If returned, the attached Changes and Signature
05  page contains any changes and the reasons therefor;
06      If returned, the original deposition was delivered
07  to _____, Custodial Attorney;
08      That $_____ is the deposition officer's
09  charges to the Plaintiff for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein on and filed with the
14  Clerk.
15      Certified to by me this _____ day of
16  _____, 2003.
17
18
19          _____
20          Mark A. Miller
21          Texas CSR No. 1190
22          Expiration Date:  12/31/04
23
24          Nell McCallum & Associates
25          Firm Registration No. 243
26
27
28
```

**Transcript of Graeber, James**

Page 128

**Transcript of Graeber, James**

# Exhibit 3

# Transcript Report

---

## Keenan, Thomas

Plaintiffs' designations are in yellow. No counter-designations or objections were received.

**Transcript of Keenan, Thomas**

# Full Transcript Report
## Designation Legend

KEENAN - (THOMAS) VOL 1

**Transcript of Keenan, Thomas**

```
01          SUPERIOR COURT OF THE STATE OF CALIFORNIA
02               FOR THE COUNTY OF ALAMEDA
03
04   JIMMY THOMAS and      :  NO. RG17882514
05   SONYA THOMAS          :
06                         :
07        Plaintiffs       :
08                         :
09      v.                 :
10                         :
11   AKZO NOBEL COATINGS,  :
12   INC., et al.,         :
13                         :
14        Defendants.      :
15
16                   - - -
17               June 7, 2019
18                   - - -
19
20        Videotaped Oral Deposition of THOMAS KEENAN, as
21   Person Most Qualified - Ashland, LLC, taken pursuant
22   to Notice, at the EVEN Hotel Sarasota, 6231 Lake
23   Osprey Drive, Sarasota, Florida 34240, beginning at
24   11:05 a.m. before Mary Ann Smith, RPR, RMR, and Notary
25   Public.
26                   - - -
27
28
29          VERITEXT LEGAL SOLUTIONS
30             MID-ATLANTIC REGION
31          1801 Market Street, Suite 1800
32          Philadelphia, Pennsylvania 19103
```

Transcript of Keenan, Thomas

# Keenan, Thomas
## Rhyne Trial Master

```
01  APPEARANCES:
02
03  LOCKS LAW FIRM
04  BY:  ANDREW J. DUPONT, ESQUIRE (Via telephone.)
05  The Curtis Center
06  601 Walnut Street
07  Suite 720 East
08  Philadelphia, Pennsylvania 19106
09  215.893.0100
10  ADupont@lockslaw.com
11  Counsel for Plaintiffs
12
13  BOWMAN AND BROOKE
14  BY:  FREDDY I. FONSECA, ESQUIRE (Via telephone.)
15  970 West 190th Street
16  Suite 700
17  Torrance, California 90502
18  310.768.3068
19  Freddy.Fonseca@bowmanandbrooke.com
20  Counsel for Defendant W.M. Barr & Company, Inc.
21
22  CLARK HILL LLP
23  BY:  MICHAEL K. TCHENG, ESQUIRE (Via telephone.)
24  One Embarcadero Center
25  Suite 400
26  San Francisco, California 94111
27  415.984.8564
28  MTcheng@clarkhill.com
29  Counsel for Defendant Berg Lacquer Company
30
31  FOLEY & MANSFIELD
32  BY:  MARK D. SAYRE, ESQUIRE
33  300 South Grand Avenue
34  Suite 2800
35  Los Angeles, California 90071
36  213.283.2147
37  MSayre@foleymansfield.com
38  Counsel for Defendant Ashland, LLC
39
40
41
42
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas
## Rhyne Trial Master

```
01  APPEARANCES (continued):
02
03  FRANCK & ASSOCIATES
04  BY:  HERMAN FRANCK, ESQUIRE (Via telephone.)
05  910 Florin Road
06  Suite 212
07  Sacramento, California 95831
08  916.447.840022
09  Franckhermanlaw88@yahoo.com
10  Counsel for Defendant East Bay Color Service
11
12  GORDON & REES SCULLY MANSUKHANI
13  BY:  PHILLIP H. LO, ESQUIRE (Via Telephone.)
14  2211 Michelson Drive
15  Suite 400
16  Irvine, California 92612
17  949.255.6987
18  Plo@grsm.com
19  Counsel for Defendant The Savogran Company
20
21  ALSO PRESENT
22
23  LAJUANA PRUITT, Videographer
24
25  BENJAMIN NEATE, Video Technician
26
27
28
29
30
31
32
33
34
35
36
```

**Transcript of Keenan, Thomas**

```
01                    INDEX
02 WITNESS                                    PAGE
03
04 THOMAS KEENAN
05
06    Direct Examination by Mr. DuPont............ 9
07
08 Witness Signature page........................ 151
09 Errata Sheet.................................. 152
10 Certificate of Oath of Witness............... 153
11 Reporter's Deposition Certificate............. 154
12 Letter to Witness Re:  Reading................ 155
13
14
15            PLAINTIFFS' EXHIBITS
16
17 NUMBER            DESCRIPTION          PAGE
18
19 Exhibit 1    API Toxicological Review........... 41
20             Benzene Second Edition, 1960
21 Exhibit 2    Manufacturing Chemists'............ 52
22             Association Chemical Safety Data
23             Sheet SD-2, Properties and
24             Essential Information for Safe
25             Handling and Use of Benzene 1960,
26             Third Revision
27
28 Exhibit 3    IARC Monographs On The Evaluation.. 59
29             Of The Carcinogenic Risk of
30             Chemicals To Man
31
32 Exhibit 4    Ashland Oil, Inc., Interim......... 68
33             Material Safety Data Sheet For
34             Benzene
35
36 Exhibit 5    11/11/76 Ashland Material Safety... 72
37             Data Sheet for benzene
38             Bates ASHCOLE 00912 - 00915
39
40 Exhibit 6    Excerpt from Industrial............ 77
41             Toxicology, Third Edition, 1974
42             Hamilton and Hardy textbook
43
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas

## Rhyne Trial Master

```
01                    PLAINTIFFS' EXHIBITS

02

03  NUMBER                DESCRIPTION              PAGE

04

05  Exhibit 7     9/21/1976 memorandum between....... 96

06                J.H. Sweet and D.L. Coticchia

07                Subject:  Benzene

08  Exhibit 8     11/15/90 letter from Sally........ 112

09                Cowles, M.D., to Paul Price,

10                American Petroleum Institute

11  Exhibit 9     6/22/05 Shanghai Health Study..... 126

12  Exhibit 10    International Leveraged........... 130

13                Research Proposal

14

15  Exhibit 11    Ashland hazard determination...... 136

16                document for Toluene

17                Bates ASH-00314 - 00337

18

19  Exhibit 12    2/27/2003 Exxon Mobil MSDS........ 144

20                for Toluene

21

22

23

24                   DEFENDANT'S EXHIBITS

25

26  NUMBER                DESCRIPTION              PAGE

27

28  Exhibit 1     Notice of Objections............... 9

29

30

31

32

33

34
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas

### Rhyne Trial Master

```
01                P R O C E E D I N G S
02        THE VIDEOGRAPHER:  We are now on the record.
03        Please note that the microphones are
04   sensitive and make pick up whispering and private
05   conversations.  Please turn off all your cell
06   phones or place them away from the microphones as
07   they can interfere with the deposition audio.
08   Recording will continue until all parties agree
09   to go off the record.
10        My name is Lajuana Pruitt, representing
11   Veritext.  The date today is June the 7th, the
12   year 2019, and the time is approximately
13   11:05 a.m.  This deposition is being held at 6231
14   Lake Osprey Drive in Lakewood Ranch, Florida, and
15   is being taken by counsel for the plaintiff.
16        The caption of the case is Thomas versus
17   Akzo.  The case is filed in the Superior Court of
18   the State of California for the County of
19   Alameda.  The case number is RG17882514.  The
20   name of our witness is Tom Keenan.
21        At this time will all attorneys please -- the
22   attorneys present please say who you -- identify
23   who you are and those remotely please identify
24   who you are and the parties you represent.
25        MR. SAYRE:  So here in the room is Mark
```

**Transcript of Keenan, Thomas**

01     Sayre.  I represent Ashland.

02          THE VIDEOGRAPHER:  Gentlemen.

03          MR. DUPONT:  Andrew DuPont, on behalf of

04     Jimmy and Sonya Thomas.

05          MR. TCHENG:  And on the phone this is Michael

06     Tcheng, for Berg Lacquer Company.

07          MR. FONSECA:  Freddy Fonseca, for W.M. Barr

08     Companies, Inc.  I'm on the phone as well.

09          MR. LO:  Philip Lo, on behalf of The Savogran

10     Company.

11          MR. FRANCK:  Herman Franck, for East Bay

12     Color.

13          THE VIDEOGRAPHER:  Will our court reporter,

14     Mary Ann Smith, please swear our witness.

15          THOMAS KEENAN, called as a witness by the

16     Plaintiffs, having been first duly sworn, testified as

17     follows:

18          THE WITNESS:  I do.

19          MR. SAYRE:  And before we get started,

20     counsel for the plaintiff myself, Mark Sayre, had

21     a conversation and counsel for the plaintiff had

22     asked me to make a statement at the beginning of

23     the deposition with regard to the deposition so I

24     would be happy to do that.

25          I have in front of me the Defendant Ashland

**Transcript of Keenan, Thomas**

01    LLC's, objection to plaintiffs' notice of taking

02    deposition of the person most qualified directed

03    to defendant Ashland, LLC, and in brackets Thomas

04    Keenan.  Mr. Keenan -- excuse me.  Dr. Keenan is

05    here to testify.  We have gone through the

06    notice.  This notice of objection goes through

07    each category and provides legal objections.

08        We have met with Dr. Keenan yesterday and

09    we've determined that he has knowledge with

10    regard to categories 20 -- let me make sure of

11    this.  27 -- just confirm.  27, 30, and 31.  We

12    will rely on our objections to the other

13    categories and we would be happy to meet and

14    confer at another time with Mr. DuPont concerning

15    those other categories, but for the purposes of

16    today in this deposition he's being offered and

17    he has knowledge with regard to those categories.

18        And I will make as an exhibit to the

19    deposition a copy of the notice of objection that

20    I mentioned.  Just as a housekeeping matter, the

21    copy I have in front of me is highlighted so I

22    don't want to use that, but if it's all right

23    with all parties including the plaintiff, I would

24    be happy to provide the reporter a digital copy

25    so she can attach that.

**Transcript of Keenan, Thomas**

```
01          MR. DUPONT:  That's agreeable.

02          MR. SAYRE:  We're good to go.

03          (Defendant's Exhibit No. 1 was marked for

04  identification.)

05                    DIRECT EXAMINATION

06  BY MR. DUPONT:

07      Q.    Would you give us your full name, please.

08      A.    Sure.  My full name is Thomas Harry Keenan.

09      Q.    Dr. Keenan, you have a Ph.D.; is that

10  correct?

11      A.    That's correct.

12      Q.    And you are testifying here on behalf of

13  Ashland, LLC?

14      A.    On behalf of Ashland, yes.

15      Q.    And you understand that your testimony here

16  today is binding upon Ashland as its representative?

17          MR. SAYRE:  Objection to form.  You can

18      answer.

19      A.    That's my understanding, that I'm

20  representing Ashland in this deposition.

21      Q.    And you have done this on at least two

22  occasions in the past where you've been asked to

23  testify as a representative of Ashland?

24      A.    Yes.

25      Q.    We're taking this deposition remotely and
```

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01 speaking to each other over the phone, so if at any

02 point in time I ask you a question and you do not

03 understand it, would you please tell me that?

04     A.    I will.

05     Q.    And if you answer a question, will you agree

06 that you answered it because you both heard it and

07 understood it?

08     A.    Yes.

09     Q.    We need to do our best to not speak over each

10 other so that the court reporter can write everything

11 down that we are both saying, so would you please

12 allow me a little time to finish my questions before

13 you begin your response?

14     A.    I will.

15     Q.    And you are generally familiar with

16 deposition procedures based on your experiences in the

17 past?

18     A.    I am.

19     Q.    So would you begin, please, by describing

20 your employment dates and positions that you've held

21 with Ashland?

22     A.    Okay.  I started with Ashland in December of

23 1989 as a toxicologist.  I continued working there

24 until I retired on December 31, 2014.  During that

25 time period, the first five to ten years I was

01  primarily doing toxicology support as consulting

02  services, but also supporting MSDS and label creation.

03  After that I became more -- got more responsibilities,

04  I added industrial hygiene, more MSDS preparation.

05          During the 2000s I had some responsibility

06  for environmental health and safety in a broader

07  context.  In 2011 I was over in Europe for a while

08  managing our European environmental health and safety

09  group and when I came back I managed the environmental

10  health and safety and this is including MSDS and label

11  production for our water treatment chemical company.

12  And then my last few months that I was at Ashland I

13  was helping get that company ready for sale to another

14  entity and then I retired.

15      Q.    Have you had an opportunity to prepare for

16  your deposition today?

17      A.    I have.

18      Q.    And what did you do to prepare?

19      A.    I met with counsel yesterday and then I also

20  reviewed prior a deposition.

21      Q.    Which prior deposition?

22      A.    It was con -- I think it's Cacoilo.  Cacoilo.

23  I can't pronounce the name, but it's something like

24  that.  It was in 2016.

25      Q.    It was in the Milton Cacoilo case?

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

Case 3:18-cv-00197-RJC-DSC   Document 311-3   Filed 09/02/20   Page 14 of 161
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 338 of 1330

01    A.    Yes.

02    Q.    And that's C-a-c-o-i-l-o for the record.

03          Other than the transcript of your deposition

04   in the Cacoilo case, did you review any other

05   documents in order to prepare for your deposition?

06    A.    I did not actually observe any other

07   documents.  We discussed documents, but we did not --

08   I did not look at them.

09    Q.    What documents did you discuss?

10          MR. SAYRE:  I'm going to object on the basis

11       of attorney-client privilege.  Obviously the

12       communications themselves are privileged.  So

13       instruct him not to answer that question.

14          Any question that does not call for the

15       communication between a client and an attorney is

16       obviously fair game.  It's just you can't ask him

17       about the conversation.

18    Q.    Did you see the documents that were

19   discussed?

20    A.    No, I did not.

21    Q.    What is your understanding as to what you

22   will be testifying about here today?

23    A.    My understanding, I will be probably a little

24   bit broader than what the statements say, but

25   essentially the health hazards of benzene and

**Transcript of Keenan, Thomas**

01 benzene-containing solvents and benzene composition in

02 solvents. And Ashland's knowledge during that time

03 period.

04     MR. SAYRE: I'm sorry. I'm sorry, Counsel.

05   He hadn't finished his answer.

06   A. I added something and, unfortunately, I was

07 adding it just as you were starting to talk. It was

08 adding the perspective and Ashland's knowledge of

09 those issues.

10   Q. All right. So, in addition to the topics of

11 the health hazards of benzene and the benzene content

12 of solvents, you understand that you're testifying

13 about Ashland's knowledge of the health hazards of

14 benzene?

15     MR. SAYRE: I'm going to object to the

16   question. It misstates testimony.

17     You can answer.

18   A. My perspective is I'm going to be testifying

19 as to what Ashland knew during certain time periods

20 about the health hazards of benzene.

21   Q. During what time periods?

22   A. Depends on -- well, I will be able to cover,

23 I think, most of the time period that's relevant.

24   Q. And what is your understanding of what that

25 time period that is relevant?

**Transcript of Keenan, Thomas**

01          MR. SAYRE:  I'm going to object to this

02     question and the line of questioning on the basis

03     that it calls for speculation as to what you want

04     to ask.  He's going off the notice of the

05     deposition, so he's trying to restate what's in

06     your notice, which is unfair to the witness.

07     Obviously if you have questions concerning these

08     matters, please ask them, but his understanding

09     is irrelevant.

10          You can answer.

11     A.    I'm not certain what the time period is.  I

12 mean, we mentioned it yesterday.  I vaguely remember

13 it was late '60s, early '70s, something like that,

14 until '90s or 2000s.  I can't remember.

15     Q.    Have you ever conducted an investigation into

16 what Ashland knew about the health hazards of benzene

17 in the 1960s and the 1970s?

18     A.    And I would -- I'm not sure what you mean by

19 investigation.  Could you be a little bit --

20     Q.    You began to work for Ashland in 1989;

21 correct?

22     A.    That's correct.

23     Q.    So you were not employed by Ashland in the

24 1960s and 1970s; right?

25     A.    That is correct.

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01    Q.    And you understand that we're -- I've asked

02 to question somebody on behalf of Ashland about what

03 Ashland knew about the health hazards of benzene,

04 including in the period of the 1960s and 1970s;

05 correct?

06    A.    Yes.  That's what you're asking, yes.

07    Q.    So have you done anything to obtain

08 information about what Ashland knew about the health

09 hazards of benzene in the 1960s and 1970s?

10    A.    Not specifically for today, but while I was

11 still an employee before I retired I have had

12 interviews with people who were working during that

13 time period, plus I would have gained knowledge of

14 some of the procedures during that time period before

15 I started just because of what I was doing, but I also

16 specifically sought out people that were responsible

17 during that time period to gain knowledge about

18 benzene manufacturer and what the company knew about

19 benzene health hazards during that time period.

20    Q.    So the first thing you told me that you did

21 was to interview employees who were with Ashland from

22 the '60s and '70s?

23    A.    That were responsible for some of these

24 areas, yes.  Some of them may not have been directly

25 responsible, but had a history at that time.  A lot of

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01 them were retirees by the time I interviewed them.

02     Q.   Who did you interview?

03     A.   I may not be all inclusive because it's been

04 some time ago, but my memory is Dick Toeniskoetter,

05 who I was reporting to when I first was hired on. He

06 covered from the early '70s until '93 as responsible

07 for environmental health and safety.

08       Prior to that there was Jack Sweet. Jack was

09 responsible from the late '60s until into the early

10 '90s for the labeling system for the distribution

11 company.

12       I interviewed Scotty Patrick. Scotty was,

13 when I interviewed him, was an executive vice

14 president of Ashland, but he was responsible for the

15 manufacturer of benzene. He helped put some of the

16 systems in place in the Catlettsburg refinery.

17       Ernie Purdue, who was the technician at the

18 Catlettsburg refinery who did a lot of analytical

19 analysis of the benzene being produced. And Buddy

20 Whitlock, who was in our distribution business and he

21 was responsible for the technical specifications for

22 the distribution products.

23       I may have left some others off, but that's

24 my memory right now of who I interviewed in the past.

25     Q.   The first gentleman's name who you gave me

**Transcript of Keenan, Thomas**

01  was --

02      A.      Dick Toeniskoetter.

03      Q.      -- Dick Toeniskoetter?

04      A.      Yes.

05      Q.      How do you spell his last name?

06      A.      All right.  It's been a while.  I'll try.

07  T-o-e-n-i-s-k-o-e-t-t-e-r.

08      Q.      And what did you learn from -- well, let's

09  back up.  Let's go in chronological order here.

10              What were Scotty Patrick's years of

11  employment at Ashland?

12      A.      I don't know when he started.  He retired, I

13  believe, in the 2000s some time.  I don't know the

14  exact time period of his employment.

15      Q.      What were Ernie Purdue's years of employment

16  at Ashland?

17      A.      Once again, I'm not going to be able to cite

18  starting dates and ending dates.  Ernie would have

19  retired before Scotty, but probably in the '90s I

20  would assume.

21      Q.      Another thing you said that you did to learn

22  about what Ashland's activities and knowledge about

23  benzene were in the 1960s and 1970s was to seek out

24  people who had responsibility in the area.  Is that

25  the same as your interviews with the five people that

Transcript of Keenan, Thomas

01  you listed for me or was that something different than

02  interviewing them?

03          MR. SAYRE:  I'll object to the form of the

04      question.

05          And, Counsel, by the way, when I object to

06      the form I do that shorthand so that it doesn't

07      interrupt your deposition, but if you need a

08      basis for the objection to correct your question,

09      if you want to know it, please ask and I'd be

10      happy to provide.  Is that agreeable?

11          MR. DUPONT:  Yes.

12          MR. SAYRE:  Go ahead.

13      A.   The people that I interviewed were

14  responsible for a lot of this area.  That's the reason

15  why I interviewed them.

16  BY MR. DUPONT:

17      Q.   All right.  So when you generally told me

18  about seeking out people who had responsibility to

19  talk to, those are the five people that you've told me

20  about, there's no additional people I need to ask you

21  about?

22      A.   Well, none that I recall at this point.

23  We're talking at least almost ten years ago or more

24  that I did this activity.

25      Q.   So it's your estimation that these interviews

**Transcript of Keenan, Thomas**

# Keenan, Thomas

### Rhyne Trial Master

```
01  that you conducted were approximately ten or more
02  years ago?
03      A.   Yes.
04      Q.   Did you create any type of notes or
05  memorandum as the result of or during the course of
06  these interviews?
07      A.   No, I didn't.
08      Q.   Did you read the transcripts of depositions
09  given by other Ashland employees or former employees
10  in order to learn about Ashland's historic activities
11  and knowledge?
12           MR. SAYRE:   Objection to form.
13      A.   Yes.  I've read depositions from some of
14  these individuals, yes.
15      Q.   Which depositions did you read?
16      A.   I don't recall.  I mean, it's been a long
17  time.
18      Q.   Did you keep any file of materials that you
19  have reviewed or relied upon in order to testify on
20  behalf of Ashland?
21      A.   I have not personally kept a file.
22      Q.   Has a file been kept by Ashland or its
23  attorneys with that information?
24           MR. SAYRE:   Objection.  Calls for
25      speculation, lacks foundation.  You can answer.
```

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01    A.   There was information in a file when I was

02  employed at Ashland.  I cannot tell you whether it

03  still exists or not.

04    Q.   What was the name of that file?

05    A.   It was just Benzene.

06    Q.   Through your interviews did you learn about

07  Ashland manufacturing benzene?

08    A.   I did.

09    Q.   What did you learn?

10    A.   I learned that we first started to

11  manufacture benzene in 1958 at the Buffalo refinery,

12  and in 1961 we also started producing benzene in

13  Catlettsburg, Kentucky.  We were using what was called

14  the UOP process and that was -- we only used the UOP

15  process at the Buffalo refinery and we used -- what

16  was it.

17          Something started -- it was a deacylation

18  process that was used and it's HYD.  I can't -- I

19  can't remember the name of the process that we used at

20  Catlettsburg, but it used a separate stream from the

21  UOP process and it was more efficient than the UOP

22  process.

23    Q.   Did Ashland manufacture benzene at any

24  facility other than the Buffalo refinery and

25  Catlettsburg refinery?

**Transcript of Keenan, Thomas**

01     A.   No.   Those are the only two locations Ashland
02  manufactured benzene.
03     Q.   And Ashland began to manufacture benzene at
04  the Buffalo refinery in 1958?
05     A.   That's my recollection, yes.
06     Q.   Until what year did Ashland continue to
07  manufacture benzene at the Buffalo refinery?
08     A.   I don't know the answer to that.   They
09  decommissioned the Buffalo refinery before I got there
10  and I don't know when that occurred.
11     Q.   Do you know by decade when Ashland stopped
12  manufacturing benzene at the Buffalo refinery?
13     A.   It would be a guess by me at this point.   I
14  don't know.   I know the refinery had been shut for
15  some time when I got there in '89.
16     Q.   Ashland began to manufacture benzene at the
17  Catlettsburg refinery in 1961?
18     A.   That's correct.
19     Q.   And that was Catlettsburg, Kentucky?
20     A.   Yes.
21     Q.   Until what year did Ashland manufacturer
22  benzene at the Catlettsburg, Kentucky refinery?
23     A.   It's my understanding they quit manufacturing
24  in 1989 or late '80s.   It might have been earlier than
25  '89, but sometime in that time period.

**Transcript of Keenan, Thomas**

01    Q.   Do you know why Ashland stopped manufacturing

02 benzene at the Catlettsburg refinery?

03    A.   No, I do not know the reason.

04    Q.   What did Ashland do with the benzene that was

05 manufactured at the Buffalo refinery?

06    A.   My understanding is that it was all corporate

07 accounts and they put it into tankers on the lake and

08 I believe it went to Dow primarily.

09    Q.   When you say corporate account, describe to

10 me what you mean?

11    A.   Large accounts using large volumes of this

12 material.  Neither refinery had drumming capabilities

13 so everything that was manufactured there was shipped

14 in bulk.  So barge and tanker quantities.

15    Q.   So the Buffalo Ashland refinery shipped

16 benzene by barges that navigated on water as one

17 method?

18    A.   Tankers.  Because Lake Erie, Lake Ontario.

19       MR. SAYRE:  Objection.  Misstates testimony.

20 To the last question.

21    Q.   Did the Buffalo Ashland refinery distribute

22 benzene on railroad cars?

23    A.   Not to my understanding.

24    Q.   Did the Ashland Buffalo refinery distribute

25 benzene in truck tanks?

**Transcript of Keenan, Thomas**

01      A.    That's not my understanding.   What I was
02 informed was that it was all by tanker.
03      Q.    What did Ashland do with the benzene that was
04 manufactured at the Catlettsburg, Kentucky refinery?
05      A.    My understanding there it was all barge
06 shipments on the Ohio River and one of the customers,
07 I don't know all of them, but the one that I remember
08 is Hooker.
09      Q.    The company was Hooker?
10      A.    Yes.
11      Q.    What type of company was Hooker?
12      A.    I'm sorry.   It was a chemical company, but I
13 don't know what they were doing with the benzene.
14      Q.    Did Ashland also distribute benzene that was
15 manufactured by other companies?
16      A.    Yes.
17      Q.    During what periods of time did Ashland
18 distribute benzene manufactured by other companies?
19      A.    My understanding is that we were -- did
20 drumming operations of benzene from late '60s, early
21 '70s until about 1977.
22      Q.    And who was it that told you -- or what was
23 your source of information that Ashland was in the
24 business of drumming benzene for distribution --
25 strike that.

**Transcript of Keenan, Thomas**

# Keenan, Thomas

### Rhyne Trial Master

```
01          When you're saying drumming benzene, you mean
02   taking benzene and putting it into 55 gallon drums and
03   shipping it out to customers?
04       A.   That's one of the possible -- yes, that was a
05   possibility.  They could have also been doing other
06   things with it, but, yes, drumming operations and
07   specifically saying they're taking it from bulk and
08   putting it into 55-gallon drums.
09       Q.   Did Ashland distribute other companies'
10   manufactured benzene using containers other than
11   55-gallon drums?
12       A.   I don't know the answer to that.
13       Q.   Did Ashland have a business that involved
14   blending chemicals on behalf of other companies?
15       A.   Yes.
16       Q.   During which years did Ashland blend
17   chemicals on behalf of other companies?
18       A.   Well, we first acquired a distribution
19   business in 1956 and we sold the distribution business
20   in 2011.  So, during that time period, if requested by
21   a customer, we would blend solvents for them.
22       Q.   What was the name of the distribution
23   business that Ashland acquired in 1956?
24       A.   I think it was Brunoco, B-r-u-n-o-c-o.  I
25   think that's right, but I'm not a hundred percent sure
```

**Transcript of Keenan, Thomas**

01 about that.  Might have been JW Brown or JT Brown or

02 something like that.  There were several companies

03 that they acquired.  I don't remember the name of the

04 first one.

05     Q.    Where were Ashland's benzene distribution

06 operations located?

07     A.    Well, there were a lot of distribution sites.

08 There were 20 to 30 distribution sites across the

09 country and I don't know which ones handled benzene.

10 And it would vary depending upon the time period and

11 what the customers were requesting.  If there was no

12 customer in the area that wanted benzene that facility

13 would not have benzene on site.  It was all

14 customer-driven demand.

15     Q.    And which areas of the country -- strike

16 that.

17          Where were Ashland's blending operations

18 located?

19     A.    Well, most of the distribution sites had

20 blending capabilities.  So most of the sites would

21 have it.

22     Q.    Did Ashland blend benzene with other

23 chemicals on behalf of its customers?

24     A.    I don't have any specific knowledge of that

25 so I can't say one way or the other.  I do know we

**Transcript of Keenan, Thomas**

01 sold benzene in drums, but that's all that I remember

02 at this point.

03     Q.    Have you ever undertaken to determine who

04 Ashland's customers were that it blended product on

05 behalf of that included benzene as an ingredient?

06         MR. SAYRE:  Object to the question as calling

07     for speculation.  I think he just said he didn't

08     know one way or the other.

09         You can answer.

10     A.    I have not conducted an investigation trying

11 to ascertain if Ashland blended benzene with other

12 solvents or, if they did, who their customers would

13 have been.

14     Q.    When Ashland blended products containing

15 benzene as an ingredient on behalf of its customers,

16 do you know who determined what the formula for the

17 products would be?

18     A.    Could you repeat that.  I'm not sure I got it

19 all.

20     Q.    Sure.  When Ashland blended products

21 containing benzene on behalf of its customers, do you

22 know who made the decision as to what the formula of

23 the product would be?

24         MR. SAYRE:  I'm going to object to the

25     question.  It calls for speculation.

**Transcript of Keenan, Thomas**

01          Maybe I misunderstood.  I thought he said

02     that he didn't know if Ashland blended for

03     customers.  But that's my objection.

04          You can answer.

05     A.    What I said was I didn't know if they blended

06     benzene for customers.  We did blend for customers and

07     my understanding is it was all based upon their

08     formulas as what they wanted in the product and then

09     Ashland would follow their guidance as far as if they

10     wanted 50 percent acetone and 50 percent ethanol we

11     would do that for them.  But that would be driven from

12     them and not Ashland putting that product together and

13     saying, we've got this for sale.  We wouldn't be able

14     to anticipate what their needs were in these solvents.

15     Q.    What is your basis for that answer?

16     A.    Well, my basis is for at least working with a

17     company for at least 15 years or around 15 years while

18     the distribution business was there and understanding

19     what the business model was.  It wasn't that they were

20     developing and designing products.  That was just not

21     what that business was all about.  It was about

22     providing solvent blends or solvents, pure solvents,

23     to customers and not to develop unique products.

24     Q.    Have you spoken with anybody or seen any

25     documents that describe how the decision was made

**Transcript of Keenan, Thomas**

01 about what the formula would be for products that were

02 blended by Ashland on behalf of customers in the '60s

03 and '70s?

04     A.   I've seen -- no.  If I'm understanding the

05 question right, you're asking me if I've seen

06 information from customers specifying what the blends

07 would be.  Is that what you asked me?

08         MR. SAYRE:  Is that right, Counsel?

09     Q.   No.  Let me back up.  And thank you for

10 asking me to clarify that.

11         You told me that your answer as to who made

12 the decision about what a formula for the product that

13 Ashland blended would be was based on your experience

14 of about 15 years working with Ashland; is that right?

15     A.   With Ashland distribution being part of the

16 company, yeah.  They were -- there from '89 when I

17 started until 2011, so that's 12 years.  But, yes,

18 during that time period I understood the business

19 model.

20     Q.   And are you assuming that Ashland had the

21 same business model in the 1960s and 1970s in terms of

22 how the decision was made on what the formula of a

23 blend made by Ashland would be?

24         MR. SAYRE:  Objection to the form of the

25     question as to assume.  You can answer.

**Transcript of Keenan, Thomas**

01    A.   Well, I have no direct knowledge during that

02  time period, but it would make sense -- it would not

03  make sense, to me anyway, that they would have had a

04  different model prior to that just because it's a very

05  simple business model.  They source chemicals from

06  other manufacturers and they provide it based upon the

07  customer demand or request.

08         And so they have sources, they know what some

09  of the solvents are that are high volume as far as

10  what customers in that area need, so they'd require

11  that.  But if there was specific things that were

12  requested by a customer for, in the situation of a

13  blend, that was not something Ashland created on its

14  own.  The customer would say, can you blend A, B, C

15  together and Ashland would do that.  And the customer

16  would specify the concentrations of each component.

17    Q.   Has anybody told you how the decision was

18  made in the 1960s and 1970s as to what the formula for

19  a blend of product blended by Ashland on behalf of the

20  customer would be?

21         MR. LO:  Objection.  Calls for speculation.

22    This is Phillip Lo.

23         MR. SAYRE:  Do we have an agreement that one

24    objection is good for all?

25         MR. DUPONT:  One objection by a defendant is

**Transcript of Keenan, Thomas**

```
01     good for all defendants.

02          MR. SAYRE:  Thank you, Counsel.

03          MR. LO:  Thank you.

04          MR. SAYRE:  Do you have the question in mind?

05     A.   Could you repeat the question, please.

06 BY MR. DUPONT:

07     Q.   Yeah.  What I'm just trying to learn is, did

08 anybody tell you how the decision was made about what

09 chemicals would go into a blend that Ashland made for

10 a customer during the 1960s and 1970s?

11     A.   I did not specifically ask anyone that

12 question, no.  I'm sorry?

13     Q.   Were you finished your response?

14     A.   I don't remember what I was going to say.

15          MR. SAYRE:  You said something about

16     documents.  Or he did.

17          THE WITNESS:  He did.  I didn't say

18     documents.

19          MR. SAYRE:  All right.  Next question.

20 BY MR. DUPONT:

21     Q.   Have you seen any documents that provided you

22 with information about how the decision was made on

23 what chemicals would go into a blend made by Ashland

24 for a customer in the '60s and '70s?

25     A.   No, I have not seen documents that would --
```

**Transcript of Keenan, Thomas**

01   that cover that area.

02       Q.    When Ashland blended products on behalf of

03   the customer in the '60s and '70s, who made the

04   decision about what warning information would be

05   provided for the blend?

06            DEFENSE COUNSEL:  Calls for speculation.

07       A.    During the '60s and '70s there was -- the

08   requirement for hazard warnings was not there.  The

09   labeling, Ashland labeling started -- well, they

10   stenciled the name of the product and the company on

11   the labels, sorry, on the drums up until about 1970,

12   '69, '70.  At that time period they implemented a

13   labeling program which provided information on the

14   chemical name, the logo of the company.  And if there

15   was some specific guidance from trade associations or

16   other agencies at that time period, they would put

17   that information on.

18            I think '71 might have been about the start

19   of that with the federal Hazardous Substance Labeling

20   Act for certain select -- I think there's 30 chemicals

21   total.  And even that was focused on consumer products

22   and not industrial products such as these.

23            So during that time period there wasn't

24   really specific requirements, but Ashland was

25   providing labels and also started to provide MSDSs in

**Transcript of Keenan, Thomas**

01 the late '60s and during the '70s. The MSDS

02 requirement, as I understand it, didn't really come

03 about until 1985.

04     Q.   So once Ashland began to provide labeling

05 information and MSDS for chemicals, at least for some

06 chemicals in 1969, 1970 going forward, was it Ashland

07 that determined what language would go on to a label

08 for an MSDS?

09     A.   Not at the beginning because a lot of that

10 was -- there was documents out there from National

11 Safety Counsel, from Manufacturing Chemists'

12 Association, from the American Petroleum Institute

13 which selected chemicals. They provided

14 recommendations as to what labels should look like or

15 hazard warnings and they produced documents that were

16 also could be provided upon request to customers

17 during that time period.

18        It was probably in the early '70s -- well, in

19 late '60s that Ashland was starting to also develop a

20 hazard determination procedure and to provide MSDSs

21 and labels, which some of those products would have

22 been Ashland coming up with the recommendations for

23 warnings, but some of it would be relied upon trade

24 associations and other agencies too.

25     Q.   In what year did Ashland first provide a

**Transcript of Keenan, Thomas**

01 label with warning information on a container that had

02 benzene in it that it sold to a customer?

03     A.    I don't know the exact date, but I think it

04 was around '71.

05             (Telephone interruption.)

06             MR. SAYRE:   May we take a short break?

07             THE WITNESS:   Yeah, we need to take a break.

08     I'm sorry.

09             THE VIDEOGRAPHER:   We're going off the record

10     at 11:48.

11         (Recess from 11:48 a.m. to 11:59 a.m.)

12             THE VIDEOGRAPHER:   We're back on the record.

13     The time is 11:59 a.m.

14 BY MR. DUPONT:

15     Q.    Dr. Keenan, before the break we began

16 discussing when Ashland started putting a label on

17 benzene that is distributed to customers, and you told

18 me that the year was 1971 when that started?

19     A.    It was around 1971, yes.   I don't know

20 whether that's the exact date, but that's the time

21 period that I recall.

22     Q.    Before 1971, when Ashland sold benzene to a

23 customer did it provide any type of information off of

24 a label about the health hazards of benzene?

25     A.    My understanding is that if a customer

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01 requested information that there was information

02 available such as the document from the American

03 Petroleum Institute and the document from -- yeah, and

04 document from the Manufacturing Chemists' Association

05 at that time period also.

06     Q.   What document from the American Petroleum

07 Institute did Ashland provide to a customer if the

08 customer requested information on benzene before 1971?

09     A.   There was that report in 1960, I think it

10 was, from Drinker. I think it was Drinker. And then

11 Manufacturing Chemists' Association also put almost

12 like a MSDS, but not per se, and I think 1960 was

13 about the date on that one also.

14     Q.   Was the American Petroleum Institute 1960

15 document by Drinker the API Toxicological Review

16 Benzene?

17     A.   Without having it in front of me I can't say

18 that for certain, but I think that was the title.

19     Q.   And why was it only provided, that document,

20 to a customer if the customer requested it?

21         MR. SAYRE: Objection to form.

22     A.   Could you repeat it because somebody joined

23 in and I didn't hear the full question.

24     Q.   Why did Ashland only provide its customers

25 with the API 1960 toxicological review for benzene

**Transcript of Keenan, Thomas**

# Keenan, Thomas
## Rhyne Trial Master

01  when a customer requested it?

02       MR. SAYRE:  Objection to form.

03   Argumentative.  You can answer it.

04   A.   I don't know the answer to that.

05   Q.   Why did Ashland not automatically send

06  customers the API toxicological review on benzene from

07  1960 when it shipped benzene to them?

08       MR. SAYRE:  Same objection.  Same basis.

09   A.   At that time period there was no requirements

10  to provide information on products and so I can't

11  answer one way or the other.  I have no -- I don't

12  know why the decisions not to send it or send it were

13  made in that time period.

14   Q.   When you say there was no requirement to

15  provide that type of information to customers in that

16  time period, what requirement are you referring to?

17   A.   There was no requirement, so that's what I

18  was referring to.  I'm not aware of any legal

19  requirements to provide that information along with

20  products in that time period.

21   Q.   When you say legal requirement -- I

22  apologize.  When you say legal requirements, are you

23  talking about a law requiring that Ashland provide

24  information on the health hazards of benzene?

25       MR. SAYRE:  Objection to form.

**Transcript of Keenan, Thomas**

01     A.    During that time period, 1960s and '70s,

02  there was no requirement for that, that's correct.

03     Q.    At some point in time did a law come into

04  place that did require Ashland to provide information

05  on the health hazards of benzene?

06     A.    Yes.

07     Q.    When was that?

08     A.    I think it was published in '84 and the

09  requirements started in '85 for internal employees,

10  and '85, '86 for external.  For customers.

11     Q.    Did Ashland provide information on the health

12  hazards of benzene at some time before 1971 and 1984?

13     A.    You mean from the time period '71 to '84?

14     Q.    Yes.

15     A.    Yes.  Yes, we did.

16     Q.    So at some point Ashland decided, before

17  there was a law in place requiring it to provide

18  information to customers, that it would provide health

19  hazard information on benzene?

20     A.    Benzene and other products we sold, yes.

21     Q.    So why was the decision made in 1971 to start

22  providing information on the health hazards of

23  benzene?

24        MR. SAYRE:  Objection to form.

25     A.    I don't know the answers to what the thought

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01 process was to implement the hazard communication

02 system that they did in the late '60s, early '70s, but

03 that decision was made and they continued to provide

04 that information through when the hazard communication

05 standard was implemented in the '80s.

06     Q.   Did the API toxicological review of 1960

07 provide the reader with information about leukemia

08 resulting from exposure to benzene?

09     A.   I don't -- I can't say one way or the other.

10 I haven't reviewed that document in quite some time.

11     Q.   What was the Manufacturing Chemists'

12 Association's document that Ashland provided to

13 customers, if requested, on the topic of benzene

14 before 1971?

15     A.   I don't recall the title of it.  I just

16 remember that there was a document, but the specifics

17 of it, without seeing it, I don't recall what that

18 was.

19     Q.   Was the name of the Manufacturing Chemists'

20 Association's document Chemical Safety Data Sheet SD-2

21 for benzene?

22     A.   I'm not sure what the title was.  It sounds

23 plausible, but that's all I can say is that that title

24 is -- sounds like it could be it, but until I see it I

25 can't really say one way or the other.

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

01          MR. DUPONT:  To our video technician, could

02     you give me your e-mail address, please.

03          THE VIDEO TECHNICIAN:  Sure.  It's Benjamin,

04     the letter B, n-e-a-t-e, at Gmail.com.

05          MR. DUPONT:  I'm sorry.  Benjamin.

06          THE VIDEO TECHNICIAN:  The letter B.  And

07     then it's my last name, which is N-e-a-t-e, like

08     the word neat with a silent E at the end, at

09     Gmail.com.

10 BY MR. DUPONT:

11    Q.   All right, Dr. Keenan, I'm going to see if I

12 can get these documents over to you.

13    A.   Okay.

14    Q.   So once Ashland put a label on the benzene

15 that it sold to customers in around 1971, what did

16 that label say?

17    A.   I don't recall what it said.  I would have to

18 see the label.  And I don't believe they started --

19 I'm sorry.  I don't believe they started dating the

20 labels until about 1974, so the only thing I recall is

21 that there was no date on those labels until '74.

22    Q.   Does Ashland still have copies of the labels

23 it used on benzene when they started putting labels on

24 benzene in the 1970s?

25    A.   I have seen them before.  I cannot say one

**Transcript of Keenan, Thomas**

```
01  way or the other whether they're still there, but I
02  have seen them in depositions before.
03      Q.   Did Ashland place a warning about -- strike
04  that.
05          Did Ashland place a warning about benzene
06  causing aplastic anemia on a label that it used to
07  sell benzene to customers on?
08      A.   Once again, I don't recall exactly what was
09  provided on the labels at that time period.  I do
10  recall that the MSDSs would have addressed aplastic
11  anemia during the '70s.  I don't remember the exact
12  dates on that, but during the '70s they did have
13  aplastic anemia prior to '77.
14      Q.   What was the first date that Ashland put a
15  aplastic anemia warning on a label -- strike that.
16          What was the date of the first MSDS
17  distributed by Ashland that contained an aplastic
18  anemia warning on it for benzene?
19      A.   I don't recall the exact date.  It was early
20  '70s.
21      Q.   Did Ashland sell benzene to customers in the
22  1960s and 1970s which put the benzene into consumer
23  products?
24          MR. SAYRE:  Objection.  Calls for
25      speculation, lacks foundation.
```

KEENAN -
(THOMAS) VOL 1
**Transcript of Keenan, Thomas**

Page 40

01          You can answer.

02      A.    Yeah, I don't know the answer to that one way

03  or the other.  And I don't believe we started

04  selling -- well, I don't know the answer.  Just forget

05  that.

06      Q.    Did Ashland have any type of policy in the

07  1960s and 1970s that it would not sell benzene for use

08  in consumer products?

09      A.    I don't know the answer to that one way or

10  the other.

11          MR. DUPONT:  All right.  Our videographer,

12      did you receive the documents I sent to you?

13          THE VIDEO TECHNICIAN:  I have been refreshing

14      my e-mail.  I don't see it yet.  Did you just

15      send it now?

16          MR. DUPONT:  Yes.

17          THE VIDEO TECHNICIAN:  I'm not seeing it in

18      my e-mail.  Here we go.

19          MR. DUPONT:  Let's begin with the document

20      that has PDF API Toxicological Review Benzene

21      1967.  Would you be kind enough to show that to

22      the witness.

23          THE VIDEO TECHNICIAN:  Sure.  If you just

24      give me one second, I have to pull it into the

25      program.  Sorry.  Bear with me one minute.

**Transcript of Keenan, Thomas**

```
01          Which one did you want up first?

02          MR. DUPONT:  API Toxicological Review Benzene

03     1960.

04          THE VIDEO TECHNICIAN:  This one right?

05          MR. DUPONT:  Yes.

06          THE VIDEO TECHNICIAN:  Okay.

07          MR. DUPONT:  Let's mark this as Exhibit 1 to

08     the deposition.

09          (Plaintiffs' Exhibit No. 1 was marked for

10     identification.)

11  BY MR. DUPONT:

12     Q.   Dr. Keenan, I've marked as Exhibit 1 a

13  document with the title API Toxicological Review

14  Benzene, Second Edition, 1960.  Can you see that?

15     A.   No, not yet.

16     Q.   Our technician has blown up the front page of

17  the API Toxicological Review Benzene, Second Edition,

18  1960.  Can you see it now?

19     A.   No, we're still not seeing it here.

20          MR. SAYRE:  Technology promises so much.

21          THE WITNESS:  Yes.

22          THE VIDEO TECHNICIAN:  There's a way to make

23     it full screen.  If you go to the share section

24     on there there should be four arrows to make the

25     document share full screen.
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas

## Rhyne Trial Master

01          MR. SAYRE:  We don't see anything other than

02     the witness's face.

03          THE VIDEO TECHNICIAN:  I'm not sure why

04     you're not.  It should be up there.

05          MR. DUPONT:  In the top right-hand corner are

06     there four arrows pointing in if you put the

07     mouse up there?

08          MR. SAYRE:  Hey, gang, sorry to interrupt.

09     Let's go off the record so the reporter can help

10     without typing.  Everyone agrees.

11          MR. DUPONT:  Yes.  Thank you.

12          THE VIDEOGRAPHER:  We're going off the record

13     at 12:18.

14               (Discussion off the record.)

15          THE VIDEOGRAPHER:  We're back on the record

16     at 12:18.

17          MR. SAYRE:  And, Andrew, I would like you to

18     represent that this is a full and complete copy

19     of what this document purports to be as its

20     title.

21          MR. DUPONT:  Let me ask the question first.

22 BY MR. DUPONT:

23     Q.   Dr. Keenan, we have put on the screen on the

24 computer in front of you an image of the API

25 Toxicological Review Benzene, Second Edition, 1960,

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

Case 3:18-cv-00197-RJC-DSC   Document 311-3   Filed 09/02/20   Page 45 of 161
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 369 of 1330

01  which is marked as Exhibit 1.  Is this the API's

02  document from 1960 that you referred to as having been

03  prepared by Philip Drinker?

04      MR. SAYRE:  And again, I'd asked can you

05    represent that this is a full and complete copy?

06      MR. DUPONT:  Yes.

07      MR. SAYRE:  Okay.  Thank you.  Go ahead.

08  A.   Yes, it is.

09  BY MR. DUPONT:

10  Q.   And it's your understanding that this

11  document was provided to customers of Ashland if

12  requested when they purchased benzene?

13  A.   That's my understanding, yes.

14  Q.   And this document was provided for the period

15  of time before 1971 when labels weren't on the benzene

16  that Ashland sold?

17  A.   I don't know whether it stopped in 1971.  I

18  don't know the end date when they stopped sending this

19  out up on request.

20  Q.   Is your expectation that after 1971 if a

21  customer requested information on the health hazards

22  of benzene, that this API Toxicological Review Benzene

23  1960 would have been provided to them?

24  A.   Well, I don't know when they would have

25  stopped sending this out.  You got to understand that

01  Ashland was still in the process of implementing a
02  system at that standpoint and whether there could have
03  been overlap they might have continued to send it out
04  and for the benzene that we manufactured a lot of the
05  customers probably already had this document in their
06  file because of just being members of the American
07  Petroleum Institute.
08      Q.    Were some of Ashland's benzene customers not
09  members of the American Petroleum Institute?
10          MR. LO:  Calls for speculation.
11          THE COURT REPORTER:  Can you identify
12      yourself, please.
13          MR. LO:  Sure.  Philip Lo.  Sorry.
14      A.    I don't know the answer to that.
15          MR. SAYRE:  Since one objection is good for
16      all, feel free to just put defense counsel.
17          THE COURT REPORTER:  Thank you.
18          MR. DUPONT:  For our videographer, can we go
19      to page 4 of the document.  And could you blow up
20      the paragraph on the right-hand column.  It's the
21      second full paragraph and it says "The bone
22      marrow" as the first words.
23          THE VIDEO TECHNICIAN:  Where it says bone
24      marrow?
25          MR. DUPONT:  That full paragraph, please.

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01          THE VIDEO TECHNICIAN:  The last one?

02          MR. DUPONT:  No, the second full paragraph on

03     the right-hand column that begins with "The bone

04     marrow."

05          MR. SAYRE:  And while that's being done, I'm

06     going to object to the use of the document in

07     this fashion.  The witness can't page through the

08     document to look at its entirety to refresh his

09     recollection.  Also, the document appears to have

10     been altered with underlining and highlighting,

11     et cetera.  So I object to the use of the

12     document for questioning.

13          Please go ahead.

14     BY MR. DUPONT:

15     Q.    Dr. Keenan, we're looking at the API

16     toxicological review on benzene in 1960 and a

17     paragraph on the document that begins with the

18     sentence "The bone marrow may be hypoplastic, fairly

19     normal, or hyperplastic in appearance."  Are you able

20     to see that?

21     A.    Yes.

22     Q.    The next sentence in the API 1960

23     Toxicological Review for benzene says "Abnormal forms

24     or young cells may abound and leukemia, as a result of

25     chronic benzene exposure, has been reported;" is that

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

01  correct?

02      A.    That's what the sentence says, yes.

03      Q.    So did this API Toxicological Review on

04  benzene from 1960 provide the reader with information

05  about benzene causing leukemia?

06          DEFENSE COUNSEL:  Objection.  Calls for

07      speculation.  Calls for an expert opinion.

08          MR. SAYRE:  Join.

09      A.    My understanding is that what they are

10  referring are case reports here and the case reports

11  are not really establishing causation, they're just

12  observations that have occurred.

13          MR. DUPONT:  Objection.  Move to strike as

14      nonresponsive.

15  BY MR. DUPONT:

16      Q.    Does this API Toxicological Review for

17  benzene inform the reader that there have been reports

18  of leukemia as a result of chronic exposure to

19  benzene?

20          DEFENSE COUNSEL:  Same objection.

21          MR. SAYRE:  I'll object to the question in as

22      much as it calls for speculation as to what the

23      author intended.  The document, of course, speaks

24      for itself.  The witness is not an expert on the

25      document, is not being offered as to the

KEENAN -
(THOMAS) VOL 1

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

```
01      knowledge of the author, and it says what it
02      says.
03           You can answer.
04           MR. DUPONT:  Counsel, I think you can make an
05      objection to the form and then if I need further
06      clarification, as you said, I'll ask for it, but
07      providing additional information in your
08      objections is improper and should not be done.
09           MR. SAYRE:  I think it was important for this
10      only because the court would need to know the
11      basis for the objection because this is kind of
12      important.  So it's not my -- the witness is
13      fully capable -- he's got a Ph.D. in toxicology,
14      so he's fully capable of answering these
15      questions.  I just want to make sure that the
16      court is aware, when it's reviewing the
17      transcript and if you were to highlight this
18      testimony as that which you want to read at
19      trial, that the court has the full information.
20           Not to mention I think you could -- you're a
21      very good lawyer.  I'm sure you could rephrase
22      the question so that it's not objectionable.
23      A.   I'm going to need you to repeat the question.
24           MR. SAYRE:  We can have it reread.
25           THE WITNESS:  Reread, either way.
```

**Transcript of Keenan, Thomas**

01  BY MR. DUPONT:

02      Q.    Dr. Keenan, does the reader of this API

03  toxicological review for benzene in 1960 receive

04  information that there have been reports of leukemia

05  as a result of chronic benzene exposure?

06          MR. SAYRE:  Same objections.

07      A.    The document says what it says.  It does say

08  that individuals have had a -- I'm trying to find it

09  again.  Leukemia as a result of chronic benzene

10  exposure has been reported, and my understanding of

11  that is there were case reports of benzene exposure

12  being related to leukemia or associated with leukemia,

13  but those were case reports and observations, they're

14  not based upon an epidemiology study.

15      Q.    Do you know how many reports and cases of

16  leukemia following exposure to benzene there were by

17  1970?

18          DEFENSE COUNSEL:  Calls for speculation.

19      A.    No.

20          MR. SAYRE:  Go ahead.

21      A.    I don't know the answer to that question as

22  what the specific number is, no.

23      Q.    Was it your expectation that Ashland would

24  have been following the literature that was published

25  on the health hazards of benzene through the 1960s and

01  1970s?

02          MR. SAYRE:  Objection as to form,

03      specifically with the words "your expectation" as

04      vague and ambiguous.

05          You can answer.

06      Q.  Let me back up.  Did Ashland maintain abreast

07  of the literature on the health hazards of benzene

08  through the 1960s and 1970s?

09      A.   That's my understanding, that they were

10  following the information on benzene during that time

11  period.

12          MR. DUPONT:  If the technician would blow up

13      the paragraph above the one that we're looking at

14      right now that starts with "There is some."

15          THE VIDEO TECHNICIAN:  I'm sorry.  Is this

16      still page 4?

17          MR. DUPONT:  Yes.

18  BY MR. DUPONT:

19      Q.  Before we do that, let me ask you,

20  Dr. Keenan, did this API Toxicological Review on

21  benzene from 1960 provide the reader with information

22  about benzene causing aplastic anemia?

23          MR. SAYRE:  Same objections as before.  The

24      document speaks for itself.

25          You can answer.  Calls for speculation.

**Transcript of Keenan, Thomas**

01     A.   I'd have to see whether they actually called

02 out aplastic anemia.  I don't see it, just scanning

03 the document in this paragraph.  So I don't know the

04 answer to that.  Specifically, my assumption is that

05 it did some place in the document say -- relate to

06 aplastic anemia.

07          MR. SAYRE:  Move to strike the answer as an

08     assumption.

09     Q.   Where the API Toxicological Review on benzene

10 from 1960 uses the term "chronic benzene poisoning" or

11 "benzene poisoning," what does that refer to?

12          MR. SAYRE:  Same objections as before.  Calls

13     for speculation, lacks foundation.  Document

14     speaks for itself.

15     A.   I don't see where that is in here in front of

16 me at this point.  Oh, wait, I do see.  Follow-up of

17 chronic benzene poisoning.

18          During early years -- my understanding is

19 during the early years of benzene exposure that a lot

20 of -- very extremely high exposures to benzene could

21 occur and those exposures cause CNS depression and

22 things like that, and that would be my thoughts on

23 what they were talking about people who were exposed

24 to large enough to cause acute symptoms of benzene

25 effects.

**Transcript of Keenan, Thomas**

```
01      Q.   Was benzene poisoning a term used to describe

02 aplastic anemia?

03           MR. SAYRE:   Same objections.  Calls for

04      speculation.   Document speaks for itself.

05      A.   That's not my understanding.

06           MR. DUPONT:   To our videographer, can you

07      pull up the PDF of the document that says 1960

08      MCA Chemical Safety Data Sheet SD-2 Benzene.  And

09      can you blow up that section with the title of

10      the document.

11           MR. SAYRE:   And while we're doing that

12      technically, I will object to the use of this

13      document on the same basis that I objected to the

14      use of the last document, specifically that the

15      document is not before the witness, it's only

16      there virtually and it's -- we have no means of

17      looking at the document in total except what is

18      being shown.

19 BY MR. DUPONT:

20      Q.   Dr. Keenan, for any of these documents, the

21 videographer is capable of showing any portion of the

22 document that you want to see.  So if I ask you a

23 question and you feel the need to look at another

24 portion of the document, you're free to do so.  Okay?

25      A.   Okay.
```

**Transcript of Keenan, Thomas**

01          (Plaintiffs' Exhibit No. 2 was marked for

02   identification.)

03      Q.    So, Dr. Keenan, we're looking at the document

04   which we'll mark as Exhibit 2 with the title Chemical

05   Safety Data Sheet SD-2, Properties and Essential

06   Information For Safe Handling and Use of Benzene, 1960

07   Third Edition.  Third Revision, excuse me.  Do you see

08   that?

09      A.    Yes, I do.

10      Q.    Is this the Manufacturing Chemists'

11   Association document from 1960 that you referred to as

12   a document that Ashland would have provided upon

13   request to a customer buying benzene from Ashland in

14   the 1970s?

15          MR. SAYRE:  I apologize.  I thought you were

16      done.

17          Same objections as before.  You're showing a

18      title page and you're showing a blowup the of the

19      title page.  Once again, the witness has already

20      testified he hasn't seen this document for a long

21      time, he wouldn't know where to look otherwise to

22      authenticate it.  So, again, we object to the use

23      of the document in this fashion.

24          You can answer.

25      A.    I was going to ask if you could back off of

**Transcript of Keenan, Thomas**

01  the blowup so I could see the whole title page first

02  and just -- yes, this is the document.  Because down

03  at the bottom it says Manufacturing Chemists'

04  Associated, Incorporated.  It was the one I was --

05      Q.   All right.  And was this document sent to

06  Ashland's customers who purchased benzene when they

07  requested it in both the 1960s and 1970s?

08          MR. SAYRE:  Same objections.

09      A.   It would have -- that's my understanding, but

10  probably not until the late '60s when Ashland became a

11  member of the Manufacturing Chemists' Association.

12      Q.   When did Ashland become a member of the

13  American Petroleum Institute?

14      A.   Oh, gosh.  I think it was 1940s.  I want to

15  say '48, but I'm not exactly sure why that date is

16  hanging in my mind.  It's some time in that time

17  frame.

18      Q.   Did Ashland receive the 1948 version of the

19  API toxicological review for benzene?

20      A.   It is my understanding that they didn't

21  initially because they weren't manufacturing benzene

22  at that time period.

23      Q.   What is your understanding of when Ashland

24  first received the API toxicological review for

25  benzene dated 1948?

**Transcript of Keenan, Thomas**

01     A.    It would have been in the late '50s when

02 Ashland started to produce benzene.

03     Q.    Did Ashland, at some point, have a library or

04 collection of documents related to the health hazards

05 of benzene?

06     A.    Yes, there was information maintained on

07 hazards of benzene, either through textbooks or some

08 documents from trade associations.

09     Q.    How would you refer to that collection of

10 information on the health hazards of benzene?

11     A.    It was benzene, a file containing benzene

12 information.  During that time period that would

13 have -- it would have just been a hard copy file.

14     Q.    Where did Ashland keep its hard copy file of

15 benzene health hazard information?

16     A.    When I first started there was a file room

17 that we kept information on all the products that we

18 sold and that's where it was maintained.  A lot of

19 it's been -- I don't know what's happened to some of

20 it now.

21     Q.    Where did Ashland --

22           (Telephone interruption.)

23           MR. SAYRE:  I apologize, Counsel, we just

24     got --

25           THE WITNESS:  This is all right.  It's spam.

**Transcript of Keenan, Thomas**

```
01           MR. SAYRE:  It's spam.  Go ahead.
02  BY MR. DUPONT:
03      Q.   In the 1960s and 1970s, where did Ashland
04  keep its file of benzene health hazard information?
05      A.   I don't know the answer to that question.  I
06  wasn't around at that time period at Ashland.  I
07  didn't pursue where they were maintained, that
08  information.
09      Q.   What textbooks did Ashland have in its
10  collection of benzene health hazard information in the
11  1960s and 1970s?
12      A.   Once again, I won't be able to answer that
13  question either because I only was familiar with the
14  documents -- with the textbooks that were present when
15  I started.
16      Q.   When you started with Ashland in 1989, which
17  textbooks were in Ashland's collection of information
18  on the health hazards of benzene?
19      A.   The one I can remember most vividly, because
20  we had the whole collection, was the IARC monographs
21  on benzene, I mean on carcinogens, and there was a
22  volume, maybe more than one volume on benzene.  Other
23  than that -- it's been too long.  I don't remember
24  what else was there.
25           I know IARC was there.  We had some other
```

**Transcript of Keenan, Thomas**

01 toxicology textbooks, Casarett & Doull, which would

02 have been there, which would have covered benzene to

03 some degree, but there were other textbooks there.

04 I'm just not recalling what they were.

05     Q.   Are you familiar with the Irving Sax's

06 textbook entitled Dangerous Properties of Industrial

07 Materials?

08     A.   I am.

09     Q.   Was that a textbook Ashland had in its files

10 of the health hazards of benzene when you began in

11 1989?

12     A.   They had the textbook.  It would not be in

13 the files, no.  Textbooks would not be in files.  They

14 were in the library.

15     Q.   Which editions of the Sax Dangerous

16 Properties of Industrial Materials did Ashland have in

17 the library when you began in 1989?

18     A.   I don't recall the dates.

19     Q.   Did Ashland have the third edition from 1968

20 of the Sax Dangerous Properties of Industrial

21 Materials textbook?

22     A.   Once again, I don't know one way or the other

23 what the date was on that textbook.

24     Q.   When you interviewed the individuals who were

25 employed by Ashland in the 1960s and 1970s in order to

**Transcript of Keenan, Thomas**

01 learn about Ashland's historic activities and

02 knowledge related to benzene, did they tell you what

03 their sources of knowledge were about the health

04 hazards of benzene?

05     A.    Well, yes, from some degree they did.  I

06 mean, these documents that we're talking about

07 participation in the trade associations they did, but

08 specifically as to which texts they relied upon, there

09 is also NIOSH criteria documents that were available

10 in the '70s.  So there was a lot of information that

11 came out in the '70s on benzene.

12     Q.    Did any of the individuals that you

13 interviewed tell you what textbooks Ashland had in its

14 possession in the 1960s?

15     A.    No.  We did not ask -- I did not ask that

16 question and no one provided that information to me.

17     Q.    Did any of the individuals that you

18 interviewed tell you which textbooks Ashland had in

19 the 1970s?

20     A.    No, they did not.  That was another question

21 I did not ask that question.

22     Q.    Did Ashland have the 1974 IARC monograph

23 which addressed benzene?

24     A.    I'd have to see the document.  We had the

25 IARC monographs, but I don't recall the dates of the

**Transcript of Keenan, Thomas**

01   IARC monographs on benzene so I can't confirm one way

02   or the other whether it was 1974 or not.

03       Q.   What was Ashland's procedure in the 1970s for

04   obtaining copies of the IARC monographs?

05       A.   They purchased them from IARC.

06       Q.   Did Ashland purchase the IARC monographs in

07   the 1970s at or about the time they were published?

08       A.   I don't know the answer to that question.

09          MR. SAYRE:   Calls for speculation, last

10      question.

11          MR. DUPONT:   For the video technician,

12      there's a PDF that you should have that is IARC

13      1974.   Would you display that to the witness,

14      please.

15          THE VIDEO TECHNICIAN:   You said IRC 1974?

16          MR. DUPONT:   IARC 1974.

17          MR. SAYRE:   And, Andrew, may I have a

18      continuing objection so I don't have to keep

19      saying the same thing, that presenting documents

20      to the witness in this fashion does not allow him

21      to peruse the document both before and after

22      what's been being shown to him and, of course,

23      your comments in response.

24          MR. DUPONT:   Yes, you can.

25          MR. SAYRE:   Thank you.   Thank you, Counsel.

**Transcript of Keenan, Thomas**

01          (Plaintiffs' Exhibit No. 3 was marked for

02  identification.)

03  BY MR. DUPONT:

04      Q.    Dr. Keenan, our videographer, or video

05  technician is displaying to you a document that I'm

06  going to mark as Exhibit 3 to your deposition with the

07  title that begins IARC Monographs On The Evaluation Of

08  The Carcinogenic Risk Of Chemicals To Man, Some

09  anti-thyroid and related substances, nitrofurans and

10  industrial chemicals Volume 7.  Do you see that?

11      A.    Yes, I do.

12      Q.    And at the bottom of the document there are

13  dates, 4 to 11 February 1974 and 18 to 24 June 1974.

14  Do you see that?

15      A.    I do.

16      Q.    Is this a IARC monograph that was in

17  Ashland's records when you began with the company in

18  1989?

19      A.    Yes, we had Volume 7.

20      Q.    And is this type of document that Ashland

'21  would have read in order to follow what was being

22  published on the health hazards of benzene?

23      A.    We would have used -- relied on this document

24  as well as other pieces of information, yes.

25      Q.    Did Ashland ever pass on the IARC monograph

**Transcript of Keenan, Thomas**

01  from 1974 to customers that bought benzene from it?

02      A.    You mean provide them with this textbook?

03      Q.    Yes, or information from it.

04      A.    I know -- I would assume that we did not

05  provide them with a textbook since I believe they're

06  copyrighted, but I'm not a hundred percent sure about

07  that because I can't see the full document, but the

08  hazard communication that would have been provided in

09  our MSDSs and labels during this time period, if the

10  people doing the evaluation felt it was relevant they

11  would have passed information on from that, but I

12  would have no way of knowing whether they provided

13  excerpts out of this document to our customers upon

14  request.

15          MR. DUPONT:  To our video technician, can we

16      turn to page 15 of the document, please.  And

17      could you blow up that portion of it.  There you

18      go.

19      Q.    Doctor, if -- strike that.

20          Dr. Keenan, we've now blown up the language

21  on page 216 of the IARC monograph relating to benzene

22  in 1974 and there's sections that discuss comments on

23  data reported and evaluation.  Do you see that?

24      A.    Yes.

25      Q.    And section 4.2 contains information on human

**Transcript of Keenan, Thomas**

01  data.  Do you see that?

02      A.   I do.

03      Q.   And in this section the IARC states, "It is

04  established that exposure to commercial benzene or

05  benzene-containing mixtures may result in damage to

06  the hematopoietic system."  Do you see that?

07      A.   I do.

08      Q.   And is it your understanding that the

09  hematopoietic system is the blood-forming system?

10      A.   That's correct.

11      Q.   And that consists primarily of the bone

12  marrow?

13      A.   Yes.

14      Q.   The section on human data in the IARC's

15  conclusions in 1974 continues to read, "A relationship

16  between such exposure and the development of leukemia

17  is suggested by many case reports and this suggestion

18  is strengthened by a case-control study from Japan."

19  Do you see that?

20      A.   I do.

21      Q.   In 1974, did Ashland's benzene MSDS and

22  labels provide information about benzene and leukemia?

23      A.   Before I answer that question, there should

24  have been also in this document, someplace maybe in

25  the next page, where they come -- IARC comes to some

**Transcript of Keenan, Thomas**

01  type of final conclusion about the weight of evidence

02  of this data.  So I'd like to see that.  But my --

03          MR. SAYRE:  May we see that before he answers

04      your question?

05      Q.    Actually, the next page, page 217, begins the

06  list of references.  So page 216 that I've shown you

07  is the --

08      A.    Maybe it's a prior page then.

09          MR. SAYRE:  Perhaps it's a prior page.

10      Q.    Page 215, if you would like to see that,

11  contains information on epidemiological studies.  Is

12  that what you're referring to?

13      A.    No.  And maybe it was later documents they

14  started to do an overall weight of evidence.

15          MR. SAYRE:  Here's the problem, Counsel,

16      because we can't look through the document, we

17      can't find what the witness recalls.  So the

18      questioning, for the purposes of moving to

19      exclude this testimony at the time of trial, I'm

20      speaking now to the court, this is patently

21      unfair to the witness because he can't look

22      through the document and peruse it.  So we're

23      trying to find what he needs and we can't do it

24      through this system.

25          You may continue your deposition.

**Transcript of Keenan, Thomas**

# Keenan, Thomas
Rhyne Trial Master

01          DEFENSE COUNSEL:  Objection as to this line

02      of questioning.  Calls for an expert opinion.

03          THE VIDEO TECHNICIAN:  Excuse me, Counsel.

04      Which page would you like me to be on right now?

05          MR. SAYRE:  That's the videographer; right?

06      Are you asking us here in the deposition room or

07      are you asking plaintiffs' counsel?

08          MR. DUPONT:  Go back to PDF page 15, please.

09      That's PDF page 14.

10          THE VIDEO TECHNICIAN:  I thought you said

11      215.  I'm sorry.

12  BY MR. DUPONT:

13      Q.   All right, Dr. Keenan.  We're looking at the

14  section of the 1974 API -- strike that.

15          Dr. Keenan, we're looking at the IARC's 1974

16  monograph for benzene and section 4 that says Comments

17  on Data Reported and Evaluation.  Do you see that?

18      A.   Yes.

19      Q.   And under the section on Human Data there's a

20  sentence that reads, "A relationship between such

21  exposure and the development of leukemia is suggested

22  by many case reports, and this suggestion is

23  strengthened by a case-control study from Japan."  Did

24  I read that correctly?

25      A.   You did.

**Transcript of Keenan, Thomas**

01          DEFENSE COUNSEL:  The document speaks for

02      itself.

03      Q.   So we're clear, when it says "A relationship

04  between such exposure and the development of

05  leukemia," what they're referring to is exposure to

06  benzene and the development of leukemia; correct?

07          DEFENSE COUNSEL:  Calls for speculation.

08          MR. SAYRE:  Lacks foundation.

09      A.   What it's talking about is, once again,

10  referring to case reports and it's suggested, they're

11  saying there's some reports that are out there that

12  are suggesting it.  Another document that was

13  available at this time period from NIOSH also referred

14  to the case reports, but felt like there wasn't

15  sufficient evidence to develop or establish a

16  relationship between benzene exposure and leukemia and

17  suggested that further epidemiology studies be

18  conducted, which were started in the '70s and started

19  to really come about in the later '70s.

20          So, during this time period this, to me, it

21  says there's information out there that's suggestive,

22  but it's not conclusive and doesn't really tell you

23  that there is a relationship.  And NIOSH was also

24  agreeing with that type of opinion, that the data were

25  not strong enough to make a conclusion that that is --

**Transcript of Keenan, Thomas**

01  there was a relationship here in 1974.

02      MR. DUPONT:  Objection.  Move to strike.

03      Nonresponsive.

04      Q.  Dr. Keenan, my question is when the document

05  states "A relationship between such exposure and the

06  development of leukemia is suggested by many case

07  reports and the suggestion is strengthened by a

08  case-control study from Japan," the exposure they're

09  referring to is exposure to benzene or

10  benzene-containing mixtures; correct?

11      MR. SAYRE:  Same objection.  Asked and

12      answered.

13      A.  The prior sentence does refer to benzene and

14  benzene-containing mixtures.  So that statement was,

15  in my interpretation, is referring to benzene and

16  benzene-containing chemicals.  But, once again, this

17  says suggested.  It's not saying there's an

18  established relationship between exposure to benzene

19  and the development of leukemia.

20      MR. DUPONT:  I'll move to strike everything

21      beyond the word "chemicals."

22      THE WITNESS:  Can we take a break soon?  We

23      can finish this line of questioning.

24      MR. SAYRE:  By the way, Counsel, I'm sorry,

25      the witness had asked, turned to me and asked if

**Transcript of Keenan, Thomas**

```
01      we could take a break soon, but then he realized

02      that you had further questions about this

03      document.  So when you get to a natural breaking

04      point, let's take a quick break.

05 BY MR. DUPONT:

06      Q.   Did Ashland's MSDS for benzene that was used

07 in 1974 reference leukemia?

08      A.   Without having the document in front of me, I

09 can't answer that question.  I don't know one way or

10 the other.

11      Q.   When is your understanding of when the date

12 the word "leukemia" first appeared on an MSDS for

13 benzene that was used by Ashland?

14      A.   I'm fairly certain that it was 1977 without

15 looking at the documents, but I can't -- I think it

16 was 1977, but that's my assumption.  Sometime in that

17 time period.

18      Q.   When did the word "leukemia" first appear on

19 a label that was used by Ashland for benzene?

20      MR. SAYRE:   Objection to form.  You can

21      answer.

22      A.   I can't answer that question one way or the

23 other.  I don't know without seeing the document.

24      MR. DUPONT:   The witness has requested a

25      break, so we'll take a break.
```

**Transcript of Keenan, Thomas**

```
01          THE VIDEOGRAPHER:  We are going off the
02     record.  The time is 12:57 p.m.
03          (Recess from 12:57 p.m. to 1:05 p.m.)
04          THE VIDEOGRAPHER:  We're back on the record.
05     The time is 1:05 p.m.  This begins media unit
06     number two.
07 BY MR. DUPONT:
08     Q.   Dr. Keenan, we have on the screen for you the
09 complete page of a document that has at the top
10 Ashland Oil, Inc., Interim Material Safety Data Sheet
11 for benzene, and at the bottom has a date, December 2,
12 1971.  Have you seen this document before?
13     A.   Yes, I have.
14     Q.   And you're familiar with it?
15     A.   I am somewhat.  I mean, I don't have it
16 committed to memory but I know what the document is.
17     Q.   What is your understanding of what the
18 document is?
19     A.   This was the -- well, as it says on the
20 document, it was an interim safety data sheet while
21 they were still preparing the material safety data
22 sheet systems to provide hazard communication
23 information in the early '70s.
24     Q.   How was this interim material safety data
25 sheet for benzene dated December 2, 1971 used?
```

**Transcript of Keenan, Thomas**

01    A.    This would have been provided to customers if
02  they requested it.
03    Q.    So the procedure, at least in 1971, was that
04  Ashland provided the interim material safety data
05  sheet for benzene to a customer only if a customer
06  requested it?
07    A.    That's my understanding.
08        MR. DUPONT:  We'll go ahead and mark this as
09    the next exhibit number.  I think that's 4.
10        (Plaintiffs' Exhibit No. 4 was marked for
11  identification.)
12    Q.    Did the December 2, 1971, Interim Material
13  Safety Data Sheet For Benzene provide a warning about
14  benzene causing aplastic anemia?
15    A.    I can't read it very well.  Can it be
16  enlarged?
17    Q.    We can enlarge any section of the document
18  that you want to see.
19    A.    Okay.
20        THE VIDEO TECHNICIAN:  Is there a particular
21    spot that you want enlarged?
22        THE WITNESS:  I don't remember the document
23    well enough to tell you.
24        MR. SAYRE:  Doctor, is this the same copy?
25        THE WITNESS:  Yes.

**Transcript of Keenan, Thomas**

01          MR. SAYRE:  I have a paper copy I'm showing

02     him right now.

03          MR. DUPONT:  Great.

04 BY MR. DUPONT:

05     Q.   Dr. Keenan, do you have what we've marked as

06 Exhibit 4 before you, the Ashland Oil, Inc., Interim

07 Material Safety Data Sheet For Benzene dated December

08 2, 1971?

09     A.   I do.  Yes.

10     Q.   Does the 1971 version of Ashland's material

11 safety data sheet for benzene provide the reader with

12 any warning or information about benzene causing

13 aplastic anemia?

14          MR. SAYRE:  He's reading the document.

15     A.   No, it does not appear to have that

16 information on here.

17     Q.   Does 1971 Ashland MSDS for benzene provide

18 the information with any information and benzene

19 causing damage to the blood-forming system?

20     A.   No, it does not have that warning on this

21 document.

22     Q.   Does the 1971 Ashland MSDS for benzene

23 provide the reader with any information about benzene

24 causing anemia?

25     A.   No, that information is not here.

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

01    Q.   Did the 1971 Ashland MSDS for benzene provide
02 the reader with any information about the need to wear
03 a respirator to prevent exposure to benzene?
04    A.   It suggests having special ventilation, but
05 do not see anything for respirator.
06    Q.   What is your understanding of what is meant
07 by special ventilation?
08    A.   It could be lots of different things.  It
09 would depend upon the operation that the material was
10 being used in, so this was information to a customer
11 if they were using this product that they should
12 consider ventilation in the area it's using it.
13    Q.   Does this 1971 benzene MSDS tell the reader
14 that benzene is absorbed through human skin?
15       MR. SAYRE:  The document speaks for itself.
16 You can answer.
17    A.   No, it does not address skin absorption.
18    Q.   Do you know what information was reviewed by
19 individuals at Ashland when they prepared this
20 material safety data sheet?
21    A.   This is an interim material safety data
22 sheet.  I don't know exactly what they reviewed, but
23 they would have had the documents, some of the
24 documents we discussed prior to this on the -- from
25 the Manufacturing Chemists' Association and API.

**Transcript of Keenan, Thomas**

01    Q.    You're saying they would have had the API

02  toxicological review on benzene from 1960 and 1948 as

03  well as the Manufacturing Chemists' Associations SD-2

04  sheet?

05    A.    That would be my understanding, yes.

06         THE COURT REPORTER:  I need to turn up the

07    volume.  Hold on one second.  Okay.

08         MR. SAYRE:  Good to go.

09  BY MR. DUPONT:

10    Q.    What was the next date of material safety

11  data sheet that was prepared by Ashland for benzene?

12    A.    I don't know off the top of my head.  I would

13  have to see the document.

14         MR. DUPONT:  And to our video technician, can

15    we display PDF 1976.11.11 Ashland MSDS.

16    Q.    Dr. Keenan, are you able to see the November

17  11, 1976 Ashland benzene MSDS that's on the screen?

18         MR. SAYRE:  Andrew, may I ask, does the copy

19    that you have have an ASHCOLE 00912?

20         MR. DUPONT:  It does.

21         MR. SAYRE:  Okay.  I have it here for him.  I

22    will show it to him now.

23    A.    It's difficult to read on the screen.  It's

24  difficult to read on paper too.

25         Yes, I do see this document.

**Transcript of Keenan, Thomas**

```
01            (Plaintiffs' Exhibit No. 5 was marked for
02    identification.)
03      Q.    All right.   So we'll mark as Exhibit 5 to
04    your deposition, the Ashland Material Safety Data
05    Sheet for benzene that's dated November 11, 1976.
06      A.    Yes.
07      Q.    By this time, November 11, 1976, was benzene
08    accepted to be a cause of aplastic anemia?
09            MR. SAYRE:   Objection.   Vague and ambiguous
10        by what you mean accepted.
11            You can answer.
12            DEFENSE COUNSEL:   Calls for an expert
13        opinion.   Calls for speculation.
14      A.    It's my understanding that benzene had been
15    associated with aplastic anemia in 1976.
16    BY MR. DUPONT:
17      Q.    And would you say that benzene was a known
18    cause of aplastic anemia by 1976?
19      A.    Yes, I would say that.   Yes.
20            DEFENSE COUNSEL:   Sorry.   Same objections.
21      Q.    So we have context, what is aplastic anemia?
22      A.    Well, aplastic anemia is -- well, it's
23    anemia.
24            MR. SAYRE:   Calls for an expert opinion.   The
25        witness can answer based on his understanding.
```

**Transcript of Keenan, Thomas**

01      Go ahead.

02      A.    My understanding is more vague than it used

03  to be since I've been retired for a few years, but

04  it's -- I think all the blood-forming cells are in

05  deficit in aplastic anemia.

06      Q.    Are you aware that aplastic anemia can be a

07  fatal condition?

08          MR. SAYRE:   Objection.   Calls for an expert

09      opinion.   Calls for a medical opinion.

10      A.    Yeah, I'm not a physician so I'm not going

11  to -- I don't have an answer for that one way or the

12  other.

13      Q.    Does this November 11, 1976, MSDS for benzene

14  that was prepared by Ashland make reference to

15  leukemia or cancer?

16      A.    Well, there's more pages than this, so I

17  would have to -- I've got more pages in front of me.

18          Actually, on section 9 of this MSDS it does.

19  "Overexposure to this material has been found to cause

20  aplastic anemia and liver, kidney, system and bone

21  marrow damage and also endocrine gland changes in

22  laboratory animals.   Overexposure to this material has

23  been suggested to cause a -- cause of anemia and liver

24  and lung damage in humans."

25      Q.    Yeah.   So take a look through the entire

**Transcript of Keenan, Thomas**

01  document and tell me, does it make reference to

02  leukemia or cancer?

03      A.   I just -- it does not refer to leukemia or a

04  cancer.  It does refer to aplastic anemia and anemia

05  and other effects, bone marrow damage.  But in '76

06  there was still -- it was '77 before the Pliofilm and

07  the association came out.

08          MR. DUPONT:  Objection.  Move to strike the

09      nonresponsive portion.

10      Q.   When you began with Ashland in 1989, did the

11  company have a copy of Hamilton and Hardy's textbook?

12      A.   I believe they did.

13      Q.   And is that a textbook that you are familiar

14  with?

15      A.   I've seen it before, yes.  I wouldn't say I'm

16  familiar with it.

17      Q.   Which versions of Hamilton and Hardy's

18  textbook did Ashland have when you began with the

19  company in 1974?

20      A.   I don't recall which versions.  And, I'm

21  sorry, could you repeat -- when did he say?

22          MR. SAYRE:  Did he say '74 or '84?

23      A.   It was '89.  Should have been '89.

24      Q.   Okay.  I apologize.

25      A.   I am old, but I'm not that old yet.

**Transcript of Keenan, Thomas**

01     Q.    Which version of the Hamilton and Hardy

02  textbook did Ashland have in 1989 when you began with

03  the company?

04     A.    And, once again, I don't know which version

05  it was.

06     Q.    The Hamilton and Hardy textbook that you're

07  familiar with, was that called Industrial Toxicology?

08     A.    I don't remember the title.  I remember it by

09  Hamilton and Hardy.  It could be Industrial

10  Toxicology.  I don't know.

11     Q.    And that name Hamilton, does that refer to

12  Alice Hamilton?

13     A.    That's my understanding, yes.

14     Q.    And she was a professor of industrial

15  medicine at the Harvard School of Public Health?

16     A.    I don't recall where she was an instructor

17  at.

18     Q.    Do you agree that she was somebody who

19  published quite a few articles and texts on benzene

20  and its health hazards?

21          DEFENSE COUNSEL:  Calls for speculation.

22          MR. SAYRE:  Lacks foundation.

23     A.    I don't know the answer to that one way or

24  the other.

25  BY MR. DUPONT:

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

01    Q.    How did Ashland use the Hamilton and Hardy

02 textbook?

03    A.    Well, it would be like other textbooks, they

04 would have looked at the information in there and done

05 an evaluation of the information versus other

06 information that was also available at that time.

07    Q.    So the Hamilton and Hardy textbook was one of

08 the sources of information that Ashland had when it

09 considered the health hazards of benzene?

10       MR. SAYRE:    Objection to form.

11    A.    I can't state a hundred percent that they

12 used that document, that book at that time period, but

13 it should have -- it was available when I started.

14 But whether it was available to them in the '70s, I

15 don't know.

16    Q.    Is it the type of document or publication

17 that Ashland would read in order to maintain abreast

18 of what was being published on the health hazards of

19 benzene?

20    A.    It would have been a document that they would

21 have looked at if they had it in their possession at

22 the time periods that you're referring to, yes.  And

23 I'm not sure what time periods you're talking about

24 and which publication we're talking about and what the

25 dates of this are.

**Transcript of Keenan, Thomas**

01     Q.   In the 1960s and 1970s when Ashland was

02 reviewing information in order to be educated about

03 the health hazards of benzene, was Hamilton and

04 Hardy's textbook one of the sources of information

05 that it would have reviewed?

06          MR. SAYRE:  Objection to form.

07     A.   I can't answer that question because I don't

08 know which version of that textbook was in place and

09 whether they had it during that time period or whether

10 they had a more recent version of the textbook when I

11 got there.

12          MR. DUPONT:  To our video technician, could

13     we pull up the PDF 1974 Hamilton, A, mark it as

14     Exhibit 6, please.

15          THE VIDEO TECHNICIAN:  Sure.  Give me one

16     second to pull that item to the program.  Okay.

17          (Plaintiffs' Exhibit No. 6 was marked for

18 identification.)

19          MR. SAYRE:  And, for the record, same

20     objections.  I believe I have a continuing

21     objection to the documents being shown on the

22     computer in this fashion.

23          MR. DUPONT:  To our technician, could you

24     expand upon the section of the document that

25     includes the title Industrial Toxicology and goes

**Transcript of Keenan, Thomas**

01    through the bottom Publishing Sciences Group,

02    Inc.

03  BY MR. DUPONT:

04    Q.    Dr. Keenan, can you see what we've blown up

05  as the first -- the cover of Exhibit 6 titled

06  Industrial Toxicology, Third Edition, by Alice

07  Hamilton and Harriet Hardy?

08    A.    Yes, I see it.

09    Q.    Is that the Hamilton and Hardy textbook that

10  you saw in Ashland's records, the library, in 1989?

11    A.    I don't know whether it was the third edition

12  I saw.

13    Q.    Okay.  Understanding you're uncertain as to

14  which edition it was, was industrial toxicology by

15  Hamilton and Hardy the textbook that you saw in

16  Ashland's records when you began in 1989?

17    A.    Yes.  They had a textbook named Industrial

18  Toxicology by Hamilton and Hardy, but the edition I'm

19  not certain.

20    Q.    Did Ashland have multiple editions of

21  Industrial Toxicology by Hamilton and Hardy when you

22  began with the company in 1989?

23    A.    I don't recall one way or the other.

24    Q.    When Ashland sold benzene to customers in the

25  1960s and 1970s, did it tell them that they should or

**Transcript of Keenan, Thomas**

01 should not use benzene in consumer products?

02       MR. SAYRE: Objection. Asked and answered.

03   A. I don't know the answer to that question one

04 way or the other.

05       MR. DUPONT: To our videographer, can we go

06     to the PDF page number 4 to the exhibit.

07     THE VIDEO TECHNICIAN: I'm sorry. I couldn't

08     hear because there a noise that just happened

09     here. What did you say?

10     MR. DUPONT: Go to PDF page 4 to the exhibit,

11     please.

12     THE VIDEO TECHNICIAN: Page 4 of this

13     exhibit?

14     MR. DUPONT: Yes.

15 BY MR. DUPONT:

16   Q. Dr. Keenan, we're displaying for you a page

17 from Hamilton and Hardy's 1974 Industrial Toxicology

18 textbook which contains part of the section on toxic

19 effects. Do you see that?

20   A. Yes.

21   Q. And what I'd like to do is blow up so that

22 you can read it, the first two sentences of the second

23 paragraph under Toxic Effects.

24     MR. DUPONT: The second paragraph, please.

25     THE VIDEO TECHNICIAN: You said second

**Transcript of Keenan, Thomas**

01      paragraph down here?

02          MR. DUPONT:   Second paragraph under Toxic

03      Effects, yes.

04          VIDEO TECHNICIAN:   Sorry.   Give me one

05      second.   I don't know why it's doing this.

06          DEFENSE COUNSEL:   Can we get people to mute

07      their phone.

08  BY MR. DUPONT:

09      Q.   Dr. Keenan, while we're trying to work

10  through these technical difficulties here, can you

11  read the text that's on the page now?

12      A.   No.

13          MR. SAYRE:   It's very small.

14          THE WITNESS:   Now we got it blown up.

15          MR. SAYRE:   Again, same objections as to the

16      document being unavailable to peruse.   It's

17      unfair to the witness.

18          DEFENSE COUNSEL:   I also want to state an

19      objection that the witness is not sure that this

20      is the edition that they had.

21  BY MR. DUPONT:

22      Q.   Dr. Keenan, in this section from Hamilton and

23  Hardy's 1974 textbook Industrial Toxicology, on the

24  toxic effects of benzene there's a paragraph that

25  begins with the sentence "Chronic benzene poisoning is

**Transcript of Keenan, Thomas**

01  of far greater toxicological significance."  And the

02  next sentence reads, "Its incidents has been gradually

03  decreasing over recent years with the improvement of

04  industrial hygiene measures and a thoughtful and

05  effective search for technically satisfactory and less

06  toxic benzene substitute."  Do you see that?

07      A.   Yes.  That's what those two sentences say.

08      Q.   Was Ashland aware, by 1974, that there was

09  already, for a period of time before 1974, a movement

10  to substitute benzene for less toxic solvents?

11          MR. SAYRE:  Objection to form.

12          DEFENSE COUNSEL:  Calls for speculation and

13      expert opinion.

14      A.   I can't say one way or the other as to

15  whether that's the situation.  I know that early in

16  the 20th Century the benzene toxicity from a poisoning

17  standpoint was of concern and it was used less until,

18  I think, World War II, and then the use of it started

19  to increase again because of its usefulness.

20  BY MR. DUPONT:

21      Q.   Was the increase of benzene use in World War

22  II in order to make explosives for the war?

23      A.   I have no idea why it was used.  I just

24  remember reading that from some time period ago that

25  that was the situation, that benzene use was

**Transcript of Keenan, Thomas**

01  diminishing and then the war efforts because, I think,

02  of the lack of -- or availability of other solvents

03  caused it to increase again.

04      Q.   Can you turn to the next page of the

05  document, PDF page 5.  And if you would turn to the

06  paragraph that begins with the words "While there has

07  been no doubt."

08          Dr. Keenan, the first sentence in this

09  paragraph says, "While there has been no doubt for

10  many years that benzene can produce fatal aplastic

11  anemia, the association between benzene exposure and

12  leukemia has been a matter of more recent

13  controversy."  Do you see that?

14      A.   I do.

15      Q.   Do you agree that as of 1974 there was no

16  doubt for many years that benzene produced fatal

17  aplastic anemia?

18          MR. SAYRE:   Objection.  Calls for an expert

19      opinion, lack of foundation, calls for

20      speculation.

21          You can answer.

22      A.   I agree that benzene exposure and aplastic

23  anemia were associated prior to 1974.  I don't know

24  about the fatal part.

25      Q.   Do you agree that there was no doubt in the

**Transcript of Keenan, Thomas**

01 medical community by 1974 and years before 1974 that

02 benzene produced aplastic anemia?

03     MR. SAYRE:  Same objections.  The witness has

04     not been offered as an expert witness.  It calls

05     for an opinion and has nothing to do with

06     Ashland.  You're asking for his opinion.

07     You can answer.

08 A.    It's my understanding, as I said before, that

09 benzene exposure was associated with aplastic anemia

10 prior to 1980 -- 1974.

11     DEFENSE COUNSEL:  I also want to make a

12     belated objection this textbook is not a medical

13     textbook.

14 Q.    Dr. Keenan, the next sentence in this

15 textbook by the medical doctor, Alice Hamilton, reads

16 "It is now --" well, let me withdraw that.

17     The next sentence in this paragraph from

18 Hamilton and Hardy's 1974 Industrial Toxicology

19 textbook reads, "It is now generally accepted that

20 benzene can produce leukemia of varying forms and that

21 such leukemia can appear with or without an antecedent

22 history of aplastic anemia."  And they cite to an

23 article by Vigliani and Saita, 1964.  Do you see that?

24 A.    I see that.

25 Q.    And it continues to read that "The conversion

**Transcript of Keenan, Thomas**

01 of aplastic anemia to leukemia is not uncommon in

02 cases in which the cause of anemia is unknown."  Do

03 you see that?

04     A.   I see that.

05     Q.   And it continues to have a discussion of the

06 types of leukemia that were observed and reported

07 after exposure to benzene?

08         MR. SAYRE:  What's the question?

09     Q.   Is it correct that this paragraph follows

10 with information on types of leukemia that were

11 reported after exposure to benzene?

12         MR. SAYRE:  The document -- lack of

13     foundation, calls for speculation.  The document

14     speaks for itself.

15         DEFENSE COUNSEL:  Calls for an expert

16     opinion.  Calls for a medical opinion.

17     A.   I'm not sure if I've been asked a question.

18         MR. SAYRE:  Please rephrase your question.

19 BY MR. DUPONT:

20     Q.   When the authors state in this document

21 "Chronic myelogenous leukemia appears to be the most

22 common type associated with benzene exposure, but

23 acute myelogenous and acute and chronic lymphocytic

24 varieties has been reported as well, are they

25 providing the reader with information about the types

**Transcript of Keenan, Thomas**

01  of leukemia that has been reported following exposure

02  to benzene?

03        MR. SAYRE:  Okay.  Calls for speculation as

04     to the mind of another and the intent of the

05     author.  The document speaks for itself.  The

06     witness has not authenticated the document as one

07     in the possession of Ashland.

08        Appears you're asking for an opinion of an

09     expert.  He's not been designated as such.  And

10     all the other objections we've made to these

11     documents.

12        You can answer.

13     A.    That's what the document says.  I have no

14  other additional comments on this other than that this

15  is the opinion of the authors that they've published

16  here.

17     Q.    Where the document states "It is now

18  generally accepted that benzene can produce leukemia

19  of varying forms and that such leukemia can appear

20  with or without an antecedent history of aplastic

21  anemia," is that information that was available to

22  Ashland as of 1974?

23        MR. SAYRE:  All the same objections.

24     A.    And, once again, I cannot state that they had

25  this document prior to 1974.  Or prior to 1989.  I

**Transcript of Keenan, Thomas**

01    don't know which version we had when I got there and I

02    don't know when they purchased it.

03      Q.   Do you agree this textbook was something

04    publicly available to Ashland and that the information

05    that it states that it is now generally accepted that

06    benzene can produce leukemia of varying forms and that

07    such leukemia can appear with or without an antecedent

08    history of aplastic anemia was available to Ashland by

09    1974 through a search of the public literature?

10         MR. SAYRE:  So I will object to the question

11      on several grounds.  One is that it calls for the

12      witness to speculate.  The witness has not

13      authenticated the document, has no personal

14      knowledge of the document you've shown him and as

15      not identified it as one that Ashland necessarily

16      had.  It presumes facts not in evidence and the

17      document itself has not been authenticated, calls

18      for speculation, lacks foundation.

19       You can answer.

20       THE WITNESS:  Could you reread the question.

21      (The question was read by the reporter.)

22       MR. SAYRE:  Also it's compound and seeks an

23      opinion from an expert and he's not been offered

24      as an expert.

25      A.   I don't know the exact publication date of

**Transcript of Keenan, Thomas**

01 this book, but after it was published it would have

02 been publicly available to anybody who decided to

03 purchase it.  Now, whether Ashland purchased it or had

04 it in their possession at that time period, I don't

05 know the answer to that.

06          DEFENSE COUNSEL:  Counsel, can I have a

07      clarification.  Is Exhibit 6 the entire textbook?

08          MR. DUPONT:  It is not the entire textbook.

09          DEFENSE COUNSEL:  Thank you.

10 BY MR. DUPONT:

11      Q.   If Ashland obtained Hamilton and Hardy's 1974

12 textbook in 1974 and read the statement that it was

13 now general accepted that benzene can produce leukemia

14 of varying forms and that such leukemia can appear

15 with or without an antecedent history of aplastic

16 anemia, would it have -- would Ashland have provided

17 that information to customers on a material safety

18 data sheet?

19          MR. SAYRE:  So object to the question on the

20      basis that it's incomplete hypothetical.  The

21      witness has been designated as a corporate

22      representative to the categories mentioned and in

23      none of the categories does it suggest that a

24      hypothetical question will be asked.  He's here

25      to provide information as to what he knows

**Transcript of Keenan, Thomas**

01     actually happened, not what would have or should

02     have or could have happened, and as a result it

03     calls for speculation and lacks foundation.  May

04     also call for an expert opinion.

05          You can answer.

06     A.   I really don't know one way or the other.

07 There was a lot of information that was available that

08 they would have considered at that time period and

09 this is one author's opinion of what the data

10 suggested.

11          As I said before, the NIOSH document

12 disagrees with this statement in 1974 and so, once

13 again, you're getting into controversy about whether

14 this is happening or not in this time period.  And so

15 whether that information how Ashland would have viewed

16 that information at that time period, I cannot make

17 that leap of faith to make that statement to know how

18 they did that.

19     Q.   Was Ashland aware of the publication by

20 Vigliani and Saita during the 1960s and 1970s on their

21 investigation of benzene-exposed workers?

22          MR. SAYRE:  Same objections as before.

23     A.   I don't know one way or the other whether

24 they had that document or not.  That publication.

25     Q.   Let's go back to the 1976 Ashland benzene

**Transcript of Keenan, Thomas**

01 MSDS.

02     THE VIDEO TECHNICIAN: You said 1976 Ashland?

03     MR. DUPONT: Benzene MSDS.

04     MR. SAYRE: Andrew, he has it in front of

05 him.

06     MR. DUPONT: Yes. We don't need to put it up

07 on the screen right now because he has a hard

08 copy.

09     THE VIDEO TECHNICIAN: Okay. I'll take it

10 down.

11 BY MR. DUPONT:

12     Q. Did Ashland have a material safety data sheet

13 for benzene that was dated between the 1971 Interim

14 Benzene MSDS and the 1976 benzene MSDS?

15     A. I believe so.

16     Q. What date or dates did Ashland prepare

17 material safety data sheets between 1971 and 1976?

18     A. Without seeing the documents, I don't know

19 the exact dates. Vaguely something's sticking in my

20 mind that's '72. Might have been the first document

21 that was based on the OSHA form, form 20.

22     Q. When did Ashland first warn about aplastic

23 anemia on a benzene MSDS?

24     MR. SAYRE: Objection. Asked and answered.

25     A. Without seeing the documents, I can't state.

**Transcript of Keenan, Thomas**

01 I don't know the answer to that question. We know
02 they state it in the '76 one, but I don't know whether
03 anything prior to that.
04    Q.   Do you have any copies of Ashland material
05 safety data sheets with you other than the 1971 and
06 1976 version that we've marked as an exhibit?
07    A.   I personally didn't bring any documents to
08 this deposition.
09    Q.   Does your counsel have any copies of a
10 Ashland material safety data sheet other than the 1971
11 and 1976 version that we've marked as exhibits?
12       MR. SAYRE:   I don't believe I'm being
13    deposed.
14    A.   I don't know the answer to that, I will
15 answer that question.  They did not show me documents
16 yesterday.
17    Q.   Does Ashland still have material safety data
18 sheets for benzene that it used in the 1970s?
19    A.   I don't know the answer to that question
20 because those businesses have been sold.  Petroleum
21 business, I think, left -- well, they joint ventured
22 in 2004, 2005, and then Marathon purchased the whole
23 thing and a few years later, I think, 2008, '9,
24 something like that, and then the distribution company
25 which would have been responsible for the drums of

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

```
01  benzene in the early '70s would have been sold in
02  2011.
03          MR. SAYRE:  And I will belatedly object on
04      the basis that he's not being offered as the
05      custodian of records.  Calls for speculation,
06      lacks foundation.
07      Q.  Has any search been conducted by Ashland
08  related to its sales of benzene to a company called
09  The Savogran Company?
10          MR. SAYRE:  Same objections.  He's not being
11      offered -- it's not in the categories that I
12      mentioned that he's being offered for.  He would
13      have no way of knowing.
14          But you can answer the question.
15      Q.  You can answer the question.
16      A.  I don't know one way or the other.
17      Q.  Has Ashland ever -- strike that.
18          Has Ashland conducted any search for its
19  sales of benzene to Berryman Products, Inc.?
20          MR. SAYRE:  Same objection.
21      A.  I do not know one way or the other.
22      Q.  Are you aware that The Savogran Company has
23  produced records of their purchase of benzene for a
24  blend of 90 percent benzene and 10 percent acetone?
25          MR. SAYRE:  Beyond the scope of the
```

**Transcript of Keenan, Thomas**

01     deposition notice and the categories.  Appears

02     you're asking him a question about the status of

03     the litigation and what's happened in the

04     litigation.  Calls for speculation, lacks

05     foundation.

06         You can answer.

07         THE WITNESS:  Could you reread the question.

08     (The question was read by the reporter.)

09     A.   I'm not aware that records of purchase were

10 produced.

11 BY MR. DUPONT:

12     Q.   When Ashland sold benzene or a blend of

13 chemicals that contain benzene as an ingredient to a

14 customer in, say, 1970 through 1974, did it make any

15 effort to determine how the customer was going to use

16 that blend of benzene?

17     A.   I don't know the answer to that question.

18     Q.   Did Ashland make any recommendations against

19 using benzene as an ingredient in consumer products in

20 1970 and 1974?

21         MR. SAYRE:  I believe that was asked and

22     answered.  You can answer.  Same objections as

23     before as to that question.

24     A.   I don't know the answer to that question.

25     Q.   Before selling a customer benzene in the

**Transcript of Keenan, Thomas**

01 1970s, did Ashland make any effort to determine what

02 its customer knew about the health hazards of benzene?

03     A.   I don't know the answer to that question.

04     Q.   Would it have been a good industrial hygiene

05 practice by Ashland in the 1970s to determine what its

06 customer's knowledge of the health hazards of benzene

07 were before selling it benzene?

08         MR. SAYRE:  So let me make the objection as

09     to reptile questioning complete and then I'll

10     just reference this back every time.

11         Reptile questioning is based on a book that

12     was published by certain authors designed to call

13     for jury nullification.  It's a series of

14     questions that, in its basic form, seeks

15     hypothetical questions of witnesses in order to

16     elicit responses that would then trigger, in the

17     jury's mind, a concern for their own health and

18     safety.

19         It's improper in several respects but, most

20     importantly, it does not seek any facts that the

21     witness is here to be produced for.  It's beyond

22     the scope of the notice and it also is

23     fundamentally unfair of the witness because it's

24     would this, would that.

25         And so the hypothetical lacks foundation

**Transcript of Keenan, Thomas**

```
01    calls for speculation.  So from now on I will

02    just call that my reptile objection.

03         You can answer.

04         THE WITNESS:  Could you repeat the question.

05        (The question was read by the reporter.)

06         MR. SAYRE:  Also, the time period is not

07    noted.  It appears you're asking him that as of

08    now.  And it also seeks an opinion from an expert

09    witness and he's not an expert.

10         You can answer.

11    A.    I'm not certain what good industrial hygiene

12 practice would have been considered in the 1970s.

13 BY MR. DUPONT:

14    Q.    Did Ashland have any policy in the 1970s to

15 determine whether its customers had knowledge of the

16 health hazards of benzene before selling them benzene?

17    A.    I do not know one way or the other whether

18 there was policies in place.

19    Q.    Did Ashland have any policy of determining

20 whether its customers appreciated the health hazards

21 of benzene before making blends of chemicals

22 containing benzene for them in the 1970s?

23    A.    It would be the same response I gave before.

24 I don't know one way or the other.

25    Q.    Did Ashland have a policy in the 1970s of
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas
## Rhyne Trial Master

Page 95

01 providing its customers with all of the information

02 Ashland had about the health hazards of benzene when

03 it sold them either benzene or a blend containing

04 benzene?

05     A.   The only thing I'm familiar with is Ashland

06 would provide some of those documents we've previously

07 discussed upon request.

08     Q.   Do you have any knowledge that Ashland

09 provided its customers with all of the information it

10 had on the health hazards of benzene at or before the

11 time it sold them benzene or blends of benzene in the

12 1970s?

13     A.   I do not know one way or the other.

14         MR. SAYRE:   Could I have the question reread.

15       (The question was read by the reporter.)

16         MR. SAYRE:   Go ahead.   Is now a good breaking

17     point?   We went another hour or so.

18         MR. DUPONT:   Sure.

19         DEFENSE COUNSEL:   How much longer do you

20     have, if I may ask?

21         MR. DUPONT:   I don't know the answer to that

22     question.

23         THE VIDEOGRAPHER:   We're going off the record

24     at 1:53 p.m.

25         (Recess from 1:53 p.m. to 2:03 p.m.)

**Transcript of Keenan, Thomas**

Case 3:18-cv-00197-RJC-DSC   Document 311-3   Filed 09/02/20   Page 98 of 161
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 422 of 1330

# Keenan, Thomas

Rhyne Trial Master

```
01          THE VIDEOGRAPHER:  We're back on the record
02      at 2:03 p.m.
03          (Plaintiffs' Exhibit No. 7 was marked for
04  identification.)
05  BY MR. DUPONT:
06      Q.   Dr. Keenan, I would like to ask you about a
07  document we'll mark as the next exhibit, I think
08  Exhibit 7, and it is a memorandum dated September 21,
09  1976, between a J.H. Sweet and a D.L., I'm assuming
10  it's pronounced Coticchia, C-o-t-i-c-c-h-i-a, subject
11  benzene.  Are you able to see that?
12      A.   Yes.
13      Q.   Is this a document that you've seen before?
14      A.   No.
15          MR. SAYRE:  Could you scroll down to the
16      bottom.  Does it have a Bates stamp?
17          MR. DUPONT:  Yes.  It's ASHCOLE 2246 through
18      2247.
19          MR. SAYRE:  Thank you.
20          MR. DUPONT:  Do you have a hard copy of that
21      with you, Counsel?
22          MR. SAYRE:  I do not.
23  BY MR. DUPONT:
24      Q.   Earlier we discussed an individual named, I
25  think it was Jack Sweet, who was somebody you spoke to
```

**Transcript of Keenan, Thomas**

01  in order to learn about Ashland's operations and

02  knowledge in the 1960s and 1970s?

03      A.    That's correct.

04      Q.    Is J.H. Sweet on this memorandum the Jack

05  Sweet you're referring to?

06      A.    It is.

07          MR. SAYRE:  Objection.  Calls for

08      speculation, lack of foundation.  The witness has

09      not seen the document.

10          THE WITNESS:  That would be my assumption,

11      that it is the same person.

12          MR. SAYRE:  Move to strike as an assumption.

13  BY MR. DUPONT:

14      Q.    Were the initials J.H. and the last name of

15  Sweet used at Ashland to refer to Jack Sweet?

16          MR. SAYRE:  Same objections.  You can answer.

17      A.    Well, Sweet obviously was his last name and

18  J. is the first initial for Jack.  I don't know his

19  middle initial.

20      Q.    Are you familiar with the last name Coticchia

21  as it relates to a individual who was employed by

22  Ashland?

23      A.    I've heard the name before.  I can't remember

24  the role that the person had.

25      Q.    You've heard that there was an employee with

**Transcript of Keenan, Thomas**

01 the last name Coticchia who worked at Ashland?

02     A.    I've heard the name before, yes, in context

03 that Ashland employed, but I don't remember the time

04 period.

05     Q.    This memo contains the sentence, "The

06 attached summarizes data relative to which IC&S

07 Districts currently handle benzene." Do you see that?

08     A.    I do.

09     Q.    Do you know what IC&S Districts refers to?

10     A.    Yes.

11     Q.    What?

12     A.    That was the name of the distribution

13 business. It was Industrial Chemicals & Solvents.

14 And districts, they had the different distribution

15 sites divided into different districts.

16     Q.    So IC&S refers to Ashland's Industrial,

17 Chemicals & Solvents distribution business?

18     A.    That's correct.

19     Q.    And the word "districts" refers to the

20 facilities within the Ashland chemical distribution

21 business?

22         MR. SAYRE: I'm going to object to the

23     questioning with regard to this document as a

24     whole. Belated objection. It calls for

25     speculation, lacks foundation. The witness has

**Transcript of Keenan, Thomas**

01      said he's not seen this document before.

02           You can answer.

03      A.    IC&S was the term that was used for that

04 business within Ashland and their business, their

05 distribution facilities, were divided into districts.

06      Q.    Let's turn to the second page of the

07 document, please.  And at the top of the page it says

08 "Handles Benzene," and then there's various columns.

09 Do you see that?

10      A.    I do.

11      Q.    And the column on the left-hand side refers

12 to various districts?

13      A.    It mentions different cities, yes.

14      Q.    And are the cities listed on the column

15 district on the -- I'm sorry.

16           MR. SAYRE:  Go ahead and finish your

17      question.

18      A.    Finish.

19      Q.    What's your understanding of the significance

20 of this column for district under Handles Benzene?

21           MR. SAYRE:  Object to the question.  It calls

22      for speculation, lack of foundation.  The witness

23      has said he has not seen the document.

24           You can answer.

25      A.    My understanding of district was different

**Transcript of Keenan, Thomas**

# Keenan, Thomas
## Rhyne Trial Master

01   than this.  These are individual sites and that some

02   of the sites would have been lumped into districts.

03   So this document does not reflect my -- what my memory

04   of how those terms were used at Ashland.

05       Q.   All right.  So, as you read this document,

06   the locations under "District" are individual towns or

07   cities?

08           MR. SAYRE:  Same objection.

09       A.   They would be locations where a distribution

10   facility would be.  Some of those I recognize and some

11   of them I don't.

12       Q.   All right.  Which Ashland distribution

13   facilities do you recognize that are listed under

14   "District" in this exhibit?

15       A.   I recognize Akron and Chicago.  Columbus,

16   Ohio.  Roanoke and Sante Fe Springs are all ones that

17   I recognize and know that were distribution sites when

18   I was employed.

19       Q.   The next column of information says "In

20   Bulk," do you see that?

21       A.   I do.

22       Q.   And what is meant here by in bulk?

23           MR. SAYRE:  Same objection.  Calls for

24       speculation, lacks foundation, and the document

25       has been not authenticated by the witness.

**Transcript of Keenan, Thomas**

01          You can answer.

02     A.    Once again, I would have to assume what it

03 means, but to me it means that they are handling it in

04 bulk quantities, not drum quantities.

05          MR. SAYRE:  Move to strike as speculative.

06     Q.    And what were the methods used by Ashland to

07 distribute chemicals from a distribution facility in

08 bulk?

09     A.    Many methods that they could.  They could

10 have -- sometimes they don't even handle the --

11 sometimes they directly ship from the supplier to the

12 customer, so that could be a bulk shipment that way.

13 It could be a bulk shipment by partial tank truck.

14 And later, I don't think during the early '70s, but I

15 don't know this for a fact, there were things such as

16 totes, larger quantity containers than drums.

17     Q.    So let's take the period of 1970 to 1974.

18 Did Ashland distribution facilities have tanks where

19 they stored chemicals including benzene?

20     A.    Ashland distribution facilities would have

21 had storage tanks, yes.

22     Q.    And did Ashland distribution facilities, in

23 that period from 1970 to 1974 use tanker trucks to

24 transport chemicals including benzene from its

25 distribution facilities to customers?

**Transcript of Keenan, Thomas**

01     A.    I don't know that for a fact during that time

02 period.  I don't know the answer one way or the other.

03     Q.    When you began with Ashland in 1989, was it

04 using tanker trucks to distribute chemicals from its

05 distribution facilities?

06     A.    For certain customers for certain types of

07 products, yes, that was the situation.

08     Q.    What types of customers and what types of

09 products?

10     A.    Well, the customers I can't -- it's

11 speculation because I don't have any specific

12 examples, but I know we did sell tanker trucks of

13 material to customers.  But it would be a customer

14 that had a need for large quantities of these

15 materials and, as I said, a lot of the times we didn't

16 handle it at all, it would come directly from the

17 supplier and go straight to the customer.

18     Q.    Was it the case, in 1970 and 1974, that

19 Ashland would -- strike that.

20          Well, when chemicals went straight from a

21 supplier to a customer, how did that, logistically,

22 work?

23     A.    Well, the sale would have been handled by

24 Ashland and so Ashland would have arranged for the

25 product to be delivered from the supplier.  Often

**Transcript of Keenan, Thomas**

01 times some of the suppliers didn't want to sell to

02 smaller customers and that's the reason why it would

03 go through a distributor.

04     Q.    So when you referred to suppliers, are you

05 referring to an oil or chemical company that was

06 actually manufacturing the chemical?

07     A.    In that type of situation, yes, that would be

08 the most likely situation.

09     Q.    So sometimes Ashland would distribute a

10 chemical by picking it up directly from a supplier's

11 refinery or chemical plant and taking it to a

12 customer's facility?

13          MR. SAYRE:  I'm going to object to the

14     question as vague and ambiguous, what you mean by

15     picking up and taking.

16     A.    Could you repeat the question.

17     Q.    When Ashland --

18     A.    That's fine.  Go ahead.

19     Q.    So in those instances when there was a sale

20 of products from a supplier's facility to a customer,

21 did Ashland physically pick the product up from the

22 supplier and take it to the customer?

23     A.    I'm not certain.  I don't believe they did

24 that.  I think that we arranged a shipment through,

25 but I don't know whether we sent our own trucks to

**Transcript of Keenan, Thomas**

01 pick it up and deliver it or whether it was a

02 third-party shipment.

03    Q.    Do you know whether Ashland sold chemicals in

04 that form from suppliers to customers that appeared in

05 1970 and 1974?

06    A.    I don't know the answer to that question one

07 way or the other.

08    Q.    Now, in this exhibit where it discusses

09 locations that handle benzene, there's a column that

10 says "Makes Blends."  Can you pull that back up?

11    A.    Yes.

12    Q.    Do you know what that column means?

13        MR. SAYRE:  Same objections.  Calls for

14    speculation, lacks foundation, the witness has

15    not authenticated the document.

16        You can answer.

17    A.    Okay.  Once again, it would be an assumption,

18 but I would -- my assumption would be that it means

19 that they're making blends with benzene.

20        MR. SAYRE:  Move to strike on the basis that

21    it's an assumption.

22    Q.    Having seen this document, do you have any

23 reason to believe that it was not a document created

24 by Ashland?

25        MR. SAYRE:  Object to the question on the

**Transcript of Keenan, Thomas**

01    basis that it's argumentative and doesn't support

02    an authentication.

03        You can answer.  Do you know one way or the

04    other?

05    A.   Can we go back to the first page so I can see

06 it again.

07        No.  Other than me recognizing some names on

08 here, I can't authenticate it one way or the other.

09    Q.   Were you involved in a case that was filed

10 against Ashland with an individual last name Cole,

11 C-o-l-e?

12    A.   Possibly.  I don't know.

13    Q.   Which Ashland distribution district did

14 Massachusetts fall within?

15    A.   I don't remember the district names anymore.

16 Tewksbury, during my time period, I think that's how

17 it was pronounced, is the name of the site in

18 Massachusetts.  Tewksbury.

19    Q.   Was benzene stored and distributed from the

20 Tewksbury facility when you worked there in 1989?

21    A.   No, it would not have been.

22    Q.   Why is it that you say that?

23    A.   Because we stopped manufacturing before I got

24 there, the benzene, and we stopped selling benzene in

25 drums in 1977.  So I would have no -- it would

**Transcript of Keenan, Thomas**

01  surprise me greatly if they had benzene at that site.

02      Q.    And remind me, when did Ashland stop selling

03  benzene in bulk, meaning in containers larger than

04  drums?

05      A.    Well, the Catlettsburg refinery would have

06  been the last place that was manufacturing benzene and

07  that was to -- still was to corporate accounts so it

08  would not go through any distribution facility, that

09  would have been direct from the refinery to the

10  customer.

11      Q.    When did Ashland last sell benzene through

12  its distribution business in bulk?

13      A.    I'm not sure they ever sold benzene in bulk

14  through the distribution business.  I am aware, from

15  some of the interviews, that they drummed benzene, but

16  no one ever mentioned to me that there was bulk sales.

17      Q.    Did you ever ask anybody whether there was

18  bulk sales through the distribution business?

19      A.    Not that I recall.

20      Q.    Did you ever meet or hear of an individual

21  named John Gale who worked for Ashland?

22      A.    No, the name doesn't seem familiar.

23      Q.    Are you familiar with The Savogran Company?

24      A.    No, I'm not.

25      Q.    Was there a manager of the Tewksbury,

**Transcript of Keenan, Thomas**

01  Massachusetts district when you began with Ashland?

02      A.    I'm sure there was.  I don't know who it was.

03          MR. SAYRE:  By the way, Andrew, we have lunch

04      here.  I don't know what your plans are in this

05      regard.  I think we could eat within five or ten

06      minutes.  I'm just concerned about the witness

07      because he's got a condition that requires him to

08      eat.

09          MR. DUPONT:  Okay.  If there's a medical or

10      other need to take a lunch break, I'm perfectly

11      happy to do so.  I don't know that I have that

12      much more questions.

13          MR. SAYRE:  What would you like to do, Tom?

14      He doesn't have very many more.  Might as well

15      power through and have lunch after he's done.

16          THE WITNESS:  Yeah, we can do that.

17          MR. SAYRE:  Okay.  Andrew, go ahead.  Sorry

18      for the interruption.

19          MR. DUPONT:  Let's go back to --

20          THE WITNESS:  Could you repeat that.

21          MR. SAYRE:  There we go.

22          THE VIDEO TECHNICIAN:  Did you say to go back

23      to another document?

24          MR. DUPONT:  Why don't we do this.  Let's go

25      off the record, we can take a quick -- how much

**Transcript of Keenan, Thomas**

01    time do you think you need for lunch?

02        MR. SAYRE:  Oh, probably no more than five or

03    ten minutes.  Ten minutes.

04        MR. DUPONT:  Let's take ten minutes for

05    lunch.

06        THE VIDEOGRAPHER:  We're going off the record

07    at 2:23 p.m.

08        (Recess from 2:23 p.m. to 2:39 p.m.)

09        THE VIDEOGRAPHER:  We're back on the record

10    at 2:39 p.m.

11  BY MR. DUPONT:

12    Q.  Dr. Keenan, would you grab the exhibit that

13  we marked as the 1971 Ashland MSDS for benzene.

14    A.  The interim data sheet?

15    Q.  Yes.

16    A.  Yes, I've got it.

17    Q.  Where Ashland recommends the use of special

18  ventilation under the category of special protective

19  equipment for benzene, what is special ventilation?

20    A.  I think we've already talked about this.

21  Special ventilation, in my interpretation of this, it

22  depends upon the use that the customer is using the

23  product.  So if he was drumming the material you would

24  be using a different type of special ventilation

25  versus if we was pouring the material into a vat to

**Transcript of Keenan, Thomas**

01  make a reaction.  So it would depend upon the

02  situation.

03      Q.   Does special ventilation refer to local

04  exhaust ventilation?

05      A.   That is a type of ventilation, yes.

06          THE COURT REPORTER:  Mr. DuPont, can you get

07      closer to the phone, or the mic.  Thank you.

08          MR. DUPONT:  Yes.

09  BY MR. DUPONT:

10      Q.   Was local exhaust ventilation the proper form

11  of ventilation to use when applying a

12  benzene-containing mixture indoors?

13          MR. SAYRE:  Objection to the form of the

14      question.  It seems that you're asking an expert

15      opinion instead of factually what was done and

16      why.

17          You can answer.

18      A.   Well, I don't know enough information to know

19  what would be appropriate or not.  I need more

20  information about the situation.

21      Q.   You worked for the American Petroleum

22  Institute for a period of time; is that correct?

23      A.   That's correct.

24      Q.   And after joining Ashland as an employee in

25  1989, were there periods of time where you had

**Transcript of Keenan, Thomas**

01 interaction with the American Petroleum Institute?

02    A.   Yes.

03    Q.   And what was your role at Ashland with

04 respect to the American Petroleum Institute?

05    A.   During that time period was primarily on a

06 task force dealing with commercial hexane and testing

07 of commercial hexane.

08    Q.   Until what year did you continue to interact

09 with the American Petroleum Institute?

10    A.   It was early '90s. The testing was completed

11 early to mid '90s. I don't recall the exact date.

12    Q.   Did you have involvement with the American

13 Petroleum Institute after the year 2000?

14    A.   I don't recall. I was getting information

15 from them on a additives testing that was going on for

16 motor oils, but I wasn't having any direct

17 interactions with them after 2000 that I recall.

18    Q.   In the early 1990s when you were interacting

19 with the American Petroleum Institute on behalf of

20 Ashland, were you involved or did you receive

21 information about the American Petroleum Institute's

22 work on benzene?

23    A.   No, not during that time period, I didn't

24 receive information on benzene.

25    Q.   Until what year was Ashland a member of the

**Transcript of Keenan, Thomas**

01  American Petroleum Institute?

02      A.   It would have -- I don't know the exact date.

03  When we joint ventured the petroleum company with

04  Marathon was around 2004.  I believe we still maintain

05  membership because of our ownership of Valvoline and

06  this oil additive program that was going on in

07  American Petroleum Institute, and I don't -- after

08  that that testing was over, I think we did drop

09  membership, but I'm not a hundred percent sure of that

10  because at that point we were essentially just a

11  chemical company, we were not a petroleum company.

12      Q.   Did Ashland learn about the American

13  Petroleum Institute's Shanghai Health Study?

14      A.   Not that I'm aware of.  There was no

15  information that was directly received by Ashland on

16  that.

17      Q.   Did Ashland provide support to the American

18  Petroleum Institute or the benzene -- strike that.

19          Did Ashland provide support to the Benzene

20  Health Research Consortium related to the Shanghai

21  Health Studies?

22      A.   Not that I'm aware of.

23          MR. DUPONT:  To our video technician, can you

24      pull up the document that says "Review of

25      ChemRisk Draft Entitled Benzene-Induced

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

01    Leukemia."

02       MR. SAYRE:  I'm going to reassert my

03    objections as to showing the witness documents

04    that he's unable to peruse.  Sections of these

05    documents are being shown to him without giving

06    the witness the opportunity to find context for

07    them.  As a result, it's patently unfair of the

08    witness to do this this way.

09       (Plaintiffs' Exhibit No. 8 was marked for

10    identification.)

11 BY MR. DUPONT:

12    Q.  Dr. Keenan, we're showing you what we'll mark

13 as the next exhibit in order, and it's a letter dated

14 November 15, 1990, from Sally Cowles, M.D., to Paul

15 Price of the American Petroleum Institute.  Are you

16 able to see that?

17    A.  Yes.

18    Q.  Have you seen this letter before?

19    A.  I don't recall it.

20    Q.  Are you familiar with the American Petroleum

21 Institute interacting with the organization ChemRisk

22 with respect to drafting an article entitled

23 Benzene-Induced Leukemia, An Examination of Disease

24 Endpoints?

25    A.  No, I'm not familiar with this.

**Transcript of Keenan, Thomas**

01      MR. SAYRE:  I will add to my objection to

02   these documents, this one in particular, I can't

03   see it so I've been effectively eliminated from

04   the process in order to object to these

05   documents.

06   Q.   Dr. Keenan, did you know Sally Cowles?

07   A.   No, I did not.

08   Q.   Did you know Paul Price?

09   A.   Yes, I did know Paul.

10   Q.   And how did you know Paul Price?

11   A.   I think Paul actually worked for ChemRisk at

12   one point.  And then -- I think I knew him from that

13   time period.  I didn't realize he worked for the

14   American Petroleum Institute.

15   Q.   The first paragraph of the document, let's go

16   step by step with this.  In the first sentence here

17   Dr. Cowles writes to Paul Price that Ralph Gingell

18   provided me a copy of the ChemRisk draft, referring to

19   the draft of Benzene-Induced Leukemia, An Examination

20   of Disease Endpoints, and asked that I submit comments

21   directly to you.  Do you see that?

22   A.   Yes.

23   Q.   And then Dr. Cowles writes, "I have read the

24   above referenced draft and have the following general

25   comments."  Do you see that?

**Transcript of Keenan, Thomas**

01    A.    I do.

02    Q.    And in the first paragraph Dr. Cowles writes,

03    "It is not clear to me just what is hoped to be gained

04    from emphasizing the potential role of MDS as a

05    leukemia precursor and a chemically-induced

06    condition."  Do you see that?

07    A.    I do.

08    Q.    And then she continues to write, "I don't

09    have any great disagreement with the discussion, but

10    think that the endpoint --" excuse me "-- but think

11    that the point can be made that there are differences

12    between the different leukemias without admitting that

13    benzene may cause MDS as well."  Do you see that?

14    A.    I do.

15    Q.    In your time at Ashland and otherwise, did

16    you review a document that was -- strike that.  Have

17    you seen -- strike that.

18         Are you aware of ChemRisk or anybody else

19    ever publishing the article Benzene-Induced Leukemia,

20    An Examination of Disease Endpoints?

21         MR. SAYRE:  I'm going to object to the line

22         of questioning with regard to this document on

23         the same basis I've said before, but also on the

24         basis that the document has not been

25         authenticated.  You're assuming that the document

**Transcript of Keenan, Thomas**

# Keenan, Thomas
## Rhyne Trial Master

```
01      is authentic and then asking questions concerning
02      the substance of it to the witness, which is
03      patently unfair to the witness because he has not
04      acknowledged he's ever seen the document.  So he
05      would be speculating as to --
06          MR. DUPONT:  Counsel, I'm sure, as in every
07      jurisdiction, there are rules that you can make a
08      succinct objection to the form or foundation of a
09      question.  I think many times during this
10      deposition you've gone beyond what's permissible
11      and I'd ask you to please stop and follow the
12      rules and simply make a succinct objection.
13          MR. SAYRE:  So let me respond for the
14      purposes of meet and conferring.
15          I've been very lenient on the use of these
16      documents in this manner because it's my desire
17      to get the deposition done with, but I will tell
18      you, Mr. DuPont, that what you're doing is
19      patently improper and unfair to the witness and
20      there is a basis for me to instruct him not to
21      answer questions this way.  We were not given
22      these documents in hard copy and what you're
23      doing is patently wrong and inconsistent with
24      California Rules of Court and California Civil
25      Procedure.
```

**Transcript of Keenan, Thomas**

Page 116

01          And I understand that you would prefer to be
02      in your office doing this, but that doesn't
03      create an obligation for the witness to try to
04      answer questions in this fashion.  I'm relying on
05      my objections as a choice instead of instructing
06      and then getting into law and motion on it.  I
07      believe the court will sustain these objections,
08      but the court needs to know why I'm objecting
09      because, unless I do that, you will make the
10      argument that I've waived those objections.
11          So I'm not trying to coach or instruct.  What
12      I'm trying to do is make a record because I fully
13      intend to exclude all of this questioning with
14      regard to each one of the documents that have
15      been shown to him via this system you've set up.
16      It serves your purpose, but not the witness's.
17          MR. DUPONT:  Can I get the last question read
18      back, please.
19          (The question was read by the reporter.)
20      A.   I'm not aware one way or the other whether
21  this was published or not.
22  BY MR. DUPONT:
23      Q.   Do you know why members of the American
24  Petroleum Institute in 1990 would have had a concern
25  with admitting that benzene may cause MDS?

**Transcript of Keenan, Thomas**

01          MR. SAYRE:  Calls for speculation, lacks

02     foundation, beyond the scope of the deposition

03     notice.

04     A.    I don't have an opinion on that.  I have no

05 idea as to why -- as to how to answer that question.

06     Q.    In this paragraph Dr. Cowles continues to

07 write, "There would appear to be ample other arguments

08 for different etiologies of the lymphocytic leukemias

09 and CML than the argument presented that since MDS

10 cases often showed similar chromosomal changes to AML

11 cases and a certain percentage go on to become AML,

12 that therefore MDS is the just another entity in the

13 benzene-induced disease continuum."  Do you see that?

14     A.    I do.

15     Q.    Was there a awareness at Ashland, in the late

16 1980s, early 1990s, that there were cases of

17 benzene-caused leukemias where the individual was

18 first diagnosed with MDS?

19          MR. SAYRE:  Objection to the extent that

20     you're using this document as a basis for your

21     question is improper.  The document is not

22     authenticated, he's not the author of the

23     document, he's not a recipient of the document

24     and neither is Ashland.

25          You can answer.

**Transcript of Keenan, Thomas**

01    A.    I don't know one way or the other whether
02  Ashland had any awareness of this in the '80s.
03    Q.    When did Ashland first become aware of
04  benzene causing MDS?
05    A.    I'm not sure Ashland became aware of it.
06  They stopped manufacturing it in 1989.
07    Q.    Dr. Cowles continues to write that, "This
08  only effects a trade in diseases.  We won't consider
09  ALL, CLL, or CML to be benzene-induced, but we will
10  accept all MDS.  I am skeptical that anything is
11  gained from such position and suspect that a net loss
12  would result."  Do you see that?
13    A.    I do.
14    Q.    Do you know what the net loss to the members
15  of the American Petroleum Institute would be for
16  recognizing that benzene causes all MDS?
17         MR. SAYRE:  So I'm going to object on the
18      basis it calls for speculation, lacks foundation,
19      on the basis that the witness is not a recipient
20      of this document, not the author, it's not
21      authenticated, he's not said that he's ever seen
22      it, and it's not part of Ashland's records.
23         You're clearly asking him to speculate and
24      you're getting into the realm, right now, of
25      harassing him.  So I advise you, Counsel, to be

**Transcript of Keenan, Thomas**

```
01    very careful here because I think the record is
02    very clear now that you're ignoring my requests
03    to not do this.  It's not fair to the witness.
04    He keeps telling you he doesn't know.  He's never
05    seen this before.
06         I will not instruct now, he will tell you
07    again that he doesn't know, but any more
08    questions we're going to take a break and maybe
09    we can get the court on the line.  This is really
10    unfair and wasting time.
11         Go ahead, sir.
12         THE WITNESS:  Would you repeat the -- reread
13    the question.
14         (The question was read by the reporter.)
15    A.   I have no idea one way or the other what
16    Dr. Cowles was trying to refer to in this letter.  I
17    just don't know.
18    BY MR. DUPONT:
19    Q.   Was there discussion at the American
20    Petroleum Institute about benzene causing MDS in the
21    early 1990s?
22    A.   I did not participate in the API on these
23    topics in the early 1990s, so I have no way of
24    knowing.
25    Q.   Were there others from Ashland who
```

**Transcript of Keenan, Thomas**

01 participated at the American Petroleum Institute on

02 benzene-related issues in 1990s?

03     A.   Not that I'm aware of.

04     Q.   Was Ashland receiving information from the

05 American Petroleum Institute on the health hazards of

06 chemicals in the early 1990s?

07     A.   As I stated before, we were specifically --

08 in the chemical business we were specifically working

09 on the commercial hexane testing and we also, after

10 the 2000 time period were receiving information on the

11 additives for motor oils.  But, beyond that, I am not

12 aware of any other information.  We were no longer

13 manufacturing benzene at that point, so we would not

14 have been participating on these councils.

15     Q.   Was Ashland receiving information from the

16 American Petroleum Institute in the early 1990s about

17 the health hazards of chemicals?

18     A.   As I stated before that, yes, we were

19 receiving information on the commercial hexane because

20 we were active participants and also on the additives

21 for the motor oils.  Other than that, I'm not aware of

22 any other thing we would have received.

23     Q.   Can you turn to the second page of the

24 document, please.  The last paragraph of Dr. Cowles

25 letter says, in the first sentence, "In summary, my

**Transcript of Keenan, Thomas**

01  impression is that this draft needs considerable work

02  and perhaps a thorough discussion and identification

03  of just what its purpose is before a rewrite."  Do you

04  see that?

05      A.   I do.

06      Q.   And Dr. Cowles continues to write, "As it

07  stands, it would appear to accept MDS as a

08  benzene-related disease and the potential for many

09  other solvents in addition to benzene to cause

10  leukemia.  This would not seem to further the API

11  cause particularly."  Do you see that?

12      A.   I do.

13      Q.   Do you know what the API cause is that

14  Dr. Cowles is referring to here?

15          MR. SAYRE:  Same objections.

16      A.   I have no idea what she's referring to.  This

17  is her letter.  You should ask her.

18      Q.   Was part of the API's purpose to advocate on

19  behalf of members of the American Petroleum Institute?

20          MR. SAYRE:  Calls for speculation, lacks

21      foundation.

22          By the way, this is not in your notice.

23      Counsel, could you direct me where in this notice

24      that that's a category, what you just asked?

25      Q.   Sir, you worked at the American Petroleum

**Transcript of Keenan, Thomas**

01  Institute; correct?

02      A.   I did, yes.

03      Q.   And through your employment working at the

04  American Petroleum Institute, did you come to learn

05  that part of the purpose of the American Petroleum

06  Institute was to be an organization that advocated on

07  behalf of its members?

08          MR. SAYRE:  So let me interrupt this

09      questioning.  This is the deposition of Ashland,

10      not of that organization.  This is not in your

11      notice.  This is really outrageous.

12          What you're trying to do is question him

13      regarding his relationships as a person outside

14      of Ashland.  It's not proper.  It's patently

15      improper, actually.

16          Please direct me where in your notice that

17      you've identified this line of questioning.  And

18      how does it relate to Ashland.

19      Q.   Can you answer the question, please?

20          MR. SAYRE:  No, he's not until you answer

21      mine.  Counsel, you can't just do whatever you

22      want.  It's not proper.

23          MR. DUPONT:  Paragraph 28 to my notice of

24      deposition, participation by you, your employees,

25      and your representatives in meetings, groups, and

**Transcript of Keenan, Thomas**

01    committees of the American Petroleum Institute,

02    Manufacturing Chemists' Association a/k/a

03    Chemical Manufactures Association a/k/a American

04    Chemistry Council during and prior to the

05    applicable period.

06         MR. SAYRE:  Right.  And, if you notice, if

07    you take a look at your first page, it's a notice

08    to Ashland.  So the you is to Ashland; right?

09         MR. DUPONT:  Are you instructing the witness

10    not to answer the question?

11         MR. SAYRE:  I'm just trying to understand so

12    that I can make a record.  I'm trying to

13    understand what you're doing here.

14         DEFENSE COUNSEL:  For the record, that's not

15    one of the categories that Dr. Keenan was

16    produced for.

17         MR. SAYRE:  Correct.  And we've objected to

18    category number 28.  And it's directed to

19    Ashland, not Dr. Keenan personally.

20         I don't want to get into a long motion fight

21    with you, Andrew, but this is really beyond the

22    pale.  You're going to leave me no choice.  You

23    cannot question him as an individual.

24         MR. DUPONT:  Your interference with the

25    deposition and -- well, I'm going to ask my

**Transcript of Keenan, Thomas**

01    question.  If you want to stop the deposition and

02    if you want to tell the witness not to answer a

03    question, that's your prerogative.

04        MR. SAYRE:  How much more do you have on

05    this?  How much more do you have on this?

06        MR. DUPONT:  On what?

07        MR. SAYRE:  Let's start with the deposition.

08    Because I thought we were close to being done.

09        Look, I don't want to have a long motion

10    fight with you about something that's

11    inconsequential.  We've got trial in just a few

12    weeks.  I want to get ready for trial, not fight

13    a long motion battle.  But you know this is not

14    proper, Andrew.

15        MR. DUPONT:  No, actually, I don't.  I don't.

16    And your objections are taking a lot more time

17    than it would to get answers to the question.

18        MR. SAYRE:  Ask your question again.

19  BY MR. DUPONT:

20    Q.   Dr. Keenan, while you were employed by the

21  American Petroleum Institute, did you become aware

22  that part of the purpose of the American Petroleum

23  Institute was to advocate on behalf of its members?

24        MR. SAYRE:  Same objections.  Beyond the

25    scope of the depo.  You can answer.

**Transcript of Keenan, Thomas**

# Keenan, Thomas
Rhyne Trial Master

```
01     A.   While I worked there I learned that American
02 Petroleum Institute was set up like a petroleum
03 company, every business division that a typical
04 petroleum company would have and that we worked for
05 common interests among the petroleum industry.  So my
06 area, toxicology, we did testing of refinery streams
07 because that was of common interest and it didn't make
08 sense for each petroleum company to test the streams
09 multiple times.  It was more efficient to do it once.
10 So in that way, yes, they did work on behalf.
11          Outside of the area of toxicology, I don't
12 know if I -- I would only be speculating on what
13 because I didn't really work there, that was my first
14 job out of college so I'd say my level of
15 understanding of how the trade association was working
16 is not -- I'm not able to answer that question.
17     Q.   Did the American Petroleum Institute submit
18 information to regulatory bodies on topics that were
19 relevant to the business of its members?
20          MR. SAYRE:  Beyond the scope of the
21     deposition notice, beyond the scope of Ashland.
22     He's also said he didn't know, it was his first
23     job out of college.  Lacks foundation, calls for
24     speculation.
25          You can answer.
```

Transcript of Keenan, Thomas

# Keenan, Thomas

Rhyne Trial Master

01    A.    They did submit comments to the regulatory

02  bodies, but they were typically work groups that

03  included members of the petroleum industry at member

04  companies.

05    Q.    Did the American Petroleum Institute submit

06  comments or information to OSHA, for example, as it

07  related to benzene?

08        MR. SAYRE:  Objection.  Beyond the scope of

09      the deposition, beyond the scope of anything

10      having to do with Ashland.  It also calls for

11      speculation, lacks foundation.

12    A.    I know that during my time period there that

13  there were some interactions with American Petroleum

14  Institute, its member companies, and some outside law

15  firms on benzene.

16        MR. DUPONT:  Let's pull up the PDF of the

17      document that begins with 77 API, please.  And

18      let's mark this as the next exhibit to the

19      deposition.

20        (Plaintiffs' Exhibit No. 9 was marked for

21  identification.)

22        MR. SAYRE:  And I will assert the same

23      objections I've made for every document that's

24      been shown digitally.  It's improper and unfair

25      to the witness.  He can't peruse the document.

**Transcript of Keenan, Thomas**

01          I'd also add, any question with regard to the

02     Shanghai Health Study, the witness has already

03     said that he's not aware of Ashland having

04     received a copy of it.

05     Q.   Dr. Keenan, do you know what the Shanghai

06 Health Study was?

07     A.   I don't have any direct knowledge of the

08 study, no.

09     Q.   Do you have indirect knowledge of what the

10 Shanghai Health Study was?

11     A.   I vaguely know that it was a -- some type of

12 investigation into benzene exposure in China.

13     Q.   And was that a investigation that was

14 financially sponsored by some members of the American

15 Petroleum Institute?

16          MR. SAYRE:   Objection.  Beyond the scope of

17     the deposition, vague and ambiguous, calls for

18     speculation, lacks foundation.

19     A.   It is my understanding there was a subgroup

20 of companies that funded the studies.

21     Q.   Do you know who Patsy Clegg is?

22     A.   I do not.

23     Q.   So what we're looking at is the first page of

24 a PDF entitled The Shanghai Health Study dated June

25 22, 2005.  Now, 2005, was Ashland again involved with

**Transcript of Keenan, Thomas**

01  the American Petroleum Institute?

02        MR. SAYRE:  Same objections.

03    A.    I believe that we were still involved from

04  the standpoint of the petroleum additives for the

05  motor oils.  Beyond that, in 2005 we would have

06  joint-ventured the petroleum company with Marathon at

07  that time period and would not have any direct

08  relationship with API beyond those motor oil studies.

09        MR. DUPONT:  Let's turn to PDF page 12 of

10      this exhibit, please.

11        THE VIDEO TECHNICIAN:  Sorry.  Just trying to

12      get this oriented.  There we go.

13  BY MR. DUPONT:

14    Q.    Dr. Keenan, we're looking at another page of

15  the exhibit on The Shanghai Health Study.  It's dated

16  June 22, 2005, and there's a page here that has a

17  titled Benzene Health Research Consortium.  Are you

18  familiar with the term -- the name Benzene Health

19  Research Consortium being used to describe the

20  companies from the American Petroleum Institute that

21  financially sponsored The Shanghai Health Study?

22        MR. SAYRE:  Objection to the question.  It

23      calls for speculation, lacks foundation.

24    A.    No, I'm not familiar with this organization.

25    Q.    On this page of the exhibit it's written that

**Transcript of Keenan, Thomas**

01  Marathon/Ashland is providing additional support.  Do

02  you see that?

03      A.    I do.

04      Q.    Does this help you remember whether or not

05  Ashland was providing financial support to The

06  Shanghai Health Study?

07            MR. SAYRE:  Objection.  Misstates testimony.

08        He hasn't authenticated the document, so how

09        would it refresh his recollection.

10            You can answer.

11      A.    Well, if you go back to some of my prior

12  answers you would recognize that Marathon and Ashland

13  were in a joint venture.  It was a separate company at

14  that point.  It wasn't really Ashland that was dealing

15  with this.  So I would not have any knowledge of what

16  was going on here.

17            Marathon Ashland Petroleum, it was called

18  MAP, and that's what this is referring to because of

19  the time period of 2005 was a joint venture at that

20  time period operated by oversight committee -- well,

21  by Marathon primarily and Ashland was like a 40

22  percent member or 38 percent, I think, we owned in the

23  company, but we did not operationally manage that

24  company so I had no direct knowledge of what was going

25  on with that.

**Transcript of Keenan, Thomas**

01     Q.     So Ashland was a 38 percent owner of
02  Marathon, Ashland Petroleum, in 2005?
03     A.     That's my understanding.  I could be a little
04  bit wrong on the percentages, but it was something
05  like that.
06     Q.     Do you know how much money was provided to
07  the researchers of The Shanghai Health Study to the
08  Benzene Health Research Consortium?
09          MR. SAYRE:  Objection.  Lack of foundation,
10      calls for speculation.
11     A.     I have no idea.
12          MR. SAYRE:  The question assumes money was
13      paid, et cetera.
14          MR. DUPONT:  Let's go to the next document,
15      which is 80 API, the PDF.
16          MR. SAYRE:  Same objections with regard to
17      the documents being produced digitally.  It's
18      unfair to the witness for all the reasons I've
19      stated before.
20          MR. DUPONT:  And we'll mark this as the next
21      exhibit to the deposition.
22          (Plaintiffs' Exhibit No. 10 was marked for
23  identification.)
24  BY MR. DUPONT:
25     Q.     Dr. Keenan, we're looking at the first page

**Transcript of Keenan, Thomas**

01  of the document that has the title at the top

02  International Leveraged Research Proposal.  Do you see

03  that?

04       A.   I do.

05       Q.   And underneath that title there's a section

06  of the document that says "Project Description."  And

07  the first sentence says, "The proposed research is an

08  investigation of the effects and dose response of

09  hematological effects of benzene exposure in a

10  population of workers in Shanghai, China (PRC) to

11  respond to allegations from a nationwide study of

12  benzene-exposed workers in over 50 industries by

13  researchers from the United States National Cancer

14  Institute and the Chinese Academy of Preventative

15  Medicine."  Do you see that?

16       A.   I do.

17       Q.   Do you understand this to be referring to The

18  Shanghai Health Study?

19            MR. SAYRE:  I object to the question.  He's

20       already stated that he's unaware of the substance

21       of the study and now you're asking him questions

22       about what it says.  It's clearly harassing the

23       witness.  It's challenging him to tell you again

24       he has no basis for his answers with regard to

25       anything because he's never seen this document.

**Transcript of Keenan, Thomas**

01      I warn you, Counsel, even if I let him answer

02   I may seek sanctions.  This is getting

03   outrageous.

04      You can answer.

05      THE WITNESS:  Okay.  Could you reread the

06   question.

07      (The question was read by the reporter.)

08   A.   I don't know whether it refers to The

09   Shanghai Health Study or not.  That does say Shanghai

10   in that sentence, but I don't know.

11   BY MR. DUPONT:

12   Q.   You do understand that the Shanghai Health

13   Study was a study of exposure to benzene in workers in

14   Shanghai, China?

15      MR. SAYRE:  Objection.  Asked and answered.

16   A.   That would be my assumption, but since I had

17   no direct involvement with this and didn't review any

18   of the documents, that's only an assumption.

19      MR. SAYRE:  Move to strike all the testimony

20      with regard to The Shanghai Health Study on the

21      basis of assumptions.

22   Q.   There's another section of this first page

23   that says "Background.  Describe the significant

24   issues of concerns to global petroleum industry that

25   the research would effect."  Do you see that?

**Transcript of Keenan, Thomas**

01    A.   I do.

02    Q.   And the first point under that section says,

03 "The expected health effects of ambient air

04 concentrations of benzene currently drive calls for

05 the reformulation of motor gasoline which would have

06 massive financial --"

07         THE COURT REPORTER:  I'm sorry.  I need the

08    question again.

09         MR. DUPONT:  Sure.

10 BY MR. DUPONT:

11    Q.   The first point under that section of the

12 document says, "The expected health effects of ambient

13 air concentrations of benzene currently drive calls

14 for the reformulation of motor gasoline which would

15 have massive financial impacts on petroleum refiners."

16 Do you see that?

17    A.   I do.

18    Q.   Was Ashland following, in the 2000s,

19 regulations as they related to benzene in products?

20    A.   Could you repeat the question.  I'm not sure

21 I understood you.

22    Q.   Sure.  Was Ashland following regulations

23 related to benzene in products during the 2000s?

24    A.   We were following regulations, but in regard

25 to what type of regulations are you asking about?  We

**Transcript of Keenan, Thomas**

01  were no longer -- around mid 2000 we were no longer in

02  the refining industry.

03      Q.    Was Marathon Ashland Petroleum refining

04  gasoline in the mid 2000s?

05      A.    I've never been employed by Marathon Ashland

06  Petroleum.  I have no way of knowing.  My assumption

07  is, yes, they were because they sold it, but I don't

08  know that.

09          MR. SAYRE:  I'm going to move to strike on

10      the basis that's assumption.  Also, the

11      questioning is outside of the notice.

12      Q.    In the section of the document, the last

13  bullet point states, "Litigation alleging induction of

14  various forms of leukemias and other hematopoietic

15  diseases from exposure to petroleum-derived benzene

16  result in millions of dollars of expenses to

17  industry."  Do you see that?

18      A.    I do.

19      Q.    Was Ashland aware that when The Shanghai

20  Health Study research was being proposed that one of

21  the considerations for the research was the cost to

22  industry either through regulations or litigation

23  relating to exposure to benzene?

24          MR. SAYRE:  So I'm going to object to the

25      question.  You've not established that --

**Transcript of Keenan, Thomas**

01          DEFENSE COUNSEL:  Vague and ambiguous.  Calls

02     for speculation.  Outside the scope.

03          MR. SAYRE:  I'll finish my objection.  You've

04     not established that Ashland was aware of this

05     study and then you've assumed that in your

06     question as some sort of have you stopped beating

07     your wife type question.  Again, harassing the

08     witness, wasting time.

09          You can tell him again.

10          THE WITNESS:  Could you repeat the -- reread

11     the question.  I'm sorry.

12          (The question was read by the reporter.)

13     A.   I can't give you any more than what this

14 document says.  I have no idea what the foundation or

15 basis of this document was.  I've never seen it

16 before.  I can't answer one way or the other.

17 BY MR. DUPONT:

18     Q.   Was Ashland approached by members of the

19 American Petroleum Institute to provide funding or

20 support to The Shanghai Health Study or the Benzene

21 Health Research Consortium?

22     A.   Not that I'm aware of.

23     Q.   Was Marathon Ashland Petroleum approached by

24 members of the American Petroleum Institute to provide

25 funding to the Benzene Health Research Consortium for

**Transcript of Keenan, Thomas**

```
01  The Shanghai Health Study?
02          MR. SAYRE:  Objection.  Outside the scope of
03      the deposition notice.
04          You can answer.
05  A.   I would have no idea.  I was not involved in
06  that Marathon Ashland Petroleum.
07          THE VIDEOGRAPHER:  Mr. DuPont, this is the
08      videographer at the deposition.  I have five
09      minutes left before I need to change my media.
10          MR. DUPONT:  Sure.
11          THE VIDEOGRAPHER:  Thank you.
12          MR. DUPONT:  Pull up the PDF, please, that
13      has the title Exhibit Number 5 on it, Ph.D.
14          THE VIDEO TECHNICIAN:  You said pull up
15      Exhibit Number 5?
16          MR. DUPONT:  Yes.  Begins 99659, Exhibit
17      Number 5.  Dr. Keenan -- and let's mark this as
18      the next exhibit to the deposition, please.
19          (Plaintiffs' Exhibit No. 11 was marked for
20  identification.)
21          MR. SAYRE:  Same objections with regard to
22      producing these records digitally.  It's unfair
23      to the witness.  He can't peruse the document.  I
24      can't see the document.
25  BY MR. DUPONT:
```

**Transcript of Keenan, Thomas**

01     Q.   Dr. Keenan, looking at the first page of what

02 we've marked as the next exhibit that begins with

03 Bates number ASH-314, is this an Ashland hazard

04 determination study for toluene?

05     A.   Ashland hazard determination document for

06 toluene.

07     Q.   And how did Ashland use the hazard

08 determination documents that it prepared?

09     A.   We reviewed, for many chemicals and solvents,

10 health hazards of the products themselves.  So in this

11 page here you can see Eye and you can see Skin Contact

12 as to the endpoints.  There were multiple endpoints

13 and we used -- we evaluated the literature and came up

14 with a classification for that and that classification

15 then would relate to hazard warnings for the MSDS and

16 for the label.  And that's what the purpose of this

17 was.

18          So we would uniformly provide the warnings

19 across products.  So if toluene was in three or four

20 different products, the same warning for toluene would

21 be carried by all of those products.

22     Q.   Was this hazard determination document

23 provided by Ashland to customers that purchased

24 toluene from it?

25     A.   At times --

**Transcript of Keenan, Thomas**

# Keenan, Thomas
### Rhyne Trial Master

01          DEFENSE COUNSEL:  Calls for speculation.

02     A.   At times it was provided.  It was upon

03   request and we -- but we didn't routinely provide

04   this.  And we would usually alter the document by

05   taking off the finding because it was internal

06   document, internal purposes for those findings as our

07   own classification system which may or may not

08   correspond to theirs.

09     Q.   If a Ashland customer that was buying toluene

10   from Ashland asked for information about the health

11   hazards of toluene or anything in toluene, is this the

12   document that Ashland would have provided to them?

13          DEFENSE COUNSEL:  Calls for speculation.

14     Vague and ambiguous.

15          MR. SAYRE:  Yeah, it sounds like a

16     hypothetical.  You can answer.

17     A.   The MSDS and label provided the summary of

18   this information.  If they wanted some more

19   information they would ask a specific question as to

20   relating to why we might have provided a hazard

21   warning for something.  And in that situation we might

22   have extracted pieces of this document and provided it

23   to them as our basis for that hazard warning.  And --

24   but most of the time we would not provide the whole

25   document.

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

```
01            THE VIDEOGRAPHER:  Sir, I'm going to need to

02       change my media.

03            MR. DUPONT:  Sure.

04            THE VIDEOGRAPHER:  We're going off the

05       record.  The time is 3:30 p.m.

06            (Recess from 3:30 p.m. to 3:34 p.m.)

07            THE VIDEOGRAPHER:  We're back on the record.

08       The time is 3:34 p.m.  This is media unit number

09       three.

10            MR. DUPONT:  Can we turn to page 21 of the

11       document, which has the Bates number ASH-334 on

12       it.

13            THE VIDEO TECHNICIAN:  Page 21; right?

14            MR. DUPONT:  Correct.

15  BY MR. DUPONT:

16       Q.   Dr. Keenan, does page 21 of this exhibit,

17  which is the hazard determination document created by

18  Ashland for toluene, list various sources that were

19  relied upon by Ashland in creating the hazard

20  determination document?

21       A.   Yes.

22       Q.   And does that list of sources relied upon by

23  Ashland in creating the hazard determination document

24  continue on to the next page, page 22?

25       A.   I believe so.  There's more than -- yes.  I
```

**Transcript of Keenan, Thomas**

01  can see 22 now, yes.

02      Q.    And how was it that Ashland determined which

03  documents would be reviewed and relied upon for

04  creating this hazard determination document?

05          DEFENSE COUNSEL:  Calls for speculation.

06      A.    We would -- based upon access to databases,

07  we had organizations that we belonged to, textbooks

08  that we had in place, and then we would also review

09  documents that may come into our possession as they

10  were provided to us.

11      Q.    Now, if you look to the bottom of this

12  document, if we could highlight the dates towards the

13  bottom, does this tell us dates that the document was

14  first prepared on and then several dates that it was

15  updated on?

16      A.    Yes.

17      Q.    So it appears that the document was first

18  prepared October 20, 1993?

19      A.    That's the date, yes, that's there.

20      Q.    And then it was updated again on July -- in

21  July 1996, October 22, 2001, July 16, 2003, and June

22  29, 2004?

23      A.    Yes.

24      Q.    Now, at this period of time from 1993 to

25  2004, is it correct that Ashland was no longer

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

01 refining toluene?

02    A.   Some time in that time frame, yes, the

03 petroleum company would have not been part of Ashland

04 anymore.

05    Q.   Do you recall when it was that Ashland

06 stopped refining toluene?

07    A.   No, I don't recall the exact date.  But we

08 still sold toluene.

09    Q.   Thanks.  So when Ashland stopped refining

10 toluene but was selling toluene manufactured by other

11 companies, would it receive material safety data

12 sheets for toluene from the companies that supplied

13 Ashland the toluene?

14    A.   We would receive material safety data sheets

15 from other companies, but we also had databases that

16 had MSDSs from other companies for toluene and we may

17 also review data sheets from other companies that were

18 not necessarily our suppliers.

19    Q.   Do you know who Ashland's suppliers of

20 toluene were in 2003, 2004?

21    A.   No, I do not.

22       THE COURT REPORTER:  Mr. DuPont, can you get

23    closer to the mic?

24       MR. DUPONT:  Is that better?

25       THE COURT REPORTER:  Yes.

**Transcript of Keenan, Thomas**

# Keenan, Thomas
Rhyne Trial Master

01  BY MR. DUPONT:

02      Q.    In creating this hazard determination

03  document, is it correct that Ashland reviewed toluene

04  MSDS from several other companies including Texaco,

05  Shell, Exxon Mobil, Phillips 66, and Coke?

06          MR. SAYRE:  Objection to the form of the

07      question.  Compound.  You can answer.

08      A.    Those companies' data sheets are listed as

09  references that you've mentioned.

10      Q.    Do you know why it was that Ashland selected

11  those companies' MSDS for toluene to review and rely

12  on in creating this hazard determination document?

13      A.    I do not know exactly why they were -- each

14  one of those were included, no, I don't know.

15      Q.    One of the toluene material safety data

16  sheets that Ashland is referring to in relying on the

17  information on the health hazards of toluene is an

18  Exxon Mobil toluene MSDS dated February 27, 2003,

19  that's reference number 24?

20      A.    Yes, I see that.

21      Q.    And based on the notes at the bottom of 22,

22  it looks like that MSDS was added as a reference on

23  July 16, 2003?

24      A.    No.  I would interpret that that we received

25  a new MSDS from Exxon Mobil for that product.

**Transcript of Keenan, Thomas**

01    Q.    Okay.  So on July 16, 2003, Ashland received
02 a new MSDS from Exxon Mobil for toluene?
03    A.    That would be my impression, yes.
04    Q.    And why was Exxon Mobil sending toluene MSDS
05 to Ashland in 2003?
06    A.    I don't know why they sent the data sheet at
07 that time period.
08    Q.    Was there a practice at Ashland to receive
09 material safety data sheets from its suppliers of
10 toluene?
11    A.    There is, but they may not have -- we may
12 have come across it too and, as I said, we had data
13 sheet databases that we pulled from too.  I don't know
14 exactly why that was coming in at that time or
15 updated.
16        MR. DUPONT:  To our video technician, can you
17    pull up the Exxon Mobil MSDS for toluene dated
18    February 27, 2003.
19        THE VIDEO TECHNICIAN:  I'm sorry.  Is that
20    the name of the document?
21        MR. DUPONT:  It begins with Toluene 11.  I
22    e-mailed it to you.
23        THE VIDEO TECHNICIAN:  I'm just receiving
24    that right now.
25        MR. DUPONT:  We will mark this as next to the

**Transcript of Keenan, Thomas**

01      document to the deposition.  Excuse me.

02          (Plaintiffs' Exhibit No. 12 was marked for

03  identification.)

04  BY MR. DUPONT:

05      Q.   Dr. Keenan, we'll blow up for you the top

06  portion of the first page of the document including

07  the title in section one so you can see a little

08  better.

09          MR. SAYRE:  And I object to the document on

10      the basis that it's being shown in digital form,

11      it's not being given to the witness to peruse.

12      All the objections I made before I incorporate

13      herewith.

14      Q.   Dr. Keenan, do you see that this is a Exxon

15  Mobil MSDS dated February 27, 2003, for toluene?

16          MR. SAYRE:  Yes, I'm going to object to the

17      question on the basis that it seeks to have the

18      witness authenticate a document based on its

19      title in the document instead of asking the

20      witness whether he's ever seen the document

21      before.  It's improper.

22          You can answer.

23      A.   That's what the document says, Material

24  Safety Data Sheet for Exxon Mobil for toluene.

25      Q.   Is this the same material safety data sheet

**Transcript of Keenan, Thomas**

01  for Exxon Mobil toluene that's reflected on the hazard

02  determination document that we just looked at?

03       MR. SAYRE:  Object to the question on the

04       basis that it calls for speculation, lacks

05       foundation.  You showed him the document, by the

06       way, in digital form when we can't look at the

07       whole thing and, as a result, you're trying to

08       get him to authenticate something that he's not

09       said he's seen yet.

10       So you can answer if you know.

11       A.   I'd have to go back and verify the date.  I'm

12  not sure.

13       Q.   When you say verify the dates --

14       A.   This says February 27, 2003.  I want to see

15  if that's the document that was referred to on the

16  references in the toluene hazard determination.

17       MR. DUPONT:  Great.  To our video technician,

18       can we go back to the last exhibit and page 22 of

19       that exhibit, please.

20       THE VIDEO TECHNICIAN:  What was the name of

21       it again?  Actually, I have it right here.  No,

22       that wasn't it.  What was the name of the last

23       one?  That's it.  Page 22?

24       MR. DUPONT:  Yes.  Could you blow up

25       reference 24.

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

```
01          THE WITNESS:  Okay.
02  BY MR. DUPONT:
03     Q.   So we're now showing to you reference number
04  24 from the Ashland hazard determination document for
05  toluene.  Does reference 24, is that the Exxon Mobil
06  MSDS dated February 27, 2003, which is what we were
07  just looking at?
08          MR. SAYRE:  Objection.  Patently improper.
09     The witness has not seen the other document.
10     It's your showing him this document, it's not
11     from our business records.
12          You're asking him to authenticate a document
13     that you're representing to be that simply based
14     on the title and the date, which is improper, it
15     doesn't authenticate the document.  Calls for
16     speculation, lacks foundation.
17     A.   The reference here says Exxon Mobil MSDS
18  2/27/03.  It matches the date on the other document,
19  but I don't know if exactly.  I can't say a hundred
20  percent certainty that that's the same document.
21     Q.   Do you recall discussing this material safety
22  data sheet during your deposition in the Robert Bruce
23  case?
24     A.   The which case?  I'm sorry.
25     Q.   Robert Bruce.
```

**Transcript of Keenan, Thomas**

01     A.   No, I don't recall that case.

02     Q.   When Ashland sold benzene during the 1970s,

03 specifically from 1970 to 1974, did it do so for

04 industrial uses?

05     A.   I can't say with certainty.  I mean, our

06 operations were industrial.  I don't know all the

07 customers that we sold to, so I can't say one way or

08 the other whether all customers were industrial or

09 not.

10     Q.   Do the labels for benzene used by Ashland in

11 the 1970s contain the statement "for industrial use

12 only"?

13     A.   I'd have to see the label.  I'm not sure that

14 that wasn't added on later.  But I don't know when the

15 timing was but we did have a -- we did put that on our

16 labels at one time period and continued on, but I

17 don't know when they were at.

18     Q.   Why did Ashland put the statement "for

19 industrial use only" on labels of benzene?

20     A.   I don't have an answer to that.  I don't know

21 one way or the other.

22     Q.   Was the -- strike that.

23          Was the statement "for industrial use only"

24 something that appeared on labels of benzene used by

25 Ashland at some point in the 1970s?

Transcript of Keenan, Thomas

Page 148

01        MR. SAYRE:  I will object to the question.

02    I'm not sure I understand "used by Ashland."

03        You can answer.

04        THE WITNESS:  Could you reread the question.

05 BY MR. DUPONT:

06    Q.   I'll re-ask the question.

07    A.   Okay.

08    Q.   At some point during the decade of the 1970s,

09 when Ashland sold benzene or a blend containing

10 benzene as an ingredient, did the statement "for

11 industrial use only" appear on the label?

12    A.   Without seeing the label, I don't recall when

13 that was added.  I don't know whether it was there

14 during that time period or not.

15    Q.   In the 1970s, did Ashland follow a format for

16 how to prepare benzene labels?

17    A.   My understanding that Ashland was trying to

18 mirror the Manufacturing Chemists' Associations

19 recommendations for benzene on their labels.

20    Q.   And what documents in the Manufacturing

21 Chemists' Association had the recommendation for

22 benzene labeling?

23    A.   I think it was the same one we've looked at

24 before, the material safety data sheet for benzene

25 from Manufacturing Chemists' Association.  That's my

**Transcript of Keenan, Thomas**

01  recollection, but I would have to see the document to

02  be certain.

03      Q.   Do you have any labels with you that were

04  used on benzene or blends containing benzene as an

05  ingredient sold by Ashland in the 1970s?

06      A.   I do not have any labels on me at this point.

07      Q.   When was Ashland first aware that benzene is

08  absorbed through the human skin?

09      A.   I don't know the exact time period of that.

10      Q.   If benzene absorbed into the human skin was

11  something that was discussed in the API's

12  toxicological reviews on benzene, is that information

13  that Ashland would have received and known about

14  benzene being absorbed through human skin when it

15  obtained those toxicological reviews on benzene?

16          MR. SAYRE:  Objection.  Calls for

17      speculation.

18      A.   Are you referring to the 1960 document that

19  we've seen earlier today?

20      Q.   Right.  We discussed both a 1960 document,

21  which you looked at, and also that there was a 1948

22  API toxicological review on benzene.

23      A.   Yes.  I don't recall exactly what those

24  documents said.  If they referred to dermal absorption

25  then Ashland would have had possession of those

**Transcript of Keenan, Thomas**

# Keenan, Thomas
### Rhyne Trial Master

```
01   documents, but I don't know whether they do without

02   reviewing it.

03        MR. DUPONT:  All right.  Those are all the

04   questions I have.

05        MR. SAYRE:  Any other questions?  Hearing

06   none, we are done.

07        THE VIDEOGRAPHER:  This concludes the

08   deposition.  The time is 3:54 p.m.

09        (This deposition concluded at 3:54 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas
### Rhyne Trial Master

```
01  RE    :  Jimmy H. Thomas v. Akzo Nobel Coatings
02  DEPO OF:  Thomas Keenan
03  TAKEN :  June 7, 2019
04
05                    EXCEPT FOR ANY CORRECTIONS
06                    MADE ON THE ERRATA SHEET BY
07                    ME, I CERTIFY THIS IS A TRUE
08                    AND ACCURATE TRANSCRIPT.
09                    FURTHER DEPONENT SAYETH NOT.
10
11                     THOMAS KEENAN
12
13  STATE OF FLORIDA          )
14                            )  SS:
15  COUNTY OF SARASOTA         )
16
17          Sworn and subscribed to before me this
18
19  _____ day of _____, 2019.
20
21  PERSONALLY KNOWN_____ OR I.D._____
22
23                     _____
24                     Notary Public in and for
25                     the State of Florida at
26                     Large.
27  My commission expires:
28
29
30
31
32
33
34
35
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas

Rhyne Trial Master

```
01                    ERRATA SHEET
02  RE    :  Jimmy H. Thomas v. Akzo Nobel Coatings
03  DEPO OF:  Thomas Keenan
04  TAKEN  :  June 7, 2019
05
06    DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
07
08  Page    Line      Change           Reason
09  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  State of Florida)
25  County of Sarasota)
26
27  Under penalties of perjury, I declare that I have read
28  the deposition transcript and it is true and correct
29  subject to any changes in form or substance entered
30  here.
31
32  _____      _____
33  Date                Thomas Keenan
```

**Transcript of Keenan, Thomas**

```
01              CERTIFICATE OF OATH OF WITNESS

02

03  STATE OF FLORIDA

04  COUNTY OF SARASOTA

05

06        I, MARY ANN SMITH, Registered Professional

07   Reporter, Registered Merit Reporter, Notary

08   Public, State of Florida, certify that the

09   witness, Thomas Keenan, personally appeared

10   before me on the 7th day of June, 2019, and was

11   duly sworn by me.

12

13        WITNESS my hand and official seal this 21st

14   day of June, 2019.

15

16

17

18

19        _____

20        Mary Ann Smith, RPR, RMR

21        Notary Public - State of Florida

22        My Commission No. FF 977637

23        Expires:  May 17, 2020

24

25

26

27

28
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas

## Rhyne Trial Master

```
01              REPORTER'S DEPOSITION CERTIFICATE

02

03   STATE OF FLORIDA

04   COUNTY OF MANATEE

05

06           I, MARY ANN SMITH, Registered Professional

07   Reporter, Registered Merit Reporter, certify that I

08   was authorized to and did stenographically report the

09   deposition of Thomas Keenan, the witness herein, on

10   June 7, 2019; that a review of the transcript was

11   requested; that the foregoing transcript, pages 1

12   through 156 inclusive is a true and complete record of

13   my stenographic notes of the deposition by said

14   witness; and that this computer-assisted transcript

15   was prepared under my supervision.

16           I further certify that I am not a relative,

17   employee, attorney or counsel of any of the parties,

18   nor am I a relative or employee of any of the parties'

19   attorney or counsel connected with the action.

20

21           DATED this 21st day of June, 2019, at

22   Lakewood Ranch, Manatee County, Florida.

23

24

25

26                  <%14070,Signature%>

27           _____

28           Mary Ann Smith, RPR, RMR

29

30

31

32

33

34
```

**Transcript of Keenan, Thomas**

```
01                Thomas v. Akzo

02                Thomas Keenan

03      INSTRUCTIONS TO THE WITNESS

04          Please read your deposition over

05      carefully and make any necessary corrections.

06      You should state the reason in the

07      appropriate space on the errata sheet for any

08      corrections that are made.

09          After doing so, please sign the errata

10      sheet and date it.

11          You are signing same subject to the

12      changes you have noted on the errata sheet,

13      which will be attached to your deposition.

14          It is imperative that you return the

15      original errata sheet to the deposing

16      attorney within thirty (30) days of receipt

17      of the deposition transcript by you.  If you

18      fail to do so, the deposition transcript may

19      be deemed to be accurate and may be used in

20      court.

21

22

23

24      3412943

25
```

**Transcript of Keenan, Thomas**

# Keenan, Thomas
Rhyne Trial Master

```
01              Thomas v. Akzo

02               Thomas Keenan

03           E  R  R  A  T  A

04               - - - - -

05    PAGE   LINE    CHANGE

06    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

07    Reason:_____

08    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

09    Reason:_____

10    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

11    Reason:_____

12    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

13    Reason:_____

14    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

15    Reason:_____

16    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

17    Reason:_____

18    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

19    Reason:_____

20    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

21    Reason:_____

22    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _

23    Reason:_____

24    3412943

25
```

Transcript of Keenan, Thomas

```
01              Thomas v. Akzo

02            Thomas Keenan

03      ACKNOWLEDGMENT OF DEPONENT

04          I, _____, do

05   hereby certify that I have read the foregoing

06   pages and that the same is a correct

07   transcription of the answers given by

08   me to the questions therein propounded,

09   except for the corrections or changes in form

10   or substance, if any, noted in the attached

11   Errata Sheet.

12

13   _____      _____

14   DATE                 SIGNATURE

15

16

17

18

19

20

21

22

23

24   3412943

25
```

**Transcript of Keenan, Thomas**

Page 158

**Transcript of Keenan, Thomas**

# Exhibit 4

# Transcript Report

---

## Masaitis, John

Plaintiff designations in yellow

US Steel counter designations in green

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

# Full Transcript Report
## Designation Legend

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

Page 1

```
01           IN THE COURT OF COMMON PLEAS
02           IN AND FOR PHILADELPHIA COUNTY
03
04                   - - -
05
06   ESTATE OF RONALD DAVIS,    : MARCH TERM, 2009
07                             :
08       Plaintiff,            :
09                             :
10       vs.                   :
11                             :
12                             :
13   SUNOCO, INC. (R&M), et    :
14   al.,                      :
15                             :
16       Defendants.           : No. 01835
17                   - - -
18
19           Tuesday, November 9, 2010
20
21                   - - -
22
23           Videotaped Deposition of JOHN
24   MASAITIS, taken at the Law Offices of Dickie
25   McCamey & Chilcote, Two PPG Plaza, Suite 400,
26   Pittsburgh,  Pennsylvania 15222, beginning at
27   9:58 a.m., before Brigitte A. Strain, a
28   Federally Certified Registered Professional
29   Reporter, Certified LiveNote Reporter and a
30   Notary Public.
31                   - - -
32
33   VERITEXT NATIONAL COURT REPORTING COMPANY
34           MID-ATLANTIC REGION
35       1801 Market Street - Suite 1800
36       Philadelphia, Pennsylvania  19103
37
38                         2
```

```
01      A P P E A R A N C E S :

02

03      LOCKS LAW FIRM

04      BY:  ANDREW J. DuPONT, ESQUIRE

05      601 Walnut Street

06      Suite 720 East

07      Philadelphia, Pennsylvania 19106

08      215.893.0100

09      adupont@lockslaw.com

10      Representing the Plaintiff

11

12      COATS ROSE

13      BY:  JAMES M. RILEY, JR., ESQUIRE

14      3 Greenway Plaza, Suite 2000

15      Houston, Texas  77046

16      713.653.7375

17      jriley@coatsrose.com

18      Counsel for Radiator Specialty

19

20      ALSTON & BIRD LLP

21      BY:  SARAH BABCOCK, ESQUIRE

22      1201 West Peachtree Street

23      Atlanta, Georgia 30309-3424

24      404.881.7000

25      Sarah.Babcock@alston.com

26      Representing the Defendant, Handschy

27      Industries LLC

28      (Via teleconference)

29

30      DICKIE, McCAMEY & CHILCOTE, P.C.

31      BY:  KATHERINE S. GALLAGHER, ESQUIRE

32      Two PPG Place

33      Suite 400

34      Pittsburgh, Pennsylvania  15222

35      412.392.5280

36      Kgallagher@dmclaw.com

37      Representing the Defendant, The

38      Sherwin-Williams Company

39

40

41

42

43                          3
```

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 5 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 490 of 1330

Page 3

```
01      APPEARANCES (continued):
02      ECKERT SEAMANS
03      BY:  JODI DYAN OLEY, ESQUIRE
04      Two Liberty Place
05      50 South 16th Street
06      22nd Floor
07      Philadelphia, PA  19102
08      215.851.8473
09      Joley@eckertseamans.com
10      Representing the Defendant, Tower Products
11      (Via teleconference)
12
13      FORMAN PERRY WATKINS KRUTZ & TARDY LLP
14      BY:  PHILLIP S. SYKES, ESQUIRE
15      BY:  LEA ANN SMITH, ESQUIRE
16      City Centre, Suite 100
17      200 South Lamar Street
18      Jackson, Mississippi 39201-4099
19      601.969.7840
20      Psykes@fpwk.com
21      Lsmith@fpwk.com
22      Representing the Defendant, U.S. Steel
23
24
25      KENT & McBRIDE, P.C.
26      BY:  JENNIFER HESLER, ESQUIRE
27      1617 John F. Kennedy Boulevard
28      Suite 1200
29      Philadelphia, Pennsylvania  19103
30      215.568.1800
31      Jhesler@kentmcbride.com
32      Representing the Defendant, Braden Sutphin
33      Ink
34      (Via teleconference)
35
36      KENT & McBRIDE, P.C.
37      BY:  GEORGE F. DALE, ESQUIRE
38      1617 John F. Kennedy Boulevard
39      Suite 1200
40      Philadelphia, Pennsylvania  19103
41      215.568.1800
42      Gdale@kentmcbride.com
43      Representing the Defendant, WM Barr Company
44      (Via teleconference)
45
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 6 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 491 of 1330

```
01    APPEARANCES (continued):
02        KUTAK ROCK LLP
03        BY:  JULIE B. NEGOVAN, ESQUIRE
04        Suite 28B
05        Two Liberty Place
06        50 South Sixteenth Street
07        Philadelphia, PA 19102-2519
08        215.299.4384
09        Julie.Negovan@kutakRock.com
10        Representing the Defendant, Handschy
11        Industries
12
13        MARGOLIS EDELSTEIN
14        BY: MARK COHEN, ESQUIRE
15        170 S. Independence Mall West
16        601 Walnut Street, 4th Floor
17        Philadelphia, PA  19106
18        215.931.5819
19        Mcohen@margolisedelstein.com
20        Representing the Defendant, Fehnel Press
21        Service & Supply, LLC
22        (Via teleconference)
23
24        MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
25        BY:  MICHAEL HAMILTON, ESQUIRE
26        913 N. Market Street
27        Suite 800
28        Wilmington, DE 19801
29        302-658-6688
30        Mhamilton@mooclaw.com
31        Representing the Defendant, Rycoline
32        Products, Inc., a Division of Sun Chemical
33        Commercial Group a/k/a Rycoline Products,
34        LLC, and Successor to Rogersol, Inc.
35
36        MARON MARVEL BRADLEY & ANDERSON, P.A.
37        BY: LINA M. CARRERAS, ESQUIRE
38        1700 Market Street, Suite 1500
39        Philadelphia, PA  19103
40        215.231.7100
41        LMC@maronmarvel.com
42        Counsel for Defendant, Printers Service
43        Company d/b/a PRISCO
44        (Via teleconference)
45
```

```
01     APPEARANCES (continued):

02

03     MARSHALL, DENNEHEY, WARNER, COLEMAN &

04     GOGGIN

05     BY: JENNIFER M. BRANCH, ESQUIRE

06     1845 Walnut Street

07     Philadelphia, PA  19103-4708

08     215.575.2600

09     Jmbranch@mdwcg.com

10     Representing the Defendant, Van Son Holland

11     Ink Corp. of America, and Cabrun Ink Products

12     Corp.

13     (Via teleconference)

14

15

16     MARSHALL, DENNEHEY, WARNER, COLEMAN &

17     GOGGIN

18     BY:  LEE C. DURIVAGE, ESQUIRE

19     1845 Walnut Street

20     Philadelphia, PA  19103-4708

21     215.575.2584

22     Lcdurivage@mdwcg.com

23     Representing the Defendant, Fujifilm, Hunt

24     Chemicals, USA, Inc., f/k/a Fuji Hunt

25     Photographic Chemicals, Inc., Successor to

26     Anchor/Lith-Kem-Ko, Inc.

27     (Via teleconference)

28

29     McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

30     BY:  RICHARD C. BIEDRZYCKI, ESQUIRE

31     1617 John F. Kennedy Boulevard

32     Suite 1500

33     Philadelphia, Pennsylvania 19103

34     215.557.2981

35     Rbiedrzycki@mdmc-law.com

36     Representing the Defendants, Chevron U.S.A.

37     and Sunoco, Inc. (R&M)

38     (Via teleconference)

39

40

41

42
```

```
01      APPEARANCES (continued):
02
03      MORGAN LEWIS & BOCKIUS LLP
04      BY:  AARON SKRYPSKI, ESQUIRE
05      1701 Market Street
06      Philadelphia, PA  19103-2921
07      215.963.5149
08      Ecline@morganlewis.com
09      Askrypski@morganlewis.com
10      Representing the Defendant, Philips
11      Electronics North America Corp. (PENAC)
12      (Via teleconference)
13
14      NELSON LEVINE deLUCA & HORST
15      BY:  ROBERT S. STICKLEY, ESQUIRE
16      518 Township Line Road
17      Suite 300
18      Blue Bell, PA  19422
19      215.358.5158
20      Rstickley@NLDHlaw.com
21      Representing the Defendant, EMCO Chemical
22      Distributors, Inc.
23      (Via teleconference)
24
25      PEPPER HAMILTON LLP
26      BY:  MEREDITH A. STOW, ESQUIRE
27      3000 Two Logan Square
28      18th and Arch Streets
29      Philadelphia, PA  19103
30      215.981.4341
31      Stowm@pepperlaw.com
32      Representing the Defendant, Sun Chemical
33      (Via teleconference)
34
35      REILLY JANICZEK & McDEVITT, P.C.
36      BY:  DAVID P. LODGE, ESQUIRE
37      One South Penn Square Building, Suite 410
38      Philadelphia, PA 19107
39      215.972.5200
40      Dlodge@rjm-law.com
41      Representing the Defendant, Varn
42      International, Inc. and Day International,
43      Inc.
44      (Via teleconference)
45
```

Transcript of Masaitis, John                    Saturday, August 15, 2020

```
01      APPEARANCES (continued):

02

03      SALMON, RICCHEZZA, SINGER & TURCHI, LLP

04      BY:  MICHELE L. WECKERLY, ESQUIRE

05      1700 Market Street, Suite 3110

06      Philadelphia, PA  19103

07      215.606.6600

08      Mweckerly@srstlaw.com

09      Representing the Defendant, National Paint

10      Industries, Inc.

11      (Via teleconference)

12

13      SHEEHY WARE & PAPPA, P.C.

14      BY:  RAYMOND A. NEUER, ESQUIRE

15      BY:  LEE ANN SMITH, ESQUIRE

16      909 Fannin Street, Suite 2500

17      Houston, Texas 77010-1008

18      713.951.1000

19      Rneuer@sheehyware.com

20      Representing the Defendant, T H Agriculture

21      & Nutrition

22

23      STEVENS & LEE, P.C.

24      BY:  DAVID J. PARSELLS, ESQUIRE

25      620 Freedom Business Center, Suite 200

26      King of Prussia, PA 19406

27      610.205.6000

28      DJP@stevenslee.com

29      Representing the Defendant, International

30      Paper Company, d/b/a XPEDX

31      (Via teleconference)

32

33      SWARTZ, CAMPBELL, LLC

34      BY:  CHARLES D. ROME, ESQUIRE

35      Two Liberty Place, 28th Floor

36      50 South 16th Street

37      Philadelphia, PA  19102

38      215.299.1910

39      Crome@swartzcampbell.com

40      Representing the Defendant, Graphic

41      Chemical & Ink Co.

42
```

# Masaitis, John
## Rhyne Trial Master

```
01      APPEARANCES (continued):
02
03      THE CAIRONE LAW FIRM PLLC
04      BY:  MATT CAIRONE, ESQUIRE
05      38 Virginia Lane
06      Canonsburg, Pennsylvania  15317-5802
07      (888) 609-1113
08      Mcairone@caironelaw.com
09      Representing the Defendant, U.S. Steel
10
11      TRESSLER, LLP
12      BY:  PETER CHOY, ESQUIRE
13      744 Broad Street
14      Suite 1510
15      Newark, New Jersey  07102
16      973.848.2900
17      Pchoy@tresslerllp.com
18      Representing the Defendant, Deleet
19      Merchandising Corporation
20      (Via teleconference)
21
22
23      WARD GREENBERG HELLER & REIDY LLP
24      BY:  SCOTT R. JENNETTE, ESQUIRE
25      300 State Street
26      Rochester, New York  14614
27      585.454.0700
28      Sjennette@wardgreenberg.com
29      Representing the Defendant, Eastman-Kodak
30      (Via teleconference)
31
32      Also Present:
33           Adrisen Young, Video Technician
34
35
36
37
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                  I N D E X
02                   -  -  -
03
04      Testimony of:  John Masaitis
05
06      By Mr. DuPont.....................14, 180
07      By Mr. Neuer..................... 160, 186
08      By Mr. Riley......................179
09
10                   -  -  -
11              E X H I B I T S
12                   -  -  -
13
14      EXHIBIT NUMBER     DESCRIPTION   PAGE MARKED
15
16      Masaitis 1   Davis Deposition
17                   Materials              18
18      Masaitis 2   Invoice, THAN 2209     51
19      Masaitis 3   MSDS, Benzene, Benzol
20                   H-D 649-650            68
21
22      Masaitis 4   USS Chemicals Safety
23                   Data Sheet,
24                   USS 02617A-2619        85
25
26      Masaitis 5   USS Chemicals Safety
27                   Data Sheet, Benzene
28                   USS 05889-891          87
29
30      Masaitis 6   Shipping Paper
31                   USS 02519              92
32      Masaitis 7   Product Shipping
33                   Data Sheet
34                   USS 02520              99
35      Masaitis 8   Benzene
36                   USS 01246             101
37
38      Masaitis 9   Product Shipping
39                   Data Sheet, Benzene
40                   USS 02517-18          100
41
42      Masaitis 10  Label, Benzene
43                   USS 00296-97          102
44
```

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01      EXHIBITS (continued):

02      EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED

03      Masaitis 11   Chemical Safety Data

04                    Sheet SD-2, Benzene

05                        USS 0298-313        104

06      Masaitis 12   USS Chemicals - Benzene

07                        USS 00316           114

08

09      Masaitis 13   MCA Chem-Card, Benzene

10                        USS 00314           114

11      Masaitis 14   Cargo Information Card

12                    Benzene, USS 00315      114

13

14      Masaitis 15   Environmental Health

15                    Monitoring Manual

16                        USS 2298-2361       118

17

18      Masaitis 16   Health Hazards in use

19                    Of Solvents for Motor

20                    Vehicles

21                        USS 03850-3859      127

22      Masaitis 17   MSDS

23                        USS 08892-93        152

24

25      Masaitis 18   Safety Data Sheet

26                    For Raffinate

27                        USS 16-22           154

28

29      Masaitis 19   Letter, 11/13/52

30                    To E.C. Myers

31                        USS 16982           189

32

33

34

35

36

37

38
```

**Transcript of Masaitis, John**                     **Saturday, August 15, 2020**

```
01              DEPOSITION SUPPORT INDEX
02      INSTRUCTION NOT TO ANSWER:
03      Page Line
04
05      (None)
06
07
08      REQUEST FOR PRODUCTION OF DOCUMENTS:
09      Page Line      Description
10
11      (None)
12
13      STIPULATIONS:
14      Page Line
15
16      13      19
17
18      QUESTIONS MARKED:
19      Page Line
20
21      (None)
22
23
24
25
26
27
28
29
30
31
32
33
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

01          JOHN MASAITIS

02          VIDEO TECHNICIAN:  My name is

03    Adrisen Young representing Veritext.

04    The date today is November 9, 2010,

05    and the time is approximately 9:58

06    a.m.

07          This deposition is being held at

08    the office of Dickie McCamey &

09    Chilcote, located at Two PPG Place,

10    Suite 400, Pittsburgh, Pennsylvania

11    15222.

12          The caption of this case is

13    Ronald Davis versus Sunoco

14    Incorporated, et al., filed in the

15    Court of Common Pleas of Philadelphia

16    County, March Term 2009.

17          The name of the witness is John

18    Masaitis.

19          At this time will the attorneys

20    present please identify themselves for

21    the record.

22          MR. DuPONT:  Andrew DuPont from

23    the Locks Law Firm for the Estate of

24    Ronald Davis.

25          MR. NEUER:  Ray Neuer here for T

Page 13

```
01                    JOHN MASAITIS
02        H Agriculture and Nutrition.
03             MS. GALLAGHER:  Katherine
04        Gallagher for Sherwin Williams.
05             MR. HAMILTON:  Michael Hamilton
06        for Rycoline Products.
07             MS. NEGOVAN:  Julie Negovan for
08        Handschy Industries.
09             MS. SMITH:  Lea Ann Smith,
10        United States Steel Corporation.
11             MR. SYKES:  Phillip Sykes for
12        U.S. Steel.
13             MR. CAIRONE:  Matt Cairone for
14        United States Steel Corporation.
15             VIDEO TECHNICIAN:  Our court
16        reporter, Brigitte Strain of Veritext,
17        will please swear in the witness.
18                    -   -   -
19             (It is hereby stipulated and
20        agreed by and among counsel for the
21        respective parties that sealing,
22        certification and filing are waived,
23        that all objections, except as to the
24        form of the question, be reserved
25        until the time of trial, and that an
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 16 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 501 of 1330

```
01                    JOHN MASAITIS
02           objection by one defendant inures to
03           the benefit of all defendants.)
04                       -  -  -
05                JOHN MASAITIS, after having been
06           first duly sworn, was examined and
07           testified as follows:
08                       -  -  -
09                    EXAMINATION
10                       -  -  -
11   BY MR. DuPONT:
12           Q.     Good morning, Mr. Masaitis.
13           A.     Good morning.
14           Q.     Am I pronouncing your name
15   correctly?
16           A.     That's good enough.
17           Q.     All right.  If I get it wrong,
18   please let me know.
19           A.     No, that's fine.
20           Q.     Thank you.  My name is Andrew
21   DuPont, we introduced ourselves briefly this
22   morning.  I am the attorney for the Estate of
23   Ronald Davis, I'm here to take your
24   deposition.  I know you've given depositions
25   in the past, but I'll briefly review the
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 311-4  Filed 09/02/20  Page 17 of 197
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 502 of 1330

```
01                    JOHN MASAITIS
02      rules.
03                    If I ask you a question that
04      you do not understand, please let me know.
05      If you answer the question, we'll assume that
06      you answered the question that I asked and
07      that you understood that question.  Is that
08      okay?
09           A.     Yes.
10           Q.     We should not talk over each
11      other, because that makes our court
12      reporter's job difficult.  So I will allow
13      you to finish your response before I begin my
14      next question.  If you'll allow me to finish
15      my question before you begin your response, I
16      would appreciate that as well.
17           A.     Yes.
18           Q.     All right.  If you need a break
19      at any point in time, let us know that.  I
20      just ask that you answer any question that's
21      pending before you take a break.  Okay?
22           A.     Sure.
23           Q.     Sir, what --
24                    MR. BIEDRZYCKI:  Andrew, before
25           you begin, this is Rich Biedrzycki,
```

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 18 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 503 of 1330

```
01              JOHN MASAITIS

02        can we just have a stipulation that an

03        objection by one is an objection by

04        all.

05              MR. DuPONT:  Yes, we've been

06        stipulating at all these depositions

07        that an objection by one is an

08        objection by all.  And that the -- all

09        objections, except as to form, are

10        preserved until the time of trial.

11              MR. BIEDRZYCKI:  Thanks.

12  BY MR. DuPONT:

13        Q.    All right.  Okay.  When was the

14  last time you gave a deposition?

15        A.    Last summer.

16        Q.    Do you recall the name of the

17  case?

18        A.    No, I don't.

19        Q.    What did that case involve?

20        A.    That case was benzene

21  raffinate, similar to this.

22        Q.    Before we get into your prior

23  testimony, I would like to ask you what you

24  did to prepare for your deposition today?

25        A.    I went through material that
```

Object to "Before we get into your prior testimony"

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**                     **Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02   was sent to me by the law firm representing
03   U.S. Steel.  I also met with the U.S. Steel
04   attorneys yesterday.
05         Q.    What material was sent to you
06   that you reviewed?
07         A.    I had a book of it over here
08   (indicating.)
09         Q.    All right.  Is that accessible
10   to you right now?  You don't have to get up.
11   If you can point it to me, I'd be happy to
12   get it for you.
13         A.    Yes.
14         Q.    This one here, in the black
15   book?
16         A.    Yes.
17         Q.    Let me hand that to you.
18         A.    Thank you.  Thank you very
19   much.
20         Q.    You're welcome.
21               And can you tell me generally,
22   what does that binder consist of?
23         A.    There's a table of contents.
24   It shows the deposition notice, Amended
25   Complaints, U.S. Steel discovery responses,
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01              JOHN MASAITIS

02    deposition transcripts, U.S. Steel records of

03    sales.

04          Q.     Let me stop you there.  If we

05    could -- if you don't mind, could I take the

06    Table of Contents out and mark that as an

07    exhibit just so I have a record of what you

08    have reviewed?

09          A.     Sure.

10          Q.     Thank you.

11                    -  -  -

12          (Whereupon the document was

13          marked, for identification purposes,

14          as Masaitis Exhibit Number 1.)

15                    -  -  -

16    BY MR. DuPONT:

17          Q.     Sir, approximately how much

18    time did you spend reviewing the materials

19    that are listed on Exhibit 1?

20          A.     Well, it was sent to me last

21    week.  I would say maybe eight hours, ten

22    hours, going through it.

23          Q.     And are you compensated for

24    your time in preparing for depositions and

25    testifying at depositions on behalf of U.S.
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 21 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 506 of 1330

```
01                    JOHN MASAITIS

02   Steel?

03                    MR. CAIRONE:   I object to the

04        form.   It's two questions.

05                    THE WITNESS:   I don't charge for

06        the time that I spend testifying, but

07        I do charge for the industrial hygiene

08        consulting, preparation, that sort of

09        thing.

10   BY MR. DuPONT:

11        Q.      Can you tell me what you mean

12   when you say you charge for the industrial

13   hygiene consulting, preparation?

14        A.      Well, I'm an industrial hygiene

15   consultant.   I have been since I retired, and

16   I consider this industrial hygiene consulting

17   because I am not charging for the time that I

18   am testifying.

19        Q.      Okay.   How much do you charge,

20   either on an hourly basis or otherwise, for

21   your consultant work?

22        A.      300.

23        Q.      $300 per hour?

24        A.      Yes.

25        Q.      Can you estimate for me
```

```
01                    JOHN MASAITIS
02   approximately how many hours per year you
03   work on behalf of U.S. Steel as an industrial
04   hygiene consultant?
05        A.     This was the first activity
06   this year.
07        Q.     How about last year, how many
08   hours did you spend doing that?
09        A.     Oh, I would say 12, 14.
10   Something like that.  Possibly 20.  It's not
11   very often.
12        Q.     Do you have a written agreement
13   or contract with U.S. Steel concerning your
14   work as an industrial hygiene consultant?
15        A.     No.
16        Q.     Do you testify as an expert on
17   behalf of U.S. Steel?
18        A.     I have in the past.
19        Q.     Do you know whether or not you
20   will be testifying as an expert in this
21   case --
22        A.     No.
23        Q.     -- for U.S. Steel?
24        A.     No.
25        Q.     No, you do not know or, no, you
```

```
01                    JOHN MASAITIS
02    will not be?
03         A.    To my knowledge, I will not be.
04         Q.    All right.  Did you make any
05    kind of notes or memorandum as a result of,
06    or during the course of your reviewing the
07    materials that you have in front of you?
08         A.    No.
09         Q.    And did you say that you
10    received these materials last week?
11         A.    Yes.
12         Q.    Do you maintain your own
13    collection of materials, documents, things
14    like that, related to U.S. Steel?
15         A.    No.
16         Q.    Do you maintain your own
17    collection of materials relating to benzene
18    in general?
19         A.    No.
20         Q.    When did you first begin to
21    testify on behalf of U.S. Steel as an
22    industrial hygiene consultant?
23         A.    I believe it was 1997, the year
24    after I retired.
25         Q.    Do you understand that you're
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02   here as the corporate representative of U.S.
03   Steel?
04        A.    Yes.
05        Q.    And that means you're speaking
06   on behalf of the corporation?
07        A.    Yes.
08        Q.    Did you testify as a corporate
09   representative of U.S. Steel prior to 1997?
10        A.    I may have.  I may have done
11   some testifying in '96 because as I was
12   sitting here now I was thinking I retired in
13   February of '96.  And I think there may have
14   been some other litigation I represented the
15   corporation in.  I think -- it could have
16   been something in asbestos in '96, later on,
17   after I retired.
18        Q.    Okay.  Have you testified or
19   been retained as an expert by any companies
20   other than U.S. Steel?
21        A.    Yes.
22        Q.    What companies are those?
23        A.    I did some work for, I believe
24   it was Koppers.  I have done work for other
25   companies shortly after I retired.  I can't
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02    recall.  I've done consulting for The
03    Americanized Steel Institute on some
04    radiation matters.  And I -- I -- I can't
05    recall.  There weren't that many.
06          Q.    Did your consulting work for
07    Koppers involve litigation?  Was it given in
08    the context of litigation?
09          A.    I believe I gave a deposition,
10    but I didn't go to trial.
11          Q.    Okay.  Did that case concern
12    benzene exposure?
13          A.    No.
14          Q.    Was there a particular toxin at
15    issue?
16          A.    I believe it was regarding coke
17    emissions.
18          Q.    Has all of your consulting work
19    for U.S. Steel, from 1997 to the present,
20    related to benzene exposure?
21          A.    No.
22          Q.    In what other areas of
23    litigation have you provided support?
24          A.    Asbestos.  That's primarily it,
25    asbestos and the benzene.
```

```
01              JOHN MASAITIS
02      Q.    Can you estimate for me how
03 many times you've testified on behalf of U.S.
04 Steel, either in a deposition or at trial, in
05 a case relating to benzene exposure?
06      A.    I may have given six or eight
07 depositions.
08      Q.    Have you ever testified at a
09 trial?
10      A.    Yes.
11      Q.    On how many occasions?
12           MR. CAIRONE:  Andrew, to be
13      clear, are you talking about any trial
14      or a benzene trial?
15           MR. DuPONT:  Good question.
16 BY MR. DuPONT:
17,     Q.    Have you ever testified at a
18 trial in a case concerning benzene exposure?
19      A.    Yes.  I recall one.  I don't
20 think there were any others relating to
21 benzene.  I can recall one.
22      Q.    Do you recall the name of the
23 case where you testified at trial regarding
24 benzene exposure?
25      A.    No.
```

```
01                    JOHN MASAITIS
02        Q.    Do you recall where the trial
03   was geographically?
04        A.    It was -- was it in
05   Mississippi?  Yes, Mississippi.
06        Q.    Do you recall the name of the
07   attorney that represented the injured person?
08        A.    It was Karlaps (phonetic).
09              MR. SYKES:  No, he represented
10        U.S. Steel.
11              THE WITNESS:  Represented U.S.
12        Steel.
13              MR. CAIRONE:  The question was,
14        who represented the injured person.
15              THE WITNESS:  Oh, the injured
16        person, I'm sorry.  My hearing isn't
17        what it used to be either, I thought
18        you were talking about the attorney
19        for U.S. Steel.  No, I don't.
20   BY MR. DuPONT:
21        Q.    Okay.  I will try and keep my
22   voice up.  If at any point in time you can't
23   hear a question I'm asking, please let me
24   know and I'll --
25        A.    Okay.
```

01                  JOHN MASAITIS

02          Q.       -- and I'll remember myself, or

03   remind myself to keep my voice up.

04                  All right.  I'd like to learn a

05   little bit about the background of U.S.

06   Steel.  I have one of your prior deposition

07   transcripts that your counsel produced to me

08   and I want to just get a little more

09   information.  Do I recall correctly that U.S.

10   Steel has been producing benzene since the

11   1920s?

12          A.       U.S. -- I can't recall the

13   exact date, but when the coke by-product

14   plants came into operation, that's when U.S.

15   Steel started to produce benzene as a

16   by-product of those ovens, which was probably

17   in about 1920.

18          Q.       Are you able to tell me where

19   U.S. Steel has ranked in terms of producers

20   of benzene in the United States since the

21   1920s?  Understanding that it's changed over

22   time, but can you give me any sense of that?

23          A.       No.  Other than -- to my

24   knowledge, that we were producing quite a bit

25   during the thirties, forties, the war years,

```
01                    JOHN MASAITIS
02    when a lot of steel was being made.
03          Q.    Can you tell me, during the
04    1970s, where U.S. Steel ranked in terms of
05    producers of benzene in the United States?
06          A.    No, I can't.
07          Q.    Do you know whether they were
08    in the top ten?
09          A.    I wouldn't know.  It's a, you
10    know, correlation with the amount of steel
11    that is being produced.  I -- I wouldn't
12    venture a guess.
13          Q.    Okay.  In how many locations
14    has U.S. Steel produced benzene?
15          A.    Well, each location we had the
16    by-product, COG Mon operations.  What do I
17    want to say?  Six or eight.
18          Q.    Is that consistent from the
19    1920s up through the -- I believe you
20    previously testified that in about the early
21    to mid 1980s, the benzene producing
22    operations of U.S. Steel kind of tailed off?
23          A.    Let me correct that last
24    statement.  Actually you said benzene.  I was
25    looking at the light oil, which is -- benzene
```

```
01                    JOHN MASAITIS
02      is a constituent of light oil.  I think there
03      were only two or three plants where we
04      actually broke the light oil down to benzene,
05      toluene and xylene.  So if I could correct
06      that last statement regarding the coke
07      by-product plants.
08              Q.      All right.  Let me see if I
09      understand that correctly.  There have been
10      six to eight locations at which U.S. Steel
11      produced light oil, of which benzene, toluene
12      and xylene are components.
13              A.      There were six plants, as I
14      recall, thereabouts, that produced coke.  And
15      at those plants, the light oil was a
16      by-product of the coke.  And at three plants,
17      I only recall that those three plants
18      produced benzene, toluene and xylene from the
19      light oil.  They had a further extraction
20      process.
21              Q.      Was that further extraction
22      process done through what's called a Udex
23      unit, or has that technology changed over
24      time?
25              A.      Well, we called it a BTX plant.
```

01                    JOHN MASAITIS

02     But I think they only had the Udex process at

03     Claritin.

04          Q.     So Claritin was one of the

05     plants where benzene was produced.  What were

06     the other two plants where benzene was

07     produced?

08          A.     I recall it being produced at

09     Gary Works and also Geneva Works.

10          Q.     Gary Works is that in Gary,

11     Indiana?

12          A.     Yes.

13          Q.     During which years did U.S.

14     Steel produce benzene at the Claritin Works?

15          A.     I can't say specifically when

16     the BTX plants went into operation, but I

17     would say it would be early on.  We were

18     producing benzene in the twenties.  There had

19     to be some type of extraction.

20          Q.     And when did U.S. Steel stop

21     producing benzene at Claritin?

22          A.     I think they're still producing

23     it.

24          Q.     How about the Gary Works in

25     Gary, Indiana, when did U.S. Steel begin to

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02   operate that plant?
03                    MR. CAIRONE:  Let me put an
04              objection on the record.  In fairness
05              to the witness, I don't think that
06              this was a subject notified for
07              deposition.  So unless you can point
08              me to where it was, he hasn't been
09              prepared.
10                    I'm going to let the question
11              go, but I want that on the record,
12              that this was not a subject for this
13              witness to be prepared.
14   BY MR. DuPONT:
15         Q.     Okay.  You can answer.
16         A.     And the question was?
17         Q.     Sure.  Are you able to tell me
18   when U.S. Steel began to produce benzene at
19   the Gary Works?
20         A.     I -- I don't know.
21         Q.     Does U.S. Steel continue to
22   operate the Gary Works plant?
23         A.     The benzene plant?
24         Q.     Gary Works in general.  Then
25   I'll ask you about benzene.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          A.    Gary Works is still operating,
03    yes.
04          Q.    Is benzene still produced at
05    Gary Works?
06          A.    I don't know.
07          Q.    Okay.
08          A.    I don't think so.  I think they
09    just take it down to the light oil.  That's
10    what I recall.  I don't think they produce
11    benzene at Gary anymore.
12          Q.    All right.  Are you able to
13    recall when they stopped producing benzene at
14    Gary?
15          A.    No.
16          Q.    And Geneva Works was the third
17    location you gave me.  Does U.S. Steel
18    continue to operate the Geneva Works plant?
19          A.    To this day?
20          Q.    Yes, sir.
21          A.    No.
22          Q.    Okay.  Do you know when that
23    plant shut down?
24          A.    Well, I think the plant is
25    still in operation, but U.S. Steel sold it
```

01                    JOHN MASAITIS

02    years ago.

03         Q.     I understand.  Do you know when

04    U.S. Steel sold the Geneva Works plant?

05         A.     It was sold while I was still

06    working.  So it was, you know, maybe 20 years

07    ago.

08                    MR. CAIRONE:  And before you go

09              on, Andrew, I'll represent to you that

10              the BTX unit at Claritin was shut down

11              in '86, benzene, toluene and xylene.

12              And I'll be happy to provide you with

13              the background to support that

14              representation.

15                    MR. DuPONT:  Okay.

16    BY MR. DuPONT:

17         Q.     Has U.S. Steel produced benzene

18    anywhere outside of the United States?

19         A.     No, not to my knowledge.

20         Q.     Has U.S. Steel sold benzene

21    outside of the United States?

22         A.     Not to my knowledge.

23         Q.     Has U.S. Steel ever had its own

24    occupational exposure limit or level for

25    benzene?

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN MASAITIS
02      A.    No.
03      Q.    Am I correct that U.S. Steel
04  has a medical department?
05      A.    Yes.
06      Q.    Does it also have a toxicology
07  department?
08      A.    No.
09      Q.    It has an industrial hygiene
10  department?
11      A.    Yes.
12      Q.    And it has a safety department?
13      A.    Yes.
14      Q.    Are you able to tell me when
15  U.S. Steel first had a medical department?
16      A.    I would say the early 1900s.
17      Q.    How about an industrial hygiene
18  department, when did U.S. Steel first have an
19  industrial hygiene department?
20      A.    Well, the first professional
21  industrial hygienist was Ken Morris, and he
22  was hired around 1950, '51.
23      Q.    Did U.S. Steel create an
24  industrial hygiene department when they hired
25  Mr. Morris?
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 36 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 521 of 1330

Page 34

```
01              JOHN MASAITIS

02        A.    Yes.

03        Q.    How about the safety department

04   in U.S. Steel, when was the safety department

05   first created?

06        A.    I don't know.

07        Q.    On average, since the 1950s to

08   the present time, how many industrial

09   hygienists has U.S. Steel employed?

10        A.    Oh, I'd -- I would have to

11   speculate.  It's increased through the years

12   substantially.  I -- I wouldn't venture a

13   guess.

14        Q.    I have, in your resume here

15   from another case, that you began to work at

16   United States Steel Corporation as an

17   industrial hygiene engineer in 1964, and that

18   you maintained that position until 1968.  Is

19   that correct?

20        A.    Yes.  It could be correct, if

21   you're looking at my resume.

22        Q.    Right.  And I'll represent to

23   you that I am.  And that's marked as Bates

24   Numbers USS Depo 2787 through 2790.  If you'd

25   like to see it --
```

Objection: Delete "from another case"

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02         A.     No, that's fine.
03         Q.     -- I'll give that to you.
04                Then you went on to become the
05    industrial hygiene engineer from 1964 to
06    1968.
07         A.     If that's what's on the resume,
08    yes.
09         Q.     From 1978 to 1986, you were a
10    corporate assistant manager for the
11    industrial hygiene at United States Steel
12    Corporation?
13         A.     Yes.
14         Q.     When you were working as an
15    industrial hygienist from 1962 to 1964 --
16    strike that.  I apologize, I'm looking at the
17    wrong dates.
18                When you were working as an
19    industrial hygiene engineer for the United
20    States Steel Corporation from 1964 to 1968,
21    how many people were employed in the
22    industrial hygiene department?
23         A.      '64 through '68, there were
24    about half a dozen.
25         Q.     I take it there was a director
```

```
01                    JOHN MASAITIS
02     of the industrial hygiene department at that
03     time.
04          A.     Yes.
05          Q.     Who was the director at that
06     time?
07          A.     Ken Morris.
08          Q.     How many people were employed
09     in the medical department during 1964 to
10     1968?
11          A.     I don't know.
12          Q.     Did you have interaction with
13     the medical department during that period of
14     time?
15          A.     Yes.
16          Q.     And what types of people would
17     you interact with in the medical -- medical
18     department?
19          A.     The -- me personally, or the
20     industrial hygiene department?
21          Q.     You personally.
22          A.     When I would go to a facility,
23     I would periodically see the plant physician.
24          Q.     What would you see the plant
25     physician for?
```

```
01                    JOHN MASAITIS
02          A.       Just since he was, you know,
03    the plant physician and we both were
04    occupational health professionals, and I may
05    stop in to see him.  He may have requested
06    that -- the activity that I was visiting the
07    plant for.
08          Q.       Was there a plant physician at
09    each one of U.S. Steel's plants?
10          A.       The larger facilities, yes.
11          Q.       When you say the larger
12    facilities, what do you mean?
13          A.       Well, the integrated steel
14    plants, as opposed to smaller facilities,
15    where you didn't have a large population.
16          Q.       How many of these larger
17    facilities were there that had a dedicated
18    industrial -- excuse me, occupational as a
19    position?
20          A.       From '64 to '68?
21          Q.       Yes, sir.
22          A.       I -- it could take some time to
23    count them, but I would say approximately a
24    dozen.
25          Q.       Who was the director of
```

```
01                JOHN MASAITIS
02   medicine for U.S. Steel in '64 to '68?
03        A.    Dr. Bundy was a director, but
04   there was a doctor -- Vice President of
05   Health Services, I believe we called it then,
06   that oversaw the medical, safety and
07   industrial hygiene department.  That was Dr.
08   O'Connor.
09        Q.    Did the medical department at
10   that period in time, '64 to '68, have its own
11   building?
12        A.    No.
13        Q.    Did U.S. Steel have, at that
14   point in time, at its medical department any
15   kind of laboratory where it could conduct
16   medical experiments or testing?
17        A.    No.
18        Q.    Sorry.  Were you finished?
19        A.    No.  There -- there were no
20   experiments or anything conducted.  No
21   studies or anything like that.  They may have
22   had a small laboratory that -- where they
23   would do some type of tests associated with
24   the annual physical examination of a worker
25   or something like that, but nothing
```

01                    JOHN MASAITIS

02      elaborate.

03              Q.      Okay.  I've seen in records

04      that have been produced to us that U.S. Steel

05      would conduct pre-employment blood

06      examination, complete blood counts, and

07      conduct complete blood counts on its

08      employees throughout their employment.  Would

09      that type of test, for example, be done

10      in-house?  In other words, a physician for

11      U.S. Steel, or a nurse for U.S. Steel perhaps

12      would take a blood test and then there would

13      be a laboratory at U.S. Steel that processed

14      the actual test?

15              A.      The industrial hygiene

16      laboratory would do some urine analysis, but

17      I don't recall that we ever did do blood

18      counts or anything like that.  And the

19      medical department didn't do it, so it

20      possibly was done outside.

21              Q.      After 1968, when you worked as

22      a senior industrial hygiene engineer from '68

23      to '78, did the industrial hygiene department

24      grow?  Were there more employees during that

25      period of time?

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 42 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 527 of 1330

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02        A.      Yes.
03        Q.      How many?
04        A.      Possibly five.
05        Q.      Are you able to tell me what
06   the size of the medical department at the
07   United States Steel Corporation was from '68
08   to '78?
09        A.      No, I couldn't tell you.
10        Q.      Sir, when did you first learn
11   that benzene causes cancer?
12        A.      I would say that it was
13   probably the late seventies, early eighties.
14   About that time.
15        Q.      Prior to the late seventies,
16   had you seen any information that associated
17   benzene exposure with cancer?
18        A.      There was literature that would
19   -- there were some studies done that
20   associated it with cancer.  Some
21   organizations were looking at it as a
22   suspected carcinogen prior to that.
23        Q.      When is the earliest you saw
24   information associating benzene with cancer?
25        A.      I can't recall the earliest
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                  JOHN MASAITIS
02     date.  It could have been in the
03     mid-seventies, the late seventies.
04          Q.     When you worked -- I understand
05     you worked for the Commonwealth of
06     Pennsylvania as an industrial hygienist from
07     '62 to '64.  Is that correct?
08          A.     Yes.
09          Q.     At that point in time, did you
10     have a -- were you aware that there was an
11     association between benzene exposure and
12     cancer?
13          A.     No.
14          Q.     Had you seen any information
15     during your employment with the Commonwealth
16     of Pennsylvania relating to the ability of
17     benzene to cause cancer?
18          A.     Not that I recall.
19          Q.     When you learned that benzene
20     was a suspected carcinogen, if I understand
21     you correctly, in the mid 1970s, what forms
22     of cancer were associated, that you learned,
23     with benzene at that time?
24               MR. CAIRONE:  Andrew, when
25          you're saying you, just to be clear,
```

```
01              JOHN MASAITIS

02         are you asking him personally or as

03         the representative of U.S. Steel?

04              MR. DuPONT:  I'm asking him

05         personally at this time.

06              MR. CAIRONE:  Okay.

07              THE WITNESS:  I would say

08         leukemia.

09    BY MR. DuPONT:

10              Q.    Are you able to tell me now, as

11    we sit here today, what forms of cancer are

12    caused by exposure to benzene?

13              A.    I'm, you know, not a medical

14    person.  I just look at it very broadly as --

15    as causing leukemia.

16              Q.    Are you aware that benzene

17    causes damage to human chromosomes?

18              A.    I'm not -- as I said, I'm not a

19    medical person.  I don't get into that.  I'm

20    not aware if benzene is associated with

21    chromosomes.

22              Q.    In the course of your work with

23    United States Steel Corporation did you come

24    to learn that the United States Federal

25    Government said that there is no safe level
```

```
01                    JOHN MASAITIS
02   of exposure to benzene?
03        A.    No.
04        Q.    Never seen any information from
05   the government to that effect?
06        A.    No.  I know that through the
07   years they have come out with proposals, and
08   the last was one part per million.
09        Q.    And what -- what is your
10   understanding of what one part per million
11   represents?
12        A.    That represents permissible
13   exposure level of an eight hour work period,
14   time-weighted average.
15        Q.    As an industrial hygienist with
16   the United States Steel Corporation, you were
17   aware, were you not, that one could develop
18   leukemia from exposure to benzene at levels
19   less than one part per million as a
20   time-weighted average?
21        A.    No.
22        Q.    You've never seen any
23   information to that effect?
24        A.    Not that I recall.
25        Q.    As an industrial hygienist with
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01              JOHN MASAITIS
02   U.S. Steel, you are aware that benzene could
03   be absorbed through human skin; is that
04   correct?
05        A.    There is some absorption, I
06   understand.
07        Q.    When did you first learn, you
08   personally learn as an industrial hygienist,
09   that benzene is absorbed through human skin
10   when benzene, the liquid, comes into contact
11   with the skin?
12        A.    I can't recall.  I'd have to
13   say that it was in the early years of my
14   industrial hygiene career.
15        Q.    While you were working for the
16   Commonwealth of Pennsylvania?
17        A.    Probably.
18        Q.    Did you also come to learn that
19   vapors in the air, benzene vapors in the air,
20   can actually be absorbed through human skin?
21        A.    If there is some absorption I
22   don't -- again, from an industrial hygiene
23   point of view, I don't know it would be
24   consequential.
25        Q.    Let me see if I understand
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 47 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 532 of 1330

```
01                    JOHN MASAITIS
02      that.  You were aware, as an industrial
03      hygienist working for U.S. Steel, that a
04      person can absorb benzene through their skin
05      by virtue of there being benzene vapors in
06      the air.
07                    MR. CAIRONE:  Objection,
08           leading.
09      BY MR. DuPONT:
10           Q.     Is that correct?
11           A.     No.  No.  No, what I said is
12      that there is some -- not benzene absorption
13      through skin.  You know, of course if there
14      is a break in the skin you're going to get
15      more absorption.  So it's dependent upon a
16      number of factors.  So far as vapors in the
17      air, there may be an extremely small amount
18      of absorption.  I wouldn't venture to guess,
19      but it's possible.  But I don't think it's of
20      significance compared to the hazard
21      associated with inhalation of vapors.
22           Q.     Let me ask it -- I just want to
23      see if I can understand you correctly.  As an
24      industrial hygienist with U.S. Steel, you are
25      aware that benzene can be absorbed through
```

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02      the skin when the skin comes into contact
03      with air that has benzene vapors in it; is
04      that correct?  Regardless of what quantity of
05      benzene is being absorbed, you are aware that
06      that could happen.
07            A.     To my knowledge, we really
08      never considered the benzene vapors being
09      absorbed through the skin.  I -- it would to
10      be of any consequence, it would have to be
11      extremely high concentrations.  But here
12      again, the major concern would be associated
13      with inhaling the vapors into the lungs and
14      getting into the blood stream that way.  More
15      so than the vapors themselves penetrating
16      intact skin.
17            Q.     I don't want to talk to you
18      right now about the relative amount of
19      exposure that you get from the various routes
20      of exposure.  I just want to know, yes or no,
21      were you aware, as an industrial hygienist
22      with U.S. Steel, that benzene can be absorbed
23      through human skin through contact with air
24      containing benzene vapors?
25            A.     Not really, no.
```

```
01                    JOHN MASAITIS
02          Q.     Two of the chemicals that U.S.
03    Steel produced from light oil were toluene
04    and xylene; correct?
05          A.     Yes.
06          Q.     How much benzene was present in
07    the toluene that U.S. Steel produced in the
08    1970s?
09          A.     I have no idea.
10          Q.     Were you aware that benzene was
11    in toluene as it was produced by U.S. Steel?
12          A.     I'm aware that there is a
13    residual amount of benzene in toluene and
14    xylene, yes.
15          Q.     How much benzene is in xylene
16    and toluene?
17                 MR. CAIRONE:  Let me object.
18          It's not a subject designated for this
19          witness to testify on.  It's not a
20          chemical involved in this case.  And
21          so it's not relevant.  And it's not a
22          subject that we have presented this
23          witness to testify for U.S. Steel.
24    BY MR. DuPONT:
25          Q.     How much benzene was in toluene
```

Obj
402,
403

```
01              JOHN MASAITIS
02    manufactured by U.S. Steel during the 1970s?
03         A.    I have no idea.
04         Q.    How much benzene was in xylene
05    manufactured by U.S. Steel in the 1970s?
06              MR. CAIRONE:  Same objection.
07              THE WITNESS:  No idea.
08    BY MR. DuPONT:
09         Q.    During the 1970s did U.S. Steel
10    monitor its employees for exposure to benzene
11    when they were working with or around
12    toluene?
13         A.    There could have been some
14    studies done.  I can't recall a specific
15    study that was associated with monitoring for
16    benzene from toluene.
17         Q.    Is that a -- was it a practice
18    of the industrial hygienist at U.S. Steel in
19    the 1970s to monitor employees handling
20    toluene or working around toluene?
21              MR. CAIRONE:  Can we agree,
22         Andrew, so that I don't need to keep
23         repeating my objection, that my same
24         objection will apply to any question
25         you ask related to toluene or xylene?
```

```
01                    JOHN MASAITIS
02               MR. DuPONT:  Yes, you can have
03          that standing objection.
04               MR. CAIRONE:  Okay.  Fine.
05               THE WITNESS:  And the question
06          again.
07     BY MR. DuPONT:
08          Q.     Sure.  My question is, was it
09     U.S. Steel's practice, or was it the practice
10     of U.S. Steel's industrial hygienists in the
11     company to monitor its employees for chemical
12     exposures when they worked with or around
13     toluene?
14          A.     Well, from an industrial
15     hygiene standpoint, toluene had its own
16     permissible exposure level.  So when we would
17     do an exposure evaluation regarding toluene,
18     typically the way it would be done is, we
19     would use the permissible exposure level for
20     toluene.  But at the same time, we may take a
21     bulk sample of the toluene to see the -- if
22     there were any constituents in it, such as
23     benzene.
24          Q.     Do you recall actually doing
25     that, taking bulk samples of toluene for
```

01                    JOHN MASAITIS

02    benzene content?

03          A.    Yes.

04          Q.    Do you recall monitoring the

05    air, either personal air monitoring or area

06    monitoring, for toluene and people working

07    with toluene that gave benzene as a result of

08    air monitoring?

09          A.    Unless they were working

10    specifically with toluene, it -- it was part

11    of the industrial hygiene practice to look

12    for benzene in toluene and xylene.  So

13    depending upon the area you were at would

14    determine the type of monitoring that you

15    did.  Meaning, was there a need to be

16    specific for toluene, was there a need to be

17    specific for benzene, was there a need to be

18    specific for xylene.

19          Q.    Okay.  But one of the things

20    U.S. Steel would do for employees working

21    with toluene would be to measure the air

22    around them to see whether or not that

23    reflected the presence of benzene as well;

24    correct?

25                    MR. CAIRONE:  Objection,

```
01                    JOHN MASAITIS
02          leading.
03               THE WITNESS:  No.  No.  We would
04          do a toluene exposure evaluation.  But
05          here again, as part of that evaluation
06          we may take a bulk sample, if we have
07          reason to believe there could be a
08          significant amount of benzene in the
09          toluene as part of the evaluation.
10     BY MR. DuPONT:
11          Q.    Are you familiar, or do you
12     know of any U.S. Steel or USS Chemicals
13     facility in Argo, Illinois?
14          A.    No.
15          Q.    I'll mark the next document as
16     Exhibit 2.
17                         -   -   -
18               (Whereupon the document was
19          marked, for identification purposes,
20          as Masaitis Exhibit Number Two.)
21                         -   -   -
22     BY MR. DuPONT:
23          Q.    For the record, this is Bates
24     Number THAN 2209.
25               And, for the record, this is a
```

**Transcript of Masaitis, John**                **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 54 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 539 of 1330

01                    JOHN MASAITIS

02     document that was produced to us in the

03     course of discovery by TH Agriculture and

04     Nutrition.  Are you familiar with this

05     document, this type of document?

06          A.     I looked at some of these

07     documents that were in this book last week,

08     but I don't know if this specific one was in

09     there or not.

10          Q.     Had you seen documents like

11     this during the course of your employment

12     with U.S. Steel?

13          A.     Not in the course of my

14     employment, no.

15          Q.     Okay.  Towards the top of the

16     document, under the word shipped from --

17          A.     Yes.

18          Q.     -- there is an indication of

19     Argo, Ill, which I presume is Illinois.

20          A.     Right.

21          Q.     You're not familiar with any

22     U.S. Steel facility that was in Argo,

23     Illinois?

24          A.     No, I -- I never heard of a

25     facility located in Argo, Illinois.

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          Q.      Did U.S. Steel have any plants
03    in Chicago?
04          A.      We had an integrated facility
05    in South Chicago, our South Works.
06          Q.      When you say an integrated
07    facility, what do you mean by that?
08          A.      I mean that they brought in raw
09    material, and from the raw materials they had
10    an integrated steel making process where they
11    manufactured steel products.
12          Q.      Were there coke ovens at that
13    South Works in South Chicago?
14          A.      Yes, I believe there were.
15    Yes.
16          Q.      Was benzene produced there?
17          A.      No.
18          Q.      Was light oil produced there?
19          A.      There was light oil, and all of
20    the by-product coke ovens, to my knowledge.
21          Q.      I see a reference to a Chicago
22    plant at 14700 South Harvard Avenue.  Is that
23    the address for South Works?
24          A.      I can't recall.
25          Q.      Sir, do you have any personal
```

```
01                    JOHN MASAITIS
02   knowledge, or knowledge that you gathered,
03   outside the context of this litigation,
04   concerning Thompson-Hayward Chemical Company?
05        A.    No.
06        Q.    Have you ever heard of that
07   company before becoming involved with this
08   case?
09        A.    No.
10        Q.    What have you learned about
11   Thompson-Hayward Chemical Company since
12   becoming involved with this case?
13        A.    I learned that we sold benzene
14   to Thompson-Hayward Chemical Company.
15        Q.    Anything else?
16        A.    I learned that Thompson-Hayward
17   made products for other companies.
18        Q.    Anything else?
19        A.    I understand that they were a
20   relatively large company.
21        Q.    What is the basis for that
22   understanding?
23        A.    The number of employees that
24   they had.  The number of facilities that they
25   had.
```

```
01                    JOHN MASAITIS
02          Q.      Where did you gather that
03    information?
04                    MR. CAIRONE:  Well, let me just
05          make sure we don't cross any lines.
06          Part of the preparation of a corporate
07          representative is to prepare them for
08          the deposition.  And so some of this
09          information came in the context of
10          what we provided to Mr. Masaitis.
11          You're free to ask him how he arrived
12          at it, as long as it doesn't involve
13          privileged communications.
14    BY MR. DuPONT:
15          Q.      Okay.  I don't want to know
16    what your lawyers told you.  I want to know
17    what sources, document forms or other forms,
18    other than what your lawyers told you.  What
19    source of information do you have, or have
20    you reviewed that allowed you to talk to me
21    about Thompson-Hayward Chemical Company?
22          A.      Well, going through the
23    purchase orders, that they were purchasing
24    large amounts of benzene.  So they had to be
25    a relatively large corporation, company, to
```

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 58 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 543 of 1330

```
01                 JOHN MASAITIS

02    purchase those amounts.

03         Q.      Were the purchase orders, the

04    purchase records, the only documents that you

05    reviewed that gave you information regarding

06    the size of the Thompson-Hayward Chemical

07    Company?

08         A.      Pretty much, yes.

09         Q.      Any other information you have

10    about Thompson-Hayward Chemical Company would

11    have come from your lawyers, or U.S. Steel's

12    lawyers?

13         A.      Pardon me?

14         Q.      Any other information that you

15    would have regarding Thompson-Hayward

16    Chemical Company has come from U.S. Steel's

17    lawyers, in terms of communications you had

18    with them?

19         A.      Yes.

20         Q.      Your -- am I correct that your

21    first involvement with this case was -- was

22    when?  When you received the materials last

23    week?

24         A.      No.  Mr. Sykes called me a

25    couple of months ago and asked if I would
```

```
01                    JOHN MASAITIS
02   give the deposition.  I've been trying to get
03   away from giving the depositions.  Would much
04   rather be fishing or doing something else.
05   But anyway, that was my first involvement.
06   Because I told him that I didn't want to do
07   this anymore.  He called and asked if I would
08   be the corporate representative and we talked
09   and I agreed to it.
10        Q.     Okay.  Prior to last week, did
11   you receive any documents pertaining to this
12   case?
13        A.     No.
14        Q.     Ronald Davis' case?
15        A.     No.
16        Q.     Do you have any knowledge as to
17   whether or not Thompson-Hayward Company --
18   Chemical Company manufactured chemicals?
19             MR. CAIRONE:  Object to form.
20             THE WITNESS:  I guess it depends
21             upon what you mean by manufacture.  I
22             would say that, yes, they probably
23             have, from my understanding.  If
24             manufacturing is getting chemicals
25             together, a group of chemicals, to
```

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                  JOHN MASAITIS
02          make a product from that, then I would
03          say yes.
04   BY MR. DuPONT:
05          Q.     Let me ask you:  Have you seen
06   any documents from U.S. Steel that would
07   indicate what U.S. Steel knew about
08   Thompson-Hayward Chemical Company during the
09   1960s and the 1970s?
10          A.     I may have, I can't recall
11   specifically.  I know that they were making
12   products for other companies.
13          Q.     Well, you know that now.  But I
14   want to ask you about what U.S. Steel knew
15   about Thompson-Hayward Chemical Company
16   during the 1960s and the 1970s.  Do you have
17   any documents or any information to indicate
18   to you what U.S. Steel knew about
19   Thompson-Hayward Chemical Company, say, prior
20   to 1977?
21          A.     I don't have any documents, or
22   I don't have any personal knowledge of what
23   they knew.  And I don't know specifically
24   what other representatives of U.S. Steel knew
25   about that company.
```

```
01                    JOHN MASAITIS
02          Q.     Are you able to tell me that
03   representatives of U.S. Steel actually knew
04   anything about Thompson-Hayward Chemical
05   Company during and prior to 1977?
06          A.     Well, I -- I would say that the
07   people who were dealing with them knew about
08   the company, yes.
09          Q.     They knew that they sold them
10   benzene?
11          A.     They knew they sold them
12   benzene.  They had some idea as to what they
13   did, I'm sure, and the number of people that
14   they employed, their facilities, where they
15   were located.  That sort of thing.
16          Q.     Sir, I want to know what you
17   actually know, not what you might be guessing
18   those people knew.
19          A.     I don't know what other people
20   knew regarding the company.
21               MR. DuPONT:  Let's take a five
22          minute break.
23               VIDEO TECHNICIAN:  The time is
24          10:53 a.m., this is the end of tape
25          number one.
```

# Masaitis, John

## Rhyne Trial Master

```
01                  JOHN MASAITIS
02                     -  -  -
03              (Whereupon there was a recess in
04         the proceeding.)
05                     -  -  -
06              VIDEO TECHNICIAN:  The time is
07         11:01, this is the beginning of tape
08         number two.  We're now back on the
09         record.
10    BY MR. DuPONT:
11         Q.    Mr. Masaitis, during your
12    employment with U.S. Steel as an industrial
13    hygienist, did you ever perform exposure
14    assessments for workers?
15         A.    Yes.
16         Q.    Did those exposure assessments
17    include the chemical, benzene?
18         A.    Yes.
19         Q.    How would you go about
20    performing an exposure assessment as an
21    industrial hygienist for U.S. Steel?
22         A.    Well, there were -- there were
23    different techniques you could utilize.
24    There was instrumentation available that
25    would give you a number that was comparable
```

```
01                    JOHN MASAITIS
02    to the percentage of vapors in the air, but
03    was not specific to any vapor.  There were
04    what we called the colormetric detector tubes
05    for different compounds.  There was one for
06    benzene, toluene, xylene.  You could use
07    that.  Again, if you didn't want to be that
08    specific, or if you didn't need to be that
09    specific, then there were methods whereby you
10    could take a grab sample of the air and have
11    that analyzed by a laboratory instrument to
12    be more specific.  Or you could take charcoal
13    tube samples that would absorb the vapors in
14    the air, and later analyzed by a laboratory
15    instrument, which was very specific.
16          Q.    All right.  Were there --
17    strike that.
18                Let me ask you.  When you
19    tested specifically for benzene, how did you
20    do that?
21          A.    Well, pretty much used every
22    method I just mentioned.
23          Q.    Did you also use urinary penal
24    analysis for benzene?
25          A.    Well, I didn't.  But there were
```

# Masaitis, John
## Rhyne Trial Master

```
01                    JOHN MASAITIS
02      samples of the urine of the workers exposed
03      to benzene that were taken.
04           Q.      Was that done by industrial
05      hygienists at U.S. Steel?
06           A.      No, that was the medical.
07           Q.      Okay.  And did U.S. Steel also
08      test blood of its workers to determine
09      whether or not they were being exposed to
10      benzene?
11           A.      Yes.
12           Q.      When did U.S. Steel begin to
13      use urinary penal analysis as one method of
14      determining how much exposure, and whether
15      the workers were having exposure to benzene?
16           A.      I can't say.  I don't know.
17           Q.      Was that a practice used by
18      U.S. Steel before you began with the company?
19           A.      I would say, yes.
20           Q.      When did U.S. Steel begin to
21      use testing the blood of its workers to
22      determine whether or not they were being
23      exposed to benzene?
24           A.      I can't say the exact date.  It
25      was prior to me starting.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02         Q.      Was that something the company
03   did as far back as the 1920s?
04         A.      I have no idea.
05         Q.      Do you know if they did that in
06   the 1930s?
07         A.      I -- I don't know.
08         Q.      Did you ever perform exposure
09   assessments when you did not have actual air
10   monitoring data available?
11         A.      Actually, exposure monitoring
12   is a determination of the amount of the
13   material in the workers' breathing zone that
14   you're interested in.  So one would go hand
15   in hand.  If you do an exposure assessment,
16   you do take samples.
17         Q.      Okay.  Well, I want to make
18   sure we're talking about the same thing.
19   Exposure monitoring would be either measuring
20   of the air or the blood or urine for some
21   indication that there is benzene present in
22   the air, or benzene that's been absorbed into
23   the human body; correct?
24         A.      Yes.
25         Q.      That -- would you call that --
```

01                    JOHN MASAITIS

02    as an industrial hygiene technique, would you

03    call that a quantitative exposure assessment?

04          A.    I would -- if you do any type

05    of air monitoring, it's quantitative.  Now,

06    how refined the quantitative analysis is is

07    something different.  In other words, you

08    could take a sample for the total amount of

09    vapors that are combustible in the area, an

10    environment, or you could take a sample to

11    find out what specific vapors were present in

12    that environment.

13          Q.    Now, can an industrial

14    hygienist perform an exposure assessment,

15    sometimes referred to as a qualitative

16    exposure assessment?  Have you ever heard

17    that term before, qualitative exposure

18    assessment?

19          A.    I know that there are some

20    people who will go out into an environment

21    and do a look-see and make a guesstimate, but

22    we did not do that.  Any analysis of exposure

23    assessment that we did was based upon air

24    monitoring.

25          Q.    If you didn't have air

Page 65

```
01                    JOHN MASAITIS
02   monitoring available, and there was some sort
03   of incident at U.S. Steel, somebody
04   complained that they became sick from
05   exposure and you didn't have air monitoring
06   available for that individual, or that area
07   of a particular plant, what would you do to
08   go back retrospectively and try to figure out
09   what happened?
10              MR. CAIRONE:   Object to the
11         form.
12              THE WITNESS:  We would -- in
13         either situation, we would be in there
14         doing air monitoring for the vapors or
15         whatever form of the contaminant
16         existed specifically for what was in
17         the environment.
18   BY MR. DuPONT:
19         Q.    Were there ever situations
20   where someone at U.S. Steel became sick or
21   had some sort of reaction to exposure -- from
22   exposure to a chemical and brought that to
23   the attention of the medical department or
24   industrial hygiene department, and you were
25   called upon to determine what it was that
```

```
01                    JOHN MASAITIS
02   happened to that individual?
03        A.      There could have been.  As I
04   sit here today, I can't recall any specific
05   incident.
06        Q.      If you were called upon to
07   investigate that type of incident as an
08   industrial hygienist for U.S. Steel, and you
09   didn't have specific air monitoring data for
10   that person who was injured, or that area of
11   the plant where that person was injured, what
12   would you do in order to figure out what
13   happened to that individual?
14        A.      We would go into the area and
15   get it.  We would go into the area and do an
16   evaluation by taking samples that were
17   specific to the materials in the environment
18   that he was working in.
19        Q.      Are you able to tell me what
20   specifically -- strike that.
21             Do you have any knowledge of
22   what information, if anything, U.S. Steel
23   provided to Thompson-Hayward Chemical Company
24   regarding benzene prior to 1977, or during
25   that year?
```

Page 67

```
01                  JOHN MASAITIS
02        A.      I know that there were material
03   safety -- there was a Material Safety Data
04   Sheet that I saw.  I believe it was dated
05   '72.
06        Q.      Okay.  And is that information
07   that you received in the context of this
08   litigation?
09        A.      Yes.
10        Q.      As part of the book -- the
11   binder that you were looking at earlier
12   today; correct?
13        A.      Correct.
14        Q.      Independent from the material
15   that you received in the context of this
16   case, do you have any knowledge of what
17   documents or information U.S. Steel provided
18   to Thompson-Hayward Chemical Company, if any,
19   during or prior to 1977?
20        A.      I personally have no knowledge.
21        Q.      Besides seeing the Material
22   Safety Data Sheet in the documents that you
23   brought with you today, the documents that
24   you reviewed for your deposition and provided
25   to you by U.S. Steel, do you have any other
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02    documents that indicate what information, if
03    any, was provided to Thompson-Hayward
04    Chemical Company, during or prior to 1977,
05    concerning benzene?
06          A.    No.
07                        -  -  -
08          (Whereupon the document was
09          marked, for identification purposes,
10          as Masaitis Exhibit Number 3.)
11                        -  -  -
12    BY MR. DuPONT:
13          Q.    I'm going to hand you what I've
14    marked as Masaitis 3, and it was previously
15    marked as Carter 3.  And ask you, is that the
16    Material Safety Data Sheet that you were
17    referring to?
18          A.    (Reviewing document.)
19                Yes.
20          Q.    Sir, can you confirm for me
21    that this Material Safety Data Sheet does not
22    contain any warning concerning benzene
23    actually potentially causing cancer?
24          A.    There are no warning signs on
25    this Material Safety Data Sheet of benzene
```

```
01                 JOHN MASAITIS
02    causing cancer.
03          Q.     There are also no warnings on
04    this Material Safety Data Sheet that benzene
05    can cause damage to the human bone marrow and
06    blood, are there?
07          A.     There are references on the
08    Material Safety Data Sheet to the MCA Safety
09    Data Sheet regarding different health hazards
10    and other aspects of information that are put
11    on Material Safety Data Sheets.
12          Q.     Sir, my question is, yes or no,
13    does this Material Safety Data Sheet that you
14    have in front of you, that's been marked as
15    Exhibit 3, inform the reader, based on the
16    information that's in this Material Safety
17    Data Sheet, that benzene can cause damage to
18    the blood and bone marrow in human beings?
19                 MR. CAIRONE:  I'm going to
20             object.  I think he tried to answer
21             that question.  You can answer it
22             again.
23                 THE WITNESS:  The Material
24             Safety Data Sheet doesn't have any
25             language specifically addressing
```

```
01                  JOHN MASAITIS
02         cancer.  However, there are references
03         to another Material Safety Data Sheet
04         published by the Manufacturers
05         Chemical Association that talks about
06         health hazards and other information
07         that's put on Material Safety Data
08         Sheets.
09              MR. DuPONT:  Objection, I'm
10         going to move to strike your response
11         because it did not answer my question.
12    BY MR. DuPONT:
13         Q.     My question, which can be
14    answered by a yes or no, am I correct, that
15    this Material Safety Data Sheet that you have
16    in front of you as Exhibit 3 does not contain
17    any warning or any information that benzene
18    can cause damage to human bone marrow in a
19    human being?
20              MR. CAIRONE:  Objection, asked
21         and answered.  Are you asking him
22         excluding the reference that he's
23         answered twice?
24              MR. DuPONT:  I'm asking him
25         whether those warnings appear anywhere
```

Transcript of Masaitis, John                    Saturday, August 15, 2020

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 73 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 558 of 1330

Page 71

```
01                JOHN MASAITIS
02        on this Material Safety Data Sheet
03        itself.
04             THE WITNESS:  I have -- I'll
05        answer the question the same way as I
06        did before, because there is no
07        reference to it, but it -- cancer, the
08        word cancer doesn't appear.  However,
09        there are references to health hazards
10        on the Material Safety Data Sheet and
11        other information that is specifically
12        put on Material Safety Data Sheets.
13   BY MR. DuPONT:
14        Q.     Sir, do you see the words blood
15   or bone marrow on this Material Safety Data
16   Sheet?
17        A.     No, I don't see it on this
18   Material Safety Data Sheet.  But that's not
19   to say that it's not on the material
20   referenced in this Material Safety Data
21   Sheet.
22             MR. DuPONT:  I move to strike
23        anything after, I don't see it on this
24        Material Safety Data Sheet.
25   BY MR. DuPONT:
```

# Masaitis, John
## Rhyne Trial Master

```
01                  JOHN MASAITIS
02          Q.     If the only thing an individual
03   has in front of them, a worker has in front
04   of them, is this Material Safety Data Sheet
05   I've marked as Exhibit 3, do they receive any
06   warning that benzene exposure can cause
07   damage to human blood or bone marrow?
08          A.     They would -- if they were
09   interested, they would reference what is
10   referenced on the --
11                  MR. DuPONT:  Objection.
12                  MR. CAIRONE:   Mr. Masaitis,
13          just answer his question.  Can you
14          repeat it, Andrew?
15                  MR. DuPONT:  Sure.
16   BY MR. DuPONT:
17          Q.     Sir, my question is, if the
18   only information an individual or a worker or
19   a company had in front of them was this
20   Material Safety Data Sheet that's marked as
21   Exhibit 3, would they receive any warning
22   that benzene can cause damage to human blood
23   or bone marrow?
24          A.     Looking at the Material Safety
25   Data Sheet, the words are not spelled out.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                  JOHN MASAITIS
02      But they are spelled out in the material
03      that's referenced in the Material Safety Data
04      Sheet.
05            Q.    Sir, I'm not asking you at this
06      point in time about any material referenced
07      in the Material Safety Data Sheet.  Okay?  My
08      question to you -- I move to strike your last
09      response.  I need you to tell me, as a
10      representative of U.S. Steel here today, that
11      if the only information an individual had in
12      front of them concerning U.S. Steel's benzene
13      was this Material Safety Data Sheet, would
14      that individual receive a warning that
15      benzene exposure can cause damage to the
16      blood and bone marrow in a human body?
17            A.    If they were just looking at
18      this Material Safety Data Sheet and they
19      didn't go to the references on the Material
20      Safety Data Sheet, they would not.
21            Q.    And am I also correct that if
22      the only information an individual had in
23      front of them was this Material Safety Data
24      Sheet, they would not be warned that it's
25      necessary to use respiratory protection when
```

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02    working with benzene from U.S. Steel?
03              MR. CAIRONE:  Object to the
04         form because your characterization of
05         information excludes the reference.
06         But -- so if you're asking whether if
07         they only look at this piece of paper,
08         then I think that's a legitimate
09         question.
10              MR. DuPONT:  I think the
11         legitimate objection is objection to
12         form and the rest is --
13              MR. CAIRONE:  Well, if I don't
14         tell you what's wrong with the form --
15              MR. DuPONT:  No, you say form
16         and then it's up to me to correct it.
17              MR. CAIRONE:  All right.
18              MR. DuPONT:  Anything other than
19         that is an improper objection.
20              MR. CAIRONE:  I disagree, but
21         we'll do it that way.
22              THE WITNESS:  Your question was?
23    BY MR. DuPONT:
24         Q.   Yes, sir.  My question was, if
25    the only information an individual had in
```

**Transcript of Masaitis, John**          **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 77 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 562 of 1330

```
01                JOHN MASAITIS
02    front of them regarding U.S. Steel's benzene
03    was this Material Safety Data Sheet, would
04    that individual be warned that he needed to
05    wear respiratory protection or ask for a
06    respirator when working with benzene?
07                MR. CAIRONE:  Objection, form.
08                THE WITNESS:  Well, you really
09         don't have to wear respiratory
10         protection when you're working with
11         benzene.  It depends upon the benzene
12         concentration that the individual is
13         subjected to to determine the amount
14         or the type of respiratory protection
15         that would be needed.
16    BY MR. DuPONT:
17         Q.    Sir, the purpose of this
18    exercise is for me to ask you a question and
19    you to answer the question that I'm asking.
20         A.    Yes.
21         Q.    And I don't mean to sound
22    contrite, and I apologize if I do, but you're
23    not answering my questions.  Okay.  I'm going
24    to move to strike your last response.
25                My question to you, sir -- and
```

```
01                    JOHN MASAITIS
02   the answer is yes or no.
03                    If the only individual (sic)
04   that a person had in front of them was this
05   Material Safety Data Sheet, would that
06   individual be warned that they need to wear a
07   respirator, a mask or other respiratory
08   protection when working with U.S. Steel's
09   benzene?
10                    MR. CAIRONE:   Object to form.
11                    THE WITNESS:  My answer is the
12           same.  The industrial hygiene answer
13           is that you do not have to wear a
14           respirator when you're working with
15           benzene.  It's not necessary.  What
16           determines when you have to wear
17           respiratory protection is the exposure
18           to the vapors from the benzene that
19           you're working with.
20   BY MR. DuPONT:
21           Q.    Sir, I'm not asking you what
22   you opinion is, I'm asking you what this
23   Material Safety Data Sheet says and what it
24   does not say.
25           A.    That's -- that's my answer.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 79 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 564 of 1330

```
01                    JOHN MASAITIS
02    I'm -- I can't change that answer as a
03    professional industrial hygienist.  I can't
04    sit here and say that everybody that works
05    with benzene at all times has to wear a
06    respirator.
07              MR. CAIRONE:  Mr. Masaitis, let
08         me see if we can get on track because
09         I think that that is a different
10         issue.  If you listen to Mr. DuPont's
11         question carefully, and I think he
12         phrased it the last time as saying,
13         does it say it on this piece of paper
14         or not.  Am I right, Andrew.
15              MR. DuPONT:  I'll repeat my
16         question.
17    BY MR. DuPONT:
18         Q.    If the only information that an
19    individual received regarding U.S. Steel's
20    benzene is this Material Safety Data Sheet,
21    would that person be warned that they need to
22    wear respiratory protection when working with
23    benzene?
24              MR. CAIRONE:  Object to form.
25              THE WITNESS:  I can't agree that
```

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02         a Material Safety Data Sheet has to
03         say that a person working with benzene
04         needs to wear a respirator because
05         they don't, unless their
06         concentrations of exposure to the
07         benzene are excessive.
08    BY MR. DuPONT:
09         Q.     Sir, I'm not asking you to
10    agree with me.  I'm just asking you to tell
11    me whether or not this Material Safety Data
12    Sheet provides the user with a warning that
13    they need to wear material -- respiratory
14    protection when working with benzene.
15         A.      When working with benzene that
16    exceeds a permissible exposure level.
17         Q.     Sir, I'm not placing that
18    qualification on the question.  Okay.  If you
19    have an answer that you want to give that's
20    being an advocate for the company, I'm not
21    interested in that today.  I just want to
22    know the answer to my question.
23              MR. CAIRONE:  Okay.  I think you
24         need to stop arguing with the witness.
25         I think there is a legitimate
```

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 81 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 566 of 1330

```
01                    JOHN MASAITIS

02          misunderstanding here.  And I think

03          that the way you framed your question

04          has led the witness to a point that

05          he's having difficulty answering.

06          Maybe if we went off the record we

07          could straighten it out.  If you don't

08          want to, we can continue to go in

09          circles.  But it's your deposition.

10   BY MR. DuPONT:

11          Q.    If I had this Material Safety

12   Data Sheet in front of me for U.S. Steel

13   benzene and nothing else, would I be warned

14   that I need to wear respiratory protection

15   under any circumstances?

16                MR. CAIRONE:  The document

17          speaks for itself.  You can answer.

18                THE WITNESS:  Under -- you

19          wouldn't be warned of the need to wear

20          respiratory protection if your

21          exposures were excessive.

22   BY MR. DuPONT:

23          Q.    All right.  Would I be warned

24   that I would need to wear material -- strike

25   that.
```

01          JOHN MASAITIS

02               If this Material Safety Data

03     Sheet was the only information I had in front

04     of me, would I be warned that I need to wear

05     a respirator under any circumstances when

06     working with U.S. Steel's benzene?

07          A.     You would be warned if there

08     was some necessity to wear a respirator.

09          Q.     Okay.  Show me on this Material

10     Safety Data Sheet where it says wear a

11     respirator under these circumstances?

12          A.     There is -- there is no section

13     on this Material Safety Data Sheet that says

14     that.  There are references to the MCA

15     Material Safety Data Sheet that talks about

16     respiratory protection.

17          Q.     All right.  We're talking for

18     the moment about this Material Safety Data

19     Sheet that we have in front of us.  Is your

20     answer that there is no information on this

21     Material Safety Data Sheet that advises the

22     user under which circumstance they should

23     wear respiratory protection when working with

24     benzene?

25          A.     Without referring to the -- the

```
01                    JOHN MASAITIS
02    manufactured chemicals Material Safety Data
03    Sheet, no.
04            Q.    Okay.  In fact, if you look
05    under Section Eight of the Material Safety
06    Data Sheet, on the second page of the
07    document, there is a category that says,
08    respiratory protection, specified type, and
09    no information is provided in that category.
10    Is that correct?
11            A.    That's correct.
12            Q.    Sir, if I could turn your
13    attention back to Exhibit 3.  I believe you
14    told me, and correct me if I'm wrong, that
15    this Material Safety Data Sheet was dated
16    1972.  Did I hear your correctly?
17            A.    I did mention 1972.  I think
18    that -- looking at the information in the
19    upper lefthand corner, it talks about the
20    approval expires April 30, 1971.  So we're
21    saying it was after '71, so I'm saying '72.
22            Q.    So why are you saying 1972?
23            A.    I may have seen some
24    correspondence that went out with this.  I
25    can't recall specifically, but I think that
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

```
01                JOHN MASAITIS
02    it was thereabouts that it went out.
03         Q.     Can you point to any
04    correspondence that you had that went out
05    with this Material Safety Data Sheet to
06    Thompson-Hayward Chemical Company?
07               And I'm asking because I don't
08    recall seeing that.  If you have it, I'd like
09    to see it.
10         A.     Yes.  January, 1972.
11         Q.     Is that correspondence to
12    Thompson-Hayward Chemical Company, or is this
13    a general document that U.S. Steel produces
14    in every benzene case?
15         A.     It's not a document that's
16    produced in every benzene case.  What it is
17    is a Material Safety Data Sheet that was sent
18    to our customers along with a cover letter,
19    dated January 1972.
20         Q.     Okay.  My question to you, is
21    that January 1972 cover letter a form cover
22    letter that U.S. Steel has in its records, or
23    is that a cover letter that U.S. Steel knows
24    actually went to Thompson-Hayward Chemical
25    Company?  Is there any indication in the
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02    records that that cover letter went to
03    Thompson-Hayward Chemical Company?
04          A.      No, but there's indication on
05    the Material Safety Data Sheet that the
06    Material Safety Data Sheet went to
07    Thompson-Hayward Chemical Company.  And I
08    believe that in the search that the Material
09    Safety Data Sheet was found with this letter.
10          Q.      Okay.  I don't believe it was.
11    So what I'm trying to learn is, does U.S.
12    Steel -- and maybe your counsel can clarify
13    this, but does U.S. Steel have any cover
14    letter that accompanied the actual Material
15    Safety Data Sheet that was marked as
16    Exhibit 3?
17               MR. CAIRONE:  Can we go off the
18          record a second.
19               VIDEO TECHNICIAN:  The time is
20          11:28, we're now off the record.
21                     -  -  -
22               (Discussion held off the
23          record.)
24                     -  -  -
25               VIDEO TECHNICIAN:  The time is
```

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 311-4  Filed 09/02/20  Page 86 of 197
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 571 of 1330

```
01              JOHN MASAITIS
02         11:29, we're now back on the record.
03    BY MR. DuPONT:
04         Q.    Let me see if I can clarify
05    this based on what your counsel has just told
06    me.
07              U.S. Steel does not have a
08    cover letter that accompanied Exhibit 3
09    specifically going to Thompson-Hayward
10    Chemical Company.
11         A.    We don't --
12         Q.    Is that correct?
13         A.    We don't have a form letter
14    with Thompson Hayward's name on the letter,
15    that's correct.
16         Q.    And this Material Safety Data
17    Sheet, if I understand you correctly, that
18    we've marked as Exhibit 3, which is Bates
19    Number HD 649 to 650, is the same form of the
20    Material Safety Data Sheet that's attached to
21    the cover letter dated January, 1972 that you
22    directed me to.
23         A.    Yes.
24         Q.    Correct?
25         A.    Yes.
```

```
01                 JOHN MASAITIS
02         Q.     That January 1972 letter is
03    Bates Number USS 02617A; correct?
04         A.     Yes.
05         Q.     Let's go ahead, if we can.  Can
06    you take out that cover letter and allow me
07    to mark that -- well, I can't do that,
08    because I've already marked the next one in
09    sequence, and it actually goes along with
10    that.  So I'll just hand that to you.
11                      -   -   -
12                 (Whereupon the document was
13            marked, for identification purposes,
14            as Masaitis Exhibit Number 4.)
15                      -   -   -
16    BY MR. DuPONT:
17         Q.     The first page of Exhibit 4,
18    is a form cover letter dated January, 1972.
19         A.     Is there a question pending?
20         Q.     Yes, is that the same document
21    that you pointed out to me in your binder of
22    information?
23         A.     Yes.
24         Q.     What that document is, if I
25    understand it, is a form cover letter dated
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

01                    JOHN MASAITIS

02      January, 1972 that you indicated would

03      accompany U.S. -- USS Chemicals' benzene

04      Material Safety Data Sheets; right?

05              A.      Yes.

06              Q.      All right.  So at some point in

07      time, after 1971, the Material Safety Data

08      Sheet that's marked as Exhibit 3 would have

09      been sent, but we can't say at what point in

10      time after 1971.  Is that correct?

11              A.      Yes.

12              Q.      Looking at the cover letter

13      that is marked as Exhibit 4, USS 2617A, does

14      that cover letter contain any warnings

15      information concerning benzene?

16              A.      No.

17              Q.      Other than Material Safety Data

18      Sheets for benzene during the 1970s, let's

19      say from 1970 to 1977, what types of

20      documents did U.S. Steel use, if any, to

21      convey warnings information concerning

22      benzene?

23              A.      For purposes of?

24              Q.      To convey warnings information

25      to U.S. Steel's customers that were buying

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Page 87

```
01                  JOHN MASAITIS
02    benzene from it?
03          A.    I'm not aware of any other form
04    of this.  There may have been other
05    information, but I'm not aware of it.
06                      -   -   -
07          (Whereupon the document was
08      marked, for identification purposes,
09      as Masaitis Exhibit Number 5.)
10                      -   -   -
11    BY MR. DuPONT:
12          Q.    I'm going to hand you what's
13    been marked as Exhibit 5.  And that, for the
14    record, is Bates Number USS 5889 to 5891.
15    Can you identify for the record what this
16    document is?
17          A.    It's a cover letter dated
18    September 1979, conveying a Material Safety
19    Data Sheet for benzene.
20          Q.    And is the Material Safety Data
21    Sheet for benzene also attached to it?
22          A.    Yes.
23          Q.    Does this Material Safety Data
24    Sheet we've marked as Exhibit 5 convey any
25    warning that benzene can cause cancer?
```

Obj
402,
403
Rel
evance;
After 19
78 - the
rest of
the
page

S

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                     **Saturday, August 15, 2020**

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02        A.     No.
03        Q.        Does this Material Safety Data
04   Sheet that we've marked as Exhibit 5 convey
05   any warning that benzene can cause damage to
06   the human blood and bone marrow?
07        A.     No.
08        Q.     Now, this Material Safety Data
09   Sheet does contain information regarding
10   respiratory protection; correct?
11        A.     Yes, it does.
12        Q.        And that's under section nine,
13   special precautions?
14        A.     Yes.
15        Q.        Why did U.S. Steel decide to
16   put respiratory information on the Material
17   Safety Data Sheet itself beginning in 1979?
18        A.     I didn't prepare the Material
19   Safety Data Sheets.  I do not know why it's
20   on this Material Safety Data Sheet.  I mean,
21   it's something that should be on the Material
22   Safety Data Sheet.
23        Q.        This 1979 Material Safety Data
24   Sheet was prepared after OSHA implemented the
25   emergency temporary standard for benzene.  Is
```

Objec
tion:
402,
403,
Relev
ance;
After
1978
– the
enti
e
page

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02   that correct?
03        A.     I believe so.
04        Q.     What's your understanding of
05   what the emergency temporary standard for
06   benzene was?
07        A.     In what regard?
08        Q.     Why -- are you familiar --
09   you're familiar with the emergency temporary
10   standard for benzene; correct?
11        A.     I'm aware of that there was an
12   emergency temporary standard came out, yes.
13        Q.     That came out in 1977?
14        A.     I believe it was '77.
15        Q.     And at that point in time, OSHA
16   reduced the permissible exposure levels for
17   benzene from 10 parts per million on an eight
18   hour time-weighted average to one part per
19   million.  Am I correct?
20        A.     Yes.
21        Q.     And that was a result of OSHA
22   receiving information confirming, through
23   epidemiological studies, that benzene causes
24   leukemia?
25        A.     They had accumulated some
```

Objection:
402 403,
Relevance;
After 1978

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02   studies that talked about leukemia.
03          Q.     Do you know why U.S. Steel did
04   not warn, in its Material Safety Data Sheet
05   dated 1979, that benzene causes cancer?
06          A.     I don't know that when this
07   Material Safety Data Sheet was prepared, that
08   it was widely accepted by the occupational
09   health community that indeed these studies
10   that OSHA was referencing were correct.  At
11   least I don't know if the scientific and the
12   medical community was subscribing to what was
13   being said regarding the carcinogenicity of
14   benzene at that time.
15          Q.     OSHA was the federal agency
16   that regulated workplace safety and health;
17   correct?
18          A.     Yes.
19          Q.     And as of 1977, the federal
20   government, the agency responsible for
21   protecting workers, said benzene causes
22   cancer definitively.
23               MR. CAIRONE:  Is that a
24          question?
25   BY MR. DuPONT:
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          Q.     Can you tell me why it is U.S.
03   Steel did not follow the direction of the
04   United States Government to provide a warning
05   concerning benzene causing cancer on this
06   Material Safety Data Sheet?
07                  MR. CAIRONE:    Object to the
08          form.  You asked him before why, and
09          he answered it, so it's also asked and
10          answered.
11                  THE WITNESS:  I would say that
12          at that time, the majority of the
13          occupational health community's
14          scientific and medical people were not
15          convinced that indeed there was
16          sufficient evidence to warrant it as a
17          carcinogen.
18   BY MR. DuPONT:
19          Q.     What was your involvement
20   during the late 1970s of studying the
21   literature of benzene's health effects on
22   human beings?
23          A.     My personal --
24          Q.     Yes.
25          A.     -- knowledge?
```

```
01                  JOHN MASAITIS
02          Q.      I wasn't reviewing studies, but
03   I certainly was in contact with other
04   occupational health professionals.  And at
05   that time there was a discussion, that I
06   recall, regarding that.  Specific people,
07   specific discussion, I can't state.
08                       -   -   -
09                  (Whereupon the document was
10          marked, for identification purposes,
11          as Masaitis Exhibit Number 6.)
12                       -   -   -
13   BY MR. DuPONT:
14          Q.      The next document is marked as
15   Exhibit Six.  The next Bates Number, USS
16   2519.  Can you identify for us what this
17   document is?
18          A.      It's a document regarding the
19   bulk shipment of benzene.
20          Q.      When you say the bulk shipment
21   of benzene, what do you mean?
22          A.      It talks about shipping papers,
23   placarding, tagging requirements and shipping
24   container required.
25          Q.      Is this a document that would
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                  JOHN MASAITIS
02    actually accompany shipments of benzene, or
03    is this a document that sets forth U.S.
04    Steel's practices regarding what types of
05    documentation would accompany shipments of
06    benzene?  I'm just trying to learn more about
07    what it is.
08          A.     Other than going through it
09    and, you know, trying to come up with an
10    answer to that question, I can't say
11    specifically how it was used at this time.
12          Q.     This document is dated
13    April 29, 1974; is that correct?
14          A.     Yes.
15          Q.     It says, non-ferrous traffic.
16    What does that mean to you?
17          A.     Non-ferrous, meaning not iron
18    related.
19          Q.     Do you have any knowledge,
20    based on your understanding of the company's
21    procedures, or your work at U.S. Steel, as to
22    whether or not this specific document, or
23    this type of document would actually
24    accompany shipments?
25          A.     I -- I can't say specifically
```

Transcript of Masaitis, John                    Saturday, August 15, 2020

Page 94

```
01                JOHN MASAITIS
02   that it accompanied a shipment, other than
03   going through the document and it talks about
04   the following description shall appear in the
05   bill of lading and any other shipping papers
06   accompanying shipments.  It talks about the
07   shipping papers, the placarding of the -- the
08   vessel that was used to transport the
09   material and tagging requirements and the
10   requirements of the container itself.
11        Q.     Okay.  All right.  So let's go
12   through that.  Roman Numeral one, shipping
13   paper at the top of the document.  Do you see
14   that?
15        A.     Yes.
16        Q.     Is says, "The following
17   description shall appear on the bill of
18   lading."  Correct?
19        A.     Yes.
20        Q.     A bill of lading is a piece of
21   paper that accompanies the shipment of a
22   material to say what the material is, what
23   the cost of the material is and what the
24   quantity of the material being shipped is.
25   Generally, that's what it is?
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 97 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 582 of 1330

```
01                JOHN MASAITIS

02        A.    Yes.

03        Q.    So what this document we're

04   looking at as Number Exhibit 6 is, it tells

05   us that the language past the colon that's in

06   that sentence is what would appear on the

07   actual bill of lading?  The language that

08   starts with, in parentheses, benzol,

09   flammable liquid, note, in the event of an

10   emergency concerning the chemicals in the

11   shipment call toll free 800-424-9300 day or

12   night, that's the language that would appear

13   in the bill of lading.

14        A.    Yes.

15        Q.    Then it says, "Note, in

16   addition to the above, the following

17   clarification must be displayed."  And then

18   there is language in quotations.

19        A.    Yes.

20        Q.    So that language in quotations

21   would also be conveyed on the bill of lading

22   for benzene, for example?

23        A.    I would say yes.

24        Q.    The next section discusses the

25   placarding requirements for Roman Numeral
```

# Masaitis, John
### Rhyne Trial Master

```
01                 JOHN MASAITIS
02   Number II?
03          A.     Yes.
04          Q.     Talking about -- when they say
05   placarding requirements, what do they mean by
06   a placard?
07          A.     Putting a placard, a tag, or,
08   you know, something on the vessel identifying
09   it.
10          Q.     Okay.  That vessel could be a
11   rail car, it could be a tanker truck, it
12   could be a barge?
13          A.     Yes.
14          Q.     The third section addresses
15   tagging requirements.  Where are the tags
16   placed that are referred to here?
17          A.     Where are they placed?
18          Q.     Correct.
19          A.     There is a holder on the vessel
20   itself to put the tag on.
21          Q.     And the next section discusses
22   shipping container required.  My question,
23   sir, is, looking at this document, does this
24   tell you that any warning is placed on any of
25   the shipping papers or placards or tags or
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02    shipping containers of benzene regarding any
03    cancer hazard associated with benzene
04    exposure?
05          A.     The -- this describes how to
06    comply with the, I guess, it would be the
07    Interstate Commerce Commission Shipping
08    Requirements, and I think the language is
09    very specific as to what they had to put on
10    the devices that were conveying the
11    information.  There is nothing on here that
12    says cancer hazard.  But it is compliant, as
13    I understand, with the ICC regulations on
14    what should be placarded and put in the
15    container and the tags.
16          Q.     Okay.  To your knowledge, as of
17    1974 and before then, any of those
18    regulations of this document pertains to,
19    require the shipper or otherwise -- strike
20    that.
21                 Do you have any knowledge as to
22    whether any of the shipping papers, placards,
23    tags or shipping containers used to transport
24    benzene by U.S. Steel, as of 1974 or before,
25    contained any cancer warning?
```

01                    JOHN MASAITIS

02          A.      Not to my knowledge.

03          Q.      Do you know whether any of

04    those materials contain any warning regarding

05    the use of respiratory protection?

06          A.      Not to my knowledge, no.

07          Q.      Do you know whether any of

08    those materials contained any warnings

09    regarding benzene being able to cause damage

10    to the blood and bone marrow of humans?

11          A.      I don't -- not to my knowledge,

12    no.

13          Q.      Do you know whether any of

14    those warnings appeared on shipping papers,

15    placards, tags or shipping containers through

16    1978?

17          A.      Not 1974.  I don't think so,

18    no.

19          Q.      I'm sorry, I'll keep my voice

20    up.  And I wanted to ask you until the time

21    point of 1978 because we have been discussing

22    including and prior to 1974.

23                  At any point in time up through

24    and including 1978, were there any benzene

25    warnings -- strike that.

01                    JOHN MASAITIS

02              At any point in time up until

03      and including 1978, did any cancer warnings

04      appear on shipping papers, placards, tags or

05      shipping containers used by U.S. Steel to

06      ship benzene?

07          A.      Not to my knowledge.

08          Q.      Same question regarding

09      warnings that benzene can cause damage to the

10      blood and bone marrow of humans.

11          A.      Not on the shipping labels, no.

12          Q.      Same question as to the need

13      for using respiratory protection of benzene.

14          A.      Not to my knowledge.

15              MR. DuPONT:  Mark the next

16          document as Exhibit 7.

17                  -  -  -

18              (Whereupon the document was

19          marked, for identification purposes,

20          as Masaitis Exhibit Number 7.)

21                  -  -  -

22      BY MR. DuPONT:

23          Q.      And I'd just like to confirm

24      with you that this is an updated version of

25      the product shipping data sheet that we were

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01              JOHN MASAITIS
02    looking at that was marked as Exhibit 6, this
03    one being dated April 1 of 1976.
04        A.    It appears to be as you've
05    described.
06        Q.    This, for the record, is Bates
07    Number USS 2520 to 2521.
08              I'm going to go out of order
09    here, so I apologize.  The next document is
10    Exhibit Number 9.
11                    -  -  -
12              (Whereupon the document was
13          marked, for identification purposes,
14          as Exhibit Number 9.)
15                    -  -  -
16    BY MR. DuPONT:
17        Q.    Is that the April 1, 1978
18    version of the product shipping data sheet
19    that we discussed at Exhibit Number 6 and
20    Exhibit Number 7?
21        A.    It appears to be.
22        Q.    I'll hand you the exhibit I
23    skipped, which is Exhibit Number 8.  That's
24    USS 1246.
25                    -  -  -
```

```
01              JOHN MASAITIS
02              (Whereupon the document was
03      marked, for identification purposes,
04      as Masaitis Exhibit Number 8.)
05                    -  -  -
06  BY MR. DuPONT:
07      Q.      Sir, can you tell me what kind
08  of document this is?
09      A.      It's a document regarding
10  benzene.
11      Q.      Do you know how this document
12  was used?  Strike that.
13              Had you seen a document like
14  this in your employment with U.S. Steel?
15      A.      Not that I recall.
16      Q.      Do you have any knowledge as to
17  how this document was used?
18      A.      No.
19      Q.      Do you know whether this
20  depicts any language that was used on the
21  labels or shipping materials or anything of
22  that nature?
23      A.      Other than the fact that it
24  says, keep container closed.  I don't know
25  how it was used.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          Q.     Okay.  And we can agree that
03   looking at this document, however it was
04   used, conveys no cancer warning associated
05   with benzene?
06          A.     There is no cancer warning on
07   this document.
08          Q.     It also doesn't warn the reader
09   that benzene can cause damage to the blood
10   and bone marrow.
11          A.     It does not.
12          Q.     It also does not warn the
13   reader that the reader must wear a respirator
14   or mask or other respiratory protection when
15   working with benzene or around benzene under
16   any circumstances?
17          A.     It doesn't discuss respiratory
18   protection usage.
19          Q.     The next exhibit I'll mark is
20   Exhibit 10.
21                      -   -   -
22                (Whereupon the document was
23          marked, for identification purposes,
24          as Masaitis Exhibit Number 10.)
25   BY MR. DuPONT:
```

```
01              JOHN MASAITIS
02      Q.     And that's Bates Number 296 to
03 297.
04              Can you tell us what this
05 document depicts?
06      A.     Looks like copies of tags
07 regarding benzene.
08      Q.     How would these tags be used by
09 U.S. Steel?
10      A.     They could have been shipping
11 tags.
12      Q.     What would they be attached to?
13      A.     It would be attached to the
14 shipping vessels, possibly at the dome.
15      Q.     So it could be on a truck tank,
16 it could be on a rail car, it could be on a
17 barge?
18      A.     Yes.
19      Q.     Could it be on a 55 gallon
20 drum?
21      A.     No.
22      Q.     Okay.  In reference to the
23 documents that are marked as Exhibits 4
24 through 9, is it your understanding that
25 these are all documents that came from U.S.
```

```
01                    JOHN MASAITIS
02      Steel's records, documents that were
03      maintained in the regular course of business
04      by U.S. Steel?
05              A.      I believe so.
06              Q.      The next exhibit is Exhibit 11.
07                        -  -  -
08              (Whereupon the document was
09      marked, for identification purposes,
10      as Masaitis Exhibit Number 11.)
11                        -  -  -
12      BY MR. DuPONT:
13              Q.      Can you identify what this
14      document is?
15              A.      It's the Chemical Safety Data
16      Sheet published by the Manufacturers Chemists
17      Association in 1960.
18              Q.      All right.  If we turn back to
19      Exhibit Number 3, which was the Material
20      Safety Data Sheet with an expiration date of
21      1991.
22              A.      Is that it?
23              Q.      Yes.
24              MR. CAIRONE:   Jack, is your copy
25      upside down?
```

```
01                 JOHN MASAITIS
02                 THE WITNESS:  Mine is as well.
03                 MR. DuPONT:  I apologize.
04      BY MR. DuPONT:
05           Q.    When you look at Exhibit Number
06      3, the document makes reference to MCA Safety
07      Data Sheet SD-2.  Is Exhibit Number 11 the
08      document that is being referenced?
09           A.    Yes.
10           Q.    You would agree with me that
11      Exhibit Number 11 -- and take your time to
12      look through it, Chemical Safety Data Sheet
13      SD-2 for benzene, does not provide any
14      warning that benzene can cause cancer.
15           A.    In 1960 I don't think it did.
16      I don't believe I saw the word cancer in
17      here.
18           Q.    And this is the document that
19      the Material Safety Data Sheet marked as
20      Exhibit Number 3 is referring to; correct?
21           A.    Yes.
22           Q.    Now, you had testified
23      previously that the Safety Data Sheet -- the
24      MCA Safety Data Sheet makes reference to
25      respiratory protection?
```

01                    JOHN MASAITIS

02          A.       I believe there is a section in

03   here that talks about respiratory protection.

04          Q.       And I'm looking at Bates Number

05   USS 303.

06          A.       Yes.

07          Q.       And in Section 5.2.3, on that

08   page, continuing on to the next page, that

09   discusses the circumstances under which

10   respiratory protection should be worn?

11          A.       Yes.

12          Q.       Can you read for me the first

13   paragraph under Section 5.2.3?

14          A.       "Severe exposure to benzene may

15   occur in tanks during equipment cleaning and

16   repairs, when decontaminating areas following

17   spills, or in cases of failure of piping or

18   equipment.  Employees who may be subject to

19   such exposure should be provided with proper

20   respiratory protection and trained in its use

21   and care.  Available types are described

22   below."

23          Q.       So the first sentence sets

24   forth three circumstances under which

25   employees should be provided respiratory

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 109 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 594 of 1330

```
01                    JOHN MASAITIS
02      protection when exposed to benzene; correct?
03                    MR. CAIRONE:   Object to the
04           form.
05                    MR. DuPONT:  I'm sorry.  I
06           apologize.
07      BY MR. DuPONT:
08           Q.      The first sentence of that
09      paragraph that you just read describes three
10      circumstances of exposure to benzene.  Is
11      that accurate?
12                    MR. CAIRONE:   Object to the
13           form.  I think it said severe.
14      BY MR. DuPONT:
15           Q.      Okay.
16           A.      It talks about three
17      occurrences for severe exposure to benzene.
18           Q.      And then the next sentence
19      says, that is under those types of severe
20      exposures to benzene, that respiratory
21      protection should be provided to employees;
22      correct?
23           A.      Yes.
24           Q.      And the examples given are
25      employees entering tanks during equipment
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 110 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 595 of 1330

```
01                  JOHN MASAITIS
02    cleaning and repairs.  Number one.  Correct?
03          A.      Yes.
04          Q.      Decontaminating areas following
05    spills.  That's number two; correct?
06          A.      Yes.
07          Q.      And failure of piping or
08    equipment.  That's circumstance number three;
09    correct?
10          A.      Yes.
11          Q.      So what the reader of this
12    document is told is, under these three types
13    of severe exposure circumstances, that
14    respiratory protection should be provided to
15    the employees; correct?
16          A.      Yes.
17          Q.      Then the document continues to
18    describe the types of respiratory protection
19    that are available for use in these severe
20    exposure situations.  Is that accurate?
21          A.      It -- there's a sub-paragraph
22    talking about self-contained breathing
23    apparatus.  It talks about the available
24    types of respiratory protection at the end of
25    the first paragraph.  I guess it can be
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                  JOHN MASAITIS
02    assumed that it's making reference to the
03    first paragraph.  But, in general, it's
04    talking about self-contained breathing
05    apparatus.
06           Q.      Right.  But what the first
07    paragraph says is that employees may be
08    subject to the exposures and pre-exposures
09    described in the first paragraph -- first
10    sentence of this paragraph.  Employees who
11    may be subject to those types of exposures
12    should be provided with proper respiratory
13    protection.  And then it goes on to list what
14    the types of respiratory protection and
15    describes them; correct?
16           A.      Yes, it says, available type
17    ares described below.
18           Q.      Reading those three sentences
19    together, the reader is informed that these
20    are the types of respiratory protection to
21    use under these severe exposure
22    circumstances; correct?
23           A.      Yes.
24           Q.      It does not warn the reader
25    that respiratory protection is required under
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 112 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 597 of 1330

```
01                  JOHN MASAITIS
02   ordinary use of a product containing benzene,
03   does it?
04         A.    I --
05               MR. CAIRONE:  To be fair, do you
06         want him to read the whole -- it's a
07         long document.  And as long as we're
08         -- we have an understanding that he's
09         either testifying from his memory of
10         his review or his review right now --
11               MR. DuPONT:  I told him at the
12         outset of asking about this document
13         that if he feels he needs to, he's
14         available to read the document.
15               MR. CAIRONE:  Okay.  Then if the
16         question is, does this document --
17         Andrew, can repeat his question, then
18         I'd advise you to read it.
19               THE WITNESS:  Sure.
20               MR. CAIRONE:  Read the whole
21         thing, not -- unless he's asking about
22         this paragraph only.
23   BY MR. DuPONT:
24         Q.    This is the -- look to Material
25   Safety Data Sheet that's marked Exhibit
```

```
01              JOHN MASAITIS
02    Number 3.  Under special protection
03    information it refers the reader to pages six
04    and seven of the MCA Safety Data Sheet SD-2;
05    correct?
06         A.    Yes.
07         Q.    Okay.  Pages six and seven of
08    the MCA Safety Data sheet is what we're
09    looking at right now, the section that begins
10    with, 5.2.3, Respiratory Protection, and
11    continues on to page seven, up to 5.2.4, head
12    protection.  Is that accurate?
13         A.    Yes.
14         Q.    This is the information that
15    U.S. Steel, at pages six and seven, is
16    referring a reader to in the Material Safety
17    Data Sheet with respect to the use of
18    respiratory protection; correct?
19         A.    Yes.
20         Q.    You just told me that reading
21    the first paragraph of Section 5.2.3, reading
22    that paragraph together, what it tells you is
23    that respiratory protection is required under
24    the three circumstances that are set forth in
25    the first sentence of that paragraph.
```

403, cumulative waste of time

Page 112

```
01                    JOHN MASAITIS
02      Correct?
03            A.      Yes.
04            Q.      So reading the information that
05  U.S. Steel directs the reader of the Material
06  Safety Data Sheet marked as Exhibit 3 to
07  reference, what that tells the reader is that
08  respiratory protection is required under
09  these three severe exposure circumstances,
10  but it doesn't tell the reader that
11  respiratory protection is required during the
12  normal or intended use of a product
13  containing benzene.  Is that correct?
14            MR. CAIRONE:  Well, Section
15       5.2.3 speaks for itself.  You can
16       answer the question.
17            THE WITNESS:  It starts off by
18       talking about the severe exposures to
19       benzene that can occur under the
20       circumstances you described.  It talks
21       about the different types of devices
22       that are available.  And the -- it
23       doesn't mention anything regarding --
24       it talks about other circumstances of
25       exposure with -- so I don't know.
```

403 cumulative
waste of time

○

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 115 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 600 of 1330

```
01                    JOHN MASAITIS

02    BY MR. DuPONT:

03           Q.     Reading the first paragraph of

04    that section, the second sentence of that

05    paragraph, it says, "That employees who may

06    be subject to such exposures should be

07    provided with proper respiratory protection."

08    Such exposures references the three exposures

09    that are set forth in the first sentence of

10    that paragraph.  Am I correct?

11           A.     Yes.

12           Q.     It does not reference the

13    ordinary or intended use of a product

14    containing benzene, does it?

15           A.     No.

16                  MR. CAIRONE:  Is there a good

17           place to break, Andrew?

18                  (Discussion held off the

19           record.)

20                  MR. DuPONT:  If you'd like to

21           take a break, I'm fine with taking a

22           break now.

23                         -   -   -

24                  (Discussion held off the

25           record.)
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN MASAITIS
02              -   -   -
03              VIDEO TECHNICIAN:  The time is
04       12:09.  This is the end of tape number
05       two.
06              -   -   -
07              (Whereupon there was a recess in
08       the proceeding.)
09              -   -   -
10              VIDEO TECHNICIAN:  The time is
11       12:20 p.m., this is the start of tape
12       number three.
13              -   -   -
14              (Whereupon the documents were
15       marked, for identification purposes,
16       as Masaitis Exhibit Numbers 12, 13 and
17       14.)
18              -   -   -
19   BY MR. DuPONT:
20       Q.    Mr. Masaitis, while we were on
21   the break I've marked some additional
22   exhibits as Exhibit 12, which is Bates Number
23   316, Exhibit 13, which is Bates Number 314,
24   and Exhibit 14, which is Bates Number 315.
25              The first one I'm going to hand
```

```
01                JOHN MASAITIS
02   to you is Exhibit 12.  And can you simply
03   tell me what that document is and how that
04   document was used by U.S. Steel?
05        A.    It's a document talking about
06   one degree nitration grade benzene.
07        Q.    How is that document used by
08   U.S. Steel?  I'll withdraw it.
09              Would you confirm that this
10   document does not convey warnings information
11   regarding benzene?
12        A.    Well, it has -- has some, I
13   guess, characteristics, warnings in --
14   relating to health hazards.
15        Q.    Health hazards, the use of
16   personal protective equipment?
17        A.    No.
18        Q.    The next document I'm going to
19   hand you is Exhibit 13.
20              MR. CAIRONE:  Which Bates Number
21        is that one?
22              MR. DuPONT:  Sure.  Exhibit 13
23        is Bates Number 314.
24              MR. CAIRONE:  Thanks.
25   BY MR. DuPONT:
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                JOHN MASAITIS
02        Q.     This document indicates that
03   it's an MCA Chem-Card.  Is that correct?
04        A.     Yes.
05        Q.     And MCA refers to the
06   Manufacturing Chemists Association?
07        A.     Yes.
08        Q.     Of which U.S. Steel was a
09   member?
10        A.     I believe the chemical division
11   was, yes.
12        Q.     When did -- when you say the
13   chemical division, are you referring to USS
14   Chemicals?
15        A.     Yes.
16        Q.     Was U.S. Steel in and of itself
17   a member of the Manufacturing Chemists
18   Association?
19        A.     The chemical division may
20   not -- for example, U.S. Steel steel
21   producing wasn't.
22        Q.     Okay.  When did USS Chemicals
23   become a member of the Manufacturing Chemists
24   Association?
25        A.     I have no idea.
```

```
01                    JOHN MASAITIS
02            Q.       Were they a member prior to
03   your beginning with the company in 1964?
04            A.       I have no idea.
05            Q.       My question to you, is this a
06   document that actually accompanied shipments
07   of benzene made by U.S. Steel, or was this a
08   document that was used by U.S. Steel as a
09   guide in developing its own labels?
10            A.       I -- I have no idea how it was
11   used.  I mean, the document speaks for
12   itself.  I -- it says, Transportation
13   Emergency Guide.
14            Q.       Okay.  You don't know that this
15   document actually accompanied shipments of
16   U.S. Steel benzene?
17            A.       I can't say that it did or it
18   didn't.
19            Q.       The next document will be
20   Exhibit Number 14, and it's Bates labeled USS
21   315.  Is this an MCA Manufacturing Chemists
22   Association Cargo Information Card for
23   benzene?
24            A.       Yes.
25            Q.       Would your answer be the same,
```

```
01                    JOHN MASAITIS

02      that you do not know how this document was

03      used by U.S. Steel?

04            A.      Correct.

05            Q.      And you have no knowledge of

06      this document accompanying shipments of

07      benzene made by U.S. Steel?

08            A.      I don't know how the document

09      was used.

10            Q.      Sir, would you agree with me

11      that threshold limit values are not intended

12      to protect against the carcinogenic effects

13      of chemicals?

14            A.      No.

15            Q.      You do not agree with that?

16            A.      No.

17            MR. DuPONT:  Mark this as

18      Exhibit 15.

19                     -  -  -

20            (Whereupon the document was

21      marked, for identification purposes,

22      as Masaitis Exhibit Number 15.)

23                     -  -  -

24      BY MR. DuPONT:

25            Q.      Can you tell us what this
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 121 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 606 of 1330

```
01              JOHN MASAITIS
02  document is?  And I'll -- I'll represent to
03  you that this -- the portion that I've copied
04  here are portions of a larger document that
05  was produced to us.  Specifically Chapter
06  Five of this document.  First I would like to
07  ask you, what is this document?
08       A.    It looks like a section from
09  the Environmental Health Monitoring Manual
10  that was put together by U.S. Steel
11  Industrial Hygiene.
12       Q.    Okay.  And it's dated 1973?
13       A.    Correct.
14       Q.    In 1973, you were a senior
15  industrial hygiene engineer with U.S. Steel
16  -- United States Steel Corporation?
17       A.    Yes.
18       Q.    Were you involved with
19  developing this document?
20       A.    Yes.
21       Q.    I am turning to a page that is
22  Bates Number USS -- actually, strike that.
23              Chapter Five of this document
24  is what I've attached to it, along with the
25  cover, the title page, the Table of Contents
```

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02      and forward.  And Chapter Five generally
03      discusses TLVs, which are threshold limit
04      values.  Correct?
05           A.     Yes.
06           Q.       It discusses what TLVs are, how
07      they're to be used and how they're not to be
08      used.  Is that correct?
09           A.     Yes.
10           Q.       If you turn to the page that is
11      Bates Number USS 2356.
12           A.       (Complying with request.)
13           Q.       There is a section of this
14      Chapter Five that discusses the use and
15      misuse of TLVs; is that correct?
16           A.     Yes.
17           Q.       Can you read the first two
18      sentences of that section of the document for
19      the record, please?
20           A.       "It is most important that TLV
21      data be correctly used.  Misuse can occur
22      when uninformed individuals view these levels
23      as magic numbers, below which workers are
24      safe and above which they become ill."
25           Q.       The document, in the next
```

01                    JOHN MASAITIS

02     sentence, goes on to discuss that there is

03     wide variation in of individual

04     susceptibility to exposure to air

05     contaminants; is that correct?

06          A.     Yes.

07          Q.     Which means that each person

08     can respond differently to exposure to a

09     chemical; is that correct?

10          A.     Not each.  It says, some

11     workers may.  In other words, some workers

12     may be specifically influenced, different

13     than the majority of workers.

14          Q.     Okay.  Including at lower

15     levels of exposure?

16          A.     Some individuals, yes.

17          Q.     In fact, the document goes on

18     to explain that.  Can you read the next

19     sentence that begins with "Some workers" into

20     the record?

21          A.     "Some workers may experience

22     some discomfort from exposures at or below

23     the TLV, and a much smaller number may be

24     affected more seriously by aggravation of a

25     pre-existing condition or by development of

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 124 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 609 of 1330

```
01                    JOHN MASAITIS
02   an occupational illness."
03           Q.      And occupational illnesses
04   would include cancer; correct?
05           A.      If it's contracted during the
06   occupation.
07           Q.      Okay.  Can you read the next
08   sentence into the record?
09           A.      "Therefore, the TLV's as
10   published were intended to be used only as
11   guides in the control of health hazards and
12   not as levels which separate safe from
13   dangerous exposures."
14           Q.      And that sentence would be
15   true, would it not, including as it relates
16   to the development of occupational illnesses
17   such as cancer from exposures; correct?
18           A.      Yes.
19           Q.      Sir, during the 1960s and 1970s
20   U.S. Steel was aware of the manner in which
21   end users -- strike that.
22                   During the 1960s and 1970s U.S.
23   Steel was aware of the manner in which some
24   of its customers used benzene?
25                   MR. CAIRONE:  Object to form.
```

```
01                  JOHN MASAITIS
02   BY MR. DuPONT:
03        Q.      Is that correct?
04        A.      I can't say that.
05        Q.      Was U.S. Steel aware, during
06   the 1960s and 1970s, that products made by
07   U.S. Steel, sold to its customers that
08   contained benzene would be placed into
09   products that would be used in the work
10   place?
11        A.      Could have been.
12        Q.      You've seen correspondence back
13   and forth between U.S. Steel and Radiator
14   Specialty Company; correct?
15        A.      Yes.
16        Q.      You would agree with me that
17   through those correspondence, U.S. Steel
18   became aware that its products raffinate was
19   used in a product manufactured by Radiator
20   Specialty Company called Liquid Wrench;
21   correct?
22        A.      Yes.
23        Q.      And U.S. Steel was aware that
24   raffinate contained benzene from one to three
25   percent, as much as 14 or 15 percent; is that
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02     correct?
03           A.     I know the average was three
04     percent.
05           Q.     Okay.  But it had benzene in
06     that range; correct?
07           A.     Yes.
08           Q.     And U.S. Steel was aware that
09     Radiator Specialty Company was putting
10     raffinate, or the benzene into the Liquid
11     Wrench product; correct?
12           A.     Yes.
13           Q.     And U.S. Steel was also aware
14     that people who might be mechanics and even
15     people in their homes would use Liquid
16     Wrench; is that correct?
17           A.     I imagine if you were
18     mechanically inclined, working for U.S.
19     Steel, you would know that.
20           Q.     Did U.S. Steel do anything to
21     conduct any kind of audit on how its
22     customers used products containing benzene?
23     In other words, did it do anything to learn
24     what its customers were doing with U.S. Steel
25     benzene containing products that it sold to
```

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 127 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 612 of 1330

Page 125

```
01                    JOHN MASAITIS
02    customers?
03         A.       Not to my knowledge.
04         Q.       Did U.S. Steel do anything,
05    prior to selling benzene to a company, in
06    order to determine what that company knew, if
07    anything, about the health hazards of benzene
08    during the 1970s and prior to that period?
09         A.       Did they do anything?
10         Q.       Yes.
11         A.       Other than, you know, their
12    knowledge of specific companies, I don't know
13    if they really -- I can't say if they did
14    anything or they didn't do anything.  You
15    know, like I say, if you're selling a product
16    to a large company and you know that company
17    is -- you know, makes petroleum products, or
18    something like that, you would know -- have
19    some idea as to what they were doing with it.
20         Q.       But U.S. Steel didn't, prior to
21    deciding its own -- strike that.
22              Prior to deciding to sell
23    benzene to a company, U.S. Steel didn't go
24    and do any audits to determine what that
25    company it was selling benzene to knew about
```

*1*

Objection: 402, Relevance; no sales of benzene in this case

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Page 126

```
01              JOHN MASAITIS
02   the health hazards of benzene?
03              MR. CAIRONE:  Object to the
04         form.
05   BY MR. DuPONT:
06         Q.    Is that correct?
07         A.    To my knowledge, they did --
08   conducted no audits of their customers.
09         Q.    And they didn't do anything to
10   affirmatively determine what that company did
11   or did not know about benzene; correct?
12         A.    I'm not aware of U.S. Steel
13   sending out any questionnaires regarding what
14   the company knew about benzene, or any
15   activities such as that.
16         Q.    No questionnaires, no audits,
17   no other communications --
18         A.    They have may to some people in
19   other divisions.  I'm not aware of that, no.
20         Q.    You have no knowledge of U.S.
21   Steel doing that; correct?
22              MR. CAIRONE:  Asked and
23         answered.
24              THE WITNESS:  I have no
25         knowledge of it.  I didn't do it.  I'm
```

Object
ion:

402,
R
Elevan
ce; No
sales
of
benze
ne in
this
case

Same
Object
ions

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

# Masaitis, John

## Rhyne Trial Master

Continuing objection

```
01                JOHN MASAITIS
02        not aware of it.  Someone else may
03        have done it, I didn't.
```

602, speculation

```
04                MR. DuPONT:  Mark the next
05        document as Exhibit Number 16.
06                     -   -   -
07                (Whereupon the document was
08        marked, for identification purposes,
09        as Masaitis Exhibit Number 16.)
10                     -   -   -
11   BY MR. DuPONT:
12        Q.     For the record, that's Bates
13   Number USS 3850 to USS 3859.
14                Sir, have you seen this
15   document before?
16        A.     Not that I recall.
17        Q.     On the first page of the
18   document it says, United States Steel
19   Corporation, Industrial Relations Department.
20   Do you see that?
21        A.     Yes.
22        Q.     Are you aware of the United
23   States Steel Corporation having an industrial
24   relations department?
25        A.     Yes.
```

Obj:;402,

403, Relevance; MIL

Obj: 602, 802

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Page 128

```
01                    JOHN MASAITIS
02          Q.     At the bottom of the document
03   it says, Prepared By Industrial Hygiene
04   Section, Medical Division.  Are you aware
05   that U.S. Steel had an industrial hygiene
06   section?
07          A.     Yes.
08          Q.     Okay.  They say we're not
09   supposed to ask questions we don't know the
10   answer to.
11                    The title of this document is
12   "Health Hazards in Use of Solvents For Motor
13   Cleaning".  Do you see that?
14          A.     Yes.
15          Q.     Are you able to tell me what
16   the date of this document is?
17          A.     That's exactly what I was
18   looking at.  It seems like -- I see a 1953
19   date, but -- I -- I don't see any other
20   dates, other than that 1953 date.
21          Q.     Maybe that first paragraph,
22   that 1953 date of this document is the
23   context for it.  In reading that first
24   paragraph, does it appear to you that there
25   was an issue within U.S. Steel regarding the
```

403, waste of time
not a question

Objection: 402, 403, 802, MIL

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                JOHN MASAITIS
02    desirability of using organic solvents for
03    cleaning motors?
04         A.     Correct.
05         Q.     Then it goes on that the
06    industrial hygiene section of U.S. Steel
07    apparently was cooperating with the
08    maintenance committee of U.S. Steel to
09    investigate solvents to be used for cleaning
10    motors.  Do you see that?
11         A.     Yes.
12         Q.     And it appears that some report
13    of the results of the investigation made by
14    the industrial hygiene department were
15    transmitted or given to the maintenance
16    company -- maintenance committee on
17    January 15th of 1953.  Do you see that?
18         A.     Yes.
19         Q.     And it goes on to say that the
20    intention of this document, or the desire of
21    this document is to supplement the
22    information previously transmitted on
23    January 15 regarding the use of solvents for
24    cleaning motors.  The industrial hygiene
25    section investigation of that property.
```

Continuing Objection through line 18

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

01                    JOHN MASAITIS

02          A.     Where are you reading?

03          Q.     Sure, the last sentence of that

04   first paragraph.

05          A.     Shall desire at this time to

06   supplement, yes.

07          Q.     Is that a fair interpretation

08   of that -- of this document?

09          A.     Yes.

10          Q.     Then what follows through this

11   document is recommendations that the

12   industrial hygiene committee are making

13   regarding the use of organic solvents;

14   correct?

15          A.     I --

16                 MR. CAIRONE:  Do you need to

17          read?  I mean, I don't know that it's

18          fair to ask these questions about a 10

19          page document that he just said he's

20          never seen.

21                 MR. DuPONT:  Sure.

22   BY MR. DuPONT:

23          Q.     And again, I gave you the

24   instruction earlier, if you need to look at

25   the document, please feel free to do.

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02         A.     It talks about the utilization
03    factors, fire hazards, health hazards, tables
04    listing the health hazards and fire hazards
05    in motor cleaning solvents.  And your
06    question pertaining --
07         Q.     Sure.  My question is simply,
08    is it a fair interpretation of this document
09    that what is happening to the industrial
10    hygiene committee is providing advice and
11    guidance to the maintenance committee
12    regarding the use of organic solvents for
13    cleaning motors?  Is that fair?
14              MR. CAIRONE:  The fairest
15              interpretation is gleaned from reading
16              it, which I still think you need to do
17              if you're going to ask about what the
18              fairest interpretation is.  I know
19              you -- it's a long document and you
20              would rather not, but...
21              THE WITNESS:  Well, I can sit
22              here and read it.
23              (Reading document.)
24    BY MR. DuPONT:
25         Q.     Sir, if I could interrupt you
```

```
01                    JOHN MASAITIS

02       there.

03            A.    Yes.

04            Q.    Have you read enough of the

05       document to be able to determine that,

06       generally speaking, what the industrial

07       hygiene committee is doing here is providing

08       guidance and advice to the maintenance

09       committee regarding the use of organic

10       solvents for cleaning engines?

11            A.    After getting into the

12       document, I have a better understanding of

13       what it is.  And I do recall now seeing parts

14       of this document.  I know -- get an

15       understanding of what its purpose was.

16            Q.    Okay.

17                  Is it fair to say, generally,

18       what was happening here is, the industrial

19       hygiene committee at U.S. Steel was providing

20       advice and consultation to the maintenance

21       committee of U.S. Steel regarding the use of

22       organic solvents; correct?

23            A.    Yes.

24            Q.    If you look at page two of the

25       document, which is Bates numbered USS 3852.
```

Continuing Objection to the use of this Document; 402, 403, 802

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Page 133

```
01                JOHN MASAITIS
02           MR. CAIRONE:  Just to be clear,
03      there are two page twos.  So you're
04      looking at the page two that is 3852?
05           MR. DuPONT:  Yes.  Right.
06   BY MR. DuPONT:
07      Q.     Bates Number 3852, if you look
08   at the first full paragraph.  Can you read
09   into the record what the industrial hygiene
10   department at U.S. Steel is telling the
11   maintenance department?  Can you read that
12   first sentence into the record?
13      A.     Beginning with, "In any event"?
14      Q.     Yes, sir.
15      A.     "In any event, every effort
16   should be made to exclude carbon
17   tetrachloride and benzol for cleaning
18   purposes.  These are the most toxic of
19   organic solvents and excessive exposure to
20   them may result in severe illness.  These
21   solvents may be found in various mixtures
22   available through manufacturers and
23   suppliers.  Cleaning solvents are generally
24   sold under a trade name or trade number, so
25   that the user has very little information
```

Conitinuing objections to the use of this document

402,

403,

802

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Page 134

```
01                  JOHN MASAITIS
02   upon which to evaluate the fire and health
03   hazard potentials.  We should like,
04   therefore, to urge that when you contemplate
05   the use of any cleaning solvent, a quart
06   sample be submitted to our Industrial Hygiene
07   Section, Medical Division Industrial
08   Relations Department so that it may be
09   analyzed and the health and fire hazards
10   evaluated."
11        Q.      Okay.  So what the industrial
12   hygiene committee is telling the maintenance
13   committee within U.S. Steel is, don't use
14   benzene for cleaning purposes; correct?
15               MR. CAIRONE:    Object to the
16        form.
17               THE WITNESS:  It says, "In any
18        event every effort should be made to
19        exclude carbon tetrachloride and
20        benzol for cleaning purposes."
21   BY MR. DuPONT:
22        Q.      Right.
23        A.      To exclude.
24        Q.      Exclude it, don't use it;
25   correct?
```

Continuing Objections to the use of this document 402, 403, 802

through the end of the page

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 137 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 622 of 1330

```
01              JOHN MASAITIS
02      A.      Every effort -- no, it's
03   saying, every effort should be made to
04   exclude.
05      Q.      All right.  By exclude, it
06   means eliminate benzene from use; correct?
07      A.      Yes.
08      Q.      All right.  One of the reasons
09   given is that benzene, along with carbon
10   tetrachloride, are the most toxic of organic
11   solvents.  Correct?
12              MR. CAIRONE:  Well, we've read
13          that into the record twice now and it
14          says what it says.
15   BY MR. DuPONT:
16      Q.      Is that correct?
17      A.      Yes.
18              MR. CAIRONE:  Are you asking
19          whether it says that again?  Is
20          that -- because it does.
21   BY MR. DuPONT:
22      Q.      It goes on to say that
23   excessive exposure to benzene may result in
24   severe illness; correct?
25      A.      Yes.
```

Objections to the use of the document: all designations on this page; 402, 403, 802

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                JOHN MASAITIS
02        Q.     All right.  Can you show me on
03   any Material Safety Data Sheet or any
04   document that was provided to any U.S. Steel
05   customer purchasing benzene prior to 1978, or
06   during that year, where that information is
07   conveyed, that benzene should not be used as
08   a cleaning solvent?
09        A.     No.  I can't show you anything
10   that states specifically it shouldn't be used
11   for cleaning purposes, and I can't show you
12   instances where it should be used for any
13   other purpose.
14        Q.     All right.  The document says,
15   you also read for the record, cleaning
16   solvents are generally sold under a trade
17   name or trade numbers that the user has very
18   little information upon which to evaluate the
19   fire and health hazard potentials.  As an
20   industrial hygienist, that's a problem, isn't
21   it?
22             MR. CAIRONE:  Object to the
23        form.
24             THE WITNESS:  This -- yes, it's
25        a problem.  And that's why --
```



Continuing objections to the questions on the document: 402, 403, 802 MIL

To the end of this page

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02   BY MR. DuPONT:
03         Q.     And the reason there is --
04                MR. CAIRONE:   Let him finish his
05         answer.
06   BY MR. DuPONT:
07         Q.     And the reason it's a problem
08   is that you're not providing -- strike that.
09                Can you turn to page 3858,
10   please?
11         A.     Page 3858?
12         Q.     Right.  Does this page of the
13   document provide a pictorial depiction, a
14   drawing, of the types of respiratory
15   protection and ventilation that should be
16   used in conjunction with cleaning solvents?
17         A.     It's a diagram showing a man
18   with personal protective equipment spray
19   cleaning a part.
20         Q.     And the personal protective
21   equipment, what type of respirator is he
22   wearing?
23         A.     A chemical cartridge, organic
24   vapor.
25         Q.     What is that in front of the
```

01                    JOHN MASAITIS

02     respirator?

03          A.      Face shield.

04          Q.      Is he wearing any type of

05     personal protective equipment, besides his

06     clothing?

07          A.      Looks like he's wearing gloves

08     that should be impervious to the material

09     that he's cleaning with, and also coveralls

10     that should be impervious.

11          Q.      What type of ventilation is

12     depicted in this diagram?

13          A.      It's a spray-type booth with

14     baffle plates and an exhaust stack and

15     explosive proof light fixtures.

16          Q.      And the exhaust stack -- the

17     purpose of the exhaust stack is to suck

18     vapors out of the air where the solvent

19     cleaning is taking place?

20          A.      Yes.

21          Q.      Sir, I would like to turn your

22     attention back to some of the changes that

23     happened in the late 1970s and 1980s

24     regarding the OSHA benzene standard.  We

25     discussed that in 1977 the emergency

# Masaitis, John

## Rhyne Trial Master

```
01                    JOHN MASAITIS
02   temporary standard was issued by OSHA.
03   Correct?  Do you recall that?
04        A.     Yes.
05        Q.     And the result of that was to
06   lower the permissible exposure level from 10
07   part per million to one part per million?
08        A.     That was one of the purposes,
09   yes.
10        Q.     Then, are you aware that the
11   American Petroleum Institute and other
12   members of industry litigated OSHA's decision
13   up to the United States Supreme Court?
14        A.     Yes.
15        Q.     Do you know when the reduction
16   of the permissible exposure level from 10
17   part per million to one part per million
18   became final?
19        A.     I believe it was the mid to
20   late eighties.
21        Q.     Do you know what resulted or
22   what happened in order for the exposure
23   standard to become final in the mid to late
24   eighties?
25               MR. CAIRONE:    Object to the
```

All of this starting on page 138: Relevance; MIL re lobbying efforts.

MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 142 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 627 of 1330

# Masaitis, John

Rhyne Trial Master

```
01              JOHN MASAITIS
02        form.
03              THE WITNESS:  I have some recall
04        regarding the rule making process.
05   BY MR. DuPONT:
06        Q.    What do you recall?
07        A.    Specifically pertaining to
08   what?
09        Q.    What resulted in the benzene
10   standard reduction from 10 part per million
11   to one part per million becoming the final
12   rule?
13              MR. CAIRONE:  Object to the
14        form.
15   BY MR. DuPONT:
16        Q.    How did that happen?  What
17   changed between 1977 and 1985 or 1986?
18              MR. CAIRONE:  Object to the
19        form.
20              THE WITNESS:  After reviewing
21        the OSHA proposal, there was a large
22        majority of toxicologists,
23        epidemiologists, industrial hygienists
24        who took exception to some of the
25        studies that OSHA used in its
```

602, foundation
802, hearsay

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

01                    JOHN MASAITIS

602 foundation
802 hearsay

02          documentation for the need.  And in
03          the rule making process presented
04          testimony from more authoritative
05          sources objecting to the need to that
06          standard at that time, and other
07          portions of it.
08     BY MR. DuPONT:
09          Q.      And apparently it's your
10     understanding that by 1985, 1986 the standard
11     became final because there was now a
12     consensus that benzene causes leukemia.  Is
13     that what you're telling me?
14               MR. CAIRONE:   Form.
15               THE WITNESS:   There was -- there
16          was interaction amongst the people
17          participating in the rule making here
18          in the organizations and eventually
19          they came to a consensus.
20     BY MR. DuPONT:
21          Q.      Should U.S. Steel have warned
22     that benzene causes cancer in 1977, when the
23     federal government issued the emergency
24     temporary standard?
25          A.      I don't think so.

```
01                    JOHN MASAITIS
02           Q.     Is it your position that U.S.
03      Steel should not have -- when I say you, I
04      mean the company.  Was it U.S. Steel's
05      position that it should not have warned that
06      benzene causes leukemia until the standard
07      became final in 1985 or 1986?
08           A.     There is an established
09      procedure that the country has regarding rule
10      makings, and the procedure was followed.  And
11      that's pretty much, you know, what happened
12      during that time period.
13           Q.     I'm not -- I'm not asking about
14      the country's procedures, I'm asking about
15      U.S. Steel's procedures.
16           A.     Well --
17                  MR. CAIRONE:  Let him ask his
18           question.
19      BY MR. DuPONT:
20           Q.     At what point in time -- at
21      what point in time is U.S. Steel satisfied
22      that there is enough information that a
23      particular chemical can cause cancer such
24      that it should issue those warnings?
25                  MR. CAIRONE:  Object to the
```

```
01              JOHN MASAITIS
02        form.
03              THE WITNESS:  I can't say
04        specifically when each and every
05        individual of U.S. Steel, you know,
06        may -- you know, was convinced that
07        indeed that benzene was a carcinogen.
08        I can't even recall specifically when
09        I was, you know, convinced to
10        subscribe to it.  All I can recall is
11        that when the standard became final,
12        then the -- it -- yes, then it's a
13        carcinogen.  It's that -- it has to be
14        accepted because it's the law.  But
15        you have to go through the rule making
16        procedures.
17   BY MR. DuPONT:
18        Q.    So let me see if I can
19   understand this.  In 1977 the federal
20   government, through OSHA, says benzene is a
21   carcinogen; correct?
22              MR. CAIRONE:  Object to form.
23              THE WITNESS:  They said they
24        suspect that it was a carcinogen.
25   BY MR. DuPONT:
```

```
01                    JOHN MASAITIS
02          Q.      Are you telling me that the
03    federal government did not say in 1977 that
04    benzene is a carcinogen?
05          A.      In 1977, when the rule making
06    process began, yes.  Then, yes.
07          Q.      Right.  Okay.  And U.S. Steel
08    did not accept that, did it?
09          A.      Well, the majority of the
10    occupational health community didn't accept
11    it.
12                  MR. DuPONT:  Objection, move to
13          strike.
14    BY MR. DuPONT:
15          Q.      I'm not asking you about the
16    occupational health community.
17          A.      I can't --
18          Q.      Sir, U.S. Steel did not accept
19    in 1977 that the federal government said that
20    benzene causes cancer, did it?
21                  MR. CAIRONE:  Object to form.
22                  THE WITNESS:  Personally, I did
23          not.  Other members of U.S. Steel, I
24          don't know what each and every member
25          of the corporation thought about the
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          emergency temporary standard.
03    BY MR. DuPONT:
04          Q.     You're testifying on behalf of
05    United States Steel.  I'm asking you, is it
06    your testimony, as a representative of United
07    States Steel, that United States Steel
08    Corporation did not accept, in 1977, that the
09    federal government said that benzene is a
10    carcinogen?
11                    MR. CAIRONE:  Object to the
12              form.
13                    THE WITNESS:  Here again, how
14              each and every individual thought, I
15              think the corporation participated in
16              rule making hearings through the AISI,
17              as I recall.  So maybe they didn't
18              agree.
19    BY MR. DuPONT:
20          Q.     So you think maybe U.S. -- you
21    think U.S. Steel did agree with the federal
22    government that benzene was a carcinogen in
23    1977?
24                    MR. CAIRONE:  Object to the
25              form.
```

```
01                    JOHN MASAITIS
02              THE WITNESS:  No, I don't think
03         so.
04    BY MR. DuPONT:
05         Q.    So is what you're telling me,
06    as a representative from U.S. Steel, is that
07    it did not accept that the government
08    declared benzene as a carcinogen in 1977?
09              MR. CAIRONE:   Object to the
10         form.  Hold on a minute, because this
11         is about the seventh time.  He's doing
12         the best job he can, I think, to
13         answer what is an unfair question and
14         very unclear.  So he's answered it six
15         times to the best of his ability.
16              THE WITNESS:  I'm saying that I
17         did not think that it was from the
18         information that I had time to go
19         through and read.  What each and every
20         member thought of U.S. Steel, I can't
21         say.
22              MR. CAIRONE:  Let me also say,
23         please, that I don't believe this was
24         a subject designated for testimony.
25         So our obligation under the
```

```
01                    JOHN MASAITIS
02          Pennsylvania Rules of Civil Procedure
03          is to designate somebody who is able
04          to testify about what the corporation
05          either knows or has access to.  And
06          this whole rule making process, I
07          don't think it -- if it's there and
08          you can show it to me --
09               MR. DuPONT:  I'm not talking
10          about the rule making process.
11               MR. CAIRONE:  Sure, you are.
12               MR. DuPONT:  I'm talking
13          about --
14    BY MR. DuPONT:
15          Q.     My question to you is, I'm
16    asking you, as a representative of U.S.
17    Steel, not you personally, not what everybody
18    at U.S. Steel knew or accepted.  I'm asking
19    you, when the federal government in 1977 said
20    that benzene was a carcinogen, did U.S. Steel
21    accept what the federal government said, or
22    did it decide that it was not going to accept
23    what the federal government's determination
24    was and it was not --
25               MR. CAIRONE:  Objection to the
```

```
01                  JOHN MASAITIS
02          form.
03   BY MR. DuPONT:
04          Q.     -- going to consider benzene a
05   carcinogen?
06                  MR. CAIRONE:   Object to the
07          form.
08                  THE WITNESS:   What U.S. Steel
09          decided, it would participate in the
10          rule making process, as each and every
11          affected party had the right to do.
12          And that's what was done.   In other
13          words, we were there to learn too.
14          Show us what you're talking about.
15          Show us your studies.   Give us the
16          information that you have, you know.
17          It's something that, you know, has to
18          be done, just like any other
19          reasonable event, you know.   Why are
20          you saying this?   Show me your
21          studies.
22   BY MR. DuPONT:
23          Q.     So when the federal government
24   in 1977 said that benzene was a carcinogen,
25   U.S. Steel -- U.S. Steel did not accept that?
```

Page 149

```
01              JOHN MASAITIS
02              MR. CAIRONE:  That is about the
03        tenth time that the same question has
04        been answered.  So you can have one
05        more shot at it and then I'm going to
06        tell him, no more.
07              THE WITNESS:  U.S. Steel, like
08        the other parties involved, wanted to
09        see the information that OSHA had put
10        together to come up with this
11        conclusion.  And because up until that
12        point in time, we didn't think that
13        there was sufficient information out
14        there.  So we wanted to participate in
15        hearings to personally see what OSHA
16        had, that I shouldn't -- to understand
17        where they were coming from.
18   BY MR. DuPONT:
19        Q.    Part of what U.S. Steel did as
20   a member of the American iron and steel
21   industry, was to hire its own medical
22   consultants to submit information to OSHA in
23   the context of the ruling; is that correct?
24        A.    I can't recall who was hired or
25   -- I can't answer that.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 311-4  Filed 09/02/20  Page 152 of 197
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 637 of 1330

```
01                 JOHN MASAITIS
02         Q.      Are you aware, from reviewing
03    the documents from U.S. Steel, that the
04    American Iron and Steel Industry, that
05    organization, hired medical professionals to
06    submit information to OSHA concerning benzene
07    rule changes?
08                 MR. CAIRONE:  Can you point to
09         me, please, before we continue this
10         line, where you designated this as a
11         subject for the corporate deposition.
12         Then maybe we can continue.  Because
13         if you didn't, which is what I think
14         is the case, he has no obligation to
15         review the documents or prepare
16         because it wasn't a subject
17         designated.  So is it in your notice
18         or not?
19                 MR. DuPONT:  Are you telling me
20         that the company's knowledge of the
21         health hazard of benzene warnings and
22         issues related to that aren't in the
23         Notice of Deposition?
24                 MR. CAIRONE:  That's not what
25         you're asking.  You're asking him
```

# Masaitis, John

Rhyne Trial Master

```
01                JOHN MASAITIS
02        about the rule making process leading
03        up to litigation challenging the OSHA
04        standard in '77.  And it's a
05        completely discrete topic.
06            MR. DuPONT:  I'm asking about
07        documents that have been produced in
08        this litigation.
09            MR. CAIRONE:  Well --
10            MR. DuPONT:  -- By U.S. Steel,
11        and that I believe is a subject of the
12        Notice of Deposition.
13            MR. CAIRONE:  Well, I'm
14        objecting to the whole line of
15        questioning and the fact that you
16        didn't notice it as a topic.  And --
17        go ahead.
18  BY MR. DuPONT:
19        Q.    Sir, are you aware that U.S.
20  Steel, as a member of the American Iron and
21  Steel Industry, hired medical experts to
22  submit information to OSHA in the context of
23  the rule making procedures?
24            MR. CAIRONE:  Asked and
25        answered.
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Page 152

```
01              JOHN MASAITIS
02          THE WITNESS:  I personally can't
03      recall who the AISI hired and what
04      their particular expertise was.
05                    -  -  -
06          (Discussion held off the
07      record.)
08                    -  -  -
09  BY MR. DuPONT:
10          Q.      Sir, I'm going to hand you a
11  document which I've pulled from your
12  materials.  I'm handing it to your counsel.
13  It's being marked as Exhibit Number 17.
14                    -  -  -
15          (Whereupon the document was
16      marked, for identification purposes,
17      as Masaitis Exhibit Number 17.)
18                    -  -  -
19          THE WITNESS:  '82 Material
20      Safety Data Sheet.
21  BY MR. DuPONT:
22          Q.      It's Bates Number USS 8892 to
23  8893.  And you've identified for us that that
24  is a Material Safety Data Sheet for benzene
25  dated 1982.
```

Objection: 402, 403; Document is not relevant; post-1978

Same objections

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Page 153

```
01                    JOHN MASAITIS
02          A.       Yes.
03          Q.       And that Material Safety Data
04   Sheet does provide a warning that exposure to
05   benzene can cause leukemia?
06                    MR. CAIRONE:  I'm sorry, did I
07          distract you?  Can you repeat that?
08                    THE WITNESS:  It does, yes.
09   BY MR. DuPONT:
10          Q.       And that Material Safety Data
11   Sheet is dated 1982, which is before the
12   finalization, reduction of the benzene
13   exposure permissible -- strike that.
14                    1982 is before OSHA finalized
15   the reduction of the benzene permissible
16   exposure level from 10 to one part per
17   million, is it not?
18          A.       Yes.
19          Q.       And this is the first time that
20   United States Steel Corporation put a cancer
21   warning on a benzene Material Safety Data
22   Sheet; is that correct?
23          A.       Material Safety Data Sheets
24   that I have seen, yes.  I have seen in regard
25   to this litigation.  I can't recall if this
```

Same object ions

Same object ions

Same objecti ons

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Page 154

```
01                    JOHN MASAITIS
02    was the very first one ever.
03              Q.      Okay.  Do you have any
04    knowledge that United States Steel
05    Corporation issued Material Safety Data
06    Sheets prior to 1982 that said benzene can
07    cause cancer?
08              A.      I have no knowledge of that.
09              Q.      Now, you've discussed raffinate
10    before as a product that contained anywhere
11    from 1 to 14 or 15 percent benzene, as
12    manufactured by U.S. Steel; correct?
13              A.      I've seen documents saying one
14    to 14 percent.
15              Q.      You also testified that it's
16    your understanding on average the product
17    contained three percent benzene?
18              A.      Yes.
19                          -  -  -
20              (Whereupon the document was
21         marked, for identification purposes,
22         as Masaitis Exhibit Number 18.)
23                          -  -  -
24    BY MR. DuPONT:
25              Q.      I'm going to hand you what I've
```

Same objections

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                 JOHN MASAITIS

02   marked as Exhibit Number 18.  Sir, is that a

03   Safety Data Sheet for raffinate?

04         A.     Yes, it is.

05              MR. CAIRONE:  This one has

06         handwritten notes on it.

07              (Discussion held off the

08         record.)

09   BY MR. DuPONT:

10         Q.     Sir, is this dated 1969?  Can

11   you tell that, looking at the top righthand

12   corner of the document?

13         A.     It appears to be '69.

14         Q.     And if you look at the page

15   that is Bates Number USS 18, that contains

16   certain health warnings.

17         A.     Yes.

18         Q.     Can you read the first sentence

19   in that paragraph into the record?

20         A.     "Raffinate has an anesthetic

21   effect on the body when inhaled in sufficient

22   quantities (sic)."

23         Q.     When you say an anesthetic

24   effect, what are you talking about?

25              MR. CAIRONE:  That's what the
```

01                    JOHN MASAITIS

02          document says.  Are you asking him

03          what he understands that to mean?

04                    MR. DuPONT:  Sure.

05     BY MR. DuPONT:

06          Q.    What is meant by anesthetic

07     effect?

08          A.    An anesthetic is something that

09     is a numb effect.

10          Q.    All right.  Turn to the same

11     paragraph, last sentence.

12          A.    "Chronic exposure to low

13     concentrations of the vapors can cause severe

14     damage to blood-forming structures."

15          Q.    Is that talking about the

16     vapors in the raffinate itself, or the vapors

17     in the benzene and raffinate.

18          A.    Well, I think that it's talking

19     to the benzene concentration in the

20     raffinate.

21          Q.    Does it say that?

22          A.    No, but it's implied, in my

23     mind.

24          Q.    If you turn under -- to the

25     warning properties on the same page.  It

```
01                  JOHN MASAITIS
02      says, "Raffinate does not have good warning
03      properties."  What's meant by warning
04      properties?
05            A.     Well, something that would
06      cause the individual to avoid it.
07            Q.     Can you go to page six of the
08      document, please?
09            A.     (Complying with request.)
10            Q.     The first sentence of this
11      paragraph repeats what we saw on page two of
12      the document, which is that repeated
13      exposures at low vapor concentrations over a
14      period of time can result in chronic
15      poisoning.
16                  MR. CAIRONE:  Object to the
17            form.  I don't think it repeats it.
18            It says something different, but --
19                  THE WITNESS:  It's somewhat
20            similar, but it's not exactly.  One
21            talks about blood-forming structures
22            and the other talks about chronic
23            poisoning.
24      BY MR. DuPONT:
25            Q.     Okay.  And the chronic
```

01          JOHN MASAITIS

02     poisoning reaction that's being referred to

03     on page six, that reaction will differ in

04     people, depending on their own susceptibility

05     to exposure to the vapors.  Is that accurate?

06          A.    It doesn't mean that each and

07     every individual has its own susceptibility.

08     It's -- what it means, that there are people

09     who may be more sensitive to particular

10     materials, as opposed to the rest of the

11     population.

12          Q.    So those particular people may

13     contract the chronic poisoning at lower

14     levels than other members of the population.

15     Is that what that means?

16          A.    Relatively speaking.

17          Q.    If you go to the last sentence

18     in this paragraph, it discusses that in

19     severe cases the bone marrow is affected so

20     as to produce blood cell deficiencies that

21     can result in death.  Do you see that?

22          A.    Yes.

23          Q.    Are you familiar with a

24     condition, aplastic anemia?

25          A.    I've heard of it.  I'm not

```
01                  JOHN MASAITIS
02   going to answer any questions regarding the
03   medical aspects of it.
04        Q.     All right.  Do you know whether
05   the blood cell deficiencies that can result
06   in death that are being referred to here are
07   aplastic anemia?
08        A.     I can't answer.
09             MR. SYKES:  Okay, I'm really not
10        trying to be uncooperative, but I
11        think we have to take a lunch break
12        here.  There are going to be other
13        questions, I'm sure.
14             (Discussion held off the
15        record.)
16             MR. DuPONT:  I may be done.  I
17        may only have one or two more minutes
18        of questioning.  So why don't we go
19        off the record and see what everybody
20        else has.
21             VIDEO TECHNICIAN:  The time is
22        1:19, going off the record.
23                  -   -   -
24             (Discussion held off the
25        record.)
```

# Masaitis, John
### Rhyne Trial Master

Page 160

```
01                    JOHN MASAITIS
02                    -   -   -
03               VIDEO TECHNICIAN:  This is the
04          beginning of tape number four, the
05          time is 1:22 p.m.
06     BY MR. NEUER:
07          Q.    Mr. Masaitis, my name is Ray
08     Neuer.  I'm a lawyer from Houston and I
09     represent a company called T H Agriculture
10     and Nutrition, LLC.  Have you and I ever met
11     before, sir?
12          A.    No.
13          Q.    Met today, earlier?
14          A.    Yes.
15          Q.    If I ask you a question that
16     you do not understand, will you please ask me
17     to rephrase it?
18          A.    Yes.
19          Q.    You've been asked some
20     questions that kind of bump up on medical
21     aspects in the case, and it's true, is it
22     not, you're not a medical doctor; correct?
23          A.    Correct.
24          Q.    You're not an epidemiologist;
25     correct?
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          A.     That's correct.
03          Q.     You were an industrial
04   hygienist by trade, so you have some
05   knowledge regarding the benzene issue that
06   existed during the 1970s.  True?
07          A.     Yes.
08          Q.     However, with respect to
09   specific issues regarding expected latency
10   periods due to exposure of benzene as far as
11   certain types of leukemia are concerned,
12   that's beyond your area of expertise.  True?
13          A.     True.
14          Q.     With respect to the specific
15   mechanism through which exposure to benzene
16   may or may not cause damage to the blood
17   forming organs, that's beyond your area of
18   expertise.
19          A.     Correct.
20          Q.     With regard to what specific
21   types of leukemia may or may not be
22   associated with exposure to benzene, that is
23   beyond your area of expertise.
24          A.     Yes.
25          Q.     With respect to what levels of
```

```
01                   JOHN MASAITIS
02    exposure the scientific community expects to
03    see in order to say that there is a link
04    between benzene exposure and certain types of
05    leukemia, that's beyond your area of
06    expertise.  True?
07          A.     Yes.
08          Q.     But you do understand, as an
09    industrial hygienist, that there are doctors
10    and epidemiologists out in the scientific
11    community who study these issues at a very
12    minded level; correct?
13          A.     Correct.
14          Q.     And you would leave it to those
15    individuals to address these issues in this
16    case.  True?
17          A.     True.
18          Q.     Now, earlier in your deposition
19    you were asked some questions about your
20    knowledge of a company called
21    Thompson-Hayward Chemical Company.  Do you
22    recall that?
23          A.     Yes.
24          Q.     I believe your testimony was,
25    is that before this case you didn't know
```

**Transcript of Masaitis, John**        **Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 165 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 650 of 1330

Page 163

```
01                  JOHN MASAITIS
02   anything about Thompson-Hayward Chemical
03   Company.  True?
04        A.    Yes.
05        Q.    And your knowledge of
06   Thompson-Hayward Chemical Company is
07   essentially limited to the information that
08   was provided to you in a notebook that was
09   given to you in preparation for this
10   deposition.  True?
11        A.    Yes.
12        Q.    But, of course, in that
13   notebook there was a good deal of information
14   that had nothing whatsoever to do with
15   Thompson-Hayward Chemical Company.  True?
16        A.    Yes.
17        Q.    I believe you indicated that
18   your knowledge of Thompson-Hayward Chemical
19   Company was limited, as far as documents are
20   concerned, to some invoices that reflected
21   that USS Chemicals had supplied benzene to
22   the Chicago office of Thompson-Hayward
23   Chemical Company.  True?
24        A.    Yes.
25        Q.    So that's one thing that you do
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01              JOHN MASAITIS
02   know about Thomas Hayward Chemical Company,
03   is that it purchased benzene from USS
04   Chemicals.  True?
05        A.    Yes.
06        Q.    As far as what particular
07   locations Thompson-Hayward Chemical Company
08   may have had throughout the country and what
09   specifically they did or what they
10   distributed, you don't have any knowledge of
11   that, beyond what you saw in the documents
12   that you reviewed in preparation for your
13   deposition.  True?
14        A.    Yes.
15        Q.    Okay.
16              MR. SYKES:  And may I interject,
17              and what he was told by counsel, which
18              is privileged.
19   BY MR. NEUER:
20        Q.    True.  You don't want me to ask
21   about that.  Okay.
22              In looking through the
23   notebook, I did not see that you had reviewed
24   the deposition of a man named Steve Carter.
25   Have you seen that deposition, sir?
```

```
01                  JOHN MASAITIS
02        A.     No.
03        Q.     He was presented as the
04   corporate representative of Thompson-Hayward
05   Chemical Company.  You have not read his
06   deposition.  True?
07        A.     True.
08        Q.     You have not read the
09   deposition of a gentleman by the name of
10   Charles Graham, who was presented as the
11   corporate representative of Handschy, have
12   you, sir?
13        A.     No.
14        Q.     So with respect to what those
15   individuals may have testified to regarding
16   the relationship between Thompson-Hayward
17   Chemical Company and Handschy, we'd have to
18   look to those depositions and that testimony.
19   True?
20        A.     Yes.
21        Q.     Now, earlier in your deposition
22   you were asked a question as to whether or
23   not you considered Thompson Hayward Chemical
24   Company a manufacturer of chemicals.  And I
25   saw that you hesitated and struggled with
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01            JOHN MASAITIS
02   that question.  Do you recall that?
03        A.    Yes.
04        Q.    All right.  Now, in this
05   particular instance, with respect to U.S.
06   Steel, did you testify earlier that benzene
07   was made secondary to the manufacture of
08   coke?
09        A.    Yes.
10        Q.    Was coke used in connection
11   with the manufacture of steel?
12        A.    Yes.
13        Q.    Do you have an appreciation and
14   understanding that coke is made from
15   petroleum crude?
16        A.    Coke is made from metallurgical
17   grade coal.
18        Q.    Okay.  So there was -- there
19   was a process through which U.S. Steel took
20   coal, created coke, and used that coke in the
21   manufacture of steel products?
22        A.    Correct.
23        Q.    As a by-product of making coke,
24   I believe you testified -- testified that
25   light oils were generated as a by-product?
```

```
01                JOHN MASAITIS
02        A.     Yes.
03        Q.     And those light oils could be
04   broken down through another manufacturing
05   product into other hydrocarbons; correct?
06        A.     Correct.
07        Q.     I believe you mentioned
08   toluene, xylene and benzene.
09        A.     Correct.
10        Q.     And you've indicated that
11   through that manufacturing process the light
12   oils, at least at three different locations,
13   U.S. Steel was a manufacturer of benzene;
14   correct?
15        A.     Yes.
16        Q.     All right.  Is it your
17   understanding, through review of the
18   materials for preparation of your deposition,
19   that what Thompson-Hayward Chemical Company
20   did in this case was that it blended raw
21   materials that had already been made by
22   manufacturers into a particular product for
23   Handschy?
24        A.     Yes.
25        Q.     You haven't seen any indication
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John

### Rhyne Trial Master

```
01                 JOHN MASAITIS
02      that Thompson-Hayward Chemical Company
03      engaged in the type of manufacturing process
04      that I have described, and you've testified
05      to, where you take a raw material, like coal,
06      break it down as a result of a by-product,
07      further break that down to make a particular
08      chemical?  You've been given no indication
09      that Thompson-Hayward Chemical Company
10      engaged in that type of activity.   True?
11           A.     That's correct.
12           Q.     Okay.  But we do know that as a
13      manufacturer of benzene, xylene, toluene,
14      that as part of that process, when a company
15      sells that product out in the open market, it
16      will typically put together product data
17      sheets and Material Safety Data Sheets to
18      disclose the proper use of that product and
19      potential hazards of that product.  Correct?
20           A.     Typically manufacturers put
21      together a Material Safety Data Sheet for any
22      product that they manufacture.
23           Q.     And part of the purpose of a
24      Material Safety Data Sheet is to tell the
25      customers who are going to use that product
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02     how to properly use that product and what the
03     hazards of that product are.  Correct?
04          A.     A Material Safety Data Sheet is
05     a means of conveying information, health
06     hazard type, protective equipment,
07     flammability, spill procedures.
08          Q.     Now, we've looked at several
09     Material Safety Data Sheets that were issued
10     by USS Chemicals for a product known as
11     benzene; correct?
12          A.     We've looked at three.
13          Q.     I believe we looked at the one
14     for 1971, the one for 1972, the one for 1979,
15     and then a fourth one we just looked at for
16     1982.  Do you recall that, sir?
17          A.     Yes.
18          Q.     And we saw that, while there
19     were references to the MCA in '71, '72 and --
20          A.     Excuse me.  When I responded
21     yes, I responded yes to the fourth one that
22     you were describing.  But, to my knowledge,
23     it was just '72, '79 and '82 that we looked
24     at.
25          Q.     Okay.  Fair enough.  We looked
```

```
01                JOHN MASAITIS
02   at a Material Safety Data Sheet from USS
03   Chemicals from 1972, '79 and then in 1982.
04        A.     '82, yes.
05        Q.     We looked at the one in the
06   seventies, and the seventies did not have a
07   specific warning on the Material Safety Data
08   Sheet that exposure to benzene could cause
09   cancer or leukemia.   True?
10        A.     That's correct.
11        Q.     The one that we did see, the
12   one in 1982 had a very specific warning that
13   exposure to benzene may result in anemia or
14   at least one type of leukemia; correct?
15        A.     Yes.
16        Q.     And I ask that question about
17   one type of leukemia because it goes back to
18   the question that I had asked you earlier
19   about whether or not you have expertise as to
20   whether or not -- what types of leukemia may
21   or may not be caused or associated with
22   exposure to benzene.   Again, that's beyond
23   your area of expertise?
24        A.     Yes.
25        Q.     With respect to this Material
```

```
01                    JOHN MASAITIS
02    Safety Data Sheet in 1982, where it says
03    there may be a causal relationship with at
04    least one type of leukemia, do you know what
05    type of leukemia was being referenced in that
06    Material Safety Data Sheet?
07            A.    No.
08            Q.    I believe you testified earlier
09    that some time in the mid 1970s you were made
10    aware that benzene was a suspected carcinogen
11    and that there was -- there were members in
12    the scientific community who were looking
13    into that issue.  Do you recall that
14    testimony?
15            A.    Yes.
16            Q.    You've also made it clear
17    through your prior testimony that there were
18    other individuals on the other side of that
19    issue, that -- scientists who were good
20    people, who were looking at the issue who
21    believed that there wasn't sufficient
22    evidence to conclude that exposure to benzene
23    could cause cancer or leukemia.  True?
24            MR. DuPONT:  Objection to form.
25            THE WITNESS:  Correct.
```

# Masaitis, John

Rhyne Trial Master

```
01                    JOHN MASAITIS
02    BY MR. NEUER:
03            Q.     We looked at the Material
04    Safety Data Sheets that U.S. Steel put
05    together.  And it wasn't until 1982 that
06    there was a specific warning that indicated
07    that there could be an association.  We just
08    discussed that; correct?
09            A.     Yes.
10            Q.     If during the 1970s you or
11    others at U.S. Steel believed that there was
12    sufficient evidence in the scientific
13    community to have an association or created a
14    link between exposure to benzene and certain
15    types of cancer, would that have been
16    included in the Material Safety Data Sheet?
17                   MR. DuPONT:  Objection to form.
18                   THE WITNESS:  Yes.
19    BY MR. NEUER:
20            Q.     Certainly by 1982, United --
21    U.S. Steel and USS Chemicals came to the
22    conclusion that there was sufficient evidence
23    to include it in the Material Safety Data
24    Sheet.  True?
25            A.     Yes.
```

# Masaitis, John
Rhyne Trial Master

```
01                JOHN MASAITIS
02        Q.     And I believe you'd indicated
03   you're unaware of any earlier Material Safety
04   Data Sheet that would have given that
05   disclosure; correct?
06        A.     Yes.
07        Q.     Now, in your book of documents
08   that you prepared for your deposition, you
09   were given a letter that was written by the
10   State of Illinois to a company called
11   Handschy, that informed Handschy that benzene
12   was a suspected carcinogen.  Do you recall
13   seeing that letter?
14        A.     Yes.
15        Q.     That was one of the things that
16   was provided to you in preparation for your
17   deposition here today; correct?
18        A.     Yes.
19        Q.     Now, with respect to what
20   Handschy did in response to that letter, you
21   don't have any information about that because
22   you weren't given any of the depositions that
23   were taken of the corporate representative or
24   representatives of Handschy; correct?
25        A.     I think in the material there
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN MASAITIS
02   was a letter from Handschy back to the
03   Department of Illinois stating what they were
04   going to do.
05        Q.    With respect to anything else
06   that they would have done in terms of taking
07   benzene out of all of their products or some
08   of their products, you're unaware of that.
09   True?
10        A.    Yes.
11        Q.    Okay.  But what we have here in
12   terms of the evidence that's before you is,
13   we know that you were aware that benzene was
14   a suspected carcinogen in the mid-seventies.
15   And we know that Handschy was told that
16   benzene was a suspected carcinogen in
17   approximately 1967.  True?
18        A.    Yes.
19        Q.    But we also know, to be fair to
20   everyone, that the issue about whether or not
21   benzene was, in fact, a carcinogen that could
22   have caused certain types of leukemia was an
23   issue that was being debated through the mid
24   to late 1970s; correct?
25              MR. DuPONT:  Objection to form.
```

Transcript of Masaitis, John                    Saturday, August 15, 2020

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 177 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 662 of 1330

```
01                    JOHN MASAITIS

02                    THE WITNESS:  Yes.

03   BY MR. NEUER:

04         Q.    We've seen -- we've discussed

05   the fact that in 1977 OSHA had an emergency

06   standard that reduced the level at which --

07   people were allowed to be exposed to benzene

08   in the workplace.  We've talked about that,

09   have we not?

10         A.    Yes.

11         Q.    And that standard went from 10

12   parts per million down to one part per

13   million; correct?

14         A.    The emergency temporary

15   standard, yes.

16         Q.    And we also know through your

17   prior testimony that that standard was

18   actually challenged by certain trade

19   associations that took the position that the

20   evidence upon which OSHA made that decision

21   wasn't sufficient to actually change the

22   standard; correct?

23         A.    Correct.

24               MR. DuPONT:  Objection to form.

25   BY MR. NEUER:
```

```
01                    JOHN MASAITIS
02          Q.      That was the position that was
03    taken by some trade associations and other
04    scientists in the community; correct?
05          A.      Yes.
06                  MR. DuPONT:  Objection to form.
07    BY MR. NEUER:
08          Q.      Now, you know that there were
09    good people on both sides of that debate,
10    were there not?
11          A.      Yes.
12                  MR. DuPONT:  Objection to form.
13    BY MR. NEUER:
14          Q.      There was simply a disagreement
15    in the scientific community as to what the
16    state of the art was in the late 1970s.
17    True?
18                  MR. DuPONT:  Objection to form.
19                  THE WITNESS:  That's correct.
20    BY MR. NEUER:
21          Q.      As far as what -- you were
22    asked some questions about what information
23    was actually provided to OSHA in order to
24    have OSHA take its position that the standard
25    should be lowered.  Have you actually gone
```

```
01                    JOHN MASAITIS
02    back and looked at what epidemiological
03    studies, or what particular studies OSHA was
04    relying on when it changed the standard?
05         A.     No.
06         Q.     Because I believe you were
07    asked some questions about whether or not
08    that literature definitively established a
09    link between benzene exposure and development
10    of cancer or certain types of leukemia.  You
11    really don't know to what extent that
12    literature actually created a link or argued
13    that there was a link.   True?
14         A.     I don't recall.
15         Q.     Were you part of the team that
16    decided in 1982 to include a warning that
17    exposure to benzene could result in anemia or
18    at least one type of leukemia?
19         A.     I don't recall participating in
20    putting that Material Safety Data Sheet
21    together.
22         Q.     Who were the individuals within
23    U.S. Steel who made that decision, do you
24    know?
25         A.     I can't say for sure.  It could
```

```
01                    JOHN MASAITIS
02      have been a joint effort.
03            Q.     As you sit here today, do you
04      know that there is still a debate in the
05      medical and scientific community as to what
06      levels of exposure of benzene can actually
07      cause disease?
08                 MR. DuPONT:  Objection to form.
09                 THE WITNESS:  I haven't given it
10            much thought through the last couple
11            days.  I'm sure that there is some
12            debate.
13      BY MR. NEUER:
14            Q.     As you sit here today, do you
15      know that there is a debate as to whether or
16      not exposure to benzene can even cause
17      certain types of leukemia?  Do you know if
18      that debate currently exists?
19            A.     I'm not aware of it, no.
20            Q.     All right.  Sir, those are all
21      the questions I have.  I want to thank you
22      for your time.
23                 VIDEO TECHNICIAN:  The time is
24            1:37, we're now off the record.
25                          -  -  -
```

```
01              JOHN MASAITIS

02              (Discussion held off the

03       record.)

04                    -   -   -

05              VIDEO TECHNICIAN:  We're now

06       back on the record, the time is 1:38.

07  BY MR. REILLY:

08         Q.    Mr. Masaitis, Jim Riley for

09  Radiator Specialty Company.  And I want to

10  address probably three brief questions

11  pertaining to Exhibit 18, the safety data

12  sheet for raffinate.  My first question, am I

13  correct or not that U.S. Steel sold raffinate

14  to its customers in thousands of gallons?

15         A.    Yes.

16         Q.    Am I correct or not that

17  raffinate, in thousands of gallons, was

18  shipped to its customers by tank cars?

19         A.    Correct.

20         Q.    And pertaining again to the

21  Safety Data Sheet for raffinate, does that

22  Safety Data Sheet on page five talk about the

23  cleaning procedures for the tank cars for the

24  thousands of gallons of raffinate that would

25  have been shipped to its customers?
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02      A.    Yes.
03      Q.    That's all the questions I
04 have, sir.  Thank you very much.
05              VIDEO TECHNICIAN:  Off the
06        record.
07                  -  -  -
08        (Discussion held off the
09        record.)
10                  -  -  -
11              VIDEO TECHNICIAN:  We're now
12        back on the record.
13 BY MR. DuPONT:
14      Q.    Mr. Masaitis, Mr. Neuer asked
15 you questions regarding trade organizations
16 that -- or trade associations that fought
17 OSHA's determination in 1977 to list benzene
18 as a carcinogen and lower the permissible
19 exposure level.
20              MR. CAIRONE:  Object to the
21        form.
22 BY MR. DuPONT:
23      Q.    Do you recall that?
24              MR. CAIRONE:  Object to the
25        form. I don't think he ever said
```

Objection:
402;
form
and
relevance

MASAITIS, JOHN -
(DAVIS) VOL 1
**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

01          JOHN MASAITIS

02      fought.

03  BY MR. DuPONT:

04      Q.     They disputed OSHA's

05  determination.

06      A.     Yes, I recall that line of

07  questioning.

08      Q.     All right.  And he used the

09  words trade associations.  And, to be fair,

10  let's talk about who those trade associations

11  were.  They were the American Petroleum

12  Institute; correct?

13      A.     Well, actually they're referred

14  to as industrial associations.

15      Q.     Industrial associations; right?

16      A.     Yes.

17      Q.     The American Petroleum

18  Institute; correct?

19      A.     Yes.

20      Q.     The Manufacturing Chemists

21  Association; correct?

22      A.     Yes.

23      Q.     The American Iron and Steel

24  Industry; correct?

25      A.     No.

Objection: 402; form and r eleva nce - all desig nation s on this page



Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 184 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 669 of 1330

JOHN MASAITIS

Continuing objections



```
01                    JOHN MASAITIS
02        Q.      No?
03        A.      No.
04        Q.      Okay.  Well, we know at least
05   the Manufacturing Chemists Association and
06   the American Petroleum Institute.
07        A.      I was going to correct you
08   before.  It's the American Iron and Steel
09   Institute.
10        Q.      Institute.  Thank you for
11   correcting that, I appreciate it.  But you
12   know who I've been talking about; correct?
13        A.      (No response.)
14        Q.      Okay.  Sir, when I referred to
15   the American Iron and Steel Institute --
16   excuse me, when I referred to the American
17   Iron and Steel Industry, did you understand
18   that I was talking about the American Iron
19   and Steel Institute?
20        A.      I sort of figured you were.
21        Q.      Thank you.
22                All right.  So these were the
23   trade associations that were fighting and
24   disputing OSHA's determination to lower the
25   permissible exposure limit; the American
```

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Page 183

```
01              JOHN MASAITIS
02   Petroleum Institute and the Manufacturing
03   Chemists Association; correct?
04              MR. SYKES:  Object to the form.
05              THE WITNESS:  I -- the
06        organizations were participating in
07        the rule making process to establish
08        regulations pertaining to benzene.  I
09        don't think I would use the term
10        fighting it.
11   BY MR. DuPONT:
12        Q.    Okay.  All right.  These were
13   organizations that represented companies that
14   manufactured and sold benzene; correct?
15        A.    Yes.
16        Q.    And part of the issue in the
17   rule making process, as you're aware, was
18   that it was going to cost these companies
19   that made and sold benzene a significant
20   amount of money if the exposure levels were
21   lower than 10 to one part per million;
22   correct?
23        A.    It was going to cost them a
24   significant amount of money, but that wasn't
25   the only reason why they participated in the
```

Object
ion:
402;
releva
nce



MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01              JOHN MASAITIS
02  rule making and challenging the standard.
03      Q.      One of the issues was that it
04  was going to cost them a lot of money to
05  comply with the new standard; correct?
06      A.      Yes.
07      Q.      Now, U.S. Steel, United States
08  Steel Company, has dealt with issues in the
09  past, well before 1977, concerning the
10  classification of chemicals as carcinogens.
11  Is that correct?
12      A.      Can you repeat that?
13      Q.      Sure.  Has U.S. Steel, in fact,
14  prior to 1977, dealt with the issue of
15  classifying chemicals as carcinogens?
16              MR. CAIRONE:   Object to the
17          form.
18              THE WITNESS:  I would say it's
19          possible, but here again, as I sit
20          here today, thinking about dates and
21          what other procedures we were involved
22          in, I can't say for sure.  I just --
23          specific dates.
24  BY MR. DuPONT:
25      Q.      A few more questions.
```

Objection:
402;
relevance

$\zeta$

MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02         I hand you a document that was
03   produced to us in the course of discovery.
04   It's Bates Number USS 16982.  This is a
05   letter from the Director, Coal Chemicals
06   Sales Division at United States Steel Company
07   to Mr. E.C. Myers, the Assistant to the Vice
08   President, Industrial Relations of the United
09   States Steel Company.  Is that correct?
10         A.    Yes.
11         Q.    And this letter is dated
12   November 13th of 1952; is that correct?
13         A.    Yes.
14         Q.    And at this point in time, in
15   review of the records, there is an issue as
16   to whether coal tar should be classified as a
17   carcinogen; is that correct?
18         A.    Yes.
19         Q.    Now, in fact, the letter in the
20   first paragraph says, from the Director of
21   the Coal Chemical Sales Division to the
22   Assistant Vice President of Industrial
23   Relations at United States Steel Company, it
24   says, "In our conversation the other day we
25   discussed a letter to you from Tom Kinsella,
```

Objection: 402; relevance - all designations on this page



MASAITIS, JOHN - (DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN MASAITIS
02   president of Barrett, regarding the
03   industrial cancer hazard of coal tar and its
04   products."  Did I read that correctly?
05        A.    Yes.
06        Q.    Can you go to the last full
07   paragraph of this document and read the first
08   sentence of that paragraph into the record,
09   the one that starts with, "The public health
10   services."
11        A.    It says, "The public health
12   services requirements on the use and labeling
13   of benzol has had a direct effect on the sale
14   of this product."
15        Q.    And benzol is synonymous for
16   benzene, is it not?
17        A.    Yes.
18        Q.    Thank you.
19              -  -  -
20        MR. NEUER:  I forgot to ask him
21   something about the '71/'72 Material
22   Safety Data Sheet.
23        (Discussion held off the
24   record.)
25   BY MR. NEUER:
```

Continuing objections



MASAITIS, JOHN -
(DAVIS) VOL 1

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

```
01                    JOHN MASAITIS
02          Q.    Sir, you're looking at what's
03   been previously marked Exhibit 3 to your
04   deposition.  And this is the Material Safety
05   Data Sheet that you looked at earlier, that I
06   believe up in the lefthand corner is dated
07   1971.  Do you see that, sir?
08          A.    Yes.
09          Q.    I forgot to ask you about this.
10   Again, I'm the lawyer who represents T H
11   Agriculture and Nutrition.  Do you see that
12   this is a Material Safety Data Sheet that was
13   issued by USS Chemicals?
14          A.    Correct.
15          Q.    As the manufacturer of the
16   product that's identified as benzene, benzol.
17   Do you see that?
18          A.    Yes.
19          Q.    Do you see also that it has a
20   stamp on it that says, Thompson-Hayward
21   Chemical Company in the righthand corner?
22          A.    Yes.
23          Q.    And have you been made aware,
24   sir, through your preparation of this
25   deposition, that the Bates label number down
```

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 311-4   Filed 09/02/20   Page 190 of 197
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 675 of 1330

```
01                  JOHN MASAITIS
02    at the bottom of that exhibit says, HD
03    000649, and that's an indication that it was
04    actually filed in the files of Handschy?
05          A.      Correct.
06          Q.      It is correct that this is the
07    way the system was supposed to work.   A
08    manufacturer, if they provided a Material
09    Safety Data Sheet to a distributor, it was
10    expected the distributor would then forward
11    that Material Safety Data Sheet on to the end
12    user; correct?
13          A.      Yes.
14          Q.      So this is an indication that
15    the system worked as it was designed to work,
16    and that Thompson-Hayward Chemical Company
17    did what you would expect a reasonably
18    prudent distributor to do.   True?
19          A.      Yes.
20          Q.      Those are all the questions
21    that I have.   Thank you, sir.
22                        -   -   -
23                  MR. SYKES:  Mr. Masaitis will
24          reserve and exercise his right to
25          review the transcript.
```

# Masaitis, John

### Rhyne Trial Master

```
01              JOHN MASAITIS

02              VIDEO TECHNICIAN:  The time is

03        1:47.  This concludes today's

04        deposition.

05                   -   -   -

06              (Whereupon the document was

07        marked, for identification purposes,

08        as Masaitis Exhibit Number 19.)

09                   -   -   -

10              (Witness excused.)

11                   -   -   -

12              (Deposition concluded at 1:47

13        p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

```
01              JOHN MASAITIS
02           C E R T I F I C A T E
03
04   COMMONWEALTH OF PENNSYLVANIA:
05
06   COUNTY OF PHILADELPHIA:
07
08        I, Brigitte A. Strain, a Notary Public
09   within and for the County and State
10   aforesaid, do hereby certify that the
11   foregoing deposition of JOHN B. MASAITIS, was
12   taken before me, pursuant to notice, at the
13   time and place indicated; that said deponent
14   was by me duly sworn to tell the truth, the
15   whole truth, and nothing but the truth; that
16   the testimony of said deponent was correctly
17   recorded in machine shorthand by me and
18   thereafter transcribed under my supervision
19   with computer-aided transcription; that the
20   deposition is a true record of the testimony
21   given by the witness; and that I am neither
22   of counsel nor kin to any party in said
23   action, nor interested in the outcome
24   thereof.
25        WITNESS my hand and official seal this
26   26th day of November, 2010.
27
28
29
30        _____
31        Brigitte A. Strain, RPR, CLR
32        Notary Public
33
34
35
36
37
38
```

```
01                    JOHN MASAITIS
02                INSTRUCTIONS TO WITNESS
03
04         Please read your deposition over
05    carefully and make any necessary corrections.
06    You should state the reason in the
07    appropriate space on the errata sheet for any
08    corrections that are made.
09         After doing so, please sign the errata
10    sheet and date it.
11         You are signing same subject to the
12    changes you have noted on the errata sheet,
13    which will be attached to your deposition.
14         It is imperative that you return the
15    original errata sheet to the deposing
16    attorney within thirty (30) days of receipt
17    of the deposition transcript by you.  If you
18    fail to do so, the deposition transcript may
19    be deemed to be accurate and may be used in
20    court.
21
22
23
24
25
```

Page 192

```
01                    JOHN MASAITIS
02                    - - - - -
03              E  R  R  A  T  A
04                    - - - - -
05    PAGE    LINE      CHANGE
06    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
07    Reason for
08    Change:_____
09    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
10    Reason for
11    Change:_____
12    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
13    Reason for
14    Change:_____
15    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
16    Reason for
17    Change: _____
18    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
19    Reason for
20    Change: _____
21    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
22    Reason for
23    Change: _____
24    _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
25    Reason for
26    Change: _____
```

**Transcript of Masaitis, John**                    **Saturday, August 15, 2020**

Page 193

```
01                  JOHN MASAITIS

02

03         ACKNOWLEDGMENT OF DEPONENT

04              I, _____, do

05    hereby certify that I have read the foregoing

06    pages __ to ___ and that the same is a

07    correct transcription of the answers given by

08    me to the questions therein propounded,

09    except for the corrections or changes in form

10    or substance, if any, noted in the attached

11    Errata Sheet.

12

13    _____        _____

14    DATE                  SIGNATURE

15

16              Subscribed and sworn to before

17    me this

18    _____ day of _____, 2010.

19

20              My commission expires:

21              _____

22

23              _____

24              Notary Public

25    156757
```

Page 194

**Transcript of Masaitis, John**

**Saturday, August 15, 2020**

# Exhibit 5

# Transcript Report

---

## Masaitis, John

Plaintiffs objections in yellow

US Steel counter objections in green

**Transcript of Masaitis, John**

# Full Transcript Report

## Designation Legend

MASAITIS, JOHN P - (KREN) 12/21/11

Transcript of Masaitis, John

Page 1

```
01           IN THE COURT OF COMMON PLEAS
02      OF PHILADELPHIA COUNTY, PENNSYLVANIA
03              CIVIL DIVISION
04                 - - -
05 SONDRA KREM, Individually : SEPT. TERM, 2010
06 And as Executrix of the  :
07 Estate of JOSEPH KREM     : NO. 001913
08         Plaintiff         :
09                           :
10         vs.               :
11                           :
12 BP CORPORATION NORTH      :
13 AMERICA, INC., et al.,    :
14         Defendants.       :
15
16                 - - -
17           Wednesday, December 21, 2011
18                 - - -
19
20         Videotaped Deposition of JOHN P.
21 MASAITIS, taken at the Hilton Daytona Beach
22 Ocean Walk Village in the Executive Conference
23 Room B, 100 North Atlantic, Daytona Beach,
24 Florida, commencing at 9:17 a.m., before
25 Brigitte A. Strain, a  Federally Approved
26 Registered Professional Reporter and Notary
27 Public.
28
29                 - - -
30
31
32    VERITEXT NATIONAL COURT REPORTING COMPANY
33           MID-ATLANTIC REGION
34       1801 Market Street - Suite 1800
35       Philadelphia, Pennsylvania  19103
```

**Transcript of Masaitis, John**

```
01  A P P E A R A N C E S:
02
03      LOCKS LAW FIRM
04      BY:  ANDREW J. DuPONT, ESQUIRE
05      The Curtis Center, Suite 720E
06      601 Walnut Street
07      Philadelphia, Pennsylvania  19103
08      (215) 893-0100
09      Adupont@lockslaw.com
10      Representing the Plaintiff
11      (Florida)
12
13
14      CHRISTIE, PABARUE, MORTENSEN &
15      YOUNG, P.C.
16      BY:  JOHN C. FALLS, ESQUIRE
17      1880 John F. Kennedy Boulevard,
18      Tenth Floor
19      Philadelphia, Pennsylvania  19103
20      (215) 587-1655
21      Jcfalls@cpmy.com
22      Representing the Defendant, CRC
23      Industries, Inc., Pep Boys
24      (Via Mobile Depo)
25
26
27      COATS ROSE
28      BY:  JAMES M. RILEY, JR., ESQUIRE
29      3 Greenway Plaza, Suite 2000
30      Houston, Texas  77046
31      (713) 653-7375
32      Jriley@coatsrose.com
33      Representing Radiator Specialty
34      Company
35      (Florida)
36
37
38
39
40
41
```

**Transcript of Masaitis, John**

```
01  APPEARANCES (continued):
02
03      FORMAN PERRY WATKINS KRUTZ & TARDY
04      BY:  PHILLIP S. SYKES, ESQUIRE
05      City Centre, Suite 100
06      200 South Lamar Street
07      Jackson, Mississippi 39201-4099
08      (601) 969-7840
09      Psykes@fpwk.com
10      Representing the Defendant, United States
11      Steel Corporation and The Witness
12      (Florida)
13
14
15      FORMAN PERRY WATKINS KRUTZ & TARDY LLP
16      BY:  LEA ANN SMITH, ESQUIRE
17      City Centre, Suite 100
18      200 South Lamar Street
19      Jackson, Mississippi 39201-4099
20      (601) 973-5926
21      Lasmith@fpwk.com
22      Representing U.S. Steel Corporation
23      (Florida)
24
25      MARSHALL DENNEHEY, WARNER, COLEMAN
26      & GOGGIN
27      BY:  JENNIFER B. STEWART, ESQUIRE
28      1845 Walnut Street
29      Philadelphia, PA   19103
30      (215) 575-2600
31      Jbstewart@mdwcg.com
32      Representing The Berkebile Oil Company
33      (Via teleconference)
34
35
36
37
38
39
```

**Transcript of Masaitis, John**

Page 4

```
01   APPEARANCES (continued):
02
03        JONES CARR McGOLDRICK
04        BY:  CHRISTOPHER W. CARR, ESQUIRE
05        Mockingbird Station
06        5307 E. Mockingbird Lane
07        Suite 600
08        Dallas, Texas  75206
09        (214) 828-9200
10        Chris.Carr@JCMFirm.com
11        Representing the Defendant, Safety-Kleen
12        Systems, Inc.
13        (Florida)
14
15        MARON MARVEL BRADLEY & ANDERSON, P.A.
16        BY: CARRIE E. KEEHNER, ESQUIRE
17        1201 North Market Street, Suite 900
18        Wilmington, Delaware  19801
19        (302) 425-5177
20        CEK@maronmarvel.com
21        Representing the Defendants, BP
22        Corporation North America
23        and Atlantic-Richfield Company
24        (Via Teleconference)
25
26
27   A L S O   P R E S E N T :
28      Clay McMillan, Video Technician
29
30
31
32
33
34
35
36
37
```

**Transcript of Masaitis, John**

```
01              I N D E X
02              -  -  -
03
04 TESTIMONY OF:  JOHN P. MASAITIS
05
06 By Mr. DuPont....................11, 113
07 By Mr. Riley.....................98, 121
08 By Mr. Sykes....................104, 123
09
10              -  -  -
11
12              E X H I B I T S
13
14              -  -  -
15
16 EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED
17
18 Masaitis-1    Deposition Materials    11
19
20 Masaitis-2    Occupational Medicine
21              And Industrial Hygiene
22              USS 2884-2904        21
23
24 Masaitis-3    Minutes of Meeting
25              5/21/53 USS 16958-80    49
26 Masaitis-4    Letter, Cancer Mortality
27              USS 16956-57         54
28
29 Masaitis-5    Potential Toxic Gas Hazards
30              In Coal Chemical Operations
31              USS 16905-51         60
32
33 Masaitis-6    Alleged Benzoil Poisoning
34              Case USS 03891-96    67
35 Masaitis-7    Periodic Occupational
36              Examinations
37              USS 03902-912        71
38 Masaitis-8    Handbook of Organic
39              Industrial Solvents
40              USS 2905-2907        73
41
42
43
```

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01  EXHIBITS (continued):
02  EXHIBIT NUMBER   DESCRIPTION    PAGE MARKED
03
04  Masaitis-9     Dangerous Properties
05                 Of Industrial Materials 82
06  Masaitis-10    Industrial Toxicology
07                 USS 2911-2916          88
08
09  Masaitis-11    Safety Data Sheet for
10                 Raffinate USS 16-22    105
11  Masaitis-12    Letter from Souder
12                 USS 15                 111
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
```

**Transcript of Masaitis, John**

Page 7

```
01          DEPOSITION SUPPORT INDEX

02   INSTRUCTION NOT TO ANSWER:

03   Page Line

04   (None)

05

06   REQUEST FOR PRODUCTION OF DOCUMENTS:

07   Page Line

08   (None)

09

10   STIPULATIONS:

11

12   Page Line

13

14   10      14

15

16   QUESTIONS MARKED:

17   Page Line

18   (None)

19

20

21

22

23

24

25

26

27

28
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02              VIDEO TECHNICIAN:   We're going
03      on the record at 9:15 a.m. Eastern
04      time.  My name is Clay McMillan of
05      Veritext Reporting.
06              Today's date is Wednesday,
07      December the 21st, 2011.
08              This deposition is being held at
09      the Hilton Daytona Beach Ocean Walk
10      Village in the Executive Conference
11      Room B.  The address is 100 North
12      Atlantic Avenue, Daytona Beach,
13      Florida.
14              The caption of this case is
15      Sondra Krem, Executrix of the Estate
16      of Joseph Krem versus B.P. Corporation
17      North America, Inc., et al.  This case
18      has been filed in the Common Pleas
19      (sic) of Philadelphia County, Civil
20      Division, Docket Number 1913,
21      September Term of 2010.
22              The name of the witness this
23      morning is Mr. John Masaitis.
24              At this time would the attorneys
25      please identify yourselves for the
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02      record and the parties you represent,
03      after which our court reporter,
04      Brigitte Strain of Veritext Reporting,
05      will swear the witness in and we can
06      proceed.
07              MR. DuPONT:  This is Andrew
08      DuPont from the Locks Law Firm for the
09      Estate of Joseph Krem and Sondra Krem.
10              MR. SYKES:  Phillip Sykes for
11      United States Steel Corporation and
12      the witness.
13              MS. SMITH:  Lee Ann Smith,
14      United States Steel Corporation and
15      the witness.
16              MR. CARR:  Chris Carr for
17      Safety-Kleen.
18              MR. RILEY:  Jim Riley for
19      Radiator Specialty Company.
20              VIDEO TECHNICIAN:  And those
21      present on video conference or audio
22      conference?
23              MR. FALLS:  This is John Falls
24      in Philadelphia on behalf of CRC
25      Industries and also on behalf of Pep
```

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

01          JOHN P. MASAITIS

02     Boys.  We'll be doing a substitution

03     of attorneys within the next couple of

04     days for the representation of Pep

05     Boys.

06          MS. KEEHNER:  This is Carrie

07     Keehner for Atlantic Richfield

08     Company, BP Products North America,

09     Inc., and BP Corporation, North

10     America, Inc.

11          VIDEO TECHNICIAN:  Court

12     Reporter, would you please swear in

13     the witness.

14               -   -   -

15          (It is hereby stipulated and

16     agreed by and among counsel for the

17     respective parties that all

18     objections, except as to the form of

19     the question, be reserved until the

20     time of trial and that an objection by

21     one defendant inures to the benefit of

22     all defendants.)

23               -   -   -

24          JOHN P. MASAITIS, after having

25     been first duly sworn, was examined

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02         and testified as follows:
03                   -  -  -
04              EXAMINATION
05                   -  -  -
06  BY MR. DuPONT:
07         Q.    Good morning, Mr. Masaitis.
08         A.    Good morning.
09         Q.    My name is Andrew DuPont.  You
10  and I have actually met before at a prior
11  deposition.  We're here to take your
12  deposition in the case of Joseph Krem who
13  contracted and passed away from
14  myelodysplastic syndrome and acute
15  myelogenous leukemia.  Have you given a
16  deposition or testified in any other matter
17  since November of 2010?
18         A.    Not that I recall.
19         Q.    I understand that you have been
20  provided by your counsel with a series of
21  documents to review in preparation for your
22  deposition; is that correct?
23         A.    Yes.
24                   -  -  -
25              (Whereupon the document was
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC  Document 311-5  Filed 09/02/20  Page 14 of 132
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 696 of 1330

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02        marked, for identification purposes,
03        as Masaitis Exhibit Number 1.)
04                  -   -   -
05  BY MR. DuPONT:
06        Q.     I've been handed a list of
07  those documents that were provided to you
08  that has been marked as Exhibit Masaitis 1.
09  I would like to hand that to you and just ask
10  you to confirm if that, in fact, accurately
11  represents the documents that you reviewed
12  and prepared for your deposition?
13        A.     Yes.
14        Q.     Now, were those documents that
15  you requested U.S. Steel provide to you?
16        A.     No.   These were documents that
17  the attorneys representing U.S. Steel sent to
18  me to review in preparation.
19        Q.     And you understand that you're
20  testifying here today on behalf of U.S. Steel
21  Corporation?
22        A.     Yes.
23        Q.     And you have testified in the
24  past as a corporate representative of U.S.
25  Steel, also known as United States Steel
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  Corporation, on a number of occasions?
03          A.      Yes.
04          Q.      And you do that in a consulting
05  fashion?  In other words, you're no longer
06  employed by United States Steel Corporation,
07  you're paid on an hourly basis to testify for
08  United States Steel Corporation to provide
09  litigation support services?
10          A.      I act as a consultant for cases
11  of this type.  I do not charge for the time
12  that I spend testifying at a deposition or in
13  court, but I do charge for preparing for the
14  case.
15          Q.      And your charges for preparing
16  for the case, you last told me in
17  November 2010, I believe were $300 an hour?
18          A.      Yes.
19          Q.      Is that still the case or has
20  that changed?
21          A.      No, that's the case.
22          Q.      Several of the documents
23  included in the documents provided to you by
24  the lawyers for United States Steel are
25  transcripts of the deposition of Joseph Krem.
```

**Transcript of Masaitis, John**

```
01                 JOHN P. MASAITIS
02 Did you read those transcripts?
03       A.      Yes, I did.
04       Q.      Did you take any notes?
05       A.      Mental notes.
06       Q.      When did you receive the
07 documents that were sent to you by the
08 lawyers for United States Steel?
09       A.      I received the first group
10 three weeks ago, and then the second part
11 about a week, week and a half ago.
12       Q.      What was the first group?
13       A.      If I'm not mistaken, it was
14 this packet.  And also this packet.
15       Q.      Okay.  Let's see if we can
16 divide those up.  When you say the packet to
17 your righthand side --
18       A.      I believe these were the first
19 ones that were sent -- excuse me, three weeks
20 ago.  And this about a week, week and a half
21 ago, if I'm not mistaken.
22       Q.      All right.  So you're holding
23 what is a copy of your deposition in the
24 Ronald Davis case, dated November 9, 2010,
25 which I'm handing back to you.  And this
```

**Transcript of Masaitis, John**

01                    JOHN P. MASAITIS

02      document was sent to you about a week, week

03      and a half ago?

04           A.     Something like that, yes.

05           Q.     And then all the other

06      documents that are on your list were sent to

07      you about three weeks ago?

08           A.     Roughly.

09           Q.     Okay.  From your review of the

10      transcript of the deposition of Joseph Krem,

11      what is your understanding as to the products

12      -- the identity of the products that Mr. Krem

13      was exposed to?

14           A.     From the depositions he talked

15      about working with gasoline and various

16      materials used for cleaning brakes.  He

17      talked about working with penetrating oils

18      like Liquid Wrench.  Typically what you find

19      in a gas station of that type.

20           Q.     Sir, would you agree with me,

21      based on your review of the deposition, that

22      when Mr. Krem worked with the Liquid Wrench

23      product, at least from the early 1950s until

24      the 1978 time period, he would have been

25      exposed to benzene from using that product?

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02              MR. SYKES:  Object to the form
03         of the question.
04              MR. RILEY:  Same objection.
05              THE WITNESS:  If there was
06         benzene in the Liquid Wrench, I would
07         assume that when he sprayed a couple
08         of drops, as he described, from the
09         plunger type oil can that he put the
10         Liquid Wrench in, there was a minimum
11         exposure.
12  BY MR. DuPONT:
13         Q.    Well, you would agree with me
14  though that when using the Liquid Wrench
15  product Mr. Krem was exposed to benzene?
16         A.    As I described.
17              MR. SYKES:  Objection to the
18         form of the question.
19  BY MR. DuPONT:
20         Q.    And you would agree with me
21  also that when Mr. Krem used the Liquid
22  Wrench product, he would have been exposed to
23  benzene when the Liquid Wrench came into
24  contact with his skin; correct?
25              MR. SYKES:  Object to the form
```

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS

02       of the question.

03              MR. RILEY:  Object to the form.

04              THE WITNESS:  If you want to

05       assume that he got the Liquid Wrench

06       on his hand, yes.  But does he

07       describe that he administered the

08       Liquid Wrench from a plunger type oil

09       can which has a long spout on it?  I

10       don't think that he would get any on

11       his hand applying it with that type of

12       a device.

13  BY MR. DuPONT:

14       Q.     Did you say that --

15              MR. CARR:  May we have an

16       agreement that one defendant's

17       objection works for all.

18              MR. DuPONT:  Yes.

19              MR. CARR:  Thanks.

20  BY MR. DuPONT:

21       Q.     Nonetheless, if his skin did

22  come into contact with Liquid Wrench, Mr.

23  Krem would have been exposed to benzene from

24  the Liquid Wrench?

25              MR. SYKES:  Object to the form
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02      of the question.
03              MR. RILEY:  Same objection.
04              THE WITNESS:  There would have
05      been a minimum exposure.  But also in
06      his deposition he talked about
07      carrying around rags, I believe, in
08      his back pocket.  And that if he got
09      anything on his hands, he would wipe
10      them off immediately.
11 BY MR. DuPONT:
12      Q.    How much benzene was Mr. Krem
13 exposed to from working with Liquid Wrench,
14 do you know that specifically?
15      A.    No, I do not.
16      Q.    Did you test -- excuse me,
17 strike that.
18              Did you see testimony regarding
19 Mr. Krem's use of a product called
20 Safety-Kleen?
21      A.    Yes.
22      Q.    Do you know if there's benzene
23 in Safety-Kleen during the time periods that
24 Mr. Krem used the product?
25              MR. CARR:  Objection calls for
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02       speculation, lack of foundation.
03              THE WITNESS:  I have no idea if
04       there is or not.
05  BY MR. DuPONT:
06       Q.    Do you know if there was
07  benzene in any of the brake cleaning products
08  that Mr. Krem used during the time period
09  that he used them?
10              MR. FALLS:  Objection to form,
11       calls for speculation.  Lack of
12       foundation.
13              THE WITNESS:  I don't think in
14       his deposition there was any
15       description of the contents of any of
16       the materials that he worked with.  I
17       guess I have no reason from his
18       deposition to think that there was any
19       benzene in any of the brake cleaning
20       products.  There could have been, but
21       I have no reason to say there was or
22       there wasn't.
23  BY MR. DuPONT:
24       Q.    Okay.  Have you observed
25  automotive mechanics at work in the past?
```

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS
02        A.      Would you repeat that?
03        Q.      Sure.  Have you watched auto
04  mechanics work in a professional context in
05  the past?
06        A.      Yes, I have.  And I do quite a
07  bit of automotive work myself since I was
08  16 years old.
09        Q.      Have you been to any of the
10  work sites that Mr. Krem worked at?
11        A.      No, but I'm familiar with them.
12  I've driven by them, being from that area.
13        Q.      Did you go to any of those work
14  sites and look inside any of the buildings?
15        A.      No.
16        Q.      Have you spoken with any
17  doctors or industrial hygienists or
18  toxicologists that have been hired by United
19  States Steel in conjunction with this
20  litigation?
21        A.      No.
22        Q.      Do you, other than the
23  documents that you've brought to your
24  deposition here today, have any United States
25  Steel Corporation documents at your house?
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02        A.      I may have some.  I was
03  preparing for another case that was -- a
04  deposition that was to be taken in November.
05  I may still have that material there.  I may
06  have something, but as a rule I don't keep
07  it.
08        Q.      Other than materials that are
09  provided to you by United States Steel for
10  the purpose of preparing for depositions, do
11  you have any documents or other materials
12  that you maintain from the time you were
13  employed by United States Steel?
14        A.      No, I can't think of any.
15        Q.      I would like to talk to you
16  about some documents that have been provided
17  to us from United States Steel's records in
18  response to discovery requests we served in
19  this case, the first of which I'll mark as
20  Exhibit 2.  And, for the record, it's USS
21  2884 through 2904.
22                    -  -  -
23              (Whereupon the document was
24        marked, for identification purposes,
25        as Masaitis Exhibit Number 2.)
```

Obj:
802

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

01                  JOHN P. MASAITIS

02                    -   -   -

03   BY MR. DuPONT:

04        Q.      While you're looking through

05   this, am I correct that this is a 1948

06   publication, at least one chapter from the

07   publication of the book, "Occupational

08   Medicine and Industrial Hygiene" by

09   Rutherford T. Johnstone?

10        A.      Yes.

11        Q.      And this would have been a

12   document that was kept in United States

13   Steel's medical or industrial hygiene

14   records?

15        A.      I've never seen this document

16   before and I'm not familiar with it.  Maybe

17   the medical doctors, they may have subscribed

18   to it or had it in their library.  But we

19   didn't in industrial hygiene, that I recall.

20        Q.      Are you familiar with this

21   publication being a standard in Occupational

22   Medicine and Industrial Hygiene publication?

23        A.      No.  No, I'm not.

24        Q.      Sir, you'd agree with me that

25   individuals working with a product that



Obj:
802
602
All lines
on page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  contains benzene should have been advised
03  that the product contained benzene, am I
04  correct?
05       A.     It's always been our practice
06  to provide as much information to the people
07  we were selling material to as we thought
08  would be beneficial to them.  If we sold
09  material that was toxic, to the extent that
10  it could cause severe or occupational
11  disease, we typically let our customers know
12  that.
13       Q.     Benzene, in fact, was a toxic
14  chemical, there's no question about that?
15       A.     Yes.
16       Q.     And that's something that was
17  known by U.S. Steel since the early 1950s and
18  even before?
19       A.     Yes.  And I believe that we
20  advised our customers that materials
21  contained benzene.
22       Q.     And you would agree with me
23  that the individual working in a mechanic
24  shop, such as Mr. Krem, should have been
25  advised not only that benzene was in a
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02  product, but that the product could,
03  therefore, cause an individual severe harm to
04  their health; correct?
05              MR. FALLS:  Objection to form.
06              MR. RILEY:  Object to form.
07              MR. SYKES:  Object to form.
08              THE WITNESS:  Well, I believed
09       that could be answered several ways.
10       I mean, I believe so far as the
11       products that we're talking about in
12       this case, the Federal Hazardous
13       Substance Labeling Act controlled
14       pretty much what had to be put on the
15       containers of materials like Liquid
16       Wrench.
17              MR. DuPONT:  Objection, move to
18       strike.
19  BY MR. DuPONT:
20       Q.     Sir, would you agree with me,
21  based on United States Steel's knowledge,
22  that benzene was a toxic substance capable of
23  causing severe occupational illnesses, that
24  users of a product containing benzene should
25  have been warned that the product contained
```

611, non-responsive

**Transcript of Masaitis, John**

# Masaitis, John
### Rhyne Trial Master

```
01            JOHN P. MASAITIS
02 benzene and that the product could cause     611, non-responsive
03 severe occupational illness?
04           MR. FALLS:  Object to the form
05      of the question.
06           MR. SYKES:  Objection to the
07      form of the question.
08           MR. RILEY:  Objection to form
09      and foundation.
10           THE WITNESS:  I believe that the   611, non-responsive
11      manufacturer has responsibility to       403, waste of time
12      inform customers what the contents of
13      the material that the solvent is
14      comprised of, but I also believe that
15      the consequences of exposure to the
16      same material is due to the particular
17      dose that an individual receives.  In
18      other words, you could work with a
19      material your entire work life and not
20      contract any occupational disease from
21      it utilizing the proper control
22      measures.  So it's all based upon the
23      dose that an individual receives and
24      the control.
25           In many situations, you can't
```

Transcript of Masaitis, John

01                    JOHN P. MASAITIS

02          anticipate how a material is going to

03          be used by each and every individual.

04  BY MR. DuPONT:

05          Q.    And if you can't anticipate how

06  a material is going to be used by an

07  individual, isn't it just better to take out

08  the hazard that could cause one?

09          A.    Well, I think benzene is

10  probably one of the top ten materials --

11  chemicals utilized in the world today.  If we

12  took benzene out of all materials that it's

13  contained in, our society would be vastly

14  different.

15          Q.    So you're not saying that

16  benzene is one of the top ten materials used

17  in workplaces like mechanic shops or by

18  painters today, are you?

19          A.    I'm saying that benzene is one

20  of the top ten materials used throughout the

21  world.  Where specifically it's used, it's

22  used in various areas.  Plastics, rubber,

23  dyes, pesticides.

24          Q.    In manufacturing facilities to

25  make other products; correct?

611, non-responsive
403, waste of time

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02        A.      In manufacturing facilities and
03  also products that get to the consumer.
04        Q.      Are you saying that benzene is
05  one of the top ten products used by end
06  consumers today?
07              MR. SYKES:  Objection to the
08          form of the question.
09              THE WITNESS:  I'm not saying
10          that.  I'm saying that benzene is used
11          to produce a lot of materials that are
12          in our society today and is one of the
13          top ten materials produced in the
14          world today.  So that there are many,
15          many materials that we would be doing
16          without if benzene was not permitted
17          to be manufactured or taken out of the
18          manufacturing process.
19  BY MR. DuPONT:
20        Q.      And benzene, in those uses, is
21  being used in chemical plants, refineries and
22  locations where there are strict controls as
23  to how benzene is contained and transported
24  and used so as to avoid people being exposed
25  to it; correct?
```

611, non-responsive

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02      A.      Well, every employer, you know,
03 should have strict controls for the people
04 working for them so that they're not exposed
05 to concentrations of material in excess of
06 the permitted occupational exposure levels,
07 such as those promulgated by OSHA or, before
08 that, the threshold limit values of the
09 American Conference of Governmental
10 Industrial Hygienists.  That's every
11 employer's responsibility.
12      Q.      Sir, my question to you:  When
13 you're talking about how benzene is used
14 today, what you're referring to is benzene
15 used as a B-stock chemical in highly
16 controlled sophisticated operations to
17 manufacture and produce other chemicals;
18 correct?
19      A.      Well, I, you know, I'm not
20 familiar with each and every process where
21 it's used.  And, you know, as I've said,
22 benzene is a toxic material.  And to minimize
23 exposure, since it has a very low permissible
24 exposure level, you have to have very rigid
25 control measures.
```

611, non-responsive
704, ultimate issue
402/403 relevance

**Transcript of Masaitis, John**

01             JOHN P. MASAITIS

02        Q.      Sir, would you agree with me

03   that an individual should have the right to

04   choose whether or not they want to work with

05   a product that has a highly toxic material in

06   it?

07        A.      Right to choose.  In other

08   words, I think, if you want to stay with the

09   Liquid Wrench, I mean, if they choose to

10   purchase the Liquid Wrench, they're making

11   that decision.  If they choose to purchase a

12   brake cleaner, they're making that decision.

13   And the labels on the container, as I said,

14   are regulated by the Federal Hazardous

15   Substance Material Labeling Act.

16        Q.      Sir, that wasn't my question.

17   My question was:  Does an individual worker

18   in the workplace have the right to be able to

19   have, (a), the information to determine

20   whether or not a product contains a toxic

21   substance, and then, (b), decide whether or

22   not they want to work with that product based

23   on the information that they've been given

24   regarding the toxicity of that product?

25        A.      Yes, I think they have that

611, non-responsive

704, ultimate issue
judge determines
the law that applies

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 32 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 714 of 1330

Page 30

```
01              JOHN P. MASAITIS
02  right.
03        Q.    And if you don't advise a
04  person that a product contains a toxic
05  substance like benzene, then that person
06  can't make the decision whether or not they
07  want to use or not use the product because of
08  its toxic content?
09              MR. CARR:  Objection.
10              MR. SYKES:  Objection to the
11        form.
12              MR. RILEY:  I object to the
13        form.
14              THE WITNESS:  The employee
15        should be made aware of, excuse me,
16        the materials that he's working with.
17        And he should be educated on those
18        materials so that he has adequate
19        knowledge of his part in controlling
20        his exposures.  His part in utilizing
21        the control measures that are
22        available, or his part of adequately
23        wearing a respirator.  That sort of
24        thing.  So, yes, it's necessary.
25              MR. DuPONT:  Object and move to
```

611, non-responsive

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01            JOHN P. MASAITIS
02       strike.
03 BY MR. DuPONT:
04       Q.     My question, sir, is, in order
05 for a person to make an informed decision
06 about whether they want to use a product that
07 contains a toxic substance, you have to first
08 tell that person that the product, (a),
09 contains a toxic substance and, (b), what the
10 toxicity of the products are; correct?
11            MR. CARR:  Objection.
12            MR. SYKES:  Objection.
13            MR. RILEY:  Objection.
14            THE WITNESS:  Well, yes, but in
15       industrial hygiene, for all intents
16       and purposes, we look at all materials
17       as being toxic.  It's all based upon
18       dose.
19 BY MR. DuPONT:
20       Q.     All right.  You're not saying
21 that all materials are toxic more than
22 benzene, are you?
23       A.     I'm not saying they're more
24 toxic than benzene.
25       Q.     They're not as toxic as
```

611, non-responsive

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  benzene; correct?
03      A.    I'm not saying that.  Some are,
04  some are not.  But all materials from an
05  industrial hygiene point of view to some
06  degree, depending upon the dose -- it's all
07  dose dependent -- are toxic.
08      Q.    And not all materials cause
09  cancer, do they?
10      A.    Not all materials, no.
11      Q.    Benzene does cause cancer,
12  doesn't it?
13      A.    Benzene is a known human
14  carcinogen, yes.
15      Q.    Mr. Masaitis, did U.S. Steel
16  refine or otherwise make kerosene?
17      A.    Not to my knowledge, no.
18      Q.    If you were working in the
19  1970s at U.S. Steel, and you wanted to advise
20  somebody to use a solvent other than benzene
21  for purposes of cleaning materials or general
22  use as a solvent, what would you advise them
23  to use?
24            MR. SYKES:  Object to the form
25      of the question.
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02              THE WITNESS:  What would we
03    advise our people?
04  BY MR. DuPONT:
05        Q.     Sure.
06              MR. SYKES:  Andrew, I think that
07    might be outside the scope of the
08    Notice.  That calls for speculation
09    and I don't see how that's relevant to
10    what U.S. Steel's activity was in this
11    case, selling Raffinate to Radiator.
12              THE WITNESS:  Typically what we
13    would do is, we would provide the
14    material to the worker based upon the
15    -- our knowledge as occupational
16    health professionals that this is the
17    least toxic of the materials possible
18    to do the job that they were doing.
19    And also instruct the employee through
20    safe job procedures as to how to
21    adequately use it.
22              So it -- here again, I think
23    that the employer makes the decision
24    and informs the employee.  And if the
25    employee really objects to it, well,
```

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02      I, you know, I don't know what can be
03      done at that point.
04 BY MR. DuPONT:
05      Q.    Maybe my question wasn't clear.
06            What I'm asking, sir, is:  If
07 an employee of U.S. Steel came to you in the
08 1960s and the 1970s -- I'll change the
09 question a little bit.  If an employee of
10 U.S. Steel came to you in the 1960s and 1970s
11 and said, I'm using benzene as a solvent, I'm
12 using a solvent that contains five percent
13 benzene in it, is there a safer solvent that
14 I should be using?  Is there a different
15 solvent that I should be using?  What other
16 solvent would you recommend to them?
17            MR. RILEY:  Object to form.
18            MR. SYKES:  Objection to the
19      form of the question.  Calls for
20      speculation.  Outside the scope of the
21      Notice.
22            THE WITNESS:  First -- the first
23      thing we would do is, we would
24      evaluate the specific material.  In
25      other words, determine what the
```

Obj:
Form



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01            JOHN P. MASAITIS
02    composition of the material was.  And
03    if indeed it did contain benzene, what
04    was the percentage of benzene in the
05    product.
06            Then we would do a worker
07    exposure evaluation.  We would spend
08    two or three days working with that
09    employee to find out what his exact
10    exposure was and compare it to the
11    criteria at the time that was
12    available to minimize any potential
13    for the occupational -- the worker
14    contracting an occupational disease.
15    If his exposure was outside of what
16    would be acceptable, we would look for
17    a suitable substitute.  We would look
18    for the controls that could minimize
19    his exposure.  We probably would
20    provide him with a respirator that
21    would reduce his exposure in the
22    interim until additional control
23    measures were put in.
24            Here again, this is all assuming
25    that his exposure was necessary.  But
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02       you can work with any material and not
03       really contract an excessive exposure.
04 BY MR. DuPONT:
05       Q.    What solvent would you provide
06 to that worker, other than the one that
07 contained five percent benzene?
08       A.    If --
09             MR. SYKES:  Object to the form
10       of the question.
11             THE WITNESS:  If there was a
12       suitable solvent available, then we
13       would choose one that was -- had the
14       lowest known toxicity.
15 BY MR. DuPONT:
16       Q.    What are some examples?
17       A.    Well, what are some examples of
18 how it's being used?
19       Q.    Solvents to clean parts.
20       A.    Solvents to clean parts?
21       Q.    Yes.
22       A.    Okay.  Well, I don't think that
23 it would be a recommended practice to use
24 benzene to clean parts.  You're talking about
25 things like automotive motors and
```

Obj:
Form

Conti
nuing
Objec
tion

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01          JOHN P. MASAITIS
02  transmissions and -- or industrial pumps and
03  motors or gear boxes.  We certainly wouldn't
04  recommend using benzene for that, no.
05          Q.    What solvent would you
06  recommend somebody to use in place of one
07  that contains five percent benzene?
08              MR. SYKES:  Object to the form
09          of the question.
10              THE WITNESS:  One that had a
11          lower toxicity.  One that was not as
12          flammable.  Maybe a petroleum naphtha
13          or a spotted solvent, or something
14          like that.
15  BY MR. DuPONT:
16          Q.    What about for use as a rust
17  manager, what solvent would you recommend
18  other than the solvent containing five
19  percent benzene for use as a rust manager?
20          A.    Well, I'm not in the business
21  of manufacturing, you know, rust penetrants.
22  So I wouldn't know.  I would, you know, go to
23  someone who was knowledgeable regarding the,
24  you know, what you wanted the product to do.
25  I wouldn't recommend another product.
```

Obj:
Form

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

01                    JOHN P. MASAITIS

02        Q.        Is there anything special about

03  benzene when it comes to rust penetration?  I

04  mean does it do anything that any other

05  solvent can't do?  Is benzene the only

06  solvent that can be used as a rust manager?

07        A.        I'm not aware of what can or

08  cannot be used.  As I said, I'm not in the

09  business of manufacturing materials that are

10  rust penetrants.

602, foundation
402, relevance

11        Q.        If you could look through

12  Exhibit 1 that's -- oh, let me come back to

13  that.

14                  You've given your example of

15  what you would do in response to someone

16  coming to you about how -- how a particular

17  solvent containing five percent benzene was

18  used and recommending an alternative solvent.

19  Conducting air monitoring or exposure

20  assessment in order to determine how long of

21  an exposure that individual had.  What would

22  you do in a situation where an individual

23  came to you regarding the use of a solvent

24  containing benzene and you didn't have any

25  information regarding how much exposure was

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  caused by use of the product?
03              MR. SYKES:  Object to the form
04     of the question.
05              THE WITNESS:  What would I do?
06  BY MR. DuPONT:
07        Q.    Right.  Would you, under that
08  circumstance, recommend a different type of
09  solvent to use if you weren't knowledgeable
10  about how much benzene exposure was caused by
11  use of that solvent?
12              MR. SYKES:  Object to the form
13     of the question.
14              THE WITNESS:  I would become
15     knowledgeable regarding his exposure.
16     Because that's what industrial hygiene
17     is, it's all about worker exposure.
18     And, you know, we have to know what
19     the worker's exposure is.  And we have
20     the equipment to make that
21     determination.  So that's what we do.
22     If there's any question regarding
23     exposure, the first thing we do is, we
24     go out, we observe the operation.
25     What's the potential for exposure.
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02        What control measures are in place.
03        What's the duration of the exposure.
04        Is it something that he just does for,
05        you know, two or three minutes a day
06        or is it something that he does for
07        hours a day every day.  So there's an
08        awful lot involved in doing a worker
09        exposure evaluation.  And then you
10        collect samples to quantify his
11        exposure.  And then you can talk
12        intelligently about what needs to be
13        done.  If his exposure is excessive,
14        the first thing you typically do is
15        see if there's a suitable substitute.
16        If there are, then you recommend that
17        to the operating people.  If there's
18        not a suitable substitute, then you
19        look at the control measures that are
20        in place and how they can be enhanced
21        or additional control measures put in.
22        In the interim you use personal
23        protective equipment, if necessary.
24  BY MR. DuPONT:
25        Q.    As a United States Steel
```

**Transcript of Masaitis, John**

01                    JOHN P. MASAITIS

02  industrial hygienist, do you make informed

03  decisions without having to quantify data

04  about how much exposure a person had of

05  benzene?

06        A.      Well if you see someone dumping

07  a 55 gallon drum of material on the floor,

08  and it's a highly volatile material, you know

09  the potential is very high.  So you don't

10  have to take samples under, you know,

11  circumstances such as that.

12        Q.      Sure.  Circumstances such as

13  that, which are somewhat out of the ordinary.

14  But without having that type of circumstance,

15  can you make an informed decision as to

16  whether the product is causing a hazard,

17  without actually monitoring and getting

18  quantified data about the exposures?

19        A.      Well, a lot of times when we

20  would go out in the workplace, in addition to

21  taking the breathing zone samples, we would

22  spend typically, you know, seven, eight hours

23  with the individuals, observing his work

24  practices.  And in that process we would be

25  talking to the employee about maybe something

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  that we saw that was increasing his exposure,
03  something he can do to minimize it.  So
04  they're the type of things that typically
05  we'd do.
06          Q.    Okay.  And, in addition to
07  that, you'd also take air monitoring to see
08  how much benzene exposure was actually being
09  caused?
10          A.    Exactly.
11          Q.    Did U.S. Steel ever do that for
12  anybody working with Liquid Wrench during the
13  1960s, 1970s?
14          A.    Not that I recall.
15          Q.    Is U.S. Steel aware of whether
16  Radiator Specialty Company ever went to a
17  work site and conducted air monitoring for
18  individuals using the Liquid Wrench product
19  during the 1960s and 1970s?
20          A.    I would have no way of knowing.
21          Q.    Would you turn to Exhibit
22  Number 2, please, on the second page of the
23  exhibit, which is USS 2886?
24          A.    Would it be in this packet?
25          Q.    Yes, sir.
```

**Transcript of Masaitis, John**

Page 43

01              JOHN P. MASAITIS

02      A.      2886.

03      Q.      Correct.

04      A.      All right.

05      Q.      The document we're looking at

06 here again is the Occupational Medicine and

07 Industrial Hygiene Textbook by Rutherford P.

08 Johnstone from 1948.  And we're looking here

09 at Chapter 17, the aromatic hydrocarbon.  And

10 benzene obviously is an aromatic hydrocarbon;

11 correct?

12      A.      Yes.

13      Q.      In 1948, what this doctor is

14 writing, at the second paragraph, can you

15 read into the record what that says?

16      A.      "While the use of benzol in

17 industry has been considerably reduced in

18 recent years, the incidence of benzol

19 poisoning is still fairly frequent.  Too

20 often is benzol hidden under a trade name or

21 is carelessly substituted for less toxic

22 solvents."

23      Q.      Benzol is a synonym or the same

24 word for benzene; correct?

25      A.      Yes.

Obj:
802
602
All
Lines
on
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 46 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 728 of 1330

# Masaitis, John
### Rhyne Trial Master

```
01              JOHN P. MASAITIS
02      Q.    And what this doctor is
03 indicating is, as of 1948, there is a
04 reduction in the use of benzene or benzol in
05 the industry; correct?
06      A.    Well, he's making a statement
07 here that it has been considerably reduced in
08 recent years.  But I -- that's what he's
09 saying.  I have no way of knowing whether or
10 not it's true or not.
11      Q.    And he's indicating that there
12 have been incidences of benzol poisoning from
13 use of benzene; correct?
14      A.    Yes.
15      Q.    Do you know what benzol
16 poisoning is?
17      A.    In 1948, you know, he's
18 probably talking about blood diseases, such
19 as anemia.
20      Q.    Aplastic anemia as well?
21      A.    I -- anemia.  The difference --
22 differentiating amongst the anemias is not my
23 business.
24      Q.    Do you know what aplastic
25 anemia is?
```



Obj:
802
602
All
Lines
on
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01                    JOHN P. MASAITIS
02        A.       I don't care to describe my
03   knowledge of it because I'm not a medical
04   person.
05        Q.       Well, I'm asking, do you know
06   what is?
07        A.       Not enough to medically
08   describe it, no.
09        Q.       Okay.  Do you know exactly how
10   benzene causes aplastic anemia?
11        A.       No.
12        Q.       Do you know how much benzene
13   exposure causes aplastic anemia?
14        A.       I know what the permissible
15   exposure levels have been through the years
16   for exposure to benzene to prevent
17   occupational diseases.  That's the area of
18   interest to industrial hygienists.
19        Q.       But do you know exactly how
20   much benzene exposure causes aplastic anemia?
21             MR. SYKES:  Object to the form
22        of the question.
23             THE WITNESS:  You know, are we
24        talking in 1948 or are we talking
25        today or let me -- because the
```

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02       knowledge has increased through the
03       years as time has gone by.  It's been
04       determined that concentrations to
05       cause the diseases related to benzene
06       are lower.
07  BY MR. DuPONT:
08       Q.     The doctor continues to write,
09  "Too often is benzol hidden under a trade
10  name."
11       A.     Uh-huh.
12       Q.     You would agree with me that
13  it's a problem to sell a product with benzene
14  in it under a different name so that somebody
15  doesn't know there is benzene in the product;
16  correct?
17            MR. FALLS:  Objection to form.
18            THE WITNESS:  If you do that to
19       mask benzene in a product, yes, that's
20       grossly wrong.
21  BY MR. DuPONT:
22       Q.     And he -- the doctor goes on to
23  describe, it is careless to substitute
24  benzene for a less toxic solvent.  Do you
25  agree with that?
```

<div style="float:right">

Obj:
802
602
Lines
8-11



Obj:
802
602
Lines
22-25



</div>

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01          JOHN P. MASAITIS
02      A.      If there is a suitable
03  substitute that is less toxic, yes.  But
04  there may be a process where there isn't a
05  known suitable substitute, then you would --
06  if you have to make the product, then you use
07  control measures.
08      Q.      But you'd agree that if there
09  is a known solvent that's a substitute and
10  less toxic, it would be careless to continue
11  to use a solvent with benzene in it; correct?
12              MR. RILEY:  Objection to form.
13              MR. SYKES:  Object to form.
14              THE WITNESS:  We always in
15          industrial hygiene recommend using the
16          most suitable substitute that is less
17          toxic, yes.
18  BY MR. DuPONT:
19      Q.      If you continue down the page
20  to the fifth paragraph, it starts with the
21  words, chronic benzol poisoning.  Could you
22  read that into the record, please?
23      A.      "Chronic benzol poisoning
24  usually proceeds (sic) severe degrees of
25  injury to the blood forming organs and often
```

Continuing Objection Lines 1-7

Obj: 802 602 Lines 19-25

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 48

Obj:
802
602
Lines
1-21



```
01              JOHN P. MASAITIS
02   proves fatal.  The blood picture is bizarre
03   and inconstant."
04        Q.    I believe you said, usually
05   proceeds.  Does it correctly read, "Chronic
06   benzol poisoning usually produces severe
07   degrees of injury to the blood forming organs
08   and often proves fatal"; is that correct?
09        A.    Yes.
10        Q.    This information, you would
11   agree, was available to United States Steel
12   as of 1948, when this document was published;
13   correct?
14             MR. SYKES:  Object to the form
15        of the question.
16             THE WITNESS:  Occupational
17        Medicine and Industrial Hygiene was
18        probably, you know, put out in the
19        occupational health community in one
20        form or another.  So I guess you would
21        say that it was available.
22   BY MR. DuPONT:
23        Q.    Have you seen documents from
24   U.S. Steel that the company became involved
25   with the Kettering Laboratories in the early
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 51 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 733 of 1330

01                    JOHN P. MASAITIS

02  1950s, about 1953, in order to conduct

03  research as to how chemicals such as benzene

04  cause cancer?

05          A.      In the 1950s, did you say?

06          Q.      Correct, I believe around 1953.

07          A.      No. That precedes my time.  I

08  know there was a period where we had

09  discussions with Kettering Laboratories, but

10  I'm not aware of what went on in '53.

11          Q.      Let me hand you a document and

12  see if you've seen it before, and see if it

13  can help us talk about this issue.

14                  Mr. Masaitis, this is

15  Exhibit 3.  I've got a copy here for your

16  counsel.

17                        -   -   -

18                  (Whereupon the document was

19          marked, for identification purposes,

20          as Masaitis Exhibit Number 3.)

21                        -   -   -

22  BY MR. DuPONT:

23          Q.      And this document bears the

24  Bates Number USS 16958 through 980 -- excuse

25  me.  -- 16981, which would indicate that this

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  is a document that came from U.S. Steel's
03  records; correct?
04       A.    I imagine.
05             MR. CARR:  Andrew, are these
06       documents exhibits to this deposition?
07             MR. DuPONT:  Yes.
08  BY MR. DuPONT:
09       Q.    Have you ever seen this
10  document before?
11       A.    Not that I recall.  I may have,
12  but I don't recall seeing it before.
13       Q.    The title of the document is
14  Minutes of a Meeting held at Kettering
15  Laboratory, Medical College, University of
16  Cincinnati, Cincinnati, Ohio, on Thursday,
17  April 30, 1953 for the Preliminary
18  Organization of Cooperative Research Work on
19  Carcinogenic Properties of Coal Tar and its
20  Components.  Is that correct?
21       A.    Yes, it is.
22       Q.    And if you turn to the page
23  that is Bates numbered 16962.  This provides
24  an indication of the representatives of
25  companies that either attended or showed
```

**Transcript of Masaitis, John**

```
01                  JOHN P. MASAITIS
02   interest in the proposed research program on
03   the cancer hazards associated with coal tars?
04        A.     Yes.
05        Q.     And one of the individuals
06   listed there is a Mr. K. Morsc, M-O-R-S-C,
07   from U.S. Steel Corporation.  Do you see
08   that?
09        A.     Yes.
10        Q.     Are you familiar with Mr.
11   Morsc?
12        A.     He hired me.
13        Q.     What was his title for U.S.
14   Steel?
15        A.     He was the director of
16   industrial hygiene.
17        Q.     Okay.  And from reading this
18   document we can tell that U.S. Steel was
19   becoming involved with a research project
20   regarding how properties of coal, tar and its
21   components cause cancer?
22             MR. SYKES:  Object to the form
23        of the question.
24             THE WITNESS:  I haven't read the
25        full document.  If -- as I really
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02        don't know what the purpose of the
03        meeting was or what was discussed.
04  BY MR. DuPONT:
05        Q.     All right.
06               Let's go back to the first
07  page, if you don't mind.  First of all, are
08  you familiar with the Kettering Laboratory?
09        A.     Yes.
10        Q.     What's your understanding of
11  what the Kettering Laboratory was?
12        A.     It's a laboratory, occupational
13  health oriented, at the University of
14  Cincinnati.  NIOSH works pretty closely with
15  Kettering.  I have been there a couple of
16  times, as other members of our staff have for
17  different purposes.
18        Q.     Are you aware that the American
19  Petroleum Institute has also participated in
20  research conducted at the Kettering Institute
21  -- excuse me, Kettering Laboratory?
22        A.     No.
23        Q.     U.S. Steel was a member of the
24  Manufacturing Chemists Association; is that
25  correct?
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02        A.     I believe they were different
03  times.  I'm -- I would think that it's
04  probably safe to say they were, although I'm
05  not positive, not having a list of the
06  organizations they belonged to over the times
07  in front of me.
08        Q.     Do you know when U.S. Steel
09  first became a member of the Manufacturing
10  Chemists Association?
11        A.     No.
12        Q.     Is benzene a component of coal
13  tar?
14        A.     There could be some residual
15  amount of benzene in coal tar.  It's possible
16  I would think.
17        Q.     Did you also work under an E.E.
18  Moore?  Are you familiar with that name?
19        A.     I'm familiar with the name
20  vaguely, but he was never in our area of
21  responsibility.
22        Q.     Who was -- what does the E.E.
23  stand for in E.E. Moore?
24        A.     I have no idea.
25        Q.     I'm going to hand you another
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  document that's been marked as Exhibit 4.  I
03  have a copy here for your counsel.
04                  -  -  -
05              (Whereupon the document was
06          marked, for identification purposes,
07          as Masaitis Exhibit Number 4.)
08                  -  -  -
09  BY MR. DuPONT:
10          Q.      This document is Bates numbered
11  USS 16956 through 957.  And this appears to
12  be a correspondence from Kenneth Morsc, who I
13  believe is the individual who hired you at
14  U.S. Steel?
15          A.      Uh-huh.
16          Q.      And it's directed to E.E.
17  Moore.  It indicates on here that E.E. Moore
18  was the vice president of industrial
19  relations.
20          A.      Okay.
21          Q.      What was the industrial
22  relations department at United States Steel
23  Corporation?
24          A.      That was the -- you might say
25  the parent department that included
```

Obj:
402
403
Lines
10-25

Page 55

Obj:
402
403
All lines
on page

```
01              JOHN P. MASAITIS
02  occupational medicine, industrial hygiene,
03  safety.  In other words, the directors of the
04  medical program, the safety program,
05  industrial hygiene program, we reported to
06  the vice president of industrial relations.
07  And it's changed through the years.  But
08  could have been at this time that's the way
09  it was set up.
10         Q.     Could you remind me of the year
11  you were first hired at United States Steel
12  Corporation?
13         A.     '64.
14         Q.     In this correspondence from Mr.
15  Morsc to Mr. Moore, which, by the way, is
16  dated May 20, 1953; correct?
17         A.     Yes.
18         Q.     Mr. Morsc is providing to Mr.
19  Moore a preliminary study of cancer
20  mortality, which Mr. Morsc apparently
21  discussed with Mr. Moore the day before?
22         A.     Well, I have to read the --
23  read it, you know, if you're asking me
24  questions about it.
25         Q.     Sure.  Please take your time
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS
02   and read it.
03        A.      (Reading document.)
04                Okay.
05        Q.      So am I correct that this
06   letter from Mr. Morsc to Mr. Moore is
07   transmitting some preliminary information
08   from a study of cancer mortality, in other
09   words, cancer deaths, among the United States
10   Steel Corporation workers?  Is that correct?
11        A.      At the Clariton facility,
12   including specific operations.
13        Q.      And the Clariton facility, if
14   I'm correct, was the facility that made the
15   product raffinate?
16        A.      Yes.
17        Q.      And one of the things that this
18   study is doing is examining workers in the
19   benzene department.  And it's indicated that
20   the benzene department is one of several
21   departments that would involve work areas at
22   which medical and public health officials are
23   casting a suspicion as a possible site for
24   exposure to industrial cancer producing
25   agents.  Did I read that correctly?
```

Obj:
402
403
All
lines
on
page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 59 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 741 of 1330

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02        A.      Yes.
03        Q.      So as of 1953, United States
04 Steel Corporation had information that made
05 it concerned that there could be cancer from
06 exposure to benzene; correct?
07              MR. SYKES:  Object to the form
08        of the question.
09              THE WITNESS:  Benzene and the
10        numerous other chemicals that are
11        found in the coking operations, the
12        byproducts operations and the tar
13        departments.  I mean the coke ovens
14        themselves have several known human
15        carcinogens.  And the coking process
16        was by far the largest process at
17        Clariton Works.  I mean, it dwarfed
18        the byproducts plans, the benzene, the
19        -- as we call it, the BTX area, the
20        tar department.  That's where we
21        converted the coal to coke.
22 BY MR. DuPONT:
23        Q.      I understand that, sir.  But
24 you would agree with me that based on this
25 document, the indication is that United
```

Obj;
402
403
All
Lines
on
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02    States Steel Corporation had concerns that
03    there was a cancer risk in those working
04    around benzene; correct?
05              MR. SYKES:  Object to the form
06         of the question.
07              THE WITNESS:  Not specifically
08         benzene.  As I said, you can't take
09         one of the areas out because that's
10         the area that you may be interested in
11         and say, yes, this is the material
12         that causes cancer.  Not when you have
13         coke ovens and, you know, others -- so
14         many other products there that are
15         known human carcinogens.  And so many
16         more people are exposed to the coke
17         oven products.  I mean, I can't give
18         you a proportion, but I believe there
19         were thousands of people that worked
20         on the coke ovens, whereby there may
21         have only been a hundred people that
22         worked in the benzene area on the
23         three shifts.
24    BY MR. DuPONT:
25         Q.    The benzol department, or the
```

Page 59

```
01            JOHN P. MASAITIS
02  benzene department was an area of cancer
03  concern for United States Steel as of 1953;
04  correct?
05      A.    Along --
06            MR. SYKES:  Object to the form
07      of the question.
08            THE WITNESS:  Along with these
09      other areas where there were known
10      human carcinogens.
11            MR. DuPONT:  Do you want to take
12      that break?
13            VIDEO TECHNICIAN:  We're going
14      off the record at 10:09 a.m.
15                  -  -  -
16            (Whereupon there was a recess in
17      the proceeding.)
18                  -  -  -
19            VIDEO TECHNICIAN:  We're back on
20      the record at 10:20 a.m.
21            Counsel, you may proceed.
22  BY MR. DuPONT:
23      Q.    Okay, Mr. Masaitis.  Now, when
24  you began with U.S. Steel in 1964 there were
25  already in place practices and procedures for
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  monitoring workers' exposure to benzene at
03  U.S. Steel's facilities, were there not?
04      A.      Yes.
05      Q.      And they included monitoring
06  the air, monitoring the blood and even the
07  urine of workers for indication of benzene
08  exposure; correct?
09      A.      Yes.
10      Q.      And it's your understanding
11  that that was a practice that U.S. Steel had
12  conducted for a number of years prior to your
13  beginning with the company in 1964 in order
14  to monitor their workers' exposure to
15  benzene; correct?
16      A.      Yes.
17      Q.      And the purpose of that
18  monitoring was to determine whether or not
19  individuals were being placed at risk for any
20  occupational disease from benzene exposure;
21  correct?
22      A.      Yes.
23              -   -   -
24              (Whereupon the document was
25      marked, for identification purposes,
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 61

```
01            JOHN P. MASAITIS
02       as Masaitis Exhibit Number 5.)
03                 -  -  -
04 BY MR. DuPONT:
05       Q.     I take it you've seen a
06 document I'm going to hand to you that has
07 been marked as Exhibit Number 5.  I
08 apologize, I don't have another copy.  It's
09 Bates Number 16905 to 16951.
10            According to records provided
11 to us this document is dated August 14th,
12 1956 and it's entitled, Survey of Potential
13 Toxic Gas Hazards in Coal Chemical Operations
14 at Gary Steel Works.  And it's a United
15 States Steel Corporation document; is that
16 correct?
17       A.     Yes.  I'm looking for a date.
18 I don't see the date.
19       Q.     I did not see the date on the
20 document either, but on the index that was
21 provided to us by counsel for U.S. Steel,
22 under which this document was produced, it
23 indicated that the document was dated
24 August 14th, 1956.  Are you aware of that?
25       A.     No.
```

Obj:
402
403
802
All on
Page



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01            JOHN P. MASAITIS
02      Q.    Okay.  If you look, I believe
03 you have that index in the materials that
04 you've brought with you today.  I just want
05 to make sure we're on the same page with
06 respect to the date of the document.
07      A.    This was provided in this
08 group?
09      Q.    I believe the index of the
10 document that was produced to us was among --
11            MR. SYKES:  In our document
12      production --
13 BY MR. DuPONT:
14      Q.    Defense Exhibit 3 there.
15            MR. DuPONT:  Counsel, we can
16      make this easier --
17            MR. SYKES:  If you just accept
18      his representation.
19            THE WITNESS:  Fine.  That's
20      fine.  No, it's definitely a document
21      of U.S. Steel.  You know, I just
22      didn't see any date on it.
23            MR. DuPONT:  Counsel, can we
24      have an agreement that it's dated
25      August 14th, 1956?
```

**Transcript of Masaitis, John**

Page 63

```
01            JOHN P. MASAITIS
02            MR. SYKES:  Can we look at the
03     document?
04            MR. DuPONT:  Sure, you can look
05     at the document and compare it to the
06     index and Bates number.
07 BY MR. DuPONT:
08            Q.    I see.  Are you referring to
09 Bates Number 16910, where it indicates the
10 date June 11 to 15 inclusive, 1956?
11            A.    Yes.
12            Q.    So that would indicate to you
13 that this document was from the June time
14 period of 1956?
15            A.    Yes.
16            Q.    And generally what's going on
17 here is, U.S. Steel is monitoring its
18 employees for exposure to benzene because of
19 health hazards associated with benzene?
20            A.    Yes.  It says benzene was one
21 of, it looks like seven or eight other
22 materials that were studied.
23            Q.    And additionally what's
24 happening here is, United States Steel
25 Corporation is making recommendations with
```

Obj:
402
403
11-2.



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01            JOHN P. MASAITIS
02  respect to training and educational and
03  control programs in order to prevent health
04  hazards of benzene exposure; is that correct?
05       A.     I haven't read the document,
06  but that sounds logical.
07       Q.     If you look to Bates Number
08  16962?
09       A.     962?
10       Q.     16926, excuse me.
11       A.     Oh.
12       Q.     On this page there's a section
13  under the word benzol, which we've already
14  discussed is benzene; is that correct?
15       A.     Yes.
16       Q.     And would you confirm for me
17  that U.S. Steel is writing in 1956 that
18  benzene vapor is considered one of the most
19  toxic industrial poisons?
20       A.     Yes.
21       Q.     And in the next paragraph U.S.
22  Steel is providing a summary of some of the
23  health hazards that are associated with
24  exposure to benzene.  If you could look at
25  the second sentence of that next paragraph,
```

Obj:
402
403

Obj:
402
403

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02  starting with "the most", could you read that
03  into the record?
04       A.      The second paragraph, the
05  second sentence?
06       Q.      Correct.
07       A.      "The most conspicuous effect,
08  however, is the effect on the blood and blood
09  forming organs, especially the bone marrow
10  and blood vessels."
11       Q.      And what we're talking about
12  here is the effect of benzene exposure on the
13  blood and bone marrow system; correct?
14       A.      Yes.
15       Q.      And it's that effect on the
16  blood and bone marrow system that leads to
17  cancer, such as myelodysplastic syndrome and
18  acute myelogenous leukemia; correct?
19             MR. SYKES:  Objection to form.
20             THE WITNESS:  I'm not a medical
21         doctor, but it's -- could very well
22         be.
23  BY MR. DuPONT:
24       Q.      It's your understanding that
25  benzene is known to cause myelodysplastic
```

Obj:
602

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 66

JOHN P. MASAITIS

01                    JOHN P. MASAITIS

02  syndrome and acute myelogenous leukemia;

03  correct?

04       A.     It causes leukemia.  You know,

05  I just know that it causes leukemia.

06       Q.     And you're aware that leukemia

07  is a cancer of the blood and bone marrow

08  producing system; correct?

09       A.     Yes.

10       Q.     If you'll turn back to page six

11  of the document, which is also 16917.  Since

12  U.S. Steel was aware that benzene is toxic to

13  the blood and bone marrow forming system, one

14  of the things it's doing to protect workers

15  is to have examinations of the blood in order

16  to examine the amount of benzene exposure

17  that's happening and that effect on its

18  workers; correct?

19       A.     To monitor the consequences of

20  benzene exposure, yes.

21       Q.     Do you know when U.S. Steel --

22  certainly it was doing it as of 1956, but do

23  you know when U.S. Steel began the practice

24  of monitoring the blood of its workers for

25  benzene exposure?

Obj:
602
403
All
Lines
on
Page



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01               JOHN P. MASAITIS

02        A.     I can't say specifically.

03        Q.     And U.S. Steel had had

04   incidences, or at least one incidence of one

05   of its workers contracting benzol poisoning

06   or benzene poisoning from exposure to

07   benzene.  Have you seen that in the records?

08        A.     I can't recall any specifics.

09   There could have been, you know, an incident.

10   I can't recall.

11        Q.     I'm handing you a document

12   that's been marked as Exhibit Number Six.

13                     -  -  -

14             (Whereupon the document was

15        marked, for identification purposes,

16        as Masaitis Exhibit Number 6.)

17                     -  -  -

18   BY MR. DuPONT:

19        Q.     This is a September 17, 1957

20   letter from H.K. Bumsted to K.M. Morsc?

21        A.     Yes.

22        Q.     And that's on United States

23   Steel Corporation letterhead?

24        A.     Yes.

25        Q.     Are you familiar with H.E. --
```

Obj:
402
403
602
All
Lines
on
Page

Obj:
402

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 68

```
01              JOHN P. MASAITIS
02 is it Humsted or Bumsted, I can't read it?
03      A.    Howard E. Bumsted.
04      Q.    Are you familiar with Mr.
05 Bumsted?
06      A.    Yes.
07      Q.    What was his position at United
08 States Steel?
09      A.    He was the chief industrial
10 hygiene chemist working in the laboratory of
11 the industrial hygiene laboratory.
12      Q.    And it appears from this
13 correspondence that there was a report of
14 somebody indicating that they had contracted
15 benzene poisoning from working at United
16 States Steel?
17      A.    The subject is alleged benzol
18 poisoning case.  Incident prepared by the
19 Department of Iron Works.
20      Q.    Right.
21      A.    Yes.
22      Q.    There is an individual who had
23 reported that he believed that he had benzol
24 poisoning from working at the Clariton plant?
25      A.    I haven't read the memo yet,
```

Obj:
402
403
602
802
All
Lines
on
Page



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 71 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 753 of 1330

01          JOHN P. MASAITIS

02 but I'm just looking at the subject where it

03 says, excuse me, alleged benzol poisoning

04 case.

05     Q.    Correct.

06          During your employment at U.S.

07 Steel, were there times that you had to take

08 employees out of an area where benzene was

09 being used and produced because of their

10 exposures?

11     A.    I can't recall any such

12 incidents.

13     Q.    Were you involved as an

14 industrial hygienist at U.S. Steel in

15 investigating Workers' Compensation claims

16 where somebody indicated that they were

17 injured on the job from exposure to a

18 chemical?

19     A.    I could have been.  Here again,

20 I can't recall any specific time that I went

21 out into a facility for that purpose.

22     Q.    Was that part of the job duties

23 of an industrial hygienist for U.S. Steel

24 during the 1960s?

25     A.    Any monitoring that's done is

Obj:
Continu
ed from
Prior
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  done by industrial hygiene, yes.  So if there
03  was an allegation of an exposure that caused
04  some disease, then industrial hygiene
05  typically would be called to go out and
06  determine what the exposure was as well.
07        Q.     Part of the reason you would be
08  called to go out and determine the exposure
09  levels would be to help defend the company
10  against a Workers' Compensation claim brought
11  by injured workers?
12              MR. SYKES:  Object to the form
13        of the question.
14              THE WITNESS:  No.  I mean, we
15        are interested in the worker.  The
16        foundation of industrial hygiene is
17        worker exposure.  That's the only
18        thing we're interested in, is worker
19        exposure.  And after that, other
20        people in the corporation make
21        decisions.  We evaluate the exposure
22        and we say what it is.  We prepare the
23        criteria that exists and, where it's
24        necessary, we would make
25        recommendations to control the
```

**Transcript of Masaitis, John**

Page 71

```
01                JOHN P. MASAITIS
02       workers' exposure if need be.
03 BY MR. DuPONT:
04       Q.     But were you not asked on
05 behalf of the corporation to gather
06 information in the context of Workers'
07 Compensation claims brought by injured
08 workers?
09       A.     We may have been asked to state
10 an opinion, but I would -- here again, I
11 can't recall any specific cases where I was
12 involved with that or anyone else.  But
13 industrial hygiene is worker exposure.
14 Defending the corporation, we're just
15 interested in worker exposure.  I mean, that
16 -- that's all.
17       Q.     Okay.  How many benzene
18 exposure Workers' Compensation claims were
19 you involved in as an industrial hygienist at
20 U.S. Steel?
21       A.     I can't recall any.
22                    -  -  -
23            (Whereupon the document was
24       marked, for identification purposes,
25       as Masaitis Exhibit Number 7.)
```

403, prejudice of reference to workers compensation - collateral source

**Transcript of Masaitis, John**

```
01                  JOHN P. MASAITIS
02                      -  -  -
03  BY MR. DuPONT:
04        Q.    This is another document that's
05  been marked as Exhibit Number 7.  This is
06  another document that outlines some aspects
07  of United States Steel Corporation's
08  practices and procedures for protecting its
09  own workers against exposure to benzene;
10  correct?
11        A.    This is -- appears to me to be
12  a pretty all inclusive document.  The subject
13  being periodic occupational examinations.
14  And it lists numerous examinations that in
15  most cases would not really have any exposure
16  to benzene.
17        Q.    If you'll look to the second
18  page.  The first full paragraph under
19  standard job title, plant job title, et
20  cetera, it includes a reference to monitoring
21  benzol workers; correct?
22        A.    Yes.  I see benzol workers
23  included amongst, you know, the other
24  workers.
25        Q.    Okay.  And, in fact, benzol
```

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS

02  workers are classified as one of the critical

03  occupations for which the plant medical

04  department has made the determination that

05  employees should be monitored for exposures;

06  correct?

07          A.      Yes.

08                      -   -   -

09              (Whereupon the document was

10          marked, for identification purposes,

11          as Masaitis Exhibit Number 8.)

12                      -   -   -

13  BY MR. DuPONT:

14          Q.      I'm handing you Exhibit

15  Masaitis 8.  This, Mr. Masaitis, is a

16  document that was also produced to us by

17  United States Steel Corporation from its

18  records in response to discovery requests

19  that we served in this case.  And its Bates

20  numbered USS 2905 to 2907.  The title is,

21  "Handbook of Organic Industrial Solvents",

22  Third Edition.  And if you look to the second

23  page, it's dated 1966.

24          A.      Uh-huh.

25          Q.      Do you see that?
```

Obj:
403
802
All
Lines
on
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS
02        A.      Yes, I do.
03        Q.      And it references the American
04  Mutual Insurance Alliance.
05        A.      Yes.
06        Q.      Are you familiar with that
07  company?
08        A.      No.
09        Q.      Do you know what United States
10  Steel Corporation's dealing with that company
11  was?
12        A.      I have no idea.
13        Q.      If you look to the third page
14  of the document, which is Bates Number USS
15  2907.
16        A.      Yes.
17        Q.      This provides information
18  regarding health hazards of a number of
19  chemicals, including benzene?
20        A.      Yes.
21        Q.      Is that correct?
22                Can you tell me whether I'm
23  reading this correctly or not, it states that
24  benzene is implicated as a producer of
25  leukemia, a blood cancer.  It's hard to read,
```

Obj:
802
403
All
Lines
on
Page

Obj:
802
403
13-2
5

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

Obj:
802
403
1-7

```
01          JOHN P. MASAITIS
02  it's on the fourth line down.
03      A.   I can see that.  Benzene is
04  implicated as a producer of leukemia, a blood
05  cancer.  All right.
06      Q.    Is that correct?
07      A.    That's what it says.
08      Q.    Do you know how U.S. Steel
09  received this document in 1966?
10      A.    I have no idea.
11      Q.    Is this a document that you had
12  available to you as an industrial hygienist
13  at U.S. Steel in the 1960s?
14      A.    I don't recall seeing this
15  publication.
16      Q.    Would this have been a document
17  kept in U.S. Steel Corporation's medical
18  department?
19      A.    I have no idea.
20      Q.    Were you aware in 1964 that
21  benzene had been reported to cause leukemia?
22      A.    I don't recall reading anything
23  regarding that in '64, no.
24      Q.    Did you ever make any effort in
25  the 1960s to research United States Steel
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01                    JOHN P. MASAITIS
02  Corporation's records for all the information
03  it had regarding benzene's ability to cause
04  cancer?
05          A.      Did I ever make an effort?
06          Q.      Yes, sir.
07          A.      Well, as I said, the industrial
08  hygiene responsibility is the worker
09  exposure.  And typically we're out in the
10  workplace doing worker exposure evaluations.
11  So when we have time we read what literature
12  is available and what we think is pertinent
13  to the conditions in our facilities.
14          Q.      Did you ever sit down and go to
15  U.S. Steel's library and read up on all the
16  information the company had on benzene's
17  ability to cause leukemia?
18          A.      I never recall doing that.  And
19  I don't know that I would have been able to
20  find time to do that.
21          Q.      What were the typical texts
22  that you would look to for information on the
23  health hazards of chemicals as it related to
24  your work as an industrial hygienist in the
25  1960s and 1970s?
```

01                    JOHN P. MASAITIS

02        A.        Well, typically, we read --

03    subscribe to the American Industrial Hygiene

04    Association journals.  ACGIH journals.  There

05    were other publications that we got.  There

06    were some handbooks written by people like

07    Hatch and Drinker.  And so they're typically

08    the type of books we looked at.  And, you

09    know, newer publications, work was going on.

10    Research that was being done and the various

11    materials.  But other than the journals that

12    we got, I can't specifically today think of

13    anything that we relied on.  But if need be,

14    we knew where to look.  There were libraries

15    nearby.

16        Q.        What were the standard

17    industrial hygiene texts that were out there

18    in the 1960s and 1970s?

19        A.        Texts, you mean textbooks?

20        Q.        Textbooks.

21        A.        Well, as I said, you know, Sax

22    was pretty prominent.  Drinker and Hatch they

23    were good publications.

24        Q.        Was Sax something that United

25    States Steel Corporation kept in its

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 80 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 762 of 1330

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02  industrial hygiene department in the 1960s?
03      A.    We had the Sax publication,
04  yes.  We had other publications like the --
05  published by, say, the Manufacturers Chemical
06  Association, their Material Safety Data
07  Sheets, that sort of thing.
08      Q.    Did any of the Manufacturing
09  Chemists Association, Material Safety Data
10  Sheets or documents, prior to 1978, indicate
11  that benzene causes leukemia, or was reported
12  to cause leukemia?
13      A.    Not that I recall, no.
14      Q.    Did any of the Manufacturing
15  Chemists Association documents, before 1978,
16  discuss cancer in the context of benzene?
17      A.    I can't recall specifically.  I
18  can't say whether they did or they didn't.  I
19  can't recall every specific discussion of
20  each and every subject of the publications
21  that we had.
22      Q.    Was there ever a warning in a
23  Manufacturing Chemist Association document,
24  before 1978, stating that benzene can cause
25  cancer?
```

611, non-responsive

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02              MR. SYKES:  Object to the form
03         of the question.
04              THE WITNESS:  I can't -- sitting
05         here now, I can't think of, you know,
06         specifically seeing the word cancer,
07         but certainly there were other words
08         that would lead us possibly, you know,
09         one, to look at the diseases of the
10         blood forming organs.
11 BY MR. DuPONT:
12         Q.    You never saw the word cancer
13 associated with benzene?
14         A.    I'm not saying that it wasn't
15 in the publication.  As I said, as I sit here
16 today, I can't recall seeing them.  I'm being
17 very honest.  I can't recall seeing the word
18 cancer.  But I'm not saying that it wasn't
19 there just because I can't recall seeing it
20 in any and all of their publications.
21         Q.    Did you receive information
22 from the American Petroleum Institute, or did
23 United States Steel Corporation receive
24 information from the American Petroleum
25 Institute concerning the health hazards of
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS

02  benzene prior to 1978?

03       A.     I can think of no publications,

04  but here again, I'm -- I wouldn't deny that

05  we did.  Or I wouldn't subscribe to the fact

06  that we did.  I just can't think of any now.

07       Q.     During the sixties and

08  seventies, and even before then, the two

09  major sources of, in general terms, benzene

10  production came from coal operations such as

11  U.S. Steel, and then the crude oil

12  operations, such as those performed by the

13  members of the American Petroleum Institute.

14  Is that generally correct?

15       A.     They're typically the major

16  sources of benzene production.

17       Q.     Was U.S. Steel aware, during

18  the 1960s and 1970s, that the American

19  Petroleum Institute and its members had been

20  researching benzene and its health hazards?

21       A.     I can't recall being aware of

22  what the API was doing at that time.

23       Q.     Have you seen that in documents

24  produced by U.S. Steel in this case?

25       A.     Not that I recall.
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02      Q.      When you went to -- I believe
03 you had testified before, and please I'm
04 going off my memory, so if I'm incorrect,
05 please let me know.  You had attended --
06 well, let me just ask you this.
07              Well, have you ever attended
08 meetings of the Manufacturing Chemists
09 Association?
10      A.      I attended some meetings when
11 it was -- I think, as you said, the Chemical
12 Manufacturers Association, which I think was
13 in later years.  Is that correct, the same
14 organization?  Yes.
15      Q.      When did you begin to attend
16 those meetings?
17      A.      Oh, I would say when I was
18 possibly the manager of industrial hygiene.
19 As I rose through the ranks of industrial
20 hygiene for the corporation, I may have
21 represented the corporation in some of the
22 CMA meetings.
23      Q.      What dates were those?  When
24 did you first became a manager?
25      A.      I would say in the eighties
```

**Transcript of Masaitis, John**

Page 82

```
01              JOHN P. MASAITIS
02  possibly.
03       Q.     At the time that you were
04  attending the CMA, the Chemical Manufacturers
05  Association, meetings, were there industrial
06  hygienists and other professionals from oil
07  companies that were members of the American
08  Petroleum Institute?
09       A.     At the CMA meetings?
10       Q.     Yes.
11       A.     Not that I recall.
12                  -   -   -
13              (Whereupon the document was
14       marked, for identification purposes,
15       as Masaitis Exhibit Number 9.)
16                  -   -   -
17  BY MR. DuPONT:
18       Q.     This is Number 9.  Mr.
19  Masaitis, this is -- and take a minute to
20  look at it.  This is a copy of the cover and
21  the title page and a section of the Sax --
22  Irving Sax, "Dangerous Properties of
23  Industrial Materials", Third Edition.  Is
24  that correct?
25       A.     Yes.
```

Obj:
802

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 85 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 767 of 1330

# Masaitis, John

### Rhyne Trial Master

01          JOHN P. MASAITIS

02      Q.      And it's dated 1968, if you'll

03 look to the second page.

04      A.      Okay. '68, yeah.

05      Q.      This is one of those standards

06 in industrial hygiene texts you had

07 identified for me just a couple minutes ago?

08      A.      Yes.

09      Q.      This is the type of text that

10 U.S. Steel kept in its library?

11      A.      We had a copy of Sax.

12      Q.      If we turn to the third page of

13 the exhibit, which is Bates numbered US 2910,

14 you'll see about midway down, in the lefthand

15 column, there's a paragraph that begins with,

16 "The chronic"?

17      A.      Yes.

18      Q.      Would you read what that says

19 into the record, please?

20      A.      It says, "The chronic, rather

21 than the acute form of benzene poisoning is

22 important in industry; it has a toxic action

23 on the blood-forming tissues. There is no

24 specific blood picture occurring in cases of

25 chronic benzol poisoning."

Obj:
802

Obj:
802
Rest of
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 84

Obj:
802
1-11

```
01              JOHN P. MASAITIS
02      Q.      Now, when we talk about the
03 terms chronic and acute, acute means a short
04 term, high level exposure; correct?
05      A.      Yes.
06      Q.      And chronic refers to a longer
07 term, lower level exposure; correct?
08      A.      A longer term, lower level,
09 yes.
10      Q.      Lower level?
11      A.      Uh-huh.
12      Q.      If you continue to the next
13 paragraph.
14      A.      "The bone marrow may be -- and
15 I'm having a difficult time reading this.
16 May be bioplastic, normal or hyperplastic
17 (sic), the changes being reflected in the
18 peripheral blood."
19      Q.      That says, hypoplastic?
20      A.      Hypoplastic, yeah.
21      Q.      Hypoplastic, do you understand
22 that means that there is a deficiency in
23 blood cells in the bone marrow?
24      A.      I'm not a medical person.
25 Hypoplastic could mean -- I would have to
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN P. MASAITIS

02    look up the definition if I was going to

03    state what indeed it is.

04         Q.     Okay.  What we're talking about

05    here is the effect of benzene exposure on the

06    blood and bone marrow?

07         A.     Uh-huh.

08         Q.     Could you continue to read the

09    next sentence, please?

10         A.     Anemia, leukopenia,

11    macrocytosis, it looks like, reticulocytosis,

12    thermo iso -- I'm just having difficulty

13    reading this -- high colon index and

14    prolonged bleeding time may be present.

15    Cases of myeloid leukemia have been reported.

16         Q.     What this standard industrial

17    hygiene text is indicating is that there have

18    been reports of individuals contracting a

19    myeloid leukemia form from exposure to

20    benzene; correct?

21         A.     It says, cases of myeloid

22    leukemia have been reported, yes.

23         Q.     And this is under the

24    toxicology heading for benzene.  So it's

25    talking about benzene exposure leading to
```

Obj:
802
16-25



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

（）

# Masaitis, John

## Rhyne Trial Master

Obj:
802
1-9

```
01              JOHN P. MASAITIS
02   individuals contracting myeloid leukemia; is
03   that correct?
04        A.    Yes.
05        Q.    And this is information that
06   was available obviously to U.S. Steel in the
07   1960s, since it was in their library, as you
08   previously testified?
09        A.    Yes.
10        Q.    And you confirmed for me that
11   U.S. Steel never indicated on any of its
12   Material Safety Data Sheets for either
13   raffinate or benzene that benzene exposure
14   had been reported to cause leukemia at any
15   point in time up until 1982?
16              Strike that, let me re-ask the
17   question.
18              Prior to 1982, U.S. Steel never
19   reported on a Material Safety Data Sheet that
20   benzene exposure had been reported to cause
21   leukemia; is that correct?
22        A.    I can recall saying that.
23              MR. DuPONT:  Let's take about a
24        two minute break.
25              VIDEO TECHNICIAN:  We're going
```

Obj:
402
403

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02      off the record at 10:54 a.m.
03                  -   -   -
04      (Whereupon there was a recess in
05      the proceeding.)
06                  -   -   -
07              VIDEO TECHNICIAN:  We're back on
08      the record at 11:07 a.m.
09              Counsel, you may proceed.
10              MR. DuPONT:  Thank you.
11  BY MR. DuPONT:
12      Q.      Mr. Masaitis, did Radiator
13  Specialty Company have an industrial hygiene
14  department or medical department in the
15  1950s, 1960s, 1970s?
16      A.      I'm not aware of that, if they
17  did or they did not.
18      Q.      Did U.S. Steel know, during
19  that time period, whether or not Radiator
20  Specialty Company had an industrial hygiene
21  department or medical department?
22      A.      I -- here again, I have no
23  idea.  I did not know of -- I never heard
24  anyone speak about Radiator Specialty
25  Company's medical department or industrial
```

**Transcript of Masaitis, John**

01              JOHN P. MASAITIS

02 hygiene department.

03      Q.      Did U.S. Steel have any

04 knowledge as to whether or not Radiator

05 Specialty Company had any industrial

06 hygienists or medical doctors that worked for

07 it during the 1950s, 1960s, 1970s?

08      A.      I have no idea if they did or

09 they did not, nor am I aware of anyone at

10 United States Steel who would have that

11 knowledge.

12              -   -   -

13              (Whereupon the document was

14      marked, for identification purposes,

15      as Masaitis Exhibit Number 10.)

16              -   -   -

17 BY MR. DuPONT:

18      Q.      I've marked another document as

19 Exhibit 10.  And this is a copy from another

20 text that came from United States Steel

21 Corporation and its records, as produced to

22 us in discovery.  The text is Industrial

23 Toxicology, Third Edition by Alice Hamilton

24 and Harriet Hardy, and it's dated 1974, if

25 you look at the copyright date on the second

Obj:
402
403
802

```
01              JOHN P. MASAITIS
02  page of the exhibit.  Do you see that?
03          A.      Uh-huh.
04          Q.      Am I correct that this is a
05  publication from 1974?
06          A.      Yes.
07          Q.      Are you familiar with this
08  publication from Alice Hamilton and Harriet
09  Hardy?
10          A.      Yes.
11          Q.      And Dr. Hamilton apparently was
12  a Professor Emeritus of Industrial Medicine
13  at the Harvard School of Public Health?
14          A.      Yes.
15          Q.      And Dr. Hardy apparently was
16  also from Harvard Medical School, as well as
17  another several institutions that are listed
18  on there.  Do you see that?
19          A.      Yes, I do.
20          Q.      If you look to the page that's
21  Bates numbered 2915.
22          A.      (Complying with request.)
23          Q.      If you'll look at the first
24  full paragraph, the paragraph that begins
25  with the words, while there.  Could you
```

Obj:
802
1-21

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 90

Obj:
802
4-25

```
01              JOHN P. MASAITIS
02   confirm for me that the text after -- you
03   know, why don't you just start by reading
04   that sentence, while there.  Read that and
05   the second sentence, please?
06        A.     "While there has been no doubt
07   for many years that benzene can produce fatal
08   aplastic anemia, the association between
09   benzene exposure and leukemia has been a
10   matter of more recent controversy."
11        Q.     Okay.  Can you read the second
12   paragraph too, please -- I'm sorry, the
13   second sentence too, please?  It begins with,
14   "it is now".
15        A.     "It is now generally accepted
16   that benzene can produce leukemia of varying
17   forms, and that such leukemia can appear with
18   or without an antecedent history of aplastic
19   anemia."
20        Q.     Have you ever seen this
21   document before?
22        A.     Not that I recall.
23        Q.     This wasn't provided to you by
24   attorneys for U.S. Steel in order to prepare
25   for your deposition?
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 91

```
01            JOHN P. MASAITIS
02       A.    I don't recall seeing this
03  document before.
04       Q.    Can you turn back to page 2914?
05       A.    (Complying with request.)
06       Q.    Under the heading, "Toxic
07  Effects", the second paragraph.  Can you
08  confirm that this report -- this document
09  reports that chronic benzene poisoning is of
10  far greater toxicological significance than
11  what it's referring to above as acute benzene
12  poisoning?
13       A.    That's what it says.
14       Q.    It goes on to discuss that the
15  incidence of benzene poisoning has decreased
16  over the years as industrial hygiene measures
17  have improved, and there has been a
18  thoughtful and technically satisfactory
19  search for less toxic benzene substitutes.
20       A.    Yes.
21       Q.    Is that correct?
22       A.    Yes.  That's what it says.
23       Q.    Did U.S. Steel have a practice
24  of marketing to its customers less toxic
25  alternatives to benzene than benzene
```

Obj:
802
All
Lines
on
Page

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 92

```
01                JOHN P. MASAITIS
02  containing solvents during the 1960s and
03  1970s?
04        A.     We had less toxic solvents that
05  we manufactured, such as toluene and xylene.
06        Q.     And did U.S. Steel consider
07  toluene and xylene an adequate replacement
08  for benzene as a solvent?
09        A.     We -- I don't think we're in a
10  position to make that determination.  I think
11  that the people who were purchasing the
12  benzene certainly knew that, you know, we
13  manufactured the toluene and xylene.  And
14  that if they felt that they would be suitable
15  substitutes for what they would be using the
16  benzene for, then I think that they would
17  have made the change.
18        Q.     Did U.S. Steel ever sit down
19  with a customer and say, hey, you know, we
20  recommend toluene and xylene.  If you're
21  thinking about using a chemical or a solvent
22  with benzene in it, try to use toluene or
23  xylene because it's less toxic?
24        A.     Somebody at U.S. Steel may
25  have, someone who was aware of the processes
```

611, beyond scope of cross

611, non-responsive

602, speculation

611, beyond scope of cross

602, speculation

611, non-responsive

**Transcript of Masaitis, John**

# Masaitis, John

Rhyne Trial Master

01                  JOHN P. MASAITIS

02 for which the material we were selling were

03 used for, but certainly not myself.

04        Q.    Do you know if that

05 conversation ever took place with Radiator

06 Specialty Company?

07        A.    I have no idea if it did or did

08 not. Certainly there was, you know, a lot of

09 correspondence between the chemists at

10 Radiator Specialty Company and our technical

11 people in the -- we call it the BTX plant,

12 benzene, toluene and xylene plant.

13        Q.    Do you see any correspondence

14 where U.S. Steel is suggesting to Radiator

15 Specialty Company that rather than use

16 raffinate, which contains benzene in as much

17 as 15 percent, Radiator Specialty Company

18 should consider substituting that solvent

19 with something less toxic, such as toluene or

20 xylene?

21        A.    I think Radiator Specialty

22 Company was in a position, you know, to make

23 that determination more so than, you know,

24 U.S. Steel because as the manufacturer of the

25 penetrating material, they were the ones who

602, speculation
611, non-responsive
beyond scope of cross

602, speculation
611, non-responsive,
beyond scope of cross

Transcript of Masaitis, John

# Masaitis, John

Rhyne Trial Master

01           JOHN P. MASAITIS

02   had tests done regarding the penetrating

03   capabilities. And as I said, they certainly

04   were aware that we manufactured toluene and

05   xylene. So if they thought that it would

06   have been suitable, they probably would have

07   taken that route.

continuation of objection

08          MR. RILEY: Objection.

09 BY MR. DuPONT:

10     Q.     Was U.S. -- was Radiator

11   Specialty Company in a better position than

12   U.S. Steel to evaluate the toxicity of

13   benzene -- of a solvent containing benzene

14   versus toluene and xylene?

15     A.     I would think that we probably

16   were in an equally, you know, comparable

17   position. I mean, if you're manufacturing,

18   using material as an employer, it's incumbent

19   upon you to be aware of the toxicity of the

20   materials that your employees are working

21   with.

602, foundation
speculation

22     Q.     Did Radiator Specialty Company

23   ever conduct any standardized mortality

24   studies or studies into the incidence of

25   cancer among its employees?

**Transcript of Masaitis, John**

```
01                    JOHN P. MASAITIS
02          A.    I am not aware of that.
03          Q.    You have no knowledge that
04  Radiator Specialty Company had any type of
05  medical department or industrial hygiene
06  department; correct?
07          A.    In-house departments I am not
08  aware of.
09          Q.    Are you aware of any documents
10  that Radiator Specialty Company maintained,
11  such as those that we've seen today that U.S.
12  Steel maintained, regarding the health
13  hazards of benzene, including benzene being
14  reported to cause leukemia?
15               MR. SYKES:  Object to the form
16          of the question.
17               THE WITNESS:  I think, you know,
18          Radiator Specialty Company was a
19          sophisticated user.  I think they were
20          a reputable employer.  And I think
21          they had access to the same
22          information that the rest of the
23          industry had access to.
24  BY MR. DuPONT:
25          Q.    What specific information did
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  Radiator Specialty Company have in its
03  possession to indicate that benzene could
04  cause cancer prior to 1978?
05          A.      I was never at a Radiator
06  Specialty Company facility, so I have no
07  idea, you know, what their library looked
08  like or anything regarding that.  But I'm
09  saying that as a manufacturer in -- even in
10  the forties and fifties, there were
11  departments out there, like the U.S. Public
12  Health Service and state organizations that
13  visited manufacturing facilities to inspect
14  them, to do the same type industrial hygiene
15  work that I was doing at U.S. Steel and the
16  Commonwealth of Pennsylvania.
17          Q.      Do you know if that ever
18  happened?  Do you have any specific knowledge
19  that would tell you what Radiator Specialty
20  Company knew about benzene's ability to cause
21  cancer during the 1950s, 1960s, 1970s?
22          A.      I have no specific knowledge,
23  but I do have the general knowledge of what
24  was going on in the occupational health field
25  at that time.
```

**Transcript of Masaitis, John**

01          JOHN P. MASAITIS

02     Q.     You also had not seen any

03 correspondence from U.S. Steel to Radiator

04 Specialty Company where U.S. Steel is

05 recommending a safer solvent other than

06 raffinate, which contained benzene, for its

07 applications; is that correct?

08     A.     I have never seen any

09 correspondence, no.

10     Q.     Are you familiar with a term,

11 hierarchy of safety when it comes to

12 industrial hygiene and workplace safety?

13     A.     Now, you're intermixing apples

14 and oranges.  Safety is not industrial

15 hygiene.  Safety is a discipline of its own.

16 Industrial hygiene is looking at the health

17 aspects of worker exposure, whereas safety is

18 looking at the physical caught by, struck by

19 type aspects.  So when you say industrial

20 hygiene safety, it's somewhat confusing to

21 me.

22     Q.     Well, as a general principal,

23 is it not a -- not considered a safer

24 practice to remove a health hazard than to

25 warn against it or to guard against it

```
01              JOHN P. MASAITIS
02 through the use of protective -- personal
03 protective equipment, for example?
04      A.      Well, yes, it's always better
05 to remove the source than trying to protect
06 against it.  That's, of course, saying that
07 it's possible to remove the source.
08              MR. DuPONT:  Let's go off the
09      record.
10              VIDEO TECHNICIAN:  We're going
11      off the record at 11:21 a.m.
12                   -  -  -
13              (Discussion held off the
14      record.)
15                   -  -  -
16              MR. DuPONT:  I'm going to pass
17      the witness for now.  I may have some
18      questions after you folks are done.
19              VIDEO TECHNICIAN:  We're
20      beginning videotape number two of the
21      deposition of Mr. John Masaitis.
22      We're going back on the record at
23      11:28 a.m.
24              Counsel, you may proceed.
25 BY MR. RILEY:
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

01              JOHN P. MASAITIS

02         Q.    Mr. Masaitis, Jim Riley

03   representing Radiator Specialty Company.  I

04   want to explore this phrase, exposed to

05   benzene a little bit.  Do you know one way or

06   the other whether benzene is part of the air

07   that we breathe?

08         A.    Benzene is a naturally

09   occurring material.

10         Q.    How does it occur?

11         A.    Well, it can occur, say, from

12   forest fires, volcanos.  It's present in the

13   earth.  For example, when -- down here in

14   Florida, when we have what we call controlled

15   burns, where they would burn the brush on

16   bush, small trees and all that, in all

17   probability benzene is produced.  It's also

18   produced in metropolitan areas in larger

19   amounts possibly, and from the exhaust of

20   internal combustion engines.  It's naturally

21   occurring in petroleum crude.  It's -- it all

22   depends upon the analytical capability in

23   your sampling methods as to whether or not

24   you can determine if benzene is present in

25   the ambient air.  It could be present in this

402, relevance
403, cumulative

$O$

**Transcript of Masaitis, John**

Page 100

```
01                    JOHN P. MASAITIS
02  room.
03          Q.      Let's talk about a product
04  that's in use today, gasoline.  Does gasoline
05  today contain benzene or not?
06          A.      As I was preparing for this
07  deposition -- I know years ago they used to
08  have the benzene as an anti knock to
09  gasoline.  And also in the winter months, it
10  seemed that they would have -- more benzene
11  would be added.  But I think through the
12  years they try to avoid actually adding it.
13  But, I don't know whether or not the gasoline
14  refining process is adequate enough to remove
15  all trace amounts of benzene from the crude.
16          Q.      So back in the sixties and
17  seventies, do you know whether or not
18  gasoline contained benzene as an additive?
19          A.      In the sixties and seventies --
20          MS. KEEHNER:  Object to form.
21          THE WITNESS:  -- yes, it
22  contained significantly more than it
23  does now.
24  BY MR. RILEY:
25          Q.      And you mentioned coal.  Back
```

402, relevance
403, cumulative

Plaintiffs MiL on post exposure uses of benzene

Transcript of Masaitis, John

Page 101

01                   JOHN P. MASAITIS

02   in the sixties, if I was up in Sugar Notch,

03   Pennsylvania, walked down into the cellar in

04   January, opened up the furnace to throw coal

05   on the fire, would that burning coal be

06   giving off benzene or not?

07        A.     It's very possible it was, yes.

08        Q.     And, in fact, doesn't the coke

09   process where these byproducts are

10   manufactured, doesn't that involve burning

11   off the coal and then the byproducts go in,

12   and toluene, xylene and benzene are

13   byproducts of that process?

14        A.     Yes. There are small amounts

15   of the benzene liberated during the coking

16   process.

17        Q.     Now, speaking of benzene,

18   because you made mention that benzene is a

19   widely used saveable chemical even today, in

20   the year 2011, was that true back in the

21   sixties and seventies and the eighties and

22   the nineties?

23        A.     Yes.

24        Q.     And if we're going to compare,

25   say, benzene to raffinate, which would be the

402, relevance
403, cumulative

402/403, relevance

402/403, relevance

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  more valuable chemical back in the sixties
03  and seventies, from a commercial standpoint?
04          A.     Well benzene, you know, would
05  be much more valuable.
06          Q.     Well, would it make sense then
07  for any kind of chemical company to try to
08  get as much benzene out of the raffinate as
09  possible purely for business reasons?
10          A.      Well, the raffinate was the end
11  of the process.  And the extraction of the
12  more saleable compounds of benzene, toluene
13  xylene and -- yes, that's the -- you develop
14  the process to extract the benzene, toluene
15  and xylene as much as you could from the
16  light oil.  And whatever you couldn't get out
17  was contained in the raffinate.  That's why
18  that's -- really it's a byproduct of the --
19  of that process.
20          Q.     Now, the documents that I've
21  seen indicate that raffinate was shipped to
22  my client by tank car in excess of 10,000
23  gallons at a time.  Is that correct or not
24  from what you reviewed?
25          A.     From my knowledge, yes.  The --
```

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02  well, actually, the only way we shipped from
03  Clariton and our other facilities, byproduct
04  plants, was in -- by barge, river barge,
05  railroad car, or tank truck, you know,
06  comparable to the tank trucks that you see at
07  filling stations delivering gasoline.
08  They're the only ways that we ship materials.
09      Q.    Just as a curiosity, this
10  product, Liquid Wrench, have you ever used it
11  yourself?
12      A.    Oh, I used it quite a bit.
13      Q.    For how long did you use it?
14      A.    Well, I started working on
15  automobiles when I purchased my first 1936
16  Ford.  And I've been still working on
17  automobiles.  I use the Liquid Wrench, WD40,
18  all of those materials.  And I buy them by
19  the gallon.
20      Q.    Do you still use it today?
21      A.    Yes.
22      Q.    I pass the witness.  Thank you,
23  sir.
24      A.    You're welcome.
25            MR. SYKES:  Does anybody else
```

402/403, relevance

Transcript of Masaitis, John

```
01              JOHN P. MASAITIS
02        have any questions for Mr. Masaitis
03        before I ask questions on behalf of
04        U.S. Steel?
05              (No response.)
06  BY MR. SYKES:
07        Q.    Mr. Masaitis, let me ask a few
08  preliminary questions to get us on the same
09  page.  Going back to Mr. Krem specifically,
10  you read his deposition; correct?
11        A.    Yes.
12        Q.    And the relevance of his
13  testimony to U.S. Steel as to his use of
14  Liquid Wrench?
15        A.    Yes.
16        Q.    And kind of getting to the
17  point, you know from your review of sale
18  records that U.S. Steel sold raffinate to
19  Radiator Specialty Company from 1960 to early
20  1978?
21              MR. DuPONT:  Objection to form.
22              THE WITNESS:  That is correct.
23  BY MR. SYKES:
24        Q.    Have you reviewed sales records
25  that substantiate that period of sale from
```

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS

02   1960 to 1978?

03        A.     Yes, I have.

04        Q.     And, in fact, we provided those

05   to you in the materials that Mr. DuPont

06   marked as Exhibit 1 that our law firm

07   delivered to you to prepare for this

08   deposition.   Correct?

09        A.     Yes.

10        Q.     Okay.  Mr. DuPont asked you a

11   number of questions about U.S. Steel's

12   knowledge of hazards of benzene and documents

13   that were produced as part of our document

14   production this morning.  Do you recall that

15   generally?

16        A.     Yes, I do.

17        Q.     I want to ask you about a

18   document that he chose not to ask you about.

19                MR. SYKES:  And, Andrew, do you

20        have the exhibit stickers?

21                MR. DuPONT:  Yes, I do.

22                   -   -   -

23                (Whereupon the document was

24        marked, for identification purposes,

25        as Masaitis Exhibit Number 11.)
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS

02                    -  -  -

03  BY MR. SYKES:

04        Q.    We'll mark this document as

05  Masaitis Number 11.  It bears Bates Number

06  USS 16.  If you would take a moment, Mr.

07  Masaitis.  Do you recognize this document?

08        A.    Yes, I do.

09        Q.    For the record, this is

10  entitled, "Safety Data Sheet for Raffinate"

11  on the cover page.  Did I read that

12  correctly?

13        A.    Yes.

14        Q.    And do you see a date on the

15  top righthand corner?

16        A.    Yes, I do.

17        Q.    Would you identify that for the

18  record, please?

19        A.    It looks like 5/15/67.

20        Q.    Correct.  Now, this is a six or

21  seven page document, is it not?

22        A.    Yes.

23        Q.    In the sixties, did you all

24  prepare documents like this with the word

25  processing programs we enjoy today?
```

**Transcript of Masaitis, John**

# Masaitis, John

Rhyne Trial Master

```
01              JOHN P. MASAITIS
02        A.    No.
03        Q.    How would this have been
04   prepared?
05        A.    Well, being familiar with this
06   document, it's apparent that, you know, there
07   was a significant amount of research went
08   into it.  It was laid out in a logical
09   manner.  It discusses the various effects of
10   the product, the properties and
11   characteristics, the health effects, warning
12   properties, fire explosive, engineering
13   controls.  It talks about the static
14   electricity, employee safety, eye protection,
15   respiratory protection, body, skin and hand
16   protection, fire fighting, handling and
17   storage, tank and equipment cleaning,
18   repairs, medical management, emergency care.
19   So it covers pretty much all the areas that I
20   think someone would be interested in.  And
21   it's also a document that at that time would
22   have had to be hand typed.
23        Q.    Would this represent many man
24   hours of work?
25        A.    I -- significant amount of man
```

Transcript of Masaitis, John

```
01              JOHN P. MASAITIS
02  hours.
03      Q.      I'll ask you not about all
04  parts of this document, but a couple
05  sections.  If you would turn to the page
06  Bates numbered USS 18, please.
07      A.      (Complying with request.)
08      Q.      It's page two of the document
09  under the heading "Health".  About halfway
10  through that paragraph, would you read the
11  portion beginning with, "Acute exposure" into
12  the record for us"?
13      A.      "Acute exposure to its vapors
14  will cause headache, confusion and tingling
15  sensations; severe cases, lost consciousness.
16  Death may occur from paralysis of the
17  breathing center.  It will also cause
18  irritation of eyes, skin and mucous
19  membranes.  Chronic exposure to low
20  concentrations of the vapors can cause severe
21  damage to the blood-forming structures."
22      Q.      Okay.  If you would turn to the
23  next page, under the heading, "Employee
24  Safety."
25      A.      Yes.
```

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02        Q.    And throughout this section
03  there are guidances provided by USS Chemicals
04  as to eye protection, respiratory protection,
05  body, skin and hand protection; correct?
06        A.    Yes.
07        Q.    If you turn to the page Bates
08  numbered USS 21 under the heading medical
09  management.  Would you read the first
10  sentence into the record, please?
11        A.    "The toxicity of raffinate is
12  principally due to its benzene content."
13        Q.    And was that consistent with
14  your understanding?
15        A.    Yes.
16        Q.    And on the next page, that's
17  Bates numbered USS 22, would you read the
18  first sentence at the top of the page into
19  the record, please?
20        A.    "Repeated exposures to low
21  vapor concentrations over a period of time
22  can result in a chronic poisoning."
23        Q.    Would you read the next two
24  sentences, please?
25        A.    "Such reaction depends on the
```

**Transcript of Masaitis, John**

# Masaitis, John

## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02  individual's susceptibility, the
03  concentration of the fumes during exposure
04  and the duration of those exposures.
05  Headache, drowsiness, excessive fatigue and
06  dizziness are the early symptoms.  In severe
07  cases the bone marrow is affected so as to
08  produce blood cell deficiencies that can
09  result in death."
10       Q.    Mr. Masaitis, we didn't see the
11  word cancer in this document, did we?
12       A.    No.
13       Q.    But we did see that this
14  raffinate data sheet referenced the
15  possibility of death; correct?
16       A.    Yes.
17       Q.    And was, to your understanding,
18  Radiator Specialty U.S. Steel's principal
19  customer of raffinate?
20       A.    Yes.
21       Q.    And do you have an
22  understanding of whether or not it was U.S.
23  Steel's practice, in this time period of the
24  sixties into the seventies, to send safety
25  data sheets with its chemicals to its
```

611, non-responsive

**Transcript of Masaitis, John**

# Masaitis, John

Rhyne Trial Master

01                    JOHN P. MASAITIS

02   purchasers?

03        A.      There were certain materials

04   that we produced Material Safety Data Sheets

05   for.  Of course, here is proof that raffinate

06   was one.

611, non-responsive

07        Q.      Was it the company's practice

08   to deliver these safety data sheets to its

09   customers?

10        A.      Well, typically the major

11   function of the Material Safety Data Sheet is

12   to communicate to people outside the

13   corporation, to, you know, your customer.  So

14   I would say that this publication was put

15   together to be sent to our customers.

602, foundation speculation

16                        -   -   -

17             (Whereupon the document was

18        marked, for identification purposes,

19        as Masaitis Exhibit Number 12.)

20                        -   -   -

21   BY MR. SYKES:

22        Q.      I've marked this as Exhibit

23   Masaitis 12.  This is Bates Number USS 15.

24             Mr. Masaitis, if you would take

25   a moment and glance at this cover letter.

403, relevance, confusion, not raffinate

**Transcript of Masaitis, John**

01                 JOHN P. MASAITIS

02   It's on USS Chemicals letterhead. It's a

03   division of United States Steel Corporation

04   in the top lefthand corner. It is signed by

05   William G. Souder, Manager of Light Oil

06   Products.

07       A.     Yes.

08       Q.     And without reading this

09   letter, the second paragraph -- the first

10   paragraph has a reference to the

11   Manufacturing Chemists Association and the

12   use of chemical safety data sheets and the

13   like. And then the second paragraph says,

14   "Enclosed is a copy of a safety data sheet

15   for each of these products for your own use

16   and one copy for the receiving locations to

17   which we ship. We would appreciate your

18   sending a copy to the appropriate supervisor

19   at each such location. If you need

20   additional copies, we shall be happy to

21   provide them to you."

22            Is this the type of letter that

23   you're familiar with that U.S. Steel would

24   have sent along with the safety data sheets?

25       A.     Yes.

403, relevance, and confusion of the issues not raffinate

611, leading

**Transcript of Masaitis, John**

Page 113

```
01              JOHN P. MASAITIS
02       Q.     And is this Mr. Souder, Manager    611, leading
03   of Light Oil Products, was that the division
04   that made products like benzene and raffinate
05   for U.S. -- for the USS Chemicals Division of
06   United States Steel Corporation?
07       A.     Yes.
08              MR. SYKES:  Could we go off the
09   record for a minute?
10              VIDEO TECHNICIAN:  We're going
11   off the record at 11:44 a.m.
12                      -  -  -
13              (Discussion held off the
14   record.)
15                      -  -  -
16              VIDEO TECHNICIAN:  We're back on
17   record at 11:44 a.m., counsel may
18   proceed.
19              MR. SYKES:  I'll tender the
20   witness.  Thank you, Mr. Masaitis.
21              THE WITNESS:  You're quite
22   welcome.
23   BY MR. DuPONT:
24       Q.     Sir, do you have specific data
25   on how much benzene U.S. Steel sold versus
```

Transcript of Masaitis, John

```
01              JOHN P. MASAITIS
02  how much raffinate it sold?
03      A.      Totally?
04      Q.      Yes.
05      A.      No.
06      Q.      And do you have the specific
07  data as to the cost of benzene versus the
08  cost of raffinate during the 1960s and 1970s?
09      A.      No, but I'm aware that the
10  benzene, toluene, xylene plant was
11  constructed to extract benzene, toluene,
12  xylene from light oil and that the end
13  product, the byproduct, what was left after
14  this extraction was raffinate.
15      Q.      But you don't know how much
16  benzene costs versus how much raffinate costs
17  in the 1960s and 1970s; is that correct?
18      A.      Well, I'm sure there was a
19  significant difference because we didn't
20  build a plant to make raffinate.
21      Q.      Well, do you know the cost of
22  benzene and the cost of raffinate in the
23  1960s and the 1970s?
24      A.      No.
25      Q.      Sir, you're not suggesting that
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  the way coal was burned to heat a house is at
03  the same temperature and the same method the
04  way coal was burned to make coke for a steel
05  operation, is it?
06          A.      Would you repeat that, please?
07          Q.      Sure.  You're not suggesting
08  that the temperature at which coal was burned
09  and the method used to burn coal was the same
10  for heating a house as it is for producing
11  coke and chemicals in a steel plant, is it?
12          A.      No.  I -- they're two different
13  operations, but it's still a matter of
14  combustion.  And, as we said, for making
15  coke, it's the -- let me see.  It's the
16  destructive distillation of the coal, but
17  it's an extraction.
18          Q.      Sir, you mention that you use
19  Liquid Wrench and WD40 today?
20          A.      Uh-huh.
21          Q.      There's no more benzene as an
22  ingredient to Liquid Wrench, is there, today?
23          A.      No, I don't think there is.
24          Q.      Okay.  Did WD40 ever have
25  raffinate in it or benzene as an ingredient?
```

**Transcript of Masaitis, John**

Page 116

```
01              JOHN P. MASAITIS
02      A.      I don't think so.  I don't
03  know.
04      Q.      Are you aware of any other
05  penetrating oils that use benzene as an
06  ingredient, other than Liquid Wrench?
07              MR. RILEY:  Objection to form.
08              THE WITNESS:  What was the
09      question?
10  BY MR. DuPONT:
11      Q.      Sure.  Are you aware of any
12  penetrating oils, other than Liquid Wrench,
13  that use benzene as an ingredient?
14              MR. RILEY:  Objection to form.
15              THE WITNESS:  No, but it
16      wouldn't surprise me that others did
17      use benzene at the time that benzene
18      was being used in Liquid Wrench.
19  BY MR. DuPONT:
20      Q.      But you don't know that they
21  did though?
22      A.      No.
23      Q.      Correct?
24      A.      No.
25      Q.      Sir, do you have a letter that
```

Obj:
402
403
Form



MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 119 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 801 of 1330

# Masaitis, John

## Rhyne Trial Master

```
01          JOHN P. MASAITIS
02  shows that this Material Safety Data Sheet
03  for raffinate, which incidentally, when I
04  took your deposition before, in
05  November 2010, I did ask you about, whether
06  this Material Safety Data Sheet for raffinate
07  was specifically provided to Radiator
08  Specialty Company for the date that it was
09  provided?
10          A.      No, I don't have any letter
11  that conveyed this Material Safety Data
12  Sheet.  But as I was sitting here looking at
13  these two exhibits, it's amazing that, you
14  know, when you -- when you compare this type
15  to this type, it's like it was done on the
16  same typewriter.
17          Q.      Sir, are you going to tell us
18  really that that document, the Material
19  Safety Data Sheet and letter, was done on the
20  same typewriter?
21          A.      No, I'm not going to say that.
22  But I just say looking at it, I mean, it's
23  just astounding the comparison between the
24  two documents and the type.  Somebody could
25  make that determination.
```

Obj:
To prior
depositi
ons
(Subjec
t of
MIL)

611, non-responsive
602, speculation

611, non-responsive
602, speculation

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Page 118

```
01              JOHN P. MASAITIS
02       Q.      And U.S. Steel doesn't have any
03  document that shows that it specifically
04  provided to Radiator Specialty Company a
05  safety data sheet for raffinate; correct?
06       A.      I have never seen any letter
07  conveying this Material Safety Data Sheet.
08  Although, as I said, in here, in this letter
09  they -- we talk about sending out the
10  Manufacturers Chemists Association chemical
11  safety data sheet for benzene, toluene and
12  xylene because they had already existed.
13  They were -- MCA had produced them.  But
14  there was none for raffinate.  So I think
15  that's why this was produced, to go along
16  with this letter as a representative of the
17  product raffinate that it was selling.
18              MR. DuPONT:  Objection, move to
19       strike.
20  BY MR. DuPONT:
21       Q.      True or false?
22       A.      Do I have that letter, no.
23       Q.      Okay.  U.S. Steel has no letter
24  to show that it actually sent this safety
25  data sheet for raffinate to Radiator
```

611, non-responsive

602, foundation

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

Case 3:18-cv-00197-RJC-DSC   Document 311-5   Filed 09/02/20   Page 121 of 132
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 803 of 1330

```
01              JOHN P. MASAITIS
02  Specialty Company; correct?
03         A.     No, we have no letter saying to
04  Radiator Specialty Company, here is a
05  Material Safety Data Sheet for raffinate.
06         Q.     Okay.  Sir --
07         A.     That I have seen.
08         Q.     Sir, do you have any
09  information, or are you able to specifically
10  say how much benzene exposure Mr. Krem had
11  from gasoline versus Liquid Wrench?
12         A.     No, I can't quantify it.  But
13  just looking at how he described using the
14  gasoline in this Coca Cola parts cleaner, I'm
15  very familiar with those type of Coca Cola
16  coolers because I've seen several of them
17  used the same way.  A bifold type lid that
18  comes together, about the size of a small
19  refrigerator.  And typically they would pour
20  material into it and do their degreasing.
21  Whereas with Liquid Wrench, Mr. Krem
22  described how he applied the Liquid Wrench
23  through a little hand held pump can onto a
24  bolt that was frozen.  So I would say that
25  the exposures, you know, which -- could have
```

MASAITIS, JOHN
P - (KREN) 12/21/11

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  been substantially different.
03       Q.     Are you going to say that Mr.
04  Krem's exposure to benzene from gasoline was
05  sufficient alone -- that exposure alone was
06  sufficient to cause his myelodysplastic
07  syndrome and acute myelogenous leukemia?
08              MS. KEEHNER:  Objection to form.
09              THE WITNESS:  No, you know, I'm
10       not a toxicologist or an
11       epidemiologist, but just looking at
12       the operations, I think that his
13       exposure to the materials released
14       from the gasoline probably would have
15       been more so than released from the
16       Liquid Wrench.
17  BY MR. DuPONT:
18       Q.     And, sir, the fact that benzene
19  is still produced today, that doesn't negate
20  the fact that benzene causes cancer, does it?
21       A.     No.  I'm not arguing that
22  benzene doesn't cause cancer, no.
23       Q.     So just because benzene might
24  be manufactured for certain specialized
25  operations today doesn't mean that it's a
```

**Transcript of Masaitis, John**

```
01              JOHN P. MASAITIS
02  safe chemical, does it?
03       A.     Well, I don't think there's
04  anything specialized about utilizing benzene
05  to produce numerous plastics and all the
06  rubber tires that are used in the world
07  through various applications in automobiles,
08  trucks, tractors, airplanes.  I don't know if
09  that's sophisticated or inter --
10       Q.     Benzene is not used for
11  cleaning parts in garages today, is it?
12       A.     No.  It's not recommended to be
13  used for that purpose.
14       Q.     That's because we know today
15  it's -- strike that.  I didn't mean to cut
16  you off.  Are you done?
17       A.     No, that's all right.  No, it's
18  because of its toxicity and, of course, now
19  there are much less expensive materials that
20  would do the job.
21       Q.     All right.  That's all the
22  questions I have.
23                     -  -  -
24  BY MR. RILEY:
25       Q.     Since we've already talked
```

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS
02  about --
03                (Discussion held off the
04        record.)
05  BY MR. RILEY:
06        Q.    Is it a fair statement to say
07  that when you have a customer for raffinate
08  that's getting a tank car delivery in excess
09  of 10,000 gallons, that this Exhibit 11
10  safety data sheet for raffinate, at least the
11  intent was to help the customer monitor the
12  workplace manufacturing exposure when they're
13  getting that level of raffinate in?  Is that
14  correct or not?
15                MR. DuPONT:  Objection to form.
16                MR. RILEY:  Hold up.  What's
17        your objection, Andrew?
18                MR. DuPONT:  I'm objecting to
19        the speculative nature.  I'm objecting
20        to the phraseology of the question.
21        I'm objecting to the form.
22                MR. RILEY:  Let me repeat it.
23  BY MR. RILEY:
24        Q.    I'm trying to determine, this
25  safety data sheet for raffinate, was the
```

**Transcript of Masaitis, John**

# Masaitis, John

Rhyne Trial Master

01                    JOHN P. MASAITIS

02  intent behind this the knowledge that the

03  customer was getting tank car shipments, and

04  that this was going to be put into a

05  manufacturing facility to help with the

06  industrial hygiene measurements of the

07  workers in the facility or not?

08          A.      It was meant to provide

09  information of an industrial hygiene nature,

10  a medical nature to assist our customers to

11  protect their workers' health.

12          Q.      And it was made contemplating

13  that the customers were going to be getting

14  tank car deliveries of the raffinate;

15  correct?

16          A.      Yes.

17          Q.      That's all I have, thank you.

18          A.      That's the only way we sold it,

19  in large quantities.

20                      -  -  -

21  BY MR. SYKES:

22          Q.      One follow-up question, Mr.

23  Masaitis.  When Mr. DuPont was asking you

24  about the cost of benzene per unit, whether

25  it be gallon or however it was sold, versus

611, leading, Radiator has a shared interest in disproving the raffinate health hazards

**Transcript of Masaitis, John**

```
01                JOHN P. MASAITIS
02  the cost per gallon of raffinate, would you
03  defer to the sales records that we have --
04  that United States Steel Corporation has to
05  assess the market price between those two
06  chemicals?
07        A.    Oh, definitely.
08        Q.    Thank you.
09              VIDEO TECHNICIAN:  Anybody else?
10              MR. DuPONT:  No further
11        questions.
12              VIDEO TECHNICIAN:  This
13        concludes the videotape deposition of
14        John Masaitis.  We're going off the
15        record at 11:55 a.m.
16                    - - -
17        (Witness excused.)
18                    - - -
19        (Deposition concluded at 11:57
20        a.m.)
21
22
23
24
25
```

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01            JOHN P. MASAITIS
02        C E R T I F I C A T E
03
04
05      I, Brigitte A. Strain, a Notary Public,
06  do hereby certify that the foregoing
07  deposition of JOHN P. MASAITIS, was taken
08  before me, pursuant to notice, at the time
09  and place indicated; that said deponent was
10  by me duly sworn to tell the truth, the whole
11  truth, and nothing but the truth; that the
12  testimony of said deponent was correctly
13  recorded in machine shorthand by me and
14  thereafter transcribed under my supervision
15  with computer-aided transcription; that the
16  deposition is a true record of the testimony
17  given by the witness; and that I am neither
18  of counsel nor kin to any party in said
19  action, nor interested in the outcome
20  thereof.
21      WITNESS my hand and official seal this
22  7th day of January, 2012.
23
24
25
26            _____
27            Brigitte A. Strain
28            Notary Public
29
30
31
32
33
34
35
36
```

**Transcript of Masaitis, John**

# Masaitis, John
## Rhyne Trial Master

```
01              JOHN P. MASAITIS
02       INSTRUCTIONS TO WITNESS
03          Please read your deposition over
04  carefully and make any necessary corrections.
05  You should state the reason in the
06  appropriate space on the errata sheet for any
07  corrections that are made.
08          After doing so, please sign the errata
09  sheet and date it.
10          You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13          It is imperative that you return the
14  original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25
26
27
28
29
30
31
32
33
```

**Transcript of Masaitis, John**

# Masaitis, John

### Rhyne Trial Master

```
01              JOHN P. MASAITIS

02               - - - - -

03            E R R A T A

04               - - - - -

05  PAGE   LINE    CHANGE

06  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

07  Reason for

08  Change:_____

09  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

10  Reason for

11  Change:_____

12  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

13  Reason for

14  Change:_____

15  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

16  Reason for Change:

17  _____

18  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

19  Reason for Change:

20  _____

21  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

22  Reason for Change:

23  _____

24  _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _

25  Reason for Change:

26  _____
```

**Transcript of Masaitis, John**

```
01                  JOHN P. MASAITIS

02

03          ACKNOWLEDGMENT OF DEPONENT

04              I, _____, do

05      hereby certify that I have read the foregoing

06      pages ___ to ____ and that the same is a

07      correct transcription of the answers given by

08      me to the questions therein propounded,

09      except for the corrections or changes in form

10      or substance, if any, noted in the attached

11      Errata Sheet.

12

13      _____        _____

14      DATE                  SIGNATURE

15

16              Subscribed and sworn to before

17      me this

18      _____ day of _____, 2012.

19

20              My commission expires:

21      .               _____

22

23                      _____

24              Notary Public

25
```

**Transcript of Masaitis, John**

Page 129

**Transcript of Masaitis, John**

# Exhibit 6

# Transcript Report

## Mehlman, Myron

**Transcript of Mehlman, Myron**

# Full Transcript Report
## Designation Legend

US Steel Deposition Designation Mehlman

MEHLMAN, MYRON A. 12-11-03 - Combined Designations 9-1-20

**Transcript of Mehlman, Myron**

```
01        IN THE CIRCUIT COURT
02        THIRD JUDICIAL CIRCUIT
03        MADISON COUNTY, ILLINOIS
04
05    RONALD E. AWALT, and      *
06             RY AWALT       *
07      *
08             .    * No. 02-L-956
09      * (BENZENE) *
10    ALLIED SIGNAL CORPORATION,* ET AL      *
11      * * * * * * * * * * * * * * * * * * * * * * * * *
12
13        ORAL AND VIDEOTAPED DEPOSITION OF
14        MYRON A. MEHLMAN, Ph.D.
15        December 11, 2003
16
17        * * * * * * * * * * * * * * * * * * * * * * * * *
18        Oral and Videotaped Deposition of MYRON A. MEHLMAN,
19        Ph.D., produced as a witness at the instance of the
20        Plaintiffs, and duly sworn, was taken in the
21    above-styled and numbered cause on the 11th day of
22        December 2003, from 10:36 to 12:47 p.m., before Tonya
23        Jackson, CSR, RPR, in and for the State of Texas,
24        reported by machine shorthand, at. Moody Gardens, 7 Hope
25        Boulevard, Galveston, Texas, pursuant to the Illinois
26    Rules of Civil Procedure and the provisions stated on
27        the record or attached hereto.
```

**Transcript of Mehlman, Myron**

# Mehlman, Myron
## Rhyne Trial Master

```
01      INDEX
02
03      Page
04   Appearances          3
05      Stipulations          4
06   MYRON A. MEHLMAN, Ph.D.
07      Examination by Mr. Hobson      4
08   amination by Mr. Lynn
09      Examination by Mr. Miller      46
10   examination by Mr. Hobson      76
11      Reexamination by Mr. Lynn      80
12   examination by Mr. Miller      86
13
14      Changes and Signature Page ......      91
15      Reporter's Certificate    .......    .    93
16
17      EXHIBITS
18   NUMBER      DESCRIPTION      PAGE IDENTIFIED
19      1     Deposition Notice    53
20      3     Attachment II    6
21      5     Memo regarding benzene levels 10/18/77      30
22      7     Memo from Lester Levin 8/18/77      87
23
24
25
26
27
28
```

**Transcript of Mehlman, Myron**

01    Appearances:

02

03       R THE PLAINTIFFS:

04

05       . Herschel L. Hobson

06    SBOT No. 09744600

07       w Offices of Herschel L. Hobson

08    2190 Harrison Street

09 aumont, Texas 77701

10

11    FOR RADIATOR SPECIALTY COMPANY:

12    Mr. Lawrence A. Lynn SBOT No. 12738250

13    Coats Rose

14       0 First City Tower

15    1001 Fannin

16 uston, Texas 77002

17

18    FOR UNITED STATES STEEL and AMOCO:

19    Mr. Adam E. Miller

20 sch & Eppenberger

21    190 Carondelet Plaza, Suite 600 St. Louis, Missouri 63105

22

23    VIDEOTAPED BY:

24    Ms. Warriene Flatt Legal Images

25

26

27

28

29

30

31

32

**Transcript of Mehlman, Myron**

01      PROCEEDING S:

02      (EXHIBITS 1 THROUGH 4 MARKED)

03      THE VIDEOGRAPHER: We're on the record at

04      10:36 a.m.

05      (WITNESS SWORN)

06      THE REPORTER: State your agreement for

07      the record.

08      MR. HOBSON: Take it pursuant -- this

09  will be the Illinois Rules of Civil Procedure.

10      MYRON A. MEHLMAN, Ph.D.,

11  having been first duly sworn, testified as follows:

12      EXAMINATION

13      BY MR. HOBSON:

14      Q.    Would you introduce yourself, please, sir.

15      A.    My name is Myron A. Mehlman, M-E-H-L-M-A-N.

16      Q.    And it's Dr. Mehlman, I believe.

17      A.    Yes.

18      Q. And you have a -- what degree for the

19      doctorate?

20      A.    I have a Ph.D. degree from Massachusetts

21      Institute of Technology.

22      Q.    Dr. Mehlman, you and your wife have two

23      homes -- one in Princeton, New Jersey, and one here in

24      Galveston, Texas -- correct?

25      A.    Yes.

US Steel          MEHLMAN,
Deposition        MYRON A. 12-11-03 -
Designation Mehlman  Combined
                  Designations 9-1-20

Transcript of Mehlman, Myron

Case 2:18-cv-00197-RJC-DSC  Document 311-6  Filed 09/02/20  Page 7 of 94
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 821 of 1330

```
01    Q.    And we're here in Galveston to take your
02    deposition today.
03    A.    Yes.
04    Q.    It's my knowledge that you used to work for
05    Mobil; is that right?
06    A.    Yes.
07    Q.    Would you give us the years of your employment
08    with Mobil, please.
09    A.    From 1977 through 1969, I was director of
10    toxicology and environmental health. Then I became
11    director of toxicology and environmental health,
12    sciences laboratory manager, both
13    toxicology/laboratory.
14    Q.    When you were working with Mobil, did you have
15    occasion to deal with the topic of benzene?
16    A.    Yes. I was pretty much responsible for
17    measuring benzene exposure with Mobil employees and its
18    affiliates as well as identify the content of benzene
19    in various Mobil products -
20    Q.    All right.
21    A.    -- and products that were used by Mobil.
22    Q.    And during your stint with Mobil, did you have
23    occasion, then, to receive and send correspondence
24    within the corporation?
25    A.    Yes.
```

US Steel
Deposition
Designation Mehlman

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

Objection: 802, 602, 701, and 402 - Entire Page

```
01      Q.      Doctor, I've got some documents that we've
02   marked as attachments to your deposition. They are
03   Exhibits 2, 3, and 4. Could I ask you to take those
04   sequentially, tell us what each one of them is? Let's
05   start with Exhibit No. 2, please.
06      A.      Exhibit 2 is a memo to Paul Carl, with copies
07   to number of individuals in the laboratory and in
08   Beaumont refinery and myself as well as to William
09   Selfridge, who was in charge of employee relationship
10   for Mobil Oil Corporation. This exhibit describes -
11   this is a memo from Hergrueter, and it refers to a memo
12   from T.W. Gregg to me of October 6th -- this is 1977 -
13   where we requested that Liquid Wrench be analyzed for
14   the content of benzene as well as all other Mobil
15   products.
16      Q.      All right, sir. And in this Exhibit 2 does it
17   indicate that you would have received a copy of this at
18   the time?
19      A.      I did receive a copy of this at that time.
20      Q.      All right, sir. Can you tell us -- identify
21   Exhibit 3, please.
22      A.      Exhibit 3 is analysis of Liquid Wrench,
23   showing that it contains 30 percent of benzene.
24      Q.      All right, sir. And Exhibit 4?
25      A.      This is a memo concerning Liquid Wrench
```

US Steel
Deposition
Designation Mehlman

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

Case 3:18-cv-00197-RJC-DSC  Document 311-6  Filed 09/02/20  Page 9 of 94
Case 3:18-cv-00197-RJC-DSC  Document 408  Filed 09/15/20  Page 823 of 1330

# Mehlman, Myron

Rhyne Trial Master

```
01   benzene content, showing the concentration of benzene

02      in Liquid Wrench by J.L. Wescoat.

03      Q.    And the date on that memo, please?

04      A.    October 12, 1977.

05      Q.    And the date on Exhibit 3 was what, sir?

06      A.    10/5/77.

07      Q.    When you left Mobil's employ, did you take

08      some documents that had been in your files at Mobil

09   with you or copies of them?

10      A.    Yes.

11      Q.    Can you tell me whether or not these documents

12      that are marked as Exhibits 2, 3, and 4, were those

13      documents -

14      A.    Yes.

15      Q.    -- part of them?

16      So, let me ask you if Exhibits 2, 3, and 4

17   have been continuously in your possession since you

18   worked for Mobil?

19      A.    Since 1977.

20      Q. And is there any reason for you to think that

21      these are not true and correct copies of the originals?

22      MR. MILLER: Object to the form.

23      A.    They're absolutely true and correct copies of

24      original documents.

25      Q.    (BY MR. HOBSON) Is there any reason for you,
```

US Steel      MEHLMAN,
Deposition      MYRON A. 12-11-03 -
Designation Mehlman   Combined
           Designations 9-1-20

**Transcript of Mehlman, Myron**

Continuing objection - through line 5

```
01   Dr. Mehlman, to question the authenticity of these
02   documents?
03       A.    No. They were authentic because I was at the
04       meeting where the subject matter was discussed, a
05   number of meetings.
06       MR. HOBSON: I pass the witness.
07       MR. MILLER: Why don't you go.
08       EXAMINATION
09   BY MR. LYNN:
10       Q.    Dr. Mehlman, my name is Lawrence Lynn. I'm
11   here representing Radiator Specialty Company. I have
12       some questions for you.
13       Can you tell us what the purpose was for
14       Mobil's testing of Liquid Wrench?
15       A.    When Occupational Safety & Health
16   Administration initiate emergency temporary standard of
17       1 part per million T.W.A., now known as T.L.V., it was
18   my responsibility to identify exposure levels of Mobil
19       employees in all the facilities as well as to identify
20       the concentration of benzene in all Mobil products as
21   well as any of the products that Mobil used. We have
22   done so on hundreds and hundreds of products, including
23       Liquid Wrench.
24       Q.    In the course of making the determination as
25       to what benzene content, if any, may have been in these
```

Objection: 602 - entire page

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 11 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 825 of 1330

# Mehlman, Myron

## Rhyne Trial Master

```
01    products, what was the procedure that was going to be
02       used?
03       A.    We used Mobil technical services analytical
04       laboratory since my facility was not yet set up and
05    they conducted comprehensive gas chromatographic
06    analysis on all products to identify -- and they have
07       identified for us, means for toxicology and medical
08    department -- the concentration of benzene products
09    and, in fact, I recommended because of high
10    concentration of benzene that use of Liquid Wrench be
11    discontinued and apparently it appears in the memo.
12       So -
13       Q.    Okay. Are you done with that answer?
14       A.    Yes.
15    MR. LYNN: Object to the nonresponsive
16       portion.
17       A.    I'm sorry. I didn't quite, then, understand
18       your question. What's the purpose? I thought I
19       explained.
20       Q.    (BY MR. LYNN) Okay. Well, you talked about
21    the purpose earlier; and then we were talking about the
22    procedure.
23       A.    Procedure was use of our analytical
24       facility -- sophisticated, entirely competent
25    analytical facility that can accurately determine
```

Objection:
602

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

# Mehlman, Myron
## Rhyne Trial Master

01    benzene concentration in petroleum product or any other

02    product.

03    Q.    Where was the facility located that was going

04    to do this testing?

05    A.    In Paulsboro.

06    Q.    Before I get to the Paulsboro testing, was

07    there any discussion of making inquiries with the

08    manufacturers of any products to see if they had done

09    any testing to find out if there was any benzene or the

10    concentration of any benzene in products being used by

11    Mobil?

12    A.    Not that I recall. Besides, that wouldn't

13    have been my responsibility to go to manufacturers and

14    inquire.

15    Q.    The Paulsboro lab, is that in New Jersey?

16    A.    In New Jersey where -- within the Paulsboro

17    refinery.

18    Q.    Did you personally take part in any of the

19    testing    with any of these products?

20    A.    No. I asked that they be tested.

21    Q.    Can you describe for us your background and

22    qualifications with respect to testing procedures?

23    A.    Training, I had some analytical chemistry,

24    organic    chemistry, number of what -- physical

25    chemistry. I had a group of industrial hygienists that

US Steel
Deposition
Designation Mehlman

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 13 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 827 of 1330

# Mehlman, Myron

Rhyne Trial Master

```
01    reported to me for a while, for about a year; and we
02    had some equipment later on in the laboratory that we
03       could do our own testing that was around 1980s. I was
04       sufficiently briefed at that time about methodology and
05    procedures that were used in analyze various
06    hydrocarbon components.
07       Q.    Do you have any type of certifications or
08       degrees in testing?
09       A.    No, I do not. I had individuals who worked
10       for me that had certification in various type of
11       testing.
12       Q.    To break it down to layperson terminology, I
13       guess, do you have the qualifications to determine
14    whether or not the technicians in the lab are
15    performing tests properly?
16       A.    Absolutely.
17       Q.    And what is the basis for that?
18       A.    I use a positive control and a negative
19       control, and we know a percent of recoveries. The
20       reason we went inside, because the testing in outside
21       laboratories was inadequate.
22       Q.    Tell me what you mean by outside laboratories
23       being inaccurate.
24       A.    Contract laboratories. When samples sent to
25       contract laboratories, I got variability in results,
```

US Steel
Deposition
Designation Mehlman

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

01      including of spike samples. So, immediately terminate

02  using of contract laboratories and went in-house where

03      results were reproducible. High recovery of samples

04      that we spiked, usually 95 to 99 percent or 101

05      percent; and blanks came out blank.

06      Q.    Now, for a particular test, a particular

07      individual test, how do you make a determination as to

08  whether or not that particular test was accurate?

09      A.    I rely on the quality of testing of Mobil

10      analytical laboratory, which was excellent. They had

11  many years of experience, and results that we got back

12      on thousands of samples were accurate.

13      Q.    Would you expect results received from that

14      laboratory to be reproducible?

15      A.    I would expect it, yes.

16      Q.    Are there any protocols that exist for the

17  type of testing that was being done by Mobil with

18      respect to benzene?

19      A.    There are protocols because Mobil routinely

20      tested for petroleum hydrocarbon, which would

21      include -- hydrocarbons, which would include benzene.

22      Q.    And what are those testing protocols?

23      A.    You need to ask the analytical laboratory.

24      They have them.

25      Q.    So, you are not personally aware of what the

Objection: 602,
701, & 402

US Steel
Deposition
Designation Mehlman

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

```
01   protocols are?
02       A.    I have seen them, but I don't remember.  I
03   didn't make any effort to memorize something that
04   transpired 26 years ago.
05       Q.    Would there be document -- let me withdraw
06   that question.
07   Should there be documentation as to the
08   protocol being utilized for a particular test so that
09   20 years later you can determine whether or not the
10   test was properly done?
11       A.    The procedure and protocol should exist.
12       Q.    In what form should they exist?
13       A.    I don't know. You need to find out what form
14   was -- they exist now.
15       Q.    When you received test results from this Mobil
16   testing program for benzene, did you at that time
17   review any of the protocols and compare them with the
18       tests to determine whether or not the tests were done
19   properly?
20       A.    I did not. I had other people do it for me.
21       Q.    Who would be the other people at Mobil who
22   would have been doing those checks?
23       A.    The analytical chemists, the quality control.
24   We also have quality assurance program. When needed, I
25       requested that that be checked.
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

```
01     Q.     Can you provide us with the names of any of
02  the individuals who would have been checking the
03     testing done with respect to this Liquid Wrench test
04     that the documents reflect?
05     A.     The names is on the memo. You can ask any of
06     the analytical chemists.
07     Q.     When was the last time you spoke with any of
08  the people whose names are on that memo?
09     A.     About 14 years ago -- 15 or 16 years ago,
10  maybe longer.
11     Q.     Do you recall ever discussing the particulars
12  of this test with any of the gentlemen reflected on the
13  memos?
14     A.     The only thing I recall is that we had
15  discussed that the concentration of benzene was high -
16  unusually high to be used without protective equipment;
17  and it was recommended that the product be discontinued
18     in the memo, as stated. So .
19     Q.     Was there any discussion of verifying the test
20     to determine whether or not it was an accurate figure?
21     A.     I am certain that the levels were accurate.
22     But did I discuss it? No.
23     Q.     Why are you certain that the levels are
24     accurate?
25     A.     Because they haven't made any mistakes and --
```

US Steel
Deposition
Designation Mehlman

Transcript of Mehlman, Myron

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 17 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 831 of 1330

01    on analysis for benzene, and they had a lot of

02    experience. They analyzed thousands of samples.

03    Q.    Well, if you haven't checked the particulars

04    of the test or reproduced the test, then how do you

05    know mistakes haven't been made?

06    A.    The quality of work was very high.

07    Q.    You're assuming because of the general

08    reputation and experience with the quality of the

09    laboratory's work, that each individual test done by

10    the laboratory was accurate; is that correct?

11    A.    I had no reason to question this analysis.

12    However, I did look, as I pointed out, at thousands of

13    samples that the laboratory did for me -- they did

14    thousands of their own samples -- and I find them to be

15    within range and acceptable and some of the samples we

16    split in two. I had my industrial hygiene split, and

17    the results came out very close together. So, I was

18    satisfied that the quality is very high.

19    Q.    Was that done with any of the tests on Liquid

20    Wrench?

21    A.    I don't know. I don't know that.

22    Q.    Were any tests done of Liquid Wrench in the

23    labs at Beaumont?

24    A.    I specifically don't recall if they did. They

25    may, but I don't recall that.

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

# Mehlman, Myron

Rhyne Trial Master

01     Q.    Okay. Do you know whether the testing done on

02 Liquid Wrench was a qualitative or a quantitative test?

03     A.    All tests were quantitative.

04     4.    For a quantitative test, would you generally

05     expect that if a substance is tested, the results will

06 show all of the components in the sample?

07     A.    Depends what you're looking for. You can

08     show -- you can measure all the components, or you can

09 only measure one component and report one component.

10     Q.    Do you know why the other components of Liquid

11 Wrench were not reported in this instance?

12     A.    We only were interested in benzene

13     concentration because we're required by law -- in

14     nineteen -- I believe it was '77 emergency temporary

15     standard -- to determine the concentration of benzene

16 in all our products, especially petroleum hydrocarbon

17     products.

18     Q.    The time period when this test would have been

19 done, do you know how the results would have been

20     reported to the testing people?

21     A.    I thought testing people report the results to

22     someone else.

23     Q.    Probably wasn't a good question. Let me back

24     up a little bit.

25     I want to talk a little bit step by step as to

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01 how this testing would have been done, if you know at

02 all. Do you know how the sample would have been

03 obtained?

04     A.    No, I do not; and if I did at that time, I

05     wouldn't recall.

06     0.    Do you know whether generally accepted

07     scientific practices generally require that data be

08 maintained as to a sample -- where it came from,

09     information about that sample -- if a test is going to

10     be utilized for a scientific purpose?

11     A.    We followed that practice on our benzene

12     samples. We had a good recordkeeping procedure and

13     documentation.

14     Q.    So, do you believe that Mobil should have had

15     a record as to where the sample of Liquid Wrench was

16 obtained from?

17     A.    They should -- they should, but you need to

18     ask the person who obtained the sample. I don't

19 remember who did that.

20     Q.    Do you know what particular formulation or

21 variation of Liquid Wrench was utilized for this test?

22     A.    No. Apparently it had to be some -- from

23     petroleum products because the benzene concentration

24     was very high. Well, coal -- petroleum or a coal tar

25     pitch, something -- not tar pitch -- coal distillation

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

# Mehlman, Myron
## Rhyne Trial Master

```
01   products. It was -- it was much too high to have come
02       from source like naphtha -- most naphtha is
03       substantially lower -- or kerosenes.
04       MR. LYNN: Object to the
05       nonresponsiveness.
06       Q.   (BY MR. LYNN) Were you aware that Liquid
07   Wrench came in different formulations?
08       MR. HOBSON: Objection, form.
09       A.   To some extent, yes, there were different
10       formulations.
11       Q.   (BY MR. LYNN) Do you know which one was used
12       for this test?
13       A.   No, I do not.
14       Q. Do you know what the chain of custody was
15       for -
16       A.   No -
17       Q.   -- the sample?
18       A.   -- I do not.
19       Q.   This chain of custody is something that should
20       be reported in doing a proper scientific test?
21       A.   I used chain of custody. I don't know if it
22       should or shouldn't be at that time period; but
23   whenever I have my people gather the sample, we have
24       chain of custody and good records.
25       Q.   Have you seen any records indicating the chain
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01  custody for this Liquid Wrench sample?

02      A.   I wouldn't even -- if I had seen it, I

03  wouldn't recall it.

04      Q.   If there were documentation regarding where

05  the sample was obtained in the chain of custody, where

06  would that be kept?

07      A.   Oh, I don't know -- I have no idea where these

08  documents now would be kept.

09      Q. At the time when you were there, was there a

10  place where they were supposed to be kept?

11      A.   Yes. We had the records and we transmitted

12  the records usually to the analytical laboratory or we

13  would have kept in our files.

14      Q.   Okay,

15      A.   We also would show these records to the

16  laboratory so they'll know -- so they can trace where

17  the sample has been, who handle it, and so on.

18      Q.   Where precisely would the records be kept?

19      A.   You would have to ask Mobil. I don't know

20  where they would be kept. They were kept in filing

21  cabinets when I was there. I don't know now where they

22  would be kept.

23      Q.   Where were those filing cabinets located while

24  you were there?

25      A.   '77, that would have been on 42nd Street in

US Steel         MEHLMAN,
Deposition       MYRON A. 12-11-03 -
Designation Mehlman  Combined
              Designations 9-1-20

**Transcript of Mehlman, Myron**

Page 20

01    New York City. In 1977 that's what -- in medical

02        department.

03        Q.    That would be at the Mobil headquarters in

04    New York?

05        A.    That's right, forty-two forty -- I don't

06    remember exactly the number anymore.

07        Q. Have you seen any documentation as to whether

08    or not there was any possibility of the sample being

09    contaminated prior to testing?

10        A.    I haven't seen any.

11        Q. Do you know whether any determination was made

12    as to whether or not the sample that was tested was a

13    typical sample of any formulation of Liquid Wrench?

14        A.    I don't recall that.

15        Q.    Okay. Do you know what testing equipment was

16    used to perform the test?

17        A.    I don't recall this now. Usually gas

18        38    chromatographs.

19        Q.    Did the gas chromatograph need to be

20    calibrated prior to testing?

21        A.    It should be, yes.

22        Q.    Do you know what calibration was done of any

23    particular equipment used to test this particular

24    sample?

25        A.    Since I didn't do any of that work, you need

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01    to ask the analytical chemist that did the work.

02        Q.    But you have no personal knowledge of any

03    calibration that was done of the equipment, do you?

04        A.    I don't recall anything specific.

05        Q.    So, you can't testify under oath that the

06    machine was properly calibrated at the time of testing,

07    can you?

08        A.    All I can testify is that these are authentic

09    documents. We measured that along with hundreds of

10    other products. That's all I can say. And I have seen

11    them.

12        MR. LYNN: Object to the responsiveness.

13        Q.    (BY MR. LYNN) Can you testify under oath that

14    the equipment used to test the Liquid Wrench sample was

15    properly calibrated prior to testing, from your

16    personal knowledge?

17        A.    I already answered that. No, I cannot.

18        Q.    What would be the proper procedure for

19    calibrating the gas chromatograph?

20        A.    I think you need to ask the analytical

21    chemists.

22        Q.    So, you have no personal knowledge sitting

23    here today -

24        A.    I do have -- excuse me. I didn't say that.

25    You need to ask; and if I do, I don't recall. It's

403,
cumulative

403,
cumulative
incomplete
question

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

403,
cumulative.
waste of time
no question
asked

01  been over 26 years since I used any of the equipment or

02  been instructed or familiarize myself with that

03  equipment. You ask me questions that are not in my

04  domain.

05  Q.    And that's all we're trying to establish,

06  Doctor, is what you know sitting here today and what

07  you don't know.

08  A.    I answered that several times, what I know and

09  what I don't know.

10  Q.    Do you know whether there are any alternative

11  types of equipment that can be used to measure benzene

12  content in a sample of a product such as Liquid Wrench

13  other than a gas chromatograph?

14  A.    There are alternatives. I don't recall what

15  they are.

16  Q.    Do you know what the relative advantages or

17  disadvantages are of a gas chromatograph as opposed to

18  a different type of equipment that might be used for

19  the test?

20  A.    A gas chromatograph is more precise. You can

21  get a more accurate analysis. Can use -- you can also

22  get at the same time many other components if you

23  choose so.

24  Q.    Are there issues, when using a gas

25  chromatograph, as to a differentiation between benzene

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01  and cyclohexane?

02  A. I wouldn't recall. I know cyclohexane was

03  analyzed also in some products, but the issue isn't -

04  well, there may be time of retention; but I don't

05  recall at this time.

06  Q. Are you aware of whether or not there was any

07  analysis done to determine whether or not it was

08  benzene or cyclohexane that was being detected in the

09  test that's reflected in the documents you've brought

10  us here today?

11  A. I don't think that was an issue. The analysts

12  were -- they knew what they were doing. They had been

13  doing it for many decades, and they're highly

14  professional and experienced chemists that did the

15  analysis.

16  MR. LYNN: Object to the responsiveness.

17  Q. (BY MR. LYNN) Are you aware at all of any

18  issues that can arise when doing a test with a gas

19  chromatograph as to difficulties in distinguishing

20  between cyclohexane and benzene?

21  A. I don't recall at this point.

22  Q. Do you recall ever having any discussions with

23  anyone at Mobil or the labs about confirming whether or

24  not what was being reported as benzene was a benzene

25  result as opposed to cyclohexane?

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01     A.     There was always a standard that's run that
02     could compare the specific substance to the one that's
03     being analyzed. I do recall that.
04     Q.     Do you recall any questions at all regarding
05     cyclohexane in regard to this test?
06     A.     I don't recall that.
07     0.     Do you know whether any additional tests are
08 needed to segregate cyclohexane and benzene results
09 when using a gas chromatograph?
10     A.     I don't recall that.
11     Q.     If any additional tests were done, would you
12     expect    that there would be documentation of those
13     tests?
14     A.     I would expect that there would be.
15     Q.     As of the time that you were at Mobil in 1977,
16 where would those documents be kept?
17     A.     Would be in a -- at -- in the files of the
18     analytical laboratory.
19     Q.     Do you know what the retention policies were
20     with respect to documents at either Mobil's
21 headquarters or the analytical lab for keeping
22     documents for this type of testing?
23     A.     I -- the retention policy, if I recall
24     correctly, was to keep -- at least the toxicological
25     documents that I can speak to, were to keep them for a

US Steel          MEHLMAN,
Deposition        MYRON A. 12-11-03 -
Designation Mehlman   Combined
                  Designations 9-1-20

Transcript of Mehlman, Myron

01 very, very long time.

02     Q.    Would you expect that if there were further

03     documentation of this Liquid Wrench test -- including

04     the protocols, the procedures used, any additional

05 tests done -- that those documents would have been

06     retained?

07     A.    I can't answer that. You need to ask the

08 analytical laboratory people who were doing these

09     tests.

10     Q.    From your testimony earlier, was a 30 percent

11 benzene level an unexpectedly high level?

12     A.    I would say it's unexpectedly high level, yes.

13     Q.    Were you surprised by that finding?

14     A.    Somewhat. I thought the level was much higher

15 than many other products that I have seen.

16     Q.    Did you do anything at that point to see if

17     the result could be verified?

18     A.    No, I didn't -- I don't remember doing

19 anything except that we suggested that the product be

20 discontinued at this level of benzene.

21     Q.    Did you request any further documentation

22     concerning the test to see whether or not there was any

23     indication whether there might have been any errors in

24     the test?

25     A.    I did not request that. I don't think it was

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

# Mehlman, Myron

## Rhyne Trial Master

```
01      needed.
02      Q.    Do you know whether there was a subsequent
03      test done to determine whether or not the results could
04  be confirmed?
05      A.    My recollection, there was a -- another test
06      was done at a later date; and I don't recall
07      specifically what it was at this moment.
08      Q.    Do you recall whether the 30 percent level was
09  ever reproduced?
10      A.    I don't recall what -- if it was reproduced or
11      not.
12      Q.    Now, 30 percent would be a high enough level
13      that is somewhat memorable; is that -
14      A.    It was very --
15      Q.    -- correct?
16      A.    -- memorable, yes.
17      Q.    If you saw another 30 percent test, do you
18  think you would have remembered that there was another
19      test out confirming the 30 percent?
20      A.    Well, you're talking about 26 years ago. Not
21      necessarily at this moment. If I saw it at that time,
22      I may or may not; but I don't know. I don't recall
23      that.
24      Q.    Do you think you would just remember the first
25  one but you wouldn't remember the confirming test?
```

US Steel
Deposition
Designation Mehlman

Transcript of Mehlman, Myron

# Mehlman, Myron
## Rhyne Trial Master

01    A.    I don't recall at this moment.

02    Q.    Okay. Do you remember seeing a test resulting

03    in a 7 percent level?

04    A.    Yes, I do remember seeing that 7 percent.

05    Q.    Okay.

06    A.    Now that you mention, I do remember.

07    Q. Do you recall when the test that you had the

08    7 percent level was done?

09    A.    No. It would be approximately the same period

10    of time.

11    Q.    Do you know where that test was done?

12    A.    I don't recall. There's a memo to that

13    effect, and I'm sure it's -- now that you mentioned it,

14    I do recall that.

15    Q.    Do you recall whether it would have been the

16    same laboratory or a different laboratory?

17    A.    I have to -- I don't recall. I have to look

18    at the memo and see who did that.

19    Q.    Would it concern you at all that there would

20    be such a wide difference between two results?

21    A.    No, I wouldn't be surprised. Depends on what

22    stock material is being used.

23    Q.    What would account for the differences?

24    A.    Well, it depends what's the source of your

25    material. If it -- if you use kerosene or sometime

Objection 802, 602, 701, and 402

US Steel Deposition Designation Mehlman

MEHLMAN, MYRON A. 12-11-03 - Combined Designations 9-1-20

**Transcript of Mehlman, Myron**

01     naphtha, the level would be substantially lower than

02     whatever was used in initial products.

03     Q.    Okay. Well, if we're talking about two tests

04     done on Liquid Wrench -- one showing 30 percent, one

05     showing 7 percent -- if they're the same product, what

06 would you expect -

07     A.    Excuse me. They're not the same product. The

08 name is the same, but the product is different.

09 Depends on the stock material that they used to put in

10     the product. They couldn't be the same product.

11     Q.    So, do you have any way of knowing whether or

12     not -- even if the 30 percent test was accurate for the

13 particular sample it was done on, whether or not any

14 other sample of Liquid Wrench would result in the same

15     level?

16     A.    I know that 30 percent was accurate at the

17     time it was measured; and if the sample -- a different

18     sample is taken with a different material that was put

19     in it, it would be different.

20     Q.    Do you have any way of determining whether or

21 not it would be more likely that different samples of

22 Liquid Wrench would come to the 7 percent or the

23     30 percent?

24     A.    I can't -- I don't know. I just -

25     Q.    You would have to test each particular --

Objection: 602, 701, and 402

US Steel    MEHLMAN,
Deposition   MYRON A. 12-11-03 -
Designation Mehlman  Combined
            Designations 9-1-20

Transcript of Mehlman, Myron

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 31 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 845 of 1330

Page 29

```
01    A.    That's right.
02    -- sample -
03    A.    You need to -- well, the way that was
04    determined was test it. So, obviously there was one
05    sample at 30 percent and one sample at 7 percent.
06    Q.    And not having -
07    A.    From a different source.
08    Q.    And you don't have personal knowledge as to
09    the source of the sample that resulted in the 30
10    percent, do you?
11    A.    I don't recall that -- where it was obtained,
12    no.
13    Q.    You don't have any personal knowledge as to
14    whether that came directly from a sealed container of
15    Liquid Wrench or whether it might have been a sample
16    that might have been mixed with something else, do you?
17    A.    I don't recall the source. It's been a long
18    time, and I just don't recall. I'm sure it was
19    described to me at that time where they obtained, but I
20    don't recall that.
21    Q.    Other than -- and let me ask you this: Do you
22    know what the sample size was that was tested?
23    A.    The actual sample size would have been very
24    small, if you use gas chromatograph; but the sample
25    size from what it was taken, no, I don't recall.
```

611,
compound
403,
cumulative

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01    Q.    Other than the one particular sample and

02  whatever that source was for that sample, you don't

03  know what the content of benzene in Liquid Wrench would

04  be in any other sample, do you?

05    A.    No, 1 do not, unless it's tested.

06    Q.    Okay.

07    MR. LYNN: Mark this.

08    (EXHIBIT 5 MARKED)

09    MR. LYNN: Do you need to take a look,

10  Herschel?

11    MR. HOBSON: From here it looks like

12    something that's already been marked.

13    THE WITNESS: Yeah, it's Exhibit 2.

14    MR. LYNN: Oh, is it the same?

15    THE WITNESS: Yes. Exhibit 2 is the same

16    as Exhibit 5, identical.

17    MR. LYNN: Okay. We hadn't put a date on

18  Exhibit 2 when we were describing it.

19    Q.    (BY MR. LYNN) So, Exhibit 2 discusses a test

20    that was done on Liquid Wrench as well, correct?

21    A.    Yes.

22    Q.    And where was this test done?

23    A.    The test was done in Paulsboro laboratory.

24    Q.    So, this test would have been done same

25    location as the other test that you testified about?

US Steel
Deposition
Designation Mehlman

Transcript of Mehlman, Myron

# Mehlman, Myron

Rhyne Trial Master

```
01     A.     Which other test?
02     Q.     The test that resulted in the 30 percent -
03     A.     Well, that's 30 percent. We're talking -
04     Exhibit 2 is 30 percent.
05     Q.     If it's the same document I'm looking at, it's
06     7 percent.
07     A.     I don't have that document. You have both
08  documents that show 30 percent. This is dated
09     October 18, 1977, October 18 -- these are two identical
10     documents.
11     Q.     Do you see there's an arrow drawn about
12  halfway or two thirds of the way down the page?
13     A.     Yes. I see on the bottom, right.
14     Q.     And what's that?
15     A.     (Reading) It contained no fat, and ash content
16  was negligible. The aromatic solvent had the following
17     characteristics: Benzene, 7 percent by volume.
18     Right, that's the same document.
19     Q.     Right. And there's a comment section below,
20     correct?
21     A.     Yes.
22     Q.     And what does the comment section say in the
23     first sentence?
24     A.     It says that it's not as high as 30 percent.
25     Q.     Okay. So, this is a 7 -- a test that showed 7
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

```
01      percent, correct?
02      A.    That's correct.
03      Q.    This is not a test that showed 30 percent,
04      correct?
05      A.    Yes.
06      Q.    So, we're talking about two separate tests.
07      A.    That's right.
08      Q.    Do you know whether both tests were done at
09   the same laboratory?
10      A.    To the best of my recollection, yes, they both
11   would have been done in the same laboratory.
12      Q.    Did you ever look at any documents to
13   determine whether or not there were any differences in
14   the procedures that were done in the two tests?
15      A.    Procedures were always the same with respect
16      to testing for benzene.
17      Q    Are you telling us that from your personal
18   knowledge or from a supposition that that's the way you
19   believe it was done?
20      A.    No. I had enough experience, communication
21   with the laboratory about testing of samples on benzene
22      that procedures was followed essentially the same.
23      Q.    Do you have a specific recollection with
24      respect to these two particular tests of having a
25   discussion or reviewing documents to determine step by
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

# Mehlman, Myron

## Rhyne Trial Master

```
01   step whether or not these two tests were performed the
02   same?
03   A.    I don't recall that.
04   Q. Do you know whether or not the same sample was
05   used for both tests?
06   A.    I doubt it very much. It's different samples.
07   Q.    Is there any explanation at all as to what the
08   differences would be that would result in a 30 percent
09   result in one test and 7 percent in another?
10   A.    Different products, different sample.
11   Q. And do you know of any determination that was
12   ever done by Mobil as to whether or not the 30 percent
13   test or the 7 percent test more accurately reflected a
14   typical or average sample of any particular formulation
15   of Liquid Wrench?
16   MR. HOBSON: Objection, form.
17   A.    I didn't quite understand your question.
18   Could you repeat that?
19   Q.    (BY MR. LYNN) Okay. You had two results.
20   One said 30 percent; and one said 7 percent, correct?
21   A.    Okay.
22   Q.    Was there ever any discussion as to whether or
23   not -- making a determination as to whether either of
24   those was a more typical result or sample of Liquid
25   Wrench?
```

403, no answer, waste of time

403, cumulative delay

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

Page 34

01     A.     I don't recall. All we are interested, that

02     the product had more than 1 percent of benzene.

03     Q.     And as far as you can tell, if another sample

04 of Liquid Wrench was tested, it might come out with a

05     completely different result again, correct?

06     MR. HOBSON: Objection, form.

07     A.     That's possible.

08     Q.     (BY MR. LYNN) And to the best of your

09 knowledge, there was no effort made to obtain every

10 different formulation or variation of Liquid Wrench to

11 determine the benzene content in each one of them, was

12     there?

13     MR. HOBSON: Objection, form.

14     A.     I'm not aware of that. If it is, the people

15 who provide the samples should be able to answer that.

16     Q.     (BY MR. LYNN) Now, we talked earlier on in

17     the deposition about being able to reproduce a result.

18 Do you have any concerns at all that the result from

19     the first test was not reproduced in the second test?

20     A.     Two different samples. I don't know how you

21     can reproduce result from two different samples.

22     Q.     And I take it there was no effort made to -

23     A.     Unless you do the same sample. And I'm

24     positive it wasn't the same sample.

25     Q. And do you know whether or not any portion of

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

01    the source for the first sample was retained and

02    available to be retested to determine whether or not

03     the 30 percent test was accurate?

04     A.    You need to ask the analytical chemists.

05     People that would be very knowledgeable is Paul Carl

06     and Gerard.

07     Q.    During the time that you were at Mobil, did

08    you keep track of other tests being done by other

09    people as to different types of substances being used

10     at Mobil?

11     A.    Yes.

12     Q.    Did you keep track of any other testing done

13     of Liquid Wrench?

14     A.    Not that I recall.

15     Do you ever remember seeing any reports from

16     any source outside Mobil stating that Liquid Wrench had

17     as high as 30 percent benzene content?

18     A.    I don't recall that. And if I had went

19    through -- I had average of several thousand documents

20    per month. So, it would be difficult to keep track of

21     a specific product unless I have direct interest in it;

22     and I did not.

23     Q.    In your time since leaving Mobil, have you

24     kept track of literature and testing done of various

25     products with respect to benzene concentrations?

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01    A.    Yes.

02    Q.    Do you recall seeing in any of the literature

03    that you've ever reviewed any report of Liquid Wrench

04    having a benzene content as high as 30 percent?

05    A.    I don't recall any concentration of most of

06    the products.

07    Q.    Now, the testimony you're giving today is with

08    respect to Mr. Awalt's case. Have you reviewed any

09    records at all regarding Mr. Await or his alleged

10    exposure?

11    A.    No. I don't even know what case this is.

12    Q.    So, I take it by that that you would have

13    absolutely no way of knowing whether or not any Liquid

14    Wrench that Mr. Await might have used would have had

15    anything in common with any of the Liquid Wrench that

16    was tested in the two tests that we've discussed today;

17    is that correct?

18    A.    I have no idea what you're asking me. I have

19    no information on the case or who are defendants,

20    except now I just learned what's the nature of the

21    case.

22    Q.    Doctor, this is not the first case that you've

23    provided testimony for, is it?

24    A.    That's correct.

25    Q.    How many cases have you testified in before?

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

# Mehlman, Myron

## Rhyne Trial Master

```
01    A.    Altogether, probably between 50 to 70.

02    Q.    Would that have been depositions in those

03    cases, trial testimony, or both?

04    A.    Both.

05    Q.    How many cases in which you gave a deposition

06    but did not testify at trial?

07    A.    A lot.

08    Q.    Okay. Can you give us an approximate number?

09    A.    No, I can't. I didn't keep track.

10    Q.    Do you recall about how many cases that you

11    actually testified at trial?

12    A.    No, that -- because -- I appeared at trial.

13    Lot of time it settled. I got certified as an expert.

14    The case got settled before I -- the last one I was in,

15    and I didn't have a chance to give any testimony.

16    Q.    Okay. But do you have any recollection as to

17    approximately how many cases you've actually given your

18    testimony at trial?

19    A.    Oh, I can tell you two or three -- trial? At

20    least one maybe, trial cases

21    Q.    When you testify, do you generally testify for

22    plaintiffs or defendants in cases?

23    A.    Generally for plaintiffs.

24    Q.    And do you know what types of defendants have

25    generally been sued in those cases?
```

402/403 relevance

408, settlements

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

Page 38

```
01     A.     They're all types -- petroleum companies,
02     chemical companies, and spillage. I really don't
03     recall what type of defendants because it's difficult
04     to say. Sometimes a list of defendants is so large
05     that I don't even read it except the first one.
06     Q.     Do you recall giving any testimony concerning
07  Liquid Wrench before?
08     A.     1 probably did, but I don't recall where or
09     when.
10     Q.     Do you recall the general substance of any of
11  your prior testimony concerning Liquid Wrench?
12     A.     No, I don't recall that.
13     Q.     Are you being paid for your work on this
14     particular case?
15     A.     No, I don't think so. I -- no one mentioned
16     any money.
17     MR. HOBSON: As you know, Dr. Mehlman is
18     being presented as a fact witness.
19     MR. LYNN: I had been told that he had
20     been designated as a fact and expert witness. Is that
21     incorrect?
22     MR. HOBSON: As far as 1 know it is.
23     THE WITNESS: An expert?
24     MR. HOBSON: No, as a fact witness.
25     MR. LYNN: Okay.
```

**Transcript of Mehlman, Myron**

01    Q.    (BY MR. LYNN) Did you review any documents

02    prior to your deposition this morning?

03    A.    No -- perhaps I did review some documents this

04    morning, but has nothing to do with this case or any

05    case Mr. Herschel Hobson is dealing with. It has to do

06    with hematological cancer that's caused by benzene.

07    MR. HOBSON: He gave me a recent

08         B    publication.

09    Q.    (BY MR. LYNN) Okay. Did you have any

10    discussions with Mr. Hobson or anyone at his office

11    prior to this deposition concerning this case or your

12    testimony?

13    A.    No. I haven't spoken with Mr. Herschel Hobson

14    for a long time.

15    Q.    Are you aware of any incidents or cases in

16    which any results from the laboratory that performed

17    the test we've been talking about today have been

18    questioned or challenged?

19    A.    I'm not aware of any challenges to the Mobil

20    analytical laboratory.

21    THE WITNESS: Herschel, could you pass

22    some water, please?

23    MR. HOBSON: Sure.

24    THE WITNESS: Thank you. Thank you.

25    Q.    (BY MR. LYNN) Do you know whether any of the

**Transcript of Mehlman, Myron**

```
01      individuals that participated in the actual testing are
02      still employed by Mobil?
03      A.    To the best of my -
04      MR. HOBSON: Objection, form.
05      A.    I don't know the name that -- the names that
06      I'm very familiar with is Gerard. I don't know if he's
07      still there or not. He might be. Paul Carl, I worked
08   with him very closely. He was a senior manager. And
09      Selfridge, I know that he's not. I -- I can't answer
10      that. I really don't know. I know who's not.
11   Selfridge wouldn't be. He was pretty old when I worked
12      with him.
13      Q.    (BY MR. LYNN) Do you know if Mr. Carl is
14      still living?
15      A.    That's good question. I don't know. I ...
16      Q.    And the last you had of any knowledge of
17   Mr. Carl, was that still while he was at Mobil?
18      A.    Yes. And I've been following Mobil World that
19      lists people who have been deceased, and I don't
20      remember seeing his name.
21      Q.    And you haven't heard of him being anywhere
22   else other than Mobil, have you?
23      A.    I think he would retire from Mobil. He had
24   been with Mobil for maybe 40 years or so.
25      Q.    Do you know who M.H. Meynig is, M-E-Y-N-I-G?
```

**Transcript of Mehlman, Myron**

Page 41

01    A.    He's not on this list, is he?

02    MR. HOBSON: I think he's on this

03    document here.

04    A.    Oh, okay. This -- I'm sorry. That's a

05    different document.

06    Name is familiar, but I don't know if he -

07    he's -- it's from analytical laboratory. It could be

08    from Beaumont, but I don't know. I don't recall who he

09    is.

403,
waste of
time

10    Q.    (BY MR. LYNN) And do you know J.L. Wescoat?

11    A.    I know his name. I may have met him, but I

12    don't recall if I met him. I went to Beaumont several

13    times and -- but specifically I don't recall.

14    Q.    Do you know what his job title was back in

15    1977?

16    A.    No, I do not.

17    Q.    Okay. Was he working at the Beaumont

18    facility,

19    A.    Yes, I believe so.

20    Q.    Do you know what department he was in?

21    A.    He would -- no, I do not know. I don't recall

22  what department. If I met him, I would have known; but

23    I wouldn't remember specific -- individuals in specific

24    departments.

25    Q. Do you know what his role would have been in

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

# Mehlman, Myron
## Rhyne Trial Master

403,
waste of
time



01    this testing program?

02        A.    I do not know, but could have been -- he

03        certainly -- I don't think he was industrial hygienist

04    because he would have reported to me.

05        Q.    On the document that we were just looking at

06        that had Mr. Meynig's name on it, there's some

07    handwritten initials about two thirds of the way down

08    the page on the right. Do you recognize any of those

09        initials?

10        A.    No, I do not.

403,
waste of
time



11        Q.    Earlier on I started asking you about how

12    results were reported and there was some confusion on

13        that and that's whenever we started talking about

14        procedures. The document that we've been looking at

15    today with the 30 percent finding has got just a

16    handwritten result on it, correct?

17        A.    Yes.

18        MR. HOBSON: Objection, form.

19        Q.    (BY MR. LYNN) If a gas chromatograph is used,

20    would the test result be printed off in some form or

21    would it -- how would the people doing the testing see

22        the result?

23        A.    I believe it would be printed off.

24        Q.    Okay. So, would you expect that there would

25    be a document someplace in some kind of mechanically

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

```
01   printed form that would contain the results from the
02     test that was performed on the Liquid Wrench sample?
03     A.    It would be -- by "printed off," I mean charts
04     from which the levels could be calculated or
05     computerized. Would I expect they'll be someplace?
06     Can't answer that. At this point in time, I don't know
07     what's -- who would have what where.
08     Q.    Okay.
09     A.    It's too many years past.
10     Q.    And would you have expected that in 1977 there
11  would be documents existing that would contain the test
12     results from the test performed on the Liquid Wrench
13     sample?
14     A.    On any samples I would expect that.
15     Q.    Do you know what the retention policy for that
16  type of document would be?
17     A.    I don't know what the analytical retention
18  policy but I do know I have a small section in
19     Paulsboro, toxicology section, Fred Feasley, and he
20     retained everything going back to early 1950s. So, I
21  was able to get documents that I need on testing and
22     discussions 25 years -- well, 1950s -- it would be 54
23     years now, but at that time it would have been 25 years
24     back.
25     Q.    And you said that gentleman's name was Fred
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01    Feasley?

02    A.    Feasley, F-E-A-S-L-E-Y.

03    Q.    And he was at the Paulsboro lab?

04    A.    Yes. He reported to me.

05    Q.    Do you know whether he is still employed by

06    Mobil?

07    A.    No, he's not employed by Mobil.

08    Q.    Do you know --

09    A.    He's deceased.

10    Q.    Okay.

11    A.    He'd been with Mobil probably between 40 and

12    50 years.

13    Q.    Do you know who his successor at Mobil might

14    have been?

15    A.    No, I -- he would not have a successor.

16    Q.    Do you know whether the facility in which he

17    worked is still existing?

18    A.    Yes. The laboratory, the refinery is still in

19    Paulsboro.

20    Q. And do you know in what way he kept the

21    records that he kept?

22    A.    Filing cabinets.

403, cumulative

23    Q.    And at the time in 1977, would you have

24    expected that there would have been a file kept with

25    the records showing test results from this type of

US Steel
Deposition
Designation Mehlman

Transcript of Mehlman, Myron

403, cumulative

```
01      testing?
02      A.      In 1977, yes.
03      Q.      Did you ever see any documentation concerning
04  the Liquid Wrench test other than the handwritten
05      result    that we've looked at here today?
06      A.      I don't recall what I have seen.
```

```
07      Q.      We spoke earlier that the 30 percent finding
08  would have been an unusually high finding. Do you know
09  whether any attempt was made to discuss that finding
10  with the manufacturers of Liquid Wrench?
11      A.      I don't recall if any attempt was made or was
12      not. I'm not aware of that -- at least I don't recall.
13      Q.      If you or anyone else at Mobil felt that there
14  was a health risk as a result of the finding with
15      respect    to Liquid Wrench, did you think that that was
16  something that should be communicated to anyone outside
17      Mobil?
18      A.      I hope that it was -- certainly must be
19  communicated to the employees and people who use it.
20  Was it communicated to manufacturers? I have no -- I
21      don't have no knowledge of that. I mean, that would be
22  by the products people. They were aware of the
23      concentrations.
24      Q.      Who would the products people be that were
25      made aware of the testing?
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

```
01      A.      I don't recall their names. There were lot of

02      products people.

03      Q.      Do you have any personal knowledge as to

04   whether or not Radiator Specialty Company, who produced

05   Liquid Wrench, was ever informed of the 30 percent test

06      result?

07      A.      I have no knowledge of that.

08   MR. LYNN: Pass the witness at this time.

09   EXAMINATION

10   BY MR. MILLER:

11      Q.      Dr. Mehlman, good morning.

12      A.      Good morning, sir.

13      Q.      My name is Adam Miller. I represent United

14   States Steel, and I have some questions for you this

15   morning.

16   Dr. Mehlman, are you familiar with any

17   evaluation or review of Mobil's analytical testing

18   laboratories or practice, any survey to evaluate the

19   consistency of the results that its laboratories

20   obtained in its testing?

21      A.      Specifically, no, not at this time.

22      Q.      All right. I'm asking about something like an

23   audit. Was it your recollection that Mobil would

24   periodically audit its analytical laboratories for the

25   purpose of assessing whether or not its laboratories
```

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

01    were conducting evaluations using good laboratory

02    practice and consistently following the appropriate

03        protocols?

04        A.    First of all, the good laboratory practice

05        didn't come into effect until later. I don't recall

06        anything specific at this time. I know we looked for

07        accuracy and reproducibility. That I'm aware of, but

08        anything else I don't recall.

09        Q.    All right. You mentioned in your last answer

10    that good laboratory practice did not come into effect

11        until after 1977; is that correct?

12        A.    I'm not too sure when it came, but we

13        immediately implemented it. It may have came -- in

14        toxicological area it came a little later. That was

15        after I.B.T. scandal, which was Industrial. Bio-Test

16    Laboratory in Chicago, which they got indicted. They

17        always produced desirable results for the industry.

18        For example, mice that died on Friday reoccurred on

19    Monday. They became alive. We called them Jesus mice.

20    Graphic methods were used to generate data, and the

21    person of that company I do recall went to jail.

22        MR. MILLER: I'm going to move to strike

23        your response as being unresponsive.

24        (BY MR. MILLER) Let me reask the question

25        again.

US Steel                 MEHLMAN,
Deposition               MYRON A. 12-11-03 -
Designation Mehlman      Combined
                         Designations 9-1-20

**Transcript of Mehlman, Myron**

# Mehlman, Myron
## Rhyne Trial Master

```
01    A.    All right.

02    Q.    You're familiar with the term "good laboratory

03    practices"?

04    A.    Yes, I am.

05    Q.    Is there a technical meaning or a meaning of

06    the phrase "good laboratory practice" that's recognized

07    in the field of analytical chemistry?

08         A.    I don't recall.

09    Q.    All right. Were there standards of good

10    laboratory practice adopted in the industry at some

11    point in time, Doctor?

12    A.    My recollection that there were standards, but

13    what they are I don't recall.

14    Q.    Do you recall when those standards became

15    effective or had been adopted in the analytical

16    chemistry?

17    A.    No, I do not, no.

18    Q.    So, you don't know whether at the time the

19    test results that we've been talking about today were

20    conducted in the laboratory under standards of good

21    laboratory practice; is that correct?

22    MR. HOBSON: Objection, form.

23    A.    All I know and I recall that they have high

24    standards in performing their work in terms of

25    accuracy.
```

403,
cumulative

US Steel
Deposition
Designation Mehlman

Transcript of **Mehlman, Myron**

403,
cumulative

| | |
|---|---|
| 01 | Q. (BY MR. MILLER) I understand that, Doctor; |
| 02 | but what I'm asking is whether or not there were |
| 03 | standards for laboratory practice that were recognized |
| 04 | in the industry that had been adopted by Mobil at the |
| 05 | time of the testing that's reflected in the documents |
| 06 | we've talked about today. |
| 07 | A. I don't recall that. |
| 08 | Q. Okay. Thank you, Doctor. |
| 09 | Doctor, is it your testimony today that every |
| 10 | single test result obtained from Mobil's analytical |
| 11 | laboratories was accurate? |
| 12 | A. Every single one? It's -- I never testified |
| 13 | to that. I said by and large, to the best of my |
| 14 | knowledge, all the results that were done for me were |
| 15 | accurate. |

403,
cumulative

611,
argumentative

| | |
|---|---|
| 16 | Q. Let me ask that question again, sir, because I |
| 17 | don't think you specifically answered my question. Is |
| 18 | it your testimony that every single analysis conducted |
| 19 | by Mobil's analytical laboratories were accurate? |
| 20 | A. I can't swear to that, that "every single." |
| 21 | |
| 22 | go ahead. |

| | |
|---|---|
| 23 | Q. Can you tell me the percentage of analyses |
| 24 | conducted by the Mobil analytical laboratories during |
| 25 | the time period that you were with Mobil -- can you |

US Steel           MEHLMAN,
Deposition         MYRON A. 12-11-03 -
Designation Mehlman Combined
                   Designations 9-1-20

**Transcript of Mehlman, Myron**

01    tell me the percentage of those results that were

02      accurate?

03      MR. HOBSON: Objection, form.

04      A.    As far as I'm concerned, they were all

05      accurate.

06      Q.    (BY MR. MILLER) Do you have any objective

07    data or information that would identify the percentage

08    of test results that were accurate?

09      MR. HOBSON: Objection, form.

10      A.    If I had any, I wouldn't recall that. I -

11    they were accurate, because we checked our samples,

12    what they did for us. The benzene analyses were

13      accurate. I split samples in two, I put in blank

14    controls, we spiked samples, and we run standards with

15      it.

16      MR. MILLER: I'm going to move to strike

17    your answer as nonresponsive.

18      A.    I thought it was very responsive. How we

19    did -- you asked me how -

20      Q.    (BY MR. MILLER) Excuse me. Sir, there's no

21    question pending. Thank you.

22      Sir, is it your testimony that for every

23      single analytical test run by Mobil in the 1977 time

24    period, the appropriate or recognized protocols were

25      followed?

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 53 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 867 of 1330

01  A. I can't answer your question because the test

02  sampling that were done for me, procedures were

03  followed -- I sent people to check in addition to

04 myself -- and the results were accurate.

05  Q. Who are the people that you sent to check on

06  the analytical chemists?

07  A. Feasley was one of them because he located on

08 the facility and had tremendous amount of knowledge.

09 There are other people that I sent to have these

10  results checked. There -- I had several other

11  industrial hygienists. I don't even remember the name

12 but I send them to Paulsboro and they spent time with

13  them looking at it and I was called constantly. That I

14  recall.

15  Q. Sir, how is it that you are satisfied that the

16  results from the testing that we've talked about here

17 today with respect to Liquid Wrench were properly

18  interpreted?

19  A. Because all the other results, samples that we

20  sent for analysis -- and these were several thousand

21  samples -- were accurate. I did not send Liquid

22  Wrench. I requested that be tested. I sent thousands

23  of other samples to be tested.

24  Q. Doctor, do you know the limits of detection

25  for gas chromatography that was used in the testing of

US Steel    MEHLMAN,
Deposition    MYRON A. 12-11-03 -
Designation Mehlman Combined
      Designations 9-1-20

**Transcript of Mehlman, Myron**

01     the Liquid Wrench reflected in the documents we've

02     talked about today?

03     A.    I don't recall specifically; but if sample is

04 very concentrate, you dilute it. You keep on diluting

05 it till you get within a range that can be measured

06     accurately.

07     Q.    Is there a rate of error for gas

08     chromatography in the 1977 time frame that you're

09     familiar with?

10     A.    There is, but I don't remember what it is.

11     Q.    Is there any extent of variability that might

12     result from test to test of a split sample, for

13 example? Can you expect some variability in gas

14 chromatography?

15     A.    Yes.

16     Q.    What is the extent of that variability?

17     A.    On my samples they were within 3 percent, the

18     ones that I split; but I don't know what it was and

19 what range.

20     Q.    Could it have been higher?

21     A.    It could be.

22     Q.    I understand that -- from your prior testimony

23     today that you have no knowledge about Mr. Awalt's

24     occupational history; is that correct?

25     A.    I don't know who Mr. Awalt is. The first time

US Steel
Deposition
Designation Mehlman
Transcript of **Mehlman, Myron**

```
01      I heard his name is right here.
02      Q.    I want to hand you what has been marked
03      Exhibit No. 1, and this is a notice to take discovery
04      deposition --
05      A.    Okay.
06      Q.    -- in the Ronald Awalt case.
07      A.    I didn't even look at that. I looked at the
08      second part.
09      Q.    Okay. That notice is for your deposition here
10      today; is that correct?
11      A.    Yes.
12      Q.    All right. And you understand now that this
13      case relates to a gentleman by the name of Ronald
14      Awalt?
15      A.    No, I don't understand that. That's just what
16      I see here. I had no idea what's the case or anything
17      about the case.
18      Q.    All right. I understand from your earlier
19      testimony today that you had some responsibility at
20      Mobil for evaluating exposures to benzene for workers
21      in Mobil's own facilities.
22      A.    Yes.
23      Q.    And can you tell me how it is that Mobil
24      assessed, during your tenure there, potential exposures
25      to benzene for its own workers?
```

**Transcript of Mehlman, Myron**

01      A.    You put equipment on the workers and tubes

02      that -- and for whatever period of time they worked,

03      different periods of time, you measured the areas where

04      they worked and the level of benzene in these areas.

05      Then be extrapolated, seeing that it's only 1 part per

06      million of benzene or less they would be inhaling that.

07      We calculated that to eight -- to eight-hour average.

08      So, what you do, I take it -- or what -

09      strike that.

10      What Mobil did during your tenure there as

11      director of toxicology and environmental health is to

12      conduct actual measurements of benzene in the work

13      environment in which benzene exposed workers actually

14      conducted their work.

15      A.    That's correct.

16      Q.    And, then, I take it that you took those

17      samples and extrapolated to I think what we call a time

18      weighted average -

19      A.    Yes.

20      Q-    -- to evaluate the concentration that a worker

21      might be exposed to over the course of an eight-hour

22      workday.

23      A.    Yes.

24      Q.    And I take it that part of that process is, as

25      we said, to put measurement devices actually within the

**Transcript of Mehlman, Myron**

01 [illegible]

02 A Yes.

03 Q [illegible]

04 [illegible]

05 [illegible]

06 A Yes.

07 Q [illegible]

08

09 [illegible]

10 [illegible]

11 [illegible]

12 [illegible]

13 A I don't recall.

14 Q [illegible]

15 [illegible]

16 [illegible]

17 A I don't recall [illegible]

18 [illegible]

19 [illegible]

20 [illegible]

21 Q It—

22 A Probably not—

23 Q [illegible]

24 [illegible]

25 [illegible]

Transcript of Mehlman, Myron

01    A.    I don't -- probably. I just don't recall

02    specifically that what -- where it comes back to.

03    Q.    How would you describe that process where you

04    take a sampling device and put it in the breathing zone

05    of the worker and put the worker in his ordinary job

06    and have him -- and evaluate those exposures?

07    A.    We had to purchase special equipment, and

08    B   recall a number of monitors. I guess that would be

09    dosimetry, yes. I had to buy over a hundred additional

10    monitors. I just recall that. Couldn't remember.

11    Q.    So, the process is called dosimetry.

12    A.    Yes.

13    Q.    Or the mechanism of doing these evaluations.

14    A.    Yes.

15    Q.    Do you recall ever conducting dosimetry on --

16    or using Mobil workers who were involved in vehicle

17    maintenance?

18    A.    I don't recall specifically. We conducted

19    measurements on all type of occupation -- mechanics,

20    probably electricians, just people working around

21    the -- many different places.

22    Q.    Do you recall whether Mobil -- during the time

23    that you were director of toxicology and environmental

24    health, do you know whether Mobil conducted dosimetry

25    of individuals using Liquid Wrench?

**Transcript of Mehlman, Myron**

01    A.    I don't know. I can't answer that. I
02    wouldn't -- I don't recall that.
03    Q.    Other than gas chromatography, which I believe
04    you've described for us earlier today, do you know
05    whether Mobil, during the time you were director of
06    toxicology and environmental health, attempted to
07    evaluate a worker's exposure to Liquid Wrench -- to
08    benzene in Liquid Wrench in his ordinary workplace?
09    A.    I don't recall that specifically.
10    Q.    Have you ever seen any results of dosimetry or
11    the evaluation of benzene exposure to a worker using
12    Liquid Wrench in his real work environment?
13    A.    I don't recall.
14    Q.    And I take it that you're not providing
15    testimony in this case about what the results of that
16    dosimetry would be for a worker using Liquid Wrench in
17    his ordinary work environment; is that correct?
18    A.    I'm not providing any testimony except to the
19    authenticity of these documents.
20    Q.    Okay. Sir, have you ever observed a worker
21    using Liquid Wrench?
22    A.    No, at least not consciously that I'm aware
23    of.
24    Q.    I take it that you may have incidentally
25    observed the use of Liquid Wrench.

Transcript of Mehlman, Myron

01    A. But I couldn't have known it.

02    Q. So I take it that you haven't done any sort

03    of the exhalation study or any specific assessment of

04    how a worker uses Liquid Wrench in his ordinary workday, the quantity that might be used or the

05

06    frequency of use of Liquid Wrench; is that true?

07    A. No — not that I recall anything like that.

08    Q. Okay. With respect to evaluating worker

09    safety with respect to exposure to benzene, when you

10    were director of toxicology and environmental health

11    at Mobil, was dosimetry the best source or best tool that

12    you had available for predicting worker exposure to

13    benzene in the worker's ordinary workday job and in the

14    environments in which the worker?

15    A. I think — no, I don't know if it was the best

16    tool; but it was a readily available tool.

17    Q. What would have been the best available tool

18    to assess the worker's exposure to benzene in the work

19    environment as he does his job?

20    MR. HOBSON: Objection, form.

21    A. I don't — I don't recall. I stopped

22    practicing industrial hygiene function for many years

23    already.

24    Q. (BY MR. MILLER) As you sit here today, can

25    you think of a tool better than dosimetry to assess a

**Transcript of Mehlman, Myron**

01  worker's exposure to benzene in his work -- in his

02  precise work environment?

03      MR. HOBSON: Objection, form.

04      A.    It's not something I do. It's not part of my

05      job; so, I can't think of anything. If I heard of some

06      better procedures, I don't recall. I'm sure I did in

07      some of the benzene meetings that I attended, but I

08      didn't make any effort to retain that information.

09      Q-    (BY MR. MILLER) In 1977 when you were

10      conducting an evaluation of Mobil employees' exposure

11  to benzene in their workplaces, did you use any

12  methodology other than dosimetry for the purpose of

13  making those assessments?

14      A.    I don't recall using anything else.

15      Q.    I take it you were satisfied with the results

16  that you could obtain from dosimetry for the use in

17  making estimates of a worker's overall exposure to

18  benzene in the precise work environments in which he

19  worked.

20      A.    I was satisfied because the exposure in

21      refineries were very low. The average is less than

22  tenth of a part per million. We need to know only the

23      areas that exceed on that 1 part per million. And

24  we're also satisfied because we measured in many

25      different facilities, both U.S. and outside; and the

Transcript of Mehlman, Myron

403,
cumulative

01    results were consistent from different facilities. So,

02    that adds a lot to credibility of your test result.

03    Q.    With respect to the specific analyses that

04    we've talked about today, those that reflect in the

05    documents that we've marked of benzene content of

06    Liquid Wrench at 7 percent and 30 percent, do you know

07    whether split samples were taken of these particular

08    samples for the purpose of comparing the results?

09    A.    I -- I don't recall how they're -- how samples

10    were taken, were they split or duplicate. I don't

11    recall.

12    Q.    Was it the standard practice for the Mobil

13    laboratory that -- or Mobil's analytical laboratories

14    to take split samples for the purpose of comparing

15    samples taken from a single source?

16    A.    I don't recall. I know I did divide some of

17    my samples in duplicate to see how they compare. If

18    they did split, then there would be four analyses in a

19    single sample.

20    Q.    But again, you don't have any information with

21    respect to these particular tests -

22    A.    I -

23    Q.    -- to know whether splits were done?

24    A.    That's right.

25    Q.    Or if they were done, what the results were?

US Steel
Deposition
Designation Mehlman

**Transcript of Mehlman, Myron**

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 63 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 877 of 1330

403,
cumulative



01    A.    I don't know.

02    Q.    Okay. You indicated that on occasion spiked

03    samples would be used for the purpose of conducting

04    analytical tests for benzene?

05    A.    That's right.

06    Q.    Can you describe for me what a spiked sample

07    is?

08    A.    Sure. You put a known amount of diluted

09    benzene in a sample and you split the samples in two

10    and you put in two of them and see what percent

11    recovery, especially you do a blank and you find -- if

12    you put, say, 5 parts per billion, you want to see how

13    much of that is recovered; or you also want standard.

14    Different concentration of benzene you provide three or

15    four samples -- usually four -- with different levels

16    and see how that analysis comes out; and then you run

17    some blanks and see that you don't find any benzene in

18    it. If you come in with blank that shows benzene

19    concentration, you would worry about it.

20    Q.    Were spiked samples used for the analyses that

21    we've talked about today --

22    A.    Don't know.

23    Q.    -- with respect to Liquid Wrench?

24    A.    I just -- that is -- don't know.

25    Q.    All right. Do you have any objective evidence

Page 62

403,
cumulative

```
01      that would suggest that the specific Liquid Wrench
02      tests that we've talked about today are -- or were at
03      the time repeatable and reproducible?
04      A.    I have no idea if they repeated them or
05      reproduced them.
06      Q.    We were talking a moment ago about evaluating
07  worker exposure in the environment in which that worker
08  conducts his workday. You remember that discussion
09      generally?
10      A.    Yes.
11      Q.    We were talking about using dosimetry.
12      It's possible, is it not, to use a product
13      even if it had 30 percent benzene, a Liquid Wrench
14  product with 30 percent benzene, and have a time
15  weighted average exposure to benzene in the workplace
16      less than 1 part per million?
17      MR. HOBSON: Objection, form.
18      A.    I would say it's very unlikely with that
19  concentration that you will have that low exposures;
20      and if it's used equip -- to clean the equipment, I
21  would say very unlikely that it would be so low.
22      Q.    (BY MR. MILLER) What's your understanding of
23  how Liquid Wrench is used?
24      A.    Cleaning equipment. It's a good cleaning
25      agent; and I'm not sure if it's used in radiators, to
```

Objection: 701
and 402 - Lines
6-21

Objection 602 -
lines 18-25

US Steel          MEHLMAN,
Deposition        MYRON A. 12-11-03 -
Designation Mehlman   Combined
                  Designations 9-1-20

Transcript of Mehlman, Myron

Case 3:18-cv-00197-RJC-DSC   Document 311-6   Filed 09/02/20   Page 65 of 94
Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 879 of 1330

Page 63
Continuing
objection

```
01      clean the radiators. I don't have extensive knowledge
02      about Liquid Wrench.
03          Q. When you say to clean equipment, do you know
04      how it would be applied for that purpose?
05          A.    No. If I did know at one time, I don't
06      recall.
07          Q. Do you know how much Liquid Wrench would be
08      used for that purpose?
09          A.    No, I do not.
10          Q.    Okay. And 1 take it you would have no
11      familiarity with what a worker might use in terms of
12      quantity of Liquid Wrench in any given day.
13          A.    That's right. I do not -- I'm not familiar at
14      this time.
15          Q.    Do you know what crafts would use Liquid
16      Wrench?
17          A.    I think it would be used -- car mechanics,
18      people who work with the equipment.
19          Q.    For cleaning?
20          A.    Cleaning. That's all that I recall.
21          Q.    And certainly you don't have any information
22      about how Mr. Awalt used Liquid Wrench.
23          A.    I have no information about Mr. Await at all.
24          Q.    Okay. Let's talk about vehicle mechanics.
25      Have you ever observed vehicle mechanics throughout
```

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

01   their workday for the purpose of assessing the

02   materials they use, the quantity of those materials, or

03   the frequency with which they use those materials?

04   A.   No.

05   Q. Do you know whether any kind of study of that

06   nature was undertaken by Mobil with respect to Liquid

07   Wrench?

08   A.   I do not know. One of my industrial

09   hygienists may know, but I do not know.

10   Q.   Okay. In the documents that you brought today

11   to the deposition and which have been marked, is there

12   any discussion about how Liquid Wrench would have been

13   used at any of Mobil's facilities in the 1977 time

14   period?

15   A.   If it was 26 years ago, I wouldn't remember

16   that.

17   Q.   Well, not only would you not remember it, sir;

18   but it's not reflected in the documents; is that

19   correct?

20   MR. HOBSON: Objection, form.

21   A.   That's correct.

22   Q.   (BY MR. MILLER) Let me reask that. Is there

23   any reference in the documents that you brought about

24   how Liquid Wrench is used by Mobil employees -- or was

25   used by Mobil employees in the 1977 time period?

Transcript of Mehlman, Myron

```
01      A.      I do not see that in the documents.

02      Q.      All right. You don't know whether it was used

03      indoors    or outdoors?

04      A.      I do not know. It could be -- well, obviously

05      it could be used indoors, it you are a mechanic and

06   working at a gas station, and outdoors. Depends on the

07      weather    conditions.

08      Q.      And it depends on the kinds of equipment that

09   you're cleaning or using the Liquid Wrench on.

10      A.      That's right.

11      Q.      Some pieces of equipment can't be brought

12      inside.

13      A.      That's right.

14      Q.      Do you know the duration of exposure to

15   benzene in Liquid Wrench that an individual would

16   experience using Liquid Wrench in the manner that you

17      believe    it's used for?

18      A.      Depends on how long it -

19   MR. HOBSON: Excuse me. Objection, form.

20      Now you may answer.

21      A.      Depends on how long the equipment is being

22      cleaned. It could be anywhere from ten minutes to

23      couple    hours. I don't -- I just don't know. I don't

24      understand these questions, I'm here only to certify

25      that the documents are authentic. All of this, it
```

**Transcript of Mehlman, Myron**

01     seems to me, leads to looking for an expert analytical

02        chemist and industrial hygienist, which I'm not going

03        to testify to that. I'm not going to testify at all

04        except to one fact.

05            MR. HOBSON: By the way, you've pointed

06        out already that Dr. Mehlman is not being paid. You've

07     wasted now two hours, in my humble opinion, going over

08        things that he -- you've asked a whole series of

09     questions about Liquid Wrench use after he says "I

10        don't remember seeing it being used," "I don't know how

11        it's used," all that sort of thing. If you're going to

12        go any further, I'd ask that you compensate Dr. Mehlman

13        his usual rates if you want to use him for his

14        testimony. I think you've beat a dead horse to death

15        again. Are we about done?

16     MR. MILLER: Yeah, we are. This kind of

17        discussion is just making things a little more

18        prolonged.

19     MR. HOBSON: Well, it does because you've

20        already prolonged it too long.

21     MR. MILLER: I'm going to move to strike

22     your previous response in the record as being

23        nonresponsive.

24            MR. HOBSON: What was it, by the way?

25     What did he say?

**Transcript of Mehlman, Myron**

01      MR. MILLER: He said something completely

02  different from the answer that would have been

03      responsive.

04      MR. HOBSON: Great.

05      A.    I just don't understand -- I said I don't

06  understand these questions because I'm not here to

07  testify on anything that you had asked me.

08      Q.    (BY MR. MILLER) Okay. I understand that,

09      sir.    I -

10      A. Anything you want to ask about hematological

11      effect of benzene and injury and levels, I'll be glad

12      to spend whatever time you want discussing it.

13      Q.    Again, Doctor, there's no question pending

14      now.

15      Sir, are you aware of the extent to which -

16      I'm sorry. Hold on just a second.

17      Doctor, are you aware of the extent to which

18  other hydrocarbon substances in a sample might

19      interfere with a determination of the quantity of

20      benzene in that sample?

21      MR. HOBSON: Objection, form.

22      A.    I don't recall. I know some discussions

23      were -- took place around that subject matter, and

24      some -- and it was explained to me that there was some

25  modification in columns to get cleaner separations.

**Transcript of Mehlman, Myron**

01    Q.    (BY MR. MILLER) Do you know the extent to

02  which that interference may have affected the

03    reliability of the samples and the results that are

04  reflected in the documents that you've brought to the

05  deposition today?

06    A.    Well -

07    MR. HOBSON: Objection, form.

08    A.    I don't think the reliability is affected in

09  analyzing from benzene. I think the procedures that

10  they -- Mobil analytical laboratory established was

11  just as good as anybody in the world can do. They

12    discussed it with, long time ago, the American

13    Petroleum Institute meeting with some other oil

14    companies; and they knew of high quality of work that

15  our analytical division or sections -- we had more than

16    one -- were doing. So, I don't think that is even in

17    question.

18    Q.    (BY MR. MILLER) I just have a few more

19  questions for you.

20    A.    Okay.

21    THE WITNESS: Can we take two-minute

22    break?

23    MR. MILLER: Absolutely.

24    THE WITNESS: Thank you.

25    THE VIDEOGRAPHER: We're off the record

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

Page 69

```
01      at 12:12.

02      (A BREAK WAS TAKEN)

03      THE VIDEOGRAPHER: We're back on the

04      record at 12:16.

05      Q.    (BY MR. MILLER) Sir, I want to hand you what

06 has previously been marked today as Exhibit No. 3. Can

07 you read the notation and handwriting down at the

08      bottom?

09      A.    "Liquid Wrench."

10      Q.    I'm sorry. Can you read the two lines there?

11      Not just the last line.

12      A.    Okay. I suspect this is (reading) please

13      attach -- whatever that word -- I don't know what it

14      is. I can read the last line, and I can read (reading)

15      attach reference Liquid Wrench.

16      Q.    It's not entirely legible; is that correct?

17      A.    That's right. Some attachments -- it is

18      either to be as an attachment, or some additional

19 attachments may have been attached.

20      Q.    And let me ask you this: The very top of this

21      document seems to reflect, aside from the fax notation

22      and other markings, that this may be an attachment

23      itself?

24      A     "Attachment II." It's -- that's what it says.

25      Q.    Do you know what document this particular
```

**Transcript of Mehlman, Myron**

01    exhibit that we've marked as Exhibit 3. I believe, was

02    attached to?

03    A    No, I don't recall. It probably was attached

04    to one document, but I don't recall.

05    Q    Is it possible that the -- well, strike that. Is this a standard form that Mobil used in the

06

07    1977 time period?

08    A    I -- I don't --

09    MR. [GIBSON]: What is? Is what?

10    Q    [BY MR. MILLER]: I'm sorry. Is the document

11    that we've marked as Exhibit 3 a standard form that

12    Mobil used during the 1977 time period?

13    A    I've seen very few of them. Occasionally

14    but very few.

15    Q    Do you know what the subject matter is of this

16    particular document? Can you read the subject matter?

17    A    It says "Topic Mechanical" something, and I

18    can't read the other one -- last one. On the bottom

19    it said they take two points, VEO, which has no

20    license, and Topic Weekly, which has 50 percent.

21    Q    But with respect to what it does after the

22    word "Subject," you can't read that in its entirety; is

23    that correct?

24    A    That's correct, without my glasses or some

25    magnification.

**Transcript of Mehlman, Myron**

01    Q.    If you had your glasses, would you be able to

02    read that?

03    A.    I don't know. I have the -- then I will

04    answer the questions if I -

05    Q.    Do you know whose handwriting this is?

06    A.    It's someplace on the bottom, but I can't read

07    that. There's a stamp, individuals who routinely get

08    copies of these, and the person has signed, but it's

09 not legible to me.

10    Q.    So, you don't know who wrote out this

11 information on this document that we've marked as

12    Exhibit 3; is that correct?

13    A.    That's correct, but it's addressed to two

14    Mobil people. One is to Beaumont refinery -- I suspect

15    he might also be in Beaumont refinery, but I don't

16    know.

17    Q.    Do you know whether these results came from an

18 analytical laboratory in Beaumont?

19    MR. HOBSON: Objection, form.

20    A.    Don't know. I don't think so. I think it

21 probably came from -- it was addressed to two

22    individuals at Beaumont refinery. I believe most

23    likely Paulsboro.

24    Q.    (BY MR. MILLER) I take it you don't know that

25    for sure, though; is that correct?

**Transcript of Mehlman, Myron**

01    A.   That's correct.

02    Q.   Was Paulsboro a better laboratory, in your

03    estimation, in terms of techniques and standards and

04    protocols?

05    MR. HERON: Objection, form.

06    Q.   (BY MR. MILLER) Than the Beaumont laboratory?

07    MR. HERON: Objection, form.

08    A.   They had a — I don't know if I can say it's

09    better. All I know is that the laboratory in Paulsboro

10    analytical section was very good. They did a lot of [ ] measurements of petroleum products.

11

12    Q.   (BY MR. MILLER) Did the company rely on the

13    Paulsboro laboratory for that purpose more so than it

14    did on the laboratory in Beaumont?

15    MR. HERON: Objection, form.

16    A.   Well, they were better equipped. They had

17    more people, better equipment, more space.

18    Q.   (BY MR. MILLER) Would you be able to say —

19    well, strike that.

20    The 30 percent — benzene percent volume that

21    appears on Exhibit 3, is it possible that that could be

22    the percent volume as a result of spiking the liquid

23    March for the purpose of an analytical test?

24    A.   No way.

25    MR. HERON: Objection.

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

# Mehlman, Myron

## Rhyne Trial Master

01    A.    No way. I mean, the spiking was only done by

02  my section before the sample went to the analytical

03    laboratory.

04    Q.    Do you know when the tests of WD-40 and Liquid

05  Wrench were made -

06    A.    From -

07    Q.    -- that are reflected in Exhibit 3?

08    A.    Is there a date? It was in 1977, and this

09  note was sent on 10/4/77. It was probably done a few

10    days before that.

11    Q.    Is there any indication that -

12    Or the same day.

13    Q.    Is there any indication on this document that

14    reflects the duration of time that may have lapsed

15  between when the samples were tested and when this

16  document was prepared?

17    A.    No. When something is handwritten, it's

18    usually the same day, but I can't be certain of that.

19    Q.    Best person to answer that question would be

20    the author himself?

21    A.    Or one of the individuals that received it.

22    Q.    Okay.

23    A.    And they -- I think one of them is probably

24    still at Mobil in Beaumont.

25    Q.    I just have a few more questions for you, and

**Transcript of Mehlman, Myron**

01     then I'll be finished.

02     We were talking earlier about airborne

03 concentrations of benzene resulting from the use of

04 this Liquid Wrench product, and I wanted to ask you:

05 The reason why you do air monitoring in the specific

06 work environment is because it's the work environment

07     that -- that varies for each worker in ways that affect

08 their overall exposure to benzene; is that correct?

09     MR. HOBSON: Objection, form.

10     A.     Yes.

11     Q.     (BY MR. MILLER) Whether the environment is

12     indoors or outdoors, whether it's poorly ventilated or

13     well-ventilated, the environment really makes an

14     important difference in the potential for exposure; is

15     that correct?

16     A.     Yes, and also proximity of individual from the

17     sample. Example, if you top load barges, you get a

18 huge exposure of hydrocarbon vapors; and certainly

19 benzene levels can vary out to 150 or maybe even more

20 parts per million because you inhale the vapors.

21     Q.     And the proximity of the individual to the

22     application and the duration of time he stays in the

23     vicinity of that application, all of that's important

24     in assessing a worker's exposure?

25     A.     Yes.

**Transcript of Mehlman, Myron**

01    Q.    Air flow from the near field to the far field

02    and vice versa, that's important in assessing a

03    worker's exposure?

04    A.    Yes.

05    Q.    In other words, whether the air is static or

06 moving, that's an important feature in assessing -

07    A.    Right, it makes a difference. The

08 concentration would be lower if the air is moving. The

09    concentration would be higher if the air is static.

10    Q.    The frequency of use makes a difference in an

11    individual's -

12    A.    Well, it's only a matter of how much he's

13    exposed. The more you use, the more exposure. We can

14 determine that in terms of total PPM years. We

15    calculate the time. Otherwise, you can't compare one

16 worker's exposure from the other one.

17    Q.    Right. And, so, overall -- strike that.

18    That's, I believe, beyond the -- where we're headed.

19    MR. HOBSON: Shouldn't have stopped you.

20    It hasn't yet.

21    MR. MILLER: What's that?

22    MR. HOBSON: I said it shouldn't have

23    stopped you. It hasn't yet.

24    Q.    (BY MR. MILLER) The temperature of the work

25 environment may make a difference?

**Transcript of Mehlman, Myron**

Page 76

01     A.     Yes.

02     Q.     Humidity may make a difference?

03     A.     Yes.

04     Q.     Temperature of the workplace may make a

05     difference?

06     A.     Yes. If the equipment is sprayed -- if the

07     solvent is sprayed on it or solvent kept in it, it will

08     make a big difference how much the material will

09     evaporate and how much a person will inhale.

10     Q. And that's why you evaluate the work

11     environment and not the product the individual is using

12     to assess a worker's exposure.

13     MR. HOBSON: Objection, form.

14     Q.     (BY MR. MILLER) Is that true?

15     A.     That's one of the ways, yes.

16     MR. MILLER: That's all the questions I

17     have for you, sir. Thank you.

18     REEXAMINATION

19     BY MR. HOBSON:

20     Q.     Dr. Mehlman, let me see if I can clarify a few

21     things.

22     Air sampling will not evaluate a worker's

23     exposure to his skin for benzene, will it?

24     A.     No, because you have a contact that's

25     substantial exposure from dermal contact.

Objection:
701 and
401



MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Transcript of Mehlman, Myron

01    Q.    So, would -

02    A.    And also possibly inhalation, if he didn't -

03    ingestion, if he doesn't wash his hands and he takes

04    food in. So, there's three ways a worker could be

05    exposed: Primarily through inhalation, second through

06    dermal absorption, and third through ingestion.

07    Q.    And you at Mobil also did something called

08    biological monitoring for benzene, did you not?

09    A.    Yes, we did.

10    Q.    What does that mean, "biological monitoring"?

11    A.    Monitoring means we measured the level of

12    benzene in individuals, how much he could expire in his

13    breath or we could take a blood sample or urine sample

14    and determine what metabolites from benzene would be

15    excreted this way. You can calculate how much benzene

16    was taken in.

17    Q.    And that would be a reflection of the total

18    dose, not just what you breathe, correct?

19    A.    Yes. You usually determine total dose for a

20    worker because breathing is only one of the ways that

21    he is exposed.

22    Q.    And did Mobil use, also, something called

23    medical monitoring for its benzene exposed workers?

24    A.    Yes. That was essential. We had people who

25    were exposed to one or more parts per million required

Continuing objections: Lines 1-25

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

Continuing
objections

01    to undergo physical examination, to take more frequent

02    blood tests. I think it -- well, we had a policy to

03    that and procedure that is developed by medical

04    department to do medical monitoring to see if any

05    changes in his blood parameters; or if we see any

06    decrease in various blood cells, you remove the worker

07    from the job category because he may be more

08    susceptible.

09        Q.    Have you seen evidence that medical monitoring

10    and biological monitoring for workers potentially

11    exposed to benzene in the workplace goes back into at

12    least the 1950s?

13    MR. MILLER: Objection, form.

14        A.    It goes back all the way, but I'm not sure for

15    nineteen -- if I can recall specifically 1950. It goes

16    back at least I recall in the 1960. In fact, the

17    medical director at Beaumont has had that program --

18    one of them, that he was still there -- he was there

19    for quite awhile in 1976, '77 when I joined Mobil.

20        Q.    (BY MR. HOBSON) So, at least to 1960 at

21    Mobil, you know about those.

22        A.    That I have seen, yes, sir.

23        Q.    I wanted to ask you -- you were asked some

24    questions about the use of Liquid Wrench at Mobil and

25    also about air sampling concerning Liquid Wrench usage

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

Objection: 802, 602, 701, and 402

Transcript of Mehlman, Myron

Continuing objection - Entire page

01    at Mobil. Do you remember those questions generally?

02    A.   Yes.

03    Q.   If you'll look at exhibit -- well, I'll just

04    pick Exhibit 5, which is the same as one of the other

05    exhibits, same as Exhibit 2.

06    A.   Yes.

07    Q.   All right. Exhibit 2 or 5, on the second

08    page, you see in the first paragraph it says "We

09    suggest that the use of the material be discontinued

10    and an alternate be found"?

11    A.   That's correct. I remember it because we

12    discussed the situation -- the products with above

13    1 part per million of benzene, we should find

14    alternatives.

15    Q.   And is that something generally known as

16    substitution?

17    A.   Correct.

18    Q.   And substitution is where you take a material

19    that has a hazardous property and substitute for it one

20    that will do the same job but doesn't have the toxic

21    property?

22    A.   That's correct.

23    Q.   Now, if your advice at Mobil was taken here in

24    October of 1977, would there be any need to do any air

25    sampling for Liquid Wrench at Mobil facilities after

MEHLMAN,
MYRON A. 12-11-03 -
Combined
Designations 9-1-20

**Transcript of Mehlman, Myron**

01      October, 1977?

02      MR, MILLER: Strike that -- I -- object

03      to the form.

04      A.    If the product was no longer used, there's

05      nothing to be monitored.

06      MR. HOBSON: Thank you, Dr. Mehlman.

07      That's all I have.

08      REEXAMINATION

09      BY MR. LYNN:

10      Q.    Just a couple of quick follow-ups. Take a

11      look at this document.

12      A.    Let's see.

13      Q.    Doctor, I handed you back Exhibit No. 4.

14      don't think we really talked too much about that

15      document.

16      You are not shown as a recipient or copied on

17      that document, were you?

18      A.    That's correct.

19      Q.    When did you first become aware of this

20      document?

21      A.    I would say October, 1977.

22      Q.    In what circumstance would it have been

23      brought to your attention?

24      A. Anything that had to do with benzene would be

25      given to us because at that time I was responsible for

**Transcript of Mehlman, Myron**

01 establishing policy and monitoring and making

02 recommendation on all subject matters related to

03 benzene.

04     Q.     Do you know who R.E. Bistline is?

05     A.     I don't recall his name. E.P. Medlin,

06 certainly name is coming back to me; but I don't know

07 what his job was.

08     Q.     Do you recall E.D. Keiper?

09     A.     No, I don't recall the name; but I'm sure I

10 knew these people -- or their name -- by names at

11 least.

12     Q.     Do you know who Doug Leitch is?

13     A.     Who?

14     Q.     Doug Leitch, the first -- at the beginning of

15 the paragraph of the text, it says "Doug Leitch advised

16 me." Do you know who Doug Leitch is?

17     A.     No, I'm not sure who he is. They had 30,000

18 employees; and many of them were in products, safety,

19 and different divisions, production, manufacturing.

20 So, I don't remember his name.

21     Q.     That's okay. The document mentioned that

22 there was another company's concern about potential

23 benzene concentration in Liquid Wrench. Do you know

24 what other company they were talking about?

25     A.     No, I do not know that.

**Transcript of Mehlman, Myron**

01    Q.    Okay. You see the last sentence of that first

02    paragraph says that "This information was relayed to

03    Corporate Safety for their confirmation and

04    recommendations." Do you know who at corporate safety

05    would receive this type of information at that time

06    frame?

07    A.    Oh, yes, yes. That would be a lot of people.

08    I knew everybody at one time in corporate. Dave Miller

09    would be the head of corporate safety.

10    Q. Do you know anybody else that might have been

11    told about this?

12    A.    No. I would say there were number of other

13    people. I don't remember their names, but I -- the

14    name that came back to me who -- is David Miller, who

15    was the head of that department. He was corporate -

16    in charge of corporate safety.

17    Q.    Do you know whether corporate safety was ever

18    able to confirm the findings that were sent to them?

19    A.    I don't know.

20    Q.    And Mr. Hobson just asked you some questions

21    about substitution of products. Do you recall that

22    testimony?

23    A.    Yes.

24    Q.    Was there a concern that if there was a

25    product with greater than 1 percent benzene content

**Transcript of Mehlman, Myron**

01    that was being used, that that would require

02    monitoring?

03        A.    I think that was the requirement, that medical

04    monitoring would be required of concentration above 1

05        percent, 1 or above.

06        Q.    And when there were discussions about

07    substituting another product for Liquid Wrench, do you

08    know if that was in order to avoid having to comply

09    with monitoring requirements?

10        A.    No, it was because the benzene exposure was

11        too high, which means that somebody else can get

12        injured, develop leukemias, lymphomas, or any other

13        type of cancers; and that presents tremendous liability

14    on part of the company.

15        MR. MILLER: I'm going to move to strike

16        the last response as being absent foundation.

17        (EXHIBIT 6 MARKED)

18        THE VIDEOGRAPHER: Excuse me. While

19    you-all are looking at that, can I change the tape,

20        please?

21        MR. LYNN: Sure.

22        THE VIDEOGRAPHER: Okay. Going off the

23        record. The time is 12:37.

24        (A BREAK WAS TAKEN)

25        THE VIDEOGRAPHER: Back on the record at

**Transcript of Mehlman, Myron**

01    12:38.

02    Q.    (BY MR. LYNN) Doctor, can you please describe

03    the document that was handed to you as Exhibit 6, for

04    the record?

05    A.    A memo to number of people from C.W. Phillips,

06 benzene in Liquid Wrench.

07    Q.    What's the date of the document, for the

08    record?

09    A.    November 29, 1977; and this was mailed by

10    Wescoat,    Wescoat -- coat, Wescoat.

11    Q.    Okay. In the middle paragraph -

12    A.    I see that, yes.

13    Q.    -- they talk about recommending -- or saying

14    that "You may wish to replace 'Liquid Wrench' with a

15    low-benzene content material." Do you see that part?

16    A.    Yes.

17    Q.    Okay. The last sentence of that paragraph,

18 what does it say about why that substitution might be

19    done?

20    A.    "This product has been analyzed by Research's

21 Analytical Department and was found to contain 0.01

22    weight    percent benzene. Thus, its use would not be

23 covered by the Emergency Temporary Standard."

24    Q.    Okay. And does the emergency temporary

25    standard relate to monitoring?

**Transcript of Mehlman, Myron**

01     A.     Emergency temporary standard was a way to

02     implement benzene starting it immediately until the

03     full standard is developed.

04     Q.     All right.

05     A.     It relates to essentially everything that

06  benzene standard relates to.

07     Q.     Okay. But the -- it's that standard that

08  would require the monitoring be done.

09     A.     Yes.

10     Q.     And in the Exhibit 5 or Exhibit 2 -- we have

11  duplicates there -- on that second page that Mr. Hobson

12  was discussing with you, it again mentions that where

13  you've got a product containing more than 1 percent

14  benzene, you then have to take into consideration

15     requirements that monitoring be done, correct?

16     A.     Yes.

17     Q.     Does it say anywhere on the document there

18     that -- well, on either of those two documents -- that

19  the substitution of a lower or nonbenzene containing

20  product was being recommended to make sure that the

21  workers weren't being exposed?

22     A.     I'm sorry. I didn't quite understand your

23     question you suggested.

24     Q.     Okay. The document mentions that substitution

25  should be made to bring the levels down below the

**Transcript of Mehlman, Myron**

01    threshold for monitoring, correct?

02    A.    Yes, an alternative should be found, same

03    thing, substitution.

04    Q.    Now, the document does not say we should be

05    substituting these materials because it's more healthy

06    for the workers, does it?

07    A.    Well, if you lower the level, it implies that

08    it will be safer product. It doesn't mean it's safe,

09    but certainly it would be considerably safer.

10    Q.    But when the words were chosen to go into the

11    corporate documents that we're looking at here today,

12    the concern that was reflected by the words used in the

13    documents was the monitoring requirement; is that

14    correct?

15    A.    That's what the document says by this

16    individual who wrote it.

17    MR. LYNN: That's all my questions.

18    Thank you.

19    MR. MILLER: I just have quick follow-up.

20    (EXHIBIT 7 MARKED)

21    REEXAMINATION

22    BY MR. MILLER:

23    Q.    Mr. Mehlman, I'm going to hand you what I've

24    marked as Exhibit No. 7 and ask if you can identify

25    this document for me, please.

**Transcript of Mehlman, Myron**

```
01    A.    Yes. The subject here is "Benzene Monitoring
02    Program, Submission of Samples."
03    Q.    It's dated August 18, 1977?
04    A.    Yes.
05    Q. And you were a recipient of this document?
06    A.    Yes.
07    Q.    And it was authored by Lester Levin; is that
08    correct?
09    A.    Yes.
10    Q.    And it refers to periodic benzene monitoring
11    that was ongoing at that time in Mobil facilities?
12    A.    Yes.
13    Q.    Was that monitoring similar to the dosimetry
14    that we talked about earlier in this deposition?
15    A.    Yes.
16    Q.    Okay. And do you know how frequently this
17    monitoring or dosimetry was being conducted by Mobil at
18    that time?
19    A.    Oh, I don't recall. That was a -- they did a
20    lot of monitoring. Lester Levin worked for me.
21    Everything he did he reported to me and got my
22    approval, including acquisition of equipment,
23    personnel.
24    Q.    I take it from this document and your
25    recollection that Mobil was conducting dosimetry on a
```

Transcript of Mehlman, Myron

01  periodic basis of employees who were working in

02  environments that may be contaminated with benzene.

03      A.    Very limited before the emergency temporary

04  standard and very few samples, not as frequently as

05  became necessary to do after 1977 Federal Register

06  publication of emergency temporary standard on benzene.

07      Q.    What was the date of the publication of the

08  emergency temporary standard?

09      A.    It's in Federal Register, and I think the

10      date -- I don't know the date. I can give you the

11      Federal Register number. It's 1910.1028. I'm sure I

12  have many copies of that.

13      Q.    Was the sampling that's discussed in what

14      we've marked as Exhibit No. 7, the Lester Levin -

15      A.    Levin.

16      Q.    -- memorandum, being conducted by Mobil in

17  response to the emergency temporary standard?

18      A.    That's correct.

19      Q.    And in August of 1977, was Liquid Wrench

20      available for use by Mobil employees in its facilities?

21      A.    I can't answer that. I don't know.

22      Q.    Was the recommendation made -- in the

23  documents we've looked at today made after August of

24      1977?

25      A.    I can't tell you what month. I just don't

**Transcript of Mehlman, Myron**

01    know.

02    Q.    We talked earlier in the deposition about

03    recommendations from individuals at Mobil to substitute

04    other products for Liquid Wrench.

05    A.    Then, it would be after emergency temporary

06    standard.

07    Q.    The October 12, 1977, memorandum, for example,

08    refers to a recommendation for substituting products

09    for Liquid Wrench.

10    A.    That's correct.

11    Q.    Were there individuals who were monitored

12    using dosimetry, as we've discussed earlier in the

13    deposition, being -- strike that.

14    There were individuals who worked with Liquid

15    Wrench in Mobil facilities that had been monitored for

16    their benzene exposure prior to the recommendation for

17    the substitution of that product?

18    MR. HOBSON: Objection, form.

19    A.    I don't know. I don't know. The person who

20    can answer that -- that would be in Mobil records

21    because individual by different job categories would be

22    listed and their exposure.

23    Q.    All right.

24    MR. MILLER: I don't have any further

25    questions, sir. Thank you.

**Transcript of Mehlman, Myron**

# Mehlman, Myron

### Rhyne Trial Master

01    MR. HOBSON: Completes the deposition.

02    THE WITNESS: Thank you.

03    THE VIDEOGRAPHER: We're off the record

04    at 12:47.

05    THE REPORTER: Do you want to read and

06    sign?

07    THE WITNESS: Yes, I do.

08

09    (THE DEPOSITION WAS CONCLUDED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Transcript of Mehlman, Myron**

Page 91

**Transcript of Mehlman, Myron**

# Exhibit 7

# Transcript Report

---

## Monique, Mark

Plaintiffs' designations are in yellow, there are no counter designations

**Transcript of Monique, Mark**

# Full Transcript Report
## Designation Legend

MONIQUE, MARK - (LEE) VOL 1

**Transcript of Monique, Mark**

Page 1

```
01                 COURT OF COMMON PLEAS
02                  PHILADELPHIA COUNTY
03                       - - -
04   ESTATE OF JACK E. LEE,    : APRIL TERM,
05             Plaintiffs,  : 2015
06                          :
07        vs.               : No. 2504
08                          :
09   UNITED STATES STEEL     :
10   CORPORATION, et al.,    :
11             Defendants.  :
12
13                    - - -
14             July 21, 2016
15                    - - -
16
17           Videotaped Deposition of MARK
18   MONIQUE, taken pursuant to Notice at the Law
19   Offices of Swartz Campbell, LLC, Two Liberty
20   Place 50 South 16th Street, Philadelphia,
21   Pennsylvania 19102, beginning at 9:30 a.m.,
22   before Brigitte A. Strain, a Federally
23   Certified Registered Professional Reporter and
24   a Notary Public.
25                    - - -
26
27
28
29
30
31           VERITEXT LEGAL SOLUTIONS
32              MID-ATLANTIC REGION
33         1801 Market Street - Suite 1800
34         Philadelphia, Pennsylvania  19103
35                                      2
```

Transcript of Monique, Mark

```
01   A P P E A R A N C E S :
02
03   LOCKS LAW FIRM
04   BY:  ANDREW J. DuPONT, ESQUIRE
05   The Curtis Center
06   Suite 720E
07   601 Walnut Street
08   Philadelphia, Pennsylvania  19103
09   215.893.0100
10   adupont@lockslaw.com
11   Representing the Plaintiffs
12
13   ARCHER & GREINER, P.C.
14   BY:  JOHN McDERMOTT, ESQUIRE
15   One Centennial Square
16       33 East Euclid Avenue
17   Haddonfield, New Jersey 08033
18   856.673.3902
19   jmcdermott@archerlaw.com
20   Representing the Defendants, CRC Industries,
21   Inc., Chevron U.S.A. Inc., Union Oil Company
22       of California, d/b/a Unocal, and ExxonMobil
23   Corporation
24
25   FISHKIN LUCKS, LLP
26   BY:  ZACHARY W. SILVERMAN, ESQUIRE
27   The Legal Center
28   One Riverfront Plaza, Suite 350
29   Newark, New Jersey  07102
30   973.679.4429
31   zsilverman@FishkinLucks.com
32   Representing the Defendant, Ashland, Inc.
33
34   GERMAN, GALLAGHER & MURTAGH
35   BY:  CHRISTIAN A. WEIMANN, ESQUIRE
36   200 S. Broad Street
37   Suite 500
38   Philadelphia, Pennsylvania  19102
39   215.875.4013
40   Weimannc@ggmfirm.com
41   Representing the Defendant, Radiator
42   Specialty Company
43   (Via Teleconference)
44
45                                    3
```

**Transcript of Monique, Mark**

Page 3

```
01    APPEARANCES (Continued):
02
03    JONES CARR McGOLDRICK
04    BY:  J. CHEVES LIGON, ESQUIRE
05    Premier Place
06    5910 N. Central Expressway, Suite 1700
07    Dallas, Texas 76206
08    214.828.9200
09    Cheves.Ligon@jcmfirm.com
10    Representing the Defendant, Safety-Kleen
11    Industries
12
13    KELLEY, JASONS, McGOWAN, SPINELLI, HANNA &
14    REBER, LLP
15    BY:  RICHARD L. WALKER, ESQUIRE
16    Two Liberty Place
17    Suite 1900
18    Philadelphia, Pennsylvania 19102
19    215.854.0658
20    Representing the Defendant, Berryman
21    Products, Inc.
22
23    LAVIN O'NEIL CEDRONE & DiSIPIO
24    BY:  STEPHEN S. DOUGHERTY, ESQUIRE
25    190 N. Independence Mall
26    Suite 500
27    Philadelphia, Pennsylvania 19106
28    215.627.0303
29    sdougherty@lavin-law.com
30    Representing the Defendant, Hunt Refining
31    Company
32
33    MARON MARVEL BRADLEY & ANDERSON LLC
34    BY:  ERNIE WETZLER, ESQUIRE
35    1717 Arch Street
36    Suite 3710
37    Philadelphia, PA 19103
38    215.231.7100
39    wsj@maronmarvel.com
40    Representing the Defendant, Genuine Parts
41    Company
42    (Via Teleconference)
43
44
```

**Transcript of Monique, Mark**

```
01      APPEARANCES (continued):
02
03      McELROY, DEUTSCH, MULVANEY &
04      CARPENTER, LLP
05      BY:  CHAD D. MOUNTAIN, ESQUIRE
06      1617 John F. Kennedy Boulevard
07      Suite 1500
08      Philadelphia, Pennsylvania  19103
09      215.557.2900
10      cmountain@mdmc-law.com
11      Representing the Defendant, Sunoco,
12      Inc. (R&M)
13
14      REED SMITH LLP
15      BY:  MEREDITH W. KNUDSEN, ESQUIRE
16      1301 K Street, N.W.
17      Suite 1000 - East Tower
18      Washington, D.C. 20005
19      202.414.9200
20      Mknudsen@ReedSmith.com
21      Representing the Defendant, Shell
22      Corporation
23      (Via Teleconference)
24
25      SWARTZ CAMPBELL, LLC
26      BY:  CHRISTINE P. BUSCH, ESQUIRE
27      115 North Jackson Street
28      Media, Pennsylvania  19063
29      610.566.9222
30      CBusch@swartzcampbell.com
31      Representing the Defendant, Savogran Company
32
33      THOMPSON HINE, LLP
34      BY:  ANDREA B. DALOIA, ESQUIRE
35      127 Public Square, 3900 Key Center
36      Cleveland, Ohio  44114
37      216.566.5818
38      Andrea.Daloia@thompsonhine.com
39      Representing the Defendant, Witco
40      Corporation, improperly sued as Witco
41      Distribution, Inc.
42      (Via Teleconference)
43
44
```

**Transcript of Monique, Mark**

```
01          APPEARANCES (continued):

02

03          THE CAIRONE LAW FIRM PLLC

04          BY:  ANGELA HAYDEN, ESQUIRE

05          38 Virginia Lane

06          Canonsburg PA 15317-5802

07          888.490.7490

08          angela.hayden@caironelawfirm.com

09          Representing the Defendant, United States

10          Steel Corporation

11

12          ALSO PRESENT:  W. R. Strain, CLVS

13                         Video Technician

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30
```

Transcript of Monique, Mark

Case 3:18-cv-00197-RJC-DSC   Document 311-7   Filed 09/02/20   Page 8 of 177

Case 3:18-cv-00197-RJC-DSC   Document 408   Filed 09/15/20   Page 916 of 1330

# Monique, Mark
## Rhyne Trial Master

```
01                I N D E X
02                  - - -
03
04    TESTIMONY OF:  MARK MONIQUE
05
06         By Mr. DuPont......................11, 157
07    By Mr. Silverman...................150, 166
08         By Mr. McDermott...................156
09
10    EXHIBIT NUMBER    DESCRIPTION    PAGE MARKED
11    Monique 1    Savogran Products
12                 Jobbers' Price List
13                 Savogran 4-19           39
14    Monique 2    Kutzit Formula 5-10-65
15                 (KT-F252-E63)
16                 Lee-Savogran 67         43
17    Monique 3    Kutzit Formula J-P16
18                 10/2/56
19                 Lee-Savogran 66         44
20    Monique 4    Handwritten Kutzit (K202)
21                 Lee-Savogran 68         52
22
23    Monique 5    Kutzit Formula H103A
24                 Lee-Savogran 69         55
25    Monique 6    Kutzit Paint Remover
26                 Label                   62
27
28    Monique 7    Kutzit Paint Remover
29                 Label                   64
30    Monique 8    Kutzit Paint Remover
31                 Label (annotated)       66
32
33    Monique 9    MSDS, AMSCO
34                 Lee-Savogran 86-87      78
35
36    Monique 10   (not marked)
37
38
39
```

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
.01    EXHIBITS (Continued):
.02    EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED
.03    Monique 11    Kutzit, Savogran
.04                  Lee-Savogran 49           91
.05
.06    Monique 12    Kutzit Paint/Varnish
.07                  Remover
.08                  Lee-Savogran 43-44        102
.09
.10    Monique 13    Savogran Kutzit Liquid
.11                  Paint & Varnish Remover
.12                  Lee-Savogran 45-46        106
.13
.14    Monique 14    Savogran Kutzit Liquid
.15                  Paint& Varnish Remover
.16                  Lee-Savogran 47-48        107
.17
.18    Monique 15    Savogran Home Upkeep
.19                  Products
.20                  Lee-Savogran 50-57        109
.21
.22    Monique 16    Letter 6/16/77 to
.23                  John Byrington from
.24                  Carl Olson
.25                  Lee-Savogran 91           115
.26
.27    Monique 17    Letter, 11/30/54, to
.28                  Dewey Mark from John
.29                  Foulger, M.D.,
.30                  DBZ9002183                118
.31    Monique 18    Letter, 5/16/67
.32                  To Friesendorf from
.33                  Kornowicz
.34                  H-D 776                   121
.35
.36    Monique 19    Letter, 5/15/67 to
.37                  Friesendorf from
.38                  Kornowicz, H-D562-565     125
.39
.40    Monique 20    Occupational Diseases
.41                  A Guide to Their Recognition 128
.42
.43                        - - -
.44
```

**Transcript of Monique, Mark**

Page 8

```
01                DEPOSITION  SUPPORT  INDEX

02

03     DIRECTION  TO  WITNESS  NOT  TO  ANSWER

04     Page    Line

05     (None)

06

07

08     REQUEST  FOR  PRODUCTION  OF  DOCUMENTS

09     Page    Line    Description

10     (None)

11

12

13     STIPULATIONS

14     Page    Line

15     (None)

16

17

18     QUESTIONS  MARKED

19     Page    Line

20     (None)

21

22

23

24

25
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02             VIDEO TECHNICIAN:  We're now on
03       the record.
04             My name is Russ Strain,
05       representing Veritext Legal Solutions.
06             The date today is July 21st,
07       2016.  The time is approximately 9:30
08       a.m.
09             This deposition is being held at
10       the office of Swartz Campbell, 50
11       South 16th Street, Philadelphia, PA.
12             The caption of this case is the
13       Estate of Jack E. Lee versus United
14       States Steel Corporation, et al.,
15       filed in the Court of Common Pleas of
16       Philadelphia County, April Term 2015,
17       Case Number 2504.
18             The name of the witness is Mark
19       Monique.
20             If counsel at this time will
21       please identify themselves for the
22       record.
23             MR. DuPONT:  Andrew DuPont for
24       the Plaintiffs.
25             MR. DOUGHERTY:  Stephen
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

```
01                    MARK MONIQUE
02        Dougherty for Hunt Refining Company.
03              MR. McDERMOTT:  Jack McDermott
04        for ExxonMobil, Chevron and Unocal.
05              MR. SILVERMAN:  Zachary
06        Silverman for Ashland and Univar.
07              MR. BUSCH:  Christine Busch for
08        Savogran.
09              MR. MOUNTAIN:  Chad Mountain for
10        Sunoco, Inc. (R&M).
11              MR. WALKER:  Richard Walker for
12        Berryman Products.
13              VIDEO TECHNICIAN:  Counsel on
14        the phone?
15              MS. KNUDSEN:  This is Meredith
16        Knudsen for Shell Oil.
17              MR. LIGON:  This is Cheves Ligon
18        for Safety-Kleen Systems.
19              MS. DALOIA:  Andrea Daloia for
20        Witco Corporation, improperly sued as
21        Witco Distribution, Inc.
22              MR. WETZLER:  Ernie Wetzler for
23        Genuine Parts Company.
24              VIDEO TECHNICIAN:  The court
25        reporter is Brigitte Strain of
```

**Transcript of Monique, Mark**

# Monique, Mark

### Rhyne Trial Master

```
01                    MARK MONIQUE
02         Veritext.  Will the court reporter
03         please swear in the witness.
04                       -  -  -
05             MARK MONIQUE, after having been
06         first duly sworn, was examined and
07         testified as follows:
08                       -  -  -
09                    EXAMINATION
10                       -  -  -
11             VIDEO TECHNICIAN:  Testimony can
12         now proceed.
13             MS. BUSCH:  Andrew, I'm sorry, I
14         didn't mean to interrupt.  Before we
15         begin, I just want to reserve the
16         right to read and sign.
17    BY MR. DuPONT:
18         Q.    What is your name, please?
19         A.    My name is Mark Monique.
20         Q.    Who are you employed by?
21         A.    Savogran Company.
22         Q.    What is your position with
23    Savogran Company?
24         A.    I'm the president.
25         Q.    What is your work history with
```

MONIQUE, MARK
- (LEE) VOL 1

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   Savogran Company?
03         A.      I started in 1987 as a chemist.
04   In 1988 I became the technical director.  And
05   then in 2007 I became the president.
06         Q.      I understand you've given a
07   deposition before.
08         A.      Yes.
09         Q.      On how many occasions?
10         A.      Two.
11         Q.      You're probably familiar with
12   the procedures that we use in a deposition,
13   but I'll review them with you so that we have
14   a clean record.
15         A.      Uh-huh.
16         Q.      If at any point in time I ask
17   you a question and you do not hear it or
18   understand it, will you agree to let me know?
19         A.      Sure.  Yes.
20         Q.      If I do ask a question and you
21   answer it, will you agree that you answered
22   the question because you heard it and you
23   understood it?
24         A.      Yes.
25         Q.      Please let me finish my
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    question before you begin your response.  We
03    have a court reporter, her job becomes
04    difficult when she's writing down two people
05    talking at the same time.  So if you'll allow
06    me to finish my question before you begin
07    your response, I would appreciate that.
08            A.      Certainly.
09            Q.      If I remind you from time to
10    time --
11            A.      Uh-huh.
12            Q.      -- to just wait until I finish
13    my question --
14            A.      Okay.
15            Q.      -- I'm not being rude, I just
16    want to make sure we have a clean record.
17            A.      Okay.
18            Q.      Your responses should be
19    verbal.  Even though we have a video camera
20    here today, nods of the head, shakes of the
21    head, uh-huhs, uh-uhs aren't written down
22    well.  So if you could say yes, no or other
23    verbal response, I would appreciate that.
24            A.      Okay.
25            Q.      We don't want you to guess in
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   response to any questions, so please answer
03   based on personal knowledge you have or
04   information that you gathered in order or
05   testify today.
06            A.     Okay.
07            Q.     If at any point in time you
08   need a break, please let me know.
09            A.     Uh-huh.
10            Q.     I only ask that you answer any
11   question that's pending before we take a
12   break.
13            A.     Okay.
14            Q.     You're here to testify on
15   behalf of the Savogran Corporation today?
16            A.     Yes.
17            Q.     And I said the Savogran
18   Corporation.  Is it Savogran Company?
19            A.     Savogran Company.  Uh-huh.
20            Q.     So you are the representative
21   of the Savogran Company?
22            A.     Yes.
23            Q.     And you are the president?
24            A.     Yes.
25            Q.     And you told me that you began
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   with the Savogran Company in 1987 as a
03   chemist.  Is that correct?
04          A.      Correct.
05          Q.      What was your educational
06   history before then?
07          A.      I have a Bachelor of Science in
08   chemistry.
09          Q.      Where did you obtain that?
10          A.      Brittingham State College.
11          Q.      In what year?
12          A.      That was 1985.
13          Q.      How did you come to work for
14   Savogran?
15          A.      It's actually pretty
16   interesting.  It's a very interesting
17   question.  I was actually recruited to work
18   for Savogran by Ashland Chemical.
19          Q.      How did that happen?
20          A.      The -- there was a salesman
21   that was -- had a very close relationship
22   with my boss at the time that worked for
23   Ashland.  And -- and he knew I was looking
24   for -- to change -- to change positions with
25   the company I was with before that.  So he
```

**Transcript of Monique, Mark**

```
01                 MARK MONIQUE
02   recruited me to interview with Savogran.
03        Q.     Who was the company that you
04   were with before the Savogran Company?
05        A.     It was Camger Chemical Systems.
06        Q.     And there was an Ashland sales
07   representative that became involved in
08   recruiting you to the Savogran --
09        A.     Yes.  Yeah.
10        Q.     What was the name of the
11   Ashland sales representatives?
12        A.     It was -- his last -- it was
13   Warren Fish.
14        Q.     How do you spell Fish?
15        A.     F-I-S-S -- F-I-S-H.
16        Q.     And Warren Fish from Ashland
17   had a relationship with the Savogran Company?
18        A.     Well, with my boss at the time.
19        Q.     Who was your boss at that time?
20        A.     John Gale, G-A-L-E.
21        Q.     And John Gale was your boss at
22   the Savogran Company?
23        A.     Yes.
24        Q.     What was the relationship
25   between Warren Fish of Ashland and John Gale
```

**Transcript of Monique, Mark**

01                    MARK MONIQUE
02    at Savogran?
03          A.      They were friends.
04          Q.      Was Warren Fish selling Ashland
05    products to the Savogran Company?
06          A.      Yes.
07          Q.      And how did you come to learn
08    that Warren Fish was selling products to the
09    Savogran Company?
10          A.      Well, just when I -- I guess he
11    told me.  I can't really -- you know, don't
12    know specifically.
13          Q.      You had a conversation with Mr.
14    Fish and you learned Mr. Fish --
15          A.      I wouldn't --
16          Q.      -- was selling products to the
17    Savogran Company?
18          A.      I would think so, yeah.
19          Q.      How long had Mr. Fish been
20    selling products to Savogran as a
21    representative of Ashland?
22          A.      I don't know.
23          Q.      Had long had Mr. Fish and John
24    Gale had this friendship before you began
25    with the company in 1987?

**Transcript of Monique, Mark**

01                    MARK MONIQUE

02          A.      I'm not sure.

03          Q.      Did Ashland continue to sell

04  products to the Savogran Company when you

05  began your employment in 1987?

06          A.      Yes.

07          Q.      And what chemicals were they

08  selling to Savogran Company?

09          A.      They sold us a whole variety of

10  different, you know, products, chemicals.

11          Q.      Was it your understanding, when

12  you started in 1987, that Ashland had been

13  selling chemicals to the Savogran Company for

14  a period of time before you began with the

15  company?

16          A.      Yes.  That's a reasonable

17  statement.

18          Q.      How did you come to meet Warren

19  Fish from Ashland?

20          A.      I just knew him from the

21  industry.

22          Q.      From your prior employment?

23          A.      Right.  Yeah.

24          Q.      Tell me again the name of the

25  company you worked for before the Savogran

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      Company.
03           A.     Camger Chemical Systems,
04      C-A-M-G-E-R.
05           Q.     What type of company was Camger
06      Chemical Systems?
07           A.     They make paint.  Paint and
08      coatings.
09           Q.     If you could please just let me
10      --
11           A.     Right.  I'm sorry.
12           Q.     -- finish my question before
13      you begin your response.
14                  Okay.  So you worked for Camger
15      --
16           A.     Uh-huh.
17           Q.     -- Chemical Systems?
18           A.     Yes.
19           Q.     And they made paint and coating
20      products?
21           A.     Yes.
22           Q.     Where were they located?
23           A.     They were in Norfolk,
24      Massachusetts.
25           Q.     When did you start working for
```

**Transcript of Monique, Mark**

```
01                  MARK MONIQUE
02      them?
03          A.      I only worked there a year.
04      Year, year and a half.
05          Q.      So it was between graduating
06      college in 1985 --
07          A.      No, I -- before -- I -- I guess
08      -- let me start from the beginning, make it
09      simple.  I did 25 years in the National
10      Guard.  I did -- I retired as a Lieutenant
11      Colonel.  During college I was -- you know, I
12      did ROTC.  I got commissioned second
13      lieutenant.  So when I graduated college I
14      went on active duty for training.  So I was
15      -- I was on active duty for about six months.
16      I came back and I worked for about a year for
17      a company call SANCora.  They made water
18      based polyurethanes.  I was an application
19      chemist there.  So I spent, I don't know,
20      roughly a year there before I went to Camger.
21      And then from -- and then from -- you know,
22      so I was in the Army.  When I graduated
23      college, I spent a little time in the Army.
24      Left there, went to SANCora for a short
25      amount of time as an application chemist
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   working on water based urethanes.  And then
03   left there and went to Camger Chemical
04   Systems for a short amount of time.  And then
05   that's when I ended up at Savogran.
06            Q.    So in terms of your employment
07   --
08            A.    Uh-huh.
09            Q.    -- in the chemical and coatings
10   industry --
11            A.    Yeah.
12            Q.    -- you graduate college in 1985
13   as a chemist.
14            A.    Correct.  Yeah.
15            Q.    Your first job in the chemical
16   and coatings industry is with SANCora for a
17   short period of time?
18            A.    Yes.
19            Q.    And they were a company that
20   made water based polyurethanes?
21            A.    Yes.
22            Q.    And you worked as an
23   applications chemist there?
24            A.    Yes.
25            Q.    And then you take a position
```

**Transcript of Monique, Mark**

```
01                MARK MONIQUE
02   with Camger Chemical Systems?
03        A.    Yes.
04        Q.    And they made paint and coating
05   products?
06        A.    Yes.
07        Q.    And then in 1987 you start with
08   the Savogran Company?
09        A.    Yes.
10        Q.    And you worked for the Savogran
11   Company from 1987 to the present?
12        A.    Yes.
13        Q.    You were first a chemist from
14   1987 until 19 --
15        A.    Till '88.  It was essentially
16   the same job, just a different title.  Yeah.
17        Q.    And then you were the technical
18   director --
19        A.    Right.
20        Q.    -- from 1988 until 2006.  And
21   then you became --
22        A.    2007.
23        Q.    2007.  In 2007, you became the
24   president, and you've been the president
25   since?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.     Yes.  Uh-huh.
03          Q.     I understand that the Savogran
04   Company has been in business since 1875?
05          A.     Yes.  It's a very rich history.
06   Started out as the India Alkaline Company.
07   It was on -- actually on India Wharf in
08   Boston.  Made -- the company made granulated
09   soaps that were sold into textile mills,
10   schools, institutions.  The word Savogran
11   used to be -- actually used to be a product.
12   And it was savo for soap and gran for
13   granulated.  So Savogran was granulated soap.
14   And that's how it got its beginning.
15               But actually currently we're
16   kind of an unusual company in the sense that
17   we're a hundred percent employee owned, we're
18   an ESOP.
19               In 1987, the -- the descendants
20   of the founder, Stoddard, wanted to diversify
21   their portfolio.  So using the tax benefits
22   of an ESOP, they sold the company to the --
23   to the employees.  And they sold -- the
24   unusual part about that is, they sold a
25   hundred percent of the company to the
```

**Transcript of Monique, Mark**

Page 24

```
01                    MARK MONIQUE
02     employees.  So our employees actually every
03     year elect a Board of Directors.  So, you
04     know, we're -- right now there's nine of us
05     that are ESOP stockholders.  And, you know,
06     we're just regular Joes, you know, just
07     trying to scratch out a living in a very
08     tough economic time with -- dealing with
09     cutthroat retailers.  And, you know, it's
10     just -- just trying to keep the legacy going
11     of this very small company.
12                    MR. DuPONT:  Motion to strike
13            the non-responsive portion.
14     BY MR. DuPONT:
15            Q.      The Savogran Company started in
16     1875; correct?
17            A.      Correct.
18            Q.      And it started as an alkali
19     company that was making a soap product?
20            A.      Yes.
21            Q.      All right.  And it was located
22     on the India Wharf in Boston at that time?
23            A.      Yes.
24            Q.      Then the Savogran Company got
25     into the business of manufacturing paint
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    removers; is that correct?
03            A.     Yes.
04            Q.     And, in fact, was Savogran
05    Company somewhat of a pioneer, one of the
06    first manufacturers of a paint remover
07    product?
08            A.     Yes.
09            Q.     So when did the Savogran
10    Company begin manufacturing paint remover
11    products?
12            A.     1938.
13            Q.     And one of those paint remover
14    products was Kutzit?
15            A.     Kutzit was -- to my
16    recollection, was not the first.
17            Q.     But one of the Savogran
18    Company's paint removing products was -- was
19    Kutzit?
20            A.     Yes.
21            Q.     And it continues to be a
22    product that's manufactured and sold by the
23    Savogran Company?
24            A.     Correct.
25            Q.     When did the Kutzit product
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      come onto the market?
03          A.      I'm not sure.
04          Q.      I've seen reference to some
05      jobbers price lists --
06          A.      Uh-huh.
07          Q.      -- for the Savogran products.
08          A.      Uh-huh.
09          Q.      And the earliest one that was
10      produced to me by the Savogran Company was
11      dated July 15, 1949.
12          A.      Okay.
13          Q.      That lists Kutzit on it.  Does
14      that refresh your recollection that by at
15      least 1949 The Savogran Company was
16      manufacturing and selling Kutzit?
17          A.      Yes.  But I don't know when it
18      actually started as a product.  Right.  Yeah.
19          Q.      So at some point in time,
20      between 1938 and 1949, the Savogran Company
21      began manufacturing and selling Kutzit?
22          A.      Yes.
23                  Can I get some water?
24                  MS. BUSCH:  Off the record.
25                  VIDEO TECHNICIAN:  Off the
```

**Transcript of Monique, Mark**

```
01              MARK MONIQUE

02         record at 9:45.

03                    -   -   -

04         (Discussion held off the

05         record.)

06                    -   -   -

07              VIDEO TECHNICIAN:  Back on the

08         record, 9:46.

09  BY MR. DuPONT:

10         Q.     Was Kutzit one of many paint

11  removing products that Savogran began to

12  manufacture and sell in 1938?

13         A.     I -- I don't think I would

14  state it was many.  At that time I think

15  maybe they had three.

16         Q.     And, over a period of time, did

17  the Savogran paint remover product line grow?

18         A.     Not substantially, no.

19         Q.     By how much did it grow?

20         A.     We might have maybe a dozen

21  products.  Paint remover products.

22         Q.     Are all Savogran's products

23  that its manufactured and sold from the 1930s

24  to the present paint remover products, or are

25  there other lines of chemical products?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.      We have -- we -- we have our
03    line is primarily paint and varnish removers,
04    cleaners, patching compounds, tile grouts.
05          Q.      Overall, how many products are
06    in the product line of Savogran over time?
07    Let's start with the 1930s and take us to the
08    present.
09          A.      I have no idea.  I mean,
10    there's products that have come and gone.
11    Yeah.  That would be -- that would be a tough
12    one to throw a number on.
13          Q.      Okay.
14          A.      It's not a tremendous number
15    though, you know.  Prob -- you know.
16          Q.      Are you talking about dozens of
17    products?
18          A.      Yeah, probably.
19          Q.      So the Savogran Company starts
20    in Boston --
21          A.      Uh-huh.
22          Q.      -- and I see reference to a
23    Norwood, Massachusetts address?
24          A.      Yes.
25          Q.      Did the company eventually move
```

Transcript of Monique, Mark

Page 29

```
01                    MARK MONIQUE
02      to Norwood, Massachusetts?
03           A.      Yes.  Yep.
04           Q.      When did that happen?
05           A.      I want to say it was in the
06      fifties.
07           Q.      And Savogran also had business
08      locations in Addison, Illinois?
09           A.      Yes.
10           Q.      And Chicago, Illinois?
11           A.      No.  Just Addison, Illinois.
12           Q.      Did Savogran have a business
13      location in Los Angeles, California?
14           A.      Yes.  But in the time frame
15      that you're talking about it wasn't actually
16      owned by Savogran.
17           Q.      When did the Savogran Company
18      begin to do business at the Addison, Illinois
19      address?
20           A.      Fifties.
21           Q.      Was that a manufacturing
22      facility?
23           A.      Yes.
24           Q.      So, in the 1950s, in terms of
25      manufacturing facilities --
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.      Uh-huh.
03          Q.      -- the Savogran Company had
04    Norwood, Massachusetts?
05          A.      Yes.
06          Q.      And it also had Addison,
07    Illinois as a manufacturing facility?
08          A.      Yes.
09          Q.      And what type of facility was
10    Los Angeles?
11          A.      That was a very small
12    manufacturing facility.  And it wasn't --
13    like I said, it wasn't actually owned by
14    Savogran.  It was owned by one of the -- it
15    was like a west coast sales guy that owned
16    it.
17          Q.      Did the Savogran Company
18    manufacture products at the Los Angeles
19    facility?
20          A.      No.
21          Q.      Were products manufactured on
22    behalf of Savogran at the Los Angeles
23    facility?
24          A.      No.
25          Q.      What business did Savogran do
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    at the Los Angeles facility?
03         A.      They -- they used -- they used
04    the Savogran name, but they were making --
05    making stuff for themselves.  It was a
06    separate -- it wasn't owned by Savogran.
07         Q.      Who was it owned by?
08         A.      It was owned by -- it was the
09    west coast sales agent at the time.
10         Q.      Did the --
11         A.      I'm -- see, now you're getting
12    into things that, you know, are way before my
13    memory.  Yeah.
14                 The other thing, Andrew, is,
15    you know, the stuff that you're talking
16    about, your client was from North Carolina,
17    all that material, you know, that was --
18    would have come out of Norwood,
19    Massachusetts.  It's -- Norwood shipped down
20    into the Carolinas.  Addison would have
21    handled Texas, the Midwest and California.
22    You know, west coast.
23                 MR. DuPONT:  Move to strike the
24         non-responsive portion.
25    BY MR. DuPONT:
```

**Transcript of Monique, Mark**

Page 32

MARK MONIQUE

01

02     Q.     So by the 1950s, is it fair to

03  say that the Savogran Company was selling its

04  products nationwide?

05     A.     Yes.

06     Q.     When did the Savogran Company

07  begin to sell its products nationwide?

08     A.     I don't know.

09     Q.     Did the Savogran Company sell

10  its products internationally?

11     A.     Caribbean.

12     Q.     When did it begin selling

13  products into the Caribbean?

14     A.     I don't know.

15     Q.     Was it selling products into

16  the Caribbean by the 1950s?

17     A.     I have no idea.

18     Q.     How did you come to learn that

19  the Savogran Company was selling products

20  into the Caribbean?

21     A.     We do now.

22     Q.     Now, the Kutzit product, was

23  that manufactured at both the Norwood,

24  Massachusetts and the Addison, Illinois

25  facility since the 1950s?

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02        A.     Yes.
03        Q.       Do you know what volume of
04   Kutzit was being manufactured on an annual
05   basis in the 1950s, 1960s, 1970s?
06        A.     No.
07        Q.       How were Kutzit products
08   marketed and sold during the 1950s, 1960s,
09   1970s?
10        A.      We sell, we still do to this
11   day, through mostly -- through distribution.
12   We sell to the hardware co-ops, like Ace
13   Hardware, True Value, Do It Best.  We sell to
14   -- back then, they did also through small
15   paint distributors that sold to like
16   independent paint stores.
17              Home Depot wasn't around in
18   those days, but some of the larger chains
19   they might have sold direct, not through a
20   distributor.  But in the -- I think the time
21   frame that you're talking about, probably
22   most of the business was probably done
23   through a distributor.
24        Q.      And did Savogran know where
25   those distributors, in turn, sold Savogran
```

**Transcript of Monique, Mark**

Page 34

```
01                   MARK MONIQUE
02   products?
03        A.     No.
04        Q.     Now, the Kutzit product, that
05   was a -- a product that was marketed to
06   consumers for consumer use?
07        A.     Yes.  Uh-huh.
08        Q.     And in the 1950s, 1960s and
09   1970s, it's a type of product that you would
10   expect somebody could find in a general store
11   or a local hardware store, something like
12   that?
13        A.      Not so much a general store,
14   but, you know, definitely a hardware store or
15   paint store.
16        Q.      If the store sold paint related
17   products or solvent related products, that's
18   the type of store that you would expect to
19   find Savogran being sold in during the
20   fifties, sixties and seventies?
21        A.     Yes.
22        Q.     Do you know how the Kutzit
23   product was developed?
24        A.     No.  No.
25        Q.     Now, understanding that you
```

**Transcript of Monique, Mark**

```
01                  MARK MONIQUE
02      began with the company in 1987 --
03              A.      Uh-huh.
04              Q.      -- have you undertaken an
05      investigation to learn about Savogran's
06      business and what happened at the company
07      before 1987?
08              A.      Could you repeat that?
09              Q.      Yeah.
10              A.      Sorry.
11              Q.      You began with Savogran in
12      1987; right?
13              A.      Yeah.  Yep.  Right.
14              Q.      So have you tried to educate
15      yourself and learn about what happened at the
16      company before 1987?
17              A.      Yes.
18              Q.      What have you done in order to
19      learn that?
20              A.      Records.  Just go through the
21      records that we could find.
22              Q.      Have you spoken to any former
23      employees or current employees at Savogran to
24      learn what happened before your time?
25              A.      Yes.
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02        Q.     Who is that?
03        A.     Tom Little.
04        Q.     Any others?
05        A.     That's it.
06        Q.     And beginning in 1987 at
07   Savogran, did you have conversations with
08   your coworkers, people that you worked for
09   and with at Savogran, in which you learned
10   about the history of the company?
11        A.     Yes.
12        Q.     Who were some of those people?
13        A.     Well, we have, you know, John
14   Gale, he was my former boss.  Steve McLane.
15        Q.     So one of the -- one of the
16   names you mentioned was Tom Little.
17        A.     Yes.
18        Q.     Who is Tom Little?
19        A.     He's my vice president of
20   operations.
21        Q.     How long has Tom Little been
22   with Savogran?
23        A.     He started in 1972.
24        Q.     Where does he work?
25        A.     He works at Norwood.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          Q.      How old is Mr. Little?
03          A.      I'm not sure.
04          Q.      Is John Gale still employed by
05   Savogran?
06          A.      He's deceased.  He was retired
07   -- he retired and then just passed away.
08   Yep.
09          Q.      Steve McLane, is he still
10   employed with --
11          A.      Yes.
12          Q.      -- Savogran?
13          A.      Yep.
14          Q.      What's his position?
15          A.      He's vice president of sales.
16          Q.      When did Steve McLane begin
17   with Savogran?
18          A.      He -- he came -- he actually
19   came to us when Savogran bought the stock of
20   the California operation.  So that was
21   probably 10, 15 years ago.
22          Q.      About 19 -- excuse me, about
23   2001?
24          A.      Something like that, yeah.
25          Q.      So it was around 2000, 2001,
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    that Savogran bought the stock of the company
03    that was out of Los Angeles?
04          A.    Yes.  Uh-huh.
05          Q.      And this was a company that was
06    -- had an affiliation with the Savogran
07    Company before 2001?
08          A.    Yes.
09          Q.      And, in fact, on marketing
10    materials, have you seen that before 2001
11    Savogran advertised that it had a facility in
12    Los Angeles?
13          A.    Yes.
14          Q.      So that would be referring to
15    -- to this facility and this operation that
16    it bought in 2001?
17          A.    Right.  Yes.  Well, like I
18    said, I don't know if it was exactly 2001.
19    It's in that time period, yeah.
20          Q.      What was Steve McLane's
21    position with the -- strike that.
22                  What was the name of the entity
23    in Los Angeles?
24          A.      I think it -- I'm not sure.
25    I'm not going to guess on that one.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02         Q.      What was Steve McLane's
03   position at the Los Angeles operation?
04         A.      He was the manager.
05         Q.      Do you know when he started
06   there?
07         A.      I don't.
08         Q.      And he is still with Savogran?
09         A.      Yes.
10                     -   -   -
11         (Whereupon the document was
12         marked, for identification purposes,
13         as Monique Exhibit Number 1.)
14                     -   -   -
15   BY MR. DuPONT:
16         Q.      I'm going to hand you
17   Exhibit 1.
18         A.      Thank you.
19         Q.      Exhibit 1 are documents that
20   are Bates Number Savogran 4 through 19.  And
21   they appear to be jobbers' price lists.  Is
22   that correct?
23         A.      Yes.
24         Q.      And the first jobbers price
25   list in Exhibit 1 says, "Effective July 15,
```

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02    1949."  Do you see that?
03          A.     Yes, uh-huh.
04          Q.     And on this jobbers' price list
05    we see the Kutzit liquid remover?
06          A.     Yes.
07          Q.     And at the bottom of the price
08    list there's the Savogran Company name with
09    an address at 60 West Superior Street,
10    Chicago, Illinois.  Do you see that?
11          A.     Yes.
12          Q.     What -- do you know what
13    Savogran did at the Chicago, Illinois address
14    that's listed there?
15          A.     I do not.
16          Q.     Earlier I had asked you whether
17    Savogran had a facility in Chicago, Illinois.
18          A.     Uh-huh.
19          Q.     Does this refresh your
20    recollection that it did have a Chicago
21    address?
22          A.     No.
23          Q.     Do you have any reason to
24    dispute that Savogran Company had a Chicago
25    address in 1949?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.      To be honest with you, that's
03    the first time I've seen that and noticed it.
04    And I've never heard any talk about any other
05    address besides the Addison address.
06          Q.      And then there's also a 25
07    Huntington Avenue, Boston, Massachusetts
08    address?
09          A.      Yes.
10          Q.      Do you know what Savogran did
11    at that Boston address?
12          A.      I don't.
13          Q.      And there's reference to the --
14    what they call the Boston plant in Norwood,
15    Massachusetts?
16          A.      Right.
17          Q.      That's one of the manufacturing
18    facilities?
19          A.      Yes.
20          Q.      And on this jobbers' price list
21    there's a number of paint remover products
22    that are listed here.  At least -- at least
23    four of them; is that right?
24                  Excuse me, let me correct that.
25    On the 1949 jobbers' price list there are two
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    paint remover products and a third paint
03    remover that's called Savablaze
04    Non-Inflammable Remover?
05            A.    Yes.
06            Q.    So there's three paint removers
07    and one liquid brush cleaner?
08            A.    Yes.
09            Q.    And out of the three paint
10    removers, Kutzit appears to be the least
11    expensive of the three?
12            A.    Yes.
13            Q.    And if we take a look through
14    these product lists and price listing for
15    Savogran, these go from the period of 1949
16    through 1976.  It appears that the Kutzit is
17    the least expensive of the paint remover
18    products that Savogran has sold throughout
19    this period of time.  Is that correct?  Take
20    a moment and look through it.
21            A.    (Complying with request.)
22                  That's correct.
23            Q.    And the Kutzit product, during
24    the periods of time, was manufactured with
25    benzene as an ingredient; right?
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE

02                    MS. BUSCH:  Object to form.

03                    THE WITNESS:  What time frame?

04    BY MR. DuPONT:

05          Q.      Well, we're going to get to

06    that.  But is it correct that the Kutzit

07    product was manufactured during periods of

08    time with benzene as an ingredient?  Is that

09    correct?

10          A.      Yes.  Uh-huh.

11          Q.      And what's your understanding

12    as to the years during which Kutzit had

13    benzene as an ingredient?

14          A.      The -- 1963 through 1973.

15          Q.      What percentage of the

16    product -- between 1963 and 1973, what

17    percentage of its formula was pure benzene?

18          A.      Can we dig out one of the

19    formula?

20                          -   -   -

21                    (Whereupon the document was

22          marked, for identification purposes,

23          as Monique Exhibit Number 2.)

24                          -   -   -

25    BY MR. DuPONT:
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        Q.      I'm handing you Exhibit 2.
03        A.      Uh-huh.
04        Q.      Exhibit 2 is Bates Number
05   Lee-Savogran 67; is that correct?
06        A.      Yes.
07        Q.      What is Exhibit 2, please?
08        A.      Oh, you want me to say what it
09   is?
10        Q.      Yes, what is Exhibit 2, please?
11        A.      I'm sorry, Andrew.  It's Kutzit
12   Formula KT-F252-E63.  And it's dated May
13   10th, 1963.
14        Q.      And the earlier version of the
15   Kutzit formula that was produced to us was
16   dated October 2, 1956.  I want to mark that
17   as Exhibit 3.
18                      -   -   -
19              (Whereupon the document was
20         marked, for identification purposes,
21         as Monique Exhibit Number 3.)
22                      -   -   -
23              THE WITNESS:  Thank you.
24   BY MR. DuPONT:
25        Q.      So Exhibit 3 is Lee-Savogran
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      66; is that right?
03            A.      Yes.
04            Q.      And Exhibit 2 is dated
05      October 2, 1956?
06            A.      Yes.
07            Q.      Strike that.
08                    The earlier version of the
09      Kutzit formula that we've have marked as
10      Exhibit 3 is dated October 2, 1956; is that
11      correct?
12            A.      Yes.
13            Q.      And in this formula benzene
14      isn't listed as an ingredient; right?
15            A.      Yes.
16            Q.      Do you know when it was,
17      between October 2, 1956 and May 10, 1963,
18      benzene began to be used as an ingredient in
19      Kutzit?
20            A.      No.
21            Q.      Do you know if the -- strike
22      that.
23                    Do you know why it was there
24      was a substitution to add benzene as an
25      ingredient in the Kutzit product at some
```

MONIQUE, MARK
- (LEE) VOL 1

**Transcript of Monique, Mark**

| | |
|---|---|
| 01 | MARK MONIQUE |
| 02 | point between 1956 and 1963? |
| 03 | A. No. |
| 04 | Q. What was used instead of |
| 05 | benzene before 1963 in Kutzit? |
| 06 | A. Methylene chloride is the |
| 07 | difference in the -- methylene chloride and |
| 08 | toluene are the difference. But we'd have to |
| 09 | know what the solvent PM 4088 is on the May |
| 10 | 1963 formula, which, if you took a look at |
| 11 | the label that corresponds to this 1963 |
| 12 | label, then we can figure out what the |
| 13 | ingredients were and then compare it to this |
| 14 | formula here. |
| 15 | Q. Okay. Was methylene chloride |
| 16 | an effective substitute for benzene in the |
| 17 | paint remover product? |
| 18 | A. It was a much more effective |
| 19 | replacement for benzene. |
| 20 | Q. So methylene chloride actually |
| 21 | worked a lot better than benzene for paint |
| 22 | removing? |
| 23 | A. I've never actually worked with |
| 24 | a benzene remover, so I guess I wouldn't be |
| 25 | qualified to say that. |

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, misstates facts, misstates testimony of Mr. Monique, lacks personal knowledge, and calls for an expert opinion

MONIQUE, MARK
- (LEE) VOL 1

**Transcript of Monique, Mark**

MARK MONIQUE

01
02      Q.      Based on your -- your
03  understanding of the chemical properties of
04  benzene and methylene chloride as a chemist,
05  what makes methylene chloride a much better
06  substitute for paint remover products than
07  benzene?
08      A.      It's a real small molecule.  So
09  it has a real good ability to diffuse through
10  the paint film.
11      Q.      And why is that important for
12  paint removers?
13      A.      Well, it gets through the -- it
14  gets through the paint film and releases the
15  bond between the paint and the substrate.
16      Q.      And that helps the product work
17  better in removing paint?
18      A.      Correct.
19      Q.      Is methylene chloride also a
20  much safer chemical than benzene?
21          MS. BUSCH:  Objection to form.
22          THE WITNESS:  I wouldn't be
23      qualified to answer that.
24  BY MR. DuPONT:
25      Q.      Benzene is a known human

> **Savogran** objects to this designation on the grounds that it calls for an expert opinion, is beyond the scope and knowledge of the deponent, posed an incomplete hypothetical, calls for speculation, vague and ambiguous and lacks foundation.

MONIQUE, MARK
- (LEE) VOL 1

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   carcinogen; right?
03          A.     Yes.
04          Q.     Methylene chloride is not a
05   known human carcinogen; right?
06              MS. BUSCH:  Object to form.
07              THE WITNESS:  That -- we can
08          debate that for a whole other day.
09   BY MR. DuPONT:
10          Q.     Okay.  So at some point in
11   time, between 1956 and 1963, benzene is
12   substituted into the Kutzit formula.  And
13   what percentage of the formula does benzene
14   become?
15          A.     Well, I guess the first comment
16   I would make is, we don't actually have a
17   label that corresponds to the 1956 formula.
18   So I can't say definitively that this was
19   ever put into commerce.  It just happens to
20   be a formula we found in the file.
21              The second part of your
22   question is, the Kutzit formula -- now,
23   benzol -- I've personally never been able to
24   understand or figure out if benzol was just
25   another name for benzene, or if benzol was a
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    mixture of benzene and something else.  So if
03    your question is, what is the percentage of
04    benzol in the formula, you know, then -- you
05    know, without doing the math, it looks like
06    it was about a third.
07               So, you know, there's a lot of
08    unanswered questions there, you know, as far
09    as, you know, definitively telling you how
10    much benzene was in that formula, you know.
11               That's where I think if you go
12    back to the labels, look at the labels, you
13    can actually see the actual ingredients that
14    were in there.
15         Q.    All right.  So you think you
16    can look at a label and compare it to this
17    1963 formula for Kutzit and determine how
18    much benzene was --
19         A.    Well, not how much.  But it
20    will tell us -- it will tell us what the
21    solvent PM 4008 (sic) was comprised of.  And
22    it will, you know, gives us a better
23    understanding of what -- you know, what that
24    is.
25         Q.    Now, are you aware that benzol
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      is used as a synonym for benzene, meaning
03      it's used as the same word for benzene?
04           A.      I'm not.  I'm not.  I've
05      actually Googled that trying to figure that
06      out, and I haven't found anything, even
07      online about that.
08           Q.      Now, the -- the October 2, 1956
09      formula that's Exhibit 3 --
10           A.      Uh-huh.  Yep.
11           Q.      -- is this also in the format
12      of a batch ticket?  Do you know what a batch
13      ticket is?
14           A.      Yes.
15           Q.      A batch ticket is instructions
16      for how a product is actually to be blended
17      and manufactured?
18           A.      Yes.
19           Q.      And is this 1956 document
20      that's marked as Exhibit 3, is this in the
21      format of a batch ticket that's actually --
22      gives you instructions of how you blend the
23      product to manufacture it?
24           A.      Yes.  Yeah.
25           Q.      And it's logical to conclude
```

**Transcript of Monique, Mark**

01                     MARK MONIQUE

02     that you would have a batch ticket for this

03     formula of Kutzit in 1956 because it was

04     actually being used as a formula at the time?

05                    MS. BUSCH:  Object to form.

06                    THE WITNESS:  Like I said, I

07          can't definitively tell you that that

08          was ever actually used to produce

09          product.  It's certainly in the right

10          format and it certainly looks like it

11          could have been, I would agree with

12          that.

13     BY MR. DuPONT:

14          Q.     Do you think it's more likely

15     than not that Kutzit was using this formula

16     of -- excuse me, strike it.

17                    Do you think it's more likely

18     than not that Savogran was using the

19     October 2, 1956 formula that substituted

20     methylene chloride for benzene?

21                    MS. BUSCH:  Object to form.

22                    THE WITNESS:  It's possible,

23          yeah.  Uh-huh.

24     BY MR. DuPONT:

25          Q.     The Kutzit product itself was a

**Transcript of Monique, Mark**

```
01                  MARK MONIQUE
02   liquid product?
03        A.     Yes.
04        Q.     And it had a viscosity, a
05   thickness, that was similar to water?
06        A.     Yes.
07        Q.     It was a light blue in color?
08        A.     Yes.
09        Q.     Was that consistent throughout
10   the product's history, that it had this light
11   blue color, kind of watery consistency?
12        A.     Yes.
13                     -    -    -
14             (Whereupon the document was
15        marked, for identification purposes,
16        as Monique Exhibit Number 4.)
17                     -    -    -
18   BY MR. DuPONT:
19        Q.     I'm handing you Exhibit 4.
20        A.     Okay.
21        Q.     What is Exhibit 4?
22        A.     Exhibit 4 is the document that
23   has a Kutzit formula on it, dated
24   November 20th, 1972.  It's labeled Kutzit
25   (K 202).
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        Q.     Is this a Kutzit formula that
03   was actually used by Savogran?
04        A.     Not sure.  Just it's a document
05   that we found in the file.
06        Q.     Are you able to tell me what
07   percentage of the Kutzit formula that's
08   listed in 1972 was benzene?
09        A.     So it would have been -- you
10   know, assuming that the benzol is a hundred
11   percent benzene, then it would have been
12   90 percent of 256 gallons.
13        Q.     What does that mean for the
14   total percentage of the product?
15        A.     Can I do the math on it?
16        Q.     Yes.
17        A.     Can I write on this?
18        Q.     Absolutely.
19        A.     So I'm guessing with the wax
20   that was in there, the total batch size was
21   probably around 460 gallons.  So if you take
22   256 times -- so it was about 50 percent.
23        Q.     So in 1972, in this formula,
24   the benzene is about 50 percent of the
25   contents of the Kutzit product?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.      On -- yeah, volume.  Yeah.
03   Uh-huh.
04          Q.      And if we look at Exhibit 2,
05   which is the 1963 formula, if we add up the
06   volume of the four ingredients that are
07   listed, the solvent PM 4088, the methanol,
08   the benzol and the Ceresine Wax, my math says
09   that they add up to 488.
10          A.      So that one is probably running
11   about 55 percent benzol.
12          Q.      So the benzene content of the
13   Savogran product, between at least 1963 and
14   1973, was somewhere between 50 and 55
15   percent?
16              MS. BUSCH:  Object to form.
17              THE WITNESS:  I'm not sure if
18         this one ever went into production.
19         But, yeah, 50 percent.  Right around
20         50 percent is a fair statement.
21   BY MR. DuPONT:
22          Q.      When you say you're not sure if
23   this went into product --
24          A.      Right.
25          Q.      -- production, you're talking
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

01                    MARK MONIQUE

02      about Exhibit 4, the 1972 version?

03            A.     Yes.  Uh-huh.

04            Q.     But we can agree that around 50

05      percent of the chemical content of Savogran's

06      Kutzit product between 1963 at least and 1973

07      was benzene?

08            A.     Yes.

09                   MS. BUSCH:  Object to the form.

10      BY MR. DuPONT:

11            Q.     Have you learned from anybody

12      or seen any documents as to why benzene was

13      taken out of the Kutzit product after 1973?

14            A.     No.

15                        -  -  -

16                   (Whereupon the document was

17            marked, for identification purposes,

18            as Monique Exhibit Number 5.)

19                        -  -  -

20      BY MR. DuPONT:

21            Q.     I'm going to hand to you

22      Exhibit 5.

23            A.     Thank you.

24            Q.     Is Exhibit 5 a November 16,

25      1973 formula for new Kutzit?

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.      Yes.
03          Q.      And in this formula we see
04   methylene chloride substituted back in for
05   benzene?
06                  MS. BUSCH:  Object to form.
07                  THE WITNESS:  Yeah.  Yes.
08   BY MR. DuPONT:
09          Q.      And do you know how long after
10   November 16, 1973 Savogran Company actually
11   began to manufacture and produce Kutzit with
12   methylene chloride instead of benzene?
13          A.      We still use this formula to
14   this day.  Very close to that formula.  Give
15   or take a few percentages on some of the
16   items.
17          Q.      So this formula is dated
18   November 16, 1973, that has methylene
19   chloride in it; right?
20          A.      Yes.
21          Q.      And it's referred to as the new
22   Kutzit; right?
23          A.      Yes.
24          Q.      So that's when this formula
25   presumably was written.  Do you know when the
```

**Transcript of Monique, Mark**

01                    MARK MONIQUE

02    formula was actually first used after

03    November 16, 1973 to manufacture Kutzit?

04          A.    No.

05          Q.    And consistent with what you've

06    told me, looking at the formulas that are

07    Exhibit 2, Exhibit 5, and some of the other

08    exhibits, we see Sudan blue dye listed in

09    here, which would be consistent with what you

10    said, that the product had a light blue color

11    to it?

12          A.    Yes.

13          Q.    Did Savogran use blue dye in

14    order to kind of distinguish Kutzit from

15    other paint removers that were on the market?

16          A.    No.  Just giving it a little

17    bit of color.

18          Q.    What's your understanding of

19    why Savogran used a blue dye?

20          A.    Like just to give it a little

21    bit of color, you know, to make it look a

22    little -- you know, jazz it up a little bit.

23          Q.    Were there other Savogran

24    products that had a blue color to them?

25          A.    Yes.

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02         Q.     Was that something of a -- kind
03    of a signature for Savogran, this blue color,
04    something that people associated with the
05    product?
06                    MS. BUSCH:  Object to form.
07                    THE WITNESS:  No.  Because the
08             -- the number one selling product was
09             orange.
10    BY MR. DuPONT:
11         Q.     What other Savogran products
12    had a blue color to them?
13         A.     Super-Strip paint and varnish
14    remover.
15         Q.     Any others?
16         A.     Are you talking about just
17    paint removers or in general?
18         Q.     In general.
19         A.     Okay.  Because we have a
20    wallpaper remover that has -- that's blue.
21    We had a concrete cleaner, we don't have it
22    anymore, but it used to be blue.  We had a
23    waterless hand cleaner that was kind of a
24    blue-green.  It started out blue, but as it
25    aged it got green.  Hence, why we don't have
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      it anymore.
03           Q.      When did Savogran begin to
04      manufacture and sell Super-Strip paint
05      varnish remover?
06           A.      I'd have to look at the -- the
07      price list.
08           Q.      Do you have that in front of
09      you still, Exhibit 1?
10           A.      You didn't give -- you didn't
11      give me all of them.  No, I don't think I do.
12           Q.      I gave you a price list that
13      went up to 1976.
14           A.      Okay.
15                   (Reviewing document.)
16                   In '68 they had Strypeeze --
17      I'm looking at 1968.  It's the document
18      marked 13, Savogran 13.  You see the product
19      called Strypeeze Paint Remover Nonflammable?
20           Q.      Yes.
21           A.      I believe that was the
22      predecessor to Super-Strip.  And then in '73,
23      you see where the next one -- I'm looking at
24      Document Number 17, August 13th, 1973.  See
25      where it says, Strypeeze Super Strip?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02            Q.      Yes.
03            A.      That's probably where they made
04    the change.  They started transitioning the
05    name from Strypeeze nonflam to Super Strip
06    nonflam.
07            Q.      Earlier you told me that
08    Savogran's best selling product was orange in
09    color.  Was that Strypeeze?
10            A.      Yes.  The Strypeeze semi paste.
11            Q.      Was the nonflammable version of
12    Strypeeze also orange in color?
13            A.      I don't know.
14            Q.      Was the Strypeeze Super Strip
15    in 1973 orange in color?
16            A.      I don't know.
17            Q.      Do you know when the
18    Super-Strip product began to have a blue
19    color to it?
20            A.      I don't.  Then it looks like in
21    '76, on the document marked 19, the Strypeeze
22    name is gone and then it's just Super Strip.
23            Q.      Do you expect that the product
24    Super Strip would have taken on the blue
25    color when it dropped the Strypeeze name in
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      order to distinguish it from Strypeeze?
03              A.    No.
04                    MS. BUSCH:  Object to form.
05                    THE WITNESS:  I'm sorry, Andrew,
06              I don't know.
07      BY MR. DuPONT:
08              Q.    What color was the label of the
09      Savogran Kutzit product?
10                    MS. BUSCH:  Object to form.
11              What period of time?
12                    THE WITNESS:  Do you want to --
13              do you want to go through the labels
14              with the dates?  It might be easier.
15      BY MR. DuPONT:
16              Q.    Let's -- let me see if you know
17      off the top of your head, and if not we'll go
18      through the labels.
19              A.    Okay.
20              Q.    Okay?  So do you know what
21      colors were on the labels of this Savogran
22      Strypeeze -- strike that.
23                    Do you know what colors were on
24      the labels of the Kutzit product in the
25      1950s, 1960s and 1970s?
```

**Transcript of Monique, Mark**

Page 62

```
01                    MARK MONIQUE
02          A.     No.  If you ask the question
03  again about the sixties and seventies, I can
04  say yes.
05          Q.     All right.  During the 1960s
06  and 1970s, what colors were the labels of the
07  Kutzit product?
08          A.     Kutzit in the sixties was blue,
09  white and orange.  And then the seventies,
10  red, white and blue.
11          Q.     In the 1960s, what portion of
12  the label of the Kutzit product was blue?
13          A.     Percentage-wise?
14          Q.     What areas of the label, what
15  portion?
16          A.     I'd -- I'd have to look at
17  them.
18          Q.     All right.
19          A.     You're throwing a lot of stuff
20  at me here.
21                      -  -  -
22          (Whereupon the document was
23       marked, for identification purposes,
24       as Monique Exhibit Number 6.)
25                      -  -  -
```

Transcript of Monique, Mark

01                    MARK MONIQUE

02                    THE WITNESS:  Thanks.

03    BY MR. DuPONT:

04            Q.      I'm handing you Exhibit 6,

05    which is Bates Number Lee-Savogran 71.  Can

06    you tell me what Exhibit 6 is and what year

07    it relates to?

08            A.      Okay.  It's the -- it's the

09    Kutzit label from -- it's dated

10    November 19th, 1963.  This would have been

11    the -- the printer's proof.

12            Q.      And just describe what a

13    printer's proof is.

14            A.      That -- this is -- it comes

15    from the plate that they used to print the

16    cans.  The cans were lithographed.

17            Q.      Okay.

18            A.      Yep.

19            Q.      And the bottom left-hand corner

20    of this printer's proof, we see the colors

21    blue and orange are handwritten there?

22            A.      Yes.

23            Q.      It's an indication that there

24    was blue and orange on the label?

25            A.      Yes.

**Transcript of Monique, Mark**

MARK MONIQUE

01

02      Q.      Now, looking at this printer's

03  proof of the November 19, 1963 version of the

04  Kutzit label, can you tell us what portions

05  of the label were blue?

06      A.      I can't.

07      Q.      Can you tell us what portions

08  of the label were orange?

09      A.      I can't.

10      Q.      Can you tell us what portion of

11  the label was white?

12      A.      No.

13      Q.      The next label I have is dated

14  February 14, 1969.  We'll mark that as

15  Exhibit 10.

16                  -   -   -

17          (Whereupon the document was

18      marked, for identification purposes,

19      as Monique Exhibit Number 7.)

20                  -   -   -

21  BY MR. DuPONT:

22      Q.      Looking at this version of the

23  label from February 14, 1969, can you tell us

24  again what portion of the label is white,

25  orange or blue?

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        A.      You can't tell.
03        Q.      Do you know, based on the
04  company's color scheming, its marketing
05  methods, how it depicted its product name,
06  what colors were used in the product name as
07  opposed to the company name?  Anything about
08  the way the company depicted its name?
09        A.      Not from the sixties because,
10  you know, starting in the seventies it got a
11  little more uniform.  We don't even use
12  orange.  You know, they haven't used orange,
13  I don't think, since the sixties for color on
14  any of the packaging.
15        Q.      So what changed in the 1970s?
16  Why did Kutzit begin to use a red, white and
17  blue color scheme?
18        A.      I'm not sure.
19        Q.      Can I have that exhibit back,
20  please?
21        A.      Sure.
22             MR. DuPONT:  Just for the
23          record, Counsel, we'll change this,
24          what I said was Exhibit 10 I'm going
25          to mark it as Exhibit 7, so we go in
```

**Transcript of Monique, Mark**

```
01                MARK MONIQUE
02        order.
03                    -  -  -
04            THE WITNESS:  Do you want me to
05        take it back?
06                    -  -  -
07            (Whereupon the document was
08        marked, for identification purposes,
09        as Monique Exhibit Number 8.)
10                    -  -  -
11    BY MR. DuPONT:
12            Q.     So is Exhibit 8 the August 27,
13    1973 version of the Kutzit label?
14            A.     Yes.
15            Q.     And is this when the red, white
16    and blue color scheme was introduced?
17            A.     Yes.
18            Q.     And looking at -- at this
19    label, are you able to tell me what portion
20    of the Kutzit label was red, what portion was
21    white, what portion was blue?
22            A.     Generally, yes.
23            Q.     What -- what areas of the label
24    were blue?
25            A.     The middle part, fast acting
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    liquid for quick stripping, that would have
03    been blue.  The right-hand side, which was
04    the back of the can, most likely was red.  I
05    don't know whether Kutzit paint remover was
06    blue or red, I can't tell you that offhand.
07    The background would have been all white.
08          Q.     I'm going to hand you a pen and
09    ask you if you could please bracket or
10    otherwise circle the areas that were blue on
11    the label, that you know.
12          A.     That I positively can identify
13    as blue?
14          Q.     Yes.
15          A.     (Complying with request.)
16                 Okay.
17          Q.     And what portions of this 1973
18    version of the Kutzit label were red?
19          A.     (Complying with request.)
20                 MS. BUSCH:  Andrew, how do you
21          want to distinguish that?  He's
22          bracketing both?
23                 THE WITNESS:  Well, I'm just
24          putting blue and red.  How's that?  Is
25          that fine?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      BY MR. DuPONT:
03           Q.    Yes.
04           A.    (Complying with request.)
05                 And that's generally.
06           Q.    Okay.  So you've put brackets
07      around the areas that are blue and written
08      the word blue next to those areas?
09           A.    Yep.  Uh-huh.
10           Q.    And you put brackets around the
11      areas that were red and wrote the word red
12      next to those?
13           A.    Yes.
14           Q.    And then the name Kutzit paint
15      remover, that would have been either blue or
16      red, you're not sure?
17           A.    It would have been either --
18      either/or, right.
19           Q.    And the background of the label
20      would have been white?
21           A.    Right.  Correct.
22           Q.    Who at the Savogran Company,
23      during the 1960s and 1970s was responsible
24      for preparing label language?
25           A.    I'm not sure.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          Q.      Do you know what types of
03   professionals, if any, Savogran Company
04   employed during the 1960s and 1970s?
05          A.      I don't.
06          Q.      Did the Savogran Company have
07   any employees in the 1960s and 1970s who had
08   education in industrial hygiene?
09          A.      I don't know.
10          Q.      Did the Savogran Company have
11   any employees in the 1960s and 1970s that had
12   education in toxicology?
13          A.      Don't know.
14          Q.      Did the Savogran Company have
15   any employees in the 1960s and 1970s that had
16   education in occupational health?
17          A.      Don't know.
18          Q.      Were there any safety
19   professionals employed by the Savogran
20   Company in the 1960s and 1970s?
21          A.      Don't know.
22          Q.      Do you have any knowledge that
23   the Savogran Company consulted with any
24   outside experts on the areas of safety,
25   industrial hygiene, toxicology or medicine
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    during the 1960s and 1970s?
03            A.      No knowledge.
04            Q.      Do you have any evidence that
05    anyone at Savogran Company was qualified, by
06    education or experience, to prepare label
07    language when it comes to chemical safety,
08    warnings, things like that?
09                    MS. BUSCH:  Object to form.
10                    THE WITNESS:  No knowledge.
11                    MR. DuPONT:  Let's take a five
12        minute break.
13                    VIDEO TECHNICIAN:  Off the
14        record at 10:34.
15                        -   -   -
16                    (Whereupon there was a recess in
17        the proceeding.)
18                        -   -   -
19                    VIDEO TECHNICIAN:  Back on the
20        record at 10:40.  Beginning of disc
21        number two.
22    BY MR. DuPONT:
23            Q.      So how did Savogran actually
24    manufacture the benzene-containing Kutzit
25    product during the 1960s and 1970s?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          MS. BUSCH:  Object to form.
03          THE WITNESS:  I can tell you
04     generally how we manufactured paint
05     removers, but I don't have any
06     knowledge of, you know, the sixties or
07     seventies.  But I can, you know, bring
08     you through the process of how we make
09     a paint remover.
10   BY MR. DuPONT:
11          Q.     Take me through that process,
12   please.
13          A.     Okay.  So we -- the -- the
14   larger volume ingredients are stored in
15   underground storage tanks.  We have a -- a
16   mixing room with steam jacketed kettles where
17   we pump the -- the ingredients from the
18   underground storage tanks into the mixing
19   kettles.  We -- the Ceresine wax that's in
20   the -- in the product gets melted.  The
21   solvents get warmed up in the -- in the
22   jacketed kettles.  And the wax, once it's
23   melted, gets mixed with the -- the solvents.
24   And then they get blended together.
25                    It's a pretty simple process.
```

**Transcript of Monique, Mark**

01                    MARK MONIQUE

02                 In the Kutzit case, you know,

03     you only have the -- the ingredients are

04     pretty simple because all you have is the

05     primary solvents and the wax.

06                 Once it's blended and mixed,

07     then it gets pumped over to a holding tank

08     where it sits while it's being filled into

09     the containers.

10          Q.    And was that the same process

11     used to manufacture Kutzit when it contained

12     benzene at both the Norwood, Massachusetts

13     facility and the Addison, Illinois facility?

14                 MS. BUSCH:  Object to form.

15                 THE WITNESS:  I'm not -- I'm not

16          sure.  Like I said, I don't have any,

17          you know, knowledge about the

18          manufacturing of Kutzit with the

19          benzene.  But I can just tell you

20          generally how the paint removers are

21          made.  Yep.

22     BY MR. DuPONT:

23          Q.    Is it your understanding though

24     that the Kutzit with benzene in it as an

25     ingredient was manufactured both at

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    Savogran's Norwood, Massachusetts facility,
03    as well as at its Illinois facility?
04          A.     Yes.
05          Q.     And earlier you told me that
06    the Norwood, Massachusetts facility sold to a
07    certain geographical area?
08          A.     Uh-huh.  I'm sorry, yes.
09          Q.     What geographical area was
10    that?
11          A.     That would have been the east
12    coast, all the way down through Florida.
13          Q.     Was that true in the 1950s,
14    1960s and 1970s?
15          A.     I believe it was.
16          Q.     In the Illinois facility, which
17    was in Addison, Illinois at one point and
18    we've seen a reference to a Chicago, Illinois
19    facility, what geographic area did the
20    Illinois manufacturing facility sell product
21    to?
22          A.     It would be Midwest, you know,
23    that would include as far east as Indiana.
24    Probably the central time zone of Tennessee,
25    all the way down to the panhandle of Florida.
```

**Transcript of Monique, Mark**

01                    MARK MONIQUE

02    And then as far west as the eastern side of

03    the Rockies down through Texas.

04         Q.    Where was the Savogran Kutzit

05    product manufactured that was sold west of

06    the Rockies?

07         A.    Where was it manufactured?

08         Q.    Yes.

09         A.    I believe they manufactured it

10    out there.

11         Q.    In Los Angeles?

12         A.    Yes.  Yeah.

13         Q.    And that was true in the 1950s,

14    1960s and 1970s?

15         A.    I believe it was, yes.

16         Q.    If we look at some of the

17    labels going as far back to 1963, which is

18    Exhibit 6 there, we see the Savogran Addison,

19    Norwood and Los Angeles California addresses

20    on there?

21         A.    Yes, uh-huh.

22         Q.    Do you know what happened to

23    the labels of the Kutzit product that predate

24    1963?

25         A.    I don't.

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02        Q.     Is there anything that's
03   reminded you or helped you remember the name
04   of the company that was in Los Angeles that
05   for some period of time was an affiliate of
06   Savogran and involved with distributing
07   Kutzit?
08        A.     No.
09        Q.     Do you -- do you have any
10   reason to believe that in the 1950s, 1960s
11   and 1970s Kutzit didn't own the actual
12   manufacturing facility in Los Angeles,
13   California?  Strike that.
14              Do you have any reason to
15   believe that Savogran didn't own the
16   manufacturing facility in Los Angeles,
17   California in the 1950s, 1960s and 1970s?
18        A.     Yes.
19        Q.     What is that?
20        A.     We -- we did not own it.
21   Right.
22        Q.     What's your basis for saying
23   that?  What have you seen?  Who have you
24   talked to that tells you that Savogran didn't
25   own a facility in Los Angeles, California in
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      the fifties, sixties and seventies?
03            A.    We had some -- some records
04      that there was -- about the stock purchase.
05            Q.    And you don't remember the name
06      of the company that was bought?
07            A.    I'm sorry, I don't.
08            Q.    On these labels though,
09      Savogran is holding out the Los Angeles,
10      California facility as one of its own
11      facilities; right?
12            A.    I don't -- that's -- I don't
13      know.  I mean, that's kind of a broad
14      generalization that, you know -- I agree
15      that, you know, they got the name on there,
16      but I don't know what the -- you know, what
17      the purpose was or anything.
18            Q.    Savogran does list in 1963
19      Los Angeles, California as an address
20      underneath its name.  Fair?
21            A.    Yes.  Yeah.
22            Q.    And there's nothing on this
23      label that would tell a purchaser of the
24      product that there was any other company
25      associated with the Los Angeles, California
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   address, is there?
03           A.      Correct.
04           Q.      So a consumer reading this
05   label, looking at the Savogran name and the
06   Los Angeles, California address under it, it
07   would be reasonable for them to expect that
08   that location was a Savogran location?
09               MS. BUSCH:  Object to form.
10               THE WITNESS:  Yes.  I mean, I
11           would say -- maybe they wanted to have
12           the appearance that they were bigger
13           than they really were.  I don't know.
14           You know.
15   BY MR. DuPONT:
16           Q.      Now, have you undertaken an
17   investigation to determine who the suppliers
18   of benzene were to Savogran in and before
19   1973?
20           A.      Yes.
21           Q.      What have you done to
22   investigate that?
23           A.      Turned that place upside and
24   down to try to find any records to that
25   effect.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE

02          Q.     What did you learn?

03          A.     I learned nothing.  Absolutely

04    nothing.

05                         -   -   -

06                 (Whereupon the document was

07          marked, for identification purposes,

08          as Monique Exhibit Number 9.)

09                         -   -   -

10    BY MR. DuPONT:

11          Q.     We were provided with a

12    document that I've marked as Exhibit 9, Bates

13    Number Lee-Savogran 86 to 87.  And this

14    appears to be a November, 1975 AMSCO

15    Division, Union Oil Company of California

16    MSDS for toluene; is that right?

17          A.     Yes.

18          Q.     Have you seen this document

19    before?

20          A.     Yes.

21          Q.     Did you find this document?

22          A.     Yes.

23          Q.     Where did you find it?

24          A.     I found it in the toluene file.

25          Q.     So tell me about that, how --
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02      how are files organized, like the toluene
03      file?  Are there files that Savogran has for
04      particular ingredients?
05              A.      Yes.  Yeah.
06              Q.      Is -- is there a benzene file?
07              A.      Unfortunately not.
08              Q.      Do you know what happened to
09      the benzene file?
10              A.      I don't think there ever was
11      one.  The file cabinet that this came out of
12      is in the laboratory, which was -- the
13      laboratory is, I guess, in the history of
14      Savogran is fairly recent, within the last
15      25 years.  It was actually set up by John
16      Gale.  And, of course, at that point they
17      weren't using benzene as an ingredient.  So,
18      hence, there's no file for benzene.
19              Q.      When did John Gale set up the
20      laboratory?  You said about 25 years ago?
21              MS. BUSCH:  Objection, form.
22              THE WITNESS:  25, 30 years ago.
23      BY MR. DuPONT:
24              Q.      So that takes us back to about
25      what, 1985, 1990?
```

**Transcript of Monique, Mark**

Page 80

MARK MONIQUE

01

02    A.    Yeah, something like that.

03 Yeah.

04    Q.    And this document, Exhibit 10,

05 is dated from 1975?

06    A.    Right.

07    Q.    Do -- do you know what John

08 Gale did with respect to documents that were

09 dated earlier than when he set up the

10 laboratory?

11    A.    I'm sorry, I don't.

12    Q.    What was the oldest date of a

13 document you found in the toluene file?

14    A.    I don't recall.

15    Q.    Were there any documents that

16 were older than 1975 in the toluene file?

17    A.    I'm sorry, Andrew, I don't

18 remember.

19    Q.    How -- how big is the toluene

20 file?  What does it look like?

21    A.    It's about like that

22 (indicating).

23    Q.    About an inch thick?

24    A.    Yeah.  Yeah.  This -- you know,

25 this -- this and the -- I think there was an

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02      Exxon one in there.  There just happened to
03      be some random ones that, for whatever
04      reason, just survived in the file.
05           Q.    All right.  The fact that
06      Savogran had an AMSCO division in Unocal
07      toluene MSDS from 1975, would that be an
08      indication to you that AMSCO was a supplier
09      of toluene to Savogran in 1975?
10                    MR. McDERMOTT:  Objection to
11           form.
12                    THE WITNESS:  Yeah.  I couldn't
13           say with any certainty.  You know, it
14           could have come in with a sample.  It
15           could be from, you know, a purchase.
16           I couldn't tell you with any -- with a
17           hundred percent certainty.
18      BY MR. DuPONT:
19           Q.    Have you spoken with Tom Little
20      in order to learn who suppliers of benzene
21      were to Savogran?
22           A.    Yes.  Yes.  I -- his
23      recollection is, when he started in '72, that
24      they weren't even using benzene then.  And --
25      but you got to remember when he started in
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    '72, he was just general factory help.  So,
03    you know, he might not even -- he might not
04    even have, you know, worked in that
05    department, or been close to it or whatnot.
06    Yes.
07           Q.     So you didn't think Tom Little
08    would have had actual knowledge of what
09    chemicals were going into Kutzit?
10           A.     I know for certain he doesn't,
11    because I asked him.
12           Q.     Okay.
13           A.     Yeah.
14           Q.     Now, is there anybody who's
15    still alive who was working for Savogran in
16    the 1960s and 1970s, besides Mr. Little?
17           A.     They -- they're all gone.
18    There's been so much time that has passed,
19    Andrew.
20           Q.     I think I've seen reference to
21    a Mr. Robert Link?
22           A.     Yes.
23           Q.     Who was Robert Link?
24           A.     He was -- he was the president
25    two -- there was a -- two presidents ago.
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   And he was the treasurer for the company for
03   a number of years.
04        Q.    During what years was Mr. Link
05   employed by Savogran?
06        A.    I'm not sure.  It was -- it was
07   a lengthy period.
08        Q.    Is Mr. Link still alive?
09        A.    No, he's gone.
10        Q.    When did he pass away?
11        A.    Two years ago.
12        Q.    Have you ever spoken with Mr.
13   Link in order to learn who suppliers of
14   benzene were to Savogran?
15        A.    No.
16        Q.    Have you ever spoken with Mr.
17   Link to learn more about the company's
18   history as it relates to the manufacture and
19   sale of Kutzit with benzene in it?
20        A.    No.  He left the company a long
21   time ago and he was really in failing health
22   for a number of years.
23        Q.    Did Savogran do anything to
24   research the health hazards of benzene when
25   it make Kutzit with benzene in it?
```

**Transcript of Monique, Mark**

```
01                MARK MONIQUE
02        A.     I have not found any records to
03   -- to show that, you know.
04        Q.     You would agree with me that
05   Savogran had an obligation to its customers
06   to educate itself about the health hazards of
07   the ingredients of its products, including
08   benzene?
09                MS. BUSCH:  Object to form.
10                THE WITNESS:  Yes.
11   BY MR. DuPONT:
12        Q.     And Savogran had a duty and
13   obligation to its customers to warn them
14   about all the health hazards of the
15   ingredients of its products like benzene?
16                MS. BUSCH:  Object to form.
17                THE WITNESS:  Yes.
18   BY MR. DuPONT:
19        Q.     Because customers and users of
20   Kutzit had a right to know what was in the
21   product they were using and what the health
22   hazards of that product were?
23                MS. BUSCH:  Object to form.
24                THE WITNESS:  Yes.
25   BY MR. DuPONT:
```

Transcript of Monique, Mark

```
01                  MARK MONIQUE
02          Q.      Now, in the 1950s, 1960s,
03   1970s, it was -- it was reasonable for a
04   company like Savogran to reach out to
05   government agencies to learn about the health
06   hazards of the chemicals that they used?
07              MS. BUSCH:  Object to form.
08              THE WITNESS:  I'm not sure about
09          that one.
10   BY MR. DuPONT:
11          Q.      Well, you recognize that a
12   company that manufactured chemical products
13   in the 1950s, '60s and '70s, they could
14   contact government agencies to learn about
15   the health hazards of chemicals?
16              MS. BUSCH:  Object to form.
17              THE WITNESS:  Definitely in this
18          day and age, but I'm not -- I'm not so
19          sure about in those days.
20   BY MR. DuPONT:
21          Q.      Let's talk about the 1970s.  Do
22   you have any reason to believe that Savogran
23   couldn't have contacted government entities,
24   like the Department of Labor or state
25   government agencies to learn about the health
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   hazards of chemicals?
03                MS. BUSCH:  Object to form.
04                THE WITNESS:  I don't know.
05   BY MR. DuPONT:
06        Q.     When you began with the company
07   in 1987, were you aware that you could
08   contact a government agency to learn about
09   the health hazards of chemicals?
10        A.     Yes.
11        Q.     And Savogran, in the 1950s,
12   1960s and 1970s, had an obligation to be
13   knowledgeable about the laws that governed
14   the use of chemicals in its products.
15                MS. BUSCH:  Object to form.
16   BY MR. DuPONT:
17        Q.     Is that fair?
18        A.     Yes.
19        Q.     Some of those laws were at the
20   federal level applied across the country and
21   some of those laws were issued by the states
22   that Savogran did business in?
23                MS. BUSCH:  Object to form.
24                THE WITNESS:  Yes.
25   BY MR. DuPONT:
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        Q.      Do you have any evidence that
03   Savogran reached out to a government agency
04   in the 1950s, 1960s or 1970s to learn what
05   those agencies knew about the health hazards
06   of benzene?
07               MS. BUSCH:  Object to form.
08               THE WITNESS:  No information on
09        that.
10   BY MR. DuPONT:
11        Q.      Do you have any evidence that
12   Savogran looked at or researched the laws
13   that applied to the use of benzene during the
14   1950s, '60s and '70s?
15               MS. BUSCH:  Object to form.
16               THE WITNESS:  No.
17   BY MR. DuPONT:
18        Q.      Do you think it would be
19   irresponsible for a company not to educate
20   itself about the laws that governed how it
21   used chemical products?
22               MS. BUSCH:  Object to form.
23               THE WITNESS:  Yes.
24               MR. DuPONT:  Let's go off the
25        record.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02              VIDEO TECHNICIAN:  Off the
03        record at 10:57.
04                    -  -  -
05              (Discussion held off the
06        record.)
07                    -  -  -
08              VIDEO TECHNICIAN:  Back on the
09        record at 11:00 a.m.
10   BY MR. DuPONT:
11         Q.    The Kutzit product was -- was
12   obviously a paint remover; right?
13         A.    Yes.
14         Q.    And it worked to remove various
15   types of coatings like varnishes, shellacs,
16   lacquers.  Is that right?
17         A.    Yes.
18         Q.    It was intended for use on a
19   variety of types of services, including
20   furniture?
21         A.    Yes.
22         Q.    Things like chairs and tables
23   and dressers, all types of furniture?
24         A.    Kutzit is -- because it's a
25   liquid, doesn't have a lot of viscosity and,
```

Transcript of Monique, Mark

Page 89

```
01                    MARK MONIQUE
02    consequently, doesn't cling very well.  It's
03    more suited for flat, horizontal surfaces.
04         Q.    Right.
05         A.    And it works, you know -- it
06    was always designed more for stripping clear
07    finishes versus heavily painted objects.
08         Q.    But the Kutzit product
09    certainly could be used for stripping heavily
10    painted projects; right?
11         A.    Yes.
12         Q.    And I seen reference in
13    advertisements for Kutzit that one of the
14    ways Kutzit could be used would be applying
15    it onto a piece of furniture and other
16    surface with a brush?
17         A.    Yes.
18         Q.    Another way Kutzit was marketed
19    to be used was in more of a dipping
20    operation, where you can have a volume of
21    Kutzit and then dip a piece of furniture into
22    it?
23         A.    Not Kutzit, no.
24         Q.    You haven't seen that reference
25    in the marketing materials?
```

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02      A.    No.
03      Q.    Now, a -- a person could take
04 Kutzit, pour it into a container and then
05 submerge a piece of furniture or another
06 object that wasn't a flat horizontal
07 substance, and use it to remove the paint or
08 coating from that surface?
09      A.    They could, certainly.
10      Q.    Is there any reason that they
11 shouldn't do that?
12      A.    Well, it's very flammable.  We
13 have a nonflammable line of paint removers
14 that we market for dip tank stripping.
15      Q.    Is there anything about the
16 health consequences of putting Kutzit into a
17 container, particularly when it contained
18 benzene, and submerging furniture into it?
19          MS. BUSCH:  Objection.
20          THE WITNESS:  Well, there's more
21          of an acute hazard than a chronic
22          hazard.  It's because of the
23          flammability.
24 BY MR. DuPONT:
25      Q.    And when you say acute hazard,
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    did that include the acute hazard from
03    exposure to benzene?
04            A.      That would be a chronic hazard.
05            Q.      Putting Kutzit into a -- some
06    type of pan or container and then submerging
07    a product to it, would that result in a
08    greater level of exposure to benzene?
09                MS. BUSCH:  I'm going to object.
10            He's not an expert on these areas.  I
11            don't think he's qualified to render
12            testimony about it.  If you know, you
13            can answer.
14                THE WITNESS:  I don't know.
15                           -   -   -
16                (Whereupon the document was
17            marked, for identification purposes,
18            as Monique Exhibit Number 11.)
19                           -   -   -
20    BY MR. DuPONT:
21            Q.      I'm handing you Exhibit 11.
22            A.      Uh-huh.
23            Q.      Is Exhibit 11 an advertisement
24    for Kutzit?
25            A.      I -- yes.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02           Q.      And it refers to Kutzit as
03   continuing to be the leading benzol paint
04   remover in the south?
05           A.      Yes.  Yes.
06           Q.      Its enjoyed wide customer
07   acceptance, fast turnover and full profits.
08   Is that what the advertisement says?
09           A.      Yes.
10           Q.      And Kutzit was referred by
11   do-it-yourselfers and preferred in the south?
12           A.      "Ideal for stripping old
13   finishes on flat or horizontal surfaces in a
14   well ventilated or open area."  That part?
15           Q.      The advertisement states that
16   Kutzit was preferred by do-it-yourselfers and
17   preferred in the South; is that correct?
18           A.      Oh, yes, I'm sorry.  I see
19   that.  "Kutzit continues to the be leading
20   benzol paint remover in the South."
21           Q.      And it says, "Kutzit is tops in
22   the South."
23           A.      Here's the top selling paint
24   remover in your market area, yes.
25           Q.      And specifically it points out
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    the South as being an area where Kutzit is
03    the top selling product?
04            A.      Yes.
05            Q.      Now, in this advertisement
06    Savogran is telling its customers that Kutzit
07    is manufactured and produced under rigid
08    quality control.  Is that right?
09            A.      Yes.  Yep.
10            Q.      Do you have any evidence that
11    there was any rigid quality control with
12    respect to the health hazards of the
13    chemicals that were used in a Kutzit product
14    containing benzene?
15                    MS. BUSCH:  Object to form.
16                    THE WITNESS:  No.
17    BY MR. DuPONT:
18            Q.      Should a company tell its
19    customers that its products are manufactured
20    under rigid quality control if those products
21    contain hazardous chemicals?
22                    MS. BUSCH:  Object to form.
23                    THE WITNESS:  Yes.
24    BY MR. DuPONT:
25            Q.      When a customer looks at an
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    advertisement and sees that there's rigid
03    quality control, are you saying that they
04    expect that that product is going to be
05    hazardous to their health?
06              MS. BUSCH:  Object to form.
07              THE WITNESS:  I don't see where
08         you can tie the two things together.
09    BY MR. DuPONT:
10         Q.     Do you expect quality products
11    to be hazardous to your health?
12              MS. BUSCH:  Object to form.
13              THE WITNESS:  They could be.
14    BY MR. DuPONT:
15         Q.     Don't you have a concern that a
16    customer reading an advertisement for Kutzit,
17    seeing that it's manufactured or produced
18    with rigid quality control is going to be led
19    to believe that that's a safe product?
20              MS. BUSCH:  Object to form.
21              THE WITNESS:  Yes.
22    BY MR. DuPONT:
23         Q.     And, in fact, if the product
24    contained a known human carcinogen, but
25    they're led to believe that it's a safe
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    product, that would be misleading, wouldn't
03    it?
04                    MS. BUSCH:  Object to form.
05                    THE WITNESS:  No.
06    BY MR. DuPONT:
07          Q.     You don't think it's misleading
08    to tell a customer that a product is safe,
09    when, in fact, it contains a known human
10    carcinogen?
11                    MS. BUSCH:  Object to form.
12            Misstates what's characterized in
13            Exhibit 11.
14                    THE WITNESS:  Was it a known
15            human carcinogen in 1960?
16    BY MR. DuPONT:
17          Q.     All right.  Well, if benzene
18    was a suspected human carcinogen, and there
19    are reports of benzene causing all forms of
20    chronic and acute leukemia, would it be
21    misleading to tell and infer to a customer
22    that the product was safe?
23                    MS. BUSCH:  Same objections.
24                    THE WITNESS:  No.
25    BY MR. DuPONT:
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02         Q.     You wouldn't want a customer to
03   be aware that benzene was suspected to cause
04   all forms of acute and chronic leukemia?
05               MS. BUSCH:  Object to form.
06               THE WITNESS:  And that's true
07         for the 1960s?
08   BY MR. DuPONT:
09         Q.     If it was true in the 1960s and
10   1970s --
11         A.     Yeah.
12         Q.     -- would you want the customer
13   to be aware of that?
14         A.     Yes, definitely.
15         Q.     And if it was true in the 19 --
16   say 1964 that benzene had been reported to
17   cause all forms of acute and chronic
18   leukemia, wouldn't you have a concern in
19   telling your customers and informing them
20   that the product was safe if, in fact, that
21   was reported for benzene?
22               MS. BUSCH:  Object to form,
23         mischaracterizes what's contained in
24         Exhibit 11.
25               THE WITNESS:  Yes.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    BY MR. DuPONT:
03         Q.     And, in fact, the customer
04    would be misled to believe that the Kutzit
05    product was safe, when, in fact, there were
06    reports of benzene causing all forms of
07    acute --
08                    MS. BUSCH:  Object --
09    BY MR. DuPONT:
10         Q.     -- and chronic leukemia; right?
11         A.     Yes.
12         Q.     And that's not a responsible
13    thing to do, is it, tell a customer that a
14    product is safe --
15                    MS. BUSCH:  Object to form.
16    BY MR. DuPONT:
17         Q.     -- when there are reports of
18    benzene causing all forms of chronic and
19    acute leukemia?
20                    MS. BUSCH:  Object to form.
21         Argumentative, misstates facts.
22                    THE WITNESS:  Yes.
23    BY MR. DuPONT:
24         Q.     You have not seen a label for a
25    Kutzit product during the 1950s, 19 -- strike
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    that.
03         Q.      You have not seen a label for a
04    Kutzit product during the 1960s and 1970s
05    that contained a cancer warning.  Is that
06    true?
07         A.      Yes.
08         Q.      And you have not seen a label
09    for a Kutzit product during the 1960s or
10    1970s that advised the user to wear a
11    respirator when working with the product.  Is
12    that true?
13         A.      Correct.
14         Q.      And you've not seen a label for
15    a Kutzit product during the 1960s and 1970s
16    that advised the user that they would be at
17    risk for a fatal blood or bone marrow disease
18    from exposure to benzene.  Is that true?
19         A.      True.
20         Q.      Would you take out Exhibit 6,
21    please?
22         A.      (Complying with request.)
23                 Got it.
24         Q.      Thank you.  We're looking at
25    the label of the Kutzit product from
```

Transcript of Monique, Mark

```
01                 MARK MONIQUE
02    November 19, 1963, when the product contained
03    benzene; right?
04         A.    Yes.
05         Q.    And on the right-hand side of
06    the label there's the word Kutzit and then
07    there are some instructions under the word
08    Kutzit in bullet points?
09         A.    Yes.
10         Q.    And would this portion of the
11    label have been on the side of the container,
12    the back of the container?
13         A.    This would have been the back.
14         Q.    And on the back of the
15    container, one of the instructions for how
16    Kutzit is to be used is to, quote, Be sure to
17    apply the thickest possible coat of remover
18    by flowing it on with a loaded brush in one
19    direction only, close quote.
20         A.    Yes.
21         Q.    So that's telling the customer
22    of Kutzit to use a lot of the product in
23    order to perform the paint removing?
24              MS. BUSCH:  Object to form.
25              THE WITNESS:  It's telling them
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

```
01                MARK MONIQUE
02        to lay it on like you're icing a cake
03        because if you brush back and forth
04        too much, the wax that's in there
05        doesn't have a chance to form a
06        barrier.  And that's what keeps the
07        solvents down on the surface.  So if
08        you just lay it on like you're icing a
09        cake, the wax forms that barrier,
10        keeps the solvents on the surface and
11        allows them to attack the paint film.
12        If you're brushing around too much, it
13        all flashes off.
14  BY MR. DuPONT:
15        Q.    And what Savogran is telling
16  the customer is to use as thick as possible
17  coat of Kutzit to do -- to do this work?
18        A.    Yes.
19        Q.    And that they want to load that
20  brush up with the Kutzit product?
21             MS. BUSCH:  Object to form.
22             THE WITNESS:  Yes.
23  BY MR. DuPONT:
24        Q.    Would you turn to Exhibit 7,
25  please?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02         A.      (Complying with request.)
03              Okay.  Go it.
04         Q.      Under -- in the same area of
05    the label, which would have been on the back
06    portion of the label, and we're now looking
07    at the February 14, 1969 label for Kutzit;
08    right?
09         A.      Yes.
10         Q.      In this label it contains a
11    reference to gloves and it tells the user
12    that in order to protect sensitive skin to
13    wear a cotton lined type heavy rubber gloves.
14    Do you see that?
15         A.      Yes.
16         Q.      Do you know why Kutzit or
17    Savogran is telling the user only wear gloves
18    when you have sensitive skin?
19         A.      I have no idea.
20         Q.      Were you aware that benzene is
21    absorbed through the human skin?
22              MS. BUSCH:  Object to form.
23              THE WITNESS:  No.
24    BY MR. DuPONT:
25         Q.      Were you aware that benzene
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   causes cancer and bone marrow toxicity when
03   it's absorbed through the human skin?
04                    MS. BUSCH:  Object to form.
05                    THE WITNESS:  No.
06   BY MR. DuPONT:
07          Q.     Do you have any evidence that
08   Savogran Company attempted to educate itself
09   about how benzene exposure happened when
10   using a product like Kutzit?
11          A.     No.
12                          -  -   -
13                    (Whereupon the document was
14             marked, for identification purposes,
15             as Monique Exhibit Number 12.)
16                          -   -   -
17   BY MR. DuPONT:
18          Q.     I'll hand you Exhibit 12.  What
19   is Exhibit 12, please?
20          A.     That's a product data sheet.
21          Q.     For Kutzit?
22          A.     Yes.  Sorry.
23          Q.     And this was generated by
24   Savogran?
25          A.     Yes.
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02        Q.     What date does this relate to?
03        A.     That -- that's probably around
04   2000.
05        Q.     And what makes you say that?
06        A.     The label.
07        Q.     Here Kutzit is saying that,
08   under the application section on the second
09   page, it's saying that one gallon of remover
10   covers approximately -- strike that.
11               I keep saying Kutzit.
12               Here, Savogran is telling the
13   user, under the application section, that one
14   gallon of remover covers approximately a
15   hundred square feet of surface area.  Do you
16   see that?
17        A.     Yes.
18        Q.     Now, at this point in time, was
19   the Kutzit being made with the methylene
20   chloride?
21        A.     Yes.
22        Q.     And we understand now that
23   methylene chloride was a much better paint
24   remover than benzene?
25        A.     Much better paint remover
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   ingredient than benzene, yep.
03          Q.     All right.  So would you expect
04   that it would take more volume of the
05   benzene-containing version of Kutzit to cover
06   an area of a hundred square feet than it
07   would the methylene chloride version of
08   Kutzit?
09               MS. BUSCH:  Object to form.
10               THE WITNESS:  I'm not sure
11          because you got to remember, these are
12          formulated products.  So each
13          component in that formula is, you
14          know, it's a synergistic effect.
15          They're all working together to strip
16          the finish.
17   BY MR. DuPONT:
18          Q.     Were there other components of
19   the Kutzit that actively stripped finishes
20   besides benzene or methylene chloride?
21          A.     Yes.  Take lacquer and shellac
22   for instance.  The acetone and the methanol
23   is a much better solvent for those types of
24   finishes than even methylene chloride.
25          Q.     Now, by the way, would -- would
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02       Kutzit take the paint off of a -- strike
03       that.
04                     Would the benzene-containing
05       version of Kutzit take paint off of an
06       automotive finish?
07            A.     Probably not.
08            Q.     What is it?  Is there something
09       about benzene that wouldn't take paint off an
10       automotive finish?
11            A.     Well, automotive finishes
12       inherently, you know, have a certain amount
13       of chemical resistance built into them.  So,
14       you know, they're very difficult finishes to
15       strip.
16            Q.     So you don't think a product
17       with benzene in it would take the paint off
18       of a car?
19            A.     Not very well, no.
20            Q.     And that's based on your --
21            A.     Just knowledge, yes.
22            Q.     Multiple decades of experience
23       working as a chemist for a company that
24       specialized in manufacturing paint removers?
25                    MS. BUSCH:  Object to form.
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02             THE WITNESS:  Correct.
03   BY MR. DuPONT:
04        Q.    Once Savogran took the benzene
05   out of the Kutzit product after 1973, did it
06   begin to manufacture Kutzit as the -- as not
07   containing benzol or benzene?
08        A.    The literature?
09        Q.    Yes.
10        A.    Yes.
11        Q.    And for how long a period of
12   time after 1973 did Savogran continue to say,
13   hey, now Kutzit doesn't contain benzene?
14        A.    I'm not sure.
15                     -  -  -
16             (Whereupon the document was
17        marked, for identification purposes,
18        as Monique Exhibit Number 13.)
19                     -  -  -
20   BY MR. DuPONT:
21        Q.    I'm handing you Exhibit 13.
22        A.    Okay.
23        Q.    Exhibit 13 is a piece of
24   marketing material for Kutzit?
25        A.    Yes.
```

Transcript of Monique, Mark

01                    MARK MONIQUE

02          Q.       And is there anything on this

03   exhibit that tells you the date that this

04   material relates to?

05          A.       1985, on the second page.

06   Lower right-hand corner.

07          Q.       All right.  And so in 1985, on

08   the first page of this -- this marketing

09   brochure, Savogran is saying that the Kutzit

10   does not contain benzol and it uses benzene

11   under the word benzol?

12          A.       Yes.

13          Q.       So here Savogran is using

14   benzene and benzol as the same thing?

15          A.       Yes.

16                         -  -  -

17                  (Whereupon the document was

18          marked, for identification purposes,

19          as Monique Exhibit Number 14.)

20                         -  -  -

21   BY MR. DuPONT:

22          Q.       Exhibit 14.  Are you able to

23   tell me what the date of Exhibit 14 is?

24          A.       It's not marked.

25          Q.       Exhibit 14 is an advertising

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02   material for Savogran's Kutzit product?
03        A.    Yes.
04        Q.    On the first page of Exhibit 14
05   there are some photographs of containers of
06   Kutzit.  Do you see that?
07        A.    Yes.
08        Q.    Does anything about the
09   appearance of the containers or the labels
10   help you with the date that this relates to?
11        A.    The best way to figure it out
12   would be with the label on the back.  Match
13   that up to the labels that -- that we gave
14   you.
15        Q.    Okay.
16        A.    Yeah.
17        Q.    Looking at the front page of
18   this piece of marketing material for the
19   Kutzit product --
20        A.    Uh-huh.
21        Q.    -- does it indicate that one of
22   the uses of Kutzit is for use in a dip tank?
23        A.    Yes.
24        Q.    When a product or a piece of
25   furniture can be totally submerged?
```

Transcript of Monique, Mark

01                     MARK MONIQUE

02          A.     Yes.

03          Q.     So one of the ways Kutzit can

04     be used when you had a piece of furniture

05     that wasn't a flat horizontal surface was,

06     you could dip it into a tank or some other

07     container that contained Kutzit; right?

08          A.     Yes, according to this.  Yeah.

09          Q.     And that was actually one of

10     the intended uses that Savogran advertised

11     for the product?

12          A.     Yes.

13                        -   -   -

14               (Whereupon the document was

15          marked, for identification purposes,

16          as Monique Exhibit Number 15.)

17                        -   -   -

18     BY MR. DuPONT:

19          Q.     I'll hand to you Exhibit 15.

20     Is Exhibit 15 a Savogran brochure?

21          A.     Yes.

22          Q.     Brochure or catalogue?

23          A.     Uh-huh.  Yes.

24          Q.     Some marketing material?

25          A.     Yes.

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02           Q.      And looking at this catalogue,
03    take your time, is there a date on here that
04    tells us what year or years this corresponded
05    to?
06           A.      Last page.  Was it possibly
07    1988?
08           Q.      So at the bottom right-hand
09    corner, last page of the exhibit, there's a
10    code, CO-3-88-7.5M?
11           A.      Yes.
12           Q.      And, reading this, this would
13    indicate to you that this catalogue was used
14    in 1988?
15           A.      Possible.  Yeah, possibly.
16           Q.      And if you would turn to the
17    second page of the exhibit, please, Bates
18    Number Lee-Savogran 51.
19           A.      Yep.
20           Q.      On the left-hand side of the
21    page there's a discussion of a customer
22    getting more from Savogran, the makers of
23    world famous Strypeeze.  Do you see that?
24           A.      Yes.
25           Q.      And there's a discussion of
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    some of the other products that Savogran
03    manufactured and sold, one of which is
04    Kutzit.  Do you see that paragraph?
05         A.     Yes.
06         Q.     And Savogran says that, "Its
07    brand name, including Kutzit, have earned its
08    consumers' trust and loyalty for their
09    effectiveness."
10         A.     Yes.
11         Q.     Would you turn to the next
12    page?
13         A.     (Complying with request.)
14         Q.     There's a description of how
15    the Kutzit product is to be used.  And,
16    consistent with what we've discussed before,
17    it indicates that it softens oil-based
18    paints, lacquers, synthetic-based finishes
19    and varnishes from flat or horizontal
20    surfaces, such as tops of tables, desks and
21    bureaus, chair, bench seats, et cetera?
22         A.     Yes.
23         Q.     And then it refers to using
24    Kutzit ideally -- can ideally be used in a
25    dip tank where a piece can be totally or even
```

**Transcript of Monique, Mark**

```
01                 MARK MONIQUE
02   partially submerged?
03        A.    Yes.
04        Q.      And under that description
05   there's a list of container types.  There's a
06   one pint, a one quart, one gallon, five
07   gallon and 55 gallon drum of Kutzit?
08        A.    Yes.
09        Q.      And looking at the jobbers'
10   price lists that go back to 1949 from Kutzit,
11   we see that those container sizes, one pint,
12   one quart, one gallon, five gallon and 55
13   gallon drums were consistent container sizes
14   for Kutzit from 1949 up until the late 1980s?
15        A.    Yes.
16        Q.      And, in fact, there's even some
17   half pint containers that were used in the
18   1940s and 1950s for Kutzit?
19               Take out Exhibit 2, please.
20        A.      You're going to make me look
21   now.
22        Q.    Excuse me, Exhibit 1.
23        A.    Yes.
24        Q.      So in Exhibit 1, there's a
25   price list from 1949, a price list from 1950
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      and a price list from 1962 -- excuse me,
03      strike that.
04                    In Exhibit 1 there's a price
05      list from 1949, 1950 that refer to the use of
06      Kutzit in half pint containers?
07              A.      Yes.
08              Q.      And the Kutzit in gallon
09      containers, was it always sold in a -- in a
10      metal kind of rectangular container with
11      rounded edges?
12              A.      Yes.
13              Q.      With a screw top?
14              A.      Yes.
15              Q.      Has Savogran Company been a
16      member of industry organizations?
17              A.      Yes.
18              Q.      Which ones?
19              A.      We -- we currently belong to
20      the Associated Industries of Massachusetts.
21      We belong to a small state organization
22      called the Massachusetts Chemistry and
23      Technology Alliance.  We belong to the
24      Halogenated Solvents -- Solvents Industry
25      Alliance.  And many years ago we belonged to
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02      the National Paint and Coatings Association.
03           Q.      And what's the purpose of
04      Savogran joining organizations like these?
05           A.      Networking.
06           Q.      Exchanging -- exchanges of
07      information?
08           A.      Information, right.  Yes.
09           Q.      Learn things from other
10      manufacturers of -- of coating products?
11           A.      Right.
12           Q.      That's one of the ways that
13      industry members got together and exchanged
14      information about their products, what they
15      knew about their products?
16           A.      Yes.
17           Q.      When was Savogran a member of
18      the National Painting and Coatings
19      Association?
20           A.      I think we dropped out 10,
21      15 years ago.
22           Q.      And I've seen some reference in
23      the documents to the National Painting --
24      National Paint and Coatings Association and
25      Savogran corresponding with the members of
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02      that association in the 1970s.  Are you
03      familiar with that?
04              A.      You'd have to show them to me.
05                          -   -   -
06                  (Whereupon the document was
07              marked, for identification purposes,
08              as Monique Exhibit Number 16.)
09                          -   -   -
10      BY MR. DuPONT:
11              Q.      I'll hand to you Exhibit 16.
12              A.      Thank you.
13              Q.      Is Exhibit 16 a June 16, 1977
14      letter from Carl O. Olson of the Savogran
15      Company?
16              A.      Yes.
17              Q.      And Mr. Olson was the president
18      of Savogran at the time?
19              A.      Yes.
20              Q.      During what years was he the
21      president of Savogran?
22              A.      I don't know.
23              Q.      Mr. Olson writes this letter to
24      an individual with the Consumer Product
25      Safety Commission, and then he copies the
```

Transcript of Monique, Mark

MARK MONIQUE

letter to several other folks.  Do you see
that?

    A.    Yes.

    Q.    The first person that's copied
on the letter is R. David Pittle.  Do you
know who that was?

    A.    I don't.

    Q.    It says, R. David Pittle, Vice
Chairman.  Does that help you?

    A.    No.

    Q.    The next person that's copied
is Barbara Franklin.  Do you know who that
was?

    A.    I don't.

    Q.    The next person is Lawrence
Kushner.  Who was that?

    A.    No idea.

    Q.    Who is T. Hadden Garrett?

    A.    No idea.

    Q.    Then the last person copied is
a Ms. Stella Miller with the National -- it's
an abbreviation, but it looks to be the
National Paint and Coatings Association?

    A.    Yes.

Transcript of Monique, Mark

# Monique, Mark

## Rhyne Trial Master

```
01                 MARK MONIQUE
02        Q.      So would this be an indication
03   to you that the Savogran Company was, more
04   likely than not, a member of the National
05   Paint and Coatings Association in 1977?
06        A.      Yes.
07        Q.      And it refers to some things
08   happening before 1977.  So would you expect
09   that it was for a number of years before 1977
10   that Savogran was a member of the National
11   Paint and Coatings Association?
12               MS. BUSCH:  Object to form.
13               THE WITNESS:  Yes.
14   BY MR. DuPONT:
15        Q.      Was Savogran a member of the
16   National Paint and Coatings Association in
17   the 1960s?
18        A.      I'm not sure.
19        Q.      But we know at least in the
20   1970s it was a member?
21        A.      Yes.
22        Q.      Do you know who the other
23   members of the National Paint and Coatings
24   Association were?
25        A.      No.
```

**Transcript of Monique, Mark**

MARK MONIQUE

01

02     Q.     Were they big paint companies,

03   like DuPont?

04     A.     I'm not sure.

05              - - -

06          (Whereupon the document was

07      marked, for identification purposes,

08      as Monique Exhibit Number 17.)

09              - - -

10   BY MR. DuPONT:

11     Q.     I'm going to hand to you

12   Exhibit Number 17, and I'll represent to you

13   that Exhibit 17 is a November 30, 1954 letter

14   from John H. Foulger, M.D., the Director of

15   Medical Research at DuPont.  And he's writing

16   to a Mr. Dewey Mark from Organic Chemicals

17   Division of Cosden Petroleum Corporation.  Do

18   you see that?

19     A.     Yes.  Uh-huh.

20     Q.     And in this letter there's a

21   discussion of the use of benzene in the

22   manufacture of paints, lacquers, enamels and

23   thinners.  Do you see that?

24     A.     Yes.

25     Q.     And Dr. Foulger writes that, in

Transcript of Monique, Mark

```
01                MARK MONIQUE

02     the second paragraph, "In the DuPont Company,

03     however, we consider benzene to be so

04     hazardous that we try to avoid its use as far

05     as possible."  Do you see that Dr. Foulger

06     writes that?

07          A.    Yes.

08          Q.    And in 1954 DuPont's Dr.

09     Foulger writes, "I personally recommend that

10     it be eliminated from all paint removers or

11     paints, lacquers, enamels and thinners

12     because, in my opinion, it should only be

13     used under circumstances in which there's

14     very thorough ventilation to prevent workers

15     from inhaling benzol and constant medical

16     supervision of these workers to make certain

17     they do not develop anemia."  Do you see

18     that?

19          A.    Yes.

20          Q.    Do you see that Dr. Foulger

21     writes that "Benzol is a very insidious

22     poison, and once bone marrow damage has been

23     produced by it, the clinical condition is

24     almost impossible to treat successfully"?

25          A.    Yes.
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02          Q.    And, for these reasons, what --
03    what does Dr. Foulger state in the last
04    sentence of that paragraph?
05          A.    I believe there are a very few
06    instances in which benzol cannot be replaced
07    by other less hazardous substances.
08          Q.    Did he say less hazardous
09    solvents?
10          A.    Correct, yeah.
11          Q.    So assuming that DuPont was a
12    member of the National Paint and Coatings
13    Association, along with Savogran in the
14    1970s, this is the type of information that
15    could have been exchanged between Savogran
16    and DuPont?
17               MS. BUSCH:  Object to form,
18          calls for speculation.
19               THE WITNESS:  I have no idea,
20          Andrew.
21    BY MR. DuPONT:
22          Q.    Well, here we see DuPont, their
23    director of medical research is writing to
24    another company, Cosden Petroleum
25    Corporation, and providing them with their
```

Transcript of Monique, Mark

01                    MARK MONIQUE

02    thoughts about the health hazards of benzene.

03    Do you see that?

04         A.    Andrew, how could I state any

05    knowledge of something from 60 years ago?    I

06    don't know that.

07         Q.    Okay.  Do you have any reason

08    to believe that this information about the

09    health hazards of benzene is information

10    DuPont would not have shared with the

11    Savogran Company in the past?

12              MS. BUSCH:  Objection, calls for

13         speculation.

14              THE WITNESS:  I don't know.

15                    -   -   -

16              (Whereupon the document was

17         marked, for identification purposes,

18         as Monique Exhibit Number 18.)

19                    -   -   -

20    BY MR. DuPONT:

21         Q.    I'll hand to you Exhibit 18.

22    Do you see that Exhibit 18 is a May 16, 1967

23    letter from the State of Illinois, Department

24    of Labor, Division of Safety Inspection and

25    Education?

**Transcript of Monique, Mark**

MARK MONIQUE

01

02      A.      Yes.

03      Q.      And it's addressed to an E.C.

04  Friesendorf with Handschy Chemical Company?

05      A.      Yes.

06      Q.      And in this letter from May 16,

07  1967, the Superintendent, Edmund Kornowicz,

08  from the State of Illinois Department of

09  Labor, do you see that he's reporting on an

10  investigation that was conducted of Handschy?

11      A.      Yes.

12      Q.      And the Department of Labor

13  from the State of Illinois reports that the

14  investigation found that a very hazardous

15  solvent was used in Handschy's product

16  Hancolite and Special Type Wash?

17      A.      Yes.

18      Q.      And it identifies that solvent

19  to be benzene or benzol?

20      A.      Yes.

21      Q.      Now, in May of 1967, do you see

22  that the State of Illinois is telling this

23  manufacturer of a product with benzene in it

24  that, "Chronic low level exposures to this

25  solvent," meaning benzene, "may produce

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02    alterations of blood elements most commonly
03    resulting in anemia, leukopenia and
04    thrombocytopenia"?
05         A.    Yes.
06         Q.    And do you see that the State
07    of Illinois is continuing to tell this
08    manufacturer of a benzene product that
09    benzene is a suspected carcinogenic agent?
10         A.    Yes.
11         Q.    And the Department of Labor in
12    the State of Illinois continues to write,
13    quote, All forms of acute and chronic
14    leukemia have been observed in workers with
15    benzene intoxication?
16         A.    Yes.
17         Q.    Now, do you have any reason to
18    believe that if Savogran had asked the State
19    of Illinois where it was manufacturing Kutzit
20    with benzene in it, what the health hazards
21    of benzene were, that it wouldn't have
22    learned that benzene was reported to cause
23    all forms of acute and chronic leukemia?
24              MS. BUSCH:  Objection, calls for
25         speculation, argumentative.
```

**Transcript of Monique, Mark**

01                    MARK MONIQUE
02            THE WITNESS:  I can't make any
03       statements on -- like I said, on
04       something from 1967 and have knowledge
05       of what the, you know, previous owners
06       were thinking or what was going on.  I
07       mean, that's just -- you know, I was
08       -- I was born in '63.
09  BY MR. DuPONT:
10            Q.    And I appreciate that.
11                  But we can agree that this was
12  information that was available to Savogran
13  from the State of Illinois, had they asked?
14            MS. BUSCH:  Objection, calls for
15       speculation.
16            THE WITNESS:  I don't know.  I'd
17       love to tell you I could, but I don't.
18  BY MR. DuPONT:
19            Q.    Do you see that the State of
20  Illinois is, in fact, urging that this
21  manufacturer substitute the solvent benzene
22  with a less toxic material to reduce the
23  health hazards to a minimum?
24            A.    Yes.
25            Q.    Do you have any reason to

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02    believe that had Savogran contacted the State
03    of Illinois to educate itself about benzene
04    and its product Kutzit, it wouldn't have been
05    urged to take benzene out and substitute it
06    with a less toxic material?
07              MS. BUSCH:  Objection, calls for
08         speculation.  Argumentative.
09              THE WITNESS:  I have no -- no
10         idea.
11                    -   -   -
12              (Whereupon the document was
13         marked, for identification, as Monique
14         Exhibit Number 19.)
15                    -   -   -
16    BY MR. DuPONT:
17         Q.    I hand to you Exhibit 19.
18         A.    Thank you.
19         Q.    Do you see that Exhibit 19 is a
20    May 15, 1967 letter from the State of
21    Illinois, Department of Labor, Division of
22    Safety Inspection and Education?
23         A.    Yes.
24         Q.    And that's to the same company,
25    Handschy Chemical Company?
```

**Transcript of Monique, Mark**

MARK MONIQUE

01

02    A.    Yes.

03    Q.    And the State of Illinois is

04 stating here that Handschy has been found in

05 violation of the Illinois Health and Safety

06 Act and Health and Safety Rules?

07    A.    Yes.

08    Q.    And attached to this letter is

09 a three page document.  Do you see that?

10    A.    Yeah.

11    Q.    And that's also on a State of

12 Illinois, Department of Labor form?

13    A.    Yes.

14    Q.    And it's the safety inspection

15 unit within the Department of Labor.  Do you

16 see that?

17    A.    Yes.  Uh-huh.

18    Q.    And on the first page of this

19 form there's writing that says, "The

20 following is a list of violations of the

21 rules and regulations promulgated by the

22 Illinois Industrial Commission by authority

23 of the Health and Safety Act, Chapter 48,

24 Illinois revised statute, 1947."  Do you see

25 that?

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02      A.      Yes.
03      Q.      If you turn to the next page,
04 there's a list on the first page and the
05 second page of seven violations that were
06 found by the Department of Labor.  Do you see
07 that?
08      A.      Yes.
09      Q.      The sixth violation of Illinois
10 Health and Safety Act that's reported here,
11 can you read what it says?
12      A.      Number six?
13      Q.      Yes, please.
14      A.      "Provide a substitute cleaner
15 eliminating the use of benzene (benzol) for
16 cleaning of pans and equipment to minimize
17 the harmful effects of the solvent as per
18 part F, Section 3, Rules 1, 2 and 7," looks
19 like K as in kilo, "and Section 3 of the
20 Health and Safety Act."
21      Q.      So here, in 1967, the
22 Department of Labor of the State of Illinois
23 was writing that it's a violation of the law
24 of Illinois to use benzene for cleaning of
25 pans and equipment?
```

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02          MS. BUSCH:  Object to form.
03          THE WITNESS:  Yes.
04  BY MR. DuPONT:
05          Q.    Are you familiar with the
06  United States Department of Health?
07          A.    No.
08                      -   -   -
09          (Whereupon the document was
10      marked, for identification purposes,
11      as Monique Exhibit Number 20.)
12                      -   -   -
13  BY MR. DuPONT:
14          Q.    I'm going to hand to you
15  Exhibit 20.  Have you heard of the Public
16  Health Service?
17          A.    Yes.
18          Q.    All right.  They're actually
19  part of the Uniform Services of the United
20  States Federal Government?
21          A.    Yes.  Uh-huh.
22          Q.    Turn to the first page of this
23  exhibit, Exhibit 20.  This is a publication
24  of the United States Public Health Service
25  entitled, "Occupational Diseases, a Guide to
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    their Recognition."
03              MS. BUSCH:  Do you have an extra
04         copy, Andrew?
05              Thank you.
06    BY MR. DuPONT:
07         Q.    Let me re-ask the question.
08    Exhibit 20 is a publication of the Public
09    Health Service of the United States entitled,
10    "Occupational Diseases, a Guide to their
11    Recognition."
12         A.    Yes.
13         Q.    And if you turn to the fourth
14    page of the exhibit, we see that it was
15    published in 1964?
16         A.    Yes.
17         Q.    If you can turn to the product
18    -- strike that.
19              If you turn to the page that
20    has the number 87 at the top right-hand
21    corner of this exhibit.
22         A.    (Complying with request.)
23              Yes.
24         Q.    There's a section within this
25    -- within this book on benzene.  Do you see
```

**Transcript of Monique, Mark**

```
01                  MARK MONIQUE
02   that?
03          A.     Yes.
04          Q.     And the harmful effects of
05   benzene?
06          A.     Yes.
07          Q.     And under harmful effects, in
08   the last full paragraph there, this
09   publication from the United States Public
10   Health Service is advising users that chronic
11   low level exposures, meaning to benzene, may
12   produce alterations of blood elements most
13   commonly resulting in anemia, leukopenia and
14   thrombocytopenia.
15          A.     Yes.
16          Q.     If you turn to the next page,
17   it's page 88 of the document.  The Public
18   Health Service is reporting in 1964 that all
19   forms of acute and chronic leukemia have been
20   observed in workers with benzene
21   intoxication.  Do you see that?
22          A.     Where is it?
23          Q.     The second paragraph on page
24   88, under occupational diseases?
25          A.     Yes.  Uh-huh.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          Q.      It's written, all forms of
03    acute and chronic leukemia have been observed
04    in workers with benzene intoxication?
05          A.      Yes.
06          Q.      This, again, would have been
07    information available to Savogran in 1964,
08    had it consulted with the federal government
09    on the health hazards of benzene?
10                    MS. BUSCH:  Objection.
11                    THE WITNESS:  Yes.
12    BY MR. DuPONT:
13          Q.      Has Savogran ever used
14    textbooks in order to educate itself about
15    the health hazards of the chemicals it used
16    in its products?
17          A.      No.
18                    MR. DuPONT:  Let's go off the
19    record.
20                    VIDEO TECHNICIAN:  Off the
21    record at 11:45.
22                            -   -   -
23                    (Whereupon there was a recess in
24    the proceeding.)
25                            -   -   -
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02             VIDEO TECHNICIAN:  Back on the
03        record at 11:56.  Beginning of disc
04        number three.
05   BY MR. DuPONT:
06             Q.    Have you read any of the
07   deposition testimony given in this case?
08             A.    Yes.
09             Q.    Okay.  Whose deposition
10   testimony did you read?
11             A.    I read Mrs. Lee and I read the
12   two sons.
13             Q.    All right.  Did you read Mark
14   Lee and Gary Lee's description of how the
15   product did -- strike that.
16                   Did you read Mark and Gary
17   Lee's description of how their father
18   performed furniture refinishing work?
19             A.    Yes.
20             Q.    Did you read Mark Lee's
21   description of how his dad used the Kutzit
22   product?
23             A.    Yes.
24             Q.    And do you have any comments
25   about how his -- he described his dad using
```

Transcript of Monique, Mark

```
01                   MARK MONIQUE
02    the product?
03         A.     No, none.
04         Q.     Is the description of his dad's
05    use of the Kutzit product typical for what
06    you would expect a Kutzit product user to do?
07         A.     Yes.
08         Q.     He used the product in the way
09    that it was intended to be used?
10         A.     There wasn't a lot -- I mean,
11    there wasn't a lot of detail there.  It
12    sounded consistent.
13         Q.     Have you conducted any
14    investigation of which stores and retailers
15    were selling Kutzit in North Carolina during
16    the 1960s and 1970s?
17         A.     No.
18         Q.     Did you read, in Mark Lee or
19    Gary Lee's testimony, the description of
20    where their dad obtained the Kutzit product?
21         A.     Yes.
22         Q.     And the type of store that they
23    described, that's the type of store you would
24    expect Kutzit to be sold at?
25         A.     Not a dry cleaner.  It's not
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   really our niche.
03          Q.     Well, you understood that they
04   testified that the store had various products
05   that it sold?
06          A.     Yes.
07          Q.     Not just dry cleaning services
08   --
09          A.     Right.
10          Q.     -- but it had a --
11          A.     Right.
12          Q.     -- a multitude of products that
13   it sold; right?
14          A.     Yes.
15          Q.     Other paint and paint-related
16   products; right?
17          A.     Yes.
18          Q.     And consistent with what you
19   told me before, you would expect Kutzit to be
20   bought at a store that sold paint and
21   paint-related products; fair?
22          A.     Yes.
23          Q.     I'd like to go back to Exhibit
24   10, if you would, please.
25          A.     Which one was that one?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        Q.       This is the AMSCO --
03        A.       Sure.
04        Q.       -- Division of Union Oil
05   Company of California MSDS from
06   November 1975.
07        A.       It happens to be the last one.
08   Got it.
09             MS. BUSCH:  I have that marked
10        as 9.  Was it 10?
11             THE WITNESS:  Yeah, it's 9 on
12        this one too.
13   BY MR. DuPONT:
14        Q.       9, excuse me.  We're looking at
15   Exhibit 9, which is Bates Number Lee-Savogran
16   86 through 87 and it's a November 1975 MSDS
17   from AMSCO Division of Union Oil Company of
18   California?
19        A.       Yes.
20        Q.       There's an address listed for
21   AMSCO in Schaumburg, Illinois.  Do you see
22   that?
23        A.       Yes.
24        Q.       Do you know where Schaumburg,
25   Illinois is in relation to Addison, Illinois?
```

Transcript of Monique, Mark

```
01                MARK MONIQUE
02        A.    I don't.
03        Q.    Do you know who was
04  manufacturing benzene in Illinois during the
05  1960s and 1970s?
06        A.    I don't.
07        Q.    Do you know which manufacturers
08  of benzene were close in proximity to
09  Savogran's facility in Massachusetts in the
10  sixties and seventies?
11        A.    No idea.
12        Q.    Did Savogran have an
13  expectation that the companies that sold it
14  benzene would provide Savogran with all the
15  information that was available about the
16  health hazards of benzene?
17        A.    Yes.
18        Q.    Would it be responsible in
19  Savogran's view -- strike that.
20              Would it be irresponsible, in
21  Savogran's view, for a manufacturer of
22  benzene to withhold information that it had
23  about the health hazards of benzene when it
24  sold that benzene to Savogran?
25              MR. McDERMOTT:  Objection to
```

**Transcript of Monique, Mark**

```
01                MARK MONIQUE
02        form.
03              THE WITNESS:  Yes.
04   BY MR. DuPONT:
05        Q.    I want to go back and talk to
06   you about your discussions with Mr. Fish from
07   Ashland.
08        A.    Yes.
09        Q.    Did you learn from Mr. Fish, or
10   anyone else, who else was selling chemicals
11   to Savogran in this time period of about
12   1987, when you started with the company?
13              MR. SILVERMAN:  Objection to
14        form.
15   BY MR. DuPONT:
16        Q.    Well, let me ask you:  Did you
17   learn from Mr. Fish whether there was anybody
18   else selling chemicals to Savogran in this
19   1980s period, when you learned that Ashland
20   was selling to Savogran?
21        A.    Mr. Fish wouldn't have known
22   that.  He wouldn't know what -- you know,
23   what competitors -- other competitors were
24   purchase -- you know, Savogran was using.
25        Q.    Were there other companies that
```

Transcript of Monique, Mark

01                     MARK MONIQUE

02     were selling chemicals to Savogran in the

03     late 1980s, besides Ashland?

04             A.      Yes.

05             Q.      Who were they?

06             A.      We purchased from the chemical

07     distribution division of Unocal.  We

08     purchased -- we purchased a lot from all the

09     local distributors in the area.  One of the

10     big ones in the day was Houghton.

11             Q.      Any others?

12             A.      Those are the ones that come to

13     mind.

14             Q.      How do you spell Houghton?

15             A.      H-O-U-G-H-T-O-N.

16             Q.      What chemicals was Savogran

17     buying from Unocal in the late 1980s?

18             A.      I couldn't tell you

19     specifically what chemicals we were buying,

20     but we, you know, they -- you know, a lot of

21     these -- the big ones, acetone, toluene,

22     methanol, those were commodities.  So, you

23     know, those would get shopped around, and

24     whoever had the best price, you know, that's

25     who they would purchase from.

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          Q.     So they would get things like
03   acetone, toluene and methanol from Ashland
04   and Unocal?
05          A.     It would Ashland, Unocal.  It
06   could have been Houghton, you know.  Whoever
07   had the best price of the day.
08          Q.     Were these same companies
09   selling the toluene, acetone to Savogran that
10   was used in the Illinois manufacturing
11   facility?
12          A.     No.
13          Q.     Who was selling to Savogran in
14   Illinois?
15          A.     I don't know.
16          Q.     Did you gain an understanding
17   or learn that Unocal had been selling
18   chemicals to Savogran before you began in
19   1987?
20          MR. McDERMOTT:  Objection.
21          THE WITNESS:  Yes.  Only because
22          John Gale had a very strong
23          relationship with one of the sales
24          guys over there.
25   BY MR. DuPONT:
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02          Q.     Who was that sales guy?
03          A.     His name was Charlie Hoar,
04    H-O-A-R.
05                  MR. McDERMOTT:  Did you get my
06          objection to that last one?
07                  COURT REPORTER:  Yes.
08                  THE WITNESS:  Sorry.
09    BY MR. DuPONT:
10          Q.     And you said John Gale had a
11    strong relationship with Charlie Hoar from
12    Unocal?
13          A.     Yes.  That's my -- that's my
14    recollection.
15          Q.     Do you understand that this was
16    a long term relationship by the time you
17    started in 1987?
18                  MR. McDERMOTT:  Objection to
19          form.
20                  THE WITNESS:  Yes.
21    BY MR. DuPONT:
22          Q.     About how old was Charlie Hoar?
23    Did you get to meet him?
24          A.     Oh, yeah.  Yes.  Yep.
25          Q.     How old was he in 1987?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        A.      Probably fifties.
03        Q.      Do you know if he's still with
04   Unocal?
05        A.      I'm not even sure he's still
06   alive.  He was retired the last time I -- I
07   spoke to him.
08        Q.      When did you last speak with
09   Charlie Hoar?
10        A.      Ten years ago.
11        Q.      And what occasions did you have
12   to talk to him?
13        A.      He was in the National Guard,
14   just like I was in the National Guard.  He
15   was trying to recruit me for -- for -- it was
16   a National Guard group of retired guys.
17        Q.      How about Warren Fish, when's
18   the last time you spoke with Warren Fish?
19        A.      Probably the same thing.
20   10 years ago, 15 years ago.
21        Q.      Do you know if Warren Fish is
22   still with Ashland?
23        A.      I'm not even sure he's still
24   alive.
25        Q.      How old would he be today?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02         A.    He's got to be in -- he'd have
03    to be in his eighties, I would think.
04         Q.    Do you know where Mr. Fish
05    lived?
06         A.    I don't.
07         Q.    Do you know where Charlie Hoar
08    lived?
09         A.    I don't.
10         Q.    Were Charlie Hoar and John Gale
11    friends outside of work as well?
12         A.    Yes.
13         Q.    Did they socialize and do
14    things together?
15         A.    Go to industry dinners, things
16    like that, yeah.
17         Q.    And what type of industry
18    dinners?
19         A.    There was different societies
20    that, you know, would have get together
21    dinners.  Attend things like that.
22         Q.    Were these industry
23    organizations?
24         A.    Right.  Yeah, they're just
25    clubs, you know.  These -- those are more
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   social than anything.  There's a big one in
03   New England called the Chem Club.  It's still
04   around.  A lot of -- a lot of guys in the
05   industry, you know, they just -- it's a
06   social thing.  Strictly social.
07            Q.     The Chem Club, is it called?
08            A.     Right.  Yes.  Yeah.  It's a
09   chemical club in New England.
10            Q.     Was there a sales
11   representative from -- from Houghton who John
12   Gale or anybody else at Savogran had a strong
13   relationship with?
14            A.     Yes.
15            Q.     Who was that?
16            A.     It was Procter Houghton.
17            Q.     Procter Houghton?
18            A.     Yes.
19            Q.     Was he an owner of the company?
20            A.     Yes.
21            Q.     And Houghton was a distributor,
22   as opposed to a manufacturer of solvents?
23            A.     Correct.
24            Q.     Do you know whose solvents they
25   distributed?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        A.      I don't.
03        Q.      How old was Procter Houghton?
04        A.      He's got to be -- he's
05   definitely got to be passed away by now.
06   He's got to be well over a hundred, I would
07   think, yeah.
08        Q.      Were there any other sales
09   representatives from Houghton that Savogran
10   dealt with that you're able to identify?
11        A.      In that day and age?
12        Q.      Yes.
13        A.      Not that I can recall.
14        Q.      Does Savogran continue to deal
15   with Houghton?
16        A.      Houghton was purchased by
17   Brenntag.  We don't do a lot of business with
18   them.
19        Q.      When was Houghton purchased by
20   Brenntag?
21        A.      Maybe five years ago.
22           MR. WALKER:  Can you spell that
23        for us?
24              THE WITNESS:  Which?
25              MR. WALKER:  The second one.
```

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02          THE WITNESS:  Brenntag,
03      B-R-E-N-N-T-A-G, Brenntag.  They're a
04      national distributor.  They compete
05      with all the other guys.  Yeah.
06  BY MR. DuPONT:
07          Q.    Were there other salespersons
08  from Unocal, besides Charlie Hoar that --
09  that Savogran dealt with?
10          A.    That's the only one I remember.
11          Q.    And were there other sales
12  representatives from Ashland, besides Warren
13  Fish, that Savogran dealt with?
14          A.    My mother's retired from
15  Ashland.  Now, Nexeo.
16          Q.    Was your mother a sales
17  representative to Savogran?
18          A.    No, she wasn't.  That would be
19  a little insidious, wouldn't it?
20          Q.    Do you have any knowledge of
21  Ashland ever providing a hazard determination
22  study that it had for toluene or xylene to
23  Savogran?
24          A.    No.
25          Q.    Does Savogran have records that
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02   indicate the years that it participated in
03   these various industry organizations that
04   you've identified for us today?
05           A.     No.
06           Q.     How far back in time does
07   Savogran keep its records of the formulas of
08   the Strypeeze and I think it was the super
09   paint remover product we talked about?
10           A.     You're talking about computer
11   records or just -- just records in general?
12           Q.     Records in general.
13           A.     It's just a -- you know, we --
14   we're a small -- you know, very, very small
15   company.  And, you know, there's never been a
16   records retention policy.  So it's -- you
17   know, to be perfectly honest, it's just very
18   haphazard.  It's a lot tighter now, you know.
19           Q.     In your experience, when
20   Savogran dealt with its suppliers of
21   chemicals, did it make its suppliers aware of
22   what it was using their chemicals for, what
23   types of products?
24           A.     Not necessarily.
25           Q.     Did Savogran -- it was -- its
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE

02   products, like Strypeeze and Kutzit, they

03   were -- they were very well known products in

04   the industry.  Is that fair?

05        A.     Yes.  We like to think so,

06   yeah.

07        Q.     And did representatives of

08   Ashland and Unocal and Houghton actually

09   visit the plant at Savogran?

10        A.     Yes, they --

11               MR. McDERMOTT:  Objection to

12        form.

13               THE WITNESS:  I'm sorry.  They

14        made sales -- sales calls.  Yeah.

15   BY MR. DuPONT:

16        Q.     And when they made sales calls,

17   did they -- was there literature and

18   containers available from which they could

19   understand what types of products Savogran

20   was manufacturing and selling?

21               MR. McDERMOTT:  Objection to

22        form.

23               THE WITNESS:  Yes.

24   BY MR. DuPONT:

25        Q.     I mean, there was no secret
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    what Savogran was using the chemicals it
03    bought from suppliers for.  It had certain
04    lines of products that were predominantly in
05    the -- in the paint stripping business.
06    Fair?
07                    MR. McDERMOTT:  Objection to
08          form.
09                    THE WITNESS:  Yes.
10    BY MR. DuPONT:
11          Q.    And these were largely consumer
12    products; right?
13          A.    Yes.
14          Q.    And that was information that
15    was out there and available to Savogran's
16    chemical suppliers?
17                    MR. McDERMOTT:  Objection, form.
18                    THE WITNESS:  Yes.
19    BY MR. DuPONT:
20          Q.    And we can reasonably conclude
21    that that would have been true in the 1960s
22    and 1970s as well?
23                    MR. McDERMOTT:  Objection to
24          form.
25                    THE WITNESS:  Again, it's hard
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02          for me to say anything about the
03          sixties or seventies.
04  BY MR. DuPONT:
05          Q.     But based on the nature of
06  Savogran's business, the products that it
07  manufactured and sold and its focus in this
08  consumer paint stripping product line, it
09  would have been known or easily knowable by
10  the suppliers of chemicals to Savogran what
11  their chemicals were going into?
12                  MR. McDERMOTT:  Objection to
13          form.
14                  THE WITNESS:  I can't stipulate
15          anything from the sixties or
16          seventies, Andrew.  It's just too long
17          ago.
18  BY MR. DuPONT:
19          Q.     Those are all the questions I
20  have.  Thank you very much for your time.
21          A.     All right.  Thank you.
22  Pleasure.
23                     -   -   -
24                  VIDEO TECHNICIAN:  Are there any
25          other questions?
```

Transcript of Monique, Mark

```
01              MARK MONIQUE
02         MR. SILVERMAN:  Yes.
03         VIDEO TECHNICIAN:  Off the
04    record at 12:12.
05                  -  -  -
06         (Discussion held off the
07    record.)
08                  -  -  -
09         VIDEO TECHNICIAN:  Back on the
10    record at 12:13.
11 BY MR. SILVERMAN:
12         Q.    Good afternoon, Mr. Monique.
13 My name is Zach Silverman, I'm from Fishkin
14 Lucks, and I represent Univar National in
15 this action.  I just have a couple of
16 questions for you.
17              You mentioned that Ashland was
18 one of Savogran's suppliers of chemicals; is
19 that correct?
20         A.    Yes.
21         Q.    And they were in 1987, when you
22 arrived at Savogran; is that correct?
23         A.    Yes.
24         Q.    And you don't know how long
25 before that they were suppliers, if at all?
```

Transcript of Monique, Mark

```
01                    MARK MONIQUE
02          A.      No idea.
03          Q.      And they are still suppliers of
04   chemicals today; is that correct?
05          A.      Ashland is not.  Only because
06   now it's -- you know, Ashland doesn't own
07   that business anymore.
08          Q.      Okay.
09          A.      It's gone to Nexeo.
10          Q.      Okay.
11          A.      The other one was Univar?  Is
12   what you said?
13          Q.      I don't have any questions
14   about Univar.
15          A.      Okay.  Okay.
16          Q.      So when did Ashland stop
17   supplying --
18          A.      Whenever they sold the
19   business.
20          Q.      And do you know if there were
21   any gaps in between '87 and when they sold
22   the business that they were not supplying
23   Savogran?
24          A.      There were no gaps.
25          Q.      There were no gaps?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02         A.    No.
03         Q.    Okay.  And it's fair to say
04   that Ashland wasn't the only supplier of
05   chemicals to Savogran during these times?
06         A.    Oh, definitely.
07         Q.    There were several others;
08   right?
09         A.    Yes.  Correct.
10         Q.    Could you estimate how many?
11         A.    Anywhere from -- are you
12   talking about solvents now?
13         Q.    Any chemical.
14         A.    Oh, there could have been, you
15   know, a couple dozen.
16         Q.    What about solvents?
17         A.    Probably no more than ten.
18         Q.    More than five?
19         A.    Probably.
20         Q.    So probably about between five
21   and 10?
22         A.    Yes.
23         Q.    Do you know if Ashland supplied
24   any chemicals that were used in Kutzit?
25         A.    In '87 onward?
```

Transcript of Monique, Mark

```
01                  MARK MONIQUE
02          Q.      At any time?
03          A.      Yes.  I can definitely say from
04   '87 onward, yes.
05          Q.      Do you know for sure that the
06   chemicals supplied by Ashland were
07   definitively used in Kutzit?
08          A.      Yes.
09          Q.      And how do you know that?
10          A.      Well, they were -- they were --
11   in that day, between -- you know, they were
12   the number one or number two supplier of
13   acetone, toluene and methanol.
14          Q.      Okay.
15          A.      Yeah, we got a lot of product
16   from Ashland in the day.
17          Q.      What about benzene?
18          A.      I have no idea.
19          Q.      You have no idea whether
20   Ashland supplied benzene at all?
21          A.      Correct.
22          Q.      And you have no idea whether,
23   if Ashland supplied benzene, that benzene
24   made it into Kutzit?
25          A.      Correct.
```

Transcript of Monique, Mark

MARK MONIQUE

Q.     Okay.  And as for the other
chemicals, you have no idea at what times
those chemicals from Ashland would have been
in Kutzit product?

A.     Correct.

Q.     And at any given time it could
have been a chemical from another company, as
opposed to Ashland, that made it into Kutzit?

A.     True.

Q.     Bear with me for a minute.

A.     That's fine.

VIDEO TECHNICIAN:  Off the
record at 12:16.

- - -

(Discussion held off the
record.)

- - -

VIDEO TECHNICIAN:  Back on the
record, 12:18.

BY MR. SILVERMAN:

Q.     Can you give me a complete and
definitive list of every chemical sold by
Ashland to Savogran that you know for certain
made it into a Kutzit product?

Transcript of Monique, Mark

01                    MARK MONIQUE

02          A.      I can from 2000 till, you know,

03    present.

04          Q.      And before that you can't at

05    all?

06          A.      Correct.

07          Q.      So from 2000 to the present,

08    can you give me that definitive list of the

09    product that you know --

10          A.      From 2000 to the present?

11          Q.      Right.

12          A.      Yes.

13          Q.      -- from Ashland that you know

14    definitively made it into Kutzit products?

15          A.      Oh, that made it into the

16    Kutzit, no.

17          Q.      No?

18          A.      No.  No, we don't lot track.

19          Q.      So you don't keep track of what

20    chemicals you purchase from a company and

21    what products specifically they go into?

22          A.      Correct.

23          Q.      Okay.  I have no further

24    questions then.  Thank you.

25          A.      Yep.

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02              VIDEO TECHNICIAN:  Any other
03        questions?
04              MR. McDERMOTT:  Yeah, I just
05        have maybe two.
06              VIDEO TECHNICIAN:  Off the
07        record at 12:19.
08                    -   -   -
09         (Discussion held off the
10        record.)
11                    -   -   -
12              VIDEO TECHNICIAN:  Back on the
13        record, 12:19.
14   BY MR. McDERMOTT:
15         Q.     Sir, we just met earlier, my
16   name is Jack McDermott.  I represent Unocal,
17   Chevron, ExxonMobil and CRC in this lawsuit.
18   Just a couple of follow-up questions.
19         A.     Uh-huh.
20         Q.     Is it right that you testified
21   earlier that in the late 1980s that Unocal
22   supplied certain chemicals to Savogran at
23   various times?
24         A.     Yes.
25         Q.     Prior to 1987, do you know
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02      whether Unocal sold chemicals to Savogran?
03           A.      I have no knowledge of that.
04           Q.      Do you know whether Unocal sold
05      benzene to Savogran at any time?
06           A.      I have no knowledge.
07           Q.      Those are all the questions I
08      have.  Thank you.
09                          -   -   -
10                   (Discussion held off the
11           record.)
12                          -   -   -
13      BY MR. DuPONT:
14           Q.      It's my understanding that for
15      a period of a time there was a law firm that
16      was directing Savogran?
17           A.      Yes.
18           Q.      All right.  Have you conducted
19      any investigation to determine the name of
20      that law firm?
21           A.      No.
22           Q.      The names of any of the lawyers
23      in the firm?
24           A.      One of them was David Fitz.
25           Q.      How do you know that?
```

**Transcript of Monique, Mark**

```
01              MARK MONIQUE
02      A.      It's just something I remember.
03  They were instrumental in the ESOP
04  transaction.
05      Q.      That law firm, was that in
06  Boston?
07      A.      Yes.
08      Q.      How many -- how many lawyers
09  were in the firm?  Was it a big firm, small
10  firm?
11      A.      I'm not sure.  I had just
12  started with the company when it ESOP'd, I
13  was there like a year.  And I wasn't that
14  close to any of that.
15      Q.      Have you or anyone else on
16  behalf of Savogran attempted to reach out to
17  the lawyers or law firm to see what documents
18  they have related to Savogran and its
19  history?
20      A.      They're -- they're all gone.
21      Q.      How do you know that?
22      A.      They are -- the firm is not
23  around anymore.  And we lost touch with the
24  two lawyers.  I'm not even sure they're still
25  alive.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          Q.     Well, do you know the name of
03    the firm?
04          A.     I don't, no.
05          Q.     Have you investigated whether
06    the firm is still around?
07          A.     Years ago.
08          Q.     When did you do that?
09          A.     I don't -- I don't -- I
10    honestly don't remember.  But my recollection
11    is, it's gone.  Yeah.
12          Q.     Now, when Savogran stored
13    chemicals before they were blended into a
14    product in underground storage tanks --
15          A.     Yes.
16          Q.     And then there would be --
17    would there be one tank per chemical?
18          A.     There were -- there was one
19    tank for toluene, one tank for acetone, one
20    tank for methanol and two tanks for methylene
21    chloride.
22          Q.     And so would Savogran use the
23    toluene in that underground storage tank, and
24    then once it was basically depleted of
25    toluene order a new shipment of toluene in?
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02          A.      Yes.
03          Q.      And then it would get an order
04  sufficient to fill that tank with toluene
05  from one supplier, like Ashland?
06          A.      Not necessarily to fill it.
07  You know, if we were -- if it's the winter
08  when things are slow, we might only purchase,
09  you know, half a tank wagon.  Yeah.
10          Q.      And then would it use that half
11  a tank wagon worth of toluene before it went
12  out and bought more toluene?
13          A.      The tank would get run down to
14  -- you know, it's a 10,000 gallon tank.  And
15  say it would get run down to, you know,
16  thousand gallons.
17          Q.      So you would use 90 percent of
18  the -- of the toluene from a supplier like
19  Ashland before you went out and bought more
20  toluene?
21          A.      Yes.
22               MR. SILVERMAN:  Objection to
23          form.
24               THE WITNESS:  Yep.
25  BY MR. DuPONT:
```

**Transcript of Monique, Mark**

```
01                  MARK MONIQUE
02          Q.      So there would be -- there
03   would be periods of time where that tank only
04   had one supplier's toluene in it, like
05   Ashland's toluene?
06                  MR. SILVERMAN:  Objection to
07          form.
08                  THE WITNESS:  Not necessarily,
09          it was always getting commingled.  You
10          know, you'd have what was left in
11          there and then dump somebody else's on
12          top of it.  They would all get mixed
13          together.
14   BY MR. DuPONT:
15          Q.      But there would be periods of
16   time when you got -- 90 percent of the
17   toluene in that tank is one supplier's
18   toluene, like Ashland?
19          A.      Yes.  Yeah.
20                  MR. SILVERMAN:  Objection to
21          form.
22   BY MR. DuPONT:
23          Q.      And there would be periods of
24   time when you guys probably made consecutive
25   orders of toluene from a supplier like
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    Ashland?
03                    MR. SILVERMAN:  Objection to
04          form.
05                    THE WITNESS:  If they had the
06          best price, then that's certainly,
07          yeah, feasible.
08    BY MR. DuPONT:
09          Q.      All right.
10          A.      Yeah.
11          Q.      So there would be periods of
12    time where one supplier was supplying all the
13    toluene that was available to go into all the
14    products, including Kutzit?
15          A.      It's certainly possible, yeah.
16          Q.      And the same would be true for
17    -- for Unocal?
18                    MR. McDERMOTT:  Objection to
19          form.
20                    THE WITNESS:  Yes.
21    BY MR. DuPONT:
22          Q.      And you said Ashland was one of
23    the top one or two suppliers of acetone,
24    toluene and methanol to Kutzit from 1987 and
25    afterwards.
```

**Transcript of Monique, Mark**

```
01                   MARK MONIQUE
02        A.      Uh-huh.
03        Q.      Was Unocal the other?
04             MR. McDERMOTT:   Objection to
05        form.
06             MS. BUSCH:   Object to form.   You
07        said Kutzit instead of Savogran.
08             MR. DuPONT:   Strike that.
09   BY MR. DuPONT:
10        Q.      You said that Ashland was one
11   of the top one or two suppliers of acetone,
12   toluene and methanol to Savogran from 1987
13   onward.   Was Unocal the other one or two top
14   suppliers?
15             MR. SILVERMAN:   Objection to
16        form.
17             MR. McDERMOTT:   Objection to
18        form.
19             THE WITNESS:   It would have
20        either been Houghton or Unocal when I
21        -- when I got there in '87, yeah.
22        Yeah.
23   BY MR. DuPONT:
24        Q.      So Ashland was definitely in
25   the top one or two, and Unocal was in the top
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    two or three?
03          A.      Correct.
04                  MR. SILVERMAN:   Objection to
05          form.
06                  MR. McDERMOTT:   Objection to
07          form.
08    BY MR. DuPONT:
09          Q.      And have those three been the
10    top three suppliers since 1987 to the
11    present?
12                  MR. SILVERMAN:   Objection to
13          form.
14                  THE WITNESS:  No.
15    BY MR. DuPONT:
16          Q.      They were the top three
17    suppliers until when, until Nexeo took over
18    from Ashland?
19                  MR. SILVERMAN:   Objection to
20          form.
21                  THE WITNESS:  No.  You know,
22          relationships change, businesses
23          change.  I think the Unocal location,
24          East Providence, got sold to -- got
25          sold to Univar.  So that upset that
```

Transcript of Monique, Mark

```
01              MARK MONIQUE
02      whole -- that whole thing.  I can't
03      even tell you offhand when that
04      happened.
05              Ashland was a strong supplier up
06      until they sold the business to Nexeo.
07      And then, you know, we don't do as
08      much business with them anymore for
09      other business reasons.
10 BY MR. DuPONT:
11      Q.     Once Unocal sold that East
12 Providence location to Univar, did Savogran
13 begin buying its solvents from Univar?
14      A.     Yes.
15      Q.     And about when did that happen?
16      A.     I don't remember.  I'm sorry,
17 Andrew.
18      Q.     Great.  Thank you very much.
19      A.     You're welcome.
20              MR. SILVERMAN:  I've got some
21      follow-up now that you mentioned
22      Univar, so...
23              VIDEO TECHNICIAN:  Off the
24      record at 12:26.
25                    -  -  -
```

Transcript of Monique, Mark

# Monique, Mark

Rhyne Trial Master

```
01                    MARK MONIQUE
02              (Discussion held off the
03         record.)
04                         -   -   -
05              VIDEO TECHNICIAN:  Back on the
06         record at 12:26.
07    BY MR. SILVERMAN:
08              Q.     Once, again, this is Zach
09    Silverman.  As well as representing Ashland,
10    I represent Univar and I have a couple of
11    questions about Univar now.
12                   You said that Univar supplied
13    Savogran with chemicals, but you don't know
14    the dates of when they did so; is that
15    correct?
16              A.     Correct.  It's a much more
17    recent event, yeah.
18              Q.     When did it start?
19              A.     Within the last -- definitely
20    within the last ten years.  Yeah.
21              Q.     Okay.  And what chemicals have
22    they supplied to Savogran?
23              A.     Oh, acetone, toluene, methanol.
24    We buy some Rohm and Haas acrylic products.
25              Q.     I'm sorry, continue.
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02        A.        Ammonia, some other oddball
03   stuff, you know.
04        Q.        And some of those products are
05   the type of products that go into Kutzit; is
06   that correct?
07        A.        Yes.
08        Q.        All right.  But do you know for
09   sure whether a Univar product has ever made
10   it into Kutzit?
11        A.        Yes.
12        Q.        How do you know that?
13        A.        Well, we've bought -- like I
14   said, we've bought acetone, toluene and
15   methanol from Univar.  We do to this day.
16   And the stuff goes -- definitely goes into
17   Kutzit.
18        Q.        Well, you have other products;
19   right?
20        A.        Yes.
21        Q.        And you have other products
22   that use those raw materials; is that
23   correct?
24        A.        Yes.  Yeah.
25        Q.        So it's possible that the
```

**Transcript of Monique, Mark**

```
01                    MARK MONIQUE
02    Univar -- the product from Univar that you
03    bought went into that other product and not
04    Kutzit?
05            A.      It's not very likely, just
06    because, you know, we make -- we buy -- say
07    we buy 6,000 gallons of methanol.  We make
08    product in 450 gallon batches.  And it's not
09    likely we buy a 6,000 gallon tanker wagon of
10    methanol and just make Kutzit, you know, for
11    a month.
12            Q.      Sure.  I'm just asking you if
13    it's possible that that stuff never made it
14    into Kutzit, it only made it into the other
15    products?
16            A.      Probably not.
17            Q.      Probably not?
18            A.      Yeah.
19            Q.      Okay.  And Univar never sold
20    benzene to Savogran.  Is that a correct
21    statement?
22            A.      I would say, no because -- you
23    know, I think Univar, we just recently
24    started -- well, you know, talking to 1875
25    now.  So recently is like a ten year period.
```

**Transcript of Monique, Mark**

```
01                MARK MONIQUE
02   We just recently started doing, you know,
03   business with Univar.  Yeah.
04        Q.     Once again, as it relates to
05   Univar, you don't track which chemicals from
06   which suppliers go into which of Savogran's
07   products.  Is that correct?
08        A.     Right.  Correct.
09        Q.     I have no further questions.
10   Thank you.
11             VIDEO TECHNICIAN:  Are there any
12        other questions?
13             (No response.)
14             VIDEO TECHNICIAN:  The time now
15        is 12:29.  This concludes the
16        deposition.  End of disc three of
17        three.
18                  -  -  -
19             (Witness excused.)
20                  -  -  -
21             (Deposition concluded at
22        12:29 p.m.)
23
24
25
```

**Transcript of Monique, Mark**

```
01                MARK MONIQUE
02           C E R T I F I C A T E
03
04
05           I do hereby certify that I am a Notary
06      Public in good standing, that the aforesaid
07      testimony was taken before me, pursuant to
08      notice, at the time and place indicated; that
09      said deponent was by me duly sworn to tell
10      the truth, the whole truth, and nothing but
11      the truth; that the testimony of said
12      deponent was correctly recorded in machine
13      shorthand by me and thereafter transcribed
14      under my supervision with computer-aided
15      transcription; that the deposition is a true
16      and correct record of the testimony given by
17      the witness; and that I am neither of counsel
18      nor kin to any party in said action, nor
19      interested in the outcome thereof.
20
21           WITNESS my hand and official seal this
22      25th day of July, 2016.
23
24
25
26                     <%signature%>
27
28                     Notary Public
29
30
31
32
33
34
35
36
```

Transcript of Monique, Mark

```
01              MARK MONIQUE

02          INSTRUCTIONS TO WITNESS

03

04      Please read your deposition over

05  carefully and make any necessary corrections.

06  You should state the reason in the

07  appropriate space on the errata sheet for any

08  corrections that are made.

09          After doing so, please sign the errata

10  sheet and date it.

11          You are signing same subject to the

12  changes you have noted on the errata sheet,

13  which will be attached to your deposition.

14          It is imperative that you return the

15  original errata sheet to the deposing

16  attorney within thirty (30) days of receipt

17  of the deposition transcript by you.  If you

18  fail to do so, the deposition transcript may

19  be deemed to be accurate and may be used in

20  court.

21

22

23

24

25
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

```
01              MARK MONIQUE

02                - - - -

03            E R R A T A

04                - - - -

05    PAGE    LINE     CHANGE

06    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

07    Reason for Change:

08    _____

09    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10    Reason for Change:

11    _____

12    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13    Reason for Change:

14    _____

15    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16    Reason for Change:

17    _____

18    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19    Reason for Change:

20    _____

21    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

22    Reason for Change:

23    _____

24    _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

25    Reason for Change:

26    _____
```

**Transcript of Monique, Mark**

Page 173

```
01                    MARK MONIQUE

02

03        ACKNOWLEDGMENT OF DEPONENT

04              I, _____, do

05    hereby certify that I have read the foregoing

06    pages __ to ___ and that the same is a

07    correct transcription of the answers given by

08    me to the questions therein propounded,

09    except for the corrections or changes in form

10    or substance, if any, noted in the attached

11    Errata Sheet.

12

13    _____        _____

14    DATE                  SIGNATURE

15

16              Subscribed and sworn to before

17    me this

18    _____ day of _____, 2016.

19

20              My commission expires:

21                     _____

22

23                     _____

24              Notary Public

25    Job No. 2344315
```

Transcript of Monique, Mark

Page 174

Transcript of Monique, Mark

# Exhibit 8

# Full Transcript Report
## Designation Legend

MONIQUE, MARK - (THOMAS) VOL 1

Plaintiffs' designations are in yellow. There are no counter-designations.

Transcript of Monique, Mark

# Monique, Mark

## Rhyne Trial Master

```
01          SUPERIOR COURT OF CALIFORNIA
02              COUNTY OF ALAMEDA
03
04                   - - -
05
06   JIMMY THOMAS and     :  NO. RG17882514
07   SONYA THOMAS        :
08                       :
09        Plaintiff    :
10                       :
11        v.            :
12                       :
13   AKZO NOBEL COATINGS, :
14   INC., et al.,        :
15                       :
16        Defendants. :
17
18                   - - -
19             May 7, 2019
20                   - - -
21             Oral Deposition of MARK
22   MONIQUE, taken pursuant to Notice, at
23   Veritext Boston, 101 Arch Street, Suite 650,
24   Boston, Massachusetts 02110, beginning at
25   11:03 a.m. before Brigitte A. Strain, RPR,
26   FCCR, and Notary Public.
27                   - - -
28
29
30
31
32        VERITEXT LEGAL SOLUTIONS
33          MID-ATLANTIC REGION
34      1801 Market Street  Suite 1800
35      Philadelphia, Pennsylvania  19103
```

Transcript of Monique, Mark

```
01   APPEARANCES:
02   LOCKS LAW FIRM
03   BY:  ANDREW J. DuPONT, ESQUIRE
04   The Curtis Center
05   601 Walnut Street
06   Suite 720 East
07   Philadelphia, Pennsylvania 19106
08   215.893.0100
09   ADupont@lockslaw.com
10   Counsel for Plaintiffs
11
12   BOWMAN AND BROOKE
13   BY:  JON J. HERNAN, ESQUIRE
14   1064 Greenwood Boulevard
15   Suite 212
16   Lake Mary, Florida 32746-5419
17   407.585.7606
18   Jon.Hernan@bowmanandbrooke.com
19   Counsel for Defendant, W.M. Barr & Company,
20   Inc.
21
22   CLARK HILL LLP
23   BY:  ARMINEH YOUSEFIAN, ESQUIRE
24   1055 West Seventh Street
25   24th Floor
26   Los Angeles, California 90017
27   213.891.9100
28   AYousefian@clarkhill.com
29   Counsel for Defendant, Berg Lacquer Company
30   (Via Teleconference)
31
32   DICKIE MCCAMEY & CHILCOTE
33   BY:  THERESA FOLINO, ESQUIRE
34   1650 Arch Street
35   Suite 21021
36   Philadelphia, Pennsylvania 19103-2003
37   215.351.581222
38   Tfolino@dmclaw.com
39   Counsel for Defendants, PPG Industries and
40   The Sherwin-Williams Company
41   (Via Teleconference)
42
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

```
01   APPEARANCES (continued):
02   DRINKER BIDDLE & REATH LLP
03   BY:  KATE WITTLAKE, ESQUIRE
04   Four Embarcadero Center, 27th Floor
05   San Francisco, California 94111-4180
06   415.591.752911
07   Kate.Wittlake@dbr.com
08   Counsel for Defendant, BASF Corporation,
09   individually and successor-in-interest to
10   and d/b/a Glassurit and R-M Company f/k/a
11   Rinshed Mason Company
12   (Via Teleconference)
13
14   DUANE MORRIS LLP
15   BY:  ROBERT KUM, ESQUIRE
16   865 South Figueroa Street
17   Suite 3100
18   Los Angeles, California 90017-5450
19   213.689.724213
20   Rkum@duanemorris.com
21   Counsel for Defendants, Akzo Nobel Coatings,
22   Individually and as Successor-in-Interest to
23   and d/b/a Sikkens Berryman Products, Inc.
24
25   FOLEY & MANSFIELD
26   BY:  ANGELA V. SAYRE, ESQUIRE
27   300 South Grand Avenue
28   Suite 2800
29   Los Angeles, California 90071
30   213.283.2147
31   ASayre@foleymansfield.com
32   Counsel for Defendant, Ashland, LLC
33   (Via Teleconference)
34
35
36
37
38
39
```

Transcript of Monique, Mark

```
01   APPEARANCES (continued):
02   FRANCK & ASSOCIATES
03   BY:  HERMAN FRANCK, ESQUIRE
04   910 Florin Road
05   Suite 212
06   Sacramento, California 95831
07   916.447.840022
08   franckhermanlaw88@yahoo.com
09   Counsel for Defendant, East Bay Color
10   Service
11   (Via Teleconference)
12
13   GORDON & REES SCULLY MANSUKHANI
14   BY:  BRIAN M. LEDGER, ESQUIRE
15   5901 Priestly Drive, Suite 308
16   Carlsbad, California 92008
17   619.230.7729
18   BLedger@grsm.com
19   Counsel for Defendant, The Savogran Company
20
21   HURRELL CANTRALL LLP
22   BY:  CATHY CHUKWUEKE
23   One California Plaza
24   300 S. Grand Avenue, Suite 1300
25   Los Angeles, California 90071
26   213.426.2000
27   Cchukwueke@hurrellcantrall.com
28   Counsel for Defendant, The Sherwin-Williams
29   Company, PPG Industries, Inc., United States
30   Steel Corporation
31   (Via Teleconference)
32
33   KUCHLER POLK WEINER LLC
34   BY:  ROBERT J. FLORA, ESQUIRE
35   2929 Allen Parkway
36   Suite 152016
37   Houston, Texas 77019
38   713.936.4707
39   RFlora@kuchlerpolk.com
40   Counsel for Defendant, E.I. DuPont de
41   Nemours & Company
42   (Via Teleconference)
43
```

**Transcript of Monique, Mark**

```
01  APPEARANCES (continued):
02  LEWIS BRISBOIS BISGAARD & SMITH LLP
03  BY:  JOSHUA BART, ESQUIRE
04  333 Bush Street, Suite 1100
05  San Francisco, California 94104
06  415.262.8528
07  Joshua.Bart@lewisbrisbois.com
08  Counsel for Defendant, Safety-Kleen Systems,
09  Inc.
10  (Via Teleconference)
11
12  LEWIS BRISBOIS BISGAARD & SMITH LLP
13  BY:  DAVID M. UCHIDA, ESQUIRE
14  633 W. 5th Street, Suite 4000
15  Los Angeles, California 90071
16  213.580.6395
17  David.Uchida@lewisbrisbois.com
18  Counsel for Defendant, FinishMaster, Inc.
19  (Via Teleconference)
20
21  MANNING GROSS + MASSENBURG, LLP
22  BY: KAREN M. SULLIVAN, ESQUIRE
23  400 Spectrum Center Drive
24  Suite 1450
25  Irvine, California 92618
26  KSullivan@mgmlaw.com
27  949.892.4703
28  Counsel for Defendant, Rust-Oleum
29  Corporation
30  (Via Teleconference)
31
32  REED SMITH, LLP
33  BY:  MICHAEL MANDELL, ESQUIRE
34  355 South Grand Avenue, Suite 2900
35  Los Angeles, California 90071
36  213.457.8000
37  MMandell@reedsmith.com
38  Counsel for Defendant, Shell Oil Company
39  (Via Teleconference)
40
41
```

**Transcript of Monique, Mark**

```
01   APPEARANCES (continued):
02   STEPTOE & JOHNSON LLP
03   BY:  JENNIFER B. BONNEVILLE, ESQUIRE
04   633 West Fifth Street
05   Suite 190021
06   Los Angeles, California 90071-3500
07   213.439.940522
08   JBonneville@steptoe.com
09   Counsel for Defendant, Union Oil Company of
10   California
11
12   VORYS, SATER, SEYMOUR and PEASE, LLP
13   BY:  GARY J. SAALMAN, ESQUIRE
14            52 East Gay Street
15   Columbus, Ohio 43215
16   614.464.6400
17   GJSaalman@vorys.com
18   Counsel for Defendant, Illinois Tool Works,
19   Inc.
20   (Via Teleconference)
21
22   WALSWORTH, LLP
23   BY:  SADAF A. NEJAT, ESQUIRE
24   One City Boulevard West, Fifth Floor
25   Suite 3280
26   Orange, California 92868
27   714.634.2522
28   SNejat@wfbm.com
29   Counsel for Defendant, The Blaster
30   Corporation
31   (Via Teleconference)
32
33
34
35
36
37
38
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

```
01              I N D E X
02                - - -
03
04  Testimony of:  MARK MONIQUE
05
06          By Mr. DuPont..................12, 225
07  By Ms. Bonneville.............202
08
09              EXHIBITS
10                - - -
11
12  EXHIBIT NUMBER  DESCRIPTION   PAGE MARKED
13
14  Monique 1    Collection of Savogran
15               Marketing Materials
16               Savogran 04-19        24
17
18  Monique 2    Kutzit Formula
19               Lee-Savogran 67       36
20  Monique 3    Kutzit Formula
21               Lee-Savogran 88       36
22
23  Monique 4    New Kutzit
24               Lee-Savogran 69       50
25  Monique 5    Kutzit Label
26               Lee-Savogran 71       52
27
28  Monique 6    Kutzit Paint Remover
29               Label, Lee-Savogran 72 54
30  Monique 7    Kutzit Paint Remover
31               Label, Lee-Savogran 73 55
32
33  Monique 8    Letter, 3.11.19 with
34               Attachment            60
35
36
37
38
```

Transcript of Monique, Mark

# Monique, Mark
## Rhyne Trial Master

```
01  EXHIBITS (continued):

02  EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED

03  Monique 9        Letter, 3.21.17        81

04  Monique 10       Agreement             120

05  Monique 11       Toxicologial Review

06                   On Benzene

07                   Sh-Hi 2611-2616       137

08  Monique 12       Occupational Medicine

09                   And Industrial

10                   Hygiene - Johnstone

11                   USS 2881-2904         149

12

13  Monique 13       Letter, November 30,

14                   1954

15                   DBZ9002183            155

16

17  Monique 14       Letter, May 18, 1967

18                   H-D 776               160

19  Monique 15       Letter, 5.15.67

20                   H-D 562-565           161

21

22  Monique 16       Occupational Diseases

23                   A Guide to Their

24                   Recognition           173

25

26

27

28

29

30

31

32

33
```

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01    EXHIBITS (continued):
02    EXHIBIT NUMBER   DESCRIPTION  PAGE MARKED
03    Monique 17    Letter, Stodder
04                  5.27.66
05                  Savogran 112          192
06    Monique 18    Letter, Stodder
07                  9.22.64
08                  Savogran 118          194
09    Monique 19    Letter, 12.11.70
10                  Savogran 115          195
11
12    Monique 20    Letter, 2.26.65
13                  Savogran 116          198
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

```
01                SUPPORT INDEX
02                  -   -   -
03    INSTRUCTION NOT TO ANSWER:
04    Page Line
05    (None)
06
07    REQUEST FOR PRODUCTION OF DOCUMENTS:
08    Page Line       Description
09    (None)
10
11    STIPULATIONS:
12    Page Line
13    237     5
14
15    QUESTIONS MARKED:
16    Page Line
17    (None)
18
19
20
21
22
23
24
```

**Transcript of Monique, Mark**

```
01              VIDEO TECHNICIAN:  Good
02       morning.  We're going on the record
03       at 11:03 a.m. on -- on May 7th, 2019.
04              Please turn off all cell
05       phones or place them away from the
06       microphones as they can interfere
07       with deposition audio.  Audio and
08       video recordings will continue to
09       take place unless all parties agree
10       to go off the record.
11              This is media unit one, in the
12       video recorded deposition of Mark
13       Monique 30(b)(c) -- 30(b)(6) witness
14       for the Savogran Company, taken by
15       counsel for Plaintiff in the matter
16       of Jimmy H. Thomas and Sonya Thomas
17       versus Akzo Nobel Coatings,
18       Incorporated, et al., in the Superior
19       Court for the State California, for
20       the County of Alameda, Number
21       RG178825.
22              This deposition is being held
23       at the Offices for Veritext, located
24       at 101 Arch Street, Boston,
```

Transcript of Monique, Mark

```
01          Massachusetts.
02                  My name is Bill Seider from
03          the firm of Veritext.  I'm the
04          videographer.  The court reporter is
05          Brigitte Strain from the firm of
06          Veritext.
07                  I'm not related to this party,
08          nor am I financially interested in
09          the outcome.
10                  Counsel and all present in the
11          room will be noted on the steno
12          record.
13                  Will the court reporter please
14          swear in the witness and we can
15          proceed.
16                      -   -   -
17                  MARK MONIQUE, after having
18          been first duly sworn, was examined
19          and testified as follows:
20                      -   -   -
21                  EXAMINATION
22                      -   -   -
23    BY MR. DuPONT:
24          Q.    Good morning, Mr. Thomas --
```

Transcript of Monique, Mark

# Monique, Mark
## Rhyne Trial Master

```
01   Excuse me.  Strike that.  That's a bad way
02   to start.
03             Good morning, Mr. Monique.
04        A.    Good morning.
05        Q.    My name is Andrew Dupont and
06   I'm an attorney for Jimmy Thomas and Sonya
07   Thomas.  I'm here to take your deposition.
08   As you're aware, in the context of a
09   deposition, if I ask you a question and you
10   don't understand it or hear it, you can let
11   me know that.  Right?
12        A.    Yes.
13        Q.    And we don't want you to guess
14   in response to any questions, but at times
15   you may give estimates.  You can give an
16   estimate as long as you're not guessing.
17   All right?
18        A.    Yes.
19        Q.    All right.  You are the
20   president of the Savogran Company?
21        A.    Yes.
22        Q.    And you're speaking here today
23   on behalf of the Savogran Company in
24   response to a Notice of Deposition that we
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, and lacks

MONIQUE, MARK
- (THOMAS) VOL 1
**Transcript of Monique, Mark**

# Monique, Mark

## Rhyne Trial Master

01    served?

02        A.    Yes.

03        Q.    And did you have an

04    opportunity to review that Notice of

05    Deposition?

06        A.    Yes.

07        Q.    And you are knowledgeable

08    about the topics that are addressed in the

09    Notice of Deposition?

10        A.    Yes.

11        Q.    Both through either your

12    personal knowledge or documents that you've

13    reviewed and people that you've spoken to to

14    learn about the history of The Savogran

15    Company?

16        A.    Yes.

17        Q.    Did you begin to work for The

18    Savogran Company in 1987?

19        A.    Yes.

20        Q.    And before you began to work

21    for The Savogran Company, did you obtain

22    your Bachelor of Science in 1985 from

23    Brittingham State College?

24        A.    Yes.

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, and lacks foundation.

> **Savogran** objects to this designation on the grounds that it is not relevant.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        Q.      Did you obtain your job with
02   The Savogran Company after being referred by
03   an employee of Ashland?
04        A.      Yes.
05        Q.      And was that gentleman's name
06   Warren Fish?
07        A.      Yes.
08        Q.      Warren Fish was a salesperson
09   employed by Ashland?
10        A.      Yes.
11        Q.      And your first boss at The
12   Savogran Company was a gentleman by the name
13   of John Gale?
14        A.      Yes.
15        Q.      And Mr. Gale had a
16   relationship with Warren Fish from Ashland?
17        A.      What kind of relationship?
18        Q.      Business relationship, whereas
19   Savogran was purchasing product from Ashland
20   at the time that you began to work for
21   Savogran.
22        A.      Savogran Norwood, yes.
23        Q.      And we'll talk about
24   Savogran's locations, but Savogran, when you
```

**Transcript of Monique, Mark**

01    began to work for the company, had its

02    headquarters in Norwood, Massachusetts?

03         A.    Yes.

04         Q.    And so what you're telling me

05    is that the Savogran Norwood, Massachusetts

06    facility was buying product from Ashland at

07    the time that you began to work with the

08    company in 1987?

09         A.    Yes.

10         Q.    And that was how Warren Fish,

11    the salesperson from Ashland, and John Gale,

12    your boss at Savogran, had a relationship?

13              MR. LEDGER:  Object.  Calls

14         for speculation.  If you know.

15              THE WITNESS:  Yes.

16    BY MR. DuPONT:

17         Q.    In fact, you learned from Mr.

18    Gale that Ashland was selling product to

19    Savogran; is that correct?

20         A.    I'm not sure I learned it from

21    Mr. Gale specifically.

22         Q.    Did you learn it from Mr.

23    Fish, that Ashland was selling product to

24    Savogran?

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01        A.    I don't -- don't remember
02   that kind of detail, you know.
03        Q.    I've had the opportunity to
04   take your deposition in the past.  Do you
05   remember that?
06        A.    Yes.  How can you forget that?
07        Q.    I'd like to refer you to some
08   of your testimony from the past to see if
09   that helps you remember.
10        A.    Sure.  What year was that?
11        Q.    So you gave a deposition in --
12   on July 21, 2016.
13        A.    Okay.
14        Q.    All right.  And --
15        A.    That was three years ago.
16        Q.    Yes.
17        A.    Okay.
18        Q.    So it's understandable that
19   there may be things that you don't remember
20   as well now as you did at that period of
21   time.
22        A.    I'll be 57 this year so, yes.
23        Q.    Okay.  So I'm going to hand to
24   you the transcript from your deposition and
```

Transcript of Monique, Mark

```
01    refer you to a portion of that transcript at
02    page 17.
03         A.      Okay.
04         Q.      And you'll see at page 17,
05    lines four to five, you're asked a question,
06    "Was Warren Fish selling Ashland products to
07    The Savogran Company?" And your answer was,
08    "Yes".  Do you see that?
09         A.      Yes.
10         Q.      And then you were asked the
11    question, "And how did you come to learn
12    that Warren Fish was selling products to The
13    Savogran Company?"  And your answer was
14    what?
15         A.      What line is that?
16         Q.      Sure.  We're looking at --
17         A.      My mind drifted for a minute
18    there.
19         Q.      Line seven, page 17 --
20         A.      Yeah, line seven.
21         Q.      Line seven.  You were asked
22    the question that, "How did you come to
23    learn that Warren Fish was selling products
24    to Savogran Company?"
```

**Transcript of Monique, Mark**

```
01              And your response was, "Well,
02    just when I -- I guess he told me -- I can't
03    really -- you know, don't know
04    specifically?"
05         A.    Right.
06         Q.    And then you're asked a
07    question on line 13, "You had a conversation
08    with Mr. Fish and you learned Mr. Fish was
09    selling products to The Savogran Company?"
10    And your answer was --
11         A.    "I would think so, yeah."
12         Q.    -- "I would think so, yeah."
13              Does that help you remember
14    that you had learned from Mr. Fish that
15    Ashland was selling product to The Savogran
16    Company?
17         A.    I think it's very similar to
18    the answer I just gave you.
19         Q.    Okay.
20         A.    Yeah.  I don't remember
21    specifically.
22         Q.    All right.
23         A.    Yeah.
24         Q.    Was it your -- your general
```

```
01    impression from discussions with Mr. Fish of
02    Ashland that Ashland had been selling
03    product to The Savogran Company?
04         A.    Yes.
05         Q.    In 1987, when you joined The
06    Savogran Company, were you a chemist?
07         A.    Yes.
08         Q.    And you held the position of
09    chemist for about a year, until 1988?
10         A.    Geez, I don't remember now, to
11    be honest with you.
12         Q.    Did you eventually take the
13    role of the technical director of The
14    Savogran Company?
15         A.    Yes.
16         Q.    And did you hold the role of
17    the technical director of The Savogran
18    Company until you became the president in
19    2007?
20         A.    Yes.
21         Q.    And you've been the president
22    of Savogran since 2007?
23         A.    Yes.
24         Q.    And just to help you remember,
```

**Savogran** objects to this designation on the grounds that it is not relevant and is vague and ambiguous.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   if you refer to page 22 of your deposition
02   from 2016, at line ten.
03        A.      I'm sorry.  Did you say page
04   22?
05        Q.      22.
06        A.      Okay.  Oh, I got it.  I'm
07   looking at the wrong page number.
08        Q.      Okay.  At the deposition, back
09   in 2016, you were asked the question, "And
10   then in 1987, you start with The Savogran
11   Company?"
12        A.      Uh-huh.
13        Q.      And your answer, like today,
14   was, "Yes."  Do you see that?
15        A.      Yes.
16        Q.      And then the next question
17   you're asked, "And you worked for The
18   Savogran Company from 1987 to the present?"
19   And your answer was "Yes" as well?
20        A.      Yes.
21        Q.      And then you're asked a
22   question, "You were first a chemist from
23   1987 until 19...", and then before the
24   question was finished you responded, "Till
```

Transcript of Monique, Mark

```
01    '88.  It was essentially the same job, just
02    a different title.  Yeah."
03              Do you see that?
04    A.    Yes.
05    Q.    Does that help you remember
06    that it was in 1988 that you transitioned to
07    the technical director of The Savogran
08    Company?
09    A.    Yes.
10    Q.    Okay.  Now, I want to talk to
11    you a little bit about the history of The
12    Savogran Company.  The Savogran Company
13    began to do business in 1875?
14    A.    Yes.
15    Q.    And it started off as an
16    alkali company that was making and selling
17    kind of granulated soaps?
18    A.    Yes.
19    Q.    They were used in some of the
20    textile industry in the Massachusetts area?
21    A.    Yes.
22    Q.    And Savogran was initially
23    located on what was called the India Wharf
24    in Boston?
```

**Savogran** objects to this designation on the grounds that it is not relevant, vague and ambiguous, lacks foundation and assumes facts not in evidence.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01          A.      Yes.
02          Q.      Did Savogran eventually get
03   into the business of manufacturing and
04   selling paint remover products?
05          A.      Yes.
06          Q.      And was Savogran actually one
07   of the first paint remover manufacturers in
08   the country?
09          A.      Yes.
10          Q.      And it started manufacturing
11   paint removers in 1938?
12          A.      Yes.
13          Q.      And, eventually, did Savogran
14   begin to manufacture a paint remover product
15   called Kutzit?
16          A.      Yes.
17          Q.      That's spelled K-U-T-Z-I-T?
18          A.      Yes.
19          Q.      Was the Kutzit product added
20   to the Savogran line some time between 1938
21   and 1949?
22          A.      I'm not sure.
23          Q.      I hand to you Exhibit 1 to
24   your deposition.
```

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, assumes facts not in evidence, and is not relevant.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01                    -  -  -
02              (Whereupon the document was
03         marked, for identification purposes,
04         as Monique Exhibit Number 1.)
05                    -  -  -
06   BY MR. DuPONT:
07         Q.      Take a moment and look at
08   that.
09         A.      (Complying with request.)
10         Q.      Is Exhibit 1 a collection of
11   marketing material from Savogran?
12         A.      They look like price lists.
13         Q.      And how are price lists used?
14         A.      That was the established price
15   of the product.
16         Q.      Were these price lists
17   provided to customers of Savogran?
18         A.      Yes.
19         Q.      The first of the price lists
20   that's marked as Exhibit 1 has an effective
21   date of July 15th, 1949?
22         A.      Yes.
23         Q.      And the Kutzit paint remover
24   product is one of the products that appears
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, assumes facts not in evidence, and is not relevant.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   on that July 15, 1949 price list?
02        A.    Yes.
03        Q.    And, so, you would agree with
04   me that at least by July of 1949 the Kutzit
05   product was a product being manufactured and
06   sold by Savogran?
07        A.    Yes.
08        Q.    Savogran had a few other paint
09   removers in its product line in the early
10   years?
11        A.    Yes.
12        Q.    And eventually it -- the
13   Savogran product line of paint removers grew
14   to about 12 products?
15        A.    I'm not sure it was ever that
16   big.
17        Q.    Somewhere between three and
18   12?
19        A.    Yes.
20        Q.    And there were other types of
21   products that Savogran sold as well.  There
22   was some tile grouts and patching compounds
23   and cleaners?
24        A.    Yes.
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, assumes facts not in evidence, and is not relevant.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01      Q.     Did The Savogran Company move
02 to its Norwood, Massachusetts facilities in
03 the 1950s?
04      A.     Yes.
05      Q.     And eventually it added
06 facilities in Addison, Illinois?
07      A.     Yes.
08      Q.     And was that a manufacturing
09 facility that was added in the 1950s?
10      A.     Yes.
11      Q.     And you see reference to the
12 price list here that there is a 60 West
13 Superior Street, Chicago, Illinois address
14 associated with Savogran?
15      A.     Yes.
16      Q.     And do you know what that
17 facility was?
18      A.     No.
19      Q.     If we look to the second page
20 of Exhibit 2 (sic), it has the Bates Number
21 Savogran 5 at the bottom and is dated
22 September 15, 1950.  There is also an
23 address that says, Chicago, but it's 85
24 Industrial Road, Addison, Illinois.

> Savogran objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, assumes facts not in evidence, and is not relevant.



MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01              So, by 1950, would you agree
02   that Savogran had the Addison, Illinois
03   facility?
04       A.    Yes.
05       Q.    Then there was also a
06   Los Angeles manufacturing facility that was
07   owned by Savogran's West Coast salesperson?
08       A.    No.
09       Q.    There was a Los Angeles
10   facility that was associated with Savogran;
11   is that fair?
12       A.    Yes.  Uh-huh.
13       Q.    And do you recall whether or
14   not that -- whether that was owned by
15   Savogran's west coast salesperson?
16       A.    I don't remember if it was
17   specifically a salesperson.  I'm not sure
18   what the relationship was there.
19       Q.    All right.
20       A.    Yeah.
21       Q.    Would you look at page 30 of
22   your deposition from --
23       A.    Yeah.
24       Q.    -- 2016?
```

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation and assumes facts not in evidence and calls for speculation.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01          A.      Uh-huh.
02          Q.      And see if we can help you
03   remember the relationship between the
04   Los Angeles facility and the salesperson.
05          A.      Okay.
06          Q.      Page 30 of that deposition,
07   line nine through 10, you're asked the
08   question, "And what type of facility was
09   Los Angeles."  And here we're talking about
10   the Los Angeles Savogran facility.
11          A.      Right.
12          Q.      So the question was, "And what
13   type of facility was Los Angeles?"  And your
14   answer was, "That was a very small
15   manufacturing facility and it wasn't -- like
16   I said, it wasn't actually owned by
17   Savogran.  It was owned by one of the -- it
18   was like a West Coast sales guy that owned
19   it."  Do you see that?
20          A.      Yes.
21          Q.      Does that help you recall that
22   it was a west coast salesperson that owned
23   the Los Angeles facility?
24          A.      Yeah.  Like I said, I'm not
```

**Transcript of Monique, Mark**

```
01    sure specifically -- you know, the west
02    coast sales guy, I'm not sure what the
03    relationship was.
04         Q.    All right.
05         A.    Yep.
06         Q.    Do you think that answer in
07    2016 was incorrect?
08         A.    It could have been.
09         Q.    And was there a -- a breakdown
10    in -- strike that.
11              Do you know when the Los
12    Angeles facility came into existence?
13         A.    I don't.
14         Q.    Do you know what the role of
15    the Los Angeles facility was?
16         A.    Yes.
17         Q.    What was that?
18         A.    Generally they were, you know,
19    selling Savogran products on the west coast.
20         Q.    And we have some documents
21    we're going to look at to explore that
22    relationship a little bit more.  But first I
23    want to give kind of a broader overview of
24    the company.
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01              So, at least by 1950, Savogran
02   had a manufacturing facility in Norwood,
03   Massachusetts and a manufacturing facility
04   in Addison, Illinois; is that right?
05        A.      Yes.
06        Q.      And what part of the country
07   did the Norwood, Massachusetts facility
08   manufacture product for sale in?
09                MR. LEDGER:   For what time
10        period?
11   BY MR. DuPONT:
12        Q.      Well, let's -- let's back up.
13   Did Savogran continue to manufacture product
14   at both the Norwood, Massachusetts and
15   Addison, Illinois facility during the 1960s
16   and 1970s?
17        A.      I don't know specifically when
18   Addison came online.
19        Q.      We looked at Exhibit 1 --
20        A.      Right.
21        Q.      -- the second page of that.
22   And it refers to Addison -- an Addison
23   Savogran facility on September 15, 1950.  Do
24   you see that?
```

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        A.      Yes.

02        Q.      All right.  Does that help you

03   remember that the Addison facility was at

04   least in place by 1950?

05        A.      Again, I don't -- I can't tell

06   you specifically when they -- when they

07   started there.  It's certainly on the -- on

08   the price list, but I have no idea what was

09   going on there.

10        Q.      The Addison facility was a

11   manufacturing facility; right?

12        A.      When I started in '87 it was,

13   yes.

14        Q.      Are you aware of the Addison

15   facility being used for anything besides

16   manufacturing?

17        A.      No.

18        Q.      And as we look through these

19   price lists that are marked as Exhibit 1, we

20   see reference to an Addison Savogran

21   facility in 1955, which is on Bates Number

22   5.

23              In 1960, which is Bates Number

24   6.
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01              In 1965, which is Bates Number
02   10.
03              In 1967, which is Bates Number
04   12.
05              In 1968, which is Bates Number
06   13.
07              In 1969, which is Bates Number
08   14.
09              In 1971, which is Bates Number
10   15.
11              In 1972, which is Bates Number
12   16.
13              In 1973, which is Bates Number
14   17.
15              In 1974, which is Bates Number
16   18.
17              And in 1976, which is Bates
18   Number 19 -- excuse me.  It's not on -- it's
19   not on page 19.  So let's stop with 1974.
20              So from at least 1950 through
21   1974, there's reference to a Savogran
22   Addison, Illinois facility; is that correct?
23        A.    Yes.
24        Q.    And do you know whether
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01    Savogran was manufacturing product at the

02    Addison, Illinois facility between 1950 and

03    1974?

04         A.    I don't.

05         Q.    Do you know when it was

06    Savogran began to manufacture product at the

07    Addison, Illinois facility?

08         A.    No.

09         Q.    We'll be able to get some

10    answers from some documents later on in your

11    testimony.  Was the Kutzit a product that

12    was manufactured at the Addison, Illinois

13    facility?

14         A.    When I started in 1987 it was.

15         Q.    And was the Kutzit product a

16    product that was manufactured in Norwood?

17         A.    Yes.

18         Q.    In the 1960s and 1970s, for

19    Kutzit product that was sold in California,

20    do you know where that was manufactured?

21         A.    I don't.

22         Q.    You can say with certainty

23    that Savogran manufactured Kutzit product at

24    the Norwood, Massachusetts facility in the

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    1960s and 1970s; is that fair?
02         A.      Definitely the seventies, yep.
03    Yes.
04         Q.      In the 1960s, where did
05    Savogran manufacture Kutzit product?
06         A.      I'm not sure.
07         Q.      In addition to the United
08    States, has Savogran also sold product in
09    the Caribbean?
10         A.      Yes.
11         Q.      In the 1950s through the
12    1970s, was the Kutzit product sold through
13    distributors?
14         A.      I have no direct knowledge of
15    that.   Yeah.
16         Q.      Was the Kutzit product sold by
17    small paint distributing companies in the
18    1950s through 1970s?
19         A.      Again, no -- no direct
20    information.
21         Q.      Do you recall testifying in
22    2016 that the Kutzit product was sold
23    through distributors in the 1950s through
24    1970s?
```

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence and calls for speculation.

```
01        A.      I don't.
02        Q.      Would you agree with me that
03   stores that sold paint related products and
04   solvent related products were the type of
05   stores that you would expect to find
06   Savogran products being sold in during the
07   1950s through 1970s?
08        A.      Yes.
09        Q.      And you've had the opportunity
10   to learn about Savogran's history prior to
11   1987 from records that you've reviewed?
12        A.      Generally.  There's not a lot
13   of records to -- to review.
14        Q.      You've also spoken with
15   employees who worked at Savogran before you,
16   including a gentleman named Tom Little?
17        A.      Yes.
18        Q.      And Tom Little began to work
19   for Savogran in 1972?
20        A.      Yes.
21        Q.      And you've spoken with other
22   individuals at Savogran to learn about its
23   history, including a John Gale and a Steve
24   McLean?
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence, calls for speculation, is inadmissible hearsay, calls for an expert opinion and is an incomplete hypothetical.



```
01        A.      Yes.
02        Q.      The -- I want to talk to you
03  some more about the Kutzit product.
04        A.      All right.
05        Q.      We know from Exhibit 1 that
06  the Kutzit product was a product being
07  manufactured and sold by Savogran by 1949;
08  correct?
09        A.      Yes.
10        Q.      And by 1963, is it your
11  understanding that the Kutzit product was
12  using benzene as an ingredient in the
13  product?
14        A.      I'm not sure.
15        Q.      I hand to you a document I'm
16  marking as Exhibit 2 to your deposition.
17                    -   -   -
18                (Whereupon the document was
19          marked, for identification purposes,
20          as Monique Exhibit Numbers 2 and 3.)
21                    -   -   -
22  BY MR. DuPONT:
23        Q.      Exhibit 2, is that a -- a
24  blend sheet for the Savogran product --
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, not relevant, lacks foundation, assumes facts not in evidence, calls for speculation, is inadmissible hearsay, calls for an expert opinion and is an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

Page 37

01   strike that.
02          Is Exhibit 2 a blend sheet for
03   the Savogran Kutzit product?
04          A.    Yes.
05          Q.    And does Exhibit 2 indicate
06   that benzene, or benzol, as the term is
07   there, is an ingredient in the Kutzit
08   product as of May 10, 1963?
09          A.    Yes.
10          Q.    And what is your understanding
11   of what the benzol was?
12          A.    A solvent.
13          Q.    And is benzol a synonym for
14   benzene?
15          A.    Yes.
16          Q.    So, looking at this blend
17   sheet -- incidentally, a blend sheet is
18   basically instructions for how to
19   manufacture the product?
20          A.    It's the formula, you know --
21   you could see that, you know, Kutzit was a
22   very thin product.  It didn't have any
23   viscosity.  You know, it was not like a
24   waffle or a pancake mix.  And it also had a

**Savogran** objects to this designation on the grounds that it is not relevant, lacks foundation, vague and ambiguous, and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01    little bit of dye in it, which made it blue.

02    So it wasn't clear product.

03                    MR. DuPONT:  Well, I'll move

04          to strike the nonresponsive portion

05          of the answer.

06    BY MR. DuPONT:

07          Q.      The blend sheet were

08    instructions to the manufacturing facility

09    as to how to make the product using the

10    product formula; is that fair?

11          A.      Yes.

12          Q.      And one of the instructions

13    given to the Savogran manufacturing facility

14    as to how to make the Kutzit product was to

15    use benzol as an ingredient; right?

16          A.      Yes.

17          Q.      And in this blend sheet there

18    are the ingredients listed and the number of

19    gallons of each ingredient to put into the

20    product; is that fair?

21          A.      Yes.

22          Q.      And the benzol ingredient in

23    the Kutzit product, as we've discussed in

24    the past, was in the range of 50 to

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous as to which blend sheet, lacks foundation, calls for speculation, witness lacks personal knowledge and the document speaks for itself.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   55 percent of the Kutzit product?
02         A.      Yes.
03         Q.      And by looking through
04   formulas in the past, and advertisements for
05   the product Kutzit in the past, is it your
06   understanding that Kutzit had benzene as an
07   ingredient in it in that range of 50 to
08   55 percent from at least May 10, 1963 until
09   some point in time around 1962 or 1973?
10         A.      You said 1962 or 1973.
11         Q.      Thank you.  I'm tired.
12                 Based on your review of
13   Savogran's historic formulas and marketing
14   materials for the Kutzit product, it's your
15   understanding that the Kutzit product had
16   benzene as an ingredient at a percentage of
17   50 to 55 percent from at least May 10, 1963
18   until some time around 1972 or 1973?
19         A.      I wouldn't say May 10th
20   specifically.  I would say some time, you
21   know, post -- you know, late in '63 most
22   likely.
23         Q.      And why do you say some time
24   late in 1963?
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous as to which blend sheet, lacks foundation, calls for speculation, witness lacks personal knowledge and the document speaks for itself.



MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01         A.      Well, just because the formula
02  is dated May 10th, '63 doesn't necessarily
03  mean it was put into production on that day.
04         Q.      Now, we've discussed in the
05  past that there is an earlier version of a
06  formula for the Kutzit product, and that
07  that is from October 2 of 1956.  Is that
08  correct?
09         A.      Yes.
10         Q.      And that version of the
11  formula does not list benzene as an
12  ingredient on October 2 of 1956; is that
13  right?
14         A.      Yes.
15         Q.      And in the past what you've
16  told me was that you didn't know if that was
17  a formula that was actually used by
18  Savogran.  Do you remember that?
19         A.      Yes.
20         Q.      And I think you had told me
21  that it was your understanding that
22  methylene chloride was an ingredient that
23  was used instead of benzene before 1963.
24         A.      No, that was after 1973.
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge and the document speaks for itself.

MONIQUE, MARK
- (THOMAS) VOL 1
**Transcript of Monique, Mark**

```
01        Q.       Okay.   Methylene chloride was
02   not used as an ingredient in the Kutzit
03   product before 1963?
04        A.       I don't know.
05        Q.       In the past, when we discussed
06   the history of the Kutzit product, you were
07   not certain as to when, between 1956 and
08   1963, benzene started to be used as an
09   ingredient.  Do you remember that?
10        A.       Yes.
11        Q.       All right.  Are you still
12   uncertain as to when exactly between 1963 --
13   excuse me, strike that.
14             Do you agree that it's
15   possible that benzene was used as an
16   ingredient in the Kutzit product before
17   1963?
18             MR. LEDGER:  Objection, calls
19        for speculation.
20             THE WITNESS:  The record
21        doesn't show that.
22   By MR. DuPONT:
23        Q.       Does the record show when
24   exactly Savogran began to use benzene as an
```

Savogran objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark
### Rhyne Trial Master

```
01    ingredient in the Kutzit?
02          A.     Yes.
03          Q.     And when is that?
04          A.     Look at the -- look at -- pull
05    up the labels that you have.
06          Q.     So you would refer to one of
07    the labels on the Kutzit product --
08          A.     Yes.
09          Q.     -- as an indication of when
10    benzene was first used as an ingredient in
11    the product?
12          A.     Yes.
13          Q.     And would that be the
14    November 19, 1963 version of the label?
15          A.     Is that the earliest one you
16    have?
17          Q.     Let's look at that for a
18    moment.  I've handed you the November 1963
19    version of the Kutzit label; is that
20    correct?
21          A.     Yes.
22          Q.     And it's November 19, 1963?
23          A.     Yes.
24          Q.     All right.  And that's a
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01 document that you would look at and say that
02 benzene for sure was being used as an
03 ingredient in the Kutzit product by this
04 period of time?
05     A.      Some time after that, yes.
06     Q.      Looking back at Exhibit 2, the
07 blend sheet for the Kutzit product in May 10
08 of 1963, nothing on this document says that
09 this is a new formula for Kutzit; correct?
10           MR. LEDGER:  I object.  The
11      document speaks for itself.
12           THE WITNESS:  There is nothing
13      on it that says new, yeah.
14 BY MR. DuPONT:
15     Q.      All right.  And this is in the
16 format of a -- of a batch ticket, the
17 instructions to the manufacturing facility
18 as to how to actually make the Kutzit
19 product; correct?
20     A.      It's a formula.
21     Q.      And the formula is on a -- on
22 a what you would call a batch ticket or
23 batch card, which are the instructions to
24 the manufacturing facility?

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and witness lacks personal knowledge.



```
01        A.      I don't know if I'd call it a
02  batch card.  It was a formula.
03        Q.      And, at some point in time,
04  Savogran decided to remove the benzene as an
05  ingredient from the Kutzit and replace it
06  with methylene chloride?
07        A.      Yes.
08        Q.      And was the methylene chloride
09  a better chemical for a paint remover?  In
10  other words, did it do a better job of
11  removing paint?
12            MR. LEDGER:  Object.  It's
13            calling for speculation.
14            THE WITNESS:  I've never
15            compared the -- the -- this 1963
16            formula to the -- to the methylene
17            chloride formula.
18  BY MR. DuPONT:
19        Q.      Methylene chloride is a
20  smaller molecule than benzene?
21        A.      Yes.
22        Q.      And since methylene is a
23  smaller molecule than benzene, it can
24  penetrate the paint, or other coating,
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, and witness lacks personal knowledge.

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   better than benzene?
02              MR. LEDGER:   Object, calls for
03          speculation.   Incomplete
04          hypothetical.
05              If you know.
06              THE WITNESS:   I don't know.
07          Like I said, I've never tested that
08          formula.
09   BY MR. DuPONT:
10       Q.    Sir, do you remember, when you
11   gave your deposition in 2016, telling me
12   that the methylene chloride was a better
13   paint remover than benzene because it was a
14   smaller molecule and it could penetrate
15   better?
16       A.    I don't.
17       Q.    Would you take a look at page
18   46 to your deposition from 2016, please?
19       A.    (Complying with request.)
20       Q.    Page 46, lines four to five,
21   in 2016 you're asked the question: "What was
22   used instead of benzene before 1963 in
23   Kutzit?"  Do you see that?
24       A.    Uh-huh.  Yes, sorry.
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        Q.       And would you read what your
02   answer was, please?
03        A.       So starting on line six?
04        Q.       Correct.
05        A.       "Methylene chloride is the
06   difference in the -- methylene chloride and
07   toluene are the difference.  But we'd have
08   to know what the solvent PM 4088 is on the
09   May 1963 formula, which, if you took a look
10   at the label that corresponds to this 1963
11   label, then we can figure out what the
12   ingredients were and then compare it to the
13   formula here."
14        Q.       So part of your answer in 2016
15   was that before 1963 methylene chloride was
16   being used instead of benzene?
17        A.       No.
18        Q.       Okay.  So, when you're asked
19   the question, what was used instead of
20   benzene before 1963 in Kutzit, your answer
21   was, "Methylene chloride is the difference
22   in the -- methylene chloride and toluene are
23   the difference;" is that what you're saying?
24        A.       No.  I don't know what I was
```

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

01 saying. That doesn't make any sense.

02     Q.    Okay. The next question

03 you're asked in 2016 is, "Was methylene

04 chloride an effective substitute for benzene

05 in the paint remover product?" And what was

06 your answer at that time?

07     A.    On line 18?

08     Q.    Correct.

09     A.    "It was a much more effective

10 replacement for benzene."

11     Q.    And then the next question

12 you're asked is, "So methylene chloride

13 actually worked a lot better than benzene

14 for paint removing?" And your answer was?

15     A.    "I've never actually worked

16 with a benzene remover, so I guess wouldn't

17 be qualified to say that."

18     Q.    And the next question you're

19 asked on page 47, line two, was: "Based on

20 your understanding of the chemical

21 properties of benzene and methylene chloride

22 as a chemist, what makes methylene chloride

23 a much better substitute for paint remover

24 products than benzene?" And what was your

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

> **Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, misstates testimony, the witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  answer?

02          A.      "It's a real small molecule.

03  So it has a real good ability to diffuse

04  through the paint film."

05          Q.      And the next question you were

06  asked was:  "And why is that important for

07  paint removers?"

08          A.      "Well, it gets through the --

09  it gets through the paint film and releases

10  the bond between the paint and the

11  substrate."

12          Q.      And, again, with reference to

13  methylene chloride, you were asked the

14  question:  "And that helps the product work

15  better in removing paint?"  And your answer

16  was?

17          A.      "Correct."

18          Q.      So, in 2016, what you told us

19  was that the methylene chloride was a real

20  small molecule, which gave it a good ability

21  to diffuse through the paint film.  And that

22  made it a much more effective replacement

23  for benzene?

24                  MR. LEDGER:  Object.  It's

**Savogran** objects to this designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, misstates testimony, the witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01              misstating his testimony.
02  BY MR. DuPONT:
03         Q.     Is that correct?
04         A.     No.  I mean, you're -- you're
05  kind summarizing things there.
06         Q.     Right.
07         A.     You know.
08         Q.     All right.  Well, you
09  certainly said that methylene chloride was a
10  real small molecule; that it has a real good
11  ability to diffuse through the paint film;
12  and that -- that allows the methylene
13  chloride to get through the paint film and
14  releases the bond between the paint and
15  substrate; right?
16         A.     Yes.
17         Q.     All right.  And when you were
18  asked the question whether methylene
19  chloride was an effective substitute for
20  benzene in the paint remover product, your
21  answer was that it was a much more effective
22  replacement for benzene; right?
23         A.     Right.
24         Q.     Now, in 1973, we see for the
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    first time that there is a formula of the

02    Kutzit product that lists methylene chloride

03    instead of benzene.  I have marked that as

04    Exhibit 4.

05                       -  -  -

06              (Whereupon the document was

07         marked, for identification purposes,

08         as Monique Exhibit Number 4.)

09                       -  -  -

10    BY MR. DuPONT:

11         Q.     Do you see that?

12         A.     Yes.

13         Q.     And when we've spoken about

14    this formula in the past, what you told me

15    was that you did not know how long after

16    November 16, 1973 this formula went into

17    production?

18         A.     Yeah, I don't remember that.

19         Q.     Would you turn to page 56 of

20    your deposition?

21         A.     Absolutely.

22         Q.     You're asked the question, at

23    line 17: "So this formula is dated

24    November 16, 1973, that has methylene
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01    chloride in it; right?"
02             And your answer was, "Yes."
03    Is that correct?
04         A.    Yes.
05         Q.    And you were then asked the
06    question:  "And it's referred to as the new
07    Kutzit; right?"
08         A.    Yes.
09         Q.    Indeed, if we look at Exhibit
10    4, the November 16, 1973 formula for Kutzit
11    says, "New Kutzit" at the top; right?
12         A.    Yes.
13         Q.    Then the next question you
14    were asked, at line 24, is, "So that's when
15    this formula presumably was written,"
16    meaning November 16, 1973.  And then the
17    question, "Do you know when the formula was
18    actually first used after November 16, 1973
19    to manufacture Kutzit?"
20             And your answer at that time
21    in 2016 was, "No."  Is that correct?
22         A.    Yes.
23         Q.    Is it still your testimony
24    today that you don't know when, after
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

## Rhyne Trial Master

| | |
|---|---|
| 01 | November 16, 1973, this formula on Exhibit 4 |
| 02 | with methylene chloride instead of benzene |
| 03 | was first actually manufactured? |
| 04 | A. Correct. |
| 05 | Q. In the 1960s, did the label |
| 06 | for the Kutzit product have the colors, |
| 07 | blue, white and orange on it? |
| 08 | A. I'm not sure. |
| 09 | Q. In the 1970s, did the labels |
| 10 | for the Kutzit product have the colors red, |
| 11 | white and blue on it? |
| 12 | A. Not sure. |
| 13 | Q. We could look at the proofs |
| 14 | for the Kutzit labels and find information |
| 15 | about what colors were on them? |
| 16 | A. Yes. |
| 17 | Q. I'm going to mark a proof for |
| 18 | a Kutzit label as Exhibit 5. And that's |
| 19 | Bates Number Lee-Savogran 71. |
| 20 | - - - |
| 21 | (Whereupon the document was |
| 22 | marked, for identification purposes, |
| 23 | as Monique Exhibit Number 5.) |
| 24 | - - - |

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, witness lacks personal knowledge, calls for an expert opinion and an incomplete hypothetical.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    BY MR. DuPONT:
02         Q.    And on this proof -- and when
03    we say proof for a label, is this basically
04    the copy of the label that was exchanged
05    between Savogran and the company that
06    printed the label for it?
07         A.    Yes.
08         Q.    And at the bottom left-hand
09    corner of this proof of the Kutzit label,
10    you see that there's some notes there?
11         A.    Yes.
12         Q.    And in those notes there's a
13    category for colors, where it's written blue
14    and orange?
15         A.    Yes.
16         Q.    And this proof is dated
17    November 19, 1963?
18         A.    Yes.
19         Q.    So that's an indication to you
20    that there was blue and orange on the label
21    of the Kutzit product in the 1960s?
22         A.    Yes.
23                        -  -  -
24              (Whereupon the document was
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01              marked, for identification purposes,
02              as Monique Exhibit Number 6.)
03                  -  -  -
04  BY MR. DuPONT:
05          Q.      I'm going to hand to you
06  Exhibit 6 to your deposition, which is Bates
07  Number Lee-Savogran 72.
08                  Is Exhibit 6 to your
09  deposition also a proof for a Kutzit label,
10  dated February 14, 1969?
11          A.      Yes.
12          Q.      And that proof also has notes
13  indicating that there was white, orange and
14  blue on the label of the Kutzit product in
15  1969?
16          A.      Yes.
17          Q.      So, from looking at these two
18  labels we can tell that between 1963 and
19  1969 the color scheme for the Kutzit label
20  included orange, blue and white?
21          A.      Yes.
22
23
24
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

Page 55

```
01                    -   -   -
02              (Whereupon the document was
03         marked, for identification purposes,
04         as Monique Exhibit Number 7.)
05                    -   -   -
06   BY MR. DUPONT:
07         Q.      I'm going to hand to you
08   Exhibit 7 to your deposition.  Is Exhibit 7
09   a August 27, 1973 version of the Kutzit
10   label?
11         A.      Yes.
12         Q.      At least it's the proof from
13   August 27, 1973?
14         A.      Yes.
15         Q.      All right.  And you've
16   actually in the past read through this label
17   and indicated that it was a white background
18   with red and blue on the label?
19         A.      Yes.
20         Q.      And you've drawn -- that's
21   your handwriting on this document, where
22   there's a horse on the label that's outlined
23   with writing and at the top it's written
24   "Red"?
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        A.      Yes.

02        Q.      And that corresponds to the

03   back panel of the Kutzit?

04        A.      Yes.

05        Q.      So the back panel had red on

06   it?

07        A.      I'm not sure at this point,

08   sitting here today.

09        Q.      All right.

10        A.      Yeah.

11        Q.      On the front of the label --

12   back in 2016, you looked at this exhibit and

13   you bracketed a portion of the label on the

14   front of the product and wrote "Blue"?

15        A.      Yes.

16        Q.      That was to indicate that that

17   portion of the label had blue on it?

18        A.      Yes.

19        Q.      And below that portion of the

20   label you bracketed an area and wrote "Red"

21   next to it?

22        A.      Yes.

23        Q.      And that was to indicate that

24   the writing in that area of the front of the
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

## Rhyne Trial Master

01   label was in red?

02       A.    Yes.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

03       Q.    Now, has your understanding of

04   the color scheme of the Kutzit product in

05   the 1970s changed, or is it still your

06   understanding that it was a red, white and

07   blue color scheme in the 1970s?

08       A.    Just going based on what's

09   written here with the white, red and the

10   blue.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and an incomplete hypothetical.

11       Q.    So it's still your

12   understanding, in the 1970s, the product had

13   a red, white and blue color scheme?

14       A.    Yes.

15       Q.    And that in the 1960s, at

16   least between '63 and '69, it had an orange,

17   blue and white color scheme?

18       A.    Yes.  That's what the record

19   shows.

20       Q.    And Savogran has been the one

21   that was responsible for preparing the

22   actual language on the Kutzit label;

23   correct?

24       A.    Uh-huh.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge.

**Transcript of Monique, Mark**

```
01                    MR. LEDGER:  Object.
02        Vague as to time.  Are you referring
03        to the sixties?
04   BY MR. DuPONT:
05        Q.    Sir, during the 1960s and the
06   1970s, it was Savogran that prepared the
07   language on the label of the Kutzit
08   products?
09                    MR. LEDGER:  Object.  It's
10        calling for speculation.  If you
11        know.
12                    THE WITNESS:  I don't know.
13   BY MR. DuPONT:
14        Q.    In the 1970s, was it Savogran
15   that prepared the language on the label for
16   the Kutzit product?
17                    MR. LEDGER:  Object.  It's
18        calling for speculation.
19                    THE WITNESS:  I don't know.
20   BY MR. DuPONT:
21        Q.    Let's see if I could turn your
22   attention to page 68 of your deposition from
23   2016.
24        A.    What page?
```

**Transcript of Monique, Mark**

```
01        Q.      Page 68, please.
02                On page 68 you were asked the
03   question, on line 22, "Who at The Savogran
04   Company, during the 1960s and 1970s, was
05   responsible for preparing label language?"
06                And your answer was, "I'm not
07   certain."
08        A.      No.
09        Q.      Excuse me.  Your answer was,
10   "I'm not sure."
11        A.      Correct.
12        Q.      Okay.  Then, if we could turn
13   to page 70.
14        A.      (Complying with request.)
15        Q.      All right.  So -- strike that.
16                So, what you're saying here
17   today is, you just don't know who actually
18   prepared the language on the label of the
19   Kutzit product during the 1960s and 1970s?
20        A.      Yes.
21        Q.      Do you have any information to
22   suggest that it was any person not employed
23   by Kutzit, or any company separate from
24   Kutzit that prepared the language on the
```

**Transcript of Monique, Mark**

```
01   label for the Kutzit product?
02        A.    Kutzit is not a company.
03        Q.    Correct.  Let me re-ask the
04   question because perhaps I didn't ask it
05   clearly.
06             Do you have any information to
07   suggest that a person or company other than
08   Savogran prepared the language -- actually
09   determined what language would go on the
10   label of the Kutzit product during the 1960s
11   and 1970s?
12        A.    No knowledge of that.
13        Q.    Did Savogran have any
14   industrial hygienists that worked for it in
15   the 1960s and 1970s?
16        A.    I don't know.
17        Q.    Did Savogran have any
18   toxicologists that worked for it in the
19   1960s and 1970s?
20        A.    Don't know.
21        Q.    Did Savogran have anybody
22   qualified in the area of occupational health
23   or occupational medicine in the 1960s and
24   1970s?
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge.

```
01          A.        Don't know.
02          Q.        Did Savogran consult with any
03   professionals that were not employed by it
04   who were qualified in the areas of
05   industrial hygiene, toxicology, occupational
06   health, in the context of preparing product
07   labels?
08          A.        Don't know.
09          Q.        What's your understanding of
10   what the process for manufacturing the
11   Kutzit product was in the 1960s and 1970s?
12          A.        I don't know.
13          Q.        Did the Norwood, Massachusetts
14   facility have storage tanks for storing
15   chemicals used in the process of blending
16   the Kutzit product in the 1960s and 1970s?
17          A.        I'm not sure.
18          Q.        What's your understanding of
19   how Savogran received chemical ingredients
20   used in the Kutzit product during the 1960s
21   and 1970s?
22          A.        Not sure.
23          Q.        How did Savogran manufacture
24   the Kutzit product in 1987, when you began
```

Transcript of Monique, Mark

```
01   with the company?
02        A.    So it's -- when I started with
03   the company -- excuse me -- the main
04   ingredients, the acetone, the methanol, the
05   toluene, the methylene chloride, came in
06   tank wagons.  And the material -- the raw
07   materials were loaded into underground
08   storage tanks.
09             And then the products, you
10   know, the individual raw materials are, you
11   know, pumped out of the underground storage
12   tank and into mixing kettles.
13             The wax gets melted and the
14   solvents get blended together.  The dye gets
15   added to make it blue.  And then it gets
16   pumped over to a holding kettle, where it
17   then gets put into the smaller containers,
18   packaged.
19        Q.    And is it your understanding
20   that the Kutzit product, when it contained
21   benzene as an ingredient, was manufactured
22   both at Savogran's Norwood, Massachusetts
23   facility and its Illinois facility?
24        A.    No, I don't know specifically.
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

Page 63

```
01        Q.      Would you do me a favor and
02   take a look at page 72 of your deposition --
03        A.      Okay.
04        Q.      -- from 2016?
05        A.      Yep.
06        Q.      In 2016 you were asked the
07   question, "Is it your understanding though
08   that the Kutzit with benzene in it, as an
09   ingredient, was manufactured both at
10   Savogran's Norwood, Massachusetts facility
11   as well as at its Illinois facility?"
12              And your answer was, "Yes."
13        A.      Yes.  Uh-huh.
14        Q.      Now, does that help you recall
15   that the Kutzit with benzene as an
16   ingredient was manufactured both at the
17   Norwood, Massachusetts Savogran facility and
18   Savogran's Illinois facility?
19        A.      Yes.
20        Q.      Now, in the 1960s and 1970s,
21   was there a breakdown geographically of
22   which products -- which -- strike that.
23              In the 1960s and 1970s, did
24   Savogran's Norwood, Massachusetts facility
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   service certain geographic areas and its
02   Illinois facility service others?
03         A.    I'm not sure.
04               MR. LEDGER:  What time is it?
05               MR. DuPONT:  It is twelve
06         o'clock.
07               MR. LEDGER:  Let's break.
08               MR. DuPONT:  That's great.
09               VIDEO TECHNICIAN:  The time is
10         12:00.  We're off the record.
11               (Whereupon there was a recess
12         in the proceeding.)
13               VIDEO TECHNICIAN:  This is the
14         beginning of media unit two.  We're
15         back on the record.  The time is
16         12:37 p.m.
17   BY MR. DuPONT:
18         Q.    Sir, before we took a break
19   for lunch I was asking you about your
20   understanding of how the Kutzit product was
21   manufactured, at least based on your time
22   working at Savogran.  And I believe you had
23   indicated that there were underground
24   storage tanks that were at the Norwood,
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01 Massachusetts facility that received

02 ingredients of the product that came in --

03 was it tank wagons, the term that you used?

04     A.    Yes.

05     Q.    All right.  Are tank wagons

06 the type of truck with a tank on the back of

07 it?

08     A.    Correct.

09     Q.    And the ingredients were

10 stored in the underground storage tank and

11 then they were transferred to mixing tanks?

12     A.    Yes.

13     Q.    And then from the mixing

14 tanks, that's where the ingredients of the

15 Kutzit product were blended?

16     A.    Yes.

17     Q.    And then, once blended, the

18 Kutzit product was transferred -- that blend

19 was transferred to holding kettles?

20     A.    A holding kettle.

21     Q.    A holding kettle?

22     A.    Yes.

23     Q.    And during this process there

24 was wax added to the Kutzit product?

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        A.      Yes.
02        Q.      Okay.  And the purpose of the
03   wax was to give the -- give the product a
04   property so that the solvent ingredients,
05   such as benzene, stayed on the surface of
06   the product while it was working into the
07   paint and removing the paint?
08              MR. LEDGER:  Object.  This
09        calls for speculation.  Calls for
10        expert opinion.
11              THE WITNESS:  Simpler -- more
12        simply, it just retards evaporation.
13   BY MR. DuPONT:
14        Q.      Okay.  It slows evaporation?
15        A.      Right, right.
16        Q.      And the reason it wants to do
17   that is to keep the solvent on the surface
18   to eat away at the -- at the paint?
19              MR. LEDGER:  Object.  Calls
20        for speculation.  If you know.
21              THE WITNESS:  Yes.
22   BY MR. DuPONT:
23        Q.      Even though the process for
24   the evaporation is slowed down, the solvent
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

### Rhyne Trial Master

| | |
|---|---|
| 01  ingredients of the Kutzit product are still<br>02  evaporating off the product?<br>03       A.     Yes.<br>04       Q.     And you know, from your<br>05  experience as a chemist, that benzene itself<br>06  has a very fast evaporation rate? | **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. |

```
01  ingredients of the Kutzit product are still
02  evaporating off the product?
03          A.      Yes.
04          Q.      And you know, from your
05  experience as a chemist, that benzene itself
06  has a very fast evaporation rate?
07                  MR. LEDGER:  I'll object.
08          Vague and ambiguous as to fast.
09                  THE WITNESS:  I actually don't
10          know the evaporation rate of benzene.
11          I can't say I really know.
12  BY MR. DuPONT:
13          Q.      Okay.  Now, when we spoke
14  before you had indicated to me that when it
15  comes to storing ingredients in the
16  underground storage tanks for the Savogran
17  products, it was the practice of Savogran to
18  use up all the ingredients in a particular
19  tank so to deplete that tank before ordering
20  a new shipment of  -- or receiving a new
21  shipment of ingredient; is that correct?
22          A.      Well, they would run --
23  normally run the tank down because it only
24  has so much storage capacity before you
```

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   purchase more.
02         Q.    All right.
03         A.    Yeah, uh-huh.
04         Q.    So when we met the last time,
05   back in 2016, we had -- I asked you
06   questions about suppliers to Savogran, and
07   you had information about some periods of
08   time, but not others.  And we didn't have
09   some of Savogran's records available during
10   that deposition.  Do you remember that?
11         A.    Vaguely.
12         Q.    Okay.  So, I'll refer you to
13   your -- first of all, I'll refer you to the
14   -- some documents that were produced to us
15   by Savogran in this case under a March 11,
16   2019 letter from your counsel.  And they
17   have Bates Number 123 through 126 on them.
18               I'll mark the cover letter
19   with -- the Bates numbered document as
20   Exhibit 8 to your deposition.
21                   -  -  -
22               (Whereupon the document was
23         marked, for identification purposes,
24         as Monique Exhibit Number 8.)
```

**Transcript of Monique, Mark**

```
01                    -  -  -
02   BY MR. DuPONT:
03        Q.      And I'd like you to take a
04   minute to look at the pages 123 through 126,
05   and then I'll have some questions for you
06   about them.   Okay?
07        A.      Okay.
08             MS. BONNEVILLE:   Andrew, can
09        you repeat the Bates numbers, please?
10             MR. DuPONT:   123 through 126.
11             MS. BONNEVILLE:   Thank you.
12   BY MR. DuPONT:
13        Q.      All right.  So, we're looking
14   at Exhibit 8 and, in particular, the
15   document Bates Numbered 123 through 126.
16   Can you identify for us what those documents
17   are?
18        A.      Those are some old purchase
19   records that we found for the Norwood, Mass.
20   location.
21        Q.      Who found these?
22        A.      Oh, I did.
23        Q.      How did you find them?
24        A.      They were in the corner of the
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    warehouse, you know.
02         Q.      What were they in?
03         A.      They were in a metal storage
04    container.
05         Q.      When did you find them; do you
06    remember?
07         A.      I don't.  I don't.
08         Q.      Okay.  So I'll represent to
09    you that when I took your deposition in July
10    of 2016 we did not have these records
11    produced to us yet.
12         A.      Okay.
13         Q.      And then on March 21 of 2017,
14    a copy of these records were sent to my
15    office in another case, the case of the
16    Estate of Jack Edgar Lee.  Okay?
17         A.      Okay.
18         Q.      So, does that help you
19    remember that it was at some time between
20    July of 2016 and March of 2017 that you
21    located the records that are marked as
22    Exhibit 8?
23         A.      Not really.
24         Q.      Okay.
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1
**Transcript of Monique, Mark**

```
01        A.      I'm sorry.

02        Q.      All right.

03        A.      Yeah.

04        Q.      Fair enough.

05        A.      But we did find them.

06        Q.      So, was there somebody else

07   who participated in searching for -- in

08   conducting the search that led to the

09   records of Exhibit 8?

10        A.      There wasn't a search.  We

11   just came across them. Yeah.

12        Q.      Okay.

13        A.      Yeah.

14        Q.      So, there wasn't an active

15   search, you just happened to come across

16   them?

17        A.      Absolutely.

18        Q.      Great.  And that was in a

19   metal storage container?

20        A.      Yes.

21        Q.      In the corner of the Norwood,

22   Massachusetts warehouse?

23        A.      Yes.

24        Q.      Why were you looking in that
```

**Transcript of Monique, Mark**

01  container?

02        A.      I wasn't necessarily looking

03  in it, but it was -- it looked like

04  something I had seen before, when I first

05  started working there, from the -- there's

06  was a woman that since passed away.  We'll

07  get that question out of the way.  Helen

08  Kowalski, that sat at the front of the

09  office in Norwood that would do the ordering

10  for John Gale.  And I recognized it as a

11  filing cabinet that used to sit next to her

12  desk.

13        Q.      Okay.  So, when you started

14  working for The Savogran Company there was a

15  filing cabinet that was next to Ms. Helen

16  Kowalski's desk?

17        A.      Correct.

18        Q.      And Ms. Kowalski had the

19  responsibility of ordering product under the

20  direction of John Gale?

21        A.      Yes.

22        Q.      And John Gale was your boss

23  when you started at The Savogran Company?

24        A.      Yes.

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01        Q.      And he was the gentleman that
02   had the relationship with -- is it Mr. Fish
03   from Ashland?
04        A.      Yes.
05        Q.      Who was the salesperson for
06   Ashland?
07        A.      Yes.
08        Q.      All right.  And so you
09   recognized that the cabinet that was in the
10   corner of the warehouse was the same cabinet
11   that was next to Ms. Kowalski's desk?
12        A.      Yes.
13        Q.      And so you decided to look
14   through it?
15        A.      Absolutely.
16        Q.      And what did you find in that
17   cabinet?
18        A.      These documents.
19        Q.      How were they kept?  Were they
20   in a book; were they individual pages?
21        A.      No, they were big cards.
22   Probably something like that (indicating).
23        Q.      Okay.  Now, when you said,
24   "like that," I can see it and the video can
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    see, but describe with your words what the
02    dimensions were --
03         A.    Probably two by two.
04         Q.    Two foot by two foot cards?
05         A.    Yeah, yes.
06         Q.    And did you -- did Savogran
07    provide us with copies of all the cards that
08    you found or only certain ones?
09         A.    No.  I mean, it had the card
10    in there on stuff like making the tile grout
11    and making like TSP cleaner.  Just, you
12    know, stuff that wasn't germane to any of
13    this.
14         Q.    Okay.
15         A.    You got all the stuff that was
16    germane to what we've been discussing.
17              (Discussion held off the
18              record.)
19    BY MR. DuPONT:
20         Q.    So, in this filing cabinet you
21    found cards that related to -- some of which
22    related to the Kutzit product, some of which
23    related to other products?
24         A.    Correct.
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge and calls for expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        Q.       And for those ones that
02  related to the Kutzit product, how did you
03  determine that they were related to the
04  Kutzit product?
05        A.       With benzene.
06        Q.       That was the only product that
07  Savogran used benzene as an ingredient in?
08        A.       Yes.
09        Q.       So did you provide to
10  Savogran's counsel all of the cards with
11  information about the benzene on them?
12        A.       Yes.
13        Q.       And is that what's attached to
14  as Exhibit 8 to your deposition?
15        A.       Yes.
16        Q.       What time period do the cards
17  that you found relate to?
18        A.       So these cards have dates of
19  '72 and '73 on them.
20        Q.       Do you know when Ms. Kowalski
21  started to work at Savogran?
22        A.       No, I don't.  No.
23        Q.       Do you know if she worked at
24  Savogran before 1972?
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge and calls for expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        A.     Not sure.
02        Q.     So, these are likely -- most
03  likely not the only records that Savogran
04  has ever had about purchasing benzene, but
05  they at least relate to the period of '72
06  and '73?
07             MR. LEDGER:  Object.  Calls
08        for speculation.
09             THE WITNESS:  Yeah.  I
10        wouldn't know that, but yeah.
11  BY MR. DuPONT:
12        Q.     But you're not -- you're not
13  able to say that these were the only records
14  that Savogran ever had about buying benzene?
15        A.     These are the records that I
16  found.
17        Q.     Okay.
18        A.     Yeah, and this is from
19  Norwood.  It's not -- this is a case in
20  California; right?
21        Q.     Correct.
22        A.     Yeah. Not quite sure where
23  you're going with this, but I guess we'll
24  find out.
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

Case 3:18-cv-00197-RJC-DSC Document 311-8 Filed 09/02/20 Page 78 of 245
Case 3:18-cv-00197-RJC-DSC Document 488-1 Filed 09/15/20 Page 1163 of 1330

```
01        Q.       How do you know that these
02   records related to Norwood?
03        A.       Because they were in the, you
04   know, the Norwood purchasing file that I
05   found.  Yeah.
06        Q.       Describe that for me.
07        A.       The file?
08        Q.       Yes.
09        A.       It's a metal box, you know.
10        Q.       Was there --
11        A.       It had the card sitting in it.
12        Q.       Was there some sort of
13   sub-folder within this filing cabinet that
14   said Norwood purchasing records?
15        A.        I think it had more -- it's
16   got more to do with the -- the vendors that
17   are listed on there; Boston, Mass.,
18   New York.
19        Q.       Okay.  So it's your
20   expectation that these were records for
21   Norwood because of the geographic locations
22   listed next to the vendor names?
23        A.       Yes.
24        Q.       All right.  And those are east
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01    coast locations?

02        A.    Yes.

03        Q.    Do you know whether purchase

04    records from the Addison, Illinois facility,

05    or any other facility, were transferred to

06    the Norwood, Massachusetts offices?

07        A.    They weren't.

08        Q.    Do you know that for a fact?

09        A.    I've never found them.

10        Q.    All right.  Do you know where

11    the purchase records for ingredients used to

12    manufacture product at the Addison, Illinois

13    facility are located?

14        A.    No.  We don't have that

15    facility anymore.  That's gone.

16        Q.    What happened with the

17    Addison, Illinois records?

18        A.    I have no idea.

19        Q.    Do you know if anyone put

20    purchase records from Addison, Illinois, or

21    any other facility, into the filing cabinet

22    where you found these purchase cards?

23        A.    There were none in there.

24        Q.    All right.  So let's talk

**Transcript of Monique, Mark**

```
01    about how -- what do you call these cards?
02          A.      Those are purchase records.
03          Q.      Okay.  Let's talk about how
04    these purchase records work.  Now, when you
05    started working at Savogran in 1987, did you
06    see how Helen Kowalski filled out purchase
07    records?
08          A.      Not really, no.  Didn't pay
09    much attention to it.
10          Q.      Are you familiar with Ms.
11    Kowalski's handwriting?
12          A.      Vaguely.
13          Q.      Are you able to tell whose
14    handwriting it is on these purchase records?
15          A.      No.  Not with any type of
16    certainty, I guess, would be a better way of
17    saying it.
18          Q.      Okay.
19          A.      Yeah.
20          Q.      Do these purchase records, are
21    they in the same format that you were
22    accustomed to Ms. Kowalski using when you
23    began with the company?
24          A.      Yes.
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

```
01        Q.      And, just briefly, describe
02   what format is that?
03        A.      I'm not following your
04   question on that one.
05        Q.      Well, these -- these purchase
06   records at the top have an item number -- a
07   category for item number, a category for
08   specifications and then several columns.
09   The left-hand column is number.  And then
10   the next column over says vendor.  Next
11   column after that is street.  Then city.
12   And it looks like, is it a Z-N?
13        A.      Yeah.  It doesn't look like
14   she was following any type of format there.
15   It's all over the place.
16        Q.      And then there's a column for
17   state, a column for terms, column for
18   shipping --
19        A.      Yeah.  She didn't use any of
20   that.
21        Q.      But the format of these
22   purchase records is similar to the format
23   that you saw Ms. Kowalski using in 1987?
24        A.      Oh, yes.
```

**Transcript of Monique, Mark**

```
01        Q.      Then next to -- under the
02   category  of vendor there are several
03   company names written here.  And, I
04   apologize, this copy is a little light.  I
05   have a darker copy if we need to look at it.
06             The first vendor is Metro Oil.
07   Did I read that correctly?
08        A.      I can't read it on mine.
09        Q.      Let me give you a different
10   copy and see if that's easier to read.
11                   -  -  -
12             (Whereupon the document was
13             marked, for identification purposes,
14             as Monique Exhibit Number 9.)
15                   -  -  -
16   BY MR. DuPONT:
17        Q.      I'm going to hand to you what
18   I marked as Exhibit 9.  And Exhibit 9, for
19   the record, is the March 21, 2017 letter
20   from counsel for Savogran with a second
21   Supplemental Answer of Defendant, The
22   Savogran Company, to Plaintiffs'
23   Interrogatories and Requests For Production
24   attached to it.  And then the same purchase
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   records that were -- we've marked as
02   Exhibit 8 are also attached.  And this is a
03   darker copy, so let's see if this helps you
04   read it.
05               And under the category here,
06   does it appear to say Metro Oil Chemical
07   Company?
08        A.     Yes.
09        Q.     All right.  And there's a --
10   followed by that is American Mineral Spirits
11   Company?
12        A.     Yes.
13        Q.     And then, after that is
14   Houghton Chemical Company?
15        A.     Yes.
16        Q.     And then the fourth one listed
17   is Ashland Chemical Company.
18        A.     Yes.  It's kind of hard to
19   read, but I think so, yes.
20        Q.     So, these records indicate
21   that companies that were selling this --
22   this blend of benzol and acetone were Metro
23   Oil Chemical Company, American Mineral
24   Spirits Company, Houghton Chemical Company,
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  and Ashland Chemical Company.  Those are

02  companies that sold this blend of benzol and

03  acetone to The Savogran Company?

04          A.      In Norwood.

05                  MS. SAYRE:  Objection.  Calls

06      for speculation.

07  BY MR. DuPONT:

08          Q.      Next to the vendors' names

09      there are numbers written on the left-hand

10      column.  And it begins with the number four

11      next to Metro Oil, the number one next to

12      American Mineral Spirits Company, the number

13      two next to Houghton Chemical Company, and

14      the number three next to Ashland Chemical

15      Company.  Do you see that?

16          A.      Yes.

17          Q.      Do you know what those numbers

18      signify?

19          A.      No, I don't.  Because she

20      didn't use them anywhere else on the card

21      there.

22          Q.      On the top of the form, does

23      it say benzol/with ten percent acetone

24      blend?

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

```
01          A.      Yes.

02          Q.      So what does that mean to you?

03          A.      90 percent benzol and ten

04   percent acetone.

05          Q.      And then there's a weight next

06   to it, 7. -- is that 33 gallons?

07          A.      It's kind of hard to read on

08   this one.

09              MR. LEDGER:  Well, don't

10          speculate.  If you know.

11              THE WITNESS:  Yeah.  I don't.

12   BY MR. DuPONT:

13          Q.      Below that there's -- there's

14   some writing, it looks like one over six,

15   .8820-8860.  Freezes at 45 degrees.  Do you

16   see that?

17          A.      Yes.

18          Q.      And then does it continue to

19   say, ten percent toluol, which is another

20   word for toluene, added to prevent freezing.

21          A.      Yes.

22          Q.      And it says, Extras:  Freezing

23   during winter?

24          A.      Yes.
```

**Transcript of Monique, Mark**

```
01        Q.      So it looks like there was
02   benzene -- or excuse me -- strike that.
03              It looks like the blend was 90
04   percent benzol and ten percent acetone, but
05   then there's reference to maybe adding
06   toluene to prevent there from being freezing
07   in the wintertime?
08        A.      Yes.
09        Q.      On top of that it says -- it's
10   hard to read.  It says, change to 10,000
11   gallons.  And then it's illegible, followed
12   by what looks like November 20, '72?
13              MR. LEDGER:  Object.  It's
14           calling for speculation.  If you
15           think you can understand that.
16              THE WITNESS:  I'm not seeing
17           that.
18              MR. DuPONT:  Okay.
19              THE WITNESS:  I'm sorry.
20   BY MR. DuPONT:
21        Q.      It might be a little easier to
22   look on the copy that's Exhibit 8 since it's
23   blown up.
24        A.      Okay.
```

Transcript of Monique, Mark

01     Q.     Can you make out what's
02 written on that top right-hand corner?
03          MR. LEDGER:  Objection.  It's
04          calling for speculation.  The
05          document speaks for itself.
06          THE WITNESS:  Yeah, I can see
07          the change, the ten thousand gallon.
08 BY MR. DuPONT:
09     Q.     And, then, does there appear
10 to be a date in the top right-hand corner?
11 It says November 20, 1972?
12     A.     It's possible.  That is --
13 that is hard to read.
14     Q.     And do you know what that date
15 means?
16     A.     I don't.
17     Q.     All right.  So, let's go back
18 to the columns.  With vendor, next to the
19 vendor name is a street -- a category for
20 street and city.  Do you see that?
21     A.     Yes.
22     Q.     And, for example, next to
23 Houghton Chemical looks to be 52 Cambridge
24 Street in Alston, Massachusetts?  Is that

**Transcript of Monique, Mark**

01    how you read that?

02              MR. LEDGER:  Object.  Calls

03        for speculation.  The document speaks

04        for itself.

05              THE WITNESS:  Yeah.  I

06        honestly can't read it.

07              MR. DuPONT:  Okay.

08              THE WITNESS:  Yeah.  I would

09        for you if I could, but I can't.

10    BY MR. DuPONT:

11          Q.    Let me do this:  I'm going to

12    give you a version of Exhibit 8 that's on my

13    laptop so that we can blow it up.  And ask

14    you, can you read it better that way?

15          A.    Yes.

16          Q.    All right.  So, it looks like

17    the address next to Houghton Chemical, is it

18    52 Cambridge?

19              MR. LEDGER:  Objection.

20        Document speaks for itself.

21              THE WITNESS:  Yes.

22    BY MR. DuPONT:

23          Q.    All right.  And that's in

24    Alston, Massachusetts?

**Transcript of Monique, Mark**

```
01        A.      Yes.
02        Q.      Can you make out the address
03  next to Metro Oil Chemical Company?
04        A.      So P.O. Box 335, Ridgefield,
05  New Jersey.
06        Q.      And can you make out the
07  address next to American Mineral Spirits
08  Company?
09        A.      Pier Road, East Providence.
10        Q.      East Providence, Rhode Island?
11        A.      Yes.
12        Q.      And then next to that, in
13  brackets, or parentheses, it's written --
14  does it say Boston plant, 364-0990?
15              MR. LEDGER:  Object.
16        Speculation.  Document speaks for
17        itself.
18              THE WITNESS:  Who's this for
19        again?
20  BY MR. DuPONT:
21        Q.      It looks to line up with
22  American Mineral Spirits Company.
23        A.      Oh, okay.  Okay.
24        Q.      Is that what's written?  Can
```

**Transcript of Monique, Mark**

```
01   you tell?
02                MR. LEDGER:  Same objection.
03                THE WITNESS:  No.  I must be
04        blind because I'm not seeing that.
05                Pier Road, East Providence
06        Rhode Island, that line?
07   BY MR. DuPONT:
08        Q.    Right.
09        A.    Boston.
10        Q.    Does it look like Boston --
11        A.    Phone.
12        Q.    Phone, okay.
13        A.    Yeah.
14        Q.    Boston phone, 364-0990?
15        A.    Right, yeah.
16        Q.    It appears that that was a
17   phone number for American Mineral Spirits?
18                MR. LEDGER:  Object.  Calls
19        for speculation.
20                THE WITNESS:  Yeah, not sure.
21   BY MR. DuPONT:
22        Q.    All right.  And then fourth on
23   the list of vendors is Ashland Chemical
24   Company?
```

**Transcript of Monique, Mark**

```
01        A.     Yes.
02        Q.     And can you make out the
03   address for Ashland?
04        A.     There's no address.
05               MR. LEDGER:  Objection.  Calls
06        for speculation.  Document speaks for
07        itself.
08               THE WITNESS:  Westfield, Mass.
09   BY MR. DuPONT:
10        Q.     And the phone number?
11        A.     Yes.
12        Q.     And that's 413 -- is it
13   569-8669?
14        A.     It's either a nine or an eight
15   there.  Yes.
16        Q.     Okay.  And can you make out
17   the writing that follows that?
18               MR. LEDGER:  Objection,
19        speculation.  Document speaks for
20        itself.
21               THE WITNESS:  It's like going
22        to the eye doctor.
23               Jim something and Peter
24        something.  In New York.  Can't make
```

**Transcript of Monique, Mark**

```
01          out the town.
02    BY MR. DuPONT:
03          Q.    And what follows after
04    New York?
05          A.    6,000 gallon.
06          Q.    At .1293 per gallon?
07          A.    Yes.
08          Q.    And do you know what those
09    numbers refer to?
10          A.    I don't.
11          Q.    Now, underneath that portion
12    of the purchase records there are columns
13    that begin with date, then vendor, then
14    order number, and quoted price.  Can you
15    read that?
16          A.    Yes.
17          Q.    Is it your understanding that
18    the dates that are written under the column,
19    date, are those dates that product was
20    ordered by Savogran?  What do those dates
21    refer to?
22                MR. LEDGER:  Objection, calls
23          for speculation.
24                MS. BONNEVILLE:  Objection,
```

Transcript of Monique, Mark

```
01          calls for speculation.
02              THE WITNESS:  Yes, most likely
03          the date that she ordered it.
04  BY MR. DuPONT:
05          Q.      Then there's another column
06  for promise delivery date.  Do you see that?
07          A.      Yes.
08          Q.      And then there's a column for
09  follow-up date towards the right-hand side?
10          A.      Yes.
11          Q.      So reading -- let's pick one
12  line from this form.  The first line has a
13  date of November, it looks like November 19,
14  1972; is that correct?
15          A.      Yes.
16          Q.      And the vendor is listed as
17  Houghton?
18          A.      Uh-huh.
19          Q.      Is that right?
20          A.      Excuse me -- yes.
21          Q.      And then, the order number is
22  08920 it looks like?
23          A.      Yes.
24          Q.      So, that should be the number
```

**Transcript of Monique, Mark**

01  that was used to identify Savogran ordering

02  the benzol acetone blend from Houghton on

03  November 19, 1972?

04         MR. LEDGER:  Objection, calls

05     for speculation.

06         THE WITNESS:  Possibly.

07  BY MR. DuPONT:

08     Q.    And then the next column says,

09  quoted price.  Is that the price that

10  Savogran was quoted by the vendor, Houghton?

11         MR. LEDGER:  Calls for

12     speculation.

13         THE WITNESS:  Possibly.

14  BY MR. DuPONT:

15     Q.    And then what's written there

16  is .3058?

17     A.    Yes.

18     Q.    So, is that a little more than

19  30 cents?

20         MR. LEDGER:  Calls for

21     speculation.

22         THE WITNESS:  Possibly.

23  BY MR. DuPONT:

24     Q.    And then the next category

**Transcript of Monique, Mark**

01 over is quantity ordered. And it says four

02 point -- looks like 4.000 per -- well, can

03 you make out what that -- what that means?

04          MR. LEDGER:  Calls for

05     speculation.

06          THE WITNESS:  I can't.

07 BY MR. DuPONT:

08     Q.    Okay.  And if we keep reading

09 over, it looks like there's information in

10 parentheses with acetone at the top and

11 benzol at the bottom.  Do you see that?

12     A.    Yes.

13     Q.    And is that weight by gallon,

14 or quantity by gallon of the acetone and

15 benzol?

16          MR. LEDGER:  Objection,

17     speculation.

18          THE WITNESS:  Yeah, not sure.

19 BY MR. DuPONT:

20     Q.    The next line on the record is

21 dated November 22, 1972; is that right?

22     A.    Yes.

23     Q.    All right.  So, November 22,

24 1972, there is a purchase of the benzol

**Transcript of Monique, Mark**

01    acetone blend from AMSCO.   That's American

02    Mineral Spirits Company?

03          A.    Yes.

04                MS. BONNEVILLE:   Objection,

05          calls for speculation.

06    BY MR. DuPONT:

07          Q.    And that has a purchase order

08    number of 08939?

09          A.    Yes.

10          Q.    And it appears that there was

11    6,050 gallons of the blend of benzol and

12    acetone ordered on November 22, 1972 from

13    AMSCO?

14                MR. LEDGER:   Calls for

15          speculation.

16                THE WITNESS:   Yes.

17    BY MR. DuPONT:

18          Q.    And then there's a category

19    for quantity received.   And in that column

20    is written November 29?

21                MR. LEDGER:   Calls for

22          speculation.

23                THE WITNESS:   Yes.

24    BY MR. DuPONT:

**Transcript of Monique, Mark**

```
01        Q.      Is that an indication to you
02   that this blend of benzol and acetone that
03   was sold by AMSCO was received by Savogran
04   on November 29?
05             MR. LEDGER:  Calls for
06        speculation.
07             MS. BONNEVILLE:  Objection,
08        calls for speculation.
09             THE WITNESS:  I have no idea
10        on that one.
11   BY MR. DuPONT:
12        Q.      Would it be logical to you
13   that seven days after Savogran ordered the
14   benzol acetone blend from American Mineral
15   Spirits Company, it would receive the blend
16   on November 29th?
17             MR. LEDGER:  Calls for
18        speculation.
19             THE WITNESS:  Yeah, I have no
20        idea what the supply chain was like
21        back then, or how long it took things
22        to get.
23   BY MR. DuPONT:
24        Q.     All right.  The next line is
```

**Transcript of Monique, Mark**

01    another reference to purchasing the benzene

02    or benzol acetone blend from American

03    Mineral Spirits Company in December of 1972?

04              MR. LEDGER:  Speculation.

05              THE WITNESS:  Yeah.  Yes.

06    BY MR. DuPONT:

07        Q.    It's in December, and it's

08    before December 20, 1972, because the next

09    purchase entry is December 20, 1972?

10              MR. LEDGER:  Calls for

11        speculation.

12              THE WITNESS:  Yes.

13    BY MR. DuPONT:

14        Q.    And the order number for that

15    purchase of the benzol acetone blend from

16    American Mineral Spirits Company is --

17    appears to be 08965?

18              MR. LEDGER:  Calls for

19        speculation.

20              THE WITNESS:  Yes.

21    BY MR. DuPONT:

22        Q.    And it appears to be 6,056

23    gallons of the benzol acetone blend?

24              MR. LEDGER:  Calls for

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01          speculation.
02              THE WITNESS:  Yes.
03  BY MR. DuPONT:
04          Q.      Then the next two purchases,
05  looks like December 20 and -- difficult to
06  make out the other date in December.  But
07  the next two purchases listed here are from
08  Houghton?
09          A.      Yes.
10          Q.      And then after those two lines
11  there is a January 10, 1973 purchase of the
12  benzol acetone blend from AMSCO; is that
13  correct?
14              MR. LEDGER:  Calls for
15          speculation.
16              MS. BONNEVILLE:  Join.
17              THE WITNESS:  It looks like
18          it's AMSCO.  It's hard to read on
19          this copy.
20  BY MR. DuPONT:
21          Q.      I have a -- I pass back to you
22  the laptop with the blown up copy on it.
23          A.      It's possibly AMSCO.
24          Q.      All right.  And that's January
```

**Transcript of Monique, Mark**

```
01   10, 1973?
02        A.    Yes.
03        Q.    And then the next line -- keep
04   it in front of you.
05              The next line, is that
06   purchase on February 6, 1973 of the benzol
07   acetone blend from Ashland?
08        A.    Yes.
09        Q.    And can you read for us what
10   quantity of the benzol acetone blend was
11   purchased at that time?
12              MR. LEDGER:  Calls for
13        speculation.
14              THE WITNESS:  Which one was
15        this?
16   BY MR. DuPONT:
17        Q.    This was, it looks like
18   February 6, 1973.  Purchase of benzol
19   acetone from Ashland.
20        A.    It's February 5th.
21        Q.    Oh, February 5.  Yes.
22        A.    Yeah.  It looks like 6,000
23   gallons.
24        Q.    Which is consistent with some
```

**Transcript of Monique, Mark**

```
01   of the other purchases that we've seen,

02   around 6,000 gallons at a time?

03       A.    Yes.

04       Q.    Now, if you move down, there's

05   some additional purchases in February, April

06   and May, looks like from Houghton and Metro

07   Oil.  Do you see that?

08       A.    Yes.

09       Q.    And if we go down to the last

10   entry, there's a May -- is it May 10 --

11   purchase from Ashland of the benzol acetone

12   blend?

13       A.    Could be the 11th too.

14       Q.    Either May 10 or 11 there --

15       A.    Yeah.

16       Q.    -- a purchase of, it looks

17   like 6,000 gallons of the benzol acetone

18   blend from Ashland?

19           MR. LEDGER:  Calls for

20       speculation.

21           THE WITNESS:  Yes.

22   BY MR. DuPONT:

23       Q.    Now, if you turn to the next

24   page, that's Bates Number 124 on the bottom.
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  What is this page?  Is this another side of
02  the same card that we're looking at on Bates
03  Number 123, or how does this work?
04        A.      Yes, it is the opposite side.
05        Q.      Okay.  And what information
06  does this card have?
07        A.      So, it shows the -- she's
08  keeping track of her inventory.  What's on
09  hand, what's consumed, what's left.
10        Q.      Okay.  So, the --
11        A.      It's pretty simple.
12        Q.      So, the date in the left-hand
13  column, what do those dates represent?
14        A.      That's the date it was -- came
15  out of inventory.
16        Q.      When you say came out of
17  inventory, what do you mean?
18        A.      It was used.
19        Q.      So those are -- are those
20  dates that the product was blended?
21        A.      Possibly.
22        Q.      Were they dates that the
23  benzol acetone blend was moved from the tank
24  that stored the benzol acetone blend to the

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01 first mixing tank?

02             MR. LEDGER: Calls for

03     speculation.

04             THE WITNESS: Possibly, yep.

05 BY MR. DuPONT:

06     Q.     Okay. There are job order

07 numbers that are listed here. Do you know

08 what the significance of the job order

09 number is?

10     A.    I don't.

11     Q.     Then there's a column for

12 issue, and numbers listed under there. Do

13 you know what the issue means?

14     A.     That is where it came out of

15 inventory. You just do the math on it from

16 the right-hand side, under balance.

17     Q.     Explain to me what you mean by

18 that.

19     A.     So on that 11,6 line, starting

20 balance of 5557. And then she took 2,034

21 out of -- out of inventory to get her

22 balance down to -- excuse me -- down to

23 3523, it looks like. So it's just a running

24 inventory.

Savogran objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

Savogran objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.



MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        Q.      So it looks like on November
02   6, 1972, 2,034 gallons of the benzol acetone
03   blend was moved from the storage tank for
04   that blend to the mixing tank?
05        A.      Possibly.
06        Q.      And before that 2,034 gallons
07   was moved, there was 5,557 gallons of the
08   benzol acetone blend in the tank that stored
09   that material?
10             MR. LEDGER:  Assumes facts not
11        in evidence.  Calls for speculation.
12             THE WITNESS:  Possibly.
13   BY MR. DuPONT:
14        Q.      Is that how you interpret this
15   document?
16        A.      Yes.
17        Q.      Was there a similar system
18   used by Savogran when you began to work for
19   the company in 1987, for tracking inventory?
20        A.      Yes.
21        Q.      And if we were to continue
22   reading down this, it looks like November 8,
23   1972, 904 gallons of the benzol acetone
24   blend was moved from the -- the storage
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  tank, and that brought the balance down to

02  2,619 gallons of the benzol acetone blend in

03  the tank that stored the benzol acetone

04  blend.

05          MR. LEDGER:  Calls for

06      speculation.

07          THE WITNESS:  It's an -- it's

08      an inventory move.  We don't know

09      what the reason could be.  Could have

10      done a physical count and just

11      adjusted the inventory.  So it

12      doesn't necessarily mean it was --

13      something was made.

14  BY MR. DuPONT:

15      Q.    Okay.  But the -- the issue

16  gallons means that something -- there was

17  product removed from the benzol acetone

18  blend tank?

19      A.    No, not necessarily.  Look at

20  that last entry in November.  Right?

21      Q.    Okay.

22      A.    It says small amount, 12.

23  Right?

24      Q.    Yes.

**Transcript of Monique, Mark**

01    A.    So she made some type of
02  adjustment there.  Might not have
03  necessarily meant that they made something.
04    Q.    Okay.  If there was a -- for
05  those larger entries --
06    A.    So, this isn't a production
07  record, this is the inventory.
08    Q.    Okay.
09    A.    Yeah.  So don't confuse the
10  two.
11    Q.    Okay.  So, was there -- what
12  else would explain why there was a drop in
13  inventory in the benzol acetone blend tank,
14  rather than moving some of that inventory to
15  the mixing tank to make the product?
16          MR. LEDGER:  Calls for
17      speculation.
18          THE WITNESS:  Math.  I don't
19      know.  Received in the wrong
20      quantity.
21  BY MR. DuPONT:
22    Q.    Okay.
23    A.    You know.
24    Q.    Now this -- so this is an

**Transcript of Monique, Mark**

01    inventory record.  And if we look to the

02    right-hand half of the page, does this

03    continue to show inventory for the benzol

04    acetone blend through May 5 of 1973?

05        A.    Yes.

06        Q.    Now, if we turn to the next

07    page, which is Bates Number 125.  Does that

08    begin with the benzol acetone blend from the

09    inventory on the date of May 11, 1973?

10        A.    Yes.

11        Q.    And it continues to list the

12    inventory of the benzol acetone blend

13    through February 28, 1974?

14        A.    Yes.

15        Q.    So, Savogran has inventory of

16    the ninety percent benzol, ten percent

17    acetone blend on hand until February 28,

18    1974?

19                MR. LEDGER:  Objection, calls

20        for speculation.

21                THE WITNESS:  So, the tank is

22        essentially empty at that point.

23    BY MR. DuPONT:

24        Q.    Right.  And --

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        A.     I think if you look at the
02   inventory, with the inches on it -- what --
03   it looks like four from here.  So the tank
04   was essentially dry.
05        Q.     Okay.  So, February 28, 1974,
06   it looks like there's only 77 gallons?
07        A.     No, 27.
08        Q.     27 gallons --
09        A.     Yeah.
10        Q.     -- of the blend left?
11        A.     Correct.
12        Q.     All right.  And then you
13   mention inches.  I'm scrolling up to see.
14   Where do you see reference to inches?
15        A.     If you look under that column
16   that says damaged in the factory.
17        Q.     Right.
18        A.     My copy looks like there's an
19   inch sign next to it, next to the number.
20        Q.     Yes.  And inches, what does
21   that say?
22        A.     In the old days they would
23   stick the tank -- we didn't have electronic
24   monitoring like we have nowadays, so you'd
```

**Transcript of Monique, Mark**

01  actually be sticking the tank, and then they
02  would see how much was in there.
03      Q.    All right.  And so the stick
04  either had inch marks on it or another way?
05      A.    Had inch marks on it.
06      Q.    Had inch marks on it?
07      A.    Yes.
08      Q.    And you could calculate the
09  number of gallons of liquid in the tank
10  based on how many inches of liquid there was
11  in the tank?
12      A.    Correct.
13      Q.    And it looks like the
14  inventory on February 26, 1974 changed from
15  43 gallons on February 26th, to 717 gallons
16  on February 27th, 1974?
17          MR. LEDGER:  Calls for
18      speculation.
19          THE WITNESS:  I don't see
20      that.  Where are you seeing that at?
21          MR. DuPONT:  On the right-hand
22      portion of the record.
23          THE WITNESS:  Yeah, I see it.
24  BY MR. DuPONT:

**Transcript of Monique, Mark**

```
01        Q.      Does that indicate to you that
02   Savogran would have received another 600 and
03   some gallons of the acetone blend -- of the
04   benzol acetone blend on February 27, 1974?
05        A.      No.
06               MR. LEDGER:  Calls for
07          speculation.
08               THE WITNESS:  It looks like
09          they made a math error because the
10          balance is going down, it's not going
11          up.
12   BY MR. DuPONT:
13        Q.      Well, there's several points
14   where the balance is low and then it
15   increases.  So if you look at the same --
16   the same half of the page -- for example,
17   you have -- on January 16, 1974, there's 86
18   gallons in inventory.  Do you see that?
19        A.      What date was it again?
20        Q.      January 16, 1974.
21        A.      Yes.
22        Q.      There's 86 gallons of the
23   benzene -- benzol acetone blend in
24   inventory.  Then the next day, January 17,
```

Transcript of Monique, Mark

01  1974, there's 172 gallons?

02       A.    Yeah.  Yes.

03       Q.    And then January 22, 1974,

04  there's 239 gallons?

05       A.    Yes.

06       Q.    And then, if we go back down

07  to February 1, 1974, it looks like there's

08  about 45 gallons of the benzol acetone blend

09  in inventory?

10       A.    No, that's not the inventory

11  number.  The inventory number is on the

12  right-hand side.

13       Q.    Okay.  I'm sorry, that's the

14  issue number.

15       A.    Right.

16       Q.    All right.  So, the inventory

17  number, or the balance, is on the -- on the

18  right-hand side?

19       A.    Yes.

20       Q.    Okay.  All right.  My fault,

21  I'm sorry.  So let's back up then.  Looking

22  at the left-hand page -- left-hand side of

23  the page on -- is that August 10, 1973, the

24  inventory is listed as 1,247 gallons of the

**Transcript of Monique, Mark**

01  benzol acetone blend?

02    A.  Yes.

03    Q.  And if we go back over to the

04  right-hand side of the page.  On August 15,

05  197 -- can you make the date out there?

06    A.  Looks like '73.

07    Q.  Okay.  August 15, 1973, the

08  inventory is now 4,673 gallons?

09    A.  Yes.

10    Q.  All right.  So, there was an

11  increase of approximately, is it 3800

12  gallons?

13    A.  Yes.

14    Q.  So it looks like on August 15,

15  1973 there was receipt of a shipment of the

16  benzol acetone blend of about 3,800 gallons?

17      MR. LEDGER:  Calls for

18    speculation.

19      THE WITNESS:  Yes.

20  BY MR. DuPONT:

21    Q.  And then by August 21 of 1973,

22  the inventory of the benzol acetone blend is

23  down to 294 gallons?

24    A.  What date was that again?  I'm

```
01   sorry.
02         Q.      It Looks like -- it looks like
03   it's either August -- looks like August 21,
04   1974, because I'm counting five rows down
05   for the balance and five rows down for the
06   date?
07         A.      Oh, '73, you mean?
08         Q.      '73, yes.
09         A.      Okay.  Yeah.
10         Q.      August 21, 1973 --
11         A.      I got you.  Yeah.
12         Q.      Inventory, 294 gallons?
13         A.      Yeah.  Yes.
14         Q.      And then on September 4, 1973
15   the inventory is 4,999 gallons?
16         A.      Yes.
17         Q.      And there is a record that
18   there was a receipt of 4,855 gallons on
19   November -- excuse me, September 4th, 1973?
20         A.      Yes.
21         Q.      And then the inventory keeps
22   going down until September 25, 1973, where
23   there's 115 gallons in the inventory?
24         A.      Yes.
```

**Transcript of Monique, Mark**

01    Q.    And then it looks like on

02  January 1, 1974, the inventory goes back up

03  to 6,051 gallons of the benzol acetone

04  blend?

05    A.    Yes.

06    Q.    And it looks like the company

07  received, on that same date, 6,529 gallons

08  of benzol acetone blend?

09          MR. LEDGER:  Calls for

10      speculation.

11          THE WITNESS:  Yes, I'm doing

12      the math myself.

13  BY MR. DuPONT:

14    Q.    And that's actually written

15  under the column for received, is 6,529

16  gallons?

17    A.    Yes.

18    Q.    It looks like on that date,

19  January 1, 1974, there was -- 478 gallons of

20  the benzol acetone blend were issued, which

21  is why there's now a balance of 6,051

22  gallons of the blend?

23    A.    Yes.

24    Q.    So, would that indicate to you

**Savogran** objects
to the designation
on the grounds
that it is vague
and ambiguous,
lacks foundation,
assumes facts not
in evidence, calls
for speculation
and the witness
lacks personal
knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  that on January 1, 1974 there was a transfer

02  of 478 gallons of the benzol acetone blend

03  to make product from that shipment of 6,529

04  gallons of the blend?

05          MR. LEDGER:  Calls for

06      speculation.

07          THE WITNESS:  No, because,

08      like I said before, it's not a

09      purchase record -- it's not a

10      production record, it's an inventory

11      record.

12  BY MR. DuPONT:

13          Q.    Okay.  It looks like from

14  January 1, 1974 through February 24 or 28

15  1974, the inventory decreases without going

16  back up?  Is that right?

17          A.    Yes.

18          Q.    Okay.  So, would that indicate

19  to you that Savogran received 6,529 gallons

20  of the benzol acetone blend on January 1,

21  1974.  And then that was consumed between

22  January 1, 1974 and February 24 or 28, 1974?

23          MR. LEDGER:  Calls for

24      speculation.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

```
01              THE WITNESS:  I don't know if
02     I would use the word consume because
03     it's not a production record, but the
04     inventory went from -- from, you
05     know, 6,051 to 27.
06  BY MR. DuPONT:
07     Q.     Do you know of anything else
08  that Savogran would have done with the
09  inventory of the 90 percent benzol, ten
10  percent acetone, besides put it into the
11  Kutzit product?
12     A.     I don't.
13              MS. BONNEVILLE:  Objection,
14     calls for speculation.
15  BY MR. DuPONT:
16     Q.     So, not knowing that there's
17  anything else Savogran would have done with
18  the product between January and
19  February 1974, the most likely conclusion is
20  that that benzol acetone blend was being
21  used to manufacture product?
22              MR. LEDGER:  Calls for
23     speculation, argumentative.
24              THE WITNESS:  Yeah, I can't
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01          make that statement.

02    BY MR. DuPONT:

03          Q.      But you can't identify

04    anything else that Savogran would have done

05    with the benzol acetone blend in January and

06    February of 1974; correct?

07          A.      Correct.

08               MR. DuPONT:  All right.  Why

09          don't we take five minutes.  Go off

10          the record.

11               VIDEO TECHNICIAN:  The time is

12          1:32, off the record.

13               (Whereupon there was a recess

14          in the proceeding.)

15               VIDEO TECHNICIAN:  This is the

16          beginning of media unit three.  We're

17          back on the record.  The time is

18          1:42.

19    BY MR. DuPONT:

20          Q.      Mr. Monique, I have a few more

21    questions about the benzol acetone blend

22    purchase records and inventory records that

23    we've been looking at.

24               Directing your attention to

```
01    the page with the Bates Number 126 on it.
02    Do you see on June 4, 1973 there is an order
03    of the benzol acetone blend from Ashland
04    that has an order number 09280 and a
05    quantity ordered, 6500 gallons?
06                 MR. LEDGER:  Calls for
07          speculation.
08                 THE WITNESS:  Yes.
09    BY MR. DuPONT:
10          Q.     And if we flip back to the
11    Bates Number 125, that's the inventory?
12          A.     Yes.
13          Q.     Do you see that there's an
14    entry on June 8, 1973, with an order number
15    of 09280?
16          A.     Yes, I got it.  Sorry about
17    that.
18          Q.     And next to that, it appears
19    to be 5445 gallons, next to that order
20    number?
21          A.     Yes.
22          Q.     And then, the entry just
23    before that, on June 6th, there's an issue
24    of 1,024 gallons?
```

Transcript of Monique, Mark

01      A.    Yes.

02      Q.    And when you add that issue

03  number up, 1,024 to the gallons next to the

04  order number of 5,445, they come out to

05  approximately 6,500 gallons?

06      A.    Okay.

07      Q.    So using the volume of the

08  blend and the order number, does it appear

09  that we can match the purchase record and

10  the inventory record up to see that that --

11  that order on June 4, 1973 of Ashland's

12  benzol acetone blend of 6,500 gallons is

13  what's reflected on the issue of June 6,

14  1973 of 1,024 gallons and the inventory

15  on -- or at least the received gallonage of

16  June 8th of 5,445 gallons?

17      A.    You're just adding the balance

18  of -- what was that, 3973 --

19      Q.    Right.

20      A.    -- to the 5945 to get the nine

21  -- you know, what is that, 9318.  You don't

22  have to concern yourself with the 1024.

23      Q.    Okay.  So it's -- I need to

24  look at the balance column?

**Transcript of Monique, Mark**

01      A.      Yeah.  Right.  That's a

02  running total.

03      Q.      Okay.  So, there's

04  3,375 gallons as of June 6, 1973.  Then with

05  the addition of the blend from Ashland of

06  54 --

07      A.      You just take the difference

08  between -- the balance on 6/8 and the

09  balance on 6/6 should equal the purchase on

10  6/8, because there's no issue on that 6/8.

11      Q.      I see.

12      A.      I would think.  I don't have a

13  calculator in front of me.  Does that work

14  out?

15      Q.      Yes.  Okay.  So the difference

16  -- the increase in the balance from June 6

17  to June 8 is a reflection of the receipt of

18  the benzol acetone blend from Ashland that

19  corresponds to order number 09280?

20      A.      Yes.

21      Q.      All right.

22      A.      Your orderly mind is -- is

23  overcomplicating things.

24      Q.      Okay.  So, using these

**Transcript of Monique, Mark**

01    records, and your understanding of how The

02    Savogran Company maintained inventory of

03    product, we can determine that during

04    certain dates certain suppliers' benzol

05    acetone blend were being used in the Kutzit

06    product?

07         A.    Yes.

08         Q.    And that's simply by tracking

09    when benzol was -- the benzol blend was

10    ordered and received from the suppliers and

11    then consumed in the product?

12         A.    You can tie the whole thing

13    up.

14         Q.    Right.

15         A.    Yes.

16         Q.    Okay.  So I'd like to change

17    gears with you and hand you a document that

18    I'm marking as the next exhibit to your

19    deposition, which is Exhibit 10.

20                   -  -  -

21              (Whereupon the document was

22         marked, for identification purposes,

23         as Monique Exhibit Number 10.)

24                   -  -  -

**Transcript of Monique, Mark**

```
01   BY MR. DuPONT:
02        Q.      Exhibit 10 is Bates Number
03   Savogran 119 through 122.  Do you see that?
04        A.      Yes.
05        Q.      What is Exhibit 10?
06        A.      I must confess, I have not
07   read this, but we did produce it.  And it's
08   the -- it's the agreement with Savogran
09   Pacific and -- and Savogran Company.
10        Q.      All right.  So Savogran
11   Pacific Corporation, what's your
12   understanding Savogran Pacific Corporation
13   was?
14        A.      They sold Savogran products
15   west of the Rockies.
16        Q.      And when did Savogran Pacific
17   Corporation begin to sell Savogran products
18   west of the Rockies?
19        A.      I, you know, specifically
20   don't know.  Well, we could certainly tear
21   the agreement apart, I guess.
22        Q.      And there's some other
23   correspondence we can look at as well that
24   might help us the answer that question.
```

**Transcript of Monique, Mark**

```
01          A.       The document has February 1966
02  on it.
03          Q.       Right.  So, this -- the first
04  page of this agreement says the 15th day of
05  February, 1966?
06          A.       Correct, yeah.
07          Q.       And so, the -- the arrangement
08  here is that The Savogran Company owns the
09  Savogran name and manufactures the Savogran
10  product.  And Savogran Pacific Corporation
11  wants to sell the product in the western
12  area of the United States?
13               MR. LEDGER:  Well, I'll
14          object.  Calls for speculation.  If
15          you know, you can answer.
16               THE WITNESS:  Yes.
17  BY MR. DuPONT:
18          Q.       All right.  In fact, as we
19  read through it, it says, in the second
20  paragraph of the first page, "The company",
21  referring to The Savogran Company,  "is
22  engaged in the business of manufacturing and
23  selling paint removers, paint cleaners,
24  brush cleaners, and other related and allied
```

**Transcript of Monique, Mark**

01  products under the trade names of Savogran

02  Products, and has a proprietary interest in

03  certain formula and manufacturing

04  processes."  Did I read that right?

05      A.    Yes.

06      Q.    All right.  And so,

07  proprietary interest means it basically owns

08  the formula and manufacturing processes?

09      A.    Yes.

10      Q.    And in the next paragraph what

11  it states is that, "The Savogran Company,

12  for the terms of this agreement, grants

13  Savogran Pacific the exclusive right to use

14  the name Savogran in that territory where

15  freight rates break west of Chicago."  What

16  does that mean to you?

17          MR. LEDGER:  Object.  It's

18      calling for speculation.

19          If you have an understanding,

20      you can go ahead.

21          THE WITNESS:  West of the

22      Rockies.

23  BY MR. DuPONT:

24      Q.    What it continues to say in

**Transcript of Monique, Mark**

01  this paragraph is that, "Savogran Pacific

02  shall also, for the term of this agreement,

03  have the exclusive right to sell and/or

04  manufacture any and all products of The

05  Savogran Company within said territorial

06  limits, again, west of the Rockies.  But all

07  containers, labels or other printed matter

08  shall first be approved in writing by The

09  Savogran Company." Is that correct?

10       A.    Yes.

11       Q.    So, reading that, does that

12  mean to you that Savogran Pacific had the

13  right to either sell or manufacture, or do

14  both, Savogran products west of the Rockies

15  for the period of time that this agreement

16  was in place?

17            MR. LEDGER:  Object, calls for

18       speculation.

19            THE WITNESS:  Yes.

20  BY MR. DuPONT:

21       Q.    And that any containers,

22  labels or other printed material that were

23  going to be used for The Savogran Company

24  products had to first be approved by The

**Transcript of Monique, Mark**

01  Savogran Company?

02        A.      Yes.

03        Q.      And it continues to read that

04  if Savogran Pacific Corporation were to

05  manufacture Savogran products, it had to do

06  so pursuant to strict accordance, or

07  compliance with specifications that The

08  Savogran Company gave to the Savogran

09  Pacific Corporation?

10                MR. LEDGER:  Objection, calls

11        for speculation.

12                THE WITNESS:  Yes.

13  BY MR. DuPONT:

14        Q.      And it continues to read that,

15  "To the extent that Savogran Pacific

16  Corporation was going to manufacture

17  product, it could not manufacture any

18  products other than The Savogran Company

19  products, unless it had written approval

20  from The Savogran Company"?

21        A.      Yes.

22        Q.      And that if Savogran Pacific

23  Corporation were to develop new product for

24  the Savogran line, they should then become

**Transcript of Monique, Mark**

```
01   available to The Savogran Company for it to

02   sell?

03          A.     Yes.

04          Q.     Now, in the next paragraph

05   what it indicates is that Savogran Pacific

06   had the right to buy from The Savogran

07   Company for resale within that western

08   territory west of the Rockies products that

09   were manufactured by The Savogran Company at

10   five percent free on board rate from either

11   Norwood, Massachusetts or Addison, Illinois?

12          A.     Yes.

13          Q.     So, does that indicate to you

14   that at least this agreement planned into it

15   that The Savogran Company would manufacture

16   product in Norwood, Massachusetts and have

17   it sold by Savogran Pacific west of the

18   Rockies?

19              MR. LEDGER:  Object.  Calls

20         for speculation.

21              THE WITNESS:  They had the

22         opportunity to do it, certainly.

23         Whether they did it or not, who

24         knows.
```

**Transcript of Monique, Mark**

```
01   BY MR. DuPONT:
02        Q.     And then it continues to read
03   that Savogran Pacific may also purchase from
04   The Savogran Company any printed matter,
05   advertising copy or containers at the cost
06   that The Savogran Company had to pay for it,
07   plus 15 percent free on board from Norwood,
08   Massachusetts?
09        A.     Yes.
10        Q.     And free on board, that's a
11   term that's used for shipping materials?
12        A.     Yes.  That -- essentially that
13   meant that they paid the freight.
14        Q.     All right.  So, this agreement
15   also planned on Savogran Pacific having the
16   opportunity to obtain advertisement, printed
17   matter and even containers of The Savogran
18   Company product from the Norwood,
19   Massachusetts Savogran Company facility?
20        A.     Yes.
21        Q.     And the original time period
22   that this agreement was to be in place for
23   was five years, beginning February 15, 1966?
24        A.     Yes, I see that.
```

**Transcript of Monique, Mark**

01        Q.      And then, if you look to the

02 next page, Savogran Pacific agreed to pay

03 The Savogran Company three percent of the

04 net sales that were generated by Savogran

05 Pacific of Savogran products?

06        A.      Yes, I see that.

07        Q.      And then, at the end of each

08 calendar year, Savogran Pacific was to give

09 The Savogran Company an annual statement

10 that was certified by a certified public

11 accountant of what the sales were, and so

12 that The Savogran Company could figure out

13 how much money it was owed?

14        A.      Yes.

15        Q.      And if we continue reading

16 down this page, it indicates that The

17 Savogran Company was to have one of its

18 employees elected as a director of Savogran

19 Pacific Corporation?

20        A.      Yes.

21        Q.      And that Savogran Pacific was

22 to use the same list price, which was this

23 price list that we looked at in Exhibit 1.

24 They would use the same list price for the

**Transcript of Monique, Mark**

01 Savogran products as The Savogran Company

02 did?

03      A.     No, I don't -- I disagree with

04 that.

05      Q.     Oh, okay. Explain what that

06 sentence means.

07      A.     Well, list price means it

08 would be the price. They weren't

09 necessarily using those same sheets.

10      Q.     Okay.

11      A.     Yeah.

12      Q.     But the price is reflected on

13 the Savogran products jobber's price list we

14 marked as Exhibit 1.

15      A.     Right.

16      Q.     The agreement between Savogran

17 Company and Savogran Pacific was that

18 Savogran Pacific was to list for sale

19 Savogran products at the same price that

20 Savogran Company listed the products at?

21      A.     Yes. That's how I would

22 interpret that.

23      Q.     Okay.

24      A.     Yeah.

**Transcript of Monique, Mark**

```
01        Q.      And then it continues to read
02   that Savogran Pacific was agreeing to
03   service in that western territory all of The
04   Savogran Company's national accounts.  Is
05   that correct?
06        A.      Yes.
07        Q.      So The Savogran Company had
08   existing relationships with national
09   accounts, and they wanted Savogran Pacific
10   to service those accounts?
11              MR. LEDGER:  Object.  Calls
12        for speculation.
13              THE WITNESS:  Yeah, I don't
14        know if they had any business out
15        there.
16   BY MR. DuPONT:
17        Q.      Well, certainly this agreement
18   was -- had in mind that there were national
19   accounts that Savogran Company already had
20   that it wanted Savogran Pacific to service,
21   meaning sell product to?
22              MR. LEDGER:  Objection.  Calls
23        for speculation.
24              THE WITNESS:  It means that
```

**Transcript of Monique, Mark**

01          perhaps they had national accounts
02          that weren't getting serviced out
03          there.
04              MR. LEDGER:  Well, don't
05          guess.  If you know, you can testify
06          to what you know.  If you don't,
07          don't.  You got to make that clear.
08              THE WITNESS:  I'm just
09          speculating.  Yeah.  All right.  No
10          guessing.
11  BY MR. DuPONT:
12      Q.      Okay.  So then what it does
13  continue to read is that, "The Savogran
14  Company and Savogran Pacific will cooperate
15  for their mutual benefit in the purchase of
16  raw materials or otherwise."  Do you see
17  that?
18      A.      Yes.
19      Q.      Does that mean to you that
20  Savogran -- The Savogran Company and
21  Savogran Pacific were to work together in
22  obtaining raw materials?
23              MR. LEDGER:  Objection.  Calls
24          for speculation.  Calls for a legal

**Transcript of Monique, Mark**

```
01        opinion.
02              THE WITNESS:  Yeah, I don't
03        know.
04   BY MR. DuPONT:
05        Q.    Now, have you seen any
06   evidence, or heard from anybody at Savogran
07   that Savogran Pacific would -- was actually
08   manufacturing Savogran brand of products?
09        A.    They were -- they were when
10   I -- when I got there in '87 they were, yep.
11        Q.    Do you know when Savogran
12   Pacific actually started manufacturing
13   Savogran Company products?
14        A.    I don't.
15        Q.    Do you know if Savogran
16   Pacific was manufacturing Savogran branded
17   product at any point in time between 1963
18   and 1974?
19        A.    I don't.
20        Q.    Between 1963 and 1974, do you
21   know if any Kutzit product was manufactured
22   by Savogran at the Addison, Illinois
23   facility?
24        A.    Say that again, I'm sorry.
```

**Transcript of Monique, Mark**

```
01        Q.        Between 1963 and 1974, do you
02   know if any of the Kutzit product was
03   manufactured at the Addison, Illinois
04   facility?
05        A.        If Kutzit was manufactured in
06   Illinois?
07        Q.        Yes, correct.
08        A.        Yeah, I believe it was.
09        Q.        Between '63 and '74?
10        A.        I'm not sure about that far
11   back, but --
12        Q.        Do you know at some point in
13   time Kutzit was being manufactured at
14   Addison, Illinois?
15        A.        Yes.
16        Q.        All right.  And as to whether
17   it was manufactured there between '63 and
18   '74, you're not certain?
19        A.        I'm not sure of the dates.
20        Q.        All right.  Now, has any of
21   your research indicated to you that there
22   were suppliers of the benzol acetone mix to
23   Savogran, other than Ashland, American
24   Mineral Spirits Company, Houghton Chemical
```

Transcript of Monique, Mark

```
01   Company and Metro Oil Chemical Company?
02        A.     That's it.
03               MS. BONNEVILLE:  Objection,
04        calls for speculation.
05               THE WITNESS:  The record that
06        we found, those were the ones that
07        were on it for Norwood.  Right.
08   BY MR. DuPONT:
09        Q.     Now, in reviewing Savogran's
10   records, did you see any indication that any
11   of its suppliers of the benzol acetone blend
12   provided information to Savogran that
13   benzene had been reported to cause leukemia?
14               MS. BONNEVILLE:  Objection,
15        calls for speculation.
16               THE WITNESS:  No.
17   BY MR. DuPONT:
18        Q.     Did anybody ever convey to
19   you, through the course of your research to
20   prepare as a witness for your work or
21   otherwise, that any of those suppliers of
22   the benzol acetone blend had told Savogran
23   that there were reports of people developing
24   leukemia following benzene exposure?
```

**Transcript of Monique, Mark**

```
01        A.      No.
02              MS. BONNEVILLE:  Objection,
03        calls for speculation.
04  BY MR. DuPONT:
05        Q.      Did your research of Savogran
06  company's records, and your discussion with
07  employees of The Savogran Company indicate
08  to you that any of its suppliers of the
09  benzol acetone blend advised The Savogran
10  Company that people exposed to benzene could
11  develop a fatal blood disease called
12  aplastic anemia?
13              MR. LEDGER:  I'll object,
14        vague as to time.
15              MS. BONNEVILLE:  Calls for
16        speculation.
17              MR. LEDGER:  And vague as to
18        time.  Are you referring to a certain
19        time period?
20  BY MR. DuPONT:
21        Q.      Well, you know, we've looked
22  at the time period of 1963 through 1974 as a
23  period of there being benzene in the Kutzit
24  product.  All right.  So we'll talk about
```

Transcript of Monique, Mark

```
01    that time period.
02              At any -- have you learned,
03    through your research of records or
04    discussion with employees of Savogran, that
05    any of Savogran's chemical suppliers that
06    sold it the benzol acetone blend advised
07    Savogran during that period of time that
08    there was a risk of contracting aplastic
09    anemia, a fatal blood disease, from exposure
10    to benzene?
11         A.    No.
12         Q.    Have you seen any records in
13    the Savogran Company's records, or learned
14    from any of the Savogran Company's
15    employees, that they were told by any of the
16    suppliers of the benzol acetone blend that
17    benzene should not be used for a cleaning
18    solvent?
19         A.    No.
20              MS. BONNEVILLE:   Objection
21         calls for speculation.
22                    -  -  -
23              (Whereupon the document was
24         marked, for identification purposes,
```

**Transcript of Monique, Mark**

01          as Monique Exhibit Number 11.)

02              -  -  -

03   BY MR. DuPONT:

04       Q.     I'm going to hand to you a

05   document that I have marked as Exhibit 11 to

06   your deposition.

07              Exhibit 11 is the API

08   "Toxicological Review, Benzene"

09   September 1948.  Do you see that?

10       A.     Yes.

11       Q.     Did you find this document

12   anywhere in The Savogran Company's records?

13       A.     No.

14       Q.     If we look on the first page

15   of the document, it says, "This review

16   summarizes the best available information on

17   the properties, characteristics and"

18   toxicity -- toxicologic -- strike that.

19   I'll try again.

20              "This review summarizes the

21   best available information on the

22   properties, characteristics and toxicology

23   of benzene."  Do you see that?

24       A.     Yes.

**Transcript of Monique, Mark**

```
01        Q.      All right.  It continues to
02   read,  "It offers suggestions and tentative
03   recommendations pertaining to medical
04   treatment, medical examination and
05   precautionary measures for workers who are
06   exposed to benzene."  Do you see that?
07        A.      Yes.
08        Q.      And it says that it was
09   prepared at the Harvard School of Public
10   Health in Boston, Massachusetts, under the
11   direction of Professor Phillip Drinker.  Do
12   you see that?
13        A.      Yes.
14        Q.      And that the review has been
15   accepted for publication by the Medical
16   Advisory Committee of the American Petroleum
17   Institute.  Does it say that on the first
18   page?
19        A.      Yes.
20        Q.      And it indicates that the
21   review was prepared by a Marshall Clinton
22   M.D., do you see that?
23        A.      Yes.
24        Q.      And it invites anybody who
```

**Transcript of Monique, Mark**

01 wants to submit additional information or

02 propose changes for consideration prior to

03 reissuance of this review to send that

04 information to the American Petroleum

05 Institute.   Okay?

06        A.     Yes.

07        Q.     All right.

08        A.     I didn't realize that was a

09 question.   Sorry.

10        Q.     And does this document list,

11 down at the bottom, the name, American

12 Petroleum Institute, with the address of the

13 Department of Safety at 50 West 50th Street

14 in New York City?

15        A.     Yes.

16        Q.     Now, I'd like to direct your

17 attention to page three of this American

18 Petroleum Institute document from 1948.   Do

19 you see on this page, in the left-hand

20 column, towards the bottom there is a title,

21 "Two Chronic Effects"?   On the bottom

22 left-hand column?

23        A.     Yes.

24        Q.     And the first thing it says,

01  in that -- in this section of the report is,

02  "Chronic benzene poisoning results from

03  repeated or continuous exposure to

04  relatively low concentrations of benzene

05  vapor."  Do you see that?

06       A.     Yes.

07       Q.     Have you seen any indication

08  that American Mineral Spirits Company,

09  Ashland, Inc., or any other supplier of the

10  benzol acetone blend told The Savogran

11  Company that chronic benzene poisoning

12  results from repeated or continuous exposure

13  to relatively low concentrations of benzene

14  vapor?

15            MS. BONNEVILLE:  Objection.

16       Calls for speculation.

17            THE WITNESS:  No.

18  BY MR. DuPONT:

19       Q.     The document continues to read

20  that, "The level and degree of exposure,

21  meaning exposure to benzene, necessary to

22  produce poisoning apparently vary widely."

23            Have you seen any evidence

24  that American Mineral Spirits Company or

01  Ashland provided that information to The

02  Savogran Company?

03      A.      No.

04      Q.      Now, if you continue to the

05  right-hand column there's a paragraph that

06  begins with, "The bone marrow where blood is

07  formed may be hypoplastic, fairly normal in

08  appearance, or hyperplastic."  Do you see

09  that sentence?

10      A.      Yes.

11      Q.      And it continues to read,

12  "Abnormal forms for young cells may abound

13  and reasonably well documented instances of

14  the development of leukemia as a result of

15  chronic benzene exposure have been cited."

16  Do you see where that's written in this

17  American Petroleum Institute document?

18      A.      Yes.

19      Q.      And have you seen any evidence

20  that Ashland, Inc., or American Mineral

21  Spirits Company provided that information to

22  The Savogran Company?

23              MS. BONNEVILLE:  Objection,

24          calls for speculation.

**Transcript of Monique, Mark**

```
01              THE WITNESS:  No.
02   BY MR. DuPONT:
03        Q.     All right.  And this document
04   was written in 1948, which is about 25 years
05   before we have record of Ashland, Inc., and
06   American Mineral Spirits Company, selling
07   the benzol acetone blend to The Savogran
08   Company.  Right?
09        A.     Yes.
10        Q.     If you continue to -- the page
11   on the exhibit has a number four on the top
12   left-hand corner.
13        A.     Got it.
14        Q.     See, there's a Section 3,
15   "Safe limits" on the bottom left-hand
16   corner?
17        A.     Yes.
18        Q.     And this section begins by
19   referring to the American Standards
20   Association and most states setting an
21   arbitrary limit of a hundred part per
22   million as the maximum permissible benzene
23   concentration for workers exposed during an
24   eight hour day in 1948?
```

**Transcript of Monique, Mark**

01          A.      Yes.

02          Q.      And it refers to some other

03   states, including Massachusetts and Oregon,

04   having set a limit of 75 part per million,

05   where New York considers a 50 part per

06   million as the highest permissible level?

07          A.      Yes.

08          Q.      But, nonetheless, what the

09   American Petroleum Institute continues to

10   write is that, "Inasmuch as the body

11   develops no tolerance to benzene, and there

12   is a wide variation in individual

13   susceptibility, it is generally considered

14   that the only absolutely safe concentration

15   for benzene is zero."  Do you see that?

16          A.      Yes.

17          Q.      Have you seen anything from

18   Ashland or American Mineral Spirits Company

19   telling The Savogran Company that because

20   there is no tolerance to benzene in the

21   human body, and because there's wide

22   variation in how people are susceptible to

23   exposure to benzene, the only absolutely

24   safe concentration for benzene is zero?

Transcript of Monique, Mark

```
01        A.     No.

02        Q.       We continue on this page.

03   There's a section with a Roman numeral five,

04   "Treatment of benzene poisoning."  Do you

05   see that?

06        A.     Yes.

07        Q.       In the second paragraph it's

08   written, in this American Petroleum

09   Institute document, "Chronic benzene

10   poisoning is extremely refractory to

11   treatment."  And I'll represent to you that

12   refractory means resistant in this instance.

13   And continues to write, "Practically all

14   therapeutic measures attempted have failed,

15   although transfusions are at least

16   temporarily useful in combating severe

17   anemia."

18            Was that information ever

19   provided to The Savogran Company in the

20   records that you've seen or the people that

21   you've spoken with?  Was that ever provided

22   by Ashland or American Mineral spirits

23   Company?

24        A.     No.
```

**Transcript of Monique, Mark**

01          Q.        This information that I read

02    to you from The American Petroleum

03    Institute's document prepared 25 years

04    before we have record of Ashland, an

05    American Mineral Spirits Company, selling

06    the 90 percent benzol, ten percent acetone

07    blend to The Savogran Company, don't you

08    think it would have been responsible for

09    American Mineral Spirits Company and

10    Ashland, Inc. to disclose that information

11    to its customers of benzene?

12              MR. LEDGER:  I'm going to

13         object.  It calls for speculation.

14              MS. BONNEVILLE:  Objection,

15         calls for speculation.

16              MR. LEDGER:  Calls for

17         speculation.  Calls for opinion

18         testimony.

19    BY MR. DuPONT:

20          A.        Let me back up.  I'll withdraw

21    the question because of the objections.

22              This information that's

23    provided in the American Petroleum

24    Institute's document drafted 25 years before

Transcript of Monique, Mark

```
01    we have record of Ashland and American
02    Mineral Spirits Company selling the 90
03    percent benzene, ten percent acetone blend
04    to The Savogran Company, isn't that
05    information that The Savogran Company would
06    have liked to have known in deciding whether
07    or not to purchase benzene for use in its
08    products?
09              MR. LEDGER:  Objection, calls
10         for speculation.
11              MS. BONNEVILLE:  Objection.
12              THE WITNESS:  Yeah, I can't
13         comment on anything from 1949, or
14         even what the former owners might
15         have been considering in 1968.
16    BY MR. DuPONT:
17         Q.    Okay.  So, you don't know what
18    was going on in the heads of the owners of
19    The Savogran Company in the sixties and
20    seventies?
21         A.    Yes.
22         Q.    All right.  But, as a general
23    practice, would you agree with me that as a
24    manufacturer of products containing
```

**Transcript of Monique, Mark**

01  chemicals, it would be helpful for The

02  Savogran Company to receive as much

03  information as it could from its suppliers

04  about the health hazards of the chemicals?

05          MR. LEDGER:  Objection.  Calls

06      for speculation.

07          THE WITNESS:  Yes, it would be

08      helpful.

09  BY MR. DuPONT:

10      Q.      Because The Savogran Company

11  was relying upon its suppliers as one source

12  of information on the health hazards of the

13  chemicals it used in order evaluate the use

14  of those chemicals and then prepare

15  warnings?

16          MS. BONNEVILLE:  Objection,

17      calls for speculation.

18          THE WITNESS:  Again, we have

19      no way of knowing what was going on

20      in the sixties, fifties.  You know,

21      that's a long time ago.

22  BY MR. DuPONT:

23      Q.      Was it the practice of The

24  Savogran Company, in 1987, when you began

**Transcript of Monique, Mark**

01    with it, to consider information received

02    from suppliers of chemicals in determining

03    how The Savogran Company used chemicals and

04    what warnings it gave for its products?

05           A.    Yes.

06           Q.    And was it your understanding

07    that the way the system was supposed to work

08    was that the chemical manufacturer, like

09    Ashland and American Mineral Spirits

10    Company, was supposed to provide what it

11    knew about the hazards of the product to

12    Savogran so that it can, in turn, either

13    incorporate that information into its

14    warnings or make the decision not to use the

15    chemical?

16           A.    I'm certainly --

17                 MS. BONNEVILLE:  Objection,

18           calls for speculation.

19                 THE WITNESS:  I'm certainly

20           not qualified to even understand or

21           know how the processes of, you know

22           -- of notifications or assimilation

23           of information happened in those

24           days.  Certainly a different time now

**Transcript of Monique, Mark**

01          than it was back then, you know.

02          Yeah.

03      BY MR. DuPONT:

04          Q.      I'm going to hand to you a

05      document that I'm marking as Exhibit 12 to

06      your deposition.

07                      -   -   -

08              (Whereupon the document was

09          marked, for identification purposes,

10          as Monique Exhibit Number 12.)

11                  -   -   -

12      BY MR. DuPONT:

13          Q.      Exhibit 12 is a chapter on the

14      aromatic hydrocarbons from the textbook,

15      "Occupational Medicine and Industrial

16      Hygiene" by Rutherford T. Johnstone, dated

17      1948.  Do you see that?

18          A.      Yes.

19          Q.      And it indicates here that

20      Rutherford T. Johnstone is a consultant in

21      industrial health, lecturer, at the

22      University of California, Los Angeles, and

23      formerly the Assistant Professor of

24      Medicine, University of Pittsburgh School of

Transcript of Monique, Mark

```
01   Medicine, and formerly Director of
02   Department of Occupational Diseases at
03   Golden State Hospital.  Do you see that?
04        A.    Yes.
05        Q.    And if you turn to the third
06   page of the exhibit, it has the page number
07   190 of the chapter at the bottom?
08        A.    Yes.
09        Q.    See, there's a section here on
10   benzol?
11        A.    Yes.
12        Q.    And it's within the chapter on
13   aromatic hydrocarbons.  And benzene, or
14   benzol is an aromatic hydrocarbon.  Right?
15        A.    Yes.
16        Q.    The first paragraph provides
17   some physical description of benzene.  It
18   says it's a coal tar product, which should
19   always be referred to as benzol in order to
20   distinguish it from the petroleum benzine,
21   spelled B-E-N-Z-I-N-E, of the aliphatic
22   hydrocarbons.  Do you see that?
23        A.    Yes.
24        Q.    And it provides information on
```

**Transcript of Monique, Mark**

01 its odor, which is described as not

02 unpleasant. It says, it's a colorless

03 liquid. And it has a boiling temperature of

04 80 degrees Celsius and solidifies at 5.5

05 degrees Celsius. Do you see that?

06      A. Yes.

07      Q. And, in fact, you saw

08 reference in some of the Savogran purchase

09 records of an addition possibly of toluene

10 to the blend to prevent it from freezing?

11      A. Yes.

12      Q. The second paragraph in this

13 chapter from Rutherford T. Johnstone's 1948

14 textbook says, "While the use of benzol in

15 industry has been considerably reduced in

16 recent years, the incident of benzol

17 poisoning is still fairly frequent." Do you

18 see that?

19      A. Yes.

20      Q. Reading this, at least in

21 Rutherford T. Johnstone's opinion, there was

22 already a reduction of the use of benzol in

23 industry. Do you agree with that?

24      A. What? Simply with what it

**Transcript of Monique, Mark**

01    says?

02        Q.      Sure.

03        A.      Yes.

04        Q.      All right.  But despite the

05    reduction in the use of benzene in industry,

06    there were still incidents of benzene

07    poisoning happening fairly frequently,

08    according to this document?

09              MR. LEDGER:  Object.  Calls

10          for speculation.  The document speaks

11          for itself.

12              THE WITNESS:  Yes.

13    BY MR. DuPONT:

14        Q.      This chapter -- this paragraph

15    in the chapter, it continues to write, "Too

16    often is benzol hidden under a trade name or

17    is carelessly substituted for less toxic

18    solvents."  Do you see that?

19        A.      Yes.

20        Q.      So, what this doctor is

21    indicating is that it would be careless to

22    use benzol in place of less toxic solvents.

23    Do you agree with that?

24              MR. LEDGER:  Do we -- does he

**Transcript of Monique, Mark**

01          agree that the document states that?

02               MR. DuPONT:  Yes.

03               MR. LEDGER:  Okay.

04               THE WITNESS:  Yes.

05  BY MR. DuPONT:

06          Q.     Now, are you aware of The

07  Savogran Company ever hiring any

08  professionals in the area of industrial

09  hygiene, toxicology or occupational medicine

10  during the 1960s or 1970s to teach it about

11  the health hazards of benzene?

12         A.     There is nothing in the

13  record.

14         Q.     Are you aware of, through your

15  review of the record and speaking with any

16  employees of The Savogran Company, whether

17  or not it suppliers, like Ashland, like

18  American Mineral Spirit Company, ever asked

19  The Savogran Company whether they understood

20  about the health hazards of the benzene that

21  were reflected in The American Petroleum

22  Institute document or this textbook by

23  Rutherford T. Johnstone?

24              MS. BONNEVILLE:  Objection,

**Transcript of Monique, Mark**

01          calls for speculation.
02              THE WITNESS:  There's nothing
03          in the record.
04    BY MR. DuPONT:
05          Q.    Do you see anything, either in
06    the records or from your conversation with
07    people at The Savogran Company, that
08    American Mineral Spirits Company or Ashland,
09    Inc. sat down the Savogran Company's
10    employees and said, just tell us what you do
11    know about the health hazards of benzene
12    before you start using the chemical?
13              MS. BONNEVILLE:   Objection,
14          calls or speculation.
15              THE WITNESS:  There's nothing
16          in the record now.
17    BY MR. DuPONT:
18          Q.    By the way, do you know what
19    was more expensive, benzene or methylene
20    chloride?
21              MR. LEDGER:  Vague as to time.
22    BY MR. DuPONT:
23          Q.    Let's say in the 1970S, do you
24    know what was more expensive, benzene or

**Transcript of Monique, Mark**

```
01  methylene chloride?
02       A.    That I don't.
03                    -  -  -
04            (Whereupon the document was
05       marked, for identification purposes,
06       as Monique Exhibit Number 13.)
07                    -  -  -
08  BY MR. DuPONT:
09       Q.    I'm going to hand to you
10  Exhibit 13.  Exhibit 13 is a November 30,
11  1954 letter from John H. Foulger M.D., the
12  Director of Medical Research.  And we can
13  tell it's from the Director of Medical
14  Research at DuPont by looking at the second
15  paragraph, where it says, "In the DuPont
16  Company."  Do you see that?
17       A.    Yes.
18       Q.    All right.  So it's John E.
19  Foulger, M.D., the Director of Medical
20  Research at the Dupont Company, writing to a
21  Mr. Mark -- excuse me -- Mr. Dewey Mark of
22  Organic Chemicals Division of the Cosden
23  Petroleum Corporation?
24       A.    Yes.
```

**Transcript of Monique, Mark**

01          Q.       And in November of 1954, what

02    Dr. Foulger is writing to Mr. Mark is that

03    he's not aware of any government, state or

04    municipal ordinance restricting or

05    recommending restrictions of benzene in the

06    manufacture of paints, lacquers, enamels and

07    thinners.  But, of course, there are many

08    regulations concerning its proper label.  Do

09    you see that paragraph?

10          A.       Yeah.

11          Q.       And Dr. Foulger continues to

12    write that, "In the Dupont Company, however,

13    we consider benzene to be so hazardous that

14    we try to avoid its use as far as possible."

15    Do you see that recommendation being made by

16    Dr. Foulger?

17          A.       Yes.

18          Q.       Did you ever see any

19    information from Ashland or American Mineral

20    Spirits Company recommending that the use of

21    benzene be avoided as far as possible being

22    provided to Savogran?

23                MS. BONNEVILLE:   Objection,

24          calls for speculation.

**Transcript of Monique, Mark**

```
01              THE WITNESS:  No.
02  BY MR. DuPONT:
03       Q.     And it continues to read, with
04  reference to Dr. Foulger, "I personally
05  recommend that it," meaning benzene, "be
06  eliminated from all paint removers or
07  paints, lacquers, enamels and thinners
08  because, in my opinion, it should only be
09  used under circumstances in which there is
10  very thorough ventilation to prevent workers
11  inhaling benzol, and constant medical
12  supervision of those workers to make certain
13  that they do not develop anemia."  Do you
14  see that?
15       A.     Yes.
16       Q.     Did you see any evidence in
17  the records you reviewed, or the folks that
18  you spoke to from Savogran, that Ashland or
19  American Mineral Spirit Company recommended
20  that benzene be eliminated from all paint
21  removers?
22       A.     No.
23       Q.     Did you see any warning or
24  recommendation from Ashland or American
```

Transcript of Monique, Mark

```
01   Mineral Spirits Company that benzene should
02   only be used under circumstances in which
03   there is very thorough ventilation to
04   prevent workers inhaling benzol?
05        A.    No.
06             MS. BONNEVILLE:  Calls for
07        speculation.
08   BY MR. DuPONT:
09        Q.    Did you see any evidence that
10   Ashland or American Mineral Spirits Company
11   recommended that there be constant medical
12   supervision of those workers to make certain
13   that they do not develop anemia?
14        A.    No.
15        Q.    The letter from Dr. Foulger at
16   DuPont continues to read, "Benzol is a very
17   insidious poison, and once bone marrow
18   damage has been produced by it, the clinical
19   condition is almost impossible to treat
20   successfully.  I believe that there are very
21   few instances in which benzol cannot be
22   replaced by other less hazardous solvents."
23   Do you see that?
24        A.    Yes.
```

**Transcript of Monique, Mark**

Page 159

```
01        Q.       Did you see any evidence in
02   records or folks that you spoke to from
03   Savogran that Ashland or American Mineral
04   Spirits Company advised that benzol is a
05   very insidious poison, and once it causes
06   bone marrow damage, the clinical condition
07   is almost impossible to treat successfully.
08             MS. BONNEVILLE:  Calls for
09        speculation.
10             THE WITNESS:  No.
11   BY MR. DuPONT:
12        Q.       Did you see any evidence from
13   the records that you reviewed or the folks
14   that you spoke with at The Savogran Company
15   that Ashland or American Mineral Spirits
16   Company told Savogran that there are very
17   few instances in which benzol cannot be
18   replaced by other, less hazardous solvents?
19             MS. BONNEVILLE:  Objection.
20        Calls for speculation.
21             THE WITNESS:  No.
22   BY MR. DuPONT:
23        Q.       And you saw in the Savogran
24   formulas that The Savogran Company was able
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

Page 160

```
01    to replace benzene with methylene chloride;
02    correct?
03         A.    Yes.
04                     -  -  -
05         (Whereupon the document was
06    marked, for identification purposes,
07    as Monique Exhibit Number 14.)
08                 -  -  -
09    BY MR. DuPONT:
10         Q.    I'm going to hand to you
11    Exhibit 14 to your deposition.  Exhibit 14
12    is a May 16, 1967 letter from an Edmund
13    Kornowicz, Superintendent at the State of
14    Illinois Department of Labor, Division of
15    Safety, Inspection and Education.  Do you
16    see that?
17         A.    Yes.
18         Q.    And Mr. Kornowicz is writing a
19    letter to a gentleman at Handschy Chemical
20    Company on May 16, 1967.  And there's
21    reference in this letter to an industrial
22    hygiene engineer from the Department of
23    Labor making an investigation of this
24    company, Handschy, and finding that they're
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation and the witness lacks personal knowledge.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, incomplete hypothetical and calls for expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    using a very hazardous solvent in the
02    products Hancolite and Special Type Wash.
03    Do you see that?
04         A.    Yes.
05         Q.    And they identify in this
06    letter the solvent in question to be benzene
07    or benzol.  Do you see that?
08         A.    Yes.
09         Q.    And the State of Illinois is
10    advising this company that's using benzene
11    or benzol in its product that chronic low
12    level exposures to benzene or benzol may
13    produce alterations of the blood elements
14    most commonly resulting in anemia,
15    leukopenia and thrombocytopenia.  Do you see
16    where it says that?
17         A.    Yes.
18         Q.    And the State of Illinois,
19    Department of Labor continues to advise that
20    benzene is a suspected carcinogenic agent.
21    And that all forms of acute and chronic
22    leukemia have been observed in workers with
23    benzene intoxication.  Do you see where
24    that's written?
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, incomplete hypothetical and calls for expert opinion.  Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

01        A.     Yes.

02        Q.    All right.  Now, are you aware

03 of The Savogran Company ever asking the

04 State of Illinois what it knew about the

05 health hazards of benzene?

06          MR. LEDGER:  Calls for

07     speculation.

08          THE WITNESS:  And nothing

09     found in the record.

10 BY MR. DuPONT:

11        Q.    Do you have any reason to

12 believe that if The Savogran Company

13 consulted the State of Illinois, Department

14 of Labor about the health hazards of

15 benzene, they would not have received the

16 same information from it?

17          MR. LEDGER:  Objection, calls

18     for speculation.

19          THE WITNESS:  There's nothing

20     in the record.

21 BY MR. DuPONT:

22        Q.    So, sitting here today, can

23 you identify any evidence or any reason that

24 you have to believe that if The Savogran

---

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, incomplete hypothetical and calls for expert opinion.  Objection based on inadmissible hearsay.

---

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01 Company asked the State of Illinois about

02 benzene in 1967, it would not have been told

03 that benzene is a suspected carcinogenic

04 agent. That all forms of acute and chronic

05 leukemia have been observed in workers with

06 benzene intoxication?

07             MR. LEDGER: Objection, calls

08       for speculation, lacks foundation.

09             THE WITNESS: There's nothing

10       in the record to say whether they did

11       or they didn't.

12 BY MR. DuPONT:

13       Q. And if we continue to read

14 down this letter, in the next paragraph,

15 "The State of Illinois is urging this

16 Handschy Chemical Company to substitute this

17 solvent benzene for a less toxic material to

18 reduce the health hazard to a minimum. Do

19 you see that?

20       A. Yes.

21       Q. Do you have any reason to

22 believe that if The Savogran Company

23 consulted with the Department of Labor in

24 the State of Illinois by 1967, they would

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    not have been told that they should
02    substitute benzene out of the Savogran
03    Kutzit product?
04              MR. Ledger:  Calls for
05        speculation.
06              THE WITNESS:  There's nothing
07        in the record to suggest whether they
08        did or did not ask.
09    BY MR. DuPONT:
10        Q.    Well, can you identify for me
11    any reason that you have to believe that the
12    Department of Labor and the State of
13    Illinois would not have provided the
14    information in this May 16, 1967 letter to
15    The Savogran Company, had it been requested?
16              MR. LEDGER:  Calls for
17        speculation.
18              THE WITNESS:  Yeah, I wouldn't
19        know.
20                    -  -  -
21        (Whereupon the document was
22        marked, for identification purposes,
23        as Monique Exhibit Number 15.)
24                    -  -  -
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

BY MR. DuPONT:

Q.      I'm handing to you Exhibit 15 to your deposition.  Exhibit 14 and 15 are related in that here, in Exhibit 15, there's a May 15, 1967 letter to the Handschy Chemical Company from the State of Illinois, Department of labor.  But this time the State of Illinois, through Mr. Edmund Kornowicz, is advising that Handschy Chemical Company was in violation of Illinois Health and Safety Act, and health and safety rules through its use of benzene.

A.      Yes.

Q.      And so, reading this letter and the record attached, we can determine that there were actually laws in place in the State of Illinois that prohibited the use of benzene in certain ways.

MR. LEDGER:  Objection, calls for speculation.  He's asking for your knowledge regarding law.

THE WITNESS:  Oh, that was another question.

MR. DuPONT:  Yes.

**Savogran** objects to the designation on the grounds that is inadmissible hearsay.



MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**



```
01              THE WITNESS:  Yeah.
02  BY MR. DuPONT:
03        Q.     Reading this letter, we can
04  interpret that there were laws in place in
05  the State of Illinois prohibiting the use of
06  benzene in the way it was being used by the
07  Handschy Chemical Company?
08              MR. LEDGER:  Calls for
09        speculation.
10              THE WITNESS:  Yeah, I'm not
11        sure.
12              MR. HERNAN:  Calls for legal
13        opinion.
14  BY MR. DuPONT:
15        Q.     I know you're not familiar
16  with what the laws were in the State of
17  Illinois, but reading this letter, the State
18  of Illinois is advising the Handschy
19  Chemical Company that it's in violation of
20  Illinois Health and Safety Act, and health
21  and safety rules.  And if we continue to
22  read through the attachment here, it refers
23  to how benzene was being used by the
24  Handschy Chemical Company.  Do you agree
```

**Transcript of Monique, Mark**

01  with that?

02      A.    Yes.

03      Q.    All right.  So, read together,

04  we can interpret this letter to mean that

05  the way that the Handschy Chemical Company

06  was using the benzene was in violation of

07  the Illinois Health and Safety Act and the

08  health and safety rules of Illinois?

09              MR. LEDGER:  Objection.  Calls

10          for speculation.  Calls for expert

11          opinion, legal opinion.

12              THE WITNESS:  Yeah, I'm not

13          sure.

14  BY MR. DuPONT:

15      Q.    If we turn to the second page

16  of the exhibit.  There is a State of

17  Illinois, Department of Labor Safety

18  Inspection Unit form that's been filled out.

19  Do you see that?

20      A.    Yes.

21      Q.    And, reading through the form,

22  there's a section where it says, "Following

23  is a list of violations of the rules and

24  regulations promulgated by the Illinois

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01    Industrial Commission by authority of the
02    Health and Safety Act, Chapter 48, Illinois
03    revised statute, 1947.  Do you see that?
04         A.    Yes.
05         Q.    And so, this is where the
06    State of Illinois is listing what violations
07    of the rules and regulations and the Health
08    and Safety Act it found?
09         A.    Yes.
10         Q.    And underneath that section,
11    and continuing on to the second page of
12    form, there's an item number six from the
13    list of violations.  Do you see that?
14         A.    Yes.
15         Q.    And what it says, as the sixth
16    violation, is, "Provide a substitute cleaner
17    eliminating the use of benzene, in
18    parentheses, benzol, for cleaning of pans
19    and equipment to minimize the harmful effect
20    of this solvent, as per part F, Section 3,
21    rules 1, 2 and 7K, and Section 3 of the
22    Health and Safety Act."  Do you see that?
23         A.    Yes.
24         Q.    So what the State of Illinois,
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01 Department of Labor is telling the Handschy

02 Chemical Company here is that they're in

03 violation of the Illinois law by using

04 benzene or benzol for cleaning of pans and

05 equipment.  And they had to stop doing that

06 to minimize the harmful effects of that

07 solvent.

08         MR. LEDGER:  Objection.  Calls

09     for speculation.  The document speaks

10     for itself.  I think it's also

11     outside the scope of the Deposition

12     Notice.  You're now asking him to

13     form opinions based on the

14     interpretation of documents.  It

15     calls for an expert witness opinion.

16     He's not designated as an expert

17     witness.

18         THE WITNESS:  I'm not sure

19     what it means.

20 BY MR. DuPONT:

21     Q.    So, reading this, where it

22 says, "Provide a substitute cleaner

23 eliminating the use of benzene, in

24 parentheses, benzol for cleaning of pans and

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

# Monique, Mark
## Rhyne Trial Master

```
01   equipment to minimize the harmful effects of
02   this solvent.  As per part F, Section 3,
03   Rules 1, 2 and 7K and Section 3 of the
04   Health and Safety Act, you don't interpret
05   that to mean that using benzene or benzol to
06   clean the pans and equipment was a violation
07   of those sections of Illinois Law?
08                 MR. LEDGER:  Objection, calls
09           for speculation.  Mr. Monique has no
10           knowledge of the state of law back in
11           Illinois back in the 1950s or '60s.
12           Calls for an expert opinion.  It's
13           also outside the scope of the
14           deposition Notice.
15                 THE WITNESS:  It sounds like a
16           recommendation.
17   BY MR. DuPONT:
18           Q.    And it's a recommendation that
19   refers to specific sections of the Illinois
20   law, including its Health and Safety Act?
21                 MR. LEDGER:  It calls for
22           speculation.  The document speaks for
23           itself, he can't testify as to
24           whether it's accurately stating the
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.



MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**



```
01          law.
02                    THE WITNESS:  Yes.
03   BY MR. DuPONT:
04          Q.     All right.  And you say it
05   sounds like a recommendation, but it's
06   listed in the section of the form where
07   there are violations of the rules and
08   regulations promulgated by the Illinois
09   Industrial Commission by authority of the
10   Health and Safety Act.  So, it's listed
11   under the section where there's -- the
12   company's been found to be in violation of
13   Illinois law.  Do you see that?
14                MR. LEDGER:  Objection.  The
15          document speaks for itself.  It calls
16          for speculation.  Calls for expert
17          opinion.  It's outside the scope of
18          the deposition Notice.  He's supposed
19          to testify about what he knows and
20          it's a fact deposition.  And you keep
21          asking him questions on how to form
22          opinions and to interpret documents
23          that he didn't create.
24                MR. DuPONT:  Counsel, you're
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        going beyond what's permissible with
02        an objection.
03             MR. LEDGER:  Let me finish.
04        The documents that were created
05        before he was born and they describe
06        laws that he has no familiarity with.
07  BY MR. DuPONT:
08        Q.    So, the fact that State of
09  Illinois is telling Handschy that they're in
10  violation of the Illinois Health and Safety
11  Act and Health and Safety rules, and listing
12  as one of the violations being the use of
13  benzene to clean pans and equipment, that's
14  not an indication to you that it was against
15  the law in Illinois to use benzene for that
16  purpose?
17             MR. LEDGER:  Objection, calls
18        for speculation.  Calls for expert
19        witness opinion.  Testimony calls for
20        -- the document speaks for itself.
21        He's not here to form opinions based
22        on old documents.
23             THE WITNESS:  Well, it's
24        certainly in violation of some --
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01          some regulations.  I think we can
02          agree on that.  Whatever they might
03          be.
04                      -   -   -
05              (Whereupon the document was
06          marked, for identification purposes,
07          as Monique Exhibit Number 16.)
08                      -   -   -
09  BY MR. DuPONT:
10      Q.      I'm going to hand to you
11  Exhibit 16 to your deposition.  And
12  Exhibit 16 is a document published by the
13  U.S. Department of Health, Education and
14  Welfare Public Health Service, called
15  "Occupational Diseases, a Guide to their
16  Recognition", and it's dated 1964.  If you
17  look to the fourth page you can see the date
18  there.  Do you see that?
19      A.      Yes.
20      Q.      And if you flip to the page
21  that has page number 87 in the top
22  right-hand corner, do you see there's a
23  section on benzene?
24      A.      Yes.
```

Savogran objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

Savogran objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01        Q.      And under benzene it says,
02   "harmful effects"?
03        A.      Yes.
04        Q.      And the second paragraph under
05   that section on benzene begins with the
06   sentence, "Chronic low level exposures may
07   produce alterations of the blood elements
08   most commonly resulting in anemia,
09   leukopenia and thrombocytopenia.  Do you see
10   that?
11        A.      Yes.  Yes.  I got it.
12        Q.      If you turn to the next page,
13   page 88.  The last two sentences of this
14   section on the health hazards -- of the
15   health effects of benzene read.  "Benzene is
16   a suspected carcinogenic agent.  All forms
17   of acute and chronic leukemia have been
18   observed in workers with benzene
19   intoxication."  Do you see that?
20        A.      Yes.
21        Q.      And that's the same thing that
22   was written in the May 16, 1967 letter from
23   the State of Illinois, Department of Labor
24   that we marked as Exhibit 14 to your
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01   deposition?

02        A.      Okay.

03        Q.      Do you want to look and

04   confirm that?

05        A.      Yes, yes.

06        Q.      All right.  Now, are you aware

07   of The Savogran Company, during the 1960s

08   and 1970s, ever consulting with the United

09   States Government's Public Health Service to

10   learn about the health hazards of benzene?

11        A.      There's nothing in the record.

12        Q.      Is this information with the

13   United States Public Health Service's

14   document about the health effects of benzene

15   information that was available to The

16   Savogran Company, if it had decided to

17   consult with the federal government?

18              MR. LEDGER:  Objection, calls

19        for speculation.

20              THE WITNESS:  Yeah, I have no

21        idea.

22   BY MR. DuPONT:

23        Q.      Based on what was written by

24   the United States Public Health Service and
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion. Objection based on inadmissible hearsay.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  the State of Illinois, Department of Labor,

02  about benzene being a suspected carcinogenic

03  agent, and all forms of acute and chronic

04  leukemia having been observed in workers

05  with benzene intoxication, would that

06  indicate to you that a primary health hazard

07  of exposure to benzene was indeed leukemia?

08      MR. LEDGER:  Objection, lacks

09      foundation.  Calls for speculation.

10      Mr. Monique has not been designated

11      as an expert in this case.  He is

12      here to give fact witness -- the

13      deposition is the person most

14      knowledgeable.  You're really going

15      outside the scope of the Deposition

16      Notice at this point.

17      THE WITNESS:  Yeah, I don't

18      know anything about the health

19      effects of benzene.

20      What time is it?

21      MR. DuPONT:  2:46.  Do you

22      need to take a break?

23      THE WITNESS:  Yeah, let's take

24      a break.

**Transcript of Monique, Mark**

01          VIDEO TECHNICIAN:  Time is

02     2:47, we're off the record.

03          (Whereupon there was a recess

04     in the proceeding.)

05          VIDEO TECHNICIAN:  This is the

06     beginning of media number four.

07     We're back on the record.  The time

08     is 2:54.

09 BY MR. DuPONT:

10     Q.    Mr. Monique, I wanted to ask

11 you some questions about the Kutzit labels.

12 Let's begin with Exhibit 5, if you don't

13 mind, please.

14     A.    No, not at all.

15     Q.    You got it in the pile in

16 front of you.

17     A.    Yep, got it.

18     Q.    Okay.  Now, do you know -- do

19 you have any information about what went

20 into the thought process in deciding what

21 words and symbols were used on the Kutzit

22 labels in the 1960s and 1970s?

23     A.    So, I can tell you, when I

24 started in 1987, they were using the

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    labeling guide that was published by the
02    National Paint Coatings Association.
03         Q.      Okay.  But as to what -- how
04    Savogran or whoever else prepared the labels
05    for the Kutzit product in the sixties and
06    seventies, do you know what basis they used
07    to decide what words or symbols they were
08    going to put on or not put on labels?
09         A.      No.  No.  I would assume that
10    it, you know, goes back to the National
11    Paint Coatings Association --
12         Q.      Okay.
13         A.      -- labeling guide.
14         Q.      All right.  Looking at Exhibit
15    5, this is the November 19, 1963 proof for
16    the Kutzit label?
17         A.      Yes.
18         Q.      And on the front of the
19    container it states that the product has
20    been laboratory tested for quality?
21         A.      Uh-huh, yes.
22         Q.      And reading that statement,
23    laboratory tested for quality, does that
24    lead the user to believe that it is indeed a
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01 product that has been tested and that it's a

02 quality product?

03          MR. LEDGER:   Objection, calls

04     for speculation.

05          THE WITNESS:   Yes.

06 BY MR. DuPONT:

07     Q.    And is that information that a

08 user of the Kutzit product could consider in

09 determining whether it's a safe product or

10 not?

11          MR. LEDGER:   Calls for

12     speculation.

13          THE WITNESS:   I wouldn't

14     interpret it as safe.  More

15     consistency in like performance,

16     yeah.

17 BY MR. DuPONT:

18     Q.    Do companies sometimes test

19 their product for safety?

20     A.    Yes.

21     Q.    And by indicating that the

22 product has been laboratory tested for

23 quality, could that be interpreted as

24 meaning safety is one of the quality

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01    aspects?
02              MR. LEDGER:  Objection, calls
03         for speculation, calls for expert
04         opinion.  If you know how people
05         interpret it, then you can go ahead.
06         Don't speculate.
07              THE WITNESS:  To me personally
08         that means consistency.  It's always
09         going to work the same, behave the
10         same every time, not safety.
11    BY MR. DuPONT:
12         Q.    On the right-hand side of the
13    label, is that the back panel of the
14    container?
15         A.    The right-hand side?
16         Q.    Yes.
17         A.    Yes.
18         Q.    And at the top of the back
19    panel it has the word Kutzit on it; right?
20         A.    Yes.
21         Q.    And underneath it there's some
22    description of how the product works and how
23    it can be used?
24         A.    Yes.
```

# Monique, Mark

## Rhyne Trial Master

```
01        Q.      And it's described to be a
02   faster acting liquid type for quick
03   stripping of paint, lacquer, enamel, shellac
04   and varnish?
05        A.      Yes.
06        Q.      And it continues to say that
07   it's especially useful on horizontal and
08   flat surfaces?
09        A.      Yes.
10        Q.      And then on upright, rounded
11   or thickly coated surfaces it recommends the
12   use of the Strypeeze Semi-Paste?
13        A.      Yes.
14        Q.      Now, the fact that the product
15   was advertised as a fast working product, or
16   a faster acting product, would that lead a
17   user to believe that it would help them get
18   a job done quicker than some other paint
19   removers?
20             MR. LEDGER:  Objection.  Calls
21        for speculation.  If you feel you
22        have reason to believe how a user is
23        going to interpret the document, then
24        go ahead.  But if you don't, don't
```

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01          speculate.
02                  THE WITNESS:  Yes.
03   BY MR. DuPONT:
04          Q.      And underneath that section
05   there are three bullet points -- four bullet
06   points, excuse me, the first of which
07   directs the user of the Kutzit product to be
08   sure to apply the thickest possible coat of
09   remover by flowing it on with a loaded brush
10   in one direction only?
11          A.      Yes.
12          Q.      All right.  And your
13   understanding that, being a chemist, the
14   more product -- Kutzit product that is
15   applied, the more solvent chemical inside
16   the product is going to evaporate off of it?
17                  MR. LEDGER:  Calls for
18          speculation.  Incomplete
19          hypothetical.
20                  THE WITNESS:  What was the
21          question again?
22   BY MR. DuPONT:
23          Q.      Sure.  Given your background
24   in chemistry, would you agree with me that
```

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, an incomplete hypothetical and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

### Rhyne Trial Master

```
01    the greater volume of the Kutzit product
02    that is applied to the surface, the greater
03    volume of solvent vapors will come off of
04    the product?
05                   MR. LEDGER:  Same objection.
06                   THE WITNESS:  Not necessarily.
07            Because you know they -- you lay it
08            down in one direction because you're
09            trying to get the wax to form that
10            layer, and that retards the
11            evaporation.
12    BY MR. DuPONT:
13            Q.    Okay, good.
14            A.    Yes.
15            Q.    But eventually all that
16    solvent's got to evaporate off for the
17    product to work.  Right?
18            A.    Right.
19            Q.    All right.
20            A.    And the other -- you know,
21    Kutzit was a liquid.  So, I mean, it's kind
22    of a silly statement there, you know.
23    Thickest possible coat, certainly Strypeeze
24    is very thick and clings to upright and
```

Transcript of Monique, Mark

01  rounded surfaces, but Kutzit, being a

02  liquid, you know, is thin.

03       Q.    All right.  Well, the

04  directions back in 1963 --

05       A.    Yeah, yeah.

06       Q.    -- and we'll look at the same

07  ones in 1969 -- do say to apply it in the

08  thickest possible coat.  Correct?

09       A.    Yes.

10       Q.    And when the Kutzit product is

11  applied to the surface that it has paint or

12  lacquer or enamel on, it's going to eat into

13  that -- that surface and kind of form a --

14  form a sludge with the paint?

15            MR. LEDGER:  Objection.  Calls

16       for speculation.  Incomplete

17       hypothetical.

18            THE WITNESS:  Yes.

19  BY MR. DuPONT:

20       Q.    All right.  In fact, if we

21  look at the third bullet point down, what it

22  says is, "When old finish is completely

23  softened, take away sludge with number two

24  coarse steel wool or scraper.  Let Kutzit do

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  the work for you."

02      A.      Yes.

03      Q.      So what happens is that the

04  Kutzit mixes with the paint, lacquer or

05  enamel, and by dissolving it becomes kind of

06  a sludge material?

07      A.      Yes.

08      Q.      And when you think of sludge

09  you think of a thicker material.  Right?

10      A.      Yes.

11      Q.      All right.  And then what the

12  Kutzit label advises the user to do is use

13  either a number two coarse steel wool or a

14  scraper to remove that sludge from the

15  surface?

16      A.      Yes.

17      Q.      And number two coarse steel

18  wool is something that somebody can hold in

19  their hand in order to rub the surface to --

20  to get the sludge off?

21      A.      Yes.

22      Q.      And towards the bottom of the

23  back panel there's a section on suggestions

24  about using the product.

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

```
01          A.     Yes.
02          Q.     And one of the suggestions, it
03  says, is, "To protect your hands, wear
04  cotton lined type of rubber gloves?"
05          A.     Yes.
06          Q.     All right.  And do you know
07  why it is that Savogran made this only a
08  suggestion and not a requirement that gloves
09  be worn with the product?
10              MR. LEDGER:  Objection, lacks
11          foundation.  Calls for speculation.
12              THE WITNESS:  I don't.
13  BY MR. DuPONT:
14          Q.     And it continues to read in
15  the next bullet point. Paint remover should
16  not be used on asphalt, linoleum, rubber
17  tires -- rubber tiles or plastic.  And to
18  shake well and not smoke while using it.
19  Right?
20          A.     Yes.
21          Q.     All right.  So those are the
22  surfaces that Savogran is advising the user
23  not to use the Kutzit product on?
24          A.     Correct.
```

**Transcript of Monique, Mark**

# Monique, Mark

## Rhyne Trial Master

```
01        Q.      And there's no cancer warning
02   or aplastic anemia warning on this label;
03   right?
04              MR. LEDGER:  Objection, the
05        document speaks for itself.
06              THE WITNESS:  No.
07   BY MR. DuPONT:
08        Q.      And the user is not told to
09   wear a respirator when working with the
10   product; correct?
11              MR. LEDGER:  Same objection.
12              THE WITNESS:  Correct.
13   BY MR. DuPONT:
14        Q.      And the user is not told that
15   something in the product can be absorbed
16   through human skin; correct?
17        A.      Correct.
18              MR. LEDGER:  Same objection.
19   BY MR. DuPONT:
20        Q.      And they're not told that
21   after being absorbed through the human skin
22   something in the product could poison their
23   blood or bone marrow, fair?
24              MR. LEDGER:  Same objection.
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, document speaks for itself and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark

## Rhyne Trial Master

```
01              THE WITNESS:  Correct.
02   BY MR. DuPONT:
03        Q.      Now, if we look at Exhibit 6,
04   that is the February 14, 1969 proof of the
05   Kutzit label.  Do you see that?
06        A.      Yes.
07        Q.      And that contains similar
08   directions in the top of the back panel to
09   be sure to apply the thickest coat possible
10   of remover by flowing it on with a loaded
11   brush in one direction only.   Right?
12        A.      Yes.
13        Q.      And it also advises the user
14   to remove the sludge from the mixture of the
15   product with the coating with a dull
16   scraper?
17        A.      Yes.
18        Q.      It's not telling the user to
19   use any steel wool anymore?  Well, not to
20   remove the sludge at least.
21              MR. LEDGER:  Document speaks
22        for itself.
23   BY MR. DuPONT:
24        Q.      Instead what it says is, for
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, document speaks for itself and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1
**Transcript of Monique, Mark**

# Monique, Mark

## Rhyne Trial Master

```
01   best results wash -- is that wash doors with
02   sharp -- with steel wool or coarse cloth
03   dipped in mineral spirits or turpentine?
04              MR. LEDGER:  Calls for
05        speculation.  If you can understand
06        it.
07              THE WITNESS:  That's to get
08        rid of the residue.
09   BY MR. DuPONT:
10        Q.     Okay.  And the type is not --
11   the type is not very clear on this copy.
12   But is that what it reads, for best results
13   wash doors with steel wool or certain thick
14   coarse cloth dipped in mineral spirits or
15   turpentine?
16        A.     No, that's not what it says.
17   For best results, wash down -- wash down
18   with steel wool or coarse cloths dipped in
19   mineral spirits or turpentine.
20        Q.     Okay.  So, it's down, not
21   doors?
22        A.     Right.  Yep.
23        Q.     All right.  And if we go down
24   to the bottom of the back panel where the
```

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, document speaks for itself and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

# Monique, Mark
## Rhyne Trial Master

| | |
|---|---|
| 01 | bullet points are. The first bullet point |
| 02 | says, "Prepare a work area outdoors or on a |
| 03 | concrete floor." Do you see that? |
| 04 | A.    Yes. |
| 05 | Q.    The comparison between |
| 06 | outdoors or on a concrete floor, do you |
| 07 | interpret that to mean that the concrete |
| 08 | floor could be inside? |
| 09 | MR. LEDGER:  Objection, calls |
| 10 | for speculation. |
| 11 | THE WITNESS:  Yeah, I'm not |
| 12 | going to interpret that one. |
| 13 | BY MR. DuPONT: |
| 14 | Q.    Would you agree with me that |
| 15 | it is reasonable that somebody can interpret |
| 16 | this to be a comparison with using the |
| 17 | product either outdoors or on a concrete |
| 18 | floor inside? |
| 19 | MR. LEDGER:  Objection. Calls |
| 20 | for speculation. Calls for expert |
| 21 | opinion. |
| 22 | THE WITNESS:  That's really a |
| 23 | strange one. I've got no opinion on |
| 24 | that one. That's actually the first |

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, document speaks for itself and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01          time I've noticed that.

02    BY MR. DuPONT:

03          Q.      Because it continues to say,

04    spread newspapers to absorb drippings, which

05    is talking about using it either outdoors or

06    on a concrete floor, and spreading

07    newspapers.  Does this appear -- does the

08    concern appear to be the mess that the

09    product will make?

10                  MR. LEDGER:  Objection, calls

11          for speculation.

12                  THE WITNESS:  Yeah, I don't

13          know.  Sorry.

14    BY MR. DuPONT:

15          Q.      Okay.  So, spreading

16    newspapers to absorb drippings, that's

17    something that somebody could do to prevent

18    there from being a mess on the floor

19    underneath where the product is used?

20                  MR. LEDGER:  Calls for

21          speculation.

22                  THE WITNESS:  Yes.

23    BY MR. DuPONT:

24          Q.      Okay.  Now, in this version of

**Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, document speaks for itself and calls for an expert opinion.

MONIQUE, MARK
- (THOMAS) VOL 1

**Transcript of Monique, Mark**

01  the label with the proof of February 14,
02  1969, what the next bullet point says is, to
03  protect sensitive skin wear cotton lined
04  type of heavy gloves.  Do you see that?
05        A.     Yes.
06        Q.     And do you know why it was
07  that Savogran suggested that it's only for
08  folks with sensitive skin that they should
09  only wear cotton lined leather -- excuse me
10  -- cotton lined heavy rubber gloves in 1969?
11              MR. LEDGER:  Calls for
12        speculation.
13              THE WITNESS:  I don't.
14                    -  -  -
15              (Whereupon the document was
16        marked, for identification purposes,
17        as Monique Exhibit Number 17.)
18                    -  -  -
19  BY MR. DuPONT:
20        Q.     I'm going to hand to you
21  Exhibit 17 to your deposition.  It's Bates
22  Number Savogran 112.  It's a May 27, 1966
23  letter From Savogran Pacific Corporation to
24  Mr. Clement Stodder of The Savogran Company.

> **Savogran** objects to the designation on the grounds that it is vague and ambiguous, lacks foundation, assumes facts not in evidence, calls for speculation, the witness lacks personal knowledge, document speaks for itself and calls for an expert opinion.

Page 193

01 In this letter, is Savogran Pacific

02 Corporation making reference to paying The

03 Savogran Company royalties on sales of

04 Savogran products?

05     A.    Yes.

06     Q.    And it refers to paying

07 royalties that correspond to a period of

08 several months?

09     A.    They go into sales for a four

10 month period, $89,834.29.

11     Q.    Okay.  So, it appears by the

12 date of this letter, in May 27, 1966, that

13 Savogran Pacific Corporation had already

14 been selling Savogran products for four

15 months?

16     A.    Not sure.

17     Q.    Or at least it was calculating

18 royalties based on the last sales made

19 during the prior four months?

20          MR. LEDGER:  Calls for

21     speculation.

22          THE WITNESS:  Yeah, I'm not

23     sure.

24              -   -   -

**Transcript of Monique, Mark**

```
01              (Whereupon the document was
02         marked, for identification purposes,
03         as Monique Exhibit Number 18.)
04              -   -   -
05   BY MR. DuPONT:
06         Q.      I'm going to hand to you
07   Exhibit 18.  Exhibit 18 is a September 22,
08   1964 letter from Savogran Pacific
09   Corporation to Mr. Clement Stodder with The
10   Savogran Company.  Do you see that?
11         A.      Yes.
12         Q.      All right.  And it indicates
13   that on September 22, 1964, Clement Stodder
14   from The Savogran Company, along with the
15   author of the letter, and individuals name
16   Karl and Jack are directors of Savogran
17   Pacific Corporation?
18         A.      Okay.
19         Q.      Is that correct?
20         A.      Yes.
21         Q.      Reading further down, is the
22   Karl being referred to the individual listed
23   under "Stock Holdings" as K. G. Johnson?
24              MR. LEDGER:  Calls for
```

**Transcript of Monique, Mark**

```
01          speculation.
02              THE WITNESS:  I'm sorry, I'm
03          lost.
04  BY MR. DuPONT:
05          Q.     Sure the Karl that's listed,
06  that's mentioned in the sentence, "In the
07  meanwhile, the directors are you, me, Karl
08  and Jack," is that Karl -- Karl Johnson,
09  who's also abbreviated as K. G. Johnson?
10          A.     Oh, I have no idea.
11                 -  -  -
12              (Whereupon the document was
13          marked, for identification purposes,
14          as Monique Exhibit Number 19.)
15                 -  -  -
16  BY MR. DuPONT:
17          Q.     Okay.  I'm going to hand to
18  you Exhibit 19.  Quickly, Exhibit 19 is a
19  December 11 -- Exhibit 19 is a December 11,
20  1970 letter from Robert Lenk, the Treasurer
21  of Savogran Company, to Karl G. Johnson,
22  vice president of Savogran Pacific
23  Corporation.
24          A.     Okay.
```

**Transcript of Monique, Mark**

```
01        Q.     All right.   Reading these two
02  together -- these two exhibits together,
03  does that indicate to you that the Karl and
04  K. G. Johnson referred to in the September
05  22, 1964 letter that's Exhibit 18 is the
06  same as the Karl G. Johnson, vice president
07  of Savogran Pacific Corporation on
08  Exhibit 19?
09             MR. LEDGER:  Calls for
10        speculation.
11             THE WITNESS:  Yes.
12  BY MR. DuPONT:
13        Q.     All right.  So, this September
14  22, 1964 letter indicates that Savogran
15  Boston, that would be The Savogran Company,
16  held 10,000 shares of Savogran Pacific
17  Corporation; is that right?
18        A.     Okay.
19        Q.     And 10,000 shares, somebody
20  has totaled up the total number of shares
21  and they total fifty thousand.  So, Savogran
22  Boston would have been a 20 percent owner of
23  Savogran Pacific Corporation at that period
24  of time?
```

**Transcript of Monique, Mark**

```
01              MR. LEDGER:  Calls for
02        speculation.
03  BY MR. DuPONT:
04        Q.     Do you agree with that?
05              MR. LEDGER:  If you know.
06              THE WITNESS:  I don't know.
07  BY MR. DuPONT:
08        Q.     Do you agree that that's what
09  this document states?
10        A.     Yes.
11        Q.     Okay.  And there's other
12  individuals listed as stockholders of
13  Savogran Pacific Corporation, the first of
14  which is John McLean.  Who is John McLean
15  employed by?
16        A.     Who is John McLean employed
17  by?
18        Q.     Yes.
19        A.     I don't know.
20        Q.     Next is Mary Compton.  Do you
21  know who Mary Compton was?
22        A.     No.
23        Q.     All right.  Peggy Pavelka.  Do
24  you know who Peggy Pavelka was?
```

Transcript of Monique, Mark

01       A.      No.

02       Q.      L. A. McLean.  Are you

03   familiar with an L.A. McLean being

04   associated with Savogran?

05       A.      No.

06       Q.      Then there's a Florence Carey.

07   Do you know who Florence Carey was?

08       A.      No.

09                    -  -  -

10            (Whereupon the document was

11       marked, for identification purposes,

12       as Monique Exhibit Number 20.)

13                    -  -  -

14   BY MR. DuPONT:

15       Q.      I'm going to hand to you

16   Exhibit 20.  Exhibit 20 is a February 26,

17   1965 letter from Clement Stodder, the

18   president of The Savogran Company, to

19   Savogran Pacific Corporation?  Do you see

20   that?

21       A.      Yes.

22       Q.      All right.  In the -- in the

23   first paragraph of this letter it refers to

24   an agreement dated December 22, 1950,

**Transcript of Monique, Mark**

01    between The Savogran Company and L.A.

02    McLean and others, which was assigned to

03    Savogran Pacific Corporation.  Do you see

04    that?

05        A.    Yes.

06        Q.    All right.  Earlier we talked

07    about there being a west coast salesperson

08    for The Savogran Company who owned the

09    Los Angeles facility.  Do you remember that?

10        A.    Uh-huh.  Yes.

11        Q.    Is that L.A. McLean?

12        A.    Well, that's what I'm saying.

13    Obviously we know now it wasn't a west coast

14    salesperson.  They had their own company out

15    there.

16        Q.    All right.

17        A.    So that clears that up.

18        Q.    Well, do we know if -- do we

19    know if -- okay.  Well, the agreement that

20    we looked at earlier in 1965 refers to

21    Savogran Pacific Corporation as a -- a

22    California corporation, I believe; right?

23        A.    Yes.

24        Q.    Okay.  And here The Savogran

**Transcript of Monique, Mark**

```
01   Company, in this letter, is granting the
02   stockholders of Savogran Pacific Corporation
03   -- well, strike that.
04              It's the other way around.   In
05   this letter, this is an agreement that the
06   stockholders of Savogran Pacific Corporation
07   are granting The Savogran Company basically
08   a right of first refusal, or first offer to
09   purchase stock of Savogran Pacific
10   Corporation?  Is that how you read this
11   letter?
12        A.     I haven't read it.
13        Q.     Okay.
14        A.     I'm sorry.
15        Q.     Sure.  In the second
16   paragraph, it says, The undersigned, being
17   stockholders of Savogran Pacific
18   Corporation, do by here -- do hereby agree
19   with The Savogran Company, for the
20   considerations herein expressed, to grant to
21   The Savogran Company, in the event that any
22   of the undersigned decide to sell any of
23   their shares of Savogran Pacific Corporation
24   to first offer such shares for purchase by
```

**Transcript of Monique, Mark**

Page 201

01  The Savogran Company at the same price at
02  which such shareholders may be able to sell
03  their shares elsewhere.  Do you see that?
04       A.     Yes.
05       Q.     Okay.  So what's happening in
06  this letter is, the shareholders of Savogran
07  Pacific Corporation are agreeing that if
08  they're going to sell their shares, that
09  The Savogran Company is going to have,
10  basically, the first right to buy them.
11       A.     Okay.
12       Q.     Do you agree with that?
13       A.     Yes.
14       Q.     And by 1964, we saw in the
15  earlier exhibit, that The Savogran Company
16  was already a 20 percent shareholder of the
17  Savogran Pacific Corporation?
18       A.     Yes.
19       Q.     Okay.  I think those are all
20  the questions I have.
21              MR. LEDGER:  Anybody on the
22       phone?
23                     -   -   -
24  BY MS. BONNEVILLE:

**Transcript of Monique, Mark**

Page 202

```
01        Q.      Hi, this is Jennifer
02   Bonneville.  I have some questions.  Sir,
03   can you hear me okay?
04        A.      Yes.
05        Q.      Sir, can you hear me?
06                MR. LEDGER:  We can hear you.
07                THE WITNESS:  Loud and clear.
08                MS. BONNEVILLE:  Okay.  I
09        can't hear -- I can't hear the
10        witness at all.
11   BY MS. BONNEVILLE:
12        Q.      My name is Jennifer
13   Bonneville.  Can you hear me?
14                MR. LEDGER:  Is it better now
15        with the witness?
16                MS. BONNEVILLE:  Yes.
17   BY MS. BONNEVILLE:
18        Q.      Sir, my name is Jennifer
19   Bonneville.  I have some questions for you.
20                I just want to make sure you
21   understand, the same rules apply.  I don't
22   want you to guess or speculate if you don't
23   know things.
24                When I ask you questions about
```

**Transcript of Monique, Mark**

```
01   what you know, the you that I'm referring to
02   is Savogran.   You understand that; correct?
03        A.     Yes.
04             MS. BONNEVILLE:  I can't hear
05        the witness at all.  I don't know if
06        he responded.
07             MR. DuPONT:  He said, yes.
08             (Discussion held off the
09        record.)
10   BY MS. BONNEVILLE:
11        Q.     You were shown a few minutes
12   ago Exhibits 11 through 16 by Mr. DuPont.
13   Do you recall that?
14        A.     No, we have to dig them out.
15        Q.     Sir, I don't need you to
16   review them, but do you recall looking at
17   those documents, 11 through 16?
18        A.     No.  We got to dig them out
19   because I -- my brain is fried at this
20   point.
21        Q.     Take your time, sir.  Let me
22   know when you're ready.
23        A.     Okay, yeah.
24             MR. LEDGER:  All right, he's
```

**Transcript of Monique, Mark**

```
01        got them.
02             THE WITNESS:  We got them.
03   BY MS. BONNEVILLE:
04        Q.     You haven't seen those
05   documents before today; correct?
06        A.     That's correct.
07        Q.     Is that correct, sir?
08             THE WITNESS:  It doesn't
09        include the Illinois one, right?
10        Because that one we've seen before,
11        right?  Didn't you have that in the
12        Lee case, the Illinois ones?
13             MR. DuPONT:  I'll represent to
14        you that the API documents and the
15        Rutherford T. Johnstone document are
16        not -- were not exhibits to your last
17        deposition.
18             THE WITNESS:  All right.
19             So I have not seen them
20        before.
21   BY MS. BONNEVILLE:
22        Q.     It's fair to say that you have
23   no information, you being Savogran, on the
24   accuracy or completeness of the information
```

**Transcript of Monique, Mark**

01    in those documents?

02          A.      Correct.

03          Q.      You don't know what the

04    background was of the documents, or what the

05    context was of those documents; is that

06    correct?

07          A.      Correct.

08          Q.      Is that correct, sir?

09          A.      That's correct.

10          Q.      It's fair to say you don't

11    know if those documents were or were not

12    available to Savogran at or about the time

13    they were created; is that correct?

14          A.      That's correct.

15          Q.      Am I correct that there's no

16    one at Savogran -- there's no one alive who

17    worked at Savogran in the sixties and

18    seventies?

19          A.      That's correct.

20          Q.      And, a thorough search was

21    done for records of Savogran regarding who

22    its suppliers were in the sixties and

23    seventies?

24          A.      I didn't catch that question.

**Transcript of Monique, Mark**

```
01   Can you repeat that?  I'm sorry.
02        Q.     Sure.
03        A.     You broke up.
04        Q.     No problem, sir.  Any time you
05   don't hear me, you let me know.
06        A.     Yeah.
07        Q.     Am I correct that Savogran
08   undertook a thorough search for records of
09   who its suppliers were in the sixties and
10   seventies relative to the Kutzit product?
11        A.     Well, we have -- we have the
12   purchase history documents for the benzene
13   from '72 and '73.
14        Q.     But you did a thorough search,
15   and that was the only document you found;
16   correct?
17        A.     Correct.
18             MR. DuPONT:  Objection,
19        misstates testimony.
20   BY MS. BONNEVILLE:
21        Q.     Is that a correct statement?
22             COURT REPORTER:  He said
23        "correct".
24             MS. BONNEVILLE:  Okay.  I'm
```

**Transcript of Monique, Mark**

01          not hearing the witness at all here.

02                THE WITNESS:  Correct.

03    BY MS. BONNEVILLE:

04        Q.     Okay.  Thank you, sir.

05            Is it fair to say that there

06    was no one for you to ask about what the

07    company knew in the sixties and seventies

08    about the health hazards of benzene because

09    there's no one alive; is that correct?

10        A.     That's correct.

11        Q.     And there is no one for you to

12    ask about what you were -- you being

13    Savogran -- were or were not told by your

14    suppliers about the health hazards of

15    benzene.  Is that correct?

16        A.     That's also correct.

17        Q.     In fact, you don't know what

18    information was or was not provided by

19    suppliers of benzene, or any other products

20    that went into Kutzit in the sixties and

21    seventies; is that fair?

22        A.     That's correct.

23        Q.     And you don't have any

24    information, because of the passage of time,

**Transcript of Monique, Mark**

```
01   available to you as to what Savogran itself
02   knew or did not know about the health
03   hazards of benzene in the sixties and
04   seventies; correct?
05        A.      Correct.
06        Q.      Correct, sir?
07        A.      Correct.
08        Q.      The only information that you
09   have is what is in the exhibits, Exhibit 8,
10   as to who its suppliers were; is that
11   correct?
12        A.      Correct.
13        Q.      And this is for the time
14   period of '73 to '74; correct?
15        A.      Correct.
16        Q.      And so you don't know if the
17   suppliers identified in Exhibit 8, if they
18   supplied to Savogran in '72 or '71 or any
19   other time period; correct?
20        A.      Correct.
21        Q.      Now, based on this document, f
22   you don't know who created it; is that fair?
23        A.      The -- the purchase document?
24        Q.      Yes.  Exhibit 8.
```

**Transcript of Monique, Mark**

```
01        A.      Yeah.
02        Q.      You don't know who created
03   this document; correct?
04        A.      Correct.  No.
05        Q.      Was there a response.
06        A.      We don't know for sure.
07        Q.      Okay.  You don't know exactly
08   when it was prepared; correct?
09        A.      No.
10        Q.      And you don't know if the
11   person who prepared this, if it was part of
12   their job duties?  You just don't know
13   anything about the circumstances of the
14   creation; is that fair?
15              MR. DuPONT:  Objection.
16        Misstates testimony.
17   BY MS. BONNEVILLE:
18        Q.      Sir, is that correct?
19        A.      Correct.
20        Q.      Okay.  Now, in 1973 and '74,
21   the time frame of this Exhibit 8, there were
22   other products being produced in the
23   Norwood; Massachusetts facility; correct?
24        A.      Correct.  Correct.
```

Transcript of Monique, Mark

```
01        Q.      How do you know that this
02  document relates to Kutzit?
03        A.      Well, Kutzit was the only --
04  it's the only product that we know of that
05  contained benzene.
06        Q.      Did you review the formulas
07  for the other products being made at the
08  Norwood, Massachusetts facility in '73 to
09  '74?
10        A.      Well, anything we could find
11  in the -- you know, in the record,
12  definitely.
13        Q.      And do you know, based on
14  Exhibit 8, if Savogran was ordering a blend
15  of benzene and acetone, or if they were
16  ordering benzene and acetone and blending it
17  themselves?  Do you know that one way or the
18  other?
19        A.      That I don't.
20        Q.      Was there an answer?
21        A.      I don't.  I don't know.
22        Q.      Looking at Exhibit 8, there's
23  date, vendor number and order numbers.
24  Correct, sir, if you look at the first page,
```

**Transcript of Monique, Mark**

01   123?

02        A.      Yes.

03        Q.      And based on your experience

04   with Savogran, you would expect for those

05   order numbers that there would have been

06   some form of purchasing paperwork that would

07   have gone with that.  Is that fair?

08        A.      Yes.

09        Q.      And then looking at the second

10   page, 124.

11        A.      Yes.

12        Q.      Do you see those same order

13   numbers.  And there would have been records,

14   some form paperwork when the products were

15   received; correct?

16        A.      Yes.

17        Q.      And none of that paperwork is

18   available anymore; correct?

19        A.      That is correct.

20        Q.      So whatever -- for example,

21   AMSCO sent, when it supplied product, you

22   just don't have that information, or those

23   documents just aren't available.  Correct?

24        A.      Correct.

Transcript of Monique, Mark

01      Q.      Now, Kutzit was formulated by

02  Savogran; correct?

03      A.      Yes.

04      Q.      And Savogran decided what

05  would go into the product and what

06  percentage of the components would go in the

07  product; correct?

08      A.      Yes.

09      Q.      And Savogran would have

10  decided who they were going to purchase from

11  and who they weren't going to purchase from;

12  correct?

13      A.      Yes.

14      Q.      Is that correct, sir?

15      A.      Yes.

16      Q.      I can't hear if there was an

17  answer.

18      A.      Yes.

19              MR. DuPONT:  He said yes.

20  BY MS. BONNEVILLE:

21      Q.      Thank you.

22              Is it fair to say that the

23  information on how Savogran selected its

24  suppliers back in the sixties and the

**Transcript of Monique, Mark**

01 seventies, that that information is just no

02 longer available.

03      A.     That is correct.

04      Q.     And when you started with the

05 company in 1987, you started as a chemist;

06 correct?

07      A.     Yes.

08      Q.     And Savogran had chemists on

09 staff prior to you being there; correct?

10      A.     My -- my boss, John Gale, was

11 a chemist.

12      Q.     And do you know if there was a

13 chemist before John?

14      A.     No.  I don't know.

15      Q.     You don't know?

16      A.     No.  You got to remember,

17 Savogran is a really small company.  I mean,

18 you guys --

19      Q.     Right.

20      A.     -- have different impressions

21 of who we are, I think.  You know, we're --

22 we're minuscule.

23      Q.     And Savogran was -- you were

24 started on the east coast; correct?

**Transcript of Monique, Mark**

```
01        A.      Yes.
02        Q.      Started in Massachusetts?
03        A.      Correct.
04        Q.      And, over time, Savogran
05   expanded to Illinois, Chicago, and then
06   there was a California location; correct?
07        A.      Correct.
08        Q.      And Savogran doesn't have any
09   record of shipping Kutzit to California in
10   the sixties and seventies; correct?
11        A.      That's correct.
12        Q.      And it doesn't have any
13   records of shipping Kutzit to Savogran
14   Pacific in the sixties and seventies.
15   That's right too, isn't it?
16        A.      Correct.
17        Q.      When you joined in 1987, was
18   there an industrial hygiene -- hygiene
19   program in place at Savogran?
20        A.      Not -- there's a hazardous
21   communications program.
22        Q.      Did that program, as far as
23   you can tell, predate your employment?
24        A.      Yes.
```

**Transcript of Monique, Mark**

```
01        Q.      I'm sorry, but was there a
02   response?  I'm not hearing anything.
03        A.      Yes.
04        Q.      Do you know how long there has
05   been a HazCom or hazard communication
06   program at Savogran?
07        A.      I don't.
08        Q.      Savogran is owned by its
09   employees; correct?
10        A.      Yes.  We're a hundred percent
11   employee owned.
12        Q.      And the health and safety of
13   those employees, that's important to
14   Savogran, isn't it?
15        A.      Yes.
16        Q.      And the health and safety of
17   its customers, that's equally important to
18   Savogran; isn't it?
19        A.      Yes.
20        Q.      And part of the reason that
21   Savogran has been in business for over a
22   hundred years is, it has a solid
23   understanding of its product, and how those
24   products are being used in the marketplace;
```

**Transcript of Monique, Mark**

```
01   correct?
02        A.      Quality, reputation.
03                MR. DuPONT:  Objection.
04                THE WITNESS:  All of the
05        above.
06                MR. DuPONT:  Vague.
07        Foundation.
08   BY MS. BONNEVILLE:
09        Q.      And Kutzit was not the first
10   paint remover that Savogran developed;
11   correct?
12        A.      No.
13        Q.      Right, I'm correct?
14        A.      It was not.
15        Q.      It was not the first?
16        A.      No.
17        Q.      And Savogran has had other
18   paint removers since Kutzit; correct?
19        A.      Yes.
20        Q.      And, over time, Savogran has
21   changed the formulation of its products, has
22   reformulated its products; is that correct?
23        A.      Yes.
24                MR. DuPONT:  Objection, vague.
```

Transcript of Monique, Mark

```
01              THE WITNESS:  We just -- as a
02       matter of fact, we just reformulated
03       them last year.  In other words, we
04       --
05  BY MS. BONNEVILLE:
06       Q.     There's a variety of reasons
07  why Savogran does that; correct?
08       A.     Yes.
09       Q.     Part of it is to make sure the
10  product was safe, make sure that you're
11  keeping up with what the market demands;
12  right?
13       A.     Yes.
14              MR. DuPONT:  Objection, vague.
15              THE WITNESS:  Regulations --
16  BY MS. BONNEVILLE:
17       Q.     I want to ask you a couple of
18  -- I want to ask you a couple of questions
19  about the manufacture of Kutzit.  You
20  indicated, at least when you started in '87,
21  that there were storage tanks, underground
22  storage tanks. Is that correct?
23       A.     Yes.
24       Q.     How long have those storage
```

Transcript of Monique, Mark

```
01   tanks been in place; if you know?

02        A.      In Norwood or in --

03        Q.      In Norwood.

04        A.      -- or in California?

05        Q.      Norwood.

06        A.      Oh, Norwood.  Well, they were

07   -- when I got there -- you know, I'm not

08   really sure.  We replaced them in 2001.  I

09   can tell you that.

10        Q.      Okay.  Do you know if that was

11   the first time they had been replaced?

12        A.      I think that was the third.

13        Q.      Do you know, were they

14   replaced about every 20 years or so?

15        A.      Yes.

16        Q.      So the third replacement would

17   have been 2000?  The tanks probably would

18   have gone back to the fifties?  Is that a

19   fair estimate?

20        A.      It's possible.

21        Q.      Are you aware of raw materials

22   being transferred between Savogran

23   manufacturing facilities in the sixties and

24   seventies?
```

**Transcript of Monique, Mark**

01     A.    No.

02     Q.    So if a raw material like

03  benzene was received in Norwood, it was used

04  in Norwood for products?

05     A.    Right. Well, they didn't have

06  the faci --

07     Q.    Correct?

08     A.    The company didn't have a tank

09  wagon to move solids around.

10     Q.    And Savogran doesn't have any

11  information on who supplied raw materials to

12  Illinois or California in the sixties and

13  seventies; correct?

14     MR. DuPONT:  Objection,

15     foundation.

16     THE WITNESS:  Correct.

17  BY MS. BONNEVILLE:

18     Q.    And I believe -- I think this

19  came out of your prior deposition, but

20  Savogran has no way to track whether or not

21  benzene, if it came from a supplier, ended

22  up a specific container of Kutzit; is that

23  correct?  There's no way to trace it through

24  the process?

**Transcript of Monique, Mark**

```
01              MR. DuPONT:  Objection.
02         Misstates testimony, lacks
03         foundation.
04              THE WITNESS:  That's correct.
05         The company's never done lot
06         tracking.
07  BY MS. BONNEVILLE:
08         Q.    Okay.  My understanding from
09  Exhibit 8, when we look at page two and page
10  three, which were those inventory records,
11  they show a shipment of benzene coming in
12  from the different suppliers, they were then
13  added to the same tank before than tank was
14  completely empty; is that correct?
15         A.    Yes.  Yes.
16         Q.    So there was mixing between
17  benzene that you received from Houghton and
18  benzene you received from AMSCO.  Is that
19  correct?
20         A.    Yes.
21         Q.    And if we look at the first
22  page of Exhibit 8 -- do you have that in
23  front of you, sir?
24         A.    I do.
```

**Transcript of Monique, Mark**

```
01        Q.      I'm looking at the page that's
02   been Bates stamped Savogran 123.
03        A.      Yes.
04        Q.      If you look at the third --
05   the third entry down.
06        A.      Yes.
07        Q.      It looks to me like it has a
08   date of December 1st, '72.  Do you see that
09   one?
10        A.      I do.
11        Q.      It has the word AMSCO.  Do you
12   see that?
13        A.      Yes.
14        Q.      And if you look across, it
15   says, not available under quantity received.
16   Do you see that?
17        A.      Yes.
18        Q.      So for that particular one, no
19   quantity was received.  Is that a fair
20   interpretation?
21             MR. DuPONT:  Objection,
22        foundation.
23             THE WITNESS:  It's possible.
24   BY MS. BONNEVILLE:
```

**Transcript of Monique, Mark**

01        Q.      And the different

02  manufacturing facilities that Savogran has,

03  they sell products in different areas; is

04  that correct?  Your geographic areas?

05        A.      Yes.

06              MR. DuPONT:  Objection.  Vague

07        as to time.

08  BY MS. BONNEVILLE:

09        Q.      And in the sixties and

10  seventies, the Norwood, Massachusetts

11  facility, it sold products on the east

12  coast; is that correct?

13        A.      Yes.

14        Q.      Do you have any reason to

15  believe that Savogran Norwood, Massachusetts

16  facility shipped products to California in

17  the sixties and seventies?

18        A.      None.

19        Q.      Do you believe it's likely

20  that any Savogran products that were sold in

21  California in the sixties and seventies

22  would have been manufactured by Savogran

23  Pacific?

24              MR. DuPONT:  Objection, lacks

**Transcript of Monique, Mark**

```
01          foundation.
02               THE WITNESS:  Yeah, I don't --
03          I don't know one way or the other.
04          There is -- there is no way of
05          knowing at this point.
06  BY MS. BONNEVILLE:
07          Q.    Do you know that product
08  manufactured in the sixties and seventies in
09  Norwood, Massachusetts, those wouldn't have
10  been shipped to California.  Those would
11  have been kept on the east coast; correct? :
12               MR. DuPONT:  Objection. That
13          assumes facts.  That lacks
14          foundation. That calls for
15          speculation.
16               THE WITNESS:  I don't know one
17          way or the other.  There's -- there's
18          really no way of knowing at this
19          point?
20  BY MS. BONNEVILLE:
21          Q.    There's just no documents
22  available; correct?
23          A.    That's correct.
24               MR. DuPONT:  That's also not
```

Transcript of Monique, Mark

```
01        true.
02  BY MS. BONNEVILLE:
03        Q.     And there's no one available
04  who has knowledge from that time frame;
05  correct?
06        A.     Correct.
07        Q.     Sir, do you know what, if any,
08  trade group Savogran belonged to in the
09  sixties and the seventies?
10        A.     I don't.  When I -- when I
11  came on the company in 1987 they belonged to
12  the National Paint and Coatings Association
13  and also the Associated Industries of
14  Massachusetts.
15        Q.     Do you have any sense of how
16  long they were members of those groups?
17        A.     I don't.
18        Q.     Sir, that's all the questions
19  I have for you.  Thank you for your time and
20  patience.
21              MR. DuPONT:  Anyone else on
22        the phone?
23              (No response.)
24              MR. DuPONT:  If nobody else on
```

**Transcript of Monique, Mark**

```
01        the phone has questions, I have a few
02        follow-ups.
03                    -   -   -
04             MR. LEDGER:  Can we take a
05        break for just two minutes?  We'll be
06        right back in.
07             MR. DuPONT:  Sure.
08             VIDEO TECHNICIAN:  Time is
09        3:42.  We're off the record.
10             (Whereupon there was a recess
11        in the proceeding.)
12             VIDEO TECHNICIAN:  This is the
13        beginning of media unit five. We're
14        back on the record.  The time is
15        3:45.
16  BY MR. DuPONT:
17        Q.    All right.  Mr. Monique,
18  Andrew DuPont again.  I have some follow-up
19  questions.
20             Just for accuracy's purpose,
21  counsel for Ashland and American Mineral
22  Spirits Company, now known as Unocal, asked
23  you about Exhibits 11 through 16 and asked
24  you whether you had seen them before.  Just
```

**Transcript of Monique, Mark**

```
01    to be clear, Exhibits 14,15 and 16 were
02    documents that you had been provided as an
03    exhibit in your deposition in 2016; is that
04    correct?
05         A.    Yes.
06         Q.    All right.
07         A.    Those are the ones I asked
08    about during that --
09         Q.    Yes, thanks.
10              And just for clarity as well,
11    documents that were marked as Exhibits 11
12    through 16, even though you don't have
13    knowledge outside of what's in the documents
14    about what was going on, you -- we can look
15    at the documents and determine what the
16    context of what was happening was from
17    what's written in the documents.  Is that
18    fair?
19              MS. BONNEVILLE:  Objection,
20         calls for speculation.
21              MR. LEDGER:  Objection, calls
22         for speculation.  The document speaks
23         for itself.
24              MR. HERNAN:  Join.
```

**Transcript of Monique, Mark**

```
01              THE WITNESS:  Yes.
02    BY MR. DuPONT:
03         Q.    All right.  You were asked
04    about the -- whether there was anybody who
05    is still around who worked Savogran in the
06    1960s and 1970s.  But you have spoken to
07    individuals who did work for Savogran at
08    least during the 1970s.  For example, Tom
09    Little was a gentleman who --
10         A.    Right.
11         Q.    And Mr. Little began to work
12    for The Savogran Company in 1972?
13         A.    It was '72, '73 or '74.  In
14    that range.
15         Q.    All right.  And he's an
16    individual that you had spoken with in the
17    past in order to educate yourself about
18    Savogran's history?
19         A.    Right.
20         Q.    The Exhibit 8, the purchase
21    records and inventory records.
22         A.    Yes.
23         Q.    You're familiar with the forms
24    of those records because you had seen them
```

Transcript of Monique, Mark

# Monique, Mark

### Rhyne Trial Master

```
01    used at The Savogran Company?
02          A.      Yes.
03          Q.      And that is the type of record
04    that Savogran has prepared, filled out and
05    relied upon in the course of doing business?
06          A.      Yes.
07          Q.      And it was in --
08          MS. BONNEVILLE:   Objection,
09          speculation.   Vague as to time.
10    BY MR. DuPONT:
11          Q.      And it's your understanding
12    that that is a -- the type of document where
13    Savogran would use to contemporaneously
14    record information about making purchases of
15    product, receiving product and measuring the
16    inventory of product?
17          A.      Yes.
18          Q.      All right. And that --
19          MS. BONNEVILLE:   Objection,
20          calls for speculation.
21    BY MR. DuPONT:
22          Q.      And there are dates where
23    entries were made into forms on Exhibit 8;
24    is that right.
```

**Transcript of Monique, Mark**

```
01         A.      Yes.
02         Q.      And it was the practice of
03  Savogran to enter the information on these
04  forms at the date that the event was
05  happening?
06              MS. BONNEVILLE:  Objection.
07         Calls for speculation.  Vague as to
08         time.  Lacks foundation.
09              MR. HERNAN:  Join.
10              THE WITNESS:  Yes.
11  BY MR. DuPONT:
12         Q.      At or around the date
13  generally?
14         A.      Yes.
15         Q.      Okay.  And even though you
16  don't know the specific name of the person
17  who wrote the information on Exhibit 8, it
18  is your understanding that it was an
19  employee of Savogran acting in the course of
20  their employment that would have wrote that
21  information out?
22              MR. LEDGER:  Calls for
23         speculation.
24              MS. BONNEVILLE:  Objection.
```

**Transcript of Monique, Mark**

01          Calls for speculation.

02   BY MR. DuPONT:

03          Q.     And, in fact, you found those

04   records that are marked as Exhibit 8 because

05   you recognized that they were stored in a

06   cabinet that was kept at the desk of Ms. --

07   was it Kowalski?

08          A.     Yes.

09          Q.     Whose job it was to order

10   product on behalf of -- of your boss at the

11   time?

12          A.     Yes.

13          Q.     All right.  And she had been

14   -- she had that job before you began with

15   Savogran as well?

16          A.     Yes.

17          Q.     Do you recall when she began

18   -- when Ms. Helen Kowalski began to work for

19   Savogran?

20          A.     Absolutely not, no.

21          Q.     Was she somebody that began to

22   work at Savogran in the 1960s?

23                 You don't know?

24          A.     I don't know.  She had been

**Transcript of Monique, Mark**

```
01    there a long time.
02         Q.     She had been there a long time
03    --
04         A.     Yeah.
05         Q.     -- before 1987?
06         A.     Yeah.
07         Q.     Now, you were asked whether
08    Savogran had any record of shipping the
09    Kutzit product to California.  Does Savogran
10    still have any record of shipping the Kutzit
11    product to Massachusetts during the 1960s
12    and 1970s?
13         A.     No.
14         Q.     All right.
15                MS. BONNEVILLE:  Objection.
16    BY MR. DuPONT:
17         Q.     So the fact -- but certainly
18    it was selling Kutzit in Massachusetts in
19    the 1960s and 1970s.
20         A.     Yes.
21         Q.     All right.  So just because
22    you don't have record of shipping Savogran's
23    Kutzit product into California in the 1960s
24    and 1970s doesn't mean it didn't happen;
```

**Transcript of Monique, Mark**

01  right?

02          MS. BONNEVILLE:  Objection.

03      Calls for speculation.

04          THE WITNESS:  Yeah, I wouldn't

05      know.

06  BY MR. DuPONT:

07      Q.    You were asked about whether

08  you could determine whether the benzol

09  acetone blend that was used in Kutzit from a

10  particular supplier made it into a

11  particular container of the Kutzit product.

12  Do you agree with me that if you can look at

13  the purchase records and the inventory

14  records and match up when an order of the

15  ninety percent benzol and 10 percent acetone

16  blend was received, put into inventory and

17  then when that inventory was used?

18      A.    Yes.

19      Q.    And it was the practice of

20  Savogran to nearly essentially deplete the

21  contents of the underground storage tank

22  that kept the particular chemical before

23  taking on a new shipment of it?

24      A.    Well, the idea --

**Transcript of Monique, Mark**

```
01              MS. BONNEVILLE:  Objection,
02         misstates testimony.
03   BY MR. DuPONT:
04         Q.    All right --
05         A.    You got to make sure you have
06   enough room in the tank --
07         Q.    Okay.
08         A.    For what you were ordering.
09         Q.    All right.  And if we look
10   through the inventory, we can spot instances
11   where the inventory is down to only, say,
12   for example, 115 gallons out of a five or
13   six thousand gallon capacity by the time a
14   new order comes in; correct?
15         A.    Right.
16         Q.    So, even though there may have
17   been a tiny bit of blend left in the tank
18   when a new shipment was received, the vast
19   majority came from the new shipment?
20              MS. BONNEVILLE:  Objection,
21         calls for speculation.
22              THE WITNESS:  Yeah, I don't
23         know if you could make that
24         assumption, but yeah.
```

Transcript of Monique, Mark

01    BY MR. DuPONT:

02          Q.      Well, for example, if the

03    inventory had 115 gallons in it, you get a

04    shipment and then all of a sudden you have

05    6051  gallons in the inventory, it would be

06    reasonable to conclude that over 5900

07    gallons of the shipment came from that

08    particular -- 6500 gallons -- strike that.

09                  It would be reasonable to

10    conclude that where you have, for example,

11    115 gallons of the benzene/acetone blend in

12    stock, and then that inventory jumps up to

13    6051 gallons, that over 5900 gallons of the

14    inventory came from that new shipment?

15          A.      Whatever the percentage is.

16          Q.      And then that inventory that

17    resulted from the new shipment is what went

18    into the containers of the Kutzit product

19    until that inventory was depleted; fair?

20          A.      Right.

21          Q.      So at least during that period

22    of time, when that inventory from the new

23    shipment was being used and put into the

24    Kutzit product, you can tell which supplier

**Transcript of Monique, Mark**

01      -- which supplier's benzene/acetone blend

02      went into the containers?

03          A.      Right.

04                  MS. BONNEVILLE:   Objection,

05          calls for speculation.

06      BY MR. DuPONT:

07          Q.      We discussed the agreement

08      between Savogran Company and Savogran

09      Pacific Corporation.   We discussed that that

10      agreement provided for Savogran Pacific

11      Corporation to purchase product manufactured

12      by The Savogran Company at the Norwood,

13      Massachusetts facility; correct?

14          A.      Yes.

15          Q.      So that is an indication that

16      it was at least anticipated by the two

17      parties that The Savogran Company would be

18      manufacturing product in Norwood,

19      Massachusetts to be sold in the western part

20      of the country, west of the Rockies,

21      including California, by Savogran Pacific

22      Corporation?

23                  MR. LEDGER:   Objection, calls

24          for speculation.

**Transcript of Monique, Mark**

```
01              MS. BONNEVILLE:  Objection,
02         calls for speculation.
03              THE WITNESS:  It certainly
04         left open the opportunity.  But it
05         doesn't necessarily mean that it ever
06         occurred.
07    BY MR. DuPONT:
08         Q.    Okay.
09         A.    Well, it was something -- it
10    was something that they were planning for.
11    Fair?
12              MR. LEDGER:  Objection, calls
13         for speculation.
14              THE WITNESS:  Something that
15         they had written into the document,
16         yes.
17    BY MR. DuPONT:
18         Q.    Right.
19         A.    But again, it doesn't
20    necessarily mean that it actually, you know,
21    happened.
22         Q.    All right.  Thank you very
23    much.
24              MR. LEDGER:  Anybody else on
```

**Transcript of Monique, Mark**

```
01        the phone?
02              (No response.)
03              MR. LEDGER:  All right.  I
04        think we're done.
05              Let's stipulate that the court
06        reporter will be relieved of her
07        duties under the California Code of
08        Civil Procedure.
09              The original deposition
10        transcript can be sent to my office.
11        I will make sure Mr. Monique has the
12        opportunity to review it, read it,
13        make any changes or corrections in it
14        that he feels are necessary and sign
15        the same as if under oath within two
16        weeks?  Is that enough time?  Is that
17        all right?
18              MR. DuPONT:  I think so.
19        Trial is the 24th.  So that will take
20        it out to -- yes, that will be all
21        right.
22              MR. LEDGER:  Notify my office
23        of any changes or corrections.  I
24        will notify all counsel of any
```

**Transcript of Monique, Mark**

01      changes or corrections within three

02      days of my receipt.

03          If for any reason the original

04      deposition transcript is unavailable

05      at the time of trial, a certified

06      unsigned copy may be used in lieu of

07      the original.  And I will maintain --

08      I will send the original back to Mr.

09      DuPont.  He will maintain custody of

10      it to be produced upon reasonable

11      request at the time of trial or for

12      any other required proceeding.

13          MR. DuPONT:  I stipulate to

14      the stipulation.

15          MR. LEDGER:  So stipulated

16      everybody?

17          MS. FOLINO:  Stipulated.

18          MS. BONNEVILLE:  So

19      stipulated.

20          VIDEO TECHNICIAN:  We're going

21      off the record at 3:56.

22              -  -  -

23      (Witness excused.)

24              -  -  -

**Transcript of Monique, Mark**

# Monique, Mark
Rhyne Trial Master

```
01                (Deposition concluded at
02         00:00 a/p.m.)
03
04
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Transcript of Monique, Mark**

```
01          C E R T I F I C A T E

02

03

04          I do hereby certify that I am a

05    Notary Public in good standing, that the

06    aforesaid testimony was taken before me,

07    pursuant to notice, at the time and place

08    indicated; that said deponent was by me duly

09    sworn to tell the truth, the whole truth,

10    and nothing but the truth; that the

11    testimony of said deponent was correctly

12    recorded in machine shorthand by me and

13    thereafter transcribed under my supervision

14    with computer-aided transcription; that the

15    deposition is a true and correct record of

16    the testimony given by the witness; and that

17    I am neither of counsel nor kin to any party

18              in said action, nor interested in the

19    outcome thereof.

20          WITNESS my hand and official seal

21    this 25th day of April, 2019.

22

23

24

25    ATXnt1024016    \ATXnt0                    <%1,Signature%>

26                                _____

27                          Notary Public

28

29

30

31

32

33

34
```

Transcript of Monique, Mark

Page 241

```
01              INSTRUCTIONS TO WITNESS

02

03         Please read your deposition over

04   carefully and make any necessary

05   corrections.  You should state the reason in

06   the appropriate space on the errata sheet

07   for any corrections that are made.

08         After doing so, please sign the

09   errata sheet and date it.

10         You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13         It is imperative that you return the

14   original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24
```

Transcript of Monique, Mark

```
01              -  -  -  -
02            E  R  R  A  T  A
03              -  -  -  -  -
04   PAGE   LINE    CHANGE
05   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
06   Reason for Change:
07   _____
08   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
09   Reason for Change:
10   _____
11   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
12   Reason for Change:
13   _____
14   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
15   Reason for Change:
16   _____
17   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
18   Reason for Change:
19   _____
20   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
21   Reason for Change:
22   _____
23   _ _ _  _ _ _  _ _ _ _ _ _ _ _ _ _ _ _ _ _
24   Reason for Change:
25   Job No. PA3311053
26   _____
```

**Transcript of Monique, Mark**

# Monique, Mark

Rhyne Trial Master

```
01
02          ACKNOWLEDGMENT OF DEPONENT
03               I, _____, do
04     hereby certify that I have read the
05     foregoing pages __ to ___ and that the same
06     is a correct transcription of the answers
07     given by me to the questions therein
08     propounded, except for the corrections or
09     changes in form or substance, if any, noted
10     in the attached Errata Sheet.
11
12     _____        _____
13     DATE               SIGNATURE
14
15
16
17
18
19
20
21
22
23        Job No. PA3311053
24
```

Transcript of Monique, Mark