## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## Civil Action No.: 3:18-cv-197-RJC

BRUCE RHYNE and JANICE RHYNE,  )
                                     )

    Plaintiffs,                  )
                                     )

  vs.                             )
                                     )

UNITED STATES STEEL          )
CORPORATION, *et al.,*       )
                                     )

    Defendants.              )
                                     )

## PLAINTIFFS' NOTICE OF FILING OF DEPOSITION DESIGNATIONS

Plaintiffs hereby file certain deposition designations along with objections and counter-designations for the following deponents:

1. James Breece

2. Debra Niemaszyk

3. James Wells (Cowey)

4. James Wells (Oakley)

*O = Overruled*

*S = Sustained*

Respectfully Submitted,

Dated: September 2, 2020

*/s/Mark Doby*
Mark Doby (NCBN 39637)
John Hughes (NCSB 22126)
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
mdoby@wallacegraham.com
jhughes@wallacegraham.com

1

Andrew J. DuPont, *admitted pro hac vice*
LOCKS LAW FIRM
601 Walnut St. Suite 720 East
Philadelphia, PA 19106
Phone: (215) 893-3425
adupont@lockslaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served by e-filing via the Western District of North Carolina's e-Filing Portal to all counsel of record on September 2, 2020

Dated: September 2, 2020

/s/Mark Doby
Mark Doby (NCBN 39637)
John Hughes (NCSB 22126)
WALLACE & GRAHAM, P.A.
525 North Main Street
Salisbury, NC 28144
Tel. No. (704) 633-5244
Fax: (704) 633-9434
mdoby@wallacegraham.com
jhughes@wallacegraham.com

Andrew J. DuPont, *admitted pro hac vice*
LOCKS LAW FIRM
601 Walnut St. Suite 720 East
Philadelphia, PA 19106
Phone: (215) 893-3425
adupont@lockslaw.com

# Exhibit 1

# Transcript Report

---

## Breece, James

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

# Full Transcript Report
## Designation Legend

BREECE, JAMES - (JOHNSON) 1-28-14 PLF Designations

BREECE, JAMES - (JOHNSON) - Safety-Clean Counter Designations

Transcript of Breece, James

```
01        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
02              IN AND FOR THE COUNTY OF ALAMEDA
03                      ---oOo---
04
05   DAVID JOHNSON and LAURA
06   JOHNSON,
07
08            Plaintiffs,
09
10   vs.                      No. RG13669270
11
12   ARMORED AUTOGROUP, INC.,
13   et al.,
14            Defendants.
15                           /
16
17
18       VIDEOTAPED DEPOSITION OF JAMES BREECE
19            COR/PMK for Safety-Kleen
20
21      Taken before KIMBERLY R. HENDERSHOTT, RPR
22              CSR NO. 12552
23              January 28, 2014
24
25
26
27
28          Aiken Welch Court Reporters
29          One Kaiser Plaza, Suite 250
30          Oakland, California 94612
31       (510) 451-1580/(877) 451-1580
32           Fax: (510) 451-3797
33             www.aikenwelch.com
```

# Breece, James

Rhyne Trial Master

```
01                I N D E X
02                                          PAGE
03
04  EXAMINATION BY MR. DUPONT                 10
05
06  EXAMINATION BY MS. KAHN                   177
07
08  EXAMINATION BY MR. CAIRONE                185
09
10
11                E X H I B I T S
12  PLAINTIFF'S                              PAGE
13  Exhibit 1    Safety-Kleen Corp. Memorandum   37
14               dated December 26, 1991
15
16  Exhibit 2    Safety-Kleen Corp. Memorandum   42
17               dated April 1, 1992
18  Exhibit 3    Safety-Kleen Corp. Memorandum   47
19               dated April 14, 1992
20
21  Exhibit 4    Virgin Parts Washer Solvents    50
22               Benzene Data Compilation dated
23               August 20, 1993
24
25  Exhibit 5    Safety-Kleen Corp. Memorandum   78
26               dated June 8, 1988
27  Exhibit 6    Safety-Kleen Corp. Memorandum  101
28               dated July 7, 1989
29
30  Exhibit 7    Safety-Kleen Corp. Memorandum  107
31               Bates stamped of SAL SK 05678
32               through SAL SK 05743
33
34  Exhibit 8    Safety-Kleen Corp.             122
35               Inter-Office Communication
36               dated April 1, 1976
37
38  Exhibit 9    Safety-Kleen Corp.             124
39               Inter-Office Communication
40               dated October 20, 1980
41
42  Exhibit 10   Safety-Kleen document from L.   134
43               Dean Hufsey
44  Exhibit 11   Safety-Kleen document dated     138
```

Case 3:18-cv-00197-RJC-DSC Document 31-409 Filed 09/25/20 Page 8 of 340

# Breece, James

## Rhyne Trial Master

| 01 | PLAINTIFFS' | PAGE |
|----|------------|------|
| 02 | Exhibit 12 | 140 |
| 03 | Safety-Kleen document dated | |
| 04 | February 26, 1988 | |
| 05 | Exhibit 13 | 143 |
| 06 | Customer Inquiries about | |
| 07 | Chemical Exposure from | |
| 08 | Safety-Kleen Products | |
| 09 | Exhibit 14 | 155 |
| 10 | Safety-Kleen Corp. Memorandum | |
| 11 | dated April 25, 1990 | |
| 12 | Exhibit 15 | 158 |
| 13 | Label Meeting | |
| 14 | Exhibit 16 | 160 |
| 15 | Safety-Kleen 105 Solvent | |
| 16 | Composition Summary for MSDS | |
| 17 | Revision | |
| 18 | Exhibit 17 | 163 |
| 19 | Safety-Kleen Corp. Memorandum | |
| 20 | dated March 9, 1994 | |
| 21 | Exhibit 18 | 168 |
| 22 | Safety-Kleen Corp. Memorandum | |
| 23 | dated March 15, 1990 | |
| 24 | Exhibit 19 | 172 |
| 25 | Weekly Training Topic | |
| 26 | Exhibit 20 | 175 |
| 27 | Safety-Kleen Corp. | |
| 28 | Authorization for Expenditure | |

29
30
31
32
33
34
35
36
37
38

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Page 4

```
01              VIDEOTAPED DEPOSITION OF JAMES BREECE
02
03      BE IT REMEMBERED, that pursuant to Notice, and on
04  the 28th day of January 2014, commencing at the hour of
05  9:14 a.m., in the offices of LEWIS BRISBOIS BISGAARD &
06  SMITH, 333 Bush Street, Suite 1100, San Francisco,
07  California 94104, before me, KIMBERLY R. HENDERSHOTT, a
08  Certified Shorthand Reporter, personally appeared JAMES
09  BREECE, produced as a witness in said action, and being
10  by me first duly sworn, was thereupon examined as a
11  witness in said cause.
12
13                      ---oOo---
14
15  APPEARANCES:
16  For the Plaintiff:
17              ANDREW DUPONT
18              Locks Law Firm
19              The Curtis Center
20              601 Walnut Street, Suite 720 East
21              Philadelphia, Pennsylvania 19106
22              (215) 893-0100
23
24  For the Defendant CSK Auto, Inc.:
25
26              CONSTANCE FRAENKEL
27              (via phone)
28              Becherer, Kannett & Schweitzer
29              1255 Powell Street
30              Emeryville, California 94608
31              (510) 658-3600
32              Cfraenkel@bkscal.com
33
```

Transcript of Breece, James

Tuesday, September 1, 2020

```
01   For the Defendant 3M:
02              JOHN EBERLEIN
03              (via phone)
04              Bowman & Brooke, LLP
05              970 W 190th Street, Suite 700
06              Torrance, California 90502
07              (310) 380-6559
08              John.eberlein@bowmanandbrooke.com
09   For the Defendant U.S. Steel:
10              MATT CAIRONE
11              (via phone)
12              The Cairone Law Firm PLLC
13              PMB# 6000
14              4017 Washington Rd
15              McMurray, Pennsylvania 15317
16              (412) 606-5751
17              Mcc@caironelawfirm.com
18
19   For the Defendant Radiator Specialty Company:
20
21              JAMES G. SCADDEN
22              (via phone)
23              Gordon & Rees
24              275 Battery Street, Suite 2000
25              San Francisco, California 94111
26              (415) 986-5900
27              Jscadden@gordonrees.com
28
29   For the Defendant Safety-Kleen:
30
31              JEFFREY F. WOOD
32              Jones Carr McGoldrick
33              Premier Place
34              5910 N. Central Expressway,
35              Suite 1700
36              Dallas, Texas 75206
37              (214) 828-9200
38              Jeff.wood@jcmfirm.com
39   For the Defendant Volvo North America:
40              LAURA MALKOFSKY
41              (via phone)
42              Law Offices of Kevin Tully
43              411 Borel Avenue, Suite 505
44              San Mateo, California 94402
```

Transcript of Breece, James

Tuesday, September 1, 2020

```
01   For the Defendant Safety-Kleen:
02            PAMELA M. FERGUSON
03            Lewis, Brisbois, Bisgaard & Smith, LLP
04            333 Bush Street, Suite 1100
05            San Francisco, California 94104
06            (415) 362-2580
07            Ferguson@lbbslaw.com
08
09   For the Defendant Genuine Parts Co.:
10
11            RHONDA L. WOO
12            Pond North, LLP
13            100 Spear Street, Suite 1200
14            San Francisco, California 94105
15            (415) 217-1240
16            Rwoo@pondnorth.com
17   For the Defendant Turtle Wax:
18            SALLY HOSN
19            (via phone)
20            Poole & Shaffery, LLP
21            400 S Hope Street, Suite 1100
22            Los Angeles, California 90071
23            (888) 595-5963
24            Shosn@pooleshaffery.com
25   For the Defendant Berryman Products, Inc.:
26            JEFF ALLEN
27            (via phone)
28            Shannon, Gracey, Ratliff & Miller, L.L.P.
29            1000 Ballpark Way, Suite 300
30            Arlington, Texas 76011
31            (817) 882-7616
32            Jallen@shannongracey.com
33   For the Defendants Armor All/STP Products Company;
34   Chevron USA, Inc.; CRC Industries, Inc.; Texaco, Inc.;
35   Sunoco, Inc. (R&M); Kingsford Products:
36            RUTH D. KAHN
37            Steptoe & Johnson, LLP
38            633 West Fifth Street, Suite 700
39            Los Angeles, California 90071
40            (213) 439-9429
41            Rkahn@steptoe.com
42
```

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

# Breece, James
## Rhyne Trial Master

```
01   For the Defendant Justice Brothers, Inc.:
02              JEFFREY M. ZECH
03              (via phone)
04              Walsworth, Franklin, Bevins & McCall
05              One City Boulevard West, 5th Floor
06              Orange, California 92868
07              (714) 634-0686
08              Jzech@wfbm.com
09   Also Present:
10              Larry Cossar, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

Transcript of Breece, James

Tuesday, September 1, 2020

```
01            THE VIDEOGRAPHER:  On the record.  My name
02   is Larry Cossar.  I am a qualified video
03   technician.  I'm videotaping on behalf of
04   Tele-Video Production Services.  The court reporter
05   today is Kimberly Hendershott of Aiken Welch.
06            Today's date is January 28th, 2014.  The
07   present time is 9:14 a.m.  The location of this
08   deposition is Lewis Brisbois in San Francisco.
09   Today's PMQ witness is James Breece in the case of
10   David Johnson versus Armored Autogroup,
11   Incorporated, et al.  Case number RG13669270, filed
12   in the Superior Court of California in and for the
13   county of Alameda.
14            This deposition was noticed by the -- the
15   Kazan Law Firm for the plaintiff.
16            Would counsel for parties please identify
17   themselves and for whom they are appearing.
18            MR. DUPONT:  Andrew DuPont for David and
19   Laura Johnson.
20            MS. WOO:  Good morning, Rhonda Woo for
21   Genuine Parts Company.
22            MS. KAHN:  Ruth Kahn with Steptoe &
23   Johnson for three defendants:  Sunoco, Inc.;
24   Chevron USA, Inc.; and Texaco, Inc.
25            MR. WOOD:  Jeff Wood on behalf of
```

01    Safety-Kleen.

02         THE VIDEOGRAPHER:  On the telephone.

03         MR. EBERLEIN:  John Eberlein on behalf of

04    3M Company.

05         MS. FRAENKEL:  Good morning, Constance

06    Fraenkel on behalf of CSK Auto, Inc.

07         MR. CAIRONE:  Matt Cairone on behalf of

08    the United States Steel Corporation.

09         MS. MALKOFSKY:  Lauren --

10         MR. SCADDEN:  Jim Scadden for Radiator

11    Specialty Company.

12         MS. MALKOFSKY:  Laura Malkofsky for Volvo

13    North America.

14         MR. ZECH:  Jeff Zech for Justice Brothers,

15    Inc.

16         MR. ALLEN:  Jeff Allen on behalf of

17    Berryman Products, Incorporated.

18         THE REPORTER:  I'm sorry.  On behalf of --

19         MS. HOSN:  Sally Hosn on behalf of Turtle

20    Wax, Inc.

21         THE REPORTER:  Jeff, if you could say that

22    again.

23         MR. ALLEN:  Jeff Allen on behalf of

24    Berryman Products, Incorporated.

25         THE VIDEOGRAPHER:  Anyone else?

Case 3:18-cv-00197-RJC-DSC   Document 34291   Filed 09/03/20   Page 15 of 340

```
01            If there's no stipulations, the
02    reporter -- reporter may swear in the witness.
03                 JAMES BREECE,
04              sworn as a witness,
05              testified as follows:
06    EXAMINATION BY MR. DUPONT:
07         Q.  Good morning, Dr. Breece.
08         A.  Good morning.
09         Q.  How are you this morning?
10         A.  I'm good.
11         Q.  All right.  My name is Andrew DuPont.  We
12    are here today to take your deposition.  I
13    understand you've given a number of depositions in
14    the past; is that correct?
15         A.  That's correct.
16         Q.  All right.  So I'm sure you're familiar
17    with the procedures, but I'll briefly review them
18    and so that we are on the same page.
19            First instruction I have for you is that
20    if I ask you any question that you do not
21    understand, will you please let me know that and I
22    will do my best to rephrase or reask the questions
23    so that you do understand it.
24         A.  Yes.
25         Q.  If you have a question that you're asked
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC Document 149 Filed 09/15/20 Page 16 of 340

01  and you're not exactly sure of the response but you

02  can give a reasonable estimate, it's fair to do

03  that.  We don't want you to guess in response to

04  any question.  Okay?

05      A.  I understand.

06      Q.  If at any point in time you feel that you

07  need to take a break from the proceedings, we can

08  do that.  I only ask that you answer any question

09  that's pending at the time that you request the

10  break?

11      A.  Certainly.

12      Q.  All right.  Would you begin by providing

13  us with your current title as it regards to

14  Safety-Kleen?

15      A.  Yes, I'm -- I'm employed by Safety-Kleen

16  as a -- basically under the title of a consultant

17  and predominantly -- well, I should say in -- in

18  litigation support is -- is what my current role

19  is.

20      Q.  Okay.  And how long have you held a

21  position as consultant to Safety-Kleen and

22  litigation support?

23      A.  From the time I left employment at -- with

24  Safety-Kleen full time in the -- in the late '90s

25  until present.  There have been some time intervals

# Breece, James

Rhyne Trial Master

01    in which there were no legal matters pending but...

02    in which I did not -- was not involved in any sort

03    of litigation support, especially during the

04    bankruptcy which Safety-Kleen underwent in the

05    early 2000 era.  And -- but otherwise, I've been

06    retained by Safety-Kleen during the entire time

07    frame from '99 until present.

08        Q.  And are you compensated for your time as a

09    consultant in litigation support for Safety-Kleen?

10        A.  I am.

11        Q.  At what rate?

12        A.  300 per hour.

13        Q.  Since you've been testifying as a

14    consultant in the litigation support for

15    Safety-Kleen since the late 1990s, in how many

16    cases have you been involved with?

17        A.  I'm -- I'm going to have to estimate that,

18    because I didn't come prepared with a checklist of

19    all of them.  I would -- I would estimate that to

20    be roughly 12 to 15 cases.

21        Q.  12 to 15 cases?

22        A.  Yes.

23        Q.  And those cases concern individuals who

24    contracted leukemia or another form of blood or

25    bone marrow cancer after exposure to Safety-Kleen

01    solvents?

02        A.  A variety of things.  A variety of health

03    issues not -- not -- not specifically leukemia, but

04    other health issues as well.

05        Q.  The majority of cases that you've

06    testified in, have they concerned individuals who

07    contracted leukemia or blood or bone marrow cancers

08    from exposure to Safety-Kleen products?

09        MR. WOOD:  Objection to form.  Assumes

10    facts not in evidence.

11        THE WITNESS:  I believe that's a fair

12    representation, yeah.

13    BY MR. DUPONT:

14        Q.  Okay.  Would you take me to the beginning

15    of your time with Safety-Kleen.  When did you start

16    with the company?

17        A.  I was recruited by Safety-Kleen in 1978,

18    and actually began working for them in 1979.  July

19    the 16th of '79.

20        Q.  What was your last date of employment as

21    an actual employee of Safety-Kleen as opposed to a

22    consultant for litigation services?

23        A.  I -- I resigned in -- in June of 1999.

24        Q.  Can you walk me through your positions

25    with Safety-Kleen from Sept -- excuse me -- July

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC  Document 34-91  Filed 09/15/20  Page 19 of 340

01    16, 1979 through June of 1999.

02        A.  Yes, I'll attempt to do that.  I was

03    initially hired in as a chemical engineer because

04    of my multitude of engineering background, and

05    really not to ruffle the feathers of -- of the

06    other chemists over there.  So I was actually hired

07    in as a -- as a chemical engineer, and -- and so I

08    worked roughly two years independently as a chem

09    engineer in various R&D projects for the company.

10            At the end of that time, I became a

11    manager of R&D which included functional

12    responsibility for the laboratories.  That

13    continued through the mid '80s.  And approximately

14    1985, I was given a position in sales, and I was

15    the manager of industrial solvents for a period of

16    about a year and a half.  And at the end of that

17    time frame, I -- I was given a title, general

18    manager of -- for engineering and tech service.

19    And I held that position from the -- approximately

20    1987 until early '90s.  At that point I was

21    promoted to vice president of technical with

22    responsibility for product development hardware and

23    chemical product development and operation of the

24    Safety-Kleen technical center.

25        Q.  Did you maintain that position of vice

```
01    president of technical services through the time
02    you left in June of 1999?
03        A.  I did.
04        Q.  Who started Safety-Kleen?
05        A.  The original name for the -- for the
06    product and the service was as a result of a patent
07    belonging to a gentleman in -- in Wisconsin who
08    worked for a gravel company, and he successfully
09    applied and received a patent for the solvent based
10    parts cleaning sink on the drum concept.  That
11    company was a very small one, and he and other
12    people attempted to operate that out of the
13    Milwaukee area, and it was purchased -- that
14    company was purchased by Chicago Rawhide in, I
15    believe -- I believe the dates would have been
16    about 1968 or '69.
17             After -- after roughly a year or year and
18    a half of being a subdivision of Chicago Rawhide,
19    Safety-Kleen as a parts cleaning company was spun
20    off individually -- as an individual company in the
21    early '70s.  And I may be off a few months or a
22    year or so in regard to this, but historically
23    it's -- it's correct.  The dates may be a little
24    fuzzy, but it's -- it's generally in that concept.
25        Q.  I've seen information regarding
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-001197-RJC-DSC   Document 3091   Filed 09/02/20   Page 18 of 195
Case 3:18-cv-00197-RJC-DSC   Document 4091   Filed 09/15/20   Page 21 of 340

# Breece, James
### Rhyne Trial Master

01  Safety-Kleen being founded as a company in 1970.
02  Would that indicate to you to be the year that
03  Safety-Kleen was spun off as its own organization?
04      A.  Yes.
05      Q.  And who was in charge of Safety-Kleen at
06  the time it was spun off in 1970?  Who were the
07  owners?  Who was the president?
08      A.  The president and CEO was Don Brinckman.
09  Donald Brinckman, B-R-I-N-C-K-M-A-N-N [sic].
10      Q.  And who owned the company in 1970?
11      A.  I believe the ownership still -- as of
12  1970 was still Chicago Rawhide.  It later -- I
13  don't have the details exactly in regard to that,
14  but there are a family of individuals, the Olson
15  family who held controlling interest in that --
16  that company early on.  I think it's O-L-S-O-N I
17  believe is the correct spelling on that.
18      Q.  Until what year -- strike that.
19          Donald Brinkman was the president and CEO
20  of Safety-Kleen in 1970.  So what year did he act
21  as the president and CEO of Safety-Kleen?
22      A.  He was actively in the company both as
23  president around CEO up until the late '80s, early
24  '90s when the presidency of the company was turned
25  over to a fellow by the name of Joe -- Joseph

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

```
01   Knott, K-N-O-T-T.  And Mr. Knott didn't live very
02   long.  He passed away after being president for
03   roughly -- as memory served me, about a year,
04   untimely death.  And at that point Mr. Brinkman
05   stepped back into the company as the chief
06   operating officer.  And after a year or so, the
07   company hired a new president by the name of Jack
08   Johnson.  And Johnson was the president of the
09   company, and Mr. Brinkman remained as the CEO until
10   the late '90s approximately 1997, 1998.  In -- in
11   1998, Mr. Johnson was fired and Mr. Brinkman
12   stepped back in into full-time management of the
13   company, and the decision was made in 1998 to sell
14   the company and the company was sold in -- in 19 --
15   late 1997 or early 1998 to -- to environmental arm
16   of Laidlaw Industries.
17        So that's -- that's the history up through
18   the '90s and -- and I actually worked one year
19   after the ownership changed until my departure in
20   1999.
21     Q.  From the beginning of it's business going
22   back to the time when it was a company in
23   Milwaukee, incidentally you -- you mentioned that
24   there was an individual who had a patent for the
25   sink on the drum solvent base parts cleaning system
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC   Document 313-1   Filed 09/02/20   Page 20 of 195
Case 3:18-cv-00197-RJC-DSC   Document 469-1   Filed 09/15/20   Page 23 of 340

01    in Milwaukee.  Who was that?

02        A.  His name was Glen Palmer, P-A-L-M-E-R.

03        Q.  Did Mr. Palmer have a business or did he

04    just hold that in his own name?

05        A.   Initially, he developed a patent, and his

06    marketing strategy was to go on fishing trips down

07    to Florida and sell part cleaners out of the back

08    of his pickup truck.  Not a very effective

09    marketing strategy but good fishing.  So it -- it

10    was really more kind of a hobby with him, and he

11    sold that -- that partially to another group of

12    individuals.  Exact structure, I don't know, but

13    Palmer remained involved with it with the major

14    portion of the ownership.  But it was a very small

15    company, operated basically out of the Milwaukee

16    area.

17        Q.  From 1970 when Safety-Kleen was a

18    corporation, was the focus of its business

19    centrally the parts washing solvent business?  In

20    other words, was that the primary focus of his

21    business?

22        A.  Yes.

23        Q.  And does that remain the case up through

24    the present time?

25        A.  No.  In the -- in the '90s there became

01 a -- other group businesses associated with -- with

02 parts cleaning including the industrial waste

03 services or the fluid recovery services.

04       (Reporter interruption for clarification.)

05       THE WITNESS:  Fluid recovery services,

06 FRS.

07       And -- and simultaneous with that we

08 acquired Brezi Lube, which was an oil re-refining

09 company, and that became a -- a major portion.  So

10 they were -- at that stage, there were industrial

11 services, parts cleaning and oil re-refining

12 services that made up -- by the late '90s, that

13 made up the predominance of the company.

14       In the years since I've left the company,

15 there's been a major emphases by Safety-Kleen to

16 orient itself towards waste disposal and oil

17 re-refining.  So today the -- I haven't looked at

18 an annual report, but my understanding is that the

19 predominance of the sales and effort today is

20 toward the oil re-refining side of the business.

21 BY MR. DUPONT:

22     Q.  Okay.  So from 1970 until the late 1990s,

23 the majority of Safety-Kleen's business was parts

24 washing solvent services; is that correct?

25     A.  It was the largest.  It was the largest

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01 single element to the sales and service side.  It

02 was the largest of -- of those.  And there were

03 three or four additional ones, but that was the'

04 largest one, yes.

05     Q.  And then from the late 1990s to the

06 present, parts washing service continued to be a

07 substantial part of Safety-Kleen's business, but

08 perhaps not the largest second of its business?

09     A.  I believe that to be correct.

10     Q.  In 1970, what geographical area did

11 Safety-Kleen do business in?

12     A.  The initial business really centered

13 around Milwaukee and the Chicago-land area.  That

14 was the initial proof of concept and the -- the

15 details beyond here what I've told you here are

16 fuzzy.  If you've -- I don't recall the exact

17 rollout schedules to each part of the country, but

18 it -- it didn't take long until it was spread

19 throughout all areas of the country.

20     Q.  Within the first two years of

21 Safety-Kleen's business, had it spread out

22 throughout the country?

23     A.  I don't know.

24     Q.  Have you undertaken to conduct any

25 research to prepare yourself for this deposition to

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01    determine when Safety-Kleen began to do business

02    throughout the country and particularly in

03    California?

04        A.  I have not.

05        Q.  Who would be the person most knowledgeable

06    that you would speak to regarding when Safety-Kleen

07    began to do business in California?

08            MR. WOOD:  Objection.  Foundation.

09            THE WITNESS:  I would actually consult

10    historical records.  I wouldn't -- wouldn't attempt

11    to do it -- to find an individual person.  I

12    wouldn't know how to find those people who would

13    know.

14    BY MR. DUPONT:

15        Q.  What records would you consult?

16        A.  There's a book written by one of the

17    senior vice presidents, Gordon Wood, and it's a

18    book specifically about Safety-Kleen, and it's

19    called Waste Not.

20        Q.  Is that a published book or something

21    internal at Safety-Kleen?

22        A.  I don't know.  I know I had -- I had a

23    copy at one time.  I don't know whether it was

24    widespread copy or not.  I haven't looked for it on

25    Amazon.  It was -- it was of interest mainly to

01  people inside the company at the time, but I really

02  don't know.

03      Q.  What's your understanding of the earliest

04  time period that Safety-Kleen did business in

05  California?

06      A.  I believe it to be the middle -- the

07  middle of the '70s.  It was operational in

08  California when I came in '79, and that occurred

09  sometime before I arrived.

10      Q.  You're saying middle of the 1970s.  Are

11  you talking about between '73 and '76.

12      A.  I -- I can't be more specific than what I

13  have.  It -- it was in existence in '79.  That's --

14  a full business was operating in '79, and in order

15  to -- from meager start in -- in Chicago and

16  Wisconsin --

17          (Reporter interruption for clarification.)

18          THE WITNESS:  Meager.

19          -- a meager business in Wisconsin and in

20  Chicago, it took some time frame in exactly how

21  long that was, I'd have to -- I'd have to consult

22  that book.  I don't -- I don't know that.

23  BY MR. DUPONT:

24      Q.  Is that a book that Safety-Kleen

25  maintained at its office, the Waste Not book by

01    Gordon Wood?

02         MR. WOOD:  Objection.  Foundation.

03         THE WITNESS:  I don't know.

04    BY MR. DUPONT:

05         Q.  Is that a book that you have at your home?

06         A.  Yes.

07         Q.  Okay.  When did Safety-Kleen first do

08    business on the east coast in states like New York

09    and New Jersey and Pennsylvania?

10         A.  I'd have to consult to get an exact date

11    on that.  Sometime in the -- in the early to mid

12    '70s.

13         Q.  Safety-Kleen's parts washing solvent

14    business in 1970, did that consist of recycling

15    spent parts washing solvent, or was it solely

16    taking out new solvent to customers with

17    Safety-Kleen parts washing machines?

18         A.  Initially, it was only providing the

19    hardware and the solvent to the customers and

20    collection of the spent material.

21         Q.  So beginning in 1970, Safety-Kleen would

22    provide its customers with a parts washing machine

23    which consisted of what?

24         A.  It consisted of a sink on a drum either as

25    a Model 16 or a Model 30.  And those model numbers

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01  refer to the size of -- of the container

02  themselves.  The 16 being a 16-gallon container,

03  the 30 being a 30-gallon container.  The sink and

04  the washing area was proportional to the volume of

05  solvent contained.  The sink on the model 16 was

06  smaller than that on a model 30.

07      Q.  What were the colors of the sinks and

08  drums that Safety-Kleen used in 1970?

09      A.  Both container and sink was red.

10      Q.  And in addition to providing the sink and

11  the container, Safety-Kleen provided the solvent

12  that came -- that came in the container?

13      A.  Yes.

14      Q.  What was that solvent?

15      A.  That was regular mineral spirits with a

16  minimum flash point of 105 degrees Farenheit.

17      Q.  At what point in time did Safety-Kleen

18  begin to recycle the solvent that it took back from

19  the customer?

20      A.  Again, I'd have to consult historically,

21  but I believe that to be about 1973 at Elgin.

22          (Reporter interruption for clarification.)

23          THE WITNESS:  Elgin, E-L-G-I-N.  Elgin,

24  Illinois.

25  BY MR. DUPONT:

01      Q.  What was the name of the facility in
02  Elgin, Illinois in 1973?
03      A.  It was -- it was noted as the Elgin
04  Recycle Center.
05      Q.  Did Safety-Kleen eventually create other
06  recycle centers in other parts of the country?
07      A.  Yes.
08      Q.  What were they in the years that they were
09  created?
10      A.  I can probably only give you exact numbers
11  only.  One, since I helped build that one, the
12  initial facility was in Elgin followed by Clayton,
13  New Jersey, then Lexington, South Carolina.  In
14  Denton, Texas which was built I would estimate
15  about 1976 or '77.  And I don't know exactly where
16  in that sequence Reedley, California.  I don't
17  recall exactly, but somewhere in that time frame,
18  and I'm not sure where in that it fits.  And the
19  last of which that was actually built from scratch
20  by Safety-Kleen was in Hebron, Ohio, and that was
21  done in the -- that was completed in the early
22  '80s.
23      Q.  You're not certain whether Reedley,
24  California was created before 1976 or 1977 when
25  Denton, Texas was created?

01    A.  No.  No, I don't -- I don't know.  I don't

02  know the order on them.

03    Q.  Okay.  And Clayton, New Jersey and

04  Lexington, South Carolina, those recycling centers

05  were established sometime between 1973 and 1976?

06    A.  That's my recollection, yes.

07    Q.  Before Safety-Kleen had recycling centers,

08  what types of facilities did it do business out of?

09    A.  In -- in terms of business structure, the

10  first of the infrastructure was a branch structure

11  which housed the sales personnel and storage tanks

12  for both the clean and dirty solvent.

13    Q.  What did Safety-Kleen do with dirty

14  solvent that it took back from the customers

15  facility before it began to recycle solvents in

16  1973?

17    A.  Being there to have to seen it, I can only

18  do it based upon information that I received from

19  my boss.  They actually sold it to -- the spent

20  solvent to waste oil dealer, and they recognized

21  that wasn't a good use for it after a few months,

22  and decided it -- one of the chem -- chemical

23  engineers we were working for, Chicago Rawhide,

24  modified a design for distilling mineral spirits,

25  and they chose to establish a recycling operation

01 rather than selling the spent material as -- for

02 other purposes. And I think some of the material

03 was probably burned by asphalt plants in the early

04 days as well.

05     Q.  Okay.  Where did Safety-Kleen have

06 branches in the 1970 and -- 1973 time period?

07     A.  Well, obviously the ones there in

08 Milwaukee in the Milwaukee area and the ones around

09 Chicago were the first.  Beyond that, I would have

10 to check the records.  I would have to consult with

11 Waste Not.  I don't know -- when I began as an

12 employee, there were 165 of them, so I don't know

13 the order in -- in which they were established.

14     Q.  Okay.  When did Safety-Kleen first have a

15 branch in California?

16     A.  I don't know that either.  Again, that's a

17 historical fact that I -- I don't -- I don't have

18 any knowledge of.

19     Q.  By the time you began with the company in

20 1973, Safety-Kleen -- excuse me.  Strike that.

21         When you began with the company in 1979,

22 Safety-Kleen had branches in California?

23     A.  Yes.

24     Q.  And when you began with the company in

25 1979, Safety-Kleen had the Reedley, California

01    recycling center?

02        A.   That's correct.

03        Q.   Where in California is the Reedley

04    recycling center?

05        A.   Near Fresno.

06        Q.   Is that a facility that's still opened and

07    operated by Safety-Kleen today?

08        A.   Nah.  No, it isn't.  That was closed in

09    some years after I left the company, exact day I

10    don't know, but that facility is closed.

11        Q.   Who did Safety-Kleen acquire the mineral

12    spirits solvents from between 1970 and 1973?

13            MS. KAHN:  Objection.  Calls for

14    speculation.

15            THE WITNESS:  I don't know who the vendors

16    were.

17    BY MR. DUPONT:

18        Q.   Who sold mineral spirits to Safety-Kleen

19    between 1973 and 1979?

20            MS. KAHN:  Objection.  Calls for

21    speculation.

22            THE WITNESS:  I don't know.

23    BY MR. DUPONT:

24        Q.   Are there documents that Safety-Kleen has

25    that we can look at to determine who its vendors

01  were during that time period?

02      MS. KAHN:  Objection.  Calls for

03  speculation.

04      THE WITNESS:  I'm not sure there are.

05  BY MR. DUPONT:

06   Q.  When you began with the company in 1979,

07  who was Safety-Kleen purchasing mineral spirits

08  from?

09   A.  Unocal, AMSCO...

10      MR. WOOD:  Slow down a little bit.

11      THE WITNESS:  AMSCO, A-M-S-C-O; Sunoco; I

12  believe Exxon; possibly some Shell; Hunt Refining.

13      MS. KAHN:  I'm sorry.

14      THE WITNESS:  Hunt, H-U-N-T, Hunt

15  Refining.  There are probably others but that's --

16  those are the ones that stick with me mentally.

17  BY MR. DUPONT:

18   Q.  Okay.  Did the -- strike that.

19      Did Safety-Kleen buy mineral spirits from

20  these vendors in 1979 for particular geographical

21  areas or were they bought from these vendors

22  throughout the country?

23   A.  You're going to have to re-ask that one.

24  I -- that's a complex question, and I can't answer.

25   Q.  Sure.  I'll -- I'll go about it a

# Breece, James

## Rhyne Trial Master

01  different way.  Until what year did Safety-Kleen
02  continue to buy mineral spirits from Unocal?
03      A.  It depended upon the product.  By the time
04  I began as an employee in 1979, Safety-Kleen
05  basically had three products which were suitable --
06  three version products which were suitable for use
07  in the parts cleaner, that was the regular 105
08  mineral spirits, a 140 mineral spirits solvent, and
09  a Rule 66 solvent, which was specified here on the
10  west coast.
11      Q.  Okay.  When you say "here on the west
12  coast," do you mean California?
13      A.  California, yeah, and the western states.
14      Q.  Were there states beyond California that
15  Rule 66 was specified for?
16      A.  I don't recall any others.
17      Q.  So let's talk about that for a little bit
18  before we get to these individual vendors.
19          Was regular mineral spirits 105 the
20  product that Safety-Kleen began to sell in 1970?
21          MS. KAHN:  Objection.  Calls for
22  speculation.
23          MR. WOOD:  Objection.  Assumes facts not
24  in evidence and asks for a legal conclusion about
25  the sale versus lease.

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 312-10  Filed 09/02/20  Page 36 of 340
Case 3:18-cv-00197-RJC-DSC  Document 409  Filed 09/13/20  Page 36 of 340

01          THE WITNESS:  First of all, Safety-Kleen

02     did not sell this product.  That's the first

03     clarification necessary.  We provided services in

04     which we leased the hardware and the solvent as

05     part of that service, but we never sold the

06     product.

07     BY MR. DUPONT:

08          Q.  Okay.  Was regular mineral -- mineral

09     spirits 105 mineral spirits that Safety-Kleen

10     provided to its customers beginning in 1970?

11          MS. KAHN:  Objection.  Calls for

12     speculation.

13          THE WITNESS:  Yes, based upon the records

14     that I've seen, that would be true.

15     BY MR. DUPONT:

16          Q.  And Safety-Kleen continued to provide

17     regular mineral spirits 105 to its customers

18     through the present time?

19          A.  I can only --

20          MR. WOOD:  Objection.  Foundation.

21          THE WITNESS:  I can only state through

22     1999 when I was employed.  Today I don't know.

23     BY MR. DUPONT:

24          Q.  All right.  When did Safety-Kleen begin to

25     distribute mineral spirits 140, or 140 mineral

01  spirits?

02       A.  It was prior to my becoming employed.

03  That was in place in 1979.  I don't know the exact

04  date.

05       Q.  And when did Safety-Kleen begin to

06  distribute Rule 66 mineral spirits?

07       A.  Same answer.

08       Q.  Some point in time before 1979?

09       A.  Yes.

10       Q.  All right.  Which form of mineral spirits

11  was Safety-Kleen acquiring from Unocal in 1979?

12       A.  Regular 105 solvent is my recollection and

13  possibly some of the others as well.

14       Q.  When you say "possibly some of the

15  others," you're referring to Rule 66 mineral

16  spirits?

17       A.  And 140.  Depended upon the location, and

18  you have to remember that I wasn't in purchasing,

19  so this is tangential to being a technical person.

20  I don't have the kind of knowledge that -- about

21  who the vendors were in those days as compared to

22  the technical side.  So I'm doing that based -- my

23  good friend was the purchasing agent, and that's

24  only by -- as a result of my association with him

25  do I know this stuff.  So that's -- that's the

01 source of much of my information was knowledge of

02 Bob Culmer who was the purchasing agent for

03 Safety-Kleen.

04     Q.  Okay.  Was Safety-Kleen still purchasing

05 regular mineral spirits 105 from Unocal in 1999

06 when you left?

07         MS. KAHN:  Objection.  Calls for

08 speculation.

09         THE WITNESS:  No.  With the introduction

10 of the 150 solvent -- in the 1993 vantage, the

11 purchasing of 105 solvent was virtually eliminated.

12 BY MR. DUPONT:

13     Q.  Okay.  Was Safety-Kleen still buying

14 regular mineral spirits 105 from Unocal in 1993?

15     A.  I believe so.

16     Q.  Did Safety-Kleen continuously buy regular

17 mineral spirits 105 from Unocal from at least 1979

18 through 1993?

19         MS. KAHN:  Objection.  Calls for

20 speculation.  Lack of personal knowledge.

21         THE WITNESS:  I don't know.

22 BY MR. DUPONT:

23     Q.  Was Safety-Kleen still purchasing Rule 66

24 mineral spirits from Unocal in 1999 when you left?

25     A.  No.

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01    Q.  When did Safety-Kleen stop purchasing Rule

02  66 mineral spirits from Unocal?

03    A.  I can't state unequivocally the date, but

04  it was the same effect, the introduction of the 150

05  solvent.  We ceased to offer much in the way of the

06  Rule 66 or the 140.  There was no need for it.

07    Q.  Okay.  Was Safety-Kleen purchasing Rule 66

08  mineral spirits from Unocal in 1993?

09    A.  I believe so.

10    Q.  Have you reviewed records to determine

11  whether or not Safety-Kleen was purchasing Rule 66

12  mineral spirits from Unocal from 1979 continuously

13  through 1993?

14    A.  I have not.

15    Q.  And was Safety-Kleen purchasing 140

16  mineral spirits from Unocal in 1993?

17    MS. KAHN:  Objection.  Calls for

18  speculation.  Lack of personal knowledge.

19    THE WITNESS:  I don't know.  I don't know

20  who the supplier for that product was.

21  BY MR. DUPONT:

22    Q.  Okay.  Did Safety-Kleen distribute Unocal

23  Rule 66 mineral spirits in California?

24    MR. WOOD:  Objection.  Form.  The use of

25  the word "distribute."  Assumes facts not in

01    evidence.  Foundation.

02          THE WITNESS:  I would have to consult a

03    study we did in 1993 that told us who the vendors

04    were and -- and the products that were being

05    supplied.  I can't quote that from memory.

06    BY MR. DUPONT:

07          Q.  Okay.  All right.  Well, we'll look at

08    some of these documents.

09          A.  Sure.

10          Q.  And I think it will provide us with

11    some -- some clarity.

12          You mentioned another company AMSCO.  Is

13    AMSCO an acronym for a larger name?

14          A.  Yeah, and I don't know what it is.

15          Q.  Okay.

16          A.  It is, but I don't know what it is.

17          Q.  If I told you American Mineral Spirits

18    Company, would that sound familiar?

19          A.  It may be.  I don't know.

20          Q.  Okay.  Was there a particular geographical

21    region that Safety-Kleen acquired mineral spirits

22    from AMSCO for use of?

23          A.  There was, but I don't know what it was.

24          Q.  Okay.  Was Safety-Kleen purchasing mineral

25    spirits from Sunoco in 1979?

01          MS. KAHN:  Objection.  Calls for

02     speculation.  Lack of personal knowledge.

03          THE WITNESS:  In 1979, I believe so.

04     BY MR. DUPONT:

05       Q.  Until what time period did Safety-Kleen

06     continue to purchase mineral spirits from Sunoco?

07       A.  I know that was still operative up until

08     1993.

09       Q.  What forms of mineral spirits did

10     Safety-Kleen purchase from Sunoco?

11       A.  It was predominantly the 1 -- the 105

12     solvent.

13          MR. DUPONT:  Let's go off the record for a

14     moment.

15          THE VIDEOGRAPHER:  The time is 9:59 a.m.

16     We're going off the record.

17          (Break taken.)

18          THE VIDEOGRAPHER:  The time is 10:13 a.m.

19     We're back on the record.

20     BY MR. DUPONT:

21       Q.  Okay.  Dr. Breece, we took a break and now

22     we're going to go through some information about

23     Safety-Kleen suppliers and mineral spirits.

24     Earlier in your testimony you mentioned some

25     studies that had been done which might provide you

01  with -- with more information regarding

02  Safety-Kleen suppliers of mineral spirits.

03      MR. DUPONT:  I'm going to hand you a

04  document that I've marked as Exhibit 1.

05      (Plaintiff's Exhibit 1 marked

06      for identification.)

07      MR. WOOD:  Do you have Bates numbers on

08  these?

09      MR. DUPONT:  This one does not have a

10  Bates number on it.

11      MR. WOOD:  All right.  Do you have one for

12  me to follow?  Oh, you have copies.

13  BY MR. DUPONT:

14      Q.  This is a December 26, 1991 memorandum

15  from Paul Dittmar to Rick Donnelly.

16      MR. WOOD:  Andrew, before we go further,

17  let me just make a mention on the record that this

18  document may have very well been produced in this

19  case stamped confidential pursuant to the

20  confidentiality order.  So pursuant to the

21  confidentiality order, I reserve the right to

22  review the transcript once it's complete and note

23  any portions of the deposition that we're going to

24  assert as being confidential pursuant to the

25  confidentiality order.  I think we have seven days,

01 within seven of receipt of the transcript to

02 designate those portions, and then we can make

03 those determinations afterwards. I just wanted to

04 get that on the record.

05 BY MR. DUPONT:

06     Q.  Dr. Breece, this is a December 26, 1991

07 Safety-Kleen Corporation memorandum from Paul

08 Dittmar to Rick Donnelly.

09     A.  Yes.

10     Q.  And who was Paul Dittmar in 1991?

11     A.  Paul Dittmar was a -- my -- one of my

12 right-hand guys, a chemical engineer and a chemist

13 together who worked in the -- the product

14 development section at the tech center.

15     Q.  And who was Rick Donnelly?

16     A.  Rick Donnelly was the purchasing for

17 Safety-Kleen.

18     Q.  And this memorandum from December 26th,

19 1991 addresses amongst other things the benzene

20 content of mineral spirits solvents that

21 Safety-Kleen acquired from various distributors.

22     A.  Well, the particular report I have in

23 front of me doesn't report -- let me make sure of

24 that.  But I don't think it reports benzene content

25 at all on this.  It -- it references but there's no

01    report.

02        Q.  Okay.

03        A.  If I'm -- let me -- this is -- this

04    Exhibit 1 that I'm looking here, correct?

05        Q.  Yes.

06        A.  Only three pages?

07        Q.  Yes, sir.

08            MR. WOOD:  And, Counsel, for the benefit

09    of the other lawyers in the room, I think this is

10    Bates number 1 -- 1827 through 1829 produced in --

11    in the Johnson case.  Sorry.

12    BY MR. DUPONT:

13        Q.  One of the subjects of this memorandum,

14    Dr. Breece, is benzene in mineral spirits that

15    Safety-Kleen has acquired from its suppliers,

16    correct?

17            MR. WOOD:  Objection.  Misstates the

18    document.

19            THE WITNESS:  Well, it's only one of

20    multiple things we're looking at, yes.

21    BY MR. DUPONT:

22        Q.  Okay.  And this document also identifies a

23    number of suppliers of mineral spirits to

24    Safety-Kleen; is that correct?

25        A.  As of that date, yes, it does.

01     Q.  All right.  And who does this document
02  identify to these suppliers of mineral spirits of
03  Safety-Kleen as of December 26th, 1991?
04     A.  You don't want me to read this list, do
05  you?
06     Q.  Well, let's start from the first page.
07     A.  Okay.
08        MS. KAHN:  Objection.  Overbroad as to
09  geographic area, and in other respects, objection
10  to form.
11  BY MR. DUPONT:
12     Q.  The first page of this exhibit, there's a
13  section with the title Benzene, correct?
14     A.  Yes.
15     Q.  All right.  And underneath Benzene, it
16  lists a number of suppliers of mineral spirits to
17  Safety-Kleen; is that correct?
18     A.  Yes.
19     Q.  All right.  And those suppliers include
20  Exxon, Witco, and Sun; is that accurate?
21     A.  It includes others, but the ones that had
22  a low benzene concentrations were from this
23  document where Exxon, Witco, and Sun.
24     Q.  All right.  And then the document also
25  indicates that other suppliers of mineral spirits

# Breece, James
## Rhyne Trial Master

01　with Safety-Kleen, notably Unocal and Koch showed

02　higher benzene levels; is that correct?

03　　A.　That's correct.

04　　Q.　So that would indicate to you that Unocal

05　and Koch were also suppliers of benzene to --

06　strike that.

07　　　　That would indicate to you that Unocal and

08　Koch were also suppliers of mineral spirits to

09　Safety-Kleen; is that correct?

10　　A.　Yes.

11　　Q.　All right.　And in particular, Unocal was

12　a supplier of mineral spirits to Safety-Kleen, and

13　the mineral spirits that Unocal supplied to

14　Safety-Kleen contained greater amounts of benzene

15　than some other suppliers; is that fair?

16　　A.　That is correct.

17　　Q.　If you look to the second page of the

18　exhibit, there is a chart of information with the

19　number of columns, and on the far left-hand side of

20　the chart, there's a column for RCID number.　Is

21　that the recycling center?

22　　A.　That's correct, uh-huh.

23　　Q.　And are you familiar with the

24　identification numbers of the recycling centers

25　that are listed here?

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

# Breece, James
## Rhyne Trial Master

01        A.   Not the recycling ID numbers, but the
02    recycling -- the code for the recycle centers, yes.
03        Q.   Okay.  What are the codes for the
04    recycling center?
05        A.   Well, it's the first letter of the -- the
06    name of that facility.  C being Clayton, D being
07    Denton, E being Elgin, L being Lexington.  I don't
08    see a Reedley on here, but H is Hebron.  There's no
09    information here on Reedley.
10            (Reporter interruption for clarification.)
11            THE WITNESS:  Reedley.
12            MR. WOOD:  R-E-E-D-L-E-Y, Reedley.
13            THE WITNESS:  I don't see a sample for
14    that region.
15            MR. DUPONT:  All right.  I'm handing
16    you -- the next exhibit is marked Exhibit Number 2.
17            (Plaintiff's Exhibit 2 marked
18            for identification.)
19            MR. WOOD:  And, Andrew, to make things
20    easier, can I just get a running objection on
21    documents, because I -- I believe that this
22    document was stamped confidential and produced in
23    this case.  You're handing me a document without
24    the Bates number from this case or without the
25    confidential stamp.  I just want to make sure I

**Transcript of Breece, James**                    **Tuesday, September 1, 2020**

01    don't waive anything.  And just so we're clear, I'm

02    not designating prophylactically everything we talk

03    about as being confidential, but I'll follow the

04    protective order, and after seven days of the

05    transcript go through it and designate portions.

06          MR. DUPONT:  You can have that running

07    objection.

08          MR. WOOD:  Okay.  This is more of a

09    housekeeping issue than anything else, but for

10    counsel, this document that Andrew marked as

11    Exhibit 2 is -- well, I believe it had been Bates

12    number 2462 through 2472 from our document

13    production in this case.

14    BY MR. DUPONT:

15      Q.  Dr. Breece, I've handed you Exhibit 2

16    which is an April 1, 1992 memorandum titled Virgin

17    Parts Washer Solvent from Paul Dittmar to Hyman

18    Bielsky; is that correct?

19      A.  Yes.

20      Q.  And was Hyman Bielsky an attorney for

21    Safety-Kleen?

22      A.  Yes, he was.

23      Q.  During what years was Safety-Kleen's

24    attorney Hyman Bielsky?

25      A.  He was one of Safety-Kleen's attorneys

01  beginning in the -- approximately 1976 -- no, no,

02  no, no.  1986 up through, I believe, the -- about

03  1993.  So roughly '86 through '93.  That's the

04  approximate range.

05      Q.  Okay.  And was Hyman Bielsky also a

06  officer or executive of Safety-Kleen in addition to

07  being an attorney employed by the company?

08          MR. WOOD:  Objection.  Foundation.

09          THE WITNESS:  Not to my knowledge.

10  BY MR. DUPONT:

11      Q.  All right.  Hyman Bielsky was employed by

12  Safety-Kleen?

13      A.  Yes.

14      Q.  Was he the head of Safety-Kleen's legal

15  department?

16      A.  No.

17          MR. WOOD:  Objection.  Foundation.

18          THE WITNESS:  No, he wasn't.

19  BY MR. DUPONT:

20      Q.  This memorandum like Exhibit 1 that we

21  went through also address the issue of benzene

22  concentration in virgin parts washer solvent which

23  was purchased from vendors to Safety-Kleen?

24      A.  Yes.

25      Q.  And this memorandum also identifies Exxon,

01    Sun, and Unocal as suppliers of mineral spirits to

02    Safety-Kleen?

03         MS. KAHN:  Objection.  Overbroad.

04         MR. DUPONT:  Strike that.  I'll withdraw.

05    BY MR. DUPONT:

06      Q.  Does this memorandum identify Sun to be

07    one of the suppliers to Safety-Kleen?

08         MS. KAHN:  Objection.  Overbroad.  The

09    document speaks for itself.

10         THE WITNESS:  Yes.

11    BY MR. DUPONT:

12      Q.  And does this memorandum also identify

13    Unocal to be a supplier of mineral spirits to

14    Safety-Kleen?

15      A.  As of 1992, yes.

16      Q.  And this memorandum indicates that the

17    mineral spirits that Unocal supplied to

18    Safety-Kleen had benzene levels that were

19    consistently higher than other suppliers?

20      A.  Yes.

21      Q.  And if we look through the exhibit

22    beginning at the third page of the exhibit, there

23    is a Bates number on the bottom SK 3477.  Do you

24    see that?

25      A.  3477, uh-huh.

01      Q.  And this is exhibit between pages 3477

02   through 3484 also contain a chart identifying

03   vendors of mineral spirits to Safety-Kleen

04   recycling centers and benzene content of mineral

05   spirits?

06          MS. KAHN:  And, I'm sorry.  What was the

07   Bates range again of this new document?

08          MR. WOOD:  I believe it's 2462 through

09   2472.

10          MS. KAHN:  I heard 3477 for some reason.

11          THE WITNESS:  It does not.

12   BY MR. DUPONT:

13      Q.  I'm sorry?

14      A.  It does not.  To answer your question, it

15   does not.

16      Q.  Okay.  Let's turn to the third page of the

17   exhibit which has a Bates number on it SK 3477 at

18   the bottom?

19      A.  Yes.

20      Q.  Okay.  What is this chart?

21      A.  This chart is a presentation of solvent

22   received at branches.  And the relative

23   concentration of benzene.

24      Q.  Okay.  Do you know what these branch

25   numbers that are under the column branch correspond

01   to?

02      A.  No.

03         MR. DUPONT:  I've handed you a document

04   that's been marked as Exhibit 3.

05         (Plaintiff's Exhibit 3 marked

06         for identification.)

07         THE WITNESS:  I'm sorry.  I was so

08   enthralled in my own document there I forgot where

09   I was.  Okay, go ahead.

10   BY MR. DUPONT:

11      Q.  All right.  Look at Exhibit 3, is this an

12   April 16, 1992 Safety-Kleen Corporation --

13         (Reporter interruption for clarification.)

14   BY MR. DUPONT:

15      Q.  Let me start over.  Sorry.

16         Is this an April 14, 1992 Safety-Kleen

17   Corporation memorandum from Rick Donnelly to Paul

18   Dittmar, yourself, along with several other

19   individuals?

20      A.  Yes, it is.

21         MR. WOOD:  Andrew, and let me just state,

22   I believe this document was produced in this case

23   and confidential pursuant to the confidentiality

24   order, and it is Bates -- I believe it was Bates

25   2496 to 2497 in this case.

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 312-1  Filed 09/02/20  Page 50 of 195
Case 3:18-cv-00197-RJC-DSC  Document 469  Filed 09/15/20  Page 53 of 340

# Breece, James
Rhyne Trial Master

01    BY MR. DUPONT:

02        Q.  Okay.  Dr. Breece, does this memorandum

03    identify vendors of mineral spirits to

04    Safety-Kleen?

05        A.  It is.

06        Q.  And is Sunoco identified as one of the

07    vendors of mineral spirits to Safety-Kleen?

08            MS. KAHN:  Objection.  Documents speaks

09    for itself.  The question is overbroad as phrased.

10            THE WITNESS:  Sun is Sunoco I believe,

11    correct.

12    BY MR. DUPONT:

13        Q.  Okay.

14        A.  That's the question?

15        Q.  Is that your understanding that Sun Oil is

16    the same as Sunoco?

17        A.  I believe that to be true, yes.

18        Q.  All right.  So where we saw the word Sun

19    on Exhibits 1, 2, and 3, is it your understanding

20    that Sun refers to Sun Oil also known as Sunoco?

21        A.  That's my understanding, yes.

22        Q.  All right.  The second page of the

23    document, Exhibit 3, discusses suppliers to

24    California being limited.

25        A.  Yes.

01     Q.  All right.  Who were the suppliers to

02   Safety-Kleen in California as of 1992.

03     A.  Unless I can identify it from this

04   document -- bear with me just a moment.  I -- I

05   can't tell you.  And there is not information

06   contained on these documents identifying Reedley --

07   recycling centers.  Okay.  What this -- what -- I'm

08   dropping back to document 2.  It correlates with --

09   with the branch to the -- which recycle center

10   serviced it.  So if you -- you look at the second

11   and third column, those give you a correlation

12   between the actual branch and which recycle center

13   would, in fact, supply solvent to that branch.

14   However, there's no information contained on this

15   initial testing about Reedley.  So I don't have

16   that information with the exception of what Rick

17   Donnelly pointed out that the need for 140 for --

18   let's see.  Yeah, he's suggesting we continue the

19   research on 140 and -- and Rule 66.  So this isn't

20   a complete report.  This is kind of a -- a work-in

21   progress as of '92.

22         THE VIDEOGRAPHER:  Excuse me.  Mr. Wood, I

23   have you in the frame a little bit.  If you could

24   just -- sorry about that.  Okay.  Sorry to

25   interrupt.

01     BY MR. DUPONT:

02         Q.  All right.  Is there another document that

03     you're familiar with?  You referenced a study from

04     a particular date that would indicate information

05     about suppliers.  Is there another document you're

06     familiar with that would indicate suppliers to

07     Reedley, California?

08         A.  Yes, there is.

09         Q.  Which document is that?

10         A.  It's -- I can't give you the exact title,

11     but it's a completed study.  This is the initiation

12     of the study.  It is a completed study by Steve Vlk

13     and -- and O'Donnell in which it --

14             (Reporter interruption for clarification.)

15             THE WITNESS:  And O'Donnell.

16             -- and it summarizes additional testing

17     for a total of about 14 to 1500 samples.  So this

18     is the first of the phase of what we began.  And

19     there's additional information on that, and I

20     can't -- I can't give you the -- the exact title of

21     it, but it exists.

22             (Plaintiff's Exhibit 4 marked

23             for identification.)

24     BY MR. DUPONT:

25         Q.  All right.  I'm going to hand you a

01  document that's entitled Virgin Parts Washer

02  Solvents, Benzene Data Compilation, date August

03  20th, 1993.  Prepared by Steve A. Vlk, I think you

04  pronounce it.

05      A.  Yes.

06      Q.  Spelled V-L-K, and O'Donnell and Paul

07  Dittmar.

08          Is this the study you were referring to

09  that would provide us information on suppliers to

10  Reedley, California?

11          MS. KAHN:  Bates range, please.

12          MR. WOOD:  Give me a second.  Can we go

13  off the record for a second, Andrew.

14          THE VIDEOGRAPHER:  Do you mind if I change

15  video for a few minutes?

16          MR. DUPONT:  Sure.

17          THE VIDEOGRAPHER:  This is the end of

18  Video Number 1.  The time is 10:36 a.m.  We're

19  going off the record.

20          (Discussion held off the record.)

21          THE VIDEOGRAPHER:  This is the beginning

22  of Video Number 2 in the deposition of Dr. Breece.

23  The time is 10:45 a.m.  We're back on the record.

24          MR. WOOD:  This is Jeff Wood on behalf of

25  Safety-Kleen.  The document that was marked as

```
01    Exhibit 3 --
02          MS. FERGUSON:  4.
03          MR. WOOD:  -- 4 in this case -- in this
04    deposition and handed to Dr. Breece was produced
05    stamped confidential in this case and comprises
06    Safety-Kleen documents production Bates number 3030
07    through 3034.
08          Exhibit 3 also has an appendix which is a
09    data compilation attached to it, that one -- 33
10    pages long which I believe was either produced
11    pursuant to a confidentiality order -- or
12    confidentiality agreement in another case or it was
13    produced separately in the Johnson case under
14    another Bates -- other Bates numbers that I cannot
15    at this time identify.  But I want to state on the
16    record that Safety-Kleen does not intend to waive
17    any confidentially with respect to the document or
18    the appendix.  And Safety-Kleen has objected during
19    this deposition to the use of nonBates stamp
20    documents produced in other cases because it's
21    difficult for us to determine where the document
22    comes -- comes from and whether it's subject to
23    confidentiality order, but I have plaintiff's
24    counsels agreement, I believe that, although he has
25    not agreed with the document in Exhibit 4 and the
```

01 appendix are confidential, he agrees that I'm not

02 waiving any right to the confidentiality under the

03 confidentiality agreement in this case, by letting

04 you ask questions about -- about it.  Is that fair?

05   MR. DUPONT:  Yeah.  And I'll only say that

06 these documents were produced in other cases

07 without a confidentiality restriction then they

08 wouldn't be confidential.  But I understand that

09 by -- to the extent you have a right to

10 confidentiality, you're not waiving that right by

11 proceeding with this deposition.

12   MR. WOOD:  And I would assert that these

13 documents were produced subject to confidentiality

14 orders in prior cases marked confidential and that

15 Safety-Kleen complied with the confidentiality

16 protection in that case.  So I'm not -- I'm not

17 going to argue about where these documents came

18 from or which particular case they came from,

19 because I don't know that, because they don't

20 demonstrate that on their face.

21   But I believe they are subject to

22 confidentiality orders in other cases.  I believe

23 they're likely subject to confidentiality

24 agreements in this particular case -- and we'll

25 comply with the confidentiality in this particular

**Transcript of Breece, James**        **Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 312-1  Filed 09/02/20  Page 56 of 195
Case 3:18-cv-00197-RJC-DSC  Document 469  Filed 09/15/20  Page 59 of 340

# Breece, James

## Rhyne Trial Master

```
01    case to maintain the confidentiality of the
02    documents.
03         THE WITNESS:  Furthermore, I believe that
04    they were confidential within Safety-Kleen, so
05    there's absolutely no reason to believe that we
06    wouldn't report this as a -- report it as a
07    safety -- as a -- as a confidential document.  It
08    was my intent, and this was done under my
09    direction, for this to be a confidential document.
10    Now, whether or not -- enough said.
11    BY MR. DUPONT:
12         Q.  Okay.  All right.  Let's get back to it.
13         A.  Okay.
14         Q.  Dr. Breece, do you recognize the document
15    marked as Exhibit 4?
16         A.  I do.
17         Q.  All right.  What is this document?
18         A.  It's a compilation of a study that
19    encompassed 1,400 plus samples of parts washer
20    solvent collected over a time frame of about a
21    little over a year.  The time of this report is
22    August of 1993, and I believe it covers back to the
23    time frame of that initial report that we were
24    reviewing earlier.  This is a study or suppliers
25    version parts washer solvent to Safety-Kleen at
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC  Document 314-1  Filed 09/02/20  Page 55 of 195
Case 3:18-cv-00197-RJC-DSC  Document 340-1  Filed 09/23/20  Page 60 of 340

01    that time.

02        Q.  All right.  Now, does the appendix --

03    strike that.  Let me go back.

04            Was this a study that you personally were

05    involved with while working at Safety-Kleen?

06        A.  Yes.  I initiated the study.  I was the

07    primary responsible party for this entire study.

08        Q.  And is this a document that Safety-Kleen

09    generated in the ordinary course of its business in

10    further -- furtherance of its business interest?

11        A.  Yes, it was.

12        Q.  All right.  Let's look through the

13    document.  Does this document provide us with

14    indication of which suppliers were supplying

15    mineral spirits to Safety-Kleen for use in

16    California?

17        A.  It does.

18        Q.  Where does it indicate that?

19        A.  On the -- basically the first page of the

20    document.

21        Q.  All right.  So we're looking at --

22        A.  Third paragraph.  "The solvent vendors

23    predominantly regional and Sun..."

24            (Reporter interruption for clarification.)

25            MR. WOOD:  Slow down.

01          THE WITNESS:  "...are predominantly

02     regional.  Sun, Witco and Kendall supply the east;

03     Hunt the southeast; Exxon..."

04          (Reporter interruption for clarification.)

05          THE WITNESS:  "...Exxon, Kerr and Cisco

06     the southwest.  Exxon, Unocal, and Kerr serve the

07     Midwest.  Route 66 solvent purchases are filled by

08     Ashland, Calsol, and Kern."

09     BY MR. DUPONT:

10          Q.  All right.  I notice that in this

11     paragraph -- and we're looking at the -- it's

12     actually the second page of the exhibit, there's a

13     title Virgin PWS Benzene Data; is that correct?

14          A.  Yes.

15          Q.  All right.  And when you say Virgin PWS,

16     that's talking about the mineral spirits as its

17     acquired from Safety-Kleen's vendors, correct?

18          A.  Yes.  That acronym is parts washer solvent

19     is what that is.

20          Q.  Okay.  So parts washer solvent as it's

21     being used in the context of this document is

22     synonymous with mineral spirits, correct?

23          A.  Yes.

24          Q.  And you say "virgin" -- I say you, I mean

25     Safety-Kleen, says virgin parts washer solvents or

Case 3:18-cv-00197-RJC-DSC  Document 312-1  Filed 09/02/20  Page 59 of 95
Case 3:18-cv-00197-RJC-DSC  Document 340-9  Filed 09/13/20  Page 62 of 340

```
01    virgin mineral spirits because separate from

02    getting mineral spirits from the supplier,

03    Safety-Kleen had mineral spirits stream that was

04    coming back from users of the Safety-Kleen parts

05    washer solvent that was in-turn recycled into its

06    process stream, correct?

07         A.  No, that's not correct.  What you said is

08    not correct.

09         Q.  Okay.  Well, is -- let me -- let me make

10    this more simple perhaps.  Is virgin parts washer

11    solvent a way to distinguish mineral spirits that

12    Safety-Kleen got directly from the supplier as

13    opposed to mineral spirits that Safety-Kleen has

14    recycled?

15         A.  Yes.

16         Q.  Okay.  And this document refers to a

17    vendor sampling program that has been in place

18    since September 1991; is that correct?

19         A.  Yes.

20         Q.  And the purpose of that program was to

21    sample mineral spirits that Safety-Kleen was

22    receiving from its vendors to determine their

23    benzene content, correct?

24         A.  Benzene among other properties.

25         Q.  All right.  Safety-Kleen was aware since
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC   Document 312-1   Filed 09/02/20   Page 60 of 195
Case 3:18-cv-00197-RJC-DSC   Document 409   Filed 09/15/20   Page 63 of 340

01    at least 1977 that there was benzene in mineral

02    spirits, correct?

03         MR. WOOD:  Objection.  Foundation.

04         THE WITNESS:  Not having been there in

05    1977, I can't -- I can't say personally.  All I can

06    depend upon is correspondence that I saw in the

07    record.  I didn't have any writings from any

08    Safety-Kleen personnel.  There are documents in the

09    records from the vendors talking about benzene

10    content of the materials that they were providing

11    to us.

12    BY MR. DUPONT:

13      Q.  Okay.  You've seen correspondence in

14    Safety Kleen's records from 1977 from Safety

15    Kleen's vendors of mineral spirits indicating that

16    there's benzene in mineral spirits that they sold

17    to Safety-Kleen?

18         MR. WOOD:  Objection.  Misstates testimony

19    and foundation.

20         MS. KAHN:  Join.

21         MR. WOOD:  You can answer.

22         THE WITNESS:  Repeat the question, please.

23    BY MR. DUPONT:

24      Q.  Sure.  Did you see correspondence in

25    Safety Kleen's records that was received from

Page 59

```
01    vendors of mineral spirits to Safety-Kleen which
02    indicated in 1977 that there was benzene in mineral
03    spirits being sold to Safety-Kleen?
04         MR. WOOD:  Same objection.
05         MS. KAHN:  Join.
06         THE WITNESS:  It's not unequivocal from
07    the correspondence I saw that the vendors stated
08    that, that their products contained benzene.  It --
09    it was totally dependent upon who the vendor was
10    and their statement of detection limits and logic
11    in which they used to identified whether benzene
12    was present or not.  So it's not a -- it's not a
13    clearcut pattern of what the vendors told us in
14    1977.
15    BY MR. DUPONT:
16       Q.  Okay.  Is it fair to say that in 1977,
17    Safety-Kleen received correspondence from some of
18    its vendors that indicate that there was benzene
19    mineral spirits that those vendors were selling to
20    Safety-Kleen?
21         MR. WOOD:  Objection.  Assumes facts not
22    in evidence.  Foundation.
23         MS. KAHN:  Join.
24         THE WITNESS:  The answer to that is yes.
25    BY MR. WOOD:
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

**Tuesday, September 1, 2020**

01    Q.  Is it fair to say that by 1977

02  Safety-Kleen had information in its possession that

03  there was benzene in mineral spirits that it was

04  using?

05       MR. WOOD:  Objection.  Foundation.

06       THE WITNESS:  I can't know that exactly.

07  I can only go by the correspondence.

08  BY MR. WOOD:

09    Q.  All right.  In 1999, Safety-Kleen began on

10  its own to test mineral spirits as they came from

11  vendors to determine their benzene content,

12  correct?

13    A.  Yes.

14    Q.  Benzene could get into Safety-Kleen's

15  parts washing solvent in several ways.  It was

16  initially in there when it came from the vendors of

17  mineral spirits, and benzene could be introduced

18  into the stream if a user of a Safety-Kleen product

19  introduced something like gasoline or another

20  solvent that contained benzene while using

21  Safety-Kleen as parts washer solvent?

22       MS. KAHN:  Objection.  Assumes facts.

23  Overbroad.  Calls for an expert opinion testimony.

24       MR. WOOD:  Join.  And I would add

25  incomplete hypothetical.

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 409  Filed 09/03/20  Page 66 of 340

```
01              THE WITNESS:  Read it back, please.
02   BY MR. WOOD:
03     Q.  Okay.  I'll ask the question.  One way
04   that benzene was present in mineral spirits used by
05   Safety-Kleen was that it was already in the mineral
06   spirits when it was sold from the vendor to
07   Safety-Kleen, correct?
08     A.  Yes.
09     Q.  Another way that benzene was present in
10   mineral spirits used by Safety-Kleen was that a
11   customer of Safety-Kleen could wash a part, an item
12   in Safety-Kleen parts washer that had gasoline or
13   another solvent in it or on it.  And that gasoline
14   or other solvent that contained benzene would be
15   introduced into the Safety-Kleen parts washing
16   solvent, correct?
17              MR. WOOD:  Objection.  Assumes facts.
18   Calls for speculation.  Foundation.  Incomplete
19   hypothetical.
20              THE WITNESS:  Yes.
21   BY MR. DUPONT:
22     Q.  And Safety-Kleen was aware that there were
23   materials that customers used in the course of
24   their working with Safety-Kleen parts washers that
25   contained benzene, such as gasoline?
```

**401, 402 irrelevant evidence is inadmissible**: there is no evidence of gasoline contamination in this case. In fact, Plaintiff testified he never dumped or saw anyone else dump gasoline, oil, etc. into a parts washer; **Assumes facts**: nowhere established customers introduce gasoline in this manner **Speculative**; and **Incomplete hypothetical**

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

602, 701 lack of
personal
knowledge; no
foundation showing
witness ever
perceived this
happening, witness
denies knowledge
below (62:12-14)
assumes facts no in
evidence
Assumes facts:
nowhere
established Safety-
Kleen customers
used other products
in the course
washing parts; and
Lacks Foundation

01    A.  Yes.

02    Q.  Safety-Kleen was aware that there were

other products that its customers used in the

course of using Safety-Kleen parts washers that

contained benzene such as solvents like Liquid

06  Wrench and B12 Chemical?

07       MS. FERGUSON:  Can I have that question

read back, please.

09       (Record read.)

10       MR. WOOD:  Objection.  Assumes facts.

11  Overly broad.  Foundation.

12       THE WITNESS:  I don't know the composition

13  of B12.  I don't know what the composition of that

14  is, but for Liquid Wrench, the answer is yes.

15  BY MR. DUPONT:

16    Q.  Okay.  What's your understanding what the

17  composition of Liquid Wrench was?

18       MR. WOOD:  Objection.  Foundation.

19       MR. CAIRONE:  Objection.  Outside the

20  scope of this deposition.

21       (Reporter interruption for clarification.)

22       MR. DUPONT:  That's Barry Steel.

23       MR. CAIRONE:  That's Matt Cairone for U.S.

24  Steel.

25       MR. DUPONT:  I was wrong.

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

BY MR. DUPONT:

    Q. Sure. I'll ask --

    A. Do you want me to answer it?

    Q. I'll ask it again since we have an objection.

       What's your understanding of what the composition of liquid wrench was?

       MR. WOOD: Objection. Foundation.

       MR. CAIRONE: Same objection.

       THE WITNESS: Based upon my personal knowledge and -- and the analytical data which we had performed or the analytical testing which we performed, we knew that Liquid Wrench could be high in benzene content, especially from the early days, and I'm going from records in regard to the raffinate which was used in that formulation of Liquid Wrench in the early days. That -- that strain was high in benzene.

BY MR. DUPONT:

    Q. When did --

       MR. WOOD: Objection. Unresponsiveness.

       (Reporter interruption for clarification.)

       MR. WOOD: Objection. Unresponsiveness.

BY MR. DUPONT:

    Q. When did Safety-Kleen conduct testing on

**401, 402 irrelevant evidence is inadmissible:** there is no evidence of gasoline contamination in this case. In fact, Plaintiff testified he never dumped or saw anyone else dump gasoline, oil, etc. into a parts washer. Further, Liquid Wrench was found in Safety-Kleen's waste disposal services, never in parts washer service (65:1-66:2). **Lacks Foundation.**

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01    raffinate?

02        A.  We didn't conduct raffinate.  That was a

03    public document in regard to compositional

04    information regarding the Liquid Wrench.

05        Q.  Okay.  You said Liquid Wrench, and I said

06    raffinate, so I apologize.

07            Did Safety-Kleen conduct any testing on

08    Liquid Wrench?

09        A.  I believe we did.

10        Q.  When did Safety-Kleen conduct testing on

11    Liquid Wrench?

12        A.  I can't say for sure.  I believe that the

13    time frame was in the early '90s.  Recognize that

14    we analyzed an average of -- during the '90s, an

15    average of 15,000 samples a year.  So there were

16    hardly any products that we didn't sample and test.

17        Q.  Why was Safety-Kleen testing products in

18    the early 1990s?

19        A.  Part of their business as far as their

20    waste collection business, to characterize the

21    waste so we could properly manifest it, treat it,

22    or dispose of it.

23        Q.  Okay.  Was Safety-Kleen acquiring waste

24    streams from Radiator Specialty Company?

25        A.  I don't recall that specifically.

01    Q.  Okay.  Is it your understanding that

02  Safety-Kleen conducted testing on Liquid Wrench in

03  the early 1990s because it was processing waste

04  streams of Liquid Wrench?

05    A.  Waste streams which contained Liquid

06  Wrench.

07    Q.  Okay.  So Safety-Kleen didn't test Liquid

08  Wrench in and of itself.  It tested parts washing

09  solvent that came back from its customers that had

10  been used with Liquid Wrench?

11    A.  No, I didn't say that.

12    Q.  Okay.  Can you clarify what you meant by

13  that?

14    A.  Yes, as part of their fluid recovery

15  services program, which was the mass of -- mass of

16  the analytical work we did during the '90s, we

17  sampled and analyzed more than 100,000 waste

18  streams during that time frame.  And some of those

19  waste streams indicated cross-contamination with

20  that, and as a result, we identified benzene

21  concentrations from that.

22    Q.  Okay.  And were any of the benzene

23  concentrations in the waste streams tied by

24  Safety-Kleen to the use of Liquid Wrench in

25  particular?

01  A. Only through the waste disposal services,

02 not the parts washer service.

03  Q. Okay. What did Safety-Kleen learn about

04 benzene and Liquid Wrench through the waste

05 disposal services?

06  A. As memory serves me -- and again, remember

07 we're talking a massive amount of data here. That

08 the modern version of the Liquid Wrench was more or

09 less normal regular mineral spirits containing with

10 an expected benzene concentration, but we saw the

11 releases for the raffinate which had previously

12 been used which was very high in the benzene

13 content. So we saw nothing unusual about Liquid

14 Wrench when we tested the waste products in the

15 '90s.

16  Q. Okay. Do you know of a product called

17 B-12 Chemtool?

18  A. I don't. I know the chem -- I know of

19 some of the Chemtool products, but I am not

20 familiar with the B-12, and I didn't attempt to

21 research it. I read about it until I was sick and

22 tired of hearing about it in this depo, but it's --

23 I do not know its composition.

24  Q. Okay. You read about B-12 in which

25 deposition?

01    A.   In Mr. Johnson's deposition.

02    Q.   Okay.  And you were sick and tired of

03 hearing Mr. Johnson testify about B-12?

04         MS. FERGUSON:  Argumentative.

05         THE WITNESS:  Yes, and Liquid Wrench both.

06         (Reporter interruption for clarification.)

07         MS. FERGUSON:  Argumentative.

08 BY MR. DUPONT:

09    Q.   Turning back to Exhibit Number 4, we

10 looked at the paragraph on the second page of the

11 exhibit, the introduction paragraph under Virgin

12 PWS Benzene Data, and I noticed that there's a

13 number of regions that are identified including

14 east, southwest, and Midwest.

15    A.   Yes.

16    Q.   And west is not specifically identified.

17 Was there a breakdown of which suppliers supplied

18 the western area -- the Western region of the

19 United States?

20    A.   I believe that's characterized in the Rule

21 66, because of the west was one of the primary

22 areas where the Rule 66 solvent was used, and

23 Reedley was the only recycle center which was

24 recycling Rule 66 base material.

25    Q.   Okay.  So the Rule 66 solvents suppliers,

**401, 402**
**Irrelevant**
evidence is not
admissible:
Plaintiffs allege all
of the exposure to
Defendants'
products occurred
in North and South
Carolina (i.e. the
East). This is a
discussion of
suppliers to the
West with nothing
to indicate its
relevance here.

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01    those suppliers that Safety-Kleen was using in

02    California?

03       A.  Yes.

04       Q.  And if we look to the third page of this

05    document under Conclusions, this sets forth some of

06    the findings in this study; is that correct?

07       A.  Yes.

08       Q.  Okay.  And one of the findings is that as

09    we discussed the benzene in the recycled 105

10    solvent does not appear to come entirely from the

11    vendor; is that correct?

12       A.  That's correct.

13       Q.  And the same statement would be true for

14    Rule 66 mineral spirits?

15       A.  Yes.

16       Q.  In fact, Safety-Kleen was able to compare

17    the benzene content of Rule 66 mineral spirits from

18    vendors versus the recycle Rule 66 benzene content

19    and determine that the recycled Rule 66 mineral

20    spirits had higher benzene content?

21       A.  That's correct.

22       Q.  One of the conclusions that was also

23    reached was that it was -- there was little chance

24    for Safety-Kleen to detect a batch of mineral

25    spirits that high -- that had a higher benzene

**401, 402 Irrelevant evidence is not admissible:** Plaintiffs do not allege exposure to Rule 66 solvent or exposure in California to any Safety-Kleen product

**401, 402 Irrelevant evidence is not admissible:** Rule 66 mineral spirits is unique to California and provided by Western suppliers, having no relevance to the allegations and facts of this case, which are limited to North and South Carolina. Thus, this document, its conclusions, and discussion of same are irrelevant

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

401, 402 Irrelevant
evidence is not
admissible:
Plaintiffs do not
allege exposure to
virgin mineral spirits
(unrecycled, from a
vendor), nor is there
any evidence it was
supplied to
Plaintiffs' employer.
Plaintiffs'
allegations are
explicitly for
"Safety-Kleen 105
Solvent Recycled."
Misstates the
Document;
Lacks Foundation;
and
Assumes Facts

01  content before it was packaged for use at one of

02  its branches?

03      A.  That's correct.

04      Q.  So Safety-Kleen recognized at this period

05  of time that it had been sending out batches of

06  mineral spirits to its customers that had greater

07  benzene content than predicted and had been unable

08  to catch that before it happened?

09      MR. WOOD:  Objection.  Misstates the prior

10  document in prior testimony.  Foundation.  Assumes

11  facts.

12      THE WITNESS:  Yes, and this was the basis

13  of part of this study was to establish approved

14  vendors.  So the answer is yes to your question.

15  BY MR. DUPONT:

16      Q.  Okay.  And then prior to 1991,

17  Safety-Kleen did not have any procedure or study in

18  place from which it could systematically determine

19  and monitor the benzene content of the mineral

20  spirits it was receiving from its vendors?

21      A.  Only through grab samples, individual

22  samples that may have been done at various time

23  frames.  Did we have data in regard to benzene

24  concentration in parts washer solvent?

25      (Reporter interruption for clarification.)

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01          MS. FERGUSON:  (Shook head.)

02     BY MR. DUPONT:

03          Q.  And Safety-Kleen begins to take those

04     grab-sample datas in 1987?

05          A.  The earlier -- the earliest one I recall

06     is 1982.

07          Q.  Okay.  And was that for benzene

08     specifically?

09          A.  Yes.

10          Q.  So prior to 1982, Safety-Kleen didn't

11     conduct any testing to monitor whether or not its

12     mineral spirits contain benzene or what level?

13          MR. WOOD:  Objection.  Foundation.

14          THE WITNESS:  I believe that to be true.

15     Excuse me.  I need to reach -- I need to qualify

16     that statement.  Safety-Kleen had analytical

17     capability that would allow them to determine prior

18     to 1982 or about 1982 if solvent contained greater

19     than approximate thousand parts per million.  So

20     gross levels we had that capability, but not at the

21     levels that we're talking about in 1990.

22     BY MR. DUPONT:

23          Q.  Okay.  So let me see if I understand that.

24     Was 1991 the first time period that Safety-Kleen

25     was able to test for benzene in and mineral spirits

01  below the level of a thousand parts per million?

02      A.  It actually began I think in 1989 and we

03  began developing the technique for that.  So we had

04  the capability approximately '89 to '90, and this

05  is the time frame we applied it on a massive scale.

06      Q.  Okay.  So prior to 1989, Safety-Kleen

07  didn't have the technology to test mineral spirits

08  for levels of benzene below a thousand parts per

09  million?

10      A.  That's right.

11      Q.  And it was in 1982 that Safety-Kleen began

12  to take some grab samples of mineral spirits to

13  determine whether or not they had benzene, and it

14  can only detect benzene if it was present over a

15  thousand parts per million?

16      A.  That was true of Safety-Kleen, but these

17  grab samples were analyzed by outside labs.

18      Q.  And did the outside labs analyze

19  Safety-Kleen's mineral spirits for levels of

20  benzene below a thousand parts per million between

21  1982 and 1989?

22      A.  Yes.

23      Q.  How often did that take place?

24      A.  My recollection is there were

25  approximately half a dozen samples during early to

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC  Document 312-1  Filed 09/02/20  Page 74 of 195
Case 3:18-cv-00197-RJC-DSC  Document 409  Filed 09/15/20  Page 77 of 340

```
01     mid '80s that were analyzed.
02          Q.  Do you know where those samples were taken
03     from?
04          A.  My recollection is that those samples
05     originated from the Elgin recycle center or
06     branches nearby Chicago.
07          Q.  Okay.  So over that seven-year time
08     period, there were six grab samples taken from the
09     Elgin/Chicago --
10          A.  Yes.
11          Q.  -- period?
12          A.  This is an approximation.  It might have
13     been four.  It might have been eight.  But
14     approximately a half dozen.
15          Q.  Okay.  Now, the recycling process for
16     Safety-Kleen was that mineral spirits would come
17     back to its recycling centers.  It would be mixed
18     into a tank with mineral spirits from various
19     customers.  And then they would go through a
20     distillation process, correct?
21          A.  Yes.
22          Q.  Okay.  And the distillation process was
23     not designed to take benzene out of the process
24     stream, was it?
25          A.  Only inadvertently.  It was not the -- the
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**                        **Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 310-1   Filed 09/06/20   Page 75 of 195
Case 3:18-cv-00197-RJC-DSC   Document 409   Filed 09/13/20   Page 78 of 340

01    design of the equipment to do that.

02       Q.  All right.  Since the process stream

03    didn't actually remove -- strike that.

04          The distillation process didn't actually

05    remove benzene from the process stream; did it?

06       A.  Some, yes.

07       Q.  When Safety-Kleen brought mineral spirits

08    back from a customer, that mineral spirits had

09    various contaminants in it; is that correct?

10       A.  Yes, mainly oil and grease, but yes.

11       Q.  And some of those contaminates were solid?

12       A.  Yes.

13       Q.  And the distillation process included a

14    step where the solids were allowed to sink to the

15    bottom of the tank and were removed?

16       A.  Yes.

17       Q.  And then the solvent was evaporated?

18       A.  From the settled solvent in which the

19    solvent had been removed, that material was then

20    distilled.

21       Q.  Okay.

22       A.  Or evaporated as you say.

23       Q.  Safety-Kleen, at one point in time,

24    researched the ability to create a distillation

25    process, a distillation column that would actually

01    remove benzene and chlorinated solvents from

02    mineral spirits, correct?

03        MR. WOOD:  Objection.  Assumes facts not

04    in evidence.

05        THE WITNESS:  Yes.

06    BY MR. DUPONT:

07    Q.  And the Safety-Kleen decided not to use

08    that distillation column procedure, correct?

09    A.  That's correct.

10    Q.  And Safety-Kleen actually calculated the

11    cost of how much it would have to spend to install

12    those distillation columns into its recycling

13    centers, correct?

14    A.  There were estimates of that, yes.

15    Q.  And what were those estimates?

16    A.  I don't recall those number.

17    Q.  Safety-Kleen actually determines what the

18    cost of installation of those distal -- strike

19    that?

20        Safety-Kleen actually estimated what it

21    would cost in terms of -- strike that.

22        Who was involved in conducting the study

23    to determine the installation of distillation

24    columns that would remove benzene.

25        MR. WOOD:  Objection.  Assumes facts not

```
01    in evidence.
02            THE WITNESS:  Repeat, please.
03    BY MR. DUPONT:
04        Q.  Sure.  Who was involved in studying the
05    use of distillation columns to remove benzene?
06            MR. WOOD:  Same objection.
07            THE WITNESS:  I authorized that study.
08    BY MR. DUPONT:
09        Q.  And were there meetings regarding the
10    study?
11        A.  Sure.
12        Q.  Who attended those meetings?
13        A.  The predominance of the meetings were
14    myself and -- and Paul Dittmar, Dennis Brinkman,
15    Robert Bentley, a chemical engineer followed by
16    more of the engineering staff in reviewing the
17    details and the -- the design.
18        Q.  When did that study take place?
19        A.  Study was performed in the late '80s.  And
20    the decision not to produce that was -- was not
21    only an economic but a technical one as well.
22        Q.  And Dennis Brinkman when he participated
23    in the meetings about that study, was the president
24    and CEO of Safety-Kleen?
25        A.  No, no.  Don Brinkman was the president.
```

611, nonresponsive

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

# Breece, James

Rhyne Trial Master

```
01    Dennis Brinkman was a Ph.D. chemist who worked for
02    me.
03        Q.  Okay.
04        A.  What was --
05        Q.  Okay.  Did Safety-Kleen's attorney Hyman
06    Bielsky participate in the meetings regarding the
07    potential for a distillation column to remove
08    benzene?
09        A.  I don't recall Hyman being involved in any
10    of that discussion.  We may have provided him with
11    results, but I don't recall meeting with him.  This
12    was a technical meeting, not a -- not a legal one
13    at that point.
14        Q.  And who ultimately approved the decision
15    not to install the distillation columns that would
16    remove benzene from the parts washing solvent
17    stream?
18            MR. WOOD:  Objection.  Assumes facts not
19    in evidence.  Foundation.
20            THE WITNESS:  I know the answer.  Shall I
21    give it?
22            MR. WOOD:  You can answer the question.
23            THE WITNESS:  The -- the final decision in
24    terms of strategy was made by my boss who was Clark
25    Rose and Joe Chalhoub who was the president of the
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**                     **Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 312-1   Filed 09/02/20   Page 79 of 195
Case 3:18-cv-00197-RJC-DSC   Document 469   Filed 09/15/20   Page 82 of 340

01     company at that time.

02   BY MR. DUPONT:

03      Q.  How do you spell Joe Chalhoub?

04      A.  C-H-A-L-O-U-B [sic].

05          (Reporter interruption for clarification.)

06          THE WITNESS:  -L-O-U-B.

07   BY MR. DUPONT:

08      Q.  Was there a calculation made by

09   Safety-Kleen that it could pass the cost of the

10   installation of these distillation columns onto a

11   customer at eight cents per gallon?

12          MR. WOOD:  Objection.  Assumes facts not

13   in evidence.  Foundation.

14          THE WITNESS:  There was a number derived.

15   I don't recall that number as being eight; but

16   there was a number derived, yes.

17   BY MR. DUPONT:

18      Q.  Okay.  Do you recall it being in the

19   ballpark of eight cents per gallon?

20      A.  I don't.

21          MR. DUPONT:  Let's go off the record.

22          MR. WOOD:  Take a break?

23          MR. DUPONT:  Yes.

24          THE VIDEOGRAPHER:  The time is 11:23 a.m.

25   We're going off the record.

# Breece, James

Rhyne Trial Master

```
01          (Break taken.)
02          THE VIDEOGRAPHER:  The time is 11:37 a.m.
03   We're back on the record.
04          (Plaintiff's Exhibit 5 marked
05          for identification.)
06   BY MR. DUPONT:
07      Q.  Okay.  Dr. Breece, I'm going to hand to
08   you a document that I marked as Exhibit 5.
09      A.  Before I address that, I'd like to have a
10   second to add -- it's amazing when you're on break
11   how you think of additional information.  I
12   couldn't think of the other people involved in the
13   distillation column involved.  Glen Kazborn who was
14   one of the lead senior engineers was involved and a
15   chemical engineer by the name of Steve Selk,
16   S-E-L-K.  And Steve Selk ran a distillation column
17   for the production of mineral spirits for SO
18   Canada.
19          (Reporter interruption for clarification.)
20          THE WITNESS:  SO Canada.
21          SO, is that right?  Shell Canada.  Excuse
22   me.  Let me get my story straight here.  Shell
23   Canada, with actual hands-on production experience
24   of that.  So that was part of the evaluation team
25   that did the technical evaluation for that column,
```

**Transcript of Breece, James**



611, there's no question pending, non-responsive, object to adding a different answer to a different question

01  and I forgotten those two names.  I just wouldn't
02  come until I took a break.

03  BY MR. DUPONT:
04      Q.  Okay.  Well, thank you for that.
05          Clark Rose, what was his position with
06  Safety-Kleen at the time that Safety-Kleen looked
07  into adding a distillation column that would remove
08  benzene from its mineral spirits parts washing
09  stream?
10          (Reporter interruption for clarification.)
11  BY MR. DUPONT.
12      Q.  ...benzene from its mineral spirits parts
13  washing stream?
14          MR. WOOD:  Objection.  Form.  Assumes
15  facts not in evidence.
16          THE WITNESS:  Initially at the time the
17  work began, Clark Rose was a chemical engineer in
18  charge of the recycle center operations.  By the
19  time the pilot work had been completed, Clark had
20  been promoted to vice president of tech services,
21  and I reported to Clark Rose.
22  BY MR. DUPONT:
23      Q.  Okay.  And you also gave me a name Glen
24  Kazborn?
25      A.  Glen Kazborn.

Transcript of Breece, James

Page 80

```
01      Q.  What was Glen Kazborn's position with
02  Safety-Kleen at the time this study into possibly
03  using distillation columns to remove benzene from
04  the parts washing stream took place?
05      A.  Glen Kazborn was a process engineer who
06  came to Safety-Kleen as part of the acquisition of
07  the Brezi Lube facility from Canada, and both Glen
08  Kazborn and Steve Selk were, I believe.  Glen was a
09  mechanical engineer and Steve Selk was a chemical
10  engineer.
11      Q.  Okay.
12      A.  Sorry for the little interruption.
13      Q.  No, I appreciate that.
14          So I've handed you what I've marked as
15  Exhibit 5.
16          MR. WOOD:  My objection to what you've
17  marked as Exhibit 5 is it is marked confidential.
18  It is as a Bates stamped SAL SK O5741.  I believe
19  that to be the Salmieri case.  This document was
20  produced subject to a confidentiality order in this
21  case that it not be used outside the purposes of
22  that litigation.  I don't -- at this time I cannot
23  confirm that it was produced as part of the
24  document production in this case.
25          Can we go off the record for a second?
```

611, non-responsive
no question pending
object to adding a
different answer to a
different question

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01          MR. DUPONT:  Yes.  And we'll go back on

02    the record, but I'll -- off the record.

03          THE VIDEOGRAPHER:  The time is 11:41 a.m.

04    We're going off the record.

05          (Break taken.)

06          THE VIDEOGRAPHER:  The time is 11:49 a.m.

07    We're back on the record.

08          MR. WOOD:  This is Jeff Wood on behalf of

09    Safety-Kleen.  Regarding Exhibit 5 that was just

10    marked, I believe it was produced in the Salmieri

11    case, Bates stamped SAL SK 05741 stamped --

12          (Reporter interruption for clarification.)

13          THE WOOD:  SK 05741.  It's stamped

14    confidential on the -- on each page of the

15    document.  I believe it was produced pursuant to a

16    confidentiality order in that case, which is very

17    similar, if not identical to the confidentiality

18    order in the Johnson case.  I believe this document

19    would have been part of the Johnson production;

20    although, I can't determine that at this time.  I'm

21    going to allow questioning on the document subject

22    to plaintiff's agreement that -- plaintiff's

23    counsel's agreement that I'm not waiving any

24    potential confidentiality by doing so.

25          MR. DUPONT:  Agreed.

Case 3:18-cv-00197-RJC-DSC  Document 312-1  Filed 09/02/20  Page 84 of 195
Case 3:18-cv-00197-RJC-DSC  Document 469  Filed 09/15/20  Page 87 of 340

# Breece, James

Rhyne Trial Master

01      MS. KAHN:  May I take a quick look at that
02   document, please.
03      MS. FERGUSON:  We'll get you copies during
04   the break.
05      MS. KAHN:  Thank you.
06   BY MR. DUPONT:
07      Q.  Okay.  Dr. Breece, you have in front of
08   you Exhibit 5.
09      A.  Yes.
10      Q.  Can you identify for us what this document
11   is?
12      A.  Yes.  It's a memo that -- the first three
13   pages of this I recognize exactly what the back
14   pages are.  I have no idea as part of the DC scan,
15   and it doesn't belong with this memo.
16      Q.  Okay.
17      A.  So that -- I don't know how it got there,
18   but it's been attached and it's not relevant to
19   this memo at all.
20      Q.  All right.  Let's talk about the first
21   three pages which are Bates number SAL SK 5741
22   through 5743.
23      A.  Yep.
24      Q.  Is this a Safety-Kleen Corporation
25   interoffice communication dated June 8, 1988

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

# Breece, James
## Rhyne Trial Master

01  addressed to you from Dean Hufsey?

02      A.  Yes.

03      Q.  And Clark Rose is copied on it?

04      A.  Yes, he was.

05      Q.  And who was Dean Hufsey at Safety-Kleen in

06  1988?

07      A.  Dean Hufsey was a chemist who worked for

08  me in the -- at the tech center, and his

09  responsibilities at this point in time were

10  material safety data sheets preparation.  He was

11  also involved in some litigation support and in

12  customer service to work with customers.

13      Q.  All right.  And is this a document that

14  came from Safety-Kleen's business records, at least

15  the first three pages, 5741 to 5743?

16      A.  Yes, I believe so.

17      Q.  And did you attach this memorandum on to

18  Joe Knott?

19      A.  I did.  And it's indicated up in the upper

20  right-hand corner I did that.

21      Q.  All right.  You made a -- a note to Joe

22  Knott on June 13th, 1988 when you passed this

23  memorandum onto him?

24      A.  I did.

25      Q.  And in that note to Joe Knott you wrote,

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

01    "I believe Dean Hufsey is exactly correct, WRT"; is

02    that with regards to?

03        A.  With respect to.

04        Q.  With respect to "benzene and possibly

05    heavy metals?  Please comment."

06            Is that correct?

07        A.  That's correct.

08        Q.  And then there's a handwritten note at the

09    bottom of the first page of the document dated June

10    16, 1988.

11            Do you see that?

12        A.  Yes.

13        Q.  Is that handwritten comment coming from

14    Joe Knott?

15        A.  It is.

16        Q.  And what does Joe Knott write on June

17    16th, 1988?

18        A.  Well, I can only read part of it.  The

19    original is readily legible; this one isn't.  "It

20    seems prudent to me to check some samples for the

21    recycle centers at a population of say 50 to 100

22    samples to see where we are.  Also, we should -- we

23    should have an ND."  That's no -- no detection on

24    it.

25            (Reporter interruption for clarification.)

**Transcript of Breece, James**

```
01          THE WITNESS:  "ND," nondetect, limit on
02    air purchased materials.
03    BY MR. DUPONT:
04       Q.  Okay.  Is that referring to putting a
05    limit of no detection level of benzene on purchased
06    materials specifications for mineral spirits?
07       A.  That was his comment.
08       Q.  All right.  As of this time in June 1988,
09    is it correct that Safety-Kleen did not have a
10    specification to control the amount of benzene in
11    the mineral spirits it acquired from its vendors?
12          MR. WOOD:  Objection.  Assumes facts.
13    Foundation.
14          THE WITNESS:  It did not have a benzene
15    specification imbedded in the purchasing specks for
16    the vendors.
17    BY MR. DUPONT:
18       Q.  All right.  In 1988, was Joe Knott the
19    president of Safety-Kleen?
20       A.  I believe at this time Joe was -- and I
21    believe I stated this earlier.  I believe Joe
22    became president about 1990.  I believe he was a
23    senior vice president of tech services at this
24    point.
25       Q.  Okay.  I wasn't sure.  I believe you
```

01    mentioned the late '80s or early '90s.

02        A.  Yeah, I believe -- I believe at this stage

03    he was still the senior vice president.

04        Q.  Okay.  And did Safety-Kleen implement a no

05    detect limit for benzene in its purchase material

06    specifications?

07        A.  It was not possible to do that.

08        Q.  Well, is it correct that Safety-Kleen did

09    not implement a no detection limit for benzene in

10    its personal -- it's purchase material

11    specifications for mineral spirits from vendors?

12            MR. WOOD:  Objection.  Asked and answered.

13            MS. FERGUSON:  Ar- --

14            MR. WOOD:  Argumentative.

15            THE WITNESS:  We did not implement a

16    nondetect for 105 solvent because it was not --

17            (Reporter interruption for clarification.)

18            THE WITNESS:  We did not implement a

19    nondetect specification for 105 solvent because it

20    was not possible.

21    BY MR. DUPONT:

22        Q.  Okay.  Did Safety-Kleen implement a

23    nondetect limit for any other mineral spirits

24    solvents in its purchase material specifications

25    that it issued to vendors?

**Transcript of Breece, James**

# Breece, James
### Rhyne Trial Master

01    A.  No, it is not possible for the -- for the

02  solvents used for parts cleaning to have a

03  nondetect unequivocally.  Analytical methods are so

04  good that it exceeds the process capabilities of

05  the refineries.

06    Q.  This memo from June 8, 1988 that's marked

07  as Exhibit 5 describes some of the history that

08  Safety-Kleen had with litigation concerning

09  injuries caused by use of its parts washing

10  solvent; is that correct?

11    A.  Mr. Hufsey had described that, yes.

12    MR. WOOD:  Objection.  Assumes facts.  I

13  don't know if you used the word alleged in the

14  question.

15  BY MR. DUPONT:

16    Q.  It begins with a case in 1979 from Corpus

17  Christi entitled Frank McDole versus Safety-Kleen;

18  is that correct?

19    A.  Yes.

20    Q.  And continuing down it discusses a case

21  involving a Chester Rasmussen?

22    A.  Yes.

23    Q.  And it indicates that with respect to the

24  Rasmussen case, that a weakness in Safety-Kleen's

25  defense in the Rasmussen case was that it did not

---

**401, 402 irrelevant evidence is inadmissible:** the document references a lead case, a mercury case, a dismissed case, and two pending matters for which liability had not been adjudicated.
**Assumes facts not in evidence:** liability for benzene exposure was not proven in any of the referenced lawsuits.
**404(b):** inadmissible evidence of prior lawsuits being offered to show that ~-Kleen acted in ...dance with past conduct.
**Inadmissible Hearsay**

**401, 402 irrelevant evidence is not admissible:** Document states McDole alleged lead poisoning, not benzene. Lead is not at issue here.
**404(b):** inadmissible character evidence
**Inadmissible Hearsay**

**401, 402 irrelevant evidence is not admissible:** Document states Rasmussen alleged mercury poisoning, not benzene exposure.
**404(b):** inadmissible character evidence
**Inadmissible Hearsay**

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

**401, 402 irrelevant evidence is not admissible:** neither mercury nor mercury testing is alleged or at issue here. Nothing indicates mercury testing has any relevance on benzene or benzene testing.
**404(b):** inadmissible character evidence
**Inadmissible Hearsay**

**401, 402 irrelevant evidence is inadmissible:** no discussion of the facts or merits of this Michigan case or its outcome.
**404(b):** inadmissible character evidence
**Inadmissible Hearsay**

**Assumes facts not in evidence:** This case was dismissed on summary judgment and the document merely states these were allegations.
**404(b):** inadmissible character evidence
**401, 402 irrelevant evidence not admissible:** the document states Safety-Kleen won summary judgment and provides no information on the details of Mr. Pierce's dismissed allegations.
**Inadmissible Hearsay**

01  test the recycled Safety-Kleen 105 solvent for the

02  presence of mercury; is that accurate?

03      A.  That's a statement in the memo.

04      Q.  And if you continue, there's reference to

05  a case in Michigan involving a Gerald Johnson who

06  contracted leukemia after he used Safety-Kleen 105

07  solvent that contained benzene; is that correct?

08      MS. FERGUSON:  Objection.  The document

09  speaks for itself.

10      THE WITNESS:  Yes.

11  BY MR. DUPONT:

12      Q.  And it also references a Johnny Pierce who

13  contracted aplastic anemia through his use of

14  Safety-Kleen 105 solvent secondary to benzene,

15  correct?

16      MR. WOOD:  Objection.  Assumes facts.

17  Document speaks for itself.

18      THE WITNESS:  I believe that's consistent

19  with what's written here, yes.

20  BY MR. DUPONT:

21      Q.  And at the time of this memorandum if we

22  look to the last photograph on this particular

23  page, it references two cases that were going on at

24  the time of the memorandum, the Junker case and the

25  Hanson case involving individuals who contracted

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

**401, 402 irrelevant evidence is inadmissible:** Cases were pending at time of memorandum, there is no discussion of their merits or outcome. To the extent there is any probative value, it would be substantially outweighed by the prejudice and confusion of referencing pending litigation in 1988.
**404(b):** inadmissible evidence of prior lawsuits being offered to show that in Safety-Kleen acted in accordance with past conduct.
**Inadmissible Hearsay**

01   leukemia after using Safety-Kleen 105 solvent which

02   contained benzene?

03       MR. WOOD: Objection. Assumes facts. The

04   document speaks for itself.

05       THE WITNESS: Yes, that's what's written

06   here.

07   BY MR. DUPONT:

08     Q. And Mr. Hufsey comments in the last

09   sentence that it's highly probable that there would

10   be other cases against Safety-Kleen where it's

11   claim that 105 solvent contains benzene?

12       MR. WOOD: Objection. Document speaks for

13   itself.

14       THE WITNESS: Please repeat the question,

15   I'm --

16   BY MR. DUPONT:

17     Q. Sure.

18     A. I'm lost.

19     Q. And this last paragraph on a page that's

20   Bates number 5742, does Mr. Hufsey comment that as

21   a result of the OSHA benzene standard and

22   proposition 65, it's highly probable that there

23   will be other allegations brought against

24   Safety-Kleen where it is claimed that Safety-Kleen

25   105 solvent contains benzene?

> Speculation: "highly probable that there will be" Inadmissible Hearsay

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

# Breece, James
## Rhyne Trial Master

Assumes facts not in evidence and misstates the exhibit: the 1988 document states Mr. Hufsey's recommendation is "based on all of the above" which includes his discussion of OSHA's 1987 benzene regulation and California's 1987 Proposition 65 (92:11-94:1).

**404(b):** inadmissible evidence of prior lawsuits being offered to show that in Safety-Kleen acted in accordance with past conduct.

**Lacks Foundation; Inadmissible Hearsay**

A. That's what's written, yes.

Q. And it's Mr. Hufsey's recommendation that based on these past lawsuits brought against Safety-Kleen and the likeliness of future lawsuits brought against Safety-Kleen, that Safety-Kleen should conduct a series of tests on its mineral spirits solvent stream to determine the benzene content?

MR. WOOD: Objection. Foundation. The document speaks for itself.

THE WITNESS: Yes.

BY MR. DUPONT:

Q. So if we read this document, what we learned is that the testing that was done in 1989 through 1993, that was reported on in Exhibit 4 was testing that came about as a result of litigation brought against Safety-Kleen for people contracting leukemia, aplastic anemia, and other injury from exposure to its mineral spirits parts washing solvent?

MR. WOOD: Objection. Lacks foundation. Assumes facts.

THE WITNESS: No, that's not true.

BY MR. DUPONT:

Q. So where Mr. Hufsey writes "Based on all

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

**Assumes facts not in evidence and misstates the exhibit:** the 1988 document states Mr. ... ey's ...nmendation is "based on all of the above" which includes his discussion of OSHA's 1987 benzene regulation and California's 1987 Proposition 65 (92:11-93:1)

**404(b):** inadmissible evidence of prior lawsuits being offered to show that in Safety-Kleen acted in accordance with past conduct.

**Asks witness to enter the mind of document's author; Inadmissible Hearsay**

```
01    of the above, I feel that it is entirely prudent

02    and it is my recommendation that we examine

03    recycled Safety-Kleen 105 solvent distillate as a

04    matter of routine practice at all of our recycle

05    centers and as part of our quality control pro --

06    program, quantitatively for benzene if it is found

07    to be present."

08         He's referring when he says "to all of the

09    above" to these lawsuits that occurred on

10    Safety-Kleen?

11         MR. WOOD:  Objection.  Document speaks for

12    itself.

13         THE WITNESS:  Yes.

14         MS. FERGUSON:  It's an improper and

15    incomplete hypothetical, and you're asking the

16    witness to get into the mindset of the author.

17    BY MR. DUPONT:

18         Q.  Is that correct?

19         A.  Repeat, please.

20         Q.  Sure.  When Mr. Hufsey says "Based on all

21    of the above, I feel that it is entirely prudent

22    and it is my recommendation that we examine

23    recycled Safety-Kleen 105 solvent distillate as a

24    matter of routine practice at all of our recycle

25    centers and as part of our quality control program
```

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

# Breece, James

Rhyne Trial Master

```
01    quantitatively for benzene if it is found to be
02    present."
03         What he's referring to as part of all of
04    the above is the litigation against Safety-Kleen
05    where individuals contracted leukemia, aplastic
06    anemia, and other conditions from exposure to the
07    105 solvent containing benzene?
08         MR. WOOD:  Objection.  Assumes facts.
09    Document speaks for itself.  Calls for speculation.
10    Lack of foundation.
11         THE WITNESS:  All I can tell you is my
12    interpretation and my --
13         (Reporter interruption for clarification.)
14         THE WITNESS:  My interpretation of this
15    memo from Dean Hufsey was that he didn't have the
16    analytical material he needed, and that there were
17    a variety of regulatory requirements that demanded
18    that we have the analytical work.  In -- in terms
19    of the hazard communication standard and in
20    particular the Prop 65, we did not have the
21    information we needed to properly respond to that.
22    He also pointed out that it would be useful in
23    these cases, but I can assure you, the conversation
24    between myself and Joe Knott didn't address
25    litigation.  It addressed knowing what our products
```

**Transcript of Breece, James**

611. non-responsive, objection to adding a different answer to a different question

```
01   were.
```

02   BY MR. DUPONT:

03       Q.  Joe Knott received this memorandum which

04   addressed the cases involving Mr. Johnson,

05   Mr. Pierce, Ms. -- Ms. Junker, and Mr. Hanson who

06   had contracted leukemia and aplastic anemia from

07   exposure to 105 solvent containing benzene,

08   correct?

09           MR. WOOD:  Objection.  Assumes facts not

10   in evidence.

11           THE WITNESS:  Yeah, I guess I don't -- I

12   don't know how to answer it.  Repeat it, please.

13   BY MR. DUPONT:

14       Q.  Sure.  Joe Knott as the president of

15   Safety-Kleen -- strike that.

16           Joe Knott as the senior vice president of

17   Safety-Kleen at the time received this memorandum

18   in 1988 that addressed these individuals who

19   brought cases because they contracted leukemia and

20   aplastic anemia from exposure to 105 solvent

21   containing benzene, correct?

22           MR. WOOD:  Objection.  Assumes facts not

23   in evidence.  Asks for expert opinion.  Incomplete

24   hypothetical.

25           THE WITNESS:  He doesn't say that here,

**Transcript of Breece, James**

01    and he never had that conversation with me, and he

02    is authorizing me to begin the study.

03    BY MR. DUPONT:

04       Q.  Okay.

05       A.  So you may imply that.  You may read it

06    that way, but I can assure you from my comment and

07    from Mr. Knotts, it never addressed these over

08    here.  But it -- the cases it addressed known

09    compositional information of a product and

10    basically he was saying we'd like to have it

11    nondetect for the 105.

12       Q.  All right.  And part of Mr. Hufsey's

13    responsibility for Safety-Kleen was litigation

14    support, correct?

15       A.  At that time, yes.

16       Q.  Did Joe Knott ever direct Safety-Kleen to

17    implement a distillation column that would remove

18    all the benzene from the parts washing solvents?

19       MR. WOOD:  Objection.  Assumes facts not

20    in evidence.

21       THE WITNESS:  No, he did not.

22    BY MR. DUPONT:

23       Q.  As the result of this memorandum, did Joe

24    Knott direct Safety-Kleen to include a benzene

25    disclosure on material safety data sheets for

**401, 402 irrelevant; evidence is inadmissible; Mr. Hufsey's role in litigation support 32 years ago in 1988 has nothing to do with the facts of Plaintiffs' case. Assumes Facts**

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

# Breece, James

Rhyne Trial Master

```
01   Safety-Kleen parts washing solvents?
02       A.  He did not.
03       Q.  As a result of this memorandum or at any
04   time, did Joe Knott direct Safety-Kleen to place a
05   cancer warning on material safety data sheets for
06   Safety-Kleen parts washing solvents?
07           MR. WOOD:  Objection.  Foundation.  Calls
08   for speculation.  Vague and overbroad as to time
09   frame.
10           THE WITNESS:  That specific request or
11   directive did not occur.  What did occur was to
12   make sure we were in compliance with all the health
13   standards and the Hazcom standards that was
14   appropriate for preparation of material safety data
15   sheets.
16   BY MR. DUPONT:
17       Q.  And those material safety data sheets did
18   not include a benzene warning?
19       A.  They did not.
20           MR. WOOD:  Objection.  Form.  Assumes
21   facts not in evidence.  Lacks to foundation.
22   BY MR. DUPONT:
23       Q.  And those material safety data sheets did
24   not include a cancer warning?
25           MR. WOOD:  Objection.  Lacks foundation.
```

611, non-responsive, object to adding a different answer to a different question

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01   Assumes facts not in evidence.

02        THE WITNESS:  They did not include a

03   cancer warning in -- in the fact that this product

04   was -- was regular mineral spirits and as a product

05   regular mineral spirits is -- is not considered a

06   cancer causing chemical in total.

611, non-responsive

07   BY MR. DUPONT:

08        Q.  Safety-Kleen knew in 1988 that benzene was

09   a known human carcinogen, correct?

10        A.  Pure benzene we knew that.

11        Q.  Safety-Kleen knew that benzene was a known

12   human carcinogen even before 1988 when it issued

13   this memorandum, correct?

14        A.  Yes.

15        Q.  Safety-Kleen knew since at least 1977 that

16   the government had indicated that benzene was known

17   to cause leukemia?

18        A.  Pure benzene, yes.

19        Q.  And Joe Knott did not -- strike that.

**Speculative: witness lacks knowledge of every conversation Mr. Knott had with Safety-Kleen personnel; Lacks Foundation**

20        Joe Knott didn't direct Safety-Kleen or

21   anyone at Safety-Kleen to include a benzene or

22   cancer warning on the labels of parts washing

23   machines distributed by Safety-Kleen to its

24   customers, did it?

25        MR. WOOD:  Objection.  Foundation.  Calls

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01   for speculation.

02       THE WITNESS:  No, and -- and I wouldn't

03   have expected he would.  He would have assigned

04   that duty to environmental health and safety.

05   BY MR. DUPONT:

06      Q.  Okay.  Did Joe Knott assign the duty of

07   placing a cancer warning and a benzene warning on

08   labels of Safety-Kleen parts washers?

09       MR. WOOD:  Same objection.

10       THE WITNESS:  His assignment was to make

11   sure that they were technically regulatorily and

12   environmental health and safe, correct.  And given

13   those instructions in concert with environmental

14   health and safety department, at the -- at the

15   presence of benzene, it was present as we found in

16   Safety-Kleen 105 solvent, it was not required.

*611, non-responsive, object to adding a different answer to a different question*

17       MR. DUPONT:  Objection.  Move to strike.

18   BY MR. DUPONT:

19      Q.  Joe Knott did not direct the environmental

20   health and safety department to issue a benzene

21   warning or a cancer warning for labels of

22   Safety-Kleen parts washers; did he?

23       MS. FERGUSON:  Argumentative.  He's asked

24   and answered the question.  You moved to strike his

25   response because you didn't like it.  But he's

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

01  answered your question, so some move on and stop

02  harassing the witness.

03       MR. WOOD:  Objection.  Foundation.  Calls

04  for speculation.

05       THE WITNESS:  I believe I did answer it.

06  BY MR. DUPONT:

07    Q.  Okay.  Did Joe Knott tell the

08  environmental and health -- environmental health

09  and safety department of Safety-Kleen after

10  receiving this June 8, 1988 memo at any point in

11  time, I want you to issue a cancer warning and a

12  benzene warning on labels of Safety-Kleen parts

13  washers?

14       MR. WOOD:  Objection.  Asked and answered.

15  Lacks foundation.  Calls for speculation.

16       THE WITNESS:  I'm puzzled by your -- your

17  characterization of being edict from -- from Joe

18  Knott, that is --

19       (Reporter interruption for clarification.)

20       THE WITNESS:  Edict, to place something on

21  there.  It was left to the staff of people to both

22  technical and environmental and health and safety

23  people to make that designation and -- and

24  certainly we couldn't agree.  It went to senior

25  management, but it was left to people who were

**Transcript of Breece, James**

611, non-responsive, object to adding a different answer to a different question

```
01    qualified to do that, not a senior executive.
```

02    BY MR. DUPONT:

03      Q.  Okay.  And those people with environmental

04    health and safety and whoever else participated in

05    the decision-making did not come to the conclusion

06    that resulted in putting a cancer warning or a

07    benzene warning on labels of Safety-Kleen parts

08    washers?

09      A.  I would agree with that.

10          MR. WOOD:  Let's break for lunch when you

11    get a chance.

12          MR. DUPONT:  We can break now.

13          MR. WOOD:  Okay.

14          THE VIDEOGRAPHER:  This is end of Video

15    Number 2.  The time is 12:14 p.m.  We're going off

16    the record.

17          (Lunch break taken.)

18          THE VIDEOGRAPHER:  This is the beginning

19    of Video Number 3 in the deposition of Dr. Breece.

20    The time is 1:08 p.m.  We're back on the record.

21    BY MR. DUPONT:

22      Q.  Okay.  Dr. Breece, did you have a good

23    lunch?

24      A.  Oh, yes.

25      Q.  Good.  We're back to continue with your

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01   deposition.  And we had discussed earlier the issue

02   of the benzene content of Safety Kleen's mineral

03   spirit streams being increased by customer use of

04   the product.  And one of the materials we discussed

05   getting into a Safety-Kleen solvent was gasoline.

06        You, at one point during your employment

07   with Safety-Kleen, actually became involved in

08   studying the amount of gasoline that was found in

09   Safety-Kleen parts-washing solvent used by

10   customers.

11        Do you recall that?

12   A.   No.

13   Q.   Okay.  And do you recall coming up with

14   methods or devices used to study -- study and

15   determine the amount of gasoline in parts-washing

16   solvents that were supplied by Safety-Kleen and

17   used by its customers?

18        MS. KAHN:  Objection.  Lack of foundation

19   and calls for speculation.

20        MR. WOOD:  Join.

21        THE WITNESS:  I have no recollection of

22   that.

23   BY MR. DUPONT:

24

25

**602 lack of personal knowledge:** witness repeatedly states he has no knowledge of studying the amount of gasoline in parts washing solvent; **Calls for Speculation;** and **Lacks Foundation**

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01     Q.  All right.  Let me see if we can help you

02 remember.

03     (Plaintiff's Exhibit 6 marked

04     for identification.)

05     MR. WOOD:  Just take me a moment to find

06 this document.  Hold on.

07     Okay.  The documents that have been marked

08 as Exhibit 6 appears to have been produced in the

09 Salmieri case, Bates'd SAL SK 07273.  It's marked

10 confidential at the top, and I believe it was

11 produced in that case subject to a confidentiality

12 order.

13     I can't determine at this time if it was

14 produced or requested in this case and thus

15 produced confidentially in this case subject to the

16 confidentiality order.

17     I will allow questioning on the document

18 as long as plaintiffs' counsel stipulates that I'm

19 not waiving confidentiality of this document in

20 either the Salmiere case or the Johnson case.

21     MR. DUPONT:  Jeff, you have a continuing

22 objection --

23     MR. WOOD:  Okay.

24     MR. DUPONT:  -- on that basis.

25     MR. WOOD:  No, I just need to do it -- I'm

01      just going to keep doing it like this.  Maybe I'll

02      try to shorten what I'm saying, but...

03          MR. DUPONT:  Okay.

04    BY MR. DUPONT:

05        Q.  Okay.  Dr. Breece, is this a memo dated

06   July 7, 1989 from Steve Parker to yourself?

07        A.  Yes.

08        Q.  And is that a internal memorandum from

09   Safety-Kleen Corporation?

10        A.  It is.

11        Q.  And is this a memo that you received in

12   the course of your work on behalf of Safety-Kleen?

13        A.  Yes.

14        Q.  All right.  And you received that as an

15   employee of Safety-Kleen in July of 1989?

16        A.  Yes.

17        Q.  And this memo is also addressed to a C.

18   Chow; is that correct?

19        A.  That's correct.

20        Q.  Who is C. Chow?

21        A.  Carol Chow.  She was the senior chemist

22   and a mass spectroscopist.

23          (Reporter interruption for clarification.)

24          THE WITNESS:  Mass spectroscopist.

25    BY MR. DUPONT:

---

**401, 402 irrelevant evidence is not admissible:** This memo relates to benzene in fuels (103:20-23). Plaintiffs are not alleging exposure to benzene in fuels. Nothing in the document indicates the mineral spirits shipment discussed came from a parts-washing customer (104:11-21). Plaintiffs only allege exposure to Safety-Kleen from parts-washers, not fuel streams.

---

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

# Breece, James
## Rhyne Trial Master

01    Q.  And there's a B. Blair.  Who was B. Blair?

02    A.  Bruce Blair.  He was the senior level

03    analytical chemist there.    Safety-Kleen Designation from 103:4-19

04    Q.  And there's D. Brinkman.  Do you know if

05    it's Donald Brinkman?

06    A.  That's Dennis Brinkman.

07    Q.  Dennis Brinkman?

08    A.  Right.

09    Q.  And J. Herman?

10    A.  That's Jim Herman.

11    Q.  Who was Jim Herman?

12    A.  Jim Herman was in charge -- this is his

13    signature at the bottom.  His initials here.  He

14    was in charge of waste acceptance, evaluation of

15    waste acceptance into our waste programs.

16    Q.  Okay.  And then you have K. Pool?

17    A.  I don't know who K. Pool is.  Maybe a --

18    some -- a -- a technician.  I don't recall who that

19    may have been.

20    Q.  All right.  This memorandum discusses

21    analyzing the benzene content of fuels; is that

22    correct?

23    A.  It does.

24    Q.  Okay.  And on the end of the first

25    paragraph it indicates that there was a shipment of

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

**401, 402 irrelevant evidence is not admissible:**
Plaintiffs are not alleging exposure to benzene in
fuels. Nothing in the document indicates the mineral
spirits shipment came from a parts-washing customer
(104:11-21). Plaintiffs only allege exposure to Safety-
Kleen from parts-washers, not fuel streams.

```
01   mineral spirits to Safety-Kleen, apparently, that
02   contained approximately 19 percent gasoline.
03        A.  Yes.
04        Q.  Is it something you became aware of in
05   July 1989?
06        A.  It is.            Safety-Kleen designation 104:7-21
07        Q.  And as a result of that shipment, did
08   Safety-Kleen begin to investigate devices to
09   measure the amount of gasoline and other fuels in
10   mineral spirits used by its customers?
11        A.  I need to explain the source of this memo    611, non-responsive
12   and it's usage.  It really relates to a -- a
13   truckload which was contaminated with gasoline that
14   was incinerated at a cement kiln, and it really has
15   nothing to do with benzene and normal parts
16   washers.
17             This is a stream that was to be burned in
18   the production of cement.  Totally different
19   product line.  It -- it ended up failing a flash
20   test and was rejected for even inclusion into the
21   parts washer stream.
22        Q.  Okay.  But is it correct that this is
23   mineral spirits that have been used by a
24   Safety-Kleen customer that had 19 percent gasoline
25   in it?
```

401, 402 irrelevant, evidence is not admissible: no indication this sample of mineral spirits came from a parts washer customer, and in fact, witness testified it did not (104:11-21).

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

01    A.  Yes, but at very high levels.  That's

02  correct.                    Safety-Kleen designation 105:3-6

03    Q.  Okay.

04        (Reporter interruption for clarification.)

05        THE WITNESS:  High, very high in

06  concentration.

07  BY MR. DUPONT:

08    Q.  All right.  And at about this time in

09  1989, was Safety-Kleen investigating the use of

10  portable sensors for determining mineral spirits

11  contaminated with gasoline?

12    A.  None of these would indicate a portable

13  sensor as -- as being part of it.  This is

14  chromatograms from gas chromatographs here --

15    Q.  Okay.

16    A.  -- with a -- with full-blown stable wax

17  columns and a -- one case flame ionization detector

18  and the other one a -- let's see.  What's the other

19  one.  Just a single line monitoring for exact

20  identification of benzene by mass spectrometry as

21  well.  There's nothing in here that I've seen that

22  talks about handheld use.

23    Q.  Okay.  Well, not limiting my question just

24  to what's in that document, do you remember in that

25  time period in 1989 that Safety-Kleen was

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

401, 402 irrelevant evidence is not admissible: Plaintiff
testified he never dumped gasoline, nor did he ever see
anyone dump gasoline, into a Safety-Kleen parts washer.
Gasoline is irrelevant. Further, Plaintiffs are not alleging
exposure to benzene in fuels. Nothing in the document
indicates the mineral spirits shipment came from a parts-
washing customer (104:11-21). Plaintiffs only allege
exposure to Safety-Kleen from parts-washers, not fuel
exposure to Safety-Kleen from parts-washers, not fuel
**Inadmissible Hearsay**



01  investigating the use of portable sensors in

02  determining the amount of gasoline in mineral

03  spirits?

04      A.  It was evaluated, yes.  But it's not part

05  of this document.

06      Q.  Okay.  And you mentioned there being a

07  flash point of -- I'm not quite certain how much

08  you said or whether you said there was a certain

09  amount.  But Safety-Kleen had a procedure for

10  measuring the flash point of the mineral spirits

11  that it received back from customers?

12      A.  Yes, from day one.  That was in place when

13  I arrived in 1979.

14      Q.  All right.  And was the cutoff for an

15  acceptable -- strike that.

16          What was the cutoff for an acceptable

17  batch of mineral spirits coming back from a

18  customer so that it could be recycled through the

19  Safety-Kleen system?

20      A.  I don't recall that number in -- in 1979.

21  Later on, the -- the number was -- a minimum flash

22  point had to be 95 degrees Farenheit.

23      Q.  Okay.  Do you recall how much gasoline

24  could be in the mineral spirits before the flash

25  point got below 95 degrees Farenheit?

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

```
01        A.  I don't recall that, but there's a -- we

02   performed a study to determine that, and I don't

03   recall the -- the absolute value for that, but we

04   did that.

05             (Plaintiff's Exhibit 7 marked

06             for identification.)

07   BY MR. DUPONT:

08        Q.  All right.  Let me hand you Exhibit 7.

09             MR. WOOD:  Exhibit 7 is marked

10   confidential and it has a Bates of SAL SK 05678.

11   Got the same objection to its use in this case and

12   request plaintiffs' agreement that I'm not

13   violating any confidentiality rights from the

14   Salmiere case or this case by allowing questioning

15   on this document.

16             MR. DUPONT:  You have that continuing

17   agreement.

18             MR. WOOD:  All right.

19   BY MR. DUPONT:

20        Q.  Dr. Breece, I've handed you Exhibit 7.  Is

21   this a memo dated May 11, 1989 from Steve Parker to

22   Dennis Brinkman titled "Summary Report on Portable

23   Sensors for Use in Determining Mineral Spirits

24   Contaminated with Gasoline"?

25        A.  It is.
```

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

401, 402 irrelevant evidence is inadmissible: the
document discusses the flash point of certain liquids for
transportation purposes and does not relate the solvent
to which it is alleged Mr. Rhyne was exposed (105
Solvent);
Inadmissible Hearsay; and
407: inadmissible to show the feasibility of design
alternatives because no alternative design alternative



# Breece, James

## Rhyne Trial Master

01    Q.   If you look at the last paragraph of the

02  first page -- and incidentally, before we do that,

03  is this a document that came from Safety-Kleen's

04  records?

05      MS. FERGUSON:   I'm sorry.   Could I have

06  the question back, please.

07      MR. DUPONT:   I'll re-ask it.

08  BY MR. DUPONT:

09    Q.   Dr. Breece, is this a document that came

10  from Safety-Kleen's records?

11    A.   It probably did since these were all

12  records from Safety-Kleen employees including

13  myself.

14    Q.   Okay.   Are some of these records involved

15  in the study that you mentioned that you

16  participated in to determine what effect of certain

17  concentrations gasoline in mineral spirits would

18  have on the flash point?

19    A.   No, this isn't it.   But this is -- has

20  that similar information.   This is what happens

21  when corporations have a lot of people working.

22  This is duplication of effort.

23    Q.   Okay.   So if we look to the first page of

24  the document, in this memorandum, there's a

25  discussion of researching sensors, portable sensors

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

401, 402 irrelevant evidence is inadmissible:
the document discusses the flash point of certain
liquids for transportation purposes and does not
relate the solvent to which it is alleged Mr. Rhyne
was exposed (105 Solvent);
Inadmissible Hearsay; and
407: inadmissible to show the feasibility of design
alternatives because no alternative design
alternative was proposed



01   to be used to determine whether mineral spirits

02   coming back from customers is contaminated with

03   gasoline?

04       A.  Yes.

05       Q.  All right.  And the mineral spirits

06   contaminated with gasoline includes the

07   parts-washing solvent that Safety-Kleen is

08   providing to its customers for use in the

09   parts-washing machines?

10       A.  That was its intent.

11       Q.  All right.  At the bottom of the first

12   page, in that last paragraph it indicates that as

13   much as four percent gasoline -- strike that.

14           If we look to the bottom of the first page

15   of the document, does it indicate that if a barrel

16   of mineral spirits contains as much as four percent

17   gasoline, the flash point can still be at or above

18   100 degrees Farenheit?

19       A.  Okay.  Please ask the question again, I --

20   so I -- this is a compilation of documents, some of

21   which I don't think I've ever seen and some of

22   which I have seen.

23       Q.  Okay.  And my question is:  As a result of

24   the study that was undertaken by Safety-Kleen, was

25   it determined that mineral spirits could have as

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01  much as four percent gasoline in it without the

02  flash point being lowered below 100 degrees

03  Farenheit?

04      A.  I don't know that.  I'll have to look at

05  this for just a second here to -- I don't interpret

06  that answer at all.  I don't get that from -- from

07  the data nor from the -- I see that, what you're

08  reading there.  What he's saying there is it's

09  highly variable.

10          But if you look at the data, it would

11  indicate that two percent -- one percent gasoline

12  would get you down well under 100.  Two percent

13  gasoline would get you down under 90.

14          So what he's saying, that this is highly

15  variable in how much gasoline was required.  And

16  this is not consistent with another study which we

17  performed.

18      Q.  All right.  Well, in the first --

19      A.  And I wouldn't agree with that statement

20  it takes four percent gasoline either.

21      Q.  Okay.  Well, I just want to talk to you

22  about what this memorandum says.  The first page of

23  the May 11, 1989 memorandum, Bates Number SAL SK

24  5678.

25          (Reporter interruption for clarification.)

**Transcript of Breece, James**

# Breece, James
Rhyne Trial Master

```
01          MR. DUPONT:  SAL SK 5678.
02    BY MR. DUPONT:
03       Q.  Did Steve Parker write, "The results of
04    the clean mineral spirits and most of the dirty
05    mineral spirit samples taken indicated that the
06    amount of gasoline contamination needed to depress
07    the flash point to less than 10 degrees Fahrenheit
08    would be approximately one to four percent."
09       A.  Yeah.  Uh-huh.
10       Q.  All right.  And so do you read that to say
11    you could have as much as four percent gasoline in
12    mineral spirits before the flash point is depressed
13    below 100 degrees Fahrenheit?
14          MR. WOOD:  Objection.  Assumes facts.  The
15    document speaks for itself.
16          THE WITNESS:  I don't agree with this
17    document either.  I hadn't read this particular
18    one.  This was one that went to Environmental
19    Health and Safety, and it -- this document isn't
20    consistent with other results that we had.
21    BY MR. DUPONT:
22       Q.  Okay.  Well, I'm just asking you, though,
23    what this document says.
24       A.  Well, you can read it as well as I.  I
25    mean, it's -- it's clearcut that's what it says.
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC   Document 109-1 Filed 09/15/20   Page 117 of 340

01    But I'm -- I'm in disagreement with this document.

02        Q.  Okay.  Did you write back to Mr. Parker

03    and -- and say that his analysis --

04        A.  I never even received this document.

05    That's what I said.

06            MR. WOOD:  Well, he said -- let him have

07    -- let him finish his question, and then you can

08    have your answer.

09            THE WITNESS:  Yeah.  Okay.

10    BY MR. DUPONT:

11        Q.  I'm just wondering did you write back to

12    Mr. Parker and indicate that his analysis was

13    incorrect?

14        A.  I never received this, so I don't -- I

15    didn't know this occurred.  I knew that meters were

16    being tested, but that particular document, I

17    wasn't aware of.

18        Q.  Okay.  Was part of the concern that

19    Safety-Kleen, for having gasoline in its

20    parts-washing solvent, the amount of benzene that

21    would be present in the parts-washing solvent?

22        A.  No.

23        Q.  Gasoline has a higher benzene content than

24    mineral spirits, correct?

25            MS. KAHN:  Objection.  Calls for expert

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

01  opinion testimony.

02      THE WITNESS:  Yes, it does.

03  BY MR. DUPONT:

04      Q.  All right.  So if a container of gasoline

05  had four percent -- strike that.

06      If a container of mineral spirits had four

07  percent gasoline in it, that would increase the

08  benzene content of the mineral spirits, right?

09      A.  Yes.

10      Q.  And if a customer of Safety-Kleen was

11  using that mineral spirits with four percent

12  gasoline in it, they would be exposed to

13  significantly more benzene, correct?

14      MR. WOOD:  Objection.  Vague.  Overly

15  broad.  Foundation.

16      THE WITNESS:  That isn't the -- we're off

17  on an area which is beyond the scope of what this

18  study was about.

19  BY MR. DUPONT:

20      Q.  Well, I'm not talking about this

21  particular document.

22      A.  Yeah, I -- but I'm -- what I'm saying,

23  we're off on a different tangent to what's being

24  tested here.  This is to look at flash point

25  depression as a function of gasoline, not to look

BREECE, JAMES -
(JOHNSON) VOL 1

611, no question, non-responsive, objection to pairing a different
question  different answer to a

**Transcript of Breece, James**



01    at benzene concentration.

02     Q.  Okay.  Was it acceptable to Safety-Kleen

03   that significant amounts of gasoline would be

04   present in its mineral spirits causing the benzene

05   content of the mineral spirits to be increased?

06     A.  No.  And it was not acceptable to have

07   material which was combustible be contaminated and

08   be flammable.  That was the greater consent --

09   concern in regard to this.

10     If you suppress the flash point below a

11   hundred, you now have a flammable liquid, and

12   you're guilty of transporting flammable materials

13   rather than combustible materials.

14     So it's -- it's a multitude of problems

15   associated with gasoline contamination.  But the

16   interest of this, this was Environmental Health and

17   Safety's attempt to get at flash point issues and

18   ben- -- and -- and gasoline contamination with a

19   meter that only measured benzene.  And benzene is

20   highly variable in gasoline, depending upon the

21   source, the refinery, the location, and grade of

22   gasoline.

23     So this didn't require a great deal of

24   research.  This just required technical knowledge.

25   This was a worthless project.

**Transcript of Breece, James**

01          (Reporter interruption for clarification.)

02          THE WITNESS:  Worthless project, with a W.

03   BY MR. DUPONT:

04     Q.  Okay.  So Safety-Kleen had no concern that

05   increased benzene content of its parts-washing

06   solvent due to the presence of gasoline could

07   present a health hazard to its customers?

08          MR. WOOD:  Objection.  Misstates his

09   testimony.  Assumes facts.

10          MS. FERGUSON:  Argumentative.

11          THE WITNESS:  That was not the intent of

12   this test or -- or the sensor.  The concern was

13   safety associated with a flash point.

611, no question
non-response, object to
adding a different answer
to a different question

14   BY MR. DUPONT:

15     Q.  Independent of this test and this

16   memorandum, is it your testimony that Safety-Kleen

17   was not concerned with the health and safety of its

18   customers from increased exposure to benzene caused

19   by gasoline contamination in its parts-washing

20   solvent?

21          MS. FERGUSON:  Same objections.

22          MR. WOOD:  Same objections.

23          THE WITNESS:  That's a -- that's really a

24   -- a strange statement for you to even ask that

25   question.  We had great concern over the health and

**Transcript of Breece, James**

01 safety of our customer. And -- and certainly,

02 anything which affected that, we had great concern

03 for it.

04 BY MR. DUPONT:

05     Q. Okay. So was Safety-Kleen concerned that

06 increased benzene content of its parts-washing

07 solvent occurred as a result of gasoline

08 contamination?

09     MR. WOOD: Same objections.

10     THE WITNESS: Anything which affected the

11 quality of the product or the safety of the

12 customer, we had concern for.

13 BY MR. DUPONT:

14     Q. And did Safety-Kleen recognize that

15 gasoline in its mineral spirits not only increased

16 the benzene content but increased the risk of

17 contracting cancer from exposure to benzene amongst

18 its customers?

19     MR. WOOD: Objection. Assumes facts.

20 Lacks foundation. Requires expert testimony.

21 Incomplete hypothetical.

22     (Reporter interruption for clarification.)

23     MR. WOOD: Yeah. Gosh, I hope I can.

24     Assumes facts. Lack of proper foundation.

25 Calls for speculation. Requires expert testimony

01    and -- and is an incomplete hypothetical.

02        THE WITNESS:  I wouldn't reach that

03    conclusion at all.  The fact that gasoline itself

04    is not classified as a carcinogen, even though it

05    may contain a couple percent of benzene, and -- and

06    then to compare that with something at less than --

07    significantly less than 50 parts per million and

08    conclude now -- now that that's a benzene causation

09    is a leap of faith that I won't make and no one at

10    Safety-Kleen would make that -- that sort of

11    assessment.

12    BY MR. DUPONT:

13        Q.  Okay.  So Safety-Kleen didn't have any

14    concern that its customers --

15        A.  No.  No, that isn't what I said.  I said

16    we had ultimate concern for the well-being of the

17    customer and the safety of the customer.  And --

18    and to -- to convolute that in that direction is

19    not -- is not representative of what we were doing.

20        Q.  All right.  I just want to ask:  Did

21    Safety-Kleen have a concern that its customers

22    would have greater exposure to a carcinogen if its

23    parts-washing solvent was contaminated with

24    gasoline?

25        MR. WOOD:  Objection.  Assumes facts.

**Transcript of Breece, James**                    **Tuesday, September 1, 2020**

# Breece, James

Rhyne Trial Master

01  Lacks foundation.  Calls for speculation.  Seeking

02  expert opinion and is an incomplete -- incomplete

03  hypothetical.

04       MS. FERGUSON:  It's also argumentative.

05       THE WITNESS:  I -- I don't think I can

06  answer that question.

07  BY MR. DUPONT:

08    Q.  Did Safety-Kleen have a concern that its

09  customers' risk of contracting cancer would be

10  greater due the greater amounts of benzene in its

11  parts-washing solvent from gasoline contamination?

12       MR. WOOD:  Same objection.  Assumes facts.

13  Lack of foundation.  Calls for speculation and

14  expert opinion.  Incomplete hypothetical.

15       THE WITNESS:  Ask -- ask the question

16  again, please.

17  BY MR. DUPONT:

18    Q.  Sure.  Was Safety-Kleen concerned that its

19  customers, through using a parts-washing solvent

20  contaminated with gasoline and therefore greater

21  amounts of benzene, would have a greater risk for

22  contracting cancer from those exposures?

23       MR. WOOD:  Same objections.

24       THE WITNESS:  Let me state what -- what

25  our position was.  We didn't want additional

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01  benzene contamination as a result of gasoline

02  occurring, first of which for the flash point and

03  secondarily, for a adulteration of the mineral --

04       (Reporter interruption for clarification.)

05       THE WITNESS:  Adulteration of the mineral

06  spirits fraction.  But to conclude that before

07  benzene contamination from gasoline that that was a

08  -- that the parts-washer solvent was a carcinogen

09  or after the gasoline contamination was a

10  carcinogen is not a leap -- is a leap of faith that

11  I'm not going to take.  Without knowing the

12  concentration, I don't think anyone can estimate

13  that.

14  BY MR. DUPONT:

15      Q.  Has Safety-Kleen ever provided warning on

16  a material safety data sheet that its mineral

17  spirits product can cause cancer?

18       MS. FERGUSON:  Same objections.

19       MR. WOOD:  Objection.  Lacks foundation.

20  Calls for speculation.  Requires expert opinion.

21       MS. FERGUSON:  Argumentative.

22       MR. WOOD:  Argumentative.

23       THE WITNESS:  Specifically under the state

24  of California, that's covered under Prop 65.  And

25  so the answer is yes, for customers in -- in

01　California and -- initially and then eventually for

02　all material safety data sheets, that warning was

03　included.

04　BY MR. DUPONT:

05　　Q.　Was that warning put onto material safety

06　data sheets independent of Proposition 65?　In

07　other words, did Safety-Kleen provide a warning

08　independent of Proposition 65 that its product

09　would cause cancer?

10　　A.　No, there's no evidence to that, and we

11　did not add that except as a result of the

12　requirements for Prop 65.

13　　Q.　When did the cancer warning first appear

14　on the Safety-Kleen material safety data sheet?

15　　A.　I believe that we were somewhat tardy in

16　the state of California in getting those out.　And

17　I believe that first occurred for the 105 solvent

18　about 1988 or 1989.

19　　　　And for the other products, it was later

20　on.　We went through a phase of material safety

21　data sheets where there was one for California and

22　one for the rest of the United States.　And then we

23　eventually consolidated them and made a universal

24　material safety data sheet.　So it was dependent on

25　time frame.

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

```
01      Q.  When did Safety-Kleen warn people outside
02  of California that exposure to its parts-washing
03  solvent could cause cancer?
04          MR. DUPONT:  Objection.  Assumes facts not
05  in evidence.  Foundation.
06          THE WITNESS:  I don't believe -- you're
07  going to have to redo that question for me.  I
08  don't think I can answer it the way you asked it.
09  BY MR. DUPONT:
10      Q.  Okay.  When did Safety-Kleen warn people
11  outside of the state of California that exposure to
12  its parts-washing solvent could cause cancer?
13          MR. WOOD:  Objection.  Assumes facts.
14  Lacks foundation.  Mischaracterizes warnings.
15          THE WITNESS:  First of all, I disagree
16  with your premise that the benzene in the mineral
17  spirits causes cancer.  That's the first problem
18  I've got.  At the -- at the levels of exposure you
19  would expect, I'm not in agreement with that.
20          And secondarily, those warnings were
21  consistent with what was required for the state of
22  California as expressed as part of Prop 65.
23          MR. DUPONT:  Objection.  Move to strike.
24  Nonresponsive.
25  BY MR. DUPONT:
```

**Assumes facts not in evidence: that Safety-Kleen causes cancer; Argumentative; and Lacks Foundation**

**401, 402 irrelevant evidence is inadmissible: Proposition 65 is unique to California and has no relevance to products in North and South Carolina.**

01  Q.  So my question really was only:  When did

02  Safety-Kleen warn users of its products outside of

03  the state of California that the parts-washing

04  solvent could cause cancer?

05  MR. WOOD:  Objection.  Objection.  Assumes

06  facts.  Lacks foundation.  Argumentative.

07  MS. FERGUSON:  Asked and answered.

08  THE WITNESS:  The pro- -- let me answer

09  the question this way, which is -- which I'd like

10  to move on, and I'm sure you would as well.  The

11  consistent use of the Prop 65 warning occurred on

12  Safety-Kleen materials safety data sheets mid '90s

13  is -- is when that occurred.  But it was only Prop

14  65.

15  BY MR. DUPONT:

16  Q.  Dr. Breece, I'm handing you a document

17  that has been marked as Exhibit 8.

18  (Plaintiffs' Exhibit 8 marked

19  for identification.)

20  MR. WOOD:  Same objections on potential

21  confidentiality.  This document doesn't indicate

22  what case this is from.  It just has a Plaintiffs'

23  Exhibit 46 sticker on it.

24  BY MR. DUPONT:

25  Q.  Dr. Breece, do you recognize this to be a

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01  document from Safety-Kleen Corporation's records?

02  A.  Yes.

03  Q.  And it's an April 1, 1976 memorandum from

04  Greg Hooper to all branch managers and sales

05  representatives at Safety-Kleen?

06  A.  It is, yes.

07  Q.  Who was Greg Hooper?

08  A.  He was the manager of advertising.

09  Q.  And Mr. Hooper is distributing a brochure

10  titled the "Read Carefully Brochure"?

11  A.  Yes.

12  Q.  Okay.  And this brochure advertises that

13  Safety-Kleen parts washers are safe and have been

14  approved for shop use by many city and state

15  agencies including the New York Fire Department and

16  the Los Angeles Department of Buildings and Safety?

17  A.  Yes, that's what's written here.

18  Q.  And if you look to the second page of the

19  brochure, there's a Section C where Safety-Kleen

20  represents that Safety -- Safety-Kleen solvent is,

21  by definition, considered only slightly toxic to

22  relatively nontoxic?

23  A.  Yes.

24  Q.  And this was a brochure that was actually

25  distributed to Safety-Kleen customers?

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC   Document 31091   Filed 09/15/20   Page 129 of 345

01     A.  Yes, it appears that way.

02     Q.  Okay.  And we can agree, sir, that benzene

03  is toxic, correct?

04          MS. FERGUSON:  Objection.  Calls for

05  expert opinion testimony.  Incomplete hypothetical.

06          MR. WOOD:  Lacks foundation and calls for

07  speculation.

08          MS. KAHN:  Join in all objections.

09          THE WITNESS:  Without doubt pure benzene

10  is toxic.  I'm not in agreement that parts-washer

11  solvent with low levels of benzene is toxic nor

12  carcinogenic.

13  BY MR. DUPONT:

14     Q.  When benzene leaves a solvent such as

15  mineral spirits, it's the same benzene as when it

16  leaves pure benzene, right?

17          MR. WOOD:  Assumes facts.  Calls for

18  speculation.  Lacks foundation.  Beyond the scope

19  of the deposition.  Calls for expert testimony.

20          THE WITNESS:  Yes, a molecule is a

21  molecule.

22  BY MR. DUPONT:

23     Q.  All right.

24          (Plaintiffs' Exhibit 9 marked

25          for identification.)

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RGJ-CSC Document 409  Filed 09/15/20  Page 130 of 340

01          MR. WOOD:  Same objections to the use of

02     the document.  Plaintiffs -- it's marked

03     Plaintiffs' Exhibit 642.  Doesn't indicate what

04     case it's from or provide any basis for the

05     foundation of the document.

06     BY MR. DUPONT:

07          Q.  Dr. Breece, you've been handed Exhibit 9,

08     which is an October 20, 1980 Safety-Kleen

09     Corporation interoffice communication from Ted

10     Miller to Dave Dattilo?

11          A.  Yes.

12          Q.  All right.  Have you seen this document

13     before?

14          A.  I have.

15          Q.  All right.  And this is a document that

16     came from Safety-Kleen's business records?

17          A.  I'm assuming so.  That's its origin.

18          Q.  All right.  And this is on Safety-Kleen

19     Corporation correspondence memorandum -- strike

20     that.

21               It's a document on Safety-Kleen

22     Corporation interoffice communication letterhead?

23          A.  Yes, it is.

24          Q.  And is this the type of communications

25     that Safety-Kleen Corporation employees exchange

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC   Document 4091   Filed 09/15/20   Page 138 of 345

01  with each other in the ordinary course of and in

02  furtherance of Safety Kleen's business?

03          (Reporter interruption for clarification.)

04          MR. DUPONT:  In furtherance of

05  Safety-Kleen's business.

06          THE WITNESS:  At this point in time, that

07  is correct.  This is one of the mechanisms for

08  conveying information back and forth within the

09  company.

10  BY MR. DUPONT:

11          Q.  All right.  And were you familiar with Ted

12  Miller from Safety-Kleen?

13          A.  Very familiar.

14          Q.  Who was Ted Miller?

15          A.  He was a -- at this point in time, he was

16  the recycle center -- he was the manager of recycle

17  operations.  All in the recycling plants reported

18  to Ted.

19          Q.  And who was Dave Dattilo?

20          A.  Dave Dattilo was senior vice president of

21  sales.

22          Q.  And does Mr. Miller write to the senior

23  vice president of sales that:  "In the past several

24  months, there have been a number of occurrences

25  which indicate that we are on the verge of losing

**401, 402 irrelevant evidence is not admissible:** Benzene is not mentioned once in the document (131:16-132:1). Containments named are paints, inks, and fatty substances (130:21-131:13). None of which Plaintiffs allege exposure to. **Inadmissible Hearsay**

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

01  control of the quality of our spent solvent

02  supply"?

03      A.  Yes, that's -- that's his first sentence.

04      Q.  Does he continue to write that:  "All five

05  recycle centers have reported that the incoming

06  spent solvent is getting worse each period"?

07          MR. WOOD:  Objection.  The document speaks

08  for itself.

09          THE WITNESS:  Yes.

10  BY MR. DUPONT:

11      Q.  And part of the problem, as we read

12  through in memo, is that branch managers and

13  Safety-Kleen employees are acquiring drums of

14  solvent from their customers without necessarily

15  knowing what's in the drums; is that correct?

16      A.  I don't -- I haven't caught that in -- in

17  this memo, but that's consistent with what Ted was

18  saying at this point in time.

19      Q.  And then Mr. Miller writes that:  "For

20  each branch manager that calls us" -- I'm talking

21  about to inquire about to do with a drum of spent

22  solvent -- "there are probably several that have

23  taken it upon themselves to help a customer and

24  their own solvent inventory recovery by hauling and

25  dumping drums of solvent without knowing for

**401, 402**
**irrelevant**
**evidence is not**
**admissible:**
Benzene is not
mentioned once in
the document
(131:16-132:1).
Containments
named are paints,
inks, and fatty
substances
(130:21-131:13).
None of which
Plaintiffs allege
exposure to.
**Inadmissible**
**Hearsay**

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

Page 128

> **401, 402 irrelevant evidence is not admissible:** Benzene is not mentioned once in the document (131:16-132:1). Containments named are paints, inks, and fatty substances (130:21-131:13). None of which Plaintiffs allege exposure to. **Inadmissible Hearsay**

01  certain if the liquid is compatible or even safe to

02  mix with our solvent."

03          MR. WOOD:  Objection.  The document will

04  speak for itself.

05          THE WITNESS:  Yeah, that's -- that's

06  what's written here.

07  BY MR. DUPONT:

08     Q.  Turn to the second page of the document.

09  Does Mr. Miller write in the second paragraph:

10  "Solvent contamination can quickly reach large

11  scale proportions.  The spent solvent received from

12  our service centers is mixed with solvent from

13  other centers and so any contamination from one

14  soon becomes widespread"?

15          MR. WOOD:  Same objection.  The document

16  will speak for itself.

17          THE WITNESS:  Yeah, that's -- that's --

18  that's what's written.

19  BY MR. DUPONT:

20     Q.  And Mr. Miller indicates that:  "One bad

21  load can foul a whole tank," talking a Safety-Kleen

22  solvent?

23     A.  Yes.

24     Q.  And he continues to write that:  "Dilution

25  is not the solution to pollution."

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01        Do you see that?

02     A.  I don't see it, but that's consistent with

03  what Ted would say.

04     Q.  Okay.  If you look to -- to Page 2, the

05  last sentence of the -- of the second paragraph,

06  does Mr. Miller write:  "Dilution is not the

07  solution to pollution"?

08     A.  I've personally heard him saying that, so

09  it doesn't surprise me.  I -- I'm not looking for

10  it, but that's consistent with Ted.

11     Q.  Okay.  And if you look to the bottom of

12  this page, Mr. Miller continues to write that:

13  "There are hundreds of truly hazardous and toxic

14  chemicals in widespread use which, if mixed in very

15  small amounts in our solvent, could endanger the

16  safety and health of unsuspecting customers and

17  Safety-Kleen employees and result in substantial

18  cost to our company"?

19        MR. WOOD:  Objection.  Document speaks for

20  itself.

21        THE WITNESS:  Yes, that's what he said.

22  BY MR. DUPONT:

23     Q.  If you turn to the third page of the

24  document, in the last full paragraph, does

25  Mr. Miller write that:  "With each passing week,

**401, 402 irrelevant evidence is not admissible:** Benzene is not mentioned once in the document (131:16-132:1). Containments named are paints, inks, and fatty substances (130:21-131:13). None of which Plaintiffs allege exposure to. **Inadmissible Hearsay**

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

**401, 402 irrelevant evidence is not admissible:** Benzene is not mentioned once in the document (131:16-132:1). Containments named are paints, inks, and fatty substances (130:21-131:13). None of which Plaintiffs allege exposure to. **Inadmissible Hearsay**

01  more indications of indiscriminate solvent pickup

02  practices are surfacing.  More evidence of the

03  decaying quality of our spent solvent is received"?

04          MR. WOOD:  Objection.  The document speaks

05  for itself.

06          THE WITNESS:  Yes, that's what he's

07  written.

08  BY MR. DUPONT:

09      Q.  And benzene and gasoline and benzene and

10  other solvents certainly was one of the

11  contaminants that was getting into Safety-Kleen's

12  part-washing solvent stream?

13          MR. DUPONT:  Objection.  Assumes facts.

14  Foundation.  Calls for speculation.  Overly broad.

15  Requires --

16          MS. KAHN:  Join.

17          MR. WOOD:  It's a -- or it's an incomplete

18  -- incomplete hypothetical.

19          MS. KAHN:  Join.

20          MR. WOOD:  Sorry.

21          THE WITNESS:  Having been involved

22  specifically and working with Ted Mueller at the --

23  at this point and aware of the problem, his concern

24  was -- was predominantly of fouling of equipment

25  due to paint, mineral-spirits-based paint material

BREECE, JAMES -
(JOHNSON) VOL 1

611, no question, non-responsive, object to combining a different answer to a different question

**Transcript of Breece, James**

# Breece, James

## Rhyne Trial Master

```
01   included in the stream and was shutting down the
02   equipment.  And he couldn't produce the volumes he
03   needed.
04        He had an overall intrinsic concern for
05   other things, but the -- the concern at hand was
06   specifically materials which fouled the stills that
07   didn't allow proper distillation to occur.  That
08   was the interest -- his major interest when this
09   was occurring.
10   BY MR. DUPONT:
11        Q.  Okay.
12        A.  I was there personally.  That's firsthand
13   information.  I was there.
14             MR. DUPONT:  Objection.  Move to strike.
15   BY MR. DUPONT:
16        Q.  My question was, though:  Benzene, we can
17   agree, was one of the contaminants that was getting
18   into the Safety-Kleen parts-washing solvent stream
19   through gasoline and other solvents, correct?
20             MS. KAHN:  Objection.  Overbroad.  Calls
21   for an expert opinion.  Incomplete hypothetical.
22   Vague and ambiguous.
23             MR. WOOD:  Join in that one, all those.
24             THE WITNESS:  I don't think Ted even
25   mentions that in here.  I don't think that's even
```

Transcript of Breece, James          611, non-responsive

01    mentioned in his memo.

02    BY MR. DUPONT:

03        Q.  Okay.  But you were aware during your time

04    at Safety-Kleen that benzene was being introduced

05    to parts-washing stream through customer usage of

06    products?

07            MR. WOOD:  Objection.  Assumes facts.

08    Lack of foundation.  Calls for speculation, expert

09    opinion, and is an incomplete hypothetical.

10            MS. KAHN:  I join.

11            THE WITNESS:  I was not aware of direct

12    contamination of 105 solvent by benzene alone.  I

13    was aware of gasoline contamination of the product

14    since we were servicing automotive customers, which

15    might con- -- contain in some concentration

16    benzene.

17            So saying that it was benzene

18    contamination is a misrepresentation of the fact.

19    We were concerned about gasoline contamination

20    which did contain benzene.

21    BY MR. DUPONT:

22        Q.  Okay.

23        A.  And that's the proper statement.

24        Q.  All right.  So gasoline got into the

25    Safety-Kleen parts-washing solvent, and with the

**Transcript of Breece, James**

01    gasoline, benzene got in there, correct?

02          MR. WOOD:  Same objection.  Lacks

03    foundation.  Calls for speculation.  Incomplete

04    hypothetical and assumes facts.

05          THE WITNESS:  Repeat the question, please.

06    BY MR. DUPONT:

07      Q.  You were aware that gasoline got into the

08    Safety-Kleen parts-washing solvent stream, and

09    along within the gasoline came benzene that

10    contaminated the Safety-Kleen parts-washing stream?

11          MR. WOOD:  Same objections plus vague and

12    overly broad.

13          THE WITNESS:  Yes, I -- I was aware of --

14    of the possibility of -- of benzene contamination

15    via gasoline in the parts cleaner since we were

16    servicing a lot of automotive applications, yes.

17    BY MR. DUPONT:

18      Q.  Okay.

19          MR. WOOD:  Andrew, if you're going to

20    start something new, is it all right if we break

21    now?

22          MR. DUPONT:  Sure.

23          MR. WOOD:  Okay.

24          THE VIDEOGRAPHER:  This is the end of

25    Video Number 3 -- excuse me -- Number 4.  Oh, I'm

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

# Breece, James

Rhyne Trial Master

```
01    sorry.  3.  The time is 1:56.  We're off the
02    record.
03            (Break taken.)
04            THE VIDEOGRAPHER:  This is the beginning
05    of Video Number 4 in the deposition of Dr. Breece.
06    The time is 2:11 p.m.  We're back on the record.
07            (Plaintiff's Exhibit 10 marked
08            for identification.)
09    BY MR. DUPONT:
10       Q.  Okay.  Dr. Breece, I'm handing you a
11    document that I marked as Exhibit 10.
12            MR. WOOD:  Same objections to the
13    document.
14    BY MR. DUPONT:
15       Q.  Have you seen this document before?
16       A.  Yes, I have.
17       Q.  In what context have you seen this before?
18       A.  Historical record dating back to when I
19    initially came to work at Safety-Kleen in '79.
20       Q.  And this is a document from Safety-Kleen's
21    business records?
22       A.  Yes.  It -- it was generated by Dean
23    Hufsey with supporting promatographic (phonetic)
24    scan on the back as well.
25       Q.  And is this a letter that Mr. Hufsey sent
```

01    to a customer of Safety-Kleen's?

02        A.  I doubt this is a letter that actually got

03    sent.  This is a copy of -- of correspondence that

04    would be sent.  It's not addressed to anyone, so I

05    don't think this went out to anyone in particular.

06    But it's something that could have been sent to

07    customers.

08        Q.  Okay.  So the purpose of this letter --

09    the first line says:  "This is in response to your

10    inquiry requesting information about the benzene

11    content of Safety-Kleen 105."

12            Do you see that?

13        A.  Yes.

14        Q.  And was this letter intended to be sent to

15    Safety-Kleen customers who had inquired about the

16    benzene content of the 105 product?

17        A.  It's my interpretation that was its

18    intent.

19        Q.  All right.  And was this text of the

20    letter -- and it is signed by L. Dean Hufsey,

21    correct?

22        A.  Yes.

23        Q.  And was this text of the letter actually

24    used in letters that went out to Safety-Kleen

25    customers?

Case 3:18-cv-00197-RJC-DSC   Document 34291   Filed 09/03/20   Page 141 of 340

01      A.  I believe it was.

02      Q.  All right.  And in the text of the letter,

03   it represents to customers that Safety-Kleen does

04   not use benzene as one of the ingredients in its

05   product?

06           MR. WOOD:  Objection.  The document --

07           THE WITNESS:  Well, it actually doesn't --

08           MR. WOOD:  -- speaks for itself.

09           THE WITNESS:  Yeah.  Actually, it doesn't

10   say that.  It says is not one of the ingredients

11   added to our solvent.

12   BY MR. DUPONT:

13      Q.  Okay.  So what it -- what it's saying is

14   that benzene is not one of the ingredients added to

15   Safety-Kleen 105 solvent?

16      A.  That's what it says.

17      Q.  And then it goes on to say that:

18   "Safety-Kleen continuously monitors the composition

19   of the solvent sent to our customers"; is that

20   correct?

21      A.  Yes.

22      Q.  Safety-Kleen, as of 1977, wasn't

23   monitoring the benzene content of the Safety-Kleen

24   105 solvent product, was it?

25           MR. WOOD:  Objection.  Assumes facts.

01  Lacks foundation.  Calls for speculation.

02       THE WITNESS:  Repeat the question, please.

03  BY MR. DUPONT:

04     Q.  Sure.  Was Safety-Kleen monitoring the

05  benzene content of the 105 solvent as of 1977?

06       MR. WOOD:  Same objections.

07       THE WITNESS:  Only through inference

08  associated with -- with flash point.  But a

09  specific analytical test, we did not have that

10  capability.

11  BY MR. DUPONT:

12     Q.  Okay.  If you look to the second page of

13  the document, there's results from gas

14  chromatograph testing.  And it's dated March 24,

15  1977.

16     A.  Yes.

17     Q.  Does that indicate to you that this letter

18  is from March of 1977 or thereabouts?

19       MR. WOOD:  Objection -- sorry.  Sorry to

20  interrupt.  Objection.  Calls for speculation.

21  Foundation.

22       THE WITNESS:  The chromatogram is from

23  1977, but I don't know the date of the letter.

24  BY MR. DUPONT:

25     Q.  Do you expect that the letter was dated at

```
01    approximately the same time that this gas
02    chromatogram results were generated?
03        A.  I --
04            MR. WOOD:  Objection.  Foundation.
05            THE WITNESS:  I have no knowledge of
06    exactly the correlation.
07            MR. WOOD:  Calls for speculation.
08            (Reporter interruption for clarification.)
09            MR. WOOD:  Lack of foundation.  Calls for
10    speculation.
11            (Plaintiffs' Exhibit 11 marked
12            for identification.)
13    BY MR. DUPONT:
14        Q.  Okay.  Handing you a document I marked as
15    Exhibit 11, does that appear to be a December 30,
16    1987 letter from Hyman Bielsky, associate counsel
17    for Safety-Kleen to a Neal Eisenberg?
18        A.  Yes.
19        Q.  And have you seen this letter before?
20        A.  Yes, I have.
21        Q.  And this letter came from Safety-Kleen's
22    business records?
23        A.  It would have, yes.
24        Q.  And is it your understanding that Neal
25    Eisenberg was representing a individual that had
```

# Breece, James
## Rhyne Trial Master

01   been exposed to Safety-Kleen 105 solvent and

02   contracted injury?

03         MR. WOOD:  Objection.  Assumes facts.

04   Foundation.

05         THE WITNESS:  At the time I initially saw

06   this, I wasn't aware of the underlying facts behind

07   it, but subsequently, I learned that.

08   BY MR. DUPONT:

09      Q.  Okay.  And, in fact, Mr. Eisenberg

10   represented James and Karen Junker who were some of

11   the individuals that contracted leukemia -- well,

12   strike that.

13         It was either James or Karen Junker

14   contracted leukemia from Safety-Kleen 105 solvent?

15         MS. FERGUSON:  Allegedly?

16         MR. WOOD:  Objection.  Assumes facts.

17         THE WITNESS:  Yes, we never agreed that

18   that was caused -- it's an alleged causation.  We

19   never agreed to that.

20   BY MR. DUPONT:

21      Q.  In this letter Mr. Bielsky writes to

22   Mr. Eisenberg that Safety-Kleen does not contain

23   benzene -- Safety-Kleen 105 solvent does not

24   contain benzene; is that correct?

25      A.  This is why you don't allow attorneys to

**Assumes facts not in evidence:** P[  ]iff [  ] presents mere allegations as facts

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

**Inadmissible Hearsay:** statements in an external letter being offered for the truth of what is asserted
**701 lay opinion based on scientific knowledge:** Mr. Bielsky was an attorney, not a chemist capable of writing a technical document on the chemical composition of Safety-Kleen 105 solvent (139:25-140:1).



01  write technical documents.

02      Q.  Nonetheless, Mr. Bielsky, Safety-Kleen's

03  attorney, stated in this letter to Mr. Eisenberg

04  that Safety-Kleen 105 solvent does not contain

05  benzene, correct?

06      A.  He did.  And within a few days of this, he

07  sees me in the hall and he asks me, "Doc, does

08  Safety-Kleen 105 solvent contain benzene?"

09      And I said, "Yes."

10      And he said, "I just perjured myself."

11      So we're aware that he made a mistake.  He

12  felt really bad about it.  But he had no

13  background, and the information he had was not

14  correct.  So it's -- and I can pound attorneys at

15  this stage for -- attorneys shouldn't write this

16  kind of letter.  Even though it's to an attorney,

17  an attorney shouldn't write it.

18      (Plaintiffs' Exhibit 12 marked

19      for identification.)

20      MR. WOOD:  Regarding exhibit marked

21  Plaintiff Exhibit 4 -- 12 to the deposition of Jim

22  Breece, same objection to these -- the document and

23  same reservation of rights and reserve

24  confidentiality.

25  BY MR. DUPONT:

**Inadmissible Hearsay:** 801(d)(2) inapplicable as Mr. Bielsky was not speaking as a representative of Safety-Kleen. Also, statement was made in jest, as Mr. Bielsky was not under oath when drafting the letter.

611, non-responsive

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

01      Q.  Dr. Breece, is this a February 26, 1988

02  letter that Safety-Kleen prepared for distribution

03  to its customers?

04      A.  Yes.

05      Q.  And does this letter state in the first

06  sentence that:  "For almost two decades,

07  Safety-Kleen has been providing customers with a

08  parts cleaner service that makes the job of

09  cleaning metal parts easier and safer for thousands

10  of users throughout the world"?

11      A.  Yes.

12      Q.  By 1988, had Safety-Kleen tested how much

13  benzene exposure an individual using Safety-Kleen

14  parts-washing solvents sustained?

15      MR. WOOD:  Objection.  Overly broad.

16  Assumes facts.  Calls for speculation.  Lacks

17  proper foundation.

18      THE WITNESS:  If you recall my earlier

19  deposition, I stated it during the '80s until

20  approximately 1989 we only had grab samples

21  indicating concentration of benzene contained in

22  105 solvent.  So we didn't have a -- an existing

23  test and, obviously, coming out of this, we

24  recognized we have to be responsive and provide

25  routine analytical basis for our products.  We

# Breece, James

Rhyne Trial Master

01 didn't suspect a -- health issues, but we thought

02 it was prudent from a technical and from a business

03 perspective to know the concentration.

04 BY MR. DUPONT:

05     Q. Okay. I guess my question was a little

06 bit different, though. By 1988, had Safety-Kleen,

07 either itself, conducted or hired anyone else to

08 conduct an air monitoring study to determine how

09 much benzene exposure the user of its parts-washing

10 solvent sustained?

11     MR. WOOD: Objection. Assumes facts.

12 Lacks foundation. Overbroad.

13     THE WITNESS: At this point in time, we

14 had performed internal tests that were monitored by

15 NATLESCO which determined --

16     (Reporter interruption for clarification.)

17     THE WITNESS: NATLESCO, N-A-T-L-E-S-C-O,

18 all caps.

19 BY MR. DUPONT:

20     Q. Was that -- was that of 1988?

21     A. Yes, this had -- was prior to 1988.

22     Q. And were those studies that were actually

23 placing a monitor on a person using parts-washing

24 solvent or were those area studies that tested the

25 air around the solvent machine when nobody was

# Breece, James

Rhyne Trial Master

```
01    actually using it?
02       A.  I can't be sure of the exact details of
03    that.  My recollection is that it was monitoring
04    the air around as a person that was actually using
05    it.  No, it was not monitoring badges, but
06    monitoring the air around the parts cleaner.
07    That's my recollection of it.
08          (Sneezes.)
09          MR. DUPONT:  Bless you.  Bless you.
10    BY MR. DUPONT:
11       Q.  Hand you a document that's marked as
12    Exhibit 13.
13          MS. FERGUSON:  14.
14          MR. DUPONT:  13.
15          MR. WOOD:  Yeah, 13.
16          MS. FERGUSON:  Wasn't the last one 13?
17          MR. DUPONT:  Last one was 14 -- excuse
18    me -- 12.
19          THE WITNESS:  Yeah.
20          (Plaintiffs' Exhibit 13 marked
21          for identification.)
22    BY MR. DUPONT:
23       Q.  Doctor, you've been handed Exhibit 13.
24    Can you identify what that is?
25       A.  It's a training topic conducted by
```

Transcript of Breece, James                    Tuesday, September 1, 2020

01    Safety-Kleen internally for training of its branch

02    and sales personnel about answering customer

03    questions from -- I was looking for a date.  I --

04    I'm not sure of the exact date on this.

05        Q.  So this was training provided by

06    Safety-Kleen to its own employees?

07        A.  That's correct.

08        Q.  And was the purpose of this training so

09    that Safety-Kleen employees could, in turn, pass on

10    information to Safety Kleen's customers?

11        A.  That was its intent, to ensure that they

12    were responding properly and -- and able to address

13    the concerns and, if necessary, where to go with --

14    to find answers to their questions.

15        Q.  Does this training advise the Safety-Kleen

16    employee that there is a known human carcinogen in

17    Safety-Kleen parts-washing solvents?

18        MR. WOOD:  Objection.  Assumes facts.

19    Overbroad and vague.  Lacks foundation.

20        MS. KAHN:  Join.

21        MR. WOOD:  The document speaks for itself.

22        MS. KAHN:  Join.

23        THE WITNESS:  You -- you continue to use a

24    human carcinogen as if mineral spirits itself, in

25    total, is a carcinogen.  That isn't the case.

01  We've -- we've agreed -- I've agreed routinely that

02  pure benzene is a carcinogen.

03      I am not agreeing in any form or fashion

04  that the mineral spirits is a carcinogen.

05  BY MR. DUPONT:

06  Q.  My question is:  Has Safety-Kleen, in this

07  document or any other document, trained its

08  employees to know that there is a known human

09  carcinogen, benzene, in its mineral spirits

10  products?

11      MR. WOOD:  Same objection.  Assumes facts.

12  Vague.  Overbroad.

13      MS. FERGUSON:  Asked and answered.

14      MR. WOOD:  Asked and answered.

15      MS. FERGUSON:  Argumentative.

16      THE WITNESS:  Why -- why would that kind

17  of information be provided when the product has

18  been tested as a whole in terms of its

19  carcinogenicity?  Why would we do that?

20  BY MR. DUPONT:

21  Q.  Why would you tell your employees that

22  benzene is in your mineral spirits products and

23  benzene is a known human carcinogen?

24      MS. FERGUSON:  Objection.

25      THE WITNESS:  Yes, why would we do that

Case 3:18-cv-00197-RJC-DSC   Document 402-1 Filed 09/16/220   Page 151 of 340
Case 3:18-cv-00197-RJC-DSC   Document 402-1 Filed 09/16/220   Page 151 of 340

```
01    when the product itself has been tested as a whole?
02    BY MR. DUPONT:
03        Q.  Okay.  Did you consider that your
04    customers might want to know that there is a
05    carcinogen in the product that you are providing
06    them to use?
07            MR. WOOD:  Objection.  Asked and answered.
08    Argumentative.
09            THE WITNESS:  I'm --
10            MR. WOOD:  It calls for --
11            THE WITNESS:  I'm done.
12            MR. WOOD:  Calls for speculation.  Lacks
13    foundation.
14    BY MR. DUPONT:
15        Q.  I'm sorry?
16        A.  I'm done.  I can't answer it beyond what I
17    have.
18        Q.  Okay.  You look to the exhibit?
19        A.  I believe I did, yeah.
20        Q.  The second paragraph of this document
21    states:  "Probably the most frequent question asked
22    is:  'What exposure concentration am I and my
23    employees being exposed to while using a gun
24    cleaner, parts washer, sandblaster or COMS'" -- I
25    believe that's customer-owned machine service unit?
```

01      A.  Uh-huh.

02      Q.  "Filled with Safety-Kleen products?"

03          Do you see that?

04      A.  I do.

05      Q.  Okay.  And it continues to say that:

06  "When a customer asks you this question, he has a

07  genuine concern for his health and the safety of

08  his employees.  However, even though he is aware of

09  recent change in the law, OSHA, he doesn't

10  necessarily understand exposures and how they

11  occur"; is that correct?

12          MR. WOOD:  Objection.  The document can

13  speak for itself.

14          THE WITNESS:  That's what's written.

15  BY MR. DUPONT:

16      Q.  All right.  Is it Safety Kleen's

17  expectation that its customers didn't understand

18  exposures to chemicals and how they occur?

19          MR. WOOD:  Objection.  Assumes facts.

20  Calls for speculation.  Lack of foundation.

21          THE WITNESS:  That Safety-Kleen -- repeat

22  the question, please.

23  BY MR. DUPONT:

24      Q.  Sure.  Is it Safety Kleen's understanding

25  that its employees didn't understand chemical

Case 3:18-cv-00197-RJC-DSC   Document 102-1   Filed 09/15/20   Page 159 of 345
Case 3:18-cv-00197-RJC-DSC   Document 3-21   Filed 09/15/20   Page 153 of 340

# Breece, James

Rhyne Trial Master

```
01    exposures and how they occur?
02         MR. WOOD:  Objection.  Mischaracterizes
03    the document.  And that was a different question.
04    By MR. DUPONT:
05         Q.  Strike that.  I don't want to
06    mischaracterize anything, so I'll withdraw that
07    question --
08         A.  Okay.
09         Q.  -- and ask a different question.
10         A.  All right.  Sure.
11         Q.  Did -- was it important to Safety-Kleen
12    that its customers didn't necessarily understand
13    exposures and how they occur?
14         MR. WOOD:  Objection.  Calls for
15    speculation.  Assumes facts.  Lack of foundation.
16         THE WITNESS:  It was very important to
17    Safety-Kleen that our customers understand the
18    product and -- and how to properly use it, which
19    included the potential for exposure.
20    BY MR. DUPONT:
21         Q.  Okay.  Including the exposure to what was
22    ever in the product, correct?
23         A.  Yes, and the product itself as well.
24         Q.  All right.  And did Safety-Kleen train its
25    employees to advise Safety-Kleen customers when
```

01  they received inquiries about exposure to

02  Safety-Kleen parts-washing solvents that yes, you

03  should know that there are carcinogens in our

04  parts-washing solvent?

05          MR. WOOD:  Objection.  Argumentative.

06  Assumes facts not in evidence.  Lacks foundation.

07  Calls for speculation.  Incomplete hypothetical.

08          THE WITNESS:  Repeat the question again,

09  please.

10  BY MR. DUPONT:

11      Q.  Sure.  Were Safety-Kleen employees trained

12  to advise their customers when asked about exposure

13  to Safety-Kleen products that there's a carcinogen,

14  benzene, in Safety-Kleen parts-washing solvent?

15          MR. WOOD:  Same objections.

16          THE WITNESS:  Our salespeople veered

17  dramatically in education, and so they were trained

18  to respond to questions.  And if there was a -- a

19  technical question which they were not equipped to

20  answer, the technical center offered a customer

21  hotline.  If it was beyond the scope of what the

22  sales representative could answer, we had a chemist

23  at the tech center who would answer those

24  questions.  So the answer is yes, we were very

25  concerned that the customer be informed.

01    Q.  And if a customer was on the phone with a

02  tech center representative at Safety-Kleen and asks

03  about what they were being exposed to by using

04  Safety-Kleen parts-washing solvent, would that tech

05  center representative had told him yes, you were

06  sustaining benzene exposure and benzene is a

07  carcinogen?

08    A.  We would have --

09       MR. WOOD:  Objection.  Assumes facts.

10  Argumentative.

11       THE WITNESS:  The composition of the -- of

12  the Safety-Kleen parts-washer solvent would have

13  been given in detail to that customer.

14  BY MR. DUPONT:

15    Q.  Including the benzene content?

16    A.  Yes.

17    Q.  And would the customer had been advised

18  that while using the Safety-Kleen parts-washing

19  solvent, they were exposed to a known human

20  carcinogen in benzene?

21       MR. WOOD:  Objection.  Assumes facts.

22  Argumentative.  Lacks foundation.

23       THE WITNESS:  I'm having trouble with your

24  question in that it's your assuming that it's the

25  full responsibility of -- of the service provider,

01  in this case Safety-Kleen, to provide all education

02  to the customer.  We attempted to convey that

03  information through material safety data sheets.

04  But clearly, if you had detailed questions, you had

05  to go to someone who was technically inclined, not

06  -- not necessarily a sales rep.

07          But to specifically talk about, okay, you

08  have these materials in there and these are human

09  carcinogens, we -- we provided those materials to

10  the -- the -- the tech center who had full access

11  to the compositional information and to the

12  material safety data sheets.

13          So I think we did do that, maybe not in --

14  in a direct technique as where you said, "Okay.  By

15  the way, I want to tell you that there's human

16  carcinogens in this."  Compositional information

17  was provided, and the associated exposure data that

18  we had was provided.

19  BY MR. DUPONT:

20      Q.  Okay.  So you're saying that Safety-Kleen

21  customers were told by tech center representatives

22  if they called that there was benzene in the

23  product and that they would be exposed to benzene?

24      A.  Yes, and if -- if that was the question,

25  "does this product contain benzene," we didn't make

Case 3:18-cv-00197-RJC-DSC  Document 402-1  Filed 09/15/20  Page 154 of 345
Case 3:18-cv-00197-RJC-DSC  Document 402-1  Filed 09/15/20  Page 157 of 340

01     the same mistake that the attorney made.

02         Q.  Okay.

03         A.  We told factually what the content was.

04         Q.  And that tech center representative would

05     also tell the customer that they were exposed to

06     benzene when using a Safety-Kleen parts-washing

07     solvent?

08         MR. WOOD:  Objection.  Assumes facts.

09     Lacks foundation.  Calls for speculation.  It's an

10     incomplete hypothetical.

11         THE WITNESS:  They -- they were given

12     exposure data which we had available in terms of

13     concentration in regard to the various components

14     in regard to the threshold limit values.

15     BY MR. DUPONT:

16         Q.  And were the customers told that by using

17     the Safety-Kleen parts-washing solvents they were

18     at an increased risk for contracting cancer because

19     of the benzene in the solvent?

20         MR. WOOD:  Objection.  Argumentative.

21     Assumes facts not in evidence.  Requires expert

22     opinion.  Incomplete hypothetical.  Beyond the

23     scope of this deposition.

24         THE WITNESS:  Without knowing the exposure

25     levels that an employee might experience, we

Transcript of Breece, James

**Tuesday, September 1, 2020**

Case 3:18-cv-00079-RJC-SC   Document 409   Filed 09/15/20   Page 158 of 340
Case 3:18-cv-00079-RJC-SC   Document 312-1   Filed 09/02/20   Page 155 of 195

01  couldn't know, with the number of customers we had,

02  every set of circumstances to say unequivocally

03  you're going to be exposed or you aren't.  That is

04  the -- the customer's business.  We weren't a

05  medical advisory group on -- on ventilation

06  requirements.

07       We provided good technical information,

08  but as far as -- as telling him, "Hey, you've

09  increased your risk of cancer," first of all, I

10  don't believe that's correct, since we don't know

11  concentration of exposure.

12       And secondarily, we don't know his

13  ventilation conditions as -- as well.  One of the

14  things we would tell him, "If you have any doubt

15  about this, make sure you contact NIOSH, and we'll

16  get a full evaluation on what your exposure might

17  be."  And they'll do that free of charge.

18  BY MR. DUPONT:

19     Q.  Okay.  So did Safety-Kleen tell its

20  customers that without knowing how much benzene

21  exposure you had from using our product, we don't

22  really know whether you're at risk for contracting

23  cancer?

24       MR. WOOD:  Objection.  Assumes facts.

25  Mischaracterizes the testimony.  Lacks proper

**Transcript of Breece, James**

```
01    predicate and foundation with this witness.  It's
02    an incomplete hypothetical, and it's beyond the
03    scope of this deposition notice.
04         MS. FERGUSON:  Argumentative.
05         THE WITNESS:  I -- I don't think I can
06    answer that question.  It's -- it's beyond the
07    scope of -- of the kind of discussion we'd have
08    either with a -- a chemist who was there to answer
09    customer questions or to provide that to customers.
10    So I'm not sure how else I answer your question.
11    BY MR. DUPONT:
12         Q.  Who was Scott Fore?
13         A.  He was the vice president of environmental
14    health and safety.
15         Q.  Okay.  And who is Corey Fishman?
16         A.  Corey Fishman would have been in the --
17    I'm not sure of his exact job title.  Corey did a
18    variety of things in operations, and I think later
19    -- later on in marketing.
20             (Reporter interruption for clarification.)
21             THE WITNESS:  In marketing.
22    BY MR. DUPONT:
23         Q.  From time to time, would Safety-Kleen have
24    label committee meetings?
25         A.  Yeah.  Oh, yes.  I'm sorry.
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC  Document 409  Filed 09/15/20  Page 160 of 340
Case 3:18-cv-00197-RJC-DSC  Document 312-1  Filed 09/02/20  Page 157 of 195

01    Q.  Okay.  And did you participate in label

02    committee meetings?

03        MR. WOOD:  Same running objection to the

04    use of this document.

05        THE WITNESS:  Generally not.

06    BY MR. DUPONT:

07    Q.  Okay.  Scott Fore participate in labeling

08    committee meetings?

09    A.  Generally not.  He -- he would attend them

10    occasionally, but it was -- he was not a -- a -- a

11    -- a weekly or monthly.  This label committee met

12    typically once a month.  If you can look at the

13    dates, March 27th, April the 10th, April 24th.

14    This looks like about every two weeks, depending on

15    the -- the requirement need.

16    Q.  Did the labeling committee report to Scott

17    Fore?

18    A.  The labeling committee consisted of -- of

19    people from environmental health and safety,

20    marketing, technical information.  I'm -- I'm not

21    sure I recall exactly who this label committee

22    reported to.  I -- I'm not sure.

23        (Plaintiffs' Exhibit 14 marked

24        for identification.)

25    BY MR. DUPONT:

**Transcript of Breece, James**

01    Q.   Okay.   The labeling committee in this

02    memorandum that's been marked as Exhibit 14, dated

03    April 25, 1990, is providing information to Scott

04    Fore; is that correct?

05    A.   Yes, it is.

06    Q.   And the memos on the first page is

07    addressed from Corey Fishman, but then on the

08    signature block, it says "the labeling committee"?

09    A.   Yeah.

10    Q.   Okay.   Is that correct?

11    A.   Yes, it is.

12    Q.   All right.   And one of the things that's

13    discussed in -- in this memorandum was a issue

14    raised that the labeling committee meetings of

15    March 27, April 10, and April 24, which is the

16    label of the Safety-Kleen parts-cleaning machine,

17    parts-washing machine?

18    A.   Right.

19    Q.   And it indicates that one of our major

20    concerns on the proposed parts cleaner label is the

21    health hazard warning section that lists the

22    contents of our parts cleaning solvent; is that

23    correct?

24    A.   Yes.   Uh-huh.

25    Q.   All right.   And the labeling committee

**401, 402 irrelevant, evidence is not admissible: the document does not discuss benzene, but focuses entirely on tetrachloroethylene, which Plaintiffs do not allege exposure to.**
**602, 701 lack of personal knowledge, witness did not attend these meetings (155:1-5).**
**Inadmissible Hearsay**

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

01  goes on to indicate that:  "This section includes

02  tetrachloroethylene, a contaminant which is listed

03  by the IARC and NTP as a suspected carcinogen."

04      A.  Yes.

05      Q.  And then the labeling committee continues

06  to write that:  "We feel that this information

07  could be detrimental to our sales marketing

08  efforts.  We have already heard about major parts

09  cleaner customers that have given us, quote, the

10  boot, when the new material safety data sheet was

11  sent out.  Another concern is the potential

12  liability suit of anyone who develops cancer who

13  has ever worked with our solvent."

14          Do you see that?

15      A.  Yes, I do.

16      Q.  Are you aware that Safety-Kleen

17  Corporation was concerned that providing a cancer

18  warning on its product label would deter sales of

19  the product?

20          MR. WOOD:  Objection.  Vague.  Assumes

21  facts.  Lacks foundation.

22          THE WITNESS:  Yes, this was a marketing

23  concern, and you note the material safety data

24  sheet which I had responsibility for already

25  contained that.  And they were chafing under the --

**401, 402 irrelevant evidence is not admissible:** the document does not discuss benzene, but focuses entirely on tetrachloroethylene, which Plaintiffs do not allege exposure to.

**602, 701 lack of personal knowledge,** witness did not attend these meetings (155:1-5).

**Inadmissible Hearsay**

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

# Breece, James

## Rhyne Trial Master

01     the instructions I'd given -- given them to include

02     that.

03     BY MR. DUPONT:

04         Q.  Okay.

05         A.  So they got slapped down for this.

06         Q.  All right.

07         A.  End of discussion.

08         Q.  They got slapped down for it?

09         A.  Yeah.

10         Q.  What do you mean by that?

11         A.  Told them put it on there and shut up.  Is

12     that close enough?  We're putting the warning --

13     we're warning them, and we're putting it on the

14     label and be done with it.  It's on the MSDS, and

15     that's it.  And that's as close to a slapdown that

16     you get in the business world.

17         Q.  Okay.

18             (Plaintiffs' Exhibit 15 marked

19             for identification.)

20     BY MR. DUPONT:

21         Q.  I'll hand you a document that's been

22     marked as Exhibit 15.

23             MR. WOOD:  Same running objection as to

24     the use of this document.

25     BY MR. DUPONT:

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01      Q.  Dr. Breece, are you familiar with this

02   document?

03      A.  I can't honestly say that I recall whether

04   I was or not.  I -- I knew that there was

05   discussions of this sort going on.  I wasn't copied

06   on this memo.  Dean Hufsey was there and -- and

07   represented the technical side of the house.  He

08   was -- he was there for the label committee along

09   with -- let's see.  Ted Miller was there as well.

10          So there was a variety of technical people

11   there and yes.  So I was -- I was aware of this

12   effort, not necessarily this specific memo, but I

13   was aware of the effort to try to get consistency

14   on the labels, yes.

15      Q.  All right.  And what was the issue with

16   the inconsistency on the labels?

17      A.  Well, this is, more or less, an in- --

18   internal working document trying to work through

19   what was necessary and what wasn't.  I don't -- I

20   don't know that anyone -- and I'm not sure -- I'm

21   not sure the extent of what anyone wanted in this,

22   to be honest with you.  Fairly detailed.  Without

23   digging through this, I don't -- I don't know all

24   the concerns that --

25      Q.  Was listing a constituents -- strike that.

**Transcript of Breece, James**

**602, 701, lack of personal knowledge:** witness had no familiarity with document (159:1-14) **Inadmissible Hearsay:** Mr. Fore was not testifying when he made the assertions, nor was he speaking on behalf of Safety-Kleen

```
01        Was listing the contents of Safety-Kleen
02   parts washing -- parts-washer solvent on the parts
03   cleaner in 2420 label discussion in the labeling
04   committee in this document?
05        A.  It appears to be, yeah.
06        Q.  And Scott Fore, who was the vice president
07   at the time, indicated that he did not want the
08   contents of the product listed on the label?
09        A.  I believe that's consistent with what
10   Scott's -- he -- he mainly insisted upon detailed
11   information being on the material safety data
12   sheets.
13        Q.  But not on the label?
14        A.  That's right.  And I don't recall the
15   logic behind that at all.
16             MR. DUPONT:  Hand you Exhibit 16.
17             (Plaintiffs' Exhibit 16 marked
18             for identification.)
19             MR. WOOD:  Same running objection to this
20   document.
21   BY MR. DUPONT:
22        Q.  Sir, is Exhibit 16 a list of the contents
23   of Safety-Kleen parts-washing solvent for
24   California?
25        A.  It is.
```

BREECE, JAMES -
(JOHNSON) VOL 1

**Transcript of Breece, James**

01      Q.  And it is dated December 1991?

02      A.  Yes, it is.  As part of a 1991 MSDS

03  revision.

04      Q.  Well, this document you're looking at

05  right here, that's not an MSDS or part of an MSDS,

06  is it?

07      A.  No, this is a -- a summary sheet as -- as

08  part of the evaluation of preparation of MSDS.

09      Q.  All right.  And this summary sheet lists

10  as one of the contents of the Safety-Kleen 105

11  solvent for California, it lists benzene?

12      A.  Yes.

13      Q.  And on the legend below the list it

14  indicates that benzene, if you follow the legend,

15  is a known carcinogen?

16      A.  Yes.

17      Q.  And it indicates that the ACGIH has listed

18  benzene as a confirmed car- --

19          (Reporter interruption for clarification.)

20  BY MR. DUPONT:

21      Q.  The ACGIH has listed benzene as a

22  confirmed carcinogen?

23      A.  As a confirmed, yes.

24          MR. DUPONT:  Take a break.

25          MR. WOOD:  Yeah.

Case 3:18-cv-00197-RJC-DSC   Document 402-1 Filed 09/15/20 Page 167 of 345
Case 3:18-cv-00197-RJC-DSC   Document 312-1 Filed 09/15/20 Page 164 of 345

# Breece, James
## Rhyne Trial Master

```
01              MR. DUPONT:  Off the record.
02              THE VIDEOGRAPHER:  The time is 2:49 p.m.
03      We're going off the record.
04              (Break taken.)
05              THE VIDEOGRAPHER:  The time is 3:05 p.m.
06      We're back on the record.
07      BY MR. DUPONT:
08          Q.  Dr. Breece, did Safety-Kleen file a
09      lawsuit against some of the suppliers of its
10      mineral spirits pertaining to Safety Kleen's
11      liability for persons who were exposed to its
12      mineral spirits parts-washing solvent?
13          A.  Did Safety-Kleen file it against vendors?
14          Q.  Yes.
15          A.  Not to my knowledge.  Possible they did,
16      but I'm not aware of it.
17          Q.  Okay.  So you're not aware of a lawsuit
18      that was brought by Safety-Kleen against Chevron
19      USA, Inc., and others?
20          A.  No, I'm not.
21          Q.  Who at Safety-Kleen would have provided
22      litigation support for that type of work in the
23      early 1990s?
24          A.  That, potentially, would have been Hyman
25      Bielsky.  I'm not sure who -- whomever else might
```

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01    have been involved in that, but it -- it's possible

02    it was Hyman.  There were additional lawyers there,

03    but it's my recollection that something like that

04    might -- might come out of Hyman's office.

05        Q.  Okay.

06            (Plaintiffs' Exhibit 17 marked

07            for identification.)

08    BY MR. DUPONT:

09        Q.  You also identified a Dean Hufsey as being

10    involved with providing litigation support.  Was he

11    doing that in the 1990s, the early 1990s?

12        A.  No, that ceased in the late '80s.

13        Q.  All right.  You've been handed Exhibit 17.

14    Is that a March --

15            MR. WOOD:  Same -- sorry, Andrew.  I

16    didn't mean to cut you off.  Same running

17    objection.

18    BY MR. DUPONT:

19        Q.  Okay.  Dr. Breece, you've been handed

20    Exhibit 17.  Is that a March 9, 1994 Safety-Kleen

21    internal memorandum?

22        A.  Yes, it is.

23        Q.  And is -- this is from a Lyle Van Wert to

24    John Lucks?

25        A.  Yes.

# Breece, James

Rhyne Trial Master

01     Q.   Who was Lyle Van Wert?

02     A.   He was a Safety-Kleen -- I believe an

03   industrial sales rep, specifically his -- his call

04   was on -- his -- his designation was to call on

05   major industries and obviously GM fits in that

06   category.

07     Q.   And who was John Lucks?

08     A.   Lucks was the -- he was a -- a marketing

09   manager for Safety-Kleen.  And I'm not really sure

10   why he got this call.  But anyway, so be it.  I

11   mean, he was a -- was a marketing manager for

12   Safety-Kleen.

13     Q.   Okay.  And what's being discussed in this

14   memorandum is that at one point a material safety

15   data sheet for Safety-Kleen 105 solvent warned that

16   there was a need to provide process enclosure or

17   local ventilation?

18       MR. WOOD:  Objection.  Misstates the

19   document.

20   BY MR. DUPONT:

21     Q.   Well, let me ask you this question:  Did

22   Safety-Kleen have a -- own a company called Phelps

23   Manufacturing?

24     A.   They did, yes.

25     Q.   And did Phelps Manufacturing manufacture

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

Case 3:18-cv-00197-RJC-DSC   Document 409   Filed 09/15/20   Page 170 of 340
Case 3:18-cv-00197-RJC-DSC   Document 312-1   Filed 09/02/20   Page 167 of 195

```
01   parts-washing machines?
02        A.  Custom parts-cleaning machines.  I
03   wouldn't describe them as parts washer, but custom
04   equipment, yes.
05        Q.  The -- the parts-washing machines that
06   Safety-Kleen supplied to its customers, were they
07   designed by Safety-Kleen?
08        A.  Parts cleaners which we provided to
09   general customers not requesting a custom machine
10   were designed by Safety-Kleen early on and were
11   improved -- from the original patent design and --
12   and later on improved from internal engineering
13   changes.
14        Q.  All right.  And did Safety-Kleen ever
15   include in the design for the parts-washing
16   machines that it supplied to its customers any
17   local exhaust ventilation that would remove solvent
18   vapor before it got into the breathing zone of the
19   user of the parts-washing machine?
20           MR. WOOD:  Objection.  Assumes facts.
21           THE WITNESS:  For custom equipment, that
22   was true or for equipment which the customer
23   insisted it be of that time -- type of device where
24   there were large volumes of solvent exposure, that
25   would be considered, but for the smaller sink on
```

BREECE, JAMES -
(JOHNSON) 1-28-14
PLF Designations

Transcript of Breece, James

Tuesday, September 1, 2020

Case 3:18-cv-00197-RJC-DSC   Document 34091   Filed 09/05/20   Page 171 of 340

01  the drum design, it was not considered.

02  BY MR. DUPONT:

611,non-responsive

03      Q.  Was it ever even investigated by

04  Safety-Kleen to put a local exhaust -- exhaust

05  ventilation to remove solvent vapors from the

06  breathing zone?

07      A.  Our testing indicated it wasn't necessary

08  based upon the -- the exposure data which we had

09  and developed subsequently, that it was not

10  necessary for normal applications.  And since we

11  can't know every case, it was not a option that we

12  offered on the smaller units.

13      Q.  Did Safety-Kleen ever investigate what

14  would be involved in actually putting in a local

15  exhaust ventilation to remove solvent vapors before

16  they reached the zone -- the breathing zone of the

17  user of a regular Safety-Kleen parts-washing

18  machine that it supplied to its customers?

19          MR. WOOD:  Objection.  Assumes facts.

20  Foundation.  Asked and answered.

21          THE WITNESS:  Ask the question again,

22  please.

23  BY MR. DUPONT:

24      Q.  Sure.  Did Safety-Kleen investigate what

25  would be involved in putting a local exhaust

# Breece, James

## Rhyne Trial Master

```
01    ventilation device on the parts-washing machines to
02    remove solvent vapors before they got to the
03    breathing zone of the user?
04         MR. WOOD:  Same objection.
05         THE WITNESS:  First of all, we -- we
06    didn't see -- from normal usage, we did not see the
07    absolute necessity of -- of doing that.
08         And secondarily, depending on the
09    location, a -- a one-size-fits-all design might
10    work in one location and -- and not in others.  So
11    we chose to -- we chose to make sure that the parts
12    cleaner functioned properly and minimized the
13    emissions of solvent.  But we did not attempt to
14    put a one-size-fits-all ventilation system on the
15    Model 30 or the Model 16 parts cleaner.
16    BY MR. DUPONT:
17         Q.  Okay.
18         A.  There is an error in -- in regard to this
19    document here.  Should I -- I should point out,
20    too.  There is a -- a conflict between the GM
21    premium 150 and then the body of the -- the memo
22    it's referring to 105.  So what's attached, I'm not
23    sure.  It says "premium solvent" on this one, which
24    would be the 150, but there is some conflict
25    between the -- between the title and -- and what's
```

611, non-responsive objection to adding a different answer to a different question

**Transcript of Breece, James**

```
01    written.
```

02      Q.  Okay.  Well, there wasn't a question

03   pending, so I move to strike.

04      A.  I -- I wanted to get that in because I

05   didn't want to answer a question --

06         MR. WOOD:  There's not a -- there's not a

07   question pending.

08         MR. DUPONT:  I'm going hand you Exhibit

09   18.

10         (Plaintiffs' Exhibit 18 marked

11         for identification.)

12         MR. WOOD:  Same running objection.

13   BY MR. DUPONT:

14      Q.  And does that exhibit include a brochure

15   for a Phillips Manufacturing Company parts washer

16   that includes a lip vent exhaust designed to remove

17   the solvent vapors before they get to the breathing

18   zone of the user of Safety-Kleen parts-washing

19   solvent?

20      A.  Yes, this is information about one of the

21   parts cleaners offered on a custom basis by a

22   Phillips manufacturer.

23      Q.  Okay.  And this parts cleaner includes a

24   lip at the top of the machine with exhaust on three

25   sides that is intended to prevent the vapor from

**401, 402 irrelevant, evidnce is not admissible:** Plaintiffs do not allege use of a Phillips parts washer.
**403 danger of misleading the jury and confusing issues:** the Phillips machine is a vapor degreaser that heats up solvent, which increases vapor exposure. (169:9-21). Safety-Kleen's parts washers do not heat up solvent. (169:2-6).

BREECE, JAMES -
(JOHNSON) VOL 1
**Transcript of Breece, James**

01    getting to the breathing zone of the user?

02    A.   Typically -- this -- this design is

03    typical for virtually all vapor degreasers, so

04    there's nothing unusual about this.  The fact it

05    happened to be suggested for another product, yes,

06    its -- its technology is well known.

611, no question, non-responsive, object to adding a different answer to a different question

07    Q.   And was suggested for use in conjunction

08    with Safety-Kleen parts-washing solvent?

09    A.   Well, I don't think it said that.  It has

10    heaters available which we aren't going to heat

11    parts-washer solvent.  And we probably wouldn't

12    have allowed this to be used with immersion cleaner

13    because, again, it's heated.  It increases the

14    vapor exposure.  Neither product is suitable for a

15    heated application here.

16         So it would not have been -- we would not

17    have allowed, had we seen this -- I don't remember

18    what our final response was, but we nixed the idea,

19    to my recollection, of considering any parts

20    cleaner to a customer where he could heat mineral

21    spirits or immersion cleaner.

22    Q.   Okay.  I was looking at the Phillips

23    Manufacturing Company.  It says, "Data sheet 42 PC,

24    dated December 17, 1987."  Excuse me, "December 1,

25    1987."

**Transcript of Breece, James**

01    A.  Uh-huh.

02    Q.  Do you see that?  And -- is that a "yes"?

03    A.  The -- let me -- let me find that again.

04    Q.  If you turn to the second --

05    A.  I think -- I think I found it.  Let me

06  make sure.

07    Q.  If you can turn to the second page of the

08  exhibit.

09    A.  Okay.  They --

10    Q.  See in the top right-hand corner it's --

11  it's hard to read because it's a little dark, but

12  it says, "data sheet 42 dash PC, date December 1,

13  1987"?

14    A.  I do.

15    Q.  All right.  And if you look at the --

16  towards the bottom of the document under the

17  diagram of the parts-washing machine, it says:

18  "Phillips Manufacturing Company is a wholly owned

19  subsidiary of Safety-Kleen Corporation."

20    A.  Yes.

21    Q.  And on the left-hand column in the

22  document there's a section for general information,

23  which says, "Industrially rated and safe to use,

24  Phillips parts cleaners are designed to meet all

25  current OSHA and EPA regulations.  Motors and

01    controls meet NEC Class I, Group C and D for use
02    with mineral-based solvents."
03        A.  Yes.
04        Q.  And if you continue down, it says:  "Along
05    with our parent company, Safety-Kleen, you can have
06    complete confidence that the difficulty of
07    disposing dirty solvent is no longer a problem.
08    Safety-Kleen will, at specified intervals, pick up
09    and recycle your solvent, and if desired, furnish
10    you with clean solvent for use in this equipment."
11        A.  Yes.
12        Q.  And is the mineral-based solvents referred
13    to here mineral spirits?
14        A.  I have no idea.  I can assure you if this
15    came across my desk, which it did, apparently, I
16    would have nixed the whole idea from a -- a safety
17    standpoint.  I wouldn't have allowed it.  I would
18    immediately have put thumbs down on it if -- if
19    anyone tried to put mineral spirits in this, I
20    would have not only have hammered them myself, but
21    I would have passed it to Environmental Health and
22    Safety and say, "No, we can't use this."  You
23    cannot heat mineral spirits safely.
24        Q.  Okay.  And who was Paul Allen?
25        A.  He was a sales -- a sales rep.

01          Where the heaters came to bear was aqueous

02     cleaners.  That would have been a suitable

03     application.

04          (Reporter interruption for clarification.)

05          THE WITNESS:  Aqueous cleaners.

06     BY MR. DUPONT:

07     Q.  Okay.  I'm looking for where you see a

08     reference to using a heater.

09     A.  Third paragraph, "Mike Weiner, Don Racquet

10     from Phillips also present agree to let us use a

11     Model-42 for the first test.  The unit has heaters

12     available so you can test it in varying

13     temperatures."  I believe this was totally nixed at

14     this phase.

15     Q.  Okay.

16     A.  That's my recollection of that.

17     Q.  All right.

18          (Plaintiff's Exhibit 19 marked

19           for identification.)

20     BY MR. DUPONT:

21     Q.  And Dr. Breece, you've been handed Exhibit

22     19.  And is this an internal Safety-Kleen training

23     document?

24     A.  Yes.  Uh-huh.  I'm familiar with this

25     document.

01    Q.   Okay.  And this comes from Safety Kleen's

02  business records?

03    A.   It would have, yes.

04    Q.   If you can turn to the second page,

05  there's a discussion of permissible exposure limits

06  and threshold limit values.  I'm talking about the

07  second full paragraph.

08    A.   Okay.  This is under the bullet point

09  Page 2?

10    Q.   At Page 2, there's -- above the bullet

11  points, there's a paragraph that begins with:  "PEL

12  and TLV exposure values are generally reported in

13  milligrams of the material per cubic meter of air

14  or more often by per million."

15        Do you see that?

16    A.   That sounds correct, but I don't see it on

17  this document.

18    Q.   That's because I handed you the wrong

19  document.

20    A.   Oh.

21    Q.   Sorry.  I'm going to withdraw that exhibit

22  and re-mark it.

23    A.   Okay.

24    Q.   I apologize.

25

```
01        A.  No problem.
02            (Plaintiff's Exhibit 19 re-marked
03            for identification.)
04   BY MR. DUPONT:
05        Q.  Okay.  So now if you would look to Page 2.
06        A.  Okay.
07        Q.  Do you now see the paragraph that begins
08   with:  "PEL and TLV exposure values are generally
09   reported in milligrams of material per cubic meter
10   of air or more often by parts per million"?
11        A.  Yes.
12        Q.  All right.  And there's some examples of
13   what one PPM would be equivalent to.  And when we
14   say "one PPM," we mean one part per million?
15        A.  That's correct.
16        Q.  And it states:  "Well, one part per
17   million would be equivalent to one penny and
18   $10,000"; is that correct?
19        A.  I believe that's right, yeah.
20        Q.  And it also states:  "One part per million
21   would also be the same as one inch in 16 miles, one
22   ounce of salt in 62,500 pounds of sugar or one
23   ounce of vermouth in 7,812 and an half gallons of
24   gin.  As you can see, one part per million is not
25   very much."
```

01    A.   Yeah, I see that.

02         (Plaintiffs' Exhibit 20 marked

03         for identification.)

04  BY MR. DUPONT:

05    Q.   Okay.  Dr. Breece, I'm going to hand to

06  you a document that's been marked as Exhibit 20.

07         MR. WOOD:  The same running objection.

08  The same question -- to reserve the rights of

09  confidentiality.

10  BY MR. DUPONT:

11    Q.   And is this document a 1991 authorization

12  for expenditure concerning the construction of the

13  distillation column to remove benzene from

14  parts-washing solvents?

15         MR. WOOD:  Objection.  Assumes facts not

16  in evidence.  And the document would speak for

17  itself.

18         THE WITNESS:  Yes, I'm familiar with this.

19  BY MR. DUPONT:

20    Q.   Okay.  And the second sentence of the

21  document reads:  "This project has been deemed

22  necessary to minimize or preclude further

23  defections of circulating parts-cleaner customers

24  and long-term risks of health-based lawsuits that

25  heretofore have resulted from current levels of

---

**401, 402 irrelevant evidence is not admissible:** document states expenditure is for the Hebron facility, no evidence this facility serviced Plaintiffs' employers.
**403, misleading and confusing:** the document states, "for the purpose of cleaning chlorinated solvents (primarily perchloroethylene) and benzene from recycled mineral spirits solvents." **Assumes facts not in evidence:** document does not state column would remove benzene. **Inadmissible Hearsay**

---

BREECE, JAMES - (JOHNSON) VOL 1

**Transcript of Breece, James**

**401, 402 irrelevant evidence is not admissible:** no evidence the "health-based lawsuits" are similar to this case. No disease type or product discussed and 105 Solvent (the product Plaintiffs allege) is not mentioned. Further, Document states expenditure is for the Hebron facility, no evidence this facility serviced Plaintiffs' employers. Also, document states expenditure is for the Hebron facility, no evidence this [ ]ed [ ] **Inadmissible Hearsay**



01     chlorinated solvents and benzene contamination

02     respectively."

03          Did I read that correctly?

04     A.  Yes.

05     Q.  Okay.

06          MR. DUPONT:  No further questions.

07          THE VIDEOGRAPHER:  Anybody else?  This is

08     the end of --

09          MS. KAHN:  I have -- I actually have a few

10     questions --

11          THE VIDEOGRAPHER:  Sure.

12          MS. KAHN:  -- for the witness, but I don't

13     mind if we take a break for a couple minutes first.

14          THE VIDEOGRAPHER:  Okay.

15          THE WITNESS:  I don't mind --

16          MR. CAIRONE:  And -- and this is Matt.  I

17     have a few as well.  I don't want to get cut off

18     before I get a chance, so -- are we taking a break

19     now?

20          THE VIDEOGRAPHER:  Yeah.

21          MS. KAHN:  Yeah.

22          THE VIDEOGRAPHER:  The time is 3:30 p.m.

23     We're going off the record.

24          (Break taken.)

25          THE VIDEOGRAPHER:  And the time is 3:42

01    p.m.  We're back on the record.

02    EXAMINATION BY MS. KAHN:

03        Q.  Good afternoon, Dr. Breece.  I am Ruth

04    Kahn.  I'll reintroduce myself to you.  And my

05    questions are going to focus on Safety-Kleen and

06    Sunoco or Sun Oil Company.

07        A.  Okay.

08        Q.  Okay.  You identified Sun Oil or Sunoco as

09    one of Safety Kleen's suppliers of regular mineral

10    sprits from 1979 to 1993.  Was there a particular

11    geographic region for which Safety-Kleen obtained

12    mineral spirits from Sunoco or Sun Oil?

13        A.  To my recollection, yes, there was.

14        Q.  What was that, please.

15        A.  Middle Atlantic states, predominantly

16    around the --

17            (Reporter interruption for clarification.)

18            THE WITNESS:  Middle Atlantic states

19    around Clayton, New Jersey and later Linden, New

20    Jersey.  So the areas serviced by the -- and it's

21    not -- may not be exactly that location, but in

22    that general area around Northern New Jersey.

23    BY MS. KAHN:

24        Q.  Okay.  To your knowledge, did Safety-Kleen

25    purchase any other type of mineral spirits from

```
01    Sunoco or Sun Oil Company besides what you called
02    regular mineral spirits that was used in the 105
03    solvent in the Mid Atlantic region?
04         A.  I don't recall any other products.
05         Q.  To your knowledge, did Safety-Kleen ever
06    buy mineral spirits, any type of mineral spirits
07    from Sunoco or Sun Oil Company in connection with
08    services that Safety-Kleen provided from its
09    Reedley, California center?
10         A.  I'm not aware of any.  I'd have to refer
11    back to that 1993 document to make sure that that's
12    true, but I don't have a recollection of any being
13    provided.
14         Q.  Is the 1993 document that you're referring
15    to one that was marked as an exhibit here today?
16         A.  It was.
17         Q.  Okay.  I think it was Exhibit 4.
18            MS. KAHN:  In fact, Ms. Reporter, if you
19    wouldn't mind, please hand him Exhibit 4.
20            (The document was handed to the witness.)
21            THE WITNESS:  Yes.  Yes.
22    BY MS. KAHN:
23         Q.  All right.
24         A.  That's the one I'm referring to.
25         Q.  All right.  Please take a moment and take
```

01 a look at this and tell me if it refresh- --

02 refreshes your recollection in any way about Safety

03 Kleen's purchase of mineral spirits from Sunoco for

04 its center in Reedley, California.

05    A.  I'll just -- I'll double check the data

06 here.  Let me look just to make sure.  No, I don't

07 believe so.  None at Reedley.

08       (Reporter interruption for clarification.)

09       THE WITNESS:  Reedley.

10 BY MS. KAHN:

11    Q.  At all times that you were employed by

12 Safety-Kleen, was it the Reedley, California

13 Safety-Kleen center that provided parts-wash

14 services to companies in Northern California?

15    A.  I can't be absolutely sure.  I can -- I

16 can tell you my recollection that predominance of

17 the production was from Reedley.  However, Northern

18 California potentially could have been supplied

19 solvents from a facility in -- I got to think where

20 that location is.  I -- I want to say it's in --

21 outside of Seattle or potential for that.

22    Q.  Can you identify any documents, as you sit

23 here today, that discuss the supply of parts-wash

24 solution by Safety-Kleen from a facility near

25 Seattle to Northern California during the time

```
01    period of 1979 to 2012?
02         MR. DUPONT:  Objection.  Vague.
03         THE WITNESS:  I believe -- I believe the
04    closest identification I can provide is -- I
05    believe that's PetroSource.  And in -- on page --
06    it's under Rule 66, vendor data.  And that is -- I
07    wish those pages were numbered.  They were at one
08    time, but it's under Rule 66, vendor data about --
09    unfortunately, the page numbers have been lost on
10    this document.
11    BY MS. KAHN:
12         Q.  Well, why don't you just count back from
13    the front of the exhibit.  You can tell me it's --
14         A.  Why don't we count from the back forward.
15    One, two, three, it's the --
16         MS. FERGUSON:  Fourth last page.
17         THE WITNESS:  Yeah.  Fourth last page,
18    correct.
19    BY MS. KAHN:
20         Q.  Okay.  Unfortunately, when my copy of the
21    exhibit was made, it was only copied every other
22    page, so I don't have that.
23         MR. WOOD:  Hold it up and show her what
24    you're talking about.
25         THE WITNESS:  Sure.
```

01          MS. KAHN:  Thank you.

02   BY MS. KAHN:

03      Q.  Okay.  You're referring to a page where at

04   the top it says "Rule 66, vendor data"?

05      A.  Yes.

06      Q.  And then the vendor is identified as Kern,

07   K-E-R-N?

08          MR. DUPONT:  Continue to the next page.

09          THE WITNESS:  And go to the next page now.

10   BY MS. KAHN:

11      Q.  The next page, the vendor is identified as

12   Ashland.  This is the problem with an

13   every-other-page document.

14          MS. FERGUSON:  Let me see.

15          THE WITNESS:  Here.

16          MS. KAHN:  One, two.

17          THE WITNESS:  Show her that page so

18   she can see the --

19          MS. FERGUSON:  That's the actual exhibit.

20          MS. KAHN:  It's not here either.  Thanks.

21   BY MS. KAHN:

22      Q.  Okay.  On the -- the page that you handed

23   me, sir, which is one, two, three, the fourth page

24   from the end of the document, Exhibit 4, it says:

25   "Rule 66, vendor data," and then PetroSource is

**Transcript of Breece, James**

**Tuesday, September 1, 2020**

01    identified as one of the vendors.  PetroSource is a

02    raw material supplier as far as you know?  Or what

03    is PetroSource?

04       A.  PetroSource, if memory serves me

05    correctly, was a combination broker and at one

06    time, was a recycler of solvent in the Seattle

07    area.

08       Q.  Okay.  I'm -- I'm going to hand -- hand

09    this back to you.  There are several branch numbers

10    identified next to PetroSource.  One is 717201,

11    another is 701501, 716601, 718501.  I think those

12    are all of them.

13       Can you tell me what those branch numbers

14    refer to?

15       A.  Unfortunately, I can't.  Without the --

16    without the phone book, which identified -- the

17    Safety-Kleen phone book which identified all this,

18    I -- I don't know where those are.  But we do know

19    it's Rule 66, so it would have been on the west

20    coast.  That's the only -- that's as close as I can

21    get to guessing where they would be.

22       Q.  Okay.  As you sit here today, do you have

23    any knowledge as to what suppliers PetroSource was

24    a broker for?

25       A.  I do not.

Case 3:18-cv-00197-RJC-DSC  Document 429  Filed 09/05/20  Page 188 of 340

01     Q.  Okay.  Do you have any reason to believe

02  PetroSource was ever a broker for Sun Oil or

03  Sunoco?

04     A.  No, I -- I -- I have no knowledge of that.

05     Q.  To your knowledge, did PetroSource have

06  any relationship whatsoever with Sun Oil or Sunoco?

07     A.  Not aware of any relationship there.

08     Q.  To your knowledge, did Sun Oil Company or

09  Sunoco ever supply any type of mineral spirits so

10  Safety-Kleen in connection with Safety Kleen's

11  Reedley, California facility?

12     A.  Not aware of there ever being that

13  relationship for supply at Reedley.

14     Q.  Are you aware, to your knowledge --

15  withdrawn.

16        To your knowledge, did Safety-Kleen ever

17  obtain mineral spirits from Sun Oil Company by any

18  facility in the Seattle, Washington area?

19        MR. DUPONT:  Objection.  Foundation.

20        THE WITNESS:  I have no knowledge of any

21  such relationship.

22  BY MS. KAHN:

23     Q.  Okay.  I'd like you to take a look,

24  please, at what was marked as Exhibit 2.  In the --

25  starting on Page 3 of the document, which is Bates

01     stamped SK 3477, there's a list of vendors.  The

02     second column, which is head "R/C" has letters in

03     it.  LLCCC.

04          Do you see where I -- I am?

05     A.  Yes.  Uh-huh.

06     Q.  Okay.  And the L stands for Linden, the C

07     stands for Clayton; is that right?

08     A.  Let me check the date of this.  What is --

09     what's the date of this report?  The reason I say

10     that, L could stand for Linden or it could stand

11     for Lexington.  Let me make sure if I can tell

12     something about that.  L is Lexington because it is

13     inclusive of -- with Hunt.

14     Q.  Okay.  Take a minute and look through

15     Exhibit 2, if you would, and tell -- tell me if you

16     see any reference to the Reedley, California

17     facility whatsoever.

18     A.  I think I stated earlier that there was

19     not reference to Reedley.  It was not included in

20     this initial phase of that.  Let me make sure that

21     that's true.  No, that is -- that is true.  Reedley

22     is not included in this initial part of the study.

23     Q.  Assuming Sun Oil, in fact, supplied

24     mineral spirits to Safety-Kleen in the Mid Atlantic

25     region in the United States, do you have any reason

01   to believe that that mineral spirits made its way

02   out to California?

03       A.  No, ma'am, it did not.

04       Q.  How do you know that?

05       A.  Safety-Kleen was a for-profit company, and

06   that sort of -- that would have been a suicidal

07   transportation error.

08           MS. KAHN:  Thank you, sir.  Those are all

09   the questions I have.

10           THE WITNESS:  Very good.  Thank you.

11           THE VIDEOGRAPHER:  On the phone?  Do we

12   have someone else with questions?

13           MR. CAIRONE:  Yes, this is Matt Cairone

14   for United States Steel.  I have a few.

15           THE VIDEOGRAPHER:  Hold on one moment.

16   I'm going to reposition the microphone.

17           MR. WOOD:  Give that back to her.

18           THE WITNESS:  I'm sorry.

19           MR. WOOD:  Just --

20           THE VIDEOGRAPHER:  Okay, sir.

21   EXAMINATION BY MR. CAIRONE:

22       Q.  Okay.  Sir, it's hard to do this by

23   telephone, so if you can't hear me at any time,

24   please let me know.  Okay?

25       A.  Yes.

01     Q.  I -- I'm going to ask you a few questions

02  about something you testified to a long time ago

03  today, and that has to do with the product Liquid

04  Wrench.

05          Do you remember that testimony?

06     A.  Yes, I do.

07     Q.  Okay.  Now, you started with Safety-Kleen

08  in 1979; is that correct?

09     A.  Yes.

10     Q.  And you talked earlier about some

11  analytical testing that Safety-Kleen did on Liquid

12  Wrench.

13          Do you remember that?

14     A.  Yes.

15     Q.  Is it true that none of that analytic

16  testing that Safety-Kleen did on Liquid Wrench

17  occurred prior to 1979?

18     A.  That's correct to my knowledge, yes.

19     Q.  Okay.  So anything you testified --

20  testified about earlier had to do with analytical

21  testing that took place after 1979; is that right?

22     A.  That is correct.

23     Q.  Okay.  I think you said that Safety-Kleen

24  did some testing on Liquid Wrench in the 1990s; is

25  that right?

```
01      A.  Late '80s, early '90s, I -- I believe we
02   did as some particular project, yes.
03      Q.  Okay.  And I think you also said earlier
04   that you found nothing unusual about the Liquid
05   Wrench that you tested in the late '80s and early
06   '90s; is that correct?
07      A.  That is correct.  We found --
08      Q.  And you did say something -- okay.  Go
09   ahead.  I'm sorry.
10      A.  We found it to be consistent
11   compositionally wise to regular mineral spirits for
12   its solvent phase.
13      Q.  Okay.  I think you also mentioned that
14   based on some public document, I think you said,
15   you were aware of a high benzene content in Liquid
16   Wrench.
17          Do you remember that?
18      A.  Yes.  And that's strictly from a
19   historical technical articles.  It -- we performed
20   no analyses which indicated that.  So it -- it --
21   that's from a historical perspective with my
22   knowledge of what I've read.
23      Q.  Can you -- can you identify what you read?
24      A.  I can't identify the source.  I can
25   basically identify the source of the solvent used
```

01  by Liquid Wrench as -- I think -- I think the term

02  that was described for the distillate was a

03  raffinate, which was a hydrocarbon stream derived

04  from coking operations, if I recall correctly.

05      Q.  But you can't identify the document that

06  you read?

07      A.  No, I cannot.  It's been a long time ago.

08          MR. CAIRONE:  Okay.  Thank you, sir.

09  That's all I have.

10          THE WITNESS:  Very good.

11          THE VIDEOGRAPHER:  Anyone else?

12          MR. WOOD:  If there's no one else, we'll

13  reserve our questions until the time of trial.

14          THE VIDEOGRAPHER:  Okay.  This is the end

15  of Video Number 4 and the conclusion of today's

16  proceeding.  The time is 4:02 p.m.  We're off the

17  record.

18          (Discussion held off the record.)

19          THE REPORTER:  Does anybody need a

20  transcript that hasn't already told me?

21          MR. SCADDEN:  Hi.  This is Jim Scadden.  I

22  would like a copy, please.

23          MS. MALKOFSKY:  And also for Kevin Tully's

24  law firm.

25          THE REPORTER:  And that's Laura --

# Breece, James
## Rhyne Trial Master

```
01          MS. MALKOFSKY:  Laura Malkofsky.

02          MR. CAIRONE:  This is Matt.  I would like

03     a copy.

04          MS. HOSN:  Hi.  This is Sally from Poole &

05     Shaffery.  Can I also get a copy.

06          THE REPORTER:  Yes.  Thank you.

07          (Whereupon, the deposition was concluded

08          at 4:02 p.m.)

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 190

```
01                    SIGNATURE OF DEPONENT
02          I, the undersigned, JAMES BREECE, do hereby
03    certify that I have read the foregoing deposition and
04    find it to be a true and accurate transcription of my
05    testimony, with the following corrections, if any:
06
07    PAGE    LINE                      CHANGE
08    _____   _____   _____
09    _____   _____   _____
10    _____   _____   _____
11    _____   _____   _____
12    _____   _____   _____
13    _____   _____   _____
14    _____   _____   _____
15    _____   _____   _____
16    _____   _____   _____
17    _____   _____   _____
18    _____   _____   _____
19    _____   _____   _____
20    _____   _____   _____
21    _____   _____   _____
22                    _____
23            JAMES BREECE                        DATE
24
25
26
```

Page 191

```
01                    REPORTER'S CERTIFICATE

02

03

04        I, KIMBERLY R. HENDERSHOTT, a Shorthand

05   Reporter, State of California, do hereby certify:

06        That JAMES BREECE, in the foregoing deposition

07   named, was present and by me sworn as a witness in the

08   above-entitled action at the time and place therein

09   specified;

10        That said deposition was taken before me at

11   said time and place, and was taken down in shorthand by

12   me, a Certified Shorthand Reporter of the State of

13   California, and was thereafter transcribed into

14   typewriting, and that the foregoing transcript

15   constitutes a full, true and correct report of said

16   deposition and of the proceedings that took place;

17        IN WITNESS WHEREOF, I have hereunder

18   subscribed my hand this 12th day of February, 2014.

19

20

21        KIMBERLY R. HENDERSHOTT, RPR, CSR NO. 12552

22        State of California

23

24

25

26
```

Page 192

Case 3:18-cv-00197-RJC-DSC   Document 340-1   Filed 09/08/20   Page 198 of 340

# Exhibit 2

# Transcript Report

## Niemaszyk, Debra

Plaintiff designations in yellow
Safety-Kleen counter designations in green

**Transcript of Niemaszyk, Debra**

# Full Transcript Report
## Designation Legend

NIEMASZYK, DEBRA - VOL 1

Transcript of Niemaszyk, Debra

Page 1

```
01        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
02              IN AND FOR THE COUNTY OF ALAMEDA
03                        ---oOo---
04   DAVID JOHNSON and LAURA JOHNSON,
05              Plaintiffs,
06   vs.                           No. RG13669270
07   ARMORED AUTOGROUP, INC.,
08        et al.,
09
10        Defendants.
11                            /
12
13
14
15        VIDEOTAPED DEPOSITION OF DEBRA NIEMASZYK
16              COR/PMK for SAFETY-KLEEN
17
18   Taken before KIMBERLY R. HENDERSHOTT, RPR
19              CSR NO. 12552
20              January 29, 2014
21
22
23
24
25        Aiken Welch Court Reporters
26        One Kaiser Plaza, Suite 250
27        Oakland, California 94612
28        (510) 451-1580/(877) 451-1580
29        Fax: (510) 451-3797
30        www.aikenwelch.com
```

Transcript of Niemaszyk, Debra

# Niemaszyk, Debra
### Rhyne Trial Master

01                    I N D E X

02                                        PAGE

03    EXAMINATION BY MR. DUPONT                    7

04

05

06

07                  E X H I B I T S

08    PLAINTIFF'S                          PAGE

09    Exhibit 1     Declaration of Debbie        9

10                  Niemaszyk

11

12    Exhibit 2     Safety-Kleen System, Inc.    14

13                  Legal Scan Customer Search

14    Exhibit 3     Safety-Kleen System, Inc.    20

15                  Legal Scan Document List

16

17    Exhibit 4     Exhibit C                    43

18

19

20

21

22

23

24

25

26

27

28

29

30

31    Aiken Welch Court Reporters   D. Niemaszyk   01/29/2014

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
## Rhyne Trial Master

```
01          VIDEOTAPED DEPOSITION OF DEBRA NIEMASZYK

02

03          BE IT REMEMBERED, that pursuant to Notice, and on

04     the 29th day of January 2014, commencing at the hour of

05     9:05 a.m., in the offices of LEWIS BRISBOIS BISGAARD &

06     SMITH, 333 Bush Street, Suite 1100, San Francisco,

07     California 94104, before me, KIMBERLY R. HENDERSHOTT, a

08     Certified Shorthand Reporter, personally appeared DEBRA

09     NIEMASZYK, produced as a witness in said action, and

10     being by me first duly sworn, was thereupon examined as

11     a witness in said cause.

12

13                           ---oOo---

14

15

16     APPEARANCES:

17     For the Plaintiff:

18                 ANDREW DUPONT

19                 Locks Law Firm

20                 The Curtis Center

21                 601 Walnut Street, Suite 720 East

22                 Philadelphia, Pennsylvania 19106

23                 (215) 893-0100

24

25     For the Defendant CSK Auto, Inc.:

26

27                 CONSTANCE FRAENKEL

28                 (via phone)

29                 Becherer, Kannett & Schweitzer

30                 1255 Powell Street

31                 Emeryville, California 94608

32                 (510) 658-3600
```

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
## Rhyne Trial Master

```
01   For the Defendant U.S. Steel Corporation:
02              DAVID W. SKAAR
03              (via phone)
04              Hogan Lovells US LLP
05              1999 Avenue of the Stars, Suite 1400
06              Los Angeles, California 90067
07              (310) 785 4676
08              David.skaar@hoganlovells.com
09   For the Defendant Safety-Kleen:
10              JEFFREY F. WOOD
11              Jones Carr McGoldrick
12              Premier Place
13              5910 N. Central Expressway,
14              Suite 1700
15              Dallas, Texas 75206
16              (214) 828-9200
17              Jeff.wood@jcmfirm.com
18
19   For the Defendant Genuine Parts Co.:
20
21              RICHARD CHON
22              (via phone)
23              Pond North, LLP
24              100 Spear Street, Suite 1200
25              San Francisco, California 94105
26              (415) 217-1240
27              Rchon@pondnorth.com
28
29   For the Defendant Turtle Wax:
30
31              SALLY HOSN
32              (via phone)
33              Poole & Shaffery, LLP
34              400 S Hope Street, Suite 1100
35              Los Angeles, California 90071
36              (888) 595-5963
37              Shosn@pooleshaffery.com
38
39   For the Defendant Berryman Products, Inc.:
40
41              JEFF ALLEN
42              (via phone)
43              Shannon, Gracey, Ratliff & Miller, L.L.P.
44              1000 Ballpark Way, Suite 300
45              Arlington, Texas 76011
46              (817) 882-7616
```

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
## Rhyne Trial Master

```
01  For the Defendant Armor All/STP Products Company;
02  Chevron USA, Inc.; CRC Industries, Inc.; Texaco, Inc.;
03  Sunoco, Inc. (R&M); Kingsford Products:
04           RUTH D. KAHN
05           Steptoe & Johnson, LLP
06           633 West Fifth Street, Suite 700
07           Los Angeles, California 90071
08           (213) 439-9429
09           Rkahn@steptoe.com
10
11  For the Defendant Justice Brothers, Inc.:
12
13           JEFFREY M. ZECH
14           (via phone)
15           Walsworth, Franklin, Bevins & McCall
16           One City Boulevard West, 5th Floor
17           Orange, California 92868
18           (714) 634-0686
19           Jzech@wfbm.com
20
21  Also Present:  Larry Cossar, Videographer
22
23
24
25
26
27
28
29
30
31
32
33
34
35
```

Transcript of Niemaszyk, Debra

# Niemaszyk, Debra

### Rhyne Trial Master

```
01          THE VIDEOGRAPHER:  On the record.  My name
02    is Larry Cossar.  I'm a qualified video technician
03    videotaping on behalf of Tele-Video Production
04    Services.  The court reporter today is Kimberly
05    Hendershott of Aiken Welch.  Today's date is
06    January 29th, 2014.  The present time is 9:05 a.m.
07          The location of this deposition is Lewis
08    Brisbois in San Francisco.  Today's witness is
09    Deborah Niemaszyk in the case of David Johnson
10    versus Armored Autogroup, Incorporated, et al.,
11    case number RG13669270 filed in the Superior Court
12    of California in and for the county of Alameda.
13    This deposition was noticed by the Kazan Law Firm
14    for the plaintiff.
15          Would the counsel for the parties present
16    please identify themselves for whom they are -- and
17    for whom they are appearing.
18          MR. DUPONT:  Andrew DuPont for David and
19    Laura Johnson.
20          MS. KAHN:  Ruth Kahn on behalf of Chevron,
21    Texaco, and Sunoco.
22          MR. WOOD:  Jeff Wood on behalf of
23    Safety-Kleen's Systems, Inc.
24          THE VIDEOGRAPHER:  And on the phone,
25    please.
```

**Transcript of Niemaszyk, Debra**

01    MR. SKAAR:  This is David Skaar for the
02  United States Steel Corporation.
03      MS. FRAENKEL:  Good morning, Constance
04  Fraenkel for CSK Auto, Inc.
05      MR. CHON:  Richard Chon for Genuine Parts
06  Company.
07      MR. ZECH:  Jeff Zech on behalf of Justice
08  Brothers, Inc.
09      MR. ALLEN:  Jeff Allen on behalf of
10  Berryman Products, Incorporated.
11      MS. HOSN:  Sally Hosn on behalf of Turtle
12  Wax, Inc.
13      THE VIDEOGRAPHER:  Okay.  If there are no
14  stipulations, the court reporter will now swear the
15  witness.
16              DEBRA NIEMASZYK,
17          sworn as a witness,
18          testified as follows:
19  EXAMINATION BY MR. DUPONT:
20    Q.  Good morning.
21    A.  Good morning.
22    Q.  My name is Andrew DuPont.  I'm an attorney
23  for David Johnson and Laura Johnson.  Would you
24  kindly give us your full name, please.
25    A.  Deborah Niemaszyk.

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
Rhyne Trial Master

01     Q.  Okay.  Ms. Niemaszyk, I'm going to be

02  asking you questions in the case for the purposes

03  of gathering evidence and -- and learning more

04  about what Safety-Kleen has done to acquire

05  certain -- and find certain records.  Have you

06  given a deposition in the past?

07     A.  Yes.

08     Q.  On how many occasions?

09     A.  One time.

10     Q.  And what did that deposition concern?

11     A.  A settlement case.

12     Q.  Was it an individual who contracted cancer

13  after exposure to a Safety-Kleen solvent?

14        MR. WOOD:  Objection.  Assumes facts.

15  Foundation.  You can answer if you know.

16        THE WITNESS:  I don't remember.

17  BY MR. DUPONT:

18     Q.  When did you give that deposition?

19     A.  I believe it was 2008.

20     Q.  I'll review some of the procedures.  I'm

21  sure you remember them from your prior deposition

22  and from getting ready for the deposition today.

23  Most important instruction I have for you is that

24  if I ask you a question and you do not hear it well

25  or you do not understand it, please let me know,

**Transcript of Niemaszyk, Debra**

```
01   and I'll do my best to re-ask it or rephrase the
02   question.  Is that acceptable?
03       A.  Yes.
04       Q.  I don't want you to guess in response to
05   any question.  If you need to provide an estimate,
06   that's fine, but if you'll agree that you are not
07   guessing in response to any question I ask, I would
08   appreciate that.  Okay?
09       A.  That's fine, yes.
10       Q.  All right.  If at any point in time you
11   need a break, please let me know.  I don't expect
12   this deposition to take too long.  But in the event
13   you do need a break, I'd be happy to oblige -- as
14   long as you answer any question that's pending
15   before we take a break.  Okay?
16       A.  Yes.
17       Q.  What did you do to prepare for your
18   deposition today?
19       A.  I went over my declaration and reviewed
20   the customer list, document list, and the
21   documents.
22           (Plaintiffs' Exhibit 1 marked
23           for identification.)
24   BY MR. DUPONT:
25       Q.  All right.  I'm going to hand you a
```

**Transcript of Niemaszyk, Debra**

01   document that's been marked as Niemaszyk Exhibit 1

02   and ask you if this is your declaration.

03       A.  Yes, it is.

04       Q.  Was that a declaration you made specific

05   for this case or is that the type of declaration

06   that you've provided on numerous occasions before?

07       A.  We have used a declaration like this

08   before.

09       Q.  All right.  I understand that you became

10   employed by Safety-Kleen in 1986?

11       A.  That's correct.

12       Q.  And what was your position at that time?

13       A.  Microphone clerk.

14       Q.  Then in the early 2000s, in your

15   declaration, it's indicated that you've became

16   responsible for maintaining and retrieving

17   Safety-Kleen service records, microfilmed or

18   scanned from Safety-Kleen branch offices

19   nationwide; is that accurate?

20       A.  Yes.

21       Q.  Did you obtain a new job title in the

22   early 2000s?

23       A.  Yes.

24       Q.  And what was that?

25       A.  Imaging supervisor.

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

Case 3:18-cv-00197-RJC-DSC   Document 409-2   Filed 09/15/20   Page 213 of 340
Case 3:18-cv-00197-RJC-DSC   Document 342-2   Filed 08/02/20   Page 213 of 340

# Niemaszyk, Debra
Rhyne Trial Master

```
01        Q.  When you say "the early 2000s," do you
02    recall a more precise date?
03        A.  I believe it was 2001.
04        Q.  Thank you.
05            And your job title from 1986 to 2001 was?
06        A.  Microphone clerk, then lead microphone
07    clerk, and then imaging supervisor.
08        Q.  Is your current position imaging
09    supervisor?
10        A.  I am a contractor currently with
11    Safety-Kleen.
12        Q.  Okay.  Are you no longer employed by
13    Safety-Kleen directly?
14        A.  Directly, yes.
15        Q.  All right.  When did you become a
16    contractor for Safety-Kleen?
17        A.  In March of 2013.
18        Q.  Why did you become a contractor as opposed
19    to a direct employee?
20        A.  We were bought out -- Safety-Kleen was
21    bought out and there was a reduction in force.
22        Q.  Okay.  And have you worked exclusively for
23    Safety-Kleen since March of 2013?
24        A.  Yes.
25        Q.  Do you work on a full-time basis for
```

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

01    Safety-Kleen since March of 2013?

02        A.  No.

03        Q.  When you began with Safety-Kleen in 1986,

04    did your responsibilities include pulling service

05    records for the purposes of litigation?

06        A.  Yes.

07        Q.  Between 1986 and 2001, what percentage of

08    your time working for Safety-Kleen as a microfilm

09    clerk and a lead microphone clerk involved pulling

10    service records for the purpose of litigation?

11        A.  And then I would have to guess because it

12    would -- it would vary depending on if there's a

13    lawsuit.

14        Q.  Okay.

15        A.  I mean there would be times there would

16    be -- I wouldn't do that at all for months at a

17    time, and then there would be times that that's all

18    I would be doing.

19        Q.  Well, I don't want you to guess, but do

20    you have a reasonable estimate on what percentage

21    of your time was spent pulling records for

22    litigation?

23        A.  That's two -- from 1986 to 2001?

24        Q.  Yes, ma'am.

25        A.  Twenty-five percent.

**Transcript of Niemaszyk, Debra**

```
01        Q.  And between 1986 and 2001, were you
02   pulling records of Safety-Kleen service records in
03   cases that concerned individuals who contracted
04   cancer after working with Safety-Kleen parts
05   washing solvents?
06        MR. WOOD:  Objection.  Assumes fact.
07   Foundation.  Calls for speculation.
08        MS. KAHN:  Also calls for expert opinion
09   testimony.  There's an expert opinion implicit in
10   the question.
11        (Reporter interruption for clarification.)
12        MS. KAHN:  Opinion implicit in the
13   question.
14        MR. WOOD:  I'll join in that objection as
15   well.
16        THE WITNESS:  I don't know why I'm pulling
17   them.  I'm not given that information.
18   BY MR. DUPONT:
19        Q.  Okay.  In the context of retrieving
20   service records from Safety-Kleen's databases and
21   other historic records between 2000 -- strike that.
22        Did you receive information concerning the
23   cases that records were being requested in between
24   1986 and 2001 when you were asked to obtain
25   Safety-Kleen records?
```

**Transcript of Niemaszyk, Debra**

01    A.  I would get a request from the -- the
02  legal department.
03    Q.  All right.  Did you have the opportunity
04  to see the complaints that were filed in the case
05  to see interrogatory answers, deposition
06  transcripts --
07    A.  No.
08    Q.  -- anything like that?
09        In 2001 as an imaging supervisor, how did
10  your duties change?
11    A.  The system went from microfilm to imaging,
12  there was just changes in the way things were
13  done --
14    Q.  Okay.
15    A.  -- from microphone to images stored
16  electronically.  I was responsible for the people
17  that -- the other employees in the department.
18    Q.  How many other individuals were in the
19  imaging department?
20    A.  There were seven at that time.
21        (Plaintiffs' Exhibit 2 marked
22        for identification.)
23  BY MR. DUPONT:
24    Q.  Okay.  Marked as Exhibit 2 to your
25  deposition, what's identified as Exhibit A to your

**Transcript of Niemaszyk, Debra**

01  declaration and it's entitled Safety-Kleen System,

02  Inc., legal scan customer search, customer data as

03  of 1/30/2010.  I'm going to hand that exhibit to

04  you and ask that you confirm for me that that is

05  what is marked as Exhibit A to your declaration.

06      A.  Yes, it is.

07      Q.  Now, you have a copy of that document in

08  front of you, so do you mind if I take the exhibit

09  back and then we'll look at it together?

10      A.  Okay.

11          MS. KAHN:  Do you have an extra copy for

12  me.

13          MR. DUPONT:  I did not bring an extra copy

14  for you since it was circulated by Safety-Kleen.

15  So everyone should have a copy.

16          MS. KAHN:  Jeff, can you tell me when it

17  was produced, and I'll look it up in the record.

18          MR. WOOD:  Let me -- let me look.  It

19  would have been an E-mail from our office with her

20  declaration and exhibits.  I don't know if it

21  was -- I can't tell you right now if it was served

22  on everyone or if it was just served initially to

23  Andrew.

24          MS. KAHN:  I don't remember seeing it

25  before because this is the first time hearing of

**Transcript of Niemaszyk, Debra**

```
01    the declaration.  I don't have any objection, but I
02    would like to see it.
03         MR. WOOD:  I don't have a hard copy of it.
04    There's one hard copy there, there's one hard copy
05    there, and I have a copy on my computer which
06    you're welcome to look at because I've seen it
07    before, so...
08         THE VIDEOGRAPHER:  Should we go off the
09    record?
10         MR. DUPONT:  Yeah.
11         MR. WOOD:  Yeah.
12         THE VIDEOGRAPHER:  The time is 9:17 a.m.
13    We're going off the record.
14         (Discussion held off the record.)
15         THE VIDEOGRAPHER:  The time is 9:20 a.m.
16    We're back on the record.
17    BY MR. DUPONT:
18      Q.  All right.  Would you kindly look at
19    Exhibit 2 to your deposition, which is Exhibit B to
20    your Affidavit with me.
21         MR. WOOD:  This is Exhibit A to the
22    declaration, Exhibit 2 to the deposition.
23         MR. DUPONT:  Okay.
24         MR. WOOD:  I just want to make sure --
25         MR. DUPONT:  I'll correct that then.  I'll
```

**Transcript of Niemaszyk, Debra**

01    withdraw that question.

02    BY MR. DUPONT:

03        Q.  We're looking at Exhibit 2 to your

04    deposition, which is also Exhibit A to your

05    declaration, and can you explain what this document

06    is?

07        A.  This is a Customer search that tells the

08    customer name, the address, city, state, zip, when

09    they became a customer, when they ended as a

10    customer, the old customer number, and if there is

11    a new customer number.

12        Q.  So there's a column for customer name, and

13    that obviously tells us who the name of the

14    business that is the customer of Safety-Kleen?

15        A.  Yes.

16        Q.  There's a column address one and two.

17    What does that represent?

18        A.  Some businesses have more than one

19    address, like a PO Box possibly so you would see

20    that on there too if there was one.

21        Q.  Next is a city, I presume it's the city

22    that the customer is located in?

23        A.  Yes.

24        Q.  Followed by the state that the customer is

25    located in?

**Transcript of Niemaszyk, Debra**

01      A.  Yes.

02      Q.  Followed by the zip code that the customer

03   is located in?

04      A.  Yes.

05      Q.  And then there's a column from.  What's

06   the significance of the data underneath the from

07   column?

08      A.  The from column is when the customer

09   became a Safety-Kleen customer.

10      Q.  And the next column is end.  Is that the

11   last date that the customer was a Safety-Kleen

12   customer?

13      A.  Yes.

14      Q.  Is it the last date absolutely that they

15   were a Safety-Kleen customer or is it the last date

16   that they were a customer for a particular period

17   of time?

18      A.  I don't know the answer to that.

19      Q.  Okay.  In other words, are there

20   circumstances where a customer has a Safety-Kleen

21   parts washing solvent service for one year, and

22   then the next year they don't have the service,

23   then the next year they have -- do -- do have the

24   service?

25      A.  Yes.

**Transcript of Niemaszyk, Debra**

01      Q.  In other words, there could be gaps in the

02   time periods of service?

03      A.  Yes, but they would have a new customer

04   number.

05      Q.  Okay.  All right.  The next column over is

06   the old customer number?

07      A.  Yes.

08      Q.  What does that represent?

09      A.  The first three digits 7185 -- and 01 are

10   the branch, and the last four are of our customer

11   number -- the account number.

12      Q.  All right.  And are you familiar with the

13   branch numbers?

14      A.  As far as what branches 718501?

15      Q.  Yes.

16      A.  I was before when I was doing this more

17   back then when it was old customer numbers, but I

18   don't know all the branches anymore.

19      Q.  Do you know which branch correlates to

20   7185001 [sic]?

21      A.  My recollection is that it was Salida.

22      Q.  Okay.  Is there a master list maintained

23   by Safety-Kleen that identifies the name of the

24   branch corresponding to a branch number?

25      A.  Yes.

**Transcript of Niemaszyk, Debra**

```
01      Q.  What is that document called?
02      A.  I don't have that.  I would -- I don't
03  have a document like that.
04      Q.  Do you know what the name of that document
05  is?
06      A.  No, I don't.
07      Q.  If you were to ask someone at
08  Safety-Kleen, could I see the list of all of our
09  branch -- branches and branch numbers, what would
10  you ask for?
11          MR. WOOD:  Objection.  Foundation.
12  BY MR. DUPONT:
13      Q.  You can answer.
14      A.  I would probably try to ask somebody if I
15  could have a list like that but I don't know who I
16  would ask anymore or where to get that from.
17      Q.  Okay.  All right.  And there's a new
18  customer number is the last column.
19      A.  Yes.
20      Q.  And what does that represent?
21      A.  Safety-Kleen eventually ran out of
22  customer numbers, and then they started using new
23  customer number.
24          (Plaintiffs' Exhibit 3 marked
25          for identification.)
```

**Transcript of Niemaszyk, Debra**

01    BY MR. DUPONT:

02        Q.  Okay.  I've marked as Exhibit 3 to your

03    deposition what is Exhibit B to your declaration

04    and it's entitled Safety-Kleen System, Inc. Legal

05    Scan Document List.

06            Thank you.

07            And do you have a copy of that in front of

08    you?

09        A.  Yes, I do.

10        Q.  What is Exhibit 3 to your deposition?

11        A.  This is the -- I take the customer number

12    and I run it into the legal scan document list

13    which produces a list of the services.

14        Q.  All right.  So you have listed on the

15    left-hand column old customer number, and on the

16    first two pages to almost midway down the third

17    page the customer -- the new Customer numbers are

18    all zeros.  What does that mean?

19        A.  That means there wasn't a new customer

20    number.

21        Q.  Okay.  And the next column is C-U-S-T

22    N-U-M, old.  I take it that's customer number old?

23        A.  Yes.

24        Q.  And the third column is service date.

25    What does the service date mean?

**Transcript of Niemaszyk, Debra**

01      A.  That is the date the sales rep went out

02  and performed the service for the customer.

03      Q.  Does the service date listed under that

04  column correspond to a date written on a particular

05  service record?

06      A.  On the preprint placement or end document.

07      Q.  Okay.  And the next column is service

08  document number?

09      A.  Yes.

10      Q.  And it's abbreviated service doc, D-O-C,

11  N-U-M?

12      A.  Yes.

13      Q.  Under this column there is a -- for some

14  of the numbers there is a letter followed by

15  numbers.  Can you tell me what the significance of

16  the letter preceding the numbers is?

17      A.  A "P" document was a placement.  An "M"

18  document was an unscheduled service, and the other

19  ones are regular scheduled services, preprints.

20      Q.  Okay.  So were there --

21          (Reporter interruption for clarification.)

22          THE WITNESS:  Preprints.

23  BY MR. DUPONT:

24      Q.  Is that an OO or a zero zero?

25      A.  Zero zero.

**Transcript of Niemaszyk, Debra**

01      Q.  So there's P for placement, M for

02  unscheduled service, and 00 for regular visit?

03      A.  That's correct.

04      Q.  And a regular visit is that just a -- an

05  ordinarily scheduled plan visit?

06      A.  Yes.

07      Q.  Looking onto the next page, there's also a

08  prefix of CP coming before the numbers.  What does

09  "CP" signi -- signify?

10      A.  I believe those were compliance documents.

11  I -- they weren't used very much.  I can't really

12  speak.  I don't remember what CP stood for.

13      Q.  Okay.  If you look to the fourth page of

14  this exhibit under the service dock number column,

15  the second to the last entry is a WP coming before

16  the numbers.  What does the "WP" mean?

17      A.  I don't remember what those were either.

18  Those were not used very often either.

19      Q.  Okay.  Then after the letters are a series

20  of numbers.  What are the numbers under service

21  document number represent?

22      A.  It's the preprint number.

23      Q.  Can you explain what that is?

24      A.  A number that was assigned through the

25  system.  A document number.

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
## Rhyne Trial Master

```
01      Q.  Okay.  So that's a number that appears on
02   the preprint form?
03      A.  Yes.
04      Q.  And the preprint form, can you explain
05   what a preprint form is?
06      A.  It's the sales and service document.
07      Q.  So that's a --
08      A.  That's -- I'm sorry.
09      Q.  I apologize.  I cut you off.  Please
10   continue.
11      A.  When the service rep would go out and
12   perform the service, that's the document he would
13   have the customer sign.
14      Q.  Okay.  Then on the right-hand side of the
15   entries under service document number, there are
16   what appear to be handwritten checks and notes?
17      A.  That's correct.
18      Q.  Did you make these handwritten checks and
19   notes?
20      A.  I did.
21      Q.  Okay.  What's the significance of a check?
22      A.  I found it.
23      Q.  And there's notes of "can't find."
24          Does that mean you couldn't find the
25   document?
```

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
## Rhyne Trial Master

01     A.  Yes.

02     Q.  And there's also, if you turn to the

03 second page, there's a note for one of the entries.

04 It says "best possible" -- and I can't read the

05 rest.

06     A.  It should say copy.

07     Q.  Okay.  So it's "best possible copy" on the

08 second page.  For that entry, does that mean that

09 you found a record that wasn't entirely legible or?

10     A.  I tried to get it to the best legible copy

11 I could get.  I just wanted them to know this is

12 the best I can do.

13     Q.  How -- how do you work with the document

14 to get it to the best legible copy?

15     A.  You can lighten or darken them.

16     Q.  Are there originals avail -- available

17 somewhere?

18     A.  No.

19     Q.  Okay.  So why don't you walk me through

20 what Safety-Kleen's procedures have been for

21 maintaining service records since the company was

22 started in 1970?

23     A.  To the best of my knowledge?  They would

24 mail in their copy to corporate.  We would either

25 microphone them or image them, and then they were

OBJECTION:
Lack of
Foundation/
Assumes facts
not in evidence:
Start of Safety-
Kleen
(cont. to 26:1);
See errata

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

01  destroyed.

02      Q.  And I understand that there are some

03  changes in the procedures over the years?

04      A.  As far as going from microfilm to imaging;

05  otherwise, no.

06      Q.  Okay.  When did the change from microfilm

07  to imaging take place?

08      A.  In 1997 period 9, they started imaging the

09  preprints but they still used microfilm for the

10  placements and manuals.  And 1999, 11/5 of 1999,

11  everything became imaged.

12      Q.  Has it always been the procedure to mail

13  the service records to Safety-Kleen headquarters,

14  or are they ever imaged at the branch?

15      A.  To the best of my knowledge, they were

16  mailed in.  I don't know what they are doing now.

17      Q.  Okay.  So to understand that a service

18  record, whether it was a preprint or a -- give me

19  examples, there's preprints, there's --

20      A.  Placement.

21      Q.  Placement?

22      A.  Manual.

23      Q.  Okay.  And are those the three options?

24      A.  On your list there was a WP, which I don't

25  remember, and a C P.  On my exhibits, if I found

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
Rhyne Trial Master

01    those, it should say what they were.

02        Q.  Okay.  What's a manual?

03        A.  An unscheduled service.

04        Q.  And is that -- is it called manual because

05    it's handwritten out?

06        A.  I don't -- I don't know.

07        Q.  Okay.  And preprints are scheduled

08    services?

09        A.  Yes.

10        Q.  And placements, what is that?

11        A.  When they went out to place a machine at

12    the customer.

13        Q.  Okay.  And a seen at time is referenced

14    to a -- someone might write pull on a record.  Are

15    you familiar with that term?

16        A.  I've seen that.

17        Q.  Okay.  Is there a specific document used

18    to record when a Safety-Kleen parts washing machine

19    is taken out of a customer location or a service is

20    discontinued?

21        A.  I don't know.

22        Q.  So does a service branch generate the

23    preprint placement and manual records?

24        A.  I don't know how those are generated

25    either.

**Transcript of Niemaszyk, Debra**

01    Q.  Okay.  In -- in general terms, what's your

02  understanding of how the documents generated, how

03  it's taken to the customer, and then how it gets

04  back to the corporate office?

05    A.  To the best of my knowledge, the sales rep

06  gets the documents, but I don't know where they

07  come from.  We go out to the customer, perform the

08  service, get a signature and mail them back in to

09  corporate.

10    Q.  And during the steps of generating the

11  document, taking it to the customer, bringing it

12  back to the service department then mailing it to

13  the corporate headquarters, is there any type of

14  operation to make a copy or scan a copy or image a

15  copy of the document before it's sent to corporate

16  headquarters by mail?

17    A.  I don't know.

18    Q.  Are the service document numbers entered

19  into some sort of system with Safety-Kleen as soon

20  as service documents come back from service

21  branches?

22    A.  I know at -- at one time they were --

23  there was a data entry department.  I don't know

24  how they do it today.

25    Q.  When there was a data entry department,

OBJECTION:
403,
Prejudicial:
Vague,
confusing
question;
602, Lack of
personal
     ...vledge:
     ...de scope
of witness's job
duties /
responsibilities,
admitted lack
of knowledge

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

01    how did it work?

02        A.  I don't know.  I just know there was a

03    data entry department and a branch services

04    department, but I didn't work in either one of

05    those departments.

06        Q.  Okay.  Is the service document number

07    entered into the system when you conduct or someone

08    in your position conducts a search for documents

09    responsive to a request in litigation, or have they

10    already been entered into a system by the time you

11    conduct your search?

12        A.  They would have already been entered in.

13        Q.  Is there a -- a backup system?  In other

14    words, if a document, a service record is misplaced

15    when it's mailed back to corporate headquarters

16    from a particular branch, that's possible that

17    there were service records that were lost in the

18    mail or someone forgot to mail them, okay.  Is

19    there any type of system that Safety-Kleen has a

20    backup in accounting or wherever for recording when

21    particular service documents were generated, what

22    information was on the service document, that sort

23    of thing?

24        A.  Not to my personal knowledge.

25        Q.  Okay.  Can you walk me through the -- the

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

```
01   steps of how it is you go about retrieving
02   documents at the request of counsel for
03   Safety-Kleen in litigation?
04        A.  I get a request with whatever information
05   they have:  Customer name, address, city, I take
06   that into the legal database, and I search either
07   by customer name, personal names, address, city,
08   and see what kind of hits I get.  At that point I
09   send it back to them, and then they will send me
10   another document requesting the documents -- the
11   document search from the customer search.  I put
12   that in to a different system, a different
13   database, and come up with a document list which I
14   \ATXnt99790       14\ATXnt1003014    \ATXnt0  send back to them.
15        Q.  Okay.  The -- the first list that you
16   created, does that -- did you call that a document
17   search list?
18        A.  The first list is a customer search
19   list --
20        Q.  Okay.
21        A.  -- based on the information that I get
22   from the attorneys.
23        Q.  And is that what we've marked as Exhibit 2
24   and Exhibit A to your declaration?
25        A.  Yes.
```

**OBJECTION:**
Transcription error designated; see errata

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

01    Q.   Which locations or which businesses did

02    you search for in this case?

03    A.   Whatever was on the list I got from the

04    attorneys.

05    Q.   Do you have that list?

06    A.   I don't.

07    Q.   Do you remember what was on the list?

08    A.   No.

09    Q.   Do you remember the names of the locations

10    you searched for?

11    A.   Only according to my customer list, that

12    I'm looking at.

13    Q.   Do you remember if you searched for a

14    business by the name of Bob's Tex- -- Texaco?

15    A.   I -- I don't know.

16    Q.   How many searches for service records have

17    you conducted, to your best estimate, in cases that

18    involve an individual who filed a lawsuit after

19    using a Safety-Kleen parts washer solvent and

20    contracting cancer?

21        MR. WOOD:  Objection.  Assumes facts.

22    Foundation.  And requires expert opinion.  Outside

23    the scope of the deposition.  You can answer.

24        THE WITNESS:  There's been hundreds.  I

25    couldn't give you an exact amount.

**OBJECTION: 401, Relevancy:** Prior lawsuits are irrelevant; **403, Prejudicial:** Jury's knowledge of prior suits is prejudicial; **404, Character evidence:** Prior lawsuits impermissible to show character; **602, Lack of personal knowledge:** Content of prior lawsuits' claims; **Assumes facts not in evidence/ Lack of foundation:** Allegations of lawsuit are not facts.

Objection
shouldn't
be played

SZYK,
OL 1

t of Niemaszyk, Debra

```
01   BY MR. DUPONT:
02        Q.  Okay.  And is that something you've been
03   doing since you started with the company in 1986?
04        A.  Yes.
05        Q.  What are the oldest service records you've
06   been able to pull, not just in this case, but in
07   general?
08        A.  1984.
09        Q.  Do I understand that you've never actually
10   retrieved a service record that's dated earlier
11   than 1984?
12        A.  There's no way to access them.
13        Q.  Explain for me what you mean by that?
14        A.  They didn't electronically store -- do any
15   indexing of the ones prior to '84 to get a list
16   like this, so I'm not able to look at those.  I
17   have the actual reel of microfilm but there's no
18   information to go search from.
19        Q.  Okay.  So Safety-Kleen service records
20   dated prior to 1984 are stored how?
21        A.  On microfilm.
22        Q.  How many microfilm rolls?
23        A.  Prior to '84?
24        Q.  Yes.
25        A.  That would be a guess too.
```

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

Case 3:18-cv-00197-RJC-DSC   Document 409-2 Filed 09/15/20 Page 233 of 340
Case 3:18-cv-00197-RJC-DSC   Document 311-2 Filed 09/02/20 Page 33 of 40

01          MS. KAHN:  Excuse me.

02          MR. DUPONT:  Bless you.

03          MS. KAHN:  Thank you.

04    BY MR. DUPONT:

05      Q.  Are there more than one microfilm rolls?

06      A.  Yes.

07      Q.  Are there more than fifty?

08      A.  Yes.

09      Q.  More than a hundred?

10      A.  Yes, but then I would get -- you know,

11    I -- I'm not sure.  500 maybe.

12      Q.  How were the microfilm rolls --

13          MR. DUPONT:  God bless you.

14          MS. KAHN:  Excuse me again.

15    BY MR. DUPONT:

16      Q.  How were the microfilm rolls organized?

17      A.  By branch, date, and period and year.

18      Q.  Are there -- is there a particular

19    microfilm for a particular branch exclusively?  In

20    other words, does one microfilm roll correspond to

21    one branch?

22      A.  There can be more than one branch on a

23    reel depending on how large the branch is.

24      Q.  Is -- are the reels organized by region of

25    the country?

Transcript of Niemaszyk, Debra

```
01      A.  By branch number.
02      Q.  Okay.  Is there a list that's been
03   generated by Safety-Kleen or a record generated by
04   Safety-Kleen on which branch numbers are on which
05   reels?
06      A.  No, there's not a list.
07      Q.  Has anyone gone through the old microfilm
08   reels to determine which branches are on which
09   reels?
10      A.  I guess I don't understand the question.
11      Q.  Sure.  At -- I'm trying to get a better
12   sense of how these microfilm reels with pre1984
13   records are organized?
14      A.  The same way as the ones after '84.
15   They're by branch -- by year first.  So in 1976
16   would be their branch starting with the first
17   branch there is, 10000, the dates and the period.
18      Q.  Okay.  So if -- if you want to look for
19   the years 1972 to 1973, does that -- are you able
20   to narrow down which reels you need to look at to
21   get to the years 1972 and 1973?
22      A.  There aren't any reels for 1972 or 1973.
23      Q.  Okay.  When do they -- when do the
24   microfilm records begin?
25      A.  1976.
```

**Transcript of Niemaszyk, Debra**

01    Q.  All right.  So Safety-Kleen has microfilm
02  records between 1976 and 1984?
03    A.  Yes.
04    Q.  Does Safety-Kleen have records for the
05  time period of prior to 1976?
06    A.  No.
07    Q.  So do I understand that Safety-Kleen has
08  no records of service -- strike that.
09        Do I understand that Safety-Kleen does not
10  have any service records for the period of 1970 to
11  1976?
12    A.  That I'm aware of, not on microfilm.
13    Q.  When in 1976 did Safety-Kleen begin to
14  save records on the microfilm?
15    A.  I don't really look at those very much
16  because I can't really access them.  I believe it
17  was period 9.
18    Q.  Okay.  If you would look back to Exhibit B
19  to your declaration which is Exhibit 3 to the
20  deposition, for those records where you've written
21  can't find, why is it that you're unable to find
22  them?
23    A.  They weren't in the system, either on
24  microfilm or if it's later than the microfilm, I
25  couldn't find them in the imaging system either.

01    Q.   Okay.  So those records that have been

02  lost or misplaced?

03    A.   Or were never mailed in.

04    Q.   If they were never mailed in, how would

05  you have a service document for them?

06    A.   I don't know.

Q.   Has it been your experience in other cases
that you've been unable to find service records?

A.   Yes.

Q.   And how common is that?

A.   Depending on the branch, some branches
were really good about the way they sent in their
records and some weren't.  So it just -- it
depends.  Sometimes I find everything; sometimes I
don't.

Q.   Which branches stick out in your mind as
being not good about sending in rec -- service

18  records?

19    A.   Offhand, there was an east coast branch

20  that I had problems with.  And that doesn't always

21  mean that I didn't find the documents.  I would

22  have to search more for them, which I do.  When I

23  can't find something, I just keep searching.

24    Q.   Okay.  Which east coast branch?

25    A.   I believe it was 211808.  I think it was

**OBJECTION:**
**401, Relevancy:**
Ability to find
service records in
other, unrelated
cases/branches
not relevant to this
case or these
alleged branches.
**403, Prejudicial:**
Danger of
confusing the
issues/misleading
the jury into
___king irrelevant
.ranches/cases
are at issue;
**404, Character**
**evidence:** Prior
lawsuits
impermissible to
show character

NIEMASZYK,
DEBRA - VOL 1

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
Rhyne Trial Master

01    out of New York.

02        Q.  Is it New York City?

03        A.  I don't -- I don't remember where the

04    branch was.  I just remember that -- that stands

05    out in my mind as a branch number I would have

06    problems finding some of the documents.

07        Q.  Okay.  And you said if you didn't find it,

08    you would keep searching for it.  Where else would

09    you look?

10        A.  On the same reel.  On the microfilm reel

11    there are daily dates.  They're -- they would -- we

12    would microfilm these daily dates that would tell

13    what would -- what should have been in that batch,

14    what they should have sent in.  So if I can't find

15    something, according to this list, then I will just

16    keep going to the date before or the date after and

17    keep searching until I'm sure I can't find.

18    BY MR. WOOD:

19        Q.  All right.  And you say the microfilm

20    reels are -- these are the post1984 microfilm

21    reels?

22        A.  No, not for those.

23        Q.  Okay.

24        A.  Those I don't search for.

25        Q.  Okay.

**Transcript of Niemaszyk, Debra**

01      A.  Because I can't get a list.

02      Q.  All right.

03          MR. WOOD:  I need to object because I

04   think your question said post '84, and I think

05   you're --

06          THE WITNESS:  Oh, I'm sorry.

07          MR. WOOD:  I think you meant -- I think

08   you meant to ask pre '84.  I think there's some

09   confusion between the question and answer.

10   BY MR. DUPONT:

11      Q.  All right.  Why don't you -- let me see if

12   I can clarify that.  You can search the microfilm

13   reels from period 9, 1976 through 1984?

14      A.  No.

15      Q.  Okay.  You cannot?

16      A.  No, I cannot.  Period one of 1984 I can.

17      Q.  All right.  Okay.  Then Exhibit C to your

18   declaration, are those all of the service records

19   that you were able to find from the list that's set

20   forth in Exhibit B to your declaration and Exhibit

21   3 to your deposition?

22      A.  Yes.

23      Q.  Have you conducted any search for --

24   strike that.

25          In -- in your responsibilities since 1986

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
Rhyne Trial Master

01    of managing and retrieving microfilm and imaging

02    records, has that included records of purchase of

03    mineral spirits made by Safety-Kleen?

04        A.  Not that I'm aware of.

05        Q.  Is there a separate department that you're

06    aware of or department that you're aware of at all

07    at Safety-Kleen that would have a responsibility

08    maintaining records of purchases of mineral

09    spirits?

10        A.  No.

11            (Reporter interruption for clarification.)

12    BY MR. DUPONT:

13        Q.  -- records of purchase of mineral spirits?

14            MR. WOOD:  Objection.  Foundation.  Calls

15    for speculation.

16            (Reporter interruption for clarification.)

17            THE WITNESS:  No.

18    BY MR. DUPONT:

19        Q.  Okay.  That's not -- that hasn't been

20    within your job responsibilities.  So if -- if

21    there were records maintained of purchases of

22    mineral spirits by Safety-Kleen in a separate

23    department, you just wouldn't be aware of that?

24            THE WITNESS:  That's correct.

25    BY MR. DUPONT:

**Transcript of Niemaszyk, Debra**

```
01        Q.  Is that fair to say?
02            Do you have somewhere a list of the
03   locations that you looked for for records in this
04   case?
05        A.  It would have been from the letter from
06   the lawyer.
07        Q.  And do you still have that letter?
08        A.  I would have it on my computer.
09        Q.  Okay.  And is that something you have with
10   you here today?
11        A.  No.
12            MR. DUPONT:  All right.  Let's go off the
13   record.
14            MR. WOOD:  Okay.
15            THE VIDEOGRAPHER:  The time is 9:52 a.m.
16   We're going off the record.
17            (Break taken.)
18            THE VIDEOGRAPHER:  The time is 9:58 a.m.
19   We're back on the record.
20   BY MR. DUPONT:
21        Q.  All right.  Has Safety-Kleen or anyone on
22   behalf of Safety-Kleen ever actually retrieved
23   records from the microfilm reels from period 9 of
24   1976 through 1984?
25        A.  No.
```

**Transcript of Niemaszyk, Debra**

01     Q.  I take it people have looked through those

02     reels?

03     A.  I've looked through them.

04     Q.  On how many occasions?

05     A.  Just a couple times to see what the

06     documents look like that were that old.

07     Q.  And were those documents legible?

08     A.  For the most part.

09     Q.  Are the reels kept in sequential order?

10     In other words, do they -- do they go from the

11     earliest to the most recent?  How does that work?

12     A.  Yes.

13     Q.  Okay.  And how are the reels identified?

14     Are they reel one, reel two, reel three?

15     A.  We did start with reel one.

16     Q.  And does reel one correspond to a

17     particular year?

18     A.  Yes.

19     Q.  Which year?

20     A.  It would be the first year, 1976.

21     Q.  All right.  What other reels contain

22     records from 1976?

23     A.  Would be the next few reels in numerical

24     order until 1976 was over.

25     Q.  Okay.  Typically how many reels did a

**Transcript of Niemaszyk, Debra**

```
01    year -- a year's worth of service records consume?
02       A.  I don't remember.
03       Q.  Okay.  Was there a range that would be at
04    least two -- two reels per year, no more than five
05    reels per year?
06       A.  No, it would be much larger than that.
07    Maybe -- and I would be guessing.
08       Q.  What's your best estimate?
09       A.  My best estimate would be -- one year
10    might be 100 to 150 reels.
11       Q.  Okay.  How many images are on each reel?
12       A.  Approximately 3,500.
13       Q.  Is there a way to extract the records from
14    those reels and put them in to digital format?
15       A.  Not that I'm aware of.
16       Q.  Have you ever had any responsibility for
17    imaging, maintaining or retrieving records that are
18    records other than Safety-Kleen service records?
19       A.  No.
20       Q.  And have you ever provided a declaration
21    or testified as a custodian of records for records
22    other than Safety-Kleen service records?
23       A.  No.
24       Q.  Who at Safety-Kleen or what department at
25    Safety-Kleen was responsible for maintaining and
```

**Transcript of Niemaszyk, Debra**

01      retrieving records that relate to internal

02      correspondence concerning Safety-Kleen products,

03      other Safety-Kleen business records?

04           MR. WOOD:   Objection.   Lacks foundation

05      and calls for speculation.

06           THE WITNESS:   I don't know.

07      BY MR. DUPONT:

08        Q.   Okay.   But if I wanted to talk to somebody

09      about what search was conducted for, say, records

10      of internal correspondence at Safety-Kleen

11      concerning health hazards of parts washer solvents,

12      you would not be individual -- the individual I

13      should speak with?

14        A.   No.

15        Q.   That's correct?

16        A.   That's correct.

17        Q.   So if I wanted to learn about

18      Safety-Kleen's record retention policies, record

19      maintaining and record retrieval for documents

20      other than service records, I would need to speak

21      with somebody else with Safety-Kleen?

22        A.   Yes.

23           (Plaintiffs' Exhibit 4 marked

24           for identification.)

25      BY MR. DUPONT:

**Transcript of Niemaszyk, Debra**

```
01      Q.  Okay.  I'm going to go ahead and mark as
02  Exhibit 4 to the deposition of what's been
03  identified as Exhibit C to your declaration.  And
04  those are the actual service records that
05  correspond to the service document numbers that you
06  were able to find on the Safety-Kleen Systems,
07  Inc., legal scan document list that's Exhibit 3 to
08  your deposition?
09      A.  Yes.
10      Q.  Okay.
11          MR. WOOD:  She's got a copy there.
12  BY MR. DUPONT:
13      Q.  All right.  Okay.  So I want to talk to
14  you about some of these records within Exhibit C
15  and some are Bates numbered but the majority are
16  not.  So I'll try and work with you on the ones
17  that are Bates numbered to make it a little easier
18  to go through.  Referring to the Bates numbers, can
19  you explain for me what each particular type of
20  document is, just so I can understand whether it
21  falls into the category for preprint form, a
22  placement form, or a manual form?
23      A.  The first document is a preprint.
24      Q.  And is there anything on the document that
25  identifies it to be a preprint so that I can say
```

**Transcript of Niemaszyk, Debra**

01  okay, whenever I see that information on a

02  particular document I know it's a preprint?

03      A.  It's the upper right-hand corner,

04  there's -- it should be a six digit number.  It

05  starts with 105.

06      Q.  Okay.

07      A.  On my copy there's something covering --

08      Q.  There's a -- there's a E service --

09      A.  Yes.

10      Q.  -- record on there so that blocks out part

11  of that number.  So maybe we can find another one

12  that doesn't have that -- that stamp on it?

13      A.  Okay.  Well, the second document is a P

14  document, placement document.

15      Q.  Okay.  And that's Bates number SKS JOH 2,

16  correct?

17      A.  Oh, yes.

18      Q.  Okay.  So this is a placement document?

19      A.  That's correct.

20      Q.  And if I want to look at another document

21  and I don't have the good fortune of having you

22  here with me to be able to guide me through the

23  documents, what would I look at on this document to

24  know that it's a placement?

25      A.  The upper right-hand corner will say P,

**Transcript of Niemaszyk, Debra**

01    and then a number after that -- a series of

02    numbers.

03        Q.   So on this particular page, we have

04    P94484?

05        A.   That's correct.

06        Q.   And is that 94484 number to distinguish

07    and identify this particular page as opposed to

08    some other placement form?

09        A.   Yes.

10        Q.   The next page is Bates numbered SKS JOH 3.

11    Is this a preplacement form?

12        A.   This is a preprint.

13        Q.   Preprint.  Okay.

14        A.   And the upper right-hand corner there's a

15    six-digit number that tells that it's a preprint.

16        Q.   And the six-digit number starts with 370

17    then 516?

18        A.   Correct.

19        Q.   What's the significance of that number?

20        A.   I don't know how they -- the numbers were

21    generated.  It's just, for me, I know that that's a

22    preprint because it doesn't have a P or an M before

23    it.

24        Q.   Okay.  So any -- any document that has an

25    identifying number that does not begin with a P or

**Transcript of Niemaszyk, Debra**

01    an M is a preprint?

02        A.  Yes.

03        Q.  So next if you could identify for me an

04    example of a manual form?

05        A.  I find one at 20.

06        Q.  Okay.  So I have Bates number 20 from

07    Exhibit C to your declaration, Exhibit 4 to the

08    deposition in front of me.  And then in the top

09    right-hand column -- excuse me, the top right-hand

10    corner of the page there's an M 20146?

11        A.  Correct.

12        Q.  And the fact that it starts with the

13    letter M tells us that this is a manual form?

14        A.  That's correct.

15        Q.  Now, we turn to the next page, Bates

16    number 21.  This is an example of a preprint form?

17        A.  Yes.

18        Q.  And are you familiar with the information

19    that's inputted into the preprint form other than

20    the reference number?

21        A.  No.

22        Q.  So in terms of what the product is that

23    this -- or the services that this preprint form

24    relates to, that sort of thing, you're not going to

25    have any information about that?

**Transcript of Niemaszyk, Debra**

01    A.  No.

02    Q.  Customer PO number.  Does that have any

03  relationship to the customer numbers that appear on

04  your legal scanned document list and your legal

05  scanned customer search that are marked as

06  Exhibit 3 and 2 to your deposition?

07    A.  No, they do not.

08    Q.  Does the branch number appear on the

09  preprint form?

10    A.  Yes.

11    Q.  Where does the branch number appear?

12    A.  Left hand -- upper left-hand corner,

13  7185012289, 718501 is the branch number.

14    Q.  Okay.

15    A.  And 2289 is the account number.

16    Q.  All right.  Then at the bottom of the form

17  there's a category for designated facility name and

18  address, and it says "Safety-Kleen Corp., 5050

19  Salida Boulevard in Salida, California.  Is that

20  the branch name that corresponds to the 718501

21  number?

22    A.  I would believe so.

23    Q.  Okay.  Was that the procedure for

24  Safety-Kleen to input the name of the branch under

25  designated facility name and address that

Transcript of Niemaszyk, Debra

01  corresponds to the branch number?

02      A.  I don't have personal knowledge of that.

03  That's what it looks like to me.

04      Q.  Has that been your experience in going

05  through these types of records?

06      A.  I --

07          MR. WOOD:  Objection.  Lacks foundation.

08  Calls for speculation.

09          THE WITNESS:  I don't really look at that

10  when I'm pulling documents.

11  BY MR. DUPONT:

12      Q.  Okay.  Is there anything on this document

13  that identifies the recycle center that service

14  this particular customer?

15      A.  I wouldn't have knowledge of that either.

16      Q.  Okay.  Okay.  So talking about the time

17  period from 1984 to the present, would you agree

18  with me that if Safety-Kleen does not have a

19  service record for a particular business or

20  location that doesn't exclude the fact that

21  Safety-Kleen provided a service to that business

22  and location?

23          MR. WOOD:  Objection.  Assumes facts.

24  Lacks foundation.  Calls for speculation.

25          THE WITNESS:  I -- I don't understand the

**Transcript of Niemaszyk, Debra**

```
01   question.
02   BY MR. DUPONT:
03      Q.  Sure.  We've seen some examples on Exhibit
04   3 to your deposition that there are records that
05   you were unable to find; okay?  Is that correct?
06      A.  That's correct.
07      Q.  Since you were unable to find records for
08   particular service documents, would you agree with
09   me that Safety-Kleen's service document records
10   aren't complete?
11         MR. WOOD:  Objection.  Vague.  Overbroad.
12   Assumes facts.
13         MS. KAHN:  Join.
14         THE WITNESS:  I don't know why they're not
15   there.  I wouldn't know why it's on a list but it's
16   not there.
17   BY MR. DUPONT:
18      Q.  Okay.
19      A.  There may be a reason I'm not aware of.
20      Q.  You've exhausted every search that can be
21   made for the service record?
22      A.  Yes.
23      Q.  And you've satisfied yourself that that
24   service record can't be found?
25      A.  Yes.
```

**Transcript of Niemaszyk, Debra**

01     Q.  Okay.  So since those service records

02     can't be found, would you agree with me that

03     Safety-Kleen's records of customer service records

04     for the period of 1984 to the present are not

05     complete?

06         MR. WOOD:  Objection.  Assumes facts.

07     Lacks foundation.  Calls for speculation.

08         THE WITNESS:  And I don't want to

09     speculate on that.  I don't know why they wouldn't

10     be there.

11     BY MR. DUPONT:

12     Q.  Okay.  Well, I'm not asking you to make a

13     determination as to why they're not there, but you

14     would agree that they're not there, right?

15     A.  I would agree that they're not there.

16     Q.  And you would agree that if certain

17     service records are not within Safety-Kleen's

18     business records, then Safety-Kleen's business

19     records are not complete?

20         MR. WOOD:  Objection.  Assumes facts.

21     Calls for speculation.

22         MS. KAHN:  Join.

23         THE WITNESS:  I'm -- I'm not comfortable

24     giving an answer to that.

25     BY MR. DUPONT:

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
## Rhyne Trial Master

Page 52

```
01      Q.  All right.  If Safety-Kleen does not have
02  all of the service records, how can its service
03  records be complete?
04          MR. WOOD:  Objection.  Assumes facts.
05  Calls for speculation.  Argumentative.
06          MS. KAHN:  Join.  Also asked and answered.
07          THE WITNESS:  I just -- I don't know what
08  to say to that.  I'm not going to answer that.
09  BY MR. DUPONT:
10      Q.  Okay.
11          MR. DUPONT:  All right.  Off the record.
12  Just a couple minutes.
13          THE VIDEOGRAPHER:  The time is 10:14 a.m.
14  We're going off the record.
15          (Discussion held off the record.)
16          THE VIDEOGRAPHER:  The time is 10:20 a.m.
17  We're back on the record.
18  BY MR. DUPONT:
19      Q.  Is there any correlation between the
20  account number that exists on a preprint form and
21  the customer number?
22      A.  Say that again, please.
23      Q.  Sure.  Is there any correlation between
24  the account number on a preprint form and a
25  customer number?  For example, we were looking at
```

**Transcript of Niemaszyk, Debra**

01   Bates number 21 and in the top left-hand corner --
02   I'll wait till you get to that page, and I'll ask
03   the question.  Thank you.
04       A.  I'm here now.
05       Q.  Okay.  We're looking at Bates number 21
06   from Exhibit 4 to your deposition and Exhibit C to
07   your declaration, and in the top left-hand corner
08   you identified that there was a branch number
09   718501 followed by an account number, 2289.
10       A.  That's correct.
11       Q.  And that account number identifies the
12   customer in this case Barbarian European Motors?
13       A.  Yes.
14       Q.  Okay.  Is there a -- is the account number
15   here synonymous to the customer number?
16       A.  Yes.
17       Q.  Okay.  And is there any way for me to tell
18   when an account number with the branch number on a
19   preprint form is a new customer number versus an
20   old customer number?
21       A.  You would see in the upper left-hand
22   corner, you will see a new customer number instead
23   of the old customer number.
24       Q.  So on -- preprinted onto the actual form
25   itself?

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra

Rhyne Trial Master

01     A.  Eventually became new customer numbers.

02     Q.  Okay.

03     A.  And sometimes they would have both numbers

04  down.

05     Q.  Are there any lists that have been

06  compiled that tell us not only what the customer

07  number is, the service date and the service

08  document number is, but also tell us what product

09  the service record or what service the service

10  record corresponds to?

11     A.  Not that I have access to.

12     Q.  Are you aware of that being done by

13  Safety-Kleen or on behalf of Safety-Kleen?

14     A.  No, I'm not.

15     Q.  What is the name of the database of

16  documents that the imaged service records appear

17  on?

18     A.  It was called IXOS, it's an SAP based

19  system.

20     Q.  You said it was called IXOS.  Is there a

21  separate system now?

22     A.  They're in the process of moving it to a

23  new system.

24     Q.  Okay.  Are there records that are

25  nonservice records that are kept on that database?

**Transcript of Niemaszyk, Debra**

01     A.  Not that I know of.

02     Q.  Are you familiar with what other databases

03 Safety-Kleen has for storage of its historic

04 business records?

05     A.  No.

06     Q.  Have you searched for service records for

07 all of the places of employment of David Johnson or

08 only certain places of employment?

09     A.  I would have searched according to what

10 was requested from the attorney.

11     Q.  And is it your understanding that you were

12 asked to search for all places of employment or

13 only certain places of employment?

14     A.  My understanding is that would be all of

15 them.

16     Q.  And sitting here today, you can't remember

17 the names of the locations you were asked to search

18 for other than what's listed on Exhibit 2 to your

19 deposition?

20     A.  That's correct.

21     MR. DUPONT:  Okay.  Those are all the

22 questions I have.

23     MS. KAHN:  I have no questions.

24     THE VIDEOGRAPHER:  Anyone on the phone

25 have questions?

**Transcript of Niemaszyk, Debra**

# Niemaszyk, Debra
### Rhyne Trial Master

01          This is the end of Video Number 1 in the

02     conclusion of today's proceeding.  The time is

03     10:25 a.m.  We're going off the record.

04          MR. WOOD:  I was going to state my

05     reservation of no questions, but you beat me to it.

06          THE VIDEOGRAPHER:  You can still do it on

07     her record.

08          MR. WOOD:  If no one has any further

09     questions, we'll reserve our questions until trial.

10          THE REPORTER:  And does anybody need a

11     copy of the transcript?  On the phone?

12          And in the room, does anybody need a copy

13     of this transcript?

14          MR. WOOD:  I do.

15          MR. DUPONT:  I do.

16          THE REPORTER:  And Ms. Kahn, you don't

17     need it?

18          MS. KAHN:  Um, yes.  I would like a copy.

19          THE REPORTER:  Okay.  And before we go off

20     the record if there's anyone on the phone that

21     needs a copy of the transcript, let me know.

22          MR. CHON:  Richard Chon.  I'd like a copy

23     of the transcript.

24          THE REPORTER:  Thank you.  Anybody else?

25

**Transcript of Niemaszyk, Debra**

```
01          (Whereupon, the deposition was concluded
02          at 10:26 a.m.)
03
04
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Transcript of Niemaszyk, Debra**

```
01                    SIGNATURE OF DEPONENT
02            I, the undersigned, DEBRA NIEMASZYK, do hereby
03      certify that I have read the foregoing deposition and
04      find it to be a true and accurate transcription of my
05      testimony, with the following corrections, if any:
06
07      PAGE    LINE                        CHANGE
08      _____   _____   _____
09      _____   _____   _____
10      _____   _____   _____
11      _____   _____   _____
12      _____   _____   _____
13      _____   _____   _____
14      _____   _____   _____
15      _____   _____   _____
16      _____   _____   _____
17      _____   _____   _____
18      _____   _____   _____
19      _____   _____   _____
20      _____   _____   _____
21      _____   _____   _____
22              _____
23              DEBRA NIEMASZYK                          DATE
24
25
26
```

Transcript of Niemaszyk, Debra

# Niemaszyk, Debra
## Rhyne Trial Master

```
01                    REPORTER'S CERTIFICATE

02

03

04           I, KIMBERLY R. HENDERSHOTT, a Shorthand

05   Reporter, State of California, do hereby certify:

06           That DEBRA NIEMASZYK, in the foregoing

07   deposition named, was present and by me sworn as a

08   witness in the above-entitled action at the time and

09   place therein specified;

10           That said deposition was taken before me at

11   said time and place, and was taken down in shorthand by

12   me, a Certified Shorthand Reporter of the State of

13   California, and was thereafter transcribed into

14   typewriting, and that the foregoing transcript

15   constitutes a full, true and correct report of said

16   deposition and of the proceedings that took place;

17           IN WITNESS WHEREOF, I have hereunder

18   subscribed my hand this 12th day of February, 2014.

19

20

21           KIMBERLY R. HENDERSHOTT, RPR, CSR NO. 12552

22           State of California

23

24

25

26
```

**Transcript of Niemaszyk, Debra**

Page 60

**Transcript of Niemaszyk, Debra**

## SIGNATURE OF DEPONENT

I, the undersigned, DEBRA NIEMASZYK, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

| PAGE | LINE | CHANGE |
|------|------|--------|
| 6 | 9 | Deborain to Debra |
| 7 | 25 | Deborah to Debra |
| 10 | 13 | microphone to microfilm |
| 11 | 6 | microphone to microfilm |
| 12 | 9 | microphone to microfilm |
| 14 | 15 | microphone to microfilm |
| 25 | 25 | microphone to microfilm |
| 30 | 7 | personal to partial |

_Debra Niemaszyk_                              33·14
DEBRA NIEMASZYK                                DATE

OFFICIAL SEAL
BRUCE A CORSARO
Notary Public - State of Illinois
My Commission Expires Jul 15, 2016

BAC          3/3/14

Aiken Welch Court Reporters    D. Niemaszyk    01/29/2014
Case 3:18-cv-00197-RJC-DSC    Document 409-2    Filed 09/15/20    Page 262 of 340
Case 3:18-cv-00197-RJC-DSC    Document 342-2    Filed 09/02/20    Page 64 of 64

# Exhibit 3

James Wells Vol II
11-6-2008

Page 96

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ROBERT B. OAKLEY and IRENE )
OAKLEY )
)
vs. )Civil Action File No. 2:07-CV-351
)
AIR PRODUCTS AND CHEMICALS, )
INC., ET AL )

ORAL VIDEOTAPED DEPOSITION
CORPORATE REPRESENTATIVE OF RADIATOR SPECIALTY COMPANY
November 6, 2008
Volume 2

ORAL VIDEOTAPED DEPOSITION OF CORPORATE REPRESENTATIVE OF
RADIATOR SPECIALTY COMPANY, produced as a witness at the
instance of the Plaintiffs and duly sworn, was taken in the
above-styled and numbered cause on November 6, 2008, from
1:35 p.m. to 6:51 p.m., before IRENE VALDES, Certified
Shorthand Reporter in and for the State of Texas, reported by
computerized stenotype machine at the offices of Coats, Rose,
Yale, Ryman & Lee, 3 Greenway Plaza, Suite 2000, Houston,
Texas, pursuant to the Texas Rules of Civil Procedure and the
provisions stated on the record or attached hereto.

Plaintiffs designations are in yellow

US Steel's designations are in green

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 98

1                    INDEX
2   CORPORATE REPRESENTATIVE OF RADIATOR SPECIALTY COMPANY
3                                            PAGE
4   Examination by Mr. Sykes ...................264
    Examination by Mr. Riley ...................270
5   Further Examination by Mr. Lubel ...........279
    Further Examination by Mr. Riley ...........289
6   Signature Page ..............................290
    Court Reporter's Certificate ................292
7
8                  EXHIBITS
9
10  EXHIBIT      DESCRIPTION           PAGE
11  3    File                    108
12  4    Consumer Product Safety Commission -
         Federal Hazardous Substances Act
13       Regulations
14  5    Mariner's info          173
15  6    Photograph              174
16  7    Radiator Specialty Co. testing
         laboratory report
17
18  8    May 29, 1969 Foster D. Snell report    188
19  9    Drawing                 205
20  10   Appendix No. 2          220
21  11   Detail specifications threaded
         fastener conditioning - 7/12/50
22  12   Photograph              240
23  13   US Steel laboratory report     264
24  14   Sale of coal chemicals    265
25

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 97

1                 APPEARANCES
2
3   FOR PLAINTIFFS:
4      Mr. Lance H. Lubel
       Mr. Hector G. Longoria
5      HEARD, ROBINS, CLOUD & LUBEL, L.L.P.
       3800 Buffalo Speedway, 5th Floor
6      Houston, Texas 77098
       Telephone: 713-650-1200
7      Fax:  713-650-1400
          E-mail: llubel@heardrobins.com
8
9   FOR DEFENDANT RADIATOR SPECIALTY COMPANY:
10     Mr. James M. Riley
       MS. STACY K. YATES
10     COATS, ROSE, YALE, RYMAN & LEE
11     3 Greenway Plaza, Suite 2000
       Houston, Texas 77046
12     Telephone: 713-651-0111
          E-mail: jriley@coatsrose.com
13
14  FOR US STEEL:
15     Mr. Phillip S. Sykes
       FORMAN, PERRY, WATKINS, KRUTZ & TARDY, LLP
16     City Centre
       200 South Lamar Street, Suite 100
16     Jackson, Ms. 39201
17     Telephone: 601-960-8600
       Fax:  601-960-8613
18        E-mail: psykes@fpwk.com
19  ALSO PRESENT:
20     Mr. Brian Bobbitt - Videographer
21
22
23
24
25

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 99

1              EXHIBITS (cont.)
2   EXHIBIT         DESCRIPTION          PAGE
3   15   Federal Register            269
4   16   Foster D. Snell testing documents   270
5   17   Foster D. Snell reports - Oct. 15, 1954  272
6   18   Product list                274
7   19   Photograph                  276
8   20   Layout drawing              281
9   21   Layout drawing              286
10  22   Layout drawing              287
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 100

1      (Volume 2 started with new court reporter.)
2      THE VIDEOGRAPHER: The time is 1:35 p.m. We
3  are back on the record. This is the beginning of tape 3.
4      MR. LUBEL: Hey, Jim, I have -- I've executed
5  of your protective order agreement except I made two minor
6  changes on page 4 I want you to see, but I'm not going to be
7  at the hearing tomorrow and I understand you're going to
8  tender an agreed protective order to the court.
9      MR. RILEY: Let me see your changes.
10      MR. LUBEL: Yeah. I mean an agreed one. I'm
11  going to need to see whatever the confidential documents are.
12  So having somebody come back and tell me what it says isn't
13  good enough.
14      MR. RILEY: Okay. Basically I'll tell the
15  court and Robert can tell the court that you want to a copy;
16  and if the judge says you can have a copy, you can have a
17  copy.
18      MR. LUBEL: Okay.
19      MR. RILEY: But, you know, it's a closely held
20  corporation; so I want it back.
21      MR. LUBEL: I think the protective order allows
22  for you to get it back at the conclusion of the case.
23      MR. RILEY: It does. It's sealed. I haven't
24  even looked at it. It's still in the original seal. But I
25  will represent to the Court that you have asked for a copy not

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 101

1  just to be seen.
2      MR. LUBEL: That's correct. And secondly I
3  think we've already established we've got an agreement between
4  you, me and Sykes and that is that we can use the Cowey
5  depositions of Mr. Wells, the corporate rep in that case. I
6  think that will shortcut what I'm going to do today.
7      MR. SYKES: I want to be clear, Lance, also
8  that in our pretrial disclosures, I forget exactly the form of
9  the pleading, but we designated passages from Cowey and DeOrio
10  of Mr. Wells.
11      MR. LUBEL: I've not seen -- I'm not sure that
12  I've seen DeOrio.
13      MR. SYKES: That's the one where Al Stewart
14  couldn't pronounce his --
15      MR. RILEY: No, it wasn't Al Stewart. It was
16  Michael Stewart.
17      MR. SYKES: Michael Stewart. Sorry.
18      MR. LUBEL: Okay. I think we've seen that one.
19  I'm not --
20      MR. SYKES: I just want to be clear since we're
21  on the record we had done that.
22      MR. LUBEL: No, no, no, I think that's good
23  because what I don't -- I don't want to agree at this point
24  that we're going to use depositions outside of ones I've been
25  at, okay? So that was a different law firm and a different

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 102

1  plaintiff.
2      MR. SYKES: Well, we'll take it up at the right
3  time.
4      MR. LUBEL: Yeah, we can take that up, but for
5  now we've got an agreement we can use -- all of us can use
6  Cowey subject to the specific objections made in the
7  deposition, that they're not waived, right?
8      MR. SYKES: Correct.
9      MR. LUBEL: Isn't that the treatment we have?
10      MR. SYKES: That's the agreement.
11      MR. RILEY: Yeah. I think we have one
12  exception to that and that's Blightschmidt? I think
13  Blightschmidt?
14      MR. SYKES: Yeah, we never talked about
15  Blightschmidt or however you say his name.
16      MR. LUBEL: I'm just talking about Wells right
17  now.
18      MR. SYKES: Correct.
19      MR. LUBEL: I know we have an agreement on
20  other people. I can't remember if Blightschmidt was raised in
21  our agreement or not.
22      MR. SYKES: We just talked about Blightschmidt
23  and Sinus and Wells that day on that Friday afternoon.
24      MR. RILEY: The party depositions. The party
25  depositions. In other words, you asked if --

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 103

1      MR. LUBEL: Corporate reps?
2      MR. SYKES: Yes.
3      MR. RILEY: You asked if Jim Wells could be
4  used, his video deposition and transcript and Cowey. And I
5  agreed to that. And you also asked me about Alan Blumenthals'
6  deposition that it could be used as if taken in this case
7  subject to all objections as is Jim's deposition subject to
8  objections.
9      MR. LUBEL: That were lodged in the deposition?
10      MR. RILEY: Well, substantively you wouldn't
11  have lodged any in the deposition.
12      MR. LUBEL: Whatever depositions -- whatever
13  objections you were required to lodge at that time?
14      MR. RILEY: Sure, responsiveness and form.
15      MR. LUBEL: Right. I think we had an agreement
16  on Masitis and Grossman too; is that right?
17      MR. SYKES: Graver.
18      MR. LUBEL: And Graver. And so Blightschmidt
19  was the one that you don't think that we specifically talked
20  about?
21      MR. SYKES: Correct.
22      MR. LUBEL: We'll address that at another time.
23      MR. RILEY: I wasn't even involved in that one;
24  so --
25      MR. LUBEL: It was in the Cowey case, wasn't

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 104

1   it? That's my recollection of when --
2   MR. SYKES: Yeah.
3   MR. RILEY: It was, but I wasn't involved in
4   the discussion about what happened.
5   MR. LUBEL: About Blightschmidt?
6   MR. RILEY: Yeah. So I can't tell you what was
7   talked about.
8   MR. LUBEL: What agreement?
9   MR. RILEY: Whatever.
10  MR. LUBEL: Gotcha.
11  Q. (BY MR. LUBEL) Okay. Lets go back, Mr. Wells, and
12  let's get back to the document search that you conducted.
13  Remember before we took a break we were talking about that
14  topic?
15  A. Yes.
16  Q. You were giving us -- you had given us a description
17  of these file cabinets in the caged area. You remember
18  generally talking about that?
19  A. Yes.
20  Q. And I wrote down that that took place in building 2?
21  A. Yes.
22  Q. And that there was a file cabinet or cabinets that
23  had a label on the outside -- these are these metal file
24  cabinets, right?
25  A. Yes.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 105

1   Q. That said products?
2   A. Yes.
3   Q. And so you went to that file cabinet, right?
4   A. Yes.
5   Q. But there was other file cabinets that had other
6   labels --
7   A. Yes.
8   Q. -- correct? Do you recall generally what the other
9   labels were on those other file cabinets?
10  A. I believe I gave to you some that I could remember
11  earlier. It was some of our competitors, suppliers, patents,
12  could have been lawsuits. I'm not sure about that.
13  Q. Testing? Was testing one of them?
14  A. Testing?
15  Q. Testing on developmental products or something like
16  that I wrote down. Does that sound right?
17  A. Oh, it could have been yeah, developmental products.
18  I'm sure that's not all of them. That's just what comes to
19  mind.
20  Q. Okay. Did you pull any of those files for this
21  lawsuit?
22  A. No.
23  Q. Did you look at those when you did this inspection?
24  A. I opened the drawers hoping to find something out of
25  place like that Liquid Wrench I was looking for, but I did not

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 106

1   pull them.
2   Q. Okay. Do you remember who the -- your competitors
3   were for Liquid Wrench?
4   A. Yeah, WD40 for one. And there were others, but I
5   just haven't associated with those companies in ten years;
6   so --
7   Q. Did you look at the file on competitors to kind
8   of --
9   A. No, I did not.
10  Q. -- remind yourself? The supplier info, did you pull
11  that file?
12  A. I did not.
13  Q. For Liquid Wrench I mean?
14  A. I did not.
15  Q. The patents, do you know if there's a patent on
16  Liquid Wrench?
17  A. There is a patent on Liquid Wrench No. 2.
18  MR. RILEY: For the record, Lance, you have
19  that. That was produced about a month ago.
20  Q. (BY MR. LUBEL) That was around 1986 or so?
21  A. Could have been. I've forgotten.
22  MR. RILEY: It was in the '90s.
23  Q. (BY MR. LUBEL) It was in the '90s?
24  A. '90s? Okay. That sounds better.
25  Q. Was there is not a patent on any of the previous

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 107

1   versions of Liquid Wrench?
2   A. Not to my knowledge.
3   Q. Have you looked for it specifically?
4   A. No.
5   MR. RILEY: Lance, let me interrupt you. Jim
6   was talking about L108 and in building 2 and frankly it
7   appears he was mistaken. That file wasn't in building 2, but
8   my client did locate some L108 and L132, L-16 material. And
9   let me see how many pages it is.
10  THE WITNESS: I do get to see that before he
11  does?
12  MR. RILEY: You can both see it at the same
13  time.
14  MR. LUBEL: You can show it to him first. What
15  do you think this represents, Jim? You think this is the L108
16  file? Jim Riley.
17  A. This -- okay. I'll shut up then.
18  Q. (BY MR. LUBEL) Let's see what Mr. Riley thinks it is
19  first, then I'm going to ask you.
20  MR. RILEY: I think it's records on L132, L108,
21  L116 and this is produced in response to a description of what
22  Jim gave in the deposition that my client looked for. They
23  did not find it where Jim thought he had seen it, but they
24  found it in a different building. So this is what I've got to
25  tender. How many pages? Again I lost my count. One, two --

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 108

1    MR. LUBEL: Jim, would you like to put Exhibit
2  sticker 3 on there so that we're clear?
3    MR. RILEY: Sure.
4    MR. SYKES: Is that the L108 file?
5    MR. LUBEL: It sounds like it's broader than
6  that.
7    MR. RILEY: Yeah, it does sound like it's
8  broader. Twelve pages, Exhibit 3. I'll tender to Mr. Wells
9  to take a look at it. It does not appear that there's
10  anything from the '70s, but that's up to you guys to take a
11  look at. Maybe Jim will be able to tell you something about
12  it.
13    (Exhibit No. 3 marked)
14    MR. LUBEL: While we're doing this, Phil, what
15  is y'all's problem with -- or I guess injection with using the
16  Blightschmidt deposition? He was -- as I recall it, he was
17  both a fact witness and an expert that U.S. Steel retained.
18    MR. SYKES: I haven't looked at the deposition,
19  but -- so I couldn't answer you; but we don't intend to use
20  him in this case, call him in this case.
21    MR. LUBEL: Do y'all have control over him, do
22  you know?
23    MR. SYKES: I have no idea.
24    MR. RILEY: Have we marked the date of first
25  sale book?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 109

1    MR. LUBEL: Not yet.
2    MR. RILEY: Okay. Well, that's been tendered
3  today also. I really don't think -- I think the portions we
4  tendered to you were the relevant portions before, but I knew
5  that you want to look at the whole thing; so I brought it in.
6    MR. LUBEL: Stacey, are you able to get the
7  production records while we're doing the depo specifically for
8  the 1978 time period? Is that something you can get faxed
9  over do you think?
10    MS. YATES: Which production records? I'm not
11  sure.
12    MR. LUBEL: Liquid Wrench.
13    MR. RILEY: Liquid Wrench production records
14  from '72 to '78 is another thing that Lance had requested, but
15  I got the impression that they were big volumes.
16    MR. LUBEL: Well, if we can just do '78 for
17  starters --
18    MS. YATES: I can see.
19    MR. LUBEL: -- so we can clear up when the last
20  production for Liquid Wrench was.
21    MS. YATES: Where were they located? They were
22  in the notebook?
23    MR. RILEY: Were they in building 2?
24    MR. LUBEL: Yeah. On the top of the file
25  cabinet there were these 3 ring binders I think.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 110

1    MR. RILEY: Well, Lance, you already know from
2  the sale records of raffinate that the last shipment would
3  have been at the latest early January; so there couldn't have
4  been anymore.
5    MR. LUBEL: January what?
6    MR. SYKES: Here. I've got them. We can mark
7  them.
8    MR. RILEY: '78. 1978. Jim resigned the
9  raffinate formula in March of 1978 and there are no more
10  shipments of raffinate after January of '78 so you already
11  know -- I mean, the production records aren't going to show
12  you anything that you don't already know.
13    MR. LUBEL: Well, I'm trying to figure out when
14  you sold of your last -- it could relate to when you sold your
15  last Liquid Wrench containing raffinate.
16    MR. RILEY: Sometime in '78 when they stopped
17  making it.
18    MR. LUBEL: I assume that's true, but I just
19  want to see what the records show.
20    MR. RILEY: I have no objection to it. I'm
21  just letting you know that the last raffinate shipment was
22  January 1978; so I don't think --
23    A. There is document already produced that I wrote that
24  says exactly when the runout dates were going to be. It's not
25  here.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 111

1    MR. RILEY: Can we find it, Jim?
2    A. We produced it earlier. It's not in this bunch.
3    MR. RILEY: It's in the original regular file
4  production.
5    MR. LUBEL: Okay.
6    MR. RILEY: Let me go get it.
7    MR. LUBEL: Well, I've got it. Here's the
8  problem, Jim. I just -- he's given an affidavit where he says
9  July. There's a document where he likes to say it's April or
10  March. I want to see what the production records say so we
11  can get a better handle on that time period.
12    MR. RILEY: The reality of it is --
13    A. There is an email that I wrote that specifically
14  addresses that and it's been produced.
15    MR. RILEY: I think the reality of it is when
16  he said July, he didn't want to be accused of, you know, of
17  shortening it just in case he added some months on to it just
18  in case something was sold after that. But, you know, I'll
19  get the production materials and him them look at it if that's
20  what you'd like.
21    MR. LUBEL: Do you have this email he's
22  referring to?
23    MR. RILEY: This is research and development.
24    MR. SYKES: Look on the next page.
25    MR. RILEY: Yeah, here it is. It's RSC00011,

Stratos Legal Services, LP
713-481-2180

## James Wells Vol II
## 11-6-2008

Page 112

1  March 30, 1978. "It is expected that our supply of
2  benzene-containing raffinate will be exhausted by the end of
3  April, 1978. When a closer date can be pinpointed, an
4  additional memo will be issued covering an addition to the
5  cutoff date."
6  　　　MR. LUBEL: Right. Have we seen that
7  additional memo?
8  　　　MR. RILEY: I don't think there is one.
9  　A. There was never one.
10 　　　MR. LUBEL: Okay. Let's get started. Are we
11 ready?
12 　　　THE WITNESS: Yeah.
13 　　　MR. RILEY: So if the supply of raffinate was
14 exhausted by the end of April, 1978, him saying July was
15 giving himself extra room just in case it was sold.
16 　　　MR. SYKES: May I ask a question? Have we been
17 on the record this whole time, ma'am?
18 　　　COURT REPORTER: Yes.
19 　　　MR. RILEY: Yes.
20 　　　MR. SYKES: Do you want the raffinate sales
21 records marked as an Exhibit, Lance.
22 　　　MR. LUBEL: I've got them started in 1968.
23 I've got those. Thanks.
24 　　　MR. RILEY: Lance, do you still want the
25 production records?

　　　Stratos Legal Services, LP
　　　　　　713-481-2180

## James Wells Vol II
## 11-6-2008

Page 114

1  manager or somebody in sales.
2  　Q. Who was that?
3  　A. Well, that was a moving target. There was more than
4  one sales manager.
5  　Q. Who do you remember being that person in '72 when
6  you started?
7  　A. I believe that guy's name was Green. I've forgotten
8  his first name but --
9  　Q. Where did he office?
10 　A. Where was his office?
11 　Q. Right.
12 　A. In Charlotte.
13 　Q. In the headquarters or in a production building?
14 　A. Headquarters.
15 　Q. In the headquarters.
16 　　　MR. RILEY: Lance, just to clarify, I know
17 you're not asking about this document, but from my review of
18 the data for the sale book, there are customers listed in
19 there.
20 　　　MR. LUBEL: There are some.
21 　　　MR. RILEY: Okay.
22 　　　MR. LUBEL: But I'm looking to the specific
23 sales records to each customer and appreciate you bringing
24 that up.
25 　Q. (BY MR. LUBEL) Where did Mr. Green keep the sale

　　　Stratos Legal Services, LP
　　　　　　713-481-2180

## James Wells Vol II
## 11-6-2008

Page 113

1  　　　MR. LUBEL: Yeah, oh, yeah.
2  　　　MR. RILEY: Okay. We'll do what we can to get
3  them.
4  　　　MR. LUBEL: Great.
5  　　　MR. RILEY: Hopefully today. If not, get to
6  you as quick as possible.
7  　Q. (BY MR. LUBEL) In these file cabinets that we were
8  talking about before we took another break, remember that?
9  You gave us a list of competitors' files and supplier info and
10 patents and testing and possibly lawsuits? Do you remember
11 that discussion?
12 　A. Yes.
13 　Q. Do you recall there being individual file folders
14 for each of those areas, topics?
15 　A. Yes.
16 　Q. Within the file cabinets, correct?
17 　A. Yes.
18 　Q. Now, where if -- in these file cabinets were the
19 sales records, like who your customers were?
20 　A. I don't think there would be any records of that
21 nature in any of those files. I don't recall any of that --
22 in any of those files.
23 　Q. Where would this sale records have been kept,
24 customer list, how much you'd supplied, things like that?
25 　A. That would have been in Charlotte in the sales

　　　Stratos Legal Services, LP
　　　　　　713-481-2180

## James Wells Vol II
## 11-6-2008

Page 115

1  records file if you know?
2  　A. I don't know. I did have an opportunity to speak
3  with the current state of that and was told that there were no
4  sale records back I think the number was six years, anything
5  past six years back. All were destroyed.
6  　Q. Were what?
7  　A. All had been destroyed.
8  　Q. Discarded?
9  　A. Yes.
10 　　　MR. RILEY: That's covered in the response to
11 the subpoena Exhibit 1.
12 　Q. (BY MR. LUBEL) And so who did you talk to that told
13 you the sales records before six years ago, would that put us
14 before 2002 or so, were discarded?
15 　A. His name is Wally Jones.
16 　Q. Wally Jones. Did you recall back when you were
17 there starting in '72 where Mr. Green kept the sales records?
18 　A. I never knew.
19 　Q. Never knew. So you don't know if he had file
20 cabinets or whatever?
21 　A. No, I don't.
22 　Q. Did -- do you know if the company kept customer
23 lists? I'm going to make up one for Sam's Hardware. Let's say
24 you did business with Sam's Hardware starting in 19, you know,
25 55. Did y'all have a list somewhere of your customers?

　　　Stratos Legal Services, LP
　　　　　　713-481-2180

James Wells Vol II
11-6-2008

Page 116

1    A.  I never saw one.
2    Q.  Who would have had such a list if there was one?
3    A.  It would have certainly in addition to the sales
4    department been in customer service.
5    Q.  Were they different departments, sales and customer
6    service?
7    A.  Customer service reported to sales.
8    Q.  And so we don't know whether there was such a list
9    or not, correct?
10   A.  I don't.
11   Q.  Did you know who they were targeting for Liquid
12   Wrench sales?
13   A.  You talking about a competitor?
14   Q.  No.  I'm more interested in who were they -- who did
15   they design the product for?
16   A.  I can't answer that directly because I don't know.
17   I can tell you that Radiator's sales was broken up among two
18   or three different sales areas.  One was automotive.  One was
19   plumbing and hardware.  One was export.  That may have been
20   all.  The Liquid Wrench raffinate formula, my recollection is
21   -- I'm not quoting numbers, but it just -- I have reasons to
22   think this, that most all of it went through the plumbing and
23   hardware duties.
24   Q.  Are there records that still exist that would firm
25   that up?

James Wells Vol II
11-6-2008

Page 117

1    A.  I don't think so.
2    Q.  Did you work in the plumbing and hardware division?
3    A.  The product that we made went into a warehouse and
4    so all sales areas pull out of the same warehouse.
5    Q.  Who worked in the plumbing and hardware division?
6    That's how you referred to it was a division?
7    A.  Yeah, call it division.  Yeah, I guess so.
8    Q.  Okay.  Were you in that division or were you in a
9    manufacturing division?
10   A.  Just manufacture.
11   Q.  So there was a separate division for plumbing and
12   hardware, correct?
13   A.  I'm not sure division is the right word.  I just
14   think sales was broken down among what I told you and there
15   was someone that called on those types -- hardware types.
16   Q.  Let me -- let me tell you what I've heard you say
17   before.  Tell me if I'm wrong, okay.  Liquid Wrench was aimed
18   at industrial uses like tradesmen; is that true?
19   A.  I think so.
20   Q.  And you've told us that tradesmen would be like
21   mechanics?
22   A.  Let's back up because again you use the word Liquid
23   Wrench.  I'm not sure whether you meant deodorized or
24   raffinate.
25   Q.  You want me to break that down?

James Wells Vol II
11-6-2008

Page 118

1    A.  Do I want you to break it down?
2    Q.  Yes, sir.
3    A.  Yes.
4    Q.  Let's do it that way then.  The raffinate version of
5    Liquid Wrench was targeted or aimed at industrial uses,
6    correct?
7    A.  I said that as my opinion based upon the experience
8    that it went through plumbing and hardware and the size of the
9    container being the larger volumes are not the kind of thing
10   that a household user would need.
11   Q.  I'm just saying have I got this right that Radiator
12   Specialty Company targeted the raffinate version of Liquid
13   Wrench to industrial uses?
14   A.  I cannot agree to the words targeted as something
15   they set out to do.  They may or may not have.  I'm not aware
16   of that.  All I'm saying is that the results were that seemed
17   to be where it went, places like Home Depot or hardwares.
18   Q.  So in the past when you've said that the raffinate
19   version of Liquid Wrench was aimed at trades people like
20   mechanics, you're trying to take that back?
21   A.  No.
22   Q.  Is that true or not?
23   A.  I think it's true.  I think it's true that they're
24   the ones who used it because of the sizes and the fact that
25   most of the Liquid Wrench raffinate went through that one

James Wells Vol II
11-6-2008

Page 119

1    sales division.
2    Q.  And when you say that that version of Liquid Wrench
3    mainly went to tradesmen, what do you mean other than
4    mechanics?
5    MR. RILEY:  Objection; form.
6    A.  I said it went through the plumbing and hardware and
7    by that I -- I'm not sure of your question now.
8    Q.  (BY MR. LUBEL) Yeah.  Do you remember testifying
9    under oath that regular Liquid Wrench was designed for
10   plumbers, mechanics and tradesmen?
11   A.  I -- I don't doubt that I didn't say that.
12   Q.  Okay.  You don't doubt that you didn't say that?
13   A.  I don't remember saying it, but that's pretty much
14   accurate I would say.
15   Q.  It's pretty much accurate?
16   A.  Yes.
17   Q.  Okay.  Why was it that regular Liquid Wrench was
18   designed to plumbers, mechanics and tradesmen?
19   A.  My opinion is because of the larger sizes.
20   Q.  Okay.  What sizes are you talking about?
21   A.  8-ounce and up even 55-gallon drums.
22   Q.  And does this -- if you look over this, I've got
23   your deposition from the Richter case.  Can you see it up on
24   the screen?
25   A.  I do.

James Wells Vol II
11-6-2008

Page 120

1    Q. It says, "Regular Liquid Wrench, it was designed and
2  manufactured for what purpose?" You said, "It was my
3  understanding it was primarily plumbers, mechanics and
4  tradesmen." Do you see that?
5    A. Yes.
6    Q. That's still your answer today, correct?
7    A. Correct.
8    Q. And so do you think that -- that the size of the
9  cans is the only reason that regular Liquid Wrench was for
10  industrial uses?
11    A. I -- I don't know how to answer that. I mean, the
12  size has an obvious effect. I don't have a good answer to
13  that.
14    Q. Well, how about the fact that it contained benzene?
15    A. Okay.
16    Q. Does that tell you anything about why it may be more
17  appropriate for an industrial use than it would be for
18  household or do you just not have an opinion on that?
19    A. I know of no reason why it would be more appropriate
20  for a pipefitter than a homeowner if it contained benzene.
21    MS. YATES: Can we take a break just so I can
22  tell him something?
23    MR. LUBEL: Sure.
24    THE VIDEOGRAPHER: Stand by. The time is
25  2:02 p.m. We're off the record.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 121

1    (Recess from 2:02 to 2:05)
2    MR. RILEY: The production records, we tried to
3  get them today. Unfortunately the person who we get to get
4  the copies and sent isn't there; so we are going to try
5  tomorrow to look for those records. We're not sure if we have
6  them from the '70s; but if we do, we will get them to
7  Mr. Lubel as soon as possible.
8    THE VIDEOGRAPHER: The time is 2:05 p.m. Back
9  on the record.
10    Q. (BY MR. LUBEL) Is it your testimony that the
11  different formulas of Liquid Wrench, the deodorized versus
12  what you're calling the raffinate-based formula weren't
13  different because of the different people that were using it
14  such as households versus tradespeople, industrial versus --
15  industrial uses versus household uses, right?
16    A. Both of those formulations were in use when I came
17  to Radiator. So why and how it got to be where they were, I
18  have no idea.
19    Q. Well, you've seen documents that go back before your
20  time, correct?
21    A. Yes.
22    Q. You've had to do that as part of your role as the
23  corporate spokesperson for the company, review documents,
24  correct?
25    A. Correct.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 122

1    Q. You've had opportunities over the years to visit
2  with certain people that worked at Radiator to help form the
3  basis of your information about Liquid Wrench, right?
4    A. In general, yes, I think so.
5    Q. And so one of the things that we know from looking
6  at the documents is that, for instance, we know that there was
7  some 8-ounce deodorized Liquid Wrench that contained benzol
8  before you got there in 1972, correct?
9    A. Yes.
10    Q. You've seen, for instance, the mariners, you know,
11  that -- what was Mariners?
12    A. You talking about sailor? I don't know what you
13  mean by Mariners.
14    MR. LUBEL: Give me the Mariners, Hector, 1970
15  document.
16    MR. RILEY: You talking about the advertisement
17  in a magazine?
18    MR. LUBEL: Yeah.
19    MR. RILEY: Yeah, let him look at it.
20    A. Oh, that does ring a bell now.
21    Q. (BY MR. LUBEL) Yeah. I'm a going to show it to you,
22  but what it's going to show is a deodorized Liquid Wrench in I
23  think an 8-ounce can that contained benzol. Have you seen
24  that before?
25    A. I have seen an 8-ounce can that contained benzol,

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 123

1  yes.
2    Q. Okay. I'm going to put it up on the screen. The
3  first thing you'll see is --
4    MR. LONGORIA: You want to give me the exhibit?
5    MR. LUBEL: When I'm ready. Just give me a
6  minute.
7    Q. (BY MR. LUBEL) You see that says Mariners annual
8  ordering guide?
9    A. Yes.
10    Q. You've seen those before, correct?
11    A. Correct.
12    Q. And, in fact, if you look at the bottom, you'll see
13  a USS. That's US Steel Cowey Bates number, correct?
14    A. Yes.
15    Q. So you recognize that being produced in a different
16  lawsuit correct?
17    A. Correct.
18    Q. And if we flip through, you'll see the first page is
19  1970 and then as we go through -- I'm going to get to the part
20  I want you to focus in on. It's this page and this shows one
21  of your products being advertised, correct?
22    A. Yes.
23    Q. And the first one is -- let me blow it up. It says
24  Radiator Specialty Company Liquid Wrench and it's got an
25  aerosol can, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 124

1    A. Yes.
2    Q. And then its got your 8-ounce can, true?
3    A. Yeah. They're called oblongs.
4    Q. Yeah. It's not aerosol?
5    A. Correct.
6    Q. You call it an oblong can, right?
7    A. That's what the can companies call it.
8    Q. All right. And that can was predominately or mainly
9 yellow on the front with some black on the side, correct?
10    A. I believe so.
11    Q. And then it's got a screw top, right?
12    A. Correct.
13    Q. And then if we unscrew that top, there's going to be
14 a spout within there, right?
15    A. Correct.
16    Q. And then what do you do, you turn that spout over,
17 screw it back on and you've got --
18    A. There's a hole on top of the cap and you just turn
19 it over and stick a spout up through the hole, yes.
20    Q. We've seen gas cans like that in Texas, right,
21 similar?
22    A. Yes.
23    Q. So if you read with me here, it says safe to use on
24 all metals and then it says deodorized Liquid Wrench. Do you
25 see that?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 125

1    A. Yes.
2    Q. As opposed to the regular Liquid Wrench. It's
3 specifying the deodorized, right?
4    A. Yes.
5    Q. And this is advertised, correct?
6    A. Yes.
7    Q. And then if we look, if you look carefully in here,
8 on the bottom of this deodorized can you'll see a skull and
9 crossbones. Do you see it?
10    A. Yes.
11    Q. And if you look really, really carefully, you'll see
12 another reference to deodorized up in that top left-hand
13 corner of the can, right?
14    A. I can see something, but I can't read it.
15    Q. But that's -- you know from looking at previous cans
16 and working there that that's where the word deodorized would
17 sometimes be, right?
18    A. Correct.
19    Q. And sometimes it would be along the ledge here,
20 right?
21    A. Could be, yes.
22    Q. It was in different spots, right?
23    A. Right.
24    Q. But we know this is a deodorized can because the
25 advertisement is referring to it as deodorized, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 126

1    MR. RILEY: Objection; form.
2    MR. SYKES: Yeah, object to the form.
3    Q. (BY MR. LUBEL) Isn't that what it says?
4    A. Well, I guess I don't like what you said. You said
5 we know this is a deodorized can because the advertising says
6 that, but then when you look at the can, it's got a skull and
7 crossbones, which obviously is not the correct warning for a
8 deodorized can.
9    Q. No, but you had some deodorized cans before you got
10 there in 1972 that contained benzene?
11    A. Yes.
12    Q. All right. From raffinate. I don't mean benzene
13 from petroleum distillate?
14    A. You mean from the raffinate?
15    Q. Correct.
16    A. Yes.
17    Q. You under stood that before you got there -- I know
18 there's a distinction in your mind at some point after you got
19 there you started making deodorized Liquid Wrench without
20 raffinate, correct? Isn't that what you've told us before?
21    A. That's correct.
22    Q. But before -- at some points before you got there in
23 1972, you realized and as we see, there are some deodorized
24 version of Liquid Wrench in the 8-ounce cans that had
25 raffinate-based product in it, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 127

1    A. No.
2    Q. You don't agree with that?
3    A. I do not.
4    Q. Okay. So what was the skull and crossbones doing on
5 the deodorized Liquid Wrench in 1970?
6    A. You want me to interpreter what I'm looking at?
7    Q. No. I want you to tell me why the deodorized can of
8 Liquid Wrench in 1970 would have a skull and crossbones on it
9 when you've told us in the past the skull and crossbones is
10 indicative of raffinate based product?
11    A. There is no -- well, I shouldn't say no
12 relationship. The -- this can with its warning is different
13 than the advertising where it says deodorized. So either
14 someone used a can and didn't realize that they got the wrong
15 can. And certainly the wrong deodorized on a can with this
16 warning is -- there's an error there somewhere.
17    Q. Okay. I thought you said this was an 8-ounce can?
18    A. I don't know what size can that is.
19    Q. Oh, you can't tell that's 8-ounce?
20    A. Not from this picture, no.
21    Q. Hadn't you told us previously under oath that all of
22 the 8-ounce cans contained raffinate-based product?
23    MR. RILEY: Objection; form.
24    A. I did say that. Based upon the knowledge I had at
25 the time, that was true.

Stratos Legal Services, LP
713-481-2180

Obj:
402
403

James Wells Vol II
11-6-2008

Page 128

1      MR. RILEY: Objection; form.
2    Q. (BY MR. LUBEL) Are you now trying to tell us that
3 when you testified under oath that the 8-ounce cans were
4 raffinate-based, you trying to take that back?
5    A. I said that -- no, I'm not trying to take that back.
6 The 8-ounce cans from 1972 forward were raffinate only.
7      MR. SYKES: From what?
8    Q. (BY MR. LUBEL) From '72 forward?
9    A. Yes.
10    Q. You mean from '72 to '78?
11    A. Yes.
12    Q. Correct?
13    A. Because it was discontinued in '78.
14    Q. What you're saying is that you took -- you
15 eliminated the raffinate, therefore the benzene from all
16 Liquid Wrench cans, correct, in '78?
17    A. No, just from the -- we just took out the -- we just
18 eliminated the raffinate formula in '78. We didn't touch the
19 deodorized formula.
20    Q. Well, but the deodorized formula in the 8-ounce cans
21 had raffinate in it, correct?
22      MR. RILEY: Objection; form.
23    A. No.
24    Q. (BY MR. LUBEL) All of the 8 -- have you not
25 testified previously that all of the Liquid Wrench 8-ounce

*Obj: 402 403*

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 130

1    A. I did.
2    Q. And you've also told us under oath that all the
3 other cans, other than aerosol and the 4-ounce deodorized can,
4 contain raffinate-base formula, true?
5      MR. RILEY: Objection; form.
6      MR. SYKES: Object to the form of the question.
7    Q. (BY MR. LUBEL) Pre-1979?
8      MR. RILEY: Wait a minute.
9      MR. SYKES: Object to the form of the question.
10      MR. RILEY: Object to the form of the question.
11      MR. LUBEL: Well, I'm not trying to make it
12 seem like in 2001 it had raffinate. Let me rephrase it.
13      MR. RILEY: '72 to '79 is when he testified.
14    Q. (BY MR. LUBEL) Are you listening to me?
15    A. Start over again.
16    Q. All of the other size cans, that means take out
17 4-ounce and aerosols --
18    A. Uh-huh.
19    Q. -- are you with me so far?
20    A. Yeah.
21    Q. All of those cans contained raffinate-based product
22 before you eliminated the raffinate sometime in 1978?
23      MR. RILEY: Objection; form.
24      MR. SYKES: Object to the form.
25    Q. (BY MR. LUBEL) Isn't that right?

*Obj: 402 403*

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 129

1 cans contain raffinate?
2    A. From '72 forward.
3    Q. Right.
4    A. Yeah. There's that's.
5    Q. Until you eliminated it?
6    A. Yes, that's true.
7    Q. And it's your position that sometime in 1978 you
8 eliminated the raffinate from Liquid Wrench?
9    A. That's correct.
10    Q. If we see 8-ounce cans before 1972, don't they also
11 have the raffinate version in there?
12      MR. RILEY: Objection; form.
13    A. 8-ounce cans before '72 had raffinate in them.
14    Q. (BY MR. LUBEL) Is that right? That's what you've
15 told us before.
16    A. Yes, that's correct.
17      MR. RILEY: Finish your answer. He started
18 explaining something. Don't cut him off.
19    Q. (BY MR. LUBEL) You've told us before that the
20 4-ounce cans and the aerosol cans were the ones that had the
21 deodorized version in it, correct?
22    A. I said that, correct.
23    Q. You've told us that before --
24    A. I have.
25    Q. -- under oath, right?

*Obj: 402 403*

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 131

1    A. Am I supposed to answer?
2    Q. Yes, sir, you're supposed to.
3      MR. RILEY: Time period?
4    Q. (BY MR. LUBEL) Before 1979?
5    A. Before when?
6    Q. Before 1979.
7    A. All right. Again, from 1979 back to 1972 all of the
8 8-ounce cans and larger contained only the raffinate formula.
9    Q. Right. And hadn't you testified before under oath
10 that all Liquid Wrench cans, except for the 4-ounce and the
11 aerosol cans, contained raffinate formula?
12      MR. RILEY: Objection; form.
13      MR. SYKES: Object to the form.
14    A. I said that based upon the knowledge I had at the
15 time. Now, since that time I have become aware that there has
16 been found an 8-ounce can that contained the deodorized
17 formula and was properly labeled with the deodorized warnings,
18 not the raffinate warnings. So it was a mistake, but there
19 was a part number, L108, that existed, one with the deodorized
20 and the different one also L108 with the raffinate. Both of
21 them contained the proper warnings under CPSC.
22    Q. (BY MR. LUBEL) Okay. We're going to get to what's
23 proper and what isn't in a minute, but do you remember
24 testifying under oath that all of the cans, the containers
25 contained raffinate-based product for Liquid Wrench before

*Obj: 402 403*

*704, ultimate issue*

*Plaintiffs FHSA MiL*

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 132

1   1979 except for the 4-ounce and the aerosols?
2       A. And I just said that.
3           MR. SYKES: Object to the form of the question.
4       A. I answered that. I said I testified that I said
5   that based upon the information at that time.
6       Q. (BY MR. LUBEL) Were you wrong?
7       A. But --
8       Q. Were you wrong?
9       A. I found -- I wasn't wrong. I just found different
10  information since that time.
11      Q. So what you're saying is you've actually seen a can
12  of deodorized Liquid Wrench of the 8-ounce variety that you
13  were able to date before 1972 that you said did not contain
14  benzol?
15      A. I have seen a picture and I know for a fact that I
16  didn't produce any 8-ounce deodorized at Indian Trail. So
17  that can had to have been produced prior to 1972. Now, when
18  it was produced, I don't know.
19      Q. Well, they were making Liquid Wrench at Charlotte
20  before you got your plant up and running?
21      A. Correct.
22      Q. Right?
23      A. I don't know when they started.
24      Q. No, you don't. That's my point. Were you mistaken
25  when you said that all of the raffinate version of Liquid

James Wells Vol II
11-6-2008

Page 133

1   Wrench came in containers all sizes except the 4-ounce and the
2   aerosol?
3       A. For the third time I was not mistaken. I told you
4   exactly what the facts were based upon the facts that I knew.
5       Q. How did the facts change, sir? Facts usually don't
6   change.
7       A. The facts didn't change, but what happened was new
8   evidence was discovered in the case of this 8-ounce can which
9   was labeled and must have contained the deodorized formula
10  based upon the label.
11      Q. Who found that can for you?
12      A. I don't know where it came from.
13      Q. Did you see the can or the photograph?
14      A. The photograph.
15      Q. And were you able to date that can from looking at
16  the photo?
17      A. I don't think so.
18      Q. Does it have a date on it?
19      A. I have seen some cans that do have a date. Now,
20  whether that was one of them, I don't know.
21      Q. Okay. Can you show me a document from Radiator
22  Specialty Company that reflects that the deodorized version
23  contained something other than raffinate before 1972?
24          MR. SYKES: Object to the form of the question.
25          MR. RILEY: Let's short-circuit it. It was

James Wells Vol II
11-6-2008

Page 134

1   produced in the Cowey case, USS Cowey --
2           MR. LUBEL: Jim --
3           MR. RILEY: -- 154 onward.
4           MR. LUBEL: Jim, please, let him answer my
5   question, please.
6           MR. RILEY: He's been talking about the
7   photographs.
8           MR. LUBEL: I know but you're --
9           MR. RILEY: Right. I'm sorry.
10      Q. (BY MR. LUBEL) Can you show me a document, sir?
11      A. The answer is, yes.
12      Q. Okay. You have a document from Radiator Specialty
13  Company that shows the formulation of deodorized Liquid Wrench
14  before 1972 having something other than raffinate in it?
15      A. I have a document that clearly says petroleum
16  distillates in the 8-ounce can.
17      Q. Sir, were you not aware that benzene is a petroleum
18  distillate?
19      A. Well, when you look under the CPSC, it separates
20  benzene, then it also looks at petroleum distillates.
21      Q. Can you show that to me?
22      A. Sure. It's under CFR1617.4 -- 1E3 or B3 or
23  something like that.
24      Q. Here's a highlighter.
25          MR. SYKES: For the record, what year is that?

James Wells Vol II
11-6-2008

Page 135

1       Q. It's the early version from Mr. Blightschmidt's
2   exhibits. We didn't use the 2001 version like Carl does.
3           MR. RILEY: What I want to know is he looking
4   at the right section?
5           MR. SYKES: That's what I want to know. I mean
6   can you --
7       A. Okay. This is 1500.143 -- 3B and it says --
8       Q. (BY MR. LUBEL) Can I see it so I can show the jury?
9   You'll be able to see it too.
10      A. You want me to read it to you?
11      Q. I'm going to show it to everybody.
12      A. Oh, okay.
13      Q. That's what you've highlighted, right?
14      A. It is.
15      Q. Okay. Doesn't it group benzol or benzene, xylenes,
16  toluene and petroleum distillates into the same section?
17      A. Well, they're grouped in the same section, but that
18  was not related to the difference of opinion that you and I
19  had a moment ago.
20      Q. Well, look over here. Benzene, toluene, xylene,
21  petroleum distillates, do you see that?
22      A. I see that.
23      Q. Do you know what a petroleum distillate is,
24  Mr. Wells?
25      A. Well, I like to think I do.

James Wells Vol II
11-6-2008

Page 136

1  Q. Well, you're a chemist. Tell me what your
2  understanding of a petroleum distillate is?
3  A. Well, as you distill an oil, these different
4  chemicals come off at different temperatures in a tower and
5  different places .and you might get benzene in one place and
6  kerosene which is listed on what I first showed you and marked
7  someplace else.
8  Q. And --
9  A. In this case the CPSC chooses to use the word
10  petroleum distillate to represent kerosene when you do the
11  warnings.
12  Q. Isn't benzene a petroleum distillate?
13  A. Well, whether it is or isn't I don't think a concern
14  in this issue.
15  Q. Sir, is benzene a petroleum distillate.
16         MR. SYKES: Object to the form of the question.
17         MR. RILEY: I'll object to the form of the
18  question also.
19  A. Yeah, I guess I'll have to agree with that.
20  Q. (BY MR. LUBEL) Isn't benzene an aromatic?
21  A. Benzene is an aromatic. Kerosene is not.
22  Q. Is xylene an aromatic?
23  A. Yes.
24  Q. Is toluene an aromatic?
25  A. Yes.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 137

1  Q. Those terms like aromatics and petroleum distillates
2  are really characterizations for a number of different
3  chemicals, correct?
4  A. Yes.
5  Q. And whether a particular chemical structure fits
6  into that category, there's books that tell us that, right?
7  A. Correct.
8  Q. And so what they've done in this regulation is
9  they've referred to benzene, toluene, xylene and petroleum
10  distillates all under this section on what warnings are
11  necessary, correct? You've seen that before?
12  A. Yeah, I have.
13  Q. Right?
14  A. Right.
15  Q. And what do you refer to, I'm going to hand it back
16  to you, this set of documents I've given you? You've seen it
17  before. You've testified about it. What do you call that?
18  A. The CFR16.
19  Q. 15, right?
20  A. 16.
21  Q. Let me see.
22         MR. SYKES: It's volume 16.
23  A. Uh-huh.
24  Q. (BY MR. LUBEL) Part 1500?
25  A. Uh-huh.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 138

1  Q. Right?
2  A. Right.
3  Q. It's the code of Federal regulations?
4  A. Right.
5  Q. You're familiar with it?
6  A. I am.
7  Q. When is the first time that you've studied it?
8  A. '72.
9  Q. First time you studied it was in 1972, correct?
10  A. That's my recollection.
11  Q. Did you make any changes to any of the labels of
12  Liquid Wrench when you started in '72?
13  A. No.
14  Q. Did you between '72 and '78?
15  A. No.
16  Q. The label stayed the same, correct?
17  A. It did.
18  Q. Others before you got there had made decisions
19  regarding what was on the labels, correct?
20  A. Correct.
21  Q. And it was not within your responsibility to change
22  the Liquid Wrench label?
23  A. Within my responsibility. There was no reason to
24  change the label. It was correct.
25  Q. It was correct, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 139

1  A. Correct.
2  Q. That's your testimony?
3  A. That's my testimony.
4  Q. Okay. Are you telling us that you analyzed the
5  label when you got there in '72 or what you're saying is that
6  that label had already been done and it wasn't up to me?
7  A. At some point. And I don't recall what year it was,
8  but, yes, I reviewed the label.
9  Q. When?
10  A. And found nothing wrong with it.
11  Q. When?
12  A. I don't recall when.
13  Q. Approximately?
14  A. I have no idea. Early '70s probably.
15  Q. And so did you likewise review this regulation?
16  A. The -- you're asking me to recall things that I
17  can't sit here and tell you yes about specific paragraphs.
18  You don't look at this regulation and decide to read one
19  little paragraph. Too many things are tied together; so --
20  answer to your question is probably, yes.
21  Q. I'm going to mark it as Exhibit 4, okay?
22         (Exhibit No. 4 marked)
23  Q. (BY MR. LUBEL) Didn't I?
24  A. Okay.
25  Q. You've seen it before. This isn't the first time,

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 140

1  right?
  A.  That's correct.
3  Q.  Okay.  Can you show me where, if anywhere, in this
4  regulation that says that your company could not have placed a
5  cancer warning hazard on the Liquid Wrench containers?
6  MR. RILEY:  Objection; form.
7  MR. SYKES:  Object to the form of the question
8  to the extent it calls for a legal conclusion.
9  A.  The experience that I have and understanding that I
10  have is that these documents tell you exactly what you must
11  have, no more, no less.  Indeed in our experience we
12  mistakenly had made an error in the label on one particular
13  occasion and they wrote us a letter and said you over-warned.
14  You just change it.
15  Q.  (BY MR. LUBEL) Sir, can you find for me in Exhibit 4
16  that code of Federal regulations where it says that Radiator
17  Specialty Company or any company that makes a product cannot
18  put additional information on the container such as a cancer
19  warning?
20  MR. SYKES:  Object to the form of the question.
21  MR. RILEY:  Objection; form.
22  A.  Well, there is a section that deals with improper --
23  that's not the right word.  Mislabeled.  Now, I haven't read
24  it in a long time, but in that section where it says
25  mislabeled.

James Wells Vol II
11-6-2008

Page 141

1  Q.  (BY MR. LUBEL) Can you find it for me?
2  A.  That's -- that's one area to look at.
3  Q.  Why don't you find for us the section you're relying
4  upon for your company's position that you could not have told
5  the consumer on the container that the product contained a
6  cancer-causing substance?
7  A.  Well, I'm not certain that I'm relying on that --
8  something in here to tell you that.  I'm also relying upon our
9  experience is that you cannot change it.
10  Q.  Okay.  Find for me where in the code of Federal
11  regulations it prohibits your company from warning about
12  cancer or things of that like on the container?
13  MR. SYKES:  Object to the form of the question.
14  MR. RILEY:  Well, let's go off the record and
15  give him some time to read it.
16  MR. LUBEL:  I'm going to let him go through it.
17  He's testified he's familiar with it.
18  A.  There is a section -- and this is not really what I
19  was looking for, but it's 1500.7 that says, "The legislative
20  history reveals that Congress intended by this provision to
21  prevent a proliferation of differing labeling requirements for
22  household products."
23  Q.  (BY MR. LUBEL) Sir, if you can find the section --
24  MR. SYKES:  Object to the form of the question.
25  Q.  (BY MR. LUBEL) Can you find a section of the code of

James Wells Vol II
11-6-2008

Page 142

1  Federal regulations that you're relying upon that says that
2  your company was prohibited by law from adding a warning to
3  the container of the Liquid Wrench that your company
4  manufactured that says contains a cancer-causing substance or
5  something like that?
6  MR. SYKES:  With all due respect to the witness
7  and the process, I believe --
8  MR. LUBEL:  Jim, don't -- don't be showing
9  him --
10  MR. RILEY:  You're not giving him the right
11  regulation.
12  MR. LUBEL:  Don't be showing him -- you're
13  woodshedding.  That's improper.
14  MR. RILEY:  You're not giving him the right
15  regulation.
16  A.  Where does that leave us?
17  Q.  (BY MR. LUBEL) Keep looking at Exhibit 4?
18  MR. RILEY:  What year is Exhibit 4?
19  A.  I may not be able to find it.  There's a lot here to
20  look over.
21  Q.  (BY MR. LUBEL) Is that the code of Federal
22  regulations?
23  A.  It's title 16.  It should be.
24  Q.  Have you seen it before?
25  A.  I've got a book, you know.  It's not -- you know,

James Wells Vol II
11-6-2008

Page 143

1  yeah.
2  Q.  Have you seen that code of Federal regulations
3  before?
4  A.  I have.
5  Q.  You recognize what you're looking at?
6  A.  Well, now, I recognize the book, yeah.
7  Q.  So tell me where is it that it says Radiator
8  Specialty Company, a company that manufactures a product
9  cannot enhance, strengthen or put something different on a
10  warning?
11  A.  I can tell you that from day one that has been my
12  understanding, that you may not add any additional warnings
13  period.
14  Q.  Sir, just tell me where in the code of Federal
15  regulations, please?
16  A.  Right now I can't find it.  I'm telling you that's
17  my understanding from the very beginning.
18  Q.  Well, haven't you been testifying under oath for
19  some period of time now that there's a specific provision of
20  the code of Federal regulations that prevents Radiator
21  Specialty Company from saying that the product contains a
22  cancer causing substance on it?
23  MR. SYKES:  Object to the form of the question.
24  MR. RILEY:  This is getting awfully close to a
25  Rule 30.

611,
non-responsive

Plaintiffs FHSA
MiL

James Wells Vol II
11-6-2008

Page 144

1     A.  I can't tell you where it says that.  All I can tell
2 you that's my understanding of the law that you cannot enhance
3 or over -- over-label.
4     Q.  (BY MR. LUBEL) It's your understanding that your
5 company could not have told the consumer that the product
6 contained cancer-causing substances?
7         MR. RILEY:  Objection.
8     A.  We never addressed cancer-causing substances early
9 on because we weren't aware of its existence with regard to
10 our products.
11    Q.  (BY MR. LUBEL) Well, could you have put it on there
12 if you knew about it?
13    A.  I don't know if I could have or not except
14 everything we knew said no, you can't.
15    Q.  Well, could you put it on there or not?
16        MR. RILEY:  Objection; form.
17        MR. SYKES:  Object to the form of the question.
18    A.  I'm telling you when we did put something that was
19 different, we had a -- an extremely hazard -- extremely
20 flammable warning, they told us no.  It's got to be flammable,
21 not extremely flammable.  You have to change.
22    Q.  (BY MR. LUBEL) What product was that?
23    A.  It was Engine Bright.
24    Q.  Okay.  Do you have that document with you?
25    A.  I don't have it with me, no.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 145

1     Q.  Where is it?
2     A.  Probably in my file somewhere.  They sent us the
3 letter.
4     Q.  Where's your documents with the Consumer Products
5 Safety Commission, your correspondence?
6     A.  Would not have been filed under that.  It would
7 have been filed under the product.
8     Q.  Where are your correspondence, Radiator's
9 correspondence with the Consumer Products Safety Commission
10 regarding Liquid Wrench?
11    A.  I just told you that if it was -- in this case the
12 letter the came in from the Commission and it was for Foamy
13 Engine Bright and that letter would have been filed --
14 actually it was in the lab file under Engine Bright.
15    Q.  Sir, do you remember my question?
16    A.  I thought I just answered it.
17    Q.  Sir, where are the documents between your company
18 and the Consumer Product Safety Commission, if any, regarding
19 Liquid Wrench?
20    A.  If you ask me did I have a file folder on
21 correspondence, not that I recall.
22    Q.  Okay.  Was there any correspondence in writing
23 between Radiator Specialty and the Consumer Product Safety
24 Commission regarding Liquid Wrench that you can recall?
25    A.  Not that I recall.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 146

1     Q.  When you went to look for documents last week at the
2 request of the -- one of the executives of Radiator Specialty
3 Company for this lawsuit, did you see any documents between
4 Radiator and the Consumer Product Safety Commission regarding
5 Liquid Wrench?
6     A.  No.
7     Q.  Do you recall testifying under oath in another
8 lawsuit involving Liquid Wrench that it was Radiator Specialty
9 Company's philosophy to not only meet all the regulations but
10 to enhance those warnings where it appears to be the thing to
11 do?
12        MR. SYKES:  Object to the form of the question.
13    A.  I don't recall saying that, but if you have it in
14 writing, maybe I did.
15    Q.  (BY MR. LUBEL) Let me show it to you.  See where it
16 says, "But our company's philosophy is to, first of all, meet
17 all of the regulations and secondly in addition to that, based
18 upon our experience, our knowledge that we have trained
19 through trade organizations, suppliers to enhance those
20 warnings where it appears to be the thing to do"?
21    A.  Yes, yes.
22    Q.  Okay.  Were you telling the truth when you said
23 that?
24    A.  Yes, that's accurate.
25    Q.  And so isn't it a fact, sir, that if your company

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 147

1 had been told by U.S. Steel that benzene could cause cancer,
2 that you would have -- you would have seen that the company
3 would have enhanced its warnings?
4         MR. SYKES:  Object to the form of the question.
5     A.  I can't say that.  If we had been told by U.S. Steel
6 it would caused cancer, we would have certainly looked into
7 it.  Now, I need to explain what this is all about just so
8 that you don't misconstrue it.
9         We had a case where someone took a can and then
10 using it under the hood of a car got the can across the
11 terminals of the battery.  The battery burned a hole in the
12 can.  The contents, which were flammable, came out.  And I
13 don't recall what ignited them, whether it was a spark off the
14 battery or the engine heat, but anyway there was a fire.  So
15 we enhanced that warning by saying avoid -- I forgot what it
16 says but avoid use around battery terminals or -- it cautions
17 you about battery terminals.
18    Q.  Sir, this is a Liquid Wrench lawsuit.  This doesn't
19 have anything to do with battery terminals.  Do you understand
20 that?
21    A.  No, I don't think you understand.  This is a
22 philosophy.
23    Q.  Sir, this is a deposition that you gave on
24 November 8 in the year 2000 in a Liquid Wrench lawsuit.  Do
25 you not know that?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 148

1    A. Okay. I'm not arguing that.
2    Q. Okay. And so you're talking about the company's
3  philosophy which including enhancing warnings based upon
4  information you got from suppliers. Isn't that what you said?
5    A. I said we obtained through trade organizations,
6  suppliers and maybe I left out personal experience, but this
7  book right here goes into you must label based upon your
8  experience with the product. And that's what we did.
9    Q. Well, that's because U.S. Steel, it's been your
10  position or your company's position, didn't provide you with
11  the safety data sheet in 1967, correct?
12    MR. SYKES: Object to the form of the question.
13    A. I'm not sure I understood your question.
14    Q. (BY MR. LUBEL) Do you recall giving testimony under
15  oath before today that U.S. Steel's 1967 safety data sheet for
16  raffinate that your company was not supplied with it?
17    MR. SYKES: Object to the form of the question.
18    A. I think -- I may have, but I've never seen a safety
19  data sheet from U.S. Steel if that's what you're asking me.
20    Q. (BY MR. LUBEL) You've looked for it and you never
21  could find it?
22    MR. SYKES: Object to the form of the question.
23    A. That's correct.
24    Q. (BY MR. LUBEL) And do you recall telling me in the
25  past that if your company would have known about the benzene

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 149

1  hazards back in the 1950s and 1960s, y'all would have
2  eliminated Liquid Wrench raffinate-containing formula from the
3  market just like you did in 1978?
4    A. I think what I said was that if Kologiski had had
5  the same data that I had, he would have suggested a move of
6  some kind.
7    Q. Didn't you say that he would have suggested that the
8  product be eliminated?
9    A. I might have said that.
10    Q. You want me to find it for you?
11    A. No, it's not necessary.
12    Q. You recall that, don't you?
13    A. I recall the conversation and whether I said --
14  whether you're quoting it accurately or I am, is probably not
15  worth the effort.
16    Q. Let me show you what I have.
17    MR. RILEY: Lance, when you're done with this
18  line of questioning, we don't even have to leave the room, I
19  just want Jim to stand up and walk around a little bit.
20    MR. LUBEL: We can take a short break if that's
21  okay.
22    MR. RILEY: Whenever you want to.
23    MR. LUBEL: Can we do it now?
24    MR. RILEY: Sure.
25    THE VIDEOGRAPHER: It's 2:44 p.m. We're off

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 150

1  the record. This concludes tape 3.
2    (Recess from 2:44 to 2:50)
3    MR. RILEY: Exhibit 4 has to date on it. What
4  year are these regulations?
5    THE VIDEOGRAPHER: We're on the record at 2:50.
6    MR. RILEY: You're representing this as 1973?
7    MR. LUBEL: That's my recollection.
8    MR. RILEY: All right. If that's what you're
9  representing.
10    MR. LUBEL: Do you have any reason to think
11  something's missing?
12    MR. RILEY: Yeah.
13    MR. LUBEL: What's missing?
14    MR. RILEY: Misbranding because I have 1973 in
15  front of me.
16    MR. LUBEL: Okay. What page?
17    MR. RILEY: Page 27013.
18    MR. LUBEL: What section?
19    MR. RILEY: Section 14.
20    MR. LUBEL: Section 14?
21    MR. RILEY: Correct.
22    MR. LUBEL: And you're saying it's not in here?
23  It's right here. You want to see it? I've marked it. I put
24  a flag on it. Is that what you're talking about?
25    MR. RILEY: I stand corrected. It is in there.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 151

1    MR. LUBEL: I mean, I could not given a bigger
2  hint to anybody. I marked the page for him. Thanks.
3    MR. RILEY: I'm actually delighted to find out
4  that we're on the same page. I would not have wanted to think
5  ill of you.
6    MR. LUBEL: And we'll go back to it.
7    MR. RILEY: Oh, we're going to go back to it.
8    MR. LUBEL: Go back to it now.
9    Q. (BY MR. LUBEL) Exhibit No. 4, the code of Federal
10  regulations. You remember I showed it to you earlier?
11    A. Yes.
12    Q. I asked you to find the section in the regulations
13  that you thought or the company's position was that stopped
14  you from saying cancer or something like that on your
15  container. Do you remember that?
16    A. Yes.
17    Q. You said you couldn't find it, right?
18    A. Correct.
19    Q. You didn't even know if it was there, right?
20    MR. RILEY: Objection.
21    A. I think it's there.
22    Q. (BY MR. LUBEL) You think it's there now because you
23  heard me have a discussion with your lawyer off the record?
24    A. I've read it before. Its not a question of I think.
25  If I had my own book marked up I could have found it.

Stratos Legal Services, LP
713-481-2180

1    Q. Okay. I put a little sticker on what I gave you on
2 the section under misbranding, section 14. Do you see it?
3    A. I see it.
4    Q. That was on it when I handed it to you, correct?
5    A. Yes.
6    Q. Okay. Is that what you think where it's at?
7    A. Well, I haven't read what you have in your hand.
8    Q. You've had a chance to hear your lawyer say that's
9 the section misbranding, correct?
10    A. I have.
11    Q. So if you would, as you read section 14 on
12 misbranding, will you find me the exact words that prohibit
13 your company from saying something about cancer, blood
14 dyscrasias or any other similar terminology?
15    A. Well, tell you the truth, I've read this and I don't
16 even understand what it says.
17    Q. Can I put it up there for all of us to see?
18    A. Sure. The language is not easily read in my
19 opinion.
20    Q. You're looking at the section on misbranding,
21 correct?
22    A. I am.
23    Q. Was that your impression when you got here today
24 that that's where it's at?
25    A. Well, I hadn't really thought about where it was at.

1 What I said to you was its been my understanding for many
2 years that you are not allowed to over- or under- label.
3    Q. All right. Well, let's look at this section 14 on
4 labeling, okay? Do you see this section here that says an
5 affirmative statement of the principal hazard or hazards? Do
6 you see that?
7    A. Yes.
8    Q. Did you understand or did Radiator Specialty Company
9 understand that they had an obligation on the container to
10 list or identify the principal hazards?
11    A. As I recall, that section E -- yeah, the affirmative
12 statement is explaining the hazard.
13    Q. I'm just asking you if Radiator Specialty Company to
14 your understanding had an obligation to list what E says, the
15 principal hazards on the container?
16    A. Yeah, well, we did that.
17    Q. Did you have an obligation to?
18    A. That's what it says.
19    Q. Is that your recollection? I know we can see it,
20 but is that your recollection?
21    A. Oh, yeah, certainly.
22    Q. So what you see confirms what you thought, right?
23    A. Yes, yes, the affirmative statement is -- yeah.
24 It's nothing new.
25    Q. Can you show me on the can or the containers of

1 Liquid Wrench where your company talked about -- use those
2 terms absorbed through the skin?
3    A. If it's on there, I think it says avoid skin contact
4 and use well ventilated areas. I believe that's the words
5 that are used as an affirmative statement on the back of the
6 can or label.
7    Q. Do you ever remember any container of Liquid Wrench
8 using the terms, the words specifically absorbed through the
9 skin?
10    A. Not specifically.
11    Q. Okay. Weren't you required to follow the exact
12 words?
13        MR. SYKES: Object to the form of the question.
14    A. I think -- it says or similar wording descriptive of
15 the hazard.
16    Q. (BY MR. LUBEL) I've highlighted that, haven't I?
17 I've highlighted that for you?
18    A. Yeah. So that gives you a little bit of leeway when
19 you say avoid skin contact or absorbed through the skin. Most
20 people I hope would believe that's one and the same.
21    Q. Well, are they one and the same? Does avoid skin
22 contact mean the same thing as it can be absorbed through the
23 skin?
24    A. Well, if you read it literally, probably not; but if
25 you are using it, I would hope that you see it the same. Why

1 else would you be warned if you weren't concerned about it
2 being absorbed through the skin.
3    Q. You tell me. What was the intention of the company?
4    A. The intention of the company was to follow the
5 warnings as outlined by the CPFC.
6    Q. But you didn't follow it. You didn't say absorbed
7 through the skin. You said something like avoid skin contact?
8    A. Well, that's similar, isn't it?
9    Q. You tell me. Is it?
10    A. I think so.
11    Q. Okay. Did the company recognize that skin contact
12 was a consequence of using the Liquid Wrench products?
13    A. I would say yes.
14    Q. So that section there that talks about you have to
15 identify on the containers the principal hazards and then they
16 give you a list and they say or similar wording descriptive of
17 the hazard, did Radiator Specialty Company appreciate that
18 that was one of their obligations on the container?
19    A. That's an awkward situation to answer.
20    Q. You want me to ask it a different way?
21    A. When we -- when I say we meaning the liquid
22 committee, we studied these books or the book very carefully
23 and tried to follow especially all that's on there very
24 carefully. We think we did.
25    Q. I understand you think you did. And you've said

James Wells Vol II
11-6-2008

Page 156

1  that several times today, right?
2      A. I hope so.
3      Q. I'm just asking you if it was your company's
4  obligation to identify on the containers the principal hazards
5  of the product?
6      A. It's everyone's obligation to do exactly that.
7      Q. You mean everybody at your company?
8      A. No, everybody who has a product.
9      Q. Everybody that makes a product?
10     A. Yeah, a hazardous product.
11     Q. All right. So companies like Radiator Specialty
12 Company that make hazardous products have the same obligation?
13     A. Yes.
14     Q. That's what you're trying to say, right?
15     A. Yes.
16     Q. And so how did your company go about determining
17 what the principal hazards of Liquid Wrench were? What was
18 its step by step approach?
19     A. As you well know, the company conducted two tests,
20 one for absorption through the skin and one for inhalation,
21 tried to determine whether it was toxic or nontoxic.
22     Q. Did they determine whether it was toxic?
23     A. Or highly toxic.
24     Q. Was it toxic?
25     A. Well, they -- those documents have been produced. I

James Wells Vol II
11-6-2008

Page 157

1  know you've read them.
2      Q. Doesn't it say it's toxic?
3      A. Well, there's an argument about it.
4      Q. There's an argument. Okay.
5      A. There's discussion that says well, it may be,
6  another that says well, it may not be. We went ahead and
7  labeled it I think with the -- under the toxic labeling.
8      Q. And how did y'all -- if you've got this disagreement
9  as whether it's toxic or highly toxic, how did y'all decide
10 that?
11     A. Well, this happened back in the early '60s; so I
12 wasn't -- you all -- Kologiski, not Jim Wells.
13     Q. How did they by looking at the documents decide that
14 it was toxic instead of highly toxic?
15     A. Well --
16     Q. Can you tell?
17     A. I can't tell. I mean, I can -- the obvious opinion
18 is straightforward, but that's just an opinion.
19     Q. Now, could you tell from the documents at your
20 company what the chronic benzene hazards were from that
21 product?
22     A. They word chronic was never used and I think we
23 didn't even consider it acute because in the testing I'm sure
24 it was done a very short period of time. And the rats or lack
25 of death, whatever it was, was there. Now, long-term to my

James Wells Vol II
11-6-2008

Page 158

1  knowledge there was nothing known about that to our company.
2      Q. Well, you didn't run any long-term tests?
3      A. We did not.
4      Q. You ran one hour test on rats?
5      A. Whatever it was, yes.
6      Q. Is that your recollection, one hour exposure test?
7      A. Whatever -- I mean, you've got the documents.
8  Whatever it says, it says.
9      Q. It came from your company.
10     A. Yeah.
11     Q. Okay. You know, you're a chemist. Don't put it on
12 me. You're the witness. Do they say one hour test or not?
13     A. I don't sit here and try to remember every word of
14 every document. If the document said one hour, okay.
15     Q. Were they chronic benzene studies or were they acute
16 short-term studies?
17     A. They were acute short-term.
18     Q. Does one hour test sound familiar to you?
19     A. Yes.
20     Q. Was your company relying on U.S. Steel if there was
21 potential chronic hazards from that raffinate?
22         MR. SYKES: Object to the form of the question.
23     A. I don't know what our company was doing in the
24 1960s.
25     Q. (BY MR. LUBEL) Okay. I thought earlier you said

James Wells Vol II
11-6-2008

Page 159

1  y'all relied on your suppliers and trade organizations to
2  provide you with health considerations?
3      A. When I went there in '72 we had a very close
4  relationship with our suppliers and of course when the MSDSs
5  came out, we worked very closely with them.
6      Q. When you got there in 1972, did you rely upon the
7  suppliers of the ingredients of the products to tell you if
8  there was health considerations?
9          MR. SYKES: Object to the form of the question.
10     A. Yes, we did.
11     Q. (BY MR. LUBEL) Was that some novel concept in
12 business back then or was it --
13     A. Standard.
14     Q. Y'all weren't the only company that felt that way?
15         MR. SYKES: Object to the form of the question.
16     Q. (BY MR. LUBEL) Radiator wasn't the only company in
17 America that relied on their suppliers?
18         MR. SYKES: Object to the form of the question.
19     A. I don't think so.
20     Q. (BY MR. LUBEL) Well, you had worked at other
21 companies, right?
22     A. I had.
23     Q. And let me go back. We digressed back to Exhibit 4
24 because your lawyer, Mr. Riley, asked me whether a particular
25 section was in there, do you remember that?

James Wells Vol II
11-6-2008

Page 160

1    A.  Well, let me go back to something.  I want to be
2  sure there was no misunderstanding between us.  It had to do
3  with my comment was if Mr. Kologiski had had the same
4  knowledge that I had, he would have done the same thing or
5  words to that effect.  Now, I want to be sure that my thought
6  process at the time, which doesn't really come out in the
7  statement or part of it, and that was that the initial
8  recommendation on my part to stop producing the raffinate
9  Liquid Wrench was because I didn't feel like it was in our
10  best interest and we would have a very difficult time meeting
11  the new expected workplace standards.  The benzene situation
12  came in sort of after the fact.  So I just wanted to get that
13  on the record.
14          MR. LUBEL:  Objection; nonresponsive.
15    Q.  (BY MR. LUBEL) Do you recall me asking you a while
16  back today whether you gave sworn testimony as a corporate
17  spokesperson for Radiator that your company, had they known
18  about these benzene toxic properties back as early as the
19  1950s or '60s, whether or not they would have done the same
20  thing that you did in 1978 and that is to eliminate the
21  product?  Do you recall that?
22    A.  And that's why I was just trying to explain that the
23  initial knowledge came about because of the standard in the
24  workplace.  Now, the benzene just was kind of like icing on
25  the cake.  That came second.

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 161

1    Q.  Sir, I'm asking you if you recall giving testimony
2  just like you are today under oath with the court reporter and
3  a videographer that if your company would have known in the
4  '50s or '60s, they would have eliminated the
5  benzene-containing product?
6    A.  Are those my words?
7    Q.  I'm going to show you.  Do you remember saying it?
8    A.  Well, actually I don't, but I don't doubt that I
9  said that.
10    Q.  I'm asking what the company's -- what's the
11  company's position, what's going to be you all's position at
12  trial as to what you all would have done in the '50s or '60s
13  and you said well, Mr. Blumental -- that was the owner, right?
14    A.  That was the owner.
15    Q.  Demonstrated his willingness to change when I
16  presented it to him in 1977.  And what you're referring to is
17  to take the benzene-contain formula out, right?
18    A.  Well --
19    Q.  That's what it says willingness to change d?
20    A.  Willingness to change.  Now, the word benzene isn't
21  in that statement.  What I went to him with was we won't be
22  able to meet these health standards in the plant.
23    Q.  Oh, okay.  So that's not what you meant when you
24  said it there?
25    A.  Yeah.  The benzene is not involved in this.

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 162

1    Q.  It wasn't?  Well, let's go down a little further.
2  And you say I see no reason why he would not have made the
3  same decision if Mr. Kologiski had gone to him with the same
4  data at an earlier date; is that true?
5    A.  That's true.
6    Q.  All right.  Now --
7    A.  Here between meaning that it couldn't meet air
8  standards.
9    Q.  I know that's your story now, but let's read on.
10          MR. SYKES:  Object to the form of the question.
11    Q.  (BY MR. LUBEL) Your story's changed, hasn't it?
12    A.  Changed?
13    Q.  Well, look.  Read on.  And given the fact that
14  Radiator Specialty Company already had a product that could
15  take the place of was a valuable substitute for the Liquid
16  Wrench that contained benzene.  Do you see that?  In other
17  words, the deodorized formula, since they already had that in
18  the 1950s, it would have been an easy transition back then if
19  they would have been armed with that information, correct?
20  And what did you answer back then when you gave your
21  testimony?
22    A.  It's still correct because the word that contained
23  benzene is just a description of the problem.
24    Q.  Sir, is it your testimony based upon the company's
25  philosophy that if they had had the information that you got

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 163

1  in the late '70s, approximately 1977, that there was a
2  potential connection between benzene and cancer, that your
3  company, if they'd had the same information in the '50s or
4  '60s, would have done the same thing?
5          MR. SYKES:  Object to the form of the question.
6    A.  We're arguing over pretty much the same thing and
7  what I'm saying to you as I've said right there is that the
8  initial action was driven by our inability to meet the
9  standards.  And then the benzene situation came along very
10  shortly.  I don't know whether it was a day or a month or six
11  months or six weeks; but we soon as learned that benzene had
12  an effect to be considered, that maybe even drove the new
13  standard.  And this -- this line here, 18, just talks really
14  about there was a valuable substitute with Liquid Wrench.  I
15  could have just as easily have said deodorized as I put
16  contained benzene, reworded that.
17    Q.  (BY MR. LUBEL) Sir, didn't you testify that if your
18  company had known in the '50s what you knew in 1977 about the
19  benzene-containing raffinate formula of Liquid Wrench, that
20  you would have done the same thing and that is eliminate it?
21    A.  That's what we're arguing about.  I don't think
22  that's what I said.
23    Q.  That's not what you meant?
24    A.  Well, I just been trying to say that just now
25  that -- what I said and what I meant had to do with the OSHA

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 164

1  reg.
2      Q. What change are you talking about that
3  Mr. Blumenthal demonstrated his willingness to change when I
4  presented to him in 1977?
5      A. He wanted us to change was to eliminate the product.
6      Q. The product containing benzene?
7      A. Well --
8      Q. Right?
9      A. But that's secondary. What we're really talking
10  about was the product we couldn't meet the standards, the OSHA
11  standards that were expected to come down.
12      Q. Because of benzene?
13      A. Well, now, I don't know that it's because of benzene
14  even sitting here, but it probably was in retrospect.
15      Q. You don't remember what your conversation with
16  Mr. Blumental was about?
17      A. It had nothing to do with benzene.
18      Q. Had nothing to do with benzene?
19      A. No, benzene wasn't even mentioned.
20      Q. You didn't tell him that it contained a
21  cancer-causing substance, Liquid Wrench?
22      A. I didn't even know it.
23      Q. You don't remember testifying in 1977 was first time
24  you found out that benzene could cause cancer?
25      A. That part's true, but it was after I found out about

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 165

1  the OSHA reg. It didn't happen at the same time.
2      Q. So once you learned that the benzene in Liquid
3  Wrench could cause cancer, didn't you go to Mr. Blumenthal, the
4  owner, and have that conversation with him about it?
5      A. No. I went to him when I found out about the
6  proposed change in the air quality.
7      Q. What was the proposed change in air quality? What
8  did it have to do with?
9      A. What did it have to do with?
10      Q. Right. What substance?
11      A. Oh, I don't recall.
12      Q. You really don't remember that it was benzene?
13      A. I'm not sure. It's been so long since I've read it.
14      Q. I thought you just read it within the last week?
15      A. I'm talking about the article that I read in the
16  magazine.
17      Q. But you read the Cowey deposition in the last week?
18      A. I did.
19      Q. You don't remember testifying under oath in the
20  Cowey deposition that you gave almost five years ago that you
21  had a conversation with Mr. Blumental, that he was essentially
22  so moved by your conversation that within minutes he would
23  eliminate the benzene-containing or raffinate-containing
24  Liquid Wrench?
25      A. I don't recall that, but I do recall that he said --

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 166

1  I think the conversation was over the phone although that may
2  not be accurate. I think I went to see him and he did say
3  immediately okay, eliminate it.
4      Q. Okay. And you don't recall testifying that you told
5  him that the benzene could cause cancer?
6      A. I don't recall. At this point I don't remember.
7      Q. Do you remember that?
8      A. I said I don't remember that.
9      Q. No, do you remember testifying that 1977 you read an
10  article that connected benzene to cancer?
11      A. I remember reading an article but my remembrance was
12  that benzene was not part of the article. Now, that's my
13  recall.
14      Q. So how do you learn that benzene could cause cancer
15  if it wasn't part of the article?
16      A. I don't remember that either. I just know that it
17  came -- my recollection is I learned it within a matter of
18  weeks, less than a month after that original article.
19      Q. Sir, let me refresh your recollection with some of
20  your testimony in the Cowey case. "When did you first learn
21  that exposure to benzene could cause cancer and other maladies
22  such as that?"
23          "My first learning of the seriousness was in
24  1975 -- '77 at I recall it." Do you see that?
25      A. Yeah, that's probably accurate.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 167

1      Q. See the word cancer? Do you see that?
2      A. I see it.
3      Q. And I said, "How did you learn it?"
4          You said, "I was reading a magazine, one of the
5  technical types of magazines and I ran across an article, a
6  very small article that said OSHA was making some proposals
7  about benzene." Right? Does that refresh your recollection
8  that the article was talking about benzene?
9      A. Well, see, the question says -- it uses the word
10  cancer or other maladies and I answered it the way I did --
11      Q. Sir, isn't it true that the primary reason that your
12  company took off the production lines the benzene-containing
13  Liquid Wrench was because of cancer?
14          MR. SYKES: Object to the form of the question.
15      A. No, it was not, it absolutely was not.
16      Q. (BY MR. LUBEL) Do you recall testifying to that
17  under oath?
18      A. I don't think I ever said that.
19      Q. Okay. Let's go to the next page. So you took the
20  benzene-containing Liquid Wrench off the market. What did you
21  say?
22      A. That's correct.
23      Q. Where people couldn't be exposed to it anymore.
24  What did you say?
25      A. That's correct. That's true.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 168

1    Q.  And that is primarily due to the cancer hazard.  Do
2  you see that question?
3    A.  And the cancer is primarily --
4    Q.  Do you see that, primarily due to the cancer hazard.
5  Do you see that question?
6    A.  I see it.
7    Q.  And here's your answer.  "I'm trying to think back.
8  You know, you said primarily and it could have been but it
9  probably was."  You see that?
10    A.  Well, I see that but --
11    Q.  Hold on.
12    A.  -- that question is kind of wobbly.
13    Q.  I'm not done.  Then you say -- I say, "Can you think
14  of any other reason than consumers out there using your
15  products potentially getting cancer from it to take it off the
16  market?"
17        And you said, "Well, I --
18        "Is there?"
19        And you said, "I really -- stay off the
20  market?"  You say, "I have to say you're probably right.  That
21  was probably the primary reason."  Those were your words, sir.
22  Now it's five years later and you're trying to say that you
23  didn't see that -- say that, aren't you?
24    A.  Well, I said I didn't remember saying that.  And I
25  think I had a little bit of leading going on there, but

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 169

1  nevertheless I said it.  I'm not going to backtrack on it, but
2  I will say what I said earlier, that the whole thing began
3  with the concern about the health hazard within the plant and
4  us being able to meet that requirement.
5    Q.  Health hazard what?  From benzene?
6    A.  Well, as it turned out to be, yeah, benzene.
7    Q.  Okay.  And what was your concern about your workers
8  in the plant?
9    A.  We could not meet whatever the new regs were going
10  to be.
11    Q.  So you weren't concerned about your workers'
12  exposures?
13    A.  We were, yes.
14    Q.  You were or you weren't?  Let's get this straight.
15    A.  We were.  The workers' exposure was primary.
16    Q.  You were concerned about them, right?  You were
17  concerned about your own employees?
18    A.  Yes, we were.
19    Q.  Being exposed to too much benzene from Liquid
20  Wrench?
21    A.  As it turned out, yes.
22    Q.  And back then the proposed regulation was one part
23  per million, correct?
24    A.  That's -- I think that's correct.
25    Q.  And so your concern -- was this your concern or

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 170

1  somebody else in the company?
2    A.  This was mine originally.
3    Q.  Okay.  It was originally your concern that you
4  couldn't keep the exposures below one part per million for
5  your employees involved in certain tasks, correct?
6    A.  That's correct.
7    Q.  Okay.  Which employees were you concerned about?
8    A.  Primarily those that were at the end of the line
9  packing the filled cans into cartons.
10    Q.  Mainly those people?
11    A.  Yes.
12    Q.  Now, tell me what a person that's taking cans that
13  have tops on them and putting them into cardboard boxes --
14  weren't your cartons cardboard boxes?
15    A.  Yes.
16    Q.  How were they going to be exposed to above one part
17  per million of Liquid Wrench?
18    A.  The equipment that the L108, et cetera was filled on
19  was very, very old.  We had moved it out of the Charlotte
20  plant into the Indian Trail plant and it was prone to miscues
21  and drips, leaks and sometimes the capping process wasn't
22  totally adequate either and the result would be there would be
23  anywhere from drops to more than just drops on top of the can.
24  And they would have to stop, refit the cap, wipe the top of
25  the can off.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 171

1    Q.  Why did that concern you?
2    A.  Well, they were exposed to the material.
3    Q.  To the benzene?
4    A.  Well, to the --
5    Q.  The raffinate?
6    A.  Everything, yeah.
7    Q.  But you understood the raffinate carried the
8  benzene?
9    A.  Yes.
10    Q.  Why didn't you just give your employees some
11  chemical resistant gloves?
12    A.  Well, there was also ventilation to be concerned
13  with.
14    Q.  Couldn't you have given them respirators?
15    A.  Could have.
16    Q.  Couldn't you have just fixed your manufacturing
17  process to where you didn't have drops sitting on top of the
18  cans?
19    A.  It could be done.  However, I think I testified
20  earlier that it was not economically feasible.  One of the
21  reasons was the sale of this Liquid Wrench formula was not
22  very good.  We were -- it was going down as I recall and I'd
23  already eliminated 16-ounce, 32-ounce.  8-ounce was all that
24  was left.  And at one point I attempted to eliminate that.  I
25  got so much difference of opinion from our salespeople, I had

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 172

1  to keep it for a while longer.
2      Q. So the Liquid Wrench product had been declining in
3  value with the company?
4      A. Yes.
5      Q. Starting when? Starting when?
6      A. Liquid Wrench regular.
7      Q. Pardon me?
8      A. The Liquid Wrench with raffinate had been declining.
9      Q. Starting when?
10     A. I don't recall when. I just know that it was
11 consistently going downward.
12     Q. Starting since you started in 1972 or late '70s or
13 what are we talking about?
14     A. Probably early '70s. I mean, that's sitting here
15 right now.
16     Q. And why is it that the value of the Liquid Wrench
17 with the raffinate was going down as compared to the
18 deodorized Liquid Wrench?
19     A. I don't know. I don't know.
20     Q. Were they two different markets?
21     A. Well, certainly as I said earlier, they were sold
22 through two different type outlets and that may have been a
23 factor.
24     Q. What were the two different types of outlets?
25     A. Well, the little the 4-ounce can would have gone

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 173

1  into K-Mart or Wal-Mart and the 16-ounce, 12-ounce -- 8-ounce
2  would have gone into a Home Depot.
3      Q. Sir, would you like to take a break where you can
4  get something to eat or something to drink real quick?
5      MR. RILEY: I think he does.
6      MR. LUBEL: Is that okay?
7      MR. RILEY: Yeah.
8      THE VIDEOGRAPHER: It's 3:21 p.m. Off the
9  record.
10     (Recess from 3:21 to 3:32)
11     THE VIDEOGRAPHER: The time is 3:32 p.m. Back
12 on the record.
13     (Exhibit No. 5 marked)
14     Q. (BY MR. LUBEL) You ready, Mr. Wells?
15     A. I am.
16     Q. I'm going to mark as Exhibit 5 that 1970s Mariners
17 annual page that you and I spoke about earlier. Let me zoom
18 out. You remember this document?
19     A. What did you ask me?
20     Q. Do you remember talking about this earlier today?
21     A. I do.
22     Q. Okay. This is a 1970 document where it's difficult
23 to read but, you know, it says on the advertisement deodorized
24 Liquid Wrench. And then if you look up here in the left-hand
25 corner, does that appear to be deodorized as well?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 174

1      A. I really cannot tell from this.
2      Q. Okay. It's difficult to read. Can you remember
3  from your experience at the company what else they would have
4  put in this left-hand corner other than deodorized?
5      A. Well, my best answer is that a lot of little things
6  got moved around like the solder seal emblem, for example. It
7  wasn't always in the same place I don't think. So I don't
8  have an answer for your question.
9      Q. Let me do it this way. Let me show you what I've
10 marked as Exhibit 6 and ask you if you recognize this can?
11     (Exhibit No. 6 marked)
12     A. That's probably the one that I looked at yesterday.
13     Q. (BY MR. LUBEL) Okay. Do you see where it says
14 deodorized up there?
15     A. Yes.
16     Q. And do you see where it's got the super penetrant and
17 it's got a pipe wrench on it?
18     A. I do.
19     Q. And it's got a skull and crossbones, correct?
20     A. I do.
21     Q. Is not going to surprise you when I flip the page
22 and it says contains benzol or benzene, right?
23     A. Right.
24     Q. You've seen that, correct?
25     A. I have.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 175

1      Q. In fact, let me see if I can zoom in. There it is
2  right there. Now, keep fresh in your mind, if you will, this
3  picture, okay? You see the deodorized on the left. You see
4  it's an 8-ounce can. It's got pipe wrench. It's got the skull
5  and crossbones, says danger poison, et cetera, okay?
6      A. Yes.
7      Q. Now, let's look back to the 1980 advertisement I
8  marked as Exhibit 5.
9      MR. LONGORIA: 1970.
10     MR. LUBEL: No, it's 5.
11     MR. LONGORIA: No. You said 1980.
12     A. This was what year?
13     Q. (BY MR. LUBEL) 1970. Do you see it?
14     A. I don't see a 1970.
15     Q. No. This is the -- see up here, 1970. This is out
16 of the Mariner's annual. 1970. I showed you this at the
17 beginning of the deposition.
18     A. Oh, okay. Yeah.
19     Q. Now, let me back it up, if I can learn how to work
20 this thing. Do you see where it says deodorized Liquid
21 Wrench, right?
22     A. Yes.
23     Q. Now go back. That says deodorized, right?
24     A. Right.
25     Q. Has a skull and crossbones and you remember it says

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 176

1  benzol on the back of it, right?
2    A. Right.
3    Q. Okay. Now, look right there. You see I'm going to
4  tell you that looks like deodorized to me. You've already
5  told us you can't read it for sure, right?
6    A. Right.
7    Q. Now, look at both. You see where the words are?
8    A. Yes.
9    Q. Don't you think that says deodorized?
10   A. Yes.
11   Q. And then you see where it says solder seal, right?
12   A. Right.
13   Q. 8-fluid ounces, right?
14   A. Right.
15   Q. We can't see what it says here, but that appears to
16 be 8 fluid ounces, but it's a poorly legible copy, right?
17   A. Yes.
18   Q. You agree with that?
19   A. I do.
20   Q. And then when we look down, when we look at the rest
21 of the product, let me zoom out a little bit, you'll see that
22 you've got a pipe wrench on this one and you've got a pipe
23 wrench on this one, right?
24   A. Okay.
25   Q. And it says the super penetrant, and on this one it

James Wells Vol II
11-6-2008

Page 177

1  says the super penetrant. Do you see that?
2    A. Yes.
3    Q. And then you'll see you've got a skull and
4  crossbones here and you've got one there, right?
5    A. Right.
6    Q. And so I know you weren't working at Radiator
7  Specialty Company in 1970, right?
8    A. Right.
9    Q. But we can tell from looking at the Mariner's annual
10 because it's a 1970 version that they're not referring to a
11 can in your vintage, in '72, '78 time period, right, because
12 it's before then? It's before you got there, right?
13   A. Well, yes, yes.
14   Q. That makes sense, right?
15   A. Right.
16   Q. And then if we look at this one, can you tell from
17 looking at this can and I'll give you the rest of the pictures
18 whether it also is pre-1972 can? And let me hand it to you.
19 Its got various pictures of it, front, side, back.
20   A. The only clue to this can versus later cans -- and
21 what I'm about to tell you is my best recollection. I could
22 be wrong, but I don't think so. Sometime after '72 is my
23 recollection that we changed the word benzol to benzene.
24   Q. Can I put that up and show the jury while you're
25 explaining it? You're looking at the back of the can, right?

James Wells Vol II
11-6-2008

Page 178

1    A. Yes.
2    Q. And just so the record is clear, we've marked that
3  as Exhibit No. 6. So let me -- where this can says benzol,
4  you're saying sometime after '72 you put on there contains
5  benzene, right?
6    A. That's my recollection, yes.
7    Q. Now, benzol and benzene are the same thing for the
8  chemist, right?
9    A. Correct.
10   Q. It's just they're synonymous terms?
11   A. Yeah. The word benzol has kind of got out of
12 popular use for whatever reason.
13   Q. For whatever reason. But benzene equals benzol?
14   A. Yeah.
15   Q. So you think this is probably a pre-1972 can because
16 it says benzol instead of benzene?
17   A. That's an indication to me that it could be.
18   Q. All right. Now, is there anything else about the
19 can that would indicate to you even if you didn't see the word
20 benzol or benzene on it that it was a benzene-containing
21 formula?
22   A. Well, let's hold that question just for a second and
23 go back to that picture where they had the benzol on it. The
24 back panel.
25   Q. Okay. You want me to put that back up?

James Wells Vol II
11-6-2008

Page 179

1    A. Yes.
2    Q. All right.
3    A. Now, you'll notice at the top -- focus on the top
4  where it says caution, flammable mixture.
5    Q. Right.
6    A. Now, then it goes ahead and talks about New York
7  City fire department.
8    Q. Right there?
9    A. Yeah.
10   Q. Okay.
11   A. First of all, that -- I think we eliminated that --
12 all of that which you see from caution down through the
13 New York City.
14   Q. When?
15   A. Well, sometime -- my recollection, I think we did in
16 early maybe '73. Again, I'm not certain.
17   Q. After you got there?
18   A. Yeah, after I got there. And the other thing about
19 it is that you'll notice it says flammable mixture. Well --
20   Q. Right there?
21   A. Yeah. The deodorized was not flammable. It's
22 combustible. So the flammable is in agreement with the skull
23 and crossbones and the rest of the label on the front.
24   Q. Anything else on this can, container?
25   A. That's all I see right now.

James Wells Vol II
11-6-2008

Page 180

1    Q. So, isn't it a fact that pre-'72 when you got there
2 the deodorized version in the 8 fluid ounce containers of
3 Liquid Wrench contained benzol?
4        MR. RILEY: Objection; form.
5        MR. SYKES: Object to the form of the question.
6    A. No.
7    Q. (BY MR. LUBEL) Well, this one shows it does?
8    A. No.
9    Q. Look.
10    A. This is a Liquid Wrench can that contains the
11 raffinate formula. The word deodorized on the front is some
12 kind of -- I'm speculating is some kind of error in -- knowing
13 what I know about the way the art work was done. This
14 deodorized was left on there by accident when they were making
15 cans.
16    Q. Okay. Can you show me the formula for deodorized
17 pre-1972 that reflects there's no raffinate in it? Can you
18 show me that document?
19    A. I can show you that document that would be dated --
20 it was dated before I came there. There is a document, and
21 you have it, that shows the formula. It may say '71 or may
22 say '70. May even say '72, but it was given to me after I got
23 there.
24    Q. I'm just asking you if you've seen the formulations
25 for deodorized Liquid Wrench before 1972?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 181

1    A. I just said yes.
2    Q. You've got one of those documents?
3    A. You have, too.
4    Q. Well, you've never been to my office, my file, have
5 you?
6    A. Well, we've produced it. Let me put it that way.
7    Q. You assume I have it?
8    A. Yes.
9    Q. True?
10    A. True.
11    Q. Now, I thought you told us earlier that the whole
12 reason that you put the skull and crossbones is because of the
13 benzene in the product. Are you saying that's a mistake?
14    A. The skull and crossbones is appropriate for what's
15 in the can, meaning the raffinate formula.
16    Q. Is it because of the raffinate is my point?
17    A. The skull and crossbones is, yes.
18    Q. Because the benzene and the raffinate, right?
19    A. Well, the toluene and the xylene, but the benzene
20 does have a special meaning as outlined in the CFR16 when it
21 comes to quantity.
22    Q. Sure. The skull and crossbones, is it to signify
23 that there's raffinate in it?
24    A. Raffinate -- yes.
25    Q. All right. Now, go back to this Exhibit 5, this

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 182

1 picture, okay. See its got the skull and crossbones?
2    A. Uh-huh.
3    Q. We've already agreed that that's the deodorized
4 version in 1970, correct?
5    A. No.
6    Q. You did. We went through it.
7    A. We agreed -- or I said that that word deodorized on
8 that can is a mistake.
9    Q. It's a mistake on this one, too?
10    A. Everything else on the can says it's the raffinate
11 formula.
12    Q. You're saying that the advertisement in 1970 is a
13 mistake, too?
14    A. We don't know where that can came from, but what I'm
15 saying is that the can that you have is a mistake and so maybe
16 this can and this can are one and the same.
17    Q. So y'all are advertising as deodorized with the
18 skull and crossbones and you're saying those were mistakes?
19    A. I'm saying that my belief is that that word was put
20 on there accidentally.
21    Q. Twice?
22    A. What do you mean twice?
23    Q. Well, you're advertising to whoever that this can is
24 deodorized and has raffinate too by virtue of the skull and
25 crossbones, correct?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 183

1    A. Well, we get hung up on something here.
2    Q. You know what --
3    A. All I can do is say it again. If you put your
4 finger over this deodorized and pretend like it's not there,
5 everything else about that can is a raffinate formula. The
6 same is true with the label that you have on there. If you
7 cover up that deodorized, everything else about it says as we
8 talked about the caution about the flammability and the skull
9 and crossbones and all the other ones that go with all the
10 things that you have to put on there when you use that
11 formula.
12    Q. Sir, the deodorized versions contain raffinate,
13 correct?
14        MR. RILEY: Objection.
15    A. No.
16    Q. (BY MR. LUBEL) So when y'all advertised this
17 deodorized version is containing raffinate with the skull and
18 crossbones you're telling us that was a mistake, right?
19    A. I'm going to tell it one more time. This is the
20 third time.
21    Q. Please do.
22    A. The word raffinate on that can is a mistake.
23        MR. RILEY: Wait a minute. You said raffinate.
24    Q. (BY MR. LUBEL) Which can?
25    A. I mean the word deodorized on this can and that one

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 188

1    are back on the record.
2        Q.   (BY MR. LUBEL) You ready to proceed?
3        A.   Yes.
4        Q.   At the break you and Mr. Riley went and located two
5    documents that he tendered to me right before we started,
6    correct?
7        A.   Located two documents and what?
8        Q.   Mr. Riley tendered to me right before we began?
9        A.   Correct.
10       Q.   I'm going to mark the first one as Exhibit 7 and the
11   second one as Exhibit 8.  Is that fine by you?
12       A.   Sure.
13            MR. RILEY:  For the record they were part of
14   the initial production and disclosures.
15            MR. LUBEL:  I'm not contesting it.  These look
16   familiar.
17            MR. RILEY:  I know.  I just had to say it.
18            (Exhibit Nos. 7 and 8 marked)
19       Q.   (BY MR. LUBEL) Let me start with, Mr. -- Mr. Wells,
20   with No. 8.  You had a chance to study it, right?
21       A.   Not in a long time, but I think I know what it is.
22       Q.   Tell me when we took a break you and Mr. Riley went
23   and found the document?
24       A.   Found it.
25       Q.   You looked at it, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 189

1        A.   Yeah.
2        Q.   It's a Foster Snell document and it's a report to
3    your company and it says a sample of penetrating oil and it
4    refers to Liquid Wrench and a parts number L103, right?
5        A.   Correct.
6        Q.   What does L103 refer to?
7        A.   L103 is the part number of a little small squeeze
8    can that historically out of all the cans that I ever produced
9    and indeed when we first went into production that was what we
10   were making, L103 with the same formula that you're going to
11   look at I guess after you finish with this.
12       Q.   All right.  Now, just to be fair, this is May 1969
13   document, right?
14       A.   That's what it says, yeah.
15       Q.   And so this really isn't a formulation or formula
16   for Liquid Wrench deodorized, is it?
17       A.   No.
18       Q.   This is a testing document done by a third party,
19   Foster Snell, for Radiator on a particular parts number L103
20   which is a very small can, true?
21       A.   True.
22       Q.   Three refers to 3 ounces?
23       A.   Correct.
24       Q.   And so it says results of test and inspection in
25   accordance with some U.S. Coast Guard rule, right?  Do you see

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 190

1    that?
2        A.   Yes.
3        Q.   What is that rule?
4        A.   I have no idea.
5        Q.   All right.  You've never had to look at that, have
6    you?
7        A.   No.
8        Q.   And then it's got a flash point for a tag open cup.
9    What does that mean, tag open cup?
10       A.   Well, there are a couple of flash point
11   measurements.  One's an open cup and one's a close cup.
12       Q.   What's the difference?
13       A.   Not much.
14       Q.   Okay.  Then it -- if we look to the back, it refers
15   to the product consists of a blend of distillable petroleum
16   solvent, petroleum based lubricating oil, petroleum
17   sulfonates, graphite and perfume, correct?
18       A.   Correct.
19       Q.   All right.  Now, it doesn't specify what the
20   petroleum distillates are, correct?
21       A.   Correct.
22       Q.   This isn't a formula in the sense where it says 70
23   percent this, 10 percent this and -- it doesn't have that kind
24   of specificity, correct?
25       A.   It does not.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 191

1        Q.   But I take it that you can tell by the flash point
2    something, correct?
3        A.   Yes.
4        Q.   What can you tell from this flash point?
5        A.   It's combustible.
6        Q.   Which means what?
7        A.   That the carbon molecules are launching.
8        Q.   So can we tell what percentage content of benzene is
9    in these petroleum distillants from the flash point?
10            MR. RILEY:  Objection; form.
11       A.   Well, the question is a little bit awkward.  I'll
12   answer it this way.  Benzene has a flash of about 5 degrees,
13   maybe 20 degrees Fahrenheit.  And typically even though you
14   might mix less than, let's say, 2 or 3 percent benzene and the
15   rest of it kerosene, it would still flash down at the very low
16   end of those numbers.  So what this really says is that I
17   doubt there's even benzene in this formula.
18       Q.   (BY MR. LUBEL) Well, you know there's some.  You
19   just doubt there's much?
20       A.   Trace amounts.
21       Q.   You doubt there's much?
22       A.   Yes.
23       Q.   True?
24       A.   True.
25       Q.   You know that you can't get all the benzene out of

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 192

1  the petroleum distillate, correct?
2    A. Understood.
3    Q. And so -- and you've acknowledged earlier in your
4  deposition that benzene is one -- fits under the category of
5  both aromatics and petroleum distillates?
6    A. Yes.
7    Q. And so -- but what you're reading from this flash
8  point is there's probably not a whole bunch of benzene in
9  there, right?
10    A. Correct.
11    Q. You think there's more kerosene or some other
12  product like kerosene?
13    A. Yes, I do.
14    Q. Right. But you can't even testify under oath it's
15  kerosene for sure?
16    A. I cannot.
17    Q. Now, have you seen the actual formula for this
18  product?
19    A. As I said, when I began the product at 103 is the
20  first Liquid Wrench that we ever made and I made it by a
21  formula. This same part number, 103.
22    Q. So you're saying that when you started at Indian
23  Trail, you were the first one to make this part number?
24    A. No. They were making it in Charlotte before I --
25  before the plant opened.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 193

1    Q. Are you sure?
2    A. Uh-huh.
3    Q. Very sure?
4    A. Uh-huh.
5    Q. How?
6    A. Well, there's lots of cans with --
7    Q. That look to be pre-'72?
8    A. Well, the cans made in Charlotte are totally
9  different than the cans made in Indian Trail. They don't look
10  the same.
11    Q. Okay. We do need to come back to that before we
12  leave, but let me write that one down. You said the cans in
13  Charlotte look totally different than at your plant at Indian
14  Trail?
15    A. Let me be a little bit more precise. I said the
16  can, but in reality it's the spout on the can.
17    Q. Okay. We'll come back to that. Now, do you have a
18  formula for this product?
19    A. L103?
20    Q. Right.
21    A. Yes.
22    Q. Okay. You don't have it with you?
23    A. Yeah. He just gave it to you I think.
24    Q. Okay. It's Exhibit 7?
25    A. Yes.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 194

1    Q. Let's put that up. I don't see L103 on there. And
2  it's dated 1971, correct?
3    A. Yeah.
4    Q. Do you see that?
5    A. Yeah.
6    Q. And the prior document we were looking at was dated
7  '69?
8    A. Yeah, correct.
9    Q. Now, how do we know that what's listed here in
10  October of '71 was for sure in existence in 1969?
11    A. We don't.
12    Q. How do we find out other than looking at a formula?
13    A. You're not going to find out.
14    Q. I thought you said earlier you thought there was a
15  formula for deodorized in the file cabinet?
16    A. Well, that's it right there.
17    Q. This is it?
18    A. Uh-huh.
19    Q. This is the only formula for deodorized Liquid
20  Wrench that Radiator Specialty has in any of their files?
21    A. Yes.
22    Q. Are we clear on that?
23    A. Yes. It never changed. From '72 on its always been
24  what you're looking at.
25    Q. But we can't tell what was in it before '71, can we?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 195

1    A. We don't know what was earlier than this one date
2  right here.
3    Q. October of '71?
4    A. Right.
5    Q. We can agree on that, right?
6    A. We will agree on that.
7    Q. From a document standpoint?
8    A. Correct.
9    Q. And so when we look at this document, it refers to
10  K-1, right?
11    A. Yeah.
12    Q. That's a code?
13    A. That's a code.
14    Q. Now, where would a chemist such as yourself that's
15  employed by Radiator Specialty find the book that describes
16  the codes?
17    A. Well, at the time we began, all that data was
18  transmitted to me and at some point there was expanded sheets
19  showing the -- everyday K-1 is kerosene.
20    Q. What's M-7?
21    A. I forgot.
22    Q. What's N-1?
23    A. It was called Nacolene. It's kind of a surfactant.
24    Q. What's B-1?
25    A. That was a similar product and it's a barium

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 196

1  sulphonate I think.
2  Q. Okay. What's D-5?
3  A. That was the perfume, deodorant.
4  Q. Okay. It was perfume?
5  A. Uh-huh.
6  Q. What's this?
7  A. O-1 was oil dag. That was the graphite.
8  Q. It was the graphite, but wasn't there a book of
9  sorts that you had codes for your 50 or more major products so
10 you didn't have to memorize every one of them?
11 A. There may have been. I don't remember.
12 Q. Doesn't that make sense?
13 A. It probably was.
14 Q. I mean it's hard to imagine y'all doing business
15 where every chemist had to memorize all the codes?
16 A. Oddly enough, all these part numbers, including
17 these and the final part number like L103, all these numbers
18 was a way of life. No one said kerosene. It was K-1. No one
19 said mineral spirits, M-13 or whatever it was. You didn't say
20 Liquid Wrench. You said L104, L108. That's the way life was.
21 Nobody talked anything but numbers.
22 Q. Parts numbers?
23 A. Uh-huh.
24 Q. Is that yes?
25 A. Yes.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 197

1  Q. But this one didn't have a parts number. It said
2  deodorized Liquid Wrench ingredients?
3  A. That's true.
4  Q. October of '71?
5  A. Okay.
6  Q. Right?
7  A. Uh-huh.
8  Q. And so you think K-1 is kerosene, right?
9  A. It still is today.
10 Q. Okay. Were you aware that there was a time period
11 before kerosene was used where they were using diesel fuel?
12 A. I don't recall that sitting here right now.
13 Q. You don't recall that in your own documents?
14 A. It could have been, but I don't remember.
15 Q. Okay. Can you tell us when kerosene was first used
16 in deodorized Liquid Wrench?
17 A. It was used at Indian Trail when we started for the
18 first time.
19 Q. You're comfortable saying that because that was you?
20 A. Yeah.
21 Q. Can you tell us any -- before you got there?
22 A. No.
23 Q. So as you sit here on behalf of the company, you
24 can't tell us what was in the deodorized Liquid Wrench before
25 '71, correct?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 198

1  A. This is the oldest document I have. This document
2  was from Charlotte and that's what you see is what you get.
3  Q. And so do you recall using kerosene in the Liquid
4  Wrench, the deodorized version at Indian Trail starting when
5  you got there in roughly '72?
6  A. Yes.
7  Q. Never used any diesel fuel?
8  A. No. Well, it's easy to get a little bit confused
9  because there was an occasion when we switched from kerosene
10 to diesel fuel for a short period of time. Not in Liquid
11 Wrench but in something else. And did we ever use it? Well,
12 I'm not sure.
13     MR. LUBEL: Let me see that book, Hector. Did
14 you find that?
15     MR. LONGORIA: Yeah.
16     MR. LUBEL: Diesel fuel.
17 Q. (BY MR. LUBEL) If you'll bear with me for just a
18 minute, Mr. Wells. Do you remember the document I'm talking
19 about that talks about diesel fuel?
20 A. I'm kind of drawing a blank on that. I don't doubt
21 that we may have used it, but I don't recall --
22 Q. Does that ring a bell?
23 A. -- testifying about it one way or the other.
24 Q. Just so the record's clear, drip oil is the same
25 thing as raffinate, correct?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 199

1  A. That's correct.
2  Q. What's oil dag?
3  A. That's what I just said to you, that was the
4  graphite, O-1.
5  Q. Fuel oil No. 2, what was that? Fuel oil No. 2?
6  A. That would have been diesel fuel.
7  Q. That would have been diesel fuel?
8  A. (Witness nods head.)
9  Q. Let me just show you this. You recognize this
10 document, don't you, eliminate benzene from Liquid Wrench
11 number one standard formula?
12 A. I don't recognize it, but go ahead.
13     MR. RILEY: What's the RSC number?
14 Q. (BY MR. LUBEL) Dated March 24 of '78. It's Radiator
15 Specialty Company 00022. Do you see that?
16 A. Yeah.
17 Q. Okay.
18 A. Is this one page out of the three or four that were
19 stapled together?
20     MR. RILEY: Here, Jim.
21     MR. LUBEL: Here.
22 Q. (BY MR. LUBEL) Who authored this? Tames, who is he?
23 A. He was a chemist in our Charlotte operation.
24 Q. Who asked him to do this study of eliminating
25 benzene from Liquid Wrench number one standard formula?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 200

1    A. I don't know.
2    Q. It was during your time there, right?
3    A. Yeah.
4    Q. '78?
5    A. Yeah.
6    Q. Weren't you in charge of that effort?
7    A. Well, this is kind of an unusual story because it's
8  like we had this fella working on something on his own and I
9  wasn't even aware that he was doing it. And we had already
10 made all the decisions as to the conversion. And I don't know
11 why this was even done, but it was done.
12   Q. He was just wasting his time? All right. It says
13 here that Liquid Wrench number one standard, that contains
14 raffinate, right?
15   A. That's what it says, yeah.
16   Q. And it says Liquid Wrench deodorized containing fuel
17 oil No. 2. You said that was the diesel fuel, right?
18   A. I think so, yeah.
19   Q. Where did y'all buy that from?
20   A. Axel Oil and -- lots of different people.
21   Q. That you bought the diesel fuel from?
22   A. Yeah.
23   Q. I take it you realize that diesel fuel has some
24 measure of benzene in it?
25   A. I'm not surprised.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 201

1    Q. Do you have any documents that quantify that for us
2  back then?
3    A. No, I don't think -- if we ever used it, and this
4  doesn't say we used it, but if we ever did, I don't think we
5  used it very long. The reason was it -- the odor was
6  terrible.
7    Q. What was?
8    A. The odor of fuel No. 2.
9    Q. Well, I thought that's why you put perfume in it?
10   A. Well, no. The perfume was already in back when it
11 was kerosene.
12   Q. You're saying you didn't use it? This report here
13 says Liquid Wrench deodorized contain fuel No. 2 and it talks
14 about three other formulas, formula B containing kerosene.
15 Those are like the developmental ones, right?
16   A. All of these are developmental.
17   Q. Well, No 2's not. It says Liquid Wrench deodorized.
18 That's not developmental?
19   A. Yes, it is. He just used the fuel oil instead of
20 kerosene. See, this is all development work.
21   Q. So there was no deodorized?
22   A. Well, formula B containing kerosene, that's probably
23 it.
24   Q. That's probably what?
25   A. That's probably deodorized with kerosene instead of

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 202

1  fuel oil No. 2.
2    Q. Are you saying he made a mistake?
3    A. No. He intentionally was looking at various
4  formulas. Then he went ahead and there's a bunch of crafts,
5  you probably have seen, trying to show how these various
6  formulas compare for functionality.
7    Q. Evaporation rates?
8    A. Well, see, he says up at the top practical test on
9  rusted bolts and all that.
10   Q. So what was No. 2, the Liquid Wrench with deodorized
11 containing fuel No. 2? Was that the product that was being
12 sold?
13   A. I don't think -- to my knowledge, no. It was just
14 instead of putting kerosene in it, he put in fuel oil No. 2
15 thinking he could cut the price. And then of course number 4,
16 formula B was the kerosene formula being sold.
17   Q. Okay. Do you have something that would show us the
18 actual formula for the product that was sold?
19   A. Yeah. That's it I just gave you right here.
20   Q. This?
21   A. Uh-huh.
22   Q. How do we know that's not a test?
23   A. Well, I know it because I made it.
24   Q. You made it?
25   A. I made it early. I made it personally, you know.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 203

1  Weighed it out and put it in the mixer.
2    Q. Where is the test on it?
3    A. What test?
4    Q. Don't you take batch tests, production tests?
5    A. Yes.
6    Q. Where are the tests on the products to confirm
7  what's in them?
8    A. That would be a batch record.
9    Q. Okay. Do we have those?
10   A. I don't think we've ever submitted any.
11   Q. Where have they been?
12   A. Laboratory.
13   Q. How do we get our hands on them?
14   A. Well, if they're still there, they're just in the
15 files or in the notebook.
16   Q. Have you looked for them recently?
17   A. No.
18   Q. Have you ever looked for them?
19   A. No.
20   Q. Who can we get over there to look for them?
21   A. Probably Bob Gear.
22   Q. What would it tell us?
23   A. Well, the tests are the color and what it's doing.
24 The color is a match to a standard for the level of oil dag
25 that you put in there. All it does says says, you've got

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 204

1  something in there. You've got the right amount. They
2  probably check the odor and maybe the density, state of
3  gravity, which really doesn't mean much. And the odor, that's
4  kind of important.
5      Q.  The odor is?
6      A.  Uh-huh. The odor and the color, that's what it
7  would tell you primarily.
8      Q.  Let me see if I can find the -- let's -- while I'm
9  searching for a document, you said the cans in the Charlotte
10  office plant look totally different than the containers in the
11  Indian Trail facility, do you recall that, because of the
12  spout?
13      A.  Yes.
14      Q.  What was different about the spout?
15      A.  If you have some pictures of the L103, L104, that's
16  the easiest. If I can draw you a picture, that might be a
17  good way.
18      Q.  But you're just talking about the 4-ounce can down,
19  right?
20      A.  The 4-ounce can.
21      Q.  And lower?
22      A.  Well, the L103 became the L104 and all it was was a
23  change in the label.
24      Q.  Okay. You want to draw a picture of how the spout's
25  different?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 205

1      A.  Yeah. Give me something to draw on.
2      Q.  Yes, sir. Do you have a pen handy?
3          THE WITNESS: Can I borrow that?
4          MR. RILEY: Of course.
5      A.  The can was different and the spout was different.
6  Okay. Here's the difference in them.
7      Q.  (BY MR. LUBEL) Okay. Let's mark that as Exhibit No.
8  9, all right?
9      A.  We going to date it and all that good stuff?
10          (Exhibit No. 9 marked)
11      Q.  (BY MR. LUBEL) No. What does Exhibit 9 represent?
12  What were you attempting to draw?
13      A.  Well, let me write it on there.
14      Q.  Here, let me put it up for the jury and then you can
15  explain what that is. That's Exhibit No. 9.
16      A.  The left-hand sketch where it says C-H-A-R, that's
17  short for Charlotte. At the time they were producing L103,
18  the top of the can shows a pedestal above the top chime, the
19  top chime is where the top and the sides were seamed together.
20      Q.  Right there?
21      A.  That's the chime. The pedestal, of course, is the
22  part sticking up.
23      Q.  That's the pedestal?
24      A.  That's the pedestal.
25      Q.  Okay.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 206

1      A.  As you can see, the plastic --
2      Q.  Let me mark that real quick. Right here?
3      A.  Call that pedestal.
4      Q.  How do you spell it?
5      A.  I don't know.
6      Q.  We're going to call it P for pedestal?
7      A.  Okay. And then the sort of rubberized plastic is
8  formed so that it slips down over top of that pedestal.
9      Q.  This is rubberized plastic in here?
10      A.  Yeah.
11      Q.  Okay.
12      A.  And then if you look at IT, which stands for Indian
13  Trail, there's a hole in the top of the can but there's no
14  pedestal. And the spout has a part sticking down that is
15  inserted through the hole and the flat part of course rests on
16  top of the can and is just a stop. Little removable cap on
17  top is virtually the same, fictionalize -- functionality
18  anyway. When you see a can looks like the one on the left,
19  that's not an Indian Trail. If you see one on the right, that
20  is an Indian Trail.
21      Q.  Which means post-'72?
22      A.  Well, I need to add one more step to that because I
23  didn't think about it until just this moment. There was
24  another spout used at Indian Trail that was never used in
25  Charlotte and the top part where the cap is on the very top of

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 207

1  the spout was different. It was actually a little push-pull
2  valve so that you can pull it up and twist it over and squirt
3  it out and if you pushed it down, it closed and wouldn't leak.
4  We only ran about a half a million of them.
5      Q.  Why?
6      A.  I forgot why.
7      Q.  Wasn't very popular?
8      A.  Well, I don't know. We mainly had some problems
9  with it leaking. It was kind of a test. We ran some. We
10  liked it. We thought it was a good idea -- actually it was my
11  idea, but it didn't turn out too good.
12      Q.  It was leaking through the insert where you put the
13  top?
14      A.  No. It was leaking up in this section up at the
15  top.
16      Q.  Oh, at the stem?
17      A.  Yeah.
18      Q.  Even with the cap on?
19      A.  There was no cap.
20      Q.  Well, of course it would leak if there's no cap.
21  There's a hole there, isn't there?
22      A.  But there was valve in it, a cutoff. I said you had
23  to pull it, push it up and down just like you do a bottle at
24  home for dishwashing detergent or drink bottle. Same process.
25      Q.  These two cans on Exhibit 9 that you're referring to

Stratos Legal Services, LP
713-481-2180

1   at Charlotte and Indian Trail, you're talking about the
2   3-ounce and the 4-ounce right?
3       A.  Yes.
4       Q.  I'm going to go ahead and put that on here.
5       A.  Okay.
6       Q.  3 oz.  4 oz.  You're not saying -- you're not
7   describing these cans as 8-ounce or 16-ounce?
8       A.  It's a 4-ounce -- both of them are 4-ounce cans.
9       Q.  Correct.  But you're not saying this is what they
10  looked like for the 8-ounce can?  They look different?
11      A.  The 8-ounce can was different.
12      Q.  All right.  Now, let's -- let me ask you something.
13  Let me take this Exhibit out of my notes before I walk off
14  with it.  Do you recall saying in the past that you could tell
15  the regular Liquid Wrench from the deodorized Liquid Wrench by
16  virtue of looking at the can to see if it had a pipe wrench on
17  it as opposed to a nut and a bolt?
18      A.  I might have said that.  I don't recall, but I could
19  have.
20      Q.  Can I refresh your recollection with it?
21      A.  If you've got it there, I accept it.
22      Q.  Let me just show it to you.  You see here it says --
23  look at that, Mr. Wells.  It says on the label -- did it say
24  regular Liquid Wrench versus deodorized Liquid Wrench.  You
25  said there was no two in the same size can, right?  You with

1   me so far?
2       A.  No, I'm not sure what we're talking about at this
3   point.
4       Q.  All right.  I'm reading your testimony from another
5   lawsuit.
6       A.  On the label did it say regular Liquid Wrench versus
7   deodorized.
8       Q.  Right.
9       A.  Okay.
10      Q.  So your answer is there were no two in the same size
11  can.  And you say obviously a 4-ounce and an 8-ounce are two
12  different size cans?
13      A.  Okay.
14      Q.  The deodorized I believe always said deodorized?
15      A.  Yeah.
16      Q.  The regular didn't say that and the picture was
17  different?
18      A.  Okay.
19      Q.  You recall saying that?
20      A.  No, but I believe it.
21      Q.  Okay.  Then you say -- well, you were asked how is
22  the picture different between the regular Liquid Wrench and
23  the deodorized Liquid Wrench.  Do you see that question?
24      A.  Yeah.
25      Q.  And then you say, "Well, I really need an example

1   label to show you, but my recollection is that whereas this
2   shows a plumber device and a pipe wrench, my recollection is
3   the other one showed just a big nut and a bolt"?
4       A.  Okay.
5       Q.  Right?
6       A.  Yeah.
7       Q.  Then you say -- you're asked, "Now, would the
8   deodorized Liquid Wrench show a nut and a bolt as well?"
9           You said, "No, I said deodorized did show a nut
10  and a bolt I believe."
11      A.  Okay.
12      Q.  Okay.  So what you were saying then was the regular
13  Liquid Wrench had the pipe wrench.  Do you see it?
14      A.  Uh-huh.
15      Q.  And the deodorized Liquid Wrench had a nut and the
16  bolt.  Two different pictures, right?
17      A.  I think so.  Sitting here right now that sounds
18  right.
19      Q.  Is that what you recall?
20      A.  Uh-huh.
21      Q.  Is that a yes?
22      A.  Yes.
23      Q.  And so if I'm trying to determine whether a man used
24  deodorized or regular Liquid Wrench, one of the things that
25  you would recommend that I do is determine -- try and find out

1   if -- whether the picture showed a pipe wrench versus a nut
2   and a bolt, right?
3       A.  That's not what I would recommend.
4       Q.  I thought we just read that that was one of the
5   differences?  I'm not done going through the list.
6       A.  But you asked me what would I recommend.  I said no,
7   I would not recommend to look at the difference between the
8   nut and bolt versus the pipe wrench.  It's far easier to look
9   and see if it's got a skull and crossbones or it doesn't.
10      Q.  So if its got a skull and crossbones, you say it's
11  regular Liquid Wrench with benzene and if it doesn't, it's
12  not?
13      A.  That's -- best of my knowledge that's correct.
14      Q.  Let's repair that.  Let's fix that.  What you're
15  really saying is that if its got a skull and crossbones, then
16  its got the raffinate version with more benzene than the
17  petroleum distillate version that's got less benzene?
18          MR. RILEY:  Objection; form.
19      A.  Well, I would describe the distillate as a trace
20  amount.
21      Q.  (BY MR. LUBEL)  Of benzene?
22      A.  Of benzene.
23      Q.  But its got some benzene in it?
24      A.  Yeah.
25      Q.  And obviously the raffinate version has more?

James Wells Vol II
11-6-2008

Page 212

1    A.  Correct.
2    Q.  Significantly more?
3    A.  That's -- based on all the evidence, yes.
4    Q.  So when somebody -- if they see this can that says
5  deodorized on it, they need not concern themselves with
6  whether it says deodorized?  If it says a skull and
7  crossbones, then its got the raffinate version of benzene in
8  it, correct?
9    A.  I think so.
10    Q.  All right.  Now, let's do it another way.  Would you
11  agree that most of the 8-ounce cans contain the raffinate
12  version?
13        MR. SYKES:  Object to the form of the question.
14    A.  I have only recently become aware that there was an
15  8-ounce that contained the deodorized version and I have no --
16  not even a wild guess as to how many might have been produced.
17    Q.  (BY MR. LUBEL) But you do know there in your tenure
18  of '72 to '78 that the 8-ounce versions that you were
19  manufacturing for the company contained raffinate?  You've
20  told us that, right?
21    A.  Correct.
22    Q.  So at least during that time period, 1972 through
23  '78, whenever it was that the raffinate version was
24  eliminated, the 8-ounce containers contained raffinate, true?
25    A.  Yes.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 213

1    Q.  What you're unsure about is whether or not there
2  were some number of 8-ounce containers pre-'72 that were
3  deodorized, some of which did not contain raffinate?
4        MR. RILEY:  Objection; form.
5    A.  That's correct.
6    Q.  (BY MR. LUBEL) Now, why is it that you believe that
7  the picture on the raffinate version of the Liquid Wrench
8  would have the pipe wrench as opposed to the nut and the bolt?
9    A.  I have no opinion on that.
10    Q.  Well, you said it; so I'm trying to figure out why
11  you said it?
12    A.  Well, I said it.  I probably noticed that there was
13  a difference and I think I was being asked, you know, how can
14  you tell them apart.  And perhaps that was the first thing
15  that came to my mind.
16    Q.  Okay.  Does this make sense to you that the products
17  that contain the pictures of these pipe wrenches were focused
18  on industrial uses, the mechanics, the tradesmen, the people
19  we talked about for which you would most likely want to have
20  benzol or benzene in it?
21        MR. SYKES:  Object to the form of the question.
22    A.  Well, how did you word that?
23    Q.  (BY MR. LUBEL) Let me do it this way.  I thought
24  I've seen you testify before, Mr. Wells, that you felt there
25  was a distinction between those containers of Liquid Wrench

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 214

1  that were predominately targeted to households versus those
2  that were for industrial or commercial uses.  Do you not
3  recall ever talking about that?
4    A.  Yes.
5    Q.  You know what I'm talking about now, right?
6    A.  Yes.
7    Q.  Does it make sense to you after working for the
8  company and being a chemist that the industrial uses are going
9  to involve projects for which you want to use materials or
10  ingredients like benzol that you would not necessarily need in
11  a household use on a bicycle?
12        MR. RILEY:  Objection; form.
13        MR. SYKES:  Object to the form of the question.
14    A.  Let me make it easy.  I don't disagree with the
15  advice on the raffinate formula in a nut and bolt on the
16  deodorized.
17    Q.  (BY MR. LUBEL) I'm with you; but what I -- I mean,
18  if you don't have an opinion or you don't know, just tell me.
19  But does it make sense to you, sir, as the corporate
20  spokesperson for Radiator that your target market of
21  households would not have benzene in it.  They'd have
22  petroleum distillates.  And your target market for industrial
23  uses would have benzene in it?
24        MR. RILEY:  Objection; form.
25        MR. SYKES:  Object to the form.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 215

1    A.  That makes sense to me.
2    Q.  (BY MR. LUBEL) Okay.  That's not same farfetched
3  concept, is it?
4    A.  I don't think so.
5    Q.  The reverse doesn't make much sense, does it, that
6  you'd send the benzol to the houses and you'd send the
7  petroleum distillate with left benzene in it to the
8  refineries?  That doesn't make any sense, does it?
9        MR. RILEY:  Objection; form.
10        MR. SYKES:  Object to the form.
11    A.  I agree with that.
12    Q.  (BY MR. LUBEL) Now, another way that we can --
13  another clue to whether it was regular Liquid Wrench versus
14  deodorized is by the spout, correct, or am I wrong?
15    A.  You're -- I think you need to start all over again
16  with that question.
17    Q.  Okay.  Can you look at a can and look at the
18  spout -- if I covered up whether there was deodorized on there
19  or not, would you be able to tell whether it was a deodorized
20  can versus a raffinate can?
21    A.  Okay.
22    Q.  By the spout?
23    A.  I guess you didn't understand what I'm saying.  You
24  said a can.  Can be a little 4-ounce can that we just showed
25  or one looks more like that when you have the screen.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 216

1  Q. I gotcha. Well, you know the 4-ounce can you've
2  told us was deodorized only, right?
3  A. Right.
4  Q. So if you look at that size can or the 3-ounce,
5  you're going to say that's deodorized, not regular?
6  A. Yes.
7  Q. If you look at an aerosol can, you're going to say
8  don't need to know anything else. That's deodorized, not
9  regular?
10  A. Yes.
11  Q. But when we get to the larger cans like 8-ounce and
12  up, most of those were raffinate, correct?
13  MR. RILEY: Objection; form.
14  MR. SYKES: Object to form.
15  A. Everything produced at Indian Trail in those sizes
16  were raffinate.
17  Q. (BY MR. LUBEL) And if we go back before Indian Trail
18  in '72 and we're looking for clues, will the spout tell us
19  anything about whether it was deodorized versus raffinate?
20  A. I don't think so.
21  Q. All right.
22  MR. LUBEL: Are you doing okay? If you need A
23  break, you're welcome to --
24  COURT REPORTER: I'm good.
25  Q. (BY MR. LUBEL) The skull and the crossbones you said

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 217

1  was an indication of the raffinate version, true?
2  A. True.
3  Q. Even before 1972, right?
4  A. Well, the raffinate formula would have required that
5  skull and crossbones, et cetera anytime it was produced after
6  the, you know, the law came into effect.
7  Q. All right. So some of the clues are whether the
8  skull and crossbones are on there, correct?
9  A. Yes.
10  Q. The size of the can, correct?
11  A. Yes.
12  Q. The description on the can, whether it says benzene
13  or benzol or deodorized or what have you, correct?
14  A. Correct.
15  Q. The picture of whether its got a pipe wrench on it
16  or a nut and a bolt is a clue?
17  A. Clue, okay.
18  Q. True?
19  A. Yes.
20  Q. The people that are using it as far as what trade
21  they're in and where they're purchasing it is a clue?
22  MR. SYKES: Object to the form of the question.
23  MR. RILEY: Objection; form.
24  Q. (BY MR. LUBEL) Right?
25  A. Not a full clue, but it could be.

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 218

1  Q. But a clue nonetheless?
2  A. A partial, yes.
3  Q. A partial clue, right? True, a partial clue?
4  A. Yeah.
5  Q. The color of the can tell us anything?
6  A. You're comparing the 8-ounce can when it had the two
7  -- two different formulas. Is that what you're comparing?
8  Q. Well, I'm not talking about the 3 or the 4-ounce.
9  I'm talking about the larger --
10  A. I said the 8-ounce can.
11  Q. That's one of the cans I'm talking about.
12  A. That's the only one that I have seen that contained
13  both formulas.
14  Q. Okay. So is it your testimony that the only
15  container that had both deodorized and regular raffinate was
16  the 8-ounce container?
17  MR. RILEY: Objection; form.
18  A. No. I said that's the only one I'm aware of is the
19  8-ounce.
20  Q. (BY MR. LUBEL) The only container that you're aware
21  of as Radiator Company spokesperson that contained both the
22  regular version and the deodorized version is the 8-ounce
23  size?
24  MR. RILEY: Objection; form.
25  A. Yes.

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 219

1  Q. (BY MR. LUBEL) The -- and when you worked at
2  Radiator between '72 and '78, the 8-ounce came -- excuse me,
3  the 8-ounce container only contained the raffinate version,
4  correct?
5  A. Yes.
6  Q. What was the color of the 8-ounce can before 1972?
7  A. The raffinate can? Is that what you're asking me?
8  Q. Whatever. If you've got two different colors for
9  deodorized and raffinate, tell me?
10  A. The color of the can post-'72 to my knowledge was
11  the same colors, maybe even the picture going backwards some
12  period of time. And I don't know how far back. Perhaps all
13  the way back to the '60s.
14  Q. Predominately yellow with some black and a little
15  bit of red maybe?
16  A. Yes.
17  Q. Is that true whether the can was deodorized or
18  regular?
19  A. The pictures I have seen the cans that were marked
20  deodorized, marked non-deodorized were pretty much duplicated.
21  Q. The cans looked the same except for the word
22  deodorized?
23  A. And the other markings, skull and crossbones.
24  Q. Right.
25  A. Benzol.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 220

1  MR. RILEY: Lance, while you're thinking, how
2  much longer are you going?
3  MR. LUBEL: Let's take a break and you and I
4  talk for a minute.
5  MR. RILEY: Sure.
6  THE VIDEOGRAPHER: The time is 4:54 p.m. Were
7  off the record.
8  (Recess from 4:54 to 5:06)
9  THE VIDEOGRAPHER: The time is 5:06 p.m. We
10 are back on the record. Beginning of tape 6.
11 (Exhibit No. 10 marked)
12 Q. (BY MR. LUBEL) Mr. Wells, do you see this document
13 I've marked as Exhibit No. 10 to your deposition?
14 A. Yes.
15 Q. Can you generally describe for us what it is?
16 A. It was some work done in our Charlotte lab. I'm not
17 sure what the intent was. I was not involved in it.
18 Q. All right. You see where it says Liquid Wrench
19 number one up here?
20 A. Yes.
21 Q. You see under Liquid Wrench it talks about raffinate
22 having almost, what, 88 percent raffinate in it?
23 A. Yes.
24 Q. And then we look at the Liquid Wrench number one,
25 deodorized formula it shows diesel fuel No. 2 at roughly

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 221

1  90 percent. Do you see that?
2  A. Yes.
3  Q. And then there's a little asterisk by that. Do you
4  see?
5  A. Yes.
6  Q. And it says -- let's see if I can blow that up a
7  little. Samples of deodorized Liquid Wrench used in this
8  project were made with diesel fuel. Do you see that?
9  A. Yes.
10 Q. Actually diesel fuel has been replaced by kerosene,
11 right?
12 A. Right.
13 Q. And when we look under Liquid Wrench, that formula,
14 deodorized, it has nothing next to kerosene, right? There's a
15 dot?
16 A. Well, the kerosene is over there -- B.
17 Q. Yeah. The kerosene is over here under experimental,
18 right?
19 A. Yeah, yeah.
20 Q. That sound like an experimental product?
21 A. Well, they're all --
22 Q. You're not saying this one is, are you?
23 A. They're showing that as diesel fuel and that's
24 experimental.
25 Q. What he's saying is that you used to use diesel fuel

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 222

1  -- it says actually diesel fuel has been replaced by kerosene.
2  Isn't that what he says?
3  A. Right, uh-huh.
4  MR. RILEY: Objection; form.
5  Q. (BY MR. RILEY) Is that what he says?
6  A. That's what it says there.
7  Q. Okay. Is he wrong?
8  A. As I said earlier, we may have used some diesel fuel
9  at one point in time, but it wasn't for very long.
10 Q. When did kerosene replace diesel fuel in deodorized
11 Liquid Wrench?
12 A. Well, it was kerosene in the beginning in '72. And
13 it was for a long time. And I think we may have put some in
14 somewhere along the way. I don't recall whether it was a cost
15 matter or maybe availability. But my recollection is we
16 didn't do it for very long and none of this is significance
17 for any reason.
18 Q. None of this is?
19 A. (Witness shakes head.)
20 Q. You know --
21 A. It's never used. That's what I'm trying to tell
22 you.
23 Q. Wouldn't this be a lot easier if you had the actual
24 formulas on the products?
25 MR. RILEY: Objection; form.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 223

1  A. I don't understand what you're asking me.
2  Q. (BY MR. LUBEL) If you had the formula on deodorized
3  Liquid Wrench --
4  A. Yeah.
5  Q. -- from like 1951 to 1972, we wouldn't have to be
6  spending all this time talking about it, would we, trying to
7  discover what was in the product?
8  A. Oh, well, I don't think we're ever going to discover
9  what's in the product. No one knows. This is just
10 experimental stuff this guy dreamed up in his head.
11 Q. Well, you've seen the documents that the regular
12 Liquid Wrench back to the 1950s contained aromatics in it,
13 correct?
14 MR. RILEY: Objection; form.
15 A. I may have. I'm not sure, but probably.
16 Q. (BY MR. LUBEL) Have you seen the regular Liquid
17 Wrench formula back in the 1950s that reflected 80 percent
18 aromatics in the formula?
19 MR. RILEY: Objection; form.
20 MR. SYKES: Object to the form.
21 A. I don't recall seeing that. I'm not saying I didn't
22 see it.
23 Q. (BY MR. LUBEL) Just doesn't surprise you?
24 MR. RILEY: Objection; form.
25 A. It could have.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 224

1  Q. (BY MR. LUBEL) You want me to show it to you?
2  A. Yeah, please.
3  Q. Now, the aromatic content of the Liquid Wrench of
4  the raffinate version you started making in '72 was just 29 or
5  30 percent, correct?
6  MR. RILEY: Objection; form.
7  A. No. Well --
8  Q. (BY MR. LUBEL) I'm not asking you what the raffinate
9  percentage was?
10  A. Yeah, yeah, I think the raffinate was about
11  30 percent of whatever it was.
12  Q. The raffinate was 90 percent of the total product?
13  A. Of the total.
14  Q. The aromatics portion the raffinate was roughly 29
15  or 30 percent; is that correct?
16  A. I believe I read that somewhere.
17  Q. And so in the '50s if the aromatic percentage of the
18  naptha in the product was 80 percent, that's most likely got
19  more benzene in it, correct?
20  MR. RILEY: Objection; form.
21  MR. SYKES: Object to the form.
22  A. Well, I don't know what the aromatic composition
23  was.
24  Q. (BY MR. LUBEL) Well, you know its got some benzene
25  in it?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 225

1  MR. RILEY: Objection; form.
2  A. Probably.
3  Q. (BY MR. LUBEL) Let me show it to you. This is from
4  1950. Have you seen this document?
5  A. I have.
6  Q. Was that one of the documents in your file?
7  A. Yes.
8  Q. Your Liquid Wrench file?
9  A. I don't know where that came from, but I know I've
10  seen it.
11  MR. RILEY: What's the Bates number?
12  MR. LUBEL: 155.
13  MR. RILEY: Thank you.
14  Q. (BY MR. LUBEL) What page is it that refers to
15  petroleum nap -- there it is. You see where it says 80
16  percent of an aromatic naptha. Do you see that?
17  A. Uh-huh, yes.
18  Q. And we don't know the exact content of that that's
19  benzene, right?
20  A. I don't.
21  Q. And you don't have a test for us that gives us that,
22  do you?
23  A. I don't have a test?
24  Q. You didn't find any test results going back to the
25  1950 version of Liquid Wrench?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 226

1  A. I did not.
2  Q. And nobody provided you with one, right?
3  A. No.
4  Q. And -- but when we look at the flash point --
5  remember you talked about that earlier?
6  A. Yes.
7  Q. You told us that a flash point of 5 degrees to 20
8  degrees to you was indicative of benzene. Do you remember
9  that?
10  A. I said that, yes.
11  Q. And we see on this Liquid Wrench its got 5 degrees,
12  right?
13  MR. RILEY: Objection; form.
14  A. Yes.
15  Q. (BY MR. LUBEL) So open cup and then it says
16  23 degrees, right?
17  A. Yes or one's centigrade and the other's Fahrenheit.
18  Q. That's right. But this formulation of Liquid Wrench
19  is consistent with a benzene-containing product, right?
20  MR. RILEY: Objection; form.
21  Q. (BY MR. LUBEL) You need me to blow it up?
22  A. No. I'm just reading down it at the bottom where it
23  says Liquid Wrench -- approval -- is supplied -- on their I
24  specifications -- 1950.
25  MR. RILEY: This is RSA 155.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 227

1  MR. LUBEL: Yeah. Where are the pictures?
2  MR. LONGORIA: 153.
3  MR. LUBEL: 153.
4  MR. RILEY: One what?
5  MR. LUBEL: This one's 153.
6  Q. (BY MR. LUBEL) Do you understand -- you remember
7  earlier when we looked at Exhibit No. 6, you remember that
8  New York City FD?
9  A. Yes.
10  Q. Remember that?
11  A. Yes, I do.
12  Q. Mr. Wells, I need your attention on the screen for
13  this picture. You see that on there?
14  A. Yes.
15  Q. That's a Liquid Wrench container, right?
16  A. Right.
17  Q. And then what we see down here is Liquid Wrench
18  New York City fire department certificate of approval, right?
19  A. Right.
20  Q. Now, go back here. New York City fire department,
21  certificate of approval, right?
22  A. Right.
23  Q. This one says 1260. You see that?
24  A. Yes.
25  Q. This one says 1260, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 228

1    A. Right.
2    Q. Okay. Now, does this refresh your recollection that
3  back during this 1950 time period that the Liquid Wrench
4  contained benzene?
5        MR. RILEY: Objection; form.
6    Q. (BY MR. LUBEL) By virtue of it's aromatic content?
7        MR. RILEY: Same objection.
8    A. The data that you show me suggests that.
9    Q. (BY MR. LUBEL) You have no data to contradict it at
10 this point, do you?
11   A. No.
12   Q. You've been looking for some time for documents that
13 would give you as much information as possible about
14 formulations going back to the beginning of time, right?
15   A. Right.
16   Q. And the content of benzene, true?
17   A. True.
18   Q. Have you seen anything for this era 1950 that's more
19 supportive of benzene content than what we see here?
20   A. No.
21   Q. This is the best we've got?
22   A. Best I've seen.
23   Q. Best you've seen.
24      (Exhibit No. 11 marked)
25   Q. (BY MR. LUBEL) We're going mark the document we just

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 229

1  have been referring to as Exhibit No. 11. Is that okay by
2  you? See the sticker?
3    A. (Witness nods head.)
4    Q. See what I've done? It's a multi-page document,
5  Mr. Wells. You see?
6    A. Okay.
7    Q. Okay?
8    A. Okay.
9    Q. All right. Now, let's go back. Really want to
10 focus in on these containers. Some of these containers have,
11 give you an example, bar codes on them. Do you see that?
12   A. Yes.
13   Q. What era is that? I'm told that bar codes hadn't
14 existed forever.
15   A. That's true. I'm reasonably certain that's a
16 post-'72 and I can't remember more than that.
17   Q. Could it be post-'78?
18   A. It could be.
19   Q. Okay. How could we find out when the bar codes were
20 placed on the containers?
21   A. There might be somebody in the company that might
22 remember who was involved in the bar codes and right now I'm
23 not sure who that would have been.
24   Q. Let's do this one by example because this may
25 refresh your recollection. It may help you. Let me show you

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 230

1  the first page of it, okay. This is a can of Liquid Wrench,
2  right?
3    A. Yeah.
4    Q. You'll see it's an 8-ounce can, right?
5    A. Yes.
6    Q. No reference to deodorized or non-deodorized, right?
7    A. What appear to be deodorized.
8    Q. Okay. No skull and crossbones, true?
9    A. Correct.
10   Q. When you flip it over, it says contains petroleum
11 distillates, right?
12   A. Right.
13   Q. Keep going, you got a bar code. Does this seem to
14 be a post-1978 can once you remove the raffinate?
15   A. Well, what's intriguing me is it looks like somebody
16 put a sticker on there. It doesn't look like part of the
17 litho. And I question that we would have -- oh, I'm not sure
18 -- I see where you're going. I'm not sure that I can make
19 that leap because of that -- this bar code could have been
20 applied at a store and before we as a company ever put our
21 labels.
22   Q. Did y'all ever put them on y'all's labels, bar
23 codes?
24   A. I'm not sure. We had them on the -- I want to say
25 yes, but right now I'm just drawing a blank.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 231

1    Q. Okay. If we wanted to know what was on the labels
2  for these containers, wasn't there an art department at
3  Radiator?
4    A. Yes.
5    Q. You obviously did not work in the art department?
6    A. No, I didn't. And that's probably the best answer.
7    Q. Okay. Who did?
8    A. There were some girls back there.
9    Q. Girls? You mean ladies?
10   A. Yeah.
11   Q. Were they girls or ladies?
12   A. They were ladies. Then there was a fellow who ran
13 it, but he retired and he died. And I'm not sure who else
14 took his placing.
15   Q. Okay. Have you seen the art department's labels for
16 these various cans, the drawings?
17   A. I don't recall.
18   Q. Okay. Have you personally looked for those or has
19 that been somebody else's job?
20   A. I personally three or four years ago went through a
21 big stack of labels and it may have been Liquid Wrench or may
22 have been something else. I just remember going through it.
23 As I think I may have testified before, they did not keep very
24 good records.
25   Q. They being the art department?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 232

1   A. Correct.
2   Q. Where were their office?
3   A. Charlotte.
4   Q. Were they in one of those office buildings?
5   A. They were in the main office building.
6   Q. What building number was that?
7   A. One.
8   Q. And where were their file cabinets?
9   A. I don't know they even had any at all. I don't know
10  the answer to that.
11  Q. Three or four years ago where were they?
12  A. How many years ago.
13  Q. Three or four?
14  A. I don't know.
15  Q. Where are they today, do you know? Should I ask
16  Mr. Winer?
17      MR. RILEY: Objection; form.
18  A. The -- what happened was we were dissatisfied with
19  the art department and the ability to do what we needed done
20  in a timely way. So we went to the computer. We started
21  making all of our labels on the computer, what we could, you
22  know, correct them, amend them, change them, whatever was
23  required.
24  Q. (BY MR. LUBEL) When was that?
25  A. I'm going to say in the '90s sometime. So probably

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 233

1   everything we did after that was on the computer -- computer
2   storage.
3   Q. Okay. I'm looking for the files before you went to
4   computers. I'm looking for pre-'79 labels?
5   A. I have no idea.
6   Q. You don't even know where I begin with that?
7   A. Well, the ones that I looked through a few years ago
8   came out of the art department and that was before the
9   building was torn down. Now that the building is no longer
10  there, everything is demolished, I don't know where they are.
11  Q. What did they do with those documents?
12  A. I don't know.
13  Q. Who gave them to you? Who handed you them to look
14  at?
15  A. I believe it was one of the girls in the art
16  department brought them to Ron Winer's office and I sat in the
17  conference room and looked at them.
18  Q. How many were there? What volume were there?
19  A. Oh, there was a stack I'm going to say four inches
20  tall.
21  Q. You think of they were all Liquid Wrench labels?
22  A. I don't remember what product they were. They could
23  have been.
24  Q. Could have been Puncture Seal for all you remember?
25  A. Could have been.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 234

1   Q. If you went back there tomorrow, who would you ask
2   for the labels on Liquid Wrench, the art?
3   A. I don't think those people who were working there
4   then still work there.
5   Q. Okay. But who would you ask today? Like is there
6   an art department today?
7   A. There must be. Somebody has to do the labels for
8   the boxes, the advertising.
9   Q. Remember telling me that when you started in '72,
10  thereabouts, they started to ship you some documents that
11  preceded your time, Mr. Kologiski's time? You remember that?
12  A. Ship me some documents?
13  Q. Yeah. You started to get Liquid Wrench files from
14  Charlotte?
15  A. Well, I got those that I produced, yeah.
16  Q. But that was right after you started, right?
17  A. A little bit later than that. I mean, I got the
18  formulas right after I started.
19  Q. Isn't it conceivable that the art department people
20  would be the people that would keep the labels that have
21  existed overtime or do you think they would go to archives or
22  where would they be?
23  A. They're the ones that kept them, but as I explained
24  to you, they -- every time they changed the label, they cut
25  the old ones up and used the pieces to make the new one. So

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 235

1   there was no archiving of the labels.
2   Q. So you're saying they threw them all away?
3   A. Well, they've been used up.
4   Q. You went and looked and they told you they were all
5   gone. Is that what you're testifying to?
6   A. No. What I testified was I looked at a pile of
7   labels a few years ago. I have not looked recently.
8   Q. You don't even know what labels those were, right?
9   A. I don't know what they were, no.
10  Q. Okay. Can you look at this can and tell me what
11  vintage it is, what time period?
12  A. Well, if you look at that spout, if that's an
13  original, in this picture at least it does not look like one
14  of the plastic spouts. It looks like one of the old lead or
15  some kind of soft metal.
16  Q. What does that tell us?
17  A. It's a very old one. That's what it looks like.
18  And this one does not have any warnings on the front panel
19  which makes you think it's pre-1960.
20  Q. '60 or '64?
21  A. Same difference. Well, okay. '64, '62. And then
22  on the back panel there does appear to be a date, 1950.
23  Q. Where do you -- can you point that to me?
24  A. Center bottom right here.
25  Q. All right. So this one has a date?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 236

1    A. Yeah.
2    Q. Most cans don't have dates, do they?
3    A. That's correct.
4    Q. When did y'all decide not to use dates?
5    A. Well, go back up there where you were. It's kind of
6 hard to tell, but this I believe is three Cs, CCC, you know,
7 expanded.
8    Q. What does that mean?
9    A. Continental Can Corporation. That was their logo.
10    Q. Okay.
11    A. And so they would have put that on there
12 irrespective of our labeling. And typically they don't put
13 dates on their cans in my experience but that one looks like
14 it--
15    Q. Why does this one say Canada? I see a lot of cans
16 with Canada on them?
17    A. All of them have Canada on them, just about.
18 They're supposed to have Canada on them.
19    Q. Why?
20    A. Because Radiator had a plant in Canada.
21    Q. Okay. But why do all your cans have a Canada
22 reference?
23    A. I think it's an advertising trying to show people
24 that -- you know --
25    Q. Worldly? That you were a worldly company?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 238

1    Q. We still see that pipe wrench, right?
2    A. Yes.
3    Q. Okay. That would be a clue that it's the raffinate
4 version, correct?
5    MR. SYKES: Object to the form of the question.
6    MR. RILEY: Same objection.
7    Q. (BY MR. LUBEL) Let me rephrase that. That would be
8 a clue to you that it's either the raffinate version or the
9 petroleum naptha version, correct?
10    MR. SYKES: Object to the form of the question.
11    MR. RILEY: Objection; form.
12    A. Petroleum naptha. Okay.
13    Q. (BY MR. LUBEL) Right? Remember the one we saw the
14 document --
15    A. It would be a clue.
16    Q. And it doesn't say deodorized, right?
17    A. It does not. At least I don't see it.
18    Q. And what size can does this appear to be? 8-ounce?
19    A. I don't know.
20    Q. See the liters at the bottom?
21    A. I can't read it.
22    Q. I can't either. What does that mean?
23    A. I can't read it.
24    Q. I don't know if I can get any better than that.
25 Does it appear to be either an 8-ounce or 16-ounce can at any

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 237

1    A. That's a good word I guess.
2    Q. Okay. Well, this one says avoid prolonged contact
3 with skin. Doesn't say anything about absorption, does it?
4    A. Well, I'm sure -- no, it doesn't.
5    Q. How long does prolonged mean, do you know?
6    A. No.
7    Q. And then it says prolonged breathing of vapor. Do
8 we know how long that means?
9    A. No.
10    Q. And it tells you what you're supposed to do with it,
11 right?
12    A. Talking about the directions?
13    Q. Yes, sir.
14    A. Yeah, how to use it, hit it with a hammer or
15 something.
16    Q. All right. Let's see if I can find the first
17 --you've got the first page. This is the front page of that
18 product, right?
19    A. Yeah.
20    Q. And that's the spout you were talking about that
21 appears to be metal instead of plastic?
22    A. Looks that way to me.
23    Q. And that -- this one looked like an older can to you
24 even before you saw the date of 1950 on it, right?
25    A. Yes.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 239

1 rate?
2    A. I can't tell.
3    Q. Okay.
4    Q. Go back up to the top and let's see what it says up
5 at the top.
6    Q. Whereabouts?
7    A. Right up here. A little higher. Okay.
8    Q. Sorry.
9    A. Looks like this one --
10    Q. That's the goofiest warning I've ever seen.
11    A. Well, this is very early --
12    Q. What does inflammable mean?
13    A. Well, that was the term used before flammable was
14 adopted and it was very misleading.
15    Q. That's the difference between sane and insane.
16    A. I think this has a 1260 over here, but I'm not sure.
17    Q. Right there?
18    A. Yeah.
19    Q. So that refers to that petroleum naptha version we
20 saw?
21    A. Yeah.
22    Q. Okay. Until -- if this is in fact the old can? If
23 it's -- when the raffinate version started and you think
24 that's around 1960, right?
25    A. Somewhere in there, '60, '62, yeah.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 240

1    Q.  Okay. So it's either petroleum naptha or raffinate,
2 one of the two?
3          MR. SYKES: Object to the form of the question.
4          MR. RILEY: Objection; form.
5    A.  Well, you know, it's hard to say.
6    Q.  (BY MR. LUBEL) That's the best clues we have at this
7 point, right?
8    A.  Yes.
9    Q.  Okay. We'll mark this one --
10         MR. RILEY: I just want to see what exhibit
11 you're marking it.
12         (Exhibit No. 12 marked)
13    Q.  (BY MR. LUBEL) The container we've been looking at
14 I've marked as Exhibit No. 12. Do you see that?
15    A.  Yes.
16    Q.  Okay.
17         MR. RILEY: Thank you, sir.
18    Q.  (BY MR. LUBEL) Okay. Sit back and let's talk for a
19 minute without looking at documents, all right? At some point
20 it was your impression -- maybe it was stronger than
21 impression. You were working there. That the product Liquid
22 Wrench was not doing so well at the company, correct?
23    A.  Well, those were facts based upon sales.
24    Q.  What percentage of the sales did Liquid Wrench make
25 up of the company during the '70s, approximately?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 241

1    A.  That was a moving target.
2    Q.  I'm trying to find out -- I'm trying to get a sense,
3 Mr. Wells, of where Liquid Wrench fit in the company as far as
4 how important it was to the company's revenues?
5    A.  All right. I'm going to say -- if I said 1980, is
6 that a good year?
7    Q.  Well, we can start there and we can go backwards or
8 forward.
9    A.  I'm going to say in 1980 -- now, we talking about --
10 well, 1980 there was no raffinate formula. We better say
11 something --
12    Q.  I just want to know about Liquid Wrench in general?
13    A.  Okay.
14    Q.  Liquid Wrench was as product that contained
15 different formulas for the company, right?
16    A.  Right.
17    Q.  How important was it to the company when you started
18 there in '72? Was it a big revenue producer, was it small?
19 Just generally give me some frame of reference?
20    A.  I'm going to say it was maybe a half a percent.
21    Q.  Very small?
22    A.  Uh-huh.
23    Q.  Did it pretty much stay that way throughout your
24 tenure there in 2001?
25    A.  No. The Liquid Wrench in general was going down,

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 242

1 down, down.
2    Q.  So when we get to 2001, it was even a smaller
3 percentage of sales, correct?
4    A.  Yes.
5    Q.  What was the driving product as far as keeping that
6 company in business?
7    A.  There were I think about five or six products that
8 maintained the company.
9    Q.  What kind were they?
10    A.  Engine cleaner.
11    Q.  Such as?
12    A.  EV1.
13    Q.  Any others?
14    A.  Brake cleaner, M720. Puncture Seal, M1112. Brake
15 fluid -- no, not brake fluid. L1 -- L112. That's Liquid
16 Wrench. They were all aerosols primarily.
17    Q.  Liquid Wrench in these types of containers, the
18 non-aerosol version was not an important part of your company,
19 true?
20    A.  No.
21    Q.  You could have survived without it true? Your
22 company could have survived without it?
23    A.  Yeah. We -- the whole line of Liquid Wrench was
24 getting pretty serious. And we phased it out, even a part of
25 it before the other part went out.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 243

1    Q.  Was the aerosol version of Liquid Wrench every
2 important to the company?
3    A.  Yes.
4    Q.  When?
5    A.  Always.
6    Q.  What percentage of sales did it constitute?
7    A.  Of course all these are wild guesses. I don't have
8 anything in front of me, but three or four percent.
9         MR. RILEY: Jim, are you doing okay?
10         THE WITNESS: Yeah.
11    Q.  (BY MR. LUBEL) Are you sure?
12    A.  Am I sure?
13         MR. RILEY: Just looking tired.
14    Q.  (BY MR. LUBEL) Yeah. Are you doing okay?
15    A.  Yeah, yeah. I was just trying -- I was calculating
16 in my head numbers.
17    Q.  (BY MR. LUBEL) Here's what I don't want to happen,
18 okay. If you're tired and your brain's not working up to a
19 capacity you're comfortable with, I want to shut this down and
20 do this another time. I know you don't want to see me again
21 if you can help me. But I would prefer to do that than for
22 you to be uncomfortable with your testimony and come back and
23 say you caught me when I was tired, I was, you know, not
24 feeling well. It's up to you what you want to do.
25    A.  Your question's about, you know, how important it

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 244

1 was. So I was sitting here trying to taking gross sales and
2 then trying to remember how much in this case the L112 might
3 have been. Now, whether it's right now or next week, without
4 looking at documents, I'm still guessing.
5     Q. I just want to make sure that you were doing okay?
6     A. Yeah, I'm fine.
7     Q. All right. You sold more of the aerosol version
8 than you did the other containers combined, right?
9     A. Yes.
10    Q. Do you know why?
11    A. Aerosols are used -- one of the primary reasons is
12 because they're so user friendly.
13    Q. What does that mean?
14    A. You pick it up and you can spray it. You don't have
15 to fiddle around taking off a cap. And you can spray it up or
16 down. You can't take a pour and spray it up very well even if
17 you squeeze it.
18    Q. You're less likely to get it on your body too,
19 aren't you?
20    A. Yes, you are.
21    Q. You ever seen those -- I know you hunt. You're not
22 a beach guy. I bet you don't go out to the beach and lay out,
23 do you?
24    A. I have laid out on the beach.
25    Q. That isn't your hobby though, is it?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 246

1 down for, you know, one drop or ten drops. And you don't get
2 it on you. Now, if you want to put your finger on there and
3 see if you can turn it, that's a different thing, but most
4 people I don't think going to do that.
5     Q. Man, you ever use this stuff?
6     A. Have I ever used it?
7     Q. Yeah.
8     A. All of it, yeah.
9     Q. Have you ever felt one of these cans after you used
10 it and its got grease all over? Its got that film all over
11 it? Do you know what I'm talking about?
12    A. Well, not the way I use it.
13    Q. Okay.
14    A. I don't get it all over me.
15    Q. You ever cleaned a gun with hops solvent?
16    A. I have used hops.
17    Q. Okay. You put a few drops on there, you somehow get
18 it on your hands anyway, don't you?
19    A. Well, you can use rubber gloves I guess.
20    Q. Okay. If you're not using rubber gloves, you get it
21 on your hands, don't you?
22    A. Yeah.
23    Q. You imagine this was any different? I mean, you've
24 already told us that the company anticipated that people would
25 get it on their skin?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 245

1     A. No.
2     Q. Okay. You know today and they've had for some time
3 these sun protectants, you know-- what do they call them?
4     MR. SYKES: Sunscreen.
5     Q. (BY MR. LUBEL) Sunscreen.
6     A. Sunscreen, yeah.
7     Q. It's in spray cans where you don't have to get oil
8 and stuff on your hands and rub it on your body. Are you
9 familiar with that?
10    A. Yes.
11    Q. It seems to me like -- well, I've used it. It's a
12 lot cleaner to use the spray sunscreen than it is the kind you
13 put on your hands, right?
14    A. I think so.
15    Q. Was there a feeling within your company that the
16 aerosol spray version of Liquid Wrench was cleaner to the user
17 than these containers that you turn it over and squirted it
18 out?
19    A. I don't recall that discussion ever taking place.
20    Q. Whether it was discussed or not, was it a fact?
21    A. I can make an argument either way. The reason is if
22 you spray it, it's likely to splash back on you or on your
23 hand or whatever when you hit whatever it is you're spraying
24 it on. When you pour it on like with one of these little
25 sprout cans, it comes out nice and soft and you can let it run

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 247

1     A. I think that's reasonable.
2     MR. SYKES: Object to the form of the question.
3     A. They could.
4     Q. (BY MR. LUBEL) The squirts, did you ever learn how
5 many squirts you'd get to a can?
6     A. No.
7     Q. Did you have an impression as to -- or was each can
8 different when you turned it over and you squeezed it how much
9 product would come out? Did it depend on the angle? What did
10 it depend on?
11    A. Well, you had to cut the tip off of that plastic.
12 Then the bigger the hole, the more that would come out.
13    Q. Take this can. Are you talking about the top here
14 you'd cut off?
15    A. Yeah, take the top off, then you had -- I think you
16 had to cut the plastic.
17    Q. Yeah. Did you use some scissors?
18    A. Yeah, a knife or whatever.
19    Q. And so depending on the size of that hole would tell
20 us how much would squirt out, right?
21    A. That's true I think.
22    Q. And you don't remember any studies by Radiator of,
23 for instance, how many squirts you'd get per can or container?
24    A. To my knowledge, none of that ever took place.
25    Q. And you can't tell us, can you, how much comes out

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 248

1  of this -- what do you call this, spigot?
2      A.  It's a spout.
3      Q.  How much comes out of that spout when you squeeze
4  the can, can you?
5      A.  Anyone can, you know, spray it out and weigh it; but
6  I can't sitting here right now.
7      Q.  Yeah, but isn't the size of the hole going to make a
8  difference?
9      A.  That's what I just said.
10     Q.  And how you hold that can, the angle of it, you
11 know?
12     A.  Well, the angle of it --
13     Q.  Didn't that make a difference?
14     A.  -- does not come in much play.  It's how hard you
15 squeeze it.
16     Q.  How hard you squeeze it.  Is there going to be some
17 individual variation in how much comes out depending on who
18 the person is?
19     A.  I don't see why not.
20     Q.  Why did they make two versions of Liquid Wrench?
21     A.  Don't know.
22     Q.  Does that seem odd to you?
23     A.  Not if you consider you wanted one for household and
24 one for industrial.
25     Q.  But if that isn't the reason, it's hard to make any

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 249

1  sense out of it, isn't it?
2      A.  Well, we never really thought about it but -- I
3  imagine that --
4      Q.  You were making it?
5      A.  Yeah, I was making it.
6      Q.  The company had you making both the household
7  version and the industrial version, correct?
8      A.  Correct.
9      Q.  And so -- and you were making how many products
10 there?
11     A.  A lot.
12     Q.  So many that you weren't focused on this issue that
13 now I'm raising in the lawsuit about why you had two, right?
14     A.  That's probably correct.
15     Q.  But at some point you started to see Liquid Wrench
16 diving, the sales?
17     A.  Yes.
18     Q.  You considered like narrowing the versions of Liquid
19 Wrench that were sold, right?
20     A.  Yes.
21     Q.  At that time did you consider why in the heck are we
22 making a household version and a commercial use version?
23     A.  Is there a question there?
24     Q.  Did you?  Did you think about that?
25     A.  Yes, I did.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 250

1      Q.  Did you ever get to the bottom of it?
2      A.  Yeah.  Sales threw a fit.  They wanted the other
3  version.
4      Q.  Was it just mainly a marketing technique?
5      A.  Well, it was sales.  Now, you can call them
6  marketing or you can call it filling out the line or maybe
7  they had some customers that bought that and they helped them
8  get their other items in the store.  I don't know.
9      Q.  Could I have gone in to -- name a store that sold
10 Liquid Wrench in the '70s.  Sears?
11     A.  I think Kmart.  Probably Sears.
12     Q.  Okay.  Could I have gone into a Kmart or Sears in
13 the 1970s and bought either what you've called household
14 version or the commercial use version?
15     A.  I -- I have no facts to back up that.
16     Q.  Who do we learn that from?
17     A.  Anyone that's done it I suppose.
18     Q.  Okay.  Are there salespeople?  Who are the people
19 that sold products at the company?
20     A.  Well, the salespeople.
21     Q.  Can you name some that were working back then?
22     A.  None that are there now were working back then.
23     Q.  I'm just saying can you name some that are alive?
24     A.  Not sitting here right now.
25     Q.  You knew some, right?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 251

1      A.  I knew them all at that time.
2      Q.  You just need to give it some thought?
3      A.  Yeah.
4      Q.  If I leave a -- some blanks in your deposition, can
5  you fill in the names you can remember later when you get a
6  chance to read it?
7      A.  Okay._____
8      _____
9      _____
10     Q.  If I went into a hardware store, do you have an
11 impression as to whether I could have purchased this
12 commercial use or industrial use Liquid Wrench?
13         MR. RILEY:  Objection; asked and answered.
14     A.  I think so.
15     Q.  (BY MR. LUBEL) Could I purchase the household
16 version there, too?
17     A.  I think so.
18     Q.  So you had a choice at the hardware store, right?
19     A.  You may have had -- the person at the hardware store
20 may have just chose to carry one.  I don't know.
21     Q.  You told us you had different divisions, automotive,
22 plumbing and hardware and what was the third one?
23 International?
24     A.  Yes.
25     Q.  Automotive, were they selling to like Auto Zones?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 252

1   A. Yes.
2   Q. Was that Sears too or was that different?
3   A. I'm not sure about Sears.
4   Q. We need to ask somebody else about the sales, don't
5   we? Somebody else knows more about the sales than you do?
6   A. Yes.
7   Q. The actual target of it, the market, true?
8   A. True.
9   Q. All right. The odors, was there a difference in the
10  odor between the deodorized and the another one?
11  A. Yes.
12  Q. The regular?
13  A. Yes.
14  Q. Can you give us any descriptive terms?
15  A. The raffinate had a very pleasant odor.
16  Q. Pleasant?
17  A. (Witness nods head.)
18  Q. Okay. How about the kerosene or diesel fuel or
19  whatever was in the deodorized?
20  A. It was kind of non-descript. It wasn't bad, but it
21  wasn't good either.
22  Q. What was better smelling, the raffinate or the
23  deodorized?
24      MR. SYKES: Object to the form of the question.
25  A. That's a matter of personal preference.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 253

1   Q. (BY MR. LUBEL) Which one did you prefer?
2   A. I liked the raffinate.
3   Q. Who was Bernice Coleman?
4   A. Bernice Coleman is a lady who worked as a
5   receptionist and she took care of supplies, pencils, erasers,
6   paper clips. That's about what I know about her.
7   Q. Did she work for you?
8   A. No.
9   Q. Who did she work for?
10  A. I don't remember.
11  Q. Did she work at Indian Trail or in Charlotte?
12  A. Charlotte.
13  Q. At the headquarters?
14  A. Yes.
15  Q. Did y'all have a respirator protection policy at
16  your plant before 1978?
17  A. I'm not sure about the timing but all those OSHA,
18  EPA requirements that came along, we ended that pretty big
19  about getting inside of tanks or not getting in in closed
20  areas, yeah. Respirators, all that was carried out
21  thoroughly.
22  Q. Do you remember when?
23  A. I'd like to say in the '70s, but could have been
24  early '80s.
25  Q. Have you gone back to look at documents to see when

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 254

1   that was?
2   A. No.
3   Q. Did y'all have employee manuals that would address
4   those issues?
5   A. Yeah. We had a book laid out that covered those and
6   there were meetings regularly and updated training, et cetera.
7   Q. Do you recall if there was any training about
8   working around raffinate?
9   A. No. All of this I think probably happened after
10  raffinate.
11  Q. So before 1978 which is when you learned about the
12  benzene cancer issue, did your company have any chemical, you
13  know, training, so to speak, where you discuss respirators or
14  chemical resistant gloves? Personal protective type equipment
15  is what I mean?
16  A. I'm sure we did. I'm just trying to remember
17  specifics. We were big on gloves, especially gloves that you
18  couldn't -- liquids didn't go through. Shoes for the mix room
19  that didn't allow materials to soak through. We were big on
20  hearing aids.
21  Q. You mean hearing protection?
22  A. I mean hearing protection, yeah. I can't remember
23  the rest.
24      MR. LUBEL: We're getting close Jim. I know.
25  Q. (BY MR. LUBEL) What documents, Mr. Wells, would we

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 255

1   go back to get a better impression or idea of what safety
2   policies and procedures your company had for its employees
3   that were working around the raffinate?
4   A. Around the raffinate. I doubt there are any.
5   Q. Okay. So you never had your employees wearing
6   chemical resistant gloves back when they worked around the
7   raffinate?
8   A. Might have. Probably.
9   Q. How do we find out an answer to that?
10  A. Well, you know, I'm trying to remember. And you're
11  asking a lot of specific details and we used -- the people in
12  the package line routinely wore plastic gloves whenever they
13  went into a product that they knew from experience it would
14  kind of burn you or it would dry your skin out or whatever. A
15  lot of them used plastic gloves.
16  Q. Was Liquid Wrench one of those?
17  A. It could have been. I just don't remember.
18  Q. If you wanted to go look for those documents, where
19  would you go?
20  A. I don't think there would be any documents like
21  that.
22  Q. No documents on safety policies?
23  A. Well, on safety policy, we had safety meetings once
24  a month I believe. And records -- here again it was a moving
25  target. Early on a lot of that was done by me and I kept the

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 256

1  agenda. And I don't know if I ever threw it away or what.
2  And after that when personnel started taking over, whatever
3  records they kept, I really don't know about.
4      Q. Let's put this in stone, okay. Are you familiar
5  with that saying?
6      A. With what?
7      Q. Let's put this in stone. Before 1978 do you recall
8  any safety policies and procedures for your employees that
9  they were trained with to use gloves, respirators or any
10 personal protective equipment when they worked around Liquid
11 Wrench?
12     A. What I said a moment ago is my best answer in that
13 they may very well have used gloves because that was pretty
14 common in the plant. Anywhere where someone felt there was a
15 need, it was automatic. You just get them. There was no
16 argument about that.
17     Q. Were these chemical resistant gloves?
18     A. Yeah.
19     Q. Okay. Do you recall seeing the use of chemical
20 resistant gloves at your plant Indian Trail for Radiator
21 Specialty Company back when you started in roughly 1972?
22     A. Rubber gloves, yeah.
23     Q. Were they available?
24     A. Yeah.
25     Q. And was it your expectation as the plant manager

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 257

1  that the employees would use those rubber gloves when they
2  worked around the ingredients of Liquid Wrench such as
3  raffinate?
4      A. Well, they used them not just on Liquid Wrench
5  raffinate, but there were other products that they would use
6  them on as well.
7      Q. I'm not trying to suggest they would only use it on
8  raffinate. I'm just asking you did you expect them to use
9  them on the raffinate as well?
10     A. I don't remember.
11     Q. Do you have a specific recollection of training your
12 employees that worked underneath you at the plant to use
13 chemical resistant or rubber gloves when working around
14 raffinate?
15     A. No, I don't think we had any training -- train
16 people to put on rubber gloves.
17     Q. You don't need to train them?
18     A. I don't think so.
19     Q. So how were your employees expected to make the
20 decisions as to whether to wear rubber gloves around
21 raffinate?
22     A. Experience. You know, if you do it once and, like I
23 said a moment ago, if your hand gets irritated, then you're --
24 not just the employee but the supervisor learns to put rubber
25 gloves on people who are handling the cans.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 258

1      Q. If the employee complains about his hands being
2  irritated?
3      A. No. It's discovered regardless, whether they're
4  complaining about it.
5      Q. How do they discover it?
6      A. Well, it could be mentioned as opposed to a
7  complaint or he himself might experience that or he may just
8  go by and notice something and ask them, you know. I'm
9  guessing. I don't know what they may have done. I wasn't
10 there. I don't know.
11     Q. You don't have a recollection, do you?
12     A. No.
13     Q. You hadn't looked for documents that would
14 potentially address policies or procedures for personal
15 protective equipment, right?
16     A. I have not looked.
17     Q. And you don't think there are any documents,
18 correct?
19     A. No, I think there are a lot of documents that
20 support personal protection equipment and training and blood
21 testing and all that stuff.
22     Q. Well, there was never any air monitoring of benzene
23 at your plants, correct?
24     A. I don't think so.
25     Q. You've testified to that in the past. You don't

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 259

1  recall ever seeing air monitoring, correct?
2      A. We had air monitoring. I just don't remember
3  benzene being part of it.
4      Q. You don't remember any air monitoring of the
5  raffinate?
6      A. No.
7      Q. Or the Liquid Wrench, correct?
8      A. No.
9      Q. Or benzene specifically, true?
10     A. I do not.
11     Q. You don't remember any tests that were specific to
12 your employees to measure their blood to see if chemicals were
13 harming it, correct?
14     A. I don't think so.
15     Q. You don't remember the plant running any
16 epidemiological studies on their employees, correct?
17     A. Not sitting here right now, no, I don't.
18     Q. You don't recall any review of retired employees
19 looking at their death certificates to see if there was any
20 patterns of disease developing at the company, correct?
21     A. I'm not aware of any.
22     Q. You never were aware of that, right?
23     A. I never what?
24     Q. You never have been aware of that?
25     A. No.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 260

1    Q.  What is the relationship, if you know, between U.S.
2  Steel and Radiator in this lawsuit?
3        MR. SYKES:  Object to the form of the question.
4    A.  I think I answered that in one of those -- the lasts
5  three questions on the -- that 126 that I suppose you
6  supplied.  And I said that the way it was worded, there were
7  none except the very last question, which I referred to
8  Mr. Riley.
9    Q.  Were you aware that U.S. Steel and Radiator
10  Specialty Company had hired the same experts in this lawsuit?
11    A.  This lawsuit?
12    Q.  Yes, sir.
13    A.  No.
14    Q.  You didn't even know that?
15    A.  I did not.
16    Q.  Okay.  Do you know what agreements, if any, exist
17  between Radiator and U.S. Steel?
18    A.  That's what I was answering there and I said no.
19    Q.  No, you don't know?
20    A.  I do not know.
21    Q.  Who do I need to talk to to find out if there are
22  any agreements between them?
23        MR. RILEY:  I've answered in response to the
24  subpoena.  The only agreements are the sharing of experts and
25  there's nothing else that's in writing.  There's no written

James Wells Vol II
11-6-2008

Page 261

1  defense agreement.
2        MR. LUBEL:  Are there any oral agreements that
3  I should know about?
4        MR. RILEY:  I don't know of any formal.
5        MR. LUBEL:  Well, I'll take informal ones.  I
6  don't want to depose you, Jim.  Who do I talk to?
7        MR. RILEY:  Informal we both think that your
8  claim is inappropriate and we're both innocent.
9        MR. LUBEL:  I'm talking about --
10        MR. RILEY:  So to that extent we have that in
11  common.
12        MR. LUBEL:  I'm talking about informal
13  agreements to prosecute or defend the case?
14        MR. RILEY:  Other than defending the case on
15  its facts and sharing experts, I've told you everything there
16  is.
17    Q.  (BY MR. LUBEL)  Has your company or its lawyers
18  participated in meetings with U.S. Steel's lawyers and their
19  insurance carriers?
20    A.  I don't know.
21    Q.  You don't know either way?
22    A.  Neither way.
23    Q.  Do you know if there's any indemnity agreements, do
24  you know what that is, between the two companies?
25    A.  I've read those and no, I don't know.

James Wells Vol II
11-6-2008

Page 262

1        MR. RILEY:  There is none, Lance.  I made sure
2  that was correct.
3    Q.  (BY MR. LUBEL)  Do you know if Radiator Specialty
4  Company participated in the funding of any chem risk studies?
5    A.  My understanding is it did not.
6    Q.  Do you know if they participated in any form or
7  fashion?
8    A.  I'm told no.
9    Q.  Okay.  Do you know what, if anything, they had to do
10  with John Spencer's study?
11    A.  I don't know anything about that.
12    Q.  You don't know one way or the other, correct?
13    A.  No.
14    Q.  Your company didn't have an in-house industrial
15  hygienist, correct?
16    A.  Correct.
17        MR. LUBEL:  I'm getting close.
18        MR. RILEY:  Thank you.
19    Q.  (BY MR. LUBEL)  And they did not have an industrial
20  hygienist come in to evaluate the -- your employees with
21  respect to any benzene exposures, correct?
22    A.  Correct.
23    Q.  Did your company ever run any tests to evaluate what
24  airborne exposures could be created by using any of the Liquid
25  Wrench that contained benzene?

James Wells Vol II
11-6-2008

Page 263

1    A.  No.
2    Q.  Did your company ever evaluate what kind of skin
3  exposures could be had by somebody using the Liquid Wrench
4  that contained benzene?
5    A.  No.
6    Q.  Have you told us everything you've done to search
7  for documents in the lawsuit?
8    A.  Yes.
9    Q.  Are you the person most knowledgeable about the
10  document retention policies, the official procedures and
11  policies at Radiator Specialty Company from today through the
12  1950s?
13    A.  There are no retention policies.
14    Q.  Ever?
15    A.  There's none today.  There was none ever advised to
16  me, told to me nor am I aware of anyone following retention
17  policies.
18    Q.  So anybody in the company could discard or throw
19  away any document at their own pleasure?
20    A.  I would say that's true.
21    Q.  And that's true even today?
22    A.  That's my understanding, yes.
23    Q.  Where did you get that understanding?
24    A.  I asked Ron Winer if there was a document retention
25  policy in effect over in the last couple of weeks.  He said

James Wells Vol II
11-6-2008

Page 264

1 no, there's not.
2     Q.  Okay.  Well, how did you learn there never had been
3 one?
4     A.  I said that in my time there no one ever advised me
5 of a retention policy and I knew of no one who was using a
6 retention policy.
7     Q.  Is there is any questions or answers that you've
8 given today in response to my questions that you need to
9 modify to make them truthful and accurate?
10     A.  After I read this, there might be.
11     Q.  Can you think of any as you sit here right now?
12     A.  I cannot.
13     Q.  Have I been courteous to you as usual?
14     A.  Oh, absolutely courteous as you could be.  Thank you
15 very much.
16         MR. SYKES:  Let's go off the record.
17         THE VIDEOGRAPHER:  Stand by.  The time is
18 6:03 p.m.  We're off the record.
19         (Recess from 6:03 to 6:06)
20         (Exhibit No. 13 marked)
21         THE VIDEOGRAPHER:  The time is 6:06 p.m.  We're
22 back on the record.
23         EXAMINATION
24 BY MR. SYKES:
25     Q.  Mr. Wells, my name is Phillip Sykes and I'm one of

James Wells Vol II
11-6-2008

Page 266

1 You see it says United States Steel Corporation and in the
2 right-hand corner it says 1959.  And the quantities if we can
3 zoom back out -- do you see that?
4     A.  Yes.
5     Q.  Are -- the quantities there are small.  You see 300
6 gallons right here in the right corner.  Do you see that?
7     A.  Yes.
8     Q.  And we can go through each one of these pages and
9 I'll show you year by year.  For instance, the next page is
10 1960.  Do you see that?
11     A.  Yes.
12     Q.  And we can go through each one of these pages that
13 show the sales of raffinate to -- from U.S. Steel to Radiator
14 Specialty.  Let's jump here to the end.  Do you -- is it
15 consistent with your understanding that the last year of sale
16 of United States Steel's raffinate to Radiator Specialty was
17 1978?
18     A.  Yes.
19     Q.  And do you see that in the top left-hand corner,
20 1978, year to date?
21     A.  Yes.
22     Q.  And you see the quantity information there across
23 the middle of the page, dollar sales, units, et cetera?  Do
24 you see that?
25     A.  I see it, but I don't see a number.

James Wells Vol II
11-6-2008

Page 265

1 the attorneys representing U.S. Steel.  I know its been a long
2 day.  I'm going to try to move through this quickly.  I want
3 to begin by clarifying the dates of sale of the raffinate from
4 U.S. Steel to Radiator Specialty.  You with me?
5     A.  Yes.
6     Q.  I'd like for you to look at the document we've
7 marked as Exhibit No. 13.  It's there on the screen.  And
8 direct your attention to the date here, December 11, 1959.
9 And do you see that it's for the material raffinate?  Do you
10 see that?
11     A.  Yes.
12     Q.  And do you see Radiator Specialty's name there on
13 the document?
14     A.  Yes.
15     Q.  And does this appear to be a one gallon sample that
16 was delivered to Radiator from U.S. Steel?
17     A.  Yes.
18     Q.  Of raffinate?
19     A.  Yes.
20         (Exhibit No. 14 marked)
21     Q.  (BY MR. SYKES) You and Mr. Lubel discussed some of
22 the sales from U.S. Steel to Radiator and what I've put on the
23 screen here and marked as Exhibit No. 14 are certain sale
24 records from U.S. Steel.  The first page is bates number USS
25 2522.  And I want to draw your attention to the date here.

James Wells Vol II
11-6-2008

Page 267

1     Q.  It's down here at the bottom of the page.  I'm
2 sorry.  And I can hand you this hard copy.  That will make it
3 easier.  My point is do you have any other information to
4 dispute that U.S. Steel sold raffinate from 1960 until
5 approximately 1978 to Radiator Specialty?
6     A.  No.
7     Q.  And that's consistent with your understanding?
8     A.  Yes.
9     Q.  I want to change subjects with you, Mr. Wells.  You
10 and Mr. Lubel discussed a number of regulations today during
11 different points of your testimony.  I want to focus on one in
12 particular.  An amendment to part 191 of the Code of Federal
13 Regulations.  And the highlighting is mine.  And specifically
14 I want to direct you to the next page.  Are you familiar with
15 a document called the Federal Register?
16     A.  Yes.
17     Q.  And do you see a date up there in the top left-hand
18 corner?
19     A.  February 6, 1980 --
20     Q.  1964.  I know that's hard to read.  February 6,
21 1964.
22     A.  Okay.
23     Q.  And are you familiar that there was an amendment to
24 the benzene regulations in the CFR in 1964?  Are you generally
25 familiar with that?

**402/403, relevance Plaintiffs FHSA MiL**

**402/403, relevance Plaintiffs FHSA MiL**

**402/403, relevance Plaintiffs' FHSA MiL**

**802, hearsay Plaintiffs FHSA MiL**

---

James Wells Vol II
11-6-2008

Page 268

```
 1        A.  Yes.
 2        Q.  I want to direct your attention to paragraph 191.7,
 3   products requiring special labeling under section 3B of the
 4   act.  Do you see that?
 5        A.  Yes.
 6        Q.  And I want to draw your attention to section B3 down
 7   here where that red line is and it's entitled benzene,
 8   toluene, xylene, petroleum distillates.  "Because inhalation
 9   of the vapors of products containing 5 percent or more by
10   weight of benzene may cause blood dyscrasias, such products
11   shall be labeled with the signal word danger, the statement of
12   hazard, vapor harmful and the word poison and the skull and
13   crossbones symbol."  Did I read that correctly?
14        A.  Yes, sir.
15        Q.  And is it your understanding that after this
16   amendment was issued that Radiator began including these
17   special labeling requirements on the Liquid Wrench cans with
18   the raffinate formula?
19        MR. LUBEL:  Objection; speculation.
20        A.  That's my understanding.
21        Q.  (BY MR. SYKES) And are you familiar with the term
22   blood dyscrasias, Mr. Wells?
23        A.  Yeah.
24        Q.  And I know its been a long day and I'll try to get
25   right to this.  I've read prior testimony of yours where you
```

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 269

```
 1   said when you came to work at Radiator in early 1970s that you
 2   saw the term blood dyscrasias and you looked it up.  Is that
 3   fair?
 4        A.  Yes.
 5        Q.  And you are aware that blood dyscrasias, blood
 6   diseases generally?
 7        A.  Correct.
 8        Q.  And is it fair to say that it was your understanding
 9   that in certain rare circumstances if someone were
10   over-exposed to benzene, it could be fatal?
11        A.  Yeah.  That's what the label calls for, says, fatal.
12        Q.  And however we describe the physiological or
13   biological process, in rare circumstances over-exposure to
14   benzene could be deadly?
15        A.  Yes.
16        Q.  I want to mark this as exhibit -- this being this
17   CFR or Federal register 1964 amendment as Exhibit 15.
18        (Exhibit No. 15 marked)
19        Q.  (BY MR. SYKES) And, Mr. Wells, as the Radiator
20   spokesman, is it your testimony based upon your experience and
21   work with the company that Radiator always did its best to
22   label the Liquid Wrench in accordance with the Federal
23   regulations?
24        MR. LUBEL:  Objection; form.
25        A.  Yes.
```

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 270

```
 1        Q.  (BY MR. SYKES) And is it your testimony that when
 2   you all had a question, you consulted with professional
 3   organizations like Foster Snell?
 4        A.  Yes.
 5        Q.  Or even the Consumer Product Safety Commission?
 6        A.  Yes.
 7        MR. SYKES:  I don't believe I have any further
 8   questions.  Thank you.
 9        MR. RILEY:  I have few.
10        MR. SYKES:  Do you want to come over here, Jim?
11        MR. RILEY:  I will in just a minute.  I've got
12   to get some documents.
13        MR. SYKES:  Why don't we go off the record?
14        THE VIDEOGRAPHER:  Stand by.  6:14 p.m.  We're
15   off the record.
16        (Recess from 6:14 to 6:19)
17        (Exhibit No. 16 marked)
18        THE VIDEOGRAPHER:  The time is 6:19 p.m.  We
19   are back on the record.
20        EXAMINATION
21   BY MR. RILEY:
22        Q.  Mr. Wells, Jim Riley.  I represent Radiator
23   Specialty Company, your company.  And you've mentioned Foster
24   D. Snell several times in this deposition, correct?
25        A.  Yes.
```

Stratos Legal Services, LP
713-481-2180

---

James Wells Vol II
11-6-2008

Page 271

```
 1        Q.  And they were outside consultants and testing
 2   engineers, correct?
 3        A.  Yes.
 4        Q.  I'm going to show you several pages marked as
 5   Exhibit 16 and specifically referencing RSC20 and ask if these
 6   are all Foster D. Snell testing documents from 1962?
 7        MR. LUBEL:  Before he answers, do you mind if I
 8   look at it real quick?
 9        MR. RILEY:  Oh, of course.  I'm sorry.
10        MR. LUBEL:  Thank you.
11        MR. RILEY:  You have them, but sure.
12        MR. LUBEL:  Yeah.
13        A.  Yes, they are.
14        Q.  (BY MR. RILEY) Okay.  Hand them to Mr. Lubel so he
15   can take a look at them.  Now, on page 20 of Exhibit -- or
16   RSC20 of Exhibit 1962 --
17        MR. LUBEL:  I'll run it.
18        Q.  (BY MR. RILEY) The conclusion basically in 1962 is
19   that Foster D. Snell is referencing the Federal Hazardous
20   Substances Act and its regulations; is that correct or not?
21        A.  Yes.
22        Q.  Ant basically they determined it to be non-toxic; is
23   that correct or not?
24        MR. LUBEL:  Objection; form.
25        A.  Yes.
```

Stratos Legal Services, LP
713-481-2180



704, ultimate issue

402, relevance

Plaintiffs FHSA MiL

James Wells Vol II
11-6-2008

Page 272

1  Q. (BY MR. RILEY) And Foster D. Snell was used on more
2  than one occasion by Radiator Specialty Company, correct?
3  A. Yes.
4  Q. And as you stated before, during your tenure you
5  labeled Liquid Wrench both deodorized formula and raffinate
6  formula in accordance with the Federal Hazardous Substances
7  Act and regulations; is that correct or not?
8  MR. LUBEL: Objection; form.
9  A. That's correct.
10  Q. (BY MR. RILEY) I'd like to show you another Foster
11  Snell document, sir.
12  (Exhibit No. 17 marked)
13  Q. (BY MR. RILEY) Is this is Exhibit No. 17. I'd like
14  you to take a look at this and read it, please?
15  A. What portion? Read it out loud?
16  Q. Read the entire document please?
17  A. To myself?
18  Q. Yes, please.
19  MR. LUBEL: Is there a question pending, Jim?
20  MR. RILEY: There will be when he's done
21  reading.
22  MR. LUBEL: Okay. I didn't know if you had
23  asked it.
24  A. Okay.
25  Q. (BY MR. RILEY) Okay. Now, the date of this document

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 273

1  is October 15, 1954, correct, sir?
2  A. Yes.
3  Q. And it's from Foster D. Snell. And does this
4  reference whether Foster D. Snell is doing an analysis of
5  Radiator Specialty Company's penetrating oil or not? Is
6  Foster D. Snell doing a report analysis of the penetrating oil
7  of Radiator Specialty Company in this 1954 report?
8  A. Yes.
9  Q. And it goes to Mr. Kologiski, correct?
10  A. Yes.
11  Q. Who we've already established was your predecessor?
12  A. Yes.
13  Q. Now, this 1954 document, if we look at page 1, there
14  is no reference to benzene on page 1, correct?
15  A. Correct.
16  Q. If we look at page 2 of this 1954 document, the only
17  reference to a chemical that we see -- oh, wait a minute.
18  MR. LONGORIA: Flip it over.
19  MR. LUBEL: I'll get it, Jim.
20  MR. RILEY: Thank you. I'm so used to the
21  old --
22  MR. LUBEL: Tell me which one to look at.
23  Q. (BY MR. RILEY) The only reference to any chemical in
24  the 1954 Foster Snell report is kerosene at the bottom
25  paragraph, correct?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 274

1  A. Yes.
2  Q. Next Exhibit -- I keep losing the exhibit stickers.
3  (Exhibit No. 18 marked)
4  MR. LUBEL: Can I see this while you do it?
5  MR. RILEY: Yeah, absolutely.
6  Q. (BY MR. RILEY) Are the Foster Snell documents that I
7  had labeled and shown to you as Exhibit 16 and 17 documents
8  that were business records of Radiator Specialty Company?
9  A. I --
10  Q. Exhibit 16, did this come from your files at
11  Radiator Specialty Company and is a business record?
12  MR. LUBEL: Objection; form.
13  A. This is what I looked at a moment ago?
14  Q. (BY MR. RILEY) Right.
15  A. Yes, it is.
16  Q. And the 1954 document addressed to Mr. Kologiski,
17  was that also a Radiator Specialty Company record?
18  A. Yes.
19  Q. Kept in the ordinary course of business as was 16?
20  A. Yes.
21  Q. Obviously addressed to someone in charge at Radiator
22  Specialty Company, in this case Mr. Kologiski, correct?
23  A. Correct.
24  Q. And they came out of your file that you inherited
25  from Mr. Kologiski at Radiator, correct?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 275

1  A. Correct.
2  Q. Let me show you Exhibit No. 18, sir, and ask if you
3  can tell me what that is?
4  A. These are pages showing date for sale of various
5  products.
6  Q. And in terms of the deodorized, does it show
7  deodorized and regular Liquid Wrench?
8  A. It shows only the word deodorized on some of the
9  samples, some of the interest.
10  Q. Okay. On page 1 of Exhibit No. 18 it reflects that
11  Liquid Wrench deodorized came in 8-ounce pints, quart and
12  gallons, correct?
13  A. Yes.
14  Q. And on page 2 it indicates what you have testified
15  to, that Liquid Wrench was first sold July 25, 1941, correct?
16  A. Yes.
17  MR. LUBEL: You want me to staple those, Jim?
18  MR. RILEY: I'll get it. Thanks, Lance.
19  Q. (BY MR. RILEY) And Exhibit No. 18, where did this
20  record come from, sir?
21  A. It came from a three-ring binder that was located
22  either in Mr. Blumenthal's office or his secretary's office.
23  I'm not sure where it was kept.
24  Q. And is that one of the business records of Radiator
25  Specialty Company?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 276

1  A. Yes.
2  Q. And was it made in the regular course of business?
3  MR. LUBEL: I'm not going to object to that as
4  hearsay, Jim. Does that help?
5  MR. RILEY: Pardon?
6  MR. LUBEL: I'm not going to object to that
7  document as hearsay. You don't need to predicate it.
8  MR. RILEY: You'll stipulate as to business
9  records?
10  MR. LUBEL: Yeah.
11  MR. RILEY: Okay. Thank you.
12  (Exhibit No. 19 marked)
13  Q. (BY MR. RILEY) Finally Exhibit No. 19, ask --
14  MR. LUBEL: I don't remember that one. Can I
15  see that one?
16  MR. RILEY: It's brand new. It's on the
17  Exhibit list though.
18  MR. LUBEL: It's on the Exhibit list?
19  MR. RILEY: Uh-huh. Sure is.
20  MR. LUBEL: But it hadn't been produced?
21  MR. RILEY: I just got it.
22  Q. (BY MR. RILEY) First of all, let me ask you when you
23  were the plant manager at Radiator Specialty Company during
24  1972 to 1978 when raffinate was being delivered to Radiator
25  Specialty Company, what are size cars were the -- was the

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 277

1  raffinate delivered in?
2  A. My recollection is it was a 10,000-gallon car.
3  Q. And a ten thousand dollar -- a 10,000-gallon car,
4  how was that emptied into the plant?
5  A. Gravity.
6  Q. Okay. And were there hoses hooked up and piped into
7  the plant?
8  A. Yes.
9  Q. And did the raffinate go through the production line
10  as you testified earlier?
11  A. As I testified earlier? I don't think I testified
12  to that.
13  Q. I'm sorry. In terms of it was pumped into the plant
14  -- tell me how -- where the raffinate went from the
15  10,000-gallon tank car to the plant? Explain how it went in?
16  A. The car was drained into a holding tank which held
17  only raffinate. From that point the raffinate was pumped into
18  a mechanized system which blended the raffinate with the other
19  components of the formula and into a holding tank for
20  regular liquid -- or raffinate Liquid Wrench. From there it
21  was pumped into the flooring machine inside the building.
22  Q. And then it went through the production line,
23  correct?
24  A. Correct.
25  Q. Like you testified earlier?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 278

1  A. Yes.
2  Q. And does Exhibit No. 19 accurately depict the size
3  of the tank car that the raffinate would have been delivered
4  to Radiator Specialty during your time period of '72 to '78?
5  It consists of two pages.
6  A. Yes, I think so.
7  Q. Mr. Wells, two more questions, trace benzene, when
8  you talk about trace --
9  MR. SYKES: Jim, I think he needs to change
10  tape.
11  (Recess taken)
12  Q. (BY MR. RILEY) When you mention the word trace, is
13  trace a word of art that indicates that benzene could be
14  present in any petroleum product in a percentage of one-tenth
15  of 1 percent or less?
16  MR. LUBEL: Leading; objection.
17  Q. (BY MR. RILEY) Or not?
18  A. One-tenth or 1 percent or less, yes.
19  Q. So we're talking about a miniscule amount and
20  sometimes even non-detectable depending upon the years. Is
21  that be correct or not?
22  MR. LUBEL: Objection; leading.
23  A. That's correct.
24  Q. (BY MR. RILEY) In terms of employees that worked for
25  you at Radiator Specialty Company and also your knowledge of

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 279

1  in terms of the health and safety of the employees, are you
2  aware of any employee of Radiator Specialty Company that ever
3  made a claim that they were injured by raffinate?
4  A. No.
5  MR. RILEY: I'll pass the witness. That's it.
6  MR. LUBEL: Can I get the microphone please?
7  MR. RILEY: Of course you can.
8  FURTHER EXAMINATION
9  BY MR. LUBEL:
10  Q. Do you remember this document that your lawyer
11  showed you?
12  A. Yes.
13  Q. It's the 1954 Foster Snell document?
14  A. Yes.
15  Q. You see it's referring to client sample 198A-5?
16  A. Yes.
17  Q. What product was that?
18  A. The exact product isn't named right there. It may
19  be from some reference somewhere else that was in the written
20  statements that it's referred to as Liquid Wrench and this
21  other sample which is earlier had been Liquid Wrench. I'm not
22  sure.
23  Q. What I'm trying to find out is this reference to
24  client sample that they're testing and comparing the Liquid
25  Wrench, do you know if it ever went into production?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 280

1    A.  I don't know.
2    Q.  And Mr. Riley asked you about that client sample
3  having a reference to kerosene.  Do you see it, client sample
4  and kerosene?
5    A.  Yes.
6    Q.  We just don't know if that ever went to production
7  or not, correct?
8    A.  I don't know.
9    Q.  Okay.  What effort has the company made, if you
10  know, to follow it retirees from health considerations
11  standpoint?
12    A.  I have no information except the retirees come
13  together once a year at Christmas and just have lunch.  That's
14  all.
15    Q.  But is there any formal follow through of all the
16  retirees, all the people that worked at the plant since the
17  beginning of time?
18    A.  None that I'm aware of.
19      MR. LONGORIA:  Less than a minute.
20      MR. LUBEL:  I need a couple of minutes.
21      THE VIDEOGRAPHER:  Okay.  Then I need to change
22  tapes.
23      MR. LUBEL:  I thought that's what you did.  I'm
24  sorry.
25      THE VIDEOGRAPHER:  6:37.  This concludes tape

James Wells Vol II
11-6-2008

Page 281

1  6.
2      (Recess from 6:37 to 6:39)
3      THE VIDEOGRAPHER:  The time is 6:39 p.m.  We
4  are back on the record. beginning of tape 7.
5      (Exhibit No. 20 marked)
6    Q.  (BY MR. LUBEL) Mr. Wells, can you identify Exhibit
7  No. 20?
8    A.  This is a sketch of production layout Indian Trail
9  plant.
10    Q.  When was this sketch made?
11    A.  The sketch was made piecemeal, meaning as more
12  equipment was installed it was added to originally '72 or '73.
13    Q.  When was this sketch completed then if it was done
14  piecemeal?
15    A.  Sometime in the '80s.
16    Q.  Can you tell us which portions of the plant sketch
17  are for a particular period of time?
18    A.  Yes, I think so.  The -- the first production line
19  put in is the one that's labeled aerosol sol line one.  That's
20  this one.  The second piece --
21    Q.  When was that done?
22    A.  This was done in March or April of '72.
23    Q.  Okay.
24    A.  This was the next production line put in and it was
25  done a few months after this was put in.

James Wells Vol II
11-6-2008

Page 282

1    Q.  The people -- we can't -- not everybody can see it.
2  Are you referring to liquid line number one?
3    A.  Liquid line number one.
4    Q.  Right under the aerosol line number one?
5    A.  Yes.
6    Q.  When was that installed?
7    A.  Maybe four, five, six months after aerosol line one.
8    Q.  Okay.  And what did it make?
9    A.  Liquid Wrench.
10    Q.  Okay.  Which version?
11    A.  The L103.
12    Q.  Okay.  Was that the deodorized version?
13    A.  Yes.
14    Q.  Only?
15    A.  Yes.
16    Q.  Okay.  What do you have next?
17    A.  I believe the next line was this line which is
18  marked liquid line 2.
19    Q.  At the top of the page?
20    A.  Yes.
21    Q.  When was it installed?
22    A.  I think it was '73.
23    Q.  And what did it make?
24    A.  It made Liquid Wrench the raffinate formula and at
25  it made some other products, different formulas, oil additives

James Wells Vol II
11-6-2008

Page 283

1  type stuff.
2    Q.  When do you think that was installed again, Liquid
3  Wrench number 2?
4    A.  '73.
5    Q.  Early, mid, late?
6    A.  I'm going to say probably in the summertime, mid
7  year.
8    Q.  Okay.
9    A.  The next line --
10    Q.  Now we're going down to the middle of the bottom of
11  the page?
12    A.  Yes.  Probably was aerosol line two.
13    Q.  Right in the middle?
14    A.  It's located --
15    Q.  Right below the middle of the page?
16    A.  -- beside liquid line one below the middle of the
17  page.
18    Q.  Okay.  What did it make?
19    A.  It made Engine Bright and it made some other
20  products as well.  The next line was probably liquid line
21  three.
22    Q.  When?
23    A.  Probably a year after aerosol line two.
24    Q.  When does that put us?  '75 roughly?
25    A.  It made brake fluid.

James Wells Vol II
11-6-2008

Page 284

1    Q.  And approximately 1975 you think time-wise?
2    A.  That's similar in the area, yes.  Then aerosol line
3  three and this line made puncture seal and some others which I
4  don't recall.
5    Q.  Not Liquid Wrench?
6    A.  Liquid Wrench was made on aerosol line one.
7    Q.  Okay.  So you don't remember it being made on
8  aerosol line three, right?
9    A.  I don't think so, no.
10    Q.  Okay.
11    A.  That's different equipment.
12    Q.  When was aerosol line three put in, do you think?
13    A.  Probably '70 -- I want to say '76, '77.
14    Q.  Okay.  What's next?
15    A.  Aerosol line four.
16    Q.  What did it make.
17    A.  Refrigerant, R-12 for automotive air conditioners.
18    Q.  When was it installed, approximately?
19    A.  The '70s.
20    Q.  Mid, late?
21    A.  Mid.
22    Q.  Is your office depicted on this schematic?
23    A.  Yes, it is.
24    Q.  Where is it?
25    A.  It's the office that's got a 15-foot number on it.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 285

1    Q.  Basically center bottom of the page?
2    A.  Yes.
3    Q.  And who office to your right?
4    A.  This one?  That was the personnel office.
5    Q.  Who was that?
6    A.  I don't remember his name.
7    Q.  Okay.  Who was to your left?
8    A.  That was my secretary.
9    Q.  What was his or her name?
10    A.  Her name is Betty Colly.
11    Q.  Okay.  Is she still there?
12    A.  Yes.
13    Q.  All right.  Who does she work for now?
14    A.  She works for the manager who's name I've forgotten.
15    Q.  All right.  Who's in the next office, next to her?
16    A.  That's a lobby, just an entrance lobby.
17    Q.  Okay.
18    A.  And this was an office that went with the laboratory
19  and this was the lab in the corner.
20    Q.  Real quick, was this a building that reassembled a
21  warehouse with office space in it?
22    A.  The building when first built was vacant from early
23  on.  All this was vacant.  So this was all cans and boxes.
24    Q.  The bottom half of the schematic?
25    A.  This half right here, yeah.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 286

1    Q.  That's the bottom half, right?
2    A.  If you want to call it that, yeah.
3    Q.  Okay.  So where was your office at that time?  Same
4  place?
5    A.  Here, yeah.
6    Q.  Let me see something real quick.
7        MR. RILEY:  Lance, do you have much more to go?
8        MR. LUBEL:  I do not.
9        MR. RILEY:  Because this is not like the most
10  cogent part of the deposition.
11        MR. LUBEL:  Do not.  Cogent like I'm not making
12  any sense or --
13        (Exhibit No. 21 marked)
14    Q.  (BY MR. LUBEL) Let's see here, let's move on to
15  Exhibit 21.  Can you tell us what that depicts?
16    A.  Well, it's the same picture that you have there.
17  It's just a little more and a little less.  I mean, you see
18  the same Liquid Wrench filling and explosion proof room.  Some
19  tanks, mixing rooms, tanks, underground tanks.
20    Q.  Is this Indian Trails?
21    A.  Yes.
22    Q.  Where is the production line on one of these
23  schematics where you said you were concerned about your
24  employees being exposed to drops of Liquid Wrench on the
25  containers?

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 287

1    A.  Right here.
2    Q.  The top of Exhibit 20, that liquid line number 2?
3    A.  See that little box?  That's a packing table.
4    Q.  And I tell you what, just -- talking about this box
5  I've highlighted yellow?
6    A.  Yes.
7        (Exhibit No. 22 marked)
8    Q.  (BY MR. LUBEL) What is Exhibit 22?
9    A.  This is a -- I started to say this is a duplicate of
10  that, but I guess it's not.  Are these the same?  Yeah.
11    Q.  Does it just have more detail on it?
12    A.  I think the difference is you can read right here.
13  You can't read right there.
14    Q.  So let me just put that up on here real quick, just
15  part of it.  Over here, if you look on the screen, you see
16  Liquid Wrench regular.  This room.  What is that?
17    A.  It's an underground storage tank.
18    Q.  Okay.  And then you say drip oil?
19    A.  Raffinate underground.
20    Q.  Okay.  What is 30-gallon -- 30,000 gallons, right?
21    A.  Yeah.
22    Q.  And then we see Liquid Wrench deodorized?
23    A.  Right.
24    Q.  Is that above ground or below ground?
25    A.  Below.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 288

1    Q. So you have three tanks?
2    A. Yeah.
3    Q. How big was the Liquid Wrench regular tank?
4    A. I think it was 2,000 gallons.
5    Q. Okay. And then what were in these tanks here?
6    A. Those are mix tanks.
7    Q. What do you mean mix tanks? Have product in them?
8    A. You mix product there. They were taken out very
9  early.
10    Q. What is the approximate date of Exhibit 22? Is this
11  early or date?
12    A. The one that shows the mix tanks was -- these were
13  taken out before -- well, when this mix room was built, these
14  were taken out and moved into the mix room. This is pre-'73.
15    Q. Okay. So where we see these mixing tanks here,
16  you're saying once this mixing room was built, these tanks
17  were moved into this room?
18    A. Yes.
19    Q. You know, I've got to tell you, I don't recall
20  seeing one of these schematics that didn't have a date on it.
21  Y'all's just didn't have dates?
22    A. I looked for a date and none of it had a date on
23  them.
24    Q. Okay. Thank you.
25    A. But as I said, it's a moving target.

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 289

1        FURTHER EXAMINATION
2  BY MR. RILEY:
3    Q. I just have one question, final. When you took over
4  for Mr. Kologiski at Radiator Specialty Company, deodorized
5  Liquid Wrench, was that base formula kerosene or something
6  else?
7    A. Kerosene.
8    Q. That's all I have. Thank you.
9        THE VIDEOGRAPHER: Stand by. Off the record at
10  6:51 p.m.
11        (Proceedings concluded at 6:51 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 290

1        CHANGES AND SIGNATURE
2  CORP. REP RADIATOR SPECIALTY CO.      NOV. 6, 2008
3  PAGE LINE CHANGE            REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 291

1    I, CORPORATE REPRESENTATIVE OF RADIATOR SPECIALTY
2  COMPANY, have read the foregoing deposition and hereby affix
3  my signature that same is true and correct, except as noted
4  above.
5
6  _____
7  CORPORATE REPRESENTATIVE OF RADIATOR SPECIALTY COMPANY
8
9  THE STATE OF _____)
10  COUNTY OF _____)
11    Before me, _____, on this day
12  personally appeared CORPORATE REPRESENTATIVE OF RADIATOR
13  SPECIALTY COMPANY, known to me or proved to me on the oath of
14  _____ or through _____
15  (description of identity card or other document) to be the
16  person whose name is subscribed to the foregoing instrument
17  and acknowledged to me that he/she executed the same for the
18  purpose and consideration therein expressed.
19    Given under my hand and seal of office on this _____ day
20  of _____, _____.
21
22        _____
23        NOTARY PUBLIC IN AND FOR
24        THE STATE OF _____
25  My Commission Expires: _____

Stratos Legal Services, LP
713-481-2180

James Wells Vol II
11-6-2008

Page 292

1    STATE OF TEXAS
2    COUNTY OF HARRIS
3
4          REPORTER'S CERTIFICATE
5    ORAL VIDEOTAPED DEPOSITION OF CORPORATE REPRESENTATIVE OF
6          RADIATOR SPECIALTY COMPANY
7              November 6, 2008
8
9        I, the undersigned Certified Shorthand Reporter in and
10   for the State of Texas, certify that the facts stated in the
11   foregoing pages are true and correct.
12       I further certify that I am neither attorney or counsel
13   for, related to, nor employed by any parties to the action in
14   which this testimony is taken and, further, that I am not a
15   relative or employee of any counsel employed by the parties
16   hereto or financially interested in the action.
17       SUBSCRIBED AND SWORN TO under my hand and seal of office
18   on this the _____ day of _____, 2008.
19
20       _____
21       IRENE VALDES, CSR
         Texas CSR 1939
22       Expiration: 12/31/2008
         STRATOS LEGAL SERVICES LP
23       Firm Registration No. 484
         1001 W. Loop South, Suite 809
24       Houston, Texas 77027
         713-481-2180
25

Stratos Legal Services, LP
713-481-2180

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ROBERT B. OAKLEY and    )
IRENE OAKLEY,           )
      Plaintiffs,     )
                        )
vs.                     ) CASE NO. 2:07-CV-351
                        )
AIR PRODUCTS AND        )
CHEMICALS, INC., ET AL  )
      Defendants.     )


ORAL VIDEOTAPED DEPOSITION

JAMES WELLS
DESIGNATED CORPORATE REPRESENTATIVE OF
RADIATOR SPECIALTY COMPANY

Volume 1

November 6, 2008


    ORAL VIDEOTAPED DEPOSITION OF JAMES WELLS, produced as a

witness at the instance of the Plaintiffs and duly sworn, was

taken in the above-styled and numbered cause on the 6th day

of November, 2008, from 10:14 a.m. to 12:17 p.m., before

Stacey Whitley, Certified Shorthand Reporter in and for the

State of Texas, reported by computerized stenotype machine at

the offices of Coats, Rose, Yale, Ryman & Lee, 3 Greenway

Plaza, 21st Floor, Houston, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on the

record or attached hereto.

    Plaintiffs designations are in yellow

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:
Lance H. Lubel, Esq.
Hector G. Longoria, Esq.
HEARD, ROBINS, CLOUD & LUBEL
3800 Buffalo Speedway, 5th Floor
Houston, Texas 77098
Telephone: 713-650-1200 - Fax: 713-650-1400

FOR THE DEFENDANT, RADIATOR SPECIALTY CORPORATION:
James M. Riley, Jr., Esq.
Stacy K. Yates, Esq.
COATS, ROSE, YALE, RYMAN & LEE
3 Greenway Plaza, Suite 2000
Houston, Texas 77046
Telephone: 713-651-0111 - Fax: 713-651-0220

FOR THE DEFENDANT, U.S. STEEL:
Phillip S. Sykes, Esq.
FORMAN, PERRY, WATKINS, KRUTZ & TARDY
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201-4099
Telephone: 601-960-8600 - Fax: 601-960-8613

ALSO PRESENT:
Stacey Whitley, CSR
Brian Bobbitt, Videographer

## Page 3

INDEX

PAGE

JAMES WELLS
Examination by Mr. Lubel ...................... 5
Signature Page ............................... 93
Court Reporter's Certificate ................. 95

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Defendant Radiator Specialty objections and responses to documents requested | 4 |
| 2 | Notice of Deposition | 4 |

## Page 4

1   (Exhibits 1 and 2 marked)
2        MR. RILEY: Exhibit 1 is a response which I
3   served on the plaintiffs on Monday, November 4th, three days
4   in advance of the deposition.  It had to do with a previously
5   issued subpoena duces tecum and there was, I think, 126
6   issues that were requested and Exhibit 1 is Radiator's
7   response -- yes, 126 to the subpoena going -- going number by
8   number and documents that are referenced in the subpoena were
9   provided to the plaintiffs in advance of the deposition.  And
10  what little objections there are are also contained in
11  November 4 and I would like this attached and incorporated
12  into the record as if I went down and read the whole thing
13  and bored everybody to death.
14       THE VIDEOGRAPHER:  We are on the record
15  November 6, 2008.  The time is 10:14 a.m.  This is the
16  videotaped deposition of James Wells taken in the matter of
17  Robert B. Oakley and Irene Oakley versus Air Products &
18  Chemicals, Inc., et al.
19       Would counsel like to identify themselves for
20  the record?
21       MR. LUBEL:  We don't do that here.
22       THE VIDEOGRAPHER:  Okay.  Will the court
23  reporter please swear in the witness?
24
25

## Page 5

1                  JAMES WELLS,
2   having been first duly sworn, testified as follows:
3                  EXAMINATION
4       Q.   (BY MR. LUBEL)  Please state your full name.
5       A.   James Dennis Wells.
6       Q.   Where do you live, Mr. Wells?
7       A.   Indian Trail, North Carolina.
8       Q.   And what do you do for a living?
9       A.   I'm retired.
10      Q.   You're retired.  Where did you retire from?
11      A.   Radiator Specialty Company.
12      Q.   You understand you're here as their corporate
13  spokesperson for this lawsuit?
14      A.   I do.
15      Q.   You've done that before, correct?
16      A.   I have.
17      Q.   How many depositions have you given in these Liquid
18  Wrench cases previously?
19      A.   I'm not sure.
20      Q.   Approximately.
21      A.   Perhaps ten.
22      Q.   And so, you know enough about this process to know
23  that if you need to take a break for any reason, if you need
24  me to repeat or rephrase a question, you know that you have
25  that ability to request such, correct?

Page 6

1    A.   Yes, I do.
2    Q.   That includes whether you want to take a coffee
3  break, return a phone call, go to the bathroom.  You just let
4  me know and I'll try to accommodate you; is that fair?
5    A.   Thank you.  Yes.
6    Q.   You and I, in fact, have met before in this context
7  of lawsuits, correct?
8    A.   Yes.
9    Q.   And I've actually taken your deposition before
10  today, correct?
11    A.   Yes.
12    Q.   And in the previous ten or so depositions that
13  you've given on behalf of Radiator Specialty Company, you've
14  served as their corporate representative, correct?
15    A.   Correct.
16    Q.   And that's because you spent a number of years as
17  their employee, right?
18    A.   Correct.
19    Q.   Why don't you give us a very brief summary of your
20  employment history with Radiator Specialty Company.
21    A.   I started there in March of 1972 with the title of
22  plant manager.  We were building a brand-new operation -- as
23  a matter of fact, there was only four walls when I first went
24  there.  So, starting at that point, I installed equipment,
25  set up the processes over the next 30 years of all the growth

Page 7

1  that took place at that location.  Subsequently the title got
2  changed from plant manager to vice-president until I retired
3  in 2001.
4    Q.   So, you retired as an executive, correct?
5    A.   Correct.
6    Q.   But you even started out as a plant manager with
7  supervisory authority over that plant, correct?
8    A.   Correct.
9    Q.   And since 2001, you've served as a consultant for
10  Radiator, correct, in defending these lawsuits?
11    A.   Yes, I have.
12    Q.   And for part of that time, if my recollection
13  serves me correctly, you were paid roughly $1500 a month and
14  then in about 2004 it went to a thousand dollars a month,
15  correct?
16    A.   I don't recall the dates, but the thousand dollars
17  is correct.
18    Q.   Okay.  Do you recall giving testimony under oath
19  where you admitted that you had been paid $1500 a month from
20  approximately May of 2001 through 2004?
21    A.   I don't recall that but I know that there was a
22  change and 1500 used to be correct.
23    Q.   And then it went down to roughly a thousand dollars
24  a month after that, correct?
25    A.   Correct.

Page 8

1    Q.   Are you still under that compensation plan for
2  defense of the lawsuits?
3    A.   Yes.
4    Q.   The thousand dollars a month?
5    A.   Yes, I am.
6    Q.   So, would it be a fair statement that from your
7  retirement, which was roughly May of 2001 --
8    A.   Correct.
9    Q.   -- through today, which is November, 2008, you've
10  been paid at least a thousand dollars a month for the defense
11  of the Liquid Wrench lawsuits, correct?
12    A.   I've been paid a thousand dollars a month to work
13  on whatever lawsuit was required.
14    Q.   Okay.  Predominantly Liquid Wrench cases, though,
15  correct?
16    A.   I don't know that for a fact.
17    Q.   What other lawsuits have you helped defend them in
18  other than Liquid Wrench?
19    A.   An engine degreaser.
20    Q.   What was it called?
21    A.   Engine Brite.
22    Q.   And what did it allegedly do?
23    A.   It cleans engines.  It's an aerosol product.  And
24  also a tire inflator sealer.
25    Q.   What was it called?

Page 9

1    A.   Puncture Seal.
2    Q.   Puncture Seal.  Any others?
3    A.   That's all I recall.
4    Q.   So, Puncture Seal and an engine degreaser?
5    A.   Yes.
6    Q.   Have you given depositions, testimony under oath
7  like you're here to do today, in those lawsuits?
8    A.   I have.  And there was also another Liquid Wrench,
9  not the same formulas that we're dealing with but a different
10  Liquid Wrench.
11    Q.   Okay.  So, on those three areas, how many
12  depositions do you believe you've given?
13    A.   Well, on the other Liquid Wrench, I think there was
14  only one.  In the case of the Engine Brite, I think one.  In
15  the case of the Puncture Seal, I think there were two or
16  three.  I'm not sure.
17    Q.   Two or three?
18    A.   Maybe more.
19    Q.   Let's start with the Liquid Wrench, the one
20  deposition you gave there.  What was the complaint as you
21  understood it in that lawsuit?
22    A.   There was a fire.
23    Q.   Where?
24    A.   In what state?
25    Q.   Yes, sir.

3  (Pages 6 to 9)

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 10

1    A.  I believe it was Tennessee.
2    Q.  Approximately when did that happen?
3    A.  Six, seven, eight years ago.
4    Q.  What was the claim? That the Liquid Wrench caused
5 the fire?
6    A.  The claim -- I'm not sure what the claim was. It
7 was involved in the fire.
8    Q.  Did anybody claim to have like lung injuries from
9 breathing in vapors?
10    A.  Not that I recall.
11    Q.  You think it wasn't a personal injury case? It was
12 property damage?
13    A.  It may have been some personal injury, burns.
14    Q.  You think that was six or seven years ago?
15    A.  Yes.
16    Q.  Was Mr. Riley your lawyer in that case?
17    A.  No.
18    Q.  Who was it?
19    A.  I don't recall.
20    Q.  All right. The Puncture Seal, you said you had
21 given sworn testimony two or three times?
22    A.  Yes.
23    Q.  What are the general complaints that are made in
24 those kind of cases?
25    A.  An accident occurs when the product is being used

## Page 11

1 in an automotive tire generally.
2    Q.  This is when somebody has a leak, they put the can
3 on the stem and they spray something in there to inflate the
4 tire and to seal it until you can get to the gas station to
5 get you a new tire?
6    A.  That's correct.
7    Q.  They call that Puncture Seal?
8    A.  Yes.
9    Q.  Were the claims -- the complaints that were made in
10 that lawsuit related to the tires exploding or the cans
11 exploding?
12    A.  The tires exploding.
13    Q.  Pretty serious injuries?
14    A.  Yes.
15    Q.  Was there any design change made to that product as
16 a result of those claims?
17    A.  That's a difficult question to answer because there
18 were design formula changes made but I'm not certain they
19 were as a result of those claims. But they're sort of
20 loosely tied together.
21    Q.  Were there design changes to that product to make
22 it safer at least in the company's mind?
23    A.  Yes.
24    Q.  What time period are we talking about?
25    A.  Late Nineties.

## Page 12

1    Q.  Of the design change or of the lawsuits or both?
2    A.  The design changes -- I'm not sure when those
3 lawsuits were, whether they were back in the Nineties or in
4 the early 2000s. But what I gave you is the current.
5    Q.  What was the basic design change that was made?
6 Did you take something out or put something in?
7    A.  We made a change in the propellant or the gas that
8 inflated the tires.
9    Q.  So that it wasn't explosive or less explosive?
10    A.  So that it was not explosive.
11    Q.  Not explosive. Did you invent that product, the
12 Puncture Seal?
13    A.  My name is on the patent.
14    Q.  When was it invented?
15    A.  I don't remember. Maybe the Nineties.
16    Q.  Did you invent it for Radiator Specialty Company?
17    A.  I did.
18    Q.  Were they the beneficiary of the patent, or were
19 you the beneficiary?
20    A.  Radiator Specialty was the beneficiary.
21    Q.  You did it as their employee?
22    A.  I did.
23    Q.  Did you receive any additional financial
24 compensation or benefits because of that patent?
25    A.  No, I didn't.

## Page 13

1    Q.  Just part of the job?
2    A.  Correct.
3    Q.  The design change, when that took place, did you
4 seek a new patent on the new product?
5    A.  You ask that as if there had been an old patent.
6 We only have one patent.
7    Q.  On the Puncture Seal?
8    A.  Yes.
9    Q.  It's the one that you got in the Nineties, right?
10    A.  Yes.
11    Q.  Anybody else's name on that patent?
12    A.  Yes.
13    Q.  Who was that?
14    A.  Horest Abramowsky (phonetic).
15    Q.  Who?
16    A.  Horest Abramowsky.
17    Q.  Abramowsky?
18    A.  Yes.
19    Q.  Was he an employee of Radiator?
20    A.  Yes.
21    Q.  What did he do for them?
22    A.  He was technical director.
23    Q.  What was his training? Was he a chemist?
24    A.  Yes.
25    Q.  Engineering?

Case 3:18-cv-00017-RBD-JSC Document 402-4 Filed 09/15/20 Page 318 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 14

1    A.   Chemist.
2    Q.   Chemist. He was the technical director. Where did
3 he office?
4    A.   At Indian Trail.
5    Q.   At your plant?
6    A.   Yes.
7    Q.   Did he work for you?
8    A.   Yes.
9    Q.   What did he do for you?
10    A.   Well, as technical director, he worked on labels
11 for production of batching, quality control, maybe some other
12 functions that were supportive of the production process.
13    Q.   Was he in charge of those areas?
14    A.   He was in charge of the quality control, the
15 batching.
16    Q.   What about the labels?
17    A.   He was involved in those.
18    Q.   He was day-to-day on that?
19    A.   Well, I'm not sure day-to-day is a good way to --
20    Q.   That's fair. In other words, you don't look at
21 labels every day?
22    A.   We looked at labels at least weekly.
23    Q.   But would he have been -- you know, he was working
24 underneath you, right?
25    A.   Correct.

## Page 15

1    Q.   He wasn't the only one at the company working for
2 you, right, at that plant?
3    A.   Correct.
4    Q.   And so, you had a lot of responsibility and I take
5 it that you would have to delegate some of that to people to
6 help you?
7    A.   Yes.
8    Q.   Would he have been one of those people?
9    A.   Yes.
10    Q.   Okay. So, in -- on the topic of labels, where did
11 he fall in the hierarchy?
12    A.   We had a small committee that met whenever is
13 necessary to look at labels. There was three or four, maybe
14 five people who were involved.
15    Q.   And was he just one of those people?
16    A.   He was, yes.
17    Q.   Was his role any different than the other two,
18 three, four, five people?
19    A.   I would say probably.
20    Q.   Because he was the technical director?
21    A.   In part.
22    Q.   Is there another reason his role would be
23 different?
24    A.   He had a lot of experience.
25    Q.   In labels?

## Page 16

1    A.   Yes.
2    Q.   Where did he get that experience, if you know?
3    A.   He worked with -- he worked for a company that made
4 Windex. He was in research. And the name of the company
5 escapes me sitting here right now.
6    Q.   Did he have something to do with labels at that
7 company, whatever they're called?
8    A.   Yes, he did.
9    Q.   Did you know him before he got to Radiator?
10    A.   Yes.
11    Q.   How did you know him?
12    A.   He worked in the Cincinnati plant of the company
13 that made Windex and I worked for a contract packer a hundred
14 miles away or so and we did the actual manufacturing of the
15 Windex for that company. And he came down from time to time
16 on quality issues because there was more than just Windex.
17 Other furniture polishes and things of that nature.
18    Q.   Was this Bristol-Myers?
19    A.   It was Bristol-Myers later. But before -- it was
20 Drackett Company at the time and then Drackett was bought out
21 by Mr. Wiresdon (phonetic). I guess Johnson & Johnson bought
22 a lot of it since then.
23    Q.   Okay. It was your impression that Mr. Abramowsky,
24 as technical director, that he had had experience working
25 with the labels on these household products, correct?

## Page 17

1    A.   Correct.
2    Q.   I take it that you felt as though he would be an
3 asset to you and your organization because of that
4 experience?
5    A.   Not necessarily because of experience. When I
6 hired him, I needed someone who could take care of the
7 batching and the quality control and that was probably the
8 driving force.
9    Q.   When did you hire him?
10    A.   My best guess is '81.
11    Q.   And is he still there?
12    A.   No.
13    Q.   Where did he go?
14    A.   He retired.
15    Q.   He retired. Okay. Now, you said he was also in
16 charge of quality control and batching?
17    A.   Yes.
18    Q.   What's batching?
19    A.   It's process of combining all the various chemicals
20 to make a final formula to go into a can or bottle.
21    Q.   So, is batching like the blending process?
22    A.   Yes, it is.
23    Q.   It's the production line?
24    A.   Yes. It's -- yes. Batching and blending are the
25 same.

5 (Pages 14 to 17)

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 18

1  Q.  So, he was in charge of that blending process?
2  A.  Yes.
3  Q.  And then quality control, what kind of quality
4  control were y'all trying to accomplish?
5  A.  The receipt of incoming products being both
6  packaging components and chemicals fell under his guideline.
7  In addition to that, we had quality control people who
8  operated on the production line checking various things.
9  They also reported to him.
10  Q.  Who had the job before Mr. Abramowsky?
11  A.  Me.
12  Q.  You did that?
13  A.  Yes.
14  Q.  You were plant manager and you were in charge of
15  quality control and production?
16  A.  Yes.
17  Q.  Who had the job at the other plant before you got
18  there at Indian Trails at Charlotte?
19  A.  George Kologiski was the chemist and they monitored
20  the production for quality of the batching or blending, for
21  your purposes.
22  Q.  So, you think Kologiski was in charge of quality
23  control and production of batching --
24  A.  Yes.
25  Q.  -- at the other plant?

## Page 19

1  A.  Yes.
2  Q.  So, you started at Radiator Specialty Company in
3  what year?
4  A.  1972.
5  Q.  Who hired you?
6  A.  Herman Blumenthal.
7  Q.  He was, for all practical purposes, the head of
8  that company, right, at that time?
9  A.  He was the head of that company.
10  Q.  He was the owner?
11  A.  He was the owner.
12  Q.  He was the decision maker?
13  A.  He was the decision maker.
14  Q.  Where did you interview with him?
15  A.  In Charlotte.
16  Q.  And how were y'all introduced?
17  A.  Mutual friend.
18  Q.  Who was that?
19  A.  I don't recall his name.
20  Q.  Do you recall what the mutual friend told you about
21  there was a job opportunity or I want to introduce you to
22  Mr. Blumenthal or how did that work?
23  A.  I really don't recall but we had -- we each,
24  Mr. Blumenthal and I, had business relationships with this
25  third party who you might say played match maker.

## Page 20

1  Q.  The third party did?
2  A.  Yes.
3  Q.  Was it a man or a woman, this third party?
4  A.  Man.
5  Q.  And you can't remember his name, or you don't want
6  to tell us?
7  A.  I don't remember his name.
8  Q.  You don't remember his name.  Y'all both were doing
9  business with this unnamed person?
10  A.  Yes.
11  Q.  And he put y'all together?
12  A.  Yes.
13  Q.  Did he tell you what he thought y'all would each
14  bring to the table?
15  A.  Not that I recall.
16  Q.  Where were you working right before you met
17  Mr. Blumenthal?
18  A.  I worked for Corning Glass.
19  Q.  You are a chemist by education and training,
20  correct?
21  A.  Correct.
22  Q.  I think you graduated in, what, 1963 or so?
23  A.  Yes.
24  Q.  From Eastern Kentucky?
25  A.  Yes.

## Page 21

1  Q.  With a major in chemistry?
2  A.  Yes.
3  Q.  With minors in physics and mathematics; is that
4  correct?
5  A.  That's correct.  Actually I had a major in physics
6  and mathematics.  That's my recollection anyway.
7  Q.  So, had you left Corning Glass to go interview with
8  Mr. Blumenthal or were you going to find a job before you
9  left there?
10  A.  I left Corning Glass to go meet with
11  Mr. Blumenthal.
12  Q.  You had already quit?
13  A.  Yes.
14  Q.  And what did Mr. Blumenthal tell you he wanted you
15  to do?
16  A.  He was building a new plant and putting in an
17  aerosol line and there had -- they had never had an aerosol
18  production facility.  So, he wanted someone with aerosol
19  experience who could come in and run everything.
20  Q.  And did you understand at that time that the
21  primary purpose of this new plant was the production of
22  aerosol products?
23  A.  No.  The purpose of building the plant was so
24  aerosol could be made but an aerosol production line was put
25  in followed immediately by a liquid line -- liquid filling

Case 3:18-cv-00197-RJC-DSC  Document 102-4 Filed 09/25/20  Page 320 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

Page 22

1  type line.
2     Q.  Well, what was your recollection at that time as to
3  the primary purpose of the plant?  Was it aerosols or liquids
4  or was it both or do you recall?
5     A.  It was both.
6     Q.  But they had not had an aerosol production line
7  before?
8     A.  That's correct.
9     Q.  Okay.  Did they sell aerosol products before that?
10     A.  Yes.
11     Q.  Were they having somebody else manufacture those
12  products?
13     A.  Yes.
14     Q.  Who was that?
15     A.  One company was Connecticut Aerosol.  There were
16  others, but I don't know who.
17     Q.  And why was the decision made to do it in-house?
18     A.  I don't know the answer to that.
19     Q.  Well, based upon your experience, were they able to
20  do it cheaper?
21     A.  You would expect so.
22     Q.  Or you wouldn't do it, right?
23     A.  Right.  Not only cheaper but you had better control
24  of inventories.
25     Q.  In other words, you could decide more quickly

Page 23

1  whether to slow that production line down or speed it up,
2  depending on the demand for your product?
3     A.  Well, that's not the way it worked.  You always ran
4  the production line just as fast as you could and run it
5  safely and quality area.  But you could decide to change and
6  fill a product if you happened to get an unusual large amount
7  of sales and your warehouse got emptied overnight.  Not
8  literally overnight but very quickly.
9     Q.  You wouldn't have to count on somebody else, a
10  third party, to deliver you the product, you could do it
11  in-house?
12     A.  Correct.
13     Q.  Which, at least theoretically, you would have more
14  faith in because it would be your people?
15     A.  Correct.
16     Q.  Okay.  So, your memory is that Mr. Blumenthal was
17  interested in you primarily because your experience in
18  aerosols?
19     A.  Yes.
20     Q.  And so, at the time you interviewed with him, the
21  plant was just up and running as far as starting to build it?
22     A.  It had four walls.
23     Q.  Four walls.  Just the beginning.  Had a foundation.
24     A.  Yeah.
25     Q.  Who designed it?

Page 24

1     A.  DuPont.
2     Q.  DuPont designed the building?
3     A.  Yes.
4     Q.  The whole building?
5     A.  Pretty much.
6     Q.  Have you seen those design drawings?
7     A.  Yes.
8     Q.  Where are they?
9     A.  I have them.
10     Q.  You have them?
11     A.  Uh-huh.
12     Q.  Still?
13     A.  Sure.
14     Q.  They let you keep them?
15     A.  Yeah.
16     Q.  Why you as opposed to the company?
17     A.  Well, I say "me."  I kept everything like that for
18  the company in case.
19     Q.  Let me be clear, though, today because I'm going to
20  ask you about documents today.  You're not saying today at
21  all that you left the company and took the documents to your
22  house, are you?
23     A.  I didn't take anything.
24     Q.  You left them at the company?
25     A.  Yes.

Page 25

1     Q.  And so, these DuPont design drawings of the Indian
2  Trail facility, you still think they're at the company
3  because that's where you left them?  Is that what you're
4  telling me?
5     A.  I said they were DuPont design drawings.  They did
6  the design.  Now, the actual drawings I'm not really clear
7  on.  They could have been done by a local architect.  But the
8  basic design was furnished by them.
9     Q.  Is there a name on the drawings?
10     A.  Maybe.  I don't remember.
11     Q.  Who did you deal with at DuPont?
12     A.  Lots of people.  Engineers, salespeople.  We had a
13  ongoing relationship with them.
14     Q.  What are the names of the people you can recall?
15     A.  I don't recall any of them.
16     Q.  Not one?
17     A.  No.
18     MR. RILEY:  Lance, you may not have seen it,
19  it may have gone to Robert or Hector but I had hand-delivered
20  in advance of the deposition a few days ago the full design
21  plat of the Indian Trails facility.  I'm not sure if that's
22  what you're getting at but you have that.  I have an extra
23  copy here if you would like to see it.
24     Q.  (BY MR. LUBEL)  You've seen this document recently?
25     A.  The one he's referring to?

7 (Pages 22 to 25)

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 26

1 Q. This design drawing of the plant.
2 A. I want to be sure we're talking about the same
3 piece of work. But I literally went and got this layout,
4 sketch of the production area and it was copied and I guess
5 it's already been furnished to you or it will be.
6 Q. Where did you get it?
7 A. The cabinet where all the drawings are kept.
8 Q. What drawings are in that cabinet?
9 A. Layouts.
10 Q. Of what?
11 A. Buildings, structures.
12 Q. For all the Radiator buildings?
13 A. Yes.
14 Q. And so, was there a file that had the drawing of
15 the Indian Trails plant in it?
16 A. Well, everything in that cabinet is Indian Trail.
17 And it's not a file. It's -- those map cabinets are about
18 6 inches or less deep but they're big so you can lay out a
19 full blueprint in there.
20 Q. They're blueprints?
21 A. Yeah.
22 Q. How many blueprints were in there, that 6-inch
23 deep --
24 A. Well, I don't know, six or seven drawers. There's
25 lots of blueprints.

## Page 27

1 Q. For things such as what?
2 A. Buildings, maybe additions, tank farms.
3 Q. Pipelines?
4 A. Pipelines, roads.
5 Q. All this having to do with Indian Trail, correct?
6 A. Correct.
7 Q. Now, what happened to the documents for the
8 Charlotte facility? Do you know?
9 A. Most all of them were thrown out.
10 Q. Did you physically see them thrown out?
11 A. No.
12 Q. Okay. Did you order somebody to throw them out?
13 A. No.
14 Q. How do you know they were thrown out?
15 A. I was told that.
16 Q. Who told you that?
17 A. I don't remember.
18 Q. The Charlotte facility made Liquid Wrench, correct?
19 A. The Charlotte facility had made Liquid Wrench prior
20 to Indian Trail taking over the production.
21 Q. Right. So, if we look back from 1941 until, what,
22 the early Seventies, the Charlotte plant, the one you did not
23 work at, is where Liquid Wrench was manufactured, right?
24 A. That's correct.
25 Q. And then when you got to Radiator as the plant

## Page 28

1 manager and started in, what, '72 or so, you waited on that
2 plant to be constructed, right?
3 A. Yes.
4 Q. And then your plant started to make Liquid Wrench?
5 A. Yes.
6 Q. And then at some point you phased out Charlotte,
7 correct?
8 A. At the time that we began to make the Liquid
9 Wrench, they stopped.
10 Q. When was that?
11 A. It was a two step process. The deodorized was
12 first and that was in '72. The raffinate formula was, I
13 think, '73.
14 Q. So, you think in '72 the deodorized Liquid Wrench
15 was moved from Charlotte to your plant, right?
16 A. I'm pretty sure of it, yes.
17 Q. And then in '73, the raffinate formulation was
18 moved from Charlotte to yours?
19 A. I think '73.
20 Q. All right. Are you confident and comfortable
21 saying that at least by 1973 that all the Liquid Wrench was
22 manufactured at the Indian Trail facility?
23 A. I'm confident to the extent that I think '73. At
24 the very latest '74. But it may have been '73.
25 Q. Let's just say in the '73, '74 time period, are you

## Page 29

1 comfortable with that?
2 A. Yes.
3 Q. So, by at least '74, all of the Liquid Wrench for
4 Radiator Specialty Company was made at Indian Trails where
5 you worked?
6 A. The short answer is yes. Long answer is as you
7 know, there are other Liquid Wrenches, three and four, and I
8 had to stop -- and two -- to make sure that the two, three,
9 and four were not in Charlotte and I think they were not.
10 So, I think the answer is yes. '73, '74 all Liquid Wrenches,
11 deodorized and raffinate based, were at Indian Trail and no
12 more production was taking place in Charlotte.
13 Q. Of Liquid Wrench?
14 A. Of Liquid Wrench.
15 Q. What did they continue to make over there after '73
16 or '74?
17 A. They made a variety of awkward and difficult
18 things. Paste, hand cleaners, items that were small in
19 volume, difficult to make, and items that we really didn't
20 want to move to Indian Trail.
21 Q. Items that had -- the sales volume was lower?
22 A. Yes.
23 Q. They were kind of one offs, so to speak?
24 A. They were kind of what?
25 Q. One offs as opposed to huge production lines where

Stratos Legal Services
800-971-1127

Case 3:18-cv-00197-RJC-DSC Document 402-4 Filed 09/15/20 Page 322 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 30

1  you sold a bunch of stuff?
2      A.   Yeah.  There was some small production lines but
3  only one or two, not many.
4      Q.   So, the real production of products for mass
5  marketing was done by the Indian Trails facility, correct?
6      A.   Yes.
7      Q.   Once Charlotte shut it down?
8      A.   Well, not exactly.  The Indian -- the Liquid
9  Wrench, as we already discussed, but the aerosol items were
10  all being done outside.  So, they were brought in to house as
11  quickly as possible.
12      Q.   But if we look at Charlotte in 1972, that plant,
13  what was it making?
14      A.   What was it making?
15      Q.   In 1972, when you first started at the company?
16      A.   It made the Liquid Wrenches.  And it made, as I
17  said a moment ago, a lot of small items like they would fill
18  small tubes, assemble nuts and bolts and little plastic
19  boxes.  Just small runs of specialty items almost.
20      Q.   Cleaners?
21      A.   There was, I think -- yes.  There was a cleaner and
22  there was a -- like a dressing for a vinyl top for your car,
23  a -- maybe a brake -- some kind of a brake product, stop the
24  noises on your brakes when you use them on a car.
25      Q.   How many different products were they making back

## Page 31

1  then?
2      A.   The list of product numbers was in the hundreds but
3  that involved lots of small part numbers that came out of the
4  rubber operation.  Each little O ring had a different part
5  number.  So, that swelled the numbers.  That number would not
6  be representative of what the business was.
7      Q.   So, you think it was in the hundreds?
8      A.   Yes.
9      Q.   The total number of products?
10      A.   Yeah.  Including those O rings and small rubber
11  products.
12      Q.   In the hundreds you're including it or you're not
13  including it, the O rings?
14      A.   Am including it.
15      Q.   You're am.  Okay.  If we take out the O rings and
16  those little small parts you're talking about, how many
17  products did y'all make?
18      A.   A product might exist in more than one size
19  container.  Could be three or four or five, as you've seen in
20  Liquid Wrench.  But about a hundred.
21      Q.   About a hundred different products were made?
22      A.   Including the various sizes, that's my
23  recollection.
24      Q.   If we take out the various sizes, how many products
25  were made?

## Page 32

1      A.   I'm going to say --
2      Q.   Like if we say Liquid Wrench is a product --
3      A.   Yes.  I'm going to say -- this is a little bit of a
4  guess -- maybe 50 or so that were major products, not the
5  little onesies and twosies.
6      Q.   Fifty or so major products.  And how many patents
7  did they have on those 50 or so major products?
8      A.   None that I know of.
9      Q.   No patents?
10      A.   I don't -- none that I know of.
11      Q.   Who invented these products?  Did they buy them
12  from inventors?
13      A.   The original -- the original product that was sold,
14  which was a radiator sealant, I believe was invented by a
15  local individual who had a little shop, Tin Smith or
16  something like that.  The rest of them I don't know who
17  invented them.
18      Q.   Who invented Liquid Wrench?
19      A.   I don't know.
20      Q.   Well, did your company invent it; or did they buy
21  it?
22      A.   I don't know.
23      Q.   Nobody was able to tell you that?
24      A.   I never asked.
25      Q.   Who would we ask at Radiator Specialty Company if

## Page 33

1  we wanted to find out who invented the product?
2      A.   Most of the people who were there that would know
3  when I went there are dead.  So, I don't know.
4      Q.   I'm not asking you about dead people.  I'm asking
5  you who you would call today to ask who invented the product.
6      A.   I don't know.  I don't have a name.
7      Q.   Who's paying you the thousand dollars a month?  Who
8  issues your check?
9      A.   Radiator.
10      Q.   Who from Radiator?
11      A.   Well, it's issued out of the accounting department.
12      Q.   Who over there do you know?  Do you know anybody at
13  Radiator?
14          MR. RILEY:  I apologize.
15          MR. LUBEL:  Your lawyer thinks he's on the
16  beach.
17      Q.   (BY MR. LUBEL)  Can you answer my question?
18      A.   Well, I know lots of people at Radiator.  But
19  people who were there or who were in a position to know
20  something like that, I don't know of anyone.
21      Q.   So, the company doesn't know where the products
22  came from?
23      A.   I don't.
24      Q.   I'm asking you if the company knows where the
25  products came from?

9  (Pages 30 to 33)

Case 3:18-cv-00197-RJC-DSC   Document 109-4   Filed 09/02/20   Page 323 of 340

## Page 34

1    A.   There are no -- there's no records anywhere that
2  says, well, we got this product from a company.  The only --
3  the only product that I know about the evolution is the
4  Engine Brite, engine degreaser and there were a couple more
5  that came to us through the purchase of an outside company.
6    Q.   Let me make sure we're communicating.  You told me
7  that if we excluded the different sizes of the products and
8  we took out little small products like O rings, this company
9  made about 50 or so major products.  Do you recall that?
10    A.   I said that's my best recollection.
11    Q.   So, are you telling anybody that's watching you
12  that the company cannot go to a book or a safety deposit box
13  or some other source to find out who invented the products or
14  how they got their hands on them?
15    A.   I don't know and I don't know of any place that one
16  would go to find that kind of information or any person.
17    Q.   That doesn't surprise you?
18    A.   I guess I never thought about it.
19    Q.   Well, think about it.  You got a company that's
20  been in business for how many years?
21    A.   Since 1924, I believe.
22    Q.   Over 80 years, right?
23    A.   Whatever the math is, yeah.
24    Q.   A family-owned business, right?
25    A.   Yes.

## Page 35

1    Q.   The Blumenthals?
2    A.   Yes.
3    Q.   Still in their hands, right?
4    A.   Yes.
5    Q.   And you don't think that that company has some
6  paper trail that talks about in general the products, where
7  they came from, how they got their hands on them?
8         MR. RILEY:  Objection.  Form.
9    A.   As I've already told you, I don't know of anything.
10  Now, if -- a lot of that information had been held in
11  Kologiski's files and got thrown out because he died and
12  somebody else went through that but the answer is still the
13  same.  I don't know anyone or any place where documents have
14  been kept.
15    Q.   (BY MR. LUBEL)  Who would we ask?  Are any of the
16  Blumenthal kids still working there or relatives?
17         MR. RILEY:  Objection.  Form.
18    A.   Are any of the Blumenthal kids still --
19    Q.   (BY MR. LUBEL)  Employed at Radiator or have
20  anything to do with that company?
21         MR. RILEY:  Objection.  Form.
22    A.   I'm not sure what the relationship is.  There are
23  three boys; and to my knowledge, none of them have an office
24  in Indian Trail at the plant.
25    Q.   (BY MR. LUBEL)  I'm just talking about anywhere.

## Page 36

1  Do they have an office?
2    A.   They do have an office in Charlotte.
3    Q.   What do they do at that office?
4    A.   I don't really know.  I can guess at it, but that's
5  all I can do.
6         MR. RILEY:  Don't guess.
7    Q.   (BY MR. LUBEL)  Have any of them been involved in
8  business with the company?
9    A.   Well, one of them at one time was president.
10    Q.   Alan --
11    A.   Yes.
12    Q.   -- Blumenthal?
13    A.   Yes.
14    Q.   You have any reason to believe he's no longer the
15  president or active in the company?
16    A.   He left that job, I'm going to say, about 2000.
17  Maybe -- yeah.  About 2000.
18    Q.   So, have all the Blumenthal relatives kind of just
19  gone somewhere else and collect paychecks, have nothing to do
20  with the company?
21    A.   I think they're probably some kind of self-employed
22  individuals.  I don't know what they do, but they've got, I
23  guess -- I shouldn't guess.  I don't know exactly what their
24  function is.
25    Q.   Can you name any of the Blumenthal family members

## Page 37

1  that still work at Radiator Specialty Company?
2    A.   To my knowledge, there are none.
3    Q.   You know this guy Ron Weiner?
4    A.   Yes.
5    Q.   Is it Wiener or Weiner?
6    A.   Weiner.
7    Q.   That's W-E-I-N-E-R?
8    A.   Yes.
9    Q.   Isn't he married to one of those Blumenthals?
10    A.   No.
11    Q.   He isn't?
12    A.   No.
13    Q.   What's he do for them?  What's he do for the
14  company?
15    A.   He is an attorney, and he has responsibility for
16  human resources.
17    Q.   What does that mean?
18    A.   Personnel.
19    Q.   He hires and fires?
20    A.   Well, the people under his organization or his
21  section have that responsibility, to maintain the records and
22  safety.  Safety as well.
23    Q.   What does Mr. Weiner know about safety?
24         MR. RILEY:  Objection.  Form.
25    A.   I don't know the answer to that.

10  (Pages 34 to 37)

Case 3:18-cv-00197-RJC-DSC   Document 40-4   Filed 09/15/20   Page 324 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f6

## Page 38

1    Q.   (BY MR. LUBEL)  Why would they put him in charge of
2  safety?
3    A.   Because safety was tied in with personnel.  Perhaps
4  it was just -- that's the way it was done.
5    Q.   Okay.  When you worked there, did you ever have to
6  deal with him?
7    A.   With him?
8    Q.   Yes, sir.
9    A.   Yes.
10    Q.   In what respect?
11    A.   Mostly legal lawsuits like this one today.
12    Q.   What about the safety stuff?
13    A.   We had our own safety program initially; and then
14  at one point, it was decided to put all the safety reporting
15  under one area, namely the personnel department.
16    Q.   So, under Mr. Weiner?
17    A.   Yeah.  Well, indirectly but yes.
18    Q.   Well, I'm kind of reading into what you're saying,
19  that he delegated it to somebody else.  Who was it?
20    A.   Well, there was a local -- at Indian Trail, a local
21  personnel person.
22    Q.   Who was that?
23    A.   Steve.  I can't remember his last name.
24    Q.   Okay.  Let's go back to this -- these 50 or so
25  products that the company has made for which you don't think

## Page 39

1  there's -- or you don't know whether there's any documents
2  that describe how they came into the company's being, these
3  products.
4        MR. RILEY:  Objection.  Form.
5    A.   I think I said a moment ago I was only aware of a
6  handful that I know how they came in.  Now, whether or not
7  there are any documents describing that, I don't know.
8    Q.   (BY MR. LUBEL)  Who would you ask if you were me?
9  Who would I start with?
10    A.   Well, you're probably looking at him.
11    Q.   You said you don't know.  So, why would --
12    A.   That's true.
13    Q.   -- I start with you?
14    A.   And if I had to go look, I don't know outside of
15  maybe -- there might be something in one of my file folders
16  that mentioned it.
17    Q.   Do you know, or are you just guessing?
18    A.   Well, a little bit of both because I haven't looked
19  at those files in a long time; but I was involved in those
20  transactions.
21    Q.   What transactions?
22    A.   Where we brought in products that had been made by
23  another company somewhere else.
24    Q.   Do you know if Liquid Wrench was invented by
25  Radiator Specialty or they bought it from somebody else?

## Page 40

1    A.   I don't have knowledge one way or the other.
2    Q.   And you don't know how we're going to find out?
3    A.   No.
4    Q.   There may or may not be documents that answer that,
5  you just don't know?
6    A.   If there are, I haven't seen them.
7    Q.   Tell me when you went and looked for them, those
8  documents specifically.
9    A.   Documents that might show who invented Liquid
10  Wrench?  All of the Liquid Wrench documents that I know of
11  that exist anywhere were under my care.
12    Q.   That's not my question.  When --
13    A.   That was my best answer.
14    Q.   Okay.  When did you specifically go look for the
15  documents about who invented Liquid Wrench?
16    A.   Well, specifically looking for who invented it,
17  I've never looked for that.
18    Q.   When did you go look for a book, whether it be a
19  binded book or a three-ring binder or something, a file
20  cabinet that addressed the 50 or so major products, you know,
21  their origin at the company?
22    A.   Well, the only book I'm aware of is what was
23  brought to you today where it was date of first sale.  And
24  you can look in there for all the products, the part numbers
25  and it gives the date of first sale.  It doesn't tell who

## Page 41

1  invented it.
2    Q.   I'm asking you did you ever go look specifically
3  for those kind of documents?
4        MR. RILEY:  Objection.  Form.
5    A.   Who invented it?
6    Q.   (BY MR. LUBEL)  Or the origin of the products.
7    A.   No.
8    Q.   Do you have a will?
9    A.   Do I have a will?
10    Q.   Yes, sir.
11    A.   Yes.  Personal will you're talking about?
12    Q.   Yes, sir.
13    A.   Yes, I do.
14    Q.   Do you keep that will in a safe place?
15    A.   I do.
16    Q.   Okay.  Is that pretty standard, your understanding
17  of people or -- that it's recommend that they keep it in a
18  safe place?
19    A.   That's my understanding.
20    Q.   Okay.  You think that the documents related to
21  these 50 or so major products such as their formulations
22  would be kept in a safe place?
23    A.   All I have is an opinion.
24    Q.   What is it?
25    A.   I don't think they were kept.

11 (Pages 38 to 41)

Case 3:18-cv-00997-RJC-DSC  Document 403-4  Filed 09/15/20  Page 325 of 340
2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 42

1    Q.  Is that the way this company did business?
2        MR. RILEY: Objection. Form.
3    A.  I can't -- I can't agree or deny. I've never
4    thought about that question. All I'm telling you is what I
5    know and don't know.
6    Q.  (BY MR. LUBEL) So, you don't think that documents
7    related, for instance, to the origin of their business
8    products, that they exist, right?
9        MR. RILEY: Objection. Form.
10   A.  I don't think that documents related to the origin
11   of the products, with some exceptions, exist.
12   Q.  (BY MR. LUBEL) You don't think that the initial
13   formulas of these 50 or so major products exist?
14   A.  Those products which were developed or changed at
15   Indian Trail after 1972, those exist. Anything before that I
16   have no knowledge of.
17   Q.  But you think the way Radiator Specialty did
18   business was that they would not keep the initial -- the
19   original formulations of these 50 or so products pre '72?
20   A.  I doubt that those type information was kept.
21   Q.  Matter of fact, you've went to look for them and
22   you've been told they've been throw away, right?
23   A.  Yes.
24   Q.  Who told you that?
25   A.  Well, I've been told that everything that was in

## Page 43

1    the Charlotte lab except for one or two files that I got out
2    of Dutch Kologiski's files were thrown out.
3    Q.  Okay. We may be missing each other. I'm asking
4    you if you've asked the question where are the formulations
5    for Liquid Wrench before 1972? Have you asked for those?
6    A.  I would have asked -- what you want to know, who I
7    would have asked?
8    Q.  Who did you ask?
9    A.  The man's name was Ken Eade.
10   Q.  E-A-D?
11   A.  E-A-D-E.
12   Q.  Okay. When did you ask him where the formulas
13   were?
14   A.  I didn't specifically ask him about the formulas.
15   I'm just asking about the general -- just general information
16   files.
17   Q.  Okay. I'm asking specifically about the formulas.
18   Who did you ask for the formulas?
19   A.  No. I never asked about the formulas.
20   Q.  So, there could be a book that's got the formulas
21   for all the products in it, correct?
22   A.  As I said earlier, if there is, I've never seen it
23   nor am I aware that it exists.
24   Q.  How would you see it if you didn't ask for it?
25   A.  Well, someone may have -- if I didn't ask, somebody

## Page 44

1    might have said, well, this is something you need to have and
2    just offered it to me. But that never happened.
3    Q.  Who are you talking about that offered it -- would
4    have offered it to you?
5    A.  Well, anyone who was about to throw it away and I
6    don't know who the individuals were that actually disposed of
7    it.
8    Q.  Are you just speculating now?
9    A.  I think that's what you asked me.
10   Q.  No. I think what you've told me -- correct me if
11   I'm wrong -- is that you've not asked for the formulas before
12   1972, correct?
13   A.  That's correct.
14   Q.  For Liquid Wrench?
15   A.  That's correct.
16   Q.  And so, you don't know if they exist or not?
17   A.  I do not.
18       MR. RILEY: Objection. Form.
19   Q.  (BY MR. LUBEL) And what I'm asking you is: Who at
20   the company would we go ask where the formulas are? I've got
21   to believe -- you tell me if you think I'm crazy -- that
22   there's a book, there's a file, there's something that keeps
23   the historical formulas for these 50 or so major products
24   that the company made over the years?
25   A.  I don't believe that book or any facsimile exists.

## Page 45

1    Q.  And you just say that, I take it -- because you
2    haven't asked for it. You just say that because you think
3    that's the way the company did business, they threw away
4    stuff?
5        MR. RILEY: Objection. Form.
6    A.  Well, I'm not going to jump to the way the company
7    did business. All I'm telling you is that I don't know about
8    any records that you're asking about.
9    Q.  (BY MR. LUBEL) And you wouldn't know if you didn't
10   go ask, right?
11       MR. RILEY: Objection. Form.
12   A.  Not necessarily. As I said a moment ago, somebody
13   might have volunteered and say "you ought to have this."
14   Q.  (BY MR. LUBEL) Sir, you got kids?
15   A.  Yes.
16   Q.  They're grown up now, right?
17   A.  Yes.
18   Q.  You keep pictures of your kids when they were
19   babies?
20   A.  Yes.
21   Q.  Don't go look at them very often but when you do,
22   it kind of brings a tear to your eye, doesn't it, for one
23   reason or another?
24   A.  I enjoy looking at the kids when they were babies,
25   yes.

12  (Pages 42 to 45)

Case 3:18-cv-00197-RJC-DSC   Document 3094   Filed 09/15/20   Page 326 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 46

1  Q.  That's right.  We do that so we can go back in
2  time.  We're proud of our kids and we want to go back and
3  keep a record of it, right?
4  A.  I'm not sure why people keep them.  Maybe it's just
5  because they enjoy looking at them.
6  Q.  That's right.  You're telling this jury that out of
7  50 or more or so major products, that they have not kept the
8  formulations over the years, they've just thrown them away?
9  A.  I am telling you and anyone else that I'm not aware
10  that they exist.
11  Q.  If you had to pick up the phone right now and call
12  somebody over there and say do a search or a manhunt for
13  those documents, who would you call?
14  A.  If those documents existed today, they would almost
15  certainly have to exist at the Indian Trail plant because the
16  Charlotte plant is no longer there.
17  Q.  Are you telling this jury that the only offices
18  that Radiator had was the Indian Trails facility?
19  A.  Today, yes.
20  Q.  Today?
21  A.  Yes.
22  Q.  Did they ever have offices anywhere else?
23  A.  Well, Charlotte was the home office.
24  Q.  When was it closed -- completely closed?
25  A.  I'm not sure when it was closed.

## Page 47

1  Q.  Just approximately.
2  A.  It's been the last few years.
3  Q.  So, after you retired?
4  A.  Yes.
5  Q.  Did they have --
6  A.  Shortly after, I think.  But the office -- the
7  sales offices were still there until very, very recently.
8  Q.  Last couple years?
9  A.  Last year, I think.
10  Q.  Were the sales offices different than the Charlotte
11  offices?
12  A.  The sales offices were in the Charlotte offices
13  which have been there all -- since 1924.
14  Q.  Then you got the Indian Trails plant, right?
15  A.  Yes.
16  Q.  They have offices there, too, right?
17  A.  Yes.
18  Q.  Where else?
19  A.  That's all currently.  I say currently.  I'm not
20  sure what you're asking when you said "where else."
21  Q.  Where else has Radiator had offices other than
22  Charlotte and Indian Trails?
23  A.  Well, we had warehousing a couple places.
24  Q.  I'm just asking about offices, whatever kind of
25  offices they are.  We're going to go down and talk about the

## Page 48

1  specifics of them.  But I'm just right now I'm trying to get
2  you to give me an answer of all the offices that they've
3  historically had.
4  A.  There was a warehouse in Dallas, and someone ran
5  the Dallas warehouse.  They had an office.
6  Q.  All right.
7  A.  There was one in Los Angeles.  Same story there.
8  Q.  All right.  Where else?
9  A.  There was --
10  Q.  Chicago?  Chicago?
11  A.  Yes.  There was a Chicago office.
12  Q.  Where else can you remember?
13  A.  That's all.
14  Q.  Where was the headquarters located?
15  A.  Charlotte.
16  Q.  Not Indian Trails, Charlotte?
17  A.  Charlotte.
18  Q.  Correct?
19  A.  You're asking -- you're asking me that question for
20  what period of time?
21  Q.  When you retired in 2001, where was the
22  headquarters of Radiator Specialty Company?
23  A.  Charlotte.
24  Q.  And who was in charge of that headquarters?
25  A.  John Huber.

## Page 49

1  Q.  What was his title?
2  A.  CEO.
3  Q.  Did he have anything to do with the Blumenthal
4  family?
5  A.  What do you mean have anything to do with the
6  family?
7  Q.  Was he related or was he just hired by them to make
8  money for them?
9  A.  My understanding he was simply hired.
10  Q.  All right.  So, Mr. Huber was the CEO.  He was in
11  charge of the headquarters when you retired in 2001, right?
12  A.  Yes.
13  Q.  How many buildings were at the Charlotte facility?
14  A.  I'm going to say four.
15  Q.  And how were they broken down, those four
16  buildings, if you know?
17  A.  When you say "broken down," I'm not sure what
18  you're asking me.
19  Q.  Did they do different things in different
20  buildings?
21  A.  Yes.  The sales and accounting, et cetera, was in
22  one building, all the main offices.  There was a building
23  which housed the rubber manufacturing.  There was a building
24  which housed the traffic cone production.  And there was a
25  building that housed the liquid -- any of the nonliquid

13 (Pages 46 to 49)

Case 3:13-cv-00097-RJC-DSC   Document 303-4   Filed 09/02/20   Page 14 of 26
Case 3:11-cv-00097-RJC-DSC   Document 403-4   Filed 09/15/20   Page 327 of 340
2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

Page 50

1  products that were manufactured in Charlotte.
2      Q.  Anything else?
3      A.  There was one other building that was -- it's just
4  a storage building, if I recall.
5      Q.  What did they store in there, if you know?
6      A.  Finished goods.
7      Q.  Finished goods?  To be shipped out?
8      A.  Yes.
9      Q.  So, it was more of a warehouse?
10     A.  Yes.
11     Q.  Who was over that warehouse, that storage building?
12     A.  I don't know.
13     Q.  Okay.  Who was over the fourth building that housed
14  the liquid and nonliquid products?
15     A.  I was at one time but only for a year or so.  Prior
16  to that, I'm not sure.
17     Q.  Okay.  What year do you think you were in charge of
18  it?
19     A.  2000.
20         MR. RILEY:  Lance, when you get to a stopping
21  point, let me know.
22         MR. LUBEL:  Can we do it now?
23         MR. RILEY:  Yeah.  That's fine.  Jim gets a
24  little bit tired and --
25         MR. LUBEL:  Let's do it now.

Page 51

1          THE VIDEOGRAPHER:  Stand by.  The time is
2  11:14 a.m.  We're off the record.
3          (Recess taken)
4          THE VIDEOGRAPHER:  The time is 11:26 a.m.  We
5  are back on the record.  Beginning of Tape 2.
6      Q.  (BY MR. LUBEL)  Is there any testimony you've given
7  so far that you need to change to make your testimony
8  truthful and accurate?
9      A.  I would add something to it.  A week ago or some
10  time in the last several days I was asked by Mr. Riley to
11  make a thorough search for documents even though I've been
12  through the same thing many times before.  So, I did go back
13  and I went through, I'm going to say, six or eight file
14  cabinets -- multiple drawer file cabinets looking for
15  documents.  I've gone through the lab's file cabinets.  I
16  asked the fellow who is currently in charge of the lab if he
17  had any Liquid Wrench documents.  And I spoke with my former
18  secretary, if she knew of any documents.  And that took about
19  half a day doing all that.  That's part of the process where
20  I went to a different office and got those documents for the
21  layout of the production facility.  So --
22     Q.  When did you do this?
23     A.  When did I do it?
24     Q.  What day?
25     A.  In the last week.

Page 52

1      Q.  What day of the week was it?
2      A.  I'm not sure.
3      Q.  You are saying it was in the last seven days.  You
4  can't remember what day?
5      A.  In the last seven days, yeah.
6      Q.  Did you go by yourself?
7      A.  Some of it yes.  And some of it no.  The documents
8  for the layout, I knew where they were.  And the fellow who
9  now has custody of them I told him what I wanted.  He knew
10  the right drawer to go to.  We pulled out several.
11     Q.  Who was that?
12     A.  His name is Paul Jorganson.
13     Q.  What does he do?
14     A.  He is the -- in charge of maintenance, run the
15  plant.
16     Q.  Does he still work for the company?
17     A.  Yes.
18     Q.  All right.  Did you drive from your house to the --
19  to a particular facility or office?
20     A.  Yes.
21     Q.  Okay.  Did you do it all in one day?
22     A.  Yes.
23     Q.  You don't remember which day, right?
24     A.  No.
25     Q.  You drove from your house by yourself to the

Page 53

1  facility, right?
2      A.  Right.
3      Q.  Which facility?
4      A.  There's only one facility.
5      Q.  Where did you drive to is what I'm getting at?
6      A.  Indian Trail.
7      Q.  And then when you got to the office -- did you make
8  arrangements before you went?
9      A.  Yes, I did.
10     Q.  Who did you talk to?
11     A.  Ron Weiner.
12     Q.  Why did you talk to him?
13     A.  Because the request from Mr. Riley had come through
14  him.
15     Q.  I don't understand.
16     A.  Mr. Riley had asked Mr. Weiner to have me do an
17  additional search of those areas which might contain
18  documents on Liquid Wrench.
19     Q.  How do you know that?  Were you part of the
20  conversation?
21     A.  No.  That's what I was told.
22     Q.  Who told you that?
23     A.  Ron Weiner.
24     Q.  Okay.  So, Mr. Weiner called you?
25     A.  Yes.  At home.

14  (Pages 50 to 53)

Case 3:18-cv-00197-RJC-DSC   Document 109-4   Filed 09/15/20   Page 328 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 54

1     Q.   And what did he tell you?
2     A.   He asked me --
3         MR. RILEY: Jim, hold it. He has an ethical
4 duty to tell you he searched for documents; but if there's
5 any legal advice involved in this, you don't have to answer
6 that.
7     Q.   (BY MR. LUBEL) My question is: What did he tell
8 you?
9     A.   He told me or he asked me if I would come in and do
10 a document search.
11     Q.   Okay. Did you ask him why he couldn't do the
12 document search?
13     A.   No.
14     Q.   Okay. Do you have -- did he tell you why he wanted
15 you to drive over to his offices to do the document search?
16     A.   No.
17     Q.   All right. So, how long did that conversation
18 last?
19     A.   I don't remember but probably five minutes.
20     Q.   He just told you he wanted you to look for some
21 more documents?
22     A.   Yes.
23     Q.   Did he tell you which categories of documents he
24 wanted you to look for?
25     A.   He just said Liquid Wrench. Liquid Wrench.

## Page 55

1     Q.   Okay. And so, what did you take that to mean?
2 Every document on Liquid Wrench?
3     A.   Sure.
4     Q.   Okay. So, you looked for sales documents, right?
5     A.   Sales, formula, anything that had Liquid Wrench
6 associated with it.
7     Q.   All right. So, where did you go look for the sales
8 documents?
9     A.   Well, I knew I didn't have any. But I looked
10 through the same files that -- I did have production records,
11 which do -- do production records reflect sales? To some
12 extent.
13     Q.   What do you --
14     A.   Gross sales.
15     Q.   Gross sales?
16     A.   Yeah. If there's -- if there's papers that show
17 where you produced, you know, 500,000 cans, then that's
18 indicative perhaps of what the sales are.
19     Q.   So, you found those?
20     A.   Well, they're there. I saw them.
21     Q.   Did you grab them?
22     A.   Did I do what?
23     Q.   Did you put your hands on them?
24     A.   They were in a three-ring binder -- multiple
25 three-ring binders and I opened up and sort of thumbed

## Page 56

1 through them and that's all I did.
2     Q.   Okay. And did you stick them back in the file
3 cabinet?
4     A.   Actually these were on top of the filing cabinet.
5     Q.   They were on top? What time period did they cover?
6     A.   1972 to 2000.
7     Q.   Just a three-ring binder, right?
8     A.   Yeah. About 4 inches thick, yeah.
9     Q.   And did it list -- the paperwork in there identify
10 who the products were sold to?
11     A.   No.
12     Q.   It just -- it was production records, how much
13 product was made?
14     A.   Correct.
15     Q.   And so, from '72 to '78 what was the production of
16 Liquid Wrench, according to those documents?
17     A.   What was the production? Are you asking me the
18 quantities?
19     Q.   Yes, sir.
20     A.   I didn't stop to add those up. These were daily
21 production records.
22     Q.   Right.
23     A.   Or monthly actually.
24     Q.   Daily or monthly?
25     A.   Well, both.

## Page 57

1     Q.   Okay. So, they were both?
2     A.   Yeah.
3     Q.   Did it have a cumulative total at the end of each
4 year?
5     A.   Those did exist. They're probably there, but I did
6 not look at them.
7     Q.   Do they give you a breakdown of sales or production
8 of particular types of Liquid Wrench like the parts numbers?
9     A.   Yes.
10     Q.   And can you tell us that from your recollection, or
11 do you need to look at the documents to talk about that?
12     A.   I can -- I have a feel for what those numbers are
13 but I literally would -- to get them accurate, would have to
14 look at the documents.
15     Q.   And I take it that you told Mr. Weiner you found
16 that book or that three-ring binder?
17     A.   Now, which three-ring binder are you talking about?
18     Q.   These production records.
19     A.   No.
20     Q.   What were you told to do with it?
21     A.   I was just supposed to look for anything that we
22 hadn't already produced.
23     Q.   Okay.
24     A.   And these binders of daily production records did
25 not seem to be anything that anyone would have any interest

Stratos Legal Services
800-971-1127

## Page 58

1  in.

2  Q.   That's what I'm trying to find out. Who told you
3  nobody would have an interest in it?

4  A.   No one.

5  Q.   You just did that on your own?

6  A.   I did.

7  Q.   Anybody give you any direction on what would be of
8  interest in the lawsuit -- this particular lawsuit?

9       MR. RILEY: Again, to the extent that we're
10  talking about attorney advice, that's privileged. But you
11  can answer the question.

12  A.   I'm not sure what may have been told me. I don't
13  recall anything specific.

14  Q.   (BY MR. LUBEL) I take it before you did this
15  document search, you weren't aware of the formal pleadings
16  specific to this lawsuit, were you? You hadn't read the
17  lawsuit?

18  A.   I read -- I may have read some of it or all of it.

19  Q.   Well, did you or didn't you?

20  A.   Well, when you say "formal pleadings," if you'll
21  show me a copy of what you're asking me about, I can tell you
22  whether I read it or not.

23  Q.   Do you know what the claims and defenses of this
24  lawsuit are?

25  A.   I know in general what the claims are.

## Page 59

1  Q.   Did you learn that from talking to the lawyers?

2  A.   Probably.

3  Q.   Okay. You haven't read the formal lawsuit itself,
4  the paperwork, have you?

5  A.   Show it to me and I will tell you.

6  Q.   I don't carry it around everywhere I go. I mean,
7  tell me what you've looked at.

8  A.   Well, I've looked at so many different things and I
9  don't always -- able to tell you what -- how it's titled.

10  Q.   Tell me what you can remember you looked at.

11  A.   There was a hundred and I think it was twenty-six
12  items that we were asked to review and comment on. I looked
13  at those a couple of times. Could have been something else.

14  Q.   Tell me anything else you remember looking at other
15  than the 126 items.

16  A.   Are you asking me in preparation for this
17  deposition?

18  Q.   Anything having to do with this lawsuit, whether
19  you were preparing for the deposition or not.

20  A.   I looked at labels that we had produced earlier. I
21  looked at documents such as the Foster D. Snell documents.
22  That's what comes to mind.

23  Q.   Did you review any depositions?

24  A.   I did.

25  Q.   Whose?

## Page 60

1  A.   Cowey and Orio.

2  Q.   And who?

3  A.   Orio.

4  Q.   Who's Orio?

5  A.   It's the man's name.

6  Q.   I know who Cowey is because I represented him. You
7  remember that? I took your deposition.

8  A.   I do.

9  Q.   Is Orio represented by somebody else?

10  A.   I don't know who represented him.

11  Q.   But it was your deposition?

12  A.   Yes.

13  Q.   Okay. Have you reviewed any depositions other than
14  your own?

15  A.   No.

16  Q.   Are you familiar with Radiator Specialty Company's
17  defenses in this lawsuit -- specific to this lawsuit?

18  A.   When you say "defenses," I really don't understand
19  enough of the legal workings to -- what does that mean?

20  Q.   Did you have a conversation with anybody from
21  Radiator Specialty Company about what their position was in
22  this lawsuit?

23       MR. RILEY: Anything to do with legal advice
24  from your attorneys, general counsel, or with me, that's
25  privileged. You don't answer that. But you can answer

## Page 61

1  anything else.

2  A.   There was some discussion about what Radiator was
3  doing in defense of this lawsuit and --

4  Q.   (BY MR. LUBEL) What was it?

5  A.   Well, I think what I just heard was that that's an
6  area that I really should not go into.

7  Q.   Who did you talk to about it?

8  A.   Mr. Riley.

9  Q.   I'm not asking you about conversations with
10  Mr. Riley. Have you talked to Mr. Weiner --

11       MR. RILEY: Thank you.

12  A.   No, not that I recall.

13  Q.   (BY MR. LUBEL) -- about this case other than
14  you're coming to look at documents?

15  A.   We had a discussion about some of the --

16       MR. RILEY: If it's legal advice, Jim, that's
17  privileged. He's your attorney.

18  A.   Okay. I'll just stop right there.

19  Q.   (BY MR. LUBEL) Are you taking the position that
20  Mr. Weiner is your lawyer?

21  A.   No. I think Mr. Riley is my attorney, and that's
22  my understanding for some time.

23  Q.   I'm asking you about Ron Weiner. Is he your
24  lawyer?

25  A.   No. Mr. Riley is.

16 (Pages 58 to 61)

Case 3:18-cv-00197-RJC-DSC   Document 408-4   Filed 09/15/20   Page 330 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 62

1    Q.   I'm not asking you about Mr. Riley. Does Mr. Ron
2  Weiner represent you in your capacity as a witness --
3    A.   No.
4    Q.   -- as a lawyer?
5    A.   No.
6    Q.   Mr. Riley, you think, is your lawyer, right?
7    A.   I do.
8    Q.   So, I want to ask you about your conversations with
9  Mr. Weiner. He's -- he's an executive at the company,
10 correct?
11   A.   Yes.
12   Q.   Have you talked to him about the company's position
13 in this lawsuit?
14        MR. RILEY: Jim, Ron Weiner is the general
15 counsel. He's in charge of the litigation. That's
16 privileged.
17        MR. LUBEL: Are you instructing him not to
18 answer?
19        MR. RILEY: On privileged material in terms of
20 what he talked to his lawyer in-house, yes.
21        MR. LUBEL: Are you instructing him not to
22 answer my question?
23        MR. RILEY: Correct. He can say if he talked
24 to him. He just can't say what he talked to him about.
25   Q.   (BY MR. LUBEL) Sir, what is Radiator Specialty

## Page 63

1  Company's defense in this lawsuit?
2    A.   I don't know.
3    Q.   Okay. Can you speak specifically to what
4  Mr. Oakley's claims are in this lawsuit?
5    A.   My understanding is that he had an exposure to
6  Liquid Wrench and that as a result of that developed cancer
7  and that is his claim.
8    Q.   Do you know the specifics of his claims, the
9  details?
10   A.   I do not.
11   Q.   Do you know if anybody within Radiator Specialty
12 Company knows the details of those claims?
13   A.   I would expect that Mr. Weiner would know that.
14   Q.   Anybody else?
15   A.   I would be surprised if anyone else knew that.
16   Q.   Like these Blumenthal kids that own the company
17 now, you wouldn't expect them to know, would you?
18   A.   I would not.
19        MR. RILEY: Objection. Form.
20   A.   I would not expect them to be involved.
21   Q.   (BY MR. LUBEL) Your understanding of their role in
22 the company is just to collect paychecks, correct?
23        MR. RILEY: Objection. Form.
24   A.   I don't even know that they collect a paycheck.
25   Q.   (BY MR. LUBEL) They just have given up complete

## Page 64

1  interest in the company, as far as you know?
2        MR. RILEY: Objection. Form.
3    A.   No. That's not correct either.
4    Q.   (BY MR. LUBEL) What do you think they do for the
5  company?
6    A.   Two of them, to my knowledge, don't do anything.
7  One of them I just happened to run into recently and he was
8  speaking with another individual and my understanding was it
9  had to do with the business. Now, beyond that, I can't tell
10 you anything.
11   Q.   What is he doing with the business, this other one?
12   A.   What was --
13   Q.   Who are you talking about, the other one?
14   A.   This was Alan.
15   Q.   This was Alan?
16   A.   Yes.
17   Q.   He used to be in charge, right?
18   A.   Yes.
19   Q.   What do you-- what's your understanding of what
20 he's doing with the company now?
21   A.   Nothing.
22   Q.   What did you overhear him say?
23   A.   Nothing.
24   Q.   So, they just own the company and don't do anything
25 with it, as far as you know?

## Page 65

1    A.   As far as I know they do not on a day-to-day
2  operation.
3    Q.   They just go to board meetings, as far as you know?
4    A.   I don't even know they do that, but I would guess
5  that they did.
6    Q.   Have you ever attended a board meeting?
7    A.   No.
8    Q.   Let's go back.
9        MR. RILEY: Lance, I don't mean to interrupt
10 you but I'll give you the option. I'm certainly willing to
11 continue on with the deposition. I've only instructed him to
12 answer one question pertaining to privilege. There's an
13 option of recessing and going to the Court for a ruling. I
14 just assume defer that and let you have a full examination of
15 Mr. Wells unless you would prefer to do otherwise.
16        MR. LUBEL: I'll tell you what's troubling me.
17 Okay? I'm still not satisfied with the production of
18 documents in these cases. Okay? A few documents seems like
19 every lawsuit get produced by both U.S. Steel and Radiator,
20 different ones. I've never been able to get to the person
21 who's looked specifically for documents like formulations,
22 who says specifically "I looked for them. I asked for them.
23 I turned over every stump."
24        MR. RILEY: Jim Wells is the one who looked.
25        MR. LUBEL: Well, the testimony is what the

17  (Pages 62 to 65)

Case 3:18-cv-00197-RJC-DSC   Document 312-4   Filed 09/02/20   Page 18 of 26
Case 3:18-cv-00197-RJC-DSC   Document 469   Filed 09/15/20   Page 331 of 340

## Page 66

1  testimony is. My point is --
2      MR. RILEY: He looked for all -- anything
3  related to Liquid Wrench and he's done it repeatedly.
4      MR. LUBEL: Where is this book, this sales
5  book?
6      MR. RILEY: I just brought it here. The one
7  that we had produced --
8      MR. LUBEL: I'm talking about the one he's
9  talking about where he's got --
10     MR. RILEY: The production?
11     MR. LUBEL: Yeah. The production book that he
12 said he got, he put back in the -- he went to look for all
13 Liquid Wrench documents, whatever that means, and then he
14 found it and then he just stuck it back in the -- on top of
15 the cabinet.
16     MR. RILEY: If you think that's relevant,
17 we'll produce it. Doesn't have anything to do with formula.
18 Doesn't have anything to do with direct sales to any of the
19 employers. But if that's something that you think is
20 relevant -- just like we had produced the Liquid Wrench line
21 at Indian Trails and y'all wanted other areas of the plant
22 unrelated to Liquid Wrench, I got it for you.
23     MR. LUBEL: Okay.
24     MR. RILEY: Anyhow, it makes more sense to go
25 forward.

## Page 67

1      MR. LUBEL: Let's try that.
2   Q.  (BY MR. LUBEL) Can you tell me between 1972 and
3  1978 how much of the 8-ounce Liquid Wrench was sold versus
4  the other size containers from your review of the production
5  records?
6   A.  The -- we need to quantify, put limits on this
7  conversation because the 8-ounce was a raffinate only
8  formulation.
9   Q.  Whatever is in it, I'm just looking at between 1972
10 and 1978, 8-ounce Liquid Wrench, do those production records
11 tell you how much was produced?
12  A.  Yes.
13  Q.  And can you help me with a comparison of how much
14 of the 8-ounce was sold versus the other sizes?
15  A.  Yes.
16  Q.  What is it?
17  A.  The 8-ounce was dominate.
18  Q.  Can you -- that helped but can you be more helpful
19 on what that means as a percentage of the total Liquid Wrench
20 sales?
21  A.  I'm going to say it was the 8-ounce compared to the
22 16, 32, and 34, a gallon. Part of the difficulty in
23 answering this question is the fact that the 16 and the 32
24 were discontinued at some point leaving only the 8-ounce.
25 So, toward the end of the era which we were making that

## Page 68

1  formula, 8-ounce was the only thing being produced a hundred
2  percent of its sizes. Does that help you?
3   Q.  It does. But I'm trying to learn a little bit
4  about your internal market share. I mean, was the 8-ounce
5  Liquid Wrench the product that you sold the most out of all
6  the sizes of Liquid Wrench?
7   A.  Well, again, you have to ask me -- are we going to
8  set aside the deodorized and talk about the raffinate formula
9  only?
10  Q.  No. I'm just asking you right now was the 8-ounce
11 Liquid Wrench sold more than all the other Liquid Wrenches in
12 different sizes?
13  A.  No.
14  Q.  What was sold the most?
15  A.  The most sold was the little 4-ounce can -- and I'm
16 quoting from memory -- of deodorized.
17  Q.  Okay. So, out of all the different size containers
18 of Liquid Wrench between 1972 and 1978, you believe that the
19 4-ounce can sold the most?
20  A.  Yes.
21  Q.  By how many orders of magnitude? What was the
22 difference?
23  A.  Compared to the 8-ounce that you're asking me
24 about, probably maybe a hundred to one. And that's just a
25 snap comment.

## Page 69

1   Q.  So, the vast majority of Liquid Wrench that was
2  sold around the country was 4-ounce --
3   A.  Correct.
4   Q.  -- during this '72 to '78 time period?
5   A.  Correct.
6   Q.  Is it your testimony that during this '72 to '78
7  time period the 4-ounce was only deodorized version?
8   A.  Yes.
9   Q.  You did not have a raffinate blend in the 4-ounce
10 container?
11  A.  Never.
12  Q.  Correct?
13  A.  Correct.
14  Q.  By the same token, the 8-ounce can that you said
15 was dominate during this time period you told us was only
16 raffinate based, correct?
17  A.  Correct.
18  Q.  All right. Now, are you able to tell us anything
19 about the production figures pre '72?
20  A.  No.
21  Q.  So, the notebook that you went and looked at
22 started in '72, you think, right?
23  A.  Let me clarify this for you because you've got a
24 misunderstanding. The notebooks, I believe there's one for
25 every year and then there's a page in there for each product

18 (Pages 66 to 69)

Case 3:18-cv-00097-RJC-DSC   Document 402-4   Filed 09/15/20   Page 332 of 340
2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

Page 70

1 and entries are made for every day that product was
2 manufactured with comments like number of cases, amount of
3 down time, just that type of information that was totally
4 production oriented.
5 Q. For every year there's a separate notebook?
6 A. Yes.
7 Q. And you think there's a number of notebooks that
8 cover the time period of 1972 through 2001?
9 A. Yes.
10 Q. That's what you saw when you went last week?
11 A. Yes.
12 Q. Right? If we -- if we look at the production
13 records, we're going to see them for, for example, the year
14 1978, right?
15 A. Right.
16 Q. And so, we will know when you last produced Liquid
17 Wrench from the 1978 book that had raffinate in it, correct?
18 A. Correct.
19 Q. And do you recall as you sit here when the last run
20 of production was made in 1978 from looking at the notebook?
21 A. It would be in there; and my recollection is it was
22 in March, April, that period of time.
23 Q. Did you specifically look for it last week?
24 A. No.
25 Q. This date?

Page 71

1 A. No. I did not.
2 Q. You've testified in the past that from your memory,
3 you thought it was March or April, correct?
4 A. I might have. I just don't know.
5 Q. I'm trying to find out if you specifically, a week
6 ago when you went and looked at these notebooks, opened up
7 the 1978 production book for Liquid Wrench to see when the
8 last production of it was in 1978?
9 A. I did not.
10 Q. Okay. But you think it would be in there?
11 A. Yes.
12 MR. LUBEL: Jim, obviously I would like to see
13 the books.
14 MR. RILEY: I understand.
15 MR. LUBEL: Thanks.
16 Q. (BY MR. LUBEL) Now --
17 MR. RILEY: It would be nice if I could look
18 at every book a thousand miles away and make the decision but
19 we'll certainly look for it and have Jim send it to me and
20 you and I will go over it.
21 Q. (BY MR. LUBEL) You left the book at Radiator
22 Specialty Company, correct?
23 A. Yes.
24 Q. What building is it in?
25 A. It's called Building No. I.

Page 72

1 Q. At Indian Trail?
2 A. Yes.
3 Q. What is in Building No. 1?
4 A. It's -- wait a minute. I said No. 1. That's not
5 correct. It's Building No. 2.
6 Q. What's in Building No. 2?
7 A. There are offices and a lot of warehousing of
8 components, empty cans.
9 Q. What does that mean, empty cans?
10 A. Empty cans. I said components.
11 Q. Why do you keep empty cans?
12 A. So we can fill them.
13 Q. It's a warehouse?
14 A. Yes.
15 Q. But there's file cabinets in there?
16 A. Well, the file cabinets are actually located in a
17 locked area.
18 Q. In Building 2?
19 A. Yes.
20 Q. What's that locked area called?
21 A. It's where spare parts are kept. There's an office
22 there.
23 Q. So, there's an office that's under lock and key
24 where this production -- these production books were located?
25 A. Yes.

Page 73

1 Q. And how many file cabinets are there?
2 A. Five or six.
3 Q. What's in each of those file cabinets?
4 A. Obviously they are -- well, not obviously but there
5 are file folders on everything that I kept records on.
6 Q. Tell me what's in the file cabinets. I don't --
7 A. In addition to files on individual part numbers,
8 there are competitors information, supplier information.
9 There are some patent information, some maybe testing on
10 products that we were researching and trying to develop, that
11 type of information.
12 Q. Anything else you can think of?
13 A. There probably is but that's all that comes to mind
14 right now.
15 Q. So, this room is in Building 2, right?
16 A. Right.
17 Q. It's under lock and key?
18 A. It's a caged area.
19 Q. It's a caged area. Who has a key to that room?
20 A. Well, certainly the fellow in charge of maintenance
21 has one and there's a -- the girl that works in there that
22 handles the parts and I'm sure she does.
23 Q. Who is that?
24 A. Beyond that, I don't know.
25 Q. What are their names?

19 (Pages 70 to 73)

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 74

1    A.   Paul Jorganson, who I mentioned to you earlier.  I
2  don't know the other girl's name.
3    Q.   You don't know the lady's name?
4    A.   No, I don't.
5    Q.   But you think they both have keys to that room?
6    A.   Yes.
7    Q.   And have you looked through every file cabinet in
8  there?
9    A.   I've looked through part of every file cabinet
10  because the outside has a label on it.  And if it was an
11  organization where I was participating in for -- let's say,
12  it's warehouse fire prevention, something like that, well,
13  you know, I might just pass on that drawer.
14    Q.   So, what are the drawers -- how are they labeled,
15  the ones that you thought were relevant to your document
16  search?  Tell me what the labels are.
17    A.   Product.  Products.
18    Q.   So, on the outside of the cabinet it said
19  "products"?
20    A.   Yes.
21    Q.   And how many file cabinets had "products" on the
22  outside?
23    A.   Only one file cabinet.
24    Q.   One file cabinet.  How many drawers did it have?
25    A.   Four or five.

## Page 75

1    Q.   And did this contain documents -- documents on
2  every product the company has ever made?
3    A.   No.  Only products made at Indian Trail.
4    Q.   So, this -- the earliest this file cabinet would
5  have covered was 1972?
6    A.   Correct.  Let me stop -- let me respond to that
7  differently.  The documents produced, for example, to
8  Foster D. Snell came from a file which was marked "regular
9  Liquid Wrench" and I got those from the Charlotte plant.  I
10  don't recall whether it was directly from Kologiski or
11  from -- I don't know how I got them.
12    Q.   Right now we're just talking about this room that's
13  got documents in it.  Okay?
14    A.   That's where all this is.
15    Q.   Okay.  Let's talk about the "products" first, that
16  file cabinet.
17    A.   Okay.
18    Q.   Is it broken down by the 50 or so major products
19  that the company made?
20    A.   Yes.
21    Q.   This file cabinet?
22    A.   Yes.
23    Q.   Okay.  And so, when you open up a drawer, how do
24  you know which drawer to open up for Liquid Wrench?
25    A.   Typically there are -- you know, it's A through G

## Page 76

1  or A through F or something.  The next one will be the next
2  alphabetical sequence.
3    Q.   So, you went to the Ls?
4    A.   Yes.
5    Q.   Right?
6    A.   Yes.
7    Q.   How many products were in the Ls other than Liquid
8  Wrench?
9    A.   I think there was eight or ten files that were
10  either Liquid Wrench or something close.
11    Q.   What does that mean, "something close"?
12    A.   Well, I don't recall what they were.  May have been
13  lithium, you know.  White lithium grease.
14    Q.   Okay.  So, there was Liquid Wrench files, right?
15    A.   Yes.
16    Q.   And what was supposed to be in those files under
17  "products" under Liquid Wrench?
18    A.   Everything that I had kept since 1972 that I
19  thought might have a value to me later on.
20    Q.   And how did you have it broken down in the file
21  cabinet?  How was it separated?
22    A.   Well, there was just a file folder -- a simple
23  manila folder.
24    Q.   There was one folder on Liquid Wrench?
25    A.   Well, there probably -- there may have been one for

## Page 77

1  L104.  That's the 4-ounce.  And maybe one for L108, which was
2  the 8-ounce.  So, maybe L116, which is the other one or
3  maybe --
4    Q.   What was it?
5    A.   Maybe the L112, which was the aerosol.
6    Q.   Was there?
7    A.   Probably.
8    Q.   Well, I mean, you did this a week ago.  I really
9  need --
10    A.   I was looking for the regular Liquid Wrench,
11  anything that had to do with that formula.
12    Q.   I'm just trying to get you to tell me, as you
13  opened up the file cabinet under "products," what you saw and
14  how it was -- how it was separated.  Was it done by parts
15  number?
16    A.   Sometimes, yes.
17    Q.   Okay.  Do you remember seeing a file folder for
18  L104?
19    A.   I'm not sure.
20    Q.   Do you remember seeing a file folder for the
21  8-ounce can?
22    A.   Again, there were several file folders there and I
23  was looking for one in particular and I didn't pull them and
24  open the others.
25    Q.   Okay.  I'm asking you if the file folders were

20  (Pages 74 to 77)

Case 3:18-cv-00097-RJC-DSC   Document 400-4   Filed 09/15/20   Page 334 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  broken down by parts number.
2      A.   And I said yes.
3      Q.   Did you see one for the 8-ounce can?
4      A.   I don't recall. I don't think I did, but I don't
5  recall.
6      Q.   Did you see one for the 4-ounce can?
7      A.   I think so.
8      Q.   Did you open it up and look at it?
9      A.   No.
10      Q.   Okay. Did you see one for a 16-ounce can?
11      A.   No, not that I recall.
12      Q.   You only saw --
13      A.   It was probably there, though.
14      Q.   Are you telling the judge and the jury that the
15  only file folder you saw a week ago was on the 4-ounce?
16          MR. RILEY: Objection. Form.
17      A.   No. I'm saying there were several of them there
18  but I was looking for one specific file folder and the others
19  I wasn't interested in.
20      Q.   (BY MR. LUBEL) How do you know if you weren't
21  interested in them if you didn't look at them?
22      A.   I knew what they contained.
23      Q.   What's in the 4-ounce file folder?
24      A.   Well, it would have been -- I don't know.
25      Q.   You don't know because you didn't look at it?

**Page 79**

1      A.   I didn't look at it.
2      Q.   Okay.
3      A.   It would have been a small folder, probably ten
4  pages or a few more, a few less.
5      Q.   How many were there? Are you saying ten?
6      A.   Pages in there?
7      Q.   Yes, sir.
8      A.   Just a few.
9      Q.   So, you did look at it?
10      A.   No, I didn't. But it was only so thick.
11      Q.   Okay. And the label at the top was titled 4-ounce?
12      A.   Probably said L104.
13      Q.   Probably?
14      A.   Yeah.
15      Q.   Are you pretty sure?
16      A.   No. I'm not too sure.
17      Q.   Okay. So, did --
18      A.   I wasn't focusing on all these things that you're
19  focusing on. I was really focusing on the regular Liquid
20  Wrench. That's what -- the file folder said regular, R-E-G,
21  didn't have it spelled out, Liquid Wrench.
22      Q.   When is the last time you remember looking
23  specifically in the 4-ounce file folder in this file cabinet,
24  if ever?
25      A.   I don't know.

**Page 80**

1      Q.   You don't even know if you've ever done it, do you?
2      A.   Well, I'm the one that put files in there or
3  actually my secretary would have filed it had I gave them to
4  her from 1972 forward. So, I probably haven't looked at it
5  since before 2000.
6      Q.   Assuming you ever looked at it?
7      A.   Well, it -- I would look at it from time to time
8  because we had a lot of problems with the can and can
9  companies. It was someone -- they didn't want to make the
10  cans. And so, that was the big concern during that era.
11      Q.   What other file folders can you specifically
12  remember seeing a week ago other than what you've called this
13  regular Liquid Wrench file folder?
14      A.   Well, as I indicated to you a moment ago, the
15  production records in these three-ring binders were on top of
16  the file cabinet.
17      Q.   I'm still talking about the "products" drawers.
18      A.   Yeah.
19      Q.   You said there was a "products" drawer --
20      A.   Yes.
21      Q.   -- that had four or five file cabinets. Remember
22  that?
23      A.   Yes.
24      Q.   Drawers, I mean.
25      A.   Yes.

**Page 81**

1      Q.   Right?
2      A.   Right.
3      Q.   So, I'm focused on that cabinet first that's got
4  the four or five "products" folders in it.
5      A.   Okay.
6      Q.   Drawers. What was in there other than a file
7  folder for 4-ounce Liquid Wrench and for regular Liquid
8  Wrench that you recall seeing a week ago?
9      A.   I still don't understand the question. There
10  were -- ask me that again. I don't really understand where
11  you're going.
12      Q.   You took -- did somebody let you in the room?
13      A.   No.
14      Q.   You just got a key and went in there?
15      A.   It wasn't locked. She was in the office. I just
16  walked in.
17      Q.   Okay. You walked in the room, right, by yourself?
18      A.   Yeah. It's not a room. It's just an area.
19      Q.   I thought you said it was under lock and key?
20      A.   I did.
21      Q.   Is it?
22      A.   I said it was a wire mesh --
23      Q.   Cage?
24      A.   -- cage. The top is open.
25      Q.   Why has it got a cage around it?

21  (Pages 78 to 81)

Case 3:18-cv-00197-RJC-DSC   Document 312-4   Filed 09/02/20   Page 22 of 26
Case 3:18-cv-00197-RJC-DSC   Document 409   Filed 09/15/20   Page 335 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

## Page 82

1    A.   Because of the tools and change parts that are kept
2  in there.
3    Q.   Are you afraid somebody is going to steal it?
4    A.   Yes.
5    Q.   Have y'all had a lot of employees stealing stuff
6  over there?
7    A.   No.
8    Q.   What are you worried about?
9    A.   Well, at the time it seemed like the better part of
10 valor.
11   Q.   Are you suggesting I start locking my computer down
12 with a chain before I leave the office?
13   A.   We had some things get gone.
14   Q.   All right.  At any rate, you walked into the room.
15 Were you by yourself?
16   A.   Yes.
17   Q.   Did you open the cage to get to these file
18 cabinets?
19   A.   When I walked into the cage, the cabinets are
20 located inside this cage --
21   Q.   Were you by yourself?
22   A.   -- all lined up.  I was by myself.
23   Q.   You said that there was file cabinets that were
24 titled "products," correct?
25   A.   "Products," yes.

## Page 83

1    Q.   In general.  It didn't say which product.  It just
2  said "products"?
3    A.   Correct.
4    Q.   So, you had to open up the drawers and find the
5  Liquid Wrench products, correct?
6    A.   Correct.
7    Q.   You opened up the drawer and went to the Ls, right?
8    A.   Right.
9    Q.   And you found a section on Liquid Wrench?
10   A.   Yes.
11   Q.   Okay.  How big was that section on Liquid Wrench,
12 total?
13   A.   I don't know.  Six inches, 10 inches, 12 inches.
14   Q.   All right.  How was that 6 to 12 inches broken
15 down?
16   A.   By various -- I'm going to use the word part number
17 because we would sometimes make a twin pack of the 4-ounce
18 can.  And so, that would be a file folder, L104 twin pack.
19 And then maybe you tied a 4-ounce can to a can of engine
20 degreaser.  That was a file folder.  So, it was various type
21 of folders.
22   Q.   By parts number?
23   A.   Yeah.  They had part numbers.
24   Q.   And do you think that there was a part number for
25 each -- pardon me.  That there was a file folder for each

## Page 84

1  part number of Liquid Wrench?
2    A.   Yes.
3    Q.   Did you see that with your own eyes?
4    A.   Well, I'm the one that had them put in there, yeah.
5    Q.   No.  I'm saying when you went and looked at it a
6  week ago, did you see that with your own eyes?
7    A.   Yes.
8    Q.   Separate file folders for each Liquid Wrench part
9  number?
10   A.   Yes.
11   Q.   So, there would have been a file folder for Liquid
12 Wrench 8-ounce, correct?  L108?
13   A.   Yes.  No.  Yes.  Yes.
14   Q.   Yes or no?
15   A.   Yes.  Yes.
16   Q.   Are we sure?
17   A.   Positive.
18   Q.   Did you look into that particular folder?
19   A.   No.
20   Q.   Why not?  Who told you not to?
21   A.   No one.
22   Q.   So, it's still there hopefully?
23   A.   Yes.
24   Q.   At least when you left it a week ago it was still
25 there, right?

## Page 85

1    A.   I think so, yes.
2    Q.   Now --
3    A.   I said it was there.  It should have been there.
4    Q.   You've got all the bases covered if it disappears.
5  It wasn't there.  I didn't see it.  It was there.  It should
6  have been there.  Which one is it?
7    A.   You're asking me to be very precise about a review
8  that I made looking for one file folder which said "regular
9  Liquid Wrench," which had everything pre-assembled over some
10 time period.  And that was it.  I wasn't interested in L104
11 or L104 twin back.
12   Q.   Maybe I'm interested in L108.
13   A.   Okay.
14   Q.   All right.  You've told us earlier that that had
15 the raffinate blend, right?
16   A.   Right.
17   Q.   Had benzene in it, correct?
18   A.   Right.
19   Q.   And so, you can understand why I'm interested in it
20 in this lawsuit, right?
21   A.   Okay.
22   Q.   I'm not jumping on you for not pulling it.  I'm
23 just saying I'm trying to get to the bottom of where the
24 documents are and they've called you and asked you to go
25 search for documents, right?

22  (Pages 82 to 85)

Case 3:18-cv-00097-RJC-DSC   Document 403-4   Filed 09/15/20   Page 336 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

Page 86

1    A.   Right.
2    Q.   You did it a week ago, right?
3    A.   Right.
4    Q.   You left your house and you went over to the
5  Radiator Specialty Company offices to look for it, right?
6    A.   Correct.
7    Q.   The L108, the 8-ounce can, that particular file
8  folder you skipped over, correct?
9    A.   Apparently.
10   Q.   You went to a regular Liquid Wrench file, correct?
11   A.   That's what I was searching for.
12   Q.   Right.  Does it say -- did it say "regular Liquid
13 Wrench" on the file folder?
14   A.   I didn't find it.
15   Q.   Where was it?
16   A.   I don't know.
17   Q.   Did you ask Mr. Weiner where it was?
18   A.   Yes.
19   Q.   What did he say?
20       MR. RILEY:  Objection.  Wait a minute.  If
21 we're talking about pure location and search for documents,
22 you can answer.  If it's advice, you cannot.
23   Q.   (BY MR. LUBEL)  What did he say about the location
24 of the missing regular Liquid Wrench file?
25   A.   He said maybe someone else had it.  And so, he

Page 87

1  called the lab and asked if they had it.  They said no, they
2  didn't have it.
3    Q.   So, it's now missing?
4    A.   It's now missing.
5    Q.   When is the last time you had seen it before you
6  went to hunt for it a week ago?
7    A.   Probably the last time we had a lawsuit involving
8  Liquid Wrench.
9    Q.   There's been quite a number of those.  Which one
10 are you talking about?
11   A.   The latest one.
12   Q.   Which one is that?
13   A.   Probably the Orio.
14   Q.   The Orio case?
15   A.   I think so.
16   Q.   You went to look at the regular Liquid Wrench file?
17   A.   I think so.
18   Q.   You looked at it and then set it back in there?
19 What did you do with it?
20   A.   I would have put it back.
21   Q.   Why do you keep going and looking at the regular
22 Liquid Wrench file?
23   A.   To review the documents.
24   Q.   And what is the volume of documents, as you recall
25 it, the last time you saw it in the regular Liquid Wrench

Page 88

1  folder or file?
2    A.   How many documents in that file?
3    Q.   Right.  Are we talking about 6 inches, 12 inches?
4    A.   No.  I'm talking about maybe six pages.
5    Q.   Six pages?
6    A.   Maybe ten but no more than that.
7    Q.   Less than ten.  Ten or less, right?
8    A.   Uh-huh.  Yes.
9    Q.   What are those ten pages made up of?
10   A.   The Foster D. Snell documents and there's probably
11 six or eight of those by itself.  There was a formula and
12 some correspondence from U.S. Steel.  So, there could have
13 been maybe 15 instead of six or eight or ten.  And there was
14 some technical data from U.S. Steel.
15   Q.   Anything else?
16   A.   That's what I recall.
17   Q.   Okay.  And just so we're clear, before it went
18 missing, there was a specific file folder in this cabinet
19 under "products" that was titled "regular Liquid Wrench,"
20 right?
21   A.   Yes.  That's correct.
22   Q.   That's what it says so you can spot it?
23   A.   Yes.
24   Q.   Five to 15 pages or so in there, right?
25   A.   Correct.

Page 89

1    Q.   It's now gone?  It's vanished?
2    A.   Well, at least we couldn't find it the other day.
3    Q.   Now, in this "product" section for Liquid Wrench,
4  what other file folders were in there other than a regular
5  Liquid Wrench file other than a regular Liquid Wrench file
6  folder, a file folder for each part number, what -- should
7  there have been a deodorized Liquid Wrench file?
8    A.   There could be.
9    Q.   Did you look for it?
10   A.   No.
11   Q.   Do you know one way or the other as to whether
12 there is one?
13   A.   No.
14   Q.   Do you imagine if there was one, it would be in
15 that file drawer?
16   A.   Yes.
17   Q.   Why would you have a separate file folder for
18 either regular Liquid Wrench or deodorized Liquid Wrench if
19 you had separate file folders per parts number?
20   A.   The regular Liquid Wrench file folder contained
21 those papers that I had received from the Charlotte operation
22 only.  All the work that had been done at Indian Trail would
23 have been in a separate folder different from that one.
24   Q.   What do we call that one?
25   A.   L108, L116, L132.

23  (Pages 86 to 89)

Case 3:18-cv-00197-RJC-DSC   Document 309-4   Filed 09/02/20   Page 24 of 26
Case 3:18-cv-00197-RJC-DSC   Document 340-4   Filed 09/15/20   Page 337 of 340

## Page 90

1  Q. It would be in the individual file folder by parts
2  number?
3  A. Correct.
4  Q. Okay. So, as you recall it, the regular Liquid
5  Wrench file folder that's now missing only contained
6  documents that the Charlotte facility sent you specifically
7  regarding -- what was his name -- Kologiski?
8  A. Kologiski.
9  Q. Right?
10  A. Correct.
11  Q. The other Liquid Wrench documents that did not come
12  from Charlotte would have, you think, been contained within
13  the other file folders?
14  A. Yes.
15  Q. Most likely by parts number?
16  A. Yes.
17  Q. And probably a file folder specific to deodorized
18  Liquid Wrench?
19  A. Yes.
20  Q. Now, do you know if within this file cabinet
21  whether there's any historical document that describes the
22  origin of the product?
23  A. Not to my knowledge.
24  Q. I take it you didn't look through every page of
25  this file drawer, did you?

## Page 91

1  A. No.
2  Q. You went straight to the Liquid Wrench -- the
3  regular Liquid Wrench file to see if it was there, right?
4  A. Correct.
5  Q. And then you didn't find it. What did you do? You
6  told us you called Mr. Weiner but what did you do next after
7  you talked to Mr. Weiner?
8  A. Well, after we discussed it and still couldn't find
9  it, it was said that everything that was in that file had
10  already been produced. And so, even though it was -- at
11  least for now, it's a loss. But I think we'll find it sooner
12  or later. But there's nothing in there that hasn't already
13  been produced.
14  Q. That's what Mr. Weiner told you?
15  A. Well, I think I know that of my own but the subject
16  came up between us. We probably -- one of us said it and the
17  other one agreed to it.
18  Q. All right. Who said it, and who agreed?
19  A. I don't know.
20  Q. Let's talk about the -- what specifically would be
21  in the L108 file folder that you didn't look at this last
22  time?
23  A. The information would have been mostly on switching
24  from one can company to another, maybe things concerning the
25  spout and the cap that was on top of it because we -- we

## Page 92

1  would have problems with the suppliers, either leak or the
2  spout wasn't made right. It would have been in a file
3  perhaps in the L108 or any of the others.
4  Q. Would you expect the formula to be in there?
5  A. Probably not.
6  Q. You wouldn't expect the formula for that parts
7  number to be in its file?
8  A. No.
9  Q. Copy of it?
10  A. No.
11  Q. How about the label?
12  A. Yeah. Label perhaps, yes.
13  Q. Do you know what's in the L108 file?
14  A. I haven't looked at it in a long time.
15  MR. RILEY: Before you go on any further,
16  Lance, I got a request for production at 6:40 p.m. last night
17  where you were asking for things that he just described in
18  terms of the spout and whatever. So, we're going to respond
19  to that.
20  MR. LUBEL: Can we take a short lunch break?
21  MR. RILEY: Certainly.
22  THE VIDEOGRAPHER: Stand by. The time is
23  12:17 p.m. We're off the record. This concludes Tape 2.
24  (Lunch recess) (New court reporter continued
25  after lunch with Volume 2)

## Page 93

CHANGES AND SIGNATURE

1
2  WITNESS NAME: _____ DATE OF DEPOSITION: _____
3  PAGE LINE  CHANGE              REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

24  (Pages 90 to 93)

Case 3:11-cv-00097-RJC-DSC  Document 400-4  Filed 09/19/20  Page 338 of 340

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8

Page 94

```
 1        I, JAMES WELLS, have read the foregoing deposition and
 2   hereby affix my signature that same is true and correct,
 3   except as noted above.
 4
 5             _____
 6             JAMES WELLS
 7
 8   THE STATE OF _____)
 9   COUNTY OF _____)
10
11        Before me, _____, on this day
12   personally appeared JAMES WELLS, known to me or proved to me
13   on the oath of _____ or through
14   _____ (description of identity card or other
15   document) to be the person whose name is subscribed to the
16   foregoing instrument and acknowledged to me that he/she
17   executed the same for the purpose and consideration therein
18   expressed.
19        Given under my hand and seal of office on this
20   _____ day of _____, _____.
21
22             _____
23             NOTARY PUBLIC IN AND FOR
24             THE STATE OF _____
25   My Commission Expires: _____
```

Page 95

```
 1   STATE OF TEXAS
 2   COUNTY OF HARRIS
 3
 4           REPORTER'S CERTIFICATE
 5        ORAL VIDEOTAPED DEPOSITION OF JAMES WELLS
 6             November 6, 2008
 7
 8        I, the undersigned Certified Shorthand Reporter in and
 9   for the State of Texas, certify that the facts stated in the
10   foregoing pages are true and correct.
11        I further certify that I am neither attorney or counsel
12   for, related to, nor employed by any parties to the action in
13   which this testimony is taken and, further, that I am not a
14   relative or employee of any counsel employed by the parties
15   hereto or financially interested in the action.
16        SUBSCRIBED AND SWORN TO under my hand and seal of office
17   on this the _____ day of _____, _____.
18
19        Stacey Whitley
20        Stacey Whitley, CSR
             Texas CSR 3999
21        Expiration:  12/31/2009
             STRATOS LEGAL SERVICES
22        Firm Registration No.: 484
             1001 West Loop South, Suite 809
23        Houston, Texas  77027
             713-481-2180
24
25
```

25 (Pages 94 to 95)

2b3350d5-8a08-4f8b-b747-4b66fe0e31f8